No. 21-1335

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

—————————————

Rebecca Brigham,
*Plaintiff-Appellant,*

v.

Frontier Airlines, Inc.,
*Defendant-Appellee.*

—————————————

**On Appeal from the United States District Court for the District of Colorado (Civil Action No. 19-cv-03417-WJM-STV, Hon. William J. Martinez)**

**APPENDIX – VOLUME 1**

John R. Crone
*Counsel of Record*
The Law Office of John R. Crone, LLC
2717 South Forest Street
Denver, CO 80222
(303) 598-3526
john@crone-law.com

*Counsel for Rebecca Brigham*

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Docket Sheet                                                      1-9

Complaint and Jury Demand with Exhibits                          10-29

Answer                                                           30-41

Plaintiff's Motion for Partial Summary Judgment with Exhibits   42-298

APPEAL,JD1,MJ CIV PP,NDISPO,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: <u>1:19–cv–03417–WJM–STV</u>

Brigham v. Frontier Airlines, Inc.
Assigned to: Judge William J. Martinez
Referred to: Magistrate Judge Scott T. Varholak
Demand: $1,000,000
Case in other court:  U.S. Court of Appeals for the Tenth
                Circuit, 21–01335
Cause: 42:12101 Americans With Disabilities Act (ADA)

Date Filed: 12/04/2019
Date Terminated: 08/27/2021
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights:
Americans with Disabilities –
Employment
Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**Rebecca Brigham**
                represented by

**Evan Scott Grimes**
John R. Crone The Law Office of
4550 East Cherry Creek Drive South
Suite 1003
Denver, CO 80246
720–660–5222
Email: <u>evan@crone–law.com</u>
*TERMINATED: 09/30/2020*
*ATTORNEY TO BE NOTICED*

**John Reily Crone**
The Law Office of John R. Crone, LLC
2717 South Forest Street
Denver, CO 80222
303–598–3526
Email: <u>john@crone–law.com</u>
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Frontier Airlines, Inc.**
*a Colorado corporation*
                represented by

**Carolyn Bailey Theis**
Littler Mendelson PC–Denver
1900 16th Street
Suite 800
Denver, CO 80202
303–362–2850
Fax: 303–484–5246
Email: <u>CaTheis@littler.com</u>
*ATTORNEY TO BE NOTICED*

**Danielle L. Kitson**
Littler Mendelson PC–Denver
1900 16th Street
Suite 800

0001

1

Denver, CO 80202
303–629–6200
Fax: 303 629–0200
Email: dkitson@littler.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/04/2019 | 1 | | COMPLAINT *and Jury Demand* against Frontier Airlines, Inc. (Filing fee $ 400,Receipt Number 1082–7028319)Attorney John Reily Crone added to party Rebecca Brigham(pty:pla), filed by Rebecca Brigham. (Attachments: # 1 Exhibit Charge Discrimination dated May 10, 2016, # 2 Exhibit EEOC Determination dated June 4, 2019, # 3 Civil Cover Sheet, # 4 Summons)(Crone, John) (Entered: 12/04/2019) |
| 12/04/2019 | 2 | | Case assigned to Magistrate Judge Scott T. Varholak. Text Only Entry. (rsams, ) (Entered: 12/05/2019) |
| 12/05/2019 | 3 | | SUMMONS issued by Clerk. (Attachments: # 1 Magistrate Judge Consent Form) (rsams, ) (Entered: 12/05/2019) |
| 12/05/2019 | 4 | | ORDER Setting Scheduling Conference for 2/13/2020 10:00 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. Consent Form due by 1/30/2020. Proposed Scheduling Order due 2/6/2020, by Magistrate Judge Scott T. Varholak on 12/5/2019. (jgonz, ) (Entered: 12/05/2019) |
| 12/12/2019 | 5 | | WAIVER OF SERVICE Returned Executed by Rebecca Brigham. Frontier Airlines, Inc. waiver sent on 12/5/2019, answer due 2/3/2020. (Crone, John) (Entered: 12/12/2019) |
| 01/07/2020 | 6 | | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Rebecca Brigham All parties do not consent.. (Crone, John) (Entered: 01/07/2020) |
| 01/08/2020 | 7 | | CASE REASSIGNED pursuant to 6 Consent/Non–Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Lewis T. Babcock. All future pleadings should be designated as 19–cv–03417–LTB. (Text Only Entry) (jgonz, ) (Entered: 01/08/2020) |
| 01/09/2020 | 8 | | MEMORANDUM RETURNING CASE by Judge Lewis T. Babcock on 01/09/2020. Case returned to Judge William J. Martinez for all further proceedings. All future pleadings should be designated at 19–cv–03417–WJM. (rvill, ) (Entered: 01/09/2020) |
| 01/09/2020 | 9 | | ORDER REFERRING CASE to Magistrate Judge Scott T. Varholak. Magistrate Judge Varohlak, or such other Magistrate Judge who may in the future be reassigned this case, is designated to conduct NDISPO proceedings pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed.R.Civ.P. 72(a) and (b). Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the Magistrate Judge or on the request of the parties by motion, the court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. SO ORDERED by Judge William J. Martinez on 1/9/2020. Text Only Entry (wjmsec, ) (Entered: 01/09/2020) |

| 01/09/2020 | 10 | | **ORDER: Counsel for the parties and all counsel who may later enter an appearance shall review and familiarize themselves with the undersigned's Revised Practice Standards (as most recently revised effective December 1, 2019 and as they may be amended from time to time), which may be downloaded here**. SO ORDERED by Judge William J. Martinez on 1/ 9/2020. Text Only Entry (wjmsec, ) (Entered: 01/09/2020) |
| 02/03/2020 | 11 | | Proposed Scheduling Order by Plaintiff Rebecca Brigham. (Crone, John) (Entered: 02/03/2020) |
| 02/03/2020 | 12 | | ANSWER to 1 Complaint, Attorney Danielle L. Kitson added to party Frontier Airlines, Inc.(pty:dft) by Frontier Airlines, Inc..(Kitson, Danielle) (Entered: 02/03/2020) |
| 02/03/2020 | 13 | | CORPORATE DISCLOSURE STATEMENT identifying Corporate Parent Frontier Airlines Holdings, Inc. for Frontier Airlines, Inc.. (Theis, Carolyn) (Entered: 02/03/2020) |
| 02/13/2020 | 14 | | MINUTE ENTRY for Scheduling Conference held before Magistrate Judge Scott T. Varholak on 2/13/2020. Discovery due by 9/1/2020. Dispositive Motions due by 10/15/2020. Final Pretrial Conference set for 12/14/2020 10:30 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. FTR: 402. (morti, ) (Entered: 02/13/2020) |
| 02/13/2020 | 15 | | SCHEDULING ORDER: by Magistrate Judge Scott T. Varholak on 2/13/2020. (morti, ) (Entered: 02/13/2020) |
| 04/15/2020 | 16 | | Unopposed MOTION for Extension of Time to *Respond to Plaintiff's Discovery Requests and to Extend Expert Disclosure Deadlines* by Defendant Frontier Airlines, Inc.. (Kitson, Danielle) (Entered: 04/15/2020) |
| 06/03/2020 | 17 | | MINUTE ORDER Per the request of the parties, this matter is set for a Telephonic Discovery Hearing on 6/16/2020 01:30 PM before Magistrate Judge Scott T. Varholak. The parties shall participate in the hearing by calling 888.808.6929 at the scheduled time and utilizing access code: 2805116#. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. Pursuant to Magistrate Judge Varholak's Practice Standards, on or before 6/11/2020, the parties shall submit via email to Varholak_Chambers@cod.uscourts.gov a brief joint statement setting forth the issues in dispute, along with a copy of the Rule 30(b)(6) deposition topics at issue. SO ORDERED, by Magistrate Judge Scott T. Varholak on 6/03/2020. Text Only Entry (stvlc1, ) (Entered: 06/03/2020) |
| 06/16/2020 | 18 | | MINUTE ENTRY for Telephonic Discovery Hearing held before Magistrate Judge Scott T. Varholak on 6/16/2020. FTR: 402. (morti, ) (Entered: 06/16/2020) |
| 07/10/2020 | 19 | | NOTICE of Entry of Appearance by Evan Scott Grimes on behalf of Rebecca BrighamAttorney Evan Scott Grimes added to party Rebecca Brigham(pty:pla) (Grimes, Evan) (Entered: 07/10/2020) |
| 07/29/2020 | 20 | | MINUTE ORDER Per the request of the parties, this matter is set for a Telephonic Discovery Hearing on 8/25/2020 01:30 PM before Magistrate Judge Scott T. Varholak. The parties shall participate in the hearing by calling |

0003

| | | 888.808.6929 at the scheduled time and utilizing access code: 2805116#. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. On or before 8/14/2020, the parties shall submit via email to Varholak_Chambers@cod.uscourts.gov a coordinated joint brief and Defendant may separately submit via email the document at issue for in camera review. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/29/2020. Text Only Entry (stvlc1, ) (Entered: 07/29/2020) |
| 07/29/2020 | 21 | Unopposed MOTION for Protective Order by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit A (Proposed Stipulated Protective Order))(Kitson, Danielle) (Entered: 07/29/2020) |
| 07/30/2020 | 22 | MEMORANDUM regarding 16 Unopposed MOTION for Extension of Time to *Respond to Plaintiff's Discovery Requests and to Extend Expert Disclosure Deadlines* filed by Frontier Airlines, Inc.. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 7/30/2020. Text Only Entry (wjmsec, ) (Entered: 07/30/2020) |
| 07/30/2020 | 23 | MEMORANDUM regarding 21 Unopposed MOTION for Protective Order filed by Frontier Airlines, Inc.. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 7/30/2020. Text Only Entry (wjmsec, ) (Entered: 07/30/2020) |
| 07/30/2020 | 24 | ORDER granting 16 Defendant's Unopposed Motion for Extension of Time to Respond to Plaintiff's Discovery Requests and to Extend Expert Disclosure Deadlines, by Magistrate Judge Scott T. Varholak on 7/30/2020. Text Only Entry(stvlc1, ) (Entered: 07/30/2020) |
| 07/30/2020 | 25 | ORDER granting 21 Motion for Protective Order, by Magistrate Judge Scott T. Varholak on 7/30/2020. Text Only Entry(stvlc1, ) (Entered: 07/30/2020) |
| 07/30/2020 | 26 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Scott T. Varholak on 7/30/2020. (jgonz, ) (Entered: 07/30/2020) |
| 08/25/2020 | 27 | MINUTE ENTRY for Telephonic Discovery Hearing held before Magistrate Judge Scott T. Varholak on 8/25/2020. FTR: 402. (morti, ) (Entered: 08/25/2020) |
| 09/02/2020 | 28 | MINUTE ORDER Per the request of the parties, this matter is set for a Telephonic Discovery Hearing on 9/10/2020 01:30 PM before Magistrate Judge Scott T. Varholak. The parties shall participate in the hearing by calling 888.808.6929 at the scheduled time and utilizing access code: 2805116#. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. Pursuant to Magistrate Judge Varholak's Practice Standards, on or before 9/04/2020, the parties shall submit via email to Varholak_Chambers@cod.uscourts.gov a brief joint statement setting forth the issues in dispute. SO ORDERED, by Magistrate Judge Scott T. Varholak on 9/02/2020. Text Only Entry (stvlc1, ) (Entered: 09/02/2020) |
| 09/10/2020 | 29 | MINUTE ENTRY for Telephonic Discovery Hearing held before Magistrate Judge Scott T. Varholak on 9/10/2020. FTR: 402. (morti, ) (Entered: 09/10/2020) |

| 09/30/2020 | 30 | | MOTION to Withdraw as Attorney by Plaintiff Rebecca Brigham. (Grimes, Evan) (Entered: 09/30/2020) |
|---|---|---|---|
| 09/30/2020 | 31 | | MEMORANDUM regarding 30 MOTION to Withdraw as Attorney filed by Rebecca Brigham. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 9/30/2020. Text Only Entry (wjmsec, ) (Entered: 09/30/2020) |
| 09/30/2020 | 32 | | ORDER granting 30 Motion to Withdraw as Attorney. Attorney Evan Scott Grimes is relieved of any further representation of Plaintiff. The Clerk of Court is instructed to terminate Attorney Grimes as counsel of record, and to remove his name from the electronic certificate of mailing. Plaintiff shall continue to be represented by Attorney John R. Crone of The Law Office of John R. Crone. SO ORDERED, by Magistrate Judge Scott T. Varholak on 09/30/2020. Text Only Entry(stvlc2, ) (Entered: 09/30/2020) |
| 10/14/2020 | 33 | | Joint MOTION to Amend/Correct/Modify 15 Scheduling Order *to Extend Dispositive Motion Deadlines* by Defendant Frontier Airlines, Inc.. (Kitson, Danielle) (Entered: 10/14/2020) |
| 10/15/2020 | 34 | | MEMORANDUM regarding 33 Joint MOTION to Amend/Correct/Modify 15 Scheduling Order *to Extend Dispositive Motion Deadlines* filed by Frontier Airlines, Inc.. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 10/15/2020. Text Only Entry (wjmsec, ) (Entered: 10/15/2020) |
| 10/15/2020 | 35 | | ORDER granting 33 Motion to Amend Scheduling Order. The Dispositive Motions deadline is extended to 11/17/2020. The Final Pretrial Conference set for 12/14/2020 10:30 AM is VACATED and RESET for 1/21/2021 10:30 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. SO ORDERED, by Magistrate Judge Scott T. Varholak on 10/15/2020. Text Only Entry(stvlc2, ) (Entered: 10/15/2020) |
| 11/17/2020 | 36 | | MOTION for Partial Summary Judgment by Plaintiff Rebecca Brigham. (Attachments: # 1 Exhibit Deposition of Gerardo Arellano, # 2 Exhibit Deposition of Frontier Airlines, Inc., # 3 Exhibit Deposition of Plaintiff Rebecca Brigham, # 4 Exhibit Memorandum dated November 17, 2008 Regarding Four Sick Instances Reminder, # 5 Exhibit Frontier Airlines Job Description for Flight Attendant, # 6 Exhibit Deposition of Stefanie Coppedge, # 7 Exhibit Plaintiffs Responses to Defendants First Set of Written Discovery Requests Directed to Plaintiff, # 8 Exhibit Treatment Plan, # 9 Exhibit Letter to Ms. Brigham Regarding Completion of Substance Abuse Program, # 10 Exhibit Collective Bargaining Agreement, # 11 Exhibit Tabs 2012–16, # 12 Exhibit Declaration of David St. Hilaire, # 13 Exhibit Affidavit of Christine Kernen in Support of Charges of Jo Roby, Stacy Rewitzer, Renee Schwartzkopf, and Melissa Hodgkins Against Frontier Airlines, # 14 Exhibit EEOC Determination, # 15 Exhibit Comanche Crossing Counseling, LLC Diagnostic Intake Summary and Treatment Plan)(Crone, John) Modified on 5/3/2021 to correct title (angar, ). (Entered: 11/17/2020) |
| 11/17/2020 | 37 | | Unopposed MOTION for Leave to *File Restricted Exhibit* 36 MOTION for Summary Judgment by Plaintiff Rebecca Brigham. (Crone, John) (Entered: 11/17/2020) |
| 11/17/2020 | 38 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for Summary Judgment by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2 Part 1, # 4 Exhibit 2 Part 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit B, # 22 Exhibit C, # 23 Exhibit D, # 24 Exhibit E, # 25 Exhibit F, # 26 Exhibit G)(Kitson, Danielle) (Entered: 11/17/2020) |
| 11/18/2020 | 39 | | MEMORANDUM regarding 37 Unopposed MOTION for Leave to *File Restricted Exhibit* 36 MOTION for Summary Judgment filed by Rebecca Brigham. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 11/18/2020. Text Only Entry (wjmsec, ) (Entered: 11/18/2020) |
| 11/18/2020 | 40 | | ORDER denying without prejudice 37 Motion for Leave to Restrict. Any request to restrict public access must comply with the requirements of D.C.COLO.LCivR 7.2. Moreover, pursuant to D.C.COLO.LCivR 7.2(c)(2), "stipulations between the parties or stipulated protective orders with regard to discovery, alone, are insufficient to justify restriction." Plaintiff is granted leave to refile a motion that complies with the local rules. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/18/2020. Text Only Entry(stvlc2, ) (Entered: 11/18/2020) |
| 11/18/2020 | 41 | | Unopposed MOTION for Leave to *File Exhibit Restricted* by Plaintiff Rebecca Brigham. (Crone, John) (Entered: 11/18/2020) |
| 11/18/2020 | 42 | | MEMORANDUM regarding 41 Unopposed MOTION for Leave to *File Exhibit Restricted* filed by Rebecca Brigham. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 11/18/2020. Text Only Entry (wjmsec, ) (Entered: 11/18/2020) |
| 11/24/2020 | 43 | | ORDER granting 41 Second Unopposed Motion for Leave to Restrict. The Clerk of the Court is directed to restrict public access to Dkt. No. 36–11 to Level 1 access only. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/24/2020. Text Only Entry(stvlc2, ) (Entered: 11/24/2020) |
| 12/08/2020 | 44 | | RESPONSE to 38 MOTION for Summary Judgment filed by Plaintiff Rebecca Brigham. (Attachments: # 1 Exhibit Declaration of Adrienne Prince dated March 13, 2020, # 2 Exhibit Deposition of Adrienne Prince, # 3 Exhibit Transcript of Meeting between Plaintiff, Jerry Arellano, Jeff Varney, and Meredith)(Crone, John) (Entered: 12/08/2020) |
| 12/08/2020 | 45 | | RESPONSE to 36 MOTION for Summary Judgment filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit 1, # 4 Exhibit 2)(Kitson, Danielle) (Entered: 12/08/2020) |
| 12/17/2020 | 46 | | MINUTE ORDER Due to a conflict on the Court's calendar, the Telephonic Final Pretrial Conference set for 1/21/2021 10:30 AM is VACATED and RESET for 2/3/2021 10:30 AM before Magistrate Judge Scott T. Varholak. The parties shall participate in the conference by calling 888.808.6929 at the scheduled time and utilizing access code: 2805116#. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. The parties shall submit a joint Proposed Pretrial Order on or before 1/27/2021. SO ORDERED, by |

0006

| | | | |
|---|---|---|---|
| | | | Magistrate Judge Scott T. Varholak on 12/17/2020. Text Only Entry (stvlc1, ) (Entered: 12/17/2020) |
| 12/21/2020 | 47 | | REPLY to Response to 36 MOTION for Summary Judgment filed by Plaintiff Rebecca Brigham. (Crone, John) (Entered: 12/21/2020) |
| 12/22/2020 | 48 | | REPLY to Response to 38 MOTION for Summary Judgment filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Kitson, Danielle) (Entered: 12/22/2020) |
| 01/26/2021 | 49 | | Proposed Pretrial Order by Plaintiff Rebecca Brigham. (Crone, John) (Entered: 01/26/2021) |
| 02/03/2021 | 50 | | COURTROOM MINUTES for Telephonic Final Pretrial Conference held before Magistrate Judge Scott T. Varholak on 2/3/2021. Final Pretrial Order approved. FTR: Courtroom A402. (ebuch) (Entered: 02/03/2021) |
| 02/03/2021 | 51 | | FINAL PRETRIAL ORDER by Magistrate Judge Scott T. Varholak on 2/3/2021. (ebuch) (Entered: 02/03/2021) |
| 02/10/2021 | 52 | | ORDER: A **5–Day Jury Trial** is hereby set to begin on **December 6, 2021 at 8:30 a.m.** in Courtroom A801. The **Final Trial Preparation Conference** is set for **November 19, 2021 at 2:15 p.m.** in Courtroom A801. Counsel are directed to this Court's Revised Practice Standards to ensure compliance with all deadlines triggered by the dates of the Final Trial Preparation Conference and Trial. In so doing, the parties are strongly encouraged to take advantage of the "Trial Preparation Conference & Pretrial Checklist" available here. SO ORDERED by Judge William J. Martinez on 2/10/2021. Tex t Only Entry (wjmsec, ) (Entered: 02/10/2021) |
| 04/02/2021 | 53 | | MOTION to Strike 51 Pretrial Order by Defendant Frontier Airlines, Inc.. (Kitson, Danielle) (Entered: 04/02/2021) |
| 04/05/2021 | 54 | | MEMORANDUM regarding 53 MOTION to Strike 51 Pretrial Order filed by Frontier Airlines, Inc.. Motions referred to Magistrate Judge Scott T. Varholak by Judge William J. Martinez on 4/5/2021. Text Only Entry (wjmsec, ) (Entered: 04/05/2021) |
| 04/05/2021 | 55 | | MINUTE ORDER This matter is before the Court on 53 MOTION to Strike Witness. Plaintiff shall file a response on or before 4/19/2021. Defendant may then file a reply, if any, on or before 4/26/2021. A Telephonic Motion Hearing is set for 5/5/2021 10:30 AM before Magistrate Judge Scott T. Varholak. The parties shall participate in the hearing by calling 888.808.6929 at the scheduled time and utilizing access code: 2805116#. The Court notes that the parties may hear the conclusion of a prior hearing at the time they call in, and are instructed to simply wait until their case is called. SO ORDERED, by Magistrate Judge Scott T. Varholak on 4/5/2021. Text Only Entry (stvlc2, ) (Entered: 04/05/2021) |
| 04/19/2021 | 56 | | RESPONSE to 53 MOTION to Strike 51 Pretrial Order filed by Plaintiff Rebecca Brigham. (Attachments: # 1 Exhibit Affidavit of Christine Kernen, # 2 Exhibit Docket Sheet for Melissa Hodgkins, et al. v. Frontier Airlines, Inc.)(Crone, John) (Entered: 04/19/2021) |
| 04/26/2021 | 57 | | REPLY to Response to 53 MOTION to Strike 51 Pretrial Order filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit |

0007

| | | | |
|---|---|---|---|
| | | | B)(Kitson, Danielle) (Entered: 04/26/2021) |
| 05/05/2021 | 58 | | MINUTE ENTRY for Telephonic Motion Hearing held before Magistrate Judge Scott T. Varholak on 5/5/2021. 53 Defendant Frontier Airlines, Inc.s Motion To Strike PlaintiffsDesignation of Christine Kernen as a Trial Witness From the FinalPretrial Order (ECF No. 51) is DENIED in part and GRANTED in part. With respect to the requests for fees and costs associated with there–deposition, the court finds that is unwarranted and therefore therequest is DENIED without prejudice. FTR: 402. (morti, ) (Entered: 05/05/2021) |
| 08/27/2021 | 59 | | ORDER granting in its entirety 38 Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment. Denying 36 Plaintiff Rebecca Brigham's Motion for Partial Summary Judgment, by Judge William J. Martinez on 8/27/2021. (ebuch) (Entered: 08/27/2021) |
| 08/27/2021 | 60 | | FINAL JUDGMENT in favor of Frontier Airlines, Inc. and against Rebecca Brigham pursuant to 59 Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment, by Clerk on 8/27/2021. (ebuch) (Entered: 08/27/2021) |
| 09/10/2021 | 61 | | Proposed Bill of Costs by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Exhibit A)(Kitson, Danielle) (Entered: 09/10/2021) |
| 09/10/2021 | 62 | | NOTICE by Clerk re: Bill of Costs Hearing re: 61 Proposed Bill of Costs. As set in the Proposed Bill, the hearing for this matter will be held on Oct. 14, 2021 at 9:30 a.m. MST. The hearing will be held IN PERSON – the parties are directed to have counsel asserting the Proposed Bill of Costs and opposing counsel presenting objections be physically present for the hearing. The hearing will be held in Courtroom A201 (2nd floor) of the Arraj U.S. Courthouse. The Clerk reminds the parties that a Statement of Conferral must be filed no later than the day before the hearing in order to confirm the attempts to reach a settlement on either some or all of the requested costs, per local rule LCivR 54.1, and to confirm the parties have utilized the Clerk's Guide to Bills of Cost Hearings (see attached) in their discussions. Finally, the Clerk strongly encourages the parties to reach an agreement as to individual costs items – or preferably – a global settlement, in light of the Rule One directive that the court and PARTIES work to secure the just, speedy, and inexpensive determination of every action and proceeding. (ebutl) (Entered: 09/10/2021) |
| 09/24/2021 | 63 | | NOTICE OF APPEAL as to 60 Judgment, 59 Order on Motion for Summary Judgment, by Plaintiff Rebecca Brigham (Filing fee $ 505, Receipt Number ACODC–8092446) (Crone, John) (Entered: 09/24/2021) |
| 09/27/2021 | 64 | | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 63 Notice of Appeal filed by Rebecca Brigham to the U.S. Court of Appeals for the Tenth Circuit. (Retained Counsel, Fee paid) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(trvo, ) (Entered: 09/27/2021) |
| 09/27/2021 | 65 | | USCA Case Number 21–1335 for 63 Notice of Appeal filed by Rebecca Brigham. (trvo, ) (Entered: 09/27/2021) |
| 10/11/2021 | 66 | | STIPULATION *to Stay the Bill of Costs Hearing* by Defendant Frontier Airlines, Inc.. (Kitson, Danielle) (Entered: 10/11/2021) |

| 10/11/2021 | 67 | | NOTICE by Clerk re 61 Proposed Bill of Costs and 66 Stipulation. Pursuant to the parties' Stipulation, the Bill of Costs hearing set for Oct. 14, 2021 is stayed, and the hearing date and time VACATED. Defendant shall notify the Clerk within fourteen (14) days after the outcome of the appeal, and if necessary, request that the Bill of Costs hearing be reset. Text Only Entry. (ebutl) (Entered: 10/11/2021) |
|---|---|---|---|
| 10/12/2021 | 68 | | TRANSCRIPT ORDER FORM re 63 Notice of Appeal by Plaintiff Rebecca Brigham (Crone, John) (Entered: 10/12/2021) |
| 10/13/2021 | 69 | | LETTER TO USCA and all counsel certifying the record is complete as to 63 Notice of Appeal filed by Rebecca Brigham. A transcript order form was filed stating that a transcript is not necessary. (Appeal No. 21−1335) (Text Only Entry) (trvo, ) (Entered: 10/13/2021) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-3417

REBECCA BRIGHAM,

            Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

            Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff REBECCA BRIGHAM (hereinafter "Plaintiff" or "Ms. Brigham"), by and through the undersigned counsel, bring this Complaint pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* (the "ADA"), demands a jury trial, and alleges as follows:

### INTRODUCTION

1.     In May 2007, Ms. Brigham became employed with Defendant Frontier Airlines, Inc. (hereinafter "Frontier") as a flight attendant. Ms. Brigham found the work interesting and she excelled in her position, accumulating accolades from Defendant for her superior performance.

2.     For Ms. Brigham her employment with Frontier was the realization of a long-sought career path. Her position as a flight attendant became part of her identity and she was proud to

discuss her career with friends and family. The compensation had the potential to allow for a middle-class life, which would have allowed Ms. Brigham to take care of her family and other financial obligations. Therefore, Ms. Brigham valued her relationship with Frontier, and was ready to excel on every shift.

3.      Unfortunately, as time went on, Ms. Brigham was occasionally tempted by alcohol as a means of relieving stress, anxiety, and the serious grief brought on by the death of her first child, born prematurely on May 22, 2009. Her occasional indulgences became more frequent until it became clear to Ms. Brigham that she had developed alcoholism and was dependent upon alcohol for relieving feelings of grief. While Ms. Brigham's disability, alcoholism, never interfered with the performance of her job duties, Ms. Brigham still felt the need to face the disorder head on.

4.      As such, and toward the end of 2014, she voluntarily self-disclosed her disability to Frontier and checked into an inpatient rehab center. While Ms. Brigham's decision to seek treatment for her alcoholism has been a tremendous success, her experience with Frontier, after self-disclosing, became negative.

5.      Ms. Brigham repeatedly requested reasonable accommodations from Frontier so that she could successfully perform the essential functions of her job, only to be told that no accommodations could be granted. At one point, Frontier blamed its inability to provide Ms. Brigham with an accommodation on an assertion that the requested accommodation (alteration of her work schedule to avoid overnights and long layovers) would violate terms of its collective bargaining agreement with the flight attendants' union **despite** support for the proposed accommodations from the Vice President of the union itself.

6.      It became clear that Frontier wanted to terminate Ms. Brigham based on her

disability and was not at all interested in helping her to be successful, let alone comply with its obligations under the ADA. The more Frontier refused to grant Ms. Brigham any type of reasonable accommodation, the more days she missed from work as she attempted to alter her work schedule to avoid long layovers or overnight flights. Of course, Frontier would then criticize Ms. Brigham for the absences from work caused by its own refusal to grant an accommodation.

7.    Finally, in about mid-November 2015, just over **8.5 years** after being hired and about **1 year** after voluntarily disclosing her disability and proactively seeking treatment, Ms. Brigham was terminated by Frontier. Thus, in the short span of a year, Frontier violated the requirements of the ADA by: failing to accommodate; failing to engage in the interactive process; retaliating against Ms. Brigham for engaging in protected activity; and engaging in unlawful disability based discrimination.

8.    Frontier's termination of Ms. Brigham has produced severe consequences including financial and emotional harm, exacerbated by the fact that Ms. Brigham has had trouble finding a position even remotely equivalent to her flight attendant position. When Frontier terminated Ms. Brigham from her position, Defendant took away the means for Ms. Brigham to secure a stable and healthy life for herself and her family.

9.    Therefore, and through this lawsuit, Ms. Brigham seeks to be paid all available economic, compensatory, and punitive damages for which she has suffered, and in any event, in an amount not less than $1,000,000. Ms. Brigham stepped up and chose to confront her disability directly, and in return, Frontier punished her and took away her livelihood. It's time that Frontier be ordered to pay the cost of its unlawful behavior.

## JURISDICTION, VENUE AND PARTIES

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.* as this Complaint raises a federal question and a private cause of action as authorized under the ADA.

11.     This Court has personal jurisdiction over Defendant as Defendant is engaged in continuous and systematic business activities within this State. Defendant is a domestic entity registered to conduct business in the State of Colorado, or directly conducts business in Colorado whether through a subsidiary company or otherwise, and is in fact engaged in continuous and systematic business activities within this State. As such, Defendant is subject to the general or specific personal jurisdiction of this Court.

12.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§ 1391(a), (b) and (c) because a substantial part of the events or omissions giving rising to Plaintiff's claims occurred in the District of Colorado and Defendant is subject to the personal jurisdiction of the Court.

13.     Plaintiff Rebecca Brigham is currently a resident of the State of Michigan and was employed by Defendant, and residing in Colorado, during the relevant time period.

14.     Defendant Frontier Airlines, Inc. is a corporation duly organized and existing under the laws of the State of Colorado. Defendant Frontier Airlines, Inc. may be served through its registered agent at: Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120.

### MS. BRIGHAM'S CASE BEFORE THE UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

15.    On May 10, 2016, Ms. Brigham filed a Charge of Discrimination with the Colorado Civil Rights Division, her charge later being transferred to the United States Equal Employment Opportunity Commission. **Exhibit 1**, Charge of Discrimination dated May 10, 2016.

16.    In the Charge, and through the EEOC's investigative process, Ms. Brigham outlined in great detail the events leading up to the filing of her Charge, including:

    a.   Requesting a reasonable accommodation on or about June 4, 2015 in the form of a schedule change allowing Ms. Brigham to avoid long layovers as they may aggravate her disability and violate her treatment plan, which was denied;

    b.   On or about October 9, 2015, Ms. Brigham again requested a reasonable accommodation in the form of an altered schedule but was denied;

    c.   On or about November 3, 2015, Frontier summoned Ms. Brigham to an "investigatory meeting," during which she again requested an accommodation, which was **supported by the union**, but was again denied; and

    d.   On or about November 14, 2015, Ms. Brigham was unlawfully terminated by Defendant.

Ex. 1.

17.    Despite Frontier's knowledge of Plaintiff's disability, Defendant's knowledge coming from Ms. Brigham's voluntary disclosure, *and* Ms. Brigham's repeated requests for a reasonable accommodation, Defendant never actually engaged in the interactive process as required under the ADA.

18.     Ms. Brigham proposed at least two reasonable accommodations: (1) a change to her schedule to avoid long layovers and overnights as these situations exacerbate her disability and violated her alcohol treatment plan; or (2) transfer to a position within Defendant's home office on a temporary basis. Frontier never entertained these propositions in good faith, nor did Frontier propose its own possible reasonable accommodations.

19.     Ms. Brigham was placed into an untenable position as Frontier's rules regarding the voluntary disclosure of alcoholism required that Plaintiff follow every aspect of her alcohol treatment plan in order to keep her job, yet Frontier was unwilling to entertain reasonable accommodations to accomplish the same.

20.     This situation was especially troubling because Adrian Prince, the Vice President of Plaintiff's union, attended a meeting and told Ms. Brigham's supervisors that the union had no problem with Plaintiff's proposed changes in schedule as a reasonable accommodation, *i.e.*, the requested accommodation violated no terms of Frontier's collective bargaining agreement with the union.

21.     Frontier's refusal to engage in the interactive process in good faith and its refusal to grant a simple and logical requested reasonable accommodation belies the only factor motivating its decision-making: unlawful discriminatory animus.

## THE EEOC'S DETERMINATION

22.     On June 4, 2019, the EEOC issued a Determination in Ms. Brigham's favor, finding: "Based upon a review of the evidence gathered from Respondent and Charging Party, I conclude that the Respondent violated the ADA when Charging Party was denied a reasonable accommodation and discharged." **Exhibit 2**, EEOC Determination dated June 4, 2019.

COMPLAINT AND JURY DEMAND
Page 6 of 12

23.     Despite a robust investigatory process that resulted in the EEOC issuing a Determination in Plaintiff's favor, Defendant was still unwilling to correct it prior unlawful behavior, and as a result, Plaintiff filed the instant lawsuit.

**COUNT I**
**Failure to Accommodate in Violation of the ADA**
**42 U.S.C. § 12101, *et seq.***

24.     Plaintiffs incorporates all allegations contained herein as if fully stated in this Paragraph.

25.     Defendant is an employer covered by the requirements of the ADA.

26.     Plaintiff was Defendant's employee during the relevant time period and entitled to the benefits and protections of the ADA.

27.     The ADA requires that employers reasonably accommodate the known disabilities of their employees; engage in a good faith interactive process with employees to determine the nature of possible reasonable accommodations; refrain from retaliating against employees that engage in protected activity under the ADA, including but not limited to requesting a reasonable accommodation; and refrain from discriminating against employees based on their disability.

28.     Here, and as described in detail, Plaintiff's many requests for a reasonable accommodation were denied; Frontier refused to engage in the interactive process in good faith; Plaintiff was retaliated against for having the audacity to voluntarily disclose her disability and seek an accommodation; and ultimately, Plaintiff was terminated unlawfully based on her disability.

29.     Plaintiff has suffered damages as a result of Defendant's various violations of the ADA and seeks payment for all economic damages (including back and frontpay), compensatory and punitive damages, attorney's fees, costs, and interest at the highest allowable rate under law.

**<u>COUNT II</u>**
**Failure to Engage in the Interactive Process in Violation of the ADA**
**42 U.S.C. § 12101, *et seq.***

30.     Plaintiffs incorporates all allegations contained herein as if fully stated in this Paragraph.

31.     Defendant is an employer covered by the requirements of the ADA.

32.     Plaintiffs was Defendant's employee during the relevant time period and entitled to the benefits and protections of the ADA.

33.     The ADA requires that employers reasonably accommodate the known disabilities of their employees; engage in a good faith interactive process with employees to determine the nature of possible reasonable accommodations; refrain from retaliating against employees that engage in protected activity under the ADA, including but not limited to requesting a reasonable accommodation; and refrain from discriminating against employees based on their disability.

34.     Here, and as described in detail, Plaintiff's many requests for a reasonable accommodation were denied; Frontier refused to engage in the interactive process in good faith; Plaintiff was retaliated against for having the audacity to voluntarily disclose her disability and seek an accommodation; and ultimately, Plaintiff was terminated unlawfully based on her disability.

35.     Plaintiff has suffered damages as a result of Defendant's various violations of the ADA and seeks payment for all economic damages (including back and frontpay), compensatory and punitive damages, attorney's fees, costs, and interest at the highest allowable rate under law.

**COUNT III**
**Retaliation in Violation of the ADA**
**42 U.S.C. § 12101, *et seq.***

36.     Plaintiffs incorporates all allegations contained herein as if fully stated in this Paragraph.

37.     Defendant is an employer covered by the requirements of the ADA.

38.     Plaintiffs was Defendant's employee during the relevant time period and entitled to the benefits and protections of the ADA.

39.     The ADA requires that employers reasonably accommodate the known disabilities of their employees; engage in a good faith interactive process with employees to determine the nature of possible reasonable accommodations; refrain from retaliating against employees that engage in protected activity under the ADA, including but not limited to requesting a reasonable accommodation; and refrain from discriminating against employees based on their disability.

40.     Here, and as described in detail, Plaintiff's many requests for a reasonable accommodation were denied; Frontier refused to engage in the interactive process in good faith; Plaintiff was retaliated against for having the audacity to voluntarily disclose her disability and seek an accommodation; and ultimately, Plaintiff was terminated unlawfully based on her disability.

COMPLAINT AND JURY DEMAND
Page 9 of 12

41.     Plaintiff has suffered damages as a result of Defendant's various violations of the ADA and seeks payment for all economic damages (including back and frontpay), compensatory and punitive damages, attorney's fees, costs, and interest at the highest allowable rate under law.

<u>**COUNT IV**</u>
**Discrimination in Violation of the ADA**
**42 U.S.C. § 12101, *et seq.***

42.     Plaintiffs incorporates all allegations contained herein as if fully stated in this Paragraph.

43.     Defendant is an employer covered by the requirements of the ADA.

44.     Plaintiffs was Defendant's employee during the relevant time period and entitled to the benefits and protections of the ADA.

45.     The ADA requires that employers reasonably accommodate the known disabilities of their employees; engage in a good faith interactive process with employees to determine the nature of possible reasonable accommodations; refrain from retaliating against employees that engage in protected activity under the ADA, including but not limited to requesting a reasonable accommodation; and refrain from discriminating against employees based on their disability.

46.     Here, and as described in detail, Plaintiff's many requests for a reasonable accommodation were denied; Frontier refused to engage in the interactive process in good faith; Plaintiff was retaliated against for having the audacity to voluntarily disclose her disability and seek an accommodation; and ultimately, Plaintiff was terminated unlawfully based on her disability.

47.     Plaintiff has suffered damages as a result of Defendant's various violations of the ADA and seeks payment for all economic damages (including back and frontpay), compensatory and punitive damages, attorney's fees, costs, and interest at the highest allowable rate under law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for entry of judgment in her favor and against Defendant as follows:

1.      Plaintiff requests payment of all economic damages allowable under law, including but not limited to back and frontpay, in an amount not less than $400,000;

2.      Plaintiff requests payment of allowable compensatory damages in an amount not less than $300,000;

3.      Plaintiff requests payment of all allowable punitive damages in an amount not less than $300,000;

4.      Plaintiff requests payment of all attorney's fees and costs;

5.      Plaintiff requests pre and post-judgment interest at the highest rate allowable under law; and

6.      Plaintiff requests any and all other legal or equitable relief deemed appropriate by the Court.

### DEMAND FOR TRIAL BY JURY

Plaintiff requests a jury trial on all claims described herein, and as may be amended.

Respectfully submitted this 4th day of December, 2019.

/s/John R. Crone
John R. Crone

COMPLAINT AND JURY DEMAND
Page 11 of 12

CO Bar No. 48284
THE LAW OFFICE OF JOHN R. CRONE,
LLC
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
john@crone-law.com
*Attorney for Plaintiff*

COMPLAINT AND JURY DEMAND
Page 12 of 12

0021



**CHARGE OF DISCRIMINATION**
The Privacy Act of 1974 affects this form.
See Privacy Act Statement before completing this form.

EEOC Charge No.
32A-2016-00322
CCRD Charge No.
R20160020

## COLORADO CIVIL RIGHTS DIVISION AND EEOC

| Name *(Charging Party)* | | **(Area Code) Telephone** |
|---|---|---|
| Rebecca Leigh Brigham | | 303-913-6376 |

| **Street Address** | **City, State, and Zip Code** | **County** |
|---|---|---|
| 831 Centennial Drive | Bennett, CO 80102 | Adams |

**The Employer, Labor Organization, Employment Agency, Apprenticeship Committee, State or Local Government Agency who discriminated against me is:**

| Name **(Respondent)** | **Number of Employees** | **(Area Code) Telephone** |
|---|---|---|
| Frontier Airlines | 15+ | 720-374-4200 |

| **Street Address** | **City, State, and Zip Code** | **County** |
|---|---|---|
| 7001 Tower Road | Denver, CO 80249 | Denver |

| **Discrimination Based on:** | **Date Most Recent Discrimination Occurred** |
|---|---|
| Disability(alcoholism), Retaliation | 11/14/15 |

I.   **Jurisdiction:** The Colorado Civil Rights Division has jurisdiction over the subject matter of this charge; that each named Respondent is subject to the jurisdiction of the Colorado Civil Rights Division and is covered by the provisions of the Colorado Revised Statutes (C.R.S. 1973, 24-34-301, et. seq.), as reenacted.

II.  **Personal Harm:** That on or about June 14, 2015, and thereafter, I was discriminated against in terms and conditions of employment based on my disability (alcoholism) and/or in retaliation for engaging in protected activity. That on or about November 14, 2015, I was discharged based on my protected class and/or in retaliation for engaging in protected activity.

III. **Respondent's Position:** Unknown.

IV.  **Discrimination Statement:** I believe I was unlawfully discriminated against because of my disability and/or in retaliation for engaging in protected activity in violation of the Colorado Anti-Discrimination Act (CADA). 1) On or about May 24, 2007, I began employment in the position of Flight Attendant for the Respondent and at all times I performed satisfactorily. 2) On or about June 4, 2015, I requested a reasonable accommodation from the Respondent in the form of not working layovers because layovers tended to aggravate my disability. Non-compliance with the Employee Assistance Program as it related to my alcoholism could be cause for termination, according to the employee handbook. If I worked layovers, I risked non-compliance. Nevertheless, the accommodation request was denied on this date. 3) On or about October 9, 2015, I went to work but my flight had been removed from my work schedule. As a result, I went to the general office to discuss this and again ask for reasonable accommodations in not working layovers. I was denied again. 4) On or about November 3, 2015, as a result of the Respondent not accommodating me, I had received termination level attendance points and was summoned to an "investigatory meeting". I told the Respondents in this meeting that they were in violation of the Americans with Disabilities Act and I again made my request for a reasonable accommodation, a request that the Union supported, but that the Respondents denied again. 5) On or about November 14,

0022

22

2015, I received a letter from the Respondent terminating my employment. 6) I believe I was discriminated against based on my protected classes and/or in retaliation for engaging in protected activity.

**V.**   **WHEREFORE:** The Charging Party prays that the Colorado Civil Rights Division grant such relief as may exist within the Division's power and which the Division may deem necessary and proper.

I want this charge filed with both the Equal Employment Opportunity Commission and the State or local agency, if any. I will advise the agency if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Date 5|10|16        Charging Party/Complainant (Signature) _Rebecca J Brigham_





**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Denver Field Office**

303 East 17ᵗʰ Avenue, Suite 410
Denver, CO 80203
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Denver Direct Dial: (303) 866-1359
FAX (303) 866-1085
Website: www.eeoc.gov

EEOC Charge No.: **32A-2016-00322**

Rebecca Brigham                     Charging Party
10148 Green Road
Goodrich, MI 48438

Frontier Airlines, Inc.             Respondent
7001 Tower Road
Denver, CO 80249

## DETERMINATION

On behalf of the U.S. Equal Employment Opportunity Commission ("Commission"), I issue the following determination on the merits of the subject charge under Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, et seq. (ADA). Respondent ("Frontier Airlines") is an employer within the meaning of the ADA. All requirements for coverage have been met.

Charging Party was employed as a Flight Attendant with Respondent from May 2007 until she was discharged on November 11, 2015. Charging Party is an individual with a disability within the meaning of the ADA. Beginning in June 2015, Charging Party requested a reasonable accommodation based on her disability, of not working layovers or overnight flights. The Respondent denied Charging Party's request. Charging Party presented the Respondent with medical documentation, a treatment plan, and her own explanation of why this accommodation was necessary for her continued employment. Charging Party presented several possible accommodations to the Respondent for consideration, which had the support of the Vice President of the Flight Attendants' union.

Respondent rejected Charging Party's proposed accommodations, and Respondent subjected Charging Party to its dependability policy when Charging Party had to miss work due to her disability. Respondent stated that Charging Party had not met the requirements of her Family and Medical Leave Act (FMLA) certification by missing work. Charging Party implored the Respondent to accommodate her because she was missing work due to her disability. Between June 2015 and her discharge in November 2015, Charging Party communicated to Respondent's Human Resources Manager, her In-Flight Managers, and the Respondent's Leave of Absence Department, that she was being penalized for missing work due to her disability; Charging Party continued to request a reasonable accommodation.

Respondent failed to engage in an interactive process with Charging Party regarding her request for a reasonable accommodation and instead discharged her based on poor attendance.

Based upon a review of the evidence gathered from Respondent and Charging Party, I conclude that the Respondent violated the ADA when Charging Party was denied a reasonable accommodation and discharged.

The Commission makes no finding regarding any other allegation made in the charge.

This determination is final. The ADA requires that, if the Commission determines that there is reasonable cause to believe that violations have occurred, it shall endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion. Having determined that there is reason to believe that violations have occurred, the Commission now invites Respondent to join with it in an effort toward a just resolution of this matter. Disclosure of information obtained by the Commission during the conciliation process may only be made in accordance with the confidentiality provisions of the ADA and the Commission's Procedural Regulations.

You are hereby reminded that Federal Law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in the Commission's investigation is also prohibited. The protections apply regardless of the Commission's determination on the merits of the charge.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission. A Commission representative will contact each party in the near future to begin conciliation.

On Behalf of the Commission:

June 04, 2019

_____
Date

Amy Burkholder, Director
Denver Field Office

JS 44 (Rev. 06/17) District of Colorado **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Rebecca Brigham | Frontier Airlines, Inc. |

**(b)** County of Residence of First Listed Plaintiff   Genessee County (MI)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Denver County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John R. Crone, The Law Office of John R. Crone, LLC
4550 E Cherry Creek Drive South, #1003, Glendale, CO 80246
john@crone-law.com; (303) 598-3526

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ❑ 1  U.S. Government Plaintiff
- ❑ 2  U.S. Government Defendant
- ✗ 3  Federal Question *(U.S. Government Not a Party)*
- ❑ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*          Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 365 Personal Injury - Product Liability | ❑ 690 Other | ❑ 423 Withdrawal 28 USC 157 | ❑ 376 Qui Tam (31 USC 3729(a)) |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 367 Health Care/ Pharmaceutical | | | ❑ 400 State Reapportionment |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ❑ 410 Antitrust |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' Liability | ❑ 368 Asbestos Personal Injury Product Liability | | ❑ 820 Copyrights | ❑ 430 Banks and Banking |
| ❑ 151 Medicare Act | ❑ 340 Marine | **PERSONAL PROPERTY** | | ❑ 830 Patent | ❑ 450 Commerce |
| ❑ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❑ 345 Marine Product Liability | ❑ 370 Other Fraud | **LABOR** | ❑ 835 Patent - Abbreviated New Drug Application | ❑ 460 Deportation |
| | ❑ 350 Motor Vehicle | ❑ 371 Truth in Lending | ❑ 710 Fair Labor Standards Act | ❑ 840 Trademark | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 355 Motor Vehicle Product Liability | ❑ 380 Other Personal Property Damage | ❑ 720 Labor/Management Relations | **SOCIAL SECURITY** | ❑ 480 Consumer Credit |
| ❑ 160 Stockholders' Suits | ❑ 360 Other Personal Injury | ❑ 385 Property Damage Product Liability | ❑ 740 Railway Labor Act | ❑ 861 HIA (1395ff) | ❑ 490 Cable/Sat TV |
| ❑ 190 Other Contract | ❑ 362 Personal Injury - Medical Malpractice | | ❑ 751 Family and Medical Leave Act | ❑ 862 Black Lung (923) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 195 Contract Product Liability | | | ❑ 790 Other Labor Litigation | ❑ 863 DIWC/DIWW (405(g)) | ❑ 890 Other Statutory Actions |
| ❑ 196 Franchise | | | ❑ 791 Employee Retirement Income Security Act | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ❑ 865 RSI (405(g)) | ❑ 893 Environmental Matters |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❑ 895 Freedom of Information Act |
| ❑ 220 Foreclosure | ❑ 441 Voting | ❑ 463 Alien Detainee | | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 896 Arbitration |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment | ❑ 510 Motions to Vacate Sentence | | ❑ 871 IRS—Third Party 26 USC 7609 | ❑ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❑ 240 Torts to Land | ❑ 443 Housing/ Accommodations | ❑ 530 General | | | ❑ 950 Constitutionality of State Statutes |
| ❑ 245 Tort Product Liability | ✗ 445 Amer. w/Disabilities - Employment | ❑ 535 Death Penalty | **IMMIGRATION** | | |
| ❑ 290 All Other Real Property | ❑ 446 Amer. w/Disabilities - Other | **Other:** | ❑ 462 Naturalization Application | | |
| | ❑ 448 Education | ❑ 540 Mandamus & Other | ❑ 465 Other Immigration Actions | | |
| | | ❑ 550 Civil Rights | | | |
| | | ❑ 555 Prison Condition | | | |
| | | ❑ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ✗ 1  Original Proceeding
- ❑ 2  Removed from State Court
- ❑ 3  Remanded from Appellate Court
- ❑ 4  Reinstated or Reopened
- ❑ 5  Transferred from Another District *(specify)*
- ❑ 6  Multidistrict Litigation - Transfer
- ❑ 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 12101, et seq.
Brief description of cause:
Disability discrimination, retaliation, failure to accommodate; failure to engage in interactive process
❑ AP Docket

**VII. REQUESTED IN COMPLAINT:**
❑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ 1,000,000
CHECK YES only if demanded in complaint:
JURY DEMAND:  ✗ Yes   ❑ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  December 4, 2019
SIGNATURE OF ATTORNEY OF RECORD  /s/ John R. Crone

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

0026

Print    Save As...    Reset

26

JS 44 Reverse (Rev. 06/17)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.    Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

REBECCA BRIGHAM

)
)
)
)
_____
)
*Plaintiff(s)*
)
v.
)
FRONTIER AIRLINES, INC.
)
)
)
)
_____
)
*Defendant(s)*
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Frontier Airlines, Inc.
Corporation Service Company
1900 W Littleton Blvd.
Littleton, CO 80120

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   John R. Crone
The Law Office of John R. Crone, LLC
4550 E Cherry Creek Drive South, #1003
Glendale, CO 80246
john@crone-law.com
(303) 598-3526

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

0028

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

                                             _____
                                                      *Server's signature*

                                             _____
                                                      *Printed name and title*


                                             _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03417-STV

REBECCA BRIGHAM,

      Plaintiff,

v.

FRONTIER AIRLINES, INC.,

      Defendant.

---

**DEFENDANT'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT**

---

Defendant Frontier Airlines, Inc. ("Frontier"), by and through its attorneys, Danielle L. Kitson and Carolyn B. Theis of Littler Mendelson, P.C., submits the following Answer and Defenses to Plaintiff's Complaint [ECF No. 1].

**<u>INTRODUCTION</u>**

1.     Frontier admits that Frontier hired Plaintiff in May of 2007 as a flight attendant. Frontier lacks sufficient knowledge or information upon which to form a belief as to whether Plaintiff found the work interesting and therefore, denies the same. Frontier denies the remaining allegations set forth in paragraph 1 of the Complaint.

2.     Frontier lacks sufficient knowledge or information upon which to form a belief as to the allegations set forth in paragraph 2 of the Complaint and therefore, denies them.

3.     Frontier lacks sufficient knowledge or information upon which to form a belief as to the allegations set forth in paragraph 3 of the Complaint and therefore, denies them.

4.      Frontier admits that Plaintiff disclosed her alcoholism to Frontier. Frontier lacks sufficient knowledge or information upon which to form a belief as to the remaining allegations set forth in paragraph 4 of the Complaint and therefore, denies them.

5.      The allegations set forth in paragraph 5 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

6.      Frontier denies the allegations set forth in paragraph 6 of the Complaint.

7.      Frontier admits that it terminated Plaintiff's employment in or around mid-November of 2015. The remaining allegations set forth in paragraph 7 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

8.      Frontier lacks sufficient knowledge or information upon which to form a belief as to the allegations set forth in paragraph 8 of the Complaint and therefore, denies them.

9.      The allegations set forth in paragraph 9 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

**JURISDICTION, VENUE AND PARTIES**

10.     The allegations set forth in paragraph 10 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier admits that this Court has subject matter jurisdiction over this action, but denies that any unlawful employment practices were committed and denies any remaining allegations in paragraph 10 of the Complaint.

11.     The allegations set forth in paragraph 11 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier admits that it is subject to this Court's personal jurisdiction in this case, but denies that any unlawful employment

practices were committed and denies any remaining allegations in paragraph 11 of the Complaint.

12.     The allegations set forth in paragraph 12 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier admits that venue is proper in this District and that Frontier is subject to this Court's personal jurisdiction. Further answering, Frontier denies that any unlawful employment practices were committed and denies any remaining allegations in paragraph 12 of the Complaint.

13.     Frontier admits that Frontier employed Plaintiff, but lacks sufficient knowledge or information upon which to form a belief as to the remaining allegations set forth in paragraph 13 of the Complaint and therefore, denies them.

14.     Frontier admits the allegations set forth in paragraph 14 of the Complaint.

## MS. BRIGHAM'S CASE BEFORE THE UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

15.     Frontier admits the allegations set forth in paragraph 15 of the Complaint upon information and belief.

16.     Frontier admits that Plaintiff filed a Charge of Discrimination. Further answering, Frontier states that the Charge of Discrimination speaks for itself and denies the allegations in paragraph 16 of the Complaint to the extent they are inconsistent with that document. In addition, Frontier states that the allegations set forth in subpart d of paragraph 16 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

17.     Frontier states that the allegations set forth in paragraph 17 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

18.     Frontier states that the allegations set forth in paragraph 18 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

19.     Frontier states that the allegations set forth in paragraph 19 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

20.     Frontier lacks sufficient knowledge or information upon which to form a belief as to the allegations set forth in paragraph 20 of the Complaint and therefore, denies them.

21.     Frontier states that the allegations set forth in paragraph 21 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

**THE EEOC'S DETERMINATION**

22.      Frontier admits upon information and belief that the EEOC issued a Determination on or about June 4, 2019. Further answering, Frontier states that the Determination speaks for itself and denies the allegations set forth in paragraph 22 of the Complaint to the extent they are inconsistent with the document.

23.     Frontier admits upon information and belief that the EEOC issued a Determination, which speaks for itself, and denies the allegations set forth in paragraph 23 of the Complaint to the extent they are inconsistent with the document. Further answering, Frontier states that the remaining allegations set forth in paragraph 23 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

## COUNT I
### Failure to Accommodate in Violation of the ADA
### 42 U.S.C. § 1201, *et seq.*

24.    Frontier incorporates by reference its preceding responses as though fully restated here.

25.    Frontier states that the allegations set forth in paragraph 25 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

26.    Frontier admits that it employed Plaintiff between May of 2007 and November of 2015. Further answering, Frontier states that the remaining allegations set forth in paragraph 26 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

27.    Frontier states that the allegations set forth in paragraph 27 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

28.    Frontier states that the allegations set forth in paragraph 28 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

29.    Frontier states that the allegations set forth in paragraph 29 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

## COUNT II
### Failure to Engage in the Interactive Process in Violation of the ADA
### 42 U.S.C. § 1201, *et seq.*

30.     Frontier incorporates by reference its preceding responses as though fully restated here.

31.     Frontier states that the allegations set forth in paragraph 31 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

32.     Frontier admits that it employed Plaintiff between May of 2007 and November of 2015. Further answering, Frontier states that the remaining allegations set forth in paragraph 32 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

33.     Frontier states that the allegations set forth in paragraph 33 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

34.     Frontier states that the allegations set forth in paragraph 34 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

35.     Frontier states that the allegations set forth in paragraph 35 of the Complaint are legal conclusions to which no response is required. To the extent that a response is required, Frontier denies them.

<u>**COUNT III**</u>
**Retaliation in Violation of the ADA**
**42 U.S.C. § 1201,** *et seq.*

36.      Frontier incorporates by reference its preceding responses as though fully restated here.

37.      Frontier states that the allegations set forth in paragraph 37 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

38.      Frontier admits that it employed Plaintiff between May of 2007 and November of 2015. Further answering, Frontier states that the remaining allegations set forth in paragraph 38 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

39.      Frontier states that the allegations set forth in paragraph 39 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

40.      Frontier states that the allegations set forth in paragraph 40 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

41.      Frontier states that the allegations set forth in paragraph 41 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

<u>**COUNT IV**</u>
**Discrimination in Violation of the ADA**
**42 U.S.C. § 1201, *et seq.***

42.     Frontier incorporates by reference its preceding responses as though fully restated here.

43.     Frontier states that the allegations set forth in paragraph 43 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

44.     Frontier admits that it employed Plaintiff between May of 2007 and November of 2015. Further answering, Frontier states that the remaining allegations set forth in paragraph 44 of the Complaint are legal conclusions to which no response is required.   To the extent that a response is required, Frontier denies them.

45.     Frontier states that the allegations set forth in paragraph 45 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

46.     Frontier states that the allegations set forth in paragraph 46 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

47.     Frontier states that the allegations set forth in paragraph 47 of the Complaint are legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

### PRAYER FOR RELIEF

In response to the "WHEREFORE" clause contained in Plaintiff's Complaint, Frontier denies that Plaintiff is entitled to judgment in her favor, judgment against Frontier, and/or any of the relief that Plaintiff seeks.

### DEMAND FOR TRIAL BY JURY

Answering the JURY DEMAND paragraph following the WHEREFORE paragraph of the Complaint, Frontier states that the paragraph alleges legal conclusions to which no response is required.  To the extent that a response is required, Frontier denies them.

**Frontier denies all allegations not specifically admitted herein.**

### DEFENSES

Frontier reserves the right to rely upon the foregoing and following denials and defenses to the extent they are supported by evidence later developed or facts later learned, without now assuming the burden of proof on any such defense that would otherwise rest on Plaintiff and with the reservation of its right to amend or supplement its responses to the Complaint, as well as its defenses, as information is gathered through discovery.

1.      Plaintiff's allegations fail to state a claim for which relief can be granted.

2.      Plaintiff's claim is barred, in whole or in part, by the applicable statutes of limitations.

3.      Upon information and belief, Plaintiff has failed to mitigate her damages, if any.

4.      Plaintiff was an at-will employee, as that term is defined under Colorado common law, and therefore, could have been terminated at any time, for any reason (not specifically prohibited by state or federal law), and with or without cause.

5.      Plaintiff's claim is barred because no adverse employment action was taken because of any disability.

6.      The challenged actions about which Plaintiff complains would still have been taken irrespective of any alleged impermissible motivating factor.

7.      The challenged actions about which Plaintiff complains would still have been taken, notwithstanding any of Plaintiff's factual allegations, for legitimate reasons unrelated to any request for a reasonable accommodation under the Americans with Disabilities Act (ADA) or any activity protected by the ADA.

8.      The accommodations requested by Plaintiff were not reasonable and would have imposed an undue burden on Frontier.

9.      All actions taken by Frontier were taken in good faith, and were based on legitimate, non-discriminatory reasons.

10.     Plaintiff's claim is subject to statutory caps or other limitations on remedies, and any damages awarded must be reduced to the level of the caps or pursuant to other limitations.

11.     Plaintiff's damages must be reduced, in whole or in part, to the extent that Frontier has discovered and may continue to discover after-acquired evidence of wrongdoing by Plaintiff for which she would have been discharged.

12.     Plaintiff failed to engage in, and was responsible for the breakdown of the interactive process envisioned by the ADA.

13.     Plaintiff was unable to perform the essential functions of her position, with or without reasonable accommodation.

14.     Frontier effectively promulgated and maintained a policy prohibiting discrimination, and it makes good faith efforts to prevent discrimination in the workplace. Accordingly, Plaintiff is not entitled to recover liquidated or punitive damages.

15.     Plaintiff's claims are barred to the extent they are based on matters that were not included in an underlying charge of discrimination.

16.     No proximate cause or causal connection exists between any alleged protected activity and any adverse action.

17.     The claim for punitive damages must be dismissed because Frontier did not commit any intentional, malicious, and/or recklessly indifferent act toward Plaintiff.

WHEREFORE, Frontier respectfully requests that the Court: (1) dismiss Plaintiff's Complaint with prejudice; (2) deny Plaintiff's demands and prayer for relief; (3) award Frontier its costs and reasonable attorneys' fees incurred in defense of this action; and (4) grant Frontier such other and further relief as the Court deems just and proper.

Respectfully submitted this 3rd day of February, 2020.

*/s/ Danielle L. Kitson*
Danielle L. Kitson
Carolyn B. Theis
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email:  dkitson@littler.com
            catheis@littler.com

*Attorneys for Defendant Frontier Airlines, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 3rd day of February, 2020, I filed and served the foregoing

**DEFENDANT FRONTIER AIRLINES, INC.'S ANSWER AND DEFENSES TO**

**PLAINTIFF'S COMPLAINT** via CM/ECF to the following:

John R. Crone
The Law Office of John R. Crone, LLC
4550 E. Cherry Creek Drive South, #1003
Glendale, Colorado 80246
john@crone-law.com

*Attorney for Plaintiff*

*s /Joanna Fox*
Joanna Fox, Legal Secretary

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

      Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

      Defendant.

---

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff, by and through the undersigned, hereby submits *Plaintiff's Motion for Partial Summary Judgment*.  As there are no disputed issues of material fact between the Parties with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; or (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff respectfully requests the Court grant this Motion in its entirety.

### I.      INTRODUCTION

Prior to filing this Motion, Plaintiff carefully examined the factual record developed in discovery and endeavored to request summary judgment on a narrow set of issues where the material facts necessary for the Court to issue a ruling are genuinely undisputed. Plaintiff in this matter, Rebecca Brigham, was a Flight Attendant for Defendant Frontier Airlines, Inc. for just

over eight (8) years, starting in May 2007 and ending with her termination in November 2015. Ms. Brigham thoroughly enjoyed her position with Defendant, incorporated the position of Flight Attendant into her identity, and importantly, was able to support her family on the good and stable income the job provided. In the background, Ms. Brigham struggled with alcoholism from her teenage years into adulthood.

A couple of years into her tenure with Frontier, Ms. Brigham suffered a tragic situation: her daughter passed away just 45 minutes after birth. This event greatly exacerbated Ms. Brigham's alcoholism, and while she never let her drinking affect her job performance, her condition did take a toll on her family, marriage, and general health. As a result, and because she was on the verge of losing all that she cared for, Ms. Brigham checked herself into an in-patient rehab program to treat her alcoholism in late 2014. At the same time, Ms. Brigham self-disclosed her alcoholism to Frontier through its self-disclosure program. While Ms. Brigham's treatment has been a great success, she has not touched alcohol since completing her treatment program, Defendant Frontier never treated her the same again.

Defendant refused to grant Ms. Brigham any reasonable workplace accommodations as dictated by her alcohol treatment plant despite *simultaneously requiring* her compliance with the same treatment plan under threat of termination. Unable to complete her essential job functions without reasonable accommodation and stuck with the unreasonable choice between maintaining a job or foregoing alcohol treatment, Ms. Brigham chose to prioritize her health and well-being while attempting to maintain all scheduled shifts with Defendant. Unfortunately, and predictably given that Ms. Brigham's treatment plan required her to avoid overnight shifts, Ms. Brigham accrued enough absences under Frontier's "dependability program" to suffer termination.

0043

Frontier's failure to accommodate Ms. Brigham's repeated requests for accommodation, its retaliation against her for requesting accommodations, its failure to meaningfully engage in the interactive process, and its discriminatory treatment, were all in violation of the ADA; and therefore, the instant lawsuit was filed (after Ms. Brigham obtained a positive determination from EEOC).

In this Motion, Ms. Brigham seeks partial summary judgment with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation.

## II.    MOVANT'S STATEMENT OF MATERIAL FACTS

1.      Plaintiff Rebecca Brigham started working for Defendant as a flight attendant in May 2007. Dkt. 1, Complaint and Jury Demand, at 1, ¶ 1; Dkt. 12, Answer and Defenses, at 1, ¶ 1.

2.      Throughout her tenure Ms. Brigham was an excellent performer, and up until she disclosed her disability, she incurred no serious performance or disciplinary issues. **Exhibit 1**, Deposition of Gerardo Arellano, at 6:8-11 ("Q. . . . [C]an you state your current position at Frontier, generally what you do? A. So senior manager of talent acquisition, employee relations."); Ex. 1 at 8:21-24 ("And at that time [referring to 2008 through 2010], did you – were – were you ever aware of any performance issues with regard to Ms. Brigham? A. Not that I recall, no."); **Exhibit 2**,[1]

---

[1] Plaintiff notes that this Exhibit 2 contains names of certain Frontier employees with brief discussion of the nature of disabilities. While Defendant failed to mark any part of this deposition transcript as "Confidential" pursuant to the Protective Order [Dkt. 26] entered in this case, Plaintiff has, to the best of her ability, redacted names of certain Frontier employees for privacy. In so

Deposition of Frontier Airlines, Inc. [Gerardo Arellano designated as 30(b)(6) deponent] at 177:17-179:8 (wherein Mr. Arellano admits that managers "have the best information on [] employee's performance" when being questioned on Plaintiff's evaluation in which her manager stated: "Rebecca has two very nice kudos letters in her file and her IOE eval has raving [sic] review. The two missed trips in no way affect her performance or attitude. She obviously loves this job."); and **Exhibit 3**, Deposition of Plaintiff Rebecca Brigham at 40:23-41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick. You're getting a point. I should have never gotten that sick point. I should have not – it should not have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

3.      While Frontier issued written warnings to flight attendants for using sick time, including a few to Ms. Brigham over a period of approximately seven (7) years prior to disclosure of her disability, these warnings were not disciplinary in nature, **Exhibit 4**, Memorandum dated November 17, 2008 Regarding Four Sick Instances Reminder ("The purpose of this letter is for advisement only."), nor did flight attendants generally believe that Defendant's attendance policy was reasonable. Ex. 3 at 36:13-16 ("That's four times being sick in a year, when you're working with the public, who are sick. And I just – I will argue all day that Frontier's attendance policy was ridiculous. We even tried to strike over it.").

4.      Ms. Brigham's performance was measured by her ability to perform the essential functions of her position as a flight attendant, which were explicitly listed in the Flight Attendant

_____

doing, Plaintiff assumes no obligations or liability stemming from disclosure of private or confidential information that should have been protected by Frontier.

Position Description. **Exhibit 5**, Frontier Airlines Job Description for Flight Attendant (listing, among other duties: "Follows all Federal Aviation Regulations as required as well as all established Frontier Airlines Policies and procedures" and "Initializes and conducts emergency evacuation of cabin if necessary."); **Exhibit 6**, Deposition of Stefanie Coppedge [Plaintiff's direct supervisor during relevant time period], at 12:2-7 ("Any sort of performance or work issues that – you know, negative things that you can think of related to Ms. Brigham? A. We had to work through the dependability process [referring to absences accrued after Ms. Brigham disclosed her disability]. Q. Okay. Anything outside of the dependability process?  A. No, sir.").

5.      Unfortunately for Ms. Brigham, she has battled issues related to alcoholism for most of her adolescent and adult life. Ex. 3 at 62:24-63:10 ("I mean, that's hard. I have – since I was a teenager, I have always liked alcohol. It was my escape from reality. It was my best friend. And I've always – I was always sort of like a binge drinker, where if I had one, I had to have 20 more. And I was the life of the party. I was just a party girl, and it was all fine and dandy. And then there was a major shift in my drinking after my first daughter passed away. She – she passed away in 2009. And that's when my drinking switched from happy-go-lucky party to sort of drinking more out of sadness and to numb and – yeah.").

6.      The passing of Ms. Brigham's daughter in 2009 had a profound effect on her life and her alcoholism. Ex. 3 at 214:5-20 ("I was five and a half months pregnant, and I got an infection in the lining of my uterus, because I have an incompetent cervix, which we didn't know then. And I got an infection in the lining of my uterus, and my body went into labor to try and get rid of the infection. My daughter, Cindy Lee Brigham, was born, and lived for 45 minutes and died in my arms. Q. How does that still impact you today? A. It's hard. I would have a 12-year old. It's

really hard. I'm not going to lie . . . I did lots of therapy about it, so I'm way better than, of course, I was. Prior to going to treatment, I just hadn't even dealt with it emotionally. I ignored it. I drank it away.").

7.     Alcoholism negatively affected Ms. Brigham's ability to conduct her day-to-day life activities. Ex. 3 at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); **Exhibit 7**, Plaintiff's Responses to Defendant's First Set of Written Discovery Requests Directed to Plaintiff, at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); **Exhibit 15**, Comanche Crossing Counseling, LLC Diagnostic Intake Summary and Treatment Plan, at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her."); and Ex. 15 at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol

dependance.").

8.     Notwithstanding, Ms. Brigham did undertake great efforts to make sure she completed her job duties sober and in compliance with any and all rules surrounding the use of alcohol. Ex. 3 at 68:17-22 ("Q. Was there ever a time that you could not fly because you were drunk or because of the aftereffects of that? A. No, not while I was already on a trip at all. I mean, there were plenty of times that I flew pretty hung over, but never intoxicated."); Ex. 3 at 67:25-68:8 ("Q. Before that, did you ever have a drink while on the job at Frontier? A. No. Luckily, I have never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on duty. However, on overnights, after you're done, it's – it was just kind of a culture where you would take off all the flight attendant gear, put on normal clothes, and go meet at the bar. Nine times out of ten, that's what you did.").

9.     After disclosing her disability to Defendant, Ms. Brigham was capable of performing all essential functions of her job with reasonable accommodation. Ex. 3 at 224:14-22 ("Q. And when – when you – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

10.     Moreover, and with respect to the fundamental question of whether Ms. Brigham was disabled within the meaning of the ADA, Frontier has conceded the same. Ex. 2 at 98:14-99:14 ("Q. Does – does Frontier consider alcoholism to be a disability as defined under the ADA? . . . A. Yes . . . Q. Does Frontier treat a disabled person who has alcoholism any differently than they treat a person with any other disability? A. . . . . [T]he process is designed to see what

accommodation we can provide. But the outcome also depends if the individual is covered under the collective bargaining . . . Do we treat them differently? No, in that form . . . Q. So there's nothing different about the nature of alcoholism that would cause Frontier to approach the interactive process any differently than if, say, for example, somebody broke their leg? A. No.").

11.     After self-disclosing her disability, alcoholism, to Defendant, Ms. Brigham successfully completed an in-patient treatment program, was discharged with a treatment plan, and has not touched alcohol since. Ex. 3 at 65:10-66:8 ("Q. How long were you in rehab in that September 2014 era? A. 60 days . . . I came back, and I tried to return to work, and I had to meet certain criteria in order to come back. I had to meet with a DOT specialist, where – I don't even know why I had to do half the stuff."); Ex. 2 at 70:15-73:12 ("Q. Did – did Frontier have any sort of program related to substance abuse? A. Yes. It was our self-disclosure program . . . Anybody who felt they needed assistance due to some type of . . . dependency . . . had the ability to step forward then essentially say, I'm – I need assistance . . . If an employee did step forward, then that then starts what we call the checklist . . . We would partner with the EAP [employees assistance program] to then identify a substance abuse professional, or SAP. The SAP would then contact the individual . . . And so the SAP would then determine the severity of the situation; they would identify recommendations for the individual; and they would then communicate with our compliance individual."); **Exhibit 8**, Treatment Plan; Ex. 3 at 67:4-10 ("Q. When was the last time you had a drink? A. My sobriety date is September 5th of 2014. I got some treatment September 7th of 2014.").

12.     Ms. Brigham's treatment plan required, among other things, that she avoid "triggers" for drinking identified as "overnight trips or anything longer than a given work day in

her professional arena," with a review of treatment plan requirements to occur every 90 days. Ex.

8 at 2.

13.     Defendant required Ms. Brigham to comply with the terms of her treatment plan as

a condition of continued employment through Defendant's self-disclosure program. **Exhibit 9**,

Letter to Ms. Brigham Regarding Completion of Substance Abuse Program ("Congratulations on

completion of your Substance Abuse Program and beginning the process of returning to work . . .

As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or

support group services recommended by your SAP . . . non-compliance with any recommended

treatment, aftercare or testing may result in your removal from the performance of your job duties

and cause you to be subjected to disciplinary action, up to and including termination of

employment."); Ex. 2. at 76:25-77:1 (" . . . [W]e're not a second-chance company.").

14.     Unfortunately for Ms. Brigham, it was difficult for her to avoid overnight trips

altogether because she did not possess enough seniority to create a schedule that would never

include such trips. Ex. 3 at 211:19-212:6 ("Senior flight attendants, and at one point, I was not

considered a super senior, but I was senior enough to hold turns. Little turns. I couldn't hold the

big high-hour New York/LaGuardia turns, but I was able to hold the super early in the morning

Dallas turn that had me home by 11:00 in the afternoon. And then Frontier opened up – Frontier

opened the new base in Orlando, and everybody junior to me went over there to get a line. So,

therefore, because I obviously couldn't move to Orlando, I – my seniority went down, and that's

when we started having problems. And that's when I started asking for reasonable

accommodations so that this could work with my recovery.").

15.     Therefore, Ms. Brigham requested three primary accommodations from Defendant

so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the general office (commonly referred to as the "GO") to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior." Ex. 3 at 71:24-72:24; *see also* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time.").

16.    With respect to Ms. Brigham's request to temporarily transfer to the GO, Defendant denied the request because "she wasn't in the work comp program or on OJI [on the job injury], [] she was not eligible to be reassigned." Ex. 2 at 93:19-21; *see also* Ex. 2 at 95:17-23 ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program.").

17.    The collective bargaining agreement applicable to Ms. Brigham during the relevant time period contains no prohibition on temporarily reassigning Plaintiff, or any other individual requesting a reasonable accommodation, to the GO. **Exhibit 10**, Collective Bargaining Agreement, at 43 (internal page 22) ("Flight Attendants are eligible to bid [on a schedule] unless they have been granted Company approved leaves (LOA, MED, FMLA, OJI, etc.) or removed for Company

Business."); 108-09 (internal page 87-88) (outlining the process by which an employee suffering an occupational injury may file a claim, seek leave, and return to duty, but notably, this process contains on restrictions on who may be temporarily reassigned to the GO or for what reasons).

18.     In fact, in the Collective Bargaining Agreement, Defendant made sure to retain all the necessary management rights which allowed it to grant or deny Ms. Brigham's request to temporarily transfer to the GO: "Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate its business and work force . . . ." Ex. 10 at 141 (internal page 120). Moreover, the seniority provisions contained in the Collective Bargaining Agreement do not apply to "assignment to non-flying duty (e.g., light duty)," *i.e.*, the seniority provisions did not apply to Ms. Brigham's request to be transferred to the GO. Ex. 10 at 101 (internal page 80).

19.     In response to companywide requests for reasonable accommodation between 2012 and 2016, Defendant did in fact regularly grant requests to modify schedules and transfer to light duty positions. **Exhibit 11**, Tabs 2012-16[2] (noting various "X" marks under Reasonable Accommodation columns "Modify work schedule" or "Modified Work Schedule," "Explore other positions within Frontier," and other similar granted accommodations described under "Findings/Recommendations" columns for same years); Ex. 3 at 134:7-25 ("Q. Okay. And so this document [referring to Ex. 11 attached hereto] – is this – is this document something you created

---

[2] Plaintiff notes that this document was originally produced by Defendant in native form, Microsoft Excel; however, Plaintiff has converted that document to PDF for the purpose of filing the instant Motion. Should the Court desire to view this Exhibit in native form, Plaintiff will deliver via electronic mail or by whatever method is most convenient. Plaintiff further notes that with respect to this Exhibit, Plaintiff has concurrently filed Plaintiff's Unopposed Motion to File Restricted Exhibit.

in preparation for this deposition, or did this document already exist? A. It was already in existence
. . . Okay. And who maintains this document? Do you know? A. It depends on – ERMs, the
employee relations managers, predominantly are the ones navigating around this document, and
any interactive process will be documented on here."); Ex. 3 at 141:22-142:3 ("Q. Are these – are
these employees just in Denver, or are they employees based anywhere in the country? A. Back in
2012, it would have been – we only had our hub in Denver, so it would include – well, outside of
our customer service, so it would include everybody. It would be companywide."); Ex. 3 at 147:1-
9 ("So in this case [still referring to Ex. 11 attached hereto], we had her [referring to a flight
attendant that suffered an on-the-job injury] – see if she wanted the offer of the role of reservations
agent. So we extended her the offer, which would then require her to transfer to a role, which
means change of job title, not just job functions. She would transfer from the flight attendant role
into the department of reservations. So we extended her the offer for a reservations – reservations
agent, and she declined.").

20.     The only difference was that none of those accommodated, or offered to be
accommodated, employees suffered from the disability of alcoholism. Ex. 2 at 159:23-160:10 ("Q.
Okay. So is it – for the – for the – for the years that we looked at and that are relevant to this
deposition, so definitely the 2012, 2013, 2014, and 2015 tabs . . . you weren't able to identify any
– at least not based on the notes, you weren't able to identify any employees that suffered from the
disability of alcoholism . . . A. Just based on what was on that document, no."); Ex. 3 at 113:9-14
("Q. Are those the accommodations that we've been talking about? A. Except not the one where I
would go work at the general office. They had told me that that was impossible because that was
just for people that got back from OJI.").

21.     Because Ms. Brigham was not accommodated by Defendant but was nevertheless required to comply with her treatment plan, she began to accrue absences that Defendant considered to be violations of its attendance policy, culminating in Plaintiff's termination. Ex. 3 at 41:12-20 ("A. Correct, and I could not do overnights. And I could not do overnights. It's not that I didn't want to do these trips, Danielle. I could not do overnights in order to adhere to my program. Frontier knew this. We had multiple meetings about this. I asked multiple times for reasonable accommodations that they denied, denied, denied. And then give me sick points, and then ultimately fired me for said sick points. It was not fair, and I will argue that till the day I die."); Ex. 2 at 94:3-19 ("Q. Was – was Ms. Brigham ultimately terminated due to attendance issues? A. Yes . . . Q. Was she terminated for any other reason than attendance? A. No, sir.").

22.     Unfortunately, Ms. Brigham is not the only alcoholic at Frontier that suffered unlawful and discriminatory treatment. **Exhibit 12**, Declaration of David St. Hilaire at 1-4 ("On or about May 19, 2015, I entered treatment for alcohol addiction. I was fearful about disclosing my condition to Frontier because I was concerned that given Frontier's reputation for handling these types of issues, I would be retaliated against and treated unfairly . . . These management officials [including Jerry Arellano and Shelley Leyner] told me they knew that I suffered from alcoholism. A former coworker of mine showed these management officials a Facebook post that I had recently posted celebrating the fact that I had been sober for 90 days . . . I was suspended for over a month, without pay, following this meeting."). Notably, Mr. St. Hilaire was never engaged in the interactive process despite management's discovery of his disability; instead, Mr. St. Hilaire was harassed until he quit. Id.

23.     Ms. Brigham is likewise not the only individual at Frontier that has been unlawfully

denied reasonable accommodations. **Exhibit 13**, Affidavit of Christine Kernen in Support of

Charges of Jo Roby, Stacy Rewitzer, Renee Schwartzkopf, and Melissa Hodgkins Against Frontier

Airlines, at 1-6 ("I gave birth to two children while working for Frontier, the first on March 3,

2014 and the second on November 9, 2015 . . . As was true for the Charging Parties, Frontier did

not provide me with appropriate workplace accommodations for pregnancy or breastfeeding . . . I

became concerned about incurring additional dependability points if I continued to call in sick,

risking disciplinary action or termination, but I could not maintain a schedule which was

incompatible with my medical need to express breast milk frequently and regularly.").

24.     Prior to filing this lawsuit, the United States Equal Employment Opportunity

Commission issued a Determination in Ms. Brigham's favor. **Exhibit 14**, EEOC Determination,

at 2 ("Based upon a review of the evidence gathered from Respondent and Charging Party, I

conclude that the Respondent violated the ADA when the Charging Party was denied a reasonable

accommodation and discharged.").

### III.     LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." *Davis v. United States Dept. of Veterans

Affairs*, 2017 WL 3608192, at *2 (D. Colo. Aug. 22, 2017) (M.J. Shaffer) (quoting Fed. R. Civ. P.

56(a)).   "A material fact is one which could have an impact on the outcome of the lawsuit."  *Id.*

(quoting *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000) (internal

quotation omitted)). "A dispute over a material fact is genuine if a rational [trier of fact] could find

in favor of the nonmoving party on the evidence presented." *Id.* (quoting *E.E.O.C. v. Horizon/CMS

Healthcare Corp.*, 220 F.3d 1184, 1190 (10th. Cir. 2000) (internal quotation omitted)).  The burden

shifts to the party opposing summary judgment once the movant has made its initial showing.  *Id.*

The court must view the factual record and draw all reasonable inferences therefrom in the light most favorable to the party opposing the motion for summary judgment.  *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  However, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by the party contradict facts specifically averred by the movant, the motion must be denied." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). "Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial . . . it is not enough that the evidence be merely colorable or anything short of significantly probative." *Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

## IV.   ARGUMENT

Because there are no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff seeks summary judgment on the same.

### A.   Plaintiff is a qualified individual with a disability under the ADA.

"The ADA was created to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Mestas v. Town of Evansville*, Case No. 17-8092, at *5 (10th Cir. Sep. 6, 2019) (quoting 42 U.S.C. § 12101(b)(1)). Thus, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a). "The term 'discriminate against a qualified individual with on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). And the term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Under the ADA, a person with a disability is defined as an individual who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)). "Whether a person has a substantially limiting impairment, or that they established a record of such, should be 'construed broadly.'" *Id.* (quoting 29 C.F.R. 1630.2(j)(1)(i)). "And even a record of 'previous[]' impairments can still entitle a person to reasonable accommodations in the work place." *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(i) and 1630.2(k)(2). A person is "'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived mental impairment, *whether or not* the impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l)(1) (italics added).

*First*, the undisputed portions of the factual record demonstrate that Ms. Brigham was a "qualified individual" within the meaning of the ADA, *i.e.*, she was able to perform the essential functions of being a flight attendant with a reasonable accommodation. After disclosing her

disability to Defendant, Ms. Brigham was capable of performing all essential functions of her job with reasonable accommodation. Ex. 3 at 224:14-22 ("Q. And when – when you – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

Testimony from Ms. Brigham's direct supervisor, Stefanie Coppedge, during the relevant time period also confirms the same: "Q. Any sort of performance or work issues that – you know, negative things that you can think of related to Ms. Brigham? A. We had to work through the dependability process [referring to absences accrued after Ms. Brigham disclosed her disability]. Q. Okay. Anything outside of the dependability process? A. No, sir." Ex. 6 at 12:2-7; Ex. 6 at 11:3-9 ("Q. Okay. And I think I know that at one point you were her [referring to Ms. Brigham] in-flight supervisor; is that correct? A. Correct . . . That would be in -- I believe it to be August 2014 is when I became an in-flight supervisor, so sometime between August 2014 and, I believe, April or March of 2016.").

And testimony from Mr. Arellano, Frontier's Senior Manager of Employee Relations during most of the relevant time period also confirms that Ms. Brigham was a "qualified individual": "Q. And at that time [referring to 2008 through 2010], did you – were – were you ever aware of any performance issues with regard to Ms. Brigham? A. Not that I recall, no." Ex. 1 at 8:21-24; *see also* Ex. 2 at 177:17-179:8 (wherein Mr. Arellano admits that managers "have the best information on [] employee's performance" when being questioned on Plaintiff's evaluation in which her manager stated: "Rebecca has two very nice kudos letters in her file and her IOE eval

has raving [sic] review. The two missed trips in no way affect her performance or attitude. She obviously loves this job."). The undisputed factual record demonstrates that Ms. Brigham had no difficulty completing the essential functions of her job as a flight until she required a reasonable accommodation. Ex. 3 at 40:23-41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick. You're getting a point. I should have never gotten that sick point. I should have not – it should not have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

And of course, the accommodations requested by Ms. Brigham would have allowed her to comply with her treatment plan as well as the terms of Defendant's self-disclosure program, *i.e.*, Ms. Brigham's requested accommodations would have permitted her to perform the essential functions of her job. *Compare* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time.") *with* Ex. 8 at 2 (Ms. Brigham's treatment plan requiring, among other things, that she avoid "triggers" for drinking identified as "overnight trips or anything longer than a given work day in her professional arena.")

Thus, Ms. Brigham was a "qualified individual" within the meaning of the ADA, *i.e.*, she was able to perform the essential functions of being a flight attendant with a reasonable accommodation, and the Court should find the same.

***Second***, there can be no reasonable dispute that Ms. Brigham was "disabled" within the

meaning of the ADA. Under the ADA, a person with a disability is defined as an individual who:
(1) has a physical or mental impairment that substantially limits one or more major life activities;
(2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case
No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)).

Here, Defendant Frontier has conceded that Ms. Brigham was disabled within the meaning
of the ADA. Ex. 2 at 98:14-99:14 ("Q. Does – does Frontier consider alcoholism to be a disability
as defined under the ADA? . . . A. Yes . . . Q. Does Frontier treat a disabled person who has
alcoholism any differently than they treat a person with any other disability? A. . . . [T]he process
is designed to see what accommodation we can provide. But the outcome also depends if the
individual is covered under the collective bargaining . . . Do we treat them differently? No, in that
form . . . Q. So there's nothing different about the nature of alcoholism that would cause Frontier
to approach the interactive process any differently than if, say, for example, somebody broke their
leg? A. No."). Because there's no genuine dispute that Ms. Brigham was and remains an alcoholic
and given that Frontier considers alcoholism to be a disability as defined by the ADA, there is no
genuine dispute of material fact as to whether Ms. Brigham was disabled as defined by the ADA.

Even setting aside Defendant's concession, the underlying undisputed facts should lead the
Court to the same conclusion. Alcoholism **substantially limited** Ms. Brigham's ability to conduct
many major life activities. Ex. 3 at 225:1-226:1 ("Q. After you self-disclosed your disability of
alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall
being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that
honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is,
your ability to complete day-to-day life activity? Do you have any issues with that now? A. The

sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Ex. 7 at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); Ex. 15 at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her.") and Ex. 15 at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol dependance.").

Ms. Brigham was substantially limited in a variety of major life activities, and therefore, was disabled within the meaning of the ADA. "Whether a person has a substantially limiting impairment, or that they established a record of such, should be 'construed broadly.'" *Mestas*, Case No. 17-8092, at *5 (quoting 29 C.F.R. 1630.2(j)(1)(i)); 29 C.F.R. § 1630.2(j)(1)(i) ("'Substantially limits' is not meant to be a demanding standard."); Id. at § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.").

Ms. Brigham also had a **record of such impairment**. Apart from the requirement that the Court construe this potential element "broadly," "various requests for accommodations and

treatment" are sufficient to demonstrate a plaintiff had a "record of disability." *Mestas*, Case No. 17-8092, at *6; *see also* 29 C.F.R. § 1630.2(k)(2) ("Whether an individual has a record of impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis.").

Here, there can be reasonable dispute that Ms. Brigham made "various requests for accommodations and treatment." Ex. 3 at 65:10-66:8 ("Q. How long were you in rehab in that September 2014 era? A. 60 days . . . I came back, and I tried to return to work, and I had to meet certain criteria in order to come back. I had to meet with a DOT specialist, where – I don't even know why I had to do half the stuff."); Ex. 2 at 70:15-73:12 ("Q. Did – did Frontier have any sort of program related to substance abuse? A. Yes. It was our self-disclosure program . . . Anybody who felt they needed assistance due to some type of . . . dependency . . . had the ability to step forward then essentially say, I'm – I need assistance . . . If an employee did step forward, then that then starts what we call the checklist . . . We would partner with the EAP [employees assistance program] to then identify a substance abuse professional, or SAP. The SAP would then contact the individual . . . And so the SAP would then determine the severity of the situation; they would identify recommendations for the individual; and they would then communicate with our compliance individual."); Ex. 3 at 67:4-10 ("Q. When was the last time you had a drink? A. My sobriety date is September 5th of 2014. I got some treatment September 7th of 2014."); Ex. 9 ("Congratulations on completion of your Substance Abuse Program beginning the process of returning to work . . . As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or testing may result in your removal from the

performance of your job duties and cause you to be subjected to disciplinary action, up to and including termination of employment."); Ex. 3 at 71:24-72:24 (Ms. Brigham requested three primary accommodations from Defendant so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the general office (commonly referred to as the "GO") to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior."); and Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time."). Therefore, Ms. Brigham was also disabled by way of having a "record of such impairment."

Finally, Ms. Brigham was disabled within the meaning of the ADA because she was **regarded as having such an impairment**. "An individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l)(1). "Establishing that an individual is 'regarded as having such an impairment' does not, by itself, establish liability. Liability is established under Title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability . . . ." Id. at § 1630.2(l)(3). "For a plaintiff alleging disability discrimination to show that the employer regarded [her] as having an impairment, the

plaintiff must show that (1) she has an actual or perceived impairment, (2) that the impairment is

neither transitory nor minor, and (3) the employer was aware of and therefore perceived the

impairment at the time of the alleged discriminatory action." *McHenry v. Lincare Inc.*, Case No.

15-CIV-343-RAW, at *14 (E.D. Okla. Jul. 27, 2016) (citing *Adair v. City of Muskogee*, 2016 WL

3034084, at *6 (10th Cir. 2016)).

As described in detail above, Ms. Brigham has shown she suffers from an actual

impairment, Ex. 3 at 62:24-63:10 ("I mean, that's hard. I have – since I was a teenager, I have

always liked alcohol. It was my escape from reality. It was my best friend. And I've always – I

was always sort of like a binge drinker, where if I had one, I had to have 20 more. And I was the

life of the party. I was just a party girl, and it was all fine and dandy. And then there was a major

shift in my drinking after my first daughter passed away. She – she passed away in 2009. And

that's when my drinking switched from happy-go-lucky party to sort of drinking more out of

sadness and to numb and – yeah."). Ms. Brigham has further shown that this impairment was

neither transitory nor minor. Id..

And finally, Defendant was aware of and therefore perceived the impairment at the time of

the alleged discriminatory action. Ex. 9 ("Congratulations on completion of your Substance Abuse

Program and beginning the process of returning to work . . . As a reminder, Frontier Airlines

requires compliance with ALL additional treatment, after-care or support group services

recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or

testing may result in your removal from the performance of your job duties and cause you to be

subjected to disciplinary action, up to and including termination of employment."). Ms. Brigham

alleges her termination from Frontier was discriminatory in violation of the ADA. Ex. 3 at 40:23-

41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick. You're getting a point. I should have never gotten that sick point. I should have not – it should not have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

As such, Ms. Brigham is also disabled by way of being regarded as having such an impairment. All of the above analyses taken together, there can be no reasonable dispute that Ms. Brigham was a qualified individual with a disability within the meaning of the ADA, and the Court should find the same.

**B.      Defendant violated the law when it failed to reasonably accommodate Ms. Brigham's request for temporary reassignment.**

There are generally four elements a plaintiff must show to succeed on a failure-to-accommodate claim: (1) she was disabled; (2) she was otherwise qualified; (3) she requested a plausibly reasonable accommodation; and (4) the defendant refused to accommodate her disability. *Aubrey v. Koppes*, Case No. 19-1153, at *12 (10th Cir. Sep. 18, 2020). "Establishing a prima facie case is not onerous." *Id.* at *13 (citing *Osborne v. Baxter Healthcare Corp.*, 708 F.3d 1260, 1266 (10th Cir. 2015)). A plaintiff satisfies her burden, in a failure to accommodate claim, to show she was discriminated against because of her disability "*as soon as* the employer, with adequate notice of the disabled employee's request for some accommodation, fails to provide a reasonable accommodation." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, Case No. 16-1412, at *19 (10th Cir. Oct. 28, 2020) (italics in original). If plaintiff establishes a prima facie case, the burden shifts to defendant to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue burden or one of the other affirmative defenses available to the employer. *Id.* (citing *Lincoln v. BNSF Ry.*, 900 F.3d

1166, 1204 (10th Cir. 2018)).

As discussed above, there can be no reasonable dispute that Ms. Brigham was a qualified individual with a disability within the meaning of the ADA.[3] Therefore, she need only show she requested a plausibly reasonable accommodation and that Defendant Frontier refused to accommodate her disability. Here, Ms. Brigham requested at least three plausibly reasonable accommodations from Defendant so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the GO to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior." Ex. 3 at 71:24-72:24; *see also* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time."). For the purpose of this Motion, Ms. Brigham is only focused on the denial of her request to temporarily transfer to the GO.

A request for a plausibly reasonable accommodation "refers to those accommodations

---

[3] Plaintiff notes that while she is disabled under the "regarded as" prong under the ADA, being "regarded as" having a disability does not necessarily support her failure to accommodate claims even if it is sufficient to support her discrimination and retaliation claims. *See* 29 C.F.R. § 1630.2(o)(4) ("A covered entity is required, absent undue hardship, to provide reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the 'actual disability' prong . . . or 'record of' prong . . . but is not required to provide a reasonable accommodation to an individual who meets the definition solely under the 'regarded as' prong . . . ."). In any event, as Plaintiff is disabled under any of the prongs (actual, record of, or regarded as), she may prevail on her failure to accommodate claim described herein.

0066

which presently, or in the near future, enable the employee to perform the essential functions of [their] job." *Aubrey*, Case No. 19-1153, at *15. "The ADA provides that a 'reasonable accommodation' may include . . . reassignment to a vacant position." *Id.* "Reassignment, too, is a plausibly reasonable accommodation. The ADA expressly recognizes reassignment can be a reasonable accommodation." *Id.* at 27. Here, Ms. Brigham's request to transfer to the GO was a request for reassignment, and therefore, was plausibly reasonable. *See also* Ex. 11 (noting various "X" marks under Reasonable Accommodation columns "Modify work schedule" or "Modified Work Schedule," "Explore other positions within Frontier," and other similar granted accommodations described under "Findings/Recommendations" columns for same years).

Ms. Brigham's request for reassignment was denied. Ex. 2 at 93:19-21; *see also* Ex. 2 at 95:17-23 ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program.").

"[I]f the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Aubrey*, Case No. 19-1153, at *23. Here, Defendant has developed no factual record whatsoever demonstrating that reassigning Ms. Brigham would have constituted an "undue hardship." *See* 29 C.F.R. § 1630.2(p)(1) ("Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section."); *Id.* at §

1630.2(p)(2) (setting forth undue hardship factors such as "nature and net cost," "overall financial resources of the facility," and "[t]he impact of the accommodation upon the operation of the facility . . . .").

Here, Defendant cannot show undue hardship nor can Defendant show it otherwise accommodated Ms. Brigham. *See* 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means . . . modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."); *see also Exby-Stolley*, Case No. 16-1412, at *18 ("[T]he ADA imposes on the employer . . . an *affirmative obligation* to make a reasonable accommodation . . . and we have referred to this duty as an *unvarnished obligation*.") (italics in original, internal quotations and citations omitted). Therefore, Ms. Brigham respectfully requests the Court grant her Motion in this regard in its entirety finding that Defendant violated the ADA when it failed to grant Ms. Brigham's request for reassignment.

## V.    CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests the Court grant this Motion in its entirety thereby holding: (a) Plaintiff was a qualified individual with a disability under the ADA; and (b) Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation.

Respectfully submitted this 17th day of November, 2020.

THE LAW OFFICE OF JOHN R. CRONE, LLC

0068

/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2020, a true and correct copy of the foregoing *Plaintiff's Motion for Partial Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
        John R. Crone

**GERARDO ARELLANO - July 14, 2020**

---

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO

Civil Action No.:   19-cv-03417-WJM-STV
_____

REBECCA BRIGHAM,

Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

Defendant.
_____

        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                   GERARDO ARELLANO
                     July 14, 2020
_____

        PURSUANT TO NOTICE and the Federal Rules
of Civil Procedure, the videotaped videoconference
deposition of GERARDO ARELLANO, whose identity has
been verified by the court reporter, was taken on
behalf of the Plaintiff on July 14, 2020, commencing
at 8:58 a.m., before Jill S. Nielsen, Registered
Professional Reporter and Notary Public within the
state of Colorado.


(The reporter, Jill S. Nielsen, appearing remotely
via videoconference.)
```

---

**Page 2**

```
                      APPEARANCES
FOR THE PLAINTIFF:
    JOHN R. CRONE, ESQ.
    EVAN S. GRIMES, ESQ.
    The Law Office of John R. Crone, LLC
    4550 East Cherry Creek Drive South, Suite 1003
    Glendale, Colorado 80246
    303.598.3526
    john@crone-law.com
    (Appearing via videoconference)

FOR THE DEFENDANT:
    DANIELLE L. KITSON, ESQ.
    CAROLYN THEIS, ESQ.
    Littler Mendelson, P.C.
    1900 Sixteenth Street, Suite 800
    Denver, Colorado 80202
    303.629.6200
    dkitson@littler.com
    catheis@littler.com
    (Appearing via videoconference)


ALSO PRESENT:

    JACALYN PETER, In-House Counsel, VP of Labor
    Relations (Appearing via videoconference)
    WALT MATHERN, Videographer
    (Appearing via videoconference)
```

---

**Page 3**

```
                        INDEX
EXAMINATION OF GERARDO ARELLANO:              PAGE
By Mr. Crone                                    5
                       EXHIBITS
                                             INITIAL
NUMBER                                       REFERENCE
Exhibit 1    Inflight Performance               52
             Counseling Record

Exhibit 2    1/29/10 Memo to Kruger from        55
             Arellano re Sick Instances
Exhibit 3    Untitled document requesting       57
             reasonable accomodation

Exhibit 4    10/4/12 Letter To Whom It May      57
             Concern from Dr. Volin;
             5/30/13 Letter To Whom It May
             Concern from Dr. McCrann;
             12/22/13 Note from
             Presbyterian/St. Luke's

(Exhibits provided electronically to the court
reporter.)
```

---

**Page 4**

```
                    P R O C E E D I N G S

        THE VIDEOGRAPHER:  Good morning.  We are on
the record.  The time now is 8:58 a.m. on July 14,
2020.

        We are conducting the virtual deposition of
Gerardo Arellano in the matter of Rebecca Brigham v.
Frontier Airlines in the United States District Court
for the District of Colorado, Case Number 19cv03417.

        The video technician is Walt Mathern.  The
court reporter is Jill Nielsen.

        Will the parties and their counsel please
indicate your agreement that this is a virtual
deposition and state your name and whom you
represent.

        MR. CRONE:  Plaintiff agrees this is a
virtual deposition.  My name is John Crone, and I
represent the plaintiff.

        MR. GRIMES:  My name is Evan Grimes,
attorney for Plaintiff.

        THE WITNESS:  Rebecca Brigham, Plaintiff.

        MS. KITSON:  Good morning.  Danielle Kitson
with Littler Mendelson.  We agree that this is a
virtual deposition, and with me today is my colleague
Carolyn Theis from Littler, and also Jacalyn Peter,
in-house counsel for Frontier.
```

**GERARDO ARELLANO - July 14, 2020**

---

**5**

1  GERARDO ARELLANO,
2 having been first duly sworn to tell the truth,
3 testified as follows:
4  EXAMINATION
5 BY MR. CRONE:
6  Q.  Good morning, Mr. Arellano.  How are you?
7  **A.  I'm doing good.  Good morning.**
8  Q.  Very good.  Well, thanks for coming back
9 and showing up for Part 2.  I want to give you a
10 sense of where we're going today as well.  I think we
11 have two hours, maximum, of your time that we'll
12 need.
13  **A.  Okay.**
14  Q.  Hopefully less.
15  **A.  Okay.**
16  Q.  So we'll start.  So -- so some of the
17 questions will be a little bit repetitive to start.
18  **A.  Okay.**
19  Q.  We covered a lot of ground yesterday, so
20 we'll try to -- I'll -- I'll try to be as efficient
21 as I can.
22  And so the first -- first question for you,
23 we -- we talked a lot about your background
24 yesterday, that is, the positions you've held at
25 Frontier, your educational background and such.  Do

**6**

1 you remember those questions?
2  **A.  I do.**
3  Q.  Is it fair to incorporate all of that
4 information here today rather than going back over
5 it?
6  **A.  Yes.**
7  Q.  Okay.  However, just for the sake of
8 clarity and -- and the record, can you state your
9 current position at Frontier, generally what you do?
10  **A.  So senior manager of talent acquisition,**
11 **employee relations.  I oversee the talent acquisition**
12 **team, and in this case, it's made up of three teams.**
13 **You've got the corporate recruitment team, the**
14 **inflight recruitment team.  You've got the pilot**
15 **recruitment team, and then I also support the**
16 **employer relation side of the house for the pilot**
17 **group.**
18  Q.  Thank you.  And then a couple of questions
19 related to the mechanics of today's deposition.
20  Do you recall receiving a notice of today's
21 deposition that originally asked for the deposition
22 to be in person?
23  **A.  Yes.**
24  Q.  And then do you recall, after that,
25 subsequent to that deposition notice, Plaintiff

**7**

1 amended it so that we -- that way we could do the
2 deposition virtually?
3  **A.  Yes.**
4  Q.  Okay.  And I -- I notice today that
5 you're -- you're sitting in a room with a few other
6 people.  How -- how many other people are in the
7 room?
8  **A.  There's three others.**
9  Q.  Okay.  Do you feel safe being in a room
10 with three other people?
11  **A.  I do.**
12  Q.  Okay.  If you have any concern about your
13 safety, just like yesterday, please let me know and
14 we'll -- and we'll -- we'll -- we'll end this thing
15 and get you out of there, okay?
16  **A.  Will do.  Thank you.**
17  Q.  Thank you.
18  Q.  Okay.  So, Mr. Arellano, when -- when can
19 you first recall meeting Plaintiff?
20  **A.  It would have been back early when I was**
21 **working in group flight, which is by -- I think**
22 **that's where I initially remember her from, and I was**
23 **one of the inflight managers.**
24  Q.  And what was your -- what was your position
25 in relation to hers?  Did you supervise her, or were

**8**

1 you doing something else?
2  **A.  I didn't -- no, I didn't supervise her.  I**
3 **was manager of inflight services.  I had supervised**
4 **the administrative pieces of the office.**
5  Q.  Okay.  And that was, if I remember
6 correctly yesterday -- and please correct me if I'm
7 wrong -- that would have been in the late 2000s, up
8 to 2010 or something?
9  **A.  Yeah, because I think we ended up --**
10 **during the Republic transition -- it would have**
11 **been in 2006, so 2006 and -- 2004, '5, '6 -- '10.**
12 **Two thousand, like, eighth.  Yeah, so late 2 --**
13 **2008, 2009, and 2010.**
14  Q.  Okay.  That -- that makes sense.  Thank
15 you.
16  And -- and so -- so when you first met her,
17 she was a flight attendant and you were an inflight
18 manager.  Is -- is that what you stated?
19  **A.  No, manager of inflight services.**
20  Q.  Got it.  Yeah.  That's right.
21  And at that time, did you -- were -- were
22 you ever aware of any performance issues with regard
23 to Ms. Brigham?
24  **A.  Not that I recall, no.**
25  Q.  And -- and did your -- did your working

---

**ROCKY MOUNTAIN REPORTING**
**(720) 877-1910**

9

1 relationship, that is, the structure of where you
2 were in the company, manager of inflight services and
3 then Ms. Brigham was a flight attendant, did that
4 change over time?
5     A.   In what form?
6     Q.   Did you ever -- did you ever come to
7 directly supervise her at any point?
8     A.   No.
9     Q.   Okay.  And so -- so -- so during 2008, '9,
10 '10 through the end of 2015, with relation to
11 Ms. Brigham, you were always dealing with
12 administrative tasks?
13     A.   No.  During that time as well, there was a
14 dependability piece, so I tracked attendance,
15 essentially.
16     Q.   Okay.  Got it.  And -- and that's the
17 dependability policy we -- we spoke about briefly
18 yesterday, right?  Is -- is that what you're
19 referring to?
20     A.   No.  The policy then was different.
21     Q.   Got it.
22     A.   It was -- ultimately, it was designed to
23 just track attendance for the flight attendant group,
24 but not one specific group per se.  And also an
25 extension of that was the leave-of-absence tracking.

10

1 It was more of the data-tracking pieces of -- of the
2 dependability aspects of the flight attendant group.
3     Q.   Okay.  So how long -- so -- so when
4 you're -- when you're describing this for me now, are
5 you talking about from 2008 or so until some date
6 when the dependability program was more formalized?
7     A.   Say that again.
8     Q.   So -- so what you had just described for
9 me, that you are tracking attendance for the flight
10 attendant group, by extension, the leave-of-absence
11 tracking occurred as well, was that prior to the
12 impletation [sic] of -- implementation of the formal
13 dependability policy?
14     A.   As it exists today?
15     Q.   Yes.
16     A.   Yeah.  So it was way before that.
17     Q.   Okay.  Yeah.  And so what -- what dates are
18 you describing here?
19     A.   That would have been prior to 2010.
20     Q.   Got it.  Okay.
21     A.   Yeah.
22     Q.   So -- so prior to 2010, you would track
23 attendance for the flight attendants group and do
24 some leave-of-absence tracking.
25         Was there anything else you were doing as

11

1 part of this dependability?
2     A.   No, just administrating.  We had a team of
3 admins there.  One admin would do the day-to-day,
4 funnel questions, direct traffic for the admin
5 office.  And then I tracked just the -- again, the
6 administrative pieces: resources, files that were --
7 what they call the V files that existed in the crew
8 room.  But, yeah, primarily administrative.
9     Q.   Okay.  If -- if a flight attendant was
10 having an issue with attendance, say too many
11 absences --
12     A.   Uh-huh.
13     Q.   -- would you get involved in any way?  This
14 is prior to 2010.
15     A.   I'm trying to recall.  I was involved in
16 the form of accounting for what they showed based off
17 of their schedule.
18     Q.   But would you ever -- would you ever
19 verbally counsel a flight attendant or issue a
20 letter?
21     A.   I believe I did, yes.
22     Q.   Okay.  And -- and that was prior to 2010?
23     A.   That was 2010 and prior.
24     Q.   Okay.
25     A.   Before -- yeah, when I was involved in that

12

1 role.
2         THE REPORTER:  I'm sorry?
3         THE WITNESS:  When I was in that role.
4     Q.   (BY MR. CRONE)  Do you recall Ms. Brigham
5 having any attendance issues prior to 2010?
6     A.   Not offhand, no.
7     Q.   Okay.  Now, after 2010, is that when the
8 dependability policy was written down and made
9 formal?
10     A.   After 2010?
11     Q.   Yes.
12     A.   I believe so.  I don't know about written
13 down and made formal.  I know it changed, so . . .
14     Q.   Okay.  Well, that's -- that's fair.  So
15 how -- how did it change in 2010?
16     A.   I would have to go and look at the
17 dependability policy then.  I can't recall.
18     Q.   And I've seen a -- I've seen a written --
19 I've seen a written policy.  Did -- can you recall
20 what date it was actually written down?
21     A.   That, I don't.
22     Q.   Okay.
23     A.   I don't know.
24     Q.   And I know you just stated you can't recall
25 how the policy changed after 2010 --

**GERARDO ARELLANO - July 14, 2020**

13

1    A.    Uh-huh.
2    Q.    -- but can you recall any of the
3 differences?  Were there different consequences for
4 the flight attendants if they were absent or anything
5 like that?
6    A.    From what time period?
7    Q.    After 2010.
8    A.    Through . . .
9    Q.    Through the end of -- through the end of
10 2015.  I'm sorry.
11    A.    At that time, I believe it was just based
12 on occurrence.  So an occurrence -- they called it --
13 at that time, I think they said an occurrence is an
14 occurrence, but I can't remember the specifics in
15 terms of the -- the meat within those policies.
16    Q.    Okay.  And then between 2010, whenever it
17 is in 2010 -- after 2010 when the policy changed and
18 then through the end of 2015, can you recall
19 Ms. Brigham having any attendance issues?
20    A.    Between 2010 and 2015?
21    Q.    Yeah.
22    A.    In 2010, I believe that's when I left the
23 organization.  I came back in 2012, so in that time
24 period I can't speak to.
25    Q.    All right.

14

1    A.    In 2012, I was the employee relations
2 manager, so possibly between 2012 and 2015, yes.
3    Q.    Okay.  And can you -- can you -- is there a
4 way for you to describe for me what those attendance
5 issues were, the nature of those attendance
6 issues between 2012 and the end of 2015?
7    A.    In general or regarding Rebecca?
8    Q.    Regarding Rebecca.
9    A.    I would have to refer to the documents.
10 Yeah, I -- I can't specifically off recollection.
11    Q.    So -- so you can't, sitting here today,
12 remember the nature of any one of those attendance
13 issues?
14    A.    I would have to refer to the documents.
15 Yeah.
16    Q.    And what about after the end of 2015?  Did
17 the dependability policy change at all between the
18 end of 2015 and -- and now?
19    A.    Yes.
20    Q.    And how so?
21    A.    Between that time period through present,
22 it went from an occurrence over to a point system.
23    Q.    And -- and what does -- what does that
24 mean?  How -- how does the point system work?
25    A.    The point system is designed to then break

15

1 down how the occurrence took place.  For example,
2 a sick call could be worth one point.  If the
3 individual called in late sick, is what they call it,
4 that was an additional half point.
5         So half points were introduced into the
6 dependability, but the total number of occurrences
7 one was allowed did not change.  It was everything in
8 between first occurrence through the end.
9    Q.    Okay.
10    A.    Not end, but the point system changed.
11    Q.    So the occurrences were scored differently;
12 is that -- is that fair?
13    A.    Not that the occurrences were scored
14 differently; they just introduced a different
15 component to it.
16    Q.    Okay.  And -- and -- and maybe that's the
17 point system generally.  Or am I not --
18    A.    That's the -- yeah.
19    Q.    Okay.
20    A.    Yeah.
21    Q.    So going back to the time period between
22 2012 when you came back to Frontier --
23    A.    Uh-huh.
24    Q.    -- and the end of 2015, if a flight
25 attendant took a sick day, for example, how was

16

1 that -- was the flight attendant given some sort
2 of -- I don't want to say point, because you just
3 said the point system is new, but was there some sort
4 of scoring or something because the flight attendant
5 took that day off?
6    A.    If they called in sick and it was qualified
7 and classified or coded as sick, yes, it would be
8 one -- it would be one occurrence.
9    Q.    Okay.  Even if they had -- did flight
10 attendants accrue sick time?
11    A.    Through -- yes.  Through the automated
12 accrual system, yes.
13    Q.    Okay.  So if they had sick time accrued and
14 available to use, would they still be -- be given
15 this occurrence point?
16    A.    Repeat that again.
17    Q.    Yeah.  Sorry.  It was a little -- a little
18 confusing.
19         So -- so you had said that flight
20 attendants accrued sick time, and if they had enough
21 sick time accrued and then used a sick day, would
22 they still be scored this occurrence?
23    A.    Yes.
24    Q.    Okay.  What if they -- did the flight
25 attendants accrue vacation time?

**GERARDO ARELLANO - July 14, 2020**

---

17

1    A.   Yes.
2    Q.   And if they used vacation time, would they
3 also be scored this occurrence?
4    A.   I guess repeat that again.
5    Q.   Yeah.  And just to be clear, I'm talking
6 about the time period 2012, the -- the end of 2013
7 before the policy changed again.
8         And -- and I was asking, if -- if a flight
9 attendant used their vacation time, would they also
10 be scored some type of occurrence under this policy?
11    A.   I guess that's a -- I'm still not
12 understanding.  Just to clarify, are you asking if a
13 flight attendant -- if a flight attendant took a
14 vacation time, would they accrue an occurrence of
15 attendance, or . . .
16    Q.   Correct.  Yeah, yeah, correct.
17    A.   I don't believe so.  So just -- if they --
18 they took a vacation day, let's say, today, would
19 that count against their dependability?  Is that what
20 you're asking?
21    Q.   That's exactly what I'm asking.
22    A.   No, not to my knowledge.
23    Q.   Okay.  But if they took the sick time, it
24 would?
25    A.   Towards their dependability, yes.

---

18

1    Q.   Okay.  Okay.  What about --
2    A.   To clarify --
3    Q.   I'm sorry.  Go ahead.
4    A.   To clarify, sick can be a little bit
5 different.  If it's coded under LOA and they're using
6 their sick time, then that's not counted against
7 dependability.
8         If it's only a sick day for what they're
9 calling in -- for example, if an individual had IFM,
10 intermittent FMLA, and they used sick time to get
11 paid for that time, it didn't count against their
12 dependability.
13         So if they call -- called in sick and it
14 is re -- it's not recoded, then in that moment, yes,
15 it would count against their dependability.
16    Q.   Okay.  So in order for it to count, they
17 would have to -- they would have to call in sick, and
18 they could be using their sick time, and -- and then
19 it would count.  But if it -- is that correct?
20    A.   So -- because they could be -- if they
21 called in sick, which essentially -- if they called
22 in intermittent FMLA, the trip is covered under
23 intermittent FMLA, but they're using their sick time.
24 So in that moment, it does not count towards their
25 dependability.  They're not receiving an infraction,

---

19

1 if you will.
2    Q.   Got it.
3    A.   But if they called -- go ahead.
4    Q.   I'm sorry.  Say that -- go ahead, go ahead.
5    A.   If they call in sick and that occurrence is
6 not recoded to anything else and the sick occurrence
7 stands, then, yes, that counts towards the
8 dependability.
9    Q.   Yeah.  And -- and -- and that makes sense
10 to me.
11         So the -- so if -- if the flight attendant
12 had the IFM already approved and was using one of
13 those days --
14    A.   Uh-huh.
15    Q.   -- whether or not the flight attendant has
16 sick time to be paid for the day, it won't count as
17 an infraction?
18    A.   It won't count as an infraction, correct.
19    Q.   But if they use the sick time to -- to --
20 to make sure they're paid for the day they're out, it
21 still won't count as infraction because they had the
22 IFM accrued?
23    A.   Okay.  Say that again.
24    Q.   If they used the sick time to make sure
25 they're paid for that IFM day that they're out --

---

20

1    A.   Uh-huh.
2    Q.   -- it wouldn't count as an infraction -- an
3 infraction because the IFM was already approved; is
4 that correct?
5    A.   Yeah, if they requested IFM for that day.
6    Q.   Okay.
7    A.   So it's also -- it's a two-part system.
8 The flight attendant would need to have requested
9 intermittent FMLA on that day, and then that gets
10 recoded.  So if the trip is recoded to IFM, then yes
11 to your question.
12    Q.   So it -- so it can be -- it can be -- the
13 trip could be retroactively recoded?  So in other
14 words, a flight attendant could call out sick.
15 Initially that would be an infraction, but -- but
16 perhaps it could be retroactively recoded as IFM, and
17 then it wouldn't count as an infraction?
18    A.   If the request for intermittent FMLA was
19 done within 24 hours.
20    Q.   Okay.
21    A.   So there's a time period to request the
22 recode, if you will.
23    Q.   Okay.  Okay.
24    A.   And in that example, yes.
25    Q.   Okay.  Okay.  Good.

---

**GERARDO ARELLANO - July 14, 2020**

21

```
 1         And what about after the end of 2015 when
 2 you said the policies changed?  Has it changed at all
 3 in regard to how an infraction might -- might be
 4 given or not given when somebody calls in sick?
 5    A.   In what -- what form, I guess?  Did what
 6 change?  I'm not following you.
 7    Q.   Has it -- has it -- has it changed in any
 8 way?  So since the end of 2015, the dependability
 9 policy --
10    A.   Uh-huh.
11    Q.   -- has it changed in any way with regard to
12 how people are given infractions?
13    A.   When you say "given" -- I guess I'm getting
14 lost in how they're given.  You mean when they accrue
15 an infraction, or . . .
16    Q.   Yeah.  So we had just -- you had just
17 described for me a scenario where a flight attendant
18 might call in sick --
19    A.   Yes.
20    Q.   -- and then they're -- and then that's an
21 infraction.
22    A.   Uh-huh.
23    Q.   So just -- just sticking with that sort of
24 basic scenario, no IFM included or anything --
25    A.   Okay.
```

22

```
 1    Q.   -- since 2015, does it still operate that
 2 way?  If a flight attendant just calls in sick, will
 3 he or she be given an infraction?
 4    A.   Yeah.  Towards the dependability policy,
 5 yes.
 6    Q.   Okay.  What about if it was -- if they were
 7 using IFM time?
 8    A.   No.
 9    Q.   Okay.  And what about if they were using
10 vacation time?
11    A.   And, again, that's where I'm getting lost.
12 Are -- are you asking vacation with intermittent FMLA
13 or just a strict vacation?
14    Q.   Just -- just I have vacation time accrued;
15 I'm going to the beach.
16    A.   For a flight -- and I guess this is why it
17 gets confusing.  A flight attendant has to bid for
18 their vacation one year in advance.  So if the
19 vacation is scheduled, that does not count against
20 their dependability.
21    Q.   Okay.  Okay.
22    A.   So --
23    Q.   Yeah, yeah.
24    A.   So a flight attendant can't simply say,
25 Hey, I'm going to take tomorrow as a vacation,
```

23

```
 1 because they had not initially bid for it one year in
 2 advance.  They have the opportunity to slide it back
 3 or forth, but yet that's through a different process.
 4 But, yeah, the scheduled vacations don't count
 5 against them.
 6    Q.   Okay.  So -- and -- and I -- and I think --
 7 and I appreciate that clarification.  I think
 8 you're -- you're getting at something else, so --
 9 so -- and I want to make sure I understand that.
10         When a -- when a flight attendant wants to
11 use vacation time, they have to plan that pretty far
12 in advance?
13    A.   For time off, vacation, yes.
14    Q.   Yeah.  Okay.  And -- and -- and, therefore,
15 it doesn't count against them under the dependability
16 policy?
17    A.   When it's scheduled vacation, correct.
18    Q.   Correct.  Okay.  And -- and that's the same
19 since 2015 and before 2015, right?
20    A.   Correct.  Yes.
21    Q.   Okay.
22    A.   They have to bid for their schedule, yeah.
23 So for December, start bidding their schedule for
24 next year.
25    Q.   Okay.  Are there -- are there any other
```

24

```
 1 types of time off a flight attendant can -- can
 2 accrue?  I mean, I -- so I've asked you about sick
 3 time and vacation time just because I assume Frontier
 4 offers that, but -- but is there any other time of --
 5 of accrued -- or any other type of accrued time off?
 6    A.   During what time period?  '11 through '15?
 7    Q.   Yeah, let's start '11 through '15.
 8    A.   There was a provision in the contract that
 9 allowed them to accrue one day if they had perfect
10 attendance.
11    Q.   For a calendar year or for six months or --
12 or do you know?
13    A.   Six months.  I believe it was six months.
14 But outside of that, they -- there was no other
15 option to approve time, that I can recall, at this
16 point.
17    Q.   Okay.  What about from '15 onward to the
18 present?
19    A.   Nothing outside of that perfect attendance,
20 that I can think of.
21    Q.   Okay.
22    A.   There may be, but I just -- it's not coming
23 to my memory.
24    Q.   Okay.  A quick follow-up on the -- the --
25 you -- you told me that if somebody called in sick,
```

**GERARDO ARELLANO - July 14, 2020**

25

1 within 24 hours they can make a request to -- to
2 retroactively code that as IFM?
3     A.   Correct.
4     Q.   Is there any reason why the policy is 24
5 hours?  Do -- do you know?
6     A.   Not specifically.
7     Q.   Okay.
8     A.   I -- I don't know the background to that.
9     Q.   Okay.  Is it different -- if somebody -- if
10 somebody requests to have the trip recoded to IFM
11 within the 24-hour period, does it matter -- and I'm
12 asking just about applying the 24-hour period -- does
13 it matter whether that person has made a request for
14 a reasonable accommodation?
15     A.   You lost me again.
16     Q.   Yeah.  So -- so after -- so a person calls
17 in sick.  They want to re -- they -- they want to
18 recode the sick day as an IFM day, and they've got 24
19 hours to do it.
20     A.   Okay.
21     Q.   Does -- does Frontier -- does it matter at
22 all whether or not the person has made a request for
23 a reasonable accommodation?
24         So what I'm asking is could they have 36
25 hours in that instance, or is it just 24 hours no

26

1 matter what?
2     A.   In certain cases, we kind of assess the
3 situation to determine what -- the nature of the
4 request or is there a condition, was there something
5 that prohibited them from making that 24-hour
6 notification.  We would take that into consideration.
7     Q.   Okay.  So -- so there's flexibility in the
8 policy?
9     A.   No.  You had to call within that 24-hour
10 time period, but if there's something precluding that
11 individual in that moment -- I mean, there's many
12 medical conditions that potentially could be.  We
13 would have to assess it in that minute.
14     Q.   Got it.  So --
15     A.   But -- but we -- everybody had to call
16 within 24 hours of that.
17     Q.   Yeah.  But I guess what I'm asking is so
18 it's not an absolutely rigid policy because you might
19 make an exception if somebody had some condition that
20 prevented them from complying with the 24 hours?
21     A.   Sure.  Yeah.
22     Q.   Okay.  All right.  So I want to -- I want
23 to ask you, hopefully in -- in a -- in a -- in an
24 efficient way, about the job duties of flight
25 attendants.

27

1     Q.   So -- so do you recall yesterday we
2 spoke -- we spoke at some length about what it is a
3 flight attendant does day to day?
4     A.   Yeah.
5     Q.   Okay.  Have those duties changed at all
6 from 2015 onward to the present?
7     A.   From when again?  The time period?
8     Q.   From the time period 2011 -- so yesterday
9 we talked about what flight attendants do from the
10 end of 2011 to the end of 2015.
11     A.   Uh-huh.
12     Q.   And I'm curious if there's anything --
13 and -- and it doesn't have to be small, minute
14 details, but any -- any -- if there's anything that
15 sticks out in your mind as having changed in what a
16 flight attendant does day to day from the end of 2015
17 to the present.
18     A.   Yes.  A lot of it is -- now they do sales
19 onboard.  A lot of that.  So that's changed since
20 then.
21     Q.   Okay.
22     A.   Trying to think.  Yeah, other things within
23 the day-to-day has possibly changed, but I can't
24 account for them all.  But one that comes to mind is
25 the sales.  We do more sales onboard.

28

1     Q.   And what are they selling?
2     A.   They sell from -- it -- again, from that
3 time period, a change -- at one point we were doing
4 boxes.  They were doing some form of meals, and then
5 it changed to dry snacks.  And then the dry snacks
6 then changed to certain potato chips.
7         Drinks, obviously.  We served wine at one
8 point, different types of wine, and then we also
9 do -- the credit card promotion was also included as
10 part of that.  And the devices also changed, so . . .
11     Q.   Okay.  Do you recall yesterday we talked
12 generally about what benefits are afforded to flight
13 attendants, so medical insurance?
14     A.   Yes.
15     Q.   Okay.
16     A.   Yes.
17     Q.   Has anything changed from the end of 2015
18 to the present in terms of what benefits are offered
19 to flight attendants?
20     A.   Are you -- has -- different benefits, are
21 you asking?  Or changes within the benefits or types
22 of benefits?
23     Q.   So -- so not changes within the plan --
24     A.   Yeah.
25     Q.   -- within the insurance plan, but -- but --

### GERARDO ARELLANO - July 14, 2020

29

1 but types of benefits.

2    A.    We do -- I think we offer company-paid LTD,
3 long-term disability.  So at one point, the employee
4 paid for it.  Now we -- the company pays for
5 long-term disability.

6    Q.    Okay.

7    A.    And the company also pays for vision as
8 well, and I believe dental.  But yeah.  But primarily
9 the long-term disability was the biggest change.

10   Q.    And so when you say pay for long-term
11 disability, vision, and dental, you mean the company
12 pays the entirety of the premium?

13   A.    Correct.

14   Q.    Okay.  And then medical is still split in
15 some way?

16   A.    Yes.  The employee pays a portion.

17   Q.    Yesterday, we also talked a fair amount
18 about the Frontier self-disclosure plan.  Do you
19 recall that?

20   A.    I do.

21   Q.    Okay.  Has anything changed with regard to
22 the self-disclosure plan from the end of 2015 to now?

23   A.    I believe so.  I think it was what was
24 determined self-disclosure.

25   Q.    And -- and what does that mean?

30

1    A.    By simply including it on your FMLA
2 application, that could be interpreted that you're
3 self-disclosing to the company.  And I'm not -- I'm
4 trying to figure out when that was rolled out, but
5 that was a change between 2015 and present.

6    Q.    Okay.  Anything else that you can recall?

7    A.    You say specific to change within the
8 reporting structure or -- I do -- I know we changed
9 vendors of who we used.  But other than that, I can't
10 recall any other specific change.

11   Q.    Okay.  What about generally with regard to
12 substance abuse, alcohol or drugs?  Does Frontier
13 have any new or different programs from the end of
14 2015 to now?

15   A.    I can't recall.  I would have to look at
16 the employee handbook, if it's something referenced
17 in there.

18   Q.    Sure.  Do you know if the flight attendants
19 and Frontier had negotiated any new or different
20 collective bargaining agreement since the end of
21 2015?

22   A.    Like renegotiated the agreement?  Yes.

23   Q.    Correct.  Okay.  Do you know how many
24 times?

25   A.    Once.

31

1    Q.    And when did that occur?

2    A.    I think January of 2019.  Possibly around
3 there.

4    Q.    Okay.  Do you know if Frontier agreed to
5 any new obligations under the -- the new collective
6 bargaining agreement with regard to seniority or how
7 shift bidding works?

8    A.    Can you say that again?

9    Q.    Do you -- do you know if -- if Frontier
10 agreed to any new structure in the collective
11 bargaining agreement that -- that dictates how shift
12 bidding and seniority works?

13        MS. KITSON:  I'm going to object at this
14 point.  I mean, I've been letting this go pretty far
15 afield just for general background and general policy
16 information, but we're now into 2019.

17        That's way outside the relevant time
18 period, and I'm going to instruct him not to answer
19 that question.  It's going to reveal confidential
20 information about union negotiations.  He's not
21 answering that question.

22        MR. CRONE:  Well, he's -- he's -- so
23 your -- your objection on relevance is noted, but you
24 can't instruct to answer based on relevance -- or
25 instruct not to answer based on relevance.

32

1        Moreover, I'm not asking him to -- to
2 reveal the negotiations.  Literally, I'm asking
3 whether a new seniority provision now exists or
4 doesn't exist.

5        Any flight attendant at Frontier would
6 probably know this information; any management
7 official would probably know this information.  It's
8 not confidential in any way.

9        MS. KITSON:  And I am invoking the
10 protective order provisions of the federal rules to
11 say that this is so far outside the field and impacts
12 current flight attendant negotiations and the
13 collective bargaining agreement.  I'm not letting him
14 answer that question.

15        If we need to call the judge, that's
16 perfectly fine, but I don't see -- and relevance does
17 play into that in the sense of whether this is unduly
18 harassing or prying into the business affairs of the
19 company unnecessarily.

20        MR. CRONE:  Well, let's -- let's attack
21 the relevance.  First, the -- the relevance is clear.

22        So -- so part of the reason Frontier
23 testified it couldn't accommodate Ms. Brigham was
24 due to the seniority provision in the collective
25 bargaining agreement.

**GERARDO ARELLANO - July 14, 2020**

---

33

1 Whether that's different now is -- is
2 absolutely relevant to her claims. And -- and the
3 case law is clear on that. We've already taken this
4 issue to the judge, and Frontier did not prevail on
5 this issue last time we were before the judge.
6 And, again, there's nothing confidential,
7 work product proprietary about a provision in a
8 collective bargaining agreement that exists out in
9 the world right now. I'm simply --
10 MS. KITSON: We --
11 MR. CRONE: -- asking -- I'm simply
12 asking Mr. Arellano if he knows whether that
13 provision is different than it was under the regime
14 that Mr. [sic] Brigham lived under. That's a
15 perfectly fine, relevant, permissible question.
16 And -- and if -- and if you're going to --
17 if you're going to stand on this hill, then let's
18 call the judge.
19 MS. KITSON: Okay. I think that's fine. I
20 mean, and that is not what the ruling was. We went
21 to the judge. We defined the relevant time period,
22 and the relevant time period, by court order, was
23 defined as November 2011 through November 2015.
24 So, you know, I've allowed you to answer
25 some -- ask some questions about general policies,

---

34

1 but when you get into union -- union negotiations,
2 what was negotiated and the dynamics of that four
3 years after the fact, we're not going to go there. I
4 mean, I'm happy to call the judge, if you'd like.
5 MR. CRONE: Well, to -- to be -- to be
6 clear, what I meant by we've already addressed this
7 issue is what the scope of relevance is. And -- and
8 we agreed at that point, before we went to the judge
9 last time, that we'd cap it at the end of 2015 just
10 to prevent the argument, but the scope of what's
11 relevant still extends to all of the -- the
12 employer's general practices.
13 And here, we're -- we're not asking for --
14 again, we're not asking for anything that's
15 confidential, proprietary, protected in any way. And
16 so --
17 MS. KITSON: You are asking for
18 confidential, proprietary information that's
19 protected. This is not something the company
20 publishes.
21 MR. CRONE: It's published in the
22 collective bargaining agreement right now because --
23 because he said they -- they -- he just testified
24 that they renegotiated in January 2019. Every flight
25 attendant right now has a copy of it.

---

35

1 MS. KITSON: Yeah, employees of the
2 company. Current flight attendant employees have a
3 copy of it, internal to the company. It's not posted
4 online.
5 MR. CRONE: Every flight attendant could
6 publish that thing online if they wanted to. There's
7 absolutely nothing stopping them. And so to say it's
8 confidential is -- it's not -- it's not -- it's
9 disingenuous.
10 I just -- I just want to ask if the policy
11 is different now than it was before. The policy
12 lives in the collective bargaining agreement. The
13 collective bargaining agreement is -- is in the hands
14 of hundreds, probably thousands of people out there
15 in the world. That's it.
16 MS. KITSON: I mean, a -- a company has a
17 right to publish and to provide access to information
18 to its employees and to keep that confidential.
19 Nevertheless, I will allow him to answer
20 as to what the current state of the collective
21 bargaining agreement is. I will not allow him to
22 answer as to the negotiations that went into that.
23 Is that --
24 MR. CRONE: I'm not asking about the
25 negotiations. I'm -- I'm asking -- I -- I -- the --

---

36

1 the question only asks what the policy is.
2 So thank you, Danielle. I appreciate it.
3 Let's -- let's carry on.
4 Q. (BY MR. CRONE) Mr. Arellano, I'm -- I'm --
5 I'm going to repeat the question for you because it's
6 probably lost in the depths of your mind somewhere
7 after that.
8 So -- so the question I was asking is, with
9 regard to the -- the seniority and the shift-bidding
10 provision that existed in the -- in the collective
11 bargaining agreement between 2011 and 2015 that we
12 discussed with -- with respect to Ms. Brigham
13 yesterday -- so I just want to focus you right in on
14 just the -- that provision.
15 Today, from 2015 to now, is that provision
16 any different in the collective bargaining agreement?
17 MS. KITSON: Object to form. Vague and
18 ambiguous as to "that provision." Are you asking him
19 generally how bidding works? Are you pointing to a
20 specific CBA provision?
21 MR. CRONE: Your objection is noted. I
22 think he can answer if he understands.
23 **A. Yeah, I truly don't know. I was -- since**
24 **I've handled more on the pilot side since then, I**
25 **haven't been involved in much of the flight attendant**

---

### GERARDO ARELLANO - July 14, 2020

37

1  contract, so I don't have much of the details from
2  the flight attendant contract anyway.
3     Q.   That's fair.  Thank you.
4     A.   Yeah.
5     Q.   Yesterday, you talked a fair amount about
6  what -- what happens at Frontier if -- if -- if
7  Frontier, you know, know -- knows that somebody has a
8  disability.  And so -- so you called that the
9  interactive process, and you -- you took me through
10 all those steps.  Do -- do you recall that?
11    A.   Yes.
12    Q.   Has anything changed with regard to that
13 interactive process at Frontier between the end of
14 2015 to now?
15    A.   When you say "changed," with regard to how
16 we handle it or steps?  I mean, what specifically?
17    Q.   That -- that's correct, how -- how you
18 handle it.  So the steps you outlined yesterday for
19 me.  And we can go back over them if you don't
20 remember, but -- but if you do remember and you can
21 answer, that's -- that's the question.
22    A.   To my knowledge, I don't think anything's
23 changed.  I think we basically do the intake with the
24 meeting and determine next steps.
25    Q.   Okay.  Have you conducted any of these

38

1  meetings, these interactive process meetings, since
2  the end of 2015?
3     A.   Yes, some.  Not all.
4     Q.   Can you -- can you recall how many?
5     A.   Not offhand, no.
6     Q.   Is it less than five?
7     A.   I would say more than five.
8     Q.   Can you recall, at any of these -- during
9  any of these interactive processes, whether or not
10 you agreed to allow an employee to modify their
11 schedule?
12    A.   I would have to look at my records.  I
13 can't recall.
14    Q.   Can you --
15         MS. KITSON:  I'm going to object on, again,
16 it's outside the scope of what the judge ordered in
17 terms of the relevant time period.
18    Q.   (BY MR. CRONE)  Can you recall, at any of
19 these interactive processes, whether or not you've
20 allowed an employee to -- to be reassigned
21 temporarily to a different position?
22         MS. KITSON:  Objection.  We're so far --
23 what time period are you talking about?
24         MR. CRONE:  We're -- we're -- we're in the
25 period from the end of 2015 onward.

39

1         MS. KITSON:  I'll let him speak generally
2  to that, but I'm not going to -- and as to flight
3  attendants, but beyond that, we're getting a little
4  too far afield.  But can you ask -- can you ask the
5  question again?
6         MR. CRONE:  So -- so -- so, Danielle,
7  let's -- let's try to clear this up now.
8         So I'm entitled -- this isn't the 30(b)(6)
9  deposition, so I -- I'm -- I'm entitled to inquire of
10 anything that's discoverable.
11        And so -- so it's not a -- so -- so -- so
12 here the question is, from the end of 2015 onward,
13 has Mr. Arellano been involved in any -- any
14 interactive processes in which a flight attendant was
15 granted the reasonable accommodations that were
16 denied to Ms. Brigham.  It's clearly relevant.  It's
17 proper.  It's discoverable.
18        And so if we agree on that much, then let's
19 carry on with the deposition.  If we can't agree and
20 we're going to keep getting delayed with these long
21 speaking objections, we should get the judge on the
22 phone.
23        MS. KITSON:  I don't know that we can
24 agree, because we -- not just with respect to the
25 30(b)(6) deposition -- we disagreed on the scope of

40

1  time that would be permissible in this case, not just
2  with respect to the 30(b)(6) deposition.
3         And we argued about that, and we argued
4  about the scope of comparators, and we agreed and the
5  Court ordered that the relevant time period with
6  respect to comparators generally -- and that was one
7  of the 30(b)(6) topics -- that we would not go
8  outside of that time frame.
9         MR. CRONE:  We --
10        MS. KITSON:  Let -- let me take a break,
11 John, and take a look back at the Court's order and
12 take a look back at our correspondence.  Let me take
13 ten minutes and look back --
14        MR. CRONE:  Okay.
15        MS. KITSON:  -- and we can maybe confer
16 offline.
17        MR. CRONE:  Okay.  But -- but before we do,
18 I just want to note that the Court's order applied to
19 the 30(b)(6) deposition.  That's it.
20        And -- and the authority that the Court
21 relied on, that authority clearly laid out that
22 events even four or five years after an employee's
23 termination are relevant to that employee's claims
24 when they have to prove intentional discrimination,
25 which Ms. Brigham needs -- needs to do here.  So --

**GERARDO ARELLANO - July 14, 2020**

41

```
1  so --
2         MS. KITSON:  Right.
3         MR. CRONE:  -- with that said, let's --
4  and -- and with this question still pending, you
5  know, let's -- let's take the break.
6         MS. KITSON:  Okay.
7         THE VIDEOGRAPHER:  The time now is
8  9:40 a.m.  We're off the record.
9         (Recess from 9:40 a.m. to 9:52 a.m.)
10        THE VIDEOGRAPHER:  The time now is 9:52.
11 We're back on the record.
12        MR. CRONE:  So can the court reporter
13 please read back the last pending question.
14        THE REPORTER:  Sure.  Sorry; I have to go
15 back a minute.
16        MR. CRONE:  I -- I know.  That's fine.
17        MS. KITSON:  While the court reporter does
18 that, too, I just want to put on the record what we
19 just discussed, which is that Frontier is allowing
20 these questions to proceed for this specific
21 deposition, but we are reserving our rights, and it
22 is -- and our objections -- and it is our position
23 that this is outside the scope of what should be
24 permissible in questioning.
25        That said, for this deposition to move
```

42

```
1  forward and in the interest of efficiency, we'll
2  allow the questions as to flight attendants
3  post-2015.
4         MR. CRONE:  And -- and -- and while
5  Plaintiff -- just for the record, and while
6  Plaintiff disagrees with the substance of Frontier's
7  objections, Plaintiff in no way thinks Frontier has
8  waived its objection.
9         MS. KITSON:  So with that, could we read
10 the question back?
11        MR. CRONE:  Thank you.
12        THE REPORTER:  Yes.  Now I've got to go
13 back again.
14        MS. KITSON:  Sorry.
15        THE REPORTER:  That's okay.
16        (The last question was read by the reporter
17 as follows:  "Can you recall, at any of these
18 interactive processes, whether or not you've allowed
19 an employee to -- to be reassigned temporarily to a
20 different position?")
21        MS. KITSON:  I don't think that was the
22 last question, was it?
23        MR. CRONE:  I -- I think it -- my -- my
24 recollection is that it was.
25        THE REPORTER:  That's what I show as the
```

43

```
1  last one.
2         MS. KITSON:  Okay.  Well, can you restate
3  the question, then, I guess, John?  Just restate the
4  question.
5         MR. CRONE:  Yeah, I can --
6     Q.  (BY MR. CRONE)  Well, first let me ask,
7  Mr. Arellano, did -- did you have trouble
8  understanding the question that the court reporter
9  read back?
10    A.  Yes.
11    Q.  Okay.  Well, then let's -- let's back up a
12 tad, not to waste time, but just to bring context
13 back into the room.
14        And so I had asked you if -- if you had
15 conducted any interactive process meetings from the
16 end of 2015 onward to the present.  Did you recall
17 that?
18    A.  Yes.
19    Q.  Okay.  So let's start there.  Oh, and I'd
20 asked you how many do you recall conducting.  You had
21 stated more than five.
22    A.  Correct.
23    Q.  And do you recall that answer?
24    A.  I do.
25    Q.  Okay.  Was it more than ten?
```

44

```
1     A.  Between 2015 and present?
2     Q.  Yes.
3     A.  Possibly, yeah.  I would have to look in my
4  records.
5     Q.  And I understand you'd have to look in your
6  records to be exact.  Is it -- is it possible that
7  there was more than 15?
8     A.  Possibly.
9     Q.  What about more than 20?  Is that possible?
10    A.  No.
11    Q.  Okay.  All right.  And in any of these
12 interactive process meetings that you -- that you
13 just identified from the end of 2015 onward to the
14 present, in any of those, did you grant an employee a
15 temporary reassignment to a different position?
16        MS. KITSON:  I'm going to limit that
17 question to flight attendants since that's what we're
18 talking about.
19    Q.  (BY MR. CRONE)  I'm going to -- I'm --
20 I'm -- I'm going to ask -- so -- so -- so the
21 question stands.  It's any employee and any
22 interactive process meeting that you've just
23 identified, any employee.  Did you grant them a
24 temporary reassignment to a different position?
25        MS. KITSON:  We'll have to call the judge
```

**GERARDO ARELLANO - July 14, 2020**

45

1 on that.  See, and that's the divisible unit, that's
2 the universe of comparators, is flight attendants.  I
3 mean, are you talking about baggage handlers?  You're
4 talking about the entire company for a five-year
5 period?
6         MR. CRONE:  So -- so, Danielle, I -- I've
7 got to -- I -- so what's the objection?
8         MS. KITSON:  The objection is that it's
9 unduly burdensome and harassing and outside the scope
10 of what the Court ordered, and it's outside the scope
11 of the comparative universe that's at issue.
12         MR. CRONE:  So -- so, one, the Court hasn't
13 ordered anything with regard to this deposition.
14 Second, the scope of the comparators is -- has not
15 been ordered either, so the Court hasn't said only
16 these people are comparators.
17         This is discovery.  We're entitled to
18 discover.  In fact, in the spreadsheet that was
19 produced for yesterday's deposition, Frontier didn't
20 limit it to flight attendants.  There were various
21 other employees on that spreadsheet.
22         And so if -- I didn't hear anything in --
23 in your objection that would allow you to instruct
24 the witness not to answer the question, and so if we
25 have to -- if you want to stop the depo, we can stop

46

1 it, and we can go to the judge, but, again, this
2 is -- this is clearly relevant information.  It's
3 discoverable.
4         MS. KITSON:  Let me --
5         MR. CRONE:  It's not --
6         MS. KITSON:  Let's just go off the record
7 really quickly.  Let's go on mute.  I have one
8 question for the witness.  Let's go on mute for a
9 second.
10         MR. CRONE:  Hold on.  There's -- there's
11 a -- there's a question pending, and so I don't -- I
12 don't want to leave a question pending before we go
13 off the record.
14         MS. KITSON:  Right, but I can't determine
15 whether we're going to call the judge or not unless I
16 confer with the witness quickly.
17         MR. CRONE:  Danielle --
18         MS. KITSON:  Let's call the judge.
19         MR. CRONE:  Let's -- why don't you --
20         MS. KITSON:  You're -- you're probing
21 beyond the scope of what is relevant to this case in
22 a post-2015 world which has nothing to do with
23 anything, and it's harassing to the company and
24 prying into the business affairs of the company
25 unnecessarily.

47

1         MR. CRONE:  If we -- if we -- if we go off
2 the record, can you review the authority that
3 Plaintiff submitted to the judge in our last dispute
4 where courts have held -- many courts have held that
5 even four or five years after an employee's date of
6 termination, what the company does is relevant
7 because -- and discoverable, properly discoverable,
8 because the -- it's -- it's absolutely relevant to
9 the employer's intent that the -- that the employee
10 has to prove.
11         And so we're not treading new ground here.
12 I mean, this is -- this is -- this is well-worn
13 territory, and if we have to go to the judge about
14 it, then let's do it.
15         But -- but the question that was pending,
16 you were fine with it if it was -- if it was confined
17 to flight attendants but not if we add customer
18 service agents or counter service agents.  I -- I
19 don't understand how that's the dividing line between
20 what's discoverable and what's not.  And -- and I --
21         MS. KITSON:  It's -- under -- under the
22 ADA, the relevant universe is the similarly situated
23 comparable employee universe, and we've talked about
24 that in the context of the organizational structure
25 of the company through the flight attendant reporting

48

1 structure and with respect to flight attendants
2 specifically.
3         So to go rooting around in what's happened
4 post-2015 with respect to baggage handlers is too far
5 afield, and, you know, I believe this is probably
6 going to be a bigger discovery fight than this
7 deposition.
8         And I just don't know that it's even an
9 issue in this deposition, and I just need -- let me
10 go off the record and look again at the authority
11 that you've cited.
12         MR. CRONE:  And let's -- and -- and if
13 we -- and -- and this time, let's -- if -- if we --
14 if we can't agree, let's just get the judge on the
15 phone, because now we've -- you know, we're 20
16 minutes into this dispute, and I think the depo would
17 be over by now.  So . . .
18         MS. KITSON:  I 100 percent agree about the
19 judge.  So let me just take a quick look at that, and
20 we'll come back on.
21         MR. CRONE:  Okay.  Let's go off the record.
22         THE VIDEOGRAPHER:  The time now is 10 a.m.
23 We're off the record.
24         (Recess from 10:00 a.m. to 10:15 a.m.)
25         THE VIDEOGRAPHER:  The time now is 10:15.

GERARDO ARELLANO - July 14, 2020

49

1 We're back on the record.
2         MR. CRONE:  So, Danielle, do you want to
3 put your position on the record, and then we'll do
4 ours, and then we'll read back the last question?
5         MS. KITSON:  Sure.  On the break, I
6 attempted to do some legal research and to look back
7 at the Court's orders and, unfortunately, was not
8 able to do that from a technical standpoint.
9         So we are going to allow Mr. Arellano, for
10 the sake of efficiency, to answer these questions,
11 but Frontier is lodging the objection, preserving its
12 rights, and would like to confer with Mr. Crone after
13 this deposition for purposes of future discovery.
14 But Mr. Arellano, for today, can answer the
15 questions.
16         MR. CRONE:  And Plaintiff is of the opinion
17 that that's a fine solution.  All of Frontier's
18 objections, we agree, are reserved.  We will
19 absolutely confer on them in the future.
20         And now if we could read back the last
21 question, we'll -- we'll get going again.
22         THE REPORTER:  Sure.  Sorry.
23         The last question:  "I'm going to -- I'm
24 going to ask -- so -- so the question stands.  It's
25 any employee and any interactive process meeting that

50

1 you've just identified, any employee.  Did you grant
2 them a temporary reassignment to a different
3 position?")
4         (BY MR. CRONE)  Do you understand that
5 question, Mr. Arellano?
6     A.   I do.
7     Q.   Okay.
8     A.   I -- I don't recall.
9     Q.   Okay.  And what about any employee in which
10 you've conducted an interactive process meeting from
11 the end of 2015 onward to the present?  Did you grant
12 them a modified schedule?
13     A.   Can you repeat that again?
14     Q.   Yeah.  So in any interactive process
15 meetings from 2015 to the present, for any employee
16 that you've been involved in, have you granted any
17 of those employees a modified schedule as an
18 accommodation?
19     A.   I can't recall at this moment.
20     Q.   Do you recall a Frontier employee named
21 David St. Hilaire?
22     A.   Not offhand, no.
23     Q.   Since the end of 2015 onward to the
24 present, have you been involved in the termination of
25 any employee at Frontier?

51

1     A.   Possibly, yes.  I'd have to look at my
2 notes.
3     Q.   Can you recall how many?
4     A.   Since 2015 to present?
5     Q.   Yes.
6     A.   I can't recall.  It would have to be a
7 handful.  Not many.
8     Q.   So is it possible it was more than five or
9 less than five?
10     A.   Possibly more than five.
11     Q.   Is it possible it's more than ten?
12     A.   No, I don't think more than ten.
13     Q.   And of those terminations that you were
14 involved in, can you recall if any of those
15 terminated employees suffered from alcoholism?
16     A.   I don't recall.
17     Q.   What about any form of substance abuse or
18 addiction?
19     A.   Again, I can't recall.
20     Q.   Mr. Arellano, is -- is there anybody
21 sitting to your right?
22     A.   No.
23     Q.   What about to your left?
24     A.   Danielle.
25     Q.   Okay.  Any -- anybody else?

52

1         MS. KITSON:  (Inaudible.)
2         THE REPORTER:  I'm sorry?  I didn't hear
3 you.
4     Q.   (BY MR. CRONE)  Is -- is there anybody else
5 sitting to your left?
6     A.   No.  Just -- well, Carolyn --
7         MS. KITSON:  Carolyn Theis is down at the
8 very end of the conference table.
9         MR. CRONE:  Okay.
10     Q.   (BY MR. CRONE)  All right.  I'm going to
11 hand you -- just like we did yesterday, I'm going to
12 e-mail it to Danielle and then hand you what's been
13 marked Exhibit 1.
14         Same drill.  Once you've pulled that up and
15 you've reviewed it, let me know.
16     A.   Okay.  I have it up, and I'm reading it
17 now.
18     Q.   Thank you.
19     A.   Okay.
20     Q.   Do you know what this document is?
21     A.   The document is a Performance Counseling
22 Record.
23     Q.   Have you ever -- have you seen these
24 documents before?
25     A.   Yes.

**GERARDO ARELLANO - July 14, 2020**

---

53

1    Q.   Is this a form that Frontier used back in
2 September of 2014 when the document's dated?
3    A.   I believe so.
4    Q.   Okay.  Have you ever filled out one of
5 these forms?
6    A.   Yes.
7    Q.   Who -- who would typically fill out one of
8 these forms?  By that -- by that I mean what would
9 their position be?
10    A.   Could be a supervisor and above.
11    Q.   Okay.  And what's the issue -- and so -- so
12 this -- this is issued to Rebecca Brigham; is that
13 correct?
14    A.   It looks -- yes, her name is on there.
15    Q.   Okay.  And it was -- it's dated
16 September 1, 2014; is that correct?
17    A.   Correct.
18    Q.   And is there any way to tell who -- who --
19 who filled out this form by looking at it?
20    A.   No, not off -- by looking at it, no.
21    Q.   Okay.
22    A.   You can't see who filled it out.
23    Q.   And I see where -- towards the bottom
24 where it says Issued By and there's place for a
25 supervisor's signature, there's no signature there.

---

54

1 Is that -- is that unusual?
2    A.   No, there should be a signature on there.
3    Q.   And down at the very bottom where it says
4 Employee's Signature, there's not one there either.
5 Is that unusual?
6    A.   No.  We should have the employee's
7 signature, but that is not unusual.
8    Q.   Okay.  So sometimes employees don't sign
9 but the supervisor should sign?
10    A.   Correct.
11    Q.   Okay.  And then what is the -- can you tell
12 by looking at this what the -- what the issue is
13 here, why this was issued to Ms. Brigham?
14    A.   Failure to read a "Must Read," seems like.
15    Q.   And then can you tell by looking at this
16 what -- how Ms. Brigham was expected to resolve this
17 issue?
18        MS. KITSON:  Object to the form.
19    A.   It looks like she was being asked to
20 complete the CBT in accordance to FAM 5 -- 05.25,
21 page 4.
22    Q.   (BY MR. CRONE)  Okay.  Would that be the
23 proper directive to issue Ms. Brigham for this
24 situation?
25        MS. KITSON:  Object to the form.

---

55

1    A.   In terms of failure to complete or read the
2 CBT?
3    Q.   (BY MR. CRONE)  Correct.
4    A.   Yes.
5    Q.   Okay.  And then right in the middle
6 it says, Effective 9/1/14, you begin a
7 warning/suspension of 365 calendar days, ending
8 9/1/15.
9        Do you see where I just read that?
10    A.   Yes.
11    Q.   Is -- is that -- is that -- is it proper
12 to put someone on a 365-day -- calendar day
13 warning/suspension for this type of issue?
14        MS. KITSON:  Object to the form.
15    A.   That, I -- I wouldn't know.
16    Q.   (BY MR. CRONE)  Okay.  Okay.  We can set
17 that aside.  I'm going to hand you, in the same
18 manner, what has been marked Exhibit 2.  And same --
19 same thing.  Once you've opened it and reviewed it,
20 let me know.
21    A.   Okay.
22    Q.   Okay.  You've seen this document before,
23 haven't you?
24    A.   Yes.
25    Q.   And you -- you wrote this document,

---

56

1 correct?
2    A.   Correct.
3    Q.   Okay.  And it's dated January 29, 2010?
4    A.   Uh-huh.
5    Q.   Do you think that's the correct date?
6    A.   I believe so, yes.
7    Q.   Okay.  And why did you write this document
8 to Ms. Brigham?
9    A.   To give her an update in terms of where she
10 stood with her occurrences at that time period.
11    Q.   Okay.  So this is not disciplinary in
12 nature?
13    A.   No.
14    Q.   Is this part of -- did you write this
15 letter as part of the dependability policy --
16 policy -- excuse me -- as it existed prior to 2012?
17    A.   I believe so, yeah.
18    Q.   And towards the bottom, you list out sick
19 occurrences.  Do you see where there's four sick
20 occurrences listed?
21    A.   Yes, sir.
22    Q.   Was -- was there anything abnormal about a
23 flight attendant using sick days during this time?
24    A.   No.
25        MS. KITSON:  Object to the form.

---

## GERARDO ARELLANO - July 14, 2020

57

1    A.    No.

2    Q.    (BY MR. CRONE)  No?  Were these -- so
3  this -- this letter was issued prior to 2012.  Was --
4  was there -- was -- was it considered an infraction
5  at that time for Ms. Brigham -- an infraction under
6  the dependability policy for Ms. Brigham to have used
7  these sick days?

8    A.    No.

9    Q.    Okay.  We can set that aside, and I'll hand
10 you what has been marked Exhibit 3.  And after you've
11 reviewed that document, let me know.

12   A.    Okay.

13   Q.    Have you seen this document before?

14   A.    Yes.

15   Q.    Okay.  Do you know who wrote it?

16   A.    To my understanding, Rebecca did.

17   Q.    Do you -- when did you first see this
18 document?  Can you recall?

19   A.    No.  Not the date specific, no.

20   Q.    Do you know if it was before or after
21 Ms. Brigham was terminated?

22   A.    Might have been before.

23   Q.    Okay.  We can set that aside, and I'll hand
24 you what has been marked Exhibit 4.  And after you've
25 reviewed that document, let me know.

58

1    A.    Okay.

2    Q.    Okay.  And have you ever seen any of
3  these -- these documents at -- at Exhibit 4?

4    A.    They look familiar, but I'm -- okay.

5    Q.    Okay.  So let's -- let's start at page 1.
6  Would you agree with me that that's a letter from
7  Dr. Stephen Volin dated October 4, 2012?

8    A.    Yes.

9    Q.    Okay.  And here that letters says, To Whom
10 It May Concern:  This letter is to certify that
11 Rebecca Kruger is being seen in our office for
12 medical care.

13        First of all, are you aware that
14 Ms. Brigham, the plaintiff in this lawsuit, her --
15 her last name at the time was Kruger, not Brigham?

16   A.    Yes, it says there on the document.

17   Q.    And so here, this note from -- from
18 Ms. Brigham's doctor, would this constitute
19 sufficient evidence for an employee to take a -- a --
20 time off?

21        MS. KITSON:  Object to the form.

22   A.    Can you repeat that again?

23   Q.    (BY MR. CRONE)  Yeah.  So when Ms. --
24 in -- in reviewing this note and thinking about
25 when Ms. Brigham submitted this to Frontier on

59

1  October 4 -- or around October 2012, would this have
2  been sufficient evidence to allow her to take the day
3  off?

4        MS. KITSON:  Object to the form.

5    A.    I guess I'm stuck on the "allowed to take a
6  day off."  Yeah, she definitely has the option to
7  call in and have herself removed from her trip, for
8  certain, yeah.

9    Q.    (BY MR. CRONE)  And -- and if she did and
10 she said, "I'm taking a sick day" and submitted this
11 document, you would -- you would have no issue
12 saying, Well, that's a sick day, right?

13        MS. KITSON:  Object to the form.

14   A.    Based on that, yeah, I would think she
15 would -- I mean, that's what the sick policy would be
16 there for.

17   Q.    (BY MR. CRONE)  Okay.  And she wouldn't be
18 disciplined for having taken this day off, would she?

19   A.    It would depend on where she was within
20 total number of infractions or sick instances at that
21 time.

22   Q.    So this could have been coded still as an
23 infraction under the dependability policy?

24        MS. KITSON:  Object to the form.

25   A.    It would have been coded as a sick call and

60

1  subject to the dependability policy.

2    Q.    (BY MR. CRONE)  Got it.

3        Let's go to page 2 of this document.  Would
4  you agree that this is a note from Dr. Elizabeth
5  McCrann To Whom It May Concern dated May 30, 2013?

6        MS. KITSON:  Object to the form.

7    A.    Yes.

8    Q.    (BY MR. CRONE)  Okay.  So I have the same
9  question with regard to this document.  Is -- would
10 this document constitute sufficient evidence for
11 Ms. Brigham to have taken time off from Frontier?

12        MS. KITSON:  Object to the form.

13   A.    And can you define when you say "time off"?

14   Q.    (BY MR. CRONE)  Let's say she -- she
15 submitted this in order to take sick time.

16   A.    Yes.

17   Q.    Let's say she submitted this in order -- in
18 order to take FMLA time.

19   A.    When -- well, I guess, take FMLA -- because
20 I'm looking -- just really quickly, I'm looking at
21 the date of May 30.  So by that time, she would have
22 already had -- so it would have been retro to
23 April 1, '13.

24        At that point, she would have needed to
25 have already -- it's a little confusing, though.

**GERARDO ARELLANO - July 14, 2020**

---

61

1  ". . . will be completely disabled from April 14
2  until June 14."
3          So she would have already taken sick time
4  at the time that she would have presented that note,
5  and it's looking like she needed additional time into
6  June, and she had questioned if this would have been
7  sufficient for her to take time off.  She would have
8  already been calling out.  And so I guess I'm lost in
9  the question.  Does that make sense?
10     Q.   It does make sense.  So would it have been
11  sufficient to retroactively code her time as FMLA?
12         MS. KITSON:  Object to the form.
13     A.   I would have to check and see if she had
14  FMLA in that -- in that time period.
15     Q.   (BY MR. CRONE)  Okay.  And would she have
16  been disciplined for taking this time off?
17         MS. KITSON:  Object to the form.
18     A.   Again, I would have to look and see where
19  she would have been in terms of dependability, in
20  terms of how many occurrences she would have had on
21  her -- on her record.
22     Q.   (BY MR. CRONE)  Okay.  Let's go to the
23  third page, and here -- this one's a little harder to
24  read.  It's a -- it's a -- it's written in -- in
25  doctor scribble a bit more, but would you agree that

---

62

1  this appears to be a note from Dr. Pamela Mattson
2  dated December 22, 2013?
3         MS. KITSON:  Object to the form.
4     A.   It looks like 2013, but it's kind of
5  blurry.  Yeah, definitely a doctor's note.
6     Q.   (BY MR. CRONE)  Okay.  And same question.
7  Would this be sufficient for Ms. Brigham to have
8  taken -- first -- we'll start with just sick time --
9  between December 17, 2013, and December 22, 2013?
10     A.   And can you repeat the question again?
11     Q.   Yeah.  Would this have been sufficient
12  evidence for Ms. Brigham to have taken sick time
13  during that time period?
14     A.   It would depend.  And, again, I would have
15  to go back to -- the note is postdated after the
16  22nd.  So if she called off for a trip and she called
17  out sick, this would be her way to substantiate the
18  time off.  But, again, she would have already called
19  out if she had trips scheduled during that time
20  period.
21     Q.   Are -- are there instances in which
22  employees at Frontier call off due to an emergency?
23  In other words, they're -- they're not able to call
24  ahead of time because the emergency, by definition,
25  hasn't happened yet?

---

63

1     A.   There is what they call emergency drop.
2     Q.   Okay.  And how does that work?
3     A.   I'm trying to recall.  A crew member or
4  flight attendant would have needed to call or make
5  contact with one of their -- if not their supervisor
6  or manager, explain the situation, and request and
7  see if they could take emergency drop for that time
8  period.
9     Q.   Okay.
10     A.   So the manager would evaluate what was
11  provided by the crew member or flight attendant and
12  then make that assessment themselves.
13     Q.   And they probably evaluate a doctor's note
14  just like this, right?
15     A.   If one was presented, yes, that would be
16  part of the decision-making process.
17     Q.   Okay.  And at that point in the
18  decision-making process, would this note have been
19  sufficient to excuse Ms. Brigham for -- under the
20  dependability policy?  Would she still get an
21  infraction there?
22     A.   So say that again.  You're seeing if this
23  would excuse her sick time?
24     Q.   Yeah.  Yeah.  Well, from being -- from
25  earning an infraction under the dependability policy.

---

64

1     A.   I guess I don't see the relevance of
2  emergency drop to this, and so that's where I'm
3  getting a little lost.
4     Q.   Well -- well, then, let me back up.
5          So -- so in that situation and then this
6  note is provided --
7     A.   Okay.
8     Q.   -- what would -- how would her time be
9  coded, that missed -- the missed time?
10     A.   Okay.  And so in -- in just that example,
11  what would the time be coded, not taking anything
12  else in consideration, she would have already had --
13  if she had a trip during the 17th and the 22nd, she
14  would have needed to remove herself from her trip;
15  typically how we look at the flight attendant's
16  responsibility for their schedule.  So they have to
17  call in and remove.
18          So she would have done that.  If she had a
19  trip, it would have been coded as possibly sick at
20  that time, if that's what she requested.  And then
21  how it would have been handled, it would fall under
22  the dependability policy.
23          And to your point, if she requested
24  emergency drop, then that would be something
25  different.

---

**GERARDO ARELLANO - July 14, 2020**

65

1    Q.   Okay.  So then -- then there wouldn't be --
2  she wouldn't receive an infraction under the
3  dependability policy at that point?
4    A.   Under which point, though?
5    Q.   If she had requested the emergency drop.
6    A.   If it was approved by the inflight manager.
7  Again, she would have to -- she or he would have had
8  to review the circumstances of the situation.
9    Q.   Okay.
10    A.   Yeah.
11    Q.   And then what about if she submitted this
12  in order to retroactively code this as FMLA time?
13  Would this be sufficient evidence to accomplish that?
14         MS. KITSON:  Object to the form.
15    A.   I would have to, again, go back to if she
16  had FMLA in place.
17    Q.   (BY MR. CRONE)  What do you mean by "FMLA
18  in place"?
19    A.   You're saying if this would be sufficient
20  for her to put it as FMLA.  I would have to verify if
21  she had intermittent FMLA in place.  So she would
22  have had options.  If she didn't have FMLA in place,
23  she could have applied.  But, yeah, it depends.
24    Q.   So I just want to make sure I understand
25  that.

66

1         So you would look back to check to see if
2  she had already gotten approved for FMLA?
3    A.   I would have to just do my due diligence
4  and double-check.
5    Q.   Yeah, yeah, but -- but I'm just trying to
6  figure out the -- the steps you're actually taking.
7         So you're saying -- when you say I'd have
8  to go back and check to see if she had FMLA in place,
9  are you saying already certified, approved FMLA time
10  available?  Or are you talking about something else?
11    A.   No.  So, ultimately, you had asked me would
12  this be enough for her -- for the trip to be recorded
13  FMLA.
14    Q.   Correct.
15    A.   Anytime there's a recode, if they're
16  requesting FMLA, we have to see that the employee has
17  FMLA in place, in that example.
18    Q.   Yeah, and that's what I'm trying to really
19  just ask very specifically.  By "in place," do you
20  mean already approved?
21    A.   Already approved, correct.
22    Q.   Okay.  And if that wasn't there, could she
23  then apply for it?
24    A.   Yes.
25    Q.   Okay.

67

1    A.   Definitely.
2    Q.   Okay.  And if she did and presented this
3  note as evidence, would that be sufficient to recode
4  this as FMLA time?
5         MS. KITSON:  Object to the form.
6    A.   If she already did -- had FMLA in place?
7    Q.   (BY MR. CRONE)  Well, yeah.  Let's start
8  there.  Let's say she already had it in place and
9  this was submitted as evidence.
10         Would -- would the -- would the time off be
11  recoded to FMLA time?
12         MS. KITSON:  Object to the form.
13    A.   I guess the question would be when would
14  she have presented this note?  We would have to look
15  at that time frame as well.  So there's other pieces
16  that would be considered, I guess.  And it also
17  depends if it was intermittent FMLA versus continuous
18  FMLA.
19    Q.   (BY MR. CRONE)  So let me -- let me back up
20  and -- and try to make this a bit easier to
21  understand.
22    A.   Okay.
23    Q.   I'm not sure -- I'm not sure where the
24  disconnect is, but I believe if it's on my --
25         MS. KITSON:  It's a hypothetical question

68

1  outside of any specific situation.
2         MR. CRONE:  Okay.
3         MS. KITSON:  Anyway, ask your question.
4    Q.   (BY MR. CRONE)  If it's on my side, I want
5  to clarify for you.  And so -- so let's -- let's look
6  at the note.  The note's dated December 22, 2013,
7  correct?
8    A.   Correct.
9    Q.   And it appears to be excusing an absence
10  between December 17 and December 22.  Do you agree?
11    A.   Agree.
12    Q.   Okay.  So Ms. Brigham -- let's say she
13  submits this note on December 22, the day it's dated.
14    A.   Okay.
15    Q.   And she says, I'd like to recode that --
16  that time as FMLA time that I missed.
17    A.   Uh-huh.
18    Q.   Would -- and then you -- first of all,
19  would this note be sufficient for you, at that time,
20  to say, Okay, I'll do that or I won't do that?
21    A.   Perfect.  So, now, does she have FMLA in
22  place?
23    Q.   First let's say that she does.
24    A.   If she does and she provides this note on
25  December 22, 2013, which is on the day that the --

**GERARDO ARELLANO - July 14, 2020**

---

69

1 looks like she was in the hospital, then yes.
2      Q.   Okay.  And now let's say she didn't have
3 the FMLA in place.
4      A.   Okay.  And so -- and the question is would
5 this constitute FMLA?  I mean, that's a conversation
6 that we would have to have and say, Do you want to
7 apply for FMLA?
8      Q.   So in that scenario -- in that scenario,
9 your response would be, Do you want to apply?  And
10 then it would go down that road?
11     A.   Yeah, because if she's requesting FMLA and
12 if it's not in place, then we would definitely send
13 her to the FMLA department to then submit her
14 application for FMLA.
15     Q.   Okay.  And then the final question in this
16 is, if she had the FMLA in place already -- and you
17 had just said this note would be sufficient to code
18 it as FMLA -- would those absences count against her
19 under the dependability policy?
20     A.   So in that example, if she had FMLA, if it
21 was continuous, then she wouldn't be required to put
22 the note.  But if it's intermittent FMLA and if it's
23 already in place, the note, whether she submitted it
24 or not, she could simply have requested it to be
25 recoded.

---

70

1           But either way, the FMLA, continuous
2 or FMLA, does not count against an individual's
3 dependability.
4      Q.   Thank you.  I appreciate you helping me
5 work through those questions.
6           So just a few last questions, and then,
7 like yesterday, we'll take a break real quick.  I'll
8 circle back and see if I missed anything.
9           So have you yourself ever been disciplined
10 by Frontier Airlines?
11     MS. KITSON:  Object to the form.  I'm
12 instructing the witness not to answer that question.
13 Actually --
14     MR. CRONE:  Danielle, do you want to -- do
15 you want to propose the same solution?  We could
16 agree to the same solution with regard to this
17 objection?
18     MS. KITSON:  Sure.  Go ahead.
19     MR. CRONE:  Okay.
20     Q.   (BY MR. CRONE)  Have you ever been
21 disciplined by Frontier Airlines?
22     A.   Yes.
23     Q.   Do you recall when?
24     A.   Last year.
25     Q.   So 2019?

---

71

1      A.   2018, 2019.
2      Q.   2018 or '19.  Any other -- have you ever --
3 ever been disciplined at any other time by Frontier
4 Airlines?
5      A.   Yes.
6      Q.   When?
7      A.   '16, '17.  2016, '17, in that -- possibly
8 around that time frame.
9      Q.   Any other times?
10     A.   Not -- not that I can recall.
11     Q.   Okay.  So thinking about the time in 2018
12 or 2019, what was the discipline for?
13     A.   Dependability.
14     Q.   Did you agree or disagree with the
15 discipline?
16     A.   Whether I agreed or not, it was
17 administered, so . . .
18     Q.   I understand that, but did you think it was
19 administered properly?
20     A.   Sure.
21     Q.   And why were you disciplined under the
22 dependability?
23     A.   Attendance.
24     Q.   How many days did you miss?
25     A.   That, I don't recall.

---

72

1      Q.   Why did you miss the days?
2      A.   They were just sick occurrences.
3      Q.   For what?
4      A.   Just for sick call, that I called in.
5      Q.   Do you recall what you were sick with?
6      A.   Not -- not right at this point, no.
7      Q.   Were you sick at all?
8      A.   Yes.
9      Q.   Okay.  Now, thinking back to the time in
10 2016, 2017, what were you disciplined for then?
11     A.   Dependability.
12     Q.   So that's also related to sick time?
13     A.   Correct.
14     Q.   How many days were you out?
15     A.   That, I don't recall.
16     Q.   Do you recall why you were out?
17     A.   Just for being sick.
18     Q.   Do you recall what you were sick with?
19     A.   No.
20     Q.   Were -- were you, in fact, sick?
21     A.   Yes.
22     Q.   Okay.  Have you ever been subject to any
23 sort of verbal counseling or -- or verbal warning or
24 something like that during your time at Frontier?
25     A.   Not that I can recall off the bat, no.

---

### GERARDO ARELLANO - July 14, 2020

---

**73**

1    Q.   Any sort of written counseling or warning
2  that wouldn't rise to the level of discipline?
3        A.   Not that I can recall at this point, no.
4    Q.   When you were disciplined under the
5  dependability policy, that was -- you weren't a
6  flight attendant during any of those times, were you?
7        A.   No.
8    Q.   Were you still subject to the same sort of
9  occurrences, sort of being -- receiving an infraction
10 based on the number of occurrences, or -- or was it
11 something different for you?
12       A.   It was just based on attendance.  I don't
13 know.  I guess I'm not understanding the question.
14   Q.   Yeah.  So you had mentioned that if -- if
15 Ms. Brigham, for example, was -- violated the
16 dependability policy, she'd receive an infraction.
17 And then if enough of these infractions added up,
18 what would happen?
19       A.   Is that --
20   Q.   Yeah, I'm asking you the question.
21       So if -- if -- if, under the dependability
22 policy, Ms. Brigham was -- was given an infraction,
23 how many could she get before something worse would
24 happen, and what would that be?
25       A.   For Brigham or . . .

---

**74**

1    Q.   Yeah, yeah, for Brigham.
2        A.   How many -- I guess -- I guess I'm not
3  understanding the question.
4    Q.   So let's go back to the time period 2011 --
5  end of 2011 to 2015.
6        A.   Okay.
7    Q.   Let's say Ms. Brigham violates the
8  dependability policy at that time.  She'd be given an
9  infraction, correct?
10       A.   If she violated the policy or she --
11   Q.   Yeah.
12       A.   She would -- it would just be an occurrence
13 towards the dependability policy.
14   Q.   Got it.  So there's an occurrence.  So how
15 many occurrences is she allowed?
16       A.   Total of eight.
17   Q.   And then after eight, what happens?
18       A.   Then the term processes or the steps kick
19 in, the investigatory meetings, per the contract.
20   Q.   Okay.  So what I'm asking is, with regard
21 to you and these depend -- the dependability issues
22 in 2018, '19, and 2016, '17, did it operate the same
23 way for you, or is it -- or -- or did it operate
24 differently?
25       MS. KITSON:   Same policy?

---

**75**

1        THE WITNESS:   No, the policy is different.
2        A.   I would fall under the corporate policy.
3    Q.   (BY MR. CRONE)   Okay.  And -- and how
4  does that work?  Does it track occurrences, or is
5  something else happening?
6        A.   It tracks occurrences, I believe.
7    Q.   Okay.  And how many occurrences could
8  you -- could you have before something negative
9  happened?
10       A.   I don't recall.  I'd have to look at the
11 employee handbook.
12   Q.   Okay.  But is it -- was there some limit
13 of -- on occurrences, and then the term steps would
14 also start?
15       A.   I would have to look at the employee
16 handbook.  I can't recall.
17   Q.   Okay.  Are the -- so there's a corporate --
18 a corporate dependability policy that applied to you,
19 and then there was a dependability policy that
20 applied to the flight attendants.
21       Is there a dependability policy at any
22 time, that you're aware of, at Frontier that applies
23 to the baggage handlers?
24       A.   I can't recall, no.
25   Q.   What about the counter service agents?

---

**76**

1        A.   I don't recall, no.
2    Q.   What about any of the other employees at
3  Frontier?
4        A.   I -- I don't recall.  Yeah.  Not offhand.
5    Q.   What -- what about the pilots?
6        A.   Not that I remember, no.
7    Q.   If you wanted to find out whether there was
8  a dependability policy that applied to the baggage
9  handlers, where would you look?
10       A.   I would look in first and see if it was
11 included in the contract, CBA.  And if it was not
12 there, then the employee handbook would apply.
13   Q.   Do you know if baggage handlers are
14 represented by a different union than Ms. Brigham's?
15       A.   Baggage handlers, no.
16   Q.   You don't know, or they -- or they are
17 represented by a different union?
18       A.   They're not represented by a union, baggage
19 handlers.
20   Q.   They -- they don't have a union?
21       A.   No.
22   Q.   So with them, you would look, then, just to
23 the employee handbook?
24       A.   Yes.
25   Q.   Okay.  What about the counter service

---

**GERARDO ARELLANO - July 14, 2020**

77

1 agents?
2   A.   If there -- they would be held to the
3 employee handbook.
4   Q.   Okay.  Did they have -- are -- are -- are
5 the counter service agents issued a different
6 handbook than would have been issued to Ms. Brigham?
7   A.   Currently?  Are -- are you looking at now,
8 or during that time period?
9   Q.   Now.
10   A.   We outsource that function.
11   Q.   What about --
12   A.   We --
13   Q.   I'm sorry.  I --
14   A.   Go ahead.
15   Q.   What about during this time that
16 Ms. Brigham was employed?
17   A.   We would have deferred to the employee
18 handbook.
19   Q.   Yeah, and -- and was that the same handbook
20 Ms. Brigham would have been issued?
21   A.   Yeah.  At the time of the employment, she
22 gets the employee handbook.
23   Q.   Okay.  And then same question for the
24 counter service agents.  At the time that Ms. Brigham
25 was employed, would they have been using the same

78

1 handbook that Ms. Brigham was using?
2   A.   Yes.
3   Q.   Okay.  And what about the pilots during the
4 time that Ms. Brigham was employed?  Did -- were --
5 they were represented by a union, weren't they?
6   A.   They were, in-house union.
7   Q.   So it's different than Ms. Brigham's union?
8   A.   Yes.
9   Q.   Do you know the name of their union during
10 that time?
11   A.   It was FAPA.
12   Q.   F-A-P-A?
13   A.   Correct.
14       MR. CRONE:  Okay.  Mr. Arellano, I thank
15 you for your patience, especially during the sort of
16 back-and-forth between lawyers in the room, and so I
17 appreciate that.
18       If you -- if you give me five minutes, I
19 just want to circle through my notes, and then I
20 think we're done.
21       THE WITNESS:  Okay.
22       MR. CRONE:  So we can go off the record
23 now.
24       THE WITNESS:  All right.
25       THE VIDEOGRAPHER:  The time now is 10:54.

79

1 We're off the record.
2       (Recess from 10:54 a.m. until 11:01 a.m.)
3       THE VIDEOGRAPHER:  The time now is 11:01.
4 We're back on the record.
5       MR. CRONE:  Mr. Arellano, just a couple
6 quick follow-up questions.
7   Q.   (BY MR. CRONE)  After you were disciplined
8 in 2018, 2019 for the dependability policy issues,
9 did you suffer any further discipline as a result of
10 that incident?
11   A.   No.
12   Q.   Okay.  And same question for the one in
13 2016, 2017.  Any -- any further discipline after
14 that?
15   A.   No.
16   Q.   Okay.  When you left Frontier in around
17 2010 or so to go to Fresenius, any particular reason
18 you left?
19   A.   The company was purchased by Republic, so
20 my position was moved to Indianapolis.
21   Q.   Got it.
22   A.   Yeah.
23   Q.   And you didn't want to live in
24 Indianapolis?
25   A.   I did not, no.

80

1   Q.   Okay.  That's fair.
2       And then what about when you left in 2014,
3 I think, or so --
4   A.   Okay.
5   Q.   -- to go to JetBlue?  Any -- any particular
6 reason at that time?
7   A.   No.  The opportunity presented itself.
8   Q.   Okay.
9   A.   So they came and searched me.
10   Q.   Excellent.  Thank you.
11       MR. CRONE:  So thank you again.  I don't
12 know if your attorney has any follow-up questions for
13 you, but we are done.
14       MS. KITSON:  I do not.  We're done.  Thank
15 you.
16       MR. CRONE:  Great.  You're welcome.  Thanks
17 again, Mr. Arellano.  Appreciate it.
18       THE WITNESS:  Yeah.  Thank you.
19       MR. CRONE:  We can go off the record.  You
20 too.
21       THE VIDEOGRAPHER:  The time is 11:02.
22 We're off the record.  This concludes today's
23 deposition.
24       (The following proceedings continued on the
25 stenographic record only:)

**GERARDO ARELLANO - July 14, 2020**

---

81

1       THE REPORTER:  Same for order for everybody
2 on this one?
3       MR. CRONE:  Yes, for plaintiff.
4       THE REPORTER:  Ms. Kitson?
5       MS. KITSON:  (No response.)
6       THE REPORTER:  Did she leave?
7       MR. CRONE:  Did we lose her already?  Well,
8 yes for plaintiff, anyway.
9       THE REPORTER:  Okay.
10       MR. CRONE:  Thanks very much.  We
11 appreciate it.
12       THE REPORTER:  Thank you.
13       WHEREUPON, the foregoing deposition was
14 concluded at the hour of 11:03 a.m. on July 14, 2020.
15                 *   *   *   *
16
17
18
19
20
21
22
23
24
25

---

82

1       I, GERARDO ARELLANO, do hereby certify that
2 I have read the foregoing transcript and that the
3 same and accompanying amendment sheets, if any,
4 constitute a true and complete record of my
5 testimony.
6
7
8       _____
        GERARDO ARELLANO
9
10       ( ) No Amendments
11       ( ) Amendments Attached
12
        Subscribed and sworn to before me this
13 _____ day of _____, 2020.
14
15
        Notary Public:_____
16
        Address: _____
17
        _____
18
19
        My Commission Expires: _____
20
        Seal:
21
22
23
24
25

---

83

1 WITNESS:  GERARDO ARELLANO
2 DATE OF DEPOSITION:  July 14, 2020
3 CASE:  Brigham v. Frontier Airlines, Inc.
4                 ERRATA SHEET
5 PAGE     LINE            CHANGE          REASON
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Signature_____Date_____

---

84

1               REPORTER'S CERTIFICATE
2 STATE OF COLORADO     )
                        ) ss.
3 COUNTY OF DENVER      )
4       I, JILL S. NIELSEN, do hereby certify that I
  am a Registered Professional Reporter and Notary
5 Public within the State of Colorado; that previous to
  the commencement of the examination, the witness was
6 duly sworn by me to testify to the truth.
7       I further certify this deposition was taken
  remotely in shorthand by me at the time herein set
8 forth, and that it was thereafter reduced to
  typewritten form, and that the foregoing constitutes
9 a true and correct transcript.
10       I further certify that I am not related to,
  employed by, nor of counsel for any of the parties or
11 attorneys herein, nor otherwise interested in the
  result of the within action.
12
       IN WITNESS WHEREOF, I have hereunto affixed
13 my hand and seal this 27th day of July, 2020.
14 My commission expires July 7, 2023.
15 _____
       JILL S. NIELSEN, RPR
16       Notary Public in and for the
       State of Colorado
17
18
19
20
21
22
23
24
25

---

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

**Page 1**

```
1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLORADO

  Civil Action No.:   19-cv-03417-WJM-STV
3  _____

4  REBECCA BRIGHAM,

5    Plaintiff,

6  v.

7  FRONTIER AIRLINES, INC.,
   a Colorado corporation,
8    Defendant.
9  _____

10    VIDEOTAPED VIDEOCONFERENCE 30(B)(6) DEPOSITION OF
              FRONTIER AIRLINES, INC.,
11     THROUGH THE TESTIMONY OF GERARDO ARELLANO
                 July 13, 2020
12  _____

13         PURSUANT TO NOTICE and the Federal Rules

14  of Civil Procedure, the videotaped videoconference

15  30()b)(6) deposition of FRONTIER AIRLINES, through

16  the testimony of GERARDO ARELLANO, whose identity has

17  been verified by the court reporter, was taken on

18  behalf of the Plaintiff on July 13, 2020, commencing

19  at 9:01 a.m., before Jill S. Nielsen, Registered

20  Professional Reporter and Notary Public within the

21  state of Colorado.

22

23  (The reporter, Jill S. Nielsen, appearing remotely

24  via videoconference.)

25
```

---

**Page 2**

```
1               APPEARANCES
2  FOR THE PLAINTIFF:
3     JOHN R. CRONE, ESQ.
      EVAN S. GRIMES, ESQ.
4     The Law Office of John R. Crone, LLC
      4550 East Cherry Creek Drive South, Suite 1003
5     Glendale, Colorado 80246
      303.598.3526
6     john@crone-law.com
      (Appearing via videoconference)
7
8  FOR THE DEFENDANT:
9     DANIELLE L. KITSON, ESQ.
      CAROLYN THEIS, ESQ.
10    Littler Mendelson, P.C.
      1900 Sixteenth Street, Suite 800
11    Denver, Colorado 80202
      303.629.6200
12    dkitson@littler.com
      catheis@littler.com
13    (Appearing via videoconference)
14

15  ALSO PRESENT:

16    JACALYN PETER, In-House Counsel, VP of Labor
      Relations (Appearing via videoconference)
      WALT MATHERN, Videographer
17    (Appearing via videoconference)
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1                    INDEX
2  EXAMINATION OF GERARDO ARELLANO:         PAGE
3  By Mr. Crone                               6
4                  EXHIBITS
                                          INITIAL
5  NUMBER                                 REFERENCE
6  Exhibit 1    Plaintiff's Amended Notice    28
                of Deposition Pursuant to
7               Federal Rule 30(b)(6) -
                Frontier Airlines, Inc.
8
    Exhibit 2    Frontier Organizational Chart  34
9                September 2015
10 Exhibit 2-1  Frontier Airlines Job Description 48
11 Exhibit 2-2  Excel Spreadsheet              134
12 Exhibit 3    Order on Discovery Dispute      46
                30(b)(6)
13
   Exhibit 4    Declaration of Adrienne Prince  86
14
   Exhibit 5    10/5/15 E-mail from Arellano   100
15               to Rush, Leyner, Thompson,
                 Coppedge, and Warfield
16
   Exhibit 6    10/15/15 E-mail from Arellano  163
17               to Coppedge, cc Thompson
18 Exhibit 7    12/10/15 Letter to Reef from   108
                 Arellano
19
   Exhibit 8    10/30/15 Letter to Brigham     166
20               from Coppedge
21 Exhibit 10   10/27/15 E-mail from Leyner    168
                 to Inflight DIA MGR, cc
22               Arellano
23 Exhibit 12   Investigation Notes/Tracking   192
                 Form
24
   Exhibit 13   Probationary Flight Attendant  176
25               Evaluation, 2/18/08
```

---

**Page 4**

```
1                  EXHIBITS
                                          INITIAL
2  NUMBER                                 REFERENCE
3  Exhibit 14   10/6/15 E-mail from Arellano   179
                 to Coppedge, cc Rush, Leyner,
4                Thompson, and Warfield
5  Exhibit 15   E-mail chain, top e-mail from  172
                 Arellano to Leyner, 10/2/15
6
   Exhibit 16   E-mail chain, top e-mail from  182
7                Arellano to Micklich, 7/15/15
8  Exhibit 17   12/21/15 Letter to Board of    110
                 Adjustment from Nelson;
9                Grievance Form 11/23/15;
                 12/10/15 Letter to Reef from
10               Arellano
11 Exhibit 20   E-mail chain, top e-mail from  184
                 Arellano to Leyner, 9/28/15
12
   Exhibit 21   9/5/14 E-mail from JaJuan      174
13               Williams to Leyner, cc Aragon
14 Exhibit 23   E-mail chain, top e-mail from  188
                 Arellano to Leyner, 9/21/14
15
   Exhibit 25   6/4/15 E-mail from Leyner      194
16               to Arellano and Aragon, cc
                 Micklich
17
   (Exhibits provided electronically to the court
18 reporter.)
19
20
21
22
23
24
25
```

---

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

Page 5

```
1               P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning.  We are
3 now on the record.  The time now is 9:01 a.m.
4 Mountain Time.  Today is July 13, 2020.  We are
5 conducting the virtual deposition of Frontier
6 Airlines 30(b)(6) witness Gerardo Arellano in the
7 matter of Rebecca Brigham v. The Frontier Airlines in
8 the United States District Court for the District of
9 Colorado, Case Number 19-cv-03417.
10         The video technician is Walt Mathern.  The
11 court reporter is Danielle -- excuse me -- is
12 Jill Nielsen.
13         Will parties please identify themselves,
14 beginning with the plaintiff's client.
15    MR. CRONE:  John Crone for the plaintiff.
16    MR. GRIMES:  Evan Grimes for Plaintiff.
17    THE WITNESS:  Rebecca Brigham, Plaintiff.
18    MS. KITSON:  Daniel Kitson with Littler
19 Mendelson on behalf of the defendant.  With me is
20 Carolyn Theis with my firm and Jackie Peter, who is
21 with Frontier as in-house counsel, and her title is
22 vice president of labor relations.
23               GERARDO ARELLANO,
24 having been first duly sworn to tell the truth,
25 testified as follows:
```

Page 6

```
1                    EXAMINATION
2 BY MR. CRONE:
3    Q.  Good morning, Mr. Arellano, and thanks for
4 appearing by video.  I know it's a bit of a pain.
5 Ms. Brigham appreciates it.
6         So are you aware that when we first noticed
7 the deposition of Frontier Airlines, we had noticed
8 the deposition to be in person?
9    MS. KITSON:  And, Mr. Crone, we had
10 expected the in-person aspect of the deposition would
11 be -- are you asking about in person versus video?
12    MR. CRONE:  I'm just -- I'm just -- I'd
13 appreciate it if the -- if the witness could answer.
14    Q.  (BY MR. CRONE)  I'm simply asking,
15 Mr. Arellano, are you aware that when Ms. Brigham
16 first noticed your deposition, that is, Frontier's
17 deposition, it was meant to be in person?
18    MS. KITSON:  Object to the form.
19    A.  Yes.
20    Q.  (BY MR. CRONE)  And -- and then at
21 Frontier's request, we amended the deposition to do
22 it by video.  Are you aware of that?
23    MS. KITSON:  Object to the form.  There's
24 no abandoning of the deposition.
25         But you can answer the question that he's
```

Page 7

```
1 asking.
2    A.  Yes.
3    Q.  (BY MR. CRONE)  And was one of the reasons
4 that you didn't want to do the deposition in person
5 that you were worried about sharing a room with other
6 people for an extended period of time?
7    MS. KITSON:  Object to the form, and that
8 calls for attorney-client privileged information.
9 I'm instructing him not to answer.
10    Q.  (BY MR. CRONE)  Mr. Arellano, did you have
11 any safety concerns about doing a deposition in which
12 you would share a room with multiple people for an
13 extended period of time?
14    MS. KITSON:  Object to the form.  This
15 calls for a legal discussion between counsel.  I am
16 the one who expressed the reservations because I have
17 a high-risk mother at home who's 72 years old, and my
18 concern was about too many people being in a room
19 together where they could not socially distance with
20 at least 6 feet between them all wearing masks.  And
21 that is my concern and not Mr. Arellano's.
22    MR. CRONE:  I appreciate you expressing
23 your concerns.
24    Q.  (BY MR. CRONE)  Do you need me to repeat
25 the question, Mr. Arellano?
```

Page 8

```
1    A.  Yes.
2    Q.  Did you have any safety concerns related to
3 doing an in-person deposition?
4    A.  Yes.
5    Q.  Okay.  But now you find yourself in a room
6 with other people; isn't that correct?
7    A.  Correct.
8    Q.  Okay.  Do you have any safety concerns now?
9    A.  Not at this time, no.
10    Q.  Okay.  If you do, please speak up and let
11 me know, because Plaintiff has no desire to put you
12 at risk.  Is that clear?
13    A.  Yes.
14    Q.  Thank you.
15         Okay.  Mr. Arellano, you understand that
16 you're testifying on behalf of Frontier Airlines,
17 Incorporated, right?
18    A.  Yes.
19    Q.  Okay.  And in order to do that, you, I
20 assume, spent a fair amount of time preparing for
21 today's deposition?
22    A.  Correct.
23    Q.  And without telling me what you spoke about
24 with your attorneys -- I have no interest in that --
25 can you tell me if you reviewed any documents in
```

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

9

1 order to prepare?

2    **A.   I did.**

3    Q.   And are those documents -- so this morning,
4 I'll tell you that I received a folder with a variety
5 of documents in it, and it was labeled -- excuse
6 me -- it was labeled Virtual Binder.

7       Do you know if -- it's called Virtual
8 Binder, Rule 30(b)(6) Reference Materials.  Is
9 that -- are those the documents you reviewed to
10 prepare for today?

11   **A.   I did, yes.**

12   Q.   Okay.  And then last Friday, so just a few
13 days ago Friday, I had received a folder of materials
14 from your attorneys that I thought was the same
15 binder, that is, a binder of materials you reviewed
16 for today's deposition.

17      Are you familiar with that folder that was
18 produced on Friday?

19   **A.   No.**

20   Q.   Okay.  So you have no idea if those are the
21 same documents or if there are different documents?

22   **A.   No.**

23   Q.   Okay.  So what -- what we'll do is at --
24 at -- at the first break we take, I'll review that so
25 we don't have to stop now.

10

1    **A.   Okay.**

2    Q.   And -- and then we'll -- we'll take it as
3 it goes.

4    **A.   Okay.**

5    Q.   How long did you spend preparing for
6 today's deposition?

7    **A.   Over the weekend.**

8    Q.   Okay.  Can you -- can you guess at how many
9 hours?

10   **A.   Oh, 12 to 15.**

11   Q.   Mr. Arellano, if you need to take a break
12 at any time -- I -- I should have mentioned it.
13 Before we get too much farther into this, if you need
14 to take a break, let me know.

15   **A.   Okay.**

16   Q.   If there -- if there's a question pending,
17 I'll just ask that you finish the question.  But
18 other than that, there aren't -- you're not hostage
19 in the room.  So if you -- if you need a break,
20 please let me know.

21   **A.   Understood.**

22   Q.   Yep.  So let's -- let's start with -- let's
23 start with your current position.  What's your
24 position with Frontier Airlines?

25   **A.   Senior manager of talent acquisition and**

11

1 **employee relations.**

2    Q.   Senior manager of talent acquisition and
3 employee relations?

4    **A.   Uh-huh.**

5    Q.   I should have mentioned, too, so in order
6 to make this work on -- on video, I'm looking at one
7 screen to look at you, and then I've got a screen to
8 the left where I can look at the exhibits.  And so if
9 I'm looking at that while talking to you and that's a
10 bit annoying, I apologize for that.  It's not --

11   **A.   Okay.**

12   Q.   Okay.  And how long have you been the
13 senior manager of talent acquisition and employee
14 relations?

15   **A.   I'm thinking.  Sorry.**

16   Q.   That's fine.

17   **A.   About five years.**

18   Q.   So roughly 2015 to 2020?

19   **A.   Yeah, yeah.**

20   Q.   And were you employed with Frontier
21 Airlines prior to 2015?

22   **A.   Prior to 2013, yes.**

23   Q.   I said 2015.  I'm sorry.

24   **A.   And let me correct that.  Actually, in this**
25 **world now, possibly maybe three years as a senior**

12

1 **manager of talent acquisition.  I came back five**
2 **years ago, though.**

3    Q.   Okay.  So what was your -- what was your
4 position prior to your current position?

5    **A.   It was senior manager of employee**
6 **relations.**

7    Q.   And how long did you hold that position?

8    **A.   In that for about two years.**

9    Q.   Okay.  And then prior to that, what was
10 your position?

11   **A.   I think it was manager of staffing and**
12 **compliance.**

13   Q.   Can you remember how long you were the
14 manager of staffing and compliance?

15   **A.   Not off the bat.  Maybe a few years.**

16   Q.   Okay.

17   **A.   Yeah.**

18   Q.   When you first started with Frontier, what
19 was your position?

20   **A.   I was the inflight administration back in**
21 **2004.**

22   Q.   So --

23   **A.   So admin.**

24   Q.   -- you were -- I'm sorry.  I'm sorry; go
25 ahead.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

13

1    A.    I was an admin, administrative assistant.
2    Q.    And that was in 2004?
3    A.    2004.
4    Q.    Okay.  And then between the time you were
5  an inflight admin in 2004 and then you were a manager
6  of staffing and compliance, did you hold any other
7  positions with Frontier?
8    A.    Yes.
9    Q.    And -- and what were those?
10   A.    After the inflight admin, I was an inflight
11  coordinator.  Then I became an inflight supervisor,
12  then inflight manager, and then employee relations
13  manager, and then the senior manager of employee
14  relations.
15   Q.    And after you were senior manager of
16  employee relations, you became the manager of
17  staffing and compliance?
18   A.    Manager of staffing and compliance,
19  correct.
20   Q.    And then you were the senior manager of
21  employee relations again in 2015, about?
22   A.    2015, yeah.
23   Q.    And then you are the senior manager, talent
24  acquisition and employee relations currently?
25   A.    Correct.

14

1    Q.    Okay.  During that time period from 2004 to
2  present, did you work for any other companies?
3    A.    I did.
4    Q.    What were those?
5    A.    Fresenius Medical Care.
6          THE REPORTER:  I'm sorry?
7          THE WITNESS:  Fresenius Medical Care.
8    Q.    (BY MR. CRONE)  And what was your position
9  there?
10   A.    Employee relations manager.
11   Q.    And were you the employee relations manager
12  concurrently with -- while at Frontier, or were there
13  gaps in -- in the time you worked at Frontier?
14   A.    Yeah, there's gaps, so between Frontier and
15  Fresenius.
16   Q.    Okay.
17   A.    Yeah.
18   Q.    And so what -- what was the time period
19  that you were at Fresenius?
20   A.    Would have been in 2010 through 2012,
21  possibly.
22   Q.    Any other companies you worked for between
23  2004 and present?
24   A.    Yes.  JetBlue Airways.
25   Q.    And what was your position there?

15

1    A.    There, manager of talent acquisition.
2    Q.    Anywhere else?
3    A.    No.
4    Q.    Okay.  And then what -- what time period
5  were you at JetBlue Airways?
6    A.    It would have been 2014, 2015.
7    Q.    Okay.  So I want to focus in on your
8  current position.  So that's senior manager of talent
9  acquisition and employee relations --
10   A.    Okay.
11   Q.    -- that you've held for about the past
12  three years.  That -- that's correct, the past three
13  years, right?
14   A.    (Nodded head up and down.)
15   Q.    Okay.  In that position, what are your --
16  what are your primary duties?
17   A.    I oversee all of talent acquisition, which
18  would be the corporate recruitment team, pilot
19  recruitment team, and the flight attendant
20  recruitment team.  And then I handle employee
21  relations for our pilot group.
22   Q.    Okay.  So when you say talent acquisition
23  for the corporate group, are you talking about -- so
24  what types of employees fall into the corporate
25  group?

16

1    A.    Oh, so the corporate group will be
2  everybody in this facility, in the corporate office:
3  marketing, accounting, finance.  Anybody who is
4  identified as a corporate employee.
5    Q.    When you say "this facility," are you --
6  are you talking about an office in Denver?
7    A.    Yes.
8    Q.    And is that office in -- at the airport?
9  Is it downtown?  Where is it located?
10   A.    It's close to the airport.
11   Q.    Okay.
12   A.    Right down the road.
13   Q.    Is that -- is that Frontier's headquarters,
14  if that makes sense?
15   A.    It -- it is, yes.
16   Q.    Is that also referred to as the GO, the
17  general office?
18   A.    No.  This place -- the -- the GO was a
19  former building.
20   Q.    And where -- where was that former
21  building?
22   A.    Also right down the road.
23   Q.    Is it -- did -- did you-all just move
24  buildings, or is it -- or are there two occupied
25  buildings now?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

17

1  A.  We moved about two years ago.
2  Q.  So everything that was referred to as the
3  "GO" in any of the documents I have referred to has
4  now moved to where you are now?
5  A.  Yes.
6  Q.  Okay.  Does that building have an acronym
7  or a name?
8  A.  Just headquarters, HQ.
9  Q.  Okay.  So you handle talent recruitment for
10 everyone that works in that headquarters?
11 A.  Correct.
12 Q.  And then -- okay.  And then you also
13 mentioned the -- the pilot group.  What -- what's
14 that about?
15 A.  Yeah.  So there's three different teams.
16 There's a corporate recruitment team, the inflight or
17 flight attendant recruitment team, and then the pile
18 recruitment team.
19 Q.  Any -- any other primary duties in your
20 current position?
21 A.  No.
22 Q.  Okay.  When you were the senior manager of
23 employee relations with Frontier for a couple of
24 years around 2015, what were your primary duties
25 then?

18

1  A.  2015, much of the focus was the inflight or
2  flight attendant employee relations business partner.
3  And I also had a few of the corporate departments as
4  well that I was responsible for.
5  Q.  Okay.  So focusing on the flight attendant
6  employee relations, what were the highlights of your
7  job in that regard?
8  A.  Can you explain a little more in terms of
9  highlights?
10 Q.  So -- so -- so what do you do?  I mean, so
11 when you say "flight attendant employee relations,"
12 what does the job entail as related to that, if that
13 makes better sense?
14 A.  If there was a concern dealing with anybody
15 within the inflight group, whether that be management
16 or flight attendant group, and they needed HR
17 consultation, I would be the point of contact.
18 Q.  What are the types of things somebody might
19 have asked for an HR consultation on?
20 A.  Whether it be a complaint that was filed
21 internally or any disagreements between flight
22 attendants, or investigation of sorts, or just
23 guidance in terms of benefits, things like that.
24 Q.  Would the investigations ever relate to
25 allegations of discrimination in the workplace?

19

1  A.  Yes.
2  Q.  How about allegations of retaliation in the
3  workplace?
4  A.  Yes.
5  Q.  How about disability-based discrimination?
6  A.  Yes.
7  Q.  Requests for reasonable accommodation?
8  A.  Yes.
9  Q.  Engaging in the interactive process with
10 somebody who's requested a reasonable accommodation?
11 A.  Yes.
12 Q.  Okay.  And then prior to your time as
13 senior manager of employee relations when you were
14 the manager of staffing and compliance, what were the
15 primary job duties in that position?
16 A.  Under the manager of compliance and
17 staffing?  That one?
18 Q.  Yes.  Yeah.
19 A.  I oversaw all of corporate -- all of talent
20 acquisition as well.  We were a smaller organization
21 at that time, but it was only one recruitment team at
22 the time.  And then compliance is the drug and
23 alcohol program associated with -- whether it be
24 preemployment and everything in between.
25 Q.  And the drug and alcohol program

20

1  preemployment, is that drug-testing somebody prior
2  to -- prior to them taking a job?
3  A.  Yeah.
4  Q.  And then "everything else in between," is
5  there some other component to that?  Does it go on
6  beyond the hiring process?
7  A.  Yes, beyond -- we do the random drug
8  testing for anybody who is DOT; the self-disclosure
9  program as well.
10 Q.  When you say "DOT," what -- what do you
11 mean by that?
12 A.  Department of Transportation.
13 Q.  So is that like if they were caught
14 drinking on the job or something?  Or is that some --
15 A.  Yes.
16 Q.  Okay.
17 A.  Primarily anybody who is safety sensitive
18 is determined as part of the -- the Department of
19 Transportation.  So the corporate group is not
20 considered a DOT role, so people that work in the --
21 at that time it would have been the GO.  They're
22 not subject to some of the requirements that a
23 safety-sensitive role would be.
24 Q.  So if somebody's in the GO and they were
25 caught drinking on the job, is that just a -- a

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

21

1 matter of internal discipline?  The -- the DOT
2 doesn't get involved?
3       A.   Yes.  That would be handled internally
4 based on who supported that core group in terms of
5 the employee relation site.
6       Q.   But somebody in a safety-sensitive position
7 is also subject to these Department of Transportation
8 regulations; is that fair?
9       A.   Yes.
10      Q.   If somebody -- what -- what does the DOT do
11 if somebody's caught using drugs or alcohol on the
12 job and they're in a safety-sensitive position?
13           MS. KITSON:  Object to the form.
14      A.   What would be -- say that again?
15      Q.   (BY MR. CRONE)  I'm -- so -- so the -- if
16 somebody's in a safety-sensitive position and they're
17 caught using drugs or alcohol on the job, what is --
18 what is DOT's response?
19      A.   That, I wouldn't know.  We would handle it
20 from a corporate side of the house, so I don't know
21 what the DOT's response would be.
22      Q.   Okay.  But what -- what would then
23 Frontier's response need to be?
24      A.   Well, we would definitely have to
25 investigate the situation and -- and determine the

22

1 next course of action.
2       Q.   Okay.  And -- which might involve random
3 drug and alcohol screenings?
4       A.   In what form?  I guess I'm confused with
5 the question.
6       Q.   Yeah.  I'm just -- I'm just trying -- when
7 you said you would have to investigate and figure out
8 the proper response, would one proper response be
9 random drug and alcohol screenings?
10          MS. KITSON:  Object to the form.
11      A.   I'm still not connecting the dots.  Yeah.
12      Q.   (BY MR. CRONE)  Okay.  Let -- let me back
13 up.
14           So -- so the question I was asking was if
15 somebody's in a safety-sensitive position and they're
16 caught using drugs or alcohol, what would Frontier's
17 response be.  Do you recall that question?
18      A.   Yes.  No.  But in what form, I guess?
19 Because if they could be -- if they're caught by --
20 in the act, in the moment, or they're said to
21 believe.  It just depends in what moment.
22           So everything goes back to the
23 documentation and what took place in the situation.
24 So that would then yield the response.  So that's
25 where I'm kind of lost in --

23

1       Q.   Yeah.  I -- yeah.  Okay.  So -- so is there
2 ever a situation where the response would be the
3 employee must submit to random drug and alcohol
4 screening?
5       A.   Not if they tested positive for drugs or
6 alcohol, no.
7       Q.   So that's never a response?
8       A.   No.  There would be -- there again, it goes
9 back to if they were identified -- if a drug test
10 deemed that the person was under the influence, it
11 would go to termination.
12      Q.   Got it.  Okay.  Got it.
13      A.   Yeah.
14      Q.   Okay.
15      A.   We're not a second-chance company, so if
16 anybody did test positive -- and that's what I was
17 trying to say.
18      Q.   I see, I see, I see.  Okay.  I -- I was --
19 I -- I had -- I thought you had mentioned that random
20 drug and alcohol screenings might occur.  I was just
21 trying to figure out when that might occur.
22      A.   Correct.
23      Q.   Okay.
24      A.   So, there's -- yeah, there's different
25 categories within the complaints program that yield a

24

1 certain action.
2       Q.   Okay.  Okay.  All right.  And then before
3 you were the manager of staffing and compliance
4 when you were the inflight supervisor, inflight
5 coordinator, and inflight admin -- I'm hoping we
6 can -- we can tackle these as a group.
7       A.   Okay.
8       Q.   Is it possible for you to delineate what
9 the job duties of each of those positions were, or do
10 you want me to go one by one?
11      A.   One by one.
12      Q.   Okay.  Let's start with -- let's start with
13 as the inflight admin.  We'll start at the bottom and
14 go up.
15      A.   Okay.
16      Q.   So what are the primary duties when you
17 were an inflight admin?
18      A.   There was truly administrative support for
19 the director of inflight services at the time.
20      Q.   Okay.  And how -- how about when you were
21 the inflight coordinator?
22      A.   Inflight coordinator, in that role, I also
23 maintained a lot of the administrative functions but
24 also then assisted the inflight payroll and
25 processing, gathering data, things of that nature.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

25

1    Q.    And how about as the -- as an inflight
2  supervisor?
3    A.    Inflight supervisor, in that moment, I
4  started to handle a lot of the dependability piece
5  and assisted with recoding schedules related to types
6  of absences that were associated with a leave of
7  absence or for a leave of absence.  And then also
8  maintained a lot of the previous role and
9  responsibilities from the admin piece.  So it's kind
10 of a merge.
11   Q.    And who -- and who -- as the inflight
12 supervisor, who are you supervising?
13   A.    I did not have any direct reports.  It was
14 more supervising the process.
15   Q.    And who -- who is in the process?  I guess,
16 what -- what employees are wrapped up in that
17 process?
18   A.    The process would be anybody who filed for
19 a leave of absence deemed by the leave-of-absence
20 department.  I would assist with them in terms of
21 their coding schedules and what helped them return to
22 work by giving them guidance, what they needed to do
23 to be back online, meaning, if there was requirements
24 that they needed to complete, any training that they
25 needed to complete, I would be the -- more of the

26

1  person disseminating that information.
2    Q.    And are these all, you know -- when you're
3  the inflight supervisor, is it -- is it -- is it all
4  flight attendants that are -- that are in this
5  process or anybody else?
6    A.    No, just flight attendants.
7    Q.    Okay.  And when you were at Fresenius and
8  you were the employee relations manager there, what
9  were your -- what were your primary duties at that
10 position?
11   A.    Basically, provided support to everybody,
12 what they deemed in the western division, and HR
13 support in terms of employee relations specific.
14        So I had Colorado, New Mexico, Utah,
15 Wyoming as part of my responsibilities.  So every
16 clinic within those states, basically I was their HR
17 point of contact on all issues.
18   Q.    And how about when you were the manager of
19 talent acquisition at JetBlue?  What were your
20 primary duties there?
21   A.    I ran their pilot recruitment programs
22 there.
23   Q.    Are you a pilot?
24   A.    No.
25   Q.    Have you ever been a flight attendant?

27

1    A.    No.
2    Q.    Is there -- is -- is there a difference at
3  Frontier between human resources and employee
4  relations?
5        MS. KITSON:  In what time frame?
6        MR. CRONE:  Any -- any time frame.
7    Q.    (BY MR. CRONE)  So let -- let's start --
8  let's start right now, currently.
9        MS. KITSON:  I'm going to object that
10 that's outside the scope.  I'm going to limit the
11 witness to what the Court has ordered and what we've
12 agreed to, which is the late 2011 to 2015 time frame.
13   Q.    (BY MR. CRONE)  Then between -- and --
14 and -- and your lawyer -- your lawyer's correct.  So
15 between November 14, 2011, and November 14, 2015, is
16 there any difference between human resources and
17 employee relations at Frontier?
18        In other words, are they different
19 departments?  Are they -- are they in the same
20 department?  Job titles?  What -- what's the
21 difference, if any?
22   A.    Employee relations is -- it's within the HR
23 department.  It's a division of the HR department.
24   Q.    Earlier, before the deposition started, I
25 had distributed Exhibit 1.  Can you -- can you pull

28

1  that up for me?
2        MS. KITSON:  Are you talking to us or the
3  court reporter?
4        MR. CRONE:  I'm asking the witness.
5        THE WITNESS:  Oh, I haven't seen anything.
6        MR. CRONE:  Oh --
7        MS. KITSON:  Yeah, I don't think we got any
8  exhibits.
9    Q.    (BY MR. CRONE)  All right.  Let's try this
10 again.  Give me just one second.  It takes a second
11 to attach the -- the file.
12        How about now?  So if you open your chat,
13 and Exhibit 1 should have -- should have popped up
14 that you can open.
15   A.    Okay.
16        MS. KITSON:  I want to be looking at this
17 together.
18   A.    It has to be downloaded.
19   Q.    (BY MR. CRONE)  I think this will be a good
20 test for whether we want to -- I think this is how we
21 have to do the exhibits, so if it's a little -- it's
22 a little cumbersome, I apologize, but were you able
23 to open it?
24   A.    No, not yet.  It's still --
25   Q.    Okay.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

29

1    A.    Save it.  Okay.

2    Q.    Okay.  Have you -- have you seen this

3 document before?

4    A.    One second.

5    Q.    Yeah, feel -- feel free to scroll through

6 it.

7    A.    I've seen it, yes.

8    Q.    Okay.  And so at page 2 through the end of

9 the document, there's a -- a list of topics that

10 Ms. Brigham had asked you to prepare to testify on

11 today.  Have you reviewed that list of topics?

12    A.    Yes.

13    Q.    And are you prepared to testify on all

14 of those topics with -- with the -- the -- the

15 understanding that any question that calls for a time

16 period is actually only referring to the end of 2011

17 through the end of 2015?

18    A.    Okay.

19    Q.    And so -- and so you are prepared to

20 testify on all of those topics today?

21    A.    Yes.

22    Q.    And what I'd like to do now is -- well,

23 actually, let's go through a few more things, and

24 then -- and then we'll take a short break so I can

25 review the folder that was submitted today.

---

30

1    A.    Okay.

2    Q.    I think that will be a bit more efficient

3 use of time.  So let's -- let's -- let's wrap up some

4 information on your background.

5         What -- what's your educational background?

6    A.    In what form?

7    Q.    Do you have any college or postgraduate

8 degrees?

9    A.    Yes.  I've got two degrees from New Mexico

10 State University.

11    Q.    And -- and what are those degrees?

12    A.    One is hotel management, bachelor's in

13 hotel management, and bachelor's in Spanish.

14    Q.    Do you have any additional certificates or

15 training or any -- anything like that?

16    A.    Training received at, like, conferences,

17 things of that nature, yeah.  Web training, yeah.

18    Q.    Are any of -- any of those trainings that

19 you've done through conferences, whether in person or

20 online -- are any of them related to the work that

21 you do now with Frontier?

22    A.    Yes, the majority of them are.

23    Q.    Okay.  Can you -- can you recall what types

24 of trainings you've attended?

25    A.    A lot of them were employee law.  A lot of

---

31

1 them were employee relation conferences.  Some were

2 FMLA-specific.  Yeah.

3    Q.    Any of them discuss the ADA?

4    A.    Yes.

5    Q.    Do you -- do you attend any trainings

6 related to compliance with the ADA that are put on

7 by Frontier, like any internal in-house type of

8 trainings?

9    A.    No.

10    Q.    What about related to anti-discrimination

11 laws more generally, whether it has to do with race

12 or gender or -- or anything like that?

13    A.    And when you say in training, conducted by

14 the company or . . .

15    Q.    Yeah.  So -- so let's -- yeah, let's --

16 let's narrow that down.  Either -- either conducted

17 by the company or perhaps the company hires a third

18 party to do it.

19    A.    No.  I mean, right now I do conduct the

20 discrimination harassment training for all new

21 employee orientation.  I handle that on my site for

22 pilot hiring.  I do that on a regular basis up until

23 recently, every month.  But in terms of participating

24 in the training, not recently.

25    Q.    Okay.  Has -- has -- has Frontier ever put

---

32

1 on a training or hired a third party to put on a

2 training related to anti-discrimination laws in the

3 workplace ever, in your recollection?

4         MS. KITSON:  And, again, I'll limit that

5 time frame to 2011 to 2015.

6    Q.    (BY MR. CRONE)  So, again, with that time

7 frame in mind, has it ever occurred, to your

8 recollection?

9    A.    I don't recall at this point.  I know there

10 was training; I just don't know if it was in that

11 time period, no.  Very possible, though.

12    Q.    All right.

13         MR. CRONE:  Okay.  Mr. Arellano, I want

14 to -- I want to take a break.  I -- I typically would

15 try to get a little farther down the road, but like I

16 had mentioned, I want to get through that folder of

17 documents just to try to be efficient with -- with

18 our time and make sure I'm not repeating documents

19 and such as -- as we go down the road.

20         MR. CRONE:  So, Danielle and company, if --

21 if you don't mind if we go off the record for -- for

22 about 15 minutes.

23         MS. KITSON:  Sure.  Sounds good.

24         MR. CRONE:  Yeah.  If we reconvened at

25 9:50, I think that would be perfect.

---

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

33

1          MS. KITSON:  Sounds good.  Will do.
2          MR. CRONE:  Thank you.
3          THE WITNESS:  Thank you.
4          THE VIDEOGRAPHER:  The time now is
5  9:34 a.m.  We're off the record.
6          (Recess from 9:34 a.m. to 9:50 a.m.)
7          THE VIDEOGRAPHER:  The time now is
8  9:50 a.m.  We're back on the record.
9      Q.   (BY MR. CRONE)  Mr. Arellano, do you go by
10 Jerry as a first name?
11     A.   Yes.
12     Q.   Okay.  But your full name is Gerardo?
13     A.   Correct.
14     Q.   Okay.  Thank you.
15          Okay.  So I want to -- I want to talk a bit
16 about -- or I want to ask you to talk a bit about the
17 organizational structure of Frontier Airlines as it
18 relates to Plaintiff Rebecca Brigham.
19     A.   Okay.
20     Q.   So I want to put a document in front of
21 you.  This will be Exhibit 2.  Let's see if we can
22 make this work a little easier this time.
23          Okay.  So that -- I assume the noise I
24 heard is Exhibit 2 coming to you.
25     A.   Yeah.

34

1      Q.   And I know -- yeah, I know you'll take a
2  minute to pull it up.  Once you have it pulled it up,
3  let me know.
4      A.   Okay.
5          MS. KITSON:  Looks like Tab 1 from the
6  binder.  Is that --
7          MR. CRONE:  That's correct.  Yep.
8      A.   Okay.
9      Q.   (BY MR. CRONE)  Okay.  So Exhibit 2 is
10 labeled Frontier Organizational Chart September 2015.
11 Is this -- have you seen this document before?
12     A.   Give me a second.  Let me -- let me open it
13 up.
14     Q.   Yeah, please do.  Yeah.
15     A.   Okay.
16          MS. KITSON:  And, John, if there's any
17 way -- I don't know if Evan can e-mail those exhibits
18 to me.  I can probably pull those up for Mr. Arellano
19 faster than it's taking to download, if that makes
20 sense.
21          MR. CRONE:  Yeah.  Once -- once we get
22 through the binder ones, I think we can make that
23 work.  But for now --
24          MS. KITSON:  Okay.
25          MR. CRONE:  -- I'm kind of having to just

35

1  take them out.  I -- I -- I hoped -- I was just going
2  to mark the entire binder and then go through it that
3  way --
4          MS. KITSON:  Okay.
5          MR. CRONE:  -- but I think, with the two
6  different versions, it's easier to just sort of pull
7  these out.  So I think -- once we get through this
8  stuff, I think it will be --
9          MS. KITSON:  Easier?
10         MR. CRONE:  -- a bit easier, yeah.
11         MS. KITSON:  And, actually, I have the
12 entire binder on my hard drive, too, so if we're
13 referring to tabs, I can pull that up.
14         MR. CRONE:  Yeah, to the -- yeah, to the
15 extent I can refer to tabs and that makes it easier
16 for us, I'll try to.  But if it's in the other
17 folder, it might be just Bates numbers, so . . .
18     A.   So I have it up.
19     Q.   (BY MR. CRONE)  Okay.  Thanks.
20         Okay.  So is this -- so have you seen this
21 document before?
22     A.   Yes.
23     Q.   And this is a document you relied upon in
24 preparing for today's deposition?
25     A.   Yes.

36

1      Q.   Okay.  So I was hoping you could walk me
2  through this chart, and first I just want to nail
3  down the time period for the chart.
4          So is this the organization -- organization
5  of the company for -- is it just September 2015, or
6  is it the whole year?  Is that when the document was
7  revised, or sort of how does that work?
8      A.   I'm just going to look through it real
9  quickly.
10     Q.   Oh, yeah, yeah.  Please do.
11     A.   I believe that -- to my understanding, that
12 was the org chart at September 2015.
13     Q.   Okay.
14     A.   For that period, yeah.
15     Q.   Okay.  And if you look at the first page of
16 it -- or not the first page -- sorry -- the second
17 page where it has Barry Biff [sic] at the top -- I
18 don't know if I'm pronouncing that right, but is --
19     A.   Yeah.
20     Q.   -- is -- is Mr. Biff the president of
21 Frontier, or is this, like, some Denver division?
22     A.   No, he's the president of Frontier.
23     Q.   Okay.  So then as we work down that chart
24 page by page, where are you in this chart?
25     A.   On page 1 where it shows Barry Biffle?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

37

1    Q.    Yeah.  Oh, "Biffle."  Thank you.  Sorry.
2    A.    **In that time frame, September 2015, I would**
3 **be under Jackie Peter.**
4    Q.    Okay.  And then where would I -- where --
5 in 2015 before Ms. Brigham was -- was terminated --
6    A.    **Uh-huh.**
7    Q.    -- where would I place her in this chart?
8    A.    **That would place her under --**
9    Q.    Is she on page 4?
10    A.    **Let me check.  Should be listed under the**
11 **one that has Laura Rush, Director of Inflight**
12 **Services, at the top.**
13    Q.    Got it.  So -- so Ms. Brigham would fall on
14 that -- in that square that says "flight attendant"
15 at the bottom?
16    A.    **Correct.**
17    Q.    Okay.  And 1187, is that how many flight
18 attendants that were employed as of the date of this
19 org chart?
20    A.    **That is correct.**
21    Q.    Okay.  Is that just -- how do you -- how do
22 you organize the flight attendants?  Are they -- is
23 that 1187 companywide?  Is that just based out of a
24 certain city?  Or how does that work?
25    A.    **That -- that is companywide.**

38

1    Q.    Okay.  Okay.  And so then -- so then the
2 flight attendants that fall into that box of 1187,
3 Ms. Brigham included --
4    A.    **Okay.**
5    Q.    -- their -- their direct supervisors -- is
6 that the line above them, Stefanie Coppedge,
7 et cetera?
8    A.    **That is correct.**
9    Q.    Okay.  And all of those people have titles
10 that say "Supervisor, Inflight."
11          Is that the inflight supervisor
12 position -- is that the same type of position you
13 held that you described earlier?
14    A.    **No, it's a little bit different.**
15    Q.    Can you tell me how it's different?
16    A.    **So the individuals listed here are**
17 **individuals who manage the day-to-day operation.**
18 **My -- so specifically when I was supervisor, I didn't**
19 **oversee any flight attendants.  I oversaw the**
20 **processes associated with all the administrative**
21 **pieces of the -- of the role.**
22          **So I had no direct reports, nor did I have**
23 **oversight of any of the flight attendants.**
24    Q.    Got it.  And -- and so these individuals
25 on the -- on the -- on the org chart,

39

1 Stephanie Coppedge, et cetera, on that line
2 directly above Plaintiff's box --
3    A.    **Uh-huh.**
4    Q.    -- what are their -- what are their day --
5 day-to-day duties or their primary duties?  Do you
6 know?
7    A.    **Their primary duty was to supervise or**
8 **oversee a group of flight attendants assigned to**
9 **them.  Typically, that was alphabetical order at the**
10 **time.  And so they managed all the day-to-day piece**
11 **specific to that individual or to that work group.**
12    Q.    Do they handle the scheduling of flight
13 attendants?  Is that part of the day-to-day?
14    A.    **No.**
15    Q.    Okay.  Who -- who handles that?
16    A.    **That would be our crew-scheduling**
17 **department.**
18    Q.    Is anyone in the -- in the crew-scheduling
19 department -- or excuse me.  Let me start over.
20          Was anybody in the crew-scheduling
21 department a supervisor of Plaintiff Rebecca Brigham?
22    A.    **In -- I guess I'm not understanding the --**
23    Q.    Yeah.  I'm trying -- I'm trying to figure
24 out -- so I can see that Ms. Brigham's direct
25 supervisor here is Stefanie Coppedge, et cetera, in

40

1 that line above her.
2          Where does the crew schedule -- where does
3 the crew-scheduling department fall in?  Are they
4 even on this chart, or are they somewhere else?
5    A.    **They're somewhere else.  They would be**
6 **under the SOC, systems operation control department.**
7    Q.    Okay.  So Ms. Brigham wouldn't have
8 reported to anybody in the crew-scheduling
9 department?
10    A.    **That is correct.**
11    Q.    Okay.  And then above the line that
12 includes Stefanie Coppedge --
13    A.    **Uh-huh.**
14    Q.    -- I see Kari Thompson is the manager of
15 inflight services?
16    A.    **Correct.**
17    Q.    Is that similar to the role you once held,
18 or is that something different too?
19    A.    **No, mine was completely different.**
20    Q.    Okay.  So what is -- can you describe
21 Kari Thompson's role at the time of this org chart,
22 what her primary duties are?
23    A.    **Yeah.  So she oversaw all of the**
24 **supervisors.  She -- they were the next direct line,**
25 **so all those people -- people listed there were her**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

41

1 direct reports.  So she not only oversaw the
2 day-to-day, but she was also the point of contact
3 from the inflight side of the house with AFA, the
4 union organization.
5     Q.    Okay.
6     A.    So if there were grievances, she would sit
7 in on those behalf, as well as representing the
8 organization.
9     Q.    Representing Frontier?
10    A.    Frontier, correct.
11    Q.    And I want to come back and talk about the
12 grievance process a little bit, but -- but we'll
13 circle back to that in just a few minutes just to get
14 through the chart here.
15         I -- I don't see that there's a line
16 connecting Nicholas Kohlhepp -- if I'm pronouncing
17 that right -- or Lara Jacobsen to Ms. Brigham's
18 square, so she didn't report to either of those two
19 individuals, did she?
20    A.    That is correct.
21    Q.    Okay.  But then Laura Rush, who's the
22 director of inflight services, ultimately was then
23 Ms. Thompson's boss?
24    A.    Correct.
25    Q.    And then what were Laura Rush's primary

42

1 duties?
2     A.    Director of inflight services, so she
3 oversaw the entire operation from an inflight
4 perspective; she also was the point of contact
5 between the department and all the executive team;
6 and she also was the -- oversaw a lot of the
7 discussions, decisions associated with flight
8 attendants in general, work -- work procedures,
9 operating procedures, the contract, quote, the
10 bargaining agreement.
11        Also, on the training side of the house, as
12 you can see, Laura Jacobson was the manager of
13 inflight, so she also oversaw all of the training
14 capabilities, whether it be initial, recurrent, or
15 ground school, things of that nature.
16    Q.    Okay.  And thinking about this chart as
17 we've just discussed it, was it different in 2014?
18 Were -- were there different -- and so I don't mean
19 the whole chart, but just this page with the director
20 of inflight services on the top down to the flight
21 attendants, do you know if that was different at all
22 for 2014?
23    A.    Not off the hand.  I know we were growing
24 the organization, so things often did change in
25 reporting structure departments.

43

1         In 2014, probably Nicholas might have not
2 been in that role, policies and procedures.  But I --
3 it might have been different, definitely.
4     Q.    Okay.  What about in 2013?
5     A.    2013, it was definitely different.  When I
6 became inflight manager, then the supervisors, if I
7 remember correctly, they were managers, not
8 supervisors.
9     Q.    Were they -- and so were they -- so the
10 supervisors and -- that are indicated on 2015 -- in
11 the 2015 chart, in 2013 they were called managers?
12    A.    It's hard for me to say.  I'm trying to
13 think, because at one point, the organization was
14 purchased by Republic Airways, which would have been
15 around 2010.
16        A lot of work functions from Denver or
17 Frontier Airlines either transitioned to Indianapolis
18 under the Republic Airways umbrella, so a lot of
19 these rules were not in existence because they were
20 handled by a different organization or part of the, I
21 guess, parent company at that time.
22        So 2013, I -- I don't know.  I came back in
23 2012, I believe.
24    Q.    Okay.
25    A.    So, yeah, it's hard to say.  It's hard to

44

1 say.
2     Q.    When -- you said Republic Airways bought
3 Frontier in 2010?
4     A.    Yeah.
5     Q.    Does Republic Airways still own Frontier?
6     A.    No.
7     Q.    Okay.  How long did Republic Airways own
8 Frontier?  Do you know?
9     A.    Not offhand, I don't.
10    Q.    Okay.
11    A.    I would have to refer to documents.
12    Q.    But -- but I guess we could -- we could
13 presume less than ten years?
14    A.    Yes.
15    Q.    Yeah?  Okay.
16        Does -- do you know if Republic Airways
17 ever owned any other airlines?
18    A.    I know there was Chautauqua Airlines.  They
19 had Shuttle America.  Frontier was part of that.  I
20 can't think of any others.
21    Q.    When you're -- and when you're talking
22 about Frontier was growing and -- and changes were
23 occurring in, like, 2012, 2013 and after, is that --
24 does that have anything to do with being owned by
25 Republic Airways, or do you know?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

45

1   A.  I do not know, no.  It was outside of my
2 wheelhouse.
3   Q.  Okay.  Was -- was Frontier -- was Frontier
4 expanding as a company from roughly 2012 forward?
5   A.  Yes.
6   Q.  Okay.  And then this -- back to the
7 question about how this org chart has changed over
8 time.  Can you recall if there were differences in
9 2012 to this chart?
10   A.  You know, I honestly don't know.
11   Q.  Okay.  And then -- and then 2011?
12   A.  No, not -- not offhand, no.
13   Q.  Okay.  I'm going to put -- try this -- try
14 this again here.  I'm going to put Exhibit 3 in front
15 of you, and this ought to be -- it ought to be
16 quicker to discuss this than it is to put in front of
17 you, I hope.
18   MS. KITSON:  Is it a tab number, John?
19   MR. CRONE:  No, it's not.  It's -- it's --
20   MS. KITSON:  Oh, shoot.  Okay.
21   MR. CRONE:  Yeah.  But I -- I just have --
22 I just have one quick question.  I -- I just want to
23 make the record clear.
24   Q.  (BY MR. CRONE)  Just let me know when
25 you -- you have it pulled up.

46

1   A.  I have it open, yeah.
2   Q.  Great.  Thank you.
3       So -- so have you -- have you seen this
4 order before?
5   A.  I don't believe I have.
6   Q.  Okay.  And I'm -- at the -- at the bottom
7 of page 1 where it says Ordered, it says Defendant's
8 witness shall be prepared to testify for the time
9 frame of four years preceding Plaintiff's date of
10 termination.
11      Myself and your lawyers have mentioned a
12 few times here that you are to testify in this rough
13 time period of the end of 2011 to the end of 2015.
14 Does that make sense to you?
15   A.  It does.  I do have some documents here in
16 front of me.
17   Q.  Okay.  Good.  Okay.  So you can set that
18 aside.
19   A.  Okay.
20   Q.  Okay.  So I want to -- what I want to do is
21 I want to ask you some questions that focus you in
22 on -- I'm hoping you can explain to me what exactly a
23 flight attendant does.
24   A.  Okay.
25   Q.  And so -- but I want to ground this in

47

1 time, too, because I assume people's jobs change over
2 time, even if only slightly.
3   A.  Uh-huh.
4   Q.  And so I was hoping you could -- you could
5 explain to me what -- what -- what the primary job
6 duties of a flight attendant were --
7   A.  Okay.
8   Q.  -- in -- in roughly the end of 2011 going
9 into 2012.
10   A.  Perfect.  Are you okay if I refer to the
11 job description?
12   Q.  Please do.  Yeah, that's fine.  If you can
13 just let me know what page number it is, and then
14 please -- yeah, please do.
15   A.  Looks like it says 0001863.
16   Q.  1863?
17   A.  Tab Number 7.
18   Q.  Oh, Tab Number 7?
19   MR. CRONE:  Danielle, do you mind throwing
20 that in here, and we could call that 2-1?
21   MS. KITSON:  So, unfortunately, I have
22 really low bandwidth on my computer --
23   MR. CRONE:  Oh.
24   MS. KITSON:  -- and I've got these on my
25 hard drive.  So -- in fact, I think I've been kicked

48

1 out of the Zoom meeting because of my low bandwidth.
2   MR. CRONE:  No, you're fine.  Hold on.
3 Give me just --
4   MS. KITSON:  The court -- court reporter
5 has the tabs as well.  I believe they were sent.
6   MR. CRONE:  Okay.  So if we could mark
7 Tab 7 as Exhibit 2-1, that would be great.
8   Q.  (BY MR. CRONE)  And then, Mr. Arellano, if
9 you want to refer to that to answer the question,
10 that would be fantastic.
11   A.  Yes.  So you're asking what the primary
12 responsibilities are?
13   Q.  Yeah.  For -- for -- for a flight attendant
14 in 2011.  And just to preview the questions going
15 forward, it will sort of be "and then up through
16 2015."  So if -- if it helps you to just explain
17 that, tell me in one shot, that's fine too.
18   A.  Do you want me to read what it says here
19 or, I guess, overall information about the role?
20   Q.  Yeah, yeah, overall.  You certainly don't
21 need to read the document.  Just what's your
22 understanding of -- of what their primary job duties
23 are is fine.
24   A.  Okay.  (Inaudible.)
25   MS. KITSON:  I'm trying to get back on, and

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

49

1 I'm not able to mute it. Hold on one second.
2         MR. CRONE: That's fine. This is the --
3 this is the fun of the new world.
4         MS. KITSON: Right. I've got to get this
5 shut down.
6         MR. CRONE: No problem.
7         MS. KITSON: It's not letting me do it.
8 Let's try having you mute.
9         Okay. Can you hear -- let's see if we can
10 hear you.
11         MR. CRONE: There's -- there's -- yeah,
12 there's still an echo.
13         THE WITNESS: Yeah, I'm good to go.
14         MS. KITSON: Okay. You unmute. Are you
15 unmuted?
16         THE WITNESS: I'm unmuted, yeah.
17         MS. KITSON: Okay. Can you guys hear him?
18         MR. CRONE: Yeah.
19         THE WITNESS: Can you hear me?
20         MR. CRONE: Yeah, and -- and -- and with no
21 echo, so . . .
22         Q. (BY MR. CRONE) If you can recall what you
23 were about to discuss, feel free. If you need me to
24 repeat it, that's fine.
25         A. Ultimately, the role of the flight

50

1 attendant is not only a safety professional, but
2 they're there to make sure the passenger experience
3 is a positive one from every aspect of serving drinks
4 and sharing -- safety is obviously the most
5 important.
6         Ensuring everything goes smooth from
7 beginning to end in the cabin and everything in
8 between. Serving drinks, being mindful, making aware
9 of any situation that might be ongoing on the
10 aircraft.
11         So there's a lot of components to the role
12 of the flight attendant versus just having a beverage
13 cart pushing up and down the aisle.
14         Q. As far as the safety component is
15 concerned --
16         A. Yeah.
17         Q. -- can you break that down for me? Can you
18 explain to me exactly what a flight attendant does to
19 ensure the passengers are safe?
20         A. Perfect. Upon boarding, to make sure that
21 everybody's assigned to their specific seats. A lot
22 of that is determined based on the manifest, and it's
23 important that passengers seat -- are seated in their
24 proper seats for that specific reason.
25         Flight attendants do undergo a training.

51

1 As part of their training, they go through
2 self-defense training. They go through how to
3 restrain a passenger in the event of emergency;
4 what -- all the dos and don'ts should things get
5 escalated.
6         They also need to know how to unarm an
7 individual if they're trying to create harm on any
8 passenger. They go through proper door drills, how
9 to open up their -- the door, the airplane door, how
10 to not open up the -- the door.
11         Obviously, the beverage cart, what is
12 stowed where. At that time, we did have coffee pots
13 on the aircraft. They knew how to make the coffee.
14 Outside of that, how to defend themselves with the
15 proper equipment, coffee, hot liquids, things of that
16 nature.
17         They were also informed of how to maintain
18 and unlatch the bathroom doors, what happens, how to
19 unlock. Emergency procedures as well.
20         Also informed in the event of evacuation --
21 evacuation; how to evacuate the aircraft, how to
22 deploy the slide from the aircraft. Let's see. How
23 to stow luggage up to how to stow the beverage cart.
24         So that's kind of a summary piece of that
25 from a safety perspective.

52

1         Q. Are there no more -- is there -- are there
2 no more coffee pots due to COVID?
3         A. It's a different type of -- I haven't been
4 on an aircraft recently, but I know they removed
5 the -- in terms of weight, the coffee pots actually
6 are extremely heavy. But it -- it's a little bit
7 different now. But yeah.
8         Q. So it's not a pandemic-related thing; it's
9 a --
10         A. No.
11         Q. Okay. And so what about intoxicated
12 passengers? Are they trained to deal with those?
13         A. Yes.
14         Q. Is there any component to that training
15 that trains them on how to identify whether
16 somebody's under the influence of alcohol or drugs?
17         A. Definitely.
18         Q. Okay. And then the other sort of broad
19 component that you mentioned which is related to the
20 passenger experience, which, you mentioned, is -- is
21 serving drinks and being mindful of the passengers --
22 are there -- is there anything else going on there?
23 Can you -- can you flush that out for me?
24         A. Say that again? I'm sorry.
25         Q. That's fine. The -- the passenger

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

53

1 experience, so -- so not thinking about the safety
2 component, which you just outlined really well for
3 me --
4     A.   Uh-huh.
5     Q.   -- on the passenger experience side, is
6 there more to it there?  Can you -- can you outline
7 that a bit or break it down a bit for me?
8     A.   Yeah, just making sure their experience is
9 a positive one, from either -- A, if they have
10 questions, if they're wanting additional food items
11 or -- or snacks, things of that nature.
12         A lot of times -- there may be a baby
13 crying onboard.  There -- sometimes they go and try
14 and assist with that to make the experience for
15 everybody a very positive one.
16         So in terms of the passenger experience,
17 it's upmost because, at the end of the day, we want
18 that returning customer to come back.
19         So if they have a positive experience,
20 which is -- dealt with the flight attendants, which
21 is the first line of -- the passenger sees, it's
22 important that that experience be a -- positive from
23 beginning to end.
24     Q.   What about fearful flyers?  Are they
25 trained to -- to -- to -- to calm or comfort fearful

54

1 flyers?
2     A.   Definitely.  And I guess fearful can be
3 in -- in all forms.  For example, I'm not -- I don't
4 like flying, but I do it for the role.  And so at
5 times, they either engage in conversation, trying to
6 just calm the anxiety down.  So it depends on fearful
7 in what form.  It could be a variety of forms.
8         So, yeah, I think they are trained in that
9 customer service to make sure to ease the anxiety,
10 which I think then leads to any type of fear.
11     Q.   I also dislike flying.  Talking about it
12 right now kind of makes me nervous, to be honest.
13         I -- it -- it just -- it strikes me that
14 the position is stressful.  Is it -- is it fair to
15 call it a stressful position?
16     A.   The flight attendant role?
17     Q.   Yes.
18     A.   It -- it depends on who you ask.  I think a
19 lot of people see it a little bit differently.  So I
20 don't know if it would be -- I -- I don't -- I don't
21 think it's a stressful role, but it depends, again, I
22 would say, on who you ask.
23     Q.   Is it fair to say whether it's stressful or
24 not is subjective?
25     A.   Yeah.

55

1     Q.   What about -- what about the -- the actual
2 day-to-day schedule?  So setting aside what flight
3 attendants do, what their duties actually are,
4 what -- what's a day look like?  When do they start?
5 Where do they go?  How does the day end?  Can you
6 walk me through that, if that makes sense.
7     A.   That's a big question.  I guess there's so
8 many components to that.  So are you looking at what
9 is the day in the life of a flight attendant, or what
10 is their schedule specifically?
11     Q.   Yeah, I'm looking for a day in the life as
12 related to their schedule.  I think -- I think the
13 way to make this easier to look at is let's think
14 about, were you familiar, between 2011 and 2015, with
15 Rebecca Brigham personally?
16     A.   Yes.  Between 2011 and '15, yes.  I am --
17 the company came back -- when I say "came back," came
18 back from Indianapolis in 2012, which is when I
19 returned, so from 2012 forward.
20     Q.   Okay.  And -- and so she was a flight
21 attendant that you knew from the job; is that -- is
22 that correct?
23     A.   Right.  Yeah.
24     Q.   And so thinking about the types of flights
25 that she worked on and the routes that she was

56

1 scheduled on and that sort of thing, what are -- what
2 does a day look like for that flight attendant?  What
3 time does it start?  Where do they go?  How does it
4 end?  That -- that sort thing.
5     A.   And it's hard to answer that question
6 because everybody had a different -- a flight
7 attendant had a different way to bid a schedule based
8 on their preference.
9     Q.   Okay.
10     A.   So every day would be different for each
11 flight attendant based on the type of routes they bid
12 for, the type of flying they bid for.  So it's hard
13 to say what that would be, ideally, for every -- in a
14 general purpose.
15         It just depends on preferential treatment
16 on the individuals who bid and the type of schedule
17 and the type of flying they wanted to do: locations,
18 if they wanted day trips, if they wanted redeyes, if
19 they wanted layovers.  It just depended on the
20 individual.  It's all completely different.  It's
21 hard to answer that question.
22     Q.   Yeah, and that's actually very helpful.
23 And so -- so the -- so the flight attendants are able
24 to bid on certain types of trips that they want to
25 work on?

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

57

1    A.   Yes.
2    Q.   Okay.  How does that -- how does that
3 bidding process work?
4    A.   They go through -- which I believe the
5 scene is they submit their bid through -- I believe
6 at that time it would have been -- Sabre is the
7 overall software.
8         They submit their bid there.  It goes
9 through -- and, again, there's so many preferences as
10 to how they're able to bid their schedule.  "If this,
11 then that" is kind of the process, and the networking
12 part of that.
13        And so when they submit the bid, they --
14 essentially they're submitting their preferences.
15 And it can come down to I don't want to work this
16 type of trip; I don't want to work into these cities;
17 I do want to work these cities; I'd rather not do day
18 trips, layovers, redeyes; I'd rather only do two
19 days, not three days.
20        So there's so many preferences that they're
21 able to do that, and those preferences are large.
22        Once they submit their bid, as we call it,
23 then it goes through -- and, again, it's all a
24 seniority-based system.  The system is then kind of
25 calculated based on seniority based on that bid to

58

1 see who can hold that particular trip.
2    Q.   Okay.
3    A.   And then at the end of the day, it spits
4 out everybody's -- sorry -- it kind of displays
5 everybody's schedule, keeping in mind all those rules
6 and regulations associated with the collective
7 bargaining agreement.
8    Q.   So through that process, are there any
9 flight attendants -- and, again, limited by the time
10 period end of 2011 to end of 2015 -- were there any
11 flight attendants that were able to obtain a
12 relatively set schedule, you know, every -- every --
13 roughly every week they'd get the same trips, or was
14 it just always different all the time?
15    A.   It would depend -- that's also a difficult
16 question to answer because it depends on that type of
17 month.  If -- it depends on our seasons, if it's a
18 busy season, if it's summer, if it's a holiday
19 season.
20        But if you were a very, very senior flight
21 attendant, obviously they get the first pick of
22 everything that's out there.  So if that individual
23 always bid a certain trip, it would be very likely
24 that they would have a set schedule.
25        But, again, it's all based on preference

59

1 and what they can hold, and in that moment.  Some
2 people wanted holidays off, so they would bid their
3 schedules accordingly.  If there was some time that
4 they were going on vacation, they would bid their
5 schedule accordingly.  So it would always constantly
6 change.
7    Q.   So is one of the -- the perks of becoming a
8 more senior flight attendant having more control over
9 your schedule?
10    A.   Definitely leads to quality of life.
11    Q.   Yeah.  Do flight attendants ever perform
12 duties at the headquarters or what was called the GO?
13 Or are all of their duties performed inflight?
14    A.   In what -- what form?  I guess if you can
15 elaborate.
16    Q.   Yeah, sure.  So -- so the -- the primary
17 job duties that you've described for me of a flight
18 attendant during the time period, I imagine all of
19 that happening on the plane or at the gate, you know,
20 sort of inflight or -- on the way to go fly.  Is
21 that -- is that fair, my assumption?
22    A.   No, because there's also the training
23 component.
24    Q.   Oh, okay.
25    A.   So they would have to go do training,

60

1 recurrent training, ground school, train -- if there
2 was a new policy being rolled out or something that
3 the flight attendants -- say, for example, that
4 they're changing the beverage service or a new
5 product being rolled out.  They would have to go
6 through that training, which would be off the
7 aircraft.
8    Q.   And what's the -- would -- would that occur
9 at the -- at what was the GO or headquarters now?
10    A.   At that time, yes, that's where we actually
11 had all of the training.  Recurrent training was also
12 there.
13    Q.   And what is flight school?
14    A.   Flight school is anybody -- any flight
15 attendant coming on board, they go through -- at that
16 time -- the training has since revolved.  I think it
17 was six weeks that they would have to go through
18 training.  And in that, they covered everything that
19 they needed to know.
20        They reviewed the collective bargaining
21 agreement with them as well.  The training manual,
22 basically, is everything that the flight attendant
23 needs to know before they're actually released to
24 line.
25        They would go through self-defense

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

---

61

1 training.  They would go through beverage cart
2 training service.  Rules and regulations.  FARs
3 associated with the FAA.
4       They would go through -- they were taken
5 out by the airport to do -- how to distinguish flames
6 if the plane got caught on -- got on -- on fire.
7 They would do how to open up the doors, slide
8 deployment.  They would actually have to jump down
9 the slide to make sure there's no issues or concerns
10 with that.  So, yeah, quite a bit.
11       Q.   When you mentioned that they would review
12 the collective bargaining agreement as part of this
13 training, who, during the -- the time period that we
14 defined, would have been that individual in charge of
15 reviewing the collective bargaining agreement with
16 the new flight attendants?
17       A.   And let me -- I guess I should repeat that.
18 They would discuss the -- that the flight attendants
19 were covered by the collective bargaining agreement.
20 I'm not sure they went through it by detail.
21       Q.   Okay.
22       A.   But the FAA or the AFA or -- I'm not sure
23 who the union representation was at that time.  I
24 believe they just came in and would say, Hi, we're
25 representing this.

---

62

1       Q.   Okay.  Got it.
2       A.   If you have any questions here forth, you
3 can reach out to us.  But, yeah, I think that was
4 maybe one day they would came in.
5       Q.   And who was the person again -- I think you
6 mentioned it already, so I apologize.  Who was the
7 person on the org chart we looked at that -- that
8 was -- I think you mentioned one individual was in
9 charge of overseeing the -- the CBA or being the
10 liaison to the union or something like that,
11 seeing --
12       A.   It -- it would depend.  You know, there's
13 Laura Rush.  Under her would be Kari Thompson.  And
14 then you had Nicholas Kohlhepp on the side that
15 handled all policies and procedures; basically, the
16 operating procedures for the flight attendants.
17       So in terms of the collective bargaining
18 agreement, a lot of the language in there would be --
19 roll under the labor department, the language
20 specifically.
21       The management of the collective
22 bargaining agreement was a shared responsibility with
23 Kari Thompson, Laura Rush, and employee relations at
24 that time, and our labor department.
25       Q.   Did we -- did we -- I don't think we saw

---

63

1 anybody in the labor department on the -- on the org
2 chart that I can recall; is that correct?
3       A.   It was -- at that time, labor was part of
4 HR.
5       Q.   Oh, it was?  Okay.
6       A.   Yeah, yeah.
7       Q.   All right.  Okay.  So outside of the --
8 outside of the -- the training that at that time
9 would occur at the GO or headquarters, was there
10 anything else a flight attendant might do at the GO
11 or at headquarters?
12       A.   And, again, that's also a tough question.
13 So, for example, a lot of our instructors were
14 certified flight attendants.  Some of them would fly;
15 some of them would instruct.  And so they would work
16 at the GO under the training department.
17       So everybody -- let's see.  Our inflight
18 instructors as well assisted out at the airport.  It
19 would just depend.  I think at times they would use
20 flight attendants in other capacities, but I don't
21 know all the details around that.
22       Q.   Okay.  What if a -- what if a flight
23 attendant became injured or something like that and
24 they couldn't -- couldn't stand for long periods, or
25 whatever the case may be, they couldn't work in -- in

---

64

1 the plane and do the inflight service?  Would they
2 ever be temporarily reassigned to the GO or
3 headquarters?
4       A.   At times, yeah.
5       Q.   Can you recall any of those times?  Can --
6 can you recall specifically that ever occurring with
7 respect to any flight attendant?
8       A.   Yeah.  I don't know the specific names, but
9 yes.
10       Q.   Can you -- whatever is coming to mind,
11 can you describe for me what the injury was that led
12 to being reassigned temporarily to the GO or
13 headquarters?
14       A.   Yeah, what the injury was specifically
15 or . . .
16       Q.   Yeah, or just -- or just -- well, whatever
17 the cause was.  Whatever --
18       A.   It would be attributed to work comp or
19 on-the-job injury, the work comp program.
20       Q.   So if somebody was injured on the -- if
21 somebody was a flight attendant, they were injured on
22 the job, they might be temporarily reassigned to the
23 GO or headquarters?  Am I -- am I describing that
24 right?
25       A.   Yeah.

---

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

65

1    Q.   Okay.  And then what types of work might
2 they be assigned there?
3    **A.   It would just depend on what was available,**
4 **what was needed.  It was pretty much administrative.**
5    Q.   Okay.  When this has occurred in the -- in
6 the past, can you recall how long the employee was --
7 was reassigned to the GO or headquarters?
8        MS. KITSON:  Object to the form.
9    **A.   I don't know the specific time frame.  If**
10 **anything, it was always different.  It would be based**
11 **upon restrictions, the improvement of the individual.**
12 **Yeah, so it would -- it would vary.**
13    Q.   (BY MR. CRONE)  Okay.  What -- what's --
14 what's the shortest time you can recall somebody was
15 reassigned to the GO?
16    **A.   I can't -- I can't think offhand.  I mean,**
17 **it could have been a month, could have been two.**
18 **Yeah.**
19    Q.   Can you recall the longest time you -- that
20 a flight attendant was reassigned to the GO?
21    **A.   Not specifically, no.**
22    Q.   Can you recall roughly how many flight
23 attendants you recall -- now I'm not making sense.
24 Let me start over.
25        Can you recall roughly how many flight

---

66

1 attendants were reassigned to the GO due to a work
2 comp injury or something like that during the
3 relevant time period?
4        MS. KITSON:  I'm just going to interpose an
5 objection that this is outside the scope, because the
6 objection that we lodged and that was accepted is
7 that we would only be testifying about disability
8 accommodations, not temporary conditions.
9        That said, if you want to ask him in his
10 individual capacity if he has any memory of that, I
11 just want to make it clear that he's testifying on
12 his own behalf and not the company's.
13        MR. CRONE:  Yeah.  So the objection's
14 noted.
15    Q.   (BY MR. CRONE)  So, Mr. Arellano, do -- do
16 you need me to repeat that question?
17    **A.   Yes.**
18    Q.   Okay.  Can you recall roughly how many
19 flight attendants were temporarily reassigned to the
20 GO during the relevant time period?
21    **A.   It would be a handful.  Again, this is just**
22 **a guesstimate.  Eight to ten.  Maybe a little bit**
23 **more.**
24    Q.   What -- so you had mentioned that a flight
25 attendant might be reassigned to the GO temporarily

---

67

1 due to a work comp issue or something like that.
2 Were there any other reasons?
3    **A.   From an HR perspective, I can't think of**
4 **one.  I -- I can't speak to what the inflight**
5 **department did, but on the HR side, OJI work comp**
6 **would be the only reason.**
7    Q.   Sure.  And what does OJI mean?
8    **A.   On-the-job injury.  So -- yeah.**
9    Q.   Okay.  So thinking -- thinking again about
10 how a flight attendant's day is actually structured,
11 do flight attendants ever start in one city and end
12 their day in another?
13    **A.   Yes.**
14    Q.   And if they do, I assume they don't -- they
15 don't fly home.  I mean, do they -- do they stay at
16 this other city where they ended?
17    **A.   Yes.**
18    Q.   Okay.  And where -- where do they stay?
19    **A.   At hotels.**
20    Q.   Are they on the clock the whole time? off
21 the clock?  Do you know?
22    **A.   In -- in what form off the clock?  I**
23 **guess . . .**
24    Q.   So -- so let's say the flight attendant
25 starts in Denver and ends in Cleveland --

---

68

1    **A.   Uh-huh.**
2    Q.   -- and they're going to stay in a hotel
3 overnight in Cleveland.  Are they being paid
4 overnight, or are they off on their own time?
5    **A.   They do receive per diem.**
6    Q.   Per diem?
7    **A.   Uh-huh.**
8    Q.   Is it possible for a flight attendant to --
9 to stay multiple nights before returning home while
10 working?
11    **A.   It is possible, yes.**
12    Q.   How many -- how many nights might a flight
13 attendant stay away from home while working?
14    **A.   It would be, again, depending on**
15 **preference.  Our line of flight has changed**
16 **dramatically from that time period.  Then, everything**
17 **predominantly did come through Denver since our --**
18 **Denver was our hub.**
19        **If there was a layover, again, it just**
20 **depends on the type of flying and how the lines were**
21 **built in terms of the pairings.  So yeah.**
22    Q.   Okay.  Now --
23    **A.   At max, possibly -- maybe a little more,**
24 **yeah.**
25    Q.   Okay.  I want to -- I want to switch gears

---

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

69

1 a little bit and chat about benefits that were
2 provided to flight attendants during this time.  And
3 were flight attendants provided medical insurance?
4      A.   They were.
5      Q.   Was it fully paid by Frontier, or did they
6 have to chip in?
7      A.   They had to pay a portion.
8      Q.   Okay.  What about dental?
9      A.   Yes.
10     Q.   Same?  Did they -- was -- did -- did the
11 employee pay a portion?
12     A.   I would have to refer to the benefit
13 package to determine that.
14     Q.   Okay.
15     A.   Yeah.
16     Q.   Were they provided, do you know, any other
17 types of insurance --
18     A.   Yes.
19     Q.   -- or benefits --
20     A.   Yes.
21     Q.   -- beyond specifically insurance?  I'm
22 sorry.
23     A.   Yeah.  Yes, we offered a medical package.
24 We offered dental, vision, obviously.  We offered
25 life insurance policies, short-term disability,

---

70

1 long-term disability.
2      Q.   Okay.  Did -- did Frontier offer any
3 wellness programs?  So not an insurance benefit, but
4 any sort of wellness program that encouraged
5 employees to live healthy lifestyles and that sort of
6 thing?
7      A.   We utilized quite heavily the EAP program.
8      Q.   Is -- is "EAP" employee assistance?
9      A.   That's correct, the employee assistance
10 program.
11     Q.   Okay.
12     A.   At that time, I would have to double-check
13 the benefit package, if we did have one of those
14 programs.
15     Q.   Did -- did Frontier have any sort of
16 program related to substance abuse?
17     A.   Yes.  It was our self-disclosure program.
18     Q.   Okay.  So that's what it was called, the
19 self-disclosure program?
20     A.   Correct.
21     Q.   And what was the purpose of that program?
22     A.   Anybody who felt they needed assistance due
23 to some type of dependability -- or a dependency, I
24 should say, they had the ability to step forward and
25 then essentially say, I'm -- I need assistance.  So

---

71

1 they would do that through our compliance program.
2      Q.   And was this -- was this part of some
3 benefit provided through insurance, or was this just
4 something Frontier did on its own?
5      A.   I guess, in the form of "insurance," can
6 you explain or elaborate?
7      Q.   So like the medical insurance was provided
8 through Blue Cross or United or something like that;
9 is that right?
10     A.   At that time, I would have to check to see
11 who the provider was.
12     Q.   I just mean some private insurance provider
13 actually --
14     A.   Okay.
15     Q.   -- was -- was retained?
16     A.   For, yeah, medical packages.  Yes.
17     Q.   But for the self-disclosure program, is
18 this something that Frontier is just paying for, it's
19 just doing -- it's created this program of its own
20 volition?  There's not a third party involved?
21     A.   That is correct.
22     Q.   And so anybody who needs assistance could
23 self-disclose through this program?
24     A.   Yes.
25     Q.   And then what would happen if they did?

---

72

1      A.   If an employee did step forward, then that
2 then starts what we call the checklist.  There was a
3 checklist of events that the compliance coordinator,
4 specialist, whoever the -- received the disclosure.
5 That individual would meet with the employee, review
6 guidelines then set forth, and expectations.
7           In that point, that's where we would then
8 partner with the EAP, the employee assistance
9 program, with regard to the substance abuse piece
10 where we -- they would -- we would reach out to them,
11 said an employee has now self-disclosed.
12           We would partner with the EAP to then
13 identify a substance abuse professional, an SAP.  The
14 SAP would then contact the individual and then would
15 review the -- the initial-contact counseling and then
16 determine next steps from that point forward.
17           And so the SAP would then determine the
18 severity of the situation; they would identify
19 recommendations for the individual; and they would
20 then communicate with our compliance individual.
21           And then they would partner in terms of
22 what the next steps were that they recommended,
23 that they be enrolled in a program.  The SAP
24 would determine the length of the program based on
25 their conversation, which was private, with the

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

73

1 individual.
2      Q.   And -- and that's what I was going to ask
3 is is the whole process confidential once an employee
4 self-discloses?
5      A.   Confidential, yes.  So people who are
6 attached to -- and HR in this case would have access
7 to the information, if needed.
8      Q.   So it's confidential within the group --
9 within the people that are a part of the
10 self-disclosure program?
11      A.   Yeah, compliance and HR, but nobody outside
12 of that.
13      Q.   Okay.  Was the employee -- was the employee
14 promised that if they self-disclosed, they wouldn't
15 lose their job because they self-disclosed?
16      A.   That, I -- I do not know, no.  I don't know
17 if anybody was promised that.  Self-disclosure,
18 ultimately it is is, Hey, I need assistance with
19 an issue and then guided through the process.  Yeah.
20      Q.   Did Frontier have any concern that -- that
21 people would be worried about losing their job if
22 they -- if they came out and said, I need assistance?
23      A.   No.
24          MS. KITSON:  Object to the form.
25      A.   And when you're in the program, it all

74

1 depends, because they're -- once you go through the
2 required steps identified by the substance abuse
3 provider, there is what we call the aftercare
4 program.
5          The aftercare program is a collaboration
6 between the substance abuse provider and the facility
7 where the individual went and did their treatment.
8 Combine these two, then determine what that aftercare
9 program is.
10          The aftercare program identifies that the
11 individual will now go through random drug testing,
12 which is designed and identified by the substance
13 abuse provider based on their dialogue with the
14 treatment center.
15          And so an individual, for year one, can
16 say, I want them to go through 24 random drug tests.
17 That's where the compliance department then schedules
18 a drug test, or randoms.
19          If the individual is -- tests positive in
20 that, then, yes, in that moment, they've now failed
21 the program because they tested positive, and that
22 could potentially lead to separation.
23      Q.   Okay.  Got it.  Got it.
24      A.   Only then.  But being in the program, no.
25      Q.   Okay.  Do you know if Ms. Brigham was

75

1 subject to random drug or alcohol tests at any point
2 during her employment with Frontier?
3      A.   She would have been subject to that as part
4 of the role of a flight attendant because all -- and
5 this goes back to the DOT, safety sensitive.  They
6 are subject to the random drug testing.
7      Q.   What about through the self-disclosure
8 program?
9      A.   Yes, that would be in addition to the
10 regular random drug.  Then they go through the
11 program as well.  So that's in addition to what she
12 would be subject to.
13      Q.   Do you know if she ever failed to pass one
14 that she took?
15      A.   Excuse me?
16      Q.   Do you know if she ever failed to pass a
17 drug or alcohol screening?
18      A.   To my understanding, no.
19      Q.   When you were at JetBlue in roughly 2014 to
20 2015, did JetBlue have a similar self-disclosure
21 program?
22      A.   That, I don't know.
23      Q.   Is it -- is -- are you aware of whether
24 other airlines have self-disclosure programs, or is
25 this unique to Frontier, or do you know?

76

1      A.   No, other airlines have them.  But all --
2 it comes down to if they're a second-chance company.
3 That also defines a different type of regulation or
4 process.  Frontier is not a second-chance company.
5      Q.   Okay.  So what -- when -- when you say
6 Frontier is not a second-chance company, what exactly
7 does that mean?
8      A.   If you're, for example, under FAA
9 regulations, if you test positive for drugs or
10 alcohol either through a test, random, reasonable, or
11 suspicion, if your results come back positive,
12 ultimately, our compliance department is required to
13 report that to the FAA.
14          In that -- and so the -- typically, the
15 employee would be released.  If that employee is
16 released, that positive test does follow them
17 throughout their career should they want to apply for
18 a DOT position.
19          So it could prevent them from applying
20 with another carrier, unless the carrier was a
21 second-chance company.  If they're a second-chance
22 company, they could apply with that airline.
23          In that same scenario, if the employee had
24 previously tested positive, they would not be
25 eligible for hire at Frontier, because we're not a

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

77

1 second-chance company.

2    Q.   Got it.  Okay.  So -- so at Frontier, if
3 I fail one of these tests, you'll be fired.  And
4 that -- and -- and you couldn't reapply at Frontier.
5 But if you went to a second-chance airline, you
6 could -- you could at least try?

7    A.   If you -- and, again, in terms of
8 failure -- you would have to then define "failure."
9 If you tested -- if, for whatever reason, during a
10 reasonable random, if you tested a -- it depends on
11 the level.

12       And so if it's alcohol, if it was above .02
13 or .04, there was a condition.  If you were above
14 .04, then, yes, you would be separated because that
15 was above the legal limit.

16    Q.   Okay.

17    A.   If you were below that -- I would have to
18 look at the contract at the time.  I believe there
19 was some language that existed on there.

20    Q.   Yeah.  So -- so an employee could
21 self-disclose through the self-disclosure program
22 that they had a problem with alcohol?

23    A.   Uh-huh.

24    Q.   And that wouldn't trigger this
25 second-chance program at that point?

78

1    A.   Correct, because it was brought in forward
2 through the self-disclosure program, so they have
3 protection under that.

4    Q.   Okay.  Okay.  Got it.

5       During -- during the relevant time period,
6 so end of 2011 through end of 2015, who was in charge
7 of the self-disclosure program?

8    A.   2011 -- say that again.

9    Q.   So end of 2011 through the end of 2015,
10 the -- the relevant time period that we're in, who
11 was in charge of the self-disclosure program?

12    A.   I believe there was some changes at one
13 point.  2011 to -- we -- we had Chris Benedict, who
14 was manager of staffing and compliance, so the role
15 that I had previously had, he oversaw --

16    Q.   Uh-huh.

17    A.   -- the substance abuse program or the
18 self-disclosure.  Prior to -- at one portion, I would
19 have been in that position.

20    Q.   Okay.

21    A.   Yeah.

22    Q.   So it would have been either Chris Benedict
23 or yourself during that time period?

24    A.   I'm just trying to think in my career here.
25 I think it would have been just Chris Benedict.  I

79

1 would have to look at it, because I think I had a
2 portion there.  I came back from JetBlue -- no, we
3 came back in 2012.  2013.  I think a portion I did,
4 yes.

5    Q.   Okay.

6    A.   Yeah.

7    Q.   Was there any other sort of drug- or
8 alcohol-related programs at Frontier outside of the
9 self-disclosure program?

10    A.   In what -- just programs in general
11 or . . .

12    Q.   Yeah.  Just any -- any -- any program to
13 deal with employees that might have drug or alcohol
14 issues generally, outside of this self-disclosure
15 program?

16    A.   And you're talking about the company,
17 correct?

18    Q.   Correct.

19    A.   The pilots have their own program, which is
20 called the HIMS program, to be equivalent to our
21 self-disclosure program.  And that would be -- to my
22 knowledge, that would be the only other program.

23    Q.   Okay.  Do you know, does Frontier still
24 have this self-disclosure program in place currently?

25       MS. KITSON:  Object to the form.  I'm going

80

1 to instruct the witness not to answer.  It's outside
2 the relevant time frame.

3    Q.   (BY MR. CRONE)  So -- so at -- at -- at the
4 present date, is -- does the self-disclosure program
5 exist in any form at Frontier?

6       MS. KITSON:  Same instruction.

7       MR. CRONE:  So, Danielle, it's -- it's
8 tough without seeing you, but is this really a point
9 we're going to take to the judge?

10       MS. KITSON:  And I would -- again, to make
11 a distinction, we're talking about the scope of the
12 30(b)(6) topic.  So if you want to ask him in his
13 personal capacity, that's fine.

14       MR. CRONE:  I -- I -- yeah, I'm aware that
15 I can do that, but it's -- it's -- it's a
16 straightforward yes, no, and it will be in the record
17 in a tidy spot right here.  I mean, do we really want
18 to -- I mean, how -- is the question really --

19       MS. KITSON:  Is this your only question, as
20 to whether it exists today?

21       MR. CRONE:  Yeah.  I just want to know if
22 it exists today or if it's -- or if it's no longer
23 there.  That's all.

24       MS. KITSON:  You can answer that.

25       MR. CRONE:  Thank you.

81

1    A.    Yes.
2          THE WITNESS:  And do you guys mind if I
3 take a break?  I've been drinking a lot of water.
4          MR. CRONE:  I think -- I think now is a
5 great time for a break, but why don't we -- is ten
6 minutes good?
7          THE WITNESS:  Yes, yes, definitely.
8          MR. CRONE:  Okay.  We'll see you in -- in
9 ten minutes.  Thanks.
10         THE WITNESS:  Thank you.
11         MR. CRONE:  We'll go off record.
12         THE VIDEOGRAPHER:  The time now is 10:46.
13 We're off the record.
14         (Recess from 10:46 a.m. to 10:57 a.m.)
15         THE VIDEOGRAPHER:  The time now is 10:57.
16 We're back on the record.
17    Q.    (BY MR. CRONE)  Mr. Arellano, I want to --
18 I want to give you a little hope here about how the
19 rest of the day is going so you're not -- I think --
20 I think we can easily get to lunch in the next hour
21 and take a better break for everybody.
22    A.    Uh-huh.
23    Q.    And then I think, after that, we're looking
24 at maybe a couple of hours, and we'll have it wrapped
25 up.  I -- I don't think we'll have to sit here the

82

1 entire day.
2          So I don't want to make any promises, but I
3 want to give you some sense of where we're -- where
4 we're going, so . . .
5    A.    Thank you.
6    Q.    Yeah, no problem.
7          And so the self-disclosure program, do you
8 have any idea how -- how much it costs Frontier to
9 run that program?
10   A.    I do not.
11   Q.    Okay.  I want to -- I want to switch gears
12 a little bit and talk a bit more about the collective
13 bargaining agreement.  I promised you earlier in the
14 morning that we would.
15   A.    Yeah.
16   Q.    I don't want to -- I don't want to let you
17 down.
18         So the -- the -- the union that exists that
19 represents -- or represented Ms. Brigham during --
20   A.    Uh-huh.
21   Q.    -- during the relative time period, do you
22 know if that union always represented Frontier flight
23 attendants, or did they come in at some time, that
24 you can recall?
25   A.    We did have an in-house -- I don't want to

83

1 say in-house union, but prior to AFA -- it's always
2 been AFA.
3    Q.    Okay.
4    A.    Before that, it was just handled
5 internally --
6    Q.    Okay.
7    A.    -- through --
8    Q.    Okay.
9    A.    It was a committee.  Yeah.
10   Q.    Okay.  Okay.
11         Okay.  So what's your understanding of the
12 purpose of the collective bargaining agreement
13 between the AFA and Frontier?
14   A.    Pretty much it defines a lot of the
15 expectations for -- and coverages awarded to the
16 flight attendants.  It addresses consistency.  It
17 addresses bidding process, training requirements
18 outlined.  A lot of rules and regulations,
19 essentially.  It's kind of their version of the
20 employee handbook, if you will.
21   Q.    Okay.  Is -- does -- does Frontier and the
22 AFA renegotiate that collective bargaining agreement
23 from time to time?
24   A.    When it comes up for negotiations, yes.
25 When it comes up for re-up.

84

1    Q.    Is -- is Frontier obligated to comply with
2 whatever agreements are made inside of the collective
3 bargaining agreement?
4    A.    Yes.
5    Q.    And then I think -- I think you had
6 mentioned that it was, I want to say, Laura Rush
7 that was sort of overseeing -- one of the people
8 overseeing Frontier's compliance with the collective
9 bargaining agreement.  Is that -- is that correct, or
10 am I getting that wrong?
11   A.    I'm -- I'm not sure she ensured compliance.
12 I think, overall, she was there to run the operation
13 as it stood but yet being compliant with the rules
14 and regulations outlined in the collective bargaining
15 agreement.
16   Q.    All right.
17   A.    Yeah.
18   Q.    I'm sorry.  Was there anybody else doing
19 that with her?
20   A.    On the inflight side, you would have --
21 Kari Thompson, at times, would assist with that.  And
22 a lot of that would be -- be dependent upon, let's
23 say, the scheduling.  If a flight attendant wanted a
24 certain -- when they arrived late, they would adhere
25 to the collective bargaining agreement.  They were

85

```
 1 there to enforce it, essentially.
 2    Q.   Okay.
 3    A.   Yeah.
 4    Q.   Do you know Adrienne Prince?
 5    A.   I do.
 6    Q.   Who was Adrienne Prince during the relevant
 7 time period?
 8    A.   She, at that time -- I know she was a
 9 steward at one point and then became the vice
10 president, so I would have to see where she was in
11 terms of that time period.
12    Q.   Whether she was steward or vice president,
13 those are roles with the AFA?
14    A.   With the AFA, correct.
15    Q.   Was she, I assume, also then employed by
16 Frontier?  Or maybe not.  I'm not sure.
17    A.   She was.  She was a flight attendant -- or
18 is a flight attendant.  I believe she still works.
19    Q.   Okay.  I want to put in front of you
20 Exhibit 4.  And so this is -- give me just one second
21 here.
22         MS. KITSON:  John, can I ask you a favor?
23         MR. CRONE:  Yeah.
24         MS. KITSON:  Can you e-mail that document,
25 like shoot it to me via e-mail as you're pulling
```

86

```
 1 these things up one by one just like you would hand
 2 it to me?
 3         MR. CRONE:  Yeah.
 4         MS. KITSON:  That would be great.
 5         MR. CRONE:  Yeah.  No problem.  I'll send
 6 it over right now.
 7         There you are, Danielle.  That should be
 8 off to you.
 9    Q.   (BY MR. CRONE)  And hopefully that should
10 be in front of you, Mr. Arellano.
11    A.   Yep.  I've got it in front of me.
12    Q.   Great.  Can you give it a review for me?
13    A.   Yeah.
14    Q.   Thanks.
15    A.   Yeah.  Okay.
16    Q.   Have you ever -- prior to reviewing that
17 today, have you ever seen that document?
18    A.   No.
19    Q.   But you -- you've reviewed it now?
20    A.   Yeah.
21    Q.   And is there anything in that -- is there
22 any factual statement in that document that you think
23 is inaccurate?
24    A.   Let me look at it again.
25    Q.   Sure.
```

87

```
 1         MS. KITSON:  I would take it sentence by
 2 sentence.
 3         THE WITNESS:  Yeah.
 4    A.   If I look at Number 5, I don't ever recall
 5 the union seeking accommodations.  And, again, the
 6 reason -- if -- if I was in that conversation, due to
 7 confidentiality, we do feel that that meeting, with
 8 the interactive process, was outside of the realm of
 9 the CBA, so that conversation primarily was with
10 Rebecca.
11         So I don't recall any conversations with
12 the union where they proposed accommodations, at
13 least to my knowledge.
14    Q.   (BY MR. CRONE)  Okay.  So -- so the
15 allegations on paragraph 5, you don't recall that
16 happening, but you don't know if that's inaccurate;
17 is that fair?
18    A.   I simply don't recall, correct.
19    Q.   Okay.  And -- and take your time and let me
20 know if there's anything else.
21    A.   And I -- I don't agree with where it says
22 Ms. Brigham was denied this requested accommodation.
23 I do feel we requested her accommodation in the form
24 of time off through the intermittent FMLA, which
25 allowed her to manipulate her schedule.
```

88

```
 1         And Number 6, we did again grant her
 2 accommodation just in the form of IFM, so it -- it
 3 allowed her to adjust her schedule as she saw fit
 4 and, of course, based within her seniority.
 5    Q.   Okay.  So I want to -- I want to take both
 6 of those since you just mentioned -- so it's
 7 Frontier's position that Ms. Brigham was granted an
 8 a -- an accommodation in the form of IFM?  Am I -- am
 9 I hearing you correctly?
10    A.   No, in the form of time off.
11    Q.   Time off.
12    A.   Yeah.
13    Q.   Okay.  And -- I'm sorry.  Go ahead.
14    A.   And Number 7, I do feel we provided Rebecca
15 with solutions.  And so, again, we did accommodate
16 her requests in many forms, not only in the form of
17 time off, but the ability to use intermittent FMLA as
18 she sees fit.
19         We also allowed her other opportunities to
20 look within the job or to see if there was another
21 opportunity that would better assist her with what
22 she was requesting.
23    Q.   Okay.  So I want to make sure that we have
24 this properly summarized.  It's -- it's Frontier's
25 position that Ms. Brigham was offered, one, the time
```

89

1 off you mentioned as an accommodation; is that
2 correct?
3     A.    Correct.
4     Q.    And then, two, intermittent FMLA leave?
5     A.    Correct.
6     Q.    And, three, the ability to look for
7 different jobs --
8     A.    Yes.
9     Q.    -- within the -- within the organization?
10     A.    Yeah.  She was also offered personal leaves
11 of absence, vis-a-vis -- oh, and also non-FMLA
12 medical leave as well, which is an additional to the
13 FMLA.  So she was, I believe -- and to my
14 recollection, she had non-FMLA medical leave, and I
15 believe that might have been it.
16     Q.    Okay.  So I want to make sure we've got it.
17 So you added non-FMLA medical leave, and was there
18 something else, or was it just that?
19     A.    Non-FMLA medical leave, FMLA personal
20 leave.
21     Q.    Okay.
22     A.    Yeah.
23     Q.    Okay.  And then is the time off, the first
24 thing we listed, is that different from the non-FMLA
25 medical leave and the FMLA personal leave?  Is

90

1 there -- is there also just a category of time off,
2 or is that the same?
3     A.    It would have been under her personal
4 leave, definitely.
5     Q.    Okay.  So that would just be regular
6 personal leave?
7     A.    Time off would also -- well, she had the
8 ability to use intermittent FMLA in the form that she
9 felt needed to assist with her request to adjust her
10 schedules.
11     Q.    Okay.
12     A.    So we did allow her the ability to use it
13 outside of parameters for what she was approved for.
14     Q.    Okay.  So the intermittent FMLA, thinking
15 about that specifically, how does that work?  How
16 does one go about obtaining approval to use
17 intermittent FMLA?
18     A.    Typically, the first step is they have a
19 dialogue with their leave-of-absence department.  In
20 that dialogue, the person doing the intake meeting
21 will then determine if the need is either continuous
22 or intermittent FMLA.
23          Based upon assessment, the individual or
24 the employee is then provided with the application,
25 whether it be intermittent or FMLA.

91

1          If it is intermittent FMLA, they're
2 instructed that there's a certain time period.
3 Typically, it's 15 days from the date of that
4 conversation.  They're provided with the application
5 and the 15 days marked and provided with a deadline,
6 Please return the completed paperwork by this time
7 frame.
8          And then once that application is received,
9 they then look at it and see if the nature of the
10 request qualifies the individual for FMLA or
11 intermittent FMLA.
12          They also look at the individual's schedule
13 to see if they worked a set number of hours.  They
14 looked at year of service; if the employee has been
15 here more than a year, things of that nature, to then
16 determine if they qualify or are approved for the
17 leave of absence.
18     Q.    All right.  With regard to the ability to
19 look for different jobs within the organization, did
20 Frontier ever offer to reassign Ms. Brigham, or -- or
21 did they offer the opportunity to -- to allow her to
22 apply for other jobs?
23     A.    The opportunity to apply.  Typically, what
24 we did with the interactive process, if there was a
25 role that the individual was interested, outside of

92

1 Rebecca Brigham, but if an individual said, I'd like
2 this role, we would look and see if they met the
3 essential functions of the role, were able to
4 complete the essential functions of the role, and if
5 they were minimally qualified.
6          We, as employee relations, would then have
7 that conversation with the hiring manager and see if
8 there was an opportunity to at least award the
9 individual the opportunity to interview for the
10 role --
11     Q.    Okay.
12     A.    -- outside of just the standard application
13 process.
14     Q.    Okay.  Did -- did Frontier -- excuse me.
15 Did Frontier ever offer to reassign Ms. Brigham to
16 the GO or headquarters?
17     A.    Not to my knowledge.
18     Q.    Did Ms. Brigham ever request that as a
19 reasonable accommodation?
20     A.    Yes, she did.
21     Q.    Why did Frontier deny that request?
22     A.    I'm not -- again, this is my opinion.  I'm
23 not sure we denied the request.  We were trying to
24 operate within the rules and regulations outlined in
25 the collective bargaining agreement.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

93

1           And in that opportunity -- and, again, it's
2 a complicated process in the form of there's so many
3 avenues that we need to look at.  So when she
4 requested that, we then determined she was an active
5 employee.  And as an active employee, she was
6 required to go ahead and bid for a schedule.
7           So being an active employee, we were unable
8 to assign her to a temporary ground assignment or
9 another opportunity, because she was technically an
10 active employee, and it was only allowed for OGI or
11 work comp, that opportunity to be reassigned.  That
12 option was only afforded to individuals who sustained
13 an injury.
14      Q.   Okay.  So because she didn't sustain an
15 injury, she wasn't eligible to be reassigned to the
16 GO as --
17      A.   No.
18      Q.   -- as an accommodation?
19      A.   Since she wasn't in the work comp program
20 or on OJI, then she was not eligible to be
21 reassigned.
22      Q.   Okay.
23      A.   Yeah.
24      Q.   Any other reason why Frontier felt like it
25 couldn't reassign her to the GEO -- or the -- excuse

94

1 me -- the GO as she requested?
2      A.   No, not to my knowledge.
3      Q.   Was -- was Ms. Brigham ultimately
4 terminated due to attendance issues?
5      A.   Yes.
6      Q.   And was she taking time off work through
7 any of these various processes that you had just
8 testified that Frontier offered, so the time off,
9 like personal leave, intermittent FMLA, non-FMLA
10 medical leave, FMLA personal leave?  Was she using
11 all of that time off?
12      A.   She -- yes, she was utilizing those
13 resources, true.  Yeah.
14      Q.   But she was still, then, terminated for
15 attendance issues?
16      A.   Correct.
17      Q.   Was she terminated for any other reason
18 than attendance?
19      A.   No, sir.
20      Q.   Did -- did Ms. Brigham request to
21 modify her schedule?  Whether or not you recall
22 Adrienne Prince helping her with it, did Ms. Brigham
23 request to modify her schedule as a reasonable
24 accommodation for her alcoholism?
25      A.   She did request it, yes.

95

1      Q.   And do you recall whether Frontier granted
2 that request?
3      A.   We did not.
4      Q.   And why was that?
5      A.   Due to the collective bargaining agreement.
6      Q.   So Frontier thought if -- if Ms. Brigham
7 was allowed to modify her schedule, that would
8 violate the terms of the collective bargaining
9 agreement?
10      A.   I agree, yes.
11      Q.   Okay.  Do you recall Adrienne Prince
12 communicating to Frontier that it would not violate
13 the terms of the collective bargaining agreement?
14      A.   I do not.
15      Q.   And sorry.  I'm going to go back just a
16 little bit.
17           Did Frontier think that transferring
18 Ms. Brigham to the GO, reassigning her would violate
19 the terms of the collective bargaining agreement, or
20 was that due to the OGI -- or OJI work comp issue?
21      A.   It was the OJI work comp.  She was just not
22 eligible.  At the time, she wasn't part of the work
23 comp program.
24      Q.   Okay.  Does Frontier's opinion change at
25 all today about whether a modified schedule would

96

1 violate the terms of the collective bargaining
2 agreement based on your review of Adrienne Prince's
3 declaration?
4      A.   Can you rephrase that again?
5      Q.   Yeah.  Does -- does -- does Frontier's
6 opinion change today as to whether or not allowing
7 Ms. Brigham to modify her schedule would violate
8 the terms of the CBA based on your reading of
9 Adrienne Prince's declaration in Exhibit 4?
10      A.   No.
11      Q.   Okay.  So the -- the time off for personal
12 leave or through intermittent FMLA or -- or non-FMLA
13 medical leave or FMLA personal leave -- those
14 things -- were they offered by Frontier to
15 Ms. Brigham, or does she request those things?
16      A.   They were available to her, so she had to
17 request them.  In certain cases --
18      Q.   And so --
19      A.   -- she was offered personal leave.
20      Q.   So --
21      A.   If she is not eligible for an FMLA or
22 intermittent FMLA or a non-FMLA medical leave, the
23 department would offer her personal leave.
24      Q.   So the -- so setting the personal leave
25 aside and -- and thinking about the FMLA, whether

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

---

97

1 it's intermittent or for personal leave or -- or the
2 medical leave, those things were available to
3 Ms. Brigham as they are to any other employee; is
4 that correct?
5    A.   That is correct.
6    Q.   Okay.  But the personal leave was something
7 different that -- that -- I mean, can -- could any
8 other employee get additional personal leave if they
9 were, say, out of FMLA time, or did they have to ask?
10   A.   Yeah.
11   Q.   Oh, they can?
12   A.   They had to request it.
13   Q.   Oh, they have to request it.  Okay.  Okay.
14   A.   And these were approved by the department.
15   Q.   Okay.  And -- and so setting all of the --
16 the -- the leave, the FMLA leave, intermittent or
17 personal FMLA leave, or whatever it is that Frontier
18 offered -- or, I mean -- sorry -- was available to
19 Ms. Brigham to request --
20   A.   Okay.
21   Q.   -- did Frontier offer any other reasonable
22 accommodation to Ms. Brigham in response to her
23 requests?
24        MS. KITSON:  Objection.  Asked and
25 answered.

---

98

1    Q.   (BY MR. CRONE)  I can rephrase that -- it
2 got a little wordy -- if -- if you need it.  Do you
3 want me to rephrase?
4    A.   Yes, please.
5    Q.   Yeah.  Okay.  Yeah.  So -- so did Frontier
6 offer any other proposed reasonable accommodations to
7 Ms. Brigham other than, You can request leave time of
8 some sort or you can apply for different jobs?
9    A.   Okay.  That would be it, yeah.
10   Q.   All right.  And just to make this clear,
11 too, so any -- any employee can apply for any listed
12 jobs, can't they?
13   A.   Correct.
14   Q.   Does -- does Frontier consider alcoholism
15 to be a disability as defined under the ADA?
16        MS. KITSON:  Object to the form.
17        THE WITNESS:  Do I answer?
18   A.   Yes.
19   Q.   (BY MR. CRONE)  Does Frontier treat a
20 disabled person who has alcoholism any differently
21 than they treat a person with any other disability?
22        MS. KITSON:  Object to the form.
23   A.   I would have to say, as part of the
24 interactive process, we also have to keep in mind,
25 if they're covered by the collective bargaining

---

99

1 agreement, certain terms of what we are allowed to
2 offer, in that case, yes.
3        But, overall, the process is designed to
4 see what accommodation we can provide.  But the
5 outcome also depends if the individual is covered
6 under the collective bargaining.
7    Q.   (BY MR. CRONE)  Okay.
8    A.   Do we treat them differently?  No, in that
9 form.
10   Q.   So there's nothing about the nature of
11 alcoholism that would cause Frontier to approach the
12 interactive process any differently than if, say, for
13 example, somebody broke their leg?
14   A.   No.
15   Q.   I'm pulling up an exhibit.  Sorry.  I'm
16 not -- I'm not -- I'm not ignoring you.  I also want
17 to get it e-mailed to Danielle.
18        MS. KITSON:  Thank you.
19        MR. CRONE:  Yeah.
20   Q.   (BY MR. CRONE)  Okay.  Mr. Arellano, so I
21 sent you, when it gets there, what has been marked
22 Exhibit 5.  If you can just review it and let me know
23 once you've reviewed it.
24   A.   Okay.
25        MS. KITSON:  I'm going to object,

---

100

1 Mr. Crone.  And you are not permitted to use this
2 document.  We have claimed privilege over this
3 document, and under Rule 26(b)(5), you are not
4 permitted to use it until we resolve that claim with
5 the judge.
6        So I'm happy to call the Court, if you
7 would like -- we can take a break for that later --
8 but you are not permitted to ask questions about this
9 document, and I'm instructing the witness not to
10 answer.
11        MR. CRONE:  We -- what if we agree that --
12 that he'll only refer to the part of the document
13 that's clearly not privileged?  And so I'm talking
14 about the last couple of sentences.  Would that
15 resolve the issue that way?
16        MS. KITSON:  No.  I mean, the entire e-mail
17 is a re -- relaying of what has been told to
18 Mr. Arellano by outside counsel, Holland & Hart.
19        MR. CRONE:  Well, I don't -- I don't -- I
20 mean, that's not apparent on the face of the e-mail,
21 that's for sure.
22        MS. KITSON:  And I'm happy to confer with
23 you about the context of the e-mail.  And if you want
24 to ask Mr. Arellano the context in which he wrote
25 this e-mail, that's fine, but he's not going to

---

101

1 answer any substantive questions about it.

2          MR. CRONE:  Okay.  Well, then how do you

3 propose we go about resolving the privilege issue

4 today?

5          MS. KITSON:  As I just said, you could ask

6 him if he were at a meeting, if there were attorneys

7 there.  You could ask him if all of the information

8 in this e-mail is information that was relayed to him

9 by Holland & Hart.

10          You can ask him those types of questions.

11 He's not going to answer substantive questions about

12 the content of the e-mail.

13          MR. CRONE:  Yeah, and -- and so I -- I

14 think that will get us there.

15          What if I direct him to the exact two

16 sentences I want him to -- that I want to ask a

17 question about and ask whether that was relayed by an

18 attorney at Holland & Hart -- at Holland & Hart or

19 not?  Can I do that?

20          MS. KITSON:  Let me confer with him

21 quickly.  If we can go on mute, and we'll confer

22 off-screen and come right back.

23          MR. CRONE:  That will work.

24          (Short interruption.)

25          MS. KITSON:  Okay.  So I understand that

102

1 the very last sentence that begins with "Next

2 steps" --

3          MR. CRONE:  Yep.

4          MS. KITSON:  Are you with me?  That

5 sentence is not privileged.  So you can ask about

6 that sentence.

7          MR. CRONE:  Okay.  Give me just one second

8 here.  So -- and then, Danielle, I just wanted --

9 just to just make sure the record is clear, you're

10 definitely asserting that this is confidential under

11 the proposed protective order that I don't remember

12 if we have in place yet?

13          MS. KITSON:  I don't believe so.  Did we

14 mark it confidential?

15          MR. CRONE:  I -- I don't think you did, and

16 I don't care if we do right now even though -- I

17 don't think the protective order is on file yet, or

18 maybe it is.  But, I mean, I don't care.  We can act

19 as if it is, is what I'm saying.

20          MS. KITSON:  Yeah, and that's fine.  I -- I

21 don't think there's anything confidential in it other

22 than if Ms. Brigham wanted to assert that it's

23 confidential.

24          MR. CRONE:  Well, I thought, you know, just

25 in terms of while we resolved the privilege issue, I

103

1 mean, maybe it doesn't hurt.  I mean, I'm not telling

2 you what to do.  I just want to -- I just want to --

3 you know, just want to know if -- if -- if it's going

4 to fall under the protective order or not, at least

5 until we're --

6          MS. KITSON:  Let me look at it again.  Hold

7 on.

8          MR. CRONE:  Okay.  And I'm sorry, Danielle.

9 I just -- I just want to prevent the problem down the

10 road.

11          MS. KITSON:  No, that's fine.

12          Hey, John, so, you know, I would say all of

13 the documents that are produced are subject to the

14 protective order in that it governs all document

15 productions, but we would not mark this document as

16 confidential per the protective order.

17          MR. CRONE:  Okay.  Okay.  Got it.  Yep,

18 yep.  That's helpful.

19          (BY MR. CRONE)  Okay.  So -- hold on one

20 second.  Okay.  So, Mr. Arellano, the sentence that

21 starts with "Next steps" -- are you with me there?

22     **A.**   Yes.

23     Q.   Did you write that sentence?

24     **A.**   **Did I write that sentence?**

25     Q.   Yeah.

104

1     **A.**   Yes.

2     Q.   Yep.  And -- and then everything above that

3 in the e-mail, is it your contention that you're just

4 relaying what the attorney told you or what -- I

5 should say what an attorney told you?

6     **A.**   Yes.

7     Q.   Okay.  So then let's just look at the next

8 steps, if we could -- we could do that.

9          You wrote, If the last occurrence is not

10 covered by FMLA, then we would proceed with the term

11 steps.

12          Is that termination, what you're referring

13 to by "term steps"?

14     **A.**   Yeah, **term steps typically starts, under

15 the contract at that point -- it starts the

16 investigatory meeting that they outlined in the

17 contract.  So that's the meeting with the union

18 representation, and it's kind of dialogue with the

19 flight attendants to get their feedback of what took

20 place.**

21     Q.   Okay.

22     **A.**   **So that's kind of the steps, correct.**

23     Q.   Okay.  And by "the last occurrence," do you

24 recall what you're -- you're referring to?  What's

25 the occurrence?

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

---

105

1     A.    The infraction, the date that she had
2 missed.
3     Q.    So -- so an absence from work?
4     A.    An absence from work, correct.
5     Q.    Okay.  And then the -- that last sentence
6 there, is that -- where it says, On this one -- so
7 it's in that same little paragraph.  That's not
8 something the attorney told you, or is that?  I just
9 want to be really clear.
10          MS. KITSON:  Where are you?  I'm sorry.
11          MR. CRONE:  So right on -- in the same
12 little "next steps" paragraph.
13    A.    Yeah.
14    Q.    (BY MR. CRONE)  I didn't realize those are
15 two separate sentences.  It says, On this one, comma.
16    A.    Yes.
17    Q.    Is that -- that's your own writing?  The
18 attorney didn't tell you that?
19    A.    Correct.
20    Q.    Okay.  And so on that one where it says,
21 "On this one, let's definitely ensure she has union
22 representation available," why did you definitely
23 want to ensure she had union representation
24 available?
25    A.    It's per the contract.  And so at that

---

106

1 point, because we were beginning the steps as
2 outlined in the contract, we wanted to make sure that
3 she had union representation.
4     Q.    Okay.  So you're just following the terms
5 of the collective bargaining agreement there?
6     A.    Correct.
7     Q.    Okay.  And the date on the e-mail is
8 October 2, 2015; is that correct --
9     A.    Yes.
10    Q.    -- to your recollection?
11    A.    That is correct, yes.
12    Q.    Mr. Arellano, do you have any -- do you
13 have any medical training?
14    A.    In what form?
15    Q.    Any -- any form at all.
16    A.    No.
17    Q.    No?  What about any training in therapy of
18 any type?
19    A.    Like formal training, no.
20    Q.    Okay.  Any expertise developed along the
21 way on substance abuse or addiction?
22    A.    Just through the training we received
23 either through employment conferences or Web -- Web
24 conferences or Web training.
25    Q.    Okay.  And was any of that -- was any of

---

107

1 that directly -- any of that training directly
2 related to the mechanism of how addiction works or
3 how it should be treated?
4     A.    Not to my knowledge.
5     Q.    Okay.  I want to hand you a document that's
6 marked Exhibit 7.  I understand that that's out of
7 order, but I've kind of rearranged things.  And so if
8 we just go out of order a tad, it will -- it will
9 allow me to follow this outline, and it will then, I
10 think, get us out the door quicker today.
11    A.    Okay.
12    Q.    So if you don't mind being out of order,
13 let me send this to Danielle.
14          I put Exhibit 7 up here.  There you are.
15 And let me know once you've reviewed that.
16    A.    Okay.
17    Q.    Okay.  Did you draft Exhibit 7?
18    A.    Excuse me?
19    Q.    Did you -- did you draft Exhibit 7?
20    A.    I did, yes.
21    Q.    And what -- what is that?  What is
22 Exhibit 7?
23    A.    It's a response to a grievance that was
24 filed through the union, and this is basically the
25 results of that meeting.

---

108

1     Q.    Okay.  And so -- so Ms. Brigham followed --
2 or first filed a grievance with the union; is that
3 correct?
4     A.    When you say "first filed," what does that
5 mean?
6     Q.    So this is -- I'm trying to figure out
7 if this is -- this is Frontier's response to
8 Ms. Brigham's grievance.  Is that what's happening
9 here?
10    A.    Yes.
11    Q.    Okay.  And then -- and then -- so what
12 you're asking for here is Frontier was asking that
13 the grievance be denied?  Is that what -- is that
14 what the purpose of that letter is?
15    A.    No.  It's more the purpose of the results
16 of that request.  So if we go to Number 1 --
17    Q.    Uh-huh.
18    A.    -- it was a request communicated on the
19 grievance filed.  I'm not sure if Rebecca filed it or
20 not, but it was definitely on behalf of her by the
21 union.
22    Q.    Okay.
23    A.    And so the response to that.
24    Q.    So who is -- who -- who denies or grants
25 the grievance?  Was it you or somebody else?

---

109

1    A.    It's filed through the union.  So anytime
2 there is a result that the flight attendant does not
3 agree with, they have the ability to file the
4 grievance through the union.  And then that then
5 comes to the company.
6    Q.    And then -- and then does the company
7 ultimately decide to grant or deny the grievance, or
8 is there some other party in there?
9    A.    No.  Yeah.  After the -- so we -- a meeting
10 is conducted to then discuss the grievance, and we
11 meet at the table with the union.  They present their
12 case.  We review the facts, all facts related.
13          And then after that -- a decision isn't
14 made on the spot, but then after the grievance, we
15 all collaborate, review the facts again of the -- the
16 case and what was presented at that grievance
17 meeting, and then a decision is rendered.
18    Q.    So here, that occurred with Ms. Brigham,
19 and her grievance was denied?
20    A.    Yes.
21    Q.    Okay.  And did you make the decision to
22 deny her grievance, or was it somebody else, or was
23 it a team -- excuse me -- a collaborative effort?
24    A.    It was a collaborative effort.
25    Q.    Do you recall who was in the group?

110

1    A.    Not -- not off the bat right now.
2    Q.    But you certainly were?
3    A.    Yes.
4    Q.    Just to make sure I'm absolutely positive
5 on how this works, I'm going to hand you -- an even
6 more out-of-order exhibit.  This one is going to be
7 called 17.  Sorry about that.  And let me send it to
8 Danielle first.
9          Okay.  And then once you get that, if you
10 could take a look at that for me.  I don't know if
11 you need to review it in detail.  I just want to ask
12 you if this is Ms. Brigham's grievance.
13          So review it as much as you need to, but
14 that -- but that's the question, whether or not this
15 is Ms. Brigham's grievance, or if you should.
16          I should -- I should direct you to --
17 Mr. Arellano, I'm sorry.  I should direct you to page
18 3 of the document.  That -- my question is if page 3
19 is her grievance, and then I'll have some other
20 questions about the --
21    A.    Page 3?  Okay.
22    Q.    Sorry about that.
23    A.    That is the grievance, yes.
24    Q.    Okay.  Okay.  And then -- so you've seen
25 that document before, then, page 3?

111

1    A.    Yes.
2    Q.    Okay.  And then page 1 to 2 of the
3 document, have you seen that?  Do you know what that
4 is?
5    A.    Page 2?
6    Q.    Page 1 and 2.
7    A.    Oh, yes.  That's the request that then is
8 elevated to the Assistant Board of Adjustment.
9    Q.    Okay.  So if the -- if the employee in this
10 case, Ms. Brigham, doesn't agree with Frontier's
11 position, they can then appeal to this Board of
12 Adjustment?
13    A.    That is correct.
14    Q.    Do you know what happened at the Board of
15 Adjustment in this case?
16    A.    That, I don't know.
17    Q.    Okay.
18    A.    Even though it's forwarded to the SBAs,
19 what we call it, they determine if the union wants to
20 proceed on their side.  I don't know if the union
21 proceeded with it on their end.
22    Q.    Okay.  Okay.
23    A.    Yeah.
24    Q.    So it becomes -- it's your understanding
25 that it becomes up to the union at some point to

112

1 decide how far to push it?
2    A.    That is correct.
3    Q.    Okay.  Do you think you've got 20 more
4 minutes in you?  We can get to noon and take a lunch
5 at noon?
6    A.    I'm okay with that.
7    Q.    Okay.  Great.
8          So let's switch gears here a little bit and
9 talk about Frontier's policies and procedures related
10 to the ADA, so the Americans With Disabilities Act.
11    A.    Okay.
12    Q.    And I just want to ask generally -- and
13 this is, of course, during the relevant time period,
14 so the end of 2011 to the end of 2015.  Generally, if
15 Frontier learns that an employee has a disability,
16 what's the first thing that Frontier does?
17    A.    We begin the interactive process, and that
18 means scheduling a -- typically at that time it was a
19 face-to-face meeting with the individual to get more
20 facts.
21    Q.    So you -- so you start what's called the
22 interactive process.  That starts with typically a
23 face-to-face meeting?
24    A.    Yeah.
25    Q.    And there you want to gather facts about

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

113

1 what exactly?

2    A.   Yeah.  Oh, exactly what the situation is?

3    Q.   Yeah, yeah.  So, what -- yeah, what facts

4 are you after?  What are the important facts?

5    A.   Ultimately, when they have a disability,

6 we're trying to see what it is that they're seeking,

7 what is their request if they have a request, and

8 basically just truly gather information.

9    Q.   Okay.

10   A.   Yeah.

11   Q.   Okay.  Then what happens next?

12   A.   At that point, we then determine, based on

13 their request -- again, we have to evaluate what

14 specifically that they're seeking, and then offer

15 recommendations.

16        But before we do that, we always reveal --

17 or review what we obtained from that meeting with the

18 folks on the HR side --

19   Q.   Uh-huh.

20   A.   -- and determine what can be done, if

21 anything.

22   Q.   Okay.  And then at that point, did --

23 does -- can it go different ways?  So is that -- or I

24 should just ask you what -- what -- what happens

25 after that?

114

1    A.   After the review?

2    Q.   Yeah, yeah.

3    A.   We then go back to the employee, have,

4 again, another conversation, see if anything's

5 changed from the time of the intake meeting, see if

6 there's any new information that we need to take into

7 consideration, and then hopefully address any

8 concerns or questions they may have.

9    Q.   Does -- and then after that, what happens?

10   A.   After that, if we are making an

11 accommodation, we'll work with the hiring manager

12 or we'll work with their manager, we'll work with

13 their department and make sure that what we agree to

14 in terms of an accommodation -- that they're able to

15 roll that out and make sure that it's implemented and

16 followed.

17        If there is no accommodation or if there is

18 no agreement, then we close out the case.

19   Q.   And then is that the end of the process, or

20 is there any more to it?

21   A.   In what form, I guess?

22   Q.   Just after -- so if you make the

23 accommodation, you said you'll work with a -- a

24 manager to implement it and make sure it's followed.

25 If there isn't, you close out the case, and then is

115

1 that the end of the -- the process, or is there

2 anything else?

3    A.   Oh, no, no.  If -- if we do make an

4 accommodation, it's constant follow-up with the

5 individual, with the department, to make sure that

6 nothing has changed --

7    Q.   Okay.

8    A.   -- and making sure the manager is being

9 compliant with what is recommended.  So there's

10 constant follow-up with the employee.

11   Q.   Okay.

12   A.   Yeah.

13   Q.   Is this the process that was followed with

14 Ms. Brigham?

15   A.   I do believe so.

16   Q.   Do you know, did -- did Frontier become

17 aware of Ms. Brigham's disability, or did Ms. Brigham

18 make Frontier aware of her disability?

19   A.   And when you say "Frontier," you're

20 referring to my knowledge?  Their -- her supervisors?

21 Managers?  Or in general?

22   Q.   Good question.  Any -- any of her -- anyone

23 supervisory to her -- to Ms. Brigham at Frontier.

24   A.   I believe, if -- if I recall conversations

25 with Rebecca, Ms. Brigham, she did disclose that she

116

1 had shared her disability with her supervisors.  Some

2 of her supervisors, not all.  I think three specific.

3    Q.   Do you recall who?

4    A.   It would have been -- we called her JJ, but

5 JaJuan is her name, Williams, Stefanie Coppedge, and

6 Jeff, and I'm blanking on his name.

7    Q.   But Jeff is the first name?

8    A.   Jeff is the first name, yeah.

9    Q.   Yeah.  Okay.

10        MS. BRIGHAM:  Last name Farney.

11        MR. CRONE:  Ah, thank you.

12        THE WITNESS:  Yeah, Farney.

13        MR. CRONE:  Okay.

14        MS. BRIGHAM:  And I also had talked to

15 Fadia.

16        MR. CRONE:  Hey -- hey, Rebecca --

17        THE WITNESS:  What?

18        MR. CRONE:  -- it's -- it's not your turn

19 to testify today.

20        MS. BRIGHAM:  Oh.

21        MR. CRONE:  Thanks for --

22        MS. BRIGHAM:  Sorry.

23        MR. CRONE:  No, you're okay.  Thanks for

24 getting the last name in there.  That's appreciated.

25 But you'll get -- you'll get your turn.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

117

1    Q.  (BY MR. CRONE)  Okay.  So the last name was
2 correct that -- that -- that Rebecca --
3    A.  Yeah.  Farney, yeah.
4    Q.  Okay.
5    A.  And I guess Fadia Daphis, too, then.
6    Q.  Okay.  Yeah.  Well, then -- perfect.
7        And then so after Ms. Brigham shared this
8 with her supervisors, then the process that you just
9 described to me is -- is -- is what happened?
10   A.  No.  That -- at that point, I'm not sure
11 exactly how long the supervisors were aware or when
12 they were notified.  It was just when it was brought
13 to my attention by Rebecca.
14   Q.  Okay.
15   A.  Yes.
16   Q.  So you -- so you think there might have
17 been some gap between them being notified and this
18 interactive process beginning?
19   A.  That, I don't know.  I really don't know
20 the time frame associated with --
21   Q.  Okay.
22   A.  Or the time then, yeah.
23   Q.  But at some point it did occur, the
24 interactive process?
25   A.  Oh, yes, 100 percent.

118

1    Q.  Okay.  Are there -- are there any -- so the
2 interactive process, as -- as you've described it to
3 me, are there any reasons for Frontier to deviate
4 from following that process?
5    A.  In -- in what form?
6    Q.  Are -- are there any employees with
7 certain, you know, issues or disabilities or
8 requested accommodations?  Just any reason at all why
9 Frontier might deviate from following the interactive
10 process as -- as you've outlined it?
11   A.  Not to my knowledge, no.  I mean, one
12 thing that we -- we're just having to take into
13 consideration the collective bargaining agreement.
14 But outside of that, all cases are typically handled
15 the same.
16   Q.  Okay.  Taking into consideration the
17 collective bargaining agreement, is -- when you say
18 that, are you -- do you mean whether or not Frontier
19 can comply with the request the employee may have
20 made or whether or not Frontier can come up with a --
21 with a possible solution for the employee, or both?
22   A.  It's more with -- complying with the
23 request.
24   Q.  And so in this case, with respect to Ms. --
25 Ms. Brigham's request, did you understand her to have

119

1 made a request to Frontier to be transferred to the
2 GO or headquarters as a reasonable accommodation?
3        MS. KITSON:  Asked and answered.
4        You can answer.
5        THE WITNESS:  Oh.
6    A.  A request to transfer to the GO?  That, I
7 don't know.  I know she requested to see if there's
8 other responsibilities that she could do instead of
9 flying.  I don't know if it was specific to the GO.
10   Q.  (BY MR. CRONE)  But a different --
11 different position, in any event, than a flight
12 attendant?
13   A.  I don't know if different position; just
14 different duties.
15   Q.  Okay.  And was it Frontier's position,
16 then -- I think you testified before last break that
17 it's Frontier's position that that would violate the
18 collective bargaining agreement?
19        MS. KITSON:  Objection.
20   Q.  (BY MR. CRONE)  Is that correct?
21        MS. KITSON:  Misstates prior testimony.
22        THE REPORTER:  I'm sorry; I didn't hear the
23 objection.
24        MS. KITSON:  Misstates prior testimony.
25        THE REPORTER:  Thank you.

120

1    Q.  (BY MR. CRONE)  And -- and I don't want to
2 misstate your testimony, so that's why I'm just
3 asking the question.
4        Is -- did -- did Frontier believe that a
5 transfer of duties, maybe -- I mean, you're just
6 saying it -- maybe it wasn't necessarily to the GO,
7 but a -- but a -- a reassignment of duties would
8 violate the collective bargaining agreement?
9    A.  Give me a second.  I'm trying to . . .
10   Q.  That's fine.
11   A.  It's -- it's hard to answer this question
12 because -- not "reassignment of duties."  It's what
13 she was requesting is more specific.  That was only
14 specific to the work comp department and OGI.
15        So to say "reassignment of duties," it's --
16 it's just -- it's hard to answer that.  That's the
17 position.  It's more so -- she wasn't on work comp,
18 so when the request came through, it was hard to
19 honor that request when she, technically, wasn't in
20 the work comp program.
21   Q.  Okay.  But by "hard to honor," do you mean
22 it would violate the collective bargaining agreement
23 to honor the request, or it was just hard to do it?
24   A.  Again, it's a complicated question.  How we
25 define eligible and not eligible is based on their

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

121

1 active status as deemed by the HR department.
2          Active status is anybody not on a
3 continuous leave of absence.  And so in Rebecca's
4 case, she was considered to be active, and so -- and,
5 therefore, then that triggers rules and regulations
6 associated with bidding in the contract.
7          And so in that moment was she eligible to
8 bid for a regular site?  No, because she had a bid
9 for a line of flying.  And so how -- we have to carve
10 out that question to -- to then take a position.
11    Q.   Yeah, but was she -- but was she requesting
12 to bid differently?  I -- I -- I was asking about the
13 request to -- to work at the GO instead of her normal
14 duties, so to be reassigned.
15    A.   Yeah, but you were asking if it was a
16 violation of the contract.
17    Q.   Correct.
18    A.   And so in order for me to respond, at that
19 moment, she was considered an active employee.
20    Q.   Okay.
21    A.   So as an active employee, she had to then
22 follow the requirements of eligible to bid in order
23 to bid for a line.  So in that point, it made her not
24 eligible for a temporary ground assignment.  And so
25 it's not -- it's hard for me to answer yes or no to

122

1 that question.
2    Q.   Yeah, and -- and I appreciate you taking
3 the time to explain it.  And -- and so that -- I
4 guess I still want to -- I want to zero in on this,
5 though.
6          So is that -- would that have violated --
7 so not being eligible to bid on a temporary ground
8 assignment, would that violate the CBA, or is -- or
9 is it a policy or something?  I'm trying to figure
10 out why she couldn't do it.
11    A.   Yeah.  So it would, in that case -- since
12 she's eligible to bid and she didn't submit the bid,
13 then that then triggers other pieces of the contract.
14 So with every piece of the contract, there's a
15 tentacle attached to it.  One leads to another.
16    Q.   Uh-huh.
17    A.   And so the request isn't as simple as, Is
18 she eligible for this?  We then have to kind of
19 dissect.  We have to look at the contract and what --
20 what her status was at that time.
21          She was an active employee, thus, not
22 making her eligible for a -- any type of -- of
23 temporary ground assignment because she was
24 considered active, if that makes sense.
25          So she was ineligible for the work comp

123

1 program, two cases, because she wasn't -- she hadn't
2 sustained an injury that removed her from service,
3 and the other piece is it was only awarded to
4 those -- that -- reassignment was only offered to
5 individuals on a work comp status.
6    Q.   Okay.  Okay.
7    A.   It all determines on that status of the
8 individual.  It's hard to --
9    Q.   Okay.
10    A.   So yeah.
11    Q.   Yeah, and I think -- I think we're covering
12 some ground we already covered, so I think we --
13 we've closed that loop.
14    A.   Okay.
15    Q.   I -- I appreciate the explanation.
16    A.   Yeah.
17    Q.   I -- the last question on -- on this topic:
18 When -- in the interactive process that you outlined
19 for me --
20    A.   Yeah.
21    Q.   -- and you had said, you know, we have to
22 take into consideration the CBA, is that what you're
23 talking about, what you just described here?  So
24 you -- you looked at Ms. Brigham's request, and then
25 the issue with the work comp and OJI is taking into

124

1 consideration the collective bargaining agreement; is
2 that fair?
3    A.   In -- in one moment -- in one factor, I
4 should say, but it's also looking at her status.
5 We have to look at her status to make that
6 determination.  And her status goes, then, back to
7 the contract.  If she's an active employee per the
8 collective bargaining agreement, she's required to
9 submit a bid.
10    Q.   Okay.
11    A.   And if she then doesn't submit a bid, then
12 other pieces then kick in.  And so it's kind of a --
13 that's how we need to determine -- it all goes back
14 to what was her status at the time?
15    Q.   Yeah.
16    A.   So if she was on intermittent FMLA leave,
17 she was not considered to be on a leave of absence;
18 therefore, making her an active individual, an active
19 bidder.
20    Q.   Okay.  Do you happen to know -- can you
21 recall what other provisions of the collective
22 bargaining agreement are then triggered by this
23 request?
24    A.   Yes.  The -- basically, it comes out to
25 eligible to bid.  If she's eligible to bid, then at

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

125

1 that point she's required to then follow the rules
2 and regulations associated with bidding.
3         Now, if she elected not to bid, then
4 there's what they call the default bid.  If she had a
5 default bid, that would then kick in.  If she did not
6 have a default bid, then she was assigned a
7 schedule --
8     Q.   Okay.
9     A.   -- whether she bid for one or not.  And
10 that was then determined by what was left, what was
11 not bid for anybody.  Then the scheduling department
12 then puts together a schedule for her.
13    Q.   Okay.
14    A.   Yes.
15    Q.   So could she bid, then -- so when she's
16 active, could she -- could she -- just setting aside
17 the disability and all of that, just in a normal day,
18 could she bid for a temporary ground assignment
19 whenever she wanted?
20    A.   No.  That was not part of the process.
21 It's not a -- it's not a bid for it.
22    Q.   So when she asks to be reassigned to the
23 GO, this isn't something she could have just done
24 through this bidding process anyway; is that correct?
25    A.   Correct.  It's not outlined in the

126

1 collective bargaining agreement.
2     Q.   So the -- so the process that you're --
3 that you just described didn't really prevent her
4 from asking to be reassigned to the GO, at least
5 through the process that was available under the
6 collective bargaining agreement, that is, the bidding
7 process?
8     A.   I'm not understanding the question.
9     Q.   So her -- so her -- she couldn't have
10 requested to be reassigned to the GO through the
11 bidding process?  That wasn't possible, correct?
12    A.   No, but she did request it via in person
13 when she and I spoke.  So she did request it, but not
14 through the bidding process, correct.
15    Q.   Okay.  Okay.  And then -- and so she made
16 that request face to face with you?
17    A.   Yes, I do recall that.
18    Q.   What about her request for a modified
19 schedule?  Did she make that face to face with you,
20 or was that made some other way?
21    A.   I believe she did, had -- in that same
22 conversation had asked that she could only bid a
23 certain type of trip.  So yes.
24    Q.   Okay.  I've got a couple of quick questions
25 in a different ballpark --

127

1     A.   Okay.
2     Q.   -- and I think that will -- that will get
3 us to lunch and put us in good shape to -- to still
4 get done in the midafternoon instead of evening --
5     A.   Okay.
6     Q.   -- hopefully.
7         So for flight attendants such as
8 Rebecca Brigham during the relevant time period,
9 does Frontier maintain a -- a personnel file on those
10 employees?
11    A.   Yes.
12    Q.   Do you know what's in a -- in one of those
13 personnel files?
14    A.   Are you just referring to a personnel file
15 in general, the HR personnel file?
16    Q.   Yeah, yeah.  Just that.  Do you know -- do
17 you know what documents are stored in there?
18    A.   Yeah.  We would include anything collected
19 during the employment process: driver's license, any
20 certification provided, résumé.
21        It would include any disciplinary
22 notifications, if anything were registered throughout
23 their tenure with the company.  Any performance
24 appraisals, if anything was administered, would be in
25 that file.

128

1         Social security card, I think, would be in
2 there if we were presented one during the employment
3 process.  And I believe that would be it in terms of
4 personnel file.
5     Q.   Okay.  What about in Ms. Brigham's case
6 where she made a self-disclosure and then the
7 subsequent reasonable accommodation process occurred
8 that we discussed?  Would that be in the file, or
9 would that be somewhere else?
10    A.   That would be somewhere else.
11    Q.   Where would that -- where would those types
12 of documents be stored?
13    A.   I believe that might be -- so the
14 compliance department at that time had their own
15 tracking method because they were considered DOT, and
16 so during an audit, they had to account for any
17 records, things of that nature, so they would be
18 filed within the compliance files, which were under
19 secured lock and key, per DOT regulations.
20    Q.   Okay.
21    A.   So those were kept separate from the
22 personnel file.
23    Q.   Okay.  Do you know how long the -- those
24 secured lock-and-key DOT files -- do you know how
25 long they're maintained?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

129

1    A.    They're kept in place during the tenure of
2 the individual.  That's -- that's all I know right
3 now, yeah.
4    Q.    Do you know if -- if all of that
5 information that would have been in the lock-and-key
6 file with regard to Ms. Brigham -- do you know if
7 it's been disclosed in this lawsuit?
8    A.    I believe so, yes.
9    Q.    So nothing -- nothing was lost or destroyed
10 after she -- after Ms. Brigham was terminated?
11    A.    Not to my knowledge, no.
12    MR. CRONE:  Okay.  I think, unless anybody
13 disagrees, we made it to lunch.
14    Danielle, do you want to take a full hour,
15 or do you want -- I could -- I could probably do 45
16 minutes, if you really want to.
17    MS. KITSON:  I'm going to defer to Jerry.
18 How long do you want to take?
19    THE WITNESS:  I'm good whichever.
20    MS. KITSON:  Okay.  Let's just take an
21 hour.
22    MR. CRONE:  Okay.  Okay.  So we -- we can
23 go off the record.  Sorry; I should have mentioned
24 that.  And I'll see you at 1:00.
25    THE VIDEOGRAPHER:  The time now is 11:58.

---

130

1 We're off the record.
2    (Recess from 11:58 a.m. to 12:56 p.m.)
3    THE VIDEOGRAPHER:  The time now is 12:56.
4 We're back on the record.
5    MR. CRONE:  Thank you.
6    Q.    (BY MR. CRONE)  So, Mr. Arellano, I think
7 we all got back from lunch.  Were you able to get
8 a -- a break and chance to eat something?
9    A.    Definitely.
10    Q.    Good.  And I just want to reiterate again,
11 if there are any issues, in your mind, related to
12 sitting in a room with other people, please let me
13 know.  I don't want you to be there if you don't want
14 to be.
15    A.    Okay.  Thank you.
16    Q.    Okay.  And when we left off, I was asking
17 you some questions about documents, the personnel
18 file and such.  Do -- do you remember those
19 questions?
20    A.    Yes, I do.
21    Q.    So I have a few more similar questions
22 related to how members of management at Frontier
23 communicated during the relevant time period.
24    A.    Okay.
25    Q.    I'm also only asking questions about

---

131

1 Ms. Brigham's supervisors, so the org chart we looked
2 at, and, and, you know, we sort of went through that
3 structure.  I'm just talking about those people,
4 okay?
5    A.    Okay.
6    Q.    How, generally, do members of that
7 management team, if it's fair to call them that,
8 communicate?  Is it by e-mail? verbally?  Something
9 else?
10    A.    Both.  Both e-mail or verbally, by phone.
11    Q.    Okay.  And for everything that -- for all
12 communications that are done by e-mail, are those
13 e-mails saved by Frontier?
14    A.    They're saved as part of the -- yeah, when
15 you send an e-mail, it goes into your "sent," things
16 of that nature.
17    Q.    Okay.  And what about, are verbal
18 communications ever documented after the fact in
19 a memorandum or something like that?
20    A.    By supervisors?
21    Q.    Yes.
22    A.    That, I don't know.  I don't know if
23 they . . .
24    Q.    Okay.  And are there any -- you know, apart
25 from e-mail communications and verbal communications,

---

132

1 is there any other way that the management team would
2 typically communicate?  So I'm not asking for some
3 weird, random, one day somebody used a messenger or a
4 pigeon for fun.  I just mean the -- the regular
5 course of business.
6    A.    Can you explain?  I'm lost.
7    Q.    Yeah.  Might -- might somebody use, say, a
8 text message or something like that?
9    A.    That, I don't know.  I mean, back then, I
10 don't know if our phones had text capabilities,
11 but -- yeah.
12    Q.    Okay.  Do -- does Frontier issue company
13 phones to management personnel?
14    A.    No.
15    Q.    No.  Okay.  So now we're going to -- now
16 we're going to switch gears a bit, and I want to ask
17 you some questions that hopefully will allow you to
18 explain to me sort of the circumstances surrounding
19 other employees, employees not necessarily being
20 Rebecca Brigham --
21    A.    Okay.
22    Q.    -- and reasonable accommodations they
23 sought and those types of things.
24    A.    Okay.
25    Q.    So I'm going to hand you, via -- you know,

---

133

1 via Zoom here, a document that was disclosed in the
2 virtual binder.
3    **A.  Okay.**
4        MR. CRONE:  And so I think, unless the
5 court reporter corrects me, I think we could mark
6 this one 2-1, unless -- do we already have a 2-1?
7        THE REPORTER:  I'll have to look.  Sorry.
8 I don't --
9        MR. CRONE:  That's okay.  I just -- for
10 some reason, I don't remember if we did.
11       THE VIDEOGRAPHER:  I have a 2-1 marked.
12       THE REPORTER:  Yeah, I was going to say, I
13 thought so too.  Yes.
14       MR. CRONE:  This will be 2-2.  Sorry about
15 that.
16       And, Danielle, this is Tab 71 in the
17 virtual binder.
18       MS. KITSON:  Okay.
19       MR. CRONE:  Okay.  And I will send this
20 over.
21    Q.  (BY MR. CRONE)  So that's on its way to
22 you, Mr. Arellano.  It's an Excel spreadsheet.  Let
23 me know when you have it opened.
24    **A.  Okay.  It's open.**
25    Q.  Okay.  And is this one of the documents you

134

1 reviewed in preparation for today's deposition?
2    **A.  Yes.**
3    Q.  Okay.  And when I open this document, it --
4 it opens to Tab 2020.  Are -- is your spreadsheet
5 also on Tab 2020?
6    **A.  It is.**
7    Q.  Okay.  And so this document -- is this --
8 is this document something you created in preparation
9 for this deposition, or did this document already
10 exist?
11   **A.  It was already in existence.**
12   Q.  Okay.  Is this document something that
13 Frontier has maintained over the years, or was it
14 created more recently?
15   **A.  No, it's been maintained over the years.**
16   Q.  Okay.  And who maintains this document?  Do
17 you know?
18   **A.  It depends on -- ERMs, the employee**
19 **relations managers, predominantly are the ones**
20 **navigating around this document, and any interactive**
21 **process will be documented on here.**
22   Q.  Okay.  And so they're all able to access,
23 like, a shared spreadsheet document of some sort and
24 type the information in?
25   **A.  Correct.**

135

1    Q.  Okay.  Okay.  So if you look at the 2020
2 tab, and there's -- there's an employee name at
3 the -- in the Last and First Name.  It says
4 Minnie Mouse.  Is this a real employee, or is this an
5 example?
6    **A.  Example.**
7    Q.  Okay.  Got it.  Okay.  Good.
8        And so I want to look at the 2012 tab, if
9 you can navigate to the 2012 tab.
10   **A.  Okay.**
11   Q.  Okay.  And my question here, first, is is
12 there a -- is there a document like this that covers
13 the latter part of 2011?
14   **A.  I would have to check.  That, I don't know**
15 **offhand.**
16   Q.  Okay.
17   **A.  Yeah.**
18   Q.  And looking at the 2012 tab, at Line 5 --
19 or excuse me -- Line 5, there's an employee named
20 ▮▮▮▮▮  ▮▮▮▮▮.  Are -- do you see where I'm looking
21 at there?
22   **A.  Yes.**
23   Q.  Okay.  So I want to make sure I understand
24 how this works.  So if I look at her row, which is
25 Line 5, and then I start to scroll over to the

136

1 right --
2    **A.  Uh-huh.**
3    Q.  -- I see that -- it looks like under --
4 under the -- the column Reasonable Accommodation,
5 there's a -- there's an X mark under Modified Work
6 Schedule.  Do you see that?
7    **A.  Standby.  Modified -- okay.  Yeah.**
8    Q.  Does that mean -- does that mean that
9 ▮▮▮▮▮  ▮▮▮▮▮ was granted a modified work schedule as
10 a reasonable accommodation?
11   **A.  Based on this, I would have to assume so,**
12 **yes.**
13   Q.  Okay.  And then when you -- when you go a
14 little bit farther to the right, it says, Slide -- I
15 assume that means sliding, but correct me if I'm
16 wrong -- ten-hour schedule, two hours in the morning
17 to accommodate her not driving in the dark.
18   **A.  Uh-huh.**
19   Q.  Is that -- is that additional comment
20 there -- that's one of those ERMs putting that
21 information in?
22   **A.  Correct.**
23   Q.  Okay.  Is there any way to figure out who
24 drafted that particular comment?
25   **A.  Yes.  If you scroll to the left --**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

137

```
 1    Q.   Uh-huh.
 2    A.   -- under Client Manager --
 3    Q.   Yep.
 4    A.   -- it would have been that individual,
 5 Peggy Decker.
 6    Q.   Oh, got it.  Okay.  So then -- so the
 7 client manager is the specific manager working with
 8 this particular employee, ████████████?
 9    A.   Correct.
10    Q.   Okay.  And then -- and then the manager, is
11 that the -- is that just the employee's immediate
12 supervisor, or is that somebody else?
13    A.   That's the immediate supervisor, correct.
14    Q.   Okay.  Okay.  And then staying -- staying
15 on Line 5 with ████████████ there --
16    A.   Yes.
17    Q.   -- on the Type where it says Non-OJI, does
18 that mean it's not an on-the-job injury?
19    A.   That is correct.  It's not OJI-specific to
20 the accommodation.
21    Q.   Okay.  Got it.  And then the next column,
22 Medical Issue, there's a column for vision
23 impairment?
24    A.   Uh-huh.
25    Q.   And so -- and then as -- and then the next
```

138

```
 1 set of columns are all the various accommodations
 2 that Ms. Worthey received.
 3         So here is it -- in reading this, is it --
 4 is it fair that she was granted a modified work
 5 schedule, intermittent FMLA, and that's it?
 6    A.   No.  Typically the way we use this
 7 document is anything that was captured during that
 8 conversation, then we would mark with the X.  And
 9 then the result would be noted in the column
10 Comments.
11    Q.   Oh, got it.  Okay.
12    A.   Yes.
13    Q.   So these were -- so those things were
14 brought up --
15    A.   Yes.
16    Q.   -- and then you -- and then you can read
17 the comments to see that she got a modified work
18 schedule?
19    A.   Yes.
20    Q.   Okay.
21    A.   Yes.
22    Q.   Okay.  Got it.  Okay.
23         And then to the right of those comments, it
24 says EEOC Charge Filed, question mark.  There's
25 nothing for this one.  Notification Letter, there's
```

139

```
 1 nothing.  But then it says, Interactive Checklist
 2 Used, and it says no?
 3    A.   Where do you see that?
 4    Q.   So I'm still on Row 5, which is
 5 ████████████.
 6    A.   Okay.
 7    Q.   All the way to the right, then, of the
 8 Findings and Recommendations.  There's three more
 9 columns.  They're AE, AI --
10    A.   Oh, yeah.
11    Q.   Okay.  So the -- so the EEOC Charge Filed
12 column, I assume that's a yes or no whether or not
13 the employee filed a complaint of discrimination with
14 the EEOC?
15    A.   That is correct.
16    Q.   Okay.  And then the next one, Notification
17 Letter, what's that about?
18    A.   Notification Letter, that I would -- yeah,
19 I'm unsure on that specific column.
20    Q.   Okay.
21    A.   The only thing that I can think of is if
22 there was a follow-up letter that went out to the
23 individual.
24    Q.   Okay.
25    A.   But, again, I'm not sure specifically, back
```

140

```
 1 in 2012, how it was used.
 2    Q.   Okay.
 3    A.   Yeah.
 4    Q.   And then the column for Interactive
 5 Checklist Used, here it says no.
 6    A.   Yes.
 7    Q.   Do you know what that interactive checklist
 8 is?
 9    A.   No.
10    Q.   Okay.  Is it safe to assume there's some
11 document that the ERM can use to check off something
12 task-related to the interactive process?
13    A.   It's hard to say.  That can mean a lot of
14 things, but, yet again, yeah, I wouldn't -- I don't
15 want to just assume, so --
16    Q.   Okay.
17    A.   -- yeah.
18    Q.   Okay.  Okay.  And then -- so here, is it --
19 so this -- this spreadsheet that existed at least as
20 far back as 2012 and then up to 2016 -- we have that
21 data --
22    A.   Uh-huh.
23    Q.   -- it's tracking -- and I don't want to --
24 I mean, my math is just -- is not that good, but
25 it -- it tracks Columns A through AG, so that's
```

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

<table>
<tr><td>

141

1 roughly 30 or more data points, is that fair, for
2 each employee?
3     A.    I -- say that again, now.  You lost me.
4     Q.    Yeah.  So I'm trying to -- I'm trying to --
5 so it looks like, for each employee, there's roughly
6 30 or more potential --
7     A.    Oh.
8     Q.    -- data points that are being tracked.
9     A.    Got it.  Oh, I see what you're saying.
10    Q.    Yeah.  Okay.
11    A.    Perfect.  Yes.
12    Q.    Okay.  Thanks.
13          And so do you know if -- if any employee
14 on this 2012 tab suffered from the disability of
15 alcoholism?
16    A.    No, but I can check for you, if you'd like.
17 I would have to look at the notes.
18    Q.    Got it.  Okay.  Well, before we -- before
19 we do that -- and it -- and it might be worth it to
20 do that.  A quick question, sort of, while we're --
21 while we're kind of on these general questions.
22          Are these -- are these employees on Tab
23 2012, are these employees just in Denver, or are they
24 employees based anywhere in the company?
25    A.    Back in 2012, it would have been -- we only

</td><td>

143

1 injury, right?
2     A.    Right.  She was a --
3     Q.    Okay.  And then --
4     A.    She was a reservations agent.
5     Q.    Got it.
6     A.    Yeah.
7     Q.    And then for -- like, for example, on Line
8 9, that's ▇▇▇▇▇.  That has "OJI" checked, so
9 ▇▇▇▇▇, then, did suffer an on-the-job injury?
10    A.    That is correct.
11    Q.    Okay.  Okay.
12          Okay.  So we can turn to Tab 2013.
13    A.    Okay.
14    Q.    And in looking at the spreadsheet for 2013,
15 is it fair to say all the same data points are being
16 tracked that were tracked in 2012?
17    A.    Let me just double-check.
18    Q.    Sure.
19    A.    I believe so.
20    Q.    Okay.  And then, just as another example
21 to make sure I'm looking at this right, Line 6 is
22 ▇▇▇▇▇.  Do you see that employee?
23    A.    I do.
24    Q.    And it says that she suffered a non-OJI,
25 and it sounds like she was also granted a modified

</td></tr>
<tr><td>

142

1 had our hub in Denver, so it would include -- well,
2 outside of our customer service, so it would include
3 everybody.  It would be companywide.
4     Q.    Okay.  So -- so when I look at this tab for
5 2012, that means that, starting with ▇▇▇▇▇ on
6 Row 5 and ending with ▇▇▇▇▇ on Row 24 -- so
7 that would mean 19 employees companywide requested
8 accommodations that were captured on this spreadsheet
9 for 2012?
10    A.    My understanding, yes.
11    Q.    Okay.  Okay.  Now, back to the question
12 about whether any of these employees in 2012 on
13 this spreadsheet suffered from the disability of
14 alcoholism.  If there's any way for you to answer
15 that, that would be great.
16    A.    Can you give me a chance just to go through
17 the notes really quick?
18    Q.    Yeah, please do.  Yes.
19    A.    Okay.  I don't see anything on here that
20 would identify that.
21    Q.    Okay.  Thanks.  And we can -- before we
22 turn the tab, at -- at ▇▇▇▇▇, it -- it shows
23 here that non-OJI is checked for her?
24    A.    Uh-huh.
25    Q.    That means she didn't suffer an on-the-job

</td><td>

144

1 schedule.
2          Is that -- is that -- am I reading that
3 right?
4     A.    Let me double-check.  So what was your
5 question again?  That she was offered a modified?
6     Q.    That she was granted a modified schedule,
7 and she also was non-OJI.
8     A.    Was non-OJI.  It looks like they did have a
9 discussion, but the notes just indicate there was a
10 scheduled adjustment.  So I'm not sure -- I can't
11 speak to what the actual adjustment was, though.
12    Q.    Sure.
13    A.    Yeah.
14    Q.    But the schedule must have changed in some
15 way?  That's what adjusted would mean?
16    A.    Correct.
17    Q.    Okay.  And then same for ▇▇▇▇▇,
18 who's on Line 7 right below ▇▇▇▇▇?
19    A.    Yes.
20    Q.    Looks like she was also non-OJI and also
21 received a modified schedule?
22    A.    Yes.
23    Q.    Okay.  And then -- and then
24 ▇▇▇▇▇, Line 11, she's an inflight employee;
25 is that correct?  Does that mean flight attendant?

</td></tr>
</table>

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

145

1    A.   That is correct.
2    Q.   Okay.  And she -- she was OJI, so she had
3  an on-the-job injury, and she received a modified
4  schedule; is that correct?
5    A.   Let me double-check.
6    Q.   Okay.
7    A.   So yes to your question.
8    Q.   Okay.  Thank you.
9         Okay.  So let's --
10        MS. KITSON:  I'm sorry; can you read back
11  the question?
12        THE REPORTER:  Sure.
13        (The following question was read by the
14  reporter:  "And she -- she was OJI, so she had an
15  on-the-job injury, and she received a modified
16  schedule; is that correct?")
17    A.   No.
18    (BY MR. CRONE)  I'm sorry.  She was -- she
19  was offered a modified schedule; is that -- is that
20  correct?
21    A.   Not a modified schedule.  If I look at
22  this -- and I'm looking at the notes --
23    Q.   Uh-huh.
24    A.   -- we would try to facilitate an
25  opportunity for her to move into a role.  I know we

146

1  possibly discussed modified schedule, but it's hard
2  to determine if one was offered or provided.
3    Q.   Sounds like -- I'm sorry.  Go ahead.
4    A.   No, go ahead.
5    Q.   I'm looking at -- so for ███████ --
6  I'm looking -- I just want to make sure we're on the
7  same thing.  I'm at Row 11, and then I'm over in
8  Column AD, which is the Findings, Recommendations.
9         And right at the bottom of that paragraph,
10  in red it says, 3/29/13, ███████ was offered to -- to
11  position of reservations agent -- I think that's a
12  typo --
13    A.   Yeah.
14    Q.   -- offered the position of reservations
15  agent to begin on 4/8/13.  After much discussion,
16  ███████ has elected to decline the offer.
17    A.   Yeah.  So --
18    Q.   Yes.  I'm sorry.  No, I was just going to
19  ask if that's what you're trying to clarify, what
20  that is.
21    A.   Yeah.  Ultimately, during the interactive
22  process, if it's deemed that the individual cannot
23  meet the essential functions of the role, in that
24  case, we try to see if there's another role that they
25  can potentially perform.

147

1         So in this case, we had her -- see if she
2  wanted the offer of the role of reservations agent.
3  So we extended her the offer, which would then
4  require her to transfer to a role, which means change
5  of job title, not just job functions.
6         She would transfer from the flight
7  attendant role into the department of reservations.
8  So we extended her the offer for a reservations --
9  reservations agent, and she declined.
10    Q.   Okay.  And what was -- what was
11  ███████ disability?  Can you tell from this?
12    A.   No, I cannot tell from this.
13    Q.   All -- but we can -- we can tell that it
14  was -- it was an on-the-job injury of some sort; we
15  just don't know what exactly?
16    A.   Correct.
17    Q.   Okay.  Okay.
18         Okay.  If we could, for 2013, same tab, is
19  there a way for you to tell if any of these people
20  had alcoholism as a disability?
21    A.   Can you allow me -- can you give me an
22  opportunity to read through the notes?
23    Q.   Yep, yep.  No problem.
24    A.   Okay.  Not that I see.
25    Q.   Okay.  Could you turn to Tab 2014?

148

1    A.   Okay.
2    Q.   And Tab 2014 looks like a slower year in
3  the reasonable accommodation business, and so it
4  seems like there's fewer employees here, but it looks
5  to be like roughly all the same data points are being
6  tracked for each one; is that fair?
7    A.   I believe so.
8    Q.   Okay.  And can you tell me, in 2014,
9  whether any of these employees had alcoholism as --
10  as a disability?
11    A.   Let me read through those real quick.
12    Q.   Sure.  Thank you.
13    A.   Okay.  I don't see any on there.
14    Q.   Okay.  Now can we turn to Tab 2015?
15    A.   Yes.
16    Q.   Okay.  So Tab 2015 is where Rebecca Brigham
17  appears at Row 10.  Do you see that?
18    A.   I do.
19    Q.   Okay.  And the column for Date Notified By
20  EE, which is Column I, does that mean date notified
21  by employee?
22    A.   Yes.
23    Q.   Okay.  And then for Rebecca Brigham, which
24  is Row 10, at -- at the date filed, it says June 4,
25  2015.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

149

1        Does that mean the date Frontier was first
2   notified about the existence of her disability or the
3   request for a reasonable accommodation or something
4   else?
5        A.   Let me -- let me read the notes.
6        Q.   Sure.  Thank you.
7        A.   Typically, it's down in the notes.
8        Q.   Yeah.  No problem.
9        A.   I would have to look at the date when HR
10  was aware; not when the company was notified.
11       Q.   Okay.
12       A.   Because I think she had notified the
13  supervisors prior to that.
14       Q.   Okay.  All right.  So this is -- so that
15  Date Filed column means date HR is aware?
16       A.   Yes.
17       Q.   Okay.  All right.  And then at -- for
18  Rebecca Brigham again, so staying on Line -- or Row
19  12 --
20       A.   Okay.
21       Q.   -- at Column Q, it says -- that's the
22  Modify Work Schedule column under the reasonable
23  accommodation umbrella.  Do you see where I'm at
24  there?
25       A.   Yes.

150

1        Q.   And in Rebecca's column there, it says N/A.
2   Do you see that?
3        A.   I do.
4        Q.   Do you know why it says N/A there?
5        A.   Typically, N/A, not applicable, since it
6   wasn't necessarily associated with a work comp claim
7   or OJI, on-the-job injury.
8        Q.   Okay.  I don't see N/A in that column for
9   any other employee on any other tab for any year in
10  this spreadsheet.
11       Can you explain why it's only in
12  Rebecca Brigham's row?
13       A.   If you give me a second, let me just kind
14  of review that.
15       Q.   Yeah.
16       A.   Honestly, I don't know.
17       Q.   Okay.  But you -- you -- you did fill in
18  this information because you're noted as the client
19  manager.  Jerry, in -- in Column G, that's you,
20  right?
21       A.   Yes.
22       Q.   Okay.
23       A.   The only piece with this, because of the
24  case that had been -- it was a long case for Rebecca.
25  There were different responsibilities, so at one

151

1   point I was handling the case.  Another point, when I
2   left and came back, somebody else was handling the
3   case.
4        But it's always the same person, or
5   different people -- whoever was handling that case
6   was able to make comments.
7        Q.   Okay.  Okay.
8        A.   If that makes sense.
9        Q.   It does.  Thank you.
10       A.   Yeah.
11       Q.   And then on these other rows where the
12  client manager is noted as you, Jerry, you input the
13  information there as well, but you never used the
14  phrase "N/A," did you?
15       A.   So what is the question?  I'm sorry.
16       Q.   So the -- the question is anywhere on this
17  spreadsheet where the client manager is noted as
18  Jerry, that's you inputting this information,
19  correct?
20       A.   It -- yes.  But, again, it depends on who
21  was handling the case at the time.  So if my name was
22  listed, not every time did the client manager go in
23  there and change the name if they had overseen or
24  were jumping in.  So -- but it was just more updating
25  the common field.

152

1        Q.   Okay.  But you'd agree that whoever put the
2   information in, nobody had used the term "N/A"
3   anywhere else on this document, did they?
4        A.   Let me just verify.  One second.
5        Yes, I would agree.
6        Q.   Okay.  In the Findings and Recommendation
7   for Rebecca Brigham -- so we're at Row 10 and Column
8   AF.  Sort of in the middle of that -- that paragraph
9   it says -- it's the third line down.  It says,
10  Ms. Brigham failed to provide medical documentation
11  supporting her position.
12       Do you see where I'm at?
13       A.   Yes.
14       Q.   What medical document -- what medical
15  documentation did Ms. Brigham fail to provide?
16       A.   Let me just read the comments real quickly.
17       Q.   Sure.
18       A.   Got it.  So, ultimately, when I say on
19  there, Ms. Brigham failed to provide medical
20  documentation supporting her position, she was
21  requesting herself to -- looks like here --
22  overnights -- flying overnights, staying overnights
23  in hotels, things of that nature.
24       So when we look at her accommodation, we
25  look at what is provided on the certification form.

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

153

1    Q.    Okay.
2    A.    On the certification form, it does not
3 mention no flying overnights.  And so as part of the
4 interactive process, we would have looked at that as
5 well.
6          And so, ultimately, that's stating that
7 there was no medical documentation to support her
8 position that she was not allowed to fly overnights.
9    Q.    Okay.  So --
10   A.    Or layovers, I should say.
11   Q.    Oh, yeah.  Sorry.
12         So specifically what you were referring to
13 here is that you didn't have -- Frontier didn't have
14 documentation that Ms. Brigham couldn't do overnight
15 flights, overnight trips?
16   A.    Medical documentation.
17   Q.    Medical documentation.  Okay.
18   A.    Yeah.
19   Q.    Okay.  So -- so for these on Ms. -- on --
20 on Ms. Brigham's row here, Row 10 --
21   A.    Yeah.
22   Q.    -- under the Reasonable Accommodation
23 umbrella, so that's Columns -- looks like Columns Q
24 through AC?
25   A.    Yeah.

154

1    Q.    So there's -- we had already discussed
2 there's "N/A" under Modified Work Schedule.
3    A.    Uh-huh.
4    Q.    There's an X under FMLA Intermittent.
5    A.    Uh-huh.
6    Q.    And I think you had mentioned -- was she
7 granted that?
8    A.    She was granted intermittent FMLA, correct.
9    Q.    Okay.  And -- and was she granted it, or
10 was she just allowed to apply to use it?
11   A.    Can you explain?
12   Q.    So could she have applied to use
13 intermittent FMLA whether or not the interactive
14 process ever occurred?
15   A.    Yes.
16   Q.    Okay.  And then there's an X under Explore
17 Other Positions With Frontier?
18   A.    Uh-huh.
19   Q.    So is this what you mentioned earlier, she
20 could have applied for other positions?
21   A.    Not only could she have applied, but we did
22 mention other opportunities that she should consider.
23   Q.    And she could have applied for these other
24 opportunities whether or not the interactive process
25 ever occurred, right?

155

1    A.    Correct.
2    Q.    And then a couple columns down, AD, where
3 it says Termed, again, that means terminated?
4    A.    And where was that again?  I'm sorry.
5    Q.    Column AD.  It's just a few to the right
6 from the Reasonable Accommodation -- or just one to
7 the right from the Reasonable Accommodations.
8    A.    Yeah.  Typically, we use that term in terms
9 of what the status would be, so it goes back to their
10 status at that time.  Or if there was an update
11 regarding the outcome, then yes.
12   Q.    Okay.  And -- and here that means
13 terminated?
14   A.    Yes.
15   Q.    Yeah.  Okay.
16         For 2015, can you tell me if anybody else
17 had alcoholism as a disability?
18   A.    One moment, please.  Let me read through
19 the comments.
20   Q.    Sure.
21   A.    So what was your question again?  Can you
22 ask that last one?
23   Q.    Yeah.  Was there anybody else in 2015, at
24 least on this spreadsheet, that had alcoholism as
25 their stated disability?

156

1    A.    So let me rephrase that.  According to the
2 notes, it doesn't reference if anybody was on there.
3 Just based on the notes, I don't see that on the
4 notes.
5    Q.    Got it.  Yeah, I mean, except for
6 Ms. Brigham, we know --
7    A.    Yes.
8    Q.    Yeah, yeah, yeah.
9          Okay.  And then last question with respect
10 to Row 10, Ms. Brigham and this -- and Tab 2015.
11   A.    Yes.
12   Q.    On the right of the Findings and
13 Recommendations where the EEOC Charge Filed column is
14 at, there's no check mark.
15         Does that mean, at the time of this
16 document's creation, Ms. Brigham hadn't yet filed
17 her charge, or -- or -- or whoever was filling this
18 out didn't know about it?
19   A.    Could be that they did know, did not know.
20 It just wasn't checked.
21   Q.    Got it.
22   A.    So don't know.  Yeah.
23   Q.    Okay.  And then under Notification Letter,
24 that's not checked either.  So whatever that
25 notification letter is, safe to assume it didn't

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

157

1 happen yet or whoever was filling this out didn't
2 know about it?
3      A.   It -- yeah.  It's hard to say.
4      Q.   And what about the Interactive Checklist
5 Used?  That's not checked either here.  Does that
6 mean no interactive checklist was used --
7      A.   Not --
8      Q.   -- with --
9      A.   Not necessarily.  Just depends on the
10 individual, whoever's working the case, if they
11 checked that box or not.
12      Q.   And one of those individuals here would
13 have been yourself, right?
14      A.   Correct.
15      Q.   Yeah.  Do you recall using an interactive
16 checklist with Ms. Brigham?
17      A.   I'm trying to recall.  Not a checklist
18 per se, but just more, during the process, we would
19 document her file.
20      Q.   Okay.
21      A.   And I also refer to that in terms of what
22 steps we were with her, so -- yeah.
23      Q.   Okay.  Okay.  Let's flip to Tab 2016.  And
24 Rebecca Brigham remains on -- on -- on this for the
25 year 2016, so my only questions are related to her.

---

158

1 And she's at Row 10 still.
2      A.   Okay.
3      Q.   And if we -- if we move over to the right
4 to those same columns we were just discussing --
5      A.   Uh-huh.
6      Q.   -- right next to the Findings and
7 Recommendations, so Columns AG and AH --
8      A.   Uh-huh.
9      Q.   -- there now it says the EEOC charge is
10 filed.
11      A.   Uh-huh.
12      Q.   Now, is -- whoever's filling this out would
13 check that because now they've seen an EEOC charge;
14 is that fair?
15      A.   Yes.
16      Q.   And the Notification Letter is checked, so
17 whatever that is, that must have occurred by now,
18 too, right?
19      A.   Right.
20      Q.   But the Interactive Checklist is still not
21 used -- or Interactive Checklist Used, question mark,
22 is still not checked.
23           Fair to say, by this point, whoever's
24 filling this out has decided the interactive
25 checklist was not used?

---

159

1      MS. KITSON:  Object to the form.
2      A.   Yeah, I'm not sure.  Again, it just depends
3 on the individual filling this out, and when they did
4 such, say that a list was or was not used.  It's just
5 the box was not checked.
6      Q.   (BY MR. CRONE)  Okay.
7      A.   Yeah.
8      Q.   Well, for 2016, it -- it still notes Jerry
9 as the client manager.  Did -- did you fill this out?
10      A.   Some pieces I would have; some pieces not.
11 If you recall, I was not here during a certain time
12 period as well --
13      Q.   Uh-huh.
14      A.   -- that Rebecca's case was still being
15 handled.  So, again, I -- yeah, it's hard to say.
16 But, for the most part, a lot of that is my comments
17 as well.
18      Q.   Okay.  And there's a -- there's a tab --
19 sorry.  Hold on.  Let me find this.
20           Never mind.  You've already answered that
21 question, so we're going to -- we're going to skip
22 that one.
23           Okay.  So is it -- for the -- for the --
24 for the years that we looked at and that are relevant
25 to this deposition, so definitely the 2012, 2013,

---

160

1 2014, and 2015 tabs --
2      A.   Uh-huh.
3      Q.   -- you weren't able to identify any -- at
4 least based on the notes, you weren't able to
5 identify any employees that suffered from the
6 disability of alcoholism?
7      A.   Based on -- go ahead.
8      Q.   I'm sorry.  Go ahead.  I'm sorry.
9      A.   Just based on what was on that document,
10 no.
11      Q.   Got it.  Does that seem -- does that seem
12 atypical for you, or -- or is that expected, in your
13 review of those years?
14      MS. KITSON:  Object to the form.
15      A.   Yeah, because I think at -- when -- when
16 you read the document, it identifies that that's part
17 of the self-disclosure program.
18      Q.   (BY MR. CRONE)  Uh-huh.
19      A.   I don't know if any of the other
20 individuals were part of the self-disclosure
21 program.
22      Q.   Got it.  So it may just be that the notes
23 aren't thorough enough to reflect others?
24      A.   I'm not sure, yeah.  Ultimately, we
25 identify the situation.  In that case, Rebecca was in

---

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

161

1 the self-disclosure program, which would then
2 highlight that.
3        If it's not noted on any of the other
4 individuals, I would have to assume that they were
5 not part of that program.
6    Q.   Okay.  Okay.
7    A.   Yeah.
8    Q.   That's fair enough.  Thank you.
9        We can set that exhibit aside, whatever
10 that means, closing the window or -- or -- or
11 whatever.  So . . .
12       Okay.  So I want to -- I want to turn --
13 turn your attention to -- to a different topic now,
14 which is more specifically Frontier's decision to
15 terminate Ms. Brigham in the -- towards the end of
16 2015.
17   A.   Okay.
18   Q.   And so you had noted earlier that the
19 documents in a -- in a -- in a flight attendant's
20 personnel file were stored in -- in one of two
21 places.  Would that include any documents related
22 to the basis for her termination, for Ms. Brigham's
23 termination?
24   A.   Can you explain a little more?
25   Q.   Yeah.  So I -- I -- we were talking

162

1 generally about what's in an -- in an employee's
2 personnel file.  Do -- do you recall that?
3    A.   Yes.
4    Q.   And then there was -- there was the -- the
5 second sort of part of the file that was under lock
6 and key that has to do with the -- with the --
7    A.   Compliance?
8    Q.   -- the drug -- yeah.  And -- and so in --
9 in either of those places, is that where -- all the
10 documents related -- that would go into an employee's
11 personnel file related to why they were terminated,
12 would they live in one of those two places?
13   A.   No.
14   Q.   No?  So -- so there's more -- there's
15 somewhere elsewhere they might exist?
16   A.   It's called a P-tracker.
17   Q.   Okay.  Can you explain what that is?
18   A.   P-tracker is the -- basically, the
19 department file.
20   Q.   Uh-huh.
21   A.   Anything that we felt that would not go
22 into the personnel file: comments, notes.  But it
23 also tracks any accolades, performance issues,
24 discussions, letters, things of that nature.
25       Or any discussions that the supervisors may

163

1 have had with any employee under the inflight or
2 flight employment group would be documented in
3 P-tracker.
4    Q.   Okay.  Okay.  Do you know if all that
5 information has been turned over in this lawsuit?
6    A.   To my understanding, yes.
7    Q.   Okay.  Okay.  I'm going to -- I'm going to
8 send over Exhibit 6.
9        MR. CRONE:  And, Danielle, I'll e-mail it
10 to you.
11       MS. KITSON:  Can we take a break at the
12 next convenient time, too, John?
13       MR. CRONE:  Yeah, absolutely.  If you want,
14 I only have a couple on this one, and we -- and then
15 we can definitely do a break easily there.
16       MS. KITSON:  Thanks.
17   A.   Okay.  I have it up.
18   Q.   (BY MR. CRONE)  Excellent.  So can you give
19 it a quick review for me?
20   A.   You bet.
21   Q.   Yeah.
22   A.   Okay.
23   Q.   Okay.  And so you wrote this e-mail, right?
24   A.   Right.
25   Q.   Okay.  So in the middle at the -- at the

164

1 first bullet point, you had wrote -- at the end of
2 that sentence it says, The company has continued to
3 make exceptions for her.
4        Do you see that?
5    A.   Yes.
6    Q.   And what exceptions are you referring to
7 there?
8    A.   Well -- well, it depends on this time.  So
9 when Rebecca would be approved, let's just say, 8
10 days per month, a lot of the times she would have
11 exceeded that; she would call in 10, 11, sometimes up
12 to 12.  And so in those cases, we would make
13 exceptions for her to go above what the medical
14 documentation supported.
15   Q.   Okay.  And so that's -- that's what you're
16 talking about when you -- when you -- in -- in the
17 second bullet point where it says, We're also willing
18 to provide her new FML -- FMLA paperwork to allow for
19 the ability to increase the number of days she's
20 allowed to use, that's what you're talking about
21 there?
22   A.   Yes.  And it's more to drive consistency.
23 Typically, just generally, we try and hold
24 individuals, Hey, if you're approved for five days,
25 make sure you remain within that.

165

1        But if we see a pattern of individuals
2 utilizing more than they're approved for, we ask them
3 to recertify or just provide us updated medical
4 information to support their need.
5     Q.   Okay.  So -- so here, Ms. Brigham was --
6 she wasn't approved prior to -- to take off the
7 amount of days that she was taking?  Is that what
8 you're saying here?
9     A.   Based on the medical documentation, the
10 doctor would have indicated.  If she was approved or
11 can take a maximum of eight, we typically just
12 approved what the medical professional was providing
13 us.
14     Q.   Okay.
15     A.   Whatever's on there is what -- what --
16 what -- we would try and document that.
17     Q.   Okay.  So somewhere out there, there's a --
18 a medical certification that says that Ms. Brigham should
19 have X number of days off per month?
20     A.   Yes.  And the employee certification form,
21 whether that be intermittent or FMLA, there is a
22 section of that notification that includes frequency,
23 frequency of use I believe it specifically says.  And
24 under the frequency, the provider would indicate how
25 many times per month, per week, and things of that

166

1 nature.
2     Q.   Okay.
3     A.   So we basically -- we don't make
4 adjustments in -- on that.  We just basically -- if
5 you request or the nature of the request qualifies
6 the individual for intermittent FMLA, we'll then
7 approve for the frequency documented by the medical
8 professional.
9     Q.   Got it.  Okay.
10        MR. CRONE:  Now is a great time to go off
11 the record and take that break.
12        THE WITNESS:  All right.  Thank you.
13        THE VIDEOGRAPHER:  The time now is 1:48.
14 We're off the record.
15        (Recess from 1:48 p.m. to 1:59 p.m.)
16        THE VIDEOGRAPHER:  The time now is 1:59.
17 We're back on the record.
18     Q.   (BY MR. CRONE)  While we were off the
19 record, I went ahead and sent you Exhibit 8.
20     A.   Oh.
21     Q.   So hopefully you can pull that up.
22        MR. CRONE:  And, Danielle, I e-mailed
23 Exhibit 8 to you as well.
24        MS. KITSON:  Great.
25     Q.   (BY MR. CRONE)  So once you have it pulled

167

1 up, let me know.
2     A.   It is open.
3     Q.   Okay.  Great.  Okay.  So have you seen this
4 document before?
5     A.   I can't say I have.
6     Q.   Okay.  Do you mind reading it --
7     A.   Yeah.
8     Q.   -- quickly?  Thanks.
9     A.   Will do.  Okay.
10     Q.   So here, Ms. Coppedge appears to be telling
11 Ms. Brigham that there's going to be an investigatory
12 meeting pursuant to the CBA on a certain date; is
13 that fair?
14     A.   Yes.
15     Q.   Okay.  And what's an investigatory meeting?
16     A.   That is a meeting -- it's called a
17 fact-finding.  Ultimately, it's an opportunity to
18 discuss either concerns from management and allow
19 the individual, in this case Rebecca, or flight
20 attendant, to then either answer questions, voice
21 concerns, or just basically dialogue with the
22 individual.
23     Q.   Okay.  So prior to this investigatory
24 meeting with Ms. Brigham, management would not have
25 yet made up its mind to terminate Ms. Brigham; is

168

1 that fair?
2     A.   Yeah.
3     Q.   Okay.
4     A.   That -- that's the purpose of the
5 investigatory meeting.
6     Q.   Got it.  Okay.
7        And that, here, was set to occur on
8 November 3, 2015.  Do you know if it did occur on
9 that date?
10     A.   That, I don't.
11     Q.   Okay.  And the letter here is dated
12 October 30, 2015.  So by October 30, 2015, management
13 hadn't yet made up its mind to terminate Ms. Brigham?
14     A.   That's my understanding.
15     Q.   Okay.  Let's set -- let's set that aside,
16 and I want to -- sorry.  I want to -- I want to pull
17 up -- this is going to be a little out of order
18 again.  Sorry about that.  I'm going to send you
19 what's -- what's going to be labeled Exhibit 10.  I'm
20 sending it to Danielle, and now I will send it to
21 you.
22        Okay.  Once you have Exhibit 10, if you
23 could -- it's a short e-mail letter.  If you could
24 review it.  Let me know when you've done that.
25     A.   Okay.  I just opened it up, so I'm going to

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

169

1 read it now.
2    Q.    Thanks.
3    A.    Okay.
4    Q.    So Exhibit 10 is an e-mail from Shelly --
5 how do you pronounce her last name?  Is it "Leyner"?
6 "Leyner"?
7    A.    "Leyner."
8    Q.    "Leyner" -- to yourself; is that correct?
9    A.    It's to the inflight department.
10   Q.    Oh, and -- and you're cc'd.  Yeah.
11   A.    Yeah.
12   Q.    Okay.  Do you recall receiving this e-mail?
13   A.    Yes.
14   Q.    Okay.  And the date is October 27, 2015; is
15 that correct?
16   A.    Looks like it, yes.
17   Q.    And what is Ms. Leyner telling not just
18 you, but -- but you by way of copy on this e-mail?
19   A.    Basically, that the infraction that
20 occurred 23-25 did not meet their criteria for -- to
21 be recorded to intermittent FMLA.
22   Q.    And what did that mean for Ms. Brigham on
23 October 27?
24   A.    Can you repeat that?
25   Q.    What did that mean for Ms. Brigham as of

170

1 October 27, 2015?
2    A.    That meant that the nature -- so,
3 essentially, she would have requested intermittent
4 FMLA, and the request was not necessarily accepted;
5 therefore, they were notifying the department that it
6 would remain as a sick call.
7    Q.    Does that mean that she would be
8 terminated?
9    A.    No.  That means that the instance would
10 be -- fall under the dependability policy.
11   Q.    Okay.  Can you pull up Exhibit 5 again?  Do
12 you have that still at your fingertips?
13   A.    Do you know which one it was?
14   Q.    It was -- it was Number 5, and it was the
15 e-mail that we were arguing about whether a portion
16 was privileged.  And I don't want to look at that
17 part at all.  I want to look at that last sentence
18 that we agreed was okay to look at.
19   A.    Okay.  One second.
20   Q.    I can resend it, if need be.
21   A.    I'm just going through all the attachments
22 real quick.  I think I might have closed it.
23   Q.    Okay.  I'm going to -- I'll get you another
24 copy.
25   A.    Okay.  Thank you.

171

1    Q.    Yeah, no problem.  There you -- I have it
2 there.
3    A.    Okay.  The one that has the next steps?
4    Q.    Yeah.  Just that line because, again, I --
5 I don't want to wade into that privileged area.  Just
6 the next steps.
7    A.    Uh-huh.
8    Q.    Do you see where you had wrote on -- so,
9 first of all, this is on October 2, 2015; is that
10 correct?
11   A.    Yes.
12   Q.    And here you wrote, Next steps.  If the
13 last occurrence is not covered by FMLA, then we
14 proceed with the term steps.
15   A.    Uh-huh.
16   Q.    So here, are you saying that if the last
17 occurrence isn't covered by FMLA, then you're going
18 to fire Ms. Brigham?
19   A.    No.  Term steps will always refer to the
20 section of the contract -- the investigatory meeting.
21 It was just a side term that -- we referred to that
22 investigatory meeting as term steps.  So it was the
23 beginning process of that.
24   Q.    Okay.
25   A.    But no, not -- not that she was going to be

172

1 terminated.
2    Q.    Okay.
3    A.    That decision is never rendered until all
4 the facts are determined and the employee is allowed
5 to weigh in in case there's something that we have
6 missed.
7    Q.    So if there was something you had missed,
8 for example, that would recode the absence described
9 in -- in Exhibit 10 by Ms. Leyner, that could change
10 the outcome?  Is that what you're saying?
11   A.    Yeah, depending on what the employee
12 presented.  Correct.
13   Q.    Okay.  Okay.  I'm going to -- I'm going to
14 go out of order a little bit again, so sorry about
15 that.  This one is going to be called Exhibit 15.
16 And let me send it to Danielle first.  Then I will
17 send it to you.  I'm getting a little more efficient
18 at this, I think, and that ought to show up to you in
19 a second.
20   A.    Okay.
21   Q.    And then the same thing.  Once you get it,
22 if you could review it real quick and let me know
23 once you've done that.
24   A.    Okay.  I have it.
25   Q.    Thank you.  Oh, you know what?  I -- I just

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

173

1 noticed something, Mr. Arellano. I'm sorry. The
2 very bottom of this exhibit has that same e-mail
3 where a good portion of it is privileged.
4    **A.   Okay.**
5    Q.   So the same -- same sort of caution. I
6 don't want to look at any of that stuff. Just --
7 just anything else.
8    **A.   Okay. Go ahead.**
9    Q.   So at the top of that Exhibit 15, there
10 you're writing an e-mail to Shelly Leyner on
11 October 2, 2015; is that correct?
12    **A.   That is correct.**
13    Q.   And you wrote, Hi Shelly, Let's ensure we
14 have our i's dotted and t's crossed before moving
15 forth with term.
16    **A.   Correct.**
17    Q.   Again, here are you referring to
18 terminating Ms. Brigham, or are you referring to the
19 steps taken towards --
20    **A.   Referring to the steps. Typically, what we**
21 **would do, anytime anybody reached that termination**
22 **level or step or initiating that fact-finding, we**
23 **wanted to make sure we had our facts so that we**
24 **wouldn't waste everybody's time if they came in and**
25 **we missed something.**

174

1    **So in reference to this "ensure we have our**
2 **i's dotted and t's crossed," I wanted to ensure that**
3 **any infraction was properly coded that she had**
4 **requested and that everything had been taken care of,**
5 **so that way we didn't waste her time or our time to**
6 **go to that meeting and then determine, Oh, we forgot**
7 **to recode this occurrence over to intermittent FMLA.**
8    Q.   Okay.
9    **A.   Yeah.**
10    Q.   I am -- if you give me just a second here,
11 I'm actually getting rid of stuff here. So -- so
12 this will save us some time if you just bear with me
13 for a minute here.
14    Okay. I'm going to apologize again for the
15 order. I'm going to send you a document that is
16 labeled Exhibit 21.
17    **A.   Okay.**
18    Q.   Okay. And same -- same thing as always.
19 Once you get it and review it, let me know.
20    **A.   Let me see -- oh, there it is. Okay. I'm**
21 **in there now.**
22    Q.   Okay. And is that -- is this e-mail from
23 JJ Williams -- is this the other supervisor that you
24 had mentioned was one of Ms. Brigham's supervisors?
25    **A.   She -- I don't know if she was Brigham's**

175

1 **supervisor, but she was an inflight supervisor.**
2    Q.   Got it. Okay. And it was way earlier in
3 the day when you mentioned her name, so it's a while
4 back I asked you that.
5    **A.   Yeah.**
6    Q.   And here, where -- where Ms. Williams is
7 writing to Shelly Leyner, I understand you're not
8 copied on this, but I'm -- I'm interested in your
9 opinion.
10    **A.   Okay.**
11    Q.   It says -- is -- here is -- do you
12 know what Ms. Williams is referring to, this
13 leave-of-absence paperwork for a medical condition?
14    **A.   Can I read it real quickly?**
15    Q.   Oh, yeah, please do. Yeah.
16    **A.   Okay. And so what was your question again?**
17 **I'm sorry.**
18    Q.   Yeah. This -- so here it looks like
19 Ms. Williams is referring to leave-of-absence
20 paperwork for a medical condition that will require
21 her schedule to be cleared for the month. "She
22 expressed to me that it is urgent."
23    Do you know what -- what Ms. Williams is
24 referring to?
25    **A.   Yeah. I believe either on that same day or**

176

1 the day prior, we had met with -- or even after --
2 with Ms. Rebecca Brigham in terms of what was going
3 on with her situation.
4    Q.   Got it. So --
5    **A.   So I believe she was approved for FMLA,**
6 **continuous leave.**
7    Q.   Okay. Got it. So is this when -- is
8 this -- is this right around the time, then, that
9 Ms. Brigham went to a monthlong treatment out of
10 state?
11    **A.   To my understanding, yes.**
12    Q.   Okay.
13    **A.   So that would have entered her into the**
14 **self-disclosure program.**
15    Q.   Got it. Okay.
16    Okay. We're going to back up to a document
17 that's now titled Exhibit 13. Give me just one
18 second here.
19    Okay. When that shows up for you,
20 Mr. Arellano, if you could review that and let me
21 know once you have.
22    **A.   Okay. I have it. I'm going to read it**
23 **now.**
24    Q.   Thank you.
25    **A.   Okay.**

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

177

1    Q.   Okay.  Have you ever seen this document
2 before?
3    A.   Not -- not this specific document, no.
4    Q.   But do -- do you know what it -- what this
5 document is?
6    A.   It looks -- possibly a document that was
7 used right after her hire.  She was a probationary
8 flight attendant at the time.  So other than that,
9 I -- yeah, I'm not sure what method it would have
10 been used.
11    Q.   On -- at -- at the bottom of the second
12 page where there's bolded Personnel File -- do you
13 see where I'm at there?  Then under it it says,
14 Number of Complimentary Letters --
15    A.   Uh-huh.
16    Q.   -- 2, and a bunch of exclamation points;
17 Number of Complaint Letters, zero.  And then there's
18 some comments, and whoever filled this out said,
19 Rebecca has two very nice kudos letters in her file
20 and her IOE eval has raving review.  The two missed
21 trips in no way affect her performance or attitude.
22 She obviously loves this job.
23    A.   Okay.
24    Q.   Was -- you know, based on your experience
25 and your time at Frontier, was Ms. Brigham off to a

178

1 great start?  Was she off to a good -- good start
2 when she started the position?
3    A.   It's hard for me to say because I didn't
4 manage Ms. Brigham, so I really can't speak to that
5 at all.  Yeah.
6    Q.   This is -- this isn't enough for you?
7       MS. KITSON:  Object to the form.
8    Q.   (BY MR. CRONE)  Well, not -- well -- well,
9 I was going to follow it up with what other pieces of
10 information would you need to know?
11       MS. KITSON:  Object to the form.
12    A.   Yeah, I -- I just -- I just can't make that
13 assessment.  It's hard for me to answer if she was or
14 was not.
15    Q.   (BY MR. CRONE)  Yeah, and then -- so -- so
16 then I'll -- I'll follow it up with a question.
17 What -- what additional information would allow you
18 to you make that assessment?
19    A.   I don't -- that, I don't know.  I think,
20 overall, the inflight managers/supervisors had access
21 to information that I wouldn't have.  That's through
22 everyday engagement, interaction, compliance with the
23 contract.
24       This doesn't address a lot of these issues
25 or concerns or -- or anything like that.  Yet again,

179

1 it's just -- it's hard for me to answer that question
2 honestly.  I wouldn't know.
3    Q.   Do you -- do you ever trust managers who --
4 who work below you -- do you ever trust their opinion
5 on -- on -- on -- on an employee's performance that
6 you have not directly observed?
7    A.   Yeah.  They would have the best information
8 on that employee's performance, true.
9    Q.   Okay.  And so here, whichever manager
10 filled this out, I mean, do you -- do you trust this
11 evaluation was filled out accurately?
12    A.   Sure.
13    Q.   Okay.  I'm going to hand you -- I think we
14 might actually be in order for at least one.  The
15 next one is Exhibit 14.  And same as always, if you
16 can give that a review when you receive it and let me
17 know once you have.
18    A.   Give me --
19    Q.   And I'm sorry.  And, Mr. Arellano, I'm
20 sorry.  This one also has that other e-mail.  I just
21 scrolled through it.  I see it now.
22    A.   Okay.
23    Q.   The one we've argued about.  So same kind
24 of deal, if you could just not pay attention to most
25 of that e-mail.

180

1    A.   Okay.
2       MS. KITSON:  And I think, John, what
3 happened, just for your -- I -- I think -- we have a
4 redaction tool in our document review system, and I
5 think what happened is maybe the redactions didn't
6 get applied before final production.  So we will swap
7 those out with redacted versions.
8       MR. CRONE:  Yeah, and that's okay.  I just
9 want to -- I just want you to know I'm not trying
10 to -- I'm not trying to throw this thing all over
11 there.  I just didn't -- didn't know it was there.
12 I'm actually just interested in the top.
13    Q.   (BY MR. CRONE)  But, of course, take a look
14 it all, Mr. Arellano.
15    A.   Okay.
16    Q.   So this is an e-mail from you to
17 Stefanie Coppedge; is that correct?
18    A.   Yes.
19    Q.   The -- the -- the top portion?
20    A.   Yeah.
21    Q.   And that's dated October 6, 2015?
22    A.   Correct.
23    Q.   Okay.  So at the second paragraph, you
24 wrote, The other piece I'm noticing is that all her
25 overnights (August and September) seem to only occur

181

1 over the weekends. This seems to be a change in
2 pattern from her previous months.
3        I want to just take that -- those two
4 sentences. What do you -- what do you mean there?
5 What -- what -- what are you getting at?
6    A.   Just, simply, part of the -- what we do on
7 our side is kind of assess patterns, look at
8 situations, look at schedules.
9        In an effort to better help Rebecca and
10 give her some better guidance, I would have reviewed
11 her schedule to assess and kind of see if there's any
12 change in pattern, change in bidding, and any
13 specific trips that should have occurred to help us
14 have a better understanding. And in that case, I was
15 simply highlighting that.
16    Q.   Okay. And then you go on to write, I was
17 auditing her Crew Trac schedule and find that she
18 dropped a four-day (9/18/15 through 9/21/15) and then
19 adds a three-day (9/18/15 to 9/20/15). I also
20 noticed this a few times for the August bid month.
21 The question that arises, is she truly doing
22 everything (bidding accordingly) to help herself?
23 I'm not so sure anymore.
24        What did you mean by that?
25    A.   Well, I was just answering -- or asking the

182

1 question, and I was trying to seek clarification.
2 If -- she had a -- looked like a four-day and then
3 she dropped that same trip but right over that trip
4 that she dropped, she picked up a three-day on the
5 same time period.
6        And so recapping conversations that she and
7 I had, she didn't want to do layovers. And so my
8 question was why would one pick up a three-day?
9    Q.   Did you not trust that she was doing
10 everything to help herself at this point?
11    A.   Oh, definitely. I was just kind of
12 verifying.
13    Q.   Okay. Next one is -- let me make sure.
14 Next one is Exhibit 16. Okay. Same -- same drill,
15 Mr. Arellano.
16    A.   Okay. Give me one second. Okay. I'm in
17 there now.
18    Q.   Great. Thanks. Yes. If you could take a
19 look and let me know once you've reviewed.
20    A.   Okay.
21    Q.   So at the bottom where Cassandra Micklich
22 is writing you an e-mail, that's July 10, 2015,
23 right?
24    A.   July 10, 2015, correct.
25    Q.   Yeah. Is Cassandra Micklich still employed

183

1 at Frontier?
2    A.   No.
3    Q.   But at this time, she was a drug and
4 alcohol specialist; is that correct?
5    A.   Yeah. Based on the signature line, yes.
6    Q.   Okay. And do you know where
7 Cassandra Micklich is employed now?
8    A.   I do not.
9    Q.   Okay. What is Cassandra asking you? I --
10 I read this, and I couldn't quite make sense of it.
11 I was hoping you could help.
12    A.   Looks like she had a conversation with
13 Rebecca, asking about calling in well if she called
14 off for a trip.
15        And so in the contract, there's two
16 conditions. If you are calling in sick for a trip,
17 basically, it prevents you from calling in well and
18 picking up the remainder of the trip. However, if
19 you're approved for intermittent FMLA, intermittent
20 FMLA would allow you to pick up the trip, depending
21 on the type of trip and how long -- the longevity of
22 the trip.
23        And I think Rebecca -- I mean Cassie or
24 Cassandra is trying to clarify, if she did this,
25 could she call in well. But it would depend. If

184

1 she's calling in sick, then the option would be no.
2 If she's requesting intermittent FMLA, the answer
3 would be yes.
4    Q.   Okay.
5    A.   And so in this case, anything related to
6 schedules, operational procedures, we always refer
7 them to the inflight supervisor or manager or
8 department to answer those questions.
9    Q.   Okay. And so that's why your response
10 to -- to Cassie, Cassandra, was, Good question. I
11 would recommend she reach out to her inflight
12 supervisor?
13    A.   Correct.
14    Q.   Okay. Thank you. We can set that aside.
15        I'm trying to get rid of a couple more
16 here. Just got rid of two more, if that makes you
17 feel good.
18    A.   Okay.
19        MS. KITSON: I like it.
20    Q.   (BY MR. CRONE) Okay. Where -- okay.
21 This -- so the next one out of order, of course,
22 still, because I've -- I've taken stuff out and
23 whatever, but this one's going to be Exhibit 20.
24        And when you receive it, Mr. Arellano, same
25 drill. If you can review and let me know once you've

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

185

1 reviewed.

2     **A.**   **Okay. I'm in there now.**

3     Q.   Thank you.

4     **A.**   **Okay.**

5     Q.   Okay. So at the -- at the bottom of

6 this e-mail string, you see the e-mail from

7 Rebecca Brigham to Laura Rush?

8     **A.**   **Yes.**

9     Q.   And that's dated September 28, 2015?

10     **A.**   **Right.**

11     Q.   And Rebecca says, Hi -- Hey there, Laura.

12 I was wondering if you were available anytime

13 this week to meet me -- with me regarding my

14 self-disclosure and if we can find a solution for

15 my calling in for overnights. Thanks, Rebecca

16 Brigham #413206.

17     Laura Rush then responds: Hey Rebecca, Any

18 accommodation requests must go through Shelly Leyner

19 in HR. Unfortunately, inflight is unable to do

20 anything else at this time.

21     So I want to stop there and ask you, is

22 Laura Rush's response correct?

23     **A.**   **Well, not necessarily. And the reason why**

24 **I say that, she doesn't -- she's not requesting -- in**

25 **the e-mail, just based on the language, she's not**

186

1 **requesting an accommodation. It's just simply she**

2 **wanted to discuss with Laura.**

3     **And so it's hard for me to identify if**

4 **Laura, in that respect, is incorrect, because Rebecca**

5 **does not identify she's wanting to discuss an**

6 **accommodation.**

7     Q.   Okay. So --

8     **A.**   **Is that what you were referring to?**

9     Q.   I'm sorry; I didn't mean to cut you off.

10 Please --

11     **A.**   **Is that what you were referring to, or**

12 **something else?**

13     Q.   It is, yes. So -- thank you.

14     And then -- and then as we scroll up, it

15 looks like Shelly then e-mails you on September 28,

16 2015. Do you see where I'm at?

17     **A.**   **Yes.**

18     Q.   And Shelly says, Hi Jerry. Shall we --

19 Shall we call a meeting?

20     **A.**   **Okay.**

21     Q.   And she's forwarded you Ms. Brigham's

22 e-mail; is that correct?

23     **A.**   **Yes.**

24     Q.   Okay. And at this time, Ms. Leyner is the

25 super -- supervisor of disability program management.

187

1 Is that your -- I mean, is that correct, in your

2 recollection?

3     **A.**   **That is correct.**

4     Q.   Okay. And then if we scroll up a little

5 bit higher, it looks like we're at -- still at

6 September 28, 2015.

7     You wrote back and said, Yes. Not sure

8 what more we can do for her. Can you see how many

9 FMLA days she has accrued?

10     And you wrote that back to Ms. Leyner; is

11 that correct?

12     **A.**   **Correct.**

13     Q.   Okay. And here, can you recall, as of

14 September 28, 2015, whether or not there was more

15 that you could have done for -- in response to

16 Ms. Brigham's request in this e-mail?

17     **A.**   **I believe so, and that's the reason I was**

18 **asking, Can you see how many FMLA days she has**

19 **accrued?**

20     Q.   Okay.

21     **A.**   **Fortunately, with that, FMLA days roll off**

22 **regarding intermittent, and then that way, when they**

23 **roll off, she's accruing more. Ultimately, that was**

24 **the direction, Hey, can you do another audit and see**

25 **if she has accrued any additional time?**

188

1     **So, in essence, to answer your question,**

2 **yes, we could have done more in that case had she had**

3 **more days on top. Other option: She could have**

4 **exercised personal leave as an option as well.**

5     Q.   Okay. Any -- any other options?

6     **A.**   **Definitely she could have gone on**

7 **continuous leave if she was looking to be out for**

8 **additional time. So, yeah, other options for sure.**

9     Q.   Okay. So the next one is -- is Exhibit 23.

10 I'll send it to Danielle. Okay. And then same

11 thing. Once you get it, if you could review it and

12 then let me know.

13     **A.**   **Okay. I'm in there now.**

14     Q.   Okay. Thank you.

15     **A.**   **Okay.**

16     Q.   Okay. So here it looks like, if you

17 scroll down to the bottom of the e-mail chain, on

18 September 5, 2014, you asked Shelly Leyner to get a

19 list of all active employees who have been on

20 approved LOA -- that means leave of absence, right?

21     **A.**   **Correct.**

22     Q.   -- greater than 180 days. So is that -- is

23 that what you were asking Ms. Leyner?

24     **A.**   **Yes, for basically 180 days, anybody who**

25 **was out on continuous LOA.**

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

---

189

1  Q.  Got it.  Okay.  And then she responded with
2  this chart.  And -- and that's on September 19, 2014.
3  Do you see that response?
4      A.  September 19, the little chart, yes.
5      Q.  Yeah.  So my question is it looks like -- I
6  just want to know if I'm reading this right.  So it
7  looks like that she's got this list of what would be
8  names, but it looks like, where it's highlighted in
9  black, are -- is that all Rebecca Brigham, and then
10 the ones that aren't highlighted in black are other
11 people?  Or am I looking at this wrong?
12     A.  I would have to -- yeah.  I'm just going to
13 kind of go through this now because this document
14 typically would highlight -- it just has her name.
15     No.  The way this looks, it would be a
16 spreadsheet that would document and reflect flight
17 attendants, not just Rebecca, but anybody who had
18 continuous leave for a period of time.
19     And if you look at that, you look at the
20 base-type -- base-type changes for individuals there
21 as well, so I think it was others.  Not only Rebecca,
22 but others.
23     Q.  Okay.  Got it.  Okay.  Thank you.
24     And then are you aware of whether
25 Ms. Brigham had any performance-related issues prior

---

190

1  to her self-disclosure?
2      A.  Can you define "performance"?
3      Q.  So anything that would have caused her to
4  be disciplined formally or informally, counseled
5  verbally, anything -- anything that would have --
6  would have -- well, let's start there.  So -- so
7  anything that would have resulted in discipline.
8      A.  I believe so.  That would have been -- that
9  I know of, dependability.
10     Q.  Okay.  And so can you -- can you explain
11 what you mean by that?
12     A.  Dependability is any -- is our attendance
13 policy.  If there was any infraction that violated
14 anything identified in the dependability policy, it
15 would have yielded a performance counseling either
16 via documentation of a verbal warning, written
17 warning, final termination warning.
18     Q.  Okay.  And do you know if -- if, prior to
19 her self-disclosure, she received any verbal
20 counseling related to the dependability?
21     A.  I believe so.
22     Q.  And then what about a -- a -- a written
23 warning?
24     A.  That, I don't know.
25     Q.  Okay.  What about a -- what about the

---

191

1  termination steps?
2      A.  Termination steps or a final termination
3  warning?
4      Q.  I'm sorry.  Final termination warning.
5      A.  I do believe she had a few final
6  termination warnings.
7      Q.  Okay.  And -- and it -- to your
8  recollection, this all has to do with the
9  dependability policy?
10     A.  It related to dependability, yes.
11     Q.  Okay.
12     A.  I'm not sure about the written warning.
13 Depending on the infraction, people can skip steps.
14     Q.  Okay.  Okay.
15     A.  And so she could have gone from a
16 documented verbal warning to a final termination
17 warning, depending on how many occurrences she had.
18     Q.  Okay.
19     A.  So . . .
20     Q.  And so any of these absences prior to her
21 self-disclosure, do -- do you have any recollection
22 what they were, why she was absent --
23     A.  No.
24     Q.  -- or anything like that?
25     A.  No.

---

192

1      Q.  Okay.
2      A.  I do not.
3      Q.  Okay.  Now I will hand you Exhibit 12, and
4  let me send it to Danielle.  Okay.  And same drill as
5  always.  Give it a review and let me know once you've
6  reviewed.
7      A.  I'm opening it up now.
8      Q.  Thank you.
9      A.  Okay.
10     Q.  Okay.  This Investigation Notes and
11 Tracking Form, do you know what this form is?  Have
12 you seen these before?
13     A.  I have, yes.
14     Q.  What are these forms used for?
15     A.  This was actually my form.  I created this
16 anytime I tracked my conversations with employees, so
17 this would have been in her file that I housed in the
18 HR department.
19     Q.  Okay.  And --
20     A.  Just a reminder of what I -- what --
21 previous conversations.
22     Q.  Got it.  Okay.  And this is -- and you know
23 it's your form because it's your handwriting,
24 obviously?
25     A.  That is correct.

---

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

193

1     Q.    Okay.  But -- so during the time period
2  relevant to this deposition, which is end of 2011
3  through the end of 2015 --
4     A.    Uh-huh.
5     Q.    -- did you -- did Frontier carry insurance
6  for employment-related claims?
7     A.    Can you elaborate?
8     Q.    So when -- so, for example, Ms. Brigham's
9  lawsuit against Frontier alleges that Frontier
10 discriminated against her in violation of the ADA.
11    A.    Uh-huh.
12    Q.    So are you aware of that?
13    A.    I am.
14    Q.    Okay.  And does -- did Frontier carry
15 insurance during this time period, 20 -- end of 2011
16 through end of 2015, for those types of claims?  So
17 if an employee brings a claim for unlawful
18 discrimination, is Frontier insured for it?
19         MS. KITSON:  Object to the form, outside
20 the scope of the topics.  He can answer, but it will
21 be in his individual capacity.
22         MR. CRONE:  Well, and -- and -- and that's
23 okay.  I mean, however we get the information.
24    A.    I do not know.
25    Q.    (BY MR. CRONE)  Don't know.  Okay.

194

1         Let's -- so your lawyer just sent a
2  document.  I want to take a look at it.  Believe it
3  or not, I am very close to the end of what I had
4  planned.
5         MS. KITSON:  Sorry.  Making it worse.
6         MR. CRONE:  No, you're okay.  I just wanted
7  to -- oh, okay.
8     Q.    (BY MR. CRONE)  And then --
9         MR. CRONE:  Don't worry, we don't have to
10 add that, too, but thank you, Danielle, for that.
11    Q.    (BY MR. CRONE)  And then -- okay.  I think
12 we've got just a couple more.  Okay.  Yeah.  So this
13 one's marked Exhibit 25.  I'll send it to Danielle.
14 I'll send it to you.
15         And same, Mr. Arellano, if you can review
16 once you've received it.
17    A.    Okay.  I'm in there now.
18    Q.    Thank you.
19    A.    Okay.
20    Q.    Okay.  So here, this is an e-mail from
21 Shelly Leyner to yourself dated June 4, 2015; is that
22 correct?
23    A.    That is correct.
24    Q.    Okay.  And -- and Ms. Leyner says, Jerry, I
25 looked at the cert, and Tammy approved IFM for

195

1  relapse prevention counseling and support group
2  meetings.  It states approaching nine months of
3  sobriety.  Let me know what you would like us to do
4  from here.
5     A.    Okay.
6     Q.    So who is -- who's Tammy?
7     A.    Tammy would have been somebody -- I'm
8  trying to think.  She was temporarily -- no, I
9  think she was one of our coordinators in our
10 leave-of-absence department.
11    Q.    And then --
12    A.    Like the LOA coordinator.
13    Q.    Okay.
14    A.    Yeah.
15    Q.    Okay.  And then -- and then the cert that
16 Ms. Leyner is referring to, what -- what's the cert
17 that she's referring to?
18    A.    The medical certification form that's
19 attached to the intermittent FMLA application.
20    Q.    Okay.
21    A.    There's a section that the medical
22 physician will complete, and that's returned, and
23 that's how they determine if the leave will be
24 approved or not based on what's noted in that
25 certification form.

196

1     Q.    Got it.  Okay.  So based on what was in
2  that form, IFM, intermittent FMLA leave, was approved
3  for prevention counseling and support group meetings.
4  Is that -- is that -- is that what Ms. Leyner is
5  stating here?
6     A.    Yes.  Tammy reviewed and approved it for
7  that specific reason, correct.
8     Q.    Okay.  Great.  Okay.
9         And if we're all lucky, I'm handing you the
10 last one.  And I'll send it to -- this is a longer
11 document, so when you get it, if you could open it
12 and tell me if you've seen the document before,
13 because we don't necessarily need to review it all,
14 but maybe we do.
15    A.    Okay.  Yes, I have.
16    Q.    Okay.  And this is exactly what it's
17 titled, right?  This is Frontier's answer to
18 Rebecca Brigham's lawsuit and Frontier's defenses to
19 the lawsuit; is that correct?
20    A.    Yes, that's what the document states.
21    Q.    Okay.  Can you skip down to page 9?
22         MS. KITSON:  9?
23         MR. CRONE:  Yeah, please.
24    A.    Okay.
25    Q.    (BY MR. CRONE)  So do you see the head --

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

197

1 the heading "Defenses" kind of in the middle of the
2 page?
3      A.   I do.
4      Q.   And then there's a numbered list of
5 defenses.  And these are Frontier's defenses to
6 Ms. Brigham's lawsuit, right?
7           MS. KITSON:  Object to the form.
8      A.   I would have to read it.  I don't know.
9      Q.   (BY MR. CRONE)  Okay.  Feel free to read
10 it, and then just the -- I'm only going to ask you
11 about the list of defenses, and not all of them.
12     A.   Okay.
13     Q.   But -- so that's Numbers 1 through 17.  I
14 just have a few questions about those.
15     A.   Okay.  Okay.
16     Q.   Okay.  So on -- on page 9, Number 3, do you
17 see where Frontier wrote, Upon information and
18 belief, Plaintiff has failed to mitigate her damages,
19 if any?  Do you see that line?
20     A.   I do.
21     Q.   What does Frontier mean by Plaintiff has
22 failed to mitigate her damages?
23          MS. KITSON:  Object to the form, calls for
24 a legal conclusion, and outside the scope of the
25 topics.

198

1           So Mr. Arellano can answer to the extent he
2 can, but it will be in his individual capacity.
3           MR. CRONE:  And -- and -- and we can -- we
4 can -- we can argue about whether his testimony is
5 inside or outside of the scope.  Of course that's a
6 question we can brief down the road, and I'm happy to
7 do that if -- if we -- if we need to.
8      Q.   (BY MR. CRONE)  But, again, Mr. Arellano,
9 the question is, for Number 3 where Frontier wrote,
10 Plaintiff has failed to mitigate her damages, what
11 is -- what is Frontier alleging there?
12          MS. KITSON:  Same objections.
13          You can answer.
14     A.   All right.  I'm not sure.  I'm not a -- not
15 a lawyer to be able to answer it.
16     Q.   (BY MR. CRONE)  That's fine.
17     A.   Yeah.
18     Q.   That's fine.
19     A.   Yeah.
20     Q.   In many more ways than you know, you're
21 very lucky to not be a lawyer, so . . .
22          And then Number 5, which is on page 10, it
23 says, Plaintiff's claim is barred because no adverse
24 employment action was taken because of any
25 disability.

199

1           Do you know what -- what -- what Frontier
2 is getting at there?
3           MS. KITSON:  Same objections.  Legal
4 conclusion, outside of the scope.  He can answer but
5 in his individual capacity.
6      A.   Again, I'm not a lawyer, so I can't speak
7 to that.
8      Q.   (BY MR. CRONE)  Okay.  Number 6, it says,
9 The challenged actions about which Plaintiff
10 complains would still have been taken irrespective of
11 any alleged impermissible motivating factor.
12          Any idea what that means?
13          MS. KITSON:  Same objections.
14     A.   Again, I'm not a lawyer to be able to
15 respond to that.
16     Q.   (BY MR. CRONE)  Sure.  And Number 8, it
17 says, The accommodations requested by Plaintiff were
18 not reasonable and would have imposed an undue burden
19 on Frontier.
20          What's Frontier getting at in Number 8?
21          MS. KITSON:  Same objections.
22     A.   Again, I'm not a -- I don't have the legal
23 knowledge to be able to respond to that.
24     Q.   (BY MR. CRONE)  So which accommodations did
25 Plaintiff request of Frontier?

200

1      A.   I mean, I --
2      Q.   You -- you -- you've testified to that
3 today, haven't you?
4      A.   I have.
5      Q.   Okay.
6      A.   And so what accommodations have we
7 accommodated Ms. Brigham?
8      Q.   No, no.  Which -- which were requested by
9 Ms. Brigham?  I'm -- I'm pretty sure you testified to
10 that already today.
11     A.   Yeah.  In the form of time off, so we did
12 accommodate her in that form.
13          MS. KITSON:  I think the question is what
14 did she request.
15     Q.   Oh, what was the question?  What did she
16 request?
17     Q.   Yeah, yeah, yeah.  What did Ms. Brigham
18 request of Frontier?
19     A.   Oh.  She requested adjustments to her
20 schedule.  She requested no layovers, no overnights.
21 She requested roles or responsibilities at the GO at
22 the time.  She requested that trips be dropped for
23 her.  She requested -- yeah, pretty much, that was
24 it.  Oh, and to be able to pick up trips in open
25 time.

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

---

201

1    Q.   Okay.  And so looking back at Number 8,
2 just the first part of the sentence, "The
3 accommodations requested by Plaintiff," you're
4 aware of what accommodations were requested by
5 Plaintiff.  You don't have to be a lawyer to get that
6 part of the sentence, right?
7    A.   Right.
8    Q.   Okay.  And the next few words, "were not
9 reasonable."  What was not reasonable?  Let's just
10 take it one little bit at a time.  What was not
11 reasonable about those requested accommodations?
12        MS. KITSON:  Same objections.  If
13 Mr. Arellano wants to testify regarding why the
14 accommodations were denied, that's fine.  This is a
15 question about whether they're reasonable or pose an
16 undue burden under the law, under the ADA.
17    Q.   (BY MR. CRONE)  So, Mr. Arellano, are you
18 able to testify about what was not reasonable about
19 those requested accommodations?
20    A.   No, I am not.
21    Q.   Okay.  I'm going to try to short-circuit
22 this.  You've reviewed the rest of these asserted
23 defenses.  Are you able to testify about the facts
24 underlying any of these asserted defenses by
25 Frontier?

---

202

1        MS. KITSON:  Same objections.  Legal
2 conclusion, outside the scope.  He can answer in his
3 individual capacity.
4    A.   Unfortunately, I'm not able to.  I don't
5 have the legal knowledge to be able to speak to them.
6    Q.   (BY MR. CRONE)  That's -- that's okay.
7 Thank you.  And that will save us a few more minutes
8 at the end here.
9        MR. CRONE:  So if you -- if you will -- if
10 you -- if we could take a five-minute break, I want
11 to just sort of do a quick circle through my notes,
12 make sure we didn't miss anything important, and then
13 after that, your lawyer may or may not have some
14 follow-up questions.  And then maybe we will be done
15 by 3:00.
16        So I will -- we can go off the record now,
17 and I'll see you in just a few minutes.
18        THE WITNESS:  Sounds good.
19        THE VIDEOGRAPHER:  The time now is 2:49.
20 We're off the record.
21        (Recess from 2:49 p.m. to 3:01 p.m.)
22        THE VIDEOGRAPHER:  The time now is 3:01.
23 We're back on the record.
24    Q.   (BY MR. CRONE)  Okay.  Thanks,
25 Mr. Arellano.  I just have a couple follow-up

---

203

1 questions on the bid process.
2    A.   Okay.
3    Q.   So that's -- so how flight attendants bid
4 for their -- for the trips.
5    A.   Okay.
6    Q.   And so is it correct that flight attendants
7 bid once a month for the trips that will go on their
8 schedule?
9    A.   Yes.
10    Q.   And then after all the flight attendants
11 bid by whatever the date is -- whatever the deadline
12 is for them to bid, then the schedule's created,
13 right?
14    A.   Shortly after, yes.  So the bid closes on
15 the 15th.
16    Q.   On the 15th.  And then shortly after the
17 15th, the schedule's created.  And after the
18 schedule's created, not all of the trips are covered,
19 are they?
20    A.   What do you mean, "covered"?
21    Q.   So -- so -- so trips that weren't bid on
22 and nobody's -- there's no coverage, they go into
23 something called open time, right, that anybody can
24 then further bid on; is that correct?
25    A.   That is correct.

---

204

1    Q.   Okay.  Now, was Ms. Brigham, as part of her
2 request for a modified schedule -- was she -- did she
3 ask Frontier to be allowed to just bid on that open
4 time so -- in order to -- in order to deal with
5 Frontier's anxiety that -- that the modified schedule
6 might violate the CBA?
7    A.   It's a little bit different.  It's not that
8 you bid for open time.  You can pick up trips in open
9 time.  Open time is not seniority-based.  It's first
10 come first serve.
11    Q.   So -- so Ms. Brigham could have built her
12 schedule solely from open time?
13    A.   Open time is only allowed in certain
14 circumstances, and people who have access to that,
15 essentially, were not allowed to bid.
16        And so if you're returning from a leave of
17 absence and you didn't have an opportunity to submit
18 a bid, then you had the opportunity -- meaning
19 continuously, I should say -- then you would have
20 the ability -- to not penalize them, you would have
21 the opportunity to then pick up trips out of open
22 time.
23    Q.   Okay.  See, I'm -- so I guess that's my
24 question is that if Frontier granted Ms. Brigham
25 permission to build her schedule only from open time

---

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

205

1 rather than bid --

2     A.   Uh-huh.

3     Q.   -- then the seniority provision in the CBA

4 would not have been implicated at all?

5     A.   But you also have to look at her status,

6 and I think we talked about this earlier.  It's her

7 active status in the system.

8         So if an employee is on active status, then

9 the rules and regulations regarding bidding apply.

10 And so Ms. Brigham was an active flight attendant,

11 so, therefore, she had to follow the rules and

12 regulations outlined under the eligible-to-bid

13 section of the contract --

14    Q.   Do you know --

15    A.   -- therefore, did not have --

16    Q.   I'm sorry.  Go ahead.

17    A.   Therefore, did not have access to pick up

18 or build her trips through open time.  That's only

19 for individuals who are considered on leave status in

20 the system.

21    Q.   Yeah.  Do you know if the union requested

22 that Ms. Brigham be allowed to build her schedule

23 from open time?

24    A.   Outside of that document you showed me

25 earlier, no, I was not aware of it.

---

206

1     Q.   Okay.  And by "that document," are you

2 referring to Adrienne Prince's declaration?

3     A.   That is correct.

4         MR. CRONE:  Okay.  Those are all the

5 questions I have for you, Mr. Arellano, and I thank

6 you very much.

7         And I don't know if your lawyer has any

8 follow-up, but barring that, then that's all we have

9 for you today.

10        THE WITNESS:  Okay.

11        MS. KITSON:  John, when you say that's all

12 you have, are you done completely, or are you

13 reconvening tomorrow for the individual dep, or

14 what's your plan?

15        MR. CRONE:  Yeah, that's -- do you want to

16 talk off the record about that, or do you want to

17 stay --

18        MS. KITSON:  Sure.  Yeah, let's go off the

19 record for a moment.

20        THE VIDEOGRAPHER:  The time now is

21 3:04 p.m.  We're off the record.

22        (Discussion off the record.)

23        THE VIDEOGRAPHER:  The time now is

24 3:06 p.m.  This concludes today's portion of the

25 videotaped deposition of our 30(b)(6) witness.  We're

---

207

1 off the record.

2         (The following proceedings were held on the

3 stenographic record only:)

4         THE REPORTER:  Would you both like a copy

5 of the transcript?

6         MR. CRONE:  Plaintiff says yes.

7         MS. KITSON:  Yes as well.

8         THE REPORTER:  Okay.  Both electronic?

9         MR. CRONE:  Yeah, please.

10        THE REPORTER:  And a copy of the exhibits?

11        MR. CRONE:  Please, yeah.

12        MS. KITSON:  Yes.

13        THE REPORTER:  Okay.  And you'll handle

14 reading and signing, Ms. Kitson?

15        MS. KITSON:  Yes, for sure.

16        THE REPORTER:  Okay.

17        MR. CRONE:  Thank you very much.

18        THE REPORTER:  Thank you.

19        WHEREUPON, the foregoing deposition was

20 concluded at the hour of 3:07 p.m. on July 13, 2020.

21              *    *    *    *

22

23

24

25

---

208

1         I, GERARDO ARELLANO, do hereby certify that

2 I have read the foregoing transcript and that the

3 same and accompanying amendment sheets, if any,

4 constitute a true and complete record of my

5 testimony.

6

7

8         _____

9                GERARDO ARELLANO

10   ( ) No Amendments

11   ( ) Amendments Attached

12

13   Subscribed and sworn to before me this

14   _____ day of _____, 2020.

15

16   Notary Public:_____

17   Address: _____

18         _____

19

20   My Commission Expires: _____

21   Seal:

22

23

24

25

---

**ROCKY MOUNTAIN REPORTING**
**(720) 344-2910**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

209

1  WITNESS:  GERARDO ARELLANO

2  DATE OF DEPOSITION:  July 13, 2020

3  CASE:  Brigham v. Frontier Airlines, Inc.

4                          ERRATA SHEET

5  PAGE     LINE                CHANGE              REASON

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  Signature_____Date_____

210

1                  REPORTER'S CERTIFICATE

2  STATE OF COLORADO        )
                            ) ss.
3  COUNTY OF DENVER         )

4        I, JILL S. NIELSEN, do hereby certify that I
   am a Registered Professional Reporter and Notary

5  Public within the State of Colorado; that previous to
   the commencement of the examination, the witness was

6  duly sworn by me to testify to the truth.

7        I further certify this deposition was taken
   remotely in shorthand by me at the time herein set

8  forth, and that it was thereafter reduced to
   typewritten form, and that the foregoing constitutes

9  a true and correct transcript.

10        I further certify that I am not related to,
   employed by, nor of counsel for any of the parties or

11  attorneys herein, nor otherwise interested in the
   result of the within action.

12

13        IN WITNESS WHEREOF, I have hereunto affixed
   my hand and seal this 22nd day of July, 2020.

14        My commission expires July 7, 2023.

15        _____
          JILL S. NIELSEN, RPR

16        Notary Public in and for the
          State of Colorado

17

18

19

20

21

22

23

24

25

Page 1

              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
      Civil Action No. 19-cv-03417-STV

      _____


      REBECCA BRIGHAM,
              Plaintiff,
      vs.
      FRONTIER AIRLINES, INC.,
              Defendant.

      _____
              VIDEO VIDEOCONFERENCED DEPOSITION OF
                    REBECCA LEIGH BRIGHAM
                       August 31, 2020

      _____


      VIDEOCONFERENCED APPEARANCES:

      ON BEHALF OF THE PLAINTIFF:
              JOHN REILY CRONE, ESQ.
              EVAN GRIMES, ESQ.
              John R. Crone, LLC
              4550 East Cherry Creek Drive South, Suite 1003
              Glendale, Colorado  80246
              Phone:  303-598-3526
              Email:  john@crone-law.com
              Email:  evan@crone-law.com

      ON BEHALF OF THE DEFENDANT:
              DANIELLE L. KITSON, ESQ.
              CAROLYN THEIS, ESQ.
              Littler Mendelson, P.C.
              1900 16th Street, Suite 800
              Denver, Colorado  80202
              Phone:  303-629-6200
              Email:  dkitson@littler.com
              Email:  ctheis@littler.com

      ALSO PRESENT: Cole Bartelt, Videographer
                    Jacalyn Peter
      Job No. CS4229140

Page 2

```
 1            PURSUANT TO WRITTEN NOTICE and the
 2    appropriate rules of civil procedure, the video
 3    videoconferenced deposition of REBECCA LEIGH BRIGHAM,
 4    called for examination by the Defendant, was taken
 5    remotely, commencing at 8:07 a.m  on August 31, 2020,
 6    before Laurel S  Tubbs, a Registered Professional
 7    Reporter, Certified Realtime Reporter and Notary Public
 8    in and for the State of Colorado
 9                      INDEX
10    EXAMINATION:                         PAGE
11    By Ms  Kitson                     8
      By Mr  Crone                      220
12
      EXHIBITS:                           PAGE
13
      Exhibit 3  2016 W-2 from Great West Painting and    203
14         Repair
15    Exhibit 4  2016 W-2 from EmployerBridge          50
                 Southwest
16
      Exhibit 5  2017 W-2 from Great West Painting and    50
17         Repair
18    Exhibit 6  2018 W-2 from Great West Painting and    51
           Repair
19
      Exhibit 7  2015 1099-G from Colorado Department    203
20         of Labor and Employment
21    Exhibit 11  Certification of Healthcare Provider    145
                  for Employee's Serious Health
22                Condition (Family and Medical Leave
                  Act) Intermittent Leave of Absence
23
      Exhibit 12  Certification of Healthcare Provider    157
24                for Employee's Serious Health
                  Condition (Family and Medical Leave
25                Act) Intermittent Leave of Absence
```

Page 4

```
 1    PREVIOUSLY MARKED EXHIBITS:              PAGE
 2    Exhibit 1   Association of Flight Attendants-CWA    84
                  AFL-CIO
 3                Frontier Airlines Flight Attendant
                  Contract 2011-2016
 4
      Exhibit 20  Document Entitled "Untitled"     112
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    EXHIBITS (Cont'd):                  PAGE
 2    Exhibit 14  Email Stream             167
 3    Exhibit 15  Email Stream             179
 4    Exhibit 16  Inflight Dependability Performance    33
                  Counseling Record
 5
 6    Exhibit 17  Certification of Healthcare Provider   134
                  for Employee's Serious Health
 7                Condition (Family and Medical Leave
                  Act)
 8    Exhibit 23  Frontier Airlines Job Description    118
 9    Exhibit 24  Treatment Plan Dated May 1, 2015      152
10    Exhibit 32  Transcription of Recording by Hunter   163
                  + Geist, Inc
11
12    Exhibit 33  Transcription of Recording by Hunter   173
                  + Geist, Inc
13    Exhibit 34  Transcription of Recording by Hunter   182
                  + Geist, Inc
14
      Exhibit 36  Fax Cover Sheet Dated November 8,     139
15                2014, from Mr  Riemann re: Rebecca
                  Brigham Release
16
      Exhibit 37  Email Stream             114
17
      Exhibit 41  Comanche Crossing Counseling, LLC    119
18                Intake Sheet
19    Exhibit 42  Number 1 Audio-recorded Transcription   161
20    Exhibit 43  Number 2 Audio-recording        171
                  Transcription
21
      Exhibit 44  Investigatory Meeting          182
22
      Exhibit 46  Text Messages Between Ms  Coppedge    184
23                and Ms  Brigham
24    Exhibit 47  Text Messages Between Mr  Dale Kinsey   200
                  and Ms  Brigham
25
```

Page 5

```
 1                P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Good morning.  We're on
 3    the record at 8:07 a.m. on Monday, August 31st, 2020.
 4    Please note that the microphones are sensitive and may
 5    pick up whispering, private conversations, and cellular
 6    interference.  Please turn off all cell phones or place
 7    them away from the microphones, as they can interfere
 8    with the deposition audio.  Audio and video recording
 9    will continue to take place unless all parties agree to
10    go off the record.
11            This is Media Unit 1 of the video-recorded
12    deposition of Rebecca Brigham, being taken by counsel for
13    the Defendant in the matter of Rebecca Brigham versus
14    Frontier Airlines, filed in the United States District
15    Court for the District of Colorado, Case Number
16    19-cv-03417.  This deposition is being held via remote
17    video deposition located in Genesee County, Michigan.
18            My name is Cole Bartelt from the firm
19    Veritext, and I'm the videographer.  The court reporter
20    is Laurel Tubbs from the firm Veritext.
21            I am not authorized to administer an oath.
22    I'm not related to any party in this action, nor am I
23    financially interested in the outcome.  Counsel and
24    all -- counsel and all present and appearing remotely
25    will now go ahead and state their appearances and
```

2 (Pages 2 - 5)

Page 6

1  affiliations for the record.
2       MR. CRONE:  John Crone for the Plaintiff,
3  Rebecca Brigham.
4       MR. GRIMES:  Evan Grimes for the
5  Plaintiff.
6       MS. KITSON:  Danielle Kitson for the
7  Defendant, Frontier Airlines, and with me is
8  Caroline Theis from my firm and Jacalyn Peter from
9  Frontier.
10       MS. BRIGHAM:  And Rebecca Brigham,
11  Plaintiff.
12       THE VIDEOGRAPHER:  And will the court
13  reporter please enter the statement for remote
14  proceedings into the record.
15       THE REPORTER:  The attorneys participating
16  in this deposition acknowledge that I am not physically
17  present in the deposition room and that I will be
18  reporting this deposition remotely.  They further
19  acknowledge that in --
20       (Discussion off the record.)
21       THE VIDEOGRAPHER:  We're going off the
22  record at 8:09 a.m.
23       (Discussion off the record.)
24       THE VIDEOGRAPHER:  We're going back on the
25  record at 12:00 a.m. (sic).

Page 7

1       Will the court reporter please read the
2  statement for remote proceeding on the record.
3       THE REPORTER:  The attorneys participating
4  in this deposition acknowledge that I am not physically
5  present in the deposition room and that I will be
6  reporting this deposition remotely.  They further
7  acknowledge that in lieu of an oath administered in
8  person, the witness will verbally declare his/her
9  testimony in this matter is under penalty of perjury.
10  The parties and their counsel consent to this arrangement
11  and waive any objections to this manner of reporting.
12       Please indicate your agreement by stating
13  your name and your agreement on the record, beginning
14  with the taking attorney.
15       MS. KITSON:  This is Danielle Kitson.  I
16  agree.
17       MR. CRONE:  John Crone.  Agree.
18       MR. GRIMES:  Evan Grimes.  I agree.
19       MS. THEIS:  Caroline Theis.  I agree.
20       THE VIDEOGRAPHER:  And will the court
21  reporter please swear in the witness.
22       REBECCA LEIGH BRIGHAM,
23  having been first duly sworn or affirmed, was examined and
24  testified as follows:
25       THE REPORTER:  Thank you.

Page 8

1            EXAMINATION
2  BY MS. KITSON:
3       Q.  Good morning, Ms. Brigham.  How are you
4  today?
5       A.  Good morning.  Good.  How are you?
6       Q.  Good.  Thank you.
7            Would you please state your full name for
8  the record.
9       A.  Rebecca Leigh Brigham.
10       Q.  And what's your current address?
11       A.  10148 Green Road, Goodrich, Michigan
12  48438.
13       Q.  Have you ever been deposed before?
14       A.  No.
15       Q.  Okay.  Do you understand that you're under
16  oath here today?
17       A.  Yes.
18       Q.  Do you understand that that oath is the
19  same oath that you would take in a court of law?
20       A.  Yes.
21       Q.  Have you ever participated in an online
22  deposition in this case in the past?
23       A.  Not participated, but watched.
24       Q.  Okay.  And which deposition was that?
25       A.  Both Jerry Arellano's.

Page 9

1       Q.  So then you know a little bit of the drill
2  then?
3       A.  Yeah.
4       Q.  Do you understand that you're being
5  recorded here today?
6       A.  Yes.
7       Q.  And do you understand that your words are
8  also being taken down by the court reporter, Laurel, who
9  you see on the screen there?
10       A.  Yes.
11       Q.  Would you agree to give verbal responses
12  for Laurel today, for the court reporter, with a Yes or a
13  No, instead of a shake of your head or an uh-huh, huh-uh?
14  It makes it a little bit easier for us to have a clean
15  record.
16       A.  Yes.  And I do have to warn you, Danielle,
17  I have like head tremors, and this tends to make them
18  worse.  So if you see me shaking my head no, it is not me
19  saying no.  It is my head tremors.
20       Q.  Thank you for clarifying that.  So I may
21  ask you then -- if I see that at any point today, and I
22  have a question about it or want to ask you --
23       A.  Yes.
24       Q.  -- I will definitely clarify.  So thank you
25  for that.

3 (Pages 6 - 9)

Page 10

1    A.  Okay.  I also want to point out that it's
2  just me here with my two children.  My husband is
3  actually up north.  So we may need to take a few more
4  breaks than normal.  And my kids are instructed that they
5  can come get me if it's like super important.  So I'm
6  going to apologize in advance if we get interrupted, but
7  we'll just have to kind of deal with it.
8    Q.  No problem.  That's what I call the COVID
9  new normal, right?  Mine are downstairs doing their online
10  assignments right now too.  So...
11        Is there anybody in the room with you right
12  now?
13    A.  No.  No.
14    Q.  Will you tell me at any point if there is
15  someone in the room with you that I can't see on the
16  screen?
17    A.  Yes.  And you'll see right through there
18  (indicating.
19        G).  That door is where my kids would come
20  busting through.
21    Q.  Okay.  This is an interesting format for a
22  deposition.  So I'm going to ask you a few questions I
23  don't usually ask.
24    A.  Okay.
25    Q.  But will you agree not to communicate with

Page 11

1  your counsel via text or instant message or any other
2  means while you are on the record --
3    A.  Yes.
4    Q.  -- answering my questions?
5    A.  Yes.
6    Q.  Okay.  If at any point --
7    MS. KITSON:  And -- and can I then also get
8  that commitment too from Mr. Crone and Mr. Grimes?  Will
9  you commit to not communicating with your client -- or
10  your client while she's on the record answering questions
11  in a text message format or an instant message?
12    MR. CRONE:  Danielle, of -- of course.  So
13  neither I nor Mr. Grimes would do anything improper
14  during -- during the deposition.
15    Q.  (By Ms. Kitson)  Ms. Brigham, your counsel,
16  Mr. Grimes and Mr. Crone, may make objections today.  As
17  you probably saw from Mr. Arellano's deposition, those
18  objections are for the record, unless they specifically
19  instruct you not to answer.  So the typical process is I
20  ask questions, they may object, and then you can answer
21  the questions.
22        Do you understand that?
23    A.  Yes.
24    Q.  Will you agree to give me full and complete
25  answers to my questions?

Page 12

1    A.  Yes.
2    Q.  Will you let me know at any point if
3  there's something you want to add to a prior answer?
4    A.  Yes.
5    Q.  At any point today if there's something you
6  do not understand about the questions that I'm asking you,
7  will you let me know that?
8    A.  Yes.
9    Q.  At any point today if you experience
10  technical difficulties, you're having difficulty hearing
11  me or hearing anyone else on the call, will you let me
12  know that right away?
13    A.  Yes.
14    Q.  We can take breaks whenever you need, for
15  your children or any other reason.  If you need a restroom
16  break, what have you.  But I would just ask that you
17  answer the question that's pending before we break.
18        Is that fair?
19    A.  Okay.  Sure.
20    Q.  At the end of this, you'll have an
21  opportunity to review the transcript that our court
22  reporter is taking down.
23        Will you agree to do that and fix any
24  inaccuracies in the record?
25    A.  Yes.

Page 13

1    Q.  How are you feeling today?
2    A.  Ready to get this over with.
3    Q.  Are you feeling sick at all?
4    A.  No.  I developed a little bit of a cough
5  this morning, but I don't think it's anything serious.
6    Q.  Is it anything that in any way impacts your
7  ability to think clearly or answer questions?
8    A.  No.
9    Q.  Is it anything that impacts your ability to
10  recall events clearly?
11    A.  No.
12    Q.  Have you taken any drugs in the past
13  24 hours?
14    A.  No.  Well, I mean, I took levothyroxine
15  this morning, which is because I don't have a thyroid.
16        Is that what you're considering drugs?
17    Q.  Well, however you consider it.  So --
18    A.  Okay.
19    Q.  -- sure.  Are there any drugs that you've
20  taken in the past 24 hours that would impact your ability
21  to think clearly?
22    A.  No.
23    Q.  Have you had any alcohol in the past
24  24 hours?
25    A.  No.

4 (Pages 10 - 13)

Page 14

1    Q.  Are you currently under a doctor's care for
2  any medical condition?  You mentioned a thyroid issue?
3    A.  Yeah.  That was taken out when my daughter
4  was about a year old.  And I've been on levothyroxine
5  since.
6    Q.  And what is levo- -- can you pronounce that
7  again.  I'm sorry.
8    A.  Levothyroxine.  It's thyroid hormone
9  replacement drug since I don't have a thyroid to produce
10  any of those natural stuff, it just -- yeah.
11    Q.  And do you take that daily?
12    A.  Every morning.
13    Q.  And do you know what the dosage is?
14    A.  I believe I'm on 200 milligrams right now.
15    Q.  Are there any other medications that you're
16  taking?
17    A.  Occasionally at nighttime, I'll take
18  Trazodone for sleep.
19    Q.  Anything else?
20    A.  That's it.
21    Q.  And I asked you if you were currently under
22  a doctor's care for any medical condition.
23    Other than your thyroid condition, are
24  there any other medical conditions that you're being
25  treated for?

Page 15

1    A.  Not currently.
2    Q.  Is there anything at all that would affect
3  your ability to testify truthfully and accurately here
4  today?
5    A.  No.
6    Q.  At any point if you have trouble
7  understanding me or thinking clearly or recalling events,
8  will you let me know that?
9    A.  Yes.
10    Q.  I want to ask you a little bit about what
11  you did to prepare for your deposition today.
12    First of all, you're represented here today
13  by Mr. Crone and Mr. Grimes; is that correct?
14    A.  Correct.
15    Q.  Before Mr. Crone and Mr. Grimes, did you
16  consult with any other attorney?
17    A.  My brother.
18    Q.  What's your brother's name?
19    A.  Joshua Kruger.
20    Q.  When did you first speak with Mr. Kruger,
21  without telling me what you discussed with him?
22    A.  Well, my brother I've talked to about this
23  since basically I was fired.  He helped me do the
24  rebuttal.  He helped me out in the beginning before I
25  hired Mr. Crone.  And I had also hired -- well, not

Page 16

1  really hired.  I had met another attorney, his name was
2  Jeff Bram (phonetic), right after this, and I had met him
3  through another guy, and they're the ones that sort of
4  told me more about the ADA.  And they were supposedly
5  working on my case, and then that just turned out weird.
6    They -- I -- from what I remember,
7  Mr. Bram was disbarred or something weird.  He was also
8  an alcoholic.  So I don't know if he, like, relapsed or
9  what happened, but I just lost contact with them.  And
10  it's -- I never had any type of an agreement with either
11  of them.  They were just kind of working on the case.
12    Q.  Okay.
13    A.  It was more of like a fun thing.
14    Q.  So they weren't your attorneys?
15    A.  No, no.
16    Q.  What did they tell you that they thought of
17  your case?
18    A.  They thought it was a decent case and I
19  should definitely take it forward.
20    Q.  Did they say anything about, you know,
21  weaknesses or problems with your case?
22    A.  Not that I can recall.
23    MR. CRONE:  I'm -- I'm going -- I'm going
24  to put an objection on the record too on the basis of
25  attorney-client privilege.

Page 17

1    Q.  (By Ms. Kitson)  When did you consult with
2  Mr. Bram first?
3    A.  I met him through a -- it was a chance
4  meeting at a Jiffy Lube right before my final termination
5  hearing from Frontier.  I was at Jiffy Lube, and I had a
6  bunch of stuff on the ADA, and I was working on my case
7  to present to Frontier at my final termination.
8    And there happened to be a gentleman
9  sitting next to me who had asked me what I was working
10  on.  And I basically told him, you know --
11    MR. CRONE:  Hold on.  Hold on, Rebecca.
12    Objection.  So Rebecca's not going to talk
13  about her conversations with counsel, whether it was in,
14  you know, a prospective attorney-client relationship,
15  which is also confidential and privileged, or they
16  actually formed an attorney-client relationship.
17    Don't answer any more of these questions,
18  Rebecca.
19    THE DEPONENT:  Okay.
20    Q.  (By Ms. Kitson)  And I believe my question,
21  Ms. Brigham, was when did you meet.  I think you answered
22  that.  It was right around the time of your termination
23  in --
24    A.  It would have been in late October, I
25  believe.

5 (Pages 14 - 17)

Page 18

1    Q.  Okay.  And how long were you talking with
2  Mr. Bram before you ended your communication with him?
3    A.  Two or three months.
4    Q.  After those two or three months, when was
5  the next time that you consulted an attorney about this?
6    A.  My brother.  And he's the one that helped
7  me --
8        MR. CRONE:  Again, hold on, Rebecca.
9        Let me put an objection on the record on
10  the basis of attorney-client privilege.  When she talked
11  to her brother, of course, is fine.
12        But don't testify about what you talked
13  about.
14        THE DEPONENT:  Okay.
15        MR. CRONE:  Thanks.
16    Q.  (By Ms. Kitson) So I'll just repeat that
17  question.
18        I believe you said you began speaking with
19  your brother about this about two or three months after
20  you had stopped communicating with Mr. Bram; is that
21  correct?
22    A.  Well, he knew about it the whole time.
23    Q.  How long was it that you -- before you
24  started speaking with Mr. Crone and/or Mr. Grimes?
25    A.  It was after I had spoke with you on the

Page 19

1  phone and said that I would like to contact an attorney.
2  That's when I got hooked up with Mr. Crone.
3    Q.  That would have been -- my memory is really
4  bad.
5        Was that about a year ago; would you say?
6    A.  Yeah.  Approximately.
7    Q.  And other than Mr. Crone and Mr. Grimes,
8  have you ever spoken with another attorney about this
9  case, other than also Mr. Bram and your brother?
10    A.  I had spoke with a few attorneys while I
11  was looking for them -- for somebody to represent me, at
12  the time that I hired Mr. Crone.
13    Q.  But you never formed an attorney-client
14  relationship with any of them?
15    A.  No.
16    Q.  What did you do to prepare for your
17  deposition today?
18    A.  The one today?  Or the one that was
19  supposed to happen last week.
20    Q.  Let's take them both.
21    A.  Okay.  So the one that was supposed to
22  happen last week when I flew out to Colorado, I met with
23  John and Evan, and we reviewed the lawsuit and some of
24  the things that we had submitted and also the economist's
25  report.

Page 20

1    Q.  How long did you meet?
2    A.  I want to say it was maybe three or four
3  hours.
4    Q.  Was there anyone else present when you met
5  with the two of them?
6    A.  My brother did come for lunch.
7    Q.  Anyone else?
8    A.  No.
9    Q.  Okay.  I believe you said that you also
10  prepared for the call today; is that right?
11    A.  Yeah.  And I just spent a few minutes last
12  night sort of reviewing the lawsuit again, and I
13  re-listened to some of those parts of those recordings
14  that I have.
15    Q.  How many times have you met with Mr. Crone
16  or Mr. Grimes in person?
17    A.  Once.
18    Q.  Just the time that you came out here for
19  your deposition a couple weeks ago -- a week ago?
20    A.  Yeah.
21    Q.  How many times have you spoken with them on
22  the phone?
23    A.  Lots.
24    Q.  About how frequently?
25    A.  It just depends on what's going on in the

Page 21

1  case.  Sometimes, it's every couple of days.  Sometimes,
2  it would be two weeks before we talk again.
3    Q.  Who's paying your legal bills?
4    A.  Nobody.  I'm on a contingency.
5    Q.  Full contingency?
6    A.  Yes.
7    Q.  So you haven't paid any money for this case
8  to date?
9    A.  No.
10    Q.  And what is your contingency fee
11  arrangement?
12        MR. CRONE:  Hold on.  Objection.  So the
13  terms of the fee agreement are, of course, confidential
14  and privileged.
15        MS. KITSON:  They actually are not.  10th
16  Circuit law says that the terms of the fee arrangement
17  are discoverable.
18        MR. CRONE:  If you really want to know,
19  send me the case, and I'll review it.  But for now,
20  I'm -- I'm instructing her to not answer.
21        MS. KITSON:  All right.  It's Chimney Ross
22  Public Power District versus Tri-State Generation &
23  Transmission.  I'll give you that cite here.  It's
24  2013 U.S. District Lexis 67714.  And that's citing to the
25  10th Circuit authority.

6 (Pages 18 - 21)

Page 22

1    Q.   (By Ms. Kitson)  So after the next break,
2    I'll go ahead and ask you that question, Ms. Brigham.
3    A.   Okay.
4    Q.   Have you spoken with any attorneys from the
5    ACLU.
6    A.   No.
7    Q.   Okay.  Have you spoken with any attorneys
8    about other cases that are pending against Frontier
9    Airlines right now?
10   A.   Repeat that question.
11   Q.   Have you spoken with any attorneys about
12   other cases that are pending against Frontier Airlines?
13   A.   Have I?  No.
14   Q.   Are you aware of other cases that are
15   pending against Frontier Airlines?
16   A.   Yes.
17   Q.   Okay.  And what cases are you aware of?
18   A.   I know of a giant breast-feeding and
19   pregnancy discrimination.
20   Q.   And have you --
21   A.   Before you ask -- hold on, Danielle,
22   before you ask your next question, one of my children
23   just knocked.
24   Q.   Oh, okay.
25        MR. CRONE:  Danielle, do you know what the

Page 23

1    date is on that cite you gave me?
2        MS. KITSON:  It's May 13, 2013.
3        MR. CRONE:  Thank you.
4        A.   And I'm back.
5        Q.   (By Ms. Kitson)  Okay.  Actually, let me
6    step back for one moment.
7        Has Mr. Crone given you any kind of
8    statement of the number of hours that he or Mr. Grimes
9    have spent on the case?
10   A.   No.
11        MR. CRONE:  Again, an -- an objection
12   to -- to communications of -- regarding the
13   representation.  So -- so attorney-client privilege is
14   the objection.
15        MS. KITSON:  Yeah.  It's not -- it's
16   discoverable.  But I think she's answered.  .
17   Q.   (By Ms. Kitson)  So you mentioned that
18   you're aware of these cases against Frontier involving
19   breast-feeding.
20        Have you spoken with anyone -- anyone about
21   this?
22   A.   Nobody from those cases, no.
23   Q.   Okay.  So no attorneys, no Frontier
24   employees, no one?
25   A.   I have not, no.

Page 24

1    Q.   Okay.  I have some general questions for
2    you about your background.
3        Where are you from, originally?
4    A.   From?  Golden, Colorado.
5    Q.   What states have you lived in?
6    A.   Just Colorado and Michigan, and for a
7    brief time when I was in treatment, I lived in
8    California.
9    Q.   Are you married currently?
10   A.   Yes.
11   Q.   And I believe you mentioned you have
12   children; is that correct?
13   A.   Yes, yes.
14   Q.   How many children do you have?
15   A.   I have two living children.
16   Q.   And one deceased; is that correct?
17   A.   Correct.
18   Q.   What's your husband's name?
19   A.   Sean Brigham.
20   Q.   How long have you been married?
21   A.   We got married in September of 2009.
22   Q.   Have you ever been married before
23   Mr. Brigham?
24   A.   No.
25   Q.   And what are the names and ages of your

Page 25

1    children?
2    A.   My daughter is Sylvia, and she will turn
3    10 tomorrow.  And my son is Kason Brigham, and he just
4    turned 6 April 14th.
5    Q.   Well, happy birthday to her, tomorrow.
6    A.   Thanks.  She's excited.
7    Q.   Yeah.  Mine just turned 9 in July.  So --
8    A.   Close to double digits.
9    Q.   Yeah.  I know.
10        Can you tell us a bit about your
11   educational history?
12   A.   Uh-huh.  I graduated high school.  I went
13   to Northeastern Junior College for a semester, and then I
14   did a few classes at Red Rocks Community College.
15   Q.   And when did you attend Red Rocks?
16   A.   It would have been when I was 19 or 20.
17   Q.   Have you ever had any military service?
18   A.   No.
19   Q.   What employers have you worked for?
20   A.   Oh, gosh.  I worked for Casa Bonita.  I
21   worked for Dairy Queen.  I worked for Pizza Hut.  I
22   worked for Andolini's.  I worked for a bowling alley that
23   was down the street from my parents' house.  And flight
24   attendant was what I had chosen for my career.
25        And then -- do you want me to keep going

7 (Pages 22 - 25)

Page 26

1 after?
2        Q.   Mm-hmm, sure.
3        A.   And then after I was terminated from
4 Frontier, I began work through a temp agency at --
5        THE REPORTER:  I'm sorry.  The name again
6 of the bakery?
7        THE DEPONENT:  Cakes -- Cakeheads Bakery.
8 And then I began working for Great West Painting &
9 Repair.
10       Q.   (By Ms. Kitson)  Any other employers?
11       A.   Not that I can think of right now.
12       Q.   So before beginning your career as a flight
13 attendant, you had a number of jobs at restaurants,
14 bowling alleys; is that correct?
15       A.   Yes.
16       Q.   And when did you begin working for
17 Frontier?
18       A.   In May of 2007.
19       Q.   When did you stop working for Frontier?
20       A.   November of 2015.
21       Q.   When did you begin working for Cakeheads
22 through the temp agency?
23       A.   On this, my dates are a little fuzzy.  But
24 I want to say I was on unemployment for about -- not even
25 three months when I got hooked up with the temp agency,

Page 27

1 and they had me go to the bakery.
2        Q.   How long did you work at Cakeheads?
3        A.   Four or five months maybe.
4        Q.   And when did you work for Great West
5 Painting?
6        A.   It was right after Cakeheads through the
7 end of 2018.
8        Q.   And you haven't worked for any other
9 employer since?
10       A.   No.  Well, I mean, technically I do take
11 care of my -- my husband's 94-year-old grandmother, if
12 you consider her an employer.
13       Q.   Do you receive any income?
14       A.   I do.  Yes.
15       Q.   What income do you receive?
16       A.   $12 an hour.  And pre-COVID, I would get
17 my kids on the bus in the morning.  And then I would go
18 over to her house, take care of her, hang out with her,
19 get her lunch, clean, do whatever she needed me to do.
20 And then I would be home by the time my kids got off the
21 bus.
22       Q.   How much income have you received in total
23 from working and taking care of your mother-in-law --
24 right?
25       A.   No.  My husband's grandmother.

Page 28

1        Q.   Grandmother.  Okay.
2        A.   I couldn't even give you a total.  It's
3 sort of varied.  And right now, I'm only going over there
4 one day a week because of COVID, trying to limit, you
5 know, possible spread.
6        Q.   Have you filed any tax documentation
7 related to your income from taking care of your husband's
8 grandma?
9        A.   No.  They're going to give me a 1099 at
10 the end of the year.
11       Q.   When did you begin taking care of her?
12       A.   I want to say it was probably starting in
13 February of this year.
14       Q.   Have you provided your counsel with any
15 kind of records of your earnings --
16       A.   No.
17       Q.   -- with taking care of her?  Okay.
18            And will you do that?
19       A.   I can.  I mean, she just -- she has a
20 trust account that her son writes me a check.  I just
21 keep track of my hours, and she -- or he writes me a
22 check from her trust account.
23       Q.   Ballpark it for me.  About how much do you
24 think you've earned?
25       A.   Maybe 3 -- 3,000.  That's my best guess.

Page 29

1        Q.   Okay.  I have just some general questions
2 for you about your legal background.
3            Have you ever been known by another name?
4        A.   Rebecca Kruger.
5        Q.   Any other name?
6        A.   My maiden name.
7        Q.   Any other name?
8        A.   No.
9        Q.   Have you ever been involved in a lawsuit
10 before this?
11       A.   No.
12       Q.   Have you ever been involved in any other
13 kind of legal proceeding, as a witness, or in any kind of
14 hearing or proceeding?
15       A.   No.
16       Q.   Have you ever been arrested?
17       A.   Yes.
18       Q.   Okay.  How many times have you been
19 arrested?
20       A.   I was arrested for DUI when I was in
21 Northeastern Junior College.
22       Q.   What year was that?
23       A.   That would have been 2003, 2004, maybe.
24       Q.   Is that the only time you've been arrested?
25       A.   Yes.

8 (Pages 26 - 29)

Page 30

1    Q.   Were you convicted of a crime in connection
2  with the DUI?
3        A.   I -- I believe that outcome was -- sorry.
4  I'm trying to think.  I went to Court and pled, I think,
5  no contest.  So it will show as an arrest, but never a
6  conviction.
7             And then there was one time -- I don't
8  know actually if I was arrested or not.  But when I was
9  16, I didn't have a driver's license, and I stole my
10  parents' car.  It was my mom's car.  I stole it.  I
11  rear-ended somebody, and I left the scene.  My dad turned
12  me in to the police the next morning.  And I wasn't like
13  slapped with handcuffs or anything, but they let me go
14  home with my parents.  I don't know if that shows on my
15  record as an arrest or not.
16    Q.   And that was here in Colorado?
17    A.   Yes.
18    Q.   And in connection with the DUI, did you
19  have any kind of sentence or --
20    A.   I had to do alcohol classes and pay, I
21  believe, a fine.
22    Q.   Have you ever filed for bankruptcy?
23    A.   No.
24    Q.   Other than Frontier, have you ever been
25  fired from a job?

Page 31

1    A.   Yes.
2    Q.   Which jobs have you been fired from?
3    A.   Cakeheads Bakery.  There was like a
4  two-week stretch where my kids kept getting sick and I
5  kept getting sick.  As I went back to work, and the kids
6  were having to do daycare and school and stuff like that,
7  everybody kept getting sick.
8             So there was like a two-week period where
9  I had to call out quite a few times because of illnesses.
10  I didn't have any sick time built up.  It was through the
11  temp agency, and I had no options.  So he got mad and
12  fired me, and then called me back a week or two later and
13  asked for me to come back.  But at that point, I had
14  already started my career -- or my job with Great West
15  Painting & Repair.
16    Q.   So you worked for Cakeheads for four to
17  five months; is that correct?
18    A.   Yes.
19    Q.   And then you were fired for attendance; is
20  that correct?
21    A.   Yes.
22    Q.   Other than Cakeheads and Frontier, have you
23  ever been fired from any other job?
24    A.   No.
25    Q.   Have you ever received discipline at any

Page 32

1  other job?  And by "discipline," I mean a write-up or a
2  coaching or a counseling, anything like that?
3    A.   No.
4    Q.   Other than Frontier and Cakeheads, have you
5  ever had any attendance issues with any other employer?
6    A.   No.  And, Danielle, hold on.  My kids are
7  knocking again.
8    Q.   Sure.
9        MS. KITSON:  Could we go off the record.
10        THE VIDEOGRAPHER:  Yeah, I was just going
11  to ask if you wanted to.  We're going off the record at
12  8:44 a.m. GMT (sic) time.
13        (Recess from 8:44 a.m. to 8:44 a.m.)
14        THE VIDEOGRAPHER:  We're going back on the
15  record at 8:44 a.m.
16    Q.   (By Ms. Kitson)  Ms. Brigham, do you
17  understand that you're still under oath?
18    A.   Yes.
19    Q.   Let's talk about your employment history
20  with Frontier.
21             During your time at Frontier, who was your
22  supervisor -- your direct supervisor?
23    A.   You're cutting out, kind of.
24    Q.   Oh, I think my -- I had a little alarm go
25  off here or something.  Let me ask that again.

Page 33

1    A.   Okay.
2    Q.   Over your time at Frontier, who were your
3  direct supervisors?
4    A.   At one point Jamie Shupernot (phonetic)
5  was a direct supervisor.  Mitch -- I don't remember his
6  -- his last name.  Stefanie Coppedge, and I think at one
7  point Kari Thompson.
8    Q.   Anyone else?
9    A.   Not that I can think of.
10    Q.   Over your time at Frontier, you were
11  subject to several disciplinary actions because of
12  attendance; is that correct?
13    A.   Correct.
14    Q.   And how many times?
15    A.   You mean throughout my whole time at
16  Frontier?
17    Q.   Yes.
18    A.   I don't know.  I would have to go back and
19  count.  Frontier's attendance policy changed a few times
20  throughout my career there.  At one point, it got
21  switched over to a point system.  So I -- I honestly
22  can't give you an accurate number of how many times.
23    Q.   Okay.  I'm going to introduce an exhibit.
24  This will be Brigham Exhibit 16.  And I believe that the
25  court reporter should have this exhibit and opposing

9 (Pages 30 - 33)

Page 34

1   counsel as well.  But in any event I'm going to share my
2   screen with you, if that works.
3        A.  Okay.  That's fine.
4        Q.  Ms. -- Ms. Brigham, I'm showing you Brigham
5   Exhibit 16 --
6        A.  Mm-hmm.
7        Q.  -- which bears the Bates stamp
8   FRONTIERAIRLINES(R.BRIGHAM)-0001115.
9        Do you see that?
10       A.  No.
11       Q.  In the lower right?  Are you seeing my
12   screen?
13       A.  My screen is blocking it.  Hold on.
14       0001115?
15       Q.  Yes.  And this appears to be an Inflight
16   Dependability Performance Counseling Record for
17   Rebecca Kruger, dated September 5th, 2007.
18       Do you see that?
19       A.  Yes.
20       Q.  And is this a true and correct copy of a
21   final termination warning you received based on
22   attendance?
23       A.  Probably.  Attendance was a running joke
24   with the flight attendants, because everybody got
25   warnings all the time because the dependability policy

Page 35

1   was a joke.
2        Q.  Well, let me ask you this:  Do you have any
3   reason to dispute the accuracy of the attendance points
4   that were assessed here that resulted in your final
5   termination warning?
6        A.  I would have to look back through and
7   figure out if any of those should have been coded
8   differently.  I mean, by seeing this, and I'm sure I
9   signed it, I mean, yes, this is probably accurate.
10       Q.  I'll keep scrolling down here.  The next
11   document is a memo from Kari Thompson to Rebecca Kruger,
12   dated August 23rd, 2007.
13       Do you see that?
14       A.  Yes.
15       Q.  Is that a true and correct copy of a memo
16   that you received from Kari Thompson?
17       A.  Sure.
18       Q.  I'm now showing you a memo from
19   Robert Mitchell, Inflight manager, to Rebecca Kruger,
20   dated 17 November of 2008.
21       Do you see that?
22       A.  Yes.
23       Q.  Is this a true and correct copy of a memo
24   that you received regarding attendance infractions in
25   2008?

Page 36

1        A.  I would like to see the whole thing,
2   please.
3        Q.  Mm-hmm.  Yeah.  Go ahead and read it, and
4   let me know when you'd like me to scroll down.  By the
5   way, these yellow highlights are mine.
6        A.  Okay.
7        Q.  It's just where I'm going to be pointing
8   you to.
9        A.  Right.  So can I just point out something,
10   where it says 4 sick instances in a rolling 12-month
11   period?
12       Q.  Sure.
13       A.  That's four times of being sick in a year,
14   when you're working with the public, who are sick.  And I
15   just -- I will argue all day that Frontier's attendance
16   policy was ridiculous.  We even tried to strike over it.
17       Q.  Let me stop you there, because I want to
18   make sure I understand this.
19       So the company has a dependability
20   attendance policy, correct?
21       A.  Correct.
22       Q.  And under the Collective Bargaining
23   Agreement, you have to follow that policy, correct?
24       A.  Correct.
25       Q.  And over the time that you were employed

Page 37

1   with Frontier, you don't have any reasons to dispute the
2   accuracy of the coding of the points that you received,
3   correct?
4        A.  At the end, after I self-disclosed to the
5   company, I would argue a lot of those.
6        Q.  Well, let me -- let me clarify that,
7   because I understand that you disagree with the company's
8   policy; is that right?
9        A.  Right.
10       Q.  You think that it was not a good policy,
11   correct?
12       A.  I mean, they're allowed to have whatever
13   policy they want.  I'm just saying this does not show
14   anything.  Everybody had these type of sick things.  It
15   was a running joke with the flight attendants.  Oh, how
16   many are you at?  Oh, how many are you at?
17       Q.  Yeah.
18       A.  Yeah.
19       Q.  I understand.  And I think that I really
20   just want to understand.  You know, setting aside the
21   document, there's a difference between saying, I was
22   assessed these points, and I disagree with the policy,
23   because I don't think that this should be something that
24   merits getting points; and I, at this point, was not
25   accurately assessed under the existing policy.

10 (Pages 34 - 37)

Page 38

1        Do you follow me?
2        A.  I get it.  So, yes, this was -- based on
3    theirs, yes, I would agree with it.  But when it gets
4    later on after I self-disclosed to the company, I do not
5    agree with those ones.
6        Q.  Okay.  Let me just stop sharing for a
7    minute, because I want you to set aside the document.
8        A.  Okay.
9        Q.  So let me ask you a little bit more about
10   that.
11       So during your time with Frontier, you did
12   not agree with the dependability policy, correct?
13       A.  Correct.  And along with a lot of other
14   people.
15       Q.  During your time at Frontier, though, did
16   you ever have any reason to dispute the accuracy of the
17   points that were assessed to you under the policy?
18       And by "accuracy," I mean that the policy
19   was followed.
20       A.  Explain.
21       Q.  So in 2015, the attendance points that you
22   accrued --
23       A.  Right.
24       Q.  -- do you have any reason to dispute that
25   they were accrued correctly under the terms of the policy

Page 39

1    as written?
2        A.  I would dispute a bunch of them.
3        Q.  Okay.  Tell me exactly why you dispute
4    them.
5        A.  My FMLA coded days shouldn't -- I don't
6    think should have been coded FMLA.  They were having me
7    use the Family Medical Leave Act to take over off my
8    overnights.  And when I would have my meetings with the
9    company to try and figure out what else we could do --
10   because I would run out of my intermittent FMLA time;
11   therefore, I would get sick points.
12       Those should not have been coded as sick.
13   I was not sick.  I was trying to adhere to my program,
14   which Frontier requires me to do.  I completely disagree
15   with all of those points.
16       Q.  But you missed a day, and under the policy,
17   they were coded as sick.
18       So, you disagree that they should have
19   been, but you missed a day, and they were coded as sick,
20   correct?
21       A.  Coded as sick should not have happened had
22   they reasonably accommodated me.
23       Q.  Okay.  So I -- I think we're going round
24   and round.  I want to make sure I clarify this.  So --
25       A.  Okay.  After this, can we take a little

Page 40

1    break?  I hear my kids getting loud.
2        Q.  Yes.  Let me just look here.  Can we go
3    about ten more minutes; do you think?
4        A.  Sure.
5        Q.  Okay.  So you -- these absences were coded
6    as sick, correct?
7        A.  Correct.  When I would run out of my
8    intermittent FMLA time, which was in a rolling calendar,
9    and I waited for days to drop off, yes, they would be
10   coded as sick.  I was not sick.  I was adhering to my
11   program, which Frontier requires that I do.  Those should
12   not have been coded as sick.  Frontier had the ability to
13   just remove that.  Frontier had the ability to do
14   multiple things, Danielle, and they decided not to do it.
15       Q.  Okay.  I think I get it now.  So let
16   me -- let me try again.
17       So you have certain days where you called
18   out, and these were intermittent FMLA, correct?
19       A.  Correct.
20       Q.  And you had certain days where you called
21   out, and you didn't have any intermittent FMLA left,
22   correct?
23       A.  Right.  And I would still call in
24   intermittent FMLA, but then later on, they'd be like, Oh,
25   by the way, you ran out of intermittent FMLA.  This is

Page 41

1    coded as sick.  You're getting a point.  I should have
2    never gotten that sick point.  I should have not -- it
3    should not have even shown up as sick on my schedule, had
4    Frontier reasonably accommodated me.
5        Q.  Okay.  So let me ask you this:  So you had
6    days when you called in intermittent FMLA, and it was
7    coded that way, correct?
8        A.  Yes, when I had intermittent FMLA days.
9        Q.  And you had days where, for whatever
10   reason, you didn't have any intermittent FMLA left,
11   correct?
12       A.  Correct, and I could not do overnights.
13   And I could not do overnights.  It's not that I didn't
14   want to do these trips, Danielle.  I could not do
15   overnights in order to adhere to my program.  Frontier
16   knew this.  We had multiple meetings about this.  I asked
17   multiple times for reasonable accommodations that they
18   denied, denied, denied.  And then give me sick points,
19   and then ultimately fired me for said sick points.  It
20   was not fair, and I will argue that till the day I die.
21       Q.  I -- I understand.  I'm trying to
22   understand your position.  So we had days that were I --
23   IFMLA.  We had days where you had run out, and they were
24   coded sick, correct?
25       You don't agree with it --

11 (Pages 38 - 41)

Page 42

1    A.  Correct.
2    Q.  -- but they were coded sick, correct?
3    A.  Correct.
4    Q.  Okay.  And then on at least one occasion,
5  you had neglected to mention that it was an intermittent
6  FMLA day for timing, correct?
7    A.  Correct.  And if you're talking about that
8  final one than I forgot to send an email, the exact
9  reason why I forgot to send that email is because they
10  had removed a trip from my schedule, which they had done
11  in the past, which is part of them driving me crazy on
12  purpose.  They all of a sudden told me I couldn't do a
13  turn at the end.
14    So I was more worried about why can't I do
15  this turn than sending an email in.  So I called my
16  Inflight manager, I talked to Stefanie, and she was like,
17  I don't know, you've always been allowed to do it before.
18  Let me see.  And I forgot to send the email within the
19  24 hours or whatever it was, because I was trying to
20  figure out why that turn was taken off of my schedule.
21    Q.  So you did not follow the call-out
22  procedures that were required, correct?
23    A.  I did not send the email in time, no.
24    Q.  Okay.  So you didn't -- okay.  So getting
25  back to this, so we've got these categories:  You called

Page 43

1  in for intermittent FMLA, and those were coded under the
2  dependability policy, not assessed points, correct?
3    A.  Say that again.
4    Q.  Let me start over again.
5    We've talked about the different type of
6  call-outs that you did.  One was calling out under
7  intermittent FMLA, correct?
8    A.  Correct, when I had intermittent FMLA to
9  cover those overnights.
10    Q.  One was when you didn't have any
11  intermittent FMLA left, correct?
12    A.  Well, I would --
13    Q.  There were some days where you called in,
14  and you didn't have any left, correct?
15    A.  Correct.  But I hadn't really known --
16    Q.  I'm not asking for the reason.
17    A.  -- that at this time.  Okay.
18    Q.  I'm not asking for the reason.  I just want
19  to establish that.
20    A.  Okay.
21    Q.  And there was at least one time where you
22  neglected to follow the required call-out procedures,
23  correct?
24    A.  Yes.
25    Q.  Okay.  And all of those were coded

Page 44

1  correctly under the policy -- strike that.
2    You mentioned that some of those should not
3  have been coded as sick, correct?
4    A.  Correct.
5    Q.  Okay.  And your belief as to why they
6  shouldn't have been coded as sick is because you believe
7  they should have been excused under the ADA; is that
8  correct?
9    A.  Correct.
10    Q.  And there's no other reason that you
11  believe they should have been excused?  It's just that you
12  believe that you should have been accommodated under the
13  ADA; is that correct?
14    A.  Correct.
15    Q.  Okay.  So the company coded the points
16  accurately, they just did not accommodate you in the way
17  that you believe you should have been; is that right?
18    A.  I feel like this is kind of a trick
19  question.  They did not code them correctly.  I was not
20  sick.  I was following their rules for their
21  self-disclosure policy, which stated I have to adhere to
22  every aspect of my recovery, otherwise, I could be
23  terminated from that one.
24    But then on the other hand, Danielle, I'm
25  going to be terminated if I don't do these overnights

Page 45

1  because of my sick points.
2    Q.  When you called in -- when you called in,
3  you were calling in because you could not work due to a
4  medical condition, which was alcoholism, correct?
5    A.  Correct.
6    Q.  So the reason you were calling is that you
7  couldn't medically perform your job, correct?
8    A.  Correct.  Well, it's more like -- well, I
9  guess as a general term, yes.
10    Q.  Okay.  We got a little bit off track there.
11  So that -- that helps.  Let's look back then at this
12  Exhibit 16 very quickly here.
13    A.  Okay.
14    Q.  I just want to establish -- and -- and tell
15  me -- hold on one second.  I've got it up.  I just want to
16  make sure that you recognize each of these as an
17  attendance point that you actually did receive.
18    A.  Yes.
19    Q.  So there are several pages here.  Tell me
20  when I can scroll.
21    A.  Scroll.
22    Q.  Tell me if these are all true and accurate
23  copies of attendance points that you received while at
24  Frontier.  Okay?
25    A.  Okay.  You can just scroll.

12 (Pages 42 - 45)

Page 46

1    Q.  Okay.  All right.  So I am looking at a
2  December 29, 2008, memo from Robert Mitchell to you.
3        Do you see that?
4    A.  Yes.
5    Q.  Is that a true and accurate copy of a memo
6  that you received at Frontier?
7    A.  I mean, I don't specifically remember
8  this, but I'm sure it is.
9    Q.  Okay.  I'm going to scroll down.  I'm now
10  looking at a February 16, 2009 Performance Counseling
11  Record from Inflight to you.
12        Do you see that?
13    A.  Yeah.  The documented verbal warning?
14    Q.  Yeah.  Is this a true and correct copy of a
15  counseling record that you received?
16    A.  I'm sure it is.
17    Q.  I'm going to keep scrolling.
18    A.  All right.
19    Q.  And let me know if you need me to stop at
20  any point.  When I get to the end, I'm going to ask you if
21  these are all true and accurate copies of documents that
22  you received while at Frontier.
23        Okay?
24    A.  Okay.
25    Q.  I'm going to start scrolling.  Let me know

Page 47

1  if you need me to stop.
2    A.  Okay.  Can you stop for a second,
3  Danielle.
4    Q.  Yep, you bet.
5    A.  Will you go up a little bit.
6    Q.  Yeah.
7    A.  Now, did any of these dates overlap?  Did
8  you look at that?  Like, do I have dates that are on this
9  one that are actually on the other ones too, or are they
10  all just different days?
11    Q.  I -- these are just copies of attendance
12  warnings that you received.  So I don't know in terms of,
13  you know, what infractions are what.  I just want to
14  verify that these are true and correct copies of
15  attendance points that you received.
16    A.  I don't know what UNA is on this one.  And
17  then that's a medical --
18    Q.  Did you receive this attendance warning
19  though?
20    A.  I mean, it looks like every other one that
21  I have received.
22    Q.  Okay.  Do you have any --
23    A.  I just don't know of any code -- I just
24  don't know what the code UNA is.
25    Q.  Do you have any reason to dispute that you

Page 48

1  received this?
2    A.  No, not at all.
3    Q.  Okay.  All right.  Let me keep going.  Let
4  me know if you need to stop at any point.
5    A.  Okay.
6    Q.  Okay.  I'm at the end.
7        Are these documents all true and correct
8  copies of documents that you received from Frontier?
9    A.  I believe so.
10    Q.  All right.  I'm going to stop sharing my
11  screen.  And then, did you want to take that break?
12    A.  Yes, please.
13        MS. KITSON:  Okay.  We can go off the
14  record.
15        THE REPORTER:  Cole?  Cole?
16        THE VIDEOGRAPHER:  Yes.  Give me one
17  second.  We're going off the record at 9:04 a.m.
18        (Recess from 9:04 a.m. to 9:16 a.m.)
19        THE VIDEOGRAPHER:  We are going back on
20  the record at 9:16 a.m.
21    Q.  (By Ms. Kitson)  Ms. Brigham, do you
22  understand that you're still under oath?
23    A.  Yeah.
24    Q.  We talked a little bit before the break
25  about your work for other employers.

Page 49

1        I wanted to ask you if you've ever made a
2  request for accommodation of other employers other than
3  Frontier?
4    A.  No.
5    Q.  And how much money did you make with
6  Cake --
7    A.  Cakeheads?
8    Q.  Mm-hmm.  Yes.
9    A.  I couldn't tell you without looking at my
10  W-2s.
11    Q.  Ballpark?
12    A.  I don't even know if I can ballpark it for
13  you, Danielle.
14    Q.  Less than $10,000?
15    A.  Yes.
16    Q.  How about at Great West Painting?
17    A.  Maybe like $30,000 total.
18    Q.  Okay.
19    A.  And that's just a guess.
20    Q.  I'm going to show you your W-2s quickly
21  here.
22    A.  Okay.
23    Q.  And the reason I'm going to do that is
24  because it just shows your W-2 wages and not your gross
25  wages, and so I want to see if you --

13 (Pages 46 - 49)

Page 50

1     A.   The gross isn't on the W2?
2          Q.   It's says, W-2 reportable wages.  So let me
3     just show you really quick here.  This will be Brigham
4     Exhibit 4.  It's little bit fuzzy on my screen.  Let's
5     see.  I'm showing you bringing Exhibit 4, which is a 2016
6     W-2 for Employbridge Southwest.
7          Do you see that?
8     A.   I do.
9          Q.   And is that the temp agency you worked for?
10    A.   Yeah, I believe so.
11         Q.   Was this the -- the engagement that you had
12    with Cakeheads?
13    A.   Yes.
14         Q.   And it shows here that your wages, tips,
15    and other compensation was $2,922.78.
16         Do you see that?
17    A.   Yes.
18         Q.   Was that your gross income, or was your
19    gross income higher than that?
20    A.   That was my gross income --
21         Q.   Okay.
22    A.   -- for Cakeheads, yeah.
23         Q.   Okay.  Let me show you then the Brigham
24    Exhibit 5.
25         Are you seeing your 2017 W-2 for Great West

Page 51

1     Painting & Repair?
2     A.   Yes.
3          Q.   And is this a true and correct copy of your
4     W-2?
5     A.   Yes.
6          Q.   And it shows that you earned wages, tips,
7     other comp of $15,550.05 for 2017, correct?
8     A.   It looks like it, yes.
9          Q.   Okay.  And then I'll show you Exhibit 6.
10         Are you seeing your W-2 for Great West
11    Painting & Repair for 2018?
12    A.   Yes.
13         Q.   And this -- in case I didn't state it
14    clearly for the record, this is Brigham Exhibit 6 that's
15    been supplied to the court reporter and opposing counsel.
16    And it shows that your wages, tips, and other compensation
17    was $7,295.
18         Do you see that?
19    A.   Yes.
20         Q.   Was that your total compensation for 2018
21    from Great West Painting?
22    A.   Yes.
23         Q.   Okay.  I'll stop sharing my screen.
24         Other than Cakeheads, Great West Painting,
25    and the income that you've received from taking care of

Page 52

1     your husband's grandmother, did you have any other sources
2     of income since leaving Frontier?
3     A.   I -- a few weeks ago, I went and helped my
4     husband's friend -- my husband's friend on his farm.  He
5     owns a hops farm.  And I helped him propagate like 3,000
6     hops plants.  And I think he gave me like a $150, which
7     I'll claim come tax time.
8          Q.   $150, you said?
9     A.   Yeah.  It was like $158, I want to say.
10         Q.   Any other sources of income since you left
11    Frontier?
12    A.   Nothing that -- actual income, no.
13         Q.   Okay.  Are you running a business right
14    now, an online business?
15    A.   No.
16         Q.   And I believe there was something we found
17    on social media about cups?
18    A.   About what?
19         Q.   Cups or something along those lines that
20    you were --
21    A.   Oh, Recovery Hope Cups?
22         Q.   Yes.
23    A.   That was -- so my best friend from high
24    school reached out to me saying that she had a problem
25    with alcohol.  And we set up a GoFundMe for her to be

Page 53

1     able to afford treatment.  So we got her into a treatment
2     center in Minnesota, and she was living with me after she
3     got out.  Just staying sober, I was helping her with
4     that.  And we were trying to figure out a way
5     to -- for her to make enough money to afford first and
6     last months' rent on an apartment in Denver, so she could
7     move out of my house and be independent.
8          So we started this Facebook group of
9     Recovery Hope Cups, where we would make these
10    fabric-covered tumblers, and people would donate money to
11    her getting her apartment.  But none of that was income
12    to me.  And honestly, it sort of flopped on its face.  We
13    didn't -- we didn't even have that much interest, so...
14         Q.   So no dollars came directly to you from
15    Recovery Hope Cups?
16    A.   No.  If anything, I think it might have
17    cost me money.  And then at one point, I was making flour
18    arrangements out of wood flowers and trying to sell
19    those.  I ended up probably $1,500 in the hole, because I
20    still have all the flowers, and I don't do it anymore.
21         So I -- I mean, I have all these great
22    ideas where I'm going to make money crafting, but then it
23    never pans out, and then it actually costs me money.
24         Q.   But you never received actual income
25    dollars from those?

14 (Pages 50 - 53)

Page 54

1    A.  No.
2    Q.  Since leaving Frontier, will you describe
3  for us what efforts you've made to find employment?
4    A.  Basically, the Cakeheads, I found that.
5  And then immediately after that, I got hired by
6  Great West.  I had -- I was collecting unemployment after
7  Frontier wrongfully terminated me.  And I had to
8  apply -- I think it was three jobs a week.  And I did
9  that, and then finally got hired by the temp agency, who
10  hooked me up with Cakeheads.
11    I don't have a bunch of schooling.  I
12  don't -- I mean, I was lucky to get the flight attendant
13  job, and that was like my career.  So for me to get a job
14  that would actually pay anything over what my daycare
15  costs would be would be difficult.
16    Q.  After you left Frontier, did you ever look
17  for any flight attendant position?
18    A.  No, I couldn't.  I wish I could have.  But
19  when you get hired on as a flight attendant, you start at
20  the very bottom.  And you're on what's called reserve,
21  which is where you have to be on call pretty much 24/7.
22    With Frontier, it was you had 11 days off
23  in which they couldn't call you.  They could
24  junior-assign you if you answered the phone.  However, I
25  couldn't go back to being on reserve again and still

Page 55

1  maintain my sobriety.  I just couldn't do it.  I wish I
2  could.
3    Q.  But you didn't even try to look; is that
4  correct?
5    A.  Because it wouldn't have worked out.
6    Q.  All right.  And what other fields did you
7  look at?
8    A.  Admin-type of positions, which is what I
9  ultimately got with Cakeheads and Great West.  I was a
10  house painter at first with Great West, and then they
11  switched me over to admin.
12    Q.  What was your hourly rate at Frontier when
13  you left?
14    A.  I want to say 32-something.
15    Q.  What was your hourly rate at Cakeheads?
16    A.  $12 an hour.
17    Q.  What was your hourly rate at Great West?
18    A.  I believe I was hired at $13 an hour, and
19  then when I left there, I believe I was at 18.75.
20    Q.  After you were fired from Cakeheads, you
21  got the Great West job a week after; is that right?
22    A.  Correct.
23    Q.  And is Great West affiliated with your
24  family in any way?
25    A.  Yes.  It's my dad's business and my

Page 56

1  husband's.
2    Q.  And were you working full-time for
3  Great West?
4    A.  I was working, I want to say like
5  30 hours-ish in the beginning when I was painting houses.
6  So basically I would get my kids on the bus, and then I
7  would go paint, and then I would have to be home by the
8  time my kids got off the bus.
9    Q.  After Great West, what efforts did you make
10  to find a job, if any?
11    A.  Well, we moved to Michigan.  I was still
12  working for Great West doing all the paperwork and the
13  invoicing and stuff like that.  Hold on.  Doing all the
14  invoicing and stuff remotely.  And then the company that
15  we subcontracted with restructured.  It was Tesla Energy
16  restructured their whole thing.  So they no longer needed
17  us as subcontractors.  So we dissolved the business as it
18  was.
19    Q.  What efforts after that did you make to
20  find a job, if any?
21    A.  There's not much around here that would
22  pay me anything that would even come close to paying for
23  daycare.  So at that point -- and you have to understand,
24  Danielle, we are in Goodrich, Michigan, which is a little
25  one-stoplight town.  We have, like, a Dollar General.  We

Page 57

1  have a gas station called Beacon & Bridge.  And nobody
2  around here is really hiring.  Even if I were to go to
3  Flint, I still wouldn't be able to get anything even
4  remotely close to paying what I would have to pay in
5  childcare.
6    Q.  How far is the airport from where you live?
7    A.  About an hour and a half.  Definitely over
8  two hours, if there's traffic.
9    Q.  And that's the closest airport?
10    A.  That's the main Detroit airport.  There's
11  a Flint airport somewhere, but no carriers fly out of
12  that that I'm aware of.
13    Q.  Why did you move to Goodrich, Michigan?
14    A.  Cost of living is a lot cheaper out here,
15  and my husband's whole family is here.
16    Q.  So it wasn't to pursue a job opportunity
17  for your husband or anything.  It was to be closer to
18  family and lower cost of living?
19    A.  Yes.
20    Q.  Okay.  You mentioned that you did not apply
21  for flight attendants positions.
22    And that's because of your childcare,
23  correct?
24    A.  Correct.  And to be honest, Danielle, I'm
25  a bit terrified of getting another flight attendant job

15 (Pages 54 - 57)

Page 58

1  after what happened with Frontier.
2       Q.  Is that part of the reason you did not
3  apply for a flight attendant job?
4       A.  I'm sure it was part of it, yeah.
5       Q.  So it's because of your experience with
6  Frontier and your childcare needs that you did not apply
7  for a flight attendant job, correct?
8       A.  It just wouldn't have worked.  I mean, I
9  would have had to start -- if I could honestly keep my
10 eight-year seniority that I had with Frontier and just
11 take that over to another airline, that would be easy.  I
12 would have a schedule.  I would be able to manipulate
13 that schedule.  I could not go back on reserve.
14      Q.  And I think --
15      A.  It would be impossible.
16      Q.  Yeah.  And I think I understand.  And I
17 just want to make sure I understand the reasons.
18      So --
19      A.  Yeah.
20      Q.  -- one of reasons you didn't apply is
21 because of your experience with Frontier, correct?
22      A.  Correct.
23      Q.  One of the reasons you didn't apply is,
24 because of your childcare situation, you would not in your
25 view have been able to accommodate that childcare schedule

Page 59

1  with a flight attendant's work schedule at any new
2  airline; is that correct?
3       A.  Correct.
4       Q.  Okay.  And are there any other reasons you
5  did not apply for a flight attendant?
6       A.  Not that I can think of right now.  But if
7  I think of something, I'll tell you.
8       Q.  Okay.  So since you stopped working for
9  Great West Painting, you've not attempted to apply for
10 other jobs because of your childcare situation; is that
11 correct?
12      A.  That, and there's nothing around me that I
13 could do that would pay me nearly enough to even afford
14 daycare for my children.
15      Q.  Have you looked?
16      A.  I have looked a few times about what is
17 around me, and there's really almost nothing that I --
18      Q.  When have you looked?
19      A.  -- qualify for.
20      THE REPORTER:  I'm sorry.  The question?
21      A.  When we first --
22      THE REPORTER:  What was the question?  It
23 cut out.
24      Q.  (By Ms. Kitson)  When have you looked?
25 Sorry.  When have you looked?

Page 60

1       A.  When we first dissolved the company, and
2  we were sort of looking at childcare cost, and then, I
3  just wanted to go on -- I went -- I think I did
4  like -- what's the website -- jobsdot.com or something,
5  just to kind of see what was out there.
6       And I actually -- now, it comes to memory,
7  I did go -- there was a position for like -- they made it
8  sound like a media -- multimedia consultant, something or
9  another, and they made the job sound great.  And I went
10 to an interview.  And it was -- you know the people that
11 set up at, like, grocery stores and try to sell you those
12 bamboo pillows or whatever?  It actually ended up being
13 that.  And it's all commission-based, and I'm not good at
14 sales.  I -- yeah.  I --
15      Q.  Were you qualified for that job?
16      A.  I -- I don't think there were -- I think
17 anybody would qualify for that job.
18      Q.  And were you offered that job?
19      A.  No, I was not.  I did not pursue it after
20 I went to their little orientation and found out what it
21 was, and that it was commission-based, and I wouldn't be
22 able to afford daycare and work that job.
23      Q.  Is it fair to say that there were positions
24 that you were qualified for that you did not apply for,
25 because, for whatever reason, you did not think it would

Page 61

1  fit your childcare?
2       A.  I wouldn't be able to make enough money to
3  even afford childcare.  It would have cost me money to
4  work.
5       Q.  Okay.  And -- and that's why you didn't
6  apply for anything?
7       A.  Right.  And then it ended up being a
8  blessing in disguise, because his grandmother fell ill,
9  was in the hospital for about three weeks.  And when she
10 came out, she had major loss of motor skills, and I
11 happened to be the one that was able to take care of her.
12 So that filled my -- all my needs right there.
13      Q.  I wanted to -- and I'm sorry.
14      You said after Great West, you looked on
15 jobsdot.com?
16      A.  Mm-hmm.
17      Q.  When was the last time you looked on any
18 kind of website or looked for a job at all?
19      A.  Pretty much I haven't.  I work for Sean's
20 grandma.
21      Q.  And how many hours a week is that?  I'm
22 sorry.
23      A.  Right now, it's only about maybe six to
24 eight hours a week because of COVID.
25      Q.  And before COVID, how many hours?

16 (Pages 58 - 61)

Page 62

1  A. It just depended. It depended on like if
2  the kids were in school, like if they had a day off
3  school, if my kids were sick. It varied. It was
4  anywhere from 15 to 35 hours a week. It just depended on
5  the week.
6  Q. How many hours on average were you flying
7  for Frontier per week or --
8  A. When -- that's -- so that's kind of a hard
9  question. With them not reasonably accommodating me, I
10  was working minimal hours. I got my power shut off. I
11  wasn't able to make any money. So that's not really a
12  true test to what I wanted to be working.
13  Q. Well, regardless of that, how many actual
14  hours on average were you flying with Frontier toward the
15  end of your employment?
16  A. I couldn't even tell you. My guess would
17  be maybe 20, 30 hours a month max maybe, but I would have
18  to look at my schedule in front of me to be able to give
19  you an accurate...
20  Q. Okay. I want to talk to you a little bit
21  now about your alcoholism.
22  A. Mm-hmm.
23  Q. How long have you been an alcoholic?
24  A. I mean, that's hard. I have -- since I
25  was a teenager, I have always liked alcohol. It was my

Page 63

1  escape from reality. It was my best friend. And I've
2  always -- I was always sort of like a binge drinker,
3  where if I had 1, I had to have 20 more. And I was the
4  life of the party. I was just a party girl, and it was
5  all fine and dandy.
6  And then there was a major shift in my
7  drinking after my first daughter passed away. She -- she
8  passed away in 2009. And that's when my drinking
9  switched from happy-go-lucky party to sort of drinking
10  more out of sadness and to numb and -- yeah.
11  Q. And let me ask it a different way.
12  When were you first diagnosed with
13  alcoholism?
14  A. You don't really get diagnosed with
15  alcoholism. It's either you are or you're not. You're
16  the only one that can decide really if you are an
17  alcoholic or not. And the fact that I couldn't stop
18  drinking when I wanted to made me an alcoholic.
19  Q. When did you realize you were an alcoholic?
20  A. Probably shortly after my daughter passed.
21  Q. When was the first time that you disclosed
22  to Frontier that you were an alcoholic?
23  A. When I needed to get treatment, and I had
24  to have the time off of work.
25  Q. When was that?

Page 64

1  A. That would have been in September of 2014.
2  Q. When you disclosed to Frontier in September
3  2014, you went out on a continuous leave of absence; is
4  that correct?
5  A. Correct.
6  Q. And Frontier approved that continuous leave
7  of absence, correct?
8  A. Correct.
9  Q. That was a leave of absence that was
10  offered under the Collective Bargaining Agreement,
11  correct?
12  A. I guess. I wouldn't know.
13  Q. After that continuous leave of absence that
14  you took, did you ever apply or ask for any other form of
15  continuous leave of absence?
16  A. No.
17  Q. As opposed to you -- you know, let me ask
18  it again for the record.
19  As opposed to intermittent FMLA work?
20  A. No.
21  Q. So you knew that a continuous leave of
22  absence for medical was available, correct?
23  A. Correct.
24  Q. But you did not apply for one after your
25  initial leave for rehab; is that correct?

Page 65

1  A. That is correct.
2  Q. And at some point, I think that you and
3  Jerry Arellano discussed the possibility of continuous
4  medical leave, but you decided you did not want to have
5  one, correct?
6  A. Correct. I needed money coming in. And
7  had they accommodated me, I would have had that.
8  Q. Your alcoholism -- let's say from
9  September 2014 forward -- well, strike that.
10  How long were you in rehab in that
11  September 2014 era?
12  A. 60 days.
13  Q. After that 60 days, did you return to work?
14  A. I came back, and I tried to return to
15  work, and I had to meet certain criteria in order to come
16  back. I had to meet with a DOT specialist, where -- I
17  don't even know why I had to do half the stuff.
18  But I had to meet with DOT. I had to get
19  paperwork in. I had to -- I believe during that time,
20  they decided that I needed to see a therapist, which I
21  was seeing a therapist. There were a bunch of, like,
22  hoops I had to jump through to come back, which I did.
23  And I want to say in -- because I got back
24  November 7th, and all that was done within the first
25  three weeks that I came back, I want to say. And it was

17 (Pages 62 - 65)

Page 66

1  all sent in, but because Jerry Arellano had left the
2  company since I came back, my paperwork was kind of just
3  sitting there, and nobody was doing anything with it.  So
4  it delayed me getting back to work.
5       So finally after a bunch of phone calls, I
6  finally figured out that it was because Jerry had left my
7  paperwork was just sitting there.  And then eventually I
8  finally was able to come back.
9       Q.  Since you came back to the company --
10  strike that.
11       After you returned to the company, after
12  your rehab for 60 days, how has the alcoholism affected
13  your ability to work?
14       A.  Explain that, please.
15       Q.  Well, you came back to Frontier after
16  rehab, correct?
17       A.  Correct.
18       Q.  And then from that point to the end of your
19  employment with Frontier, how did alcoholism affect your
20  ability to work?
21       A.  Well, basically, I was told it was a good
22  idea to avoid overnights, and the reason for that is
23  because there's really no accountability.  And it's an
24  environment that I was so used to drinking in.  You're
25  supposed to avoid what are called triggers.  And you're

Page 67

1  supposed to basically, they say, change your playground,
2  which is what I was doing.  And I needed Frontier's help
3  to do it.
4       Q.  When was the last time you had a drink?
5       A.  My sobriety date is September 5th of 2014.
6  I got some treatment September 7th of 2014.  When I got
7  the scholarship, it was on September 4th, and I had been
8  drinking that day and told the guy on the phone that I
9  would dump out what I had, and they put me on a plane on
10  the 7th.
11       Q.  What scholarship are you referring to?
12       A.  I got, like, a scholarship to go to a
13  treatment center.  We wouldn't have been able to afford
14  it.  And I just called the right person -- I called a
15  bunch of people that day, just trying to figure out where
16  I could go get treatment.  And I happened to get on the
17  phone with the right person, and I got a -- what they
18  call a scholarship.  It cost me $100 to do my whole
19  treatment.
20       Q.  So since September 5th, 2014, you have not
21  had a drink, correct?
22       A.  No.  Correct.
23       Q.  Your alcoholism has been under control?
24       A.  Correct.
25       Q.  Before that, did you ever have a drink

Page 68

1  while on the job at Frontier?
2       A.  No.  Luckily, I had never crossed that
3  boundary.  Oh, and I feel like I need to qualify -- or
4  clarify.  So never while on duty.  However, on
5  overnights, after you're done, it's -- it was just kind
6  of a culture where you would take off all your flight
7  attendant gear, put on normal clothes, and go meet at the
8  bar.  Nine times out of ten, that's what you did.
9       Q.  But it never impacted your ability to work
10  the next day, for instance; is that right?
11       A.  What do you mean?
12       Q.  So let's -- let's take pre-September 5th,
13  2014.
14       You would drink in hotel bars on layovers,
15  correct?
16       A.  Right.
17       Q.  Was there ever a time that you could not
18  fly because you were drunk or because of the aftereffects
19  of that?
20       A.  No, not while I was already on a trip at
21  all.  I mean, there were plenty of times that I flew
22  pretty hung over, but never intoxicated.
23       Q.  So is it fair to say that your alcoholism
24  did not prevent you from working before September 5th,
25  2014?  Is that fair?

Page 69

1       A.  Kind of.  There were plenty of times, like
2  if I had gone on a bender, I remember a few times that I
3  would have to call in sick, because I was too hung over
4  or too shaky to do my job.
5       Q.  But, in general, you were able to keep your
6  job?
7       A.  Correct.
8       Q.  You were able to meet --
9       A.  Yes.
10       Q.  -- the attendance requirements?
11       A.  Yes.
12       Q.  So prior to September 5th, 2014, you were
13  able to work in general, correct?
14       A.  Yes.
15       Q.  Since September -- sorry.
16       Since September 5th, 2014, alcoholism has
17  not impacted your ability to live your life, correct?
18       A.  Since 2014?
19       Q.  Yes.
20       A.  Yes.  Yes.
21       Q.  And let me ask that question again just so
22  the record is clear.
23       Since September 5th, 2014, alcoholism has
24  not impacted your ability to live your life, correct?
25       A.  I mean, you sort of have to clarify that.

18 (Pages 66 - 69)

Page 70

1  My recovery is part of my life now.
2      Q.  Right.  So since September 5th, 2014,
3  you've been able to live your life, correct?
4      A.  Correct.
5      Q.  You've been able to care for your husband's
6  grandmother, correct?
7      A.  Correct.
8      Q.  You've been able to care for your kids,
9  correct?
10     A.  Correct.
11     Q.  You've been able to work, correct?
12     A.  Correct.
13     Q.  Is there any area of your life that the
14 alcoholism has impacted you in terms of your ability to
15 live a daily life?
16     A.  After I got sober, we're still talking,
17 correct?
18     Q.  Correct.
19     A.  Yes.  It's just different now.  My life is
20 better since getting sober.
21     Q.  So there's no area of your life where it's
22 impacting your ability to function; is that correct?
23     A.  Not currently, but that could change
24 tomorrow, Danielle.  That's why I continue to work my
25 program.  Something could happen, and tomorrow is not

Page 71

1  guaranteed for me to be sober.  I can just take it one
2  day, one minute, at a time.  Anything could change.
3      Q.  Okay.  I understand that.
4         So --
5      A.  So far, it hasn't impacted anything.
6      Q.  Okay.  Yeah.  So let me just clarify for
7  the record.
8         So anything could change at any moment,
9  right?
10     A.  Right.
11     Q.  But from September 5th, 2014 to the
12 present, alcoholism has not impacted any of your major
13 life activities; is that right?
14     A.  Correct.
15     Q.  From September 5th, 2014 to the
16 present -- strike that.
17        From September 5th, 2014 to the end of your
18 employment at Frontier, you were always able to perform
19 the essential functions of your job while on duty,
20 correct?
21     A.  Correct.
22     Q.  Okay.  I want to talk to you now about what
23 accommodations you requested from Frontier.
24        So tell me about the accommodations that
25 you requested from Frontier from September 5th, 2014 to

Page 72

1  the end of your employment.
2      A.  Okay.  I asked to work at the general
3  office for a little while, since my attendance was so
4  bad, and it kept getting worse the more my -- basically,
5  my seniority would go down, because they opened an
6  Orlando base.  So I was not able to hold the kind of
7  trips that I needed to maintain my sobriety.
8         I had asked to maybe work at the GO, which
9  is what they let people do when they're injured on the
10 job.  I asked to start off with a blank schedule to be
11 able to create my own schedule out of open time and the
12 TradeBoard, which is pretty much what's leftover after
13 they run a schedule.  But that would take Frontier
14 starting me out with a blank schedule.  It was not
15 something that I could have just done without their help.
16     Q.  What other accommodations did you request,
17 if any?
18     A.  I requested they just remove the
19 overnights from my schedule, which they had done a few
20 times prior.  When I needed to, they had just removed
21 them and said, We'll do it this one time, but we can't do
22 it forever.  I mean -- yeah.  I had multiple meetings
23 with them trying to figure out what we could do in order
24 to get this to work.
25     Q.  What other accommodations did you request,

Page 73

1  if any?
2      A.  That's all I can think of.  Those were the
3  major ones.
4      Q.  And you did request an accomodation in the
5  form of a continuous medical leave at the beginning for
6  the reentry --
7      A.  At the beginning.
8      Q.  -- and that was -- that was granted,
9  correct?
10     A.  Correct.
11     Q.  At some point, you talked to the folks at
12 Frontier about applying for open positions; is that
13 correct?
14     A.  They had suggested it, and I looked into
15 it and figured out that, after 90 days, you're seniority.
16 And if you can't go back to inflight flight attendant,
17 which was what I wanted to do for pretty much the rest of
18 my career, you can't do it after 90 days.  You would have
19 to start all over from the bottom, which we discussed
20 earlier that was impossible for me to do.
21     Q.  Which you didn't want to do, correct?
22     A.  Correct.
23     Q.  Okay.  So open positions, and applying for
24 open positions, is an accommodation that was offered to
25 you, but you decided not to apply; is that right?

19 (Pages 70 - 73)

Page 74

1       A.  It was not an accommodation.  It was
2    something that was available for everybody.  Anybody
3    could have transferred within the company.  That was not
4    an accommodation for just me.
5       Q.  Are you aware that Frontier provides
6    preferential hiring for anyone who needs an accommodation
7    under the Americans with Disabilities Act for positions
8    for which they're minimally qualified?
9       A.  They never told me anything about that.
10      Q.  You did not know that at the time?
11      A.  No.
12      Q.  Did you ask?
13      A.  I asked multiple times what could be done
14   to help me in this situation.  I was never aware of
15   whatever you're talking about.  They never mentioned
16   anything to me.  All they said was that they could not
17   help me.
18      Q.  We -- strike that.
19         I have listened to the recordings that you
20   provided --
21      A.  Mm-hmm.
22      Q.  -- in the course of discovery in this case.
23      A.  Mm-hmm.
24      Q.  Are you familiar with those recordings?
25      A.  Yes, I am.

Page 75

1       Q.  Okay.  Did you tape those recordings?
2       A.  I did.
3       Q.  On those recordings, I heard you speaking
4    about open positions with Frontier representatives.
5         Is that your recollection as well?
6       A.  Correct.
7       Q.  Did you speak with them about open
8    positions?
9       A.  Correct.
10      Q.  Who --
11      A.  It was mentioned to me that I could
12   transfer within the company, that that was an option.
13   And at one point, I even looked into it, and I saw a
14   bunch of jobs that really I didn't qualify for.  They
15   were like statistics, ops, stuff like that that I didn't
16   qualify for.  And then I found out from another flight
17   attendant that you don't want to do that if you want to
18   go back to inflight.
19      Q.  So transfer was an option, but it was not
20   attractive to you because of loss of seniority and
21   inability to transfer back.
22         Do I have that correct?
23      A.  Correct.
24      Q.  Let's go back to the general
25   office -- well, strike that.

Page 76

1       So I have that you discussed with the
2    company a potential light-duty assignment in the general
3    office; is that correct?
4       A.  Correct.
5       Q.  And you would have taken that on an
6    intermittent basis.  So whenever you had a layover that
7    involved an overnight, your idea was that you would drop
8    that trip and work at the general office.
9         Do I have that correct?
10      A.  That was one.  The other one was just put
11   me as a GO for a while so that I don't have to do
12   overnights, until I can get further along in my recovery
13   where my therapist suggested, Hey, I think you're okay to
14   do overnights now.  I think you're at a place in your
15   recovery when you would be okay.  That's all we were
16   waiting for.
17      Q.  So then there's two different things there,
18   and I'm breaking that out.
19         So number one, you wanted potentially to be
20   in a temporary position in the general office full-time
21   indefinitely; is that correct?
22      A.  Not indefinitely.  Temporarily, until I
23   got to a point in my recovery when I could pick up the
24   overnights again.
25      Q.  But you didn't have an exact end date for

Page 77

1    when that would be, correct?
2       A.  No.  It was open-ended, and that was
3    pretty much up to my therapist, when she thought I was
4    ready, and when I felt I was ready.
5       Q.  Which could have been a year, or maybe
6    never.
7         You don't -- you didn't know, right?
8       A.  We were getting a lot further along in my
9    recovery, and it would have been pretty soon after.
10   However, with all the stuff that Frontier put me through
11   and everything that was going on, honestly, that set back
12   my recovery quite a bit.  So it was just making the
13   problem worse.
14      Q.  And the question I have for you,
15   Ms. Brigham, is you did not know exactly when you would be
16   able to fly overnights again, correct?
17      A.  Correct.
18      Q.  It was open-ended, correct?
19      A.  Open-ended, but ended.  It's -- it would
20   never have been indefinitely.
21      Q.  But you didn't know when, correct?
22      A.  Correct.
23      Q.  And the other option that you had discussed
24   with Frontier is this intermittent concept, where whenever
25   you couldn't fly a layover, you would then work in the

20 (Pages 74 - 77)

Page 78

1   general office, drop that layover intermittently, correct?
2        A.   Jerry at one point had suggested that I
3   was basically trying to use the system to not work, which
4   I was trying to show him, That's not the case, Jerry.
5   The case is I want to be at work.  I need to make money
6   for my family.  Send me to the GO.  He thought I was just
7   calling out for the overnights, because, oh, I just
8   didn't want to work on the weekend.  The reality of it
9   was I wanted to work.  I was terrified to do layovers.
10        Q.   I understand.  I'm just trying to make sure
11   I understand the -- the exact accommodations that you
12   requested.
13        A.   Okay.
14        Q.   Are you with me?
15        A.   One was intermittently.  If -- if they
16   needed me at the GO, and I had called out, sure, I'll
17   come work.  That was to prove to Jerry that I'm not just
18   trying to get out of work just -- which he insinuated
19   multiple times that that's what I was trying to do.  And
20   it's just inaccurate.
21             And I said I'll come work at the GO.  I'll
22   do whatever you want me to do except overnights.
23   Temporarily reassign me.  Reassign me the whole time at
24   the GO.  I was willing to do whatever I could to try and
25   make this work.

Page 79

1        Q.   So you were requesting the accommodation of
2   when you had an overnight trip, you would call out for
3   that instead work in the general office, correct?
4        A.   Correct.
5        Q.   And not be assessed any attendance points,
6   correct?
7        A.   Correct.
8        Q.   And be paid, correct?
9        A.   Correct.
10        Q.   Are you aware of anyone else who was given
11   that accommodation?
12        A.   Yes.  Lots of people, after they were
13   injured on the job, would go work at the GO.
14        Q.   Are you aware of anyone who was allowed to
15   do that outside the context of an injury on the job?
16        A.   No.
17        Q.   In terms of the blank schedule, describe
18   for me exactly what you requested.
19             How would that work?
20        A.   So basically -- okay.  When -- every
21   month, a flight attendant has to bid their preferred
22   schedule, and it goes by seniority.  So basically, I was
23   asking to not be awarded a schedule at all.  Leave me
24   with nothing.  Leave me with nothing.  Leave me with a
25   blank schedule, and then at the end of the bidding

Page 80

1   period -- at the end, there's what we call open time and
2   TradeBoard, which are the leftovers that nobody wants
3   that a reserve is going to have to fly or that other
4   people can swap and trade their trips out with.
5             What I was asking to do was just be left
6   with nothing.  It would not have gone above seniority.
7   It would not have violated anything in the CBA.  Leave me
8   with nothing.  And I -- it will be my responsibility to
9   build my schedule up to 60 hours, which was the
10   requirement, out of stuff that was left over and the
11   stuff that nobody wanted.
12        Q.   Tell me a little bit more about how the
13   bidding process work.
14             So every month you bid, correct?
15        A.   Mm-hmm.
16        Q.   And every month, if you are an active
17   employee, you have to bid, correct?
18        A.   Correct.
19        Q.   And if you don't bid, the CBA provides that
20   you are given a line, correct?
21        A.   Correct.
22        Q.   And a line is a --
23        A.   I mean, so you would bid for reserve if
24   you wanted, which then you'd have a reserve schedule.
25        Q.   And describe for us, what is a reserve

Page 81

1   schedule?
2        A.   Basically, it's the days that you are on
3   call.
4        Q.   So you're basically just on call until
5   you get --
6        A.   24/7.
7        Q.   Until you get up to 60 hours?
8        A.   No.  You're on call -- the days that
9   you're on call, you're on call.  It doesn't matter how
10   many hours you work.  You're guaranteed to be paid for
11   75, I believe, whether you fly them or you fly over.  Of
12   course, they're going to pay you over.  But, yeah, you're
13   on call 24/7 except for 11 days that you have off in the
14   month.
15        Q.   Okay.  So at the beginning of the
16   month -- strike that.
17             So every month, as an active flight
18   attendant, you have to bid, correct?
19        A.   Correct.  And even if you don't bid,
20   they're going to give you what's left over after
21   everybody else anyway.
22        Q.   So if you don't bid, you get an automated
23   line that is given to you, correct?
24        A.   Correct.
25        Q.   And you also have the option of bidding

21 (Pages 78 - 81)

Page 82

1  reserve, correct?
2      A.  Correct.
3      Q.  And if you bid reserve, the only
4  requirement is you just have to fly any time they ask you,
5  correct?
6      A.  Correct.
7      Q.  Okay.  Were there any other options for
8  bidding other than what you've just described?
9      A.  No, not that I can remember.
10     Q.  Now, once you have a line assigned to you
11  through the bidding process, you can begin swapping,
12  dropping, trading, picking up trips on overtime; is that
13  correct?
14     A.  Open time.
15     Q.  Open time.  Sorry.
16     A.  Yes.  As soon as it opens -- you're fine.
17         As soon as it opens, I believe it was the
18  18th or the 19th.  I can't -- it's been five years, I
19  can't remember the exact date.
20     Q.  Okay.  And -- and I'll show you the
21  Collective Bargaining Agreement a little bit later.  I
22  just want to get a general sense of what your
23  understanding is.  So let me make sure I'm following you.
24         So every month, you have to bid, correct?
25     A.  Correct.

Page 83

1      Q.  And every month, unless you bid reserve,
2  you're assigned a line, correct?
3      A.  Correct.
4      Q.  That line is at least 60 hours, correct?
5      A.  Correct.
6      Q.  At some point in the month, then, you can
7  begin to swap, drop, and trade on a TradeBoard and open
8  time, correct?
9      A.  Correct.
10     Q.  During that process, is it true that you're
11  never allowed to drop below 45 hours --
12     A.  I thought --
13     Q.  -- for each --
14     THE REPORTER:  I'm sorry.
15     A.  I thought it was 60.
16     THE REPORTER:  Can I have the question
17  again, please.  The overlap.
18     Q.  (By Ms. Kitson)  Yeah.  In the process of
19  trading, dropping, swapping, you're allowed to drop down
20  to 45, but you have to get back up to 60 by the end of the
21  process, correct?
22     A.  I don't remember anything about the 45.
23  But who knows?  That was five years ago.
24     Q.  All right.
25     A.  I thought it was you couldn't drop below

Page 84

1  60.
2      Q.  Let's go ahead and look at the Collective
3  Bargaining Agreement then.
4      A.  Is this the one that was current when I
5  was there?
6      Q.  Yes.  I am going to show you what's been
7  marked as Brigham Exhibit 1.  Brigham Exhibit 1 is a
8  document entitled -- entitled Association of Flight
9  Attendants-CWA, AFL-CIO.
10         Do you see that?
11     A.  Okay.  Yes.
12     Q.  And if I scroll down here, it says,
13  Frontier Airlines Flight Attendant Contract, 2011 to 2016.
14         Do you see that?
15     A.  Correct.
16     Q.  And the Bates number begins with
17  FRONTIERAIRLINES(R.BRIGHAM)- 815.
18         Do you see that?
19     A.  Yeah.  I've got to move my screen.  Hold
20  on.  Yes, I see that.
21     Q.  Okay.  And this is a copy of the Collective
22  Bargaining Agreement that was in place during the time
23  that you were a flight attendant with Frontier, correct?
24     A.  If that's what it says, correct.
25     Q.  All right.  I'm just going to try to search

Page 85

1  here for 45 to get us quickly to where the language is, if
2  I can  There was a 45 in here
3      A   A bad number
4      Q   Yeah   Here we go   Okay   So I'm looking
5  at Section L, Open Time, Minimum Credit Requirements
6         Do you see that?
7      A   Yep
8      Q   And in the lower right-hand corner, just
9  for the record, we're at FRONTIERAIRLINES(R BRIGHAM)- 869
10         Are you with me?
11     A   Yep
12     Q   And if you scroll up, it says, number 1, At
13  the completion of each bid period, each flight attendant
14  must accumulate a minimum of 60 credit hours
15         Do you see that?
16     A   Yep
17     Q   Is that correct?
18     A   Yes
19     Q   Okay   It says, At no time will a flight
20  attendant be allowed to drop below 45 credit hours
21         Do you see that?
22     A   Yep
23     Q   Does that refresh your recollection that in
24  the trade/swap/drop process, you were never allowed to go
25  below 45 in that process, correct?

22 (Pages 82 - 85)

Page 86

1    A.  I don't ever remember the 45 hours, to be
2  honest, Danielle.  I thought it was you can't drop below
3  60.
4    Q.  Do you have any reason to dispute that this
5  was the rule?
6    A.  No, I don't.  I just don't remember the
7  45.
8    Q.  But you know for sure that you weren't
9  allowed to drop your own schedule, right?
10    A.  Yes, for sure, unless it would be a
11  reasonable accommodation.
12    Q.  Got it.  So the Collective Bargaining
13  Agreement did not allow you to do that.
14        You wanted it as an accommodation, correct?
15    A.  I spoke with the union, Danielle, and the
16  union said that it was acceptable.  Frontier said they
17  couldn't do it, because they would have the union
18  breathing down my -- their necks.
19        So I went to the --
20    Q.  So let me --
21    A.  No, no, no, let me finish.  I went to the
22  union.  I had union permission.  Frontier knew that, and
23  they still said no.  They're whole reason for saying no
24  is because they were worried about the union.  They had
25  union permission to do it.

Page 87

1    Q.  Okay.  That wasn't my question.  My
2  question is, this is something that wasn't permitted by
3  the Collective Bargaining Agreement?
4        Now, you're saying that you then later went
5  to the union and sought permission for an exception,
6  correct?
7    A.  Yes.  Correct.
8    Q.  Okay.  So let's ask that in pieces then.
9        What you wanted to do in dropping your
10  entire schedule was not permitted by the terms of the
11  Collective Bargaining Agreement, correct?
12    A.  As it's stated right there, correct.
13    Q.  You sought permission from the union,
14  correct?
15    A.  Correct.
16    Q.  Okay.  And what makes you think that the
17  union gave you permission to do that, as you put it?
18    A.  From my conversations with
19  Adrienne Prince.  We sat in that last meeting, where she
20  told Frontier that it would not violate the contract at
21  all.
22    Q.  Okay.  Let me first understand exactly what
23  you were proposing.  So -- I want to make sure I
24  understand it.
25        So you were proposing that you would go

Page 88

1  through this process; is that right?
2    A.  No.  No.
3    Q.  Okay.
4    A.  Just leave me with nothing.  Don't even
5  put me on the award.  It would be very easy for them to
6  just leave me off of the bidding.  And then add me back
7  on before TradeBoard opens, as if I was coming back from
8  leave.
9    Q.  All right.  So then let me ask you this:
10  The accommodation you were seeking then was to not bid at
11  all and to be let in to open time after bidding was over.
12        Do I have that right?
13    A.  Leave me with a blank schedule, yes.
14    Q.  Okay.  So in your accommodation example,
15  you would not bid; is that right?
16    A.  Correct.
17    Q.  And you would not have to hold 45 hours; is
18  that correct?
19    A.  Correct.
20    Q.  And your idea was that you would build your
21  own 60 hours out of open time, correct?
22    A.  Correct, all the leftover stuff that
23  people did not want.
24    Q.  And open time was first come, first serve,
25  correct?

Page 89

1    A.  Correct.
2    Q.  And in your accommodation request, were you
3  envisioning that you would be the first one to pick up
4  those flights?
5    A.  Nope, not at all.  I -- I would go in at
6  the same time; first come, first serve.
7    Q.  All right.  I want to go through in pretty
8  great detail your conversations with the union about this.
9        So when was the first time that you --
10    MR. CRONE:  Danielle, can I cut in?  I'm
11  sorry.  I just heard you want to go into great detail on
12  this.  We've been going almost an hour.
13        Is there any way we can do a break
14  relatively soon?
15    MS. KITSON:  Absolutely.  So --
16    THE DEPONENT:  Plus my kids are getting
17  loud.
18    MS. KITSON:  What was that?
19    THE DEPONENT:  Plus my kids are getting
20  loud.
21    MS. KITSON:  Oh.  Yeah, no, we can break
22  at any time.  I mean, I -- I'll just say, you know, I
23  definitely am going to be using the full seven record
24  hours.  So just keep that in mind.
25    THE DEPONENT:  That's fine.

23 (Pages 86 - 89)

Page 90

1     MS. KITSON:  But I -- yeah, that's totally
2  fine.
3         Do you want to go off the record now?
4     MR. CRONE:  Yeah, that's -- that's fine.
5  I just -- it just seemed like a natural stopping point
6  before you kind of, you know, jump into the next
7  topic area.  So if we could do ten minutes now, that
8  would be great.
9     MS. KITSON:  Okay.
10     THE VIDEOGRAPHER:  We are going off the
11  record at 10:08 a.m.
12     (Recess from 10:08 a.m. to 10:23 a.m.)
13     THE VIDEOGRAPHER:  We're going back on the
14  record at 10:23 a.m.
15     Q.  (By Ms. Kitson)  Ms. Brigham, do you
16  understand that you're still under oath?
17     A.  Yes.
18     Q.  I want to circle back -- before we dive in
19  on your conversations with the union, I want to circle
20  back to a couple of follow-up items from earlier this
21  morning.
22         The first one being, what is your attorney
23  fee arrangement, your contingency arrangement, with your
24  counsel?
25     MR. CRONE:  So, Danielle, I'm -- I'm going

Page 91

1  to lodge the same objection on the basis of
2  attorney-client privilege.  I -- I've reviewed the case
3  that you cited me to.  It doesn't stand for the
4  proposition you say it does.  In that case, the Court
5  protected the contents of the representation agreement,
6  because, while theoretically perhaps broadly discoverable
7  in that sense, the party had not put the document at
8  issue in any way.  In other words, it wasn't relevant to
9  any of the claims or defenses, and -- and the document,
10  of course, would have included certain information that
11  was absolutely privileged.  That's exactly what we're
12  dealing with here.
13         And --
14     MS. KITSON:  Okay.  Let me just make a
15  record then.
16     Q.  (By Ms. Kitson)  So, Ms. Brigham, you're
17  seeking attorney's fees in this case, correct?
18     A.  Correct.
19     Q.  And you're seeking an award of attorney's
20  fees, correct?
21     A.  Correct.
22     Q.  What is your attorney fee arrange with your
23  counsel?  You mentioned that it's a contingency basis.
24         What is the percentage --
25     MR. CRONE:  Objection.

Page 92

1     MS. KITSON:  And -- and, John, I'm making
2  a record.  So here's what I'm going to ask her.  You
3  instruct her not to answer.  And then I'll ask her if
4  she's going to adhere to the instruction.  And I'll have
5  a record.
6     MR. CRONE:  I -- I don't know exactly what
7  you're doing.  I -- you asked the question.  I'm
8  objecting.
9         Don't answer.
10     MS. KITSON:  Right.  That's what I'm
11  trying to get is a clear record.
12     Q.  (By Ms. Kitson)  Ms. Brigham, I'm asking
13  you, so the record is clear, what is the contingency fee
14  arrangement that you have with your counsel in terms of
15  the percentage that he will get if you were to win?
16     MR. CRONE:  Objection, attorney-client
17  privilege.
18         Don't answer.
19     Q.  (By Ms. Kitson)  Are you following your
20  counsel's instruction --
21     A.  Of course.
22     Q.  -- not to answer the question?
23     A.  Of course.
24     MS. KITSON:  Okay.  I am going to hold
25  this deposition open.  I am going to take this to the

Page 93

1  judge on a discovery dispute.  I believe that you're
2  wrong, Mr. Crone.  So we can talk offline about having
3  the discovery dispute hearing set up.
4         So --
5     MR. CRONE:  Yeah.  And let -- and let
6  me -- let me just -- let me complete the record on this,
7  Danielle, because maybe over the lunch we can resolve
8  this.
9         So the case that you cited to me says --
10  says exactly this, The privileged information in this
11  document -- that's referring to the engagement
12  agreement -- does not, however, contain information that,
13  through one of the parties' affirmative acts, that party
14  put the protected information at issue by making it
15  relevant to the case.  In other words, the privileged
16  information contained in the engagement letter does not
17  relate to the claims that the party intentionally
18  asserted against the other party and -- and another
19  party, for breach of fiduciary duty, and whatever --
20  the -- and the defense on statute of limitations.
21         So here, this is exactly -- exactly the
22  same issue.  The -- the -- the terms of the
23  representation, including the terms of the contingency
24  itself, are not relevant to any claims or defenses here.
25  And so that's --

24 (Pages 90 - 93)

Page 94

1      MS. KITSON: I --
2      MR. CRONE: -- my point. I just want to
3  make --
4      MS. KITSON: I don't -- I don't want to
5  take time debating it on the record. We can talk -- you
6  and I can talk about it over lunch.
7      MR. CRONE: Look, you made your record;
8  I'm making mine. Okay? And so to the extent that I'm
9  being helpful in resolving this, instead of holding the
10  deposition open, that's what I'm doing.
11      MS. KITSON: Okay.
12      MR. CRONE: Now, I'm done. Thank you.
13      Q. (By Ms. Kitson) Okay. Ms. Brigham, let's
14  circle back to the discussion we were having about open
15  time.
16      So, in general, what are the types of trips
17  that flight attendants would tend to drop? I mean, it
18  seems to me that they would be tending to drop overnights
19  and layovers.
20      I mean, doesn't most -- don't most flight
21  attendants want to come home at night?
22      A. No, that's actually -- most trips that are
23  on the TradeBoard are victory laps, which is the turn
24  that is after your whole, let's say, three- or four-day
25  trip. Most people want to be done when they first fly

Page 95

1  into Denver. They don't want to do Salt Lake City and
2  then back to Denver. There were so many turns on the
3  TradeBoard that people were trying to get rid of, so they
4  wouldn't have to fly.
5      Q. Did you ever look to see if you actually
6  could build a schedule of 60 hours with no overnights at
7  all?
8      A. I tried every month.
9      Q. And you were not able to do that, correct?
10      A. No. At the time, what they called the
11  reserve grid was always in the red, and you can't move
12  anything around or do anything when there's not enough
13  reserves to cover it.
14      Q. So why is it you think it would have helped
15  you to be able to build a schedule from scratch?
16      A. Because that's the -- the open time was
17  there. It was what was left over. There were multiple
18  turns. TradeBoard -- there were so many turns that I
19  could have picked up and built a schedule of just day
20  trips with no overnights easily.
21      Q. Right. But you weren't able to do that
22  under the regular bidding rules, right?
23      A. No. I needed an accomodation of a blank
24  schedule. The problem is I could not -- so you have to
25  go day for day. You can trade a four-day for a four-day.

Page 96

1  You can trade a three-day for a three-day. Unless the
2  reserve grid is in the green, you can get rid of that
3  whole trip and then pick up turns. But if the reserve
4  grid is in the red, you can't do almost anything besides
5  day for day.
6      Q. Yeah. I think maybe I'm not understanding
7  you. Because you're saying on the one hand that there
8  were just a ton of these turns, you know, plenty, a
9  plethora of turns, and those were the ones you wanted, but
10  that you still weren't able to make it work. That's where
11  I'm disconnecting.
12      A. Correct. So open time and TradeBoard
13  works differently. Open time is tied to the reserve
14  grid. If the reserve grid is in the red, it means they
15  don't have enough employees to cover what's in open time.
16  So, therefore, you can't do much with swapping out.
17      At the time, when -- the reason all this
18  was so bad is because we were short in Denver. Frontier
19  was shorthanded in Denver. They did not have enough
20  reserves to cover the trips.
21      Q. Okay. So --
22      A. It would have -- it would have taken
23  Frontier leaving me with nothing in order for me to do
24  what I wanted to do. I can't start with a schedule and
25  swap. I tried multiple times every month. It was just

Page 97

1  nearly impossible.
2      Q. Okay. Nearly impossible for you to pick up
3  enough of these turns that you wanted under the regular
4  Collective Bargaining Agreement rules, correct?
5      A. No. You're putting words in my mouth. To
6  swap. You can't swap a four-day for four turns in open
7  time, because they're not -- it's not set up the way
8  the -- the reserve grid is.
9      Q. And part of that is because you can't drop
10  below 45, right?
11      A. Correct.
12      Q. Okay.
13      A. And you couldn't -- at the time, you
14  couldn't drop anything at the time, because the reserve
15  grid has to be in the green. Green means go. If you
16  have a reserve grid that's green -- let's say I was
17  awarded 80 hours in four-day trips, and that reserve grid
18  was all in the green.
19      I could drop a four-day, get rid of it,
20  and then add turns in those days, and then that takes
21  care of that. The reserve grid is still in the green. I
22  could drop another four-day and pick up all turns. But
23  when the reserve grid is in the red, it doesn't let you
24  drop anything, and I would have had to drop everything or
25  drop the whole thing in order to add stuff.

25 (Pages 94 - 97)

Page 98

1    Q.  Okay.  I think I understand.
2         All right.  So let's talk about your
3    conversations with the union about the -- and I'm just
4    going to call it the "blank schedule accommodation."
5    A.  Okay.
6    Q.  And when I'm referring to the "blank
7    schedule accommodation," I'm referring to what we've been
8    talking about where you wanted to not bid and start from
9    scratch.
10        Are you with me?
11   A.  Yes.
12   Q.  Okay.  So when did you first talk about the
13   blank schedule accommodation with the union?
14   A.  It was sometime, I believe, in October
15   when I finally got the union involved in what was going
16   on with Frontier.
17   Q.  Okay.  October 2015?
18   A.  Yes, somewhere around there.  It may have
19   been before.  I don't remember.
20   Q.  Who with the union did you speak to about
21   the blank schedule accommodation?
22   A.  Adrienne Prince, and I believe Kim --
23   Kim Mayne-Sasser or Sayser (sic) or something.
24   Q.  Anyone else from the union?
25   A.  Not that I can think of right now.

Page 99

1    Q.  Okay.  On how many occasions did you
2    discuss the blank schedule accommodation with
3    Adrienne Prince?
4    A.  Multiple times.
5    Q.  About how many?
6    A.  I would say at least three or four times
7    throughout talking, and then we talked about it more
8    during that final investigatory or termination meeting.
9    Q.  What did you discuss with Ms. Prince with
10   respect to the blank schedule accommodation?
11   A.  I explained to her the accommodation that
12   I was seeking, and I told her that Jerry Arellano said
13   that it would violate the CBA.  And she took that back to
14   whoever she took it to and then came and told me that it
15   would not violate the union contract.
16   Q.  You don't know who she took it back to at
17   the union?
18   A.  My guess would be Angie Reef Piller (sic),
19   and I know that the attorney was involved at some point.
20   Q.  But you don't know that for sure?
21   A.  That's from what -- my conversations were
22   mostly with Adrienne.
23   Q.  Okay.  And you don't know for sure who
24   Adrienne spoke with about the blank schedule
25   accommodation?

Page 100

1    A.  I know Angie Reef Piller was involved, and
2    Kim --
3    Q.  How do you know that?
4    A.  From Adrienne.
5    Q.  Any other reason you would know that?
6    A.  She was our union president, so she was
7    involved in most stuff.
8    Q.  So that's an assumption?
9    A.  From what Adrienne had told me, Angie Reef
10   Piller was involved.
11   Q.  Yeah.
12        What were the exact words that Ms. Prince
13   used?  Because earlier when you were testifying, you
14   phrased it as it was a violation of the Collective
15   Bargaining Agreement, but the union had granted you an
16   exception.
17        Do you remember that?
18   A.  No.
19   Q.  Okay.  Did Ms. Prince say to you that the
20   union was making an exception?
21   A.  No.  She said it would not violate.
22   Q.  Okay.  Tell me exactly the words she used.
23   A.  I can't tell you exactly.  Those
24   conversations were not recorded.  That happened five
25   years ago.  From my memory as it is today, she told me

Page 101

1    that it would not violate the seniority provision in the
2    CBA.  And she even stated it in that last meeting, and
3    that is recorded.
4    Q.  Anything else you remember about her exact
5    words?
6    A.  Not that I can think of.
7    Q.  She testified in a deposition recently.
8         Were you aware of that?
9    A.  Yes.
10   Q.  And if she said, I -- I didn't see this as
11   something that was permitted by the Collective Bargaining
12   Agreement, would you disagree with her?
13   A.  Absolutely.
14   Q.  Okay.  And do you believe she's lying then?
15   A.  Maybe she is misinformed, or maybe she was
16   led down the wrong path and had a crappy attorney on her
17   side.
18   Q.  So if Adrienne Prince testified that what
19   you wanted to do was a violation of the Collective
20   Bargaining Agreement, you believe that she was either
21   lying or misinformed?
22   A.  Yes.
23        MR. CRONE:  Hold on.  Also object.  It
24   mischaracterizes Plaintiff's prior testimony.
25   Q.  (By Ms. Kitson)  Is there anything else

26 (Pages 98 - 101)

Page 102

1  that Ms. Prince told you about the blank schedule
2  accommodation?
3      A.  Not that I recall.
4      Q.  How many times did you discuss this blank
5  schedule accommodation with Kim Sasser?
6      A.  I believe -- and I don't remember if it
7  was the blank -- I remember communicating with Kim about
8  something, and I can't remember if it was this blank
9  schedule accommodation.  I know it was probably
10  mentioned, because that was part of the accommodation
11  that I was asking.
12      Q.  You have no specific recollection, though,
13  of discussing that with her?
14      A.  No specific.  I remember seeing an email
15  at one point, but I don't have any of that in front of me
16  to tell you accurately.
17      Q.  Do you remember anything specifically that
18  you discussed with Kim Sasser?
19      A.  Not to be able to tell you accurately.
20      Q.  What other accommodations, if any, did you
21  discuss with the union representative?
22      A.  Working at the GO.
23      Q.  And what did they say about that?
24      A.  I honestly don't remember.  I know it was
25  part of the argument between Frontier and the union,

Page 103

1  especially during my grievance.
2      Q.  All right.  Did you ever speak to the union
3  about removing overnights?
4      A.  I don't recall.  I'm assuming it was
5  talked about.
6      Q.  But you don't have a specific recollection?
7      A.  No.
8      Q.  Now, ultimately, the union did not proceed
9  to arbitration on your grievance, correct?
10      A.  Correct.
11      Q.  They dropped it, correct?
12      A.  Correct.  But it was because they had
13  exhausted -- supposedly it was because they had gone to
14  the end of the line.  It's not like -- they basically
15  just dismissed it, so that I could go on about my stuff
16  that I was going to do for it.  They didn't dismiss it
17  because there wasn't a claim.
18      Q.  Well, they could have taken it to
19  arbitration, correct?
20      A.  I don't know.
21      Q.  I was not privy to any of that stuff after
22  termination.
23      A.  I know that Frontier's attorney and the
24  union attorney spoke.  I don't -- I don't remember the
25  outcome of any of that, really.  It's all --

Page 104

1      Q.  So, you don't know why -- you don't know
2  why they dropped it then, correct?  You're just agreeing?
3      A.  Correct.
4      Q.  The accomodation of removing overnights,
5  tell me about that.  So you would have bid, you would have
6  received a line.  You would have gone through the whole
7  drop/swap/trade process.
8          And then at the end of that, you would have
9  been requesting that these overnights just be removed from
10  your schedule?
11      A.  Yeah, just take them off, put them in open
12  time for another flight attendant to pick up if they
13  wanted or have a reserve fly them.  So if they were to
14  just remove them, then I would have nothing on my
15  schedule for that time, and I could pick up turns.
16          But you can't pick anything up when you
17  call in FMLA or even sick.  You can't add anything.  It
18  blocks your schedule.  So I was asking them to just
19  remove those overnights, which they had done a few times
20  in the past, and then I can add turns.
21      Q.  And that's something you would have done
22  after you were already flying during the month after you
23  bid?
24      A.  What do you mean?
25      Q.  Well, I'm confused about when that would

Page 105

1  happen.
2          So you would bid a line, correct?
3      A.  Right.
4      Q.  You would be given a line, correct?
5      A.  Uh-huh.
6      Q.  You could drop/swap and trade, but you
7  couldn't drop below 45 hours, correct?
8      A.  I would do what I could, and then before
9  that month of flying starts, I would request that any
10  overnights that I wasn't able to get rid of, they just
11  take them away.  And then that leaves me those days
12  when -- let's say I would have had a four-day, Danielle.
13          Okay.  So if they remove those three
14  overnights, that opens up two days in my schedule where
15  there would be nothing on it.  Therefore, I could go into
16  open time and TradeBoard, where there's a plethora of
17  turns and just add something.
18      Q.  But that's not something that you can do
19  under the regular process, correct?
20      A.  Correct.
21      Q.  So --
22      A.  Unless -- well, hold on.  Unless the
23  reserve grid was in the green.  If the reserve grid was
24  in the green, you can just dump whatever you want as long
25  as you don't go below what I remember as 60 hours.

27 (Pages 102 - 105)

Page 106

1      Q.   So the accommodation you were -- were
2   requesting, then, was to be able to do this when the
3   reserve was in the red, correct?
4      A.   Correct.  If --
5      Q.   Because otherwise, you could have done it,
6   right?
7      A.   Correct.  For them to just be able to
8   remove them, put them in open time, and those would be
9   covered by either other flight attendants with a line or
10  a reserve.
11     Q.   So --
12     A.   Because I would be freeing up -- so I
13  would be freeing up whatever turns are in there, so it's
14  not like they would have to hire a whole new flight
15  attendant.  I would still be flying something that a
16  reserve would be flying.  It just did not let me do it.
17     Q.   So the rule is that if reserve was red, you
18  couldn't do this, correct?
19     A.   Correct.
20     Q.   And you were asking for an exception to
21  that rule, correct?
22     A.   An accommodation, yes.
23     Q.   An exception, correct?
24     A.   Accommodation, I would call it.
25     Q.   Well, I mean, that's the rule, and you're

Page 107

1   asking to be --
2      A.   Danielle, I was asking that for a specific
3   accommodation.
4      Q.   But that's an exception that other people
5   did not get, correct?
6      A.   Correct.  It would be an accommodation.
7      Q.   How many times were you given this
8   exception?
9      A.   What exception?
10     MR. CRONE:  Hold on.  Objection to the
11  question.  Mischaracterizes the witness' prior testimony.
12     Q.   (By Ms. Kitson)  You mentioned in your
13  earlier testimony that, on a few occasions, Frontier had
14  allowed you to remove overnights?
15     A.   Yes.
16     Q.   And that was back when the reserve was in
17  the red, correct?
18     A.   Correct.
19     Q.   On how many occasions did Frontier do that?
20     A.   I think it was one or two times that they
21  had just removed the overnights.  And I don't remember
22  any specifics around that.  I know it -- I think at one
23  point I had talked to Cassandra Micklich, and she -- I
24  was very upset because a turn was removed from my
25  schedule and nobody knew why.  And I was upset.  And then

Page 108

1   at one point, she had removed an overnight that I was
2   supposed to fly.  I -- I don't know how she did it, but
3   she made it go away.
4      Q.   And I believe you said that you were told
5   they could do it on that occasion, but they can't be doing
6   it regularly.
7      Do I have that correct?
8      A.   Correct.
9      Q.   Okay.  And are you aware of any other
10  flight attendants who were allowed to do this, to drop
11  trips when the reserve is in the red?
12     A.   Not that I'm aware of.
13     Q.   Throughout the process that we've been
14  discussing of your discussions with Frontier about
15  possible accommodations, you spoke with Frontier
16  representatives on a number of occasions about the
17  possible accommodations, correct?
18     A.   Correct.
19     Q.   At any point, did they stop talking to you
20  about this?
21     A.   Yes.  I had emailed the director of
22  Inflight, Laura Rush -- oh, hold on.
23     Hold on, kids.
24     I had emailed Laura Rush, and she said, At
25  this point, I am going to direct you to Shelly Leyner for

Page 109

1   a leave of absence.  So basically saying that she could
2   not do anything, and -- yeah.
3      Q.   So you continued a process of discussing
4   these schedule accommodations with Frontier, correct?
5      A.   Correct.
6      Q.   I want to take a look at a document here.
7   Let me find it.  It will be --
8      A.   Danielle, hold on just a second.
9      Q.   Oh, sure.  Yeah.  Go ahead.
10     THE VIDEOGRAPHER:  Do you want me go off
11  the record?
12     MS. KITSON:  Yeah.  Let's go off the
13  record.
14     THE VIDEOGRAPHER:  We're going off the
15  record at 10:47 a.m.
16     (Recess from 10:47 a.m. to 10:49 a.m.)
17     THE VIDEOGRAPHER:  We're going back on the
18  record at 10:49 a.m.
19     Q.   (By Ms. Kitson)  Ms. Brigham, do you
20  understand that you're still under oath?
21     A.   Yes.
22     Q.   In this case, I believe that you're
23  contending -- strike that.
24     Are you contending in this case that
25  Frontier failed to engage in an interactive process with

28 (Pages 106 - 109)

Page 110

1  you; in other words, an interactive dialog about what
2  accommodations might be available to you?
3      A.  Yes.
4      Q.  Okay.  And on what do you base that claim?
5      A.  They never came up with any suggestions of
6  stuff that I could do that would be reasonable for me to
7  be able to keep flying like I needed to and to be able to
8  make hours.
9      Q.  Is there any other basis on which you're
10  basing your claim that Frontier failed to engage in an
11  interactive dialog?
12      A.  Other than they didn't come up with
13  anything that would have helped me.
14      Q.  We talked earlier about various potential
15  accommodations that you did discuss with them, correct?
16      A.  Correct, but none of those would have
17  worked for me.
18      Q.  Okay.  And for the reasons that we've
19  discussed, correct?
20      A.  Correct.
21      Q.  But they never refused to at least talk to
22  you about it, correct?
23      A.  Oh, right, they always talked about it.
24      Q.  And at the end of the day, you just
25  disagreed about what was reasonable and what wasn't,

Page 111

1  correct?
2      A.  What do you mean by "disagree"?
3      Q.  Well, you would put something forward or
4  they would put something forward.  And, you know, what
5  they offered, you didn't believe was reasonable; and what
6  you offered, they didn't believe was reasonable.
7      Does that make sense?
8      A.  It does.
9      Q.  Okay.  So you discussed possible
10  accommodations, but you just disagreed with one another
11  about what would be a reasonable accommodation, correct?
12      A.  If you put it that way, then yes.
13      Q.  At any point, did anyone refuse to talk to
14  you?
15      A.  Not that I can remember.
16      Q.  Okay.  I'm --
17      A.  I think it was a Laura Rush thing.
18      Q.  And the Laura Rush thing, I mean, she
19  basically directed you to someone else within the company,
20  correct?
21      A.  Right.  Right.  But as the director of
22  Inflight, I mean, I personally think that she should have
23  at least -- to see what was going on, I feel like if
24  Laura Rush had gotten involved, maybe something would
25  have been different.

Page 112

1      Q.  But she didn't refuse the company speaking
2  to you further; she just said, I'm going to need to direct
3  you to Shelly Leyner, correct?
4      A.  Correct.
5      Q.  And did you actually talk to Shelly Leyner?
6      A.  She was copied on that email.  I talked to
7  Shelly multiple times.
8      Q.  So no one prevented you from talking to her
9  or to Mr. Arellano, et cetera?
10      A.  No.
11      Q.  Okay.  I'm going to show you Brigham
12  Exhibit 20.  So Brigham Exhibit 20 is a document bearing a
13  Bates stamp FRONTIERAIRLINES(R.BRIGHAM)- 1766.
14      Do you see that?
15      A.  Yes.
16      Q.  Do you recognize this document?
17      A.  I do.
18      Q.  What is it?
19      A.  I had turned this in at my investigatory
20  meeting.
21      Q.  Your investigatory meeting was on or about
22  November 3rd of 2015; is that right?
23      A.  Correct.
24      Q.  And did you bring this into the meeting?
25      A.  I did.

Page 113

1      Q.  Okay.  And is this the last accommodation
2  request that you made?
3      A.  I believe so.
4      Q.  Okay.  And you say, Ideas, just remove me
5  from the overnights, have me build my own schedule out of
6  open time and TradeBoard.
7      Do you see that?
8      A.  Yes.
9      Q.  Are those the accommodations that we've
10  been talking about?
11      A.  Except not the one where I would go work
12  at the general office.  They had told me that that was
13  impossible because that was just for people that got back
14  from OJI.
15      Q.  Okay.  So other than that, this was the
16  final accommodation request that you made, if you will; is
17  that correct?
18      A.  Correct.
19      Q.  And what happened with this request?
20      A.  I retired.
21      Q.  So Frontier denies this request; is that
22  correct?
23      A.  Yes.  They wrongfully terminated me, I
24  would say.
25      Q.  Are you bringing any claim in this case

29 (Pages 110 - 113)

Page 114

1 under the FMLA?
2     A.  What do you mean?
3     Q.  You have not asserted a legal claim based
4 on the FMLA, correct?
5     A.  You're going to have to explain further.
6 I don't know what you mean.
7     Q.  You brought claims under the Americans with
8 Disabilities Act, correct?
9     A.  Correct, correct.
10     Q.  But you're not claiming a violation of the
11 Family Medical Leave Act, FMLA, correct?
12     A.  I think I shouldn't have had to have been
13 using it.
14     Q.  But it wasn't -- the law wasn't violated,
15 correct?
16     A.  Not that I'm aware of.
17     Q.  All right.  I'm going to show you what has
18 been marked as Exhibit 37.  Brigham Exhibit 37 is an email
19 to you from Leave of Absence Frontier Employees, dated
20 January 22, 2014.
21         Do you see that?
22     MR. CRONE:  Danielle, I'm trying to --
23 sorry to cut in.
24         I -- I can't find Exhibit 37 in what you
25 sent me.  I think that was part of that original part 4

Page 115

1 that never came through.  Is there any way you could just
2 email that to me?
3     MS. KITSON:  You bet.  Let me just send it
4 off now.
5     MR. CRONE:  Thank you.
6     MS. KITSON:  Hold on.  I have to stop
7 sharing to do this.  I've got multiple screens going on
8 here.  Hold on a second.
9     MR. CRONE:  That -- that's fine.  Thanks.
10     MS. KITSON:  All right.  It should be
11 coming your way now.
12     Q.  (By Ms. Kitson)  Ms. Brigam, are you still
13 seeing the document?
14     A.  I am.
15     Q.  Okay.
16     MS. KITSON:  John, do you want to let me
17 know when it comes through?
18     MR. CRONE:  Yeah, I will.
19     MS. KITSON:  That's all right.
20     MR. CRONE:  If you want -- if you want to
21 go ahead, I'll let you know if I don't get it.
22     MS. KITSON:  Okay.  Great.  And I mean,
23 you can see my screen, right?
24     MR. CRONE:  Yes, yes.
25     MS. KITSON:  Okay.  Good.

Page 116

1     Q.  (By Ms. Kitson)  Ms. Brigham, is this a
2 true and correct copy of an email that you received from
3 Frontier's Leave of Absence Department on January 22nd,
4 2014?
5     A.  I mean, I don't remember this specific
6 document, but, yeah.
7     Q.  Okay.  And it's got an attachment here, DOL
8 Employee Guide New and FMLA attachment.
9         Do you see that?
10     A.  Yes.
11     Q.  Let me scroll up.  And this is in response
12 to an email that you sent the Leave of Absence Department
13 on January 22nd, 2014, where you say, My name is
14 Rebecca Brigham, number 413206, and am requesting
15 intermittent FMLA paperwork.
16         Do you see that?
17     A.  Yes.
18     Q.  Do you recall requesting FMLA paperwork in
19 January 2014?
20     A.  Yes.
21     Q.  Okay.  And the company provided it to you,
22 correct?
23     A.  Correct.
24     Q.  Okay.  And did you review this information
25 in the employee guide to the Family Medical Leave Act?

Page 117

1     A.  Probably not.
2     Q.  Were you generally familiar with FMLA
3 guidelines and how the company employed them?
4     A.  Generally, yes.
5     Q.  Okay.  I just wanted to point you to
6 one -- we are on page 10 of the PDF, which it is
7 BRIGHAM -- or FRONTIERAIRLINES(R.BRIGHAM)- 1458.
8         Are you with me?
9     A.  Yes.
10     Q.  And it says, How do I request FMLA leave?
11 To take FMLA leave, you must provide your employer with
12 appropriate notice.
13         Do you see that?
14     A.  Yes.
15     Q.  Were you aware of that rule?
16     A.  Yes.
17     Q.  And then I wanted to show you down here
18 (indicating), the third yellow highlight.  It says, You
19 must follow.
20         Do you see that?
21     A.  Uh-huh.
22     Q.  It states, You must follow your employer's
23 usual notice or call-in procedures unless you are unable
24 to do so, for example, if you are receiving emergency
25 medical care.

30 (Pages 114 - 117)

Page 118

1          Do you see that?
2      A.   Yes.
3      Q.   And were you aware that that was a
4  requirement under the FMLA?
5      A.   Yes.
6      Q.   Okay.  We can set that aside.
7          I'm going to open what has been marked as
8  Exhibit 23.  It's such a crazy world like sharing and
9  using exhibits.
10         Okay.  Are you seeing a document, Brigham
11 Exhibit 23, which is a Frontier Airlines job description?
12     A.   Yes.
13     Q.   Okay.  And just for the record, this is
14 FRONTIERAIRLINES(R.BRIGHAM)- 93.
15         Are you with me?
16     A.   Yep.
17     Q.   Do you recognize this document?
18     A.   The job description, yes.
19     Q.   And is it familiar to you, the flight
20 attendant for Frontier Airlines?
21     A.   Yes.
22     Q.   And Section 2 is Essential functions.  And
23 then there are a list of bullet points.
24         Do you see that?
25     A.   Yep.

Page 119

1      Q.   And the first one is, Follow all aviation
2  regulations as required, as well as established
3  Frontier Airlines policies and procedures.
4          Do you see that?
5      A.   Yes.
6      Q.   Was that an essential function?
7      A.   Yes.
8      Q.   It says, Initializes and conducts emergency
9  evacuations of cabin, if necessary.
10         Was that an essential function?
11     A.   Yes.
12     Q.   Were all of these on this list an essential
13 function, in your view, of the job?
14     A.   Yes.
15     Q.   And just to confirm, your alcoholism did
16 not impede you from performing these essential functions
17 of the job, correct?
18     A.   Correct.
19     Q.   Okay.  I'm going to open another document.
20 It will be Brigham Exhibit 41.  Brigham Exhibit 41 is a
21 document entitled, Comanche Crossing Counseling, LLC.  And
22 the Bates stamp is BrighamR_PlaintiffRecords 1029.
23         Do you see that?
24     A.   Yes.
25     Q.   Okay.  And do you recognize this document?

Page 120

1      A.   Yes.
2      Q.   What is it?
3      A.   It's the intake sheet for seeing my
4  counselor after I got back from treatment.
5      Q.   So --
6      A.   Or nope, this is before I went to
7  treatment.
8      Q.   Who was your counselor?
9      A.   Her name is Marla Madrid.
10     Q.   How long have you been seeing Ms. Madrid?
11     A.   Since probably around this date.
12     Q.   So this would have been your initial
13 contact with her, roughly?
14     A.   I believe so, yeah.
15     Q.   And do you continue to see her today?
16     A.   No.  I'm in Michigan.  So there's not
17 really a way for me to see her.
18     Q.   And I ask you that because I'm actually
19 still seeing my doctors via Telehealth Zoom.  So I didn't
20 know if that was something you were doing.
21     A.   I actually did ask her, and because we're
22 in Michigan and her license is for Colorado, she can't
23 see me.
24     Q.   I see.  Are you seeing anyone else in
25 Michigan?

Page 121

1      A.   No.
2      Q.   Okay.
3      A.   We currently don't have healthcare, and we
4  can't -- with COVID going on, we can't afford to see
5  anybody right now.
6      Q.   Are you seeing any doctor for any medical
7  care, including a primary care physician?
8      A.   I mean, I have a primary care physician.
9  I haven't had to go for like nine months.
10     Q.   And who is your primary care physician?
11     A.   Her name is Tara Taylor.  She's actually
12 the PA, and I believe the doctor that's at that office is
13 Rachel Young.
14         THE REPORTER:  I'm sorry.  Last name again
15 of the doctor?
16         THE DEPONENT:  Rachel Young.
17     Q.   (By Ms. Kitson)  Any other doctors that you
18 are seeing or have seen recently?
19     A.   Nope.
20     Q.   And are you going to A.A. meetings?  What
21 are you doing to manage your alcoholism today?
22     A.   Continuing to do A.A. meetings.  However,
23 it's not as frequent as it was in the beginning.  I also
24 have an online support group called She Recovers, and I'm
25 on their Facebook page, where we discuss what we're

31 (Pages 118 - 121)

Page 122

1  dealing with as it relates to alcoholism.
2      Q.   At the bottom of Brigham Exhibit 41, it
3  says, Reason for appointment, deal with triggers of
4  alcohol.
5          Do you see that?
6      A.   Yep.
7      Q.   Did you discuss those triggers with
8  Ms. Madrid?
9      A.   Yes.
10     Q.   In the Frontier world of your job duties as
11 a flight attendant, you were not triggered by serving
12 drinks on the airplane; is that correct?
13     A.   Correct.
14     Q.   And you, in your daily life, were not
15 triggered by going to a liquor store or driving by a
16 liquor store; is that correct?
17     A.   Correct.  I mean, at the time before I had
18 been to treatment, for sure, it was hard for me to pass a
19 liquor store and not go in.  Yeah.
20     Q.   Let's talk about your job at Frontier.
21         In terms of your job, what were the
22 triggers?
23     A.   What do you mean?
24     Q.   You had mentioned earlier that being at a
25 hotel on an overnight was a trigger; is that correct?

Page 123

1      A.   After treatment, yes.  It was -- and it's
2  not really even -- well, I guess you could call it a
3  trigger.  It was sort of -- when I went through
4  treatment, they teach us how to deal with these types of
5  things.  And in the beginning, usually they say, For the
6  first year, don't make any major changes to your life.
7          So don't, like, go home and get a divorce.
8  Don't go home and quit your job.  Don't -- keep
9  everything relatively normal, but start changing your
10 playground.  Don't associate with the people that you
11 used to drink with, if that's a trigger for you.  Stuff
12 like that.
13         And one area that I -- at the treatment
14 center, we discovered that one of those areas that I
15 should try to avoid is overnight trips.
16     Q.   Were there any other triggers while you
17 were on the job or related to your job?
18     A.   Basically dealing with Frontier was a huge
19 trigger.  Every time they removed trips from my
20 schedule -- I mean, at one point, it felt like Frontier
21 was just trying to get rid of me, just almost trying to
22 torture me.
23         They just would not listen.  They would
24 not -- it felt like nobody understood that this, to me,
25 is life and death.  Like, I have to do these certain

Page 124

1  thing if I want to remain sober and change my life.
2      Q.   So overnight trips is a trigger, correct?
3      A.   Correct.
4      Q.   Dealing with Frontier, kind of the stress
5  of that, was a trigger, correct?
6      A.   It was.  And would --
7      Q.   Any other --
8      A.   Oh, go ahead.
9      Q.   Any other triggers, job-related triggers,
10 or while you were on the job?
11     A.   Not that I can think of.
12     Q.   From the date that you went into rehab,
13 that September 5th, 2014 date --
14     A.   It was September 7th.
15     Q.   Oh, September 7th.  Sorry about that.
16         From the date you went into rehab on
17 September 7th of 2014, after that, did you take any
18 overnight trips with Frontier?
19     A.   Not that I recall.
20     Q.   Okay.  So every time you had an overnight
21 trip that you could not drop through collective bargaining
22 bidding, you called out for that trip; is that correct?
23     A.   Yes.  And Frontier told me to use
24 intermittent FMLA for that.
25     Q.   So you never tried it to see if it would be

Page 125

1  an actual trigger?
2      A.   No.  That's like playing Russian roulette.
3      Q.   Okay.  I'm looking back at this Brigham
4  Exhibit 41.  And this is a second page of the document,
5  Comanche Crossing Counseling, Diagnostic Intake Summary.
6          Do you see that?
7      A.   Yes.
8      Q.   Have you reviewed this document before?
9      A.   I don't think so.
10     Q.   Looking at it, does it appear to be a
11 summary of your conversation with Ms. Madrid -- or
12 Dr. Madrid on June 13th, 2014?
13     A.   Yes.
14     Q.   Do you remember discussing these topics
15 with her?
16     A.   And will you scroll down, Danielle.
17     Q.   You bet.  And you can read the whole
18 document.  Just tell me when you want me to scroll.
19     A.   Okay.
20     Q.   The yellow highlighting is what I'm going
21 to ask you about.
22     A.   Okay.  Okay.
23     Q.   Okay.  You want to keep reading here?
24     A.   Yeah, I would like to, if that's okay.
25     Q.   Yeah.  No, you're fine.

32 (Pages 122 - 125)

Page 126

1    A.  All right.  Will you scroll, Danielle.
2    Q.  Mm-hmm.
3    A.  Okay.  Okay.
4    Q.  This is the end of it.
5    A.  Okay.
6    Q.  Let me know when you're done.
7    A.  Okay.
8    Q.  The question I have is really with respect
9  to this second page of the Diagnostic Intake Summary.
10  Ms. Madrid or Dr. Madrid is -- states, Rebecca is
11  currently struggling with admitting to being an alcoholic.
12  At this time, she is ready to take a path to recovery.
13       Do you see that?
14    A.  Yes.
15    Q.  Do you remember discussing that with
16  Dr. Madrid?
17    A.  Yes.
18    Q.  She goes on to say, Rebecca and husband
19  have been in couple's treatment prior.
20       Do you see that?
21    A.  Yes.
22    Q.  Was that true?
23    A.  Yes.
24    Q.  Why were you --
25    A.  We were in marriage counseling before,

Page 127

1  after the loss of our daughter.
2    Q.  And why were you in couple's treatment?
3    A.  Because of the loss of our daughter is
4  what started it, and my alcoholism.
5    Q.  Okay.  She goes on to say, Rebecca
6  currently uses alcohol in private.  She stated she has
7  been drinking since the age of 14.  She noted that her
8  parents are functioning alcoholics.  Her mother has
9  anywhere from 2 to 5 glasses of wine at night on average.
10  Her father has 10 beers.  Rebecca currently drinks alone.
11  She noted that her husband smokes pot.
12       Do you see that?
13    A.  Yes.
14    Q.  Is all of that accurate?
15    A.  Yes.
16    Q.  Okay.  Under Treatment Requested and
17  Rationale For Request, it states, Rebecca is currently
18  utilizing her employee assistance program benefits.  She
19  would like to work on sobriety in a therapeutic setting.
20  She would like to get at the root of the triggers, which
21  currently she believes are fighting and stressors with
22  husband.
23       Do you see that?
24    A.  Yes.
25    Q.  Is that an accurate statement at the time?

Page 128

1    A.  Yes.
2    Q.  Is there a reason that you didn't mention
3  to Dr. Madrid this issue of overnights being a trigger?
4    A.  Because we didn't realize -- or I didn't
5  realize at the time that -- because I hadn't done
6  treatment yet.  This was before, when I thought I could
7  get sober on my own.
8       And after I got to treatment is when they
9  said, Change your playground.  These are the areas where
10  you're going to want to avoid, you know, anywhere that
11  you're used to being around people drinking, in the
12  beginning.
13    Q.  Okay.  But at least as of June 13th, 2014,
14  that's not something that you had recognized as a trigger?
15    A.  No.
16    Q.  We're done with that one.
17       I have a follow-up question for you about
18  the union.  Typically, the union would send out a closeout
19  letter?
20    A.  What?
21    Q.  A closeout letter.
22    A.  Okay.
23    Q.  Did you receive any kind of closeout letter
24  from the union saying that they were done with your
25  grievance?

Page 129

1    A.  Not that I can recall.
2    Q.  Okay.  Have you turned over to your counsel
3  all correspondence that you had with the union?
4    A.  Yes.
5    Q.  And is there any place that you might have
6  additional correspondence that you haven't looked?
7    A.  Not that I can think of.
8       MS. KITSON:  I actually think we could go
9  off the record for lunch, if that works for everybody.  I
10  know you're on a later time zone, Ms. Brigham, and I'm
11  kind of an early eater.
12       So does that work, John, or do you want
13  to --
14       MR. CRONE:  Yeah.  Yeah, that -- that
15  works great.
16       MS. KITSON:  Okay.  Let's go off the
17  record for lunch.
18       THE VIDEOGRAPHER:  We're going off the
19  record at 11:37 a.m.
20       (Recess from 11:17 a.m. to 12:20 p.m.)
21       THE VIDEOGRAPHER:  We're going back on the
22  record at 12:20 p.m.
23    Q.  (By Ms. Kitson)  Ms. Brigham, do you
24  understand you're still under oath?
25    A.  Yes.

33 (Pages 126 - 129)

Page 130

1      Q.  I wanted to show you a series of documents,
2  and starting with the Collective Bargaining Agreement
3  again.  This is going to be Brigham Exhibit 1.  One second
4  while I get that up in front of you.
5          Are you seeing the Collective Bargaining
6  Agreement?
7      A.  Yes.
8      Q.  I want to show you just one provision of
9  this that I'm hoping will refresh your recollection about
10  what happens to your seniority if you transfer within the
11  company.  So this is going to be PDF page 102, which is
12  FRONTIERAIRLINES(R.BRIGHAM)- 916.
13          Are you with me?
14      A.  Yes.
15      Q.  Okay.  And I just wanted to show you this
16  to refresh your recollection.  It states, number 4, If a
17  flight attendant is permitted by the company to transfer
18  to a position outside the flight attendant craft or class
19  on account of physical incapacity, illness or injury,
20  he/she will retain and accrue seniority for a period not
21  to exceed two years of continuous service in such
22  position, after which the flight attendant will be removed
23  from the seniority list.  A period of service will be
24  deemed continuous service until it is broken by a transfer
25  back to the position of flight attendant.

Page 131

1          Do you see that?
2      A.  I do, but that's not what I was told by
3  the company.
4      Q.  Do you have any reason to -- strike that.
5          Did you have the Collective Bargaining
6  Agreement available to you when you were a flight
7  attendant with Frontier?
8      A.  I think I could have gotten it somewhere
9  online.
10      Q.  Yeah.
11      A.  But it's not something like they hand it
12  out to us.
13      Q.  And who specifically told you something
14  contrary to this?
15      A.  I believe it was Jeff Varney told me that
16  after 90 days, you lose your seniority or your ability to
17  go back to Inflight at your seniority.
18          And, I mean, I'm not an attorney.  I --
19  that's why I hired an attorney to understand some of
20  these things.  But if this is the case, then Frontier
21  would have been admitting that I was ill or had an
22  injury, which they said I didn't.  Because if I had an
23  injury, then I should have been able to work at the GO.
24      Q.  And I believe, Ms. Brigham, that every
25  flight attendant was given a hard copy of the Collective

Page 132

1  Bargaining Agreement; isn't that right?
2      A.  No.  I never got a hard copy.
3      Q.  Who's Jeff Varney?
4      A.  He was an Inflight supervisor.
5      Q.  And is that spelled with a V, as in Victor?
6      A.  Yes.
7      Q.  And is it possible that he could have been
8  mistaken about what the terms of the Collective Bargaining
9  Agreement say?
10      A.  Of course.
11      Q.  Do you have any reason to believe that this
12  policy that we're looking at under the Collective
13  Bargaining Agreement on PDF page 102 of the document is
14  incorrect?
15      A.  I have no reason to believe that, but why
16  didn't they tell me this when they were talking about
17  transferring?  The reason I told them I did not want to
18  transfer was because of the 90 day.  If they knew this
19  existed they should have told me.
20      Q.  Are you aware of anyone who lost their
21  seniority after 90 days?
22      A.  No, but I've heard about flight attendants
23  who go -- who have been injured or anything like that,
24  and they're not allowed to come back to Inflight after a
25  certain amount of time.

Page 133

1      Q.  Who specifically are you referring to?
2      A.  I couldn't even tell you.
3      Q.  And you don't know what that period of time
4  was?
5      A.  I want to say it was the 90 days.
6      Q.  But you don't know of anyone specific,
7  correct?
8      A.  Correct.
9      Q.  And was this just kind of a rumor you
10  heard?
11      A.  Yeah, flight attendants talking.
12      Q.  Okay.  Did anyone else at Frontier ever
13  indicate to you that you lost seniority after 90 days?
14      A.  Not that I can think of right now, but I
15  know I heard it a few different times.
16      Q.  But all rumors, correct?
17      A.  Rumors, or came from a direct supervisor.
18      Q.  And that's the reference you're making to
19  Mr. Varney?
20      A.  Yes.
21      Q.  And is it only on one occasion that he
22  mentioned that?
23      A.  That I have memory of.
24      Q.  Yeah.  And when was this approximately?
25      A.  I want to say it was at one of our

34 (Pages 130 - 133)

Page 134

```
1  meetings.
2      Q.  Was anyone else present?
3      A.  Maybe Kari Thompson.
4      Q.  And when you say "our meetings," what are
5  you referring to?
6      A.  When I would have to go to the general
7  office to try and ask for reasonable accommodations, ask
8  for ways to get this to work out, so that I could
9  continue to do my job.
10     Q.  I'm going to show you a different document.
11 This will be Brigham Exhibit 17.
12         Do you recognize Exhibit 17?  And I'll
13 scroll down, so you probably see.
14         Do you see in the right-hand corner, it
15 says, From The Discovery House?
16     A.  Yes.
17     Q.  And it's dated September 12th, 2014?
18     A.  Yes.
19     Q.  And it's entitled, Certification of
20 Healthcare Provider for Employee's Serious Health
21 Condition.
22         Do you see that?
23     A.  Yes.
24     Q.  And it says, Family Medical Leave Act.
25         Do you see that?
```

Page 135

```
1      A  Yes
2      Q  Do you recognize this document?
3      A  It would be the FMLA paperwork
4      Q  Is this your handwriting on the first
5  page of the document?
6      A  It is
7      Q  I'll scroll down here  I'll also note that
8  the document begins with FRONTIERAIRLINES(R BRIGHAM)- 1118
9  just for the record  And I wanted to just walk through
10 this with you  It says, Approximate date condition
11 commenced, 9/7/14
12         Do you see that?
13     A  Yep
14     Q  And that is the date that you were checked
15 into rehab  is that right?
16     A  Correct
17     Q  And it says, Probable duration of
18 condition, 30 to 90 days
19         Do you see that?
20     A  Yes
21     Q  And I believe you said you were in rehab
22 for 60
23         Is that right?
24     A  Correct
25     Q  Okay  And it says, Dates you treated the
```

Page 136

```
1  patient for condition, September 8th, 2014.
2          Do you see that?
3      A.  Let me move my people screen.  Hold on.
4          Yes.
5      Q.  Okay.  And what treatment did you receive
6  on the 8th?  Was that the first day you were in rehab?
7      A.  Yes.  I met with a doctor to talk about
8  the medications that I was on, and I think I did like a
9  questionnaire, and that's all I remember.
10     Q.  Okay.  You mentioned that the Collective
11 Bargaining Agreement was available online, correct?
12     A.  I believe so, yeah.  That's how I found
13 it.
14     Q.  And you certainly would agree that it was
15 your responsibility -- as a flight attendant, under the
16 Collective Bargaining Agreement that applied to you, that
17 it was your responsibility to be familiar with the
18 contract, correct?
19     A.  Not after being told by somebody who's
20 supposed to know what the rule is.  I didn't even -- and,
21 Danielle, why would they not tell me that?
22     Q.  And my question is, in general, it was your
23 responsibility to be familiar with the terms, correct?
24     A.  Sure.
25     Q.  Okay.  All right.  So looking back at that
```

Page 137

```
1  Brigham Exhibit 17, I've also yellow highlighted here,
2  Client in residential treatment for chemical dependence.
3          I'm guessing that's "dependency"?
4      A.  Chemical dependency.
5      Q.  Or "dependence."
6          Is that alcoholism?
7      A.  Yes.
8      Q.  Okay.  And then page 3 is a PDF.  It says,
9  Please indicate if any of the following apply to the
10 patient.  And the box is checked for, They will experience
11 a period of continuous incapacity, during which they will
12 be unable to perform the functions of their job as
13 detailed in the accompanying job description, or if no --
14 no job description is included by the employee.
15         Do you see that?
16     A.  Yes.
17     Q.  And it was true that during this 60 days of
18 time, you were unable to perform the functions of your
19 job, correct?
20     A.  Correct.
21     Q.  And you were given medical leave, correct?
22     A.  Correct.
23     Q.  And your seniority continued to accrue
24 while you were on that medical leave, correct?
25     A.  Correct.
```

35 (Pages 134 - 137)

Page 138

1    Q.  At the end here, it states that your
2  provider's name is Walter Thomas, MD.
3        Do you see that?
4    A.  Yes.
5    Q.  Is that the doctor that you saw?
6    A.  I believe so.  But I -- honestly, I saw
7  him for a whole 15 minutes.
8    Q.  There's a whole list of medications on this
9  last page of the document.
10       Do you see that?
11   A.  Mm-hmm, yep.
12   Q.  And there is a reference to that levo- --
13   A.  Levothyroxine.
14   Q.  -- levothyroxine.  There are also several
15  other medications here.
16       Do you see that?
17   A.  Uh-huh.  I do.
18   Q.  Are you still on any of those today?
19   A.  I am not.
20   Q.  Okay.  All right.
21   A.  At one point on this list, there should
22  have been the trazodone.  I originally started taking
23  trazodone about halfway through my treatment for issues
24  with sleeping.  So -- but that's when I started taking
25  trazodone, and then I weaned myself off of the gabapentin

Page 139

1  and the lamotrigine.
2        Like I stated early, I don't really like
3  being on pharmaceuticals if I don't have to be.  The
4  levothyroxine, I don't have a choice about.
5    Q.  Okay.  Let me show you what's been marked
6  as Exhibit 36 -- Brigham Exhibit 36.  Brigham Exhibit 36
7  is a fax cover sheet from Matt Riemann to a phone number
8  listed above.  But it is -- it appears to be a fax of an
9  additional medical document.
10       Are you familiar with this document at all?
11  I'm scrolling through for you.
12   A.  I'm not.
13   Q.  Here's the fax.  On the fourth page of the
14  document, it states it's from Discovery Transitions
15  Outpatient.  It's dated November 7th, 2014, and it's to
16  Frontier's leave department.
17       Do you see that?
18   A.  Yes.
19   Q.  And what is Discovery Transitions?
20   A.  So my recovery in treatment was in two
21  sections.  The first 30 days was the complete in-person
22  residential treatment.  And then the next 30 days, it
23  was -- I would do IOP, while I lived in a house with
24  other people in recovery.  It was more of an outpatient
25  program.

Page 140

1    Q.  Mm-hmm.
2        If you take a look here toward -- this is
3  PDF page 6 of the document, which is
4  FRONTIERAIRLINES(R.BRIGHAM)- 1432.
5        Are you with me?
6    A.  Yeah.
7    Q.  And this states that your medical condition
8  began on September 7th, 2014.
9        Do you see that?
10   A.  Yes.
11   Q.  And it says, Please check one of the
12  following.  And the box is checked for, Employee is able
13  to work a full, regular schedule with no restrictions
14  beginning November 17th, 2014.
15       Do you see that?
16   A.  Yep.
17   Q.  And was that correct at the time?
18   A.  I would have to disagree here, just
19  because it was in treatment that we first decided that I
20  should try to avoid layovers.  And in the beginning, it
21  was fine.  I was able to avoid layovers.  It wasn't until
22  Frontier opened the second base and everybody junior went
23  to Orlando, that we then started having issues.  So had
24  we known it was going to be an issue, it would have been
25  written on here.

Page 141

1    Q.  So take a look at this last page.  It's
2  signed by Dr. Walter Thomas.
3        Do you see that?
4    A.  Yep.
5    Q.  Is that the same doctor that treated you on
6  the prior medical certification form?
7    A.  Yes.
8    Q.  So Dr. Thomas is saying here that you're
9  able to work a full, regular schedule, correct?
10   A.  Correct.
11   Q.  And he states that you have no
12  restrictions.  He says that --
13   A.  It was to --
14   Q.  -- correct?
15   A.  It was to, basically, my physical
16  abilities is what I see.  Standing, walking, sitting,
17  lifting, pushing, pulling, carrying, use of hands.
18   Q.  And he says -- Detail any additional
19  restrictions below.  He states, None, correct?
20   A.  Correct.
21       But I also want to just add in there that
22  at first, it was fine.  I didn't need any accommodations.
23  It wasn't until later.
24   Q.  But he doesn't state anything about your
25  need to avoid layovers, correct?

36 (Pages 138 - 141)

Page 142

1     A.  He's not a psychic.  He did not know that
2  Frontier was going to open another base and my seniority
3  would go down.
4     Q.  Yeah.  But you were avoiding layovers,
5  correct?
6     A.  Correct.
7     Q.  And he didn't state that that was medically
8  necessary on that form, correct?
9     A.  He also was not my therapist there.  He
10  was just the doctor that checked the boxes and did
11  whatever to get me to be able to go back to work.  He was
12  not my therapist who I had discussed everything with.
13     Q.  This was sent on November 8th, 2014,
14  correct?
15        I'm showing you that fax -- that date in
16  the center.
17        Do you see that?
18     A.  I -- no, it's not on my screen anymore.
19     Q.  Oh, it would help if I shared it with you
20  again.
21        Okay.  Do you see it now?
22     A.  No.  Well, I see it, but not the date.
23     Q.  Yeah.  Okay.  So this is Brigham
24  Exhibit 36, again.  And I'm trying to yellow highlight the
25  date.

Page 143

1        Did that work?
2     A.  Yeah, there we go.
3     Q.  Can you see my mouse, by the way, moving?
4     A.  I see a circle.
5     Q.  Okay.  Good.  Learning every day how this
6  works with the Zoom, right?
7        Okay.  So we're looking at the PDF page 7
8  of Brigham Exhibit 36, and there's a date stamp at the
9  top.
10        Do you see that?
11     A.  Yep.
12     Q.  And it states, November 8th, 2014.
13        Do you see that?
14     A.  Yep.  That was the day after I left
15  treatment.
16     Q.  Okay.  And that was the day -- strike that.
17        So that's the date on which this was sent
18  to Frontier, correct?
19     A.  Correct.
20     Q.  Okay.  And as of that day, you were aware
21  that you needed to avoid layovers.
22        Am I right about that?
23     A.  It was talked about, yes, but it wasn't
24  until I saw Marla again that -- so Frontier had their
25  self-disclosure policy, which I'm sure you've seen it,

Page 144

1  where it says I have to adhere to all aspects of my
2  program.  So Marla Madrid and I came up with a treatment
3  plan, and that was one of the things that we had
4  discussed avoiding due to relapse.
5     Q.  But as of that date, November --
6     A.  So this was talked about -- this was
7  talked about with my therapist at The Discovery House,
8  not with this doctor.
9     Q.  Okay.  This doctor was the one filling out
10  your fitness for duty form, correct?
11     A.  Correct.  And all he -- all I see are
12  basically, physically, I'm able to do the job.
13     Q.  And, Ms. Brigham, these are yes-or-no
14  questions.
15        This is the doctor who filled out your
16  fitness for duty form, correct?
17     A.  Correct.
18        MR. CRONE:  Hold on.  Objection.
19     Q.  (By Ms. Kitson)  And --
20        MR. CRONE:  Hold on.  Hold on.  I just want
21  to put an objection on the record.  Ms. -- Ms. Brigham's
22  entitled to answer the questions.
23        MS. KITSON:  Okay.  Thank you, Mr. Crone.
24  You've made your record.
25     Q.  (By Ms. Kitson)  And this doctor who's

Page 145

1  evaluating your fitness for duty is stating that you were
2  available to work a regular -- and able to work a full,
3  regular schedule, correct?
4     A.  That's what this says, correct.
5     Q.  And at this time, you, yourself, were aware
6  of your need to avoid layovers; is that correct?
7     A.  I knew that it may have been a
8  possibility.
9     Q.  Okay.
10     A.  But it was not in part of my treatment
11  plan yet, because there was not a treatment plan yet.  It
12  wasn't until I met with Frontier and had to come up with
13  a treatment plan that I had to adhere to and see a
14  counselor, do random drug tests, I had to do all of that
15  stuff in order to come back to work.
16     Q.  Okay.  I'm going to show you what has been
17  marked as Brigham -- Brigham Exhibit 11.
18     A.  Hold on.  My -- if my computer messes up,
19  I'm sorry.  It's downloading software, doing something
20  weird.
21     Q.  It's taking me a second to get this
22  document up anyway, so...
23     A.  Okay.
24     Q.  Let me know when you're clear.
25     A.  Can you see me?

37 (Pages 142 - 145)

Page 146

1    Q. I can see you.
2    A. Okay. I can't see you.
3    Q. Oh, it says my screen sharing is paused.
4    A. Yeah, my computer is doing something
5   weird. Hold on.
6    Q. I've got it up again.
7    A. Okay. I'm back. I think we've got it.
8    Q. Okay. I've pulled up for you Brigham
9   Exhibit 11.
10    A. Okay.
11    Q. And the Bates stamp on this is
12   BrighamR_PlaintiffRecords 670-1.
13        Do you see that?
14    A. Yes.
15    Q. Okay. And this is a Certification of
16   Healthcare Provider for Employee's Serious Health
17   Condition.
18        Do you see that?
19    A. I do.
20    Q. Is this your handwriting on the first
21   page of the document?
22    A. That is not.
23    Q. Okay. Do you know who filled this out?
24    A. No clue by this handwriting.
25    Q. Okay. Let me -- I'm just going to go down

Page 147

1   to the end.
2        Have you seen this document before?
3    A. You have to go slower, so I can read it.
4    Q. Okay. It's dated the 10th of March, 2015.
5        Do you see that?
6    A. Yep.
7    Q. And by Marla M. Madrid.
8        Do you see that?
9    A. Yes.
10    Q. Does that help refresh your recollection on
11   whether you've seen this before?
12    A. I would have to see what's in the
13   document, Danielle. Of course, she signed it. It's
14   dated, but I need to see the document to let you know if
15   I have seen it before.
16    Q. Well, we're going to go through it. I'm --
17   and I'm -- I'm just asking, does this refresh your
18   recollection. It sounds like the --
19    A. No.
20    Q. -- answer to that is no?
21    A. Yes.
22    Q. Okay. All right. We've got a part A,
23   Medical Facts. Looking this over, have -- does this
24   refresh your recollection as to whether you've seen this
25   document before?

Page 148

1    A. Yes.
2    Q. Okay. And have you?
3    A. Yes.
4    Q. And is this the true and correct copy of
5   the medical certification that was submitted to Frontier?
6    A. It -- from what I seen, it appears to
7   be, what I have seen.
8    Q. Okay. It states that, The approximate date
9   condition commenced was June 2014.
10        Do you see that?
11    A. Yes.
12    Q. And is that when you first began seeing
13   Dr. Madrid?
14    A. Yes.
15    Q. And actually, let me clear something up.
16        Is -- is Marla Madrid a doctor.
17    A. She is -- well, was my therapist.
18    Q. Okay. Is she a medical doctor?
19    A. I don't know.
20    Q. You don't know either way?
21    A. I don't know if she is -- went to school
22   and got her Ph.D. and stuff like that. I don't -- I
23   mean, she's not a medical doctor that was treating like a
24   cough for me. She was my mental health doctor.
25    Q. Okay. In number 6 on PDF page 2 of the

Page 149

1   document, it says, Is the employee unable to perform any
2   of his/her job functions due to their condition?
3        Do you see that?
4    A. Yes.
5    Q. And she marked the box no, correct?
6    A. Correct. What you had put up in front of
7   me before were the --
8    Q. I just asked the question --
9    A. No. You --
10    Q. The question, Ms. Brigham, is --
11    A. No.
12    Q. -- she marked the box no? That's the
13   question.
14    A. But I'm allowed to talk after you. You
15   wanted me to give clear, concise answers, and you asked
16   me in the beginning, if there's something you need to
17   add, if you -- even later on, do so. So this is what I
18   am doing. So if you could go back to the page that you
19   were on, that would be great.
20        And, yes, the functions of my job, the
21   ones that are in the description, I could perform all of
22   those.
23    Q. Okay. But number 7 -- it says, Describe
24   other relevant medical facts. And I had highlighted the
25   language, Results in anxiety, psychomotor agitation,

38 (Pages 146 - 149)

Page 150

1 insomnia episodes, and at times inability to carry out
2 daily activity.
3        Do you see that?
4    A.  Yes.
5    Q.  Was that accurate?
6    A.  Yes.
7    Q.  Okay.  And is there any mention here of a
8 need to avoid layovers?
9    A.  No.
10    Q.  Okay.  And on the next page, it says,
11 Please indicate if any of the following apply to the
12 patient.  She has checked, They will experience
13 intermittent incapacitation.
14        Do you see that?
15    A.  Yep.
16    Q.  And they will require treatment
17 appointments for their condition.
18        Do you see that?
19    A.  Yep.
20    Q.  And then she certifies you for four days a
21 month.
22        Is that right?
23    A.  Yep.
24    Q.  Okay.  And you'll be attending followup
25 treatment one time per week for about two hours a week; is

Page 151

1 that correct?
2    A.  Correct.
3    Q.  Okay.  And she states, Rebecca is in the
4 first phase of recovery from alcoholism.  She is provided
5 weekly therapeutic support and attends up to two group
6 sessions a week to avoid relapse at this time.
7        Was that correct at the time?
8    A.  Correct.
9    Q.  She says, Within a year time frame, she is
10 hopeful to be in a place that will allow her to scale back
11 on the levels of support she currently needs.  She
12 continues to have setbacks and struggles, as she is
13 learning new skills, and a shift in mindset to see
14 recovery through her lifetime.
15        Do you see that?
16    A.  Yep.
17    Q.  So here, Ms. Madrid or Dr. Madrid is saying
18 that it would be at least a year until you were able to
19 scale this back, and that was hopeful, correct?
20    A.  Correct.
21    Q.  Okay.  All right.  I'm going to stop with
22 that one.  And I'm pull up a website -- this is the beauty
23 of Zoom -- for Dr. -- for Ms. Marla Madrid, and it states
24 that she is an LCSW, which is a clinical social worker.
25        Do you see that?

Page 152

1    A.  I don't see anything.
2    Q.  And I'm showing you the LCSW.
3    A.  All I see is you and John and Caroline and
4 Laurel.
5    Q.  Sorry.  I forgot to share my screen again.
6 Here you go.
7        Are you seeing the document now?
8    A.  Yes.
9    Q.  And this is Brigham Exhibit 11.  I'm
10 highlighting here this LCSW.
11    A.  Okay.
12    Q.  And I believe that stands for licensed
13 clinical social worker.
14        Is that your understanding?
15    A.  No.  I have no understanding of the ending
16 after people's names, except for doctor.
17    Q.  Do you have any reason to believe she's not
18 a licensed clinical social worker?
19    A.  No.
20    Q.  Bear with me a minute here.  All right.
21 I'm pulling up Exhibit 24.
22        Are you seeing a document entitled,
23 Treatment Plan?
24    A.  Yes.
25    Q.  Okay.  Do you recognize this document?

Page 153

1    A.  Yes.
2    Q.  And what is it?
3    A.  My original treatment plan.
4    Q.  And this is dated May 1st, 2015; is that
5 correct?
6    A.  Yep.
7    Q.  Okay.  So at this point, you'd been back to
8 work several months, correct?
9    A.  Correct.
10    Q.  About six months actually, right?
11    A.  Yep.
12    Q.  Okay.  It states that your DMS (sic)
13 diagnosis is alcohol withdrawal, general -- strike that.
14        It states a number of DMS diagnoses here on
15 the left-hand side of the page.
16        Do you see that?
17    A.  I see it.
18    Q.  And one of those is, Axis I, secondary
19 alcohol withdrawal.
20        Do you see that?
21    A.  Yes.
22    Q.  And was that your -- in your view, your
23 diagnosis of alcoholism?
24    A.  No.  After you quit drinking, you have
25 what they call PAWS, post-acute withdrawal symptoms, that

39 (Pages 150 - 153)

Page 154

1 can continue up to even 18 months. You can get agitated.
2 You can get really bad anxiety. And it's all sort of
3 post-acute withdrawal symptoms.
4     Q. Okay. And the question I wanted to ask you
5 is really just these two yellow highlighted items
6 (indicating).
7         Did you fill out this document, or did
8 someone else?
9     A. I did not fill this out.
10     Q. Do you believe, being familiar with this
11 document, that this is an accurate representation of what
12 you discussed with Ms. Madrid?
13     A. At the time, yes.
14     Q. And she had circled, Problems related to
15 the social environment, yes.
16         Do you see that?
17     A. Yes.
18     Q. But occupational problems, no.
19         Do you see that?
20     A. Because at the time -- the only reason she
21 put no there is because, at the time, I think I was able
22 to avoid layovers. It wasn't until, I think, after this
23 that it started becoming a problem. But I didn't fill
24 this out. I don't -- I can't speak to her mindset when
25 she was filling it out.

Page 155

1     Q. It states here, Criteria For Discharge,
2 Rebecca will have maintained a full-time job without
3 modifications for six full months.
4         Do you see that?
5     A. I do.
6     Q. Okay. And it's dated June 15th -- sorry,
7 June 16th, 2015, I believe.
8         Is that right?
9     A. Yes.
10     Q. Okay.
11     A. And what she means there, I believe, is
12 when I'm able to start doing layovers again, and I
13 continue to see her for six months after everything goes
14 back to normal, then I can be done with therapy.
15     Q. And actually, I think this is going to help
16 refresh. So at the last page of the document, which is
17 PDF page 2 of document, it states, Date of update,
18 May 1st, 2015.
19         Do you see that?
20     A. Yep.
21     Q. And it says, Rebecca has identified
22 triggers to cravings and opportunities to consume alcohol,
23 and those are on overnight trips or anything longer than a
24 given workday in her professional arena. At this time, it
25 would not be a good idea to encourage a vulnerable

Page 156

1 situation with a work schedule that serves as a
2 temptation, if possible. Her treatment plan and progress
3 towards goals will be reviewed every 90 days.
4         Do you see that?
5     A. Yes.
6     Q. So this is your treatment plan, right, that
7 you've talked about today?
8     A. Yes.
9     Q. But this --
10     A. I believe so.
11     Q. -- wasn't submitted -- at least this
12 particular form was not submitted in the form of a medical
13 certification like the ones we've seen in the prior
14 exhibits leading up to this, correct?
15     A. I don't know how this was submitted or why
16 it was submitted. I know that we were going
17 through -- it might have been the DOT people. There was
18 another agency that was involved that was requesting
19 information from Marla. And I believe this was one of
20 those requests. But I -- honestly, I don't know.
21     Q. Okay. But this at least was not on the
22 same medical certification form -- the FMLA form that we
23 saw, for instance, in Exhibit 11 --
24     A. No.
25     Q. -- which is right here?

Page 157

1     A. No. This one isn't -- didn't come out
2 until May, it says.
3     Q. Right. But it's not on the same form,
4 correct?
5     A. Correct, the way it looks right here.
6     Q. All right. I'll pull up another exhibit.
7 This will be Brigham Exhibit 12.
8     A. Okay.
9     Q. And here we see -- oh, wait. I didn't
10 share my screen, did I?
11     A. No.
12     Q. I've gotten a little better. The last
13 deposition, I kept scrolling through and not realizing I
14 was scrolling through, and the witness couldn't see what I
15 was looking at -- or could only see what I was looking at.
16         Okay. So Brigham Exhibit 12 is
17 Certification of Healthcare Provider for Employee's
18 Serious Health Condition.
19         Do you see that?
20     A. Yes.
21     Q. And this is that same form that we've seen
22 in prior exhibits such as Brigham Exhibit 11, correct?
23     A. Correct.
24     Q. Okay. And I'm just going to scroll through
25 it.

40 (Pages 154 - 157)

Page 158

1       Is this your handwriting on the first page?
2       A.   That is.
3       Q.   Okay.  And did you submit the form to
4  Frontier?
5       A.   I believe so.
6       Q.   Okay.  I'm just going through scroll down
7  again.  Actually, let me go to the end.
8       This is Marla M. Madrid again, correct?
9       A.   Yes.  And I believe she's the one that
10  faxed it over to Frontier or that other agency.  I don't
11  think I ever actually possessed these and handed them to
12  Frontier.  I believe it was all done via fax or email.
13      Q.   Okay.  And this one's dated May 28th, 2015;
14  is that right?
15      A.   Yes.
16      Q.   Okay.  I'm just going to go through this
17  one.  And again, it says at the top that your approximate
18  date condition commented was June of 2014, correct?
19      A.   Correct.  Yes, and it's not when my
20  condition commenced.  That's when I started seeing Marla.
21      Q.   Mm-hmm.
22      Okay.  Number 6, Is the employee unable to
23  perform any of his/her job functions due to their
24  condition?
25      She checks no, correct?

Page 159

1       A.   Correct.
2       Q.   And under number 7, it states, Update,
3  Rebecca continues to struggle with cravings for alcohol,
4  and vulnerable situations are challenging.  Relapse
5  prevention continues to be the priority in treatment, as
6  she has noticed desire has increased, as home life is
7  stressful, as she continues to adjust to sobriety.
8       A.   Yeah.
9       Q.   Was that an accurate statement at the time?
10      A.   Yes.
11      Q.   Okay.  I'm scrolling down.
12      She states that you'll need intermittent
13  FMLA; is that correct?
14      A.   Yep.
15      Q.   And she certifies for you 12 days a month,
16  correct?
17      A.   Yep.
18      Q.   Okay.  And again, she says, Frequency, one
19  time per week, group two times per week for two hours at a
20  time.
21      Is that right?
22      A.   Yep.
23      Q.   Okay.  And then at the end, she says,
24  Rebecca is receiving support to prevent relapse.  She is
25  now in her eighth to ninth month of sobriety, and her

Page 160

1  increase in cravings is frightening her.  She is
2  increasing face-to-face time in individual group and
3  sponsorship arenas.
4       Was that all true at the time?
5       A.   Yes.  This is when I was dealing with all
6  the Frontier stuff.
7       Q.   It states, Rebecca and her husband are
8  adapting to various stages in recovery.  Within the next
9  six months, she will work diligently at being proactive in
10  reaching out to supports, as she is doing now.  She will
11  have reached a milestone in recovery, first anniversary in
12  sobriety, and will have -- I'm not sure what that word
13  is -- something further her self-regulation skills.
14      Do you see that?
15      A.   Yes.  I don't know what --
16      Q.   Is it --
17      A.   -- the word is either.
18      Q.   -- "crafted"?  "Will have crafted further"?
19      Was it true, at the time, that you were
20  working through all of this and working on your
21  self-regulation skills?
22      A.   Yes.
23      Q.   Okay.  It says, Initially, after a year of
24  sobriety, she will undergo full physical exam, and the
25  hope is that her mindset is strong and changed.

Page 161

1       Do you see that?
2       A.   Yes.
3       Q.   And nowhere on this document does she say
4  that you need any kind of accommodation for avoiding
5  overnights or layovers, correct?
6       A.   Not that I see, nope.
7       Q.   I'll stop the screen.
8       I'm going to pull up Exhibit 42 -- Brigham
9  Exhibit 42.  I'm showing you what has been marked as
10  Brigham Exhibit 42.
11      Do you recognize this document?
12      A.   Yes.
13      Q.   What is it?
14      A.   It's a transcript of some recording that I
15  have.
16      Q.   Is this -- well, strike that.
17      On June 4th, 2015, did you attend a meeting
18  at Frontier's general office?
19      A.   Yes.
20      Q.   Did you record that meeting?
21      A.   I did.
22      Q.   Is this your transcription of the
23  recording?
24      A.   No.  I had a lady that my mom works with
25  transcribe it for me.

41 (Pages 158 - 161)

Page 162

1    Q.  After having had that lady transcribe it,
2  did you review the transcript to see if it was true and
3  accurate?
4    A.  Yes.  And there were a bunch of -- a bunch
5  of discrepancies with names and stuff that she couldn't
6  hear.  But...
7    Q.  Did you correct those?
8    A.  No.  I think a few places where I thought
9  it was relevant, I kind of wrote in.  But I never went in
10  and altered the document in any way.
11    Q.  On the first page -- well, strike that.
12      Was there anything inaccurate about the
13  words that are taken down here?
14    A.  Not in this that I see right here.
15    Q.  Okay.  And look --
16    A.  But honestly, Danielle, I'd have to have
17  the recording playing to know if there was a word off.
18    Q.  Right.  And I guess the question I have for
19  you is, did you read through it at the time or at any time
20  prior to this deposition for accuracy, and if so, did you
21  find anything inaccurate about the words that were spoken?
22    A.  I couldn't tell you what, but, yes, there
23  were inaccuracies.
24    Q.  Okay.  Well, let's go through -- let's just
25  go through the point -- parts that I was going to ask you

Page 163

1  about.  I'm actually going to only ask you about one
2  page here, and we can talk about whether there's anything
3  inaccurate on that page.
4    A.  Okay.
5    Q.  This is going to be PDF 12.
6    A.  And then whenever it's convenient, if we
7  could take another quick break, so I could check on the
8  kids.
9    Q.  Absolutely.  Okay.  So we're on PDF
10  page 12.  And there appears to be a discussion between you
11  and Cassie.
12      Do you see that?
13    A.  Yeah, that's not correct.
14    Q.  And what's not correct about it?
15    A.  "Options for FMLA transfers," I --
16    Q.  Okay.
17    A.  I don't know what an FMLA transfer is.
18    Q.  Let me -- I'm just pulling up another
19  exhibit.
20      Are you seeing a document called, Civil
21  Action Number 19 CV?
22    A.  Yes.
23    Q.  Okay.  And this has been marked Brigham
24  Exhibit 32.  The Bates stamp is
25  FRONTIERAIRLINES(R.BRIGHAM)- 4274.

Page 164

1    Do you see that?
2    A.  Yes.
3    Q.  And I'll represent to you, Ms. Brigham,
4  that this is a transcription that we had made of the
5  recording by a court reporter's office.
6    A.  Okay.
7    Q.  I'm just trying to find that same language.
8    Are you seeing my search box, by the way?
9    A.  Yes.
10    Q.  Okay.
11    A.  Yes, where it says, Options for internal
12  transfers, not FMLA transfers.
13    Q.  Got it.  Okay.  So this transcript looks
14  more accurate; is that right?
15    A.  Yes.  Yes.
16    Q.  Okay.  Okay.  So it states from you,
17  Rebecca Brigham, Okay.  Awesome.  And then my other
18  question is, how do I find out if there are any other
19  options for internal transfers besides, like, inflight
20  managers, I mean?
21    Do you see that?
22    A.  Yes.
23    Q.  And is that a question that you asked?
24    A.  Yes.
25    Q.  And then Cassandra -- who's Cassandra?

Page 165

1    A.  Cassandra Micklich.  She was sort of, I
2  think, below Jerry.  I don't know her exact title.  But
3  we have tried to find her to get a statement, and we
4  can't find her.
5    Q.  Okay.  She says, Did you check the website?
6    Do you see that?
7    A.  Yes.
8    Q.  Were you aware that there was a website you
9  could check for open positions?
10    A.  No, not at that time.
11    Q.  And you say, I don't know, what is it, just
12  on the --
13    Do you see that?
14    A.  Yes.
15    Q.  And she directs you to myfrontier.org.
16    Do you see that?
17    A.  Correct.
18    Q.  Did you then go to myfrontier.org to look
19  for positions that you could potentially transfer into?
20    A.  It was later on that day or the following
21  day that I did.
22    Q.  So you were able to successfully look for
23  potential transfer options; is that right?
24    A.  Yes.
25    Q.  And what did you find when you looked?

42 (Pages 162 - 165)

Page 166

1      A.  From -- honestly, from my memory, I
2   remember seeing a bunch of stuff that I was not quite
3   qualified for.  And then at some point, I stopped,
4   because I had been told that, You'll lose your seniority,
5   and you won't be able to go back to inflight after
6   90 days.
7      Q.  Okay.  And that -- that is the conversation
8   that you had with Jeff Varney --
9      A.  I believe so.
10      Q.  -- is that correct?
11      A.  I believe so, yeah.
12      MS. KITSON:  Okay.  We can go off the
13   record and take a break now, if you'd like.
14      THE DEPONENT:  Okay.
15      THE VIDEOGRAPHER:  We're going off the
16   record at 1:03 p.m.
17      (Recess from 1:03 p.m. to 1:17 p.m.)
18      THE VIDEOGRAPHER:  We're going back on the
19   record at 1:17 p.m.
20      Q.  (By Ms. Kitson)  Ms. Brigham, do you
21   understand you're still under oath?
22      A.  Yes.
23      Q.  I'm going to show you another document.  As
24   you can tell, this is the march through the documents
25   portion of the deposition.

Page 167

1      A.  No worries.
2      Q.  All right.  I'm showing you what has been
3   marked as Brigham Exhibit 14, which appears to be an email
4   from Cassandra Micklich to you, dated June 4th, 2015.
5      Do you see that?
6      A.  Yep.
7      Q.  Do you recall receiving this email?
8      A.  I do.
9      Q.  All right.  Ms. Micklich says, Rebecca,
10   thank you for coming in and meeting with us today.  I did
11   get some answers to your questions.
12      Do you see that?
13      A.  Yep.
14      Q.  And is that same day of the transcript
15   that we saw, June 4th, 2015?
16      A.  I believe so.
17      Q.  Okay.  Ms. Micklich says, Number 1, OJI
18   working at the GO, if that was an option for you.  A, That
19   is not an option.  The GO is only to accommodate OJI.
20      Do you see that?
21      A.  Yep.
22      Q.  And does OJI stand for on-the-job injury?
23      A.  Yes.
24      Q.  Okay.  And then says, Number 2,
25   transferring internally with the company.

Page 168

1      Do you see that reference?
2      A.  Yes.
3      Q.  And she says, Please refer to page 81 of
4   123.  It talks about the process and seniority.
5      Do you see that?
6      A.  Yes.
7      Q.  And is that a reference to the Collective
8   Bargaining Agreement?
9      A.  I don't remember.  Is that the one that
10   you put in front of me earlier?
11      Q.  Yes.  Let me see if I can cross-reference
12   it.  Hold on.  Bear with me one moment here.
13      A.  No worries.
14      Q.  Yes.  Okay.  Yeah, let's cross-reference
15   these.  So I'm going to share my screen with you.  Okay.
16   So Brigham Exhibit 14 is the email that we have been
17   looking at.
18      Do you see that?
19      A.  Yes.
20      Q.  And Ms. Micklich tells you to, Please refer
21   to page 81 of 123.  It talks about the process and
22   seniority.
23      Do you see that?
24      A.  Yes.
25      Q.  And then if we look at Brigham Exhibit 1,

Page 169

1   which is the Collective Bargaining Agreement, you can see
2   page 81 of 123 --
3      A.  Yes.
4      Q.  -- here at the bottom.
5      Do you see that?
6      A.  I do.
7      Q.  And scrolling up, there's the same
8   language, again, that talks about how you accrue seniority
9   for a period not to exceed two years.
10      Do you see that?
11      A.  I do.
12      Q.  Does that refresh your recollection that
13   the company told you about the two years of seniority that
14   you would retain?
15      A.  No.  I didn't even know what document that
16   she was even referring to.  It didn't say in the
17   Collective Bargaining Agreement or the employee handbook.
18   To be honest, I didn't even look, because I'd already
19   been told that you lose your seniority after 90 days.
20      Q.  Well, Ms. Micklich is directing you and
21   telling you to, Please refer to page 81 of 123, right?
22      A.  Yes.  But it doesn't say what page 81 of
23   123.  I didn't know if it was in the handbook or the CBA.
24   And like I said, I did not look, because I had already
25   been told.

43 (Pages 166 - 169)

Page 170

1  Q. Well, this is the exact same day that you
2  met with Ms. Micklich, correct?
3  A. Correct.
4  Q. And on that exact same day, we saw in the
5  transcript you talked about internal transfers, correct?
6  A. Correct.
7  Q. And she said she'd have to look into it,
8  correct?
9  A. Correct.
10  Q. And she's now coming back to you on the
11  exact same day and saying, Please refer to page 1 -- 81 of
12  123; is that right?
13  A. Yes, but it doesn't say what document
14  she's referring to. Page 81 of what?
15  Q. Did you ask her? Did you --
16  A. No, I did not.
17  Q. You say, The reason --
18  A. I had no reason.
19  THE REPORTER: One at a time.
20  Q. (By Ms. Kitson) You just testified that it
21  could be the handbook, it could be the Collective
22  Bargaining Agreement.
23  A. I --
24  Q. Did you look at any one of those?
25  A. I did not.

Page 171

1  MR. CRONE: Danielle, can I ask for a
2  point of clarification?
3  MS. KITSON: It depends.
4  MR. CRONE: Well, I guess I just have to
5  ask. Is -- is Frontier stipulating that it would have
6  treated this transfer as -- as on account of physical
7  injury or illness right now? Is -- is --
8  MS. KITSON: Well, no, I'm not going to
9  answer substantive questions about the case, John. This
10  is a deposition. I -- I'm questioning a witness,
11  so -- all right.
12  MR. CRONE: And -- and you're free to do
13  so. I was just asking for -- if I could ask a point of
14  clarification. The answer apparently is no.
15  Q. (By Ms. Kitson) Okay. I am going to pull
16  up the next document, Exhibit 43.
17  Do you recognize Brigham Exhibit 43?
18  A. Yes.
19  Q. And what is this document?
20  A. This is the second transcript of the
21  recording.
22  Q. I want to ask you too about the last
23  document we just looked at. Ms. Micklich said that the
24  document would provide the answer about seniority and the
25  process.

Page 172

1  Wouldn't that suggest to you that it's the
2  Collective Bargaining Agreement she's talking about?
3  A. Not really, necessarily. I would
4  have -- personally, when I looked at that, I figured it
5  was probably the handbook, not the Collective Bargaining
6  Agreement.
7  Q. The handbook doesn't address seniority,
8  correct, that's the CBA?
9  A. I don't know. I believe the handbook
10  addresses it as well.
11  Q. All right. Looking at Exhibit 43 --
12  A. And to be honest, Danielle, I remember
13  seeing somewhere about -- I'm trying to think where I saw
14  it -- about seniority, and I couldn't keep my -- go back
15  to inflight. And I'm not going to remember.
16  Q. I'm just kind of looking through the
17  handbook here to see if there's something there.
18  A. Yeah.
19  Q. Hold on. I'm almost through it. No, I
20  don't think so. All right.
21  Well, in any event, let's look back at
22  this --
23  A. Okay.
24  Q. -- Exhibit 43.
25  And you had tested that this is a

Page 173

1  transcript that was made of a recording that you took at a
2  meeting at Frontier headquarters on October 9th, 2015.
3  Is that correct?
4  A. Correct.
5  Q. And once again, is this a transcription
6  that a friend of yours made?
7  A. Yes.
8  Q. Okay. And did you review it for accuracy?
9  A. Not in its entirety.
10  Q. Were there any things that you found to be
11  inaccurate?
12  A. Yes. In all of them, there were stuff
13  that was inaccurate.
14  Q. I'm going to cross-reference -- oops. Bear
15  with me. Brigham Exhibit 33 that I'm showing you is
16  another transcription that we had made --
17  A. Okay.
18  Q. -- with Hunter + Geist, which is a court
19  reporter service.
20  A. Okay.
21  Q. And I'm showing you -- it's, Transcription
22  of Recording, October 9th, 2015.
23  Do you see that?
24  A. Yep.
25  Q. I'm just going to use that to -- for the

44 (Pages 170 - 173)

Page 174

1  part that I'm questioning you about, I just want to make
2  sure we cross-reference, so that there's no -- you know,
3  no question about whether the wording is accurate.
4        And on Brigham Exhibit 44 -- sorry -- 43,
5  I'm looking at PDF pages 3 and 4. So let me go to 3 here.
6  The red highlighting here (indicating) and the
7  highlighting throughout the document. I saw some red
8  highlighting, some yellow highlighting, some blue
9  highlighting.
10       Is that your highlighting throughout?
11    A.  Yes.
12    Q.  Okay. So this red here (indicating) is
13  your highlight, correct?
14    A.  Correct.
15    Q.  Okay. Okay. And then I wanted to just
16  walk you through -- there's a conference that you had with
17  Kari.
18       Do you see that?
19    A.  Yes.
20    Q.  Who is Kari?
21    A.  Kari Thompson.
22    Q.  Okay. And who was she with respect to you?
23  Is she your manager?
24    A.  She was not my direct manager. She was a
25  different Inflight supervisor who happened to be the one

Page 175

1  who was at the general office that day.
2    Q.  Okay. She says, Have you ever looked at
3  other positions within the company, or are you not
4  interested in it? You answer, No, I talked to training at
5  one point, and that might be good, or I just -- I don't
6  know where to look. I don't know.
7       Do you see that?
8    A.  Yes.
9    Q.  And then Ms. Thompson says, On UltiPro.
10       Are you aware what she's referring to
11  there?
12    A.  UltiPro, I believe, was a system that we
13  used at the time. UltiPro would have been like where our
14  paycheck stubs and stuff were.
15    Q.  Mm-hmm. So you knew where to look on
16  UltiPro, and you knew what she was talking about. I
17  believe it's UltiPro, with a U, but --
18    A.  I --
19    Q.  -- you knew that -- you knew what she was
20  talking about?
21    A.  I knew that she was talking about UltiPro,
22  but I didn't know like where to sort of look in there.
23  Cassie had told me to go to flyfrontier.com, which I had
24  done. I don't remember if I went to UltiPro or not.
25    Q.  Okay. But you knew what UltiPro was in

Page 176

1  her --
2    A.  Correct, yes.
3    Q.  Okay. And she suggested you go and look
4  there for job listings, correct?
5    A.  Correct.
6    Q.  And she states -- I'm back on Brigham
7  Exhibit 43 -- and, I mean, I would strongly suggest --
8  like start looking at it, and you might want to look at it
9  every week, because a lot of times jobs are only posted
10  for one week. So I would just get in the habit, in fact,
11  every Monday, getting on there and seeing what's new on
12  there. Every Monday and every Friday and see what's in
13  there, because there is all these different opportunities
14  that you probably aren't even aware that exist, right?
15  And it might not necessarily be an inflight, but there
16  is -- you know, there is a lot happening. So, I mean,
17  it's -- since you want to stay with Frontier, and I know
18  it's the flight attendant job, but I don't think it's
19  going to get easier with the schedule.
20       Do you see that language?
21    A.  Yes.
22    Q.  And did she, in fact, suggest that you go
23  into UltiPro at least weekly?
24    A.  Yes.
25    Q.  If not every Monday and every Friday?

Page 177

1    A.  Yes.
2    Q.  And did you do that?
3    A.  Occasionally, I would go on there, but
4  most of -- it either did not interest me or I didn't
5  qualify, frankly.
6    Q.  Okay. And at this point, was it your
7  understanding that you would not be able to keep your
8  seniority after 90 days? Was that your understanding at
9  this time?
10    A.  Yes.
11    Q.  And did you continue to look after that?
12    A.  Occasionally.
13    Q.  Okay. Why'd you --
14    A.  But it was something that -- it was
15  something that was not -- at the time -- I mean, I know
16  better now, because I've seen it.
17       But at the time, when I thought I was
18  going to lose my seniority after 30 days, it sort of
19  wasn't exactly in my realm of possibilities. I mean, I
20  still looked. You never know, there could be some
21  awesome job listed that was like, Oh, hey, I could do
22  this. But it was not looking with the intent to actually
23  transfer, because I was a flight attendant. That's what
24  I was good at. That's what I loved doing. That's all I
25  wanted to do. And had Frontier, honestly, reasonably

45 (Pages 174 - 177)

Page 178

1  accommodated me, it would have been easy to keep that
2  job.
3       Q.  I'm struggling with this, because you said
4  you would not entertain a transfer because of the 90-day
5  seniority thing, but then you're looking, but then you're
6  testifying that you're looking, but not to actually
7  transfer.
8       Do I have that right?
9       A.  You do.  I still looked in there.  You
10  never know.  There may have been an at-home --
11  work-from-home position doing something that I qualified
12  for, in which case, something like that, I would have
13  considered.  However, I did not want to lose my
14  seniority.
15       Q.  Hold on one second here.  I'm just
16  searching for something really quick.  All right.  Bear
17  with me one moment.
18       I want to show -- go back to an exhibit I
19  just showed you --
20       A.  Okay.
21       Q.  -- a moment ago.  This is Brigham
22  Exhibit 32.  And this, just to remind you, is the
23  transcript of the meeting you had with Cassie Micklich on
24  June 4th, 2015.
25       Do you see that?

Page 179

1       A.  Yes.
2       Q.  And to try to refresh your recollection, in
3  that conversation, it looks like you and Mr. Arellano are
4  having a discussion here on page 32 of the PDF.  And
5  you're talking about medical leave.
6       Do you see that?
7       A.  Mm-hmm.
8       Q.  And you say, As per our contract, it counts
9  as a point.
10       Do you see that?
11       A.  Yes.
12       Q.  Is the contract you were referring to the
13  CBA?
14       A.  Yes.
15       Q.  Okay.  So you did review the CBA in terms
16  of --
17       A.  No.  It was all what I had been told.  To
18  be honest with you, Danielle, I don't know if I ever even
19  looked at the contract.  It was stuff that I had been
20  told by other people that I trust.  And it was something
21  that we dealt with previously, where I was told that if I
22  reach termination points, then that medical point will be
23  taken off.  But, obviously, it still counts as a point.
24       Q.  I'll show you another document.  This is
25  Exhibit 15.  Exhibit 15 is an email from yourself to LOA

Page 180

1  Frontier employees, dated Monday October 6 -- 26, 2015.
2       Do you see that?
3       A.  Yes.
4       Q.  Is this a true and correct copy of an email
5  that you sent to the Leave of Absence Department?
6       A.  Yes.
7       Q.  It says, I woke up this morning in a panic.
8  I forgot to send you an email on Friday.  I had to use my
9  intermittent FMLA on 10-23 for a four-day, but I kept the
10  PDX turn on the end.
11       Do you see that?
12       A.  Yes.
13       Q.  And I think we talked about this earlier,
14  but is it true that you did not follow the required
15  call-out procedures for that 10-23 trip?
16       A.  Correct.
17       Q.  Okay.
18       A.  And I already explained that there was a
19  turn that was taken off, that I had to call
20  Stefanie Coppedge and do all that stuff, to figure out
21  why they were not allowing me to do what I had been
22  doing, if something had changed, which I'll take that
23  point.  That's fine.  That is my fault.
24       I'm arguing about all the points before
25  that were coded as sick, when, if Frontier would have

Page 181

1  just reasonably accommodated me, I would not have.
2       Q.  Okay.  I'm going to show you another
3  document here.  Just a second.  Hold on one second.  I'm
4  looking at the final transcript.  I'm just trying to do
5  the cross-reference thing real quick.
6       A.  And I noticed on one of the other
7  transcripts that you had put out that was your guys', I
8  believe the name of the person that was talking was
9  incorrect.
10       Q.  Yeah.  It said, Meredith.  I think that was
11  a --
12       A.  Yeah.
13       Q.  -- phonetic, because we also did not help
14  the transcriptionist --
15       A.  Okay.
16       Q.  -- with names or anything like that.
17       A.  Okay.
18       Q.  So it's kind of -- I mean, we'll probably
19  have to listen to the exact recording, but --
20       A.  Yeah.
21       Q.  -- that's so cumbersome for, you know,
22  deposition purposes, that we're going to just kind of try
23  to do our best.
24       A.  Right.
25       Q.  Okay.  I'm going to share my screen with

46 (Pages 178 - 181)

Page 182

1 you here. Okay. This is Brigham Exhibit 44.
2       Do you recognize this document?
3    A. Yes.
4    Q. Okay. And what is it?
5    A. It is the final meeting.
6    Q. Okay.
7    A. On -- the investigatory meeting.
8    Q. Okay. And what was the purpose of this
9 meeting?
10    A. It's what -- hold on. I have -- it's what
11 we call the final termination hearing. It's basically,
12 they're going to fire you, but this is your one chance to
13 try and argue that they shouldn't, basically.
14    Q. Okay. I'm going to show you pages 2 and 3
15 of the PDF. And this is just going over again. I think
16 you just said it. You say here on PDF page 2, And that is
17 honestly -- like I take that. It is my fault for not
18 sending the email right away.
19       So is that -- what you're saying right
20 there what you just testified to, which is basically that,
21 yes, that point was fairly assessed to you?
22    A. Yes.
23    Q. Okay. I think that's all I wanted to ask
24 you about. Okay. On the same transcript -- so Brigham
25 Exhibit 34 is a transcription that we had made for the

Page 183

1 same meeting, November 3rd, 2015.
2       Do you see that date here?
3    A. Yes.
4    Q. And this is, again, our court reporter,
5 Hunter + Geist. And I'm just going to ask you, again,
6 about the CBA and the contract.
7    A. Okay.
8    Q. You're speaking with someone in this
9 meeting -- let me scroll up just a bit. Someone named
10 Female 2. And then you say, And then all of a sudden, I
11 was on hold for about five minutes, and then she came
12 back, and she's like, Let me call you back. So she called
13 me back and said, One of the days on either end has to be
14 all intermittent FMLA, which has never happened to me
15 before.
16       Do you see that?
17    A. Yes.
18    Q. And is this reference, again, to that
19 October 23rd trip and what happened?
20    A. Yes.
21    Q. Okay. Female 2 says, Right. And you
22 continue on, So I was kind of flustered with that, but
23 anyways, I told her, Okay. Well, then the Portland turn
24 is worth more, I'll keep the Portland turn. So after that
25 happened, I went to try to figure -- and figure out --

Page 184

1 find the contract and figure out if that is, in fact,
2 legal.
3       Do you see that?
4    A. Yes.
5    Q. Did you find the contract?
6    A. I honestly can't remember if I found it or
7 not.
8    Q. And is the contract a reference to the
9 Collective Bargaining Agreement?
10    A. Yes.
11    Q. Did you ever go over any provisions of the
12 Collective Bargaining Agreement with the union in the
13 grievance process?
14    A. Not that I can remember specifically. I
15 just remember them saying that what I was asking for
16 would not violate the Collective Bargaining Agreement.
17    Q. I'm going to pull up another document here.
18 This will be Brigham Exhibit 46.
19       Do you recognize Exhibit 46?
20       It appears to be a -- a photo of a phone,
21 and --
22    A. Yes.
23    Q. -- on the top, it says, Stefanie Coppedge.
24       Do you see that?
25    A. Yes.

Page 185

1    Q. What is this document?
2    A. These were text messages between me and my
3 direct supervisor.
4       Hold on just a second, Danielle.
5    Q. Oh, sure.
6    A. Okay. My kids are kind of getting
7 restless. I apologize.
8    Q. Okay. Let me just pull that document back
9 up for you. Hold on.
10    A. Okay.
11    Q. Okay. We're back looking at Brigham
12 Exhibit 46. And you stated that these are text messages
13 that you exchanged with your direct supervisor.
14       Is that right?
15    A. Yes, Stefanie Coppedge -- Coppedge,
16 however she says it.
17    Q. And in these text messages, are you the
18 blue bubbles throughout, and she's the yellow bubbles?
19    A. I believe so, but hold on. Stop scrolling
20 for a second. Yep, I'm the blue.
21    Q. Okay. And I wanted to just ask you about a
22 couple of different pages here.
23    A. Okay.
24    Q. This is page 22 of PDF.
25       And are these photos that you took of these

47 (Pages 182 - 185)

Page 186

1  texts?
2      A.  Yes.
3      Q.  Okay.
4      A.  That phone is no longer -- that phone is
5  no longer on service for any carrier, so I couldn't,
6  like, screenshot and email them.  So I just took pictures
7  of them.
8      Q.  Okay.  At the top of this text message, on
9  Wednesday, November 12th, 2014, you're exchanging text
10  messages.
11      Do you see that?
12      A.  Yes.
13      Q.  That was the day after your final
14  investigatory meeting; is that right?
15      A.  Yep.
16      Q.  Okay.  You say, They are taking forever, at
17  1:46 p.m.
18      Do you see that?
19      A.  Yeah.
20      Q.  And then Ms. Coppedge responds, Yes.
21  Andrea said she would know something around 3:00.  Not
22  sure what that means.
23      Do you see that?
24      A.  Yes.
25      Q.  You respond, Okay, thanks.  They probably

Page 187

1  turned it over to legal, or maybe they will just offer me
2  money to go away.
3      Do you see that?
4      A.  Yes.
5      Q.  Did you want them to offer money to go
6  away?
7      A.  No, it was -- honestly -- no.  We had
8  discussed that Frontier -- from my memory, we had
9  discussed that Frontier tends to just offer money to have
10  it be settled.
11      Q.  Were you hoping that they would offer you
12  money to settle?
13      A.  No.  I wanted my job.  I wanted to keep my
14  job.  And that's what I was fighting for in that
15  investigatory meeting.
16      Q.  I'm going to show you page 25 of the PDF.
17  I'm going to scroll down here.  Ms. Coppedge says, Hmm,
18  Jerry said he mentioned to you to apply for other jobs at
19  Frontier, and you haven't.  I said I know you sent an
20  email to either Laura or Kari inquiring.  Hadn't applied
21  for any of those jobs.
22      A.  These ones are switched around.
23      Q.  These ones are split up, right?
24      A.  Yeah, Inquiring...
25      Q.  It looks like Ms. Coppedge is asking you

Page 188

1  about whether you applied for jobs; is that right?
2      A.  Correct.
3      Q.  And then she's asking about helping in
4  Inflight.  Okay.  And she's -- this is the question I had.
5      A.  Mm-hmm.
6      Q.  You text back, That, and all of the jobs I
7  saw on UltiPro, I didn't qualify for.
8      Did you see that?
9      A.  Yes.
10      Q.  Is it true that all of the jobs you looked
11  at, you didn't qualify for?
12      A.  All the jobs that I looked at, yes.  Not
13  every single job on that page.  Of course, I could have
14  been a -- I could have probably transferred to baggage
15  handling or something like that, but that is in no way
16  what I wanted to do.
17      Q.  Okay.  You say, I also don't want to lose
18  my seniority by switching out of inflight.
19      Do you see that?
20      A.  Yes.
21      Q.  And that's what we -- you had testified
22  for -- about before, correct?
23      A.  Yes.
24      Q.  I want to ask you in general about your
25  conversations with Stefanie Coppedge about all of these

Page 189

1  issues you've been testifying about today.
2      A.  Yes.
3      Q.  So at some point in time, did you discuss
4  with Ms. Coppedge your various requests for accommodation
5  with Frontier?
6      A.  Yes.
7      Q.  On how many occasions did you speak with
8  her?
9      A.  Lots.  She and I talked quite a bit.  She
10  was also the one that told me that I was protected under
11  the ADA, and that I should look into that, which is what
12  made me start going down -- realizing that I was a
13  protected person by the ADA.  And that's why, in that
14  investigatory meeting, I mentioned that it was illegal
15  what was happening and that I was under the category of
16  the ADA.
17      Q.  What specifically did Ms. Coppedge tell you
18  about that topic?
19      A.  I don't remember really exact words or
20  anything.  But I think she just mentioned that, Hey, you
21  need to look into the Americans with Disabilities Act,
22  what they're doing is illegal.
23      Q.  Did she use those words, "what they're
24  doing is illegal"?
25      A.  I can't tell you if those were the

48 (Pages 186 - 189)

Page 190

```
 1   specific words.  But I can tell you, from my
 2   conversations with Stefanie, she was not happy about what
 3   was happening.
 4        Q.   And you don't know if she used those words,
 5   correct?
 6        A.   Not definitively, I couldn't tell you.
 7   But that was the general idea.
 8        Q.   Who else at the company did you speak with
 9   about your requests for accommodation?
10        You spoke with Stefanie Coppedge, correct?
11        A.   Mm-hmm.
12        Q.   You spoke with Jerry Arellano, correct?
13        A.   Correct.
14        Q.   You spoke with Kari Thompson, correct?
15        A.   Mm-hmm.
16        Q.   You spoke with --
17        A.   Cassandra Micklich.
18        Q.   Cassie Micklich, correct?
19        A.   Yep.
20        Q.   Who else?
21        A.   Adrienne Prince.
22        Q.   And who else?
23        A.   I tried to talk to Laura Rush about it,
24   but that's when she sent me to Leave of Absence instead.
25   I mean, I had talked to quite a few people that I
```

Page 191

```
 1   couldn't even tell you who they were now.
 2        Q.   Well, let me ask you this:  In all of your
 3   conversations with Frontier personnel --
 4        A.   Mm-hmm.
 5        Q.   -- did anyone ever say to you that they
 6   believed you were being discriminated against on the basis
 7   of a disability?
 8        A.   Yes.
 9        Q.   Who told you that?
10        A.   I believe Stefanie.
11        Q.   What exact words did she use?
12        A.   I couldn't tell you with 100-percent
13   certainty, Danielle.
14        Q.   So what you recall is that she referred you
15   to the ADA and suggested that you look into it, correct?
16        A.   Yes.  And she said that you
17   are -- alcoholism is covered under the ADA, and what
18   they're doing is illegal.  And I couldn't tell you if she
19   used those exact words or not, but that was what I got
20   out of it.
21        Q.   That's what you inferred, but you -- she
22   didn't say -- at least you don't --
23        A.   I can't tell what she did or --
24        Q.   -- you don't recall her saying --
25        A.   -- didn't say.
```

Page 192

```
 1        Q.   Okay.  And you've got to let me get my
 2   questions out for the record.  That's for -- for Laurel,
 3   who probably has her hands up, although I can't see.
 4        Okay.  So let me -- let me get this out
 5   again, okay?  Because I want to make sure I have this
 6   down.
 7        Are you saying that Stefanie Coppedge
 8   definitely told you that she believed that the
 9   company -- what the company was doing was illegal?
10        A.   I'm 99 percent sure, Danielle.
11        Q.   She didn't use those words, correct?
12        A.   I don't know if she did or not.
13        Q.   And she --
14        A.   That's what I have -- so this is what I
15   have in my memory from, what, five years ago.
16        Q.   Yeah.  And so here's a question I have.  I
17   mean, clearly you have a recollection of her referring her
18   to the ADA, correct?
19        A.   Correct.
20        Q.   And you have a recollection of her telling
21   you that alcoholism was a protected category, correct?
22        A.   Correct, and that Frontier was doing
23   was wrong.  I know for a fact that was said.  I don't
24   know if she said "illegal."  But she said, What Frontier
25   is doing is wrong.
```

Page 193

```
 1        Q.   Okay.  Because that is a distinction in my
 2   mind --
 3        A.   Okay.
 4        Q.   -- between those two thing.
 5        So here's what I want to ask you:  Did you
 6   ever talk with her about the specific accommodations that
 7   you requested?
 8        A.   Yes.
 9        Q.   Okay.
10        A.   She knew everything that I was trying to
11   do.
12        Q.   Did she ever say to you that she believed
13   these accommodation requests were reasonable as a legal
14   matter under the ADA?
15        A.   She did say that, I don't understand why
16   they're not giving you any of these, from my memory.
17        Q.   Did she ever say to you anything along the
18   lines that she thought that these accommodation requests
19   were reasonable requests that had to be given to you as a
20   legal matter under the ADA?
21        A.   Not in the legal mumbo-jumbo that you just
22   said, but she said, I don't see why Frontier won't
23   reasonably accommodate you.
24        Q.   Okay.  And did she say that in general, or
25   was --
```

49 (Pages 190 - 193)

Page 194

1      A.  I guess.

2      Q.  -- it specific -- I guess, let me ask it

3  this way:  Was her -- were her comments just, in general,

4  I don't understand why they won't reasonably accommodate,

5  or was it specific as to -- you know, as to this

6  accommodation request you made, I don't understand why?

7      A.  I think it was specific, from my memory.

8      Q.  Okay.  Which specific request?

9      A.  The blank schedule, because she was there

10  when I was talking to Adrienne Prince before the meeting

11  as well when we were discussing that what I was doing

12  would not violate the CBA, according to Adrienne Prince,

13  and Stefanie agreed.

14      Q.  Well, I mean, Stefanie, in that transcript,

15  she never says anything along the lines of a -- never

16  mind.  Strike that.

17      A.  This is a conversation we had before we

18  went into the meeting.

19      Q.  Okay.  And tell me exactly what she said in

20  that conversation.

21      A.  And I can't tell you exactly, Danielle.

22  It's not recorded.  But this is what I remember from my

23  memory.  Stefanie was great with me.  She was the one

24  person that was, like, on my side, what they're doing is

25  wrong.  She is the one that helped me out so much.

Page 195

1      Q.  And what was your recollection of what she

2  said?  You said you can't remember exactly.  But what was

3  your general recollection?

4      A.  Basically, she didn't agree with what

5  Frontier was doing.  She didn't -- she wanted them --

6      Q.  But she didn't, as a legal -- she didn't,

7  as a legal matter, tell you that Frontier was

8  discriminating against you, correct?

9      A.  She's not an attorney.  No, she

10  didn't -- I mean, we weren't discussing it in attorney

11  terms.  We were talking about the ADA and that I was

12  protected as being an alcoholic, and that what they were

13  doing was wrong.  That's the whole reason she steered me

14  to the ADA.

15      Q.  Do you remember her at any point saying

16  specifically that this blank schedule concept would not

17  violate the contract?

18      A.  I do remember discussing it before we went

19  into the meeting with Adrienne.

20      Q.  To the best of your recollection, what

21  specific words did she use in that regard?

22      A.  And I can't tell you specific words,

23  Danielle, because I don't know.  I just told you what I

24  recall from my memory.  We were discussing what I was

25  asking, and I sort of told them where I was going with my

Page 196

1  argument kind of thing in the meeting.  And we had

2  discussed -- Adrienne and I were discussing how that

3  wouldn't have violated the CBA, and they think

4  that -- they both said, Oh, I think you're going to be

5  okay here.  Frontier can't legally fire you.

6      Q.  You just said that she didn't say anything

7  about legalities.

8      A.  Right.  This is Adrienne.

9      Q.  Right.  But either way, I mean -- what did

10  Adrienne say about this specifically?

11      A.  I just told you.  This is from my memory.

12  It is not word-for-word.  But this is what I remember

13  being said, Danielle.

14      Q.  Well, in that transcript, I didn't see

15  anything about Adrienne commenting one way or the other

16  about legalities, did you?

17      MR. CRONE:  Let me -- let me just put an

18  objection on the record.  It's been asked and answered.

19  I think she's gone to great lengths to try to give you

20  the answer.  That's the objection.

21      Q.  (By Ms. Kitson)  You can answer.

22      A.  What was the question?

23      Q.  In the transcript, I didn't see Adrienne

24  anywhere commenting on legalities, did you?

25      A.  You would have to put the transcript up in

Page 197

1  front of me, and I would have to read it word-for-word.

2      Q.  Do you have any recollection of that being

3  mentioned in that specific meeting?

4      A.  You'd have to put the transcript in front

5  of me, Danielle.

6      Q.  I'm asking you about what you remember.

7      A.  I remember her saying that what I was

8  requesting to do would not violate the CBA.

9      Q.  Okay.  But you do not remember her saying

10  something along the lines of it would be illegal to fire

11  you, correct?

12      A.  I do remember something along those lines

13  being said, by both Stefanie and Adrienne.  Now, if it

14  was being said --

15      Q.  But you testified earlier that you don't --

16  you testified earlier that you don't remember the exact

17  words, correct?

18      A.  I don't understand where the disconnect is

19  here, Danielle.  I do not remember the exact words.  But

20  that is generally my memory.  I do remember that.  And I

21  remember saying that, What they are doing is illegal.

22  And nobody said, Oh, no, wait, hold on.

23      Q.  One second.  So I'm showing you again

24  Brigham Exhibit 33.  Oops, this is the wrong one.  We're

25  looking for the 11/3 meeting, right?  44.  Actually, I

50 (Pages 194 - 197)

Page 198

1   want to text searchable, so I'm going to go to 34.
2        A.  And I'm going to need a quick break after
3   this, please.
4        Q.  Okay.  And I am in -- just for the record,
5   I'm looking at Brigham Exhibit 34, which is the
6   transcription that we had made of the November 3rd, 2015
7   meeting.
8            Do you see that?
9        A.  Correct.
10       Q.  Okay.  And I'm going to do a word search
11  for "legal."  And we're going to get "Legal Geography"
12  for all 29 pages.  So instead, let me look for "illegal."
13           So no one used the word "illegal" in
14  this --
15       A.  Not during that transcript, no.
16       Q.  Or in that meeting in general, did they?
17       A.  No.
18       Q.  Okay.
19       A.  Obviously.
20       Q.  I'm going to put in the word "law."
21           No one talked about the law, did they?
22       A.  Apparently not.
23       Q.  Okay.
24       A.  Put in "ADA," which is a law.
25       Q.  Nobody said anything that anything was

Page 199

1   wrong, correct?
2            MR. CRONE:  Danielle, maybe try "undue
3   hardship."
4        Q.  (By Ms. Kitson)  You can answer the
5   question, Ms. Brigham.
6        A.  Clearly not.
7        Q.  All right.  So just one last time for the
8   record, you don't recall the exact words that anyone
9   used --
10           MR. CRONE:  Objection, asked and answered.
11       Q.  (By Ms. Kitson)  -- with respect to --
12       A.  I don't know how many times I have to --
13       Q.  Can you let me get the question out?
14           MR. CRONE:  Yeah, I -- I apologize.  And
15  then when you do, the objection's going to be asked and
16  answered.
17           MS. KITSON:  That's lovely.
18           (By Ms. Kitson)  Ms. Brigham, the question
19  is, at no point do you remember the exact wording that
20  Frontier personnel used in terms of whether any conduct
21  concerning you was illegal, correct?
22       A.  Correct, but that was the general idea,
23  they were violating the law.
24       Q.  Okay.  Do you want to take a break now?
25       A.  Yes, please.

Page 200

1            THE VIDEOGRAPHER:  We're going off the
2   record at 2:00 p.m.
3            (Recess from 2:00 p.m. to 2:14 p.m.)
4            THE VIDEOGRAPHER:  We're going back on the
5   record at 2:14 p.m.
6        Q.  (By Ms. Kitson)  Ms. Brigham, do you
7   understand you're still under oath?
8        A.  Yes.
9        Q.  We're almost done, actually.  I'm just
10  going to show you a few more exhibits.  Hold on one second
11  here.  I'm showing you what has been marked as Brigham
12  Exhibit 47.
13           Do you recognize this exhibit?
14       A.  Yes.
15       Q.  What is it?
16       A.  This is a pilot for Frontier Airlines that
17  was trying to get me into a network marketing thing.
18       Q.  His name is Dale Kinsey; is that correct?
19       A.  Correct.
20       Q.  Mr. Kinsey was not a manager at Frontier,
21  correct?  Did you hear the question?  I'm sorry.
22       A.  I said, Correct.
23       Q.  Oh, okay.  And Mr. Kinsey didn't have any
24  position with the union to your knowledge, correct?
25       A.  Correct.

Page 201

1        Q.  Okay.  I'm just going to ask you about a
2   couple of pages here.  The first one is PDF page 7.  And
3   I'm actually going to PDF page 6.
4            It appears that Mr. Kinsey's texts are in
5   yellow; is that correct?
6        A.  Yes.
7        Q.  And yours are in blue?
8        A.  Correct.
9        Q.  Okay.  And again, we have Wednesday,
10  November 4th, 2015.
11           Do you see that here in the document?
12       A.  Yep.
13       Q.  And that was the day after your final
14  investigatory meeting, correct?
15       A.  Correct.
16       Q.  Okay.  And you're talking about -- you say,
17  I should know something by 3:00.  I'm on pins and needles.
18           Do you see that?
19       A.  Correct.
20       Q.  What were you waiting to learn?
21       A.  I was hoping that I would still have my
22  job, but I was just waiting to see the final outcome of
23  that investigatory meeting.
24       Q.  Okay.  And you say, LOL.  I just want to
25  know either way, those fuckers.  I'm sure they are doing

51 (Pages 198 - 201)

Page 202

1  it on purpose.
2      Do you see that?
3      A. Yes.
4      Q. What is that a reference to?
5      A. Torturing me.
6      Q. Okay. And did you view the personnel at
7  Frontier to be, quote, fuckers?
8      A. In this instance, yes.
9      Q. So page 11. And again, he has a text from
10  you, and I'm just going to ask you about the last part.
11  You say, I want punitive damages, because this is
12  bullshit.
13      Do you see that?
14      A. Yes.
15      Q. Are you seeking punitive damages in this
16  case?
17      A. Absolutely.
18      Q. And how much money are you going to ask a
19  jury for?
20      A. I don't want what happened to me to happen
21  to anybody else. So I will ask the jury for the maximum
22  amount that they can give. Frontier knew what they were
23  doing was wrong and continued to terminate me anyways,
24  even after I brought up the ADA. They knew what they
25  were doing was wrong and did it anyways, and that is

Page 203

1  grounds for punitive damages.
2      Q. Page 12, same reference. Still nothing
3  from the company, fuckers. I'm speaking with an attorney
4  today.
5      Is that, again, a reference to Frontier's
6  personnel?
7      A. Yes.
8      Q. I'll show you Exhibit 7. This is just
9  following up on a line of questioning earlier today.
10  Brigham Exhibit 7 is a document from the Colorado
11  Department of Labor and Employment to you.
12      Is this a true and correct copy of the
13  unemployment benefits that you received in 2015?
14      A. It looks like it.
15      Q. And was that $890? Does that sound about
16  right?
17      A. Yeah.
18      Q. And then -- okay. This will be Exhibit 3.
19  Brigham Exhibit 3, which is your 2016 W-2 from Great West
20  Painting & Repair; is that correct?
21      A. Yep.
22      Q. And does it show you made $14,502.69 from
23  Great West Painting in 2016?
24      A. Yes.
25      MS. KITSON: Okay. All right. In

Page 204

1  general, I think I'm almost done. If I could just have
2  five minutes here to organize my notes so that I can kind
3  of close out, that would be great.
4      Could we go off the record?
5      THE DEPONENT: Yeah.
6      MR. CRONE: Hey, Danielle, do you mind if
7  we did ten minutes again? I know we just did it, but
8  then I can organize my notes. I just have a few
9  follow-up questions, and then I'll be ready to go.
10      MS. KITSON: Absolutely. We have plenty
11  of time. So yeah.
12      THE VIDEOGRAPHER: We're going off the
13  record at 2:20 p.m.
14      (Recess from 2:20 p.m. to 2:33 p.m.)
15      THE VIDEOGRAPHER: We're going back on the
16  record at 2:33 p.m.
17      Q. (By Ms. Kitson) Ms. Brigham, do you
18  understand you're still under oath?
19      A. Yes.
20      Q. I wanted to ask you about your case. We
21  were talking about the fact that you'd be seeking punitive
22  damages.
23      Is that -- do you remember that testimony?
24      A. Yes.
25      Q. As part of your damages, will you be

Page 205

1  seeking emotional distress damages, so damages --
2      A. Yes.
3      Q. -- for how you've been impacted?
4      A. Yes.
5      Q. And can you tell us, how have you been
6  impacted by your termination of employment from Frontier?
7      A. It literally changed the course of my
8  life. Part of my identity and who I was so proud to be
9  was being a flight attendant. I loved my job. I told
10  everybody about my job. I was proud of my job. I -- I
11  just loved it. I loved working with the customers. It
12  was great.
13      So to have that suddenly torn away from me
14  was awful. It changed my sort of view on -- I tend to be
15  very Pollyanna, like everything's going to work out,
16  everything's going to be fine, and it kind of crushed
17  that when it didn't work out that way even though the law
18  was on my side.
19      It sort of changed my whole world view on
20  everybody should do what is right, and that didn't happen
21  in this case, and that hurt. That was terrible. You
22  couldn't pay me enough money to go through what I went
23  through again. At a time when I got home from treatment,
24  at a time when I'm supposed to be mending my
25  relationships with my family, my friends, and all the

52 (Pages 202 - 205)

Page 206

1  people that I had done harm to during my active
2  alcoholism, I was dealing with stuff with Frontier.  And
3  then all of a sudden, I didn't have health insurance for
4  my family.  I wasn't able to provide any type of money
5  for my family.  I -- I didn't know what to do.  I didn't
6  know how to be for a while.
7         I mean, I was a flight attendant, and I
8  was dang proud of it.  I also was sort of -- it changed
9  the dynamics in my marriage.  I was working, so was my
10  husband, and at times, I was the main breadwinner.  So
11  for me to get knocked all the way down to unemployed was
12  awful.
13        It -- I mean, it's hard to even describe.
14  The anxiety that I went through, having to change my
15  whole life, was awful.  I feel like I wouldn't be in
16  Michigan.  I wouldn't be -- yeah.  It would just be a
17  completely different life.
18        Q.  Okay.  I'm going to show you again an
19  exhibit that we looked at before, which is Exhibit 33,
20  which is the transcript of that October 9th, 2015 meeting
21  that you had.
22        A.  Yes.
23        Q.  Do you recall -- so it looks like you're
24  speaking with a Jeff here.
25        A.  Jeff Varney.

Page 207

1         Q.  That's Jeff Varney?
2         A.  Yes.
3         Q.  And you're talking with him about -- he
4  says, I look like a hillbilly.  You say, Here's your
5  flight attendant for the day.  He say, Yep, exactly.  I'm
6  from Denver.  And you say, Too funny.  Yeah, I just don't
7  know what else I'd want to do, Jeff, and this gives me
8  enough time off, because I'm going to start school in
9  November.
10        Do you see that?
11        A.  Yes.
12        Q.  So in the time that you were going through
13  this disciplinary process with Frontier --
14        A.  Yes.
15        Q.  -- were you planning to start school in
16  November?
17        A.  Yes, I was going to do -- it's called
18  Trinity College.  They had a naturopath program, a few
19  different programs that I wanted to take.  I was
20  interested in learning more about holistic medicines and
21  the naturopath.  It wasn't to change a career.  It was
22  more for my -- myself.  And, of course, I could have
23  turned that into a career and had something to fall back
24  on.
25        Q.  And why didn't you end up going to school

Page 208

1  after your termination of employment?
2         A.  There's no way I would have been able to
3  afford it.
4         Q.  If you take a look here, we're on page 43
5  of the PDF, you say -- you're talking with Jeff again?
6         A.  Mm-hmm.
7         Q.  And you're talking about flight
8  attendant -- being a flight attendant?
9         A.  Mm-hmm.
10        Q.  And he's talking about an office job, and
11  you say, Yeah.  And he says, You lose so much time off.
12  And you say, Do you?  And then Meredith, who I believe is
13  Cassie, says, Yeah, I feel like, God, I get -- I get up, I
14  come to work, I go home, eat dinner, and I go to bed.  I'm
15  like it's five days a week.  You say, Yeah.
16        You continue talking about it.  And Jeff
17  says, You know, I so look forward to my weekends, and it's
18  like, shit, Sunday night, I have to go to work again -- or
19  no work again.
20        Do you remember having that conversation
21  with him?
22        A.  Yes.
23        Q.  And was he expressing that kind of a
24  regular 8-to-5 job is difficult?
25        A.  Yes.

Page 209

1         Q.  And you say, Yeah, that's why I want to
2  keep doing turns if I can, because then I'll be able to go
3  back to school, and in 22 months, have my degree.
4         Do you see that?
5         A.  Yeah.
6         Q.  So is part of the reason that you wanted to
7  do turns and not have overnights is so that you could go
8  back to school?
9         A.  This actually is -- when I said "keep
10  doing turns," it was even after I was able to do layovers
11  and stuff through my treatment.  Yeah.
12        Q.  And -- so that's part of the reason you
13  wanted to keep doing turns is so you could go to school?
14        A.  Yes, but I could have done that even if I
15  was doing layovers too, in an online program.
16        Q.  But it says here that that's why you want
17  to keep doing turns, right?
18        A.  Yes, keep doing turns even after -- like
19  after everything was all said and done and I was done
20  with therapy and all that stuff.  That's why I said "keep
21  doing turns."
22        Q.  Okay.  And --
23        A.  To my memory.
24        Q.  And you -- Jeff says, What are you looking
25  for?  And then you talk about becoming a naturopath,

53 (Pages 206 - 209)

Page 210

1  correct?
2      A.  Yeah.
3      Q.  And that would have been a 22-month
4  program; is that correct?
5      A.  I believe so.
6      Q.  Okay.  I believe you also talked in this
7  meeting about wanting to spend time with your children and
8  that being why -- part of the reason why you wanted to
9  remain a flight attendant and have turns instead of
10  overnights; is that correct?
11      A.  That's why I wanted to be a flight
12  attendant.  With a flight attendant job, you get much
13  more time at home.  I mean, you're gone for a chunk of
14  time usually, but then you have -- on average, you have
15  like up to 15, to 20 sometimes, days off a month.
16      Q.  And with those turns, I think you said that
17  you're able to pick your kids up from school, for
18  instance?
19      A.  It just depends on when the turn was.
20      Q.  And it was your preference to not have to
21  do overnights in part so that you could stay home with
22  your family, correct?
23      A.  No, that was strictly because of my
24  recovery.
25      Q.  So you wouldn't mind the overnights, even

Page 211

1  though you'd be away from your kids?
2      A.  No, not at all.  Sometimes it's a nice
3  break.  But it was not safe for me to do that in my
4  recovery at the time.  I missed layovers.  I really did.
5      Q.  And you were a flight attendant for eight
6  years; is that correct?
7      A.  A little over.
8      Q.  And I'm sure you had contact with a lot of
9  flight attendants in that time; is that correct?
10      A.  Correct.
11      Q.  You were friends with flight attendants,
12  right?
13      A.  Yeah.
14      Q.  And --
15      A.  That was the majority of my social life
16  was being a flight attendant.
17      Q.  To your knowledge, who generally gets to do
18  turns?
19      A.  Senior flight attendants, and at one
20  point, I was not considered a super senior, but I was
21  senior enough to hold turns.  Little turns.  I couldn't
22  hold the big high-hour New York/LaGuardia turns, but I
23  was able to hold the super early in the morning Dallas
24  turn that had me home by 11:00 in the afternoon.
25          And then Frontier opened up -- Frontier

Page 212

1  opened the new base in Orlando, and everybody junior to
2  me went over there to get a line.  So, therefore, because
3  I couldn't obviously move to Orlando, I -- my seniority
4  went down, and that's when we started having problems.
5  And that's when I started asking for reasonable
6  accommodations so that this could work with my recovery.
7      Q.  So turns is what people typically --
8  that -- that was the premium, right, what people wanted?
9      A.  Not necessarily.  Everybody was different.
10      Q.  But for the most part?
11      A.  No.  I knew lots of people that would
12  prefer two days, and lots of people that preferred to fly
13  up to six days in a row.  That way they could have, like,
14  two weeks off.  It just depended on the person.  I mean,
15  super senior people were the ones that were able to hold
16  those long LaGuardia turns, which are eight flight hours
17  in a single day.  But there were also lots of super
18  senior people that liked to fly trips.
19      Q.  Did you ever apply for a transfer to
20  Orlando?
21      A.  Absolutely not.
22      Q.  Why not?
23      A.  Because I couldn't uproot my family and
24  move to Orlando.
25      Q.  If you had moved to Orlando, could you have

Page 213

1  held turns?
2      A.  I'm assuming.
3      Q.  And could you have commuted to Orlando?
4      A.  No.  And not -- well, I mean, technically
5  somebody can commute, but for me, for my recovery, I did
6  not feel comfortable being on an overnight or away from
7  my recovery and my support system at home overnight,
8  which commuting would have meant that I had to fly in the
9  day early, I'd have to stay in a hotel in Orlando to do
10  turns.  So it's pointless.  I might as well at that point
11  have done overnights.
12      Q.  What other reasons other than alcoholism
13  did you not want to do overnights?
14      A.  Alcoholism was the main one.
15      Q.  Were there others?
16      A.  Not that I can recall at this time.
17      Q.  So it didn't bother you at all to do
18  overnights for family reasons?
19      A.  I mean, it was nice when I was home, but
20  it wasn't the reason why I was asking for a reasonable
21  accommodation.
22      Q.  I want to talk to you a little bit about
23  the other stressors in your life in terms of other things
24  that have contributed to your emotional distress that are
25  not related to Frontier.

54 (Pages 210 - 213)

Page 214

1    What are the major emotional stressors that
2  you've experienced in your life?
3    A.  The death of my daughter in 2009.
4    Q.  Okay.  Tell me about that.
5    A.  I was five and a half months pregnant, and
6  I got an infection in the lining of my uterus, because I
7  have an incompetent cervix, which we didn't know then.
8  And I got an infection in the lining of my uterus, and my
9  body went into labor to try and get rid of the infection.
10  My daughter, Cindy Lee Brigham, was born, and lived for
11  45 minutes and died in my arms.
12    Q.  How does that still impact you today?
13    A.  It's hard.  I would have a 12-year old.
14  It's really hard.  I'm not going to lie.
15    Q.  And I'm so sorry for your loss.
16    A.  I did lots of therapy about it, so I'm way
17  better than, of course, I was.  Prior to going to
18  treatment, I just hadn't even dealt with it emotionally.
19  I ignored it.  I drank it away.  And when it comes to
20  treatment, I did a bunch of therapy around it.
21    And I did a bunch of, like, psychoactive
22  therapy.  I just don't know what they call it.  It's like
23  psychotherapy or something.  And it was very -- it was so
24  hard.  It was the first time that I allowed myself to
25  feel those feelings and to feel them sober.  It was hard,

Page 215

1  but it helped.
2    Q.  And that was happening all in this same
3  time period of 2014/2015, as you were --
4    A.  2014 is when I finally faced it and dealt
5  with it in treatment.
6    Q.  And so that period must have been very
7  hard, the 2014/2015 period, dealing with that at the same
8  time that you were going through this disciplinary
9  process, I would imagine?
10    A.  Of course.
11    Q.  What other major emotional stressors have
12  you had in your life, not counting Frontier?
13    A.  I honestly -- Frontier.  I put my daughter
14  and Frontier in pretty much the same category.  They both
15  destroyed my happiness, what I thought was going to be my
16  life, and just destroyed it.  I was worth something when
17  I was a flight attendant.  I was proud.  It was what I
18  wanted to do when I grew up.
19    Can I have a minute?
20    Q.  Yes.  Absolutely.
21    A.  Thank you.
22    Q.  Do you want to go off the record for five
23  or --
24    A.  Yes, please.
25    Q.  Okay.

Page 216

1    THE VIDEOGRAPHER:  We're going off the
2  record at 2:49 p.m.
3    (Recess from 2:49 p.m. to 2:57 p.m.)
4    THE VIDEOGRAPHER:  We're going back on the
5  record at 2:57 p.m.
6    Q.  (By Ms. Kitson)  Ms. Brigham, do you still
7  understand you're under oath?
8    A.  Yes.
9    Q.  I just have some wrap-up questions for you.
10  I want to make sure I understand your position in the
11  lawsuit.
12    So you wanted to be able -- every time you
13  had overnight trips, to just drop those and work in the
14  general office, correct?
15    A.  That was one of them, correct.
16    Q.  Even though no one else got to do that
17  other than on-the-job-injured individuals, correct?
18    A.  I don't know if they allowed other
19  individuals to do that, Danielle.  I can just speak to my
20  position.
21    Q.  But you wanted to be treated better than
22  everyone else in that regard, correct?
23    A.  I was asking for a reasonable
24  accommodation.
25    Q.  And you wanted to be able to drop your

Page 217

1  entire schedule after bidding and build it up from --
2    A.  Not drop my entire schedule.  Don't award
3  me anything.
4    Q.  All right.  Let me put it a different way.
5    You wanted to not even have to bid and get
6  to start off with scratch with no schedule?
7    A.  Correct.
8    Q.  Where everybody else had the whole 45,
9  correct?
10    A.  Correct.
11    Q.  But you get to be treated better than
12  everyone else, right?
13    A.  I was asking for a reasonable
14  accomodation, and that is my right under the ADA.
15    MR. CRONE:  And -- and -- and I want to
16  put an objection on the record that the question's
17  mischaracterizing the witness' prior testimony.
18    Q.  (By Ms. Kitson)  And, Ms. Brigham, you also
19  wanted to, after you bid a full schedule, have your
20  overnight trips just magically taken off, correct?
21    A.  Correct.
22    Q.  Even though no one else got to do that,
23  correct?
24    A.  I don't know what they did for other
25  people, Danielle.  They did it for me a few times,

55 (Pages 214 - 217)

Page 218

1 proving that they could have done it very quickly with a
2 stroke of a key.
3     Q. But you wanted to be able to do that when
4 not everybody could, correct?
5     A. That was one of my reasonable
6 accommodation requests, correct.
7     Q. And people senior to you would not have
8 been able to do that, correct?
9     A. I don't know. I at one point talked to
10 Frontier about setting up a program for people who have
11 self-disclosed to the company, and that was actually
12 during my October 9th meeting with them. And they said I
13 would have had to go to the union in order to do that.
14 And then they fired me before I could even set anything
15 up to help people that are in our position.
16     Q. You're not aware of anyone more senior to
17 you getting to do that, just drop overnight trips whenever
18 they do that, correct?
19     A. If the reserve grid was in the green, they
20 could, but if they didn't have -- that I'm aware of --
21 somebody being able to just go take them away.
22     Q. Okay. Let me ask it a different way.
23     Reserve's in the red, no one is allowed to
24 drop. You're not aware of anyone more senior to you being
25 allowed to just drop trips in that situation, correct?

Page 219

1     A. Correct.
2     Q. Okay. With respect to the blank schedule,
3 then -- and I asked you if, you know, everyone else would
4 have to hold 45 -- people more senior to you would have
5 had to hold 45, correct?
6     A. Again, I was asking for that as a
7 reasonable accommodation.
8     Q. But people more senior to you would have
9 been able to hold -- or forced to hold 45, correct?
10     A. People more senior than me would have been
11 able to bid what they wanted.
12     Q. But they always had to hold 45 hours,
13 correct?
14     A. Correct.
15     Q. And you wouldn't have had to do that,
16 correct?
17     A. Correct. It was part of what I was asking
18 as my reasonable accommodation.
19     Q. All right.
20     MS. KITSON: Those are my only questions.
21 John, did you have questions?
22     MR. CRONE: I have -- yeah, just a few,
23 though. Give me just one second, Danielle.
24     MS. KITSON: Sure.
25     THE DEPONENT: And can I actually have

Page 220

1 like two minutes? My dog is barking at the kids, I
2 think.
3     MS. KITSON: Yeah.
4     THE DEPONENT: Thank you.
5     THE VIDEOGRAPHER: We're going off the
6 record at 3:01 p.m.
7     (Recess from 3:01 p.m. to 3:04 p.m.)
8     THE VIDEOGRAPHER: We're going back on the
9 record at 3:04 p.m.
10     EXAMINATION
11 BY MR. CRONE:
12     Q. So, Rebecca, how many hours did you want to
13 hold? So the accommodation that you were just discussing
14 with Ms. Kitson, she was stating that -- that you wanted
15 to be able to, you know, build your schedule from scratch,
16 and everyone else would have to hold 45 hours.
17     How many hours were you proposing to hold?
18     A. As many as I could get to fit. I
19 mean -- and I didn't -- I don't think I remember about
20 the 45 hours being something that I remember now. But I
21 remember I would have to be up to 60 hours, which would
22 have been very doable had they reasonably accommodated
23 me.
24     My goal -- financially for my family, my
25 goal was to fly about 100 hours a month. That was my

Page 221

1 ultimate goal.
2     Q. Okay. So ideally, then, were you looking
3 to get a schedule of 100 hours per month with that
4 accomodation?
5     A. Yes.
6     Q. And then if you couldn't get the number of
7 hours you wanted, then would you just be out of luck?
8     A. I would be -- actually, at that point, I
9 would have been fine with 60 hours.
10     Q. Okay. Much earlier in the day, Ms. Kitson
11 asked you about whether or not you've applied for flight
12 attendant jobs -- flight attendant positions since being
13 terminated from Frontier.
14     Do you recall that?
15     A. Yes.
16     Q. And then you testified that currently you
17 live roughly two hours in traffic away from the Detroit
18 airport; is that correct?
19     A. Yes.
20     Q. And I wasn't clear, so I just want
21 to -- you had -- you had told Ms. Kitson, I think, that
22 one reason you couldn't get another flight attendant job
23 is now because you don't have the -- you wouldn't have the
24 seniority; is that right?
25     A. Yes. The seniority, and I was too far

56 (Pages 218 - 221)

Page 222

1    away from the airport, and I -- I could not have
2    commuted.
3        Q.  Couldn't have commuted.  And I thought
4    there was one other -- well, it doesn't matter, we can
5    look back at the transcript.
6        The -- so when you -- Ms. Kitson also asked
7    you about being granted leave time when you went to
8    inpatient treatment.
9        Do you recall that?
10       A.  Yes.
11       Q.  How did that actually happen?  So did
12   you -- did you go to treatment, then request leave?  Did
13   you request leave, go to treatment?  What was the actual
14   sort of detail on the timeline?
15       A.  I went to treatment, and they granted me
16   the permission to use a computer, so that I could check
17   to see if my schedule was clear or what I had.  And at
18   that point, I was still on the schedule.  So that's when
19   I had to self-disclose to the company, and they granted
20   the medical leave.
21       Q.  Okay.  And why did you have to ask
22   permission to use the computer?
23       A.  Because the first week in treatment,
24   you're not supposed to have any phone calls, any access
25   to computers, anything for the first seven days.

Page 223

1        Q.  Do you remember who you emailed at Frontier
2    about it?
3        A.  I don't remember who I emailed.  I do
4    remember calling Claudia Galvez, and she's the one I
5    talked to on the phone, and told her my situation.
6        Q.  Okay.  And what did she tell you?
7        A.  Get better.  We'll handle everything else
8    on our end.  Just get better.
9        Q.  Okay.  Do you remember -- Danielle referred
10   you to various provisions of the CBA.
11       Do you recall those questions?
12       A.  Yes.
13       Q.  Is there anything, to your knowledge, in
14   the CBA that would prevent Frontier from granting you the
15   accommodations you requested?
16       A.  No.
17       MS. KITSON:  Object to form.
18       Q.  (By Mr. Crone)  And do you recall --
19   Ms. Kitson asked you if you should have been familiar with
20   the terms in the Collective Bargaining Agreement.
21       Do you recall that question?
22       A.  Yes.
23       Q.  I want to ask you the sort of mirror image
24   to that question.
25       Do you think Frontier should have been

Page 224

1    familiar with the terms of the Collective Bargaining
2    Agreement as well?
3        MS. KITSON:  Object to form.
4        A.  Yes.
5        Q.  (By Mr. Crone)  Okay.  Ms. Kitson put in
6    front of you a position description for a flight
7    attendant.
8        Do you remember that?
9        A.  Yes.
10       Q.  And it listed a bunch of essential job
11   functions.
12       Do you recall those?
13       A.  Yes.
14       Q.  And when -- when you -- when you -- after
15   you self-disclosed your disability of alcoholism, were you
16   able to complete those essential job functions?
17       A.  With my reasonable accommodation being
18   granted, yes.
19       Q.  Okay.  And what about without it?
20       A.  Without it, no, because if I had to do
21   overnights, I wouldn't have my sobriety.  Therefore, I
22   would be terminated by Frontier.
23       Q.  Okay.  And do you recall -- or actually,
24   let me start over.  Let me formulate the question a
25   different way.

Page 225

1        After you self-disclosed your disability of
2    alcoholism, did you have any trouble with your day-to-day
3    life?
4        A.  Yes.
5        Q.  Okay.  Do you recall being asked a
6    discovery -- a written discovery question by Frontier
7    about that topic?
8        A.  Yes.
9        Q.  And did you answer that honestly when you
10   answered it?
11       A.  Yes.
12       Q.  And are you still suffering any of those
13   issues; that is, your ability to complete day-to-day life
14   activity?  Do you have any issues with that now?
15       A.  The sleeping part, which is why I still
16   take trazodone.  But my life now is nowhere near what it
17   was early in recovery, when it comes to those post -- the
18   post-withdrawal symptoms.
19       Q.  So you've improved a good deal now?
20       A.  Yes.
21       Q.  And -- but what about right after the
22   self-disclosure, you know, from that time until you were
23   fired by Frontier, how was it then?
24       A.  I was still early in my recovery.  I had
25   issues sleeping.  And honestly, the Frontier stuff just

57 (Pages 222 - 225)

Page 226

1 made it worse. I -- yeah.
2        Q. I want to pull up Exhibit -- what was
3 Exhibit 43 in the deposition. So Ms. Kitson marked it as
4 Exhibit 43. I'm going to try to share my screen here and
5 see if I can make this work. Oh, there we go. Okay.
6        Okay. Can you see that, Rebecca?
7        A. Yes.
8        Q. Okay. So I'm at page 19 of Exhibit 43
9 which is Bates number Brigham LM, a bunch of 0s, 36?
10       A. Yes.
11       Q. And do you see at the top where it says,
12 Rebecca, it says, I don't know if I qualify?
13       A. Yes.
14       Q. Is that you speaking?
15       A. Yes.
16       Q. And then Kari below says, And you may or
17 may not, but I would -- I was telling her earlier, I mean,
18 there's so many opportunities, right? And then a bunch of
19 other stuff.
20       Is that Kari Thompson?
21       A. Yes.
22       Q. And then below you say, Right. Do you lose
23 your seniority? Kari says, after, question mark? And
24 then Jerry says, 90 days.
25       Is that --

Page 227

1        A. That's where I heard it.
2        Q. Is that Jerry --
3        A. There it is.
4        Q. Yeah. And is that Jerry Arellano?
5        A. Yes.
6        Q. And then Kari says, Oh, is it 90 days if
7 you stay with -- within the inflight? Jerry says, If you
8 stay within the company. Kari says, It's two years. If
9 you leave inflight, it's 90 days. And then Jerry says, Or
10 if you leave the company, it's 90 days.
11       A. Correct.
12       Q. Is that all -- is that all an accurate
13 transcript of the conversation, as you remember it?
14       A. Yes.
15       Q. Okay. And what does that mean to you, the
16 90 days? What -- what is -- what are they saying to you
17 there?
18       A. After three months in a temporary
19 position, you can't go back to inflight and keep your
20 seniority.
21       Q. Okay.
22       A. Which is what I remembered being told.
23       Q. Now, I want to move over to what was marked
24 Exhibit 46, and these are your text messages with
25 Stefanie Coppedge.

Page 228

1        Do you remember looking at these earlier?
2        A. Yes.
3        Q. Okay. And I'm going to go to what's
4 page 44 in the PDF. And just to refresh our memories, the
5 yellow is Stefanie, and the blue is you, right?
6        A. Correct.
7        Q. And here -- do you see right in the middle,
8 Ms. Coppedge says, My lovely husband says no grievance.
9 Fuck those mother fuckers, just sue?
10       A. Yes.
11       Q. First of all, is -- is -- is
12 Ms. Coppedge -- I mean, she used profanity in the text
13 message.
14       Does that make her a bad person in any way?
15       A. No, not at all.
16       Q. I mean, you -- you -- we've looked at some
17 text messages where you use profanity.
18       Does it make you a bad person?
19       A. No.
20       Q. But here, Ms. Coppedge is telling you to
21 sue Frontier, isn't she?
22       A. Yes.
23       MS. KITSON: Object to form.
24       A. Yes.
25       Q. (By Mr. Crone) Okay. And is she -- to

Page 229

1 your --
2        A. She wouldn't have said that if she didn't
3 know what they were doing was wrong.
4        Q. Okay. Do you think it was
5 against the law?
6        A. Yes.
7        MS. KITSON: Object to the form.
8        A. Otherwise -- otherwise, she wouldn't have
9 said "sue." You have to have a legal case in order to
10 sue somebody, not that you just don't like what they're
11 doing to you.
12       Q. (By Mr. Crone) Okay. I'm going to move to
13 page 14 of this same Exhibit 46. At the bottom, it's a
14 text message from Stefanie to you that says, American
15 Disabilities, discrimination, alcoholics.
16       Do you recall that text?
17       A. Yes.
18       Q. What's she telling you there?
19       MS. KITSON: Object to the form. Lack of
20 foundation.
21       A. To look into the ADA, because I was a
22 protected class in being an alcoholic. And that they
23 were discriminating against me basically for being an
24 alcoholic.
25       Q. (By Mr. Crone) Okay.

58 (Pages 226 - 229)

Page 230

1      MS. KITSON: And, Ms. -- Ms. Brigham, if
2  you could wait a tick after Mr. Crone asks the questions
3  so that I could get my objection in there on the record,
4  that would be great.
5      THE DEPONENT: Okay. Sure.
6      Q. (By Mr. Crone) Okay. I'm going to move to
7  page 30 of Exhibit 46. Down at the bottom, Ms. Coppedge
8  says, Seriously, sue for stress and anxiety, shit.
9      What's she telling you there?
10     A. That --
11     MS. KITSON: Object to the form.
12     A. She basically was telling me to sue for
13 stress and anxiety because of what Frontier was putting
14 me through.
15     Q. (By Mr. Crone) At page 44 of the same
16 exhibit, we're going to go back to where we started at the
17 bottom, she tells you, You should reach out to
18 Julia Jones. She sued and won, exclamation point! Maybe
19 she can help you attorney-wise.
20     What was that about?
21     MS. KITSON: Object to the form.
22     A. Trying to help me find an attorney to sue
23 Frontier.
24     Q. (By Mr. Crone) Okay. And give me just one
25 second. I think I only have -- oh, yeah. Last couple of

Page 231

1  questions, Rebecca. So let me get rid of this.
2      Earlier you had testified that you had
3  considered going to school at one point and that that
4  program would take roughly 22 months.
5      Do you recall that?
6      A. Yes.
7      Q. So at one point, you considered going to
8  school.
9      And did you do that because you were
10 interested in the subject matter?
11     A. Yes.
12     Q. Did you also think it might lead to a
13 better job?
14     A. Yes, down the road, it could have
15 possibly, especially if things went south with Frontier.
16     Q. But ultimately, you didn't go, because you
17 couldn't afford it because you got fired.
18     Is that -- was that --
19     A. Correct.
20     Q. Okay.
21     MR. CRONE: That's it, Rebecca. Thank
22 you. I appreciate it.
23     A. Thank you.
24     MS. KITSON: Can we just take two minutes
25 off the record, John, and then, I don't think I have

Page 232

1  anything, but let me just double-check, okay?
2      MR. CRONE: Sure. Sounds good.
3      THE VIDEOGRAPHER: We're going off the
4  record at 3:17 p.m.
5      (Recess from 3:17 p.m. to 3:21 p.m.)
6      THE VIDEOGRAPHER: We're going back on the
7  record at 3:21 p.m.
8      MS. KITSON: I don't have any further
9  questions. Thank you, Ms. Brigham.
10     THE DEPONENT: Thank you.
11     MR. CRONE: Thanks, Danielle.
12     MS. KITSON: And, Laurel, did you want to
13 ask us about the order?
14     THE REPORTER: Yes. First, Ms. Kitson,
15 your order, is it the same?
16     MS. KITSON: It will be our standard
17 order, whatever we ordered last time.
18     THE REPORTER: Mr. Crone?
19     MR. CRONE: Whatever is regular and
20 formal. So slow and cheap.
21     THE REPORTER: And then signature, do you
22 want to handle it?
23     MR. CRONE: Yeah, please. Thank you.
24     THE REPORTER: Okay. Thanks.
25     THE VIDEOGRAPHER: This concludes the

Page 233

1  videotaped deposition of Rebecca Brigham. We're going
2  off the record at 3:22 p.m.
3      * * * * * * *
4      WHEREUPON, the foregoing deposition was
5  concluded at the hour of 3:22 p.m. Total time on the
6  record was 4 hours and 47 minutes.

59 (Pages 230 - 233)

Page 235

REPORTER'S CERTIFICATE

1
2
3
4        I, Laurel S. Tubbs, a Registered
5  Professional Reporter, Certified Realtime Reporter, and
6  Notary Public within the State of Colorado, do hereby
7  certify that previous to the commencement of the
8  examination, the deponent was duly sworn by me to testify
9  to the truth.
10        I further certify that this deposition was
11  taken in shorthand by me remotely and thereafter reduced
12  to a typewritten form; that the foregoing constitutes a
13  true and correct transcript.
14        I further certify that I am not related
15  to, employed by, nor of counsel for any of the parties or
16  attorneys herein, nor otherwise interested in the result
17  of the within action.
18        My commission expires September 1, 2023.
19
20
LAUREL S. TUBBS
21        Registered Professional Reporter
         Certified Realtime Reporter
22        and Notary Public
23
24
25

---

Page 236

1  John Crone, Esq.
2  john@crone-law.com
3        September 18, 2020
4  RE:  Brigham, Rebecca v. Frontier Airlines, Inc.
5  8/31/2020, Rebecca Brigham (#4229140)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

---

Page 237

1  Brigham, Rebecca v. Frontier Airlines, Inc.
2  Rebecca Brigham (#4229140)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____     _____
24  Rebecca Brigham              Date
25

---

Page 238

1  Brigham, Rebecca v. Frontier Airlines, Inc.
2  Rebecca Brigham (#4229140)
3        ACKNOWLEDGEMENT OF DEPONENT
4  I, Rebecca Brigham, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____     _____
12  Rebecca Brigham              Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20____.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

**[& - 203]**                                                                 Page 1

**&**

**&** 21:22 26:8
  31:15 51:1,11
  57:1 203:20

**0**

**0001115** 34:8,14
**03417** 1:3 5:16
**0s** 226:9

**1**

**1** 3:9,19 4:2 5:11
  63:3 84:7,7 85:12
  130:3 167:17
  168:25 170:11
  235:18
**1,500** 53:19
**10** 25:3 117:6
  127:10
**10,000** 49:14
**10-23** 180:9,15
**100** 67:18 191:12
  220:25 221:3
**1003** 1:16
**10148** 8:11
**102** 130:11 132:13
**1029** 119:22
**1099** 2:19 28:9
**10:08** 90:11,12
**10:23** 90:12,14
**10:47** 109:15,16
**10:49** 109:16,18
**10th** 21:15,25
  147:4
**11** 2:21 54:22
  81:13 145:17
  146:9 152:9
  156:23 157:22
  202:9
**11/3** 197:25
**1118** 135:8

**112** 4:4
**114** 3:16
**118** 3:8
**119** 3:17
**11:00** 211:24
**11:17** 129:20
**11:37** 129:19
**12** 2:23 27:16
  36:10 55:16 157:7
  157:16 159:15
  163:5,10 203:2
  214:13
**123** 168:4,21 169:2
  169:21,23 170:12
**12:00** 6:25
**12:20** 129:20,22
**12th** 134:17 186:9
**13** 23:2 55:18
**134** 3:5
**139** 3:14
**13th** 125:12
  128:13
**14** 3:2 127:7 167:3
  168:16 229:13
**14,502.69** 203:22
**1432** 140:4
**145** 2:21
**1458** 117:7
**14th** 25:4
**15** 3:3 62:4 138:7
  179:25,25 210:15
**15,550.05** 51:7
**150** 52:6,8
**152** 3:9
**157** 2:23
**158** 52:9
**15th** 155:6
**16** 3:4 30:9 33:24
  34:5 45:12 46:10
**161** 3:19

**163** 3:10
**167** 3:2
**16th** 1:21 155:7
**17** 3:5 35:20
  134:11,12 137:1
**171** 3:20
**173** 3:11
**1766** 112:13
**179** 3:3
**17th** 140:14
**18** 154:1 236:3
**18.75.** 55:19
**182** 3:13,21
**184** 3:22
**18th** 82:18
**19** 1:3 5:16 25:16
  163:21 226:8
**1900** 1:21
**19th** 82:18
**1:03** 166:16,17
**1:17** 166:17,19
**1:46** 186:17
**1st** 153:4 155:18

**2**

**2** 2:13,15,16,18
  3:20 49:24 50:2,6
  50:25 51:4,10
  118:22 127:9
  148:25 155:17
  167:24 182:14,16
  183:10,21 203:19
**2,922.78.** 50:15
**20** 4:4 25:16 62:17
  63:3 112:12,12
  210:15 238:15
**200** 3:24 14:14
**2003** 29:23
**2004** 29:23
**2007** 26:18 34:17
  35:12

**2008** 35:20,25 46:2
**2009** 24:21 46:10
  63:8 214:3
**2011** 84:13
**2011-2016** 4:3
**2013** 21:24 23:2
**2014** 3:15 64:1,3
  65:9,11 67:5,6,20
  68:13,25 69:12,16
  69:18,23 70:2
  71:11,15,17,25
  114:20 116:4,13
  116:19 124:13,17
  125:12 128:13
  134:17 136:1
  139:15 140:8,14
  142:13 143:12
  148:9 158:18
  186:9 215:4
**2014/2015** 215:3,7
**2015** 2:19 3:9
  26:20 38:21 98:17
  112:22 147:4
  153:4 155:7,18
  158:13 161:17
  167:4,15 173:2,22
  178:24 180:1
  183:1 198:6
  201:10 203:13
  206:20
**2016** 2:13,15 50:5
  84:13 203:19,23
**2017** 2:16 50:25
  51:7
**2018** 2:18 27:7
  51:11,20
**2020** 1:12 2:5 5:3
  236:3
**2023** 235:18
**203** 2:13,19

[22 - 99]                                                                                Page 2

**22**   114:20 185:24 209:3 210:3 231:4
**220**   2:11
**22402**   235:20
**22nd**   116:3,13
**23**   3:8 118:8,11
**23rd**   35:12 183:19
**24**   3:9 13:13,20,24 42:19 152:21
**24/7**   54:21 81:6,13
**25**   187:16
**26**   180:1
**28th**   158:13
**29**   46:2 198:12
**2:00**   200:2,3
**2:14**   200:3,5
**2:20**   204:13,14
**2:33**   204:14,16
**2:49**   216:2,3
**2:57**   216:3,5
**2s**   49:10,20

**3**

**3**   2:13 28:25 137:8 174:5,5 182:14 203:18,19
**3,000**   28:25 52:5
**30**   56:5 62:17 135:18 139:21,22 177:18 230:7 236:17
**30,000**   49:17
**303-598-3526**   1:17
**303-629-6200**   1:22
**31**   1:12 2:5
**31st**   5:3
**32**   3:10 55:14 163:24 178:22 179:4
**33**   3:4,11 173:15 197:24 206:19

**34**   3:13 182:25 198:1,5
**35**   62:4
**36**   3:14 139:6,6,6 142:24 143:8 226:9
**37**   3:16 114:18,18 114:24
**3:00**   186:21 201:17
**3:01**   220:6,7
**3:04**   220:7,9
**3:17**   232:4,5
**3:21**   232:5,7
**3:22**   233:2,5
**3rd**   112:22 183:1 198:6

**4**

**4**   2:15 36:10 50:4 50:5 114:25 130:16 174:5 233:6
**41**   3:17 119:20,20 122:2 125:4
**413206**   116:14
**42**   3:19 161:8,9,10
**4229140**   236:5 237:2 238:2
**4274**   163:25
**43**   3:20 171:16,17 172:11,24 174:4 176:7 208:4 226:3 226:4,8
**44**   3:21 174:4 182:1 197:25 228:4 230:15
**45**   83:11,20,22 85:1,2,20,25 86:1 86:7 88:17 97:10 105:7 214:11 217:8 219:4,5,9,12

220:16,20
**4550**   1:16
**46**   3:22 184:18,19 185:12 227:24 229:13 230:7
**47**   3:24 200:12 233:6
**48438**   8:12
**4th**   67:7 161:17 167:4,15 178:24 201:10

**5**

**5**   2:16 50:24 127:9 208:24
**50**   2:15,16
**51**   2:18
**5th**   34:17 67:5,20 68:12,24 69:12,16 69:23 70:2 71:11 71:15,17,25 124:13

**6**

**6**   2:18 25:4 51:9 51:14 140:3 148:25 158:22 180:1 201:3
**60**   65:12,13 66:12 80:9 81:7 83:4,15 83:20 84:1 85:14 86:3 88:21 95:6 105:25 135:22 137:17 220:21 221:9
**670-1**   146:12
**67714**   21:24

**7**

**7**   2:19 143:7 149:23 159:2 201:2 203:8,10

**7,295**   51:17
**75**   81:11
**7th**   65:24 67:6,10 124:14,15,17 139:15 140:8

**8**

**8**   2:11 3:14 208:24
**8/31/2020**   236:5
**80**   97:17
**800**   1:21
**80202**   1:22
**80246**   1:17
**81**   168:3,21 169:2 169:21,22 170:11 170:14
**815**   84:17
**84**   4:2
**869**   85:9
**890**   203:15
**8:07**   2:5 5:3
**8:09**   6:22
**8:44**   32:12,13,13 32:15
**8th**   136:1,6 142:13 143:12

**9**

**9**   25:7
**9/7/14**   135:11
**90**   73:15,18 131:16 132:18,21 133:5 133:13 135:18 156:3 166:6 169:19 177:8 178:4 226:24 227:6,9,10,16
**916**   130:12
**93**   118:14
**94**   27:11
**99**   192:10

**[9:04 - admin]**                                                      Page 3

| | | | |
|---|---|---|---|
| **9:04** 48:17,18 | **absence** 2:22,25 | 109:4 110:2,15 | 114:11 116:25 |
| **9:16** 48:18,20 | 64:3,7,9,13,15,22 | 111:10 113:9 | 134:24 189:21 |
| **9th** 173:2,22 | 109:1 114:19 | 134:7 141:22 | **action** 1:3 5:22 |
| 206:20 218:12 | 116:3,12 180:5 | 193:6 212:6 | 163:21 235:17 |
| **a** | 190:24 | 223:15 | **actions** 33:11 |
| | **absences** 40:5 | **accomodation** | **active** 80:16 81:17 |
| **a.a.** 121:20,22 | **absolutely** 89:15 | 73:4 95:23 104:4 | 206:1 |
| **a.m.** 2:5 5:3 6:22 | 91:11 101:13 | 217:14 221:4 | **activities** 71:13 |
| 6:25 32:12,13,13 | 163:9 202:17 | **accompanying** | **activity** 150:2 |
| 32:15 48:17,18,18 | 204:10 212:21 | 137:13 | 225:14 |
| 48:20 90:11,12,12 | 215:20 | **account** 28:20,22 | **acts** 93:13 |
| 90:14 109:15,16 | **acceptable** 86:16 | 130:19 171:6 | **actual** 52:12 53:24 |
| 109:16,18 129:19 | **access** 222:24 | **accountability** | 62:13 125:1 |
| 129:20 | **accommodate** | 66:23 | 222:13 |
| **abilities** 141:16 | 44:16 58:25 | **accrue** 130:20 | **acute** 153:25 |
| **ability** 13:7,9,20 | 167:19 193:23 | 137:23 169:8 | 154:3 |
| 15:3 40:12,13 | 194:4 | **accrued** 38:22,25 | **ada** 16:4 17:6 44:7 |
| 66:13,20 68:9 | **accommodated** | **accumulate** 85:14 | 44:13 189:11,13 |
| 69:17,24 70:14,22 | 39:22 41:4 44:12 | **accuracy** 35:3 | 189:16 191:15,17 |
| 131:16 225:13 | 65:7 178:1 181:1 | 37:2 38:16,18 | 192:18 193:14,20 |
| **able** 53:1 57:3 | 220:22 | 162:20 173:8 | 195:11,14 198:24 |
| 58:12,25 60:22 | **accommodating** | 236:9 | 202:24 217:14 |
| 61:2,11 62:11,18 | 62:9 | **accurate** 33:22 | 229:21 |
| 66:8 67:13 69:5,8 | **accommodation** | 35:9 45:22 46:5 | **adapting** 160:8 |
| 69:13 70:3,5,8,11 | 49:2 73:24 74:1,4 | 46:21 62:19 | **add** 12:3 88:6 |
| 71:18 72:6,11 | 74:6 79:1,11 | 127:14,25 150:5 | 97:20,25 104:17 |
| 77:16 95:9,15,21 | 86:11,14 88:10,14 | 154:11 159:9 | 104:20 105:17 |
| 96:10 102:19 | 89:2 98:4,7,13,21 | 162:3 164:14 | 141:21 149:17 |
| 105:10 106:2,7 | 99:2,10,11,25 | 174:3 227:12 | **additional** 129:6 |
| 110:7,7 131:23 | 102:2,5,9,10 106:1 | **accurately** 15:3 | 139:9 141:18 |
| 140:12,21 141:9 | 106:22,24 107:3,6 | 37:25 44:16 | **additions** 238:6 |
| 142:11 144:12 | 111:11 113:1,16 | 102:16,19 | **address** 8:10 |
| 145:2 151:18 | 161:4 189:4 190:9 | **acknowledge** 6:16 | 172:7 |
| 154:21 155:12 | 193:13,18 194:6 | 6:19 7:4,7 | **addresses** 172:10 |
| 165:22 166:5 | 213:21 216:24 | **acknowledgement** | **adhere** 39:13 |
| 177:7 206:4 208:2 | 218:6 219:7,18 | 238:3 | 41:15 44:21 92:4 |
| 209:2,10 210:17 | 220:13 224:17 | **acknowledgment** | 144:1 145:13 |
| 211:23 212:15 | **accommodations** | 236:12 | **adhering** 40:10 |
| 216:12,25 218:3,8 | 41:17 71:23,24 | **aclu** 22:5 | **adjust** 159:7 |
| 218:21 219:9,11 | 72:16,25 78:11 | **act** 2:22,25 3:7 | **admin** 55:8,11 |
| 220:15 224:16 | 102:20 108:15,17 | 39:7 74:7 114:8 | |

[administer - apply]                                                    Page 4

**administer** 5:21
**administered** 7:7
**admitting** 126:11
  131:21
**adrienne** 87:19
  98:22 99:3,22,24
  100:4,9 101:18
  190:21 194:10,12
  195:19 196:2,8,10
  196:15,23 197:13
**advance** 10:6
**affect** 15:2 66:19
**affiliated** 55:23
**affiliations** 6:1
**affirmative** 93:13
**affirmed** 7:23
**afford** 53:1,5
  59:13 60:22 61:3
  67:13 121:4 208:3
  231:17
**afl** 4:2 84:9
**aftereffects** 68:18
**afternoon** 211:24
**age** 127:7
**agency** 26:4,22,25
  31:11 50:9 54:9
  156:18 158:10
**ages** 24:25
**agitated** 154:1
**agitation** 149:25
**ago** 19:5 20:19,19
  52:3 83:23 100:25
  178:21 192:15
**agree** 5:9 7:16,17
  7:18,19 9:11
  10:25 11:24 12:23
  38:3,5,12 41:25
  136:14 195:4
**agreed** 194:13
**agreeing** 104:2

**agreement** 7:12,13
  16:10 21:13 36:23
  64:10 82:21 84:3
  84:22 86:13 87:3
  87:11 91:5 93:12
  97:4 100:15
  101:12,20 130:2,6
  131:6 132:1,9,13
  136:11,16 168:8
  169:1,17 170:22
  172:2,6 184:9,12
  184:16 223:20
  224:2
**ahead** 5:25 22:2
  36:3 84:2 109:9
  115:21 124:8
**airline** 58:11 59:2
**airlines** 1:8 3:8 4:3
  5:14 6:7 22:9,12
  22:15 84:13
  118:11,20 119:3
  200:16 236:4
  237:1 238:1
**airplane** 122:12
**airport** 57:6,9,10
  57:11 221:18
  222:1
**alarm** 32:24
**alcohol** 13:23
  30:20 52:25 62:25
  122:4 127:6
  153:13,19 155:22
  159:3
**alcoholic** 16:8
  62:23 63:17,18,19
  63:22 126:11
  195:12 229:22,24
**alcoholics** 127:8
  229:15
**alcoholism** 45:4
  62:21 63:13,15

65:8 66:12,19
  67:23 68:23 69:16
  69:23 70:14 71:12
  119:15 121:21
  122:1 127:4 137:6
  151:4 153:23
  191:17 192:21
  206:2 213:12,14
  224:15 225:2
**alley** 25:22
**alleys** 26:14
**allotted** 236:20
**allow** 86:13
  151:10
**allowed** 37:12
  42:17 79:14 83:11
  83:19 85:20,24
  86:9 107:14
  108:10 132:24
  149:14 214:24
  216:18 218:23,25
**allowing** 180:21
**altered** 162:10
**american** 229:14
**americans** 74:7
  114:7 189:21
**amount** 132:25
  202:22
**andolini's** 25:22
**andrea** 186:21
**angie** 99:18 100:1
  100:9
**anniversary**
  160:11
**answer** 11:19,20
  12:3,17 13:7
  17:17 21:20 92:3
  92:9,18,22 144:22
  147:20 171:9,14
  171:24 175:4
  196:20,21 199:4

225:9
**answered** 17:21
  23:16 54:24
  196:18 199:10,16
  225:10
**answering** 11:4,10
**answers** 11:25
  149:15 167:1
**anxiety** 149:25
  154:2 206:14
  230:8,13
**anybody** 10:11
  60:17 74:2 121:5
  202:21
**anymore** 53:20
  142:18
**anyway** 81:21
  145:22
**anyways** 183:23
  202:23,25
**apartment** 53:6,11
**apologize** 10:6
  185:7 199:14
**apparently** 171:14
  198:22
**appear** 125:10
**appearances** 1:13
  5:25
**appearing** 5:24
**appears** 34:15
  139:8 148:6
  163:10 167:3
  184:20 201:4
**appended** 238:7
**applicable** 236:8
**applied** 136:16
  187:20 188:1
  221:11
**apply** 54:8 57:20
  58:3,6,20,23 59:5
  59:9 60:24 61:6

64:14,24 73:25
137:9 150:11
187:18 212:19
**applying** 73:12,23
**appointment**
122:3
**appointments**
150:17
**appreciate** 231:22
**appropriate** 2:2
117:12
**approved** 64:6
**approximate**
135:10 148:8
158:17
**approximately**
19:6 133:24
**april** 25:4
**arbitration** 103:9
103:19
**area** 70:13,21 90:7
123:13
**areas** 123:14
128:9
**arellano** 65:3 66:1
99:12 112:9 179:3
190:12 227:4
**arellano's** 8:25
11:17
**arena** 155:24
**arenas** 160:3
**argue** 36:15 37:5
41:20 182:13
**arguing** 180:24
**argument** 102:25
196:1
**arms** 214:11
**arrange** 91:22
**arrangement** 7:10
21:11,16 90:23,23
92:14

**arrangements**
53:18
**arrest** 30:5,15
**arrested** 29:16,19
29:20,24 30:8
**aside** 37:20 38:7
118:6
**asked** 14:21 17:9
31:13 41:16 72:2
72:8,10 74:13
92:7 149:8,15
164:23 196:18
199:10,15 219:3
221:11 222:6
223:19 225:5
**asking** 12:6 43:16
43:18 79:23 80:5
92:12 102:11
104:18 106:20
107:1,2 147:17
171:13 184:15
187:25 188:3
195:25 197:6
212:5 213:20
216:23 217:13
219:6,17
**asks** 230:2
**aspect** 44:22
**aspects** 144:1
**asserted** 93:18
114:3
**assessed** 35:4
37:22,25 38:17
43:2 79:5 182:21
**assign** 54:24
**assigned** 82:10
83:2
**assignment** 76:2
**assignments** 10:10
**assistance** 127:18

**associate** 123:10
**association** 4:2
84:8
**assuming** 103:4
213:2
**assumption** 100:8
**attached** 236:11
**attachment** 116:7
116:8
**attempted** 59:9
**attend** 25:15
161:17
**attendance** 31:19
32:5 33:12,19
34:22,23 35:3,24
36:15,20 38:21
45:17,23 47:11,15
47:18 69:10 72:3
79:5
**attendant** 4:3
25:24 26:13 54:12
54:17,19 57:25
58:3,7 59:5 68:7
73:16 75:17 79:21
81:18 84:13,23
85:13,20 104:12
106:15 118:20
122:11 130:17,18
130:22,25 131:7
131:25 136:15
176:18 177:23
205:9 206:7 207:5
208:8,8 210:9,12
210:12 211:5,16
215:17 221:12,12
221:22 224:7
**attendant's** 59:1
**attendants** 4:2
34:24 37:15 57:21
84:9 94:17,21
106:9 108:10

132:22 133:11
211:9,11,19
**attending** 150:24
**attends** 151:5
**attorney** 7:14
15:16 16:1,25
17:14,16 18:5,10
19:1,8,13 23:13
90:22 91:2,22
92:16 99:19
101:16 103:23,24
131:18,19 195:9
195:10 203:3
230:19,22 236:13
**attorney's** 91:17
91:19
**attorneys** 6:15 7:3
16:14 19:10 22:4
22:7,11 23:23
235:16
**attractive** 75:20
**audio** 3:19,20 5:8
5:8
**august** 1:12 2:5
5:3 35:12
**authority** 21:25
**authorized** 5:21
**automated** 81:22
**available** 64:22
74:2 110:2 131:6
136:11 145:2
236:6
**average** 62:6,14
127:9 210:14
**aviation** 119:1
**avoid** 66:22,25
123:15 128:10
140:20,21 141:25
143:21 145:6
150:8 151:6
154:22

[avoiding - better]                                                          Page 6

**avoiding** 142:4
    144:4 161:4
**award** 88:5 91:19
    217:2
**awarded** 79:23
    97:17
**aware** 22:14,17
    23:18 57:12 74:5
    74:14 79:10,14
    101:8 108:9,12
    114:16 117:15
    118:3 132:20
    143:20 145:5
    165:8 175:10
    176:14 218:16,20
    218:24
**awesome** 164:17
    177:21
**awful** 205:14
    206:12,15
**axis** 153:18

**b**

**back** 6:24 23:4,6
    31:5,12,13 32:14
    33:18 35:6 42:25
    45:11 48:19 54:25
    58:13 65:14,16,22
    65:23,25 66:2,4,8
    66:9,15 73:16
    75:18,21,24 77:11
    83:20 88:6,7
    90:13,18,20 94:14
    95:2 99:13,16
    107:16 109:17
    113:13 120:4
    125:3 129:21
    130:25 131:17
    132:24 136:25
    142:11 145:15
    146:7 149:18
    151:10,19 153:7

155:14 166:5,18
    170:10 172:14,21
    176:6 178:18
    183:12,12,13
    185:8,11 188:6
    200:4 204:15
    207:23 209:3,8
    216:4 220:8 222:5
    227:19 230:16
    232:6
**background** 24:2
    29:2
**bad** 19:4 72:4 85:3
    96:18 154:2
    228:14,18
**baggage** 188:14
**bakery** 26:6,7
    27:1 31:3
**ballpark** 28:23
    49:11,12
**bamboo** 60:12
**bankruptcy** 30:22
**bar** 68:8
**bargaining** 36:22
    64:10 82:21 84:3
    84:22 86:12 87:3
    87:11 97:4 100:15
    101:11,20 124:21
    130:2,5 131:5
    132:1,8,13 136:11
    136:16 168:8
    169:1,17 170:22
    172:2,5 184:9,12
    184:16 223:20
    224:1
**barking** 220:1
**bars** 68:14
**bartelt** 1:24 5:18
**base** 72:6 110:4
    140:22 142:2
    212:1

**based** 34:21 38:2
    60:13,21 114:3
**basically** 15:23
    17:10 54:4 56:6
    66:21 67:1 72:4
    78:3 79:20,22
    81:2,4 103:14
    109:1 111:19
    123:18 141:15
    144:12 182:11,13
    182:20 195:4
    229:23 230:12
**basing** 110:10
**basis** 16:24 18:10
    76:6 91:1,23
    110:9 191:6
**bates** 34:7 84:16
    112:13 119:22
    146:11 163:24
    226:9
**beacon** 57:1
**bear** 152:20
    168:12 173:14
    178:16
**bearing** 112:12
**bears** 34:7
**beauty** 151:22
**becoming** 154:23
    209:25
**bed** 208:14
**beers** 127:10
**began** 18:18 26:4
    26:8 140:8 148:12
**beginning** 7:13
    15:24 26:12 56:5
    73:5,7 81:15
    121:23 123:5
    128:12 140:14,20
    149:16
**begins** 84:16 135:8

**behalf** 1:14,19
**belief** 44:5
**believe** 14:14
    17:20,25 18:18
    20:9 24:11 30:3
    30:21 33:24 44:6
    44:11,12,17 48:9
    50:10 52:16 55:18
    55:19 65:19 81:11
    82:17 93:1 98:14
    98:22 101:14,20
    102:6 108:4
    109:22 111:5,6
    113:3 120:14
    121:12 131:15,24
    132:11,15 135:21
    136:12 138:6
    152:12,17 154:10
    155:7,11 156:10
    156:19 158:5,9,12
    166:9,11 167:16
    172:9 175:12,17
    181:8 185:19
    191:10 208:12
    210:5,6
**believed** 191:6
    192:8 193:12
**believes** 127:21
**bender** 69:2
**benefits** 127:18
    203:13
**best** 28:25 52:23
    63:1 181:23
    195:20
**bet** 47:4 115:3
    125:17
**better** 70:20
    157:12 177:16
    214:17 216:21
    217:11 223:7,8
    231:13

[bid - called]                                                            Page 7

**bid**  79:21 80:14,17
 80:19,23 81:18,19
 81:22 82:3,24
 83:1 85:13 88:10
 88:15 98:8 104:5
 104:23 105:2
 217:5,19 219:11
**bidding**  79:25
 80:13 81:25 82:8
 82:11 88:6,11
 95:22 124:22
 217:1
**big**  211:22
**bills**  211:3
**binge**  63:2
**birthday**  25:5
**bit**  9:1,14 13:4
 15:10 25:10 38:9
 45:10 47:5 48:24
 50:4 57:25 62:20
 77:12 80:12 82:21
 183:9 189:9
 213:22
**blank**  72:10,14
 79:17,25 88:13
 95:23 98:4,6,13,21
 99:2,10,24 102:1,4
 102:7,8 194:9
 195:16 219:2
**blessing**  61:8
**blocking**  34:13
**blocks**  104:18
**blue**  174:8 185:18
 185:20 201:7
 228:5
**body**  214:9
**bonita**  25:20
**born**  214:10
**bother**  213:17
**bottom**  54:20
 73:19 122:2 169:4

229:13 230:7,17
**boundary**  68:3
**bowling**  25:22
 26:14
**box**  137:10 140:12
 149:5,12 164:8
**boxes**  142:10
**bram**  16:2,7 17:2
 18:2,20 19:9
**breach**  93:19
**breadwinner**
 206:10
**break**  12:16,17
 22:1 40:1 48:11
 48:24 89:13,21
 163:7 166:13
 198:2 199:24
 211:3
**breaking**  76:18
**breaks**  10:4 12:14
**breast**  22:18 23:19
**breathing**  86:18
**bridge**  57:1
**brief**  24:7
**brigham**  1:5,11
 2:3 3:15,23,24
 5:12,13 6:3,10,10
 7:22 8:3,9 11:15
 17:21 22:2 24:19
 24:23 25:3 32:16
 33:24 34:4,4
 48:21 50:3,23
 51:14 77:15 84:7
 84:7 90:15 91:16
 92:12 94:13
 109:19 112:11,12
 114:18 115:12
 116:1,14 117:7
 118:10 119:20,20
 122:2 125:3
 129:10,23 130:3

131:24 134:11
 137:1 139:6,6
 142:23 143:8
 144:13 145:17,17
 146:8 149:10
 152:9 157:7,16,22
 161:8,10 163:23
 164:3,17 166:20
 167:3 168:16,25
 171:17 173:15
 174:4 176:6
 178:21 182:1,24
 184:18 185:11
 197:24 198:5
 199:5,18 200:6,11
 203:10,19 204:17
 214:10 216:6
 217:18 226:9
 230:1 232:9 233:1
 236:4,5 237:1,2,24
 238:1,2,4,12
**brigham's**  144:21
**brighamr**  119:22
 146:12
**bring**  112:24
**bringing**  50:5
 113:25
**broadly**  91:6
**broken**  130:24
**brother**  15:17,22
 18:6,11,19 19:9
 20:6
**brother's**  15:18
**brought**  114:7
 202:24
**bubbles**  185:18,18
**build**  80:9 88:20
 95:6,15 113:5
 217:1 220:15
**built**  31:10 95:19

**bullet**  118:23
**bullshit**  202:12
**bunch**  17:6 39:2
 54:11 65:21 66:5
 67:15 75:14 162:4
 162:4 166:2
 214:20,21 224:10
 226:9,18
**bus**  27:17,21 56:6
 56:8
**business**  52:13,14
 55:25 56:17
**busting**  10:20

c

**c**  5:1
**cabin**  119:9
**cake**  49:6
**cakeheads**  26:7,21
 27:2,6 31:3,16,22
 32:4 49:7 50:12
 50:22 51:24 54:4
 54:10 55:9,15,20
**cakes**  26:7
**calendar**  40:8
**california**  24:8
**call**  10:8 12:11
 20:10 31:9 40:23
 42:21 43:6,22
 54:21,23 67:18
 69:3 79:2 80:1
 81:3,4,8,9,9,13
 98:4 104:17
 106:24 117:23
 123:2 153:25
 180:15,19 182:11
 183:12 214:22
**called**  2:4 31:12
 40:17,20 41:6
 42:15,25 43:13
 45:2,2 54:20 57:1
 66:25 67:14,14

78:16 95:10
121:24 124:22
163:20 183:12
207:17
**calling**   43:6 45:3,6
78:7 223:4
**calls**   66:5 222:24
**car**   30:10,10
**care**   14:1,22 27:11
27:18,23 28:7,11
28:17 51:25 61:11
70:5,8 97:21
117:25 121:7,7,8
121:10
**career**   25:24 26:12
31:14 33:20 54:13
73:18 207:21,23
**caroline**   6:8 7:19
152:3
**carolyn**   1:20
**carrier**   186:5
**carriers**   57:11
**carry**   150:1
**carrying**   141:17
**casa**   25:20
**case**   5:15 8:22
16:5,11,17,18,21
17:6 19:9 21:1,7
21:19 23:9 51:13
74:22 78:4,5 91:2
91:4,17 93:9,15
109:22,24 113:25
131:20 171:9
178:12 202:16
204:20 205:21
229:9
**cases**   22:8,12,14
22:17 23:18,22
**cassandra**   107:23
164:25,25 165:1
167:4 190:17

**cassie**   163:11
175:23 178:23
190:18 208:13
**categories**   42:25
**category**   189:15
192:21 215:14
**cba**   80:7,19 99:13
101:2 169:23
172:8 179:13,15
183:6 194:12
196:3 197:8
223:10,14
**cell**   5:6
**cellular**   5:5
**center**   53:2 67:13
123:14 142:16
**certain**   40:17,20
65:15 91:10
123:25 132:25
**certainly**   136:14
**certainty**   191:13
**certificate**   235:1
**certification**   2:21
2:23 3:5 134:19
141:6 146:15
148:5 156:13,22
157:17
**certified**   2:7 235:5
235:21
**certifies**   150:20
159:15
**certify**   235:7,10
235:14
**cervix**   214:7
**cetera**   112:9
**challenging**   159:4
**chance**   17:3
182:12
**change**   67:1 70:23
71:2,8 124:1
128:9 206:14

207:21 237:4,7,10
237:13,16,19
**changed**   33:19
160:25 180:22
205:7,14,19 206:8
**changes**   123:6
236:10 238:6
**changing**   123:9
**cheap**   232:20
**cheaper**   57:14
**check**   28:20,22
140:11 163:7
165:5,9 222:16
232:1
**checked**   135:14
137:10 140:12
142:10 150:12
**checks**   158:25
**chemical**   137:2,4
**cherry**   1:16
**childcare**   57:5,22
58:6,24,25 59:10
60:2 61:1,3
**children**   10:2
12:15 22:22 24:12
24:14,15 25:1
59:14 210:7
**chimney**   21:21
**choice**   139:4
**chosen**   25:24
**chunk**   210:13
**cindy**   214:10
**cio**   4:2 84:9
**circle**   90:18,19
94:14 143:4
**circled**   154:14
**circuit**   21:16,25
**cite**   21:23 23:1
**cited**   91:3 93:9
**citing**   21:24

**city**   95:1
**civil**   1:3 2:2
163:20
**claim**   52:7 103:17
110:4,10 113:25
114:3
**claiming**   114:10
**claims**   91:9 93:17
93:24 114:7
**clarification**   171:2
171:14
**clarify**   9:24 37:6
39:24 68:4 69:25
71:6
**clarifying**   9:20
**class**   130:18
229:22
**classes**   25:14
30:20
**claudia**   223:4
**clean**   9:14 27:19
**clear**   69:22 92:11
92:13 145:24
148:15 149:15
221:20 222:17
**clearly**   13:7,10,21
15:7 51:14 192:17
199:6
**client**   11:9,10
16:25 17:14,16
18:10 19:13 23:13
91:2 92:16 137:2
**clinical**   151:24
152:13,18
**close**   25:8 56:22
57:4 204:3
**closeout**   128:18,21
128:23
**closer**   57:17
**closest**   57:9

[clothes - continuing]                                                    Page 9

clothes  68:7
clue  146:24
coaching  32:2
code  44:19 47:23
  47:24
coded  35:7 39:5,6
  39:12,17,19,21
  40:5,10,12 41:1,7
  41:24 42:2 43:1
  43:25 44:3,6,15
  180:25
coding  37:2
cole  1:24 5:18
  48:15,15
collecting  54:6
collective  36:22
  64:10 82:21 84:2
  84:21 86:12 87:3
  87:11 97:4 100:14
  101:11,19 124:21
  130:2,5 131:5,25
  132:8,12 136:10
  136:16 168:7
  169:1,17 170:21
  172:2,5 184:9,12
  184:16 223:20
  224:1
college  25:13,14
  29:21 207:18
colorado  1:2,17,22
  2:8,19 5:15 19:22
  24:4,6 30:16
  120:22 203:10
  235:6
comanche  3:17
  119:21 125:5
come  10:5,19 20:6
  31:13 52:7 56:22
  65:15,22 66:8
  78:17,21 88:24
  89:6 94:21 110:12

132:24 145:12,15
  157:1 208:14
comes  60:6 115:17
  214:19 225:17
comfortable  213:6
coming  65:6 88:7
  115:11 167:10
  170:10
commenced
  135:11 148:9
  158:20
commencement
  235:7
commencing  2:5
commented
  158:18
commenting
  196:15,24
comments  194:3
commission  60:13
  60:21 235:18
commit  11:9
commitment  11:8
communicate
  10:25
communicating
  11:9 18:20 102:7
communication
  18:2
communications
  23:12
community  25:14
commute  213:5
commuted  213:3
  222:2,3
commuting  213:8
comp  51:7
company  36:19
  37:5 38:4 39:9
  44:15 56:14 60:1
  66:2,9,11 74:3

75:12 76:2 111:19
  112:1 116:21
  117:3 130:11,17
  131:3 167:25
  169:13 175:3
  190:8 192:9,9
  203:3 218:11
  222:19 227:8,10
company's  37:7
compensation
  50:15 51:16,20
complete  11:24
  93:6 139:21
  224:16 225:13
  238:8
completed  236:17
completely  39:14
  206:17
completion  85:13
computer  145:18
  146:4 222:16,22
computers  222:25
concept  77:24
  195:16
concerning  199:21
concise  149:15
concluded  233:5
concludes  232:25
condition  2:22,24
  3:6 14:2,22,23
  45:4 134:21
  135:10,18 136:1
  140:7 146:17
  148:9 149:2
  150:17 157:18
  158:18,20,24
conditions  14:24
conduct  199:20
conducts  119:8
conference  174:16

confidential  17:15
  21:13
confirm  119:15
confused  104:25
connection  30:1
  30:18
consent  7:10
consider  13:17
  27:12
considered  178:13
  211:20 231:3,7
considering  13:16
constitutes  235:12
consult  15:16 17:1
consultant  60:8
consulted  18:5
consume  155:22
cont'd  3:1
contact  16:9 19:1
  120:13 211:8
contain  93:12
contained  93:16
contending  109:23
  109:24
contents  91:5
contest  30:5
context  79:15
contingency  21:4
  21:5,10 90:23
  91:23 92:13 93:23
continue  5:9 70:24
  120:15 134:9
  154:1 155:13
  177:11 183:22
  208:16
continued  109:3
  137:23 202:23
continues  151:12
  159:3,5,7
continuing  121:22

[continuous - counseling]                                    Page 10

**continuous**  64:3,6
  64:13,15,21 65:3
  73:5 130:21,24
  137:11
**contract**  4:3 84:13
  87:20 99:15
  136:18 179:8,12
  179:19 183:6
  184:1,5,8 195:17
**contrary**  131:14
**contributed**
  213:24
**control**  67:23
**convenient**  163:6
**conversation**
  125:11 166:7
  179:3 194:17,20
  208:20 227:13
**conversations**  5:5
  17:13 87:18 89:8
  90:19 98:3 99:21
  100:24 188:25
  190:2 191:3
**convicted**  30:1
**conviction**  30:6
**copied**  112:6
**copies**  45:23 46:21
  47:11,14 48:8
  236:14
**coppedge**  3:22
  33:6 180:20
  184:23 185:15,15
  186:20 187:17,25
  188:25 189:4,17
  190:10 192:7
  227:25 228:8,12
  228:20 230:7
**copy**  34:20 35:15
  35:23 46:5,14
  51:3 84:21 116:2
  131:25 132:2

  148:4 180:4
  203:12
**corner**  85:8
  134:14
**correct**  15:13,14
  18:21 24:12,16,17
  26:14 31:17,20
  33:12,13 34:20
  35:15,23 36:20,21
  36:23,24 37:3,11
  38:12,13 39:20
  40:6,7,18,19,22
  41:7,11,12,24 42:1
  42:2,3,6,7,22 43:2
  43:7,8,11,14,15,23
  44:3,4,8,9,13,14
  45:4,5,7,8 46:14
  47:14 48:7 51:3,7
  55:4,22 57:23,24
  58:7,21,22 59:2,3
  59:11 64:4,5,7,8
  64:11,22,23,25
  65:1,5,6 66:16,17
  67:21,22,24 68:15
  69:7,13,17,24 70:3
  70:4,6,7,9,10,11
  70:12,17,18,22
  71:14,20,21 73:9
  73:10,13,21,22
  75:6,9,22,23 76:3
  76:4,9,21 77:1,16
  77:17,18,21,22
  78:1 79:3,4,6,7,8,9
  80:14,17,18,20,21
  81:18,19,23,24
  82:1,2,5,6,13,24
  82:25 83:2,3,4,5,8
  83:9,21 84:15,23
  84:24 85:17,25
  86:14 87:6,7,11,12
  87:14,15 88:16,18

  88:19,21,22,25
  89:1 91:17,18,20
  91:21 95:9 96:12
  97:4,11 103:9,10
  103:11,12,19
  104:2,3 105:2,4,7
  105:19,20 106:3,4
  106:7,18,19,21,23
  107:5,6,17,18
  108:7,8,17,18
  109:4,5 110:15,16
  110:19,20,22
  111:1,11,20 112:3
  112:4,23 113:17
  113:18,22 114:4,8
  114:9,9,11,15
  116:2,22,23
  119:17,18 122:12
  122:13,16,17,25
  124:2,3,5,22 133:7
  133:8,16 135:16
  135:24 136:11,18
  136:23 137:19,20
  137:21,22,24,25
  140:17 141:9,10
  141:14,19,20,25
  142:5,6,8,14
  143:18,19 144:10
  144:11,16,17
  145:3,4,6 148:4
  149:5,6 151:1,2,7
  151:8,19,20 153:5
  153:8,9 156:14
  157:4,5,22,23
  158:8,18,19,25
  159:1,13,16 161:5
  162:7 163:13,14
  165:17 166:10
  170:2,3,5,6,8,9
  172:8 173:3,4
  174:13,14 176:2,4

  176:5 180:4,16
  188:2,22 190:5,10
  190:12,13,14,18
  191:15 192:11,18
  192:19,21,22
  195:8 197:11,17
  198:9 199:1,21,22
  200:18,19,21,22
  200:24,25 201:5,8
  201:14,15,19
  203:12,20 210:1,4
  210:10,22 211:6,9
  211:10 216:14,15
  216:17,22 217:7,9
  217:10,20,21,23
  218:4,6,8,18,25
  219:1,5,9,13,14,16
  219:17 221:18
  227:11 228:6
  231:19 235:13
  238:8
**corrections**  238:6
**correctly**  38:25
  44:1,19
**correspondence**
  129:3,6
**cost**  53:17 57:14
  57:18 60:2 61:3
  67:18
**costs**  53:23 54:15
**cough**  13:4 148:24
**counsel**  5:12,23,24
  7:10 11:1,15
  17:13 28:14 34:1
  51:15 90:24 91:23
  92:14 129:2
  235:15 236:1
**counsel's**  92:20
**counseling**  3:4,17
  32:2 34:16 46:10
  46:15 119:21

[counseling - day]                                                                      Page 11

125:5 126:25
**counselor** 120:4,8
    145:14
**count** 33:19
**counting** 215:12
**counts** 179:8,23
**county** 5:17
**couple** 20:19 21:1
    90:20 185:22
    201:2 230:25
**couple's** 126:19
    127:2
**course** 11:12
    18:11 21:13 74:22
    81:12 91:10 92:21
    92:23 132:10
    147:13 188:13
    205:7 207:22
    214:17 215:10
**court** 1:1 5:15,19
    6:12 7:1,20 8:19
    9:8,12 12:21 30:4
    33:25 51:15 91:4
    164:5 173:18
    183:4
**cover** 3:14 43:9
    95:13 96:15,20
    139:7
**covered** 53:10
    106:9 191:17
**covid** 10:8 27:16
    28:4 61:24,25
    121:4
**craft** 130:18
**crafted** 160:18,18
**crafting** 53:22
**crappy** 101:16
**cravings** 155:22
    159:3 160:1
**crazy** 42:11 118:8

**create** 72:11
**credit** 85:5,14,20
**creek** 1:16
**crime** 30:1
**criteria** 65:15
    155:1
**crone** 1:15,16,18
    1:18 2:11 6:2,2
    7:17,17 11:8,12,16
    15:13,15,25 16:23
    17:11 18:8,15,24
    19:2,7,12 20:15
    21:12,18 22:25
    23:3,7,11 89:10
    90:4,25 91:25
    92:6,16 93:2,5
    94:2,7,12 101:23
    107:10 114:22
    115:5,9,18,20,24
    129:14 144:18,20
    144:23 171:1,4,12
    196:17 199:2,10
    199:14 204:6
    217:15 219:22
    220:11 223:18
    224:5 228:25
    229:12,25 230:2,6
    230:15,24 231:21
    232:2,11,18,19,23
    236:1,2
**cross** 168:11,14
    173:14 174:2
    181:5
**crossed** 68:2
**crossing** 3:17
    119:21 125:5
**crushed** 205:16
**cs** 236:15
**cs4229140** 1:25
**ctheis** 1:23

**culture** 68:6
**cumbersome**
    181:21
**cups** 52:17,19,21
    53:9,15
**current** 8:10 84:4
**currently** 14:1,21
    15:1 24:9 70:23
    121:3 126:11
    127:6,10,17,21
    151:11 221:16
**customers** 205:11
**cut** 59:23 89:10
    114:23
**cutting** 32:23
**cv** 1:3 5:16 163:21
**cwa** 4:2 84:9

**d**

**d** 5:1
**dad** 30:11
**dad's** 55:25
**daily** 14:11 70:15
    122:14 150:2
**dairy** 25:21
**dale** 3:24 200:18
**dallas** 211:23
**damages** 202:11
    202:15 203:1
    204:22,25 205:1,1
**dandy** 63:5
**dang** 206:8
**danielle** 1:20 6:6
    7:15 9:16 11:12
    22:21,25 32:6
    40:14 41:14 44:24
    47:3 49:13 56:24
    57:24 70:24 86:2
    86:15 89:10 90:25
    93:7 105:12 107:2
    109:8 114:22
    125:16 126:1

136:21 147:13
162:16 171:1
172:12 179:18
185:4 191:13
192:10 194:21
195:23 196:13
197:5,19 199:2
204:6 216:19
217:25 219:23
223:9 232:11
**date** 21:8 23:1
    67:5 76:25 82:19
    120:11 124:12,13
    124:16 135:10,14
    142:15,22,25
    143:8,17 144:5
    148:8 155:17
    158:18 183:2
    237:24 238:12
**dated** 3:9,14 34:17
    35:12,20 114:19
    134:17 139:15
    147:4,14 153:4
    155:6 158:13
    167:4 180:1
**dates** 26:23 47:7,8
    135:25
**daughter** 14:3
    25:2 63:7,20
    127:1,3 214:3,10
    215:13
**day** 28:4 36:15
    39:16,19 41:20
    42:6 62:2 67:8,15
    68:10 71:2 94:24
    95:19,25,25,25,25
    96:1,1,5,5 97:6,17
    97:19,22 105:12
    110:24 132:18
    136:6 143:5,14,16
    143:20 165:20,21

**[day - disabilities]**                                                                    Page 12

167:14 170:1,4,11
175:1 178:4 180:9
186:13 201:13
207:5 212:17
213:9 221:10
225:2,2,13,13
238:15
**daycare**  31:6
54:14 56:23 59:14
60:22
**days**  21:1 39:5
40:9,17,20 41:6,8
41:9,22,23 43:13
47:10 54:22 65:12
65:13 66:12 73:15
73:18 81:2,8,13
97:20 105:11,14
131:16 132:21
133:5,13 135:18
137:17 139:21,22
150:20 156:3
159:15 166:6
169:19 177:8,18
183:13 208:15
210:15 212:12,13
222:25 226:24
227:6,9,10,16
236:17
**deal**  10:7 122:3
123:4 225:19
**dealing**  91:12
122:1 123:18
124:4 160:5 206:2
215:7
**dealt**  179:21
214:18 215:4
**death**  123:25
214:3
**debating**  94:5
**deceased**  24:16

**december**  46:2
**decent**  16:18
**decide**  63:16
**decided**  40:14
65:4,20 73:25
140:19
**declare**  7:8 238:4
**deemed**  130:24
238:6
**defendant**  1:9,19
2:4 5:13 6:7
**defense**  93:20
**defenses**  91:9
93:24
**definitely**  9:24
16:19 57:7 89:23
192:8
**definitively**  190:6
**degree**  209:3
**delayed**  66:4
**denied**  41:18,18
41:18
**denies**  113:21
**denver**  1:22 53:6
95:1,2 96:18,19
207:6
**department**  2:19
116:3,12 139:16
180:5 203:11
**dependability**  3:4
34:16,25 36:19
38:12 43:2
**depended**  62:1,1,4
212:14
**dependence**  137:2
137:5
**dependency**  137:3
137:4
**depends**  20:25
171:3 210:19

**deponent**  17:19
18:14 26:7 89:16
89:19,25 121:16
166:14 204:5
219:25 220:4
230:5 232:10
235:8 236:13
238:3
**deposed**  8:13
**deposing**  236:13
**deposition**  1:11
2:3 5:8,12,16,17
6:16,17,18 7:4,5,6
8:22,24 10:22
11:14,17 15:11
19:17 20:19 92:25
94:10 101:7
157:13 162:20
166:25 171:10
181:22 226:3
233:1,4 235:10
**describe**  54:2
79:17 80:25
149:23 206:13
**described**  82:8
**description**  3:8
118:11,18 137:13
137:14 149:21
224:6
**desire**  159:6
**destroyed**  215:15
215:16
**detail**  89:8,11
141:18 222:14
**detailed**  137:13
**detroit**  57:10
221:17
**developed**  13:4
**diagnosed**  63:12
63:14

**diagnoses**  153:14
**diagnosis**  153:13
153:23
**diagnostic**  125:5
126:9
**dialog**  110:1,11
**die**  41:20
**died**  214:11
**difference**  37:21
**different**  43:5
47:10 63:11 70:19
76:17 111:25
133:15 134:10
174:25 176:13
185:22 206:17
207:19 212:9
217:4 218:22
224:25
**differently**  35:8
96:13
**difficult**  54:15
208:24
**difficulties**  12:10
**difficulty**  12:10
**digits**  25:8
**diligently**  160:9
**dinner**  208:14
**direct**  32:22 33:3,5
108:25 112:2
133:17 174:24
185:3,13
**directed**  111:19
**directing**  169:20
**directly**  53:14
**director**  108:21
111:21
**directs**  165:15
**disabilities**  74:7
114:8 189:21
229:15

disability 191:7
224:15 225:1
disagree 37:7,22
39:14,18 101:12
111:2 140:18
disagreed 110:25
111:10
disbarred 16:7
discharge 155:1
disciplinary 33:11
207:13 215:8
discipline 31:25
32:1
disclose 222:19
disclosed 37:4
38:4 63:21 64:2
218:11 224:15
225:1
disclosure 44:21
143:25 225:22
disconnect 197:18
disconnecting
96:11
discoverable
21:17 23:16 91:6
discovered 123:14
discovery 74:22
93:1,3 134:15
139:14,19 144:7
225:6,6
discrepancies
162:5
discriminated
191:6
discriminating
195:8 229:23
discrimination
22:19 229:15
discuss 99:2,9
102:4,21 110:15
121:25 122:7

189:3
discussed 15:21
65:3 73:19 76:1
77:23 102:18
110:19 111:9
142:12 144:4
154:12 187:8,9
196:2
discussing 102:13
108:14 109:3
125:14 126:15
194:11 195:10,18
195:24 196:2
220:13
discussion 6:20,23
94:14 163:10
179:4
discussions 108:14
disguise 61:8
dismiss 103:16
dismissed 103:15
dispute 35:3 37:1
38:16,24 39:2,3
47:25 86:4 93:1,3
dissolved 56:17
60:1
distinction 193:1
distress 205:1
213:24
district 1:1,2 5:14
5:15 21:22,24
dive 90:18
divorce 123:7
dkitson 1:23
dms 153:12,14
doable 220:22
doctor 121:6,12,15
136:7 138:5 141:5
142:10 144:8,9,15
144:25 148:16,18
148:23,24 152:16

doctor's 14:1,22
doctors 120:19
121:17
document 4:4
35:11 37:21 38:7
84:8 91:7,9 93:11
109:6 112:12,16
115:13 116:6
118:10,17 119:19
119:21,25 125:4,8
125:18 132:13
134:10 135:2,5,8
138:9 139:9,10,14
140:3 145:22
146:21 147:2,13
147:14,25 149:1
152:7,22,25 154:7
154:11 155:16,17
161:3,11 162:10
163:20 166:23
169:15 170:13
171:16,19,23,24
174:7 179:24
181:3 182:2
184:17 185:1,8
201:11 203:10
documentation
28:6
documented 46:13
documents 46:21
48:7,8 130:1
166:24
dog 220:1
doing 10:9 56:12
56:13 66:3 67:2
92:7 94:10 108:5
120:20 121:21
145:19 146:4
149:18 155:12
160:10 177:24
178:11 180:22

189:22,24 191:18
192:9,22,25
194:11,24 195:5
195:13 197:21
201:25 202:23,25
209:2,10,13,15,17
209:18,21 229:3
229:11
dol 116:7
dollar 56:25
dollars 53:14,25
donate 53:10
door 10:19
dosage 14:13
dot 65:16,18
156:17
double 25:8 232:1
downloading
145:19
downstairs 10:9
dr 125:12 126:10
126:16 128:3
141:2,8 148:13
151:17,23
drank 214:19
drill 9:1
drink 67:4,21,25
68:14 123:11
drinker 63:2
drinking 63:7,8,9
63:18 66:24 67:8
127:7 128:11
153:24
drinks 122:12
127:10
drive 1:16
driver's 30:9
driving 42:11
122:15
drop 40:9 76:7
78:1 83:7,11,19,25

85:20,24 86:2,9
94:17,18 97:9,14
97:19,22,24,24,25
104:7 105:6,7
108:10 124:21
216:13,25 217:2
218:17,24,25
**dropped** 103:11
104:2
**dropping** 82:12
83:19 87:9
**drug** 14:9 145:14
**drugs** 13:12,16,19
**drunk** 68:18
**due** 45:3 144:4
149:2 158:23
**dui** 29:20 30:2,18
**duly** 7:23 235:8
**dump** 67:9 105:24
**duration** 135:17
**duties** 122:10
**duty** 68:4 71:19
76:2 93:19 144:10
144:16 145:1
**dynamics** 206:9

**e**

**e** 5:1,1 237:3,3,3
**earlier** 73:20
90:20 100:13
107:13 110:14
122:24 168:10
180:13 197:15,16
203:9 221:10
226:17 228:1
231:2
**early** 129:11 139:2
211:23 213:9
225:17,24
**earned** 28:24 51:6
**earnings** 28:15

**easier** 9:14 176:19
**easily** 95:20
**east** 1:16
**easy** 58:11 88:5
178:1
**eat** 208:14
**eater** 129:11
**economist's** 19:24
**educational** 25:11
**efforts** 54:3 56:9
56:19
**eight** 58:10 61:24
211:5 212:16
**eighth** 159:25
**either** 16:10 63:15
101:20 106:9
148:20 160:17
177:4 183:13
187:20 196:9
201:25
**email** 1:18,18,23
1:23 3:2,3,16 42:8
42:9,15,18,23
102:14 112:6
114:18 115:2
116:2,12 158:12
167:3,7 168:16
179:25 180:4,8
182:18 186:6
187:20
**emailed** 108:21,24
223:1,3
**emergency** 117:24
119:8
**emotional** 205:1
213:24 214:1
215:11
**emotionally**
214:18
**employbridge**
50:6

**employed** 36:25
117:3 235:15
**employee** 80:17
116:8,25 127:18
137:14 140:12
149:1 158:22
169:17
**employee's** 2:21
2:24 3:6 134:20
146:16 157:17
**employees** 23:24
96:15 114:19
180:1
**employer** 27:9,12
32:5 117:11
**employer's** 117:22
**employerbridge**
2:15
**employers** 25:19
26:10 48:25 49:2
**employment** 2:20
32:19 54:3 62:15
66:19 71:18 72:1
203:11 205:6
208:1
**encourage** 155:25
**ended** 18:2 30:11
53:19 60:12 61:7
77:2,18,19,19
**energy** 56:15
**engage** 109:25
110:10
**engagement** 50:11
93:11,16
**enter** 6:13
**entertain** 178:4
**entire** 87:10 217:1
217:2
**entirety** 173:9
**entitled** 4:4 84:8,8
119:21 134:19

144:22 152:22
**environment**
66:24 154:15
**envisioning** 89:3
**episodes** 150:1
**era** 65:11
**errata** 236:11,13
236:17
**erratas** 236:15
**escape** 63:1
**especially** 103:1
231:15
**esq** 1:15,15,20,20
236:1
**essential** 71:19
118:22 119:6,10
119:12,16 224:10
224:16
**establish** 43:19
45:14
**established** 119:2
**et** 112:9
**evacuations** 119:9
**evaluating** 145:1
**evan** 1:15,18 6:4
7:18 19:23
**event** 34:1 172:21
**events** 13:10 15:7
**eventually** 66:7
**everybody** 31:7
34:24 37:14 74:2
81:21 129:9
140:22 205:10,20
212:1,9 217:8
218:4
**everything's**
205:15,16
**exact** 42:8 76:25
78:11 82:19
100:12 101:4
165:2 170:1,4,11

[exact - find]                                                                                          Page 15

181:19 189:19
191:11,19 197:16
197:19 199:8,19
**exactly**   39:3 77:15
79:18 87:22 91:11
92:6 93:10,21,21
100:22,23 177:19
194:19,21 195:2
207:5
**exam**   160:24
**examination**   2:4
2:10 8:1 220:10
235:8
**examined**   7:23
**example**   88:14
117:24
**exceed**   130:21
169:9
**exception**   87:5
100:16,20 106:20
106:23 107:4,8,9
**exchanged**   185:13
**exchanging**   186:9
**excited**   25:6
**exclamation**
230:18
**excused**   44:7,11
**exhausted**   103:13
**exhibit**   2:13,15,16
2:18,19,21,23 3:2
3:3,4,5,8,9,10,11
3:13,14,16,17,19
3:20,21,22,24 4:2
4:4 33:23,24,25
34:5 45:12 50:4,5
50:24 51:9,14
84:7,7 112:12,12
114:18,18,24
118:8,11 119:20
119:20 122:2
125:4 130:3

134:11,12 137:1
139:6,6,6 142:24
143:8 145:17
146:9 152:9,21
156:23 157:6,7,16
157:22 161:8,9,10
163:19,24 167:3
168:16,25 171:16
171:17 172:11,24
173:15 174:4
176:7 178:18,22
179:25,25 182:1
182:25 184:18,19
185:12 197:24
198:5 200:12,13
203:8,10,18,19
206:19,19 226:2,3
226:4,8 227:24
229:13 230:7,16
**exhibits**   2:12 3:1
4:1 118:9 156:14
157:22 200:10
**exist**   176:14
**existed**   132:19
**existing**   37:25
**experience**   12:9
58:5,21 137:10
150:12
**experienced**   214:2
**expires**   235:18
**explain**   38:20
66:14 114:5
**explained**   99:11
180:18
**expressing**   208:23
**extent**   94:8

| f |
| --- |

**fabric**   53:10
**face**   53:12 160:2,2
**facebook**   53:8
121:25

**faced**   215:4
**fact**   63:17 176:10
176:22 184:1
192:23 204:21
**facts**   147:23
149:24
**failed**   109:25
110:10
**fails**   236:19
**fair**   12:18 41:20
60:23 68:23,25
**fairly**   182:21
**fall**   207:23
**familiar**   74:24
117:2 118:19
136:17,23 139:10
154:10 223:19
224:1
**family**   2:22,24 3:6
39:7 55:24 57:15
57:18 78:6 114:11
116:25 134:24
205:25 206:4,5
210:22 212:23
213:18 220:24
**far**   57:6 71:5
221:25
**farm**   52:4,5
**father**   127:10
**fault**   180:23
182:17
**fax**   3:14 139:7,8
139:13 142:15
158:12
**faxed**   158:10
**february**   28:13
46:10
**fee**   21:10,13,16
90:23 91:22 92:13
**feeding**   22:18
23:19

**feel**   44:18 68:3
111:23 206:15
208:13 213:6
214:25,25
**feeling**   13:1,3
**feelings**   214:25
**fees**   91:17,20
**fell**   61:8
**felt**   77:4 123:20,24
**female**   183:10,21
**fiduciary**   93:19
**fields**   55:6
**fighting**   127:21
187:14
**figure**   35:7 39:9
42:20 53:4 67:15
72:23 180:20
183:25,25 184:1
**figured**   66:6 73:15
172:4
**filed**   5:14 28:6
30:22
**fill**   154:7,9,23
**filled**   61:12 144:15
146:23
**filling**   144:9
154:25
**final**   17:4,7 34:21
35:4 42:8 99:8
113:16 181:4
182:5,11 186:13
201:13,22
**finally**   54:9 66:5,6
66:8 98:15 215:4
**financially**   5:23
220:24
**find**   54:3 56:10,20
109:7 114:24
162:21 164:7,18
165:3,4,25 184:1,5
230:22

**fine**   18:11 30:21
34:3 63:5 82:16
89:25 90:2,4
115:9 125:25
140:21 141:22
180:23 205:16
221:9
**finish**   86:21
**fire**   182:12 196:5
197:10
**fired**   15:23 30:25
31:2,12,19,23
41:19 55:20
218:14 225:23
231:17
**firm**   5:18,20 6:8
**first**   7:23 15:12,20
17:2 53:5 55:10
59:21 60:1 63:7
63:12,21 65:24
87:22 88:24,24
89:3,6,6,9 90:22
94:25 98:12 119:1
123:6 135:4 136:6
139:21 140:19
141:22 146:20
148:12 151:4
158:1 160:11
162:11 201:2
214:24 222:23,25
228:11 232:14
**fit**   61:1 220:18
**fitness**   144:10,16
145:1
**five**   27:3 31:17
82:18 83:23
100:24 183:11
192:15 204:2
208:15 214:5
215:22

**fix**   12:23
**flew**   19:22 68:21
**flight**   4:2,3 25:23
26:12 34:24 37:15
54:12,17,19 57:21
57:25 58:3,7 59:1
59:5 68:6 73:16
75:16 79:21 81:17
84:8,13,23 85:13
85:19 94:17,20
104:12 106:9,14
108:10 118:19
122:11 130:17,18
130:22,25 131:6
131:25 132:22
133:11 136:15
176:18 177:23
205:9 206:7 207:5
208:7,8 210:9,11
210:12 211:5,9,11
211:16,19 212:16
215:17 221:11,12
221:22 224:6
**flights**   89:4
**flint**   57:3,11
**flopped**   53:12
**flour**   53:17
**flowers**   53:18,20
**flustered**   183:22
**fly**   57:11 68:18
77:16,25 80:3
81:11,11 82:4
94:25 95:4 104:13
108:2 212:12,18
213:8 220:25
**flyfrontier.com**
175:23
**flying**   62:6,14
104:22 105:9
106:15,16 110:7

**fmla**   39:5,6,10
40:8,18,21,24,25
41:6,8,10 42:6
43:1,7,8,11 64:19
104:17 114:1,4,11
116:8,15,18 117:2
117:10,11 118:4
124:24 135:3
156:22 159:13
163:15,17 164:12
180:9 183:14
**folks**   73:11
**follow**   36:23 38:1
42:21 43:22 90:20
117:19,22 119:1
128:17 180:14
204:9
**followed**   38:19
**following**   44:20
82:23 92:19 137:9
140:12 150:11
165:20 203:9
**follows**   7:24
**followup**   150:24
**forced**   219:9
**foregoing**   233:4
235:12 238:5
**forever**   72:22
186:16
**forgot**   42:8,9,18
152:5 180:8
**form**   64:14 73:5
141:6 142:8
144:10,16 156:12
156:12,22,22
157:3,21 158:3
223:17 224:3
228:23 229:7,19
230:11,21 235:12
**formal**   232:20

**format**   10:21
11:11
**formed**   17:16
19:13
**formulate**   224:24
**forward**   16:19
65:9 111:3,4
208:17
**found**   52:16 54:4
60:20 75:16
136:12 173:10
184:6
**foundation**   229:20
**four**   20:2 27:3
31:16 36:13 94:24
95:25,25 97:6,6,17
97:19,22 99:6
105:12 150:20
180:9
**fourth**   139:13
**frame**   151:9
**frankly**   177:5
**free**   171:12
**freeing**   106:12,13
**frequency**   159:18
**frequent**   121:23
**frequently**   20:24
**friday**   176:12,25
180:8
**friend**   52:4,4,23
63:1 173:6
**friends**   205:25
211:11
**frightening**   160:1
**front**   62:18 102:15
130:4 149:6
168:10 197:1,4
224:6
**frontier**   1:8 3:8
4:3 5:14 6:7,9
17:5,7 22:8,12,15

23:18,23 26:4,17
26:19 30:24 31:22
32:4,20,21 33:2,10
33:16 37:1 38:11
38:15 39:14 40:11
40:12,13 41:4,15
45:24 46:6,22
48:8 49:3 52:2,11
54:2,7,16,22 55:12
58:1,6,10,21 62:7
62:14 63:22 64:2
64:6 66:15,19
68:1 71:18,23,25
72:13 73:12 74:5
75:4 77:10,24
84:13,23 86:16,22
87:20 96:18,23
98:16 102:25
107:13,19 108:14
108:15 109:4,25
110:10 113:21
114:19 118:11,20
119:3 122:10,20
123:18,20 124:4
124:18,23 131:7
131:20 133:12
140:22 142:2
143:18,24 145:12
148:5 158:4,10,12
160:6 171:5 173:2
176:17 177:25
180:1,25 187:8,9
187:19 189:5
191:3 192:22,24
193:22 195:5,7
196:5 199:20
200:16,20 202:7
202:22 205:6
206:2 207:13
211:25,25 213:25
215:12,13,14

218:10 221:13
223:1,14,25
224:22 225:6,23
225:25 228:21
230:13,23 231:15
236:4 237:1 238:1
**frontier's**  33:19
36:15 67:2 103:23
116:3 139:16
161:18 203:5
**frontierairlines**
34:8 84:17 85:9
112:13 117:7
118:14 130:12
135:8 140:4
163:25
**fuck**  228:9
**fuckers**  201:25
202:7 203:3 228:9
**full**  8:7 11:24 21:5
56:2 76:20 89:23
140:13 141:9
145:2 155:2,3
160:24 217:19
**fun**  16:13
**function**  70:22
119:6,10,13
**functioning**  127:8
**functions**  71:19
118:22 119:16
137:12,18 149:2
149:20 158:23
224:11,16
**funny**  207:6
**further**  6:18 7:6
76:12 77:8 112:2
114:5 160:13,18
232:8 235:10,14
**fuzzy**  26:23 50:4

**g**

**g**  2:19 5:1 10:19
**gabapentin**  138:25
**galvez**  223:4
**gas**  57:1
**gear**  68:7
**geist**  3:10,12,13
173:18 183:5
**general**  24:1 29:1
45:9 56:25 69:5
69:13 72:2 75:24
76:2,8,20 78:1
79:3 82:22 94:16
113:12 134:6
136:22 153:13
161:18 175:1
188:24 190:7
193:24 194:3
195:3 198:16
199:22 204:1
216:14
**generally**  117:2,4
197:20 211:17
**generation**  21:22
**genesee**  5:17
**gentleman**  17:8
**getting**  31:4,5,7
37:24 40:1 41:1
42:24 53:11 57:25
66:4 70:20 72:4
77:8 89:16,19
176:11 185:6
218:17
**giant**  22:18
**girl**  63:4
**give**  9:11 11:24
21:23 28:2,9
33:22 41:18 48:16
62:18 81:20
149:15 196:19
202:22 219:23

230:24
**given**  23:7 79:10
80:20 81:23 105:4
107:7 131:25
137:21 155:24
193:19 238:9
**gives**  207:7
**giving**  193:16
**glasses**  127:9
**glendale**  1:17
**gmt**  32:12
**go**  5:10,25 22:2
27:1,17 30:13
32:9,24 33:18
36:3 40:2 47:5
48:13 54:25 56:7
57:2 58:13 60:3,7
63:9 67:12,16
68:7 72:5,8 73:16
75:18,24 76:11
78:6,16,21,24
79:13,13 84:2
85:4,24 87:25
89:5,7,11 90:3
95:25 97:15
102:22 103:15
105:15,25 108:3
109:9,10,12
113:11 115:21
121:9 122:19
123:7,8 124:8
129:8,16 131:17
131:23 132:23
134:6 142:3,11
143:2 146:25
147:3,16 149:18
152:6 158:7,16
162:24,25 165:18
166:5,12 167:18
167:19 172:14
174:5 175:23

176:3,22 177:3
178:18 184:11
187:2,5 198:1
204:4,9 205:22
208:14,14,18
209:2,7,13 215:22
218:13,21 222:12
222:13 226:5
227:19 228:3
230:16 231:16
**goal**   220:24,25
   221:1
**goals**   156:3
**god**   208:13
**goes**   79:22 126:18
   127:5 155:13
**gofundme**   52:25
**going**   6:21,24 10:6
   10:22 16:23,23
   17:12 20:25 25:25
   28:3,9 32:10,11,14
   33:23 34:1 36:7
   39:23 44:25 46:9
   46:17,20,25 48:3
   48:10,17,19 49:20
   49:23 53:22 77:11
   80:3 81:12,20
   84:6,25 89:12,23
   90:10,13,25 92:2,4
   92:24,25 98:4,15
   103:16 108:25
   109:14,17 111:23
   112:2,11 114:5,17
   115:7 118:7
   119:19 121:4,20
   122:15 125:20
   128:10 129:18,21
   130:3,11 134:10
   140:24 142:2
   145:16 146:25
   147:16 151:21

155:15 156:16
157:24 158:6,16
161:8 162:25
163:1,5 166:15,18
166:23 168:15
171:8,15 172:15
173:14,25 176:19
177:18 181:2,22
181:25 182:12,14
182:15 183:5
184:17 187:16,17
189:12 195:25
196:4 198:1,2,10
198:11,20 199:15
200:1,4,10 201:1,3
202:10,18 204:12
204:15 205:15,16
206:18 207:8,12
207:17,25 214:14
214:17 215:8,15
216:1,4 220:5,8
226:4 228:3
229:12 230:6,16
231:3,7 232:3,6
233:1
**golden**   24:4
**good**   5:2 8:3,5,5,6
   37:10 60:13 66:21
   115:25 143:5
   155:25 175:5
   177:24 225:19
   232:2
**goodrich**   8:11
   56:24 57:13
**gosh**   25:20
**gotten**   41:2 111:24
   131:8 157:12
**graduated**   25:12
**grandma**   28:8
   61:20

**grandmother**
   27:11,25 28:1
   52:1 61:8 70:6
**granted**   73:8
   100:15 222:7,15
   222:19 224:18
**granting**   223:14
**great**   2:13,16,18
   26:8 27:4 31:14
   49:16 50:25 51:10
   51:21,24 53:21
   54:6 55:9,10,17,21
   55:23 56:3,9,12
   59:9 60:9 61:14
   89:8,11 90:8
   115:22 129:15
   149:19 194:23
   196:19 203:19,23
   204:3 205:12
   230:4
**green**   8:11 96:2
   97:15,15,16,18,21
   105:23,24 218:19
**grew**   215:18
**grid**   95:11 96:2,4
   96:14,14 97:8,15
   97:16,17,21,23
   105:23,23 218:19
**grievance**   103:1,9
   128:25 184:13
   228:8
**grimes**   1:15 6:4,4
   7:18,18 11:8,13,16
   15:13,15 18:24
   19:7 20:16 23:8
**grocery**   60:11
**gross**   49:24 50:1
   50:18,19,20
**grounds**   203:1
**group**   53:8 121:24
   151:5 159:19

160:2
**guaranteed**   71:1
   81:10
**guess**   28:25 45:9
   49:19 62:16 64:12
   99:18 123:2
   162:18 171:4
   194:1,2
**guessing**   137:3
**guide**   116:8,25
**guidelines**   117:3
**guy**   16:3 67:8
**guys**   181:7

**h**

**h**   237:3
**habit**   176:10
**half**   57:7 65:17
   214:5
**halfway**   138:23
**hand**   44:24 85:8
   96:7 131:11
   134:14 153:15
**handbook**   169:17
   169:23 170:21
   172:5,7,9,17
**handcuffs**   30:13
**handed**   158:11
**handle**   223:7
   232:22
**handling**   188:15
**hands**   141:17
   192:3
**handwriting**
   135:4 146:20,24
   158:1
**hang**   27:18
**happen**   19:19,22
   70:25 105:1
   202:20 205:20
   222:11

[happened - huh]                                                                    Page 19

**happened**  16:9
17:8 39:21 58:1
61:11 67:16
100:24 113:19
174:25 183:14,19
183:25 202:20
**happening**  176:16
189:15 190:3
215:2
**happens**  130:10
**happiness**  215:15
**happy**  25:5 63:9
190:2
**hard**  62:8,24
122:18 131:25
132:2 206:13
214:13,14,24,25
215:7
**hardship**  199:3
**harm**  206:1
**head**  9:13,17,18
9:19
**headquarters**
173:2
**health**  2:21,24 3:6
134:20 146:16
148:24 157:18
206:3
**healthcare**  2:21,23
3:5 121:3 134:20
146:16 157:17
**hear**  40:1 162:6
200:21
**heard**  75:3 89:11
132:22 133:10,15
227:1
**hearing**  12:10,11
17:5 29:14 93:3
182:11
**held**  5:16 213:1

**help**  67:2 72:15
74:14,17 142:19
147:10 155:15
181:13 218:15
230:19,22
**helped**  15:23,24
18:6 52:3,5 95:14
110:13 194:25
215:1
**helpful**  94:9
**helping**  53:3 188:3
**helps**  45:11
**hereto**  238:7
**hey**  76:13 177:21
189:20 204:6
**high**  25:12 52:23
211:22
**higher**  50:19
**highlight**  117:18
142:24 174:13
**highlighted**  137:1
149:24 154:5
**highlighting**
125:20 152:10
174:6,7,8,8,9,10
**highlights**  36:5
**hillbilly**  207:4
**hire**  106:14
**hired**  15:25,25
16:1 19:12 54:5,9
54:19 55:18
131:19
**hiring**  57:2 74:6
**history**  25:11
32:19
**hmm**  26:2 34:6
36:3 49:8 61:16
62:22 74:21,23
80:15 126:2
138:11 140:1
158:21 175:15

179:7 187:17
188:5 190:11,15
191:4 208:6,9
**hold**  17:11,11 18:8
21:12 22:21 32:6
34:13 45:15 56:13
72:6 84:19 88:17
92:24 101:23
105:22 107:10
108:22,23 109:8
115:6,8 136:3
144:18,20,20
145:18 146:5
168:12 172:19
178:15 181:3
182:10 183:11
185:4,9,19 197:22
200:10 211:21,22
211:23 212:15
219:4,5,9,9,12
220:13,16,17
**holding**  94:9
**hole**  53:19
**holistic**  207:20
**home**  27:20 30:14
56:7 94:21 123:7
123:8 159:6
178:10,11 205:23
208:14 210:13,21
211:24 213:7,19
**honest**  57:24 86:2
169:18 172:12
179:18
**honestly**  33:21
53:12 58:9 77:11
102:24 138:6
156:20 162:16
166:1 177:25
182:17 184:6
187:7 215:13
225:9,25

**hooked**  19:2 26:25
54:10
**hoops**  65:22
**hope**  52:21 53:9
53:15 160:25
**hopeful**  151:10,19
**hoping**  130:9
187:11 201:21
**hops**  52:5,6
**hormone**  14:8
**hospital**  61:9
**hotel**  68:14 122:25
213:9
**hour**  27:16 55:16
55:18 57:7 89:12
211:22 233:5
**hourly**  55:12,15
55:17
**hours**  13:13,20,24
20:3 23:8 28:21
42:19 56:5 57:8
61:21,24,25 62:4,6
62:10,14,17 80:9
81:7,10 83:4,11
85:14,20 86:1
88:17,21 89:24
95:6 97:17 105:7
105:25 110:8
150:25 159:19
212:16 219:12
220:12,16,17,20
220:21,25 221:3,7
221:9,17 233:6
**house**  25:23 27:18
53:7 55:10 134:15
139:23 144:7
**houses**  56:5
**huge**  123:18
**huh**  9:13,13 25:12
105:5 117:21
138:17

**hung** 68:22 69:3
**hunter** 3:10,11,13
  173:18 183:5
**hurt** 205:21
**husband** 10:2
  57:17 126:18
  127:11,22 160:7
  206:10 228:8
**husband's** 24:18
  27:11,25 28:7
  52:1,4,4 56:1
  57:15 70:5
**hut** 25:21

**i**

**idea** 66:22 76:7
  88:20 155:25
  190:7 199:22
**ideally** 221:2
**ideas** 53:22 113:4
**identified** 155:21
**identity** 205:8
**ifmla** 41:23
**ignored** 214:19
**illegal** 189:14,22
  189:24 191:18
  192:9,24 197:10
  197:21 198:12,13
  199:21
**illness** 130:19
  171:7
**illnesses** 31:9
**image** 223:23
**imagine** 215:9
**immediately** 54:5
**impact** 13:20
  214:12
**impacted** 68:9
  69:17,24 70:14
  71:5,12 205:3,6
**impacting** 70:22

**impacts** 13:6,9
**impede** 119:16
**important** 10:5
**impossible** 58:15
  73:20 97:1,2
  113:13
**improper** 11:13
**improved** 225:19
**inability** 75:21
  150:1
**inaccuracies** 12:24
  162:23
**inaccurate** 78:20
  162:12,21 163:3
  173:11,13
**incapacitation**
  150:13
**incapacity** 130:19
  137:11
**included** 91:10
  137:14
**including** 93:23
  121:7
**income** 27:13,15
  27:22 28:7 50:18
  50:19,20 51:25
  52:2,10,12 53:11
  53:24
**incompetent** 214:7
**incorrect** 132:14
  181:9
**increase** 160:1
**increased** 159:6
**increasing** 160:2
**indefinitely** 76:21
  76:22 77:20
**independent** 53:7
**index** 2:9
**indicate** 7:12
  133:13 137:9
  150:11

**indicating** 10:18
  117:18 154:6
  174:6,12
**individual** 160:2
**individuals** 216:17
  216:19
**infection** 214:6,8,9
**inferred** 191:21
**inflight** 3:4 34:15
  35:19 42:16 46:11
  73:16 75:18
  108:22 111:22
  131:17 132:4,24
  164:19 166:5
  172:15 174:25
  176:15 188:4,18
  227:7,9,19
**information** 91:10
  93:10,12,14,16
  116:24 156:19
**infractions** 35:24
  47:13
**initial** 64:25
  120:12
**initializes** 119:8
**initially** 160:23
**injured** 72:9 79:13
  132:23 216:17
**injury** 79:15
  130:19 131:22,23
  167:22 171:7
**inpatient** 222:8
**inquiring** 187:20
  187:24
**insinuated** 78:18
**insomnia** 150:1
**instance** 68:10
  156:23 202:8
  210:18
**instances** 36:10

**instant** 11:1,11
**instruct** 11:19
  92:3
**instructed** 10:4
**instructing** 21:20
**instruction** 92:4
  92:20
**insurance** 206:3
**intake** 3:18 120:3
  125:5 126:9
**intent** 177:22
**intentionally**
  93:17
**interactive** 109:25
  110:1,11
**interest** 53:13
  177:4
**interested** 5:23
  175:4 207:20
  231:10 235:16
**interesting** 10:21
**interfere** 5:7
**interference** 5:6
**intermittent** 2:22
  2:25 39:10 40:8
  40:18,21,24,25
  41:6,8,10 42:5
  43:1,7,8,11 64:19
  76:6 77:24 116:15
  124:24 150:13
  159:12 180:9
  183:14
**intermittently**
  78:1,15
**internal** 164:11,19
  170:5
**internally** 167:25
**interrupted** 10:6
**interview** 60:10
**intoxicated** 68:22

**introduce**  33:23
**investigatory**  3:21
  99:8 112:19,21
  182:7 186:14
  187:15 189:14
  201:14,23
**invoicing**  56:13,14
**involved**  29:9,12
  76:7 98:15 99:19
  100:1,7,10 111:24
  156:18
**involving**  23:18
**iop**  139:23
**ish**  56:5
**issue**  14:2 91:8
  93:14,22 128:3
  140:24
**issues**  32:5 138:23
  140:23 189:1
  225:13,14,25
**items**  90:20 154:5

**j**

**jacalyn**  1:25 6:8
**jamie**  33:4
**january**  114:20
  116:3,13,19
**jeff**  16:2 131:15
  132:3 166:8
  206:24,25 207:1,7
  208:5,16 209:24
**jerry**  8:25 65:3
  66:1,6 78:2,4,17
  99:12 165:2
  187:18 190:12
  226:24 227:2,4,7,9
**jiffy**  17:4,5
**job**  1:25 3:8 30:25
  31:14,23 32:1
  45:7 54:13,13
  55:21 56:10,20
  57:16,25 58:3,7

60:9,15,17,18,22
61:18 68:1 69:4,6
71:19 72:10 79:13
79:15 118:11,18
119:13,17 122:10
122:20,21 123:8
123:17,17 124:9
124:10 134:9
137:12,13,14,19
144:12 149:2,20
155:2 158:23
167:22 176:4,18
177:21 178:2
187:13,14 188:13
201:22 205:9,10
205:10 208:10,24
210:12 216:17
221:22 224:10,16
231:13
**jobs**  26:13 31:2
  54:8 59:10 75:14
  176:9 187:18,21
  188:1,6,10,12
  221:12
**jobsdot.com**  60:4
  61:15
**john**  1:15,16,18
  6:2 7:17 19:23
  92:1 115:16
  129:12 152:3
  171:9 219:21
  231:25 236:1,2
**joke**  34:23 35:1
  37:15
**jones**  230:18
**joshua**  15:19
**judge**  93:1
**julia**  230:18
**july**  25:7
**jumbo**  193:21

**jump**  65:22 90:6
**june**  125:12
  128:13 148:9
  155:6,7 158:18
  161:17 167:4,15
  178:24
**junior**  25:13 29:21
  54:24 140:22
  212:1
**jury**  202:19,21

**k**

**kari**  33:7 35:11,16
  134:3 174:17,20
  174:21 187:20
  190:14 226:16,20
  226:23 227:6,8
**kason**  25:3
**keep**  25:25 28:21
  35:10 46:17 48:3
  58:9 69:5 89:24
  110:7 123:8
  125:23 172:14
  177:7 178:1
  183:24 187:13
  209:2,9,13,17,18
  209:20 227:19
**kept**  31:4,5,7 72:4
  157:13 180:9
**key**  218:2
**kids**  10:4,19 27:17
  27:20 31:4,5 32:6
  40:1 56:6,8 62:2,3
  70:8 89:16,19
  108:23 163:8
  185:6 210:17
  211:1 220:1
**kim**  98:22,23
  100:2 102:5,7,18
**kind**  10:7 16:11
  23:7 28:15 29:13
  29:13 30:19 32:23

44:18 60:5 61:18
62:8 66:2 68:5
69:1 72:6 90:6
124:4 128:23
129:11 133:9
161:4 162:9
172:16 181:18,22
183:22 185:6
196:1 204:2
205:16 208:23
**kinsey**  3:24 200:18
  200:20,23
**kinsey's**  201:4
**kitson**  1:20 2:11
  6:6,6 7:15,15 8:2
  11:7,15 17:1,20
  18:16 21:15,21
  22:1 23:2,5,15,17
  26:10 32:9,16
  48:13,21 59:24
  83:18 89:15,18,21
  90:1,9,15 91:14,16
  92:1,10,12,19,24
  94:1,4,11,13
  101:25 107:12
  109:12,19 115:3,6
  115:10,12,16,19
  115:22,25 116:1
  121:17 129:8,16
  129:23 144:19,23
  144:25 166:12,20
  170:20 171:3,8,15
  196:21 199:4,11
  199:17,18 200:6
  203:25 204:10,17
  216:6 217:18
  219:20,24 220:3
  220:14 221:10,21
  222:6 223:17,19
  224:3,5 226:3
  228:23 229:7,19

230:1,11,21
231:24 232:8,12
232:14,16
**knew**   18:22 41:16
64:21 86:22
107:25 132:18
145:7 175:15,16
175:19,19,21,25
193:10 202:22,24
212:11
**knocked**   22:23
206:11
**knocking**   32:7
**know**   9:1 12:2,7
12:12 14:13 15:8
16:8,20 17:10,14
21:18 22:18,25
25:9 28:5 30:8,14
33:18 36:4 37:20
42:17 46:19,25
47:12,13,16,23,24
48:4 49:12 60:10
64:12,17 65:17
74:10 77:7,15,21
86:8 89:22 90:6
92:6 96:8 99:16
99:19,20,23 100:1
100:3,5 102:9,24
103:20,23 104:1,1
107:22 108:2
111:4 114:6
115:17,21 120:20
126:6 128:10
129:10 133:3,6,15
136:20 142:1
145:24 146:23
147:14 148:19,20
148:21 156:15,16
156:20 160:15
162:17 163:17
165:2,11 169:15

169:23 172:9
174:2 175:6,6,22
176:16,17 177:15
177:20 178:10
179:18 181:21
186:21 187:19
190:4 192:12,23
192:24 194:5
195:23 199:12
201:17,25 204:7
206:5,6 207:7
208:17 214:7,22
216:18 217:24
218:9 219:3
220:15 225:22
226:12 229:3
**knowledge**   200:24
211:17 223:13
**known**   29:3 43:15
140:24
**knows**   83:23
**kruger**   15:19,20
29:4 34:17 35:11
35:19

**l**

**l**   1:20 85:5
**labor**   2:20 203:11
214:9
**lack**   229:19
**lady**   161:24 162:1
**laguardia**   211:22
212:16
**lake**   95:1
**lamotrigine**   139:1
**language**   85:1
149:25 164:7
169:8 176:20
**laps**   94:23
**late**   17:24
**laura**   108:22,24
111:17,18,24

187:20 190:23
**laurel**   2:6 5:20 9:8
9:12 152:4 192:2
232:12 235:4,20
**law**   8:19 21:16
27:23 114:14
198:20,21,24
199:23 205:17
229:5
**law.com**   1:18,18
236:2
**lawsuit**   19:23
20:12 29:9 216:11
**layover**   76:6 77:25
78:1
**layovers**   68:14
78:9 94:19 140:20
140:21 141:25
142:4 143:21
145:6 150:8
154:22 155:12
161:5 209:10,15
211:4
**lcsw**   151:24 152:2
152:10
**lead**   231:12
**leading**   156:14
**learn**   201:20
**learning**   143:5
151:13 207:20
**leave**   2:22,22,24
2:25 3:6 39:7 64:3
64:6,9,13,15,21,25
65:4 73:5 79:23
79:24,24 80:7
88:4,6,8,13 109:1
114:11,19 116:3
116:12,25 117:10
117:11 134:24
137:21,24 139:16
179:5 180:5

190:24 222:7,12
222:13,20 227:9
227:10
**leaves**   105:11
**leaving**   52:2 54:2
96:23
**led**   101:16
**lee**   214:10
**left**   30:11 40:21
41:10 43:11,14
52:10 54:16 55:13
55:19 66:1,6 80:5
80:10 81:20 95:17
143:14 153:15
**leftover**   72:12
88:22
**leftovers**   80:2
**legal**   21:3 29:2,13
114:3 184:2 187:1
193:13,20,21
195:6,7 198:11,11
229:9 236:23
**legalities**   196:7,16
196:24
**legally**   196:5
**leigh**   1:11 2:3 7:22
8:9
**lengths**   196:19
**letter**   93:16
128:19,21,23
**levels**   151:11
**levo**   14:6 138:12
**levothyroxine**
13:14 14:4,8
138:13,14 139:4
**lexis**   21:24
**leyner**   108:25
112:3,5
**license**   30:9
120:22

[licensed - manage]                                                        Page 23

**licensed**  152:12,18
**lie**  214:14
**lieu**  7:7
**life**  63:4 69:17,24
  70:1,3,13,15,19,21
  71:13 122:14
  123:6,25 124:1
  159:6 205:8
  206:15,17 211:15
  213:23 214:2
  215:12,16 225:3
  225:13,16
**lifetime**  151:14
**lifting**  141:17
**light**  76:2
**liked**  62:25 212:18
**limit**  28:4
**limitations**  93:20
**line**  80:20,22
  81:23 82:10 83:2
  83:4 103:14 104:6
  105:2,4 106:9
  203:9 212:2 237:4
  237:7,10,13,16,19
**lines**  52:19 193:18
  194:15 197:10,12
**lining**  214:6,8
**liquor**  122:15,16
  122:19
**list**  118:23 119:12
  130:23 138:8,21
**listed**  139:8
  177:21 224:10
**listen**  123:23
  181:19
**listened**  20:13
  74:19
**listings**  176:4
**literally**  205:7
**little**  9:1,14 13:4
  15:10 26:23 32:24

38:9 39:25 45:10
  47:5 48:24 50:4
  56:24 60:20 62:20
  72:3 80:12 82:21
  157:12 211:7,21
  213:22
**littler**  1:21
**littler.com**  1:23,23
**live**  57:6 69:17,24
  70:3,15 221:17
**lived**  24:5,7
  139:23 214:10
**living**  24:15 53:2
  57:14,18
**llc**  1:16 3:17
  119:21
**lm**  226:9
**loa**  179:25
**located**  5:17
**lodge**  91:1
**lol**  201:24
**long**  18:1,23 20:1
  24:20 27:2 62:23
  65:10 105:24
  120:10 212:16
**longer**  56:16
  155:23 186:4,5
**look**  35:6 40:2
  45:11 47:8 54:16
  55:3,7 62:18 84:2
  94:7 95:5 109:6
  140:2 141:1
  162:15 165:18,22
  168:25 169:18,24
  170:7,24 172:21
  175:6,15,22 176:3
  176:8 177:11
  189:11,21 191:15
  198:12 207:4
  208:4,17 222:5
  229:21

**looked**  59:15,16
  59:18,24,25 61:14
  61:17,18 73:14
  75:13 129:6
  165:25 171:23
  172:4 175:2
  177:20 178:9
  179:19 188:10,12
  206:19 228:16
**looking**  19:11 46:1
  46:10 49:9 60:2
  85:4 125:3,10
  132:12 136:25
  143:7 147:23
  157:15,15 168:17
  172:11,16 174:5
  176:8 177:22
  178:5,6 181:4
  185:11 197:25
  198:5 209:24
  221:2 228:1
**looks**  47:20 51:8
  157:5 164:13
  179:3 187:25
  203:14 206:23
**lose**  131:16 166:4
  169:19 177:18
  178:13 188:17
  208:11 226:22
**loss**  61:10 75:20
  127:1,3 214:15
**lost**  16:9 132:20
  133:13
**lot**  37:5 38:13
  57:14 77:8 176:9
  176:16 211:8
**lots**  20:23 79:12
  189:9 212:11,12
  212:17 214:16
**loud**  40:1 89:17,20

**loved**  177:24
  205:9,11,11
**lovely**  199:17
  228:8
**lower**  34:11 57:18
  85:8
**lube**  17:4,5
**luck**  221:7
**luckily**  68:2
**lucky**  54:12 63:9
**lunch**  20:6 27:19
  93:7 94:6 129:9
  129:17
**lying**  101:14,21

---

**m**

**m**  147:7 158:8
**mad**  31:11
**madrid**  120:9,10
  122:8 125:11,12
  126:10,10,16
  128:3 144:2 147:7
  148:13,16 151:17
  151:17,23 154:12
  158:8
**magically**  217:20
**maiden**  29:6
**main**  57:10 206:10
  213:14
**maintain**  55:1
  72:7
**maintained**  155:2
**major**  61:10 63:6
  71:12 73:3 123:6
  214:1 215:11
**majority**  211:15
**making**  53:17
  77:12 92:1 93:14
  94:8 100:20
  133:18
**manage**  121:21

**manager**  35:19 42:16 174:23,24 200:20

**managers**  164:20

**manipulate**  58:12

**manner**  7:11

**march**  147:4 166:24

**mark**  226:23

**marked**  4:1 84:7 114:18 118:7 139:5 145:17 149:5,12 161:9 163:23 167:3 200:11 226:3 227:23

**marketing**  200:17

**marla**  120:9 143:24 144:2 147:7 148:16 151:23 156:19 158:8,20

**marriage**  126:25 206:9

**married**  24:9,20 24:21,22

**matt**  139:7

**matter**  5:13 7:9 81:9 193:14,20 195:7 222:4 231:10

**max**  62:17

**maximum**  202:21

**mayne**  98:23

**md**  138:2

**mean**  13:14 27:10 28:19 32:1 33:15 35:8,9 37:12 38:18 46:7 47:20 53:21 54:12 58:8 62:24 68:11,21

69:25 72:22 80:23 89:22 94:17,20 104:24 106:25 111:2,18,22 114:2 114:6 115:22 116:5 121:8 122:17,23 123:20 131:18 148:23 164:20 176:7,16 177:15,19 181:18 190:25 192:17 194:14 195:10 196:9 206:7,13 210:13 212:14 213:4,19 220:19 226:17 227:15 228:12,16

**means**  11:2 96:14 97:15 155:11 186:22

**meant**  213:8

**media**  5:11 52:17 60:8

**medical**  2:22,24 3:6 14:2,22,24 39:7 45:4 47:17 64:22 65:4 73:5 114:11 116:25 117:25 121:6 134:24 137:21,24 139:9 140:7 141:6 147:23 148:5,18 148:23 149:24 156:12,22 179:5 179:22 222:20

**medically**  45:7 142:7

**medications**  14:15 136:8 138:8,15

**medicines**  207:20

**meet**  17:21 20:1 65:15,16,18 68:7 69:8

**meeting**  3:21 17:4 87:19 99:8 101:2 112:20,21,24 161:17,20 167:10 173:2 178:23 182:5,7,9 183:1,9 186:14 187:15 189:14 194:10,18 195:19 196:1 197:3,25 198:7,16 201:14,23 206:20 210:7 218:12

**meetings**  39:8 41:16 72:22 121:20,22 134:1,4

**memo**  35:11,15,18 35:23 46:2,5

**memories**  228:4

**memory**  19:3 60:6 100:25 133:23 166:1 187:8 192:15 193:16 194:7,23 195:24 196:11 197:20 209:23

**mendelson**  1:21

**mending**  205:24

**mental**  148:24

**mention**  42:5 128:2 150:7

**mentioned**  14:2 23:17 24:11 44:2 57:20 74:15 75:11 91:23 102:10 107:12 122:24 133:22 136:10 187:18 189:14,20 197:3

**meredith**  181:10 208:12

**merits**  37:24

**message**  11:1,11 11:11 186:8 228:13 229:14

**messages**  3:22,24 185:2,12,17 186:10 227:24 228:17

**messes**  145:18

**met**  16:1,2 17:3 19:22 20:4,15 136:7 145:12 170:2

**michigan**  5:17 8:11 24:6 56:11 56:24 57:13 120:16,22,25 206:16

**micklich**  107:23 165:1 167:4,9,17 168:20 169:20 170:2 171:23 178:23 190:17,18

**microphones**  5:4,7

**middle**  228:7

**milestone**  160:11

**military**  25:17

**milligrams**  14:14

**mind**  89:24 193:2 194:16 204:6 210:25

**mindset**  151:13 154:24 160:25

**mine**  10:9 25:7 36:5 94:8

**minimal**  62:10

**minimally**  74:8

**minimum**  85:5,14

**minnesota** 53:2
**minute** 38:7 71:2
  152:20 215:19
**minutes** 20:11
  40:3 90:7 138:7
  183:11 204:2,7
  214:11 220:1
  231:24 233:6
**mirror** 223:23
**mischaracterizes**
  101:24 107:11
**mischaracterizing**
  217:17
**misinformed**
  101:15,21
**missed** 39:16,19
  211:4
**mistaken** 132:8
**mitch** 33:5
**mitchell** 35:19
  46:2
**mm** 26:2 34:6 36:3
  49:8 61:16 62:22
  74:21,23 80:15
  126:2 138:11
  140:1 158:21
  175:15 179:7
  188:5 190:11,15
  191:4 208:6,9
**modifications**
  155:3
**mom** 161:24
**mom's** 30:10
**moment** 23:6 71:8
  168:12 178:17,21
**monday** 5:3
  176:11,12,25
  180:1
**money** 21:7 49:5
  53:5,10,17,22,23
  61:2,3 62:11 65:6

78:5 187:2,5,9,12
  202:18 205:22
  206:4
**month** 36:10
  62:17 79:21 80:14
  80:16 81:14,16,17
  82:24 83:1,6 95:8
  96:25 104:22
  105:9 150:21
  159:15,25 210:3
  210:15 220:25
  221:3
**months** 18:3,4,19
  26:25 27:3 31:17
  53:6 121:9 153:8
  153:10 154:1
  155:3,13 160:9
  209:3 214:5
  227:18 231:4
**morning** 5:2 8:3,5
  13:5,15 14:12
  27:17 30:12 90:21
  180:7 211:23
**mother** 27:23
  127:8 228:9
**motor** 61:10
**mouse** 143:3
**mouth** 97:5
**move** 53:7 57:13
  84:19 95:11 136:3
  212:3,24 227:23
  229:12 230:6
**moved** 56:11
  212:25
**moving** 143:3
**multimedia** 60:8
**multiple** 40:14
  41:16,17 72:22
  74:13 78:19 95:17
  96:25 99:4 112:7
  115:7

**mumbo** 193:21
**myfrontier.org**
  165:18
**myfrontier.org.**
  165:15

**n**

**n** 5:1
**name** 5:18 7:13
  8:7 15:18 16:1
  24:18 26:5 29:3,5
  29:6,7 33:6
  116:13 120:9
  121:11,14 138:2
  181:8 200:18
**named** 183:9
**names** 24:25
  152:16 162:5
  181:16
**natural** 14:10 90:5
**naturopath**
  207:18,21 209:25
**near** 225:16
**nearly** 59:13 97:1
  97:2
**necessarily** 172:3
  176:15 212:9
**necessary** 119:9
  142:8 238:6
**necks** 86:18
**need** 10:3 12:14,15
  46:19 47:1 48:4
  68:3 78:5 112:2
  141:22,25 145:6
  147:14 149:16
  150:8 159:12
  161:4 189:21
  198:2
**needed** 27:19
  56:16 63:23 65:6
  65:20 67:2 72:7
  72:20 78:16 95:23

110:7 143:21
**needles** 201:17
**needs** 58:6 61:12
  74:6 151:11
**neglected** 42:5
  43:22
**neither** 11:13
**network** 200:17
**never** 16:10 19:13
  30:5 41:2 53:23
  53:24 68:2,4,9,22
  74:9,14,15 77:6,20
  83:11 85:24 110:5
  110:21 115:1
  124:25 132:2
  162:9 177:20
  178:10 183:14
  194:15,15
**new** 10:9 59:1
  106:14 116:8
  151:13 176:11
  211:22 212:1
**nice** 211:2 213:19
**night** 20:12 94:21
  127:9 208:18
**nighttime** 14:17
**nine** 68:8 121:9
**ninth** 159:25
**nope** 89:5 120:6
  121:19 161:6
**normal** 10:4,9
  68:7 123:9 155:14
**north** 10:3
**northeastern**
  25:13 29:21
**notary** 2:7 235:6
  235:22 238:13,19
**note** 5:4 135:7
  236:10
**noted** 127:7,11
  238:7

**[notes - okay]**                                                      Page 26

**notes**  204:2,8
**notice**  2:1 117:12
  117:23
**noticed**  159:6
  181:6
**november**  3:14
  26:20 35:20 65:24
  112:22 139:15
  140:14 142:13
  143:12 144:5
  183:1 186:9 198:6
  201:10 207:9,16
**numb**  63:10
**number**  3:19,20
  5:15 23:8 26:13
  33:22 76:19 84:16
  85:3,12 108:16
  116:14 130:16
  139:7 148:25
  149:23 153:14
  158:22 159:2
  163:21 167:17,24
  221:6 226:9

---

**o**

**o**  5:1
**oath**  5:21 7:7 8:16
  8:18,19 32:17
  48:22 90:16
  109:20 129:24
  166:21 200:7
  204:18 216:7
**object**  11:20
  101:23 223:17
  224:3 228:23
  229:7,19 230:11
  230:21
**objecting**  92:8
**objection**  16:24
  17:12 18:9 21:12
  23:11,14 91:1,25
  92:16 107:10

144:18,21 196:18
  196:20 199:10
  217:16 230:3
**objection's**  199:15
**objections**  7:11
  11:16,18
**obviously**  179:23
  198:19 212:3
**occasion**  42:4
  108:5 133:21
**occasionally**  14:17
  177:3,12
**occasions**  99:1
  107:13,19 108:16
  189:7
**occupational**
  154:18
**october**  17:24
  98:14,17 173:2,22
  180:1 183:19
  206:20 218:12
**offer**  187:1,5,9,11
**offered**  60:18
  64:10 73:24 111:5
  111:6
**office**  72:3 75:25
  76:3,8,20 78:1
  79:3 113:12
  121:12 134:7
  161:18 164:5
  175:1 208:10
  216:14
**offline**  93:2
**oh**  22:24 25:20
  32:24 37:15,16
  40:24 52:21 68:3
  78:7 89:21 108:22
  109:9 110:23
  124:8,15 142:19
  146:3 157:9
  177:21 185:5

196:4 197:22
  200:23 226:5
  227:6 230:25
**oji**  113:14 167:17
  167:19,22
**okay**  8:15,24 10:1
  10:21,24 11:6
  12:19 13:18 16:12
  17:19 18:1,14
  19:21 20:9 22:3,7
  22:17,24 23:5,23
  24:1 28:1,17 29:1
  29:18 33:1,23
  34:3 36:6 38:6,8
  39:3,23,25 40:5,15
  41:5 42:4,24,24
  43:17,20,25 44:5
  44:15 45:10,13,24
  45:25 46:1,9,23,24
  47:2,22 48:3,5,6
  48:13 49:18,22
  50:21,23 51:9,23
  52:13 57:20 59:4
  59:8 61:5 62:20
  71:3,6,22 72:2
  73:23 75:1 76:13
  76:15 78:13 79:20
  81:15 82:7,20
  84:11,21 85:4,19
  87:1,8,16,22 88:3
  88:14 90:9 91:14
  92:24 94:8,11,13
  96:21 97:2,12
  98:1,5,12,17 99:1
  99:23 100:8,19,22
  101:14 105:13
  108:9 110:4,18
  111:9,16 112:11
  113:1,4,15 115:15
  115:22,25 116:7
  116:21,24 117:5

118:6,10,13
  119:19,25 121:2
  124:20 125:3,19
  125:22,22,23,24
  126:3,3,5,7 127:5
  127:16 128:13,22
  129:2,16 130:15
  133:12 135:25
  136:5,10,25 137:8
  138:20 139:5
  142:21,23 143:5,7
  143:16,20 144:9
  144:23 145:9,16
  145:23 146:2,7,8
  146:10,15,23,25
  147:4,21 148:2,8
  148:18,25 149:23
  150:7,10,24 151:3
  151:21 152:11,25
  153:7,12 154:4
  155:6,10 156:21
  157:8,16,24 158:3
  158:6,13,16,22
  159:11,18,23
  160:23 162:15,24
  163:4,9,16,23
  164:6,10,13,16,16
  164:17 165:5
  166:7,12,14
  167:17,24 168:14
  168:15 171:15
  172:23 173:8,17
  173:20 174:12,15
  174:15,22 175:2
  175:25 176:3
  177:6,13 178:20
  179:15 180:17
  181:2,15,17,25
  182:1,4,6,8,14,23
  182:24 183:7,21
  183:23 185:6,8,10

[okay - paperwork]                                                      Page 27

185:11,21,23
186:3,8,16,25
188:4,17 192:1,4,5
193:1,3,9,24 194:8
194:19 196:5
197:9 198:4,10,18
198:23 199:24
200:23 201:1,9,16
201:24 202:6
203:18,25 206:18
209:22 210:6
214:4 215:25
218:22 219:2
221:2,10 222:21
223:6,9 224:5,19
224:23 225:5
226:5,6,8 227:15
227:21 228:3,25
229:4,12,25 230:5
230:6,24 231:20
232:1,24
**old**  14:4 27:11
214:13
**once**  20:17 82:10
173:5
**one's**  158:13
**ones**  16:3 38:5
47:9 73:3 96:9
149:21 156:13
187:22,23 212:15
**online**  8:21 10:9
52:14 121:24
131:9 136:11
209:15
**oops**  173:14
197:24
**open**  72:11 73:12
73:23,24 75:4,7
77:2,18,19 80:1
82:14,15 83:7
85:5 88:11,21,24

92:25 94:10,14
95:16 96:12,13,15
97:6 104:11
105:16 106:8
113:6 118:7
119:19 142:2
165:9
**opened**  72:5
140:22 211:25
212:1
**opens**  82:16,17
88:7 105:14
**opportunities**
155:22 176:13
226:18
**opportunity**  12:21
57:16
**opposed**  64:17,19
**opposing**  33:25
51:15
**ops**  75:15
**option**  75:12,19
77:23 81:25
167:18,19
**options**  31:11 82:7
163:15 164:11,19
165:23
**order**  41:15 65:15
72:23 96:23 97:25
145:15 218:13
229:9 232:13,15
232:17
**ordered**  232:17
**organize**  204:2,8
**orientation**  60:20
**original**  114:25
153:3
**originally**  24:3
138:22
**orlando**  72:6
140:23 212:1,3,20

212:24,25 213:3,9
**outcome**  5:23 30:3
103:25 201:22
**outpatient**  139:15
139:24
**outs**  43:6
**outside**  79:15
130:18
**overlap**  47:7 83:17
**overnight**  76:7
79:2 108:1 122:25
123:15 124:2,18
124:20 155:23
213:6,7 216:13
217:20 218:17
**overnights**  39:8
41:12,13,15 43:9
44:25 66:22 68:5
72:19 76:12,14,24
77:16 78:7,22
94:18 95:6,20
103:3 104:4,9,19
105:10,14 107:14
107:21 113:5
128:3 161:5 209:7
210:10,21,25
213:11,13,18
224:21
**overtime**  82:12
**owns**  52:5

**p**

**p**  5:1
**p.c.**  1:21
**p.m.**  129:20,22
166:16,17,17,19
186:17 200:2,3,3,5
204:13,14,14,16
216:2,3,3,5 220:6
220:7,7,9 232:4,5
232:5,7 233:2,5

**pa**  121:12
**page**  2:10,12 3:1
4:1 117:6 121:25
125:4 126:9
132:13 135:5
137:8 138:9
139:13 140:3
141:1 143:7
146:21 148:25
149:18 150:10
153:15 155:16,17
158:1 162:11
163:2,3,10 168:3
168:21 169:2,21
169:22 170:11,14
179:4 182:16
185:24 187:16
188:13 201:2,3
202:9 203:2 208:4
226:8 228:4
229:13 230:7,15
237:4,7,10,13,16
237:19
**pages**  45:19 174:5
182:14 185:22
198:12 201:2
**paid**  21:7 79:8
81:10
**paint**  56:7
**painter**  55:10
**painting**  2:13,16
2:18 26:8 27:5
31:15 49:16 51:1
51:11,21,24 56:5
59:9 203:20,23
**panic**  180:7
**pans**  53:23
**paperwork**  56:12
65:19 66:2,7
116:15,18 135:3

**parents** 25:23
30:10,14 127:8
**part** 42:11 58:2,4
70:1 97:9 102:10
102:25 114:25,25
145:10 147:22
174:1 202:10
204:25 205:8
209:6,12 210:8,21
212:10 219:17
225:15
**participated** 8:21
8:23
**participating** 6:15
7:3
**particular** 156:12
**parties** 5:9 7:10
93:13 235:15
**parts** 20:13 162:25
**party** 5:22 63:4,4
63:9 91:7 93:13
93:17,18,19
**pass** 122:18
**passed** 63:7,8,20
**path** 101:16
126:12
**patient** 136:1
137:10 150:12
**paused** 146:3
**paws** 153:25
**pay** 30:20 54:14
56:22 57:4 59:13
81:12 205:22
**paycheck** 175:14
**paying** 21:3 56:22
57:4
**pdf** 117:6 130:11
132:13 137:8
140:3 143:7
148:25 155:17
163:5,9 174:5

179:4 182:15,16
185:24 187:16
201:2,3 208:5
228:4
**pdx** 180:10
**penalty** 7:9
**pending** 12:17
22:8,12,15
**people** 38:14
53:10 60:10 67:15
72:9 79:12 80:4
88:23 94:25 95:3
107:4 113:13
123:10 128:11
136:3 139:24
156:17 179:20
190:25 206:1
212:7,8,11,12,15
212:18 217:25
218:7,10,15 219:4
219:8,10
**people's** 152:16
**percent** 191:12
192:10
**percentage** 91:24
92:15
**perform** 45:7
71:18 137:12,18
149:1,21 158:23
**performance** 3:4
34:16 46:10
**performing**
119:16
**period** 31:8 36:11
80:1 85:13 130:20
130:23 133:3
137:11 169:9
215:3,6,7
**perjury** 7:9
**permission** 86:22
86:25 87:5,13,17

222:16,22
**permitted** 87:2,10
101:11 130:17
**person** 7:8 20:16
67:14,17 139:21
181:8 189:13
194:24 212:14
228:14,18
**personally** 111:22
172:4
**personnel** 191:3
199:20 202:6
203:6
**peter** 1:25 6:8
**ph.d.** 148:22
**pharmaceuticals**
139:3
**phase** 151:4
**phone** 1:17,22
19:1 20:22 54:24
66:5 67:8,17
139:7 184:20
186:4,4 222:24
223:5
**phones** 5:6
**phonetic** 16:2 33:4
181:13
**photo** 184:20
**photos** 185:25
**phrased** 100:14
**physical** 130:19
141:15 160:24
171:6
**physically** 6:16
7:4 144:12
**physician** 121:7,8
121:10
**pick** 5:5 76:23
89:3 96:3 97:2,22
104:12,15,16
210:17

**picked** 95:19
**picking** 82:12
**pictures** 186:6
**pieces** 87:8
**piller** 99:18 100:1
100:10
**pillows** 60:12
**pilot** 200:16
**pins** 201:17
**pizza** 25:21
**place** 5:6,9 76:14
84:22 129:5
151:10
**places** 162:8
**plaintiff** 1:6,14 6:2
6:5,11
**plaintiff's** 101:24
**plaintiffrecords**
119:22 146:12
**plan** 3:9 144:3
145:11,11,13
152:23 153:3
156:2,6
**plane** 67:9
**planning** 207:15
**plants** 52:6
**playground** 67:1
123:10 128:9
**playing** 125:2
162:17
**please** 5:4,6 6:13
7:1,12,21 8:7 36:2
48:12 66:14 83:17
137:9 140:11
150:11 168:3,20
169:21 170:11
198:3 199:25
215:24 232:23
**pled** 30:4
**plenty** 68:21 69:1
96:8 204:10

**plethora** 96:9
   105:16
**plus** 89:16,19
**point** 9:21 10:1,14
   11:6 12:2,5,9 15:6
   31:13 33:4,7,20,21
   36:9 37:24 41:1,2
   45:17 46:20 48:4
   53:17 56:23 65:2
   66:18 73:11 75:13
   76:23 78:2 83:6
   90:5 94:2 99:19
   102:15 107:23
   108:1,19,25
   111:13 117:5
   123:20 138:21
   153:7 162:25
   166:3 171:2,13
   175:5 177:6 179:9
   179:22,23 180:23
   182:21 189:3
   195:15 199:19
   211:20 213:10
   218:9 221:8
   222:18 230:18
   231:3,7
**pointing** 36:7
**pointless** 213:10
**points** 35:3 37:2
   37:22,24 38:17,21
   39:11,15 41:18,19
   43:2 44:15 45:1
   45:23 47:15 79:5
   118:23 179:22
   180:24
**police** 30:12
**policies** 119:3
**policy** 33:19 34:25
   36:16,20,23 37:8
   37:10,13,22,25
   38:12,17,18,25

39:16 43:2 44:1
   44:21 132:12
   143:25
**pollyanna** 205:15
**portion** 166:25
**portland** 183:23
   183:24
**position** 41:22
   54:17 60:7 76:20
   130:18,22,25
   178:11 200:24
   216:10,20 218:15
   224:6 227:19
**positions** 55:8
   57:21 60:23 73:12
   73:23,24 74:7
   75:4,8 165:9,19
   175:3 221:12
**possessed** 158:11
**possibilities**
   177:19
**possibility** 65:3
   145:8
**possible** 28:5
   108:15,17 111:9
   132:7 156:2
**possibly** 231:15
**post** 153:25 154:3
   225:17,18
**posted** 176:9
**pot** 127:11
**potential** 76:2
   110:14 165:23
**potentially** 76:19
   165:19
**power** 21:22 62:10
**pre** 27:16 68:12
**prefer** 212:12
**preference** 210:20
**preferential** 74:6

**preferred** 79:21
   212:12
**pregnancy** 22:19
**pregnant** 214:5
**premium** 212:8
**prepare** 15:11
   19:16
**prepared** 20:10
**present** 1:24 5:24
   6:17 7:5 17:7 20:4
   71:12,16 134:2
**president** 100:6
**pretty** 54:21 61:19
   68:22 72:12 73:17
   77:3,9 89:7
   215:14
**prevent** 68:24
   159:24 223:14
**prevented** 112:8
**prevention** 159:5
**previous** 235:7
**previously** 4:1
   179:21
**primary** 121:7,8
   121:10
**prince** 87:19 98:22
   99:3,9 100:12,19
   101:18 102:1
   190:21 194:10,12
**prior** 12:3 69:12
   72:20 101:24
   107:11 126:19
   141:6 156:13
   157:22 162:20
   214:17 217:17
**priority** 159:5
**private** 5:5 127:6
**privilege** 16:25
   18:10 23:13 91:2
   92:17

**privileged** 17:15
   21:14 91:11 93:10
   93:15
**privy** 103:21
**proactive** 160:9
**probable** 135:17
**probably** 11:17
   28:12 34:23 35:9
   53:19 63:20 102:9
   117:1 120:11
   134:13 172:5
   176:14 181:18
   186:25 188:14
   192:3
**problem** 10:8
   52:24 77:13 95:24
   154:23
**problems** 16:21
   154:14,18 212:4
**procedure** 2:2
**procedures** 42:22
   43:22 117:23
   119:3 180:15
**proceed** 103:8
**proceeding** 7:2
   29:13,14
**proceedings** 6:14
**process** 11:19
   80:13 82:11 83:10
   83:18,21 85:24,25
   88:1 104:7 105:19
   108:13 109:3,25
   168:4,21 171:25
   184:13 207:13
   215:9
**produce** 14:9
**profanity** 228:12
   228:17
**professional** 2:6
   155:24 235:5,21

**program** 39:13
40:11 41:15 70:25
127:18 139:25
144:2 207:18
209:15 210:4
218:10 231:4
**programs** 207:19
**progress** 156:2
**pronounce** 14:6
**propagate** 52:5
**proposing** 87:23
87:25 220:17
**proposition** 91:4
**prospective** 17:14
**protected** 91:5
93:14 189:10,13
192:21 195:12
229:22
**proud** 205:8,10
206:8 215:17
**prove** 78:17
**provide** 117:11
171:24 206:4
**provided** 28:14
74:20 116:21
151:4
**provider** 2:21,23
3:5 134:20 146:16
157:17
**provider's** 138:2
**provides** 74:5
80:19
**proving** 218:1
**provision** 101:1
130:8
**provisions** 184:11
223:10
**psychic** 142:1
**psychoactive**
214:21

**psychomotor**
149:25
**psychotherapy**
214:23
**public** 2:7 21:22
36:14 235:6,22
238:19
**pull** 151:22 157:6
161:8 171:15
184:17 185:8
226:2
**pulled** 146:8
**pulling** 141:17
152:21 163:18
**punitive** 202:11,15
203:1 204:21
**purpose** 42:12
182:8 202:1
**purposes** 181:22
**pursuant** 2:1
**pursue** 57:16
60:19
**pushing** 141:17
**put** 16:24 18:9
67:9 68:7 76:10
77:10 87:17 88:5
91:7 93:14 104:11
106:8 111:3,4,12
144:21 149:6
154:21 168:10
181:7 196:17,25
197:4 198:20,24
215:13 217:4,16
224:5
**putting** 97:5
230:13

**q**

**qualified** 60:15,24
74:8 166:3 178:11
**qualify** 59:19
60:17 68:3 75:14

75:16 177:5 188:7
188:11 226:12
**queen** 25:21
**question** 9:22
12:17 17:20 18:17
22:2,10,22 44:19
59:20,22 62:9
69:21 77:14 83:16
87:1,2 92:7,22
107:11 126:8
128:17 136:22
149:8,10,13 154:4
162:18 164:18,23
174:3 188:4
192:16 196:22
199:5,13,18
200:21 223:21,24
224:24 225:6
226:23
**question's** 217:16
**questioning**
171:10 174:1
203:9
**questionnaire**
136:9
**questions** 10:22
11:4,10,20,21,25
12:6 13:7 17:17
24:1 29:1 144:14
144:22 167:11
171:9 192:2 204:9
216:9 219:20,21
223:11 230:2
231:1 232:9
**quick** 50:3 163:7
178:16 181:5
198:2
**quickly** 45:12
49:20 85:1 218:1
**quit** 123:8 153:24

**quite** 31:9 77:12
166:2 189:9
190:25
**quote** 202:7

**r**

**r** 1:16 5:1 237:3,3
**r.brigham** 34:8
84:17 85:9 112:13
117:7 118:14
130:12 135:8
140:4 163:25
**rachel** 121:13,16
**ran** 40:25
**random** 145:14
**rate** 55:12,15,17
**rationale** 127:17
**reach** 179:22
230:17
**reached** 52:24
160:11
**reaching** 160:10
**read** 7:1 36:3
125:17 147:3
162:19 197:1
236:9 238:5
**reading** 125:23
**ready** 13:2 77:4,4
126:12 204:9
**real** 181:5
**reality** 63:1 78:8
**realize** 63:19
128:4,5
**realizing** 157:13
189:12
**really** 16:1 19:3
21:18 37:19 43:15
50:3 57:2 59:17
62:11 63:14,16
66:23 75:14
103:25 120:17
123:2 126:8 139:2

154:2,5 172:3
178:16 189:19
211:4 214:14
**realm** 177:19
**realtime** 2:7 235:5
235:21
**rear** 30:11
**reason** 12:15 35:3
38:16,24 41:10
42:9 43:16,18
44:10 45:6 47:25
49:23 58:2 60:25
66:22 86:4,23
96:17 100:5 122:3
128:2 131:4
132:11,15,17
152:17 154:20
170:17,18 195:13
209:6,12 210:8
213:20 221:22
236:11 237:6,9,12
237:15,18,21
**reasonable** 41:17
86:11 110:6,25
111:5,6,11 134:7
193:13,19 212:5
213:20 216:23
217:13 218:5
219:7,18 224:17
**reasonably** 39:22
41:4 62:9 177:25
181:1 193:23
194:4 220:22
**reasons** 37:1 58:17
58:20,23 59:4
110:18 213:12,18
**reassign** 78:23,23
**rebecca** 1:5,11 2:3
3:15 5:12,13 6:3
6:10 7:22 8:9
17:11,18 18:8

29:4 34:17 35:11
35:19 116:14
126:10,18 127:5
127:10,17 151:3
155:2,21 159:3,24
160:7 164:17
167:9 220:12
226:6,12 231:1,21
233:1 236:4,5
237:1,2,24 238:1,2
238:4,12
**rebecca's** 17:12
**rebuttal** 15:24
**recall** 13:10 16:22
102:3 103:4
116:18 124:19
129:1 167:7
191:14,24 195:24
199:8 206:23
213:16 221:14
222:9 223:11,18
223:21 224:12,23
225:5 229:16
231:5
**recalling** 15:7
**receipt** 236:18
**receive** 27:13,15
45:17 47:18
128:23 136:5
**received** 27:22
31:25 34:21 35:16
35:24 37:2 45:23
46:6,15,22 47:12
47:15,21 48:1,8
51:25 53:24 104:6
116:2 203:13
**receiving** 117:24
159:24 167:7
**recess** 32:13 48:18
90:12 109:16
129:20 166:17

200:3 204:14
216:3 220:7 232:5
**recognize** 45:16
112:16 118:17
119:25 134:12
135:2 152:25
161:11 171:17
182:2 184:19
200:13
**recognized** 128:14
**recollection** 75:5
85:23 102:12
103:6 130:9,16
147:10,18,24
169:12 179:2
192:17,20 195:1,3
195:20 197:2
**record** 3:4 5:3,10
6:1,14,20,22,23,25
7:2,13 8:8 9:15
11:2,10,18 12:24
16:24 18:9 30:15
32:9,11,15 34:16
46:11,15 48:14,17
48:20 51:14 64:18
69:22 71:7 85:9
89:23 90:3,11,14
91:15 92:2,5,11,13
93:6 94:5,7
109:11,13,15,18
118:13 129:9,17
129:19,22 135:9
144:21,24 161:20
166:13,16,19
192:2 196:18
198:4 199:8 200:2
200:5 204:4,13,16
215:22 216:2,5
217:16 220:6,9
230:3 231:25
232:4,7 233:2,6

**recorded** 3:19
5:11 9:5 100:24
101:3 194:22
**recording** 3:10,11
3:13,20 5:8
161:14,23 162:17
164:5 171:21
173:1,22 181:19
**recordings** 20:13
74:19,24 75:1,3
**records** 28:15
**recovers** 121:24
**recovery** 44:22
52:21 53:9,15
70:1 76:12,15,23
77:9,12 126:12
139:20,24 151:4
151:14 160:8,11
210:24 211:4
212:6 213:5,7
225:17,24
**red** 25:14,15 95:11
96:4,14 97:23
106:3,17 107:17
108:11 174:6,7,12
218:23
**reduced** 235:11
**reef** 99:18 100:1,9
**reentry** 73:6
**refer** 168:3,20
169:21 170:11
**reference** 133:18
138:12 168:1,7,11
168:14 173:14
174:2 181:5
183:18 184:8
202:4 203:2,5
**referenced** 236:6
**referred** 191:14
223:9

**referring** 67:11
93:11 98:6,7
133:1 134:5
169:16 170:14
175:10 179:12
192:17
**refresh** 85:23
130:9,16 147:10
147:17,24 155:16
169:12 179:2
228:4
**refuse** 111:13
112:1
**refused** 110:21
**regard** 195:21
216:22
**regarding** 23:12
35:24
**regardless** 62:13
**registered** 2:6
235:4,21
**regular** 95:22 97:3
105:19 140:13
141:9 145:2,3
208:24 232:19
**regularly** 108:6
**regulation** 160:13
160:21
**regulations** 119:2
**rehab** 64:25 65:10
66:12,16 124:12
124:16 135:15,21
136:6
**reily** 1:15
**relapse** 144:4
151:6 159:4,24
**relapsed** 16:8
**relate** 93:17
**related** 5:22 28:7
123:17 124:9
154:14 213:25

235:14
**relates** 122:1
**relationship** 17:14
17:16 19:14
**relationships**
205:25
**relatively** 89:14
123:9
**release** 3:15
**relevant** 91:8
93:15,24 149:24
162:9
**remain** 124:1
210:9
**remember** 16:6
33:5 46:7 69:2
82:9,19 83:22
86:1,6 98:19
100:17 101:4
102:6,7,8,14,17,24
103:24 105:25
107:21 111:15
116:5 125:14
126:15 136:9
166:2 168:9
172:12,15 175:24
184:6,14,15
189:19 194:22
195:2,15,18
196:12 197:6,7,9
197:12,16,19,20
197:21 199:19
204:23 208:20
220:19,20,21
223:1,3,4,9 224:8
227:13 228:1
**remembered**
227:22
**remind** 178:22
**remote** 5:16 6:13
7:2

**remotely** 2:5 5:24
6:18 7:6 56:14
57:4 235:11
**remove** 40:13
72:18 104:14,19
105:13 106:8
107:14 113:4
**removed** 42:10
72:20 104:9
107:21,24 108:1
123:19 130:22
**removing** 103:3
104:4
**rent** 53:6
**repair** 2:14,17,18
26:9 31:15 51:1
51:11 203:20
**repeat** 18:16 22:10
**replacement** 14:9
**report** 19:25
**reportable** 50:2
**reporter** 2:7,7
5:19 6:13,15 7:1,3
7:21,25 9:8,12
12:22 26:5 33:25
48:15 51:15 59:20
59:22 83:14,16
121:14 170:19
173:19 183:4
232:14,18,21,24
235:5,5,21,21
**reporter's** 164:5
235:1
**reporting** 6:18 7:6
7:11
**represent** 19:11
164:3
**representation**
23:13 91:5 93:23
154:11

**representative**
102:21
**representatives**
75:4 108:16
**represented** 15:12
**request** 49:2 72:16
72:25 73:4 89:2
105:9 113:2,16,19
113:21 117:10
127:17 194:6,8
222:12,13
**requested** 71:23
71:25 72:18 78:12
79:18 127:16
193:7 223:15
**requesting** 79:1
104:9 106:2
116:14,18 156:18
197:8
**requests** 156:20
189:4 190:9
193:13,18,19
218:6
**require** 150:16
**required** 42:22
43:22 119:2
180:14 238:13
**requirement**
80:10 82:4 118:4
**requirements**
69:10 85:5
**requires** 39:14
40:11
**reserve** 54:20,25
58:13 80:3,23,24
80:25 82:1,3 83:1
95:11 96:2,3,13,14
97:8,14,16,17,21
97:23 104:13
105:23,23 106:3
106:10,16,17

107:16 108:11
218:19
**reserve's**  218:23
**reserves**  95:13
96:20
**residential**  137:2
139:22
**resolve**  93:7
**resolving**  94:9
**respect**  99:10
126:8 174:22
199:11 219:2
**respond**  186:25
**responds**  186:20
**response**  116:11
**responses**  9:11
**responsibility**
80:8 136:15,17,23
**rest**  73:17
**restaurants**  26:13
**restless**  185:7
**restrictions**
140:13 141:12,19
**restroom**  12:15
**restructured**
56:15,16
**result**  235:16
**resulted**  35:4
**results**  149:25
**retain**  130:20
169:14
**retired**  113:20
**return**  65:13,14
236:13,17
**returned**  66:11
**review**  12:21
21:19 116:24
162:2 173:8
179:15 236:7
**reviewed**  19:23
91:2 125:8 156:3

**reviewing**  20:12
**rid**  95:3 96:2
97:19 105:10
123:21 214:9
231:1
**ridiculous**  36:16
**riemann**  3:15
139:7
**right**  10:9,10,11
10:17 12:12 14:14
16:2 17:4,22
20:10 21:21 22:9
26:11 27:6,24
28:3 34:11 36:9
37:8,9 38:23
40:23 44:17 46:1
46:18 48:3,10
52:13 55:6,21
59:6 61:7,12,23
67:14,17 68:10,16
70:2 71:9,10,13
73:25 77:7 83:24
84:25 85:8 86:9
87:12 88:1,9,12,15
89:7 92:10 95:21
95:22 97:10 98:2
98:25 103:2 105:3
106:6 110:23
111:21,21 112:22
114:17 115:10,19
115:23 121:5
126:1 132:1
133:14 134:14
135:15,23 136:25
138:20 143:6,22
147:22 150:22
151:21 152:20
153:10 155:8
156:6,25 157:3,5,6
158:14 159:21
162:14,18 164:14

165:23 167:2,9
169:21 170:12
171:7,11 172:11
172:20 176:14
178:8,16 181:24
182:18,19 183:21
185:14 186:14
187:23 188:1
196:8,9 197:25
199:7 203:16,25
205:20 209:17
211:12 212:8
217:4,12,14
219:19 221:24
225:21 226:18,22
228:5,7
**road**  8:11 231:14
**robert**  35:19 46:2
**rocks**  25:14,15
**rolling**  36:10 40:8
**room**  6:17 7:5
10:11,15
**root**  127:20
**ross**  21:21
**roughly**  120:13
221:17 231:4
**roulette**  125:2
**round**  39:23,24
**row**  212:13
**rule**  86:5 106:17
106:21,25 117:15
136:20
**rules**  2:2 44:20
95:22 97:4
**rumor**  133:9
**rumors**  133:16,17
**run**  39:10 40:7
41:23 72:13
**running**  34:23
37:15 52:13

**rush**  108:22,24
111:17,18,24
190:23
**russian**  125:2

s

**s**  2:6 5:1 235:4,20
237:3
**sadness**  63:10
**safe**  211:3
**sales**  60:14
**salt**  95:1
**sasser**  98:23 102:5
102:18
**sat**  87:19
**saw**  11:17 75:13
138:5,6 143:24
156:23 167:15
170:4 172:13
174:7 188:7
**saying**  9:19 37:13
37:21 52:24 86:23
87:4 96:7 109:1
128:24 141:8
151:17 170:11
182:19 184:15
191:24 192:7
195:15 197:7,9,21
227:16
**says**  21:16 36:10
50:2 84:12,24
85:12,19 93:9,10
117:10,18 119:8
122:3 134:15,24
135:10,17,25
137:8 140:11
141:12,18 144:1
145:4 146:3 149:1
149:23 150:10
151:9 155:21
157:2 158:17
159:18,23 160:23

164:11 165:5
167:9,17,24 168:3
175:2,9 180:7
183:21 184:23
185:16 187:17
194:15 207:4
208:11,13,17
209:16,24 226:11
226:12,16,23,24
227:6,7,8,9 228:8
228:8 229:14
230:8
**sayser** 98:23
**scale** 151:10,19
**scene** 30:11
**schedule** 41:3
42:10,20 58:12,13
58:25 59:1 62:18
72:10,11,13,14,19
79:17,22,23,25
80:9,24 81:1 86:9
87:10 88:13 95:6
95:15,19,24 96:24
98:4,7,13,21 99:2
99:10,24 102:1,5,9
104:10,15,18
105:14 107:25
109:4 113:5
123:20 140:13
141:9 145:3 156:1
176:19 194:9
195:16 217:1,2,6
217:19 219:2
220:15 221:3
222:17,18
**scholarship** 67:7
67:11,12,18
**school** 25:12 31:6
52:24 62:2,3
148:21 207:8,15
207:25 209:3,8,13

210:17 231:3,8
**schooling** 54:11
**scratch** 95:15 98:9
217:6 220:15
**screen** 9:9 10:16
34:2,12,13 48:11
50:4 51:23 84:19
115:23 136:3
142:18 146:3
152:5 157:10
161:7 168:15
181:25 226:4
**screens** 115:7
**screenshot** 186:6
**scroll** 36:4 45:20
45:21,25 46:9
84:12 85:12
116:11 125:16,18
126:1 134:13
135:7 157:24
158:6 183:9
187:17
**scrolling** 35:10
46:17,25 139:11
157:13,14 159:11
169:7 185:19
**sean** 24:19
**sean's** 61:19
**search** 84:25
164:8 198:10
**searchable** 198:1
**searching** 178:16
**second** 45:15 47:2
48:17 109:8 115:8
125:4 126:9 130:3
140:22 145:21
171:20 178:15
181:3,3 185:4,20
197:23 200:10
219:23 230:25

**secondary** 153:18
**section** 85:5
118:22
**sections** 139:21
**see** 9:9,18,21
10:15,17 34:9,18
35:13,21 36:1
42:18 46:3,12
49:25 50:5,7,16
51:18 60:5 65:20
84:10,14,18,20
85:6,15,21 95:5
101:10 111:23
112:14 113:7
114:21 115:23
116:9,16 117:13
117:20 118:1,24
119:4,23 120:15
120:17,23,24
121:4 122:5
124:25 125:6
126:13,20 127:12
127:23 131:1
134:13,14,22,25
135:12,19 136:2
137:15 138:3,10
138:16 139:17
140:9,15 141:3,16
142:17,21,22
143:3,4,10,13
144:11 145:13,25
146:1,2,13,18
147:5,8,12,14
148:10 149:3
150:3,14,18
151:13,15,25
152:1,3 153:16,17
153:20 154:16,19
155:4,13,19 156:4
157:9,14,15,19
160:14 161:1,6

162:2,14 163:12
164:1,21 165:6,13
165:16 167:5,12
167:20 168:1,5,11
168:18,23 169:1,5
169:10 172:17
173:23 174:18
175:7 176:12,20
178:25 179:6,10
180:2,11 183:2,16
184:3,24 186:11
186:18,23 187:3
188:8,19 192:3
193:22 196:14,23
198:8 201:11,18
201:22 202:2,13
207:10 209:4
222:17 226:5,6,11
228:7
**seeing** 34:11 35:8
50:25 51:10 65:21
102:14 115:13
118:10 120:3,10
120:19,24 121:6
121:18 130:5
148:12 152:7,22
158:20 163:20
164:8 166:2
172:13 176:11
**seeking** 88:10
91:17,19 99:12
202:15 204:21
205:1
**seen** 121:18
143:25 147:2,11
147:15,24 148:6,7
156:13 157:21
177:16
**self** 37:4 38:4
44:21 143:25
160:13,21 218:11

222:19 224:15
225:1,22
**sell** 53:18 60:11
**semester** 25:13
**send** 21:19 42:8,9
42:18,23 78:6
115:3 128:18
180:8
**sending** 42:15
182:18
**senior** 211:19,20
211:21 212:15,18
218:7,16,24 219:4
219:8,10
**seniority** 58:10
72:5 73:15 75:20
79:22 80:6 101:1
130:10,20,23
131:16,17 132:21
133:13 137:23
142:2 166:4 168:4
168:22 169:8,13
169:19 171:24
172:7,14 177:8,18
178:5,14 188:18
212:3 221:24,25
226:23 227:20
**sense** 82:22 91:7
111:7
**sensitive** 5:4
**sent** 66:1 114:25
116:12 142:13
143:17 180:5
187:19 190:24
236:14
**sentence** 30:19
**september** 24:21
34:17 64:1,2 65:9
65:11 67:5,6,7,20
68:12,24 69:12,15
69:16,23 70:2

71:11,15,17,25
124:13,14,15,17
134:17 136:1
140:8 235:18
236:3
**series** 130:1
**serious** 2:21,24 3:6
13:5 134:20
146:16 157:18
**seriously** 230:8
**serve** 88:24 89:6
**serves** 156:1
**service** 25:17
130:21,23,24
173:19 186:5
**serving** 122:11
**sessions** 151:6
**set** 38:7 52:25
60:11 77:11 93:3
97:7 118:6 218:14
**setbacks** 151:12
**setting** 37:20
127:19 218:10
**settle** 187:12
**settled** 187:10
**seven** 89:23
222:25
**shake** 9:13
**shaking** 9:18
**shaky** 69:4
**share** 34:1 152:5
157:10 168:15
181:25 226:4
**shared** 142:19
**sharing** 38:6 48:10
51:23 115:7 118:8
146:3
**she'd** 170:7
**sheet** 3:14,18
120:3 139:7
236:11

**shelly** 108:25
112:3,5,7
**shift** 63:6 151:13
**shit** 208:18 230:8
**short** 96:18
**shorthand** 235:11
**shorthanded**
96:19
**shortly** 63:20
**show** 30:5 37:13
49:20 50:3,23
51:9 78:4 82:20
84:6 112:11
114:17 117:17
130:1,8,15 134:10
139:5 145:16
166:23 178:18
179:24 181:2
182:14 187:16
200:10 203:8,22
206:18
**showed** 178:19
**showing** 34:4
35:18 50:5 142:15
152:2 161:9 167:2
173:15,21 197:23
200:11
**shown** 41:3
**shows** 30:14 49:24
50:14 51:6,16
**shupernot** 33:4
**shut** 62:10
**sic** 6:25 32:12
98:23 99:18
153:12
**sick** 13:3 31:4,5,7
31:10 36:10,13,14
37:14 39:11,12,13
39:17,19,21 40:6
40:10,10,12 41:1,2
41:3,18,19,24 42:2

44:3,6,20 45:1
62:3 69:3 104:17
180:25
**side** 101:17 153:15
194:24 205:18
**sign** 236:12
**signature** 232:21
235:20
**signed** 35:9 141:2
147:13 236:20
**single** 188:13
212:17
**sitting** 17:9 66:3,7
141:16
**situation** 58:24
59:10 74:14 156:1
218:25 223:5
**situations** 159:4
**six** 61:23 153:10
155:3,13 160:9
212:13
**skills** 61:10 151:13
160:13,21
**slapped** 30:13
**sleep** 14:18
**sleeping** 138:24
225:15,25
**slow** 232:20
**slower** 147:3
**smokes** 127:11
**sober** 53:3 70:16
70:20 71:1 124:1
128:7 214:25
**sobriety** 55:1 67:5
72:7 127:19 159:7
159:25 160:12,24
224:21
**social** 52:17
151:24 152:13,18
154:15 211:15

**software** 145:19
**solutions** 236:23
**somebody** 19:11
  30:11 136:19
  213:5 218:21
  229:10
**son** 25:3 28:20
**soon** 77:9 82:16,17
  89:14
**sorry** 14:7 26:5
  30:3 59:20,25
  61:13,22 69:15
  82:15 83:14 89:11
  114:23 121:14
  124:15 145:19
  152:5 155:6 174:4
  200:21 214:15
**sort** 16:3 20:12
  28:3 53:12 60:2
  63:2,9 69:25
  123:3 154:2 165:1
  175:22 177:18
  195:25 205:14,19
  206:8 222:14
  223:23
**sought** 87:5,13
**sound** 60:8,9
  203:15
**sounds** 147:18
  232:2
**sources** 52:1,10
**south** 1:16 231:15
**southwest** 2:15
  50:6
**speak** 15:20 75:7
  98:20 103:2
  154:24 189:7
  190:8 216:19
**speaking** 18:18,24
  75:3 112:1 183:8
  203:3 206:24

226:14
**specialist** 65:16
**specific** 102:12,14
  103:6 107:2 116:5
  133:6 190:1 193:6
  194:2,5,7,8 195:21
  195:22 197:3
**specifically** 11:18
  46:7 102:17
  131:13 133:1
  184:14 189:17
  195:16 196:10
**specifics** 107:22
**spelled** 132:5
**spend** 210:7
**spent** 20:11 23:9
**split** 187:23
**spoke** 18:25 19:10
  86:15 99:24
  103:24 108:15
  190:10,12,14,16
**spoken** 19:8 20:21
  22:4,7,11 23:20
  162:21
**sponsorship** 160:3
**spread** 28:5
**stages** 160:8
**stamp** 34:7 112:13
  119:22 143:8
  146:11 163:24
**stand** 91:3 167:22
**standard** 232:16
**standing** 141:16
**stands** 152:12
**start** 43:4 46:25
  54:19 58:9 72:10
  73:19 96:24 98:8
  123:9 155:12
  176:8 189:12
  207:8,15 217:6
  224:24

**started** 18:24
  31:14 53:8 127:4
  138:22,24 140:23
  154:23 158:20
  212:4,5 230:16
**starting** 28:12
  72:14 130:2
**starts** 105:9
**state** 2:8 5:25 8:7
  21:22 51:13
  141:24 142:7
  235:6
**stated** 44:21 87:12
  101:2 127:6 139:2
  185:12
**statement** 6:13 7:2
  23:8 127:25 159:9
  165:3
**states** 1:1 5:14
  24:5 117:22
  126:10 127:17
  130:16 138:1
  139:14 140:7
  141:11,19 143:12
  148:8 151:3,23
  153:12,14 155:1
  155:17 159:2,12
  160:7 164:16
  176:6
**stating** 7:12 145:1
  220:14
**station** 57:1
**statistics** 75:15
**statute** 93:20
**stay** 176:17 210:21
  213:9 227:7,8
**staying** 53:3
**steered** 195:13
**stefanie** 33:6
  42:16 180:20
  184:23 185:15

188:25 190:2,10
  191:10 192:7
  194:13,14,23
  197:13 227:25
  228:5 229:14
**step** 23:6
**stipulating** 171:5
**stole** 30:9,10
**stop** 26:19 36:17
  38:6 46:19 47:1,2
  48:4,10 51:23
  63:17 108:19
  115:6 151:21
  161:7 185:19
**stoplight** 56:25
**stopped** 18:20
  59:8 166:3
**stopping** 90:5
**store** 122:15,16,19
**stores** 60:11
**stream** 3:2,3,16
**street** 1:21 25:23
**stress** 124:4 230:8
  230:13
**stressful** 159:7
**stressors** 127:21
  213:23 214:1
  215:11
**stretch** 31:4
**strictly** 210:23
**strike** 36:16 44:1
  65:9 66:10 71:16
  74:18 75:25 81:16
  109:23 131:4
  143:16 153:13
  161:16 162:11
  194:16
**stroke** 218:2
**strong** 160:25
**strongly** 176:7

struggle 159:3
struggles 151:12
struggling 126:11
  178:3
stubs 175:14
stuff 14:10 17:6
  31:6 56:13,14
  65:17 75:15 77:10
  80:10,11 88:22
  97:25 100:7
  103:15,21 110:6
  123:11 145:15
  148:22 160:6
  162:5 166:2
  173:12 175:14
  179:19 180:20
  206:2 209:11,20
  225:25 226:19
stv 1:3
subcontracted
  56:15
subcontractors
  56:17
subject 33:11
  231:10
submit 158:3
submitted 19:24
  148:5 156:11,12
  156:15,16
subscribed 238:14
substantive 171:9
successfully
  165:22
sudden 42:12
  183:10 206:3
suddenly 205:13
sue 228:9,21 229:9
  229:10 230:8,12
  230:22
sued 230:18

suffering 225:12
suggest 172:1
  176:7,22
suggested 73:14
  76:13 78:2 176:3
  191:15
suggestions 110:5
suite 1:16,21
summary 125:5
  125:11 126:9
sunday 208:18
super 10:5 211:20
  211:23 212:15,17
supervisor 32:22
  32:22 33:5 132:4
  133:17 174:25
  185:3,13
supervisors 33:3
supplied 51:15
support 121:24
  151:5,11 159:24
  213:7
supports 160:10
supposed 19:19,21
  66:25 67:1 108:2
  136:20 205:24
  222:24
supposedly 16:4
  103:13
sure 12:19 13:19
  26:2 32:8 35:8,17
  36:12,18 39:24
  40:4 45:16 46:8
  46:16 58:4,17
  78:10,16 82:23
  86:8,10 87:23
  99:20,23 109:9
  122:18 136:24
  143:25 160:12
  174:2 185:5
  186:22 192:5,10

201:25 211:8
  216:10 219:24
  230:5 232:2
swap 80:4 83:7
  85:24 96:25 97:6
  97:6 104:7 105:6
swapping 82:11
  83:19 96:16
swear 7:21
switched 33:21
  55:11 63:9 187:22
switching 188:18
sworn 7:23 235:8
  238:14
sylvia 25:2
symptoms 153:25
  154:3 225:18
system 33:21 78:3
  175:12 213:7

          t

t 237:3,3
take 5:9 8:19 10:3
  12:14 14:11,17
  16:19 19:20 27:10
  27:18 39:7,25
  48:11 58:11 61:11
  68:6,12 71:1
  72:13 92:25 94:5
  104:11 105:11
  109:6 117:11
  124:17 126:12
  140:2 141:1 163:7
  166:13 180:22
  182:17 199:24
  207:19 208:4
  218:21 225:16
  231:4,24
taken 2:4 5:12 9:8
  13:12,20 14:3
  42:20 76:5 96:22
  103:18 162:13

179:23 180:19
  217:20 235:11
takes 97:20
talk 17:12 21:2
  32:19 62:20 71:22
  93:2 94:5,6 98:2
  98:12 110:21
  111:13 112:5
  122:20 136:7
  149:14 163:2
  190:23 193:6
  209:25 213:22
talked 15:22 18:10
  18:12 42:16 43:5
  48:24 73:11 99:7
  103:5 107:23
  110:14,23 112:6
  143:23 144:6,7
  156:7 170:5 175:4
  180:13 189:9
  190:25 198:21
  210:6 218:9 223:5
talking 18:1 42:7
  70:16 74:15 98:8
  99:7 108:19 112:8
  113:10 132:16
  133:11 172:2
  175:16,20,21
  179:5 181:8
  194:10 195:11
  201:16 204:21
  207:3 208:5,7,10
  208:16
talks 168:4,21
  169:8
tape 75:1
tara 121:11
tax 28:6 52:7
taylor 121:11
teach 123:4

**technical** 12:10
**technically** 27:10
  213:4
**teenager** 62:25
**telehealth** 120:19
**tell** 10:14 16:16
  25:10 39:3 45:14
  45:19,22 49:9
  59:7 62:16 71:24
  80:12 100:22,23
  102:16,19 104:5
  125:18 132:16
  133:2 136:21
  162:22 166:24
  189:17,25 190:1,6
  191:1,12,18,23
  194:19,21 195:7
  195:22 205:5
  214:4 223:6
**telling** 15:21
  169:21 192:20
  226:17 228:20
  229:18 230:9,12
**tells** 168:20 230:17
**temp** 26:4,22,25
  31:11 50:9 54:9
**temporarily** 76:22
  78:23
**temporary** 76:20
  227:18
**temptation** 156:2
**ten** 40:3 68:8 90:7
  204:7
**tend** 94:17 205:14
**tending** 94:18
**tends** 9:17 187:9
**term** 45:9
**terminate** 202:23
**terminated** 26:3
  44:23,25 54:7
  113:23 221:13

224:22
**termination** 17:4
  17:7,22 34:21
  35:5 99:8 103:22
  179:22 182:11
  205:6 208:1
**terms** 21:13,16
  38:25 47:12 70:14
  79:17 87:10 92:14
  93:22,23 122:21
  132:8 136:23
  179:15 195:11
  199:20 213:23
  223:20 224:1
**terrible** 205:21
**terrified** 57:25
  78:9
**tesla** 56:15
**test** 62:12
**testified** 7:24
  101:7,18 170:20
  172:25 182:20
  188:21 197:15,16
  221:16 231:2
**testify** 15:3 18:12
  235:8
**testifying** 100:13
  178:6 189:1
**testimony** 7:9
  101:24 107:11,13
  204:23 217:17
  236:9,18 238:8
**tests** 145:14
**text** 3:22,24 11:1
  11:11 185:2,12,17
  186:8,9 188:6
  198:1 202:9
  227:24 228:12,17
  229:14,16
**texts** 186:1 201:4

**thank** 7:25 8:6
  9:20,24 23:3
  94:12 115:5
  144:23 167:10
  215:21 220:4
  231:21,23 232:9
  232:10,23
**thanks** 18:15 25:6
  115:9 186:25
  232:11,24
**theirs** 38:3
**theis** 1:20 6:8 7:19
  7:19
**theoretically** 91:6
**therapeutic**
  127:19 151:5
**therapist** 65:20,21
  76:13 77:3 142:9
  142:12 144:7
  148:17
**therapy** 155:14
  209:20 214:16,20
  214:22
**thing** 16:13 36:1
  56:16 97:25
  111:17,18 124:1
  178:5 181:5 193:4
  196:1 200:17
**things** 19:24 37:14
  40:14 76:17 123:5
  131:20 144:3
  173:10 213:23
  231:15
**think** 13:5,7,21
  17:21 23:16 26:11
  28:24 30:4,4
  32:24 33:6,9
  37:10,19,23 39:6
  39:23 40:3,15
  52:6 53:16 54:8
  58:14,16 59:6,7

60:3,16,16,25 65:2
  73:2 76:13,14
  87:16 95:14 96:6
  98:1,25 101:6
  107:20,22 111:17
  111:22 114:12,25
  124:11 125:9
  129:7,8 131:8
  133:14 136:8
  146:7 154:21,22
  155:15 158:11
  162:8 165:2
  172:13,20 176:18
  180:13 181:10
  182:15,23 189:20
  194:7 196:3,4,19
  204:1 210:16
  220:2,19 221:21
  223:25 229:4
  230:25 231:12,25
**thinking** 15:7
**third** 117:18
**thomas** 138:2
  141:2,8
**thompson** 33:7
  35:11,16 134:3
  174:21 175:9
  190:14 226:20
**thought** 16:16,18
  77:3 78:6 83:12
  83:15,25 86:2
  128:6 162:8
  177:17 193:18
  215:15 222:3
  229:4
**three** 18:3,4,19
  20:2 26:25 54:8
  61:9 65:25 94:24
  96:1,1 99:6
  105:13 227:18

**thyroid** 13:15 14:2
14:8,9,23
**tick** 230:2
**tied** 96:13
**till** 41:20
**time** 17:22 18:5,22
19:12 20:18 24:7
27:20 29:24 30:7
31:10 32:12,21
33:2,10,15 34:25
36:25 38:11,15
39:10 40:8 42:23
43:17,21 52:7
56:2,8 61:17
63:21,24 65:19
67:4 68:17 71:2
72:11,21 74:10
76:20 78:23 80:1
82:4,14,15 83:8
84:22 85:5,19
88:11,21,24 89:6,9
89:22 94:5,15
95:10,16 96:12,13
96:15,17 97:7,13
97:14 104:12,15
105:16 106:8
113:6 122:17
123:19 124:20
126:12 127:25
128:5 129:10
132:25 133:3
137:18 140:17
145:5 150:25
151:6,7,9 154:13
154:20,21 155:2
155:24 159:9,19
159:20 160:2,4,19
162:19,19 165:10
170:19 175:13
177:9,15,17 189:3
199:7 204:11

205:23,24 207:8
207:12 208:11
210:7,13,14 211:4
211:9 213:16
214:24 215:3,8
216:12 222:7
225:22 232:17
233:5 236:19
**timeframe** 236:8
**timeline** 222:14
**times** 20:15,21
29:18 31:9 33:14
33:19,22 36:13
41:17 59:16 68:8
68:21 69:1,2
72:20 74:13 78:19
96:25 99:4,6
102:4 104:19
107:7,20 112:7
133:15 150:1
159:19 176:9
199:12 206:10
217:25
**timing** 42:6
**tips** 50:14 51:6,16
**title** 165:2
**today** 8:4,16 9:5
9:12,21 11:16
12:5,9 13:1 15:4
15:11,12 19:17,18
20:10 100:25
120:15 121:21
138:18 156:7
167:10 189:1
203:4,9 214:12
**told** 16:4 17:10
42:12 66:21 67:8
74:9 87:20 99:12
99:14 100:9,25
102:1 108:4
113:12 124:23

131:2,13,15
132:17,19 136:19
166:4 169:13,19
169:25 175:23
179:17,20,21
183:23 189:10
191:9 192:8
195:23,25 196:11
205:9 221:21
223:5 227:22
**tomorrow** 25:3,5
70:24,25
**ton** 96:8
**top** 143:9 158:17
184:23 186:8
226:11
**topic** 90:7 189:18
225:7
**topics** 125:14
**torn** 205:13
**torture** 123:22
**torturing** 202:5
**total** 27:22 28:2
49:17 51:20 233:5
**totally** 90:1
**town** 56:25
**track** 28:21 45:10
**trade** 80:4 83:7
85:24 95:25 96:1
104:7 105:6
**tradeboard** 72:12
80:2 83:7 88:7
94:23 95:3,18
96:12 105:16
113:6
**trading** 82:12
83:19
**traffic** 57:8 221:17
**training** 175:4
**transcribe** 161:25
162:1

**transcript** 12:21
161:14 162:2
164:13 167:14
170:5 171:20
173:1 178:23
181:4 182:24
194:14 196:14,23
196:25 197:4
198:15 206:20
222:5 227:13
235:13 236:6,20
238:5,8
**transcription** 3:10
3:11,13,19,20
161:22 164:4
173:5,16,21
182:25 198:6
**transcriptionist**
181:14
**transcripts** 181:7
**transfer** 75:12,19
75:21 130:10,17
130:24 132:18
163:17 165:19,23
171:6 177:23
178:4,7 212:19
**transferred** 74:3
188:14
**transferring**
132:17 167:25
**transfers** 163:15
164:12,12,19
170:5
**transitions** 139:14
139:19
**transmission**
21:23
**trazodone** 14:18
138:22,23,25
225:16

**treated** 14:25
  135:25 141:5
  171:6 216:21
  217:11
**treating** 148:23
**treatment** 3:9 24:7
  53:1,1 63:23 67:6
  67:13,16,19 120:4
  120:7 122:18
  123:1,4,13 126:19
  127:2,16 128:6,8
  136:5 137:2
  138:23 139:20,22
  140:19 143:15
  144:2 145:10,11
  145:13 150:16,25
  152:23 153:3
  156:2,6 159:5
  205:23 209:11
  214:18,20 215:5
  222:8,12,13,15,23
**tremors** 9:17,19
**tri** 21:22
**trick** 44:18
**tried** 36:16 65:14
  95:8 96:25 124:25
  165:3 190:23
**trigger** 122:25
  123:3,11,19 124:2
  124:5 125:1 128:3
  128:14
**triggered** 122:11
  122:15
**triggers** 66:25
  122:3,7,22 123:16
  124:9,9 127:20
  155:22
**trinity** 207:18
**trip** 42:10 68:20
  76:8 79:2 94:25
  96:3 124:21,22

180:15 183:19
**trips** 41:14 72:7
  80:4 82:12 94:16
  94:22 95:20 96:20
  97:17 108:11
  123:15,19 124:2
  124:18 155:23
  212:18 216:13
  217:20 218:17,25
**trouble** 15:6 225:2
**true** 34:20 35:15
  35:23 45:22 46:5
  46:14,21 47:14
  48:7 51:3 62:12
  83:10 116:2
  126:22 137:17
  148:4 160:4,19
  162:2 180:4,14
  188:10 203:12
  235:13 238:8
**trust** 28:20,22
  179:20
**truth** 235:9
**truthfully** 15:3
**try** 39:9 40:16
  55:3 60:11 78:24
  84:25 123:15
  134:7 140:20
  179:2 181:22
  182:13 183:25
  196:19 199:2
  214:9 226:4
**trying** 28:4 30:4
  39:13 41:21 42:19
  53:4,18 67:15
  72:23 78:3,4,10,18
  78:19 92:11 95:3
  114:22 123:21,21
  142:24 164:7
  172:13 181:4
  193:10 200:17

230:22
**tubbs** 2:6 5:20
  235:4,20
**tumblers** 53:10
**turn** 5:6 25:2
  42:13,15,20 94:23
  107:24 180:10,19
  183:23,24 210:19
  211:24
**turned** 16:5 25:4,7
  30:11 112:19
  129:2 187:1
  207:23
**turns** 95:2,18,18
  96:3,8,9 97:3,6,20
  97:22 104:15,20
  105:17 106:13
  209:2,7,10,13,17
  209:18,21 210:9
  210:16 211:18,21
  211:21,22 212:7
  212:16 213:1,10
**two** 10:2 18:3,4,19
  20:5 21:2 24:15
  31:4,8,12 57:8
  76:17 105:14
  107:20 130:21
  139:20 150:25
  151:5 154:5
  159:19,19 169:9
  169:13 193:4
  212:12,14 220:1
  221:17 227:8
  231:24
**type** 16:10 37:14
  43:5 55:8 206:4
**types** 94:16 123:4
**typewritten**
  235:12
**typical** 11:19

**typically** 128:18
  212:7

**u**

**u** 175:17
**u.s.** 21:24
**uh** 9:13,13 25:12
  105:5 117:21
  138:17
**ultimate** 221:1
**ultimately** 41:19
  55:9 103:8 231:16
**ultipro** 175:9,12
  175:13,16,17,21
  175:24,25 176:23
  188:7
**una** 47:16,24
**unable** 117:23
  137:12,18 149:1
  158:22
**undergo** 160:24
**understand** 8:15
  8:18 9:4,7 11:22
  12:6 32:17 36:18
  37:7,19,20 41:21
  41:22 48:22 56:23
  58:16,17 71:3
  78:10,11 87:22,24
  90:16 98:1 109:20
  129:24 131:19
  166:21 193:15
  194:4,6 197:18
  200:7 204:18
  216:7,10
**understanding**
  15:7 82:23 96:6
  152:14,15 177:7,8
**understood**
  123:24
**undue** 199:2
**unemployed**
  206:11

**unemployment**
26:24 54:6 203:13
**union**   86:15,16,17
86:22,22,24,25
87:5,13,17 89:8
90:19 98:3,13,15
98:20,24 99:15,17
100:6,15,20
102:21,25 103:2,8
103:24 128:18,18
128:24 129:3
184:12 200:24
218:13
**unit**   5:11
**united**   1:1 5:14
**untitled**   4:4
**update**   155:17
159:2
**uproot**   212:23
**upset**   107:24,25
**use**   39:7 78:3
124:23 141:17
173:25 180:8
189:23 191:11
192:11 195:21
222:16,22 228:17
**uses**   127:6
**usual**   117:23
**usually**   10:23
123:5 210:14
**uterus**   214:6,8
**utilizing**   127:18

**v**

**v**   132:5 236:4
237:1 238:1
**varied**   28:3 62:3
**various**   110:14
160:8 189:4
223:10
**varney**   131:15
132:3 133:19

166:8 206:25
207:1
**verbal**   9:11 46:13
**verbally**   7:8
**verify**   47:14 236:9
**veritext**   5:19,20
236:14,23
**veritext.com**
236:15
**versus**   5:13 21:22
**victor**   132:5
**victory**   94:23
**video**   1:11 2:2 5:8
5:11,17
**videoconferenced**
1:11,13 2:3
**videographer**   1:24
5:2,19 6:12,21,24
7:20 32:10,14
48:16,19 90:10,13
109:10,14,17
129:18,21 166:15
166:18 200:1,4
204:12,15 216:1,4
220:5,8 232:3,6,25
**videography**
198:11
**videotaped**   233:1
**view**   58:25 119:13
153:22 202:6
205:14,19
**violate**   87:20
99:13,15 100:21
101:1 184:16
194:12 195:17
197:8
**violated**   80:7
114:14 196:3
**violating**   199:23
**violation**   100:14
101:19 114:10

**vs**   1:7
**vulnerable**   155:25
159:4

**w**

**w**   2:13,15,16,18
49:10,20,24 50:2,6
50:25 51:4,10
203:19
**w2**   50:1
**wages**   49:24,25
50:2,14 51:6,16
**wait**   157:9 197:22
230:2
**waited**   40:9
**waiting**   76:16
201:20,22
**waive**   7:11
**walk**   135:9 174:16
**walking**   141:16
**walter**   138:2 141:2
**want**   9:22 10:1
12:3 15:10 20:2
21:18 25:25 26:24
28:12 36:17 37:13
37:20 38:7 39:24
41:14 43:18 45:14
45:15 47:13 48:11
49:25 52:9 55:14
56:4 58:17 62:20
65:4,23,25 71:22
73:21 75:17,17
78:5,8,22 82:22
87:23 88:23 89:7
89:11 90:3,18,19
94:2,4,21,25 95:1
105:24 109:6,10
115:16,20,20
124:1 125:18,23
128:10 129:12
130:8 132:17
133:5,25 141:21

144:20 171:22
174:1 176:8,17
178:13,18 187:5
188:17,24 192:5
193:5 198:1
199:24 201:24
202:11,20 207:7
209:1,16 213:13
213:22 215:22
216:10 217:15
220:12 221:20
223:23 226:2
227:23 232:12,22
**wanted**   32:11 49:1
60:3 61:13 62:12
63:18 73:17 76:19
78:9 80:11,24
86:14 87:9 96:9
96:24 97:3 98:8
101:19 104:13
117:5,17 130:1,15
135:9 149:15
154:4 174:15
177:25 182:23
185:21 187:13,13
188:16 195:5
204:20 207:19
209:6,13 210:8,11
212:8 215:18
216:12,21,25
217:5,19 218:3
219:11 220:14
221:7
**wanting**   210:7
**wants**   80:2
**warn**   9:16
**warning**   34:21
35:5 46:13 47:18
**warnings**   34:25
47:12

**watched**  8:23
**way**  13:6 36:5
  40:25 41:7 44:16
  53:4 55:24 63:11
  89:13 91:8 97:7
  111:12 115:1,11
  120:17 143:3
  148:20 157:5
  162:10 164:8
  188:15 194:3
  196:9,15 201:25
  205:17 206:11
  208:2 212:13
  214:16 217:4
  218:22 224:25
  228:14
**ways**  134:8
**we've**  42:25 43:5
  89:12 98:7 108:13
  110:18 113:9
  146:7 147:22
  156:13 157:21
  228:16
**weaknesses**  16:21
**weaned**  138:25
**website**  60:4 61:18
  151:22 165:5,8
**wednesday**  186:9
  201:9
**week**  19:19,22
  20:19 28:4 31:4,8
  31:12 54:8 55:21
  61:21,24 62:4,5,7
  150:25,25 151:6
  159:19,19 176:9
  176:10 208:15
  222:23
**weekend**  78:8
**weekends**  208:17
**weekly**  151:5
  176:23

**weeks**  20:19 21:2
  52:3 61:9 65:25
  212:14
**weird**  16:5,7
  145:20 146:5
**went**  25:12 30:4
  31:5 52:3 60:3,9
  60:20 64:3 86:19
  86:21 87:4 120:6
  123:3 124:12,16
  140:22 148:21
  162:9 175:24
  183:25 194:18
  195:18 205:22
  206:14 212:2,4
  214:9 222:7,15
  231:15
**west**  2:13,16,18
  26:8 27:4 31:14
  49:16 50:25 51:10
  51:21,24 54:6
  55:9,10,17,21,23
  56:3,9,12 59:9
  61:14 203:19,23
**whispering**  5:5
**why'd**  177:13
**willing**  78:24
**win**  92:15
**wine**  127:9
**wise**  230:19
**wish**  54:18 55:1
**withdrawal**
  153:13,19,25
  154:3 225:18
**witness**  7:8,21
  29:13 107:11
  157:14 171:10
  217:17 236:8,10
  236:12,19
**woke**  180:7

**won**  230:18
**wood**  53:18
**word**  160:12,17
  162:17 196:12,12
  197:1,1 198:10,13
  198:20
**wording**  174:3
  199:19
**words**  9:7 91:8
  93:15 97:5 100:12
  100:22 101:5
  110:1 162:13,21
  189:19,23 190:1,4
  191:11,19 192:11
  195:21,22 197:17
  197:19 199:8
**work**  26:4 27:2,4
  31:5 45:3 48:25
  59:1 60:22 61:4
  61:19 63:24 64:19
  65:13,15 66:4,13
  66:20 68:9 69:13
  70:11,24 72:2,8,24
  76:8 77:25 78:3,5
  78:8,9,17,18,21,25
  79:3,13,19 80:13
  81:10 96:10
  113:11 127:19
  129:12 131:23
  134:8 140:13
  141:9 142:11
  143:1 145:2,2,15
  153:8 156:1 160:9
  178:11 205:15,17
  208:14,18,19
  212:6 216:13
  226:5
**workday**  155:24
**worked**  25:19,20
  25:21,21,22,22
  27:8 31:16 50:9

  55:5 58:8 110:17
**worker**  151:24
  152:13,18
**working**  16:5,11
  17:6,9 26:8,16,19
  26:21 27:23 36:14
  56:2,4,12 59:8
  62:10,12 68:24
  102:22 160:20,20
  167:18 205:11
  206:9
**works**  34:2 96:13
  129:9,15 143:6
  161:24
**world**  118:8
  122:10 205:19
**worried**  42:14
  86:24
**worries**  167:1
  168:13
**worse**  9:18 72:4
  77:13 226:1
**worth**  183:24
  215:16
**wrap**  216:9
**write**  32:1
**writes**  28:20,21
**written**  2:1 39:1
  140:25 225:6
**wrong**  93:2 101:16
  192:23,25 194:25
  195:13 197:24
  199:1 202:23,25
  229:3
**wrongfully**  54:7
  113:23
**wrote**  162:9

|   y   |
| :---: |

**yeah**  9:3 14:3,10
  19:6 20:11,20
  23:15 25:7,9

32:10 36:3 37:17
37:18 46:13,14
47:6 48:23 50:10
50:22 52:9 58:4
58:16,19 60:14
63:10 71:6 72:22
81:12 83:18 84:19
85:4 89:21 90:1,4
93:5 96:6 100:11
104:11 109:2,9,12
115:18 116:6
120:14 122:19
125:24,25 129:14
129:14 131:10
133:11,24 136:12
140:6 142:4,23
143:2 146:4 159:8
163:13 166:11
168:14 172:18
181:10,12,20
186:19 187:24
192:16 199:14
203:17 204:5,11
206:16 207:6
208:11,13,15
209:1,5,11 210:2
211:13 219:22
220:3 226:1 227:4
230:25 232:23
**year**   14:4 19:5
27:11 28:10,13
29:22 36:13 58:10
77:5 123:6 151:9
151:18 160:23
214:13
**years**   82:18 83:23
100:25 130:21
169:9,13 192:15
211:6 227:8
**yellow**   36:5 117:18
125:20 137:1

142:24 154:5
174:8 185:18
201:5 228:5
**yep**   47:4 85:7,11
85:16,22 118:16
118:25 122:6
135:13 138:11
140:16 141:4
143:11,14 147:6
150:15,19,23
151:16 153:6,11
155:20 159:14,17
159:22 167:6,13
167:21 173:24
185:20 186:15
190:19 201:12
203:21 207:5
**york**   211:22
**young**   121:13,16

**z**

**zone**   129:10
**zoom**   120:19
143:6 151:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

0248

# FRONTIER AIRLINES

To:        Rebecca Kruger, 13206
From:      Robert Mitchell, inflight manager
Date:      17 November 2008
RE:        Four Sick Instances Reminder

Hi, Rebecca,

As you know, Frontier takes a great deal of pride in maintaining an outstanding completion factor and on-time performance record with the Department of Transportation. This record positions us favorably with our customers and contributes to the recognition we receive such as "Best Low-Cost Carrier."

From an Inflight standpoint, we play a significant role in supporting the airline's success by maintaining a consistent level of dependability within our Flight Attendant workgroup. To accomplish this, it is important we advise you that our records reflect that you currently have 4 sick instances in a rolling 12 month period. The purpose of this letter is for advisement only. However, I ask that you review Flight Attendant Handbook 70.00 to understand our concern should you reach five instances within any 12-month period.

I have listed the dates below for your review. If you feel this is in error, have any questions, or need assistance, please stop by the Inflight office to see me or call any time.

Sick occurrences-
1. 12.22.7
2. 9.14.8
3. 9.28-30.8
4. 10.13-15.8

I appreciate your commitment to maintaining a dependable airline.

Sincerely,


Robert Mitchell
inflight manager

720.226.1583
rmitchell@flyfrontier.com

FRONTIER AIRLINES (R. BRIGHAM) - 0001117
249
ESI00000008-3

**Frontier Airlines**
**Job Description**

| Gray Area for Human Resources Use Only | | Reports To:  Manager, Inflight Services |
|---|---|---|
| EEO1 Code:  9 | | Department Name:  Inflight |
| Job Title:  Flight Attendant | | Department #: |
| Job Code:  FFS1205 | | Structure or Grade:  Structure |
| FLSA Status: Exempt | | # Weeks Vacation: 2 |
| Job Family:   09 | | WC Code:  7405 |
| Org. Band:  Individual Contributor | | Creation/Revision Date:  2/24/14 |
| | | (Revision) |

**I.     Position Summary:** (Succinct statement (1 to 3 sentences) of the basic purpose of the position.

The Frontier Airlines Flight Attendant is essential to maintaining the well-being, safety, security and comfort of our passengers onboard our aircraft. The Flight Attendant performs a variety of services in order to maintain a high level of excellent customer service. Flight Attendants are involved in all passenger interactions in order to help answer any questions, address concerns, and sell products onboard.  It is essential for all crew members to follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight emergencies and/or security concerns in the unlikely event they arise.

**II.    Essential Functions:** (In order of importance, list only those functions that are necessary to carry out the purpose of the position.  Include the percentage of time spent on each function.)

- Follows all Federal Aviation Regulations as required as well as all established Frontier Airlines Policies and procedures.
- Initializes and conducts emergency evacuation of cabin if necessary.
- Conducts preflight safety check of cabin emergency equipment.
- Ensures proper loading and storage of carry-on luggage prior to and during the flight.
- Ensures cabin safety and security during all phases of flight, including boarding and deplaning.
- Prepares and secures doors and announces departure/arrival information to passengers over the PA system.
- Provides instruction and demonstration of onboard safety features.
- Sets up galley, brews coffee, checks supplies, stows beverage carts/snacks and verifies count.
- Serves snacks and/or beverages (including alcohol), collects and stows all beverage and snack service items inflight and prior to landing, and informs passengers of all onboard products.
- Heavy lifting, pushing and/or pulling of objects up to 200 pounds occasionally and/or up to 50 pounds frequently
- Other duties as required

**III.   Other Functions:** (Those that are marginally important to the position)

**IV.    If management or supervisory position, which positions report directly to this one?**

**V.     Qualifications:** (Formal education or training required; amount and type of prior experience required)

- High school graduate or GED required
- MUST BE 21 years of age to begin the interview process
- 1 to 2 years of customer service experience preferred
- Participate and comply with all DOT, FAA, and Frontier Airlines' regulations regarding drug and alcohol compliance of safety-sensitive transportation employees
- Willingness to work flexible hours/schedules including nights, weekends and holidays
- Valid passport is required, the ability to travel in and out of the United States, and the ability to travel to all current and future international destinations served by Frontier Airlines is required.
- Ability to sit in and be secured with seatbelt and shoulder harness in all jump seats without a seat belt extension
- Maintain a professional image and comply with all Flight Attendant uniform requirements, including no visible tattoos or multiple piercing

**VI.    Knowledge, Skills and Abilities:** (Mental and physical abilities required for the position)

FRONTIER AIRLINES (R. BRIGHAM) - 0000093

ESI00000129-1

EXHIBIT
23
250

- Excellent interpersonal, oral, and written communication skills.
- Must be able to read, speak, write, and communicate in English fluently.
- Ability to communicate effectively with and reassure passengers in a hurried and stressful environment.
- Ability to work independently as a leader and as a team member among fellow employees and passengers.

## VII.   Working Conditions:

**Equipment** – List all machines and equipment used directly in the performance of this position
Includes, but not limited to: beverage/snack carts, galley equipment, POS devices/systems, flight stairs, aircraft cabin equipment including doors, and emergency equipment.

**Work Environment** – Describe the usual working environment (i.e. normal office, outdoors subject to weather variations, elevated noise levels etc.) Identify irregular work shifts, on-call, or multiple work location requirements.

- Working environment subject to varying climate conditions, air turbulence, changing locations, variable hours, dry air, noise levels from engines and other equipment, dim lighting and confined spaces.
- Working environment is typically fast-paced and physically demanding.
- Work shifts/hours vary including weekends, evenings and holidays.

**Physical Effort** – How much physical effort is regularly required in this position? (Occasionally means the activity exists up to one-third of the time. Frequently means the activity exists from one-third to two-thirds of the time).

- Perform frequent repetitive motions, to include bending at the waist and knees and sustaining those positions for extended periods of time.
- Must have 20/20 (or "sufficient") vision and hearing to safely perform the essential functions of the position.
- Ability to hear, interpret and respond to onboard chime systems, call buttons and announcements or direction given over interphone and public address system.
- Ability to stand throughout most of work shift.
- Perform in-flight duties while in a pressurized cabin for extended periods of time.
- Possess the physical strength to reach and operate all emergency equipment and exits.
- Operate door and window exits in manual and emergency modes. (Can include weight of 33 lb window exit and investigate door "emergency mode" resistance).
- Push/pull/move a galley cart weighing 100 lbs.
- Moderate physical activity required by handling objects up to 50 lbs occasionally and/or up to 35 lbs frequently.
- Ability to lift a 35 lb luggage (occasionally - bags heavier than 50 lbs) from the floor to 33"  (i.e. floor to passenger seat).
- Ability to lift a 35 lb luggage from 33" to 67" (i.e. passenger seat to overhead compartment). Bags heavier than 35 lbs should be checked.
- Ability to reach into overhead compartments with a height of 67" and depth of 28".
- Ability to be properly secured in the cabin jumpseat by the safety belt and shoulder harness without the use of seatbelt extensions.
- Ability to balance and reach across seats and serve passengers.

Reviewed/Approved by: _____jm / Compensation_____   Date: ____2/24/13____

**Disclaimer:** *The above statements are intended to describe the general nature and level of work being performed by the individuals assigned to this position. They are not intended to be an exhaustive list of all responsibilities, duties and skills required of individuals in this position. This position description is subject to change by the Company as the needs and requirements of the position change.*

2

FRONTIER AIRLINES (R. BRIGHAM) - 0000094
251
ESI00000129-2

STEFANIE COPPEDGE - July 29, 2020

```
                                                      1
 1             IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLORADO

 3

 4  Civil Action No. 19-cv-03417-WJM-STV

 5

 6  REBECCA BRIGHAM,              )

 7          Plaintiff,           )

 8  vs.                          )

 9  FRONTIER AIRLINES, INC.,     )
    a Colorado corporation,      )
10                               )

11          Defendant.           )
    _____

12

13

14          ZOOM DEPOSITION OF STEFANIE COPPEDGE

15

16      The deposition of STEFANIE COPPEDGE was taken by the

17  Plaintiff, pursuant to Notice, pursuant to Federal Rule of

18  Civil Procedure 30, on Wednesday, July 29, 2020, commencing

19  at 9:03 a.m.

20

21

22

23

24

25
```

```
                                                      2
 1                        APPEARANCES
 2
 3  On Behalf of the Plaintiff: JOHN R. CRONE, Esquire
                                EVAN S. GRIMES, Esquire
 4                              The Law Office of John R. Crone
                                4550 E. Cherry Creek Drive South
 5                              Suite 1003
                                Glendale, Colorado 80246
 6                              john@crone-law.com
 7
 8  On Behalf of the Defendant: DANIELLE KITSON, Esquire
                                Littler Mendelson, PC
 9                              1900 16th Street
                                Suite 800
10                              Denver, Colorado 82020
                                dkitson@littler.com
11
12  Also Present:              REBECCA BRIGHAM, Plaintiff
13                             JACKIE PETER, Frontier Airlines
14                             WALTER MATHERN, Videographer
15
                       INDEX OF EXAMINATION
16                                                       Page
17  Direct Examination
       by Mr. Crone.....................................    3
18  Cross-Examination
       by Ms. Kitson...................................    59
19
                         INDEX OF EXHIBITS
20
    Exhibit                                        Referenced
21
    Exhibit 1.............................................   43
22  Exhibit 2.............................................   41
    Exhibit 4.............................................   20
23  Exhibit 6.............................................   44
    Exhibit 12............................................   44
24  Exhibit 13............................................   35
    Exhibit 19............................................   47
25  Exhibit 26............................................   32
    Exhibit 27............................................   48
```

```
                                                      3
 1                      P R O C E E D I N G S

 2      VIDEOGRAPHER:  We are on the record.  The time now is

 3  9:03 a.m. in the Mountain Time on July 29, 2020.  We are

 4  conducting the virtual deposition of Stefanie Coppedge in the

 5  matter of Rebecca Brigham v. Frontier Airlines, Inc., in the

 6  United States District Court for the District of Colorado,

 7  Case Number 19-cv-03417.  The video technician is Walter

 8  Mathern, the court reporter is Jeannie Gebes.

 9      Will counsel please state their appearances beginning

10  with the Plaintiff's counsel.

11      MR. CRONE:  John Crone for the Plaintiff.

12      MR. GRIMES:  Evan Grimes for the Plaintiff.

13      MS. BRIGHAM:  Rebecca Brigham, Plaintiff.

14      MS. KITSON:  Danielle Kitson for the Defendant and with

15  me is Jackie Peter, in-house counsel.

16      VIDEOGRAPHER:  Please swear in the witness.

17  WHEREUPON,

18                    STEFANIE COPPEDGE

19  having been first duly sworn, was examined and testified on

20  her oath as follows:

21                    DIRECT EXAMINATION

22  BY MR. CRONE:

23  Q.  Good morning, Ms. Coppedge.  Thanks for working through

24  the technical difficulties and joining us this morning.

25  A.  Of course.
```

```
                                                      4
 1  Q.  So I want to give you a quick roadmap of where I think

 2  we're going this morning so you have a sense of how long this

 3  is going to take at least.  I think that based on what I have

 4  planned to ask you that we'll probably be done within a

 5  couple of hours, so not extraordinarily long this morning,

 6  hopefully we're all done by lunch.  That being said, if you

 7  need to take a break feel free to take a break, and I'll

 8  probably want to take a couple of short breaks in the couple

 9  of hours, and if there's a question pending I'll just ask you

10  to answer the question before you take a break.  Does that

11  sound fair?

12  A.  Yes.

13  Q.  Okay.  And so I think I heard Ms. Kitson say that she

14  was there and somebody else was there.  How many people are

15  in the room with you?

16  A.  Myself and two others.

17  Q.  Okay.  And are you aware that when Ms. Brigham noticed

18  this deposition she noticed it so that we could all

19  participate remotely?

20  A.  Yes.

21  Q.  And so to me -- I guess what I mean by that is you're

22  aware that you don't have to be in a room with other people?

23  A.  Yes, I'm aware.

24  Q.  Okay.  And so what I'm getting at is I just want to make

25  sure that you're comfortable sitting in a room with other
```

**STEFANIE COPPEDGE - July 29, 2020**

<table>
<tr><td>

5

1 people for some amount of time.  Is that -- from a health
2 perspective, do you feel safe doing that?
3 A.    Oh, absolutely.
4 Q.    And just to be absolutely clear, if you don't Rebecca is
5 not requiring you to be in that room with other people and so
6 if you don't feel safe let me know.
7 A.    Okay.
8 Q.    Thank you.  And so do you have any, do you have any
9 applications or programs open on your computer other than the
10 Zoom application?
11 A.   I may have email open.  I can close it.
12 Q.   Thank you.
13 A.   Okay.
14 Q.   Great.  Okay.  So Ms. Coppedge -- am I saying that
15 right?  Is it Coppedge or Coppedge?
16 A.   It is Coppedge.
17 Q.   Coppedge, okay.  So Ms. Coppedge, I want to start with
18 just some background, you know, your current position at
19 Frontier, what you do, how you know Ms. Brigham and that sort
20 of thing, so could you start by telling me what your current
21 position is at Frontier?
22 A.   Sure.  My current position is the manager of in-flight
23 training and professional development so in that position I
24 work closely with the F-A-A, adhering to 8900s and C-F-Rs,
25 ensuring that flight attendants are trained properly.

</td><td>

7

1 A.    For about a -- a little over a year.
2 Q.    So that would be roughly somewhere in 2014 to 2015 or
3 2013 to 2015, something like that?
4 A.    20 -- the back end of 2014 into probably the -- I'm
5 going to say July of 2015 -- or, 2016.
6 Q.    Okay.  And then before you were an in-flight supervisor
7 -- I'm sorry, what was that?
8 A.    Go ahead.  Sorry.  I'm thinking about it.
9 Q.    Oh, you're fine, you're fine.  And before you were an
10 in-flight supervisor, what position did you hold?
11 A.   I was a flight attendant.
12 Q.   Okay.  Is that where you started at Frontier?
13 A.   I did.
14 Q.   Okay.  And so what year was that that you first became a
15 flight attendant for Frontier?
16 A.   1995.
17 Q.   Okay.  Did you work for any other airlines prior to
18 1995?
19 A.   I did not.
20 Q.   Between 1995 and present, is Frontier the only airline
21 you've worked for?
22 A.   It is.
23 Q.   Okay.  When you were the full-time instructor, what was
24 that position about?  What were your, what were your primary
25 duties in that job?

</td></tr>
<tr><td>

6

1 Q.    And how long have you had this position?
2 A.    Since 2016, so roughly four years, three and a half
3 years almost, almost four.
4 Q.    Okay.  And do you, do you supervise any individuals in
5 this position?
6 A.    I do.
7 Q.    How many?
8 A.    I have 11 direct reports.
9 Q.    Okay.  And those direct reports, what title do they
10 hold?
11 A.   They -- I have two in-flight training schedule
12 coordinators, I have an in-flight training supervisor and I
13 have, I guess, eight full-time instructors.
14 Q.   Okay.  And before you were the manager of in-flight
15 training and professional development, what was your
16 position?
17 A.   I was a full-time instructor.
18 Q.   Okay.  And how long did you hold that position?
19 A.   For about a year I believe.
20 Q.   So roughly mid 2015 to mid 2016, somewhere in there?
21 A.   Correct.
22 Q.   Okay.  And then before that position, what position did
23 you hold?
24 A.   I was an in-flight supervisor.
25 Q.   Okay.  And how long did you hold that position?

</td><td>

8

1 A.    Instructing current flight attendants on their annual
2 training and then instructing new-hire flight attendants on
3 the regulations of becoming a flight attendant, company
4 policy and procedure.
5 Q.    Okay.  And when you were the in-flight supervisor, what
6 were your job duties there?
7 A.    Supporting the flight attendants, running daily
8 attendance reports, adhering to F-A-Rs, ensuring flight
9 attendants were in compliance with their FAMS, working with
10 the D-O-T on compliance measures for flight attendants,
11 working with multiple departments in Frontier, streamlining
12 processes for flight attendants.
13 Q.   Okay.  And you had mentioned F-A-Rs.  What does that
14 stand for?
15 A.   Federal aviation regulations.
16 Q.   Okay.  And then I think you said AFEN too maybe.  What
17 was that?
18 A.   Flight attendant manual.
19 Q.   Got it.  Okay.  FAM.  Is the flight attendant manual
20 something different than an employee handbook, so in other
21 words, do the flight attendants have some written set of
22 policies that are different from the employee handbook?
23 A.   They're two different manuals.
24 Q.   So the one that you were referring to is called the FAM,
25 the flight attendant manual?

</td></tr>
</table>

**STEFANIE COPPEDGE - July 29, 2020**

9

1  A.    Correct.

2  Q.    And so in your current position, you supervise in-flight

3  supervisors and the full-time instructors.  Those are both

4  positions you've held, right?

5  A.    I'm sorry, will you repeat that?

6  Q.    Yeah.  No problem.  So in your current position, you

7  supervise in-flight supervisors and full-time instructors and

8  you've held both of those positions?

9  A.    I -- well, for the in-flight training department.  It's

10 two different buckets, there's the in-flight operations

11 side --

12 Q.    Uh-huh.

13 A.    -- where I worked previously as supervisor and then

14 there's the in-flight training department, and I supervised

15 the supervisor in the in-flight training department as well

16 as the full-time staff.

17 Q.    Got it.  Okay.  And then you also supervise currently

18 the in-flight schedule coordinator?

19 A.    For in-flight training.

20 Q.    Okay.  Got it, got it.  Okay.  So that schedule

21 coordinator, are they coordinating trainings or something

22 else?

23 A.    Trainings and new-hire flight attendant classes.

24 Q.    Okay, okay.  Ms. Coppedge, do you hold any, any sort of

25 specific training credentials or degrees or schooling or

10

1  anything that are related to your current position?

2  A.    I hold training certificates in respect to training

3  flight attendants.  I hold an IOSA certificate, I hold a CAMI

4  certificate, which is a training in Oklahoma for flight

5  attendants, Oklahoma City, for the F-A-A.  So I have

6  certificates specific to training flight attendants, I do not

7  have a college degree, I spent only a few years in college.

8  Q.    Okay.  What were you studying?

9  A.    Finance.

10 Q.    All right.  You took a different turn.  The IOSA, what's

11 that certificate?

12 A.    So that's for -- forgive me, my mind -- that's for code

13 sharing, airlines that code share, so airlines that share

14 with other, other airlines with the auditing process.  So

15 it's a certificate I hold to adequately audit Frontier's

16 in-flight department in line with the needed audit for the

17 IOSA --

18 Q.    Okay.

19 A.    -- in order for Frontier to have a code-share program.

20 Q.    And what's a code share?

21 A.    That means Frontier or any airline has the ability to, I

22 guess, book passengers on each other's aircraft.

23 Q.    Okay.  Any other trainings you can think of related to

24 any of your positions at Frontier?

25 A.    I cannot at this time.

11

1  Q.    Okay.  So you know Rebecca Brigham, correct?

2  A.    I do.

3  Q.    Okay.  And I think I know that at one point you were her

4  in-flight supervisor; is that correct?

5  A.    Correct.

6  Q.    Do you remember when that was, the time period?

7  A.    That would be in -- I believe it to be August 2014 is

8  when I became an in-flight supervisor, so sometime between

9  August 2014 and, I believe, April or March of 2016.

10 Q.    Okay.  And outside of that time when you were Ms.

11 Brigham's in-flight supervisor, did you ever work with her in

12 any other way?

13 A.    I believe I may have flown with Rebecca, but I don't

14 recall how many times.

15 Q.    Okay.

16 A.    As a flight attendant.

17 Q.    Okay.  So sometime prior to August 2014 you might have

18 flown together both as flight attendants?

19 A.    Yes.

20 Q.    Okay.  Did, did you know Ms. Brigham well before

21 becoming her in-flight supervisor, or did you get to know her

22 better as her supervisor?

23 A.    I got to know her better as her supervisor.

24 Q.    Did you have a good working relationship with Ms.

25 Brigham?

12

1  A.    I did.

2  Q.    Any sort of performance or work issues that -- you know,

3  negative things that you can think of related to Ms. Brigham?

4  A.    We had to work through the dependability process.

5  Q.    Okay.  Anything else outside of the dependability

6  process?

7  A.    No, sir.

8  Q.    Okay.  What is the dependability process that you're

9  referring to?

10 A.    That would be when flight attendants obtain so many

11 attendance points --

12 Q.    Uh-huh.

13 A.    -- where you would then have to work with the flight

14 attendant, have a meeting and conversations with the flight

15 attendants regarding their attendance, how can we best

16 support them, how can we help them.

17 Q.    And what was the issue with Ms. Brigham specifically?

18 A.    For Ms. Brigham she, she was hitting my attendance log

19 for gaining too many attendance points which would then

20 warrant a documented verbal warning or a written -- some sort

21 of step of discipline, so I worked directly with Rebecca and

22 sometimes the Union on figuring out the best way to manage

23 her attendance.

24 Q.    Do you recall who you worked with at the Union?

25 A.    I believe it was Angie Reef and Adrienne Prince.

## STEFANIE COPPEDGE - July 29, 2020

13

1 Q. And so can you explain, then, what was going on with her
2 attendance and what, what the solution was that you were
3 trying to reach?
4 A. With Rebecca's attendance, oftentimes if she had called
5 out on a trip it would be marked as a SIC code, S-I-C, in the
6 system. At the time Rebecca was able to get intermittent
7 F-M-L-A so it would take -- there's a process where she would
8 have to email the L-O-A department, leave of absence
9 department, once that email was cleared the L-O-A department
10 would recode the SIC as an I-F-M, intermittent F-M-L-A day in
11 the attendance tracker and Rebecca was awarded so many I-F-M
12 days per month and if she moved beyond the allowed I-F-M days
13 Rebecca and I would have to come together and have a
14 conversation regarding those days and if she had gone beyond
15 the awarded amount.
16 Q. Okay. Do you remember how many per month she was
17 awarded?
18 A. I do not.
19 Q. Do you remember why she was awarded those I-F-M days?
20 A. I was not privy to that information.
21 Q. Are you, are you aware of any, any facts related to Ms.
22 Brigham's disability of alcoholism?
23 MS. KITSON: Object to the form.
24 A. I am aware based off of conversations I had with
25 Rebecca.

14

1 Q. Uh-huh. Do you recall when the first conversation was
2 that you and Rebecca discussed her alcoholism?
3 A. I do not.
4 Q. Do you remember what you talked about?
5 A. I know I had conversations with Rebecca, I don't know at
6 what point we -- that she had told me about her alcoholism.
7 Q. Uh-huh.
8 A. So I don't know an exact point of when, when she did
9 tell me, but I know at some point throughout that period of
10 time she did tell me.
11 Q. And by the period of time you mean the time that you
12 were an in-flight supervisor?
13 A. Yes, sir.
14 Q. Okay. And do you remember what she told you about her
15 alcoholism?
16 A. She had told me that she had self-disclosed that she had
17 alcoholism and she had gone in for treatment and she was
18 working through with her, her, her schedule and the L-O-A
19 department.
20 Q. Did she ever ask you for help with her schedule?
21 A. I believe we discussed ways, such as dropping trips and
22 picking up trips, that did work to fulfill her needs.
23 Q. Yeah. Do you recall discussing any other potential ways
24 to modify her schedule?
25 A. To modify her schedule, I don't recall. I know we

15

1 discussed looking for other options, working on the ground,
2 other -- applying for other departments within Frontier, I do
3 remember discussing that.
4 Q. Okay. Did that go anywhere, working with other
5 departments within Frontier?
6 A. I don't believe so, no.
7 Q. Do you know any other flight attendants that were, that
8 were assigned to a different department within Frontier for a
9 temporary amount of time for any reason?
10 A. So contractually with the C-B-A if a flight attendant is
11 on the, on-the-job injury, if, if there is something
12 available within the company they can be assigned light duty
13 and work in said department on light duty during their O-J-I
14 period.
15 Q. Any other reasons other than the O-J-I?
16 A. Not that I'm aware of.
17 Q. Okay. And what about the -- you had mentioned the
18 dropping trips and picking up trips. How does a flight
19 attendant create their schedule?
20 A. So the bidding process is awarded by seniority and
21 bidding opens on the 5th of the previous month --
22 Q. Okay.
23 A. -- closes on the 12th, and flight attendants are able to
24 go in and pick the trip that they would like or that are
25 ideal for their own lifestyle. Bids are then posted on the

16

1 16th of every month, the month prior to what you're bidding.
2 Q. Uh-huh.
3 A. On the, on the 18th there is a -- what is called a trade
4 board, on the 18th flight attendants can trade trips amongst
5 each other, and then on the 19th the open-time pot is open
6 for bidding and the open-time pot is trips that were not
7 covered in the original bidding process.
8 Q. Okay.
9 A. So you're able to take the trip you have that you don't
10 like and trade it out with what's in the open-time pot or
11 with another flight attendant.
12 Q. Okay. And that, that last step, the open time isn't
13 seniority based, it's just whoever gets it?
14 A. It is first come, first served.
15 Q. Okay. So I just want to make sure I understand. So
16 when the bidding occurs between the 5th and the 12th, that is
17 -- the flight attendants say, "Here are the trips I want, I
18 mean here are the trips that are ideal," and then based on
19 seniority those are assigned?
20 A. Correct.
21 Q. Okay. And then after that on the 18th the trade board
22 is not seniority based, that's just you can trade with
23 whoever is willing to trade with you?
24 A. Correct.
25 Q. And then on the 19th the open time is just first come,

## STEFANIE COPPEDGE - July 29, 2020

**17**

1 first served?

2 A.  Correct.

3 Q.  Okay.  You had mentioned working with Angie and Adrienne

4 Prince.  What was Angie's last name?  I'm sorry, I didn't

5 catch that.

6 A.  Reef, R-e-e-f.

7 Q.  Thanks.  And you had mentioned those are Union people.

8 Do you remember what their, what their positions were with

9 the Union back then?

10 A.  Angie Reef was the president and Adrienne Prince was the

11 vice president.

12 Q.  Okay.  And what, what were you trying to accomplish with

13 Angie and Adrienne?

14 A.  Well, it's -- they were involved in the fact-finding

15 meetings.  If they could bring anything to light that I would

16 have been unaware of in regards to Rebecca's attendance then

17 we can look at if there was an opportunity to help with her

18 attendance.

19 Q.  Okay.  And the fact-finding meeting, do you remember

20 when that occurred?

21 A.  I do not.  There's, there's several steps to fact-

22 finding meetings from a flight attendant that's on a

23 documented verbal warning is awarded a fact finding, the

24 written warning is a fact finding, the termination warning is

25 a fact finding and then the termination itself is a fact

**18**

1 finding.

2 Q.  Okay.  And do you remember when Angie and Adrienne

3 became involved in the process with respect to Ms. Brigham?

4 So was it -- were they there from the very first fact-finding

5 meeting, did they just come in at the end?  Any sort of sense

6 of that?

7 A.  I don't, I don't recall at what point.

8 Q.  And when you communicated with Angie and Adrienne, was

9 it ever by email, was it just in these meetings, did you send

10 letters, or how did that work?

11 A.  So it's an official email that will go out to the flight

12 attendant and the Union at the same time.

13 Q.  So you didn't, you didn't communicate with them outside

14 of that email or at the meeting itself?

15 A.  I did not.

16 Q.  Okay.  Were Angie and Adrienne also -- I assume they

17 were also Frontier employees.  Is that, is that a good

18 assumption?

19 A.  That is correct.

20 Q.  Do you remember what positions they held at that time?

21 A.  Flight attendant.

22 Q.  Okay.  Have you ever been a member of a Union with

23 Frontier, or is that for non-management people?

24 A.  I have.

25 Q.  Was that when you were a flight attendant?

**19**

1 A.  It was.

2 Q.  Okay.  Were you a member of a union at any time after

3 you were a flight attendant?

4 A.  No, sir.

5 Q.  Okay.  So Ms. Coppedge, I've got some documents that I

6 want to place in front of you, you know, via remotely.

7 There's a chat box where I can drop them in and you can open

8 them up and then we can discuss them a little bit.  I'm

9 realizing as I'm sitting here that I didn't organize them

10 perfectly so if we take -- if you're not opposed to a

11 five-minute break I can sort of shuffle these around a little

12 bit and make it easier for us to discuss this.  Do you mind

13 if we take a quick break?

14 A.  Certainly.

15     MR. CRONE:  Why don't we just make it 10 minutes and

16 then just make it easier for everybody, so we can go off the

17 record.

18     VIDEOGRAPHER:  The time now is 9:32, we're off the

19 record.

20         (There was a recess taken.)

21     VIDEOGRAPHER:  The time now is 9:42, we're back on the

22 record.

23 (Direct Examination by Mr. Crone)

24 Q.  Ms. Coppedge, do you, do you remember -- did you ever

25 advise Ms. Brigham that she should make a reasonable

**20**

1 accommodation request under the A-D-A?

2 A.  I don't, I don't recall that.  I don't remember, it's

3 been five years ago.

4 Q.  That's fine, that's fine.  So you have no recollection

5 of whether you ever mentioned the A-D-A to Ms. Brigham?

6 A.  I don't.

7 Q.  Do you know Cassandra Micklich?

8 A.  I do.

9 Q.  How do you know her?

10 A.  Cassandra worked in the L-O-A department.

11 Q.  Does she still work for the Frontier?

12 A.  She does not.

13 Q.  Do you know where she went after Frontier?

14 A.  I do not.

15 Q.  Do you know when she left?

16 A.  I, I can't give you a definitive date.  I, I don't.

17 Q.  Was it in this year?  Was it in 2020?

18 A.  No, it was 2016 or '15, somewhere in there.

19 Q.  So she's been gone a few years at least then?

20 A.  Yes.

21 Q.  Okay.  Okay.  When Ms. Micklich worked at Frontier, were

22 you and her friends outside of work?

23 A.  No.

24 Q.  Okay.  So I'm going to hand you via the internet an

25 exhibit that has -- is marked Exhibit 4.  So some of these

## STEFANIE COPPEDGE - July 29, 2020

21

1 exhibits will seem out of order because they've been numbered
2 in other depositions already and I'm trying to preserve that
3 numbering to some extent so if you can kind of ignore that
4 I'll get this in front of you here.
5     MR. CRONE:  And then, Danielle, do you need me to email
6 these to you as well?
7     MS. KITSON:  Let me see.  I've also got the chat box
8 open and am going to try to download.  My connection is not
9 as strong so I'm clicking download now, but I may need, may
10 need you to email.
11     MR. CRONE:  Let me know how it works and then we can
12 figure out what to do.
13     MS. KITSON:  Go ahead and email it to me while we're
14 doing this because I'm just not sure -- I've got the spinning
15 wheel of death going on here.
16     MR. CRONE:  Okay.  Sure.  Give me one second.  This is
17 how we did it last time if I remember right, I put them in a
18 chat and email.
19     MS. KITSON:  Yes.  Hopefully it's working.  I may
20 actually have to be the one to show Ms. Coppedge too because
21 her connection also is not as strong as Arellano's was.
22     THE WITNESS:  I have it open.
23     MS. KITSON:  You have it open?
24     THE WITNESS:  Yeah.
25 Q.   Oh, good.  Okay.  So now that you have that open, Ms.

22

1 Coppedge, could you just review it for me?
2 A.   (Witness complies.)
3     MS. KITSON:  John, did you email that to me?
4     MR. CRONE:  I did -- well, let me make sure I did.
5 Yeah.
6     MS. KITSON:  Okay.  That means my computer is going
7 extra special slow, but I can see it clearly enough on Ms.
8 Coppedge's screen right now.
9     MR. CRONE:  Okay.  Yeah, if that works for you maybe we
10 can just try to make that work.  None of these are long
11 exhibits so it might be --
12     MS. KITSON:  Okay.
13 Q.   Have you reviewed that, Ms. Coppedge?
14 A.   I have.
15 Q.   Have you ever seen this document before today?
16 A.   No.
17 Q.   But you do know Adrienne Price, obviously, because we've
18 talked about her, right?
19 A.   Correct.
20 Q.   So the question I have for you is, is related to
21 paragraph 6 on the second page, do you see where Ms. Price
22 wrote, "however, I explained to Frontier that the Union was
23 not seeking an accommodation that would violate the seniority
24 provision, but rather would work within the seniority
25 provision."  Do you see where I'm at there?

23

1 A.   Yes.
2 Q.   My question for you is do you agree that if Ms. Brigham
3 was granted the accommodation that Ms. Prince is describing
4 here that that would not violate any seniority provision in
5 the Collective Bargaining Agreement?
6     MS. KITSON:  Object to the form, mischaracterizes the
7 document.
8 A.   It still violates the contract.  You can't violate the
9 contract for one employee when you have 2600 flight
10 attendants.
11 Q.   How would it violate the contract?
12     MS. KITSON:  Object to the form.  What do you mean "it"?
13 There's no specific accommodation set here.
14 Q.   Ms. Coppedge, do you understand the question I'm asking
15 you, or do you need me to clarify?
16 A.   Please repeat it.
17     MR. CRONE:  I'm asking Ms. Coppedge.
18 Q.   Do you understand the question, or do you need me to
19 clarify?
20 A.   I need you to clarify, please.
21 Q.   Okay.  So here do you understand that Ms. Prince is
22 describing a proposed accommodation that Ms. Brigham was
23 seeking?
24     MS. KITSON:  Object to the form, lack of foundation,
25 mischaracterizes the document.  You can answer.

24

1 A.   I, I understand what Ms. Prince is proposing, however,
2 it's still a violation of contract.
3 Q.   Okay.  And again that's my question, how is it a
4 violation of the contract?
5 A.   It's a violation because you're awarding one flight
6 attendant an opportunity that you're not awarding 2600 other
7 flight attendants, and it's a violation because there's a
8 restriction on hours that flight attendants are able to bid
9 and drop to.
10 Q.   Okay.  So let's start with one.  You said it would be a
11 violation because of the opportunity that would be afforded
12 Ms. Brigham that's not afforded to others.  What is that
13 opportunity?
14 A.   Well, the opportunity is not, not every flight attendant
15 is able to avoid layovers, that would be specific to Ms.
16 Brigham.  There's 2600 flight attendants some of which I
17 suspect don't want layovers.
18 Q.   Okay.  And then anything else that you meant by not
19 affording the opportunity to anybody else?
20 A.   I, I believe in my mind it's an unfair advantage, it's
21 not an equal advantage if it's not available to 2600 flight
22 attendants.
23 Q.   And that's avoiding layovers, or what are you referring
24 to?  What's the unfair advantage?
25 A.   Allowing one person to modify their ability to bid

## STEFANIE COPPEDGE - July 29, 2020

25

1 versus the other 2600.

2 Q.   Got it.  Okay.  But I thought anybody could bid on open

3 time?

4 A.   Anyone can bid on open time.

5 Q.   And I thought anybody could trade time?

6 A.   They can trade time.

7 Q.   So what exactly was Ms. Brigham asking for that anybody

8 else couldn't do?

9 A.   Well, I know in conversations I had with Ms. Brigham,

10 which is not what is stated here by Adrienne, is Ms. Brigham

11 was wanting to dump her entire schedule and rebid it or not

12 bid a schedule and simply bid out of open time which both are

13 violation of contract.  That's not in Ms. Adrienne Prince's

14 document here, but I do know that was conversations proposed

15 by Adrienne herself and Rebecca.

16 Q.   So what, what part of that would violate the contract,

17 what you just described?

18 A.   Bidding is -- every flight attendant must bid and

19 bidding is awarded in seniority order.

20 Q.   And then after that occurs then there's the trade and

21 the open time, right?

22 A.   Correct.

23 Q.   So if Ms. Brigham bid for the, for the flights she

24 wanted first and then worked through trade time and open time

25 to, to, to create a schedule that would avoid layovers, that

26

1 wouldn't violate the contract, would it?

2 A.   That would not.

3 Q.   Okay.  Ms. Coppedge, we can set that document aside or

4 close it or whatever is easy for you to sort of have it out

5 of your way.

6 A.   Okay.

7 Q.   I want to talk a little bit if you can help me

8 understand this, this process of self-disclosure that you had

9 mentioned earlier.  How's that work?

10 A.   I don't know that I had mentioned a process of self-

11 disclosure.  I think I mentioned Rebecca had at some point

12 disclosed to me that she was suffering from alcoholism, other

13 than that that is an H-R process and I'm unaware of any

14 self-disclosures on any platform level.

15 Q.   Okay, yeah.  And so maybe I, maybe I heard your answer

16 more broadly, so I want to try to make sure I understand.  So

17 you had mentioned that Ms. Brigham disclosed to you that she

18 had alcoholism, but you're not aware of sort of any formal

19 program Frontier has where people can self-disclose that type

20 of problem?

21 A.   Well, Rebecca had already self-disclosed to the company

22 prior to her conversation with me.  So as it would be with

23 any flight attendant, I have no idea why a flight attendant

24 is on an intermittent F-M-L-A and rightfully so for

25 protection purposes.  Rebecca in conversations had told me

27

1 that she had suffered from alcoholism and that is why she had

2 the I-F-M.

3 Q.   Okay.  And when you said she self-disclosed to the

4 company, are you aware of how that process works?  Do you

5 know anything about that?

6 A.   I have no idea, do not work in H-R.

7 Q.   Okay.  Do you know who's -- do you know who would know

8 about that?

9 A.   I would, I would assume -- I can assume which is not a

10 good thing, right?  My guess would be somebody in compliance,

11 in the compliance department, within H-R compliance

12 department.

13 Q.   What about Jerry Arellano?

14 A.   Jerry Arellano, I believe his position is something,

15 something in H-R.  I believe he -- I don't -- I honestly

16 don't know exactly Jerry's title in H-R, I just know he works

17 in H-R.

18 Q.   Is he your boss?

19 A.   No.

20 Q.   Who's your immediate supervisor currently?

21 A.   Currently, Stephen Howell.

22 Q.   And at the time that you were an in-flight supervisor

23 and you supervised Ms. Brigham, who was your immediate

24 supervisor?

25 A.   Kari Thompson, she was a manager.

28

1 Q.   In completing your day-to-day duties from 2016 to now,

2 do you ever have occasion to interact with Jerry Arellano?

3 A.   I don't recall the exact number of times, I'm sure I

4 have interacted with Jerry Arellano -- from 2016 to 2020, is

5 that the timeframe you gave?

6 Q.   From 2014 to 2020.

7 A.   I, I'm sure I have interacted with Jerry on matters, I

8 don't recall a number of times.

9 Q.   Do you remember why you interacted with him?

10 A.   I can think of an incident of a new-hire flight

11 attendant where I had interacted with Mr. Arellano.

12 Q.   What about, what about relating to Ms. Brigham?

13 A.   Relating to Ms. Brigham, Jerry was the original H-R

14 contact that was handling the case and at one point it

15 switched over to Andrea Warfield.

16 Q.   Did it ever, then, switch back to Mr. Arellano, or did

17 Ms. Warfield handle that issue from there on out?

18 A.   I believe Mr. Arellano was involved as Mrs. Warfield was

19 new to the role.

20 Q.   So did you interact directly with Mr. Arellano relating

21 to Ms. Brigham at all?

22 A.   I did.

23 Q.   Okay.  In what ways?

24 A.   Via, via email seeking guidance on what steps were to be

25 taken with Mrs. Brigham's situation.

## STEFANIE COPPEDGE - July 29, 2020

---

29

1  Q.    And what did Mr. Arellano reply?

2  A.    I believe that they were looking for -- the H-R

3  department was looking for all the proper documentation

4  regarding attendance, I-F-M usage and other policies to

5  ensure that going to the step of termination was the correct

6  thing to do.

7  Q.    Did Ms. Brigham ever ask to be temporarily reassigned to

8  a light-duty position?

9  A.    I don't, I don't recall.  It's so long ago I honestly

10  don't recall.

11  Q.    If, if she had do you think that would have violated the

12  Collective Bargaining Agreement in any way?

13      MS. KITSON:  Object to the form.

14  A.    I do believe it would have violated the C-B-A.  The

15  C-B-A as well as the employee handbook only refers to O-J-I

16  employees in regards to light duty and reassignment.

17  Q.    Have you -- when you were the in-flight supervisor

18  starting in 2014 or any of the positions you've held up till

19  now, are you ever involved when an employee requests a

20  reasonable accommodation?

21  A.    That's hard to say.  When you say am I involved, at what

22  point are you referring to would I be involved?

23  Q.    So at any point.  So maybe, you know, the employee

24  discloses a disability to you or maybe they ask for an

25  accommodation and then I assume it goes through some process,

---

30

1  Frontier decides do we grant this, do we not, do we propose

2  something else.  At any point along that chain are you ever

3  involved?

4  A.    That would be a complete H-R function and then I would

5  do as directed based off of H-R's recommendation.

6  Q.    Okay.  And so in Ms. Brigham's case, was H-R ever

7  directing you to do anything with regard to her reasonable

8  accommodation request?

9  A.    No.

10  Q.    Did you ever communicate to H-R a specific request --

11  reasonable accommodation request made by Ms. Brigham?

12  A.    I don't recall.

13  Q.    Do you recall ever communicating to Ms. Brigham that her

14  reasonable accommodations requests were denied or granted?

15  A.    I don't recall.  That would have been an H-R function to

16  deny or grant, I would simply be the vessel.

17  Q.    Okay.  Outside of the world of Ms. Brigham, if somebody

18  is granted a reasonable accommodation, how do you ensure or

19  is it -- I'll start with is it up to you to ensure that the

20  accommodation is actually given?

21  A.    It would not be up to me to ensure it's given.

22  Q.    So when you were an in-flight supervisor, let's kind of

23  narrow it in there, did you ever supervise any flight

24  attendants that were granted reasonable accommodations?

25  A.    I did not.

---

31

1  Q.    What about at any time while at Frontier, have you ever

2  supervised any employee that was granted a reasonable

3  accommodation?

4  A.    I can say sure is what I think, but I don't know that

5  it's answering your question.  I recently had an employee

6  that broke her kneecap --

7  Q.    Uh-huh.

8  A.    -- and therefore she needed an accommodation where she

9  couldn't stand and train flight attendants for 12 hours so I

10  had to allow her to sit and elevate her leg so many hours a

11  day based off of the O-J-I department, H-R and her doctor's

12  recommendations.  Is that what you would be speaking to?

13  Q.    Yeah, that's exactly what I'm asking.  So I'm trying to

14  figure out if that occurs, who tells you what to do?  And I

15  think you may have just answered that.  Was that H-R telling

16  you this is the accommodation, this is what you have to give

17  her?

18  A.    Correct, the leave of absence department, correct.

19  Q.    Okay.  Got it.  And then -- but then is it up to you to

20  make sure the accommodation is actually granted, that is in

21  the instance you just cited that this person is actually

22  given the time to elevate her leg?

23  A.    Well, it's up to me as the manager to make sure it's

24  implemented, that we adhere to the L-O-A department and the

25  doctor recommendation.

---

32

1  Q.    Got it, yeah.  Okay.  All right.  Do you have any, any

2  sort of involvement with the accommodation process besides

3  making sure accommodations are implemented?

4  A.    Absolutely not.

5  Q.    Do you, do you know a former Frontier employee named

6  David St. Hilaire?

7  A.    I know the name, I don't know who he is.

8  Q.    And do you think you just know the name because you're

9  generally familiar with the names of flight attendants around

10  Frontier, or do you think you ever interacted with him?

11  A.    I think I know the name because the last name is kind of

12  catchy, quite frankly.

13  Q.    Is it kind of a unique last name, isn't it?

14  A.    You know, I know a lot of faces of flight attendants,

15  there's 2600 and I may know their names, but I don't know who

16  they are.

17  Q.    That's, that's fine.  That's fair.  I'm going to put a

18  document in front of you and see if it helps refresh your

19  memory at all about David St. Hilaire.  It is titled -- let

20  me make sure this is right.  It's titled Exhibit 26, and so

21  I'll drop it in the chat box and I will email Danielle a copy

22  too just in case that works.  And the same as last time, when

23  you receive it if you could give it a review.

24  A.    Sure.

25  Q.    Thank you.  Ms. Coppedge, where are you at now?  Are you

---

**STEFANIE COPPEDGE - July 29, 2020**

| | |
|---|---|
| 33 | 35 |

**33**

1 at Frontier's lawyer's offices?

2 A.   I'm at Frontier's headquarters, our headquarter

3 building.

4 Q.   Got it.  And that's in -- is that downtown, or is that

5 at the airport?

6 A.   Out, out near the airport.

7 Q.   Okay.

8 A.   Okay.  I was able to open the document.

9 Q.   Great.  If you could give it a review that'd be helpful.

10    MS. KITSON:  John, has this been produced?

11    MR. CRONE:  Yes, it was produced right after this -- Mr.

12 Arellano's individual deposition, I think the same day -- no,

13 I think it was the day after that, so July 15th.

14    MS. KITSON:  I don't know that we received that.  I'm

15 going to need to -- Ms. Coppedge, let me review it first and

16 then --

17    THE WITNESS:  Okay.

18    MS. KITSON:  John, I'm done reviewing it and I'm now

19 handing it back it Ms. Coppedge to review and I'm also going

20 to email it to Ms. Peter to review, so just hang with us for

21 a minute.

22    MR. CRONE:  That's fine.

23    MS. KITSON:  John, while she's reviewing that, can you

24 just confirm how it is that you produced the document and,

25 you know, on what date, via what means.

**34**

1    MR. CRONE:  So just like all the other discovery

2 production it was by email with a pdf that I believe -- I can

3 just pull it up while we're waiting here.  It was --

4    MS. KITSON:  That would be great.

5    MR. GRIMES:  It was July 15th.

6    MR. CRONE:  So July 15th by email and it was to you.

7 It's called Plaintiff's Second Supplemental Rule 26(a)(i)

8 Initial Disclosures and so it's a supplement and then the

9 documents Bates number was sent to you, Carolyn, cc to Evan

10 Grimes as well.  I can resend it to you right now.  So I know

11 your internet is a little slow out there, Danielle, but I

12 just resent you the original production.

13    MS. KITSON:  Great.  Were there any other documents or

14 just that one?

15    MR. CRONE:  It was just that one, yeah, plus, plus like

16 an actual supplement to the 26(a)(i) disclosure.

17    MS. KITSON:  Got it.

18    MR. CRONE:  But I think that was just noting that this

19 document was being produced.

20    MS. KITSON:  Okay.

21    MR. CRONE:  Thanks.

22 Q.   Ms. Coppedge, have you reviewed Exhibit 26?

23 A.   I have.

24 Q.   Does that help refresh your memory as to whether or not

25 you recall David St. Hilaire's time at Frontier?

**35**

1 A.   It does not.

2 Q.   Well, much ado about nothing then.  What about

3 Christopher Benedict, do you know who that is?

4 A.   I do.

5 Q.   Who is Chris Benedict?

6 A.   Chris Benedict was the -- I believe he was a manager,

7 possibly a supervisor, I don't know his exact title, but I

8 know he was in charge of drug and alcohol compliance.

9 Q.   Is he still with Frontier, do you know?

10 A.   He is not.

11 Q.   Do you know where he went?

12 A.   I do not.

13 Q.   Do you remember when he left?

14 A.   Three or four years ago.

15 Q.   Okay.  All right.  So I've got another document to put

16 in front of you.  Hopefully, hopefully this will go a bit

17 smoother, a little smoother now, we'll find out I guess.

18 This one is titled Exhibit 13, I just dropped that into the

19 chat box.  I'll email it to Danielle.  So Ms. Coppedge, same

20 drill, once you receive it and have it open if you could give

21 it a quick review for me.

22 A.   Okay.

23 Q.   Thanks.

24 A.   Okay.

25 Q.   Have you ever seen documents like this before?

**36**

1 A.   No.

2 Q.   Do you have any idea what this is?

3 A.   No.

4 Q.   Do you know if Rebecca Kruger is Rebecca Brigham prior

5 to becoming married?

6 A.   No.

7 Q.   Okay.  When you were a -- or, in any position that

8 you've held at Frontier, have you ever supervised

9 probationary flight attendants?

10 A.   No.

11 Q.   No?  Okay.  You were a probationary flight attendant at

12 one time?

13 A.   Yes.

14 Q.   Were you evaluated at the conclusion of your

15 probationary time?

16 A.   I, I don't recall, that's 25 years ago.

17 Q.   So I'm not asking if you recall whether a piece of paper

18 like this was filled out, but whether you were just evaluated

19 at all?

20 A.   I don't, I don't recall.

21 Q.   Is there some reason why a probationary flight attendant

22 wouldn't be made -- I mean what's the name for it, I guess

23 just a regular flight attendant, a non-probationary flight

24 attendant?  What's the difference, I'm asking, between a

25 probationary flight attendant and a non-probationary flight

## STEFANIE COPPEDGE - July 29, 2020

37

1 attendant?

2 A.    I'm sorry, will you repeat that question?

3 Q.    Yeah.  What makes somebody probationary as a flight

4 attendant?

5 A.    Well, based on their hire date and what's in the

6 employee handbook.  So a new-hire flight attendant would be

7 on probation for nine months in today's world, I don't have

8 any idea what it was -- on this document in 2008 I have no

9 idea what the probationary period was.  In today's world a

10 new-hire flight attendant is on probation for nine months.

11 Q.    How does that -- in today's world, how does that flight

12 attendant get off of the probationary status?  Do they just

13 survive nine months without getting fired, or do they have to

14 do something?

15 A.    Correct, they have to be on the expected, the expected

16 behavior and procedures of the flight attendants throughout

17 that period and once they successfully complete that nine

18 months they are no longer on probation.  They're, they're not

19 covered by the C-B-A while on probation.

20 Q.    And so you've reviewed this Exhibit 13.  Is there

21 anything in this Exhibit 13 that you think would prevent

22 Rebecca Brigham, the employee being evaluated here, from

23 getting off of probationary status?

24 A.    Well, you're asking me what I think.  I don't know what

25 the process was at that time.

38

1 Q.    Yeah, I'm asking for your opinion today.  Would this

2 employee present an issue to you in terms of getting off of

3 probationary status?

4 A.    This would present an issue.  The employee was on final

5 termination warning for missing two trips, that would be a

6 concern.

7 Q.    Would it prevent the employee from getting off of

8 probationary status or what would happen today?

9 A.    I don't handle dependability today so I cannot speak to

10 that.

11 Q.    So then what is -- what's the basis for the concern

12 about the absences?

13 A.    I guess my concern as a general person is how, how is

14 somebody able to hit eight points in attendance in six

15 months.  This is a six-month period on this form, so how did

16 somebody hit eight points in six months.  Eight points would

17 give you 48 sick days, somebody was sick 48 days in six

18 months?  That may not be an ideal employee, that is

19 concerning, but again, I am not involved in the dependability

20 process.

21 Q.    But that's what you think this document says?

22 A.    Correct, it says final termination warning for

23 attendance for two missed trips.

24 Q.    For two missed trips.  So --

25 A.    Correct.

39

1 Q.    And what did you say that means, 48 points or something?

2 What does that mean?

3 A.    Well, an employee that utilizes sick call -- you have

4 eight occurrences to get you to termination level, each

5 occurrence can be for six days.  Now I don't know that this

6 employee used each occurrence for six days, but generally

7 speaking an employee can use six sick days eight times

8 meaning they have the ability to be out from work for 48 days

9 before they get to a term situation in a rolling calendar

10 year.

11 Q.    Is that for an employee covered under the Collective

12 Bargaining Agreement or is that a probationary employee too?

13 A.    The Collective Bargaining Agreement.

14 Q.    So here where it says on the second page under Comments,

15 "Rebecca is currently on a final term warning for two missed

16 trips," it just says she missed two trips, right, not eight

17 occurrences?

18 A.    Correct.

19 Q.    So all you really know from looking at this is that she

20 missed two trips, right?

21 A.    Sure.

22 Q.    And what if she was sick for two days?

23      MS. KITSON:  Object to the form.

24 A.    There's certainly a difference between missing a trip,

25 which is no-show which affects the operation, and there's a

40

1 difference between a sick call.  A missed trip means a flight

2 attendant did not show up to work leaving the operation and

3 passengers stranded, a sick call is when a flight attendant

4 calls in and says, "I will be sick," so it's -- there's a

5 difference between the term missed trip and sick call.

6 Q.    Are you able to tell that by looking at this document?

7 You know that those are no call/no shows versus sick days?

8 A.    I do because I know the terminology, so two missed trips

9 tell me it's defined as a missed trip.

10 Q.    Okay.  And what if those two missed trips were sick days

11 or days taken to -- because a child was sick or something

12 like that, would that change your opinion here?

13 A.    Well, I don't think it -- the whole scenario would have

14 changed.  If it was two sick calls, somebody wouldn't be on

15 termination warning for two sick calls.

16 Q.    Even during a probationary period?

17 A.    Even during probation.

18 Q.    Even during 2008 when you weren't in H-R and you don't

19 really know?

20      MS. KITSON:  Object to the form.

21 A.    Well, I was a flight attendant in 2008 for several years

22 so I knew the process, I knew the sick-call process, so I can

23 speak not on behalf of H-R but on myself as a flight

24 attendant knowing policy and procedure back then.

25 Q.    So you recall the probationary procedure back in 2008

STEFANIE COPPEDGE - July 29, 2020

41

1 but not in 1995?

2     MS. KITSON:  Object to the form.

3 A.   You asked me if I -- your original question was not --

4 your question originally to me is if I recalled being on

5 probation myself and getting off of probation 25 years ago, I

6 don't remember that.

7 Q.   And that's clear, I recall you testifying to that and I

8 recall that.  What I'm asking is, did you know what the

9 probationary procedure was in 2008?

10 A.   I, I may -- I would have been aware, but it didn't

11 affect me so I didn't digest and think about it.

12 Q.   Okay.  I'm going to hand you what has been marked

13 Exhibit 2.  We'll do the same, the same process -- Ms.

14 Coppedge, I've noticed you've looked off to your right and

15 laughed a couple of times.  Are you communicating with

16 somebody?

17 A.   No, no.  I'm laughing because every time you send me a

18 document it takes forever to download.

19 Q.   Got it, got it.

20 A.   I don't mean that to be disrespectful, it's more of a

21 humorous thing like --

22 Q.   No, you're fine, don't worry.  It's hard to tell what's

23 going on when I'm not in the room.  But it's on its way to

24 you, I'll email it to Danielle.  Sorry about the delay.

25 A.   That was fine, thank you.  Is it Exhibit 2, is that --

42

1 Q.   Exhibit 2, it should be one page.

2 A.   Okay.  That one was quick.

3 Q.   Okay.  Good.  Have you had a chance to look at it

4 briefly?

5 A.   No, sir, I just opened it.

6 Q.   Oh, okay.  That's fine.

7     MS. KITSON:  John, can we take a break after this

8 document?

9     MR. CRONE:  Yeah, that's fine.

10 A.   Okay, I've read through it.

11 Q.   Have you ever seen this document before?

12 A.   I have not.

13 Q.   Have you ever seen a document like this?

14 A.   I have not.

15 Q.   In your mind, was Jerry Arellano disciplining Ms.

16 Brigham in this document or no?

17     MS. KITSON:  Object to the form.

18 A.   Certainly not, he's informing her.

19 Q.   Is there any sort of term for what this is?  Is it

20 called counseling or something, or is it just -- is it

21 covered --

22 A.   I, I can't speak to what it is, I was not involved in,

23 in creating or implementing the document.  I can speak to how

24 I read the document which is an advisement regarding your

25 sick instances.

43

1 Q.   And that's something less than discipline?

2 A.   Correct.

3 Q.   Okay.

4 A.   Just like a heads-up.

5     MR. CRONE:  Okay.  Let's, let's go off the record and

6 take that break.  Do you want to do 10 minutes, Danielle?

7     MS. KITSON:  Sure, that sounds good.

8     MR. CRONE:  Okay.

9     VIDEOGRAPHER:  The time now is 10:36, we're off the

10 record.

11          (There was a recess taken.)

12     VIDEOGRAPHER:  The time now is 10:51, we're back on the

13 record.

14 (Direct Examination by Mr. Crone)

15 Q.   Ms. Coppedge, I just sent over what's labeled Exhibit 1

16 and so the same drill, when you get it if you could open it,

17 take a look and let me know.  I'll email it to Danielle too.

18 A.   Okay.  I've read through it.

19 Q.   Thanks.  Have you ever seen a document like this before?

20 A.   I have.

21 Q.   Is this the kind of thing that an in-flight supervisor

22 would issue to a flight attendant?

23 A.   Correct.

24 Q.   Okay.  And so have you, have you issued documents like

25 this before?

44

1 A.   I have.

2 Q.   Do you know if you issued this one?

3 A.   I don't, I don't recall.

4 Q.   I see that there's no supervisor signature at the

5 bottom.  Is that abnormal?

6 A.   There would have been a supervisor signature at the time

7 that the flight attendant, in this case Rebecca, signed it,

8 they would have signed it at the time.

9 Q.   And so she would have signed at the bottom there at

10 Employee Signature?

11 A.   Correct.

12 Q.   So is there any way for you to know if this was actually

13 issued or if this was a draft?

14 A.   I would have to refer to the P-track, the employee

15 record, which would indicate if this form was issued and if

16 this form was then signed.

17 Q.   Okay.

18 A.   Two separate entries.

19 Q.   Got it.  So there's a way to find out, but you can't

20 tell by looking at this document?

21 A.   Correct.

22 Q.   Got it.  I sent over what's called Exhibit 12, I'm going

23 to send it to Danielle too by email.  Same drill, if when you

24 get it, it should just be one page, if you could open it and

25 take a look.

STEFANIE COPPEDGE - July 29, 2020

45

1  A.   Okay.
2  Q.   Have you ever seen this document?
3  A.   I have not.
4  Q.   Do you know what it is?  Have you ever seen a document
5  like this?
6  A.   I have not.
7  Q.   Do you know who wrote it?
8  A.   I do not.
9  Q.   Okay.  I'm going to send over Exhibit 6, and I'll email
10  it to Danielle as well.
11  A.   Okay.
12       Have you seen this document before?
13  A.   I don't know that I've seen the document recently until
14  today.  Obviously I am one of the authors so I have seen the
15  document, I just don't believe I've seen it in several years.
16  Q.   So it's been a little while.  At the bottom where it
17  says from Stefanie Coppedge to Gerardo Arellano dated October
18  13, 2015, did you write that where it says, "Sir, where are
19  we with this one?"
20  A.   Oh, no, what did I do?  Wait.  Sorry, I just lost your
21  document.
22  Q.   You're fine.
23  A.   Okay.  I'm sorry.  Will you repeat the question?  I kind
24  of freaked out with the document.
25  Q.   No, you're okay.  At the bottom there's an email from

46

1  you to Jerry Arellano dated October 13, 2015, it says, "Sir,
2  where are we with this one?"  Did you write that?
3  A.   I did.
4  Q.   Okay.  And then, and then the top of the document is Mr.
5  Arellano's response to you.  Do you agree with that?
6  A.   I do.
7  Q.   Okay.  And do you recall -- looking at it now does it --
8  do you recall Mr. Arellano sending you this email?
9  A.   I don't, I don't recall the email, it's so long ago and
10  there's thousands of emails in our work life.  Obviously they
11  were sent because they are here.  If you're asking me if I
12  remember the content of the email, until I was refreshed by
13  reading it, no, I did not remember any of the content.
14  Q.   Okay.  But now that you've been refreshed by reading it,
15  can you tell me what was going on here?
16  A.   I suspect on October 13th I was following up with Mr.
17  Arellano on Rebecca's status with her attendance and he had
18  sent me the reply back that they had granted her -- or, made
19  an exception for her on her F-M-L-A dates and they're
20  providing her with new F-M-L-A paperwork.
21  Q.   And what was the exception that Mr. Arellano is
22  referring to?
23  A.   I, I believe the email is speaking to her SIC occurrence
24  which placed her in the term situation, I believe they
25  re-coded it as an I-F-M and that they were making an

47

1  exception for her.
2  Q.   Do you know why that was an exception?
3  A.   I believe in an effort to work with Rebecca and save her
4  employment.  I can only assume, I don't know.
5  Q.   Can any, can any employee of Frontier apply for F-M-L-A
6  time?
7  A.   That's an H-R function.
8  Q.   You're not aware of whether -- could you apply for
9  F-M-L-A time?
10  A.   I believe it's, I believe it's a government program and
11  every employee that is eligible can apply for F-M-L-A.
12  Q.   Okay.  I'm sorry, I didn't mean to cut you off.  I was
13  trying to get a jump on sending you the next one, it's going
14  to be called Exhibit 19, and when you receive Exhibit 19 if
15  you can, if you can review that.
16  A.   All right.  I have opened it and will read through it
17  now.
18  Q.   Thank you.
19  A.   Okay.
20  Q.   Do you recall this email string?
21  A.   I don't.
22  Q.   Does looking at it now --
23  A.   Even looking at it now I don't.  I believe some of it
24  has been redacted or blacked out so I don't even know --
25  other than the exchange I can see from Jerry and Kari, that's

48

1  all I'm able to see.  I don't recall the email.
2  Q.   Yeah.  So the blacked-out portion, there's the dispute
3  between Frontier's attorneys and Ms. Brigham's attorneys as
4  to whether or not that blacked-out portion is privileged or
5  not so I'm not concerned with that.
6  A.   Okay.
7  Q.   I'm actually concerned with the top part where Jerry
8  wrote to Kari, yourself and a variety of other people and he
9  says, "I'm available next week to participate in the
10  meeting."  Does reviewing this refresh your recollection as
11  to what meeting he was referring to?
12  A.   It honestly does not.
13  Q.   That's fine.  I'm going to put in front of you now an
14  exhibit that is labeled 27.  And the same here, once you have
15  that open if you could review that email thread.
16  A.   Yes, it's still downloading.
17  Q.   Okay.
18  A.   Okay, I've read through the email.
19  Q.   Okay.  Have you seen this email thread before?
20  A.   At some point I must have.
21  Q.   Does reviewing it now refresh your recollection?
22  A.   Somewhat.
23  Q.   Okay.  Let's start at the top where Mr. Arellano is
24  writing to you, it says, "Hi, Stefanie.  With regard to her
25  September, I checked the trip she added and it looks like she

## STEFANIE COPPEDGE - July 29, 2020

49

1 did work a portion of a trip" and then he attaches this chart
2 of some sort. Can you decipher that chart?
3 A.   The chart would be her, her trip, the trip she was
4 assigned.
5 Q.   Yep.
6 A.   I would need to click on details within this trip to see
7 what portion she was working and if she did drop the other
8 portion.
9 Q.   Is it --
10 A.   I can't tell from just this.
11 Q.   Is it enough -- can you look at this chart and tell me
12 if Mr. Arellano is correct in that she did work a portion of
13 the trip? Does this chart show that?
14 A.   Just this chart alone does show that.
15 Q.   Okay. And then if you scroll down below to the second
16 page, you emailed Mr. Arellano and it says -- under October
17 6, 2015, at 1:52 p.m. it says, "Jerry, were her trips swapped
18 for trips that had turns through Denver so she would be able
19 to do a portion of the trip? Thank you for keeping me
20 posted." Do you remember what you were asking about there,
21 why you were asking that?
22 A.   I believe I was asking that -- this email would
23 supersede the email where he sent me her schedule, so I
24 believe I was inquiring if she flew any portion of the trip
25 she was assigned.

50

1 Q.   Okay. And why were you asking if it had turns through
2 Denver? What was that about?
3 A.   At, at that, at that time Rebecca was able to or any
4 flight attendant was able to drop a portion of their trip if
5 that trip came through Denver.
6 Q.   Why was that?
7 A.   It was part of the drop process, an ability to help
8 flight attendants --
9 Q.   Is it because flight attendants --
10 A.   -- flexibility.
11 Q.   Is it because flight attendants live in Denver, or is
12 there some reason or do you know?
13 A.   Well, at this time Denver would have been -- or, Denver
14 is the hub of Frontier Airlines, so it would be because
15 Denver is the hub.
16 Q.   Okay. And with Denver being the hub, does that just
17 mean that a lot of the flight attendants live here in Denver
18 or around Denver?
19 A.   Yes, correct, a larger portion of the operation flies
20 out of Denver.
21 Q.   Okay. And then if you scroll down a little bit more
22 there's -- I'm sorry, were you saying something?
23 A.   No.
24 Q.   If you scroll down a little bit more from Jerry Arellano
25 to you, October 6, 2015, at 1:49 p.m. it starts with, "Hi,

51

1 Stefanie. Shelly was able to conduct an audit." Do you see
2 where I am?
3 A.   Yes.
4 Q.   Okay. So the question I have is in the second
5 paragraph, towards the last sentence of the second paragraph
6 Mr. Arellano wrote "The question that arises is she"
7 referring to Rebecca Brigham "truly doing everything fitting
8 accordingly to help herself? I'm not so sure anymore." Do
9 you know what Mr. Arellano was referring to there?
10 A.   I don't know the intent of Jerry, I can't speak to what
11 his intent was on that statement.
12 Q.   You don't recall? You never discussed it with Mr.
13 Arellano?
14 A.   I don't -- no, I do not believe so. I believe that's
15 why I asked what her trip was in the email previous.
16 Q.   Was Mr. -- during this time period was Mr. Arellano, to
17 your knowledge, skeptical about whether Ms. Brigham was truly
18 trying to schedule her trips in a way that would accommodate
19 her disability?
20     MS. KITSON: Object to the form.
21 A.   I can't speak to Mr. Arellano's mindset.
22 Q.   I'm not asking you to, I'm asking if you know. Do you
23 know whether he was skeptical or not?
24     MS. KITSON: Object to the form.
25 A.   I do not know.

52

1 Q.   On the last page do you see -- or, I'm sorry, the third
2 page do you see the portion that's redacted there?
3 A.   Sure.
4 Q.   Okay. Right below it says, "Next steps. If the last
5 occurrence is not covered by FMLA then we proceed with the
6 term steps. On this one let's definitely ensure that she has
7 Union representation available." Do you know why Mr.
8 Arellano here wanted to ensure that Ms. Brigham had Union
9 representation available?
10     MS. KITSON: Object to the form.
11 A.   With any termination we ensure that Union representation
12 is there. I think he's just solidifying let's make sure the
13 Union is present.
14 Q.   So it's required with any termination meeting?
15 A.   It's not required, it's offered. It's the flight
16 attendant's responsibility to ensure the Union is there.
17 Q.   Okay. Did Mr. Arellano ever express any concern to you
18 that terminating Ms. Brigham might result in legal action
19 from Ms. Brigham?
20 A.   No, I don't recall that to be the case.
21 Q.   Did you ever tell Ms. Brigham that if she was terminated
22 over these issues that she should, in fact, seek legal action
23 against Frontier?
24 A.   I don't recall that conversation.
25 Q.   Did you ever tell Ms. Brigham you would testify on her

STEFANIE COPPEDGE - July 29, 2020

53

1 behalf in any legal action related to her termination from
2 Frontier?
3 A.    I don't, I don't recall that conversation.
4 Q.    Were you and Ms. Brigham ever friends?
5 A.    Ms. -- yes, we were friends, we are friends, but I think
6 there's -- you have work friends, family friends, neighbor
7 friends.
8 Q.    Sure.
9 A.    I mean there's different forms of friends, but yes,
10 Rebecca and I were friends, yes.
11 Q.    And what kinds of friends?  Work friends, neighbor
12 friends?
13 A.    I believe we were, I believe we were work friends.
14 Q.    Do you think that Frontier did everything in its power
15 or its ability to accommodate Ms. Brigham's disability before
16 it terminated her?
17     MS. KITSON:  Object to the form.
18 A.    It doesn't matter what I think, it's the policy.
19 Q.    Well, it matters, it matters to Ms. Brigham what you
20 think, so do you think there was anything else Frontier could
21 have done to help her with her disability prior to
22 terminating her?
23     MS. KITSON:  Object to the form.
24 A.    Again, I believe compliance is beyond my scope so I
25 can't speak to what more Frontier could have done to help

54

1 Rebecca.
2 Q.    In your opinion as a work friend back in 2015, not as
3 not an employee/supervisor, but from the perspective of a
4 work friend of Ms. Brigham, did Frontier do everything they
5 could do to accommodate Ms. Brigham prior to terminating her?
6     MS. KITSON:  Object to the form.
7 A.    You're asking my opinion as a friend?
8 Q.    Yes.
9 A.    Correct?
10 Q.    Correct.
11     MS. KITSON:  Same objection.
12 A.    As a friend my heart hurts from Rebecca for what Rebecca
13 went through.  I admire her strength to have gone through,
14 gotten herself through therapy, of having the strength to
15 voluntary self-disclose without getting herself in a
16 situation where she was forced to do so.  In my heart, my
17 heart hurts for Rebecca.  As a friend I -- as a friend I
18 believe everybody needs a second chance and a different
19 outcome based on some of the choices we make.  So as a
20 friend, as a friend, absolutely, I would have liked to have
21 seen a different outcome, as a friend.
22 Q.    Were you at the -- are you aware of Ms. Brigham's loss
23 of a child?
24 A.    I was not aware.
25 Q.    Were you at the final -- I think you would call it fact-

55

1 finding meeting prior to Ms. Brigham's termination, were you
2 at that meeting?
3 A.    I recall being at the termination, the fact-finding
4 termination meeting, yes, I was there.
5 Q.    At that point was there anything Ms. Brigham could have
6 said or done to save her job?
7     MS. KITSON:  Object to the form.
8 A.    I believe that is an opportunity for Ms. Brigham and the
9 Union to go through all of her I-F-Ms and attendance and see
10 if they can discover where something may have been miscoded
11 improperly and present that an option allowing, allowing for
12 a re-coding changing the situation.
13 Q.    So if she could have presented some evidence that an
14 absence should have been re-coded, that could have
15 potentially saved her job?
16 A.    Correct.
17 Q.    Was there anything else she could have done?
18     MS. KITSON:  Object to the form.
19 A.    I believe that would be beyond my scope, that, again,
20 would go to an H-R function.  That's an H-R function, my
21 function was strictly the facts of the policy and the
22 procedure.
23     MR. CRONE:  Ms. Coppedge, thank you for coming this
24 morning and putting up with the technical issues and whatnot
25 and so I know that has been a little frustrating, but if we

56

1 could take a quick five-minute break I want to review my
2 notes, make sure there isn't anything else I wanted to ask
3 you and then I think we can be done before 11:30 here, that
4 would be nice.  We can go off the record now.
5     VIDEOGRAPHER:  The time now is 11:20, we're off the
6 record.
7           (There was a recess taken.)
8     VIDEOGRAPHER:  The time now is 11:32.  We're back on the
9 record.
10 (Direct Examination by Mr. Crone.)
11 Q.    Ms. Coppedge, just a couple of quick questions and then
12 we'll be done.  So do you recall back when we were discussing
13 the bid process and the open time and the trade time?
14 A.    Yes.
15 Q.    The question I have is after a flight attendant does the
16 bid and then based on seniority they're given a schedule, at
17 the point where they can then trade their time, could they
18 trade away their entire schedule for a new schedule at that
19 point?
20 A.    They're, they're locked to 50 hours.  So this is where I
21 guess it gets complicated so you'll have to follow me if you
22 can.
23 Q.    Sure, yeah.
24 A.    Let's say, for example, I have 100 hours, I've dumped 50
25 of those hours into open time so now I only have 50 hours on

STEFANIE COPPEDGE - July 29, 2020

---

57

1 my schedule, I can take one trip, let's say that trip is 10
2 hours, and I can trade that 10 hours with another trip in
3 open time that is equivalent, that is another 10 hours.  I
4 have to maintain 50 hours.
5 Q.   Got it.  So as long as you maintain your 50 hours there,
6 you could trade away all those trips for new trips?
7 A.   As long as you maintain 50 hours.
8 Q.   Got it.  Okay.  And is the hours -- when a flight
9 attendant bids, might they always bid 100 hours?  Is there
10 some number they have to bid, or is it like "I'm just going
11 to bid 20 hours this week" and then --
12 A.   It's, it's contractual on how many hours and so the
13 company will put out a threshold in line with the C-B-A so it
14 could be that you can bid anywhere from 50 up to 100, 102,
15 103.
16 Q.   Okay.  And then once you've bid that and you're awarded
17 whatever you're awarded based on seniority, then there's a
18 certain amount you can drop into open time?
19 A.   Down to 50 hours.
20 Q.   Down to 50, okay.  And then once you've done that,
21 you've got to at least keep your 50, but you could trade away
22 all 50 for a different 50 hours?
23 A.   Correct.
24 Q.   Okay.  Got it.  Okay.  Thank you.  That makes sense.
25 It's a little complex, but it makes sense.  The other

---

58

1 question is did you ever tell Jerry Arellano that Ms.
2 Brigham's brother is a lawyer and if Frontier terminated Ms.
3 Brigham, you know, she'd probably sue because she has a
4 lawyer in the family, her brother?
5 A.   I don't recall that and I don't even -- I don't recall
6 Rebecca having a brother.  I guess --
7 Q.   I'm sorry, go ahead.
8 A.   No, I'm sorry, go ahead.
9 Q.   You don't recall making any comment to Mr. Arellano
10 along those lines?
11 A.   I don't, I don't recall.  I feel like it's a general
12 statement and anytime somebody gets terminated somebody is
13 related to a lawyer, somebody is going to sue you.  I don't
14 recall the conversation, I really don't.
15    MR. CRONE:  Okay.  Ms. Coppedge, that's all we have, and
16 thanks again for appearing this morning and putting up with
17 the technical difficulties.
18    MS. KITSON:  Hey, John, I may have a couple follow-ups.
19 Give me just a couple minutes here.
20    MR. CRONE:  Yeah, that's fine.  Do you want to go off
21 the record, or do you just want to mute it for a minute or
22 two and then come back?
23    MS. KITSON:  We'll just mute it for a minute or two, it
24 should be really quick.
25    MR. CRONE:  Yeah, that's fine.

---

59

1    MS. KITSON:  Okay.  I have just a few questions if
2 everybody wants to go back on.
3    MR. CRONE:  Sure.  Thanks, Danielle.
4    MS. KITSON:  Do we have our videographer?
5    VIDEOGRAPHER:  Yeah, we're all here.
6    MS. KITSON:  Are we back on the record?
7    MR. CRONE:  We never went off, we just muted.
8    MS. KITSON:  I'm sorry, I forgot that.
9    MR. CRONE:  Oh, no, you're fine, you're fine.
10    MS. KITSON:  Here I'm sitting here.
11 WHEREUPON,
12                    CROSS-EXAMINATION
13 BY MS. KITSON:
14 Q.   Ms. Coppedge, do you recall Mr. Crone asking you about a
15 minimum requirement of hours that a flight attendant had to
16 hold after bidding?
17 A.   I did.
18 Q.   And did you testify that that number was 50 hours?
19 A.   I did.
20 Q.   While we were on the break, did you have a chance to
21 consult the Collective Bargaining Agreement that was in place
22 at the time that Ms. Brigham was employed?
23 A.   I did.
24 Q.   And did that refresh your recollection about the number
25 of hours minimally required to be held?

---

60

1 A.   It did.
2 Q.   And what is that number?
3 A.   45 hours.
4    MS. KITSON:  Okay.  And those are my only questions.
5    THE WITNESS:  Okay.
6    MR. CRONE:  Thank you, Ms. Coppedge.  And Ms. Brigham
7 has no follow-up as a result of that, so thanks again for
8 being here.
9    COURT REPORTER:  Mr. Crone, Ms. Kitson, this is the
10 court reporter.  Would you both like etrans?
11    MR. CRONE:  Yes, please.
12    MS. KITSON:  Please.
13    COURT REPORTER:  And Ms. Kitson, do you want to read and
14 sign?
15    MS. KITSON:  Yes.
16    COURT REPORTER:  Perfect.  Thank you very much.
17    VIDEOGRAPHER:  The time now is 11:40.  We're going off
18 the record.  This concludes today's deposition.
19         (The deposition was concluded at 11:40 a.m.)
20
21
22
23
24
25

---

**STEFANIE COPPEDGE - July 29, 2020**

```
                                                          61
1                    CERTIFICATE OF THE REPORTER
2
   STATE OF WYOMING        )
3                          ) ss
   COUNTY OF LARAMIE       )
4
5          I, JEANNIE GEBES, RPR, freelance court reporter and
6  Notary Public, hereby certify that I was authorized to and
7  did record in stenotype the foregoing pages, numbered 1-61,
8  inclusive.
9          I further certify that I am not an agent, attorney
10 or counsel for any of the parties hereto, nor am I interested
11 in the outcome thereof.
12         Dated this 9th day of August 2020.
13
14
15         _____
                  JEANNIE GEBES, RPR
16                Court Reporter
17                My Commission Expire:
18
19
20
21
22
23
24
25
```

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

        Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

        Defendant.

---

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF WRITTEN DISCOVERY REQUESTS DIRECTED TO PLAINTIFF

---

Plaintiff Rebecca Brigham, by and through the undersigned counsel, hereby submits *Plaintiff's Responses to Defendant's First Set of Written Discovery Requests Directed to Plaintiff.* These Responses are being served pursuant to the Federal Rules of Civil Procedure and the Court's Scheduling Order dated February 13, 2020 [Dkt. 15].

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify each person who supplied information concerning the answers and responses to these Interrogatories.

**ANSWER:** I supplied all information in response to Defendant's Interrogatories. My attorney assisted me in the preparation of these Responses; however, any information related to

my interactions with my attorney in this regard is privileged or protected by the work product doctrine.

## INTERROGATORY NO. 2:

Identify all persons known or believed by you to have knowledge of any facts, events, circumstances or issues supporting, contradicting, or in any way relating to the matters set forth in or underlying the allegations in the Complaint, and for each provide their telephone number and address.

**ANSWER:** Please see Plaintiff's Rule 26(a)(1) Initial Disclosures at 1-4, ¶¶ 1-17 (listing various individuals, primarily employees of Defendant). I am unaware of current contact information for employees of Defendant; however, Defendant should possess that information. Also, please see the following additional information:

1. Shelly Lerner: Ms. Lerner was one of Defendant's HR or payroll employees that assisted Defendant in compiling documentation on my absences from work, absences that were the result of Defendant's refusal to treat me in accordance with the law.

2. Adrian Prince: I believe the best, current contact information for Ms. Prince is: amlmprince@me.com.

## INTERROGATORY NO. 3:

Identify all persons, other than your attorneys in this case, and including but not limited to the individuals identified in your Initial Disclosures and any subsequent Disclosures, with whom you have had communications relating to your allegations against Frontier and/or your claims in this matter, including but not limited to present or former employees of Frontier. For each communication, provide the individual's current or last known address, mobile and home telephone number, and state the nature of the communications, all parties to the communication, and any written or electronic documents that were exchanged between the parties (additionally, produce such documents in response to Request for Production Nos. 12 and 13.

**ANSWER:** Of course, I spoke with various colleagues, coworkers, and supervisors of Defendant during the events at issue in this lawsuit. It is not possible to recall the nature of each communication nor do I possess current contact information for all of these individuals. But again, Defendant should be in possession of contact information for any of its former or current employees listed in my Initial Disclosures or herein. Please see my above Response to Interrogatory No. 2 for additional contact information for individuals with which I have discussed the events underlying this lawsuit.

Please also see BrighamR_PlaintiffRecords0644-45 for a current statement regarding some of the events underlying this lawsuit from Adrienne Prince. Also, please see the following additional information:

1. Lori Hughes: Ms. Hughes is a friend of mine, and I have discussed the unlawful treatment I have suffered from Frontier with Ms. Hughes on various occasions. Her telephone number is 303-520-8433.

2. Dave St. Hilaire: Mr. Hilaire was a former colleague at Frontier. Therefore, Defendant should possess his current contact information. I recall discussing Frontier's unlawful behavior with Mr. St. Hilaire because he suffered similar adverse actions after self-disclosing his issues with alcoholism to Defendant.

**INTERROGATORY NO. 4:**

List and explain in detail each and every retaliatory act that you contend was made or taken against you by Frontier, including by its representatives, agents, or employees. For each such act, state:

    A.  The name of the individual(s) whom you contend retaliated against you;

    B.  The action taken or representation made by the individual(s) that you contend constitutes retaliation;

    C.  The date of the alleged retaliatory action(s); and

    D.  Any witnesses to the alleged retaliation.

**ANSWER:** The most obvious act of retaliation occurred when I was fired by Jerry Arellano. This occurred on November 11, 2015. Leading up to my termination, it was obvious that Mr. Arellano did not like me as he would talk down to me in every conversation. He fired me due to my disability and because I was engaging, or attempting to engage, in protected activity by requesting reasonable accommodations.

0270

On August, 24, 2105, I learned that a PDX turn was removed from my schedule without explanation. I believe I asked Stefanie Coppedge for an explanation, but I never received a response.

On October 9, 2015, a DFW turn was removed from my schedule in retaliation for my attempts to engage in protected activity by requesting reasonable accommodations. I asked the GO why the turn was removed from my schedule; no satisfactory reason was provided. On this date, I told Kari Thompson that I felt like Frontier was out to get me as it seemed Frontier was looking for any reason to write me up and terminate me, which eventually happened on November 11, 2015.

**INTERROGATORY NO. 5:**

For each accommodation that you requested from Frontier, please identify:

A.  The nature of the accommodation you requested;

B.  The identity of the individual(s) from whom you requested an accommodation;

C.  Whether a doctor submitted information relating to the request;

D.  The date that you requested the accommodation; and

E.  Whether and how Frontier responded to the request for accommodation, including

   whether or not Frontier granted it.

**ANSWER:** For additional information responsive to this Interrogatory, please see BrighamR_PlaintiffRecords0644-45.

I met with my inflight managers, Stefanie Coppedge, JJ Williams, and Fadia Daphis, a few different times to discuss different ways I could avoid layovers; however, Frontier never suggested any solutions. I cannot recall the exact dates of these meetings. Also, I do recall confiding in JJ Williams and Fadia Daphis regarding my disability prior to my self-disclosure to Frontier toward the end of 2014.

On June 4, 2015, I requested to work at the GO (the "General Office") temporarily in order to avoid layovers and overnights. This meeting was recorded. Jerry Arellano and Cassie Micklich were present. The request was later denied through email.

On October 9, 2015, I again requested an accommodation through building a schedule using open time and the tradeboard. In this way, I would be able to create a schedule avoiding layovers and overnights. I requested this accommodation through Kari Thompson, and later, I again requested the same accommodation while Jerry Arellano was present. This meeting was also

recorded. I was told this accommodation would not be consistent with Frontier's practices and: "if we cherry picked to try and create you a certain situation now we have created a whole separate accommodation for you." I responded that the time might have been right to actually help people in recovery from alcoholism rather than hinder them. I also suggested that I work at the GO again. None of my requested accommodations were granted nor did Frontier offer any suggestions of its own.

On November 3, 2015, during a factfinding meeting with Stefanie Coppedge, I again requested an accommodation and in writing. This was denied; rather, I was fired on November 11, 2015.

## INTERROGATORY NO. 6:

Identify and describe in detail each occasion on which you claim you were discriminated against by Frontier, including its representatives, employees, and/or agents, on the basis of disability. For each such incident, at a minimum, please include the following:

A.  The name of the individual(s) whom you contend discriminated against you;

B.  The action taken or representation made by the individual(s) that you contend constitutes discrimination;

C.  The date of the alleged discriminatory action(s);

D.  Any witnesses to the alleged discrimination; and

E.  Whether and to whom you reported the alleged discrimination.

**ANSWER:** Unfortunately after I self-disclosed my disability, I was treated poorly virtually every time I spoke with anybody from the GO. Jerry Arellano, Shelley Lerner, and Kari Thomson talked down to me and made it clear that they did not think it necessary to accommodate my disability. I was disallowed from taking steps to create a schedule that avoided overnights and layovers. Instead I was written up for accruing too many absences even though I was trying hard to stick to my treatment plan and to arrange my schedule accordingly. Frontier would not allow me to complete the terms of my treatment plan by avoiding layovers and overnights even though it was critical that I did so in order to realize a full recovery.

I was also retaliated against, as described in response to Interrogatory No. 4, and Frontier refused to grant my accommodations or even meaningfully discuss my requested accommodations, as discussed in response to Interrogatory No. 5. Frontier never once suggested its own idea for a reasonable accommodation. After Frontier learned of my disability, my years of good performance

on the job turned into a contentious relationship where no matter how hard I tried to succeed, my managers were writing me up and disciplining me. Eventually, I was terminated by Frontier, also an act of discrimination.

**INTERROGATORY NO. 7:**

Identify all employers for whom you have worked from November 11, 2015 to the present, stating for each:

    A.  The name and present or last known address and phone number of the employer;

    B.  The dates you were employed by that employer;

    C.  Your position with that employer;

    D.  The earnings (if from self-employment, both gross and net), compensation and other benefits you received during such employment, including commissions, bonuses, etc.;

    E.  The names of your immediate supervisor(s);

    F.  The reason for your separation from employment; and

    G.  Any disciplinary action, including termination from employment, to which the employer subjected you.

This interrogatory includes any period of self-employment.  **Additionally, please execute a copy of the attached employment records release (Exhibit A) for each employer so that Frontier may obtain your employment records from the employers.**

**ANSWER: OBJECTION: The release attached as Exhibit A is overly broad, impermissibly seeks to invade Ms. Brigham's privacy, and seeks information not relevant to this lawsuit. The release seeks to provide Defendant access to "any records concerning the employment and termination of employment of Rebecca Brigham, including, but not limited to, . . . personnel files, severance agreements . . . performance reviews, grievances . . . [and] disciplinary records . . . ." Plaintiff's post-termination employment is relevant to this lawsuit insofar as Defendant may seek to establish whether or not Plaintiff properly mitigated her damages. The release, as drafted, seeks information beyond this proper scope. As such,**

0273

**Plaintiff invites Defendant to draft its release such that it only seeks information on Ms. Brigham's position descriptions, durations of employment, and rates of pay. If Defendant agrees to do so, Plaintiff will execute a properly revised release.**

With regard to the remainder of this Interrogatory, from approximately February 2016 through April 2016, I worked at Cakeheads Bakery (placed through a temp agency). My supervisor was Bradley Isroff, and I believe his contact number to be (303) 596-5176. The temp agency separated my employment with Cakeheads Bakery. Mr. Isroff did reach out to me directly asking me to resume my employment; however, I had already started a new job. I earned approximately $12.00 per hour in this position, with $15.00 per hour offered after my termination.

From approximately April 2016 through August 2018, I worked for Great West Painting and Repair. My supervisor was Steve Kruger, and I believe his contact information to be (303) 239-8933. I earned approximately $15.00 to $18.75 per hour during the time I was employed in this position.

I am currently unemployed; however, I am caring for my husband's grandmother. I earn a minimal amount for these duties, approximately $200 per paid on a 1099. All of this work occurred in 2020 so I have yet to be issued a 1099.

## INTERROGATORY NO. 8:

Identify and fully describe any efforts that you have made to seek employment or other

means of income since November 11, 2015. In so doing, identify all companies, persons or other

entities with or through whom you have applied, inquired about, or sought employment, including

employment agencies, other personnel placement services, or your personal or professional

contacts, by specifying for each the name of the company, person or other entities from whom or

through whom you sought employment or income; the date(s) of each application, inquiry, or

search; the name(s) of the person(s) to whom you addressed your application, with whom you

interviewed, or who performed employment search services on your behalf; the job or business

relationship sought; the results(s) of each such application and the reason for the result (e.g.,

offered a position but declined it for a certain reason); and the amount and nature of compensation

and benefits of any job or business relationship offered or for which you applied (e.g., whether

such compensation was based on an hourly or salary pay schedule, commission structure or other

basis).

**ANSWER: OBJECTION: This Interrogatory is duplicative, overbroad and unduly burdensome given that Ms. Brigham has detailed her post-termination employment history in response to Interrogatory No. 7. Ms. Brigham invites conferral on this issue should Defendant disagree.**

## INTERROGATORY NO. 9:

State the amount of all compensation, income and benefits you have received or expect to

receive since the date of your separation from Frontier and the sources of same. For purposes of

this Interrogatory, "benefit" means a payment made or an entitlement available to you in

accordance with a wage agreement or any other employer directed or sponsored program, an

insurance policy, or a public assistance program.

**ANSWER:** Please see documents produced herewith and Bates numbered BrighamR_PlaintiffRecords0645-50. Also, please see Plaintiff's economic expert's report Bates numbered BrighamR_PlaintiffRecords0708-0766, which contains detailed information responsive to this Interrogatory.

## INTERROGATORY NO. 10:

Identify the basis(es) for your alleged disability(ies) by identifying:

    A. The physical or mental impairment which you allegedly have that substantially

       limits a major life activity;

    B. Each major life activity in which you are allegedly substantially limited, and a

       description of the manner in which you are allegedly substantially limited; and

    C. What treatment, including medication and/or treatment plans, if any, you use as a

       result of the disability described in sub-part (A).

**ANSWER:** My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children.

Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working. I completed a program of inpatient rehabilitation at the Discovery House in California. After completion of my inpatient program, I was placed on a treatment program that has modified over time. After my inpatient program, a significant portion of the treatment program was a modified work schedule. For additional information, *see* BrighamR_PlaintiffRecords0273-76 (Treatment Plan authored by Marla M. Madrid, LCSW).

## INTERROGATORY NO. 11:

Please separately identify each and every disease, illness, injury, disability, defect, medical symptom or other physical or mental condition which you claim was caused or aggravated by Frontier as a result of Frontier's alleged improper conduct set forth in the Complaint.

**ANSWER:** Alcoholism. Anxiety. Depression. Emotional Distress. Pain and Suffering.

## INTERROGATORY NO. 12:

Please state whether you have sought or received any consultation, examination and/or treatment for any physical or psychological injuries or damages you allege were caused by your treatment by and/or employment with Frontier alleged in this action, and/or any other action or omission by Frontier for which you are seeking relief in this action. If you answer in the affirmative, state the dates of each such consultation, examination and/or treatment and identify the provider from whom you sought treatment, the nature of such consultation, examination and/or treatment, and the diagnosis and treatment you received. **Additionally, please execute a copy of the attached medical release in Exhibit B for each provider so that Frontier may obtain your medical records. Please also execute a copy of the Authorization for Release of Psychotherapy Notes, attached as Exhibit C, for each identified mental health care provider so that Frontier may obtain your psychotherapy records from the mental health care provider(s).**

**ANSWER: OBJECTION: The release attached as Exhibit B is overly broad, impermissibly seeks to invade Ms. Brigham's privacy, and seeks information not relevant to this lawsuit. The release seeks to provide Defendant access to a "copy of each and every medical or treatment-related document or record in your possession, custody or control including, but not limited to, correspondence, reports, . . . charts, x-rays, diagnostics . . . [and] prescriptions . . . ." Plaintiff's medical records are relevant to this lawsuit insofar as Defendant may seek to learn of the nature of Plaintiff's medical damages caused by Defendant's conduct at issue in this lawsuit. The release, as drafted, seeks information beyond this proper scope as it seeks health information of any type and rendered at any time. As such, Plaintiff invites Defendant to draft its release such that it only seeks information on Ms. Brigham's treatment for alcoholism, anxiety, and depression, including bills for services rendered, and incurred from 2014 to present. If Defendant agrees to do so, Plaintiff will execute a properly revised release. Exhibit C suffers from similar defects as described below in my Response to Request for Production No. 19.**

With regard to the remainder of this Interrogatory, after being terminated by Frontier, I continued to see my counselor, Marla M. Madrid. Once Frontier presents me with a properly limited release, Defendant should be able to obtain the necessary records detailing treatment dates. At present, I cannot recall the exact dates of treatment.

## INTERROGATORY NO. 13:

Describe in detail your medical history from August 2011 to the present, including every illness, injury, disorder, abnormal or disabling condition (physical, mental or emotional) or medical procedures and all treatment you have had at any time (other than common virus, cold, flu, or routine dental work), the date on which such condition began or became evident, the diagnosis of any such condition, all treatment received and the dates thereof, and the identities of all current or former physicians, therapists, dentists, psychologists, hospitals, clinics, sanitariums and other health care providers who diagnosed or treated you for each such physical, emotional, mental, or psychological condition. **Additionally, please execute a copy of the attached medical release in Exhibit B for each provider so that Frontier may obtain your medical records. Please also execute a copy of the Authorization for Release of Psychotherapy Notes, attached**

as Exhibit C, for each identified mental health care provider so that Frontier may obtain

your psychotherapy records from the mental health care provider(s).

**ANSWER: OBJECTION: The Interrogatory is overly broad, unduly burdensome, seeks to invade Ms. Brigham's privacy, and seeks information that is not relevant to any claims or defenses asserted in this lawsuit. Plaintiff is unclear as to how this broadly worded Interrogatory is relevant to the nature of her disability nor is Plaintiff aware as to how this Interrogatory seeks information relevant to her asserted damages. Plaintiff invites conferral on this Interrogatory so that she may provide any properly responsive information.**

## INTERROGATORY NO. 14:

Identify and fully describe any and all types of damages or injuries of any kind or nature

that you allege you have suffered and are seeking relief from or compensation for in this case, and

with respect to each, identify and describe the following:

a. specific type of injury alleged;

b. specific type of damages incurred;

c. amount of recovery sought for any specific type of injury or damages alleged;

d. the method used to compute each item of damages; and

e. any and all documents supporting your claims for damages.

**ANSWER:** I am seeking all available economic damages available under law, including backpay and frontpay. Please see Plaintiff's economic expert's report Bates numbered BrighamR_PlaintiffRecords0708-0766, which contains detailed information responsive to this Interrogatory.

I am also seeking all compensatory and punitive damages available under law and in amounts determined by a jury. I am also seeking my attorney's fees, costs, pre and post-judgment interest and any other legal or equitable relief determined proper by Court.

## INTERROGATORY NO. 15:

Identify by name, date, and court any other lawsuits, arbitrations, judicial proceedings,

civil, criminal, or administrative cases (including charges filed with the Equal Employment

Opportunity Commission, state human rights commission, workers' compensation claims, and claims for unemployment benefits), to which you have ever been a party (as a plaintiff or a defendant) or a witness in the past ten (10) years.

**ANSWER:** None, apart from the EEOC complaint underlying this lawsuit and this lawsuit.

## INTERROGATORY NO. 16:

Please state whether you have ever pled guilty (or *nolo contende*) to or been convicted of any criminal charge.  If your answer is yes, please state the following with respect to each incident:  the nature of the charge; the date of the plea or conviction; the court in which the charge was raised; and the sentence you received.

**ANSWER:** While in college, in Sterling, CO, I accepted a plea deal after being charged with DUI. I pled no contest, received a fine, and took DUI classes. I have had some speeding tickets but those may not have been "criminal charge[s]." In approximately 2005 or 2006, I pled guilty to a trespassing charge in Lakewood, CO, which was reduced from shoplifting. This trespassing charge involved the use of alcohol. While a juvenile, around age 16, I pled guilty to hit and run, reckless driving, and driving without a valid drivers license. This juvenile offense also involved the use of alcohol.

## INTERROGATORY NO. 17:

Identify all personal e-mail addresses (such as Gmail, Yahoo!, Hotmail, AOL, AT&T, Blackberry), social networking accounts (for online services such as Facebook, Twitter, MySpace, Twitter, Instagram, Tumblr, YouTube, Google+, Classmates, Flickr, etc.), professional networking accounts (for online services such as LinkedIn, Monster.com, etc.), and any other accounts to online sites, services, blogs, wikis, or message boards that you have used or maintained at any time since May 2007 and for each, provide your public username, the email address associated with the account, the website address, and the dates the account has been active.

**ANSWER: OBJECTION: This Interrogatory is overly broad, unduly burdensome, seeks to invade Ms. Brigham's privacy, and seeks information that is not relevant to any**

claims or defenses asserted in this lawsuit. Here, Defendant is seeking the identity of any "personal email addresses . . . social networking accounts . . . professional networking accounts . . . and any other accounts . . . ." from May 2007 to present without identifying how this information relates to this lawsuit in any way. This Interrogatory represents a classic, and impermissible, "fishing expedition." Notwithstanding, Plaintiff invites conferral on this Interrogatory so that she may provide properly responsive information, if it exists.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Produce all documents and tangible things that you reviewed, regardless of whether ultimately relied upon, for responding to the above Interrogatories and/or referenced in such Interrogatories.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

### REQUEST FOR PRODUCTION NO. 2:

Produce all documents and tangible things that you reviewed, regardless of whether ultimately relied upon, for purposes of preparing the allegations set forth in your Complaint.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333.

### REQUEST FOR PRODUCTION NO. 3:

Produce all documents that relate to your employment with and separation from Frontier, including without limitation personnel documents, evaluations, job descriptions, policy and procedures manuals, any other manuals, documents describing your duties and responsibilities as a Frontier employee, any e-mail or text message communications with or about any of Frontier's agents, and anything that you took from Frontier when your employment was terminated.

0280

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

**REQUEST FOR PRODUCTION NO. 4:**

Produce all documents which relate to the Charge of Discrimination filed with the Colorado Civil Rights Division (CCRD) and/or the Equal Employment Opportunity Commission (EEOC) on or about May 10, 2016.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333.

**REQUEST FOR PRODUCTION NO. 5:**

Produce all documents which relate to your efforts to gain employment after your separation from employment with Frontier including, but not limited to, copies of applications for training and/or education, copies of resumes, employment applications, letters to prospective employers, and correspondence between you and any employment agencies, recruiters, or headhunters.

**RESPONSE:** Please see documents produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0655.

**REQUEST FOR PRODUCTION NO. 6:**

Produce any diaries, notes, correspondence, memoranda, calendars, journals, daily, weekly, or monthly planners, social media postings, or other similar materials from May 24, 2007 to the present, demonstrating your state of mind or memorializing any aspect of your employment or separation from employment with Frontier, including any journal or diary of any sort kept during your employment with Frontier.

**RESPONSE:** Plaintiff presumes this Request is seeking information authored by Plaintiff as opposed to information authored by others that may or may not be responsive to this Request –

apart from the issue of whether Plaintiff would be in possession of any such third-party information. With this understanding, Plaintiff asserts that no information responsive to this Request exists.

## REQUEST FOR PRODUCTION NO. 7:

Produce any and all documents and tangible things which you contend reflect, show, or demonstrate discrimination against you on the basis of disability by any employee or agent of Frontier.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 8:

Produce any and all documents and tangible things which you contend reflect, show, or demonstrate retaliation against you by any employee or agent of Frontier.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 9:

Produce any and all documents and tangible things which you contend reflect, show, or demonstrate Frontier's failure to accommodate your alleged disability.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 10:

Produce any and all documents and tangible things which you contend reflect, show, or demonstrate Frontier's failure to engage in good faith with you to determine what (if any) reasonable accommodations were possible for Frontier to provide you concerning your alleged

disability.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 11:

Produce any and all documents and tangible things which relate to communications or meetings between yourself and Frontier, or any representative or employee of Frontier, including but not limited to meetings with your supervisors or members of human resources, including without limitation, memoranda, meeting minutes, notes, tapes or recordings, emails or computer records or files, diaries, calendars, planners, text-messages, or material similar to any of the foregoing, relating to your allegations against Frontier and/or your claims in this matter.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 12:

Produce any and all documents reflecting communications between yourself and anyone else (other than correspondence sent only to your attorneys or documents sent by your attorneys to you and no one else) relating to your claims against Frontier.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

## REQUEST FOR PRODUCTION NO. 13:

Produce all communications between you and any individual identified in your Initial Disclosures that relate to your claims against Frontier.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0190-0299; 0633 (note: as previously discussed between counsel, the

0283

transcripts of recorded conversations were not professionally produced and contain some errors; however, the underlying recordings have been produced); and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0680-0699.

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents relating to your accommodation requests to Frontier.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333; 0644-45; and those produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0707.

**REQUEST FOR PRODUCTION NO. 15:**

Produce all documents or tangible things which reflect, show, or demonstrate income or compensation (including salary, wages, bonuses, unemployment compensation, disability payments, benefits, and any other thing of value) received by you since November 11, 2015, including pay stubs.

**RESPONSE:** Please see documents produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0651, and please see Plaintiff's economic expert's report Bates numbered BrighamR_PlaintiffRecords0708-0766, which contains detailed information responsive to this Interrogatory.

**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents that you provided to or received from any government or administrative agency, including, but not limited to, the EEOC relating to Frontier, your employment with Frontier, the separation of your employment with Frontier, and/or the subject matter of this litigation.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0001-6333.

**REQUEST FOR PRODUCTION NO. 17:**

Produce all of your federal, state, and local income tax returns, receipts, check stubs and

W-2 forms that indicate the transfer of funds to you, whether private or governmental transfer payments, including wages, passively earned income, and benefits of any kind, from 2010 to the present.

**RESPONSE: OBJECTION: Production of Ms. Brigham's tax returns would constitute an unwarranted invasion of her and her husband's privacy. Plaintiff takes the position that her income over the relevant time period is discoverable however, and as such, Ms. Brigham is producing her Form W-2s. Plaintiff invites conferral on this issue if Defendant can articulate reasons why Ms. Brigham's tax returns (filed jointly with her husband) are relevant to the claims or defenses asserted in this lawsuit.**

Please see documents produced herewith and Bates numbered BrighamR_PlaintiffRecords0646-0655.

## REQUEST FOR PRODUCTION NO. 18:

Produce all documents, including, but not limited to, correspondence, memoranda, notes, video or audio recordings, transcriptions, written statements or other reductions to writing, of interviews or conversations with any individual, including any former agent or employee of Frontier, concerning your employment with Frontier or the subject matter of this litigation.

**RESPONSE:** Please see previously produced documents Bates numbered BrighamR_PlaintiffRecords0190-0299 and 0633 (note: as previously discussed between counsel, the transcripts of recorded conversations were not professionally produced and contain some errors; however, the underlying recordings have been produced).

## REQUEST FOR PRODUCTION NO. 19:

If your claim for compensatory damages includes any type of emotional damages or mental anguish, produce all documents relating to any emotional or mental injury or illness, which you contend resulted from your employment with Frontier, including, but not limited to, all medical records, reports, bills, diagnoses, prescriptions, or any communications with any physician, psychiatrist, nurse, counselor, therapist, or other practitioner of the healing arts regarding such injury or illness. **Additionally, please execute a copy of the attached medical release in Exhibit**

B for each provider so that Frontier may obtain your medical records. Please also execute a copy of the Authorization for Release of Psychotherapy Notes, attached as Exhibit C, for each identified mental health care provider so that Frontier may obtain your psychotherapy records from the mental health care provider(s).

**RESPONSE: OBJECTION: The release attached as Exhibit C is overly broad, impermissibly seeks to invade Ms. Brigham's privacy, and seeks information not relevant to this lawsuit. The release seeks to provide Defendant access to "any and all notes recorded in any medium" from "any and all mental health providers . . . ." Plaintiff's medical records are relevant to this lawsuit insofar as Defendant may seek to learn of the nature of Plaintiff's medical damages caused by Defendant's conduct at issue in this lawsuit. The release, as drafted, seeks information beyond this proper scope. As such, Plaintiff invites Defendant to draft its release such that it only seeks relevant information on Ms. Brigham's treatment for alcoholism, anxiety, and depression, including bills for services rendered, incurred from 2014 to present and rendered by Marla M. Madrid at Comanche Crossing Counseling, LLC and Drs. Keller and Thomas at The Discovery House. If Defendant agrees to do so, Plaintiff will execute a properly revised release. Exhibit B suffers from similar defects as described above in Plaintiff's Response to Interrogatory No. 12.**

With regard to the remainder of this Request, Ms. Brigham is in the process of collecting any additional documents responsive to this Request and will supplement as soon as she is able.

**REQUEST FOR PRODUCTION NO. 20:**

Produce all documents, which relate or refer to any claim(s) you made for any type of government (federal, state, or local) benefits assistance during or subsequent to your employment with Frontier, including but not limited to claim(s) for unemployment insurance or disability benefits.

**RESPONSE:** Please see documents produced herewith and Bates numbered BrighamR_PlaitniffRecords0651.

**REQUEST FOR PRODUCTION NO. 21:**

If your claim for compensatory damages in this lawsuit includes any type of emotional damages or mental anguish, provide a copy of all your social networking content since May 24,

2007 that relates to any of your emotions, feelings, or mental states, as well as your communications that reveal, refer, or relate to events that could reasonably be expected to produce a significant emotion, feeling, or mental state.

**RESPONSE: OBJECTION: This Request is overly broad and unduly burdensome. Plaintiff's claims for relief do seek compensatory damages for "emotional damages or mental anguish;" however, this does not entitle Defendant to any social networking content or communications that "reveal, refer, or relate" to "emotions, feelings, or mental states" or "that could reasonably be expected to produce a significant emotion, feeling, or mental state." This Request covers virtually *any* social media post or communication made by any individual at any time. Notwithstanding, Plaintiff invites conferral on this Request so that she may provide properly responsive information, if any exists.**

**REQUEST FOR PRODUCTION NO. 22:**

Produce all documents, electronically stored information, and tangible things on which you base any computation of your damages in this action (including materials bearing on the nature and extent of injuries suffered), including, but not limited to, all raw data and computation sheets upon which the amount of each claim for damages is based, and medical bills, balance sheets, financial statements, pay stubs, and federal, state, and local tax returns.

**RESPONSE:** Please see Plaintiff's economic expert's report Bates numbered BrighamR_PlaintiffRecords0708-0766, which contains detailed information responsive to this Request.

**REQUEST FOR PRODUCTION NO. 23:**

Produce all documents, electronically stored information, and tangible things that relate to, reflect, or show your medical condition(s), evaluation of any medical condition(s), and/or treatment for any medical condition(s) including, but not limited to, medical records, treatment plans, and correspondence with medical professionals, insurance carriers, Frontier, and/or any other individual or entity regarding such conditions from May 24, 2007 to the present.

**RESPONSE: OBJECTION: This Request is overly broad, unduly burdensome, seeks**

to invade Ms. Brigham's privacy, and seeks information that is not relevant to any claims or defenses asserted in this lawsuit. While Defendant is entitled to discovery on relevant medical conditions suffered by Plaintiff, Defendant is not entitled to discovery on *any* medical conditions suffered by Plaintiff from 2007 to present. Notwithstanding, Plaintiff invites conferral on this Request so that she may provide properly responsive information, if it exists.

## VERIFICATION

I, Rebecca Brigham, hereby certify that I have read the foregoing responses to Defendant's First Set of Written Discovery Requests, and the factual assertions contained herein are true and accurate to the best of my current knowledge. I will revise or supplement these responses, if needed, as additional facts become known.

/s/ Rebecca Brigham
Rebecca Brigham

Respectfully served this 1st day of June, 2020.

THE LAW OFFICE OF JOHN R. CRONE, LLC

/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2020, a true and correct copy of the foregoing *Plaintiff's Responses to Defendant's First Set of Written Discovery Requests Directed to Plaintiff* including any exhibits or documents, was served upon Defendant via electronic mail through its attorneys of record.

By:   /s/ John R. Crone
John R. Crone

## Treatment Plan

**Name:** Rebecca Brigham

**Date of Update:** 5/1/2015

**DMS Diagnosis:**
Axis I: Generalized Anxiety Disorder
Diagnostic Criteria: changes in heart rate, change in breathing pattern, fearful, feels frozen.

**Code #:** 300.02

Axis I (Secondary): Alcohol Withdrawal
Diagnostic Criteria: in recovery.

**Code #:** 291.81

Axis II: No diagnosis.
Diagnostic Criteria:

**Code #:** V71.09

Axis III: Thyroid removed September 2011

**Axis IV (Circle):**

| | | | | |
|---|---|---|---|---|
| Problems with primary support group | Yes / No | Problems related to the social environment | Yes / No |
| Educational Problems | Yes / No | Occupational Problems | Yes / No |
| Housing Problems | Yes / No | Economic Problems | Yes / No |
| Problems with access to healthcare services | Yes / No | Problems related to interaction with the legal system/crime | Yes / No |
| Other psychosocial and environmental problems | Yes / No | | |

**Axis V:**

**Current GAF:** 67

**Highest GAF in past year:**

**Client's Goals for Treatment:**

1. Continued self-regulation skill set enhancement and utilization.
   a. Objective: meditation, reading AA big book, gardening, utilising prayer
2. Rebecca would like to embrace and increase self-love, self-worth, and self-esteem.
   a. Objective: Rebecca will engage in a workbook regarding yogic philosophy on the yamas and niyamas via reading and journaling.
   b. Objective: Rebecca will reflect and write down the positive things she has done over the course of time to remind herself of her positive elements.
   c. Objective: Rebecca will utilize the first yama (non-violence) oh self by reducing the amount of negative self-talk.
3. Rebecca will improve her health and mental health by slowly shifting her diet and nutrition base.
   a. Objective: Practicing mindfulness during meal times.
   b. Objective: Will grow a garden for food.

**Treatment Plan (Long-term goals):**
Rebecca would like to maintain sobriety throughout the lifespan. The listed goals are the pathway she has chosen to guide her through recovery and into sobriety.

**Criteria for Discharge:**
Rebecca will have maintained a full-time job without modifications for 6 full months.

**Estimated Length of Treatment, Modality, and Frequency:**

1. Individual treatment, one to two times monthly for six months (to be evaluated at that time).
2. Group therapy, weekly for six months (to be evaluated at that time).

Marie M. Madrid, LCSW

**Primary Therapist**

1 May 15

**Date**

Rebecca L. Brigham

**Client/Guardian Signature**

5-21-15

**Date**

Name: Rebecca Brigham                                    Date of Update: 5/1/2015

Additional Information:
Rebecca has identified triggers to cravings and opportunities to consume alcohol and those are on over night trips or anything longer than a given work day in her professional arena. At this time it would not be a good idea to encourage a vulnerable situation with a work schedule that serves as a temptation, if possible. Her treatment plan and progress towards goals will be reviewed every 90 days.



Frontier Airlines, Inc.
7001 Tower Road
Denver, Colorado 80249

Rebecca L. Brigham
831 Centennial Drive
Bennett, CO 80102

Dear Rebecca

Congratulations on completion of your Substance Abuse Program and beginning the process of returning to work.  Per company policy, you must complete a Non-DOT Return-To-Work drug (UA) and alcohol (BAT) test before you may be allowed to return.  Upon receipt of verified negative results from these tests, you will be released to return to your scheduled shifts.  Based on the letter I received from John H. Chapman your EAP Case Manager with Ceridian, your follow-up requirements is as follows:

- Random UA testing 12 times for first year.
- Weekly individual sessions for 6 months, followed by 6 months of weekly group sessions

All of these requirements have been determined by your Substance Abuse Professional (SAP) and are expected to cause very little conflict with your work schedule (with minimal flexibility provided by the Company depending on the program schedule).  If you have issues completing any of these requirements outside of your normal work hours, you must contact me immediately.  This contact must be done proactively, not at time of report or the day before.  Doing so, will result in non-compliance and may be grounds for termination.

As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP.  Documentation of compliance may be requested by the Company at any time and non-compliance with any recommended treatment, aftercare or testing may result in your removal from the performance of your job duties and cause you to be subject to disciplinary action, up to and including termination of employment.

Again, congratulations on your success!  Please feel free to contact me if you need additional assistance.

Regards,



Chris Benedict
Manager, Staffing and Compliance (ADPM), DER
Frontier Airlines, Inc.
Christopher.Benedict@flyfrontier.com



## Association of Flight Attendants-CWA
## AFL-CIO

# Frontier Airlines
# Flight Attendant Contract

# 2011-2016

FRONTIER AIRLINES (R. BRIGHAM) - 0000815

ESI00000796-1

**EXHIBIT**

1
292

FRONTIER AIRLINES (R. BRIGHAM) - 0000816

293

ESI00000796-2

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1 | Recognition and Scope | 1 |
| Article 2 | Definitions | 3 |
| Article 3 | Compensation | 8 |
| Article 4 | Hours of Service and Crew Legality | 14 |
| Article 5 | Crew Planning and Crew Scheduling | 21 |
| Article 6 | Reserve Flight Attendants | 53 |
| Article 7 | Training | 68 |
| Article 8 | Sick Leave | 70 |
| Article 9 | Vacation | 75 |
| Article 10 | Seniority | 80 |
| Article 11 | Uniforms | 83 |
| Article 12 | Leaves of Absence | 84 |
| Article 13 | Vacancies | 91 |
| Article 14 | Furlough | 93 |
| Article 15 | Moving Expenses | 96 |
| Article 16 | Union Activities | 98 |
| Article 17 | Union Security and Dues Check-Off | 100 |
| Article 18 | Grievance Procedure | 105 |
| Article 19 | System Board of Adjustment | 109 |
| Article 20 | Missing, Internment, Hostage, or Prisoner of War Benefits | 112 |
| Article 21 | Drug and Alcohol Testing | 114 |
| Article 22 | Safety, Security, Health and EAP | 115 |
| Article 23 | General | 117 |
| Article 24 | Equity, Profit Sharing, and Wage Benefit Snapbacks | 121 |
| Article 25 | Duration | 123 |

FRONTIER AIRLINES (R. BRIGHAM) - 0000817
294
ESI00000796-3

FRONTIER AIRLINES (R. BRIGHAM) - 0000818

ESI00000796-4

# INDEX

**AFA, Association**
 AFA Insignia ........................................................................................................... 99
 Bulletin Board ......................................................................................................... 98
 Definition ................................................................................................................... 3
 Delinquent Dues ................................................................................................... 100
 Dues Check Off ............................................................................................. 102-104
 Dues Deduction ................................................................................................... 104
 Flight Pay for Union Business ................................................................................ 99
 New Hire ................................................................................................................. 98

**Alcohol Testing** ................................................ see Drug and Alcohol Testing

**Artificial Credit** ..................................................................................... 3,23,31,34

**Arbitration** ............................................................................................................ 2

**Available to Assign (AVA)** .................................................................................. 45
 Automated Bid System Error ............................................................................ 26, 38
 Credit Balancing .............................................................................................. 31,34
 Definition .................................................................................................................. 3
 Double Coverage .................................................................................................. 46
 Eligible to Bid ....................................................................................................... 23
 Non-Awarded Opentime ........................................................................................ 39
 Open Time (DROP, SWAP) .............................................................................. 33, 34
 Pay ......................................................................................................................... 10
 Rest Conflict ........................................................................................................... 17
 Return from Leave ............................................................................................ 84-85

**Base Transfer** ...................................................................... see Vacancies

**Bidding**
 Aggressive Reserve ................................................................................................ 54
 Bid Period Time Table ........................................................................................... 22
 Eligible to bid ......................................................................................... 22-23, 84, 88
 Error ..................................................................................................... 26, 27, 35, 38
 Initial Bid .......................................................................................................... 24-25
 Mis-bid .................................................................................................................. 25
 Mixed Line .............................................................................................................. 61
 Pre-Award .......................................................................................................... 26-27
 Results Page .......................................................................................................... 29
 Training ............................................................................................................... 27-28
 Vacancies ............................................................................................................... 91
 Vacation ........................................................................................................... 76-78

**CDO (Stand-up)** ...................................................................................... 4, 28, 45

**Cancelled Flight(s)**
 Commuter Corrective Action Protection ............................................................... 118
 Declared Irregular Ops ..................................................................................... 47-48
 Pay Protection .................................................................................................. 10-13
 Per Diem ............................................................................................................. 9-10
 Reassignment ................................................................................................... 41-45

FRONTIER AIRLINES (R. BRIGHAM) - 0000819
296
ESI00000796-5

**Charter Flights**.................................................................................................................51-52
    Definition...................................................................................................................... 4
    Onboard Charter Coordinator...........................................................................................52
    Premium Service...........................................................................................................52
    Reschedule...................................................................................................................42
    Report Time .........................................................................................................17-18
    Schedule Changes......................................................................................................... 21
    Scope............................................................................................................................1

**Check- In**
    Deadhead Deviation ................................................................................................49-50
    Per Diem.................................................................................................................. 9-10
    Report Time..............................................................................................................17-19

**COLA**.................................................................................................................85
    Definition ......................................................................................................................4
    Reduction in Force......................................................................................................... 93
    Vacation Adjustments..................................................................................................... 77

**Commuter, Flight Attendant (FAC)**
    Definition.......................................................................................................................5
    Policy ................................................................................................................117- 119

**Company Business**
    Commuter Protection....................................................................................................118
    Duty Limitations..................................................................................................... 15, 26
    Eligible to Bid.............................................................................................................. 22
    Jumpseat.................................................................................................................... 118
    Paid Time Off............................................................................................................... 10
    Pay............................................................................................................................. 12
    Pre-Award .........................................................................................................26-27, 29
    Reserve ...........................................................................................................55, 67
    Sick Leave Replenish.....................................................................................................71
    Trips Dropped............................................................................................................... 33
    Vacation Slides............................................................................................................. 29

**Compensation  (Article 3)**................................................................................................ 8-13
    Automated Bid System Cost.......................................................................................... 9-10
    Company Business.....................................................................................................12-13
    Deadhead  (credit added to monthly block)............................................................................ 12
    Expenses Away From Base/ Per Diem............................................................................... 9-10
    Furlough ..................................................................................................................... 94
    Holiday… ..................................................................................................................... 11
    Hourly Rate.................................................................................................................8-9
    Irregular Operations ..................................................................................................12-13
    Junior Assignment ........................................................................................................ 12
    Missing/Hostage/POW Benefits .................................................................................112-113
    Moving Expenses ..................................................................................................... 96-97
    Paid Time Off...............................................................................................................10
    Parking.......................................................................................................................11
    Pay Dates ...................................................................................................................8-9
    Reschedule/Reroute ................................................................................................. 10-11
    Sick.......................................................................................................................... 73
    Training ..................................................................................................................... 11
    Union Business.............................................................................................................99

FRONTIER AIRLINES (R. BRIGHAM) - 0000820
297
ESI00000796-6

**Contract / Agreement**
Definition........................................................................................................................... 3
Duration...........................................................................................................................123
Printing and Distribution.................................................................................................. 98
Recognition/Scope/Successorship.................................................................................. 1-2

**Credit Balancing**.................................................................................................22, 31, 34, 63

**Crew Accommodations/Hotel**............................................................................................ 20
Company Business............................................................................................................ 12
Declared Irregular Ops...................................................................................................... 48
Out of Base.................................................................................................................. 9, 20
Ready Reserve.................................................................................................................. 56

**Crew Planning and Crew Scheduling  (Article 5)** ................................................... 21-52
Bid Period Time Table....................................................................................................... 22
Declared Irregular Ops ................................................................................................ 47-48
Displacement.................................................................................................................... 47
Double Covered................................................................................................................ 46
Equipment Downgrade...................................................................................................... 47
Errors ......................................................................................................26, 27, 35,38, 46
Notification of a Flight Attendant....................................................................................... 44
Pre-Award.....................................................................................................26-29, 64,65, 78, 79
Returning From Leave Mid Month (Table)......................................................................... 24
Roles and Responsibilities................................................................................................ 21
Schedule Changes/Reassignments...............................................................................41-45
Trade Board Transfer........................................................................................................ 38

**Daily Open-Time** .................................................................**see  Open Time**

**Day(s) Off**
Definition............................................................................................................................ 4
Guaranteed – Lineholder................................................................................................... 19
Guaranteed – Reserve ...............................................................................................19, 53
Irregular Operations .............................................................................................12, 13, 15, 16
Schedule construction/adjustments ...............................................................16,17,19,25,33

**Deadhead (DH)** ...........................................................................................................48-51
Compensation – Lineholder .......................................................................................12,13
Compensation – Reserve.................................................................................................. 12
Definition............................................................................................................................ 4
Deviation ....................................................................................................................49-51
Report time.................................................................................................................. 18,19
Reroute.............................................................................................................................. 43

**Declared Irregular Ops (DIO)** ....................................................................................47-48

**Definitions** ..................................................................................................................  3-7

**Discipline**.............................................................................**see Grievance Procedure**

**Displacement**
Flight..........................................................................................................................47, 120
Furlough...................................................................................................................... 93, 94

**Diversion**......................................................................................................................... 12

FRONTIER AIRLINES (R. BRIGHAM) - 0000821
298
ESI00000796-7