No. 21-1335

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

REBECCA BRIGHAM,
*Plaintiff-Appellant,*

v.

FRONTIER AIRLINES, INC.,
*Defendant-Appellee.*

———————————————

**On Appeal from the United States District Court for the District
of Colorado (Civil Action No. 19-cv-03417-WJM-STV, Hon.
William J. Martinez)**

---

**APPENDIX – VOLUME 2**

---

John R. Crone
*Counsel of Record*
The Law Office of John R.
Crone, LLC
2717 South Forest Street
Denver, CO 80222
(303) 598-3526
john@crone-law.com

*Counsel for Rebecca
Brigham*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Plaintiff's Motion for Partial Summary Judgment with Exhibits          299-452

Defendant's Motion for Summary Judgment with Exhibits          453-596

Double Covered.......................................................................................................................46

Drug and Alcohol Testing (Article 21) ................................................................................. 114

Dues...................................................................see Union Securities and Dues Check Off

**Duty Periods/Duty Time**
    Definition........................................................................................................... 4
    Limitations....................................................................................................14-15
    End of Duty..............................................................................................15, 114
    Extension...........................................................................................................15
    Reserve Release...............................................................................................57

Emergency Leave..........................................................................................................4, 89

Equity, Profit Sharing, and Wage Benefit Snapbacks (Article 24).......................................121-122
    Additional Provisions....................................................................................... 122
    Equity Participation........................................................................................... 121
    Profit Sharing Program .............................................................................. 121-122
    Snapbacks..................................................................................................... 122

Equipment Downgrade.................................................................................................46-47

Family Medical Leave (FMLA)..........................................................................................85
    Bidding..................................................................................................22, 33,77
    Ineligible for/Exhaustion of..................................................................................86
    Returning from Intermittent.................................................................................84
    Sick Leave........................................................................................................87

Funeral Leave..........................................................................................10, 55, 84, 88- 89

Furlough (Article 14).......................................................................................................93-95
    Definition............................................................................................................5
    Dues............................................................................................................... 104
    Pay and Benefits............................................................................................... 93
    Recall................................................................................................................ 93
    Seniority.....................................................................................................80, 82
    Transfer to Other Department Prior to Furlough ............................................... 93-94
    Unused Accrued Vacation.........................................................................64, 65, 75

Grievance Procedure  (Article 18)...............................................................................105-108
    General........................................................................................................... 105
    Grievance Review Meetings ............................................................................. 108
    Investigations – Discipline and Discharge.................................................... 105-106
    Process........................................................................................................ 106-108
    Time Limits & Submissions............................................................................... 108

**Holiday**
    Pay.......................................................................................................11, 84, 88
    Recognized.........................................................................................................11
    Snapback.........................................................................................................122
    Staffing............................................................................................................. 36
    Verification of Illness......................................................................................73-74

Hotel..........................................................................................see Crew Accommodations

FRONTIER AIRLINES (R. BRIGHAM) - 0000822
299
ESI00000796-8

**Irregular Ops**
Definition...................................................................................................................5
Duty Time Limitations......................................................................................... 13-15
Junior Assignment.................................................................................................. 40
Open Time Live ................................................................................................36-37
Pay ...................................................................................................................12-13
Re-Route ......................................................................................................... 43-44
Reschedule............................................................................................................. 42
Reserve Trip from Opentime..........................................................................41, 58
Reserve Trip from Trade.................................................................................41, 59
Rest Limitations.....................................................................................15-17,19,28

**Job Share**
Definition....................................................................................................................4
Initial Bid........................................................................................................... 25-26
Sick Accrual............................................................................................................ 70
Vacation Accrual..................................................................................................... 76

**Junior Assignment**...........................................................................................40-41
Definition ................................................................................................................. 5
Pay.......................................................................................................................... 12

**Jury Duty** ................................................................................................................ 89
Pay....................................................................................................................10, 84
Pre-Award................................................................................................................26

**Leaves of Absence  (Article 12)**...................................................................... 84-90
Company-Offered Leave......................................................................................... 85
Emergency Leave (EMR)........................................................................................ 89
Family Medical Leave............................................................................................. 85
Funeral Leave.................................................................................................... 88-89
General Guidelines................................................................................................. 84
Jury Duty Leave...................................................................................................... 89
Maternity Leave................................................................................................. 85-86
Medical Leave....................................................................................................86-87
Military Leave.......................................................................................................... 90
On-the-Job Injury (OJI)...................................................................................... 87-88
Personal Leave....................................................................................................... 88
Returning from Intermittent Leave of Absence................................................. 84-85
Returning from Leave of Absence.......................................................................... 84

**Legalities**
Duty................................................................................................................... 14-15
Responsibility................................................................................................14, 21, 26
Rest.................................................................................................................. 15-17
Schedule Construction............................................................................................19

**Low-Time Flight Attendants**.............................................................................29-32
Definition.................................................................................................................. 6
Returning from Leave Mid-Month............................................................................24

**Management Rights**......................................................................................... 120

**Maternity Leave**............................................................................................. 85-86
Uniform.................................................................................................................. 83

FRONTIER AIRLINES (R. BRIGHAM) - 0000823
300
ESI00000796-9

**Medical Leave**..................................................................................................................... 86-87

**Merger Protection**...............................................**see Recognition and Scope**

**Military Leave**...........................................................................................................................90

**Minimum Credit Requirements**...............................................................................................31, 34

**Moving Expenses  (Article 15)**...........................................................................................96-97
    Eligibility.............................................................................................................................. 96
    General............................................................................................................................... 97
    Moving Benefits..............................................................................................................96-97
    Moving Days....................................................................................................................... 97

**On-the-job Injury (OJI)**
    Eligible to Bid..................................................................................................................... 22
    Leave of Absence ...........................................................................................................87-88
    Medical Fees...................................................................................................................... 72
    Returning to Work............................................................................................................... 84
    Sick Call............................................................................................................................. 72
    Vacation Bidding................................................................................................................. 77

**Onboard Charter Coordinator (OCC)**....................................................................................... 52

**Open Time** ............................................................................................................................32-36
    Errors...............................................................................................................................38-39
    Minimum Connection Time.............................................................................................. 33-54
    Minimum Credit Requirements........................................................................................ 34-35
    Non-Awarded Opentime Trips............................................................................................. 39
    Open Time Live.........................................................................................................32, 35-36
    Open Time Split........................................................................................................32, 36
    Sick bank replenishment.................................................................................................70-71
    Timeline..........................................................................................................................35-36

**Overtime**
    Funeral Leave.....................................................................................................................88
    Hours over 86 ......................................................................................................................8
    Jury Duty.............................................................................................................................89
    Reserve...........................................................................................................................58-59
    Sick...................................................................................................................................73

**Pay/Pay Rate**...........................................................**see Compensation**

**Personal Leave**.................................................................................................................... 88

**Positive Contact**
    Furlough Recall................................................................................................................... 95
    Reroute............................................................................................................................... 45
    Sick Calls............................................................................................................................ 71

**Pre-Award Periods** .............................................................................................................26-28

**Probation/Probationary Flight Attendant**.............................................................82, 100. 103, 104, 107

**Ready Reserve**..................................................**see Reserve Flight Attendants**

FRONTIER AIRLINES (R. BRIGHAM) - 0000824
301
ESI00000796-10

**Recognition and Scope  (Article 1)**............................................................................1-2
    Definitions..............................................................................................................2
    Expedited Arbitration...........................................................................................2
    Merger Protection................................................................................................2
    Recognition ..........................................................................................................1
    Scope.....................................................................................................................1
    Successor...........................................................................................................1-2

**Recurrent Training  (RGS)**
    Pay...................................................................................................................... 11
    Pre-award.....................................................................................................26-27, 29
    Requirements for Attending................................................................................68
    Reserves.........................................................................................................53, 55
    Rest requirements............................................................................................. 15
    Trading Dates.................................................................................................68-69

**Reduction in Force (RIF)**...........................see COLA or Furlough

**Red-Eye**
    AVA...................................................................................................................... 45
    Definition.................................................................................................................6
    Reserve Assignments..................................................................................... 56
    Spanning Bid Periods.................................................................................. 28-29

**Report Time**
    Definition............................................................................................................. 6
    Limitations.....................................................................................................17-19
    Reserve.........................................................................................................53-54
    To Aircraft........................................................................................................ 19

**Reserve Flight Attendants  (Article 6)** .................................................. 53-67
    Absence Proration Table ...........................................................................53
    Aggressive Reserve Assignments ...........................................................54-55
    Codes............................................................................................................. 66-67
    Contact and Report Time Guidelines ......................................................53-54
    General ............................................................................................................ 65
    Mixed Lines...................................................................................................61-65
    Ready Reserve (Airport Standby).............................................................56-57
    Red-eye Assignments................................................................................ 56
    Release From Duty .....................................................................................57-58
    Reserve Codes.............................................................................................66-67
    Schedule Adjustments..................................................................................58-60
    Short Call List .............................................................................................60-61
    Trip Assignment Process ...........................................................................55-56
    Vacation...........................................................................................................65

**Rest Time**
    24 Hour.......................................................................................................... 16-17
    Contact During................................................................................................44,55
    Extended Duty................................................................................................. 14
    Following Red-Eye (Reserve)............................................................................ 56
    In Base......................................................................................................... 15-16
    Out of Base.......................................................................................................15
    Scheduled.......................................................................................................... 19
    Training.....................................................................................................15, 28, 53

**Retirement Recognition** ......................................................................119-120

FRONTIER AIRLINES (R. BRIGHAM) - 0000825
302
ESI00000796-11

**Safety, Security, Health and EAP  (Article 22)**...............................................................115-116
   Accident/Hijacking ....................................................................................... 116
   Air Safety, Health and Security Committee ................................................... 115
   General ......................................................................................................... 115

**Schedule Changes/Reassignment**
   AVA.....................................................................................see Available to Assign
   Cancellation................................................................................................... 41
   Charter............................................................................................................51
   Pay..........................................................................................................10-11, 41
   Reroute............................................................................................ 42-44, 46, 47, 50
   Reschedule.....................................................................................41-42, 46, 47, 50

**Seniority (Article 10)** ...............................................................................80-82
   Accrual.............................................................................................................80
   Definition...........................................................................................................7
   Probation..........................................................................................................82
   Protest of Seniority List ................................................................................. 81-82
   Seniority Rights Forfeited.................................................................................82
   Transfers ..................................................................................................... 80-81
   When Seniority Will Not Govern..................................................................... 80

**Short Call**
   Definition...........................................................................................................7
   Report Time.........................................................................................17, 18, 54, 60
   Short Call List................................................................................................ 60-61

**Sick Leave   (Article 8)** ............................................................................... 70-74
   Accrual..........................................................................................32, 70, 84,  112
   Replenishment of Sick Bank..........................................................................70-71
   Sick Calls....................................................................................................71-73, 93
   Pay Policy...................................................................................................10 , 73
   Use of Sick Leave.......................................................................................70, 86-87
   Verification of Illness/Injury ......................................................................... 73-74

**Standing Bid**.......................................................see Vacancies

**System Board of Adjustment  (Article 19)** ...........................................109-111
   Documents, Witnesses, Evidence and Representation.....................................110
   Establishment.................................................................................................109
   Executive Session...........................................................................................110
   Expenses –Arbitrator/Witnesses/Hearing ......................................................111
   Jurisdiction .................................................................................................109-110
   Location of Board Hearing ..............................................................................110
   Membership....................................................................................................109

**Trades**
   Definition...........................................................................................................7
   Errors..........................................................................................................38-39
   Mixed Line..................................................................................................59, 63-64
   Reserve.......................................................................................................56, 58-59
   Rest Requirements...................................................................................... ......16
   Scheduled Connect Time..................................................................................33
   Timeline.....................................................................................................22, 35-36
   TradeBoard.............................................................................23, 26, 32, 37-38
   TradeBoard Transfer.................................................................................. ..38

FRONTIER AIRLINES (R. BRIGHAM) - 0000826
303
ESI00000796-12

Training..................................................................................................28, 68-69
Vacation ..............................................................................................78, 85,89

**Training (Article 7)**.................................................................................68-69
Bidding...................................................................................................27-28
Classroom Requirements............................................................................ 68
Pay.............................................................................................................. 11
Requirements for Attending Recurrent Training............................................. 68
Rest.................................................................................................15, 28, 53
Trading Recurrent Training Date................................................................68-69
Training Out of Base..................................................................................20. 69

**Transition** ...................................................................................................28

**Uniforms (Article 11)**................................................................................. 83
Credit and Maintenance ..........................................................................83
Purchase of Initial Uniform...........................................................................83

**Union Activities (Article 16)**.................................................................. 98-99
Committess and Insignia................................................................................ 99
Flight Pay Loss..............................................................................................98
Leave .......................................................................................................98-99
Union Business...........................................................10, 26, 27, 29, 55, 98, 99

**Union Security and Dues Check-Off (Article 17)**.............................100-104
Agency Shop...............................................................................................100
Deduction.....................................................................................................104
Delinquent.................................................................................................... 100
Dues Check-Off (DCO)..........................................................................102-104
Review Procedure.................................................................................101-102
Strike or Work Stoppage..............................................................................104
Waived Dues............................................................................................... 104

**Vacancies (Article 13)**........................................................................... 91-92
Awarding and Assignment of Vacancies ................................................ 91-92
Base Swaps................................................................................................. 92
Low Time..................................................................................................... 30
Notice of Vacancy.........................................................................................91
Standing Bids................................................................................................91

**Vacation (Article 9)** ............................................................................... 75-79
Accrual............................................................................32, 75-76, 84, 112
Bid Periods ................................................................................................ 78
Bidding.....................................................................................................76-78
Credit...................................................................................................65, 76
During Leaves.............................................................85, 86, 87, 88, 89, 90
General.........................................................................................................75
Junior Assignment........................................................................................ 40
Mixed line.................................................................................................64-65
Paid Time Off...............................................................................................10
Reserve........................................................................................................ 65
Slides..........................................................................26, 27, 29, 78-79
Trades.......................................................................................................... 78
Transition Conflict........................................................................................ 28
Unused..............................................................................64, 65, 75, 94

**Willing to Fly**..................................................................................39, 40, 58, 119

FRONTIER AIRLINES (R. BRIGHAM) - 0000827
304
ESI00000796-13

FRONTIER AIRLINES (R. BRIGHAM) - 0000828
305
ESI00000796-14

## ARTICLE 25
## DURATION

A.    This Agreement will become effective on the date of signing and will
      continue in full force and effect until March 1, 2016 and will renew itself
      without change until each succeeding March 1 thereafter unless written
      notice of an intended change is served in accordance with Section 6, Title
      1, of the Railway Labor Act, as amended, by either party hereto at least 30
      days, but no more than 240 days, prior to March 1, 2016 or any March 1 of
      any subsequent year.

B.    Notwithstanding paragraph A. above, during the duration of this Agreement
      should Frontier Airlines, Inc. earn more than a 5% annual pretax profit, after
      payment of profit sharing payments, if any, for any two consecutive years,
      then the Association may reopen this Agreement for the limited purpose of
      negotiating over rates of pay, with the goal of achieving rates consistent
      with peer group (LCC) Flight Attendants.

C.    This Agreement shall be effective August 29, 2011 and shall remain in full
      force and effect as outlined by the terms of this Article.

      IN WITNESS WHEREOF, the undersigned parties have signed this
      Agreement this 14 day of October, 2011.

FOR ASSOCIATION OF FLIGHT
ATTENDANTS – CWA, AFL-CIO                    FOR FRONTIER AIRLINES, INC.


_____                    _____
Veda Shook                                   Ron Henson
International President                       Vice President – Labor Relations

_____                    _____
Erika Schweitzer                             Jacalyn Peter
MEC President                                Sr. Manager of Labor Relations

_____
Darol Glasscock
Negotiating Committee Member

_____
Theresa Owens
Negotiating Committee Member

_____
Suzanne Balzer
AFA-CWA Negotiator


Page 123 of 124

FRONTIER AIRLINES (R. BRIGHAM) - 0000829

ESI0000073015

FRONTIER AIRLINES (R. BRIGHAM) - 0000830
307
ESI00000796-16

**Memorandum of Understanding**
**between**
**Association of Flight Attendants-CWA, AFL-CIO**
**and**
**Frontier Airlines, Inc.**

**SCHEDULING AMENDMENTS AND CORRECTIONS**

This agreement is made and entered into accordance with the provisions of the Railway Labor Act, as amended, by and between Frontier Airlines, Inc. ("Company") and the Flight Attendants in the service of Frontier Airlines, Inc., as represented by the Association of Flight Attendants-CWA (the "Association").

The parties agree to the following:

I.    CBA Article 5.W.2.h of the collective-bargaining agreement is amended as follows:

   h.    ~~If Crew Scheduling is unable to reach the Flight Attendant before he/she departs for the airport and he/she reports for the original departure time, his/her duty day begins at the originally scheduled report time.~~

II.    CBA Article 5.W.3.k.l.m of the collective-bargaining agreement will be amended to read:

   k.    When a Flight Attendant's originating trip of the day is delayed and he/she is notified prior to leaving for the airport, the trip report time will be modified by Crew Scheduling and the duty day will reflect the new report time.

   l.    If Crew Scheduling is unable to reach the Flight Attendant before he/she departs for the airport and he/she reports for the original departure time, his/her duty day begins at the originally scheduled report time.

   m.    A Reroute will be considered an irregular operation if the crew has reported for duty.

FOR:                                                         FOR:

FRONTIER AIRLINES, INC.                                      ASSOCIATION OF FLIGHT
                                                             ATTENDANTS-CWA, AFL-CIO

Jacalyn Peter                                               Kathie Weis
Director, Human Resources                                   MEC President
and Labor Relations

CC. Toni Higgins
    Jay Trumble

0308

**Letter of Agreement**
**between**
**Association of Flight Attendants-CWA, AFL-CIO**
**and**
**Frontier Airlines, Inc.**

**SCHEDULING AMENDMENTS AND CORRECTIONS**

This agreement is made and entered into accordance with the provisions of the Railway Labor Act, as amended, by and between Frontier Airlines, Inc. ("Company") and the Flight Attendants in the service of Frontier Airlines, Inc., as represented by the Association of Flight Attendants-CWA (the "Association").

The parties agree to the following:

I.   Article 4.C.2 of the collective-bargaining agreement is amended as follows:

| Scheduled Duty | Minimum Base Rest | Reducible to (Irregular ops) | Minimum Layover Rest | Reducible to (Irregular ops) |
|---|---|---|---|---|
| 14 hours or less | 10 hours | 9 hours | 9 hours | 8 hours* |
| Over 14 hours | 12 hours** | 10 hours** | 12 hours** | 10 hours** |
| All cases | 1 calendar day every 7 days | 24 hours every 7 days | 1 calendar day every 7 days | 24 hours every 7 days |

*Compensatory rest of 10 hours required to follow.
**Can be scheduled as reduced rest provided compensatory rest of 14 hours is scheduled.

II.   Article 4.B. of the collective-bargaining agreement is amended to read:

   11.   Provided that the duty period does not exceed sixteen (16) hours, a pairing may include a deadhead or limo back to domicile on the last day of the pairing.

      a.   Because the Flight Attendant(s) is no longer a required crew member, the rest requirements of 121.467 do not apply.

      b.   The Flight Attendant(s) will not be required to be available for reassignment, junior assignment or any company duty other than the deadhead or limo back to domicile.

      c.   If there are no seats available on the scheduled flight and the deadheading Flight Attendant does not want to occupy the jumpseat, the Company will provide a hotel room if a rest period is required prior to the next available flight.

      d.   The Flight Attendant(s) will have a minimum rest period of twelve (12) upon return to domicile

III.   Article 16.B.3. of the collective-bargaining agreement is amended to read:

      d   Company-Paid Flight Pay Loss

0309

FRONTIER AIRLINES (R. BRIGHAM) - 0000832

309
ESI00000796-18

> The Company will provide up to forty (40) hours of flight-pay loss per bid month
> to the Association for the purpose of compensating members of the Association's
> Scheduling Committee.  The MEC President shall be responsible for directing the
> Company how to apply such hours.  The hours will only be used for bid pairing
> and bid run purposes.  The Company and Union will mutually agree on
> participants.

IV.   Section I of this Sideletter of Agreement is a permanent change to the collective-
bargaining agreement.  Sections II and III will apply only for the first three bid periods
after the Date of Signing of this Agreement (*i.e.*, May, June and July 2012).  The parties
may choose to extend the duration by written agreement.

FOR:                                                    FOR:

FRONTIER AIRLINES, INC.                                 ASSOCIATION OF FLIGHT
                                                        ATTENDANTS-CWA, AFL-CIO

_____ Date: 5-11-12                           _____ Date: 5-11-12
Jacalyn Peter                                           Kathie Weis
Director, Human Resources                               MEC President
and Labor Relations

                                                        _____ Date: 6-11-12
                                                        Kimberley Chaput
                                                        AFA Staff Negotiator

                                                        _____ Date: 6-26-12
                                                        Veda M. Shook
                                                        International President

0310

FRONTIER AIRLINES (R. BRIGHAM) - 0000833

310
ESI00000796-19

**LETTER OF AGREEMENT**
**Between**
**FRONTIER AIRLINES, INC.**
**and the**
**FLIGHT ATTENDANTS**
**in the service of**
**FRONTIER AIRLINES, INC.**
**As represented by the**
**ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO**

## CONTINUOUS DUTY OVERNIGHT (CDO) and FERRY FLIGHTS

This Letter of Agreement is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Frontier Airlines, Inc. (the Company) and the Flight Attendants in the service of Frontier Airlines, Inc. as represented by the Association of Flight Attendants-CWA, AFL-CIO (the Union).

The undersigned parties agree as follows:

## CONTINUOUS DUTY OVERNIGHT (CDO)

1. As is past practice at Frontier Airlines, Inc., a Continuous Duty Overnight (CDO) is an overnight with less than contractually required minimum rest and will continue to be paid and credited at 6 hours or actual flight time, whichever is greater.

2. CBA Article 2.17. shall be amended to read as follows:

   **CDO (Continuous Duty Overnight/Standup)** – A scheduled duty period that begins in one Calendar Day and ends in the following Calendar Day, which includes an overnight stay out of Domicile that is scheduled for less than contractually required minimum rest.

## FERRY FLIGHTS

3. A Ferry Flight which positions an aircraft to another location and does not carry revenue passengers is considered a working segment and will receive full pay and credit.

Entered into this *30* day of July, 2012.

Frontier Airlines                                    AFA-CWA

Jacalyn Peter                                        Veda Shook

FRONTIER AIRLINES (R. BRIGHAM) - 0000834

ESI00000796-20
311

Director, Human Resources and
Labor Relations

AFA-CWA International President

Kathie Weis
MEC President

Jay Trumble
Senior Staff Attorney

FRONTIER AIRLINES (R. BRIGHAM) - 0000835

ESI0000070621

# ARTICLE 1
## RECOGNITION AND SCOPE

### A. RECOGNITION

1. In accordance with certification (R-7238) made by the National Mediation Board, the Company hereby recognizes the ASSOCIATION OF FLIGHT ATTENDANTS-CWA as the duly designated and authorized representative of the Flight Attendants in the employ of the Company for the purposes of the Railway Labor Act, as amended.

2. The Company recognizes the right of Flight Attendants on the Frontier Flight Attendant System Seniority List to perform the Company's flying on the Company's aircraft as specified in this Agreement.

### B. SCOPE

1. This Agreement covers all revenue flying performed on Company aircraft by Company Pilots.

2. As used herein, the term "all revenue flying" will include, but not be limited to, all flying over the Company's present or future routes and extensions thereof, and any contract (government, military or commercial) flying, charter flying and any "wet-lease" flying performed by the Company

3. All revenue flying covered by this Agreement will be performed by Flight Attendants whose names appear on the Frontier Airlines, Inc. Flight Attendant System Seniority Lists under the terms and conditions of the Agreement.

### C. SUCCESSOR

1. The provisions of this Agreement will be binding upon any Successor.

2. The Company will require any successor, assign, assignee, transferee, administrator, executor and/or trustee of the Company ("Successor") resulting from the transfer (in a single transaction or in multi-step transactions) to the Successor of the ownership and/or control of all or substantially all of the equity securities and/or assets of the Company (a "Successorship Transaction") to employ the Flight Attendants on the Frontier Airlines System Seniority List in accordance with the provisions of the Agreement and to assume and be bound by the Agreement.

3. The Company and its Affiliates agree to give written notice of the terms of this Agreement to a proposed Successor, before concluding any Successorship Transaction. The Company agrees that no agreement or other legally binding commitment involving a

FRONTIER AIRLINES (R. BRIGHAM) - 0000836
0313

ESI00000796-22

313

Successorship Transaction will be signed or otherwise entered into, unless it is agreed in writing as a material and irrevocable condition of entering into, concluding and implementing the transaction, that this Agreement and recognition of the Association is assumed by the Successor(s), and that the Flight Attendants on the Frontier Airlines Flight Attendants' System Seniority List will be employed in accordance with the provisions of this Agreement. The Company will provide the Association with the details of, and material agreements related to, any such transaction in a timely manner.

D.    **MERGER PROTECTION**

In the event of a merger between the Company and another air carrier (i.e. the combination of all or substantially all the assets of the 2 carriers) where the pre-merger operations are integrated, the integration will be in accordance with Articles 2, 3, and 13 of the Labor Protective Provisions specified by the Civil Aeronautics Board in the Allegheny-Mohawk merger ("Allegheny-Mohawk LLP's"). The term merger as used herein means joint action by the 2 carriers whereby they unify, consolidate, merge, or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them through such separate facilities.

E.    **EXPEDITED ARBITRATION**

Disputes concerning alleged violation of this Article 1 will be resolved by final and binding arbitration on an expedited basis directly before the Flight Attendants System Board of Adjustment sitting with a neutral member. The dispute will be heard no later than thirty (30) days following the submission to the System Board and decided no later than sixty (60) days after submission, unless the parties agree otherwise in writing.

F.    **DEFINITIONS**

1.    "Company" means Frontier Airlines, Inc.

2.    "Control" means the ownership of more than 50% of the outstanding capital stock of an entity or voting securities representing more than 50% of the total voting power of outstanding securities then entitled to vote generally in the election of such entity's board of directors or other governing body.

FRONTIER AIRLINES (R. BRIGHAM) - 0000837
0314

ESI00000796-23

314

## ARTICLE 2
## DEFINITIONS

1.  **Active** – The time a Flight Attendant is available for Duty Assignment or on paid time off.   A Flight Attendant on leave of absence, furlough, or another "no pay" status is not considered active, unless otherwise specified in this Agreement.

2.  **ADD** – To pick up additional trips in order to increase the value of a Flight Attendant's line or to replenish his/her sick bank.

3.  **Affiliate** – As used in this Agreement, the term "Affiliate" refers to: any Parent; any Entity that Controls or manages the Company or any Entity that the Company Controls or manages, or; any Entity under Common Control with the Company, or; any other corporate subsidiary, parent or division of the Company, a Parent or any other Affiliate.

4.  **Agreement (with capital "A")** – This Collective Bargaining Agreement (CBA) including any Letters of Agreement or Memorandum of Understanding between the Company and the Union.

5.  **Artificial Credit** – Unpaid credit used to adjust or build a schedule due to known absences.

6.  **Association** – See *Union*.

7.  **Automated Bid System** – A system that constructs monthly schedules for Flight Attendants based on his/her preference and seniority.

8.  **Available to Assign (AVA)** – A Flight Attendant available for assignment or reassignment per the terms of this Agreement.

9.  **Award** – An assignment given to a Flight Attendant based on his/her individual seniority and bid preferences, or as otherwise provided in this Agreement, as submitted through the Automated Bid System.

10. **Base** – Any geographic locations designated by the Company where Flight Attendants are stationed and their duty assignments are scheduled to begin and end.

11. **Bid** – Preferences submitted by a Flight Attendant through the Automated Bid System.

12. **Bid Period** – A block of time, usually a calendar month, for which Flight Attendants bid and are awarded schedules.  Under no circumstances will a Bid Period be less than 30 days.

13. **Block Hour/Block Time** – The period of time beginning when an aircraft's parking brake is released and the boarding door is closed and ending at Block In.

14.   **Block In -** The time at which an aircraft reaches a destination (generally at a gate), the parking brake is set, and the boarding door is open.

15.   **Calendar day** – Beginning at 0001 and ending at 2400.

16.   **Call-out status** – A period of time when a Reserve Flight Attendant must be available to receive duty assignments from Crew Scheduling.

17.   **CDO (Continuous Duty Overnight/Standup)** - A scheduled duty period that begins in one Calendar Day and ends in the following Calendar Day, which includes an overnight stay out of Domicile that is scheduled for less than FAR required minimum rest.

18.   **Charter** – An offline or online revenue flight that is not a regularly scheduled flight.

19.   **COLA (Company Offered Leave of Absence)** – A voluntary unpaid leave of absence for a period of time as offered by the Company and awarded as described in Article 12.D.

20.   **Company** – Frontier Airlines, Inc.

21.   **Credit/Credit Time/Credit Hour** – The total amount of time added to a Flight Attendants schedule.  Includes block time, company business, training, or any other time used for pay purposes.

22.   **Day off** - A calendar day off free of any duty.

23.   **Deadhead** – Transportation at Company direction to or from a duty assignment.

24.   **Debrief** – The time allowed for completing post flight duties.

25.   **Declared Irregular Operations (DIO)** – A short-term event including weather, airport closure, etc. that significantly disrupts or that is predicted to significantly disrupt at least 25% of the total daily system flight segments.

26.   **Domicile** – *See Base*.

27.   **DROP** – The removal of flight(s) from the Flight Attendant's schedule.

28.   **Duty Assignment-** The assignment of trip or other work by the Company.

29.   **Duty Period/Duty Time** – All time a Flight Attendant is on duty, commencing with report for duty and terminating when a Flight Attendant is released from duty.

30.   **Emergency Leave** – Unpaid time off for unavoidable serious circumstances up to 3 days with the approval of Inflight management.

31.   **Ferry** – A flight that does not transport revenue passengers used to reposition an aircraft to where it is needed.

Page 4 of 123

32.  **Flight Attendant** – An employee of the Company whose name appears on the Flight Attendant Seniority List as defined by Article 10 of this Agreement, and whose duties include the performance of inflight and ground cabin services.

33.  **Flight Attendant Commuter (FAC)** – A Flight Attendant who lives in a different city other than his/her assigned base and commutes to base via air.

34.  **Furlough** – The involuntary removal of a Flight Attendant from active duty as a Flight Attendant due to a reduction in force.

35.  **GO** – Frontier Airlines, Inc., General Offices in Denver.

36.  **Grievance** – A complaint against the Company or another department that alleges contract violations or unfair disciplinary action.

37.  **Ground Time** – The amount of time between flight segments.

38.  **International Flight**– Any flight operating to or from a city outside the United States of America.

39.  **Irregular Operation** – Flights that are delayed or do not operate in accordance with the published schedule because of circumstances such as weather, maintenance, Air Traffic Control, acts of terror, security breaches or other similar circumstances.

40.  **Job Share** – As described in Article 5.E.7., a position offered for one bid period when overstaffing occurs to allow Flight Attendants to work low-time hours.

41.  **Junior Assignment** – An involuntary duty assignment given to a Flight Attendant on a scheduled day off.

42.  **Layover** – An overnight rest period outside the Flight Attendant's base.

43.  **Like Trip** – A replacement trip due to a cancellation, schedule change, or an administrative error.  The replacement trip must fall within the following guidelines: Report time no more than 1 hour prior to the original report time and a release time of no more than 3 hours after the original release time for a "Reschedule" or 2 hours after the original release time for a "Reroute".

44.  **Line** – A bid period award built in accordance with this Agreement that consists of assigned trips, days off, and pre-award requests.

45.  **Line Holder** – A Flight Attendant who has been awarded a line.

46.  **Longevity** – the period of time commencing on the Flight Attendant's date of hire (as a Flight Attendant) which shall begin on the first day a Flight Attendant is scheduled to and reports to the Company's Flight Attendant training program and continuing while the Flight Attendant is active, except where specifically stated otherwise in this Agreement.

FRONTIER AIRLINES (R. BRIGHAM) - 0000840
0317

ESI00000796-26

47. **Low-time** – As described in Article 5.I a position granted for a defined period of time to Flight Attendants who will be awarded between 37:30 and 58 hours and may work up to 59:59 hours per bid period.

48. **Mixed Line** – A bid period award built in accordance with this Agreement that consists of trips, blocks of reserve days, days off, and pre-award requests.

49. **Month -** A calendar month.

50. **Open Time** - Trips or portions of trips that are unassigned or un-awarded with which Flight Attendants may ADD, or SWAP.

51. **Positive Contact** – A live telephone or in-person conversation between a Flight Attendant and the Company.

52. **Pre-award** – Request submitted prior to a bid period to accommodate pre-planned absences including, but not limited to: vacation, scheduled training, Company business, Union days, and jury duty.

53. **Ready Reserve (RR)** – A period of time as defined in this Agreement when a Reserve Flight Attendant is required to be on reserve at his/her base airport or another base airport.

54. **Red-eye** – Any Duty Period, other than a CDO, that reports prior to and releases after, or the entire Duty Period occurs between, 0100 and 0300 Local Base Time.

55. **Release** – Time when a Flight Attendant is relieved from duty.

56. **Report Time -** The time a Flight Attendant is scheduled to report for a flight assignment, training, or other Company-assigned duty.

57. **Reroute -** A change to a trip after 1800 the day prior to initial trip report.

58. **Reschedule –** A change to a trip before 1800 the day prior to an initial trip report.

59. **Reserve** – A Flight Attendant who was awarded a reserve line.

60. **Reserve day** – A calendar day when a Reserve Flight Attendant is available for duty assignment.

61. **Reserve Line --** A bid period award built in accordance with work rules of this Agreement consisting of Reserve days, days off and pre-award requests.

62. **RGS** – Recurrent Ground School code for the automated bid system.

63. **RON** – Remain overnight.

64. **Segment/Leg -** A flight between cities that may or may not terminate in base.

FRONTIER AIRLINES (R. BRIGHAM) - 0000841
0318

ESI00000796-27

318

65.  **Seniority/Seniority Date -** The length of service with the Company as a Flight Attendant.

66.  **Short Call** – A notification from Crew Scheduling to a Reserve Flight Attendant that requires the Flight Attendant to report for a duty assignment no later than 2 hours from the time of the call.

67.  **SWAP** – A trip swap with available Open Time via the automated bid system.

68.  **Time Zones -** Unless otherwise specified all times listed in this agreement are Eastern Time.

69.  **TRADE** – An exchange of flying, vacation or reserve days/duty periods (or other activities as allowed by this Agreement) between two Flight Attendants via the automated bid system.

70.  **Transition -** The period of time when trips may overlap bid periods.

71.  **Trip/Sequence/Pairing –** A segment or series of segments over one or more days that begin and end in a Flight Attendant's base.

72.  **Union –** Association of Flight Attendants – CWA, AFL-CIO

73.  **VAC** – Vacation code for the automated bid system.

74.  **Vacancy** – Open Flight Attendant positions at a specified Base.

75.  **Wet Lease** – An Agreement between the Company and another air carrier in which the Company provides aircraft(s) and crew(s) to the other air carrier.

FRONTIER AIRLINES (R. BRIGHAM) - 0000842
0319

ESI00000796-28

## ARTICLE 3
## COMPENSATION

A. **HOURLY RATE**

| Year of Service | Hourly Rate | Time and a Half Rate |
|---|---|---|
| 0-1 | $19.52 | $29.28 |
| 1-2 | $21.15 | $31.73 |
| 2-3 | $24.13 | $36.20 |
| 3-4 | $25.37 | $38.06 |
| 4-5 | $26.85 | $40.27 |
| 5-6 | $28.20 | $42.30 |
| 6-7 | $30.09 | $45.14 |
| 7-8 | $31.58 | $47.38 |
| 8-9 | $32.64 | $48.96 |
| 9-10 | $34.05 | $51.07 |
| 10-11 | $35.08 | $52.62 |
| 11-12 | $36.13 | $54.19 |
| 12-13 | $37.21 | $55.82 |

1. Flight Attendant pay is based on the hourly rates listed above.

2. Flight Attendant hourly rate is paid for hours flown plus credit time per bid period. Schedules will be evaluated upon completion of the bid period.

3. Flight Attendants will be paid actual or scheduled block time, whichever is greater, for segments flown.

4. Flight Attendants will be paid at their hourly rate for total bid period block hours up to 86 hours.

5. Flight Attendants will be paid 1.5 times the hourly rate for total bid period block hours over 86.

6. Time may be dropped to a minimum of 60 hours, coverage permitting. Time may not be dropped below 60 hours unless approved by Inflight Management, or otherwise provided for by this Agreement. Hours dropped by a Flight Attendant will not be paid.

7. Flight Attendants on Reserve will be paid based on a 75-hour guarantee.

8. Flight Attendant Line Holders will be paid based on hours flown, except as otherwise provided by this Agreement. Additional credit time will be paid at the applicable rate.

9. There is no line guarantee in effect for Line Holders.

10. Flight Attendants will be paid on the 5th and 20th of each month.

FRONTIER AIRLINES (R. BRIGHAM) - 0000843
0320

ESI00000796-29

320

(If the 5th or 20th falls on a Saturday, Flight Attendants will be paid on the Friday before. If the 5th or the 20th falls on a Sunday, Flight Attendants will be paid on the Monday after). Any unforeseen circumstances that would cause a change to this policy will be published in a memo.

11. The check on the 5th of the month includes 37:30 hours plus per diem for the previous bid period. The check on the 20th includes the remainder of the hours flown in the previous bid period plus any adjustments from the previous bid period (e.g., over time, sick, vacation).

B. **AUTOMATED BID SYSTEM COST**

In order to access the Automated Bid System services from a personal computer, a Flight Attendant must submit a payroll deduction form to payroll allowing $4.00 per pay period to be deducted from his/her paycheck for the Automated Bid System expenses. To access the Automated Bid System services at no charge, a Flight Attendant must use a Company authorized computer either at DIA operations or at the GO.

C. **EXPENSES AWAY FROM BASE (PER DIEM)**

1. The Company will pay directly for any hotel room required away from base.

2. Per diem will be paid from 1 hour prior to scheduled departure at the beginning of the trip to 15 minutes after actual or scheduled block in at the end of the trip, whichever is greater. For international flights, per diem ends 30 minutes after the actual or scheduled block-in at the end of the trip, whichever is greater.

3. Per diem stops at block-in plus 15 when there is a cancellation of a flight while in the base and resumes the next day at check-in when the trip is continued.

4. Per diem runs continuous when the cancellation is at an outstation until block-in plus 15 at base. Per diem runs continuous when there is cancellation in the base but the rest of the trip continues that same day.

   **Example:** Trip comes in to DEN from OMA, and next segment is DEN/ABQ and back to DEN then on to MDW for a RON. The ABQ portion gets cancelled, but the MDW portion is scheduled to fly. Per diem continues without interruption.

5. Per diem stops at block-in plus 15 when a flight is cancelled in base and Crew Scheduling releases the Flight Attendant(s) until a specified time later that same day, a legal rest period, whereupon the Flight Attendant(s) will be rescheduled for another flight later that day.

Page 9 of 123

FRONTIER AIRLINES (R. BRIGHAM) - 0000844
0321

ESI00000796-30

321

**Example:** Trip comes in to DEN from OMA and has SFO turn. The SFO turn is cancelled. The crew is released by Crew Scheduling for a specified period of time and rescheduled to return and do an LAX turn later that day. Per diem stops after OMA at block-in plus 15 and resumes at check-in for the rescheduled flight(s).

6. Any time a cancellation leads to a release from duty, per diem is not paid.

7. A Flight Attendant required to be out of his/her base for Company-assigned business will be paid per diem for the actual hours spent away from base.

8. Per diem will be paid at $1.85 per hour.

D. **PAID TIME OFF**

1. Company designated absences will be paid at hourly straight time rate according to established credit values and applies to 60-hour minimum or job share minimum: Vacation, Company Business, Union Business, Funeral Leave, Recurrent Training, Jury Duty, and any other absence approved for protection by management.

2. Flight Attendants required to testify in court, on scheduled workdays, on behalf of Frontier Airlines will be pay protected for the court day according to section K below.

3. Flight Attendants on paid time off or approved leave may not pick up trips during these absences except for awarded vacation.

4. Sick leave is pay protected for all dropped time if the Flight Attendant has sick time accrued, unless the dropped time was Open Time picked up during an awarded vacation period. Sick time is paid at hourly straight time rate.

5. Reserves are not given credit time for cancellations.

E. **RESCHEDULE/REROUTE PAY**

1. In the event that the Company cancels or revises a flight schedule for operational or marketing purposes, the Flight Attendant will be subject to reassignment per "Reschedule" or "Reroute" parameters as set forth in this Agreement.

2. Any changes prior to 1800 (base local time) the day before the original flight will be coded as AVA on the Flight Attendant's schedule. The AVA code does not count toward premium pay.

3. If the change occurs after 1800 (base local time) the day prior to the original flight, then the change will be coded as PAY and this time will be credited toward premium pay.

4. Changes may occur either prior to original trip start or during mid-

FRONTIER AIRLINES (R. BRIGHAM) - 0000845
0322

ESI00000796-31

sequence after a trip has already begun.

F. **PARKING**

1. The Company will provide the cost of parking in the Flight Attendant's home base. The Company will not be required to pay for parking at more than 1 location per Flight Attendant.

2. Paying for parking at a location other than the Flight Attendant's base will be required only when such employee parking is available and only to the extent of what the parking would have cost at the Flight Attendant's base.

G. **TRAINING PAY**

1. Flight Attendants attending recurrent training will be paid 1 hour of flight pay for every 2 hours in class. Flight Attendants will be in class for 9 hours to equal 4:30 hours pay. In addition, Flight Attendants will be paid 1:30 hours for the 3-hour computer-based training.

2. All non-classroom recurrent training completed throughout the year will be paid during the month the Flight Attendant attends his/her training.

3. Additional required training during the year will be paid at 1 flight hour per 2 hours training, up to a maximum of 4 pay hours per day.

H. **HOLIDAY PAY**

1. Frontier recognizes three premium paid Company holidays per year: Memorial Day, Thanksgiving Day, and Christmas Day. Flight Attendants who fly on these holidays will receive time and a half pay (or double time if flying over 86 hours for the bid period) for those segments of which any portion is actually flown on the holiday. Holiday pay is calculated separately from other flight time during the bid period and does not apply towards monthly total.

2. In addition to premium pay, a Flight Attendant may purchase up to two round-trip Buddy Passes for each of the above-mentioned holidays the Flight Attendant was on duty.

3. Frontier also recognizes four non-premium paid Company holidays per year: New Year's Day, Independence Day, Labor Day, and the Friday following Thanksgiving Day. Flight Attendants who are working (including scheduled RON, flying, or scheduled Ready Reserve shift) on these non-paid holidays will receive free of charge two round-trip Buddy Passes. Passes will be good for 1 year from the date of that holiday.

4. Cancelled flights on the holiday are paid at the hourly straight time rate.

FRONTIER AIRLINES (R. BRIGHAM) - 0000846
0323

ESI00000796-32

I.       **JUNIOR ASSIGNMENT PAY**

   1.    Flight Attendants who are junior assigned will be paid time and a
         half (1.5) of their hourly rate per scheduled block hour of the
         assigned trip.

   2.    Junior assignment pay is calculated separately from other flight
         time during the bid period and does not apply towards monthly
         total.

J.       **DEADHEAD PAY (CREDIT ADDED TO MONTHLY BLOCK TOTAL)**

   1.    Deadhead pay is 50% of the actual or scheduled block hours,
         whichever is greater. Reserve Flight Attendants do not receive
         deadhead pay unless their monthly flight time is over 75 hours.

   2.    While deadheading, Flight Attendants will receive free DIRECTV.

K.       **COMPANY BUSINESS PAY**

   1.    Company Business is considered a duty assignment other than
         training or flight-related functions. Company Business would
         include administrative meetings not disciplinary in nature,
         Company sponsored team meetings, or any other Company
         required duty that is not voluntary.

   2.    Flight Attendants removed on scheduled workdays will be pay
         protected for scheduled flight hours dropped and paid at hourly
         straight time rate.

   3.    Flight Attendants assigned Company Business on a scheduled day
         off will be paid 1 hour of flight pay for every 2 hours worked.

   4.    Per Diem is not paid for Company Business in base. A Flight
         Attendant required to be out of his/her base for Company
         Business will be paid per diem for the actual hours spent away
         from base unless Company pays for meals and hotel.

L.       **IRREGULAR OPERATIONS PAY**

   1.    An irregular operation occurs when there is an unforeseen
         operational stoppage, delay, or disruption of service. This will
         include extended aircraft mechanical conditions that require
         cancellations, delays, and/or diversions; extreme weather
         requiring cancellation, delays, and/or diversions; and any act of
         terror or security breaches causing cancellation, delay, and/or
         diversion. In such cases the Flight Attendant will be pay protected
         for any or all cancelled trips. If the Flight Attendant is
         subsequently reassigned, he/she will be paid for cancelled flight
         or reassigned trip, whichever is greater.

   2.    If such cancellations cause the Flight Attendant to remain at an
         outstation into a day off for an entire calendar day, the Flight
         Attendant will be compensated with 4 hours of credited time for

Page 12 of 123

that calendar day in addition to the time for the cancelled
segment(s). The Flight Attendant will also receive pay credit for the
flight home once he/she is rerouted to return to base.

**Example:** A Flight Attendant is on a 4 day trip. On day 4 the last
leg from LAS to DEN cancels due to a blizzard in DEN and the
Flight Attendant is not able to return to base until day 6. In this
example, pay credit is received for the cancelled leg on day 4, a
pay credit of 4 hours is received for the calendar day on day 5,
and pay credit for the return flight home is received for day 6. The
value of the pay credit on day 6 will be determined based on
whether the Flight Attendant works or deadheads on the flight
(50% for deadheading).

3.    A request for the 4 hours of compensation must be submitted in
writing to the Payroll by the last calendar day of the month in
which the irregular operation occurred.

4.    If the Flight Attendant returns home on a day off, he/she will be
credited for the scheduled or actual flying time, whichever is
greater. If he/she deadheads home he/she will receive deadhead
credit.

5.    Any pay issues not submitted by the Flight Attendant to the Payroll
by the last day of the fiscal year will mean the forfeit of any such
pay.

FRONTIER AIRLINES (R. BRIGHAM) - 0000848
0325

ESI00000796-34

325

## ARTICLE 4
## HOURS OF SERVICE AND CREW LEGALITY

A. **POLICY**

Crew legality as defined by the FARs is the shared responsibility between the Flight Attendant and the Company's Crew Scheduling Department. It is the Flight Attendant's responsibility to bring any legality problems he/she is aware of to the Company's attention. Crew Scheduling will make the final determination of whether a Flight Attendant is legal to fly and will assume responsibility for the decision.

B. **DUTY TIME LIMITATIONS**

1. A Flight Attendant will be scheduled in accordance with Federal Aviation Regulations (FARs).

2. A Flight Attendant will not be scheduled for more than 14 hours on duty for regularly scheduled flying. A scheduled duty period may be scheduled to exceed 14 hours by increasing the number of Flight Attendants on the crew (FAR 121.467).

3. A Flight Attendant is not considered to be scheduled on duty in excess of duty period limitations if the flights to which the Flight Attendant is assigned are scheduled and normally terminate within the limitations but due to circumstances beyond the control of the certificate holder, such as adverse weather conditions, are not at the time of departure expected to reach their destination within the scheduled time (FAR 121.467).

4. Irregular operations may cause the duty day to be extended beyond scheduled hours, but the duty day will not exceed 16 hours. Exception: may exceed 16 hours enroute if the flight can reasonably expect to depart the gate prior to 16 hours in order to return a crew to base and to avoid a cancellation at an outstation. If a Flight Attendant's duty day exceeds 16 hours, the following rest period will be increased per the table below based upon the length of the actual duty day. It will be the Flight Attendant's responsibility to contact Crew Scheduling within 2 hours of duty release to request that his/her additional rest time is scheduled and any required adjustments to the next duty are made. Any trip segment that they may be unable to fly as a result of the additional duty time and rest period will be pay protected by the company. The Flight Attendant will pick up any remaining segments after the additional base rest is completed.

5. If Actual Duty exceeds 16 hours, minimum layover rest will be 12 hours and reducible to 10 hours. . If rest is reduced, compensatory rest of 14 hours must be provided.

FRONTIER AIRLINES (R. BRIGHAM) - 0000849
0326

ESI00000796-35

| Actual Duty Day | Base Rest |
|---|---|
| 16:01 - 17:00 Hours | 12 |
| 17:01 - 18:00 Hours | 14 |
| 18:01 - 19:00 Hours | 16 |
| 19:01 - 20:00 Hours | 18 |
| Over 20:01 Hours | 20 |

6.  A Flight Attendant will be replaced in base upon reaching 12 hours on duty unless the remaining flight legs can be completed within 14 hours. Crew scheduling will evaluate the Flight Attendant's duty time.

7.  A required training session, Company Business, or an additional required preflight training briefing before or after a trip will be treated as an extension of the duty period and subject to established duty limits and rest requirements. A day of Recurrent Training (8 hours or more) must be followed by a normal 10-hour rest before the next flight assignment.

8.  It is the Flight Attendant's responsibility to notify Crew Scheduling of any work-related circumstances (e.g., excessive hours due to irregular operations) that may impair his/her ability to perform required duties. If a Flight Attendant is removed from duty due to fatigue, he/she will not be credited (paid) for the flight hours removed.

9.  For domestic flights, a Flight Attendant's duty period ends 15 minutes after scheduled block-in or actual block-in, whichever is greater.

10. For international flights, a Flight Attendant's duty period ends 30 minutes after scheduled block-in or actual block-in, whichever is greater.

## C.    REST LIMITATIONS

1.  A Flight Attendant's rest periods begin when he/she is released from duty and end at the next report time.

2.  Rest period minimums are required as per the following:

| Scheduled Duty | Minimum Base Rest | Reducible to (Irregular ops) | Minimum Layover Rest | Reducible to (Irregular ops) |
|---|---|---|---|---|
| Under 14 hours | 10 hours | 9 hours | 9 hours | 8 hours* |
| 14 hours or longer | 12 hours** | 10 hours** | 12 hours** | 10 hours** |
| All cases | 1 calendar day every 7 days | 24 hours every 7 days | 1 calendar day every 7 days | 24 hours every 7 days |

\* Compensatory rest of 10 hours required to follow.

\*\* Can be scheduled as reduced rest provided compensatory rest of 14 hours is scheduled.

Page 15 of 123

ESI00000796-36

327

3. A Flight Attendant must be given a minimum scheduled rest period of 9 consecutive hours between duty at outstations and 10 hours of rest between duty periods in base. In an irregular operation, Crew Scheduling can reduce the 9-hour rest period in an outstation to 8 hours rest between duty periods, provided compensatory rest does not apply. In an irregular operation, Crew Scheduling can reduce the 10-hour rest period in base to 9 consecutive hours between duty periods, provided compensatory rest does not apply

4. A minimum reduced rest period of 8 hours may be scheduled at a layover city to accommodate the daylight savings time change transition.

5. When a crew member is on legal rest at a layover station, and Crew Scheduling must contact them for a schedule adjustment, they will make every effort to do so in the first 2 hours or the last 2 hours of the rest period.

6. Except as otherwise provided by this Agreement, a Flight Attendant must receive at least 10 hours rest in base between each trip (including ADD/SWAP/TRADE) and/or 8 hour or longer training event. A Flight Attendant may not waive this requirement.

7. The required 24-hour rest period will be 1 calendar day at base. As a result of irregular operations, a rest period beginning no later than 0200 to the following 12 midnight will meet the 1 calendar day requirement. At no time will a Flight Attendant be scheduled for less than the FAA-mandated 24 hour break in any seven consecutive days.

8. For the definition set forth in paragraph 7 above to apply, the following conditions must be met:

   a. Release time on the 6th day is scheduled prior to midnight;

   b. Because of a delay (irregular ops), the Flight Attendant returns to base after midnight into a scheduled day off;

   c. The Flight Attendant is released from duty no later than 0200. If released after 0200, another calendar day off will be given prior to the next trip report and will be pay protected. The trip may be split to provide the calendar day;

   d. The Flight Attendant has a consecutive 24-hour break within 7 consecutive days.

9. A Flight Attendant will be scheduled with a minimum of 1 calendar day off in base during every 7-day period. A Flight Attendant MAY

FRONTIER AIRLINES (R. BRIGHAM) - 0000851

ESI00000796-37

NOT request to use a 24-hour break in a layover station to meet the 24/7 FAR rest requirement.

10. In an irregular operation, Crew Scheduling may use a 24-hour break, in or out of base, to satisfy the 24/7 rest requirement.

11. Reduced rest cannot be scheduled below any applicable compensatory rest.

12. Base trip report time is scheduled for 60 minutes prior to departure time of the first segment and cannot be reduced to accommodate rest requirements. Report time for a Reserve on a short call-out may be adjusted.

13. A Flight Attendant in an irregular operation that results in a base rest below the minimum 9 hours or less than 24 hours rest in a 7-day period will be required to contact Crew Scheduling to ensure proper rest is scheduled. To resolve the rest conflict:

   a. Crew Scheduling will remove and release the Flight Attendant from the least amount of time in the trip that will allow the reduced rest requirement to be met.

   b. If no portion of the trip can be removed to ensure legal rest, Crew Scheduling will remove the trip and assign the Flight Attendant to an alternate trip per reassignment parameters. If no trip is available, Crew Scheduling will release the Flight Attendant from the first day and assign Available per AVA rules for any subsequent day(s).

   c. The Flight Attendant may request to be removed from the trip and waive the credit. Release will be determined by Crew Scheduling and be based upon adequate reserve staffing.

14. While on a RON no Flight Attendant may board a flight for personal reasons with the intent to leave the assigned RON city without prior permission granted from Crew Scheduling. A captain's permission to travel from the RON city is not a substitute for Crew Scheduling approval. In all cases, the Captain must be given immediate contact information (e.g., cell phone number) should the Flight Attendant choose to RON in a location other than the crew hotel.

15. In the event a Flight Attendant intentionally builds a schedule with a software system in use by the Company resulting in less than a calendar day off in 7 days, the Company will remove flying from the Flight Attendant's schedule to ensure a calendar day off and the Flight Attendant will not be pay protected for such flying.

D. **REPORT TIME LIMITATIONS**

1. Report time is not scheduled less than 60 minutes prior to

FRONTIER AIRLINES (R. BRIGHAM) - 0000852
0329

ESI00000796-38

departure in base. Report time may be increased for charter operations in base and layover stations.

2. For trip report in base, Flight Attendant must check in on Company-provided computers in designated airport location(s). Under no circumstances is another employee allowed to check in for a crewmember (exception being Crew Scheduling). Doing so may result in corrective action.

3. All Flight Attendants will be provided with an individual Company log-on and check-in ability. It is the Flight Attendant's responsibility to retain his/her log-on once established. If log-on or password is lost, the Flight Attendant should contact IT help desk with sufficient time prior to scheduled check-in should there be difficulties with the Flight Attendant password or system log-on.

4. If the computer system is down the Flight Attendant will need to contact Crew Scheduling to check-in.

5. In domestic layover station, report time to the gate is not less than 45 minutes prior to departure.

6. In an international layover station, report time to the ticket counter is not less than 1 hour 15 minutes prior to departure.

7. Report time may be reduced to allow for adequate crew rest in a layover station per this Agreement. At no time will a reduced report time infringe upon the rest period required by FARs.

8. A line-holding Flight Attendant who is unable to report for work due to illness or off-duty injury must notify Crew Scheduling at least 2 hours prior to trip report time.

9. A Reserve Flight Attendant called out for a flight assignment with a 2-hour short call must report within the required time from the initial call.

10. A Flight Attendant who checks in less than 20 minutes after report time will remain scheduled to work the trip.

11. A Flight Attendant who checks in 20 minutes or more after trip report time may be placed by Crew Scheduling back on the missed portion of his/her trip with the concurrence of Inflight management and the Flight Attendant. This decision will be based on factors such as available replacement staffing or possible delay impact. The Flight Attendant will only be paid for the portion of the trip he/she works.

12. A Flight Attendant scheduled to deadhead from base will report in CrewTrac no later than 60 minutes prior to departure and will report to the gate no later than 30 minutes prior to departure.

FRONTIER AIRLINES (R. BRIGHAM) - 0000853
0330

ESI00000796-39

330

13.  A Flight Attendant scheduled to deadhead from an outstation will report to the gate no later than 30 minutes prior to departure.

E.  **REPORT TIME TO THE AIRCRAFT**

1.  Report time to the aircraft is 45 minutes prior to departure or as soon as the aircraft arrives at the gate if less than 45 minutes.

2.  During a turn of 45 minutes or less, Flight Attendants should remain on the aircraft to prevent boarding/departure delays.

3.  Flight Attendants reporting to the aircraft less than 30 minutes prior to departure may be replaced.

4.  Flight Attendants arriving late on inbound flights should report to the new aircraft as soon as possible upon arrival.

F.  **RULES GOVERNING PAIRING AND SCHEDULE CONSTRUCTION**

1.  A minimum of 11 days free of duty will be scheduled in every Reserve line.

2.  A minimum of 10 days free of duty will be scheduled in every line constructed in the Automated Bid System.

3.  A Flight Attendant will not be scheduled for more than 14 hours on duty for regularly scheduled flying.

4.  Scheduled hours on duty may be extended by increasing the number of Flight Attendants on the crew (FAR 121.467)

5.  Crew Planning will build trips with a minimum of 9 consecutive hours of scheduled rest at outstations. To accommodate the change from Standard Time to Daylight Savings Time, trips that would otherwise be scheduled for normal rest may be scheduled with a minimum of 8 consecutive hours of scheduled rest at outstations on the overnight of the daylight savings time change.

6.  The Automated Bid System will not create lines with less than 10 consecutive hours of rest at base.

7.  In an irregular operation, Crew Scheduling may choose to use a 24-hour break in or out of base to satisfy the 24/7 rest requirement.

8.  For purposes of the Automated Bid System, a calendar day off in base during every 7-day period will be required. A Flight Attendant may not waive this requirement

Page 19 of 123

G.      **CREW ACCOMMODATIONS**

    1.      For any Flight Attendant who has more than 4 hours scheduled
            ground time at a layover station, he/she will be provided an
            individual hotel room by the Company. This includes while a Flight
            Attendant is in training away from their base. Hotel rooms will not
            be provided at base.

    2.      Flight Attendants on the Hotel Committee will work with the
            Company and the Pilot Hotel Committee to select hotels for
            layover stations that can best meet the needs of the crew as well
            as the financial needs of the Company. The Company makes the
            final decision regarding hotel decisions with crew member input.

FRONTIER AIRLINES (R. BRIGHAM) - 0000855
0332

ESI00000796-41        332

## ARTICLE 5
## CREW PLANNING AND CREW SCHEDULING

A. **GENERAL ITEMS**

    1. Crew Scheduling is responsible for daily operational support. Responsibilities include but are not limited to:

        a. Operational reassignments

        b. Reserve assignments

        c. Legality monitoring

        d. Processing sick calls

        e. Ensure coverage of daily flight schedule

        f. Irregular operations

    2. Crew Scheduling is available 24 hours per day, 7 days a week.

    3. Crew Planning is responsible for administrative support. Responsibilities include but are not limited to:

        a. Preferential bidding

        b. Automated bidding functions including Open Time and trade board bidding Vacation award and vacation slide

        c. Administrative processing of Pre-awarded Absences including Training, Committee Meetings

        d. Building Reserve lines for new hire Flight Attendants upon completion of training

        e. Post-bid marketing and charter changes

    4. All telephone conversations between Crew Scheduling and Flight Attendants will be recorded. Recordings will be kept for a minimum of 60 days. Access to recorded conversations will be limited to Inflight Management and Crew Scheduling/Crew Planning management. In the event of a dispute, a Flight Attendant and/or the Union may submit a written request to the Company to review any applicable telephone recordings. The review will be conducted in the presence of the Flight Attendant and/or Union representative, Inflight and Crew Scheduling/Crew Planning management.

FRONTIER AIRLINES (R. BRIGHAM) - 0000856
0333

ESI00000796-42

B.    **BID PERIOD TIME TABLE (EASTERN TIME)**

*NOTE: All times will be considered Local Headquarters Time (IND) unless otherwise noted*

| Date | Time | Event |
|---|---|---|
| 4th day of the month | 1400 | Pre-award bid period closes. |
| No later than the 5th day of the month | 1400 | New base awards posted |
| No later than the 6th of the month | 1400 | Monthly bids open and are posted (including pre-awards) |
| 7th day of the month | 1400 | Credit Balancing starts - Company may adjust schedules below 60 credit hours |
| 8th day of the month | 1400 | Credit Balancing ends |
| 11th day of the month | 1700 | Medical release is required no later than 1700 to bid for the upcoming bid period. |
| 12th day of the month | 1400 | Bids close. |
| 16th day of the month | 1400 | Bid awards are posted. |
| 16th day of the month | 1600 | Reserve mixed line bidding begins |
| 17th day of the month | 1400 | View schedule in the Automated Bid System. Reserve and Mixed lines close. |
| 18th day of the month | 1400 | Reserve and Mixed Lines posted in the Automated Bid System. Recurrent Training trades open. |
| 18th day of the month | 1400 | TradeBoard opens for Line Holders and Reserves – including split trip trades. |
| 19th day of the month | 1400 | Daily Open Time begins - DROP/ SWAP/ADD only – no splits |
| 21st day of the month | 1400 | Base vacancy bid opens |
| 22nd day of the month | 1400 | Pre-award bid period opens. |
| 26th day of the month | 1400 | Daily Open Time Split and TradeBoard Split for the current bid period close. Daily Open Time Split for the new bid period begins. |
| 28th day of the month | 1400 | Base vacancy bid closes |

*NOTE: To prevent any conflict with the preferential bidding process, trip trade and Open Time requests to ADD or SWAP duty periods on the Flight Attendant's schedule for the last 6 days of the bid period will not be allowed between 1100 on the 10th and 1400 on the 18th.*

C.    **ELIGIBLE TO BID**

1.    Flight Attendants are considered eligible to bid unless they have been granted Company approved leaves (LOA, MED, FMLA, OJI, etc.) or removed for Company Business.

2.    Flight Attendants who are ineligible to bid due to any medical

FRONTIER AIRLINES (R. BRIGHAM) - 0000857
0334

ESI00000796-43

reason must submit a doctor's release prior to being considered eligible to bid. The release must be from the same doctor who removed the Flight Attendant from flight status or from a Frontier-designated doctor.

3.     The doctor's release must be received no later than 1700 on the 11th of the month prior to the bid period, releasing the Flight Attendant back to work no later than the 15th day of the bid period.

       *NOTE: Artificial credit of 2:30 hours per day will help establish the bid award block hours. Flight Attendants are not paid for Artificial credit.*

4.     Flight Attendants who receive a doctor's release after the 11th at 1700 will be considered available for flight status and will be expected to fly no less than the number of hours designated by the following chart.

5.     The Flight Attendant must bid for Open Time on the Automated Bid System or contact Crew Scheduling to be assigned an AVA schedule of a minimum of 4 days per week (credit value 4 hours a day if he/she doesn't fly). Time picked up through the TradeBoard does not count toward the minimum required hours.

6.     Flight Attendants whose return requires a re-entry drug test may not pick up trips from Daily Open Time Live or the Automated Bid System TradeBoard prior to clearance.

7.     Reserves who return from leave will be given a Reserve schedule based on remaining days in the month and follow all Reserve rules. For the purposes of this paragraph a Reserve is any Flight Attendant who would have held a Reserve line if they had been eligible to bid for the applicable bid period.

Page 23 of 123

D.    **RETURNING FROM LEAVE MID MONTH**

| Remaining Days | Required Minimum Hours for Full-time | Required Minimum Hours for Low-time |
|---|---|---|
| 1 | 2:06 | 1:21 |
| 2 | 4:18 | 2:41 |
| 3 | 6:24 | 4:01 |
| 4 | 8:36 | 5:22 |
| 5 | 10:42 | 6:04 |
| 6 | 12:54 | 8:03 |
| 7 | 15:00 | 9:23 |
| 8 | 17:06 | 10:43 |
| 9 | 19:18 | 12:04 |
| 10 | 2 1:24 | 13:24 |
| 11 | 23:36 | 14:45 |
| 12 | 25:42 | 16:05 |
| 13 | 27:54 | 17:25 |
| 14 | 30:00 | 18:46 |
| 15 | 32:06 | 20:18 |
| 16 | 34:18 | 21:27 |
| 17 | 36:24 | 22:47 |
| 18 | 38:36 | 24:12 |
| 19 | 40:42 | 25:28 |
| 20 | 42:54 | 26:05 |
| 21 | 45:00 | 28:09 |
| 22 | 47:06 | 29:29 |
| 23 | 49:18 | 30:49 |
| 24 | 51:24 | 32:10 |
| 25 | 53:36 | 33:30 |
| 26 | 55:42 | 34:51 |
| 27 | 57:54 | 36:11 |
| 28 or More | 60:00 | 37:31 |

E.    **INITIAL BID**

1.    Detailed Initial Bidding Information

For the most current information about bidding rules and techniques, a Flight Attendant should refer to www.MyFrontier.org/inflight/prefbid/index.asp or another Company designated website. Web page information is updated monthly with bidding tips, most common mistakes and other items which will provide assistance in the bidding process.

2.    Bid Packet

The Company will publish paper bid packets on a monthly basis and make them available in the crew room. Bid packets will be made available to all Flight Attendants by 1400 on the 6th day of each month.

FRONTIER AIRLINES (R. BRIGHAM) - 0000859
0336

ESI00000796-45

336

3.   Bid Closing

It is the responsibility of the Flight Attendant to bid in the Automated Bid System. All formal bidding will be submitted on the Automated Bid System no later than 1400 on the 12th day of the month. The Company does not accept bids by faxes, e-mail or any other means.

4.   Bidding Timeline

a.   Bids will open on the 6th at 1400.

b.   Bids will close on the 12th at 1400.

c.   Bids will be posted on the 16th by 1400.

d.   Reserve awards will be posted on the 18th by 1400.

e.   For the initial bid, a Flight Attendant must have a minimum of 1 calendar day off in base during every 7-day period.

5.   Misbidding

Each Flight Attendant will be accountable for bidding correctly. In the event he/she fails to bid (including the default bid), there are trips left, and the Flight Attendant is senior enough to hold a line, the Automated Bid System will build a line for the Flight Attendant. If there are not enough trips to fill a line then the Flight Attendant will go on Reserve for the misbid.

6.   Mixed Lines

Flight Attendants awarded Reserve status during the monthly bid will normally have the opportunity to participate in a secondary bid for Mixed Lines.

7.   Job Shares

a.   The Automated Bid System allows Flight Attendants to work low time. Frontier will offer this option in months when overstaffing occurs.

b.   A Flight Attendant interested in a job share must submit a request via email to Inflight by the published time and date.

c.   Job shares will be granted in seniority order.

d.   Flight Attendants awarded a job share will build a line in the Automated Bid System of 37:30 to 58:00 hours.

Page 25 of 123

ESI00000796-46

337

e.   A Flight Attendant who is awarded a job share line may trade or SWAP trips but may not exceed 58:00 hours or go below 37:30 hours.

f.   It is the Flight Attendant's responsibility to ensure his/her monthly credit hours do not go above 59:59 or fall below 37:30 hours. Failure to do so may result in disciplinary action.

8.   Automated Bid System Errors

If an error is made within the Automated Bid System and a Flight Attendant is not awarded a trip that he/she should have been given, he/she has the following options:

a.   The Flight Attendant will be offered a like trip if it is available in Open Time. Trips will not be split. The Flight Attendant will be pay protected for the greater of the trips;

b.   If no like trip is available, the Flight Attendant may be considered AVA based on the trip that he/she should have been awarded;

c.   The Flight Attendant may choose to accept Reserve for the days in question; or

d.   The Flight Attendant may decline all of these options, forfeit the compensation and add to the schedule from Opentime or the TradeBoard.

F.   **PRE-AWARD PERIOD**

1.   Pre-awards must be submitted via the Automated Bid System on a monthly basis from the 22nd at 1400 to the 4th at 1400 (e.g., March 22nd – April 4th for the May bid period).

2.   Requests submitted for pre-awards include the following: vacation slides, Recurrent Training and other scheduled training, scheduled Company Business, Union Business and jury duty. Company Business pre-planned meetings that are not blocked for an entire day in the Automated Bid System will allow for a Flight Attendant to fly that day, as long as it does not conflict with the Company Business time.

3.   Any trips on Company Business meeting days must meet the 14 hour duty day limitations. The 10 hour rest rule does not apply except before and after the maximum 14 hour duty day.

4.   It will be the Flight Attendant's responsibility to bid correctly to ensure that all legalities are met; should a trip violate any scheduling/FAA legality rules, the trip will be removed and will not be pay protected. Should the Flight Attendant request the day off,

Company Business day, and the system awards them a trip in error, they will be pay protected for the trip/portion of the trip that needs to be removed to make them legal for the Company Business. All other legal portions of the trip will be flown, that do not fall on the Company Business day.

5. Pre-awards are awarded by seniority except vacation slides, which will be granted according to Article 10.F.

6. Each pre-award request must be submitted separately.

7. Requests asking the Company/Crew Planning to pick any date for the award will not be granted.

8. If a Flight Attendant submits a pre-award request for any planned absence (e.g., vacation, recurrent training), he/she must verify that this request is listed in the Automated Bid System before entering his/her bid. If the Flight Attendant does not find the pre-award request, he/she must contact Crew Planning by 1700 on the 11th. Any problem arising after the Bid Award will be handled to eliminate the conflict as if the pre-award had been granted.

9. Pre-awards requests will be processed according to the following priority:

   a. Vacation;

   b. Training;

   c. Company Business;

   d. Union Business.

10. Company training events are presented throughout the year and attendance is a requirement of the job. The Company may assign individuals to specific months to attend this training, and Flight Attendants will be notified by Company email of their designated month. Flight Attendants will then be able to bid for their assigned month in the Automated Bid System between 1400 on the 22nd and 1400 on the 4th (e.g., March 22 to April 4 for May training). All training events are awarded via the Automated Bid System in seniority order.

11. Bidding for a training event:

   a. Changes to the designated month must be approved by the Inflight Training Administrator prior to bid opening on the 22nd of the month.

   b. Flight Attendants will bid for multiple programs/days in order of preference.

   c. Awards are published in the Automated Bid System at

FRONTIER AIRLINES (R. BRIGHAM) - 0000862
0339

ESI00000796-48

1100 on the 4th.

d.     Awarded training events will be noted in the Automated Bid System.

e.     Training events require a scheduled 10 hour rest in base prior to and following the event. In the case of an irregular operation, this rest may be modified as provided by this Agreement.

f.     Once awarded, training events may not be dropped, but may be traded in accordance with the provisions of this Agreement.

G.     **TRANSITION**

1.     If a trip from the previous bid period ends on a day in the new bid period, but the Flight Attendant is legal to start a trip on that same day it arrives in base, the Automated Bid System will allow the Flight Attendant to bid or assign trips starting after the arrival time with respect to legalities.

2.     Flight hours flown for the new bid period from the previous bid period's trip will be credited to the new bid period's total block hours for credit purposes.

3.     In the event that a trip of the preceding bid period falls into the new bid period, the Flight Attendant will complete the trip. When it is time for a Flight Attendant to bid for the new bid period, he/she will not be able to bid those days of the new bid period in the Automated Bid System. Those days will automatically be blocked; therefore, there will not be a transition conflict.

4.     If a transition trip overlaps an awarded vacation day, the Flight Attendant may slide his/her vacation during the pre-award period to resolve the conflict.

5.     If a transition trip overlaps an awarded vacation day(s) and the Flight Attendant chooses not to slide his/her vacation, the overlapping portion of the trip will be dropped without pay if the trip can be split in base. Otherwise, the entire trip will be dropped to resolve the conflict, and the Flight Attendant will not be pay protected.

H.     **CDOS AND RED-EYE TRIPS THAT SPAN BID PERIODS**

1.     CDOs will be credited 3 hours for the present bid period and 3 hours for the new bid period.

2.     If a Flight Attendant checks in for a red-eye trip on the last day of a bid period that is scheduled to depart before 2359 (base local time) of the bid period and is still flying into a new bid period, the

FRONTIER AIRLINES (R. BRIGHAM) - 0000863
0340

ESI00000796-49        340

block hours for that leg will be credited to the prior bid period's hours. Any legs flown after the red-eye within the same sequence will be credited to the following bid period as carry-in.

I.  **RESULTS PAGE/PRE-AWARDS**

1.  Reviewing results page is the Flight Attendant's responsibility, which includes but is not limited to:

    a.  Carry-In.

        **Example:**  Any trip that carries into the new bid period that conflicts with a pre- awarded, preplanned absence or any given credit for those hours will be dropped but not pay protected.

    b.  Vacation.

    c.  Recurrent training.

    d.  Company Business.

2.  Parameters

    All administrative parameters are subject to the Company's discretion and operational necessity.

3.  Vacation Awards And Slides

    a.  A Flight Attendant may slide his/her vacation period plus or minus three calendar days from the first day of the awarded period. A Flight Attendant will not be permitted to slide a vacation period between individual bid periods.

    b.  Vacation periods start on the first day of the listed dates in this Agreement unless the Flight Attendant exercises the slide option in the Automated Bid System.

    c.  A Flight Attendant who intends to slide his/her vacation period will do so during the pre-award period. Crew Planning will not add, change or cancel any slide request.

    d.  Vacation slide requests are processed prior to the processing of training, Company Business and Union Business requests.

J.  **LOW-TIME FLIGHT ATTENDANTS**

1.  General

    Inflight will offer low-time Flight Attendant positions. A bid will be

FRONTIER AIRLINES (R. BRIGHAM) - 0000864
0341

ESI00000796-50

341

distributed stating the timeline for application, the number of low-time Flight Attendant positions that will be offered, and the duration of the low-time period. The low-time positions will be awarded in Seniority order. The following will highlight the low-time Flight Attendant position requirements and benefits:

2.  Eligibility

    a.  A Flight Attendant is eligible for the low-time position if he/she has been active for a minimum of 6 months, and is not on Reserve status.

    b.  Any Flight Attendant interested in the low-time position must follow all procedures for application/acceptance that are supplied in the bid instructions.

    c.  Flight Attendants must be active at the point of the start date of the program to be eligible to apply.

    d.  Any Flight Attendant who is awarded a low-time position will be required to commit to the position for the entire term of the defined period of time.

    e.  Flight Attendants will only be awarded a vacancy transfer while on low-time if the Company has posted for low-time vacancy transfers.

3.  Reversion from Low-Time Status

    a.  If at any time during the low-time period a Flight Attendant's seniority falls within the bottom 15% of the seniority list within his/her base (i.e. projected to enter a Reserve status), the Company may, at its sole discretion, revert the Flight Attendant back to full-time status for the remainder of the term of the program.

    b.  Should a life changing event occur (as defined by the Company's employee benefits policy), a Flight Attendant may request to be returned to full-time status provided the Company has vacancies for full-time positions. Should a Flight Attendant request to invoke this provision and return to full-time status, he/she should contact Inflight Management for vacancy information.

4.  Low-time Hours and Scheduling Requirements

    a.  Any Flight Attendant who is awarded a low-time position must fly between 37:30 and 59:59 hours per monthly bid period. Flight Attendants awarded a part time position will build a line in the Automated Bid System of 37:30 to 58:00 hours. A Flight Attendant who is awarded a part time line may TRADE or SWAP trips in the

FRONTIER AIRLINES (R. BRIGHAM) - 0000865
0342

ESI00000796-51

Automated Bid System, but may not exceed 58:00 hours or go below 37:30 hours.

b.  The Company may increase the low-time base to 47:30 hours up to three times per year and with prior notification based on seasonal operational necessity. Conditions that must be met pertaining to the 37:30 base, (e.g. paragraphs i, k, m,) will apply to the 47:30 base in designated months.

c.  If a Flight Attendant's projected credit value for the current bid period is less than 37:30 hours, the Company may adjust the Flight Attendant's schedule to bring the line value above 37:30 hours through credit balancing. If the Company opts to use credit balancing, the schedule will be adjusted between 1200 on the 7th and 1200 on the 8th of the month. Credit Balancing may include any of the following:

    (i)    Adding trips to the schedule from Open Time
    (ii)   Swapping trips on the schedule for trips in Open Time
    (iii)  Assigning AVA days to the schedule

d.  If the Company assigns AVA days during the Credit Balancing process, these AVA days will be credited 4 hours or the value of the actual trip flown, whichever is greater. The availability window for the AVA days will be from 0001 until 2400 on each of the assigned AVA days.

e.  At the conclusion of each bid period the Company will calculate accumulated credit for each Flight Attendant, including actual credit and artificial credit. If a Flight Attendant's total bid period credit is less than 37:30 hours the Flight Attendant will be denied access to the Automated Bid System Open Time or the TradeBoard for three subsequent bid periods. During this three month penalty period the Flight Attendant will not be permitted to participate in any voluntary ADD/DROP/SWAP processes and must fly his/her line as awarded in the Automated Bid System.

f.  If the Flight Attendant is awarded a Reserve line through the Automated Bid System, then that bid period will not be counted as one of the three bid periods for purposes of this penalty.

g.  If a Flight Attendant is awarded a Reserve line while in the low-time program, he/she will be blocked from participating in any open-time processes in the Automated Bid System.

FRONTIER AIRLINES (R. BRIGHAM) - 0000866

ESI00000796-52

h.   In the event that a Flight Attendant goes over the 59:59 hour maximum part time credit window due to irregular operations (weather, mechanical, declared irregular operations, etc.), there will be no penalty to the Flight Attendant in these situations.

i.   Any Flight Attendant who accepts a low-time position must work a minimum of 540 flight hours (or as dictated by Federal Legislation) during the 12 month period prior to their anniversary date to receive a year's service toward retirement benefits. Anything less will result in a 1/2 year's service towards retirement.

5.   Benefit Changes for Low-Time Flight Attendants

| Benefit | Change from Full-Time Status |
| --- | --- |
| Sick | 50% Accrual |
| Vacation | 50% Accrual |
| Uniform Allowance | 50% Accrual |
| Buddy Passes | 1/2 of a Full-Time Employee |
| Health Benefits | See Company policy |
| Dental Vision | See Company policy |

*NOTE: All low-time Flight Attendants will bid in the Automated Bid System each bid period. Also, all low-time Flight Attendants will have access to Open Time and the TradeBoard just as all full-time Flight Attendants.*

K.   **OPEN TIME**

1.   All available Open Time will be available to view and print in the Automated Bid System.

2.   A Flight Attendant may bid in Daily Open Time Live via the Automated Bid System to ADD/DROP/SWAP trips within their base.

3.   All manual Open Time and Trip Trade processing (e.g., split trips) will be processed between the hours of 0900-0100.

4.   A Reserve is eligible to bid for trips in Daily Open Time Live within their base following the terms outlined in this Agreement.

5.   Daily Open Time Live trips may be split for the current bid period through 1400 on the 26th of the month. Daily Open Time Live trips may be split for the next bid period on the 26th of the previous month at 1400. See Bid Period Timetable.

6.   TradeBoard trips may be split for the current bid period through 1400 on the 26th of the month. TradeBoard splits for the next bid period will begin on the 18th of the previous month at 1400. See Bid Period Time Table.

FRONTIER AIRLINES (R. BRIGHAM) - 0000867
0344

ESI00000796-53

344

7.   For purposes of adding Open Time and trades to an existing trip on a Flight Attendant's schedule, there will be a minimum of 60 minutes scheduled connect time in base between flights. The 60 minutes does not include any scheduled briefing or debriefing time. For international flying, the minimum connect time is increased to 75 minutes. The minimum connect time for Open Time purposes may be increased as operational needs require.

**Example:** A trip ends in DEN with a flight from SLC which is scheduled to arrive at 1400. A Flight Attendant scheduled for this trip would be allowed to trade/ pick up another trip which is scheduled to depart to MCI at 1500 on the same day. If the MCI flight was scheduled to depart at 1459, this request would be denied since the minimum connect time of 60 minutes would not be satisfied.

8.   A Flight Attendant is responsible for checking Open Time responses in the Automated Bid System. Approved bids will be considered confirmation of awards unless otherwise described in this Agreement.

9.   If a Flight Attendant goes on OJI, FMLA, medical, or maternity leave during any given bid period and is not able to complete his/her bid period, his/her remaining trips will be placed in Open Time for all eligible Flight Attendants to bid.

10.   Pay-protected trips dropped for Company Business may be assigned to Reserves to prevent excessive cost to the Company.

11.   The Company may put Ready Reserve shifts into Open Time. These days may be bid on as any other open trip and will be credited as outlined in the Reserve section.

12.   For purposes of ADD/SWAP requests, a minimum of 1 calendar day off scheduled in base during every 7-day period will be required. A Flight Attendant may not waive this requirement.

13.   If the Automated Bid System allows an approval of a transaction that contradicts these rules, the Company will not pay protect the Flight Attendant.

14.   AVA DROPS will be processed in the Automated Bid System and be based on staffing. A drop request will require the drop of all continuous AVA days that originated from the same multiday trip. Credit for AVA days will not be pay protected if dropped.

15.   AVA SWAPS for Open Time will be processed in the Automated Bid System. A swap request will require the drop of all continuous AVA days that originated from the same multiday trip. The SWAP request must meet minimum staffing and rest requirements. Credit from AVA will not be pay protected if the Flight Attendant opts to SWAP it for a trip in Open Time.

Page 33 of 123

16. AVA cannot be split for DROP/SWAP purposes.

17. A Flight Attendant may add a trip adjacent to AVA status as long as duty and calendar day limits are not exceeded based on the combination of the trip's duty day and the scheduled AVA availability.

18. In no case will the Flight Attendant be paid for both the AVA and a trip picked up in Open Time if the AVA trip and an added trip would have resulted in a conflict.

19. An Open Time trip cannot be split to accommodate AVA SWAP requests.

L. **OPEN TIME – MINIMUM CREDIT REQUIREMENTS**

1. At the completion of each Bid Period each Flight Attendant must accumulate a minimum of 60 credit hours. At no time will a Flight Attendant be allowed to drop below 45 credit hours, except as provided for in this Agreement. For purposes of the credit calculation described in this paragraph, artificial credit will be applied to unpaid absences. The value of such unpaid absences will be determined based on the "Returning from Leave Mid Month" table in paragraph 5.D above. Any artificial credit applied as outlined here will not be included in the actual pay calculation for the bid period.

2. If a Flight Attendant's projected credit value for the current bid period is less than 60 hours, the Company may adjust the Flight Attendant's schedule to bring the line value above 60 hours through Credit Balancing. If the Company opts to use Credit Balancing, the schedule will be adjusted between 1400 on the 7th and 1400 on the 8th of the month. Credit Balancing may include any of the following:

   a. Adding trips to the schedule from Open Time

   b. Swapping trips on the schedule for trips in Open Time

   c. Assigning AVA days to the schedule

3. If the Company assigns AVA days during the Credit Balancing process, these AVA days will be credited 4 hours or the value of the actual trip flown, whichever is greater. The availability window for the AVA days will be from 0001 until 2400 (base local time) on each of the assigned AVA days.

4. At the conclusion of each bid period the Company will calculate accumulated credit for each Flight Attendant including actual credit and artificial credit as described above. If a Flight Attendant's total bid period credit is less than 60 hours the Flight

FRONTIER AIRLINES (R. BRIGHAM) - 0000869
0346

ESI00000796-55

Attendant will be denied access to the Automated Bid System Open Time or the TradeBoard for three subsequent bid periods. During this penalty period the Flight Attendant will not be permitted to participate in any voluntary ADD/DROP/SWAP/TRADE processes and must fly his/her line as awarded in the Automated Bid System. If the Flight Attendant is not awarded a regular line through the Automated Bid System then that bid period will not be counted as one of the three bid period for purposes of this penalty.

5.      In the event a Flight Attendant falls below the 60 or 37:30 hour requirement two consecutive bid periods in a row, the three bid period penalty period does not start over. It runs concurrent with the previous bid period's penalty.

**Example:** If FA Julie fell below 60 hours in June and she also fell below 60 hours in July, she would be restricted from the Automated Bid System for Daily Open Time and the TradeBoard for the bid periods of August, September, October, and November.

M.      **DAILY OPEN TIME LIVE (FIRST-COME FIRST-SERVED)**

1.      All available Open Time will be displayed in the Automated Bid System. A Flight Attendant may submit requests in the Automated Bid System to modify his/her schedule using ADD/DROP/SWAP with Open Time on a first-come first-served basis.

2.      It is the Flight Attendant's responsibility to enter or remove an Open Time request in the Automated Bid System. Crew Scheduling and/or Inflight Management will not enter, modify, or remove any request in the Automated Bid System for a Flight Attendant.

3.      Because trips that must be modified (irregular ops, sick calls mid-trip, schedule changes, etc.) are temporarily dropped into Open Time in order for Crew Planning/ Scheduling to make the adjustment, it is possible that a trip may appear to be available for ADD/DROP/SWAP when that is not the case. If a Flight Attendant is awarded one of these trips, Crew Planning/Scheduling may reverse the Automated Bid System award. This does not constitute an error on the part of Crew Planning/ Scheduling, and the Flight Attendant will not be pay-protected.

N.      **TIMELINE**

1.      Open Time Live will begin at 1400 on the 19th of each month and will be available through 1400 on the next to last day of the bid period. To prevent any conflict with the preferential bidding process, trip trades and Open Time requests to add or swap duty periods on the Flight Attendant's schedule on the last 6 days of the bid period will not be allowed between 1100 on the 10th and 1400 on the 18th.

Page 35 of 123

2. Unassigned trips will remain in Daily Open Time Live and available for ADD/SWAP requests until 1400 the day prior to the trip report.

3. Unlimited requests for Daily Open Time Live are allowed until 1400 the day prior to trip report. (For next day requests, Open Time closes at 1400 the day prior to the trip start).

4. Reserve coverage for carryover trips will not be available until after the next bid period's Reserve lines are posted at 1400 on the 18th.

O. **DROPS, ADDS, SWAPS AND SPLITS**

1. Open Time trips may only be split into two parts. The split must begin and end in base. A Flight Attendant may not split one day trips.

2. A Flight Attendant may SWAP a portion of a trip for an entire trip or entire trip for a portion of a trip. A Flight Attendant may not SWAP a portion of one trip for a portion of another trip.

3. Requests must be in compliance with duty and rest limitations as established by this Agreement.

4. Minimum reserve staffing requirements will be set by the Company on a monthly basis for each day in the bid period. Weekends (Friday-Sunday), holiday periods, and the first and last 3 days of each bid period will have a higher reserve staffing minimum. DROPS will not be approved if the days impacted are at or below established minimum staffing requirements when the DROP request is processed.

5. For purposes of DROP/SWAP in Open Time Live, the Company must consider staffing minimums on all days included in the trip.

   **Example:** If a Flight Attendant requests to drop a trip that reports at 1800 on the 23rd and releases at 0100 on the 25th, the Automated Bid System will consider staffing requirements for each day the trip touches, the 23rd, 24th, AND 25th.

6. No SWAPS are allowed between bid periods.

   **Example:** If a Flight Attendant is trying to SWAP a trip in May, he/she must pick up a trip in May. The Flight Attendant cannot pick up a trip in June.

P. **IRREGULAR OPERATIONS**

1. At the discretion of the Company, during irregular operations, Flight Attendants may pick up Open Time trips after 1400 the day prior to a trip. The cut off time for picking up these trips will be three hours prior to the report time of the open trip. After that

Page 36 of 123

ESI00000796-57

348

point, open trips will be assigned to the next legal and available Reserve Flight Attendant pursuant to the Reserve assignment procedures of this Agreement.

2.  Flight Attendants will only be able to request a trip ADD over the phone by calling Crew Scheduling. These will be awarded on a first come, first served basis. DROP/SWAP will continue to be pursuant to the terms contained in this Agreement. Flight Attendants will be notified when this provision is in effect via the Automated Bid System ticker message, an update to the Crew Scheduling phone greeting, and, if possible, a notice on the Inflight homepage of MyFrontier.org.

Q.  **TRIP TRADES**

1.  A Flight Attendant may trade any trip on his/her current schedule with another Flight Attendant. Requests must be in compliance with duty and rest limitations as established by this Agreement.

2.  The TradeBoard will open at 1400 on the 18th. Whole trip trades must be submitted by 2000 the day prior to trip report. Split trips must be submitted by 1400 the day prior to trip report.

3.  TradeBoard split closes for the current bid period at 1400 on the 26th of the month.

4.  All trip trades will be completed via the Automated Bid System TradeBoard or TradeBoard Split.

5.  Line holders and Reserves are eligible for trip trades. Reserves using the trip trade process will be subject to limitations set forth by this Agreement.

6.  One-way trip trades must also be submitted via the Automated Bid System TradeBoard.

7.  Unlimited trip trading between Flight Attendants is available through the Automated Bid System TradeBoard for full and partial trips within the parameters set forth in this Agreement or the FARs.

8.  The Flight Attendant is responsible for entering or removing a trip trade request in the Automated Bid System. Neither Crew Scheduling nor Inflight Management will enter, modify, or remove any request in the Automated Bid System for a Flight Attendant.

9.  No trades are allowed between bid periods.

    **Example:** If a Flight Attendant is trying to trade a trip in May, he/she must trade for a trip in May. The Flight Attendant cannot trade a trip in June.

FRONTIER AIRLINES (R. BRIGHAM) - 0000872
0349

ESI00000796-58

10. To prevent any conflict with the preferential bidding process, TRADE requests on the last 6 days of the bid period will not be allowed between 1100 on the 10th and 1400 on the 18th.

R. **TRADE BOARD TRANSFER**

1. At 1400, any DROP request on the TradeBoard for the following day may be transferred by the Company to Aggressive Reserve Open Time or assigned during the Reserve Trip Assignment process. The approval of these requests will be reflected in the Automated Bid System and based on, but not limited to, available staffing, length of trips, and operational factors.

2. Flight Attendants will be responsible to check for approved requests in the TradeBoard Folder on the Automated Bid System after 2000 the day prior to the trip report time.

S. **ADMINISTRATIVE AND/OR DAILY OPEN TIME ERRORS**

1. If Crew Planning/Scheduling or Inflight Management makes an administrative error, or an error in Daily Open Time Live or Daily Open Time Split, and a Flight Attendant is removed from, or not awarded, a trip he/she should have been given, he/she has the option of the following:

   a. The Flight Attendant will be offered a like trip if it is available. The like trip will be based on the Reschedule or Reroute parameters set forth in this Agreement, whichever is applicable. The Flight Attendant will be pay protected for the greater of the trips.

   b. If no like trip is available, the Flight Attendant may be considered AVA.

   c. The Flight Attendant may refuse the like trip or the AVA and receive no compensation.

2. It is the Flight Attendant's responsibility to bring an error to the attention of Crew Planning/Scheduling for review as soon as he/she discovers the error. If the error is not brought to the attention of the Company in a timely manner, the Company may not be able to rectify the error and the Flight Attendant may forfeit any applicable pay protection.

   **Example:** On August 1st a Flight Attendant submits a request to add a trip on August 15th. The trip is awarded incorrectly to another Flight Attendant. The Flight Attendant who should have been awarded the trip discovers this error on August 2nd but does not contact Crew Planning regarding the error until August 15th - 1 hour prior to the scheduled report time of the trip. In this case there is no guarantee that the Company can rectify this error.

Page 38 of 123

3. If the ADD/DROP/SWAP/TRADE conflicts with any of the terms outlined in this Agreement, the Flight Attendant will not be pay protected for the trip.

T. **NON-AWARDED OPEN TIME TRIPS**

Non-awarded Open Time trips will be awarded in the following order:

1. Available to Assign (AVA).

2. Reserve Flight Attendants (RSV).

3. Willing to Fly (WIL).

4. Junior Assignment (JRA) of Reserves and Line Holders.

5. Any Frontier employee who is Flight Attendant qualified and current to perform Flight Attendant duties, including supervisors, instructors, and managers.

U. **WILLING TO FLY LIST (WIL)**

1. The Company will maintain a Flight Attendant's WIL status in CrewTrac.

2. A Flight Attendant will contact Crew Scheduling by phone to request that he/she be added to Will Fly status. Crew Scheduling will place the WIL code on the Flight Attendant's line for each date he/she is available. Requests will only be taken once a bid period is available in CrewTrac. The Flight Attendant will also be responsible to contact Crew Scheduling to be removed from WIL.

3. Open trips will be offered in seniority order to those Flight Attendants on WIL status.

4. If the Flight Attendant cannot be contacted, Crew Scheduling will attempt to contact the next WIL Flight Attendant in seniority order, based on legality for the trip and number of days the Flight Attendant is available for WIL.

5. Crew Scheduling will make an attempt to contact the Flight Attendant at up to two phone numbers, provided two are available.

6. A Flight Attendant will have the option to pass on the assignment.

7. A Reserve is eligible for WIL on days off.

FRONTIER AIRLINES (R. BRIGHAM) - 0000874

ESI00000796-60

V.     **JUNIOR ASSIGNMENT (JRA)**

    1.    JRA will be the last resort for Crew Scheduling.

    2.    JRA will be completed in reverse order of seniority.

    3.    A Flight Attendant on vacation will not be JRA'd.

    4.    JRA'd Flight Attendants will not be assigned more than one night away from base.

    5.    A Flight Attendant may request to remain on a trip that involves more than one night away from base.

    6.    JRA'd Flight Attendants will be compensated at one and a half times his/her hourly rate. No additional day off will be given in lieu of a JRA.

    7.    Flights that were originally scheduled to depart before midnight but do not, due to irregular operations, are not considered to be a JRA and will not be paid at JRA pay.

    8.    A Flight Attendant will not be JRA'd more than once during a bid period unless the Flight Attendant agrees to the assignment. If the company attempts to JRA a Flight Attendant while he/she is operating an assignment accepted through the Willing to Fly provisions of this Article, the Flight Attendant may decline the JRA.

    9.    Before the Company begins to JRA, Crew Scheduling may ask any Flight Attendant to volunteer for the open trip.

    10.    If Crew Scheduling is in a JRA position, the Crew Schedulers must identify themselves and state, "We are Junior Assigning Flight Attendants for _____ and we have reached your name on the Junior Assign List."

    11.    Prior to canceling a flight, the Company will contact any Frontier Company employee who is FAA-qualified and current to perform Flight Attendant duties.

    12.    Days worked by such Frontier Company employees will be considered duty for legality purposes.

    13.    The Company will maintain a JRA log including a minimum of the following information:

        a.    Flight Attendant's Name;

        b.    Seniority Number;

        c.    Telephone Numbers Contacted;

FRONTIER AIRLINES (R. BRIGHAM) - 0000875
0352

ESI00000796-61

       d.      Beginning and End Time of JRA Process;

       e.      Result or Response; and

       f.      Name of Crew Scheduler processing the JRA list.

14.      If a Reserve Flight Attendant calls to request a release from duty while Crew Scheduling is Junior Assigning, he/she cannot be JRA'd without his/her consent during that phone call.

## W.    SCHEDULE CHANGES/REASSIGNMENTS

1.    General

       a.      In the event that the Company cancels or revises a flight schedule for operational or marketing purposes, the Flight Attendant will be subject to reassignment per Reschedule or Reroute parameters as set forth in this section.

       b.      A Flight Attendant reassigned from his/her regularly scheduled assignment will receive the greater of the original scheduled assignment or actual reassignment for flight time pay and credit.

       c.      Any change that causes an illegality or conflict with the next trip or a training event on a Flight Attendant's line will be adjusted. Crew Scheduling will determine where the adjustment will be made to remove the conflict. The Flight Attendant will be pay protected for the adjustment resulting from a Reschedule or Reroute.

       d.      A Reserve Flight Attendant who picks up a trip on his/her day(s) off will be considered a "Line Holder" for any schedule changes or irregular operations that may impact the trip.

       e.      If a trip modification involves only a flight number change where no destinations or scheduled arrival or departure times are modified, the Company is not required to contact the Flight Attendant to advise of this change.

2.    Reschedule

       a.      "Reschedule" is defined as a change to a trip prior to 1800 (base local time) the day before an initial trip report.

       b.      "Initial Trip Report" is defined as the day and report time for the first day of a single or multiday trip.

FRONTIER AIRLINES (R. BRIGHAM) - 0000876
0353

ESI00000796-62

c.    A Flight Attendant's availability will begin 1 hour prior to original trip report and will end no more than 3 hours after the original scheduled trip release time, not to exceed duty limitations.

d.    To be considered a Reschedule, the trip change and an attempt to notify the Flight Attendant must be made no later than 1800 (base local time) the day prior to Initial Trip Report.

e.    If the Flight Attendant desires to keep the revised trip, he/she may opt to accept a Reschedule with a report/release time earlier/later than the limitations in this provision.

f.    If a Reschedule requires a Flight Attendant to report earlier than originally scheduled, Crew Planning/Scheduling will make all reasonable efforts to notify the Flight Attendant in a timely manner. Upon receipt of a message regarding the Rescheduling, the Flight Attendant is responsible for confirming the message in a timely manner. If Crew Scheduling has not received confirmation from the Flight Attendant at least three hours prior to the new scheduled report time, the Flight Attendant will be removed and replaced on the trip until such point that it passes through base. The Flight Attendant will not be paid for the lost flight segments.

**Example:** A Flight Attendant is scheduled for a charter pairing on the 15th of the month. On the 1st of the month, a Reschedule occurs and the report time is adjusted from 1100 to 1015. Over the next two weeks, Crew Planning leaves multiple messages for the Flight Attendant at both contact numbers provided. The Flight Attendant personally receives these messages but does not confirm them with Crew Planning/Scheduling. At 0715 on the 15th, this Flight Attendant will be removed from this trip and the trip will be assigned to another Flight Attendant to ensure an on-time operation.

g.    For charter flying, a Flight Attendant's availability will begin 2 hours prior to original trip report and end no more than 5 hours after original trip release. All changes to charter trips will fall under this section, regardless of the time the change is made.

h.    If Crew Scheduling is unable to reach the Flight Attendant before he/she departs for the airport and he/she reports for the original departure time, his/her duty day begins at the originally scheduled report time.

i.    A Reschedule is not considered an irregular operation.

FRONTIER AIRLINES (R. BRIGHAM) - 0000877
0354

ESI00000796-63

354

3.  Reroute

    a.  "Reroute" is defined as a change to a trip after 1800 (base local time) the day prior to initial trip report.

    b.  A Flight Attendant's availability will end no more than 2 hours after the original scheduled trip release time.

    c.  If a Flight Attendant has reported for a trip in base and his/her scheduled flight has been cancelled prior to report time, the Flight Attendant will be available for reassignment provided notification of the assignment is made within one hour of scheduled report time. The reassignment will be for a flight that is scheduled to depart within three hours of the original departure time of the cancelled flight.

    d.  If a Flight Attendant has reported for a trip and after report his/her scheduled flight is cancelled, the Flight Attendant will be available for reassignment provided notification of the assignment is made within one hour of the time of the flight's cancellation or within one hour of the Flight Attendant's inbound arrival time if operating from an outstation. The reassignment will be for a flight that is scheduled to depart within three hours of the original departure time of the cancelled flight.

    e.  In an operational Reroute, if a flight is cancelled and there is no other Frontier flight available to return the crew (working or deadhead status) to base within the 2-hour limit, the crew will be assigned on the next available Frontier flight.

    f.  If the next available Frontier flight is not scheduled to operate until the following calendar day and the crew is not required to operate that flight, then an alternate carrier may be considered for an earlier deadhead return to base.

    g.  A crew swap for operational needs will be considered a Reroute.

    h.  Crew Scheduling will attempt to notify a Flight Attendant of any change to a trip as soon as possible. If a Flight Attendant sees a change to his/her schedule or encounters an irregular operation, but has not been notified the Flight Attendant must contact Crew Scheduling for possible reassignment.

    i.  If a trip modification involves only a flight number change with no destination or scheduled arrival or

Page 43 of 123

FRONTIER AIRLINES (R. BRIGHAM) - 0000878
0355

departure times modified, the Company is not required to contact the Flight Attendant to advise of this change.

j. If the Flight Attendant desires to keep the revised trip, he/she may opt to accept a "Reroute" with a report/release time earlier/later than the limitations in this provision.

k. When a Flight Attendant's originating trip of the day is delayed and he/she is notified of the delay prior to leaving for the airport, the trip report time will be modified by Crew Scheduling and the duty day will reflect the new report time.

l. A Reroute will be considered an irregular operation if the crew has reported for duty.

4. Notification Of A Flight Attendant

a. Crew Scheduling will call up to two of the Flight Attendant's phone numbers available in CrewTrac (or replacement software) to notify him/her of a change to his/her schedule. If it is necessary to contact a Flight Attendant during a FAA required minimum rest period, Crew Scheduling may make one phone call attempt to each contact number listed by the Flight Attendant.

b. In base, a Flight Attendant will not be called or paged between 2130-0630 (base local time) except when the Flight Attendant must be contacted immediately due to one of the following:

(i) Emergency;

(ii) To prevent an operational issue;

(iii) Junior assignment;

(iv) Reserve as required by this Agreement.

c. On a layover, a Flight Attendant will not be called or paged between 2130- 0630 (base local time) except when the Flight Attendant must be contacted immediately due to one of the following:

(i) Emergency;

(ii) To prevent an operational issue;

(iii) Reserve as required by this Agreement.

d. During a layover, Crew Scheduling will attempt to limit

FRONTIER AIRLINES (R. BRIGHAM) - 0000879
0356

ESI00000796-65

calls to the first two hours or the last two hours of the layover, unless required to do otherwise due to the reasons outlined above.

e.   If a message is left at a Flight Attendant's phone contact number, it is the Flight Attendant's responsibility to make positive contact with Crew Scheduling to verify change(s) to his/her schedule.

X.   **AVAILABLE TO ASSIGN (AVA)**

1.   If the entire trip is cancelled, the Flight Attendant will be placed on Available to Assign (AVA) status.

2.   Assignment will be based on Reroute or Reschedule parameters, whichever is applicable. In addition:

   a.   No Red-Eye/CDO pairing will be assigned, unless the original pairing contained a Red-Eye/CDO. Exception: AVA assigned as part of an Award when no trip had originally been on the Flight Attendant's schedule.

   b.   There will be no pairing assigned that includes a sit time in excess of 3 hours in length, unless this sit time was part of an original pairing that was published in the monthly bid package or the sit time is part of a pairing that was created by a Flight Attendant through an Open Time or trade transaction.

3.   All Flight Attendants on AVA status will be available for assignment in a junior to senior order, after number of days and time available are considered.

4.   The Flight Attendant will be required to call to verify reassignment/release for each calendar day of AVA status. This call must be made between 1700 and 1800 base local time the day prior to each day of AVA status.

   **Example:**  If a two-day trip reporting on the 21st and releasing on the 22nd is cancelled, and notification given per "Reschedule" parameters, the Flight Attendant must call in for reassignment/release between 1700 and 1800 base local time on the 20th and 21st. If the Flight Attendant is released they will be pay protected for the original trip credit.

5.   A Flight Attendant on AVA status will be assigned prior to a Reserve.

6.   If the Flight Attendant does not want to remain on AVA status, he/she may request to DROP/SWAP AVA through the Automated Bid System.

Page 45 of 123

Y.   **DOUBLE COVERED**

1.    If more than one Flight Attendant is assigned the same trip and position and neither Flight Attendant has been notified of the double assignment before report, the most senior Flight Attendant has the option to fly the trip or be displaced. The displaced Flight Attendant will be pay protected for flight hours lost.

2.    If more than one Flight Attendant is awarded the same trip and position and the error is discovered prior to report, Crew Scheduling must offer a like trip to the Flight Attendants. The Flight Attendant first awarded the trip has the first option of the following:

   a.    Fly the awarded trip as scheduled;

   b.    Fly a like trip and receive compensation for the greater of the two trips;

   c.    Refuse to fly either trip and receive no compensation; or

   d.    Be assigned AVA as detailed under Reschedule.

3.    The second Flight Attendant has the option of 2.b-d above only when the first Flight Attendant has chosen to fly the awarded trip.

Z.   **EQUIPMENT DOWNGRADE**

1.    When a flight on an A320 is downgraded to an A319 or A318, the Company, at its sole discretion, will exercise one of the following options:

   a.    Operate the A319 or A318 with four working Flight Attendants to maintain schedule integrity and/or necessary crew routing.

   b.    Remove an extra Flight Attendant from the trip and reassign him or her to another trip employing Reschedule or Reroute parameters, whichever is applicable. The Flight Attendant to be reassigned will be determined as follows:

      (i)    If all Flight Attendants are on a single pairing, the opportunity for reassignment will be offered in seniority order to the Flight Attendants on the pairing carrying the surplus position, with the three most senior Flight Attendants having the right of refusal. The junior Flight Attendant will be reassigned if the three more senior Flight Attendants pass on the reassignment.

      (ii)    If a Flight Attendant was added to the pairing

Page 46 of 123

from a different pairing, the added Flight
Attendant will be reassigned.

2.  If there is no need to leave the A319 or A318 with four working
    crewmembers or there are no reassignment options available, one
    Flight Attendant will be released from duty and pay protected. The
    Flight Attendant to be released will be determined in the same
    manner as 1.b of this section.

3.  If any of the above provisions are exercised and there is a
    resulting vacancy in the FA, FB, or FC positions, the Flight
    Attendant originally assigned to the FD position will fill that vacant
    position.

AA.  **DISPLACEMENT**

1.  A Flight Attendant displaced by a Company employee who is FAA-
    qualified and current to perform Flight Attendant duties will be pay
    protected for any trip or part of trip from which he/she is removed.
    The Company will notify the displaced Flight Attendant as soon as
    possible of the displacement.

2.  A displaced Flight Attendant will be released from duty and may
    be offered any available Open Time by Crew Scheduling. The
    displaced Flight Attendant may accept or decline the Open Time
    offer.

BB.  **DECLARED IRREGULAR OPS**

1.  A Declared Irregular Operations (DIO) is defined as any short-term
    event such as weather or airport closure that significantly disrupts
    or that is predicted to significantly disrupt at least 25% of the total
    daily system flight segments. A DIO may be declared by the VP of
    Flight Operations or the Director of System Operations Control (or
    a position they report to) based on a known or predicted event.

2.  This provision is intended to provide the Company greater
    flexibility to operate during, and reestablish normal scheduled
    operations after, a DIO. Notice of the beginning and the end of a
    DIO will be included as a CrewTrac message to all Flight
    Attendants. Any DIO will also be posted on MyFrontier.org.

3.  During a DIO, Crew Scheduling will be allowed reasonable relief
    from Reschedule and Reroute limitations as necessary to conduct
    operations and to reestablish normal scheduled operations.

4.  During a DIO, information for Flight Attendants will be posted at
    www.MyFrontier.org\departments\inflight (if not on the myfrontier
    home page). Flight cancellations will be posted at
    www.FrontierAirlines.com, but crews must receive notification
    through Crew Scheduling.

FRONTIER AIRLINES (R. BRIGHAM) - 0000882
0359

ESI00000796-68

359

5.      During a DIO and recovery, a Flight Attendant who is sent to a
        Crew Hotel and remains an extended period of 8 hours and 15
        minutes or more, beyond block-in will be considered to be
        released to rest until reassignment. 24 hours at rest in an out-
        station or in base will meet FAR requirements for the 24 hours in
        7 days.

        **Example:** A crew scheduled for a DFW turn is sent to the hotel in
        DFW at 2000 because the return segment is cancelled due to DIA
        closure. The crew begins normal lay-over rest (though they are not
        released from reassignment). They are reassigned at 1800 the
        second day to depart at 0600 the third day. This crew has had
        legal rest as well as a 24 in 7 break for purposes of legality.

CC.     **DEADHEADING (DH)**

        1.      A deadheading Flight Attendant is one who is flying positive space
                on duty to or from a working assignment.

        2.      In uniform

                a.      Should not call undue attention to himself/herself, but
                        may engage in personal endeavors (reading, writing
                        letters, etc.); use discretion if seated on jumpseat in view
                        of passengers.

                b.      May sleep in an assigned passenger seat but may never
                        sleep on the jumpseat.

                c.      Must not consume alcohol.

                d.      A deadheading Flight Attendant is not considered to be
                        part of the minimum crew; therefore, the deadheading
                        Flight Attendant must not interfere (unless specifically
                        requested) in any aspect of the operation.

        3.      Out of uniform:

                a.      Must wear business attire appropriate for representing
                        the Company.

                b.      All other rules apply as stated above.

        4.      A Flight Attendant scheduled to deadhead from base will report 60
                minutes prior to departure in CrewTrac (or replacement software)
                and will report to the gate 30 minutes prior to departure.

        5.      A Flight Attendant scheduled to Deadhead from an outstation will
                report to the gate 30 minutes prior to departure.

        6.      A Flight Attendant may be assigned, in reverse seniority order, the
                Flight Attendant jumpseat if the flight is full and revenue

Page 48 of 123

passengers will be left behind. If the flight is full but only non-revenue passengers will be left behind, then the deadheading Flight Attendant may occupy the jumpseat at his/her discretion.

7.  A Flight Attendant who is required by the Company to deadhead to or from any station for the purpose of covering or returning from a flying assignment will be credited with 50 percent of the scheduled flight time of the deadhead trip. This provision will also apply when deadheading is by surface transportation and made in lieu of air transportation as though the deadheading were performed by air transportation.

8.  Deadhead time will be included in duty time. A Flight Attendant may not deadhead during any rest break required by crew legalities.

9.  A Flight Attendant deadheading at the end of a trip for the purpose of returning to his/her base will be scheduled on the first scheduled Company flight. A Flight Attendant must contact Crew Scheduling to be released from duty if the Flight Attendant alters or deviates from the original deadhead flight assignment.

10. Deviation from Scheduled Deadheads

    A Flight Attendant may deviate from Scheduled Deadheads under the provisions below. If the Flight Attendant deviates from the Scheduled Deadhead, the Flight Attendant will be responsible for arranging his/her own transportation.

    a.  Lineholders – Outbound from Base

        (i)   A Flight Attendant scheduled to Deadhead on the first leg of a Sequence will call Crew Scheduling no less than 24 hours in advance to notify them that they will not be taking the Deadhead flight.

        (ii)  Following the initial notification, a Flight Attendant scheduled to Deadhead on the first leg of a Sequence will call Crew Scheduling to check-in at least 3 hours but no more than 4 hours prior to the scheduled departure of the Deadhead leg.

        (iii) The Flight Attendant is also responsible for reporting to Crew Scheduling from his/her scheduled operating flight at the gate of departure at least 1 hour, but no more than 2 hours prior to scheduled departure for the first operating leg. For International flights, the check-in will be at least 1 hour and 15 minutes but no more than 2 hours and 15 minutes prior

FRONTIER AIRLINES (R. BRIGHAM) - 0000884
0361

ESI00000796-70

to scheduled departure for the first operating leg.

(iv)  The Flight Attendant must contact Crew Scheduling as soon as possible if the Flight Attendant encounters any delays that might affect the Flight Attendant's check-in time for the operating flight.

(v)  Should a Flight Attendant decide to deviate from his/her scheduled deadhead, the deadhead leg will be removed and not paid. This will postpone the duty time and the Flight Attendant's per diem until his/her actual duty period begins.

(vi)  A Flight Attendant may be required to come to base if that Flight Attendant has been Rescheduled or Rerouted.

b.  Lineholders – Inbound to Base

(i)  If a Flight Attendant, scheduled to Deadhead on the last leg of a Sequence, intends not to Deadhead to base, the Flight Attendant will call Crew Scheduling in advance. The Flight Attendant will not be reassigned during this notification call to Crew Scheduling except to work the Deadhead leg.

(ii)  Flight Attendants electing to take an on-line flight other than their originally scheduled Deadhead flight may travel on a space-available basis in accordance with Company policy. Should a Flight Attendant decide to deviate from his/her scheduled deadhead, the deadhead leg will be removed and not paid. This will also end the Flight Attendant's per diem.

c.  Reserve Flight Attendants

(i)  A Reserve Flight Attendant may alter or deviate from the original deadhead flight assignment only if the deadhead is the final leg of a trip and he/she has previously contacted Crew Scheduling.

(ii)  Should a Reserve Flight Attendant decide to deviate from his/her scheduled deadhead, the deadhead leg will be removed and not paid. This will also end the Flight Attendant's per

FRONTIER AIRLINES (R. BRIGHAM) - 0000885
0362

ESI00000796-71

362

diem.

(iii)    If a Reserve Flight Attendant chooses to deviate from the original assigned deadhead assignment, he/she is responsible for his/her own travel and is still considered to be on duty at the arrival time of the originally scheduled deadhead flight unless released by Crew Scheduling.

**Example:** Flight Attendant Jenny is on Reserve. She was scheduled for a Kansas City overnight with a deadhead home the next afternoon at 1615. Jenny would like to come home immediately after arriving in Kansas City. She contacts Crew Scheduling and invokes her option to deviate from her assignment. Jenny will be released and allowed to travel home and will be placed back on duty (Reserve) the following day at 1700 when she was originally scheduled to arrive at her base.

## DD.    **CHARTER FLYING**

1.    "Charter Flying" refers to a duty period that includes one or all of the following:

    a.    Scheduled service required to position to/from a charter;

    b.    Aircraft ferry flights required to position to/from a charter;

    c.    A charter flight.

2.    Charter flying may exceed duty limitations given the crew complement satisfies FAR requirements (FAR 121.467).

3.    All schedule changes made to charter flying will fall under the "Reschedule" provision of this section, regardless of the time made.

4.    Charter flying is client driven not schedule driven, so wait times may be extended.

5.    Inflight works with the charter client to plan and provide food and beverage selections on a charter flight. Inflight may provide flight-specific instructions for in-flight service. Flight Attendants working a charter flight must follow the instructions provided.

6.    The same FARs and Inflight procedures as scheduled service are in effect for charter flights. Required announcements, compliance checks, etc., must be performed along with any additional

FRONTIER AIRLINES (R. BRIGHAM) - 0000886

0363

363

ESI00000796-72

instructions.

7.    The Onboard Charter Coordinator (OCC) provided by Frontier acts
      as a liaison between the client and Frontier to facilitate
      communication and handle issues that may arise. Not all charter
      flights require an OCC.

8.    Premium Service

      a.    For charter flights requiring premium service, an
            additional Flight Attendant may be assigned

      b.    Flight Attendant must be premium service qualified and
            in good standing.

      c.    Premium service qualified Flight Attendants will receive
            written notification of upcoming charter trips for that bid
            period.

      d.    Premium service qualified Flight Attendants must
            provide written notification to Inflight by the deadline.

      e.    Trips are awarded based on seniority. Trips are assigned
            before bids close.

Page 52 of 123

## ARTICLE 6
## RESERVE FLIGHT ATTENDANTS

A.   **RESERVE FLIGHT ATTENDANTS - GENERAL**

1.   General Guidelines

a.   A "Reserve" is an active Flight Attendant with assigned days on call but no assigned line of flying.

b.   Reserve lines will be constructed with two or more consecutive days off. A Reserve may choose to waive down to a single day off via the Automated Bid System during the Reserve Automated Bid System process. Crew Planning may adjust a Reserve to a single day off only for transition periods.

c.   Reserve Flight Attendants will be on-call 24 hours, midnight to midnight, as indicated by "R", "RSV" or "RSN" (RSN – for Mixed Line holders) on his/her schedule, unless released by Crew Scheduling.

d.   Reserve lines will be constructed with a minimum of three consecutive "R" days unless adjusted by Crew Resources for transition periods, which could result in a single day of Reserve duty.

e.   Reserve lines will be constructed with Recurrent Training as a pre-planned absence and will count toward the 75 hour guarantee. Recurrent Training must be scheduled adjacent to a group consisting of three or more consecutive Reserve days either prior to a block of Reserve days or following a block of Reserve days. Recurrent Training will not be scheduled in the middle of a block of Reserve days or scheduled to create a stand-alone Reserve day. Reserves attending Recurrent Training require a minimum of 10 hours rest in base before and after Recurrent Training.

f.   A minimum of 11 days free from duty will be scheduled in every Reserve line per bid period. A Flight Attendant awarded a Mixed Line will be scheduled with a minimum of 10 days free from duty.

g.   A Reserve Flight Attendant may be assigned scheduled and non-scheduled trips as well as Ready Reserve duty.

B.   **CONTACT AND REPORT TIME GUIDELINES**

1.   A Reserve Flight Attendant will ensure that Crew Scheduling has reliable contact telephone number(s) for all periods of Reserve and must be available for contact at all times while on Reserve

FRONTIER AIRLINES (R. BRIGHAM) - 0000888
0365

ESI00000796-74

status, unless released by Crew Scheduling. The contact phone number must have voicemail capability.

2. A Reserve Flight Attendant must be able to report to the crew lounge or the aircraft, as assigned by Crew Scheduling, within two hours.

3. In the event the Reserve Flight Attendant is left a message while on call-out status, he/she must respond to Crew Scheduling within 15 minutes. A Reserve Flight Attendant who fails to respond within 15 minutes will be listed as Unable To Contact. If the initial notification attempt was for a short call, the two-hour report time begins at the time Crew Scheduling made the initial call, not at the callback time. The Reserve Flight Attendant is responsible for making the original two-hour report time.

## C. **AGGRESSIVE RESERVE ASSIGNMENTS**

*NOTE: All times will be considered Local Headquarters Time (IND) unless otherwise noted.*

1. From 1500 to 1800 all open trips that report on the following calendar day will be made available for bidding in the Aggressive Reserve Folder in the Automated Bid System. Aggressive Reserve awards will be processed prior to the normal Reserve assignment process and will be awarded on a first-requested, first-awarded basis. Aggressive Reserve requests are time-stamped in the Automated Bid System and will be processed in order of the earliest time- stamp to the latest time-stamp.

2. A Reserve Flight Attendant can only bid Aggressive Reserve trips that fall within their available Reserve days. Trips will be awarded on a first-requested, first-awarded basis to Reserve Flight Attendants whose days of availability match the length of the trip. However, a trip may be awarded to a Reserve Flight Attendant that is shorter than the length of available days based on, but not limited to, operational factors and available staffing.

3. Crew Scheduling may deny an Aggressive Reserve bid if the assignment of the trip will result in a Reserve having a projected credit of more than 75 hours for the bid period. This excludes Mixed Line Flight Attendants.

4. A Reserve assignment for the current day will take precedence over an Aggressive Reserve award.

5. Reserves may use the Aggressive Reserve process to combine open trips with an existing assignment. Minimum connection time (60 minutes for domestic; 75 minutes for international) will apply when combining Open Time trips.

6. Reserve Flight Attendants will be responsible to check responses

Page 54 of 123

(Approval/Denial) in the Aggressive Reserve Folder on the Automated Bid System. Approved/Denied bids (Trip, Ready Reserve, Reserve No-Fly Days, etc.), will be published by Crew Scheduling in the Automated Bid System, and will be considered confirmation of awards/denials. All release time requirements will apply.

7.  Crew Scheduling may deny an Aggressive Reserve bid if the bid does not satisfy all duty and rest requirements.

8.  Trips not awarded through Aggressive Reserve will be assigned through the Trip Assignment Process below.

D.  **TRIP ASSIGNMENT PROCESS**

1.  Reserve assignments are made based on, but not limited to, accrued bid period credit, days available, Ready Reserve shifts worked during the bid period, and Flight Attendant legality. If multiple Flight Attendants match a trip length (e.g. four days of availability for a four-day trip) the Flight Attendant with the lowest accrued bid period credit will usually receive the trip. A Reserve Flight Attendant's credit calculation will not include any credited time picked up on a Reserve's days off. However, the credit time will include accrued bid period paid days such as Vacation, Sick, Funeral, Jury, Company Business, Union Business and Recurrent Training or other scheduled training.

2.  Reserves will be provided as much advance notification of assignments as possible. Reserve assignments for the following day will begin after 1800 (base local time).

3.  When a Reserve Flight Attendant is on a day off and needs to be given an assignment for the next day, Crew Scheduling will attempt to contact the Flight Attendant by phone during the hours of 1400-2300 (base local time).

    a.  The Flight Attendant is not required to answer the phone but is responsible for the assignment given.

    b.  If the Flight Attendant chooses not to return a call from Crew Scheduling prior to the Reserve day beginning at 0001, Crew Scheduling will notify the Reserve while he/she is on call-out status.

4.  When a Reserve is on a legal rest and needs to be given a new assignment, Crew Scheduling will attempt to contact the Flight Attendant during the first two hours or last two hours of the rest period, unless there is an emergency or operational necessity.

5.  A courtesy telephone call from Crew Scheduling during a rest period or day off does not constitute an interruption of a Reserve's rest.

FRONTIER AIRLINES (R. BRIGHAM) - 0000890

ESI00000796-76

367

6.   Reserves will not be able to make requests to Crew Scheduling involving specific assignment preferences such as layovers, types of trips, or Ready Reserve shifts, with the exception of requests submitted during the Aggressive Reserve process.

7.   A Reserve may not drop or trade a trip assigned by Crew Scheduling.

E.   **RED-EYE ASSIGNMENTS**

1.   A Reserve Flight Attendant will be released to 12 hours free from duty when inbound from a red-eye flight into home base. The Reserve Flight Attendant should remind Crew Scheduling that he/she completed a red-eye flight when he/she calls to be released from duty so that the appropriate rest time can be reflected in CrewTrac (or replacement software). A Reserve Flight Attendant will not be assigned to a flight following a red-eye flight unless it is part of the original trip pairing.

2.   The Company will not assign a Reserve Flight Attendant to a red-eye flight after an AM Ready Reserve assignment or a previous trip that returns prior to 1400 the same day (base local time), unless the assignment will prevent a Junior Assignment.

F.   **READY RESERVE (AIRPORT STANDBY)**

1.   Ready Reserve shifts will usually be scheduled for six hours and may be adjusted to eight hours as required by operational or staffing needs. Shift start and end times may be adjusted to accommodate schedule changes. Reserve Flight Attendants will submit Ready Reserve shift preferences for the following day in the Automated Bid System Aggressive Reserve Folder between 1500 and 1800 and assignments will be based on a first-requested, first-awarded basis for those Flight Attendants who will be assigned Ready Reserve. At no time will a Flight Attendant be assigned a Ready Reserve shift that results in a legality conflict.

2.   A Flight Attendant assigned to sit Reserve in another base will be paid per diem as well as provided hotel accommodations when sitting multi-day Reserve assignments. These Reserve assignments will not exceed 6 consecutive days from report to release at his/her base. All work rules applicable to Reserve Flight Attendants apply when assigned Reserve shifts out of base.

3.   Ready Reserve shifts will be designated in CrewTrac (or replacement software) as follows:

   a.   RSA - AM shift
   b.   RSB - Mid-day shift
   c.   RSC - PM shift
   d.   RSD - Night Shift

FRONTIER AIRLINES (R. BRIGHAM) - 0000891
0368

ESI00000796-77

368

4.      Ready Reserve shifts will be paid at a 1-for-2 value (one Credit Hour for every two hours on Ready Reserve). If a Ready Reserve is released early or extended, the credit for the shift will reflect the change. If a Ready Reserve is given a trip while sitting a Ready Reserve shift, the release time and shift credit will be adjusted to reflect an updated 1-for-2 credit and an end time of 0:01 minute prior to the report of the trip assignment. The Ready Reserve will receive both the Ready Reserve shift credit in addition to any flight time flown that day.

**Example:** A Ready Reserve sits six hours in the crew lounge but is not given an assignment. The Ready Reserve is released for base rest and is given three hours credit toward the guarantee for the bid period.

**Example:** A Ready Reserve receives a call from Crew Scheduling for a 1000 report time, flying an ATL turn worth six hours of credit. The Ready Reserve started the day at 0700 and will receive 1:30 credit for their Ready Reserve shift from 0700 to 1000, as well as six hours credit for the ATL turn.

**Example:** A Ready Reserve is scheduled to sit for six hours and is released after five hours to crew rest for an early trip the next day. The Reserve will receive 2:30 of credit for actual sit time.

G.      **RELEASE FROM DUTY**

1.      A Reserve Flight Attendant completing any Reserve assignment will contact Crew Scheduling before leaving the airport for release or reassignment.

2.      Reserves will be released from on-call duty after a flight assignment based on the duty day as follows:

a.      When the last duty period of an assignment is less than 10 hours, the Reserve will be: given an additional flight or Ready Reserve assignment; placed back on-call; or released.

b.      When the last duty period of an assignment is 10 hours or more, the Reserve will be released to rest or to days off, except in irregular operations situations.

3.      Reserves will be released from Reserve status until report time of their next assignment upon notification of that assignment, based on when the assignment reports the next day. If an assignment for the next day reports before 1200 (base local time), the Reserve will be released at the time of notification until the report time. If the assignment for the next day reports on or after 1200 (base local time), the Reserve will be released at 2359 (base local time) until the report time.

FRONTIER AIRLINES (R. BRIGHAM) - 0000892
0369

ESI00000796-78

369

4.   A Reserve returning from a flight assignment at 1600 (base local time) or later on the last day of a block of Reserve days will be: given another flight assignment or Ready Reserve assignment; or released into days off. A Reserve will not be placed back on-call. It will remain the Reserve's responsibility to contact Crew Scheduling for release.

5.   A Reserve Flight Attendant who has not been called on his/her last day of a block of Reserve days may call Crew Scheduling after 1800 (base local time) to be released into his/her days off.

## H.   SCHEDULE ADJUSTMENTS

1.   Reserve Flight Attendants are able to pick up Open Time and utilize the Flight Attendant TradeBoard. Reserve Flight Attendants will also be permitted to sign up for Will-Fly (WIL) status provided all rest requirements are met.

2.   Reserve Flight Attendant Open Time Procedures

   a.   Reserve Flight Attendants picking up Open Time will be required to have a minimum 10 hour rest period before/after any trip report/release. A Reserve must also be scheduled to have a calendar day off in any seven-day period. All trip additions are subject to all rest requirements as set forth by this Agreement and the FARs.

   b.   Requests for trips that add duty periods for the last six days of a bid period will not be allowed until 1400 on the 18th.

   c.   Reserves will be paid at straight time rate for hours picked up on days off in addition to their 75-hour guarantee. Should a Reserve fly more than 86 hours, the overtime rate (1.5) will be paid for the hours beyond 86. Credit for Ready Reserve shifts will apply towards the 86 hours.

   d.   A Reserve Flight Attendant, on his/her last day of a Reserve period, who has picked up a trip for the following day that causes a 10-hour rest violation, will not be pay protected for the trip or any portion of the trip that makes them illegal. The Reserve Flight Attendant will complete any portion of the added trip that is legal.

   e.   Reserve Flight Attendants who ADD/SWAP a non-Reserve trip from Open Time will be considered a Line Holder for any schedule changes or irregular operations during that trip.

FRONTIER AIRLINES (R. BRIGHAM) - 0000893
0370

ESI00000796-79

370

3. Reserve Flight Attendant TradeBoard Procedures:

   a. Reserve Flight Attendants picking up trips off the Flight Attendant TradeBoard will be required to have a minimum 10 hour rest period before/after any trip report/release. A Reserve must also be scheduled to have a calendar day off in any seven-day period. All trip additions are subject to all rest requirements of this Agreement.

   b. Requests for trips that add duty periods for the last six days of a bid period will not be allowed until 1400 on the 18th.

   c. Reserves will be paid at straight time rate for hours picked up on days off in addition to their 75-hour guarantee. Should a Reserve fly more than 86 hours, the overtime rate (1.5) will be paid for the hours beyond 86. Credit for Ready Reserve shifts will apply towards the 86 hours.

   d. A Reserve Flight Attendant, on his/her last day of a Reserve period, who has picked up a trip for the following day that causes a 10-hour rest violation, will not be pay protected for the trip or any portion of the trip that makes them illegal. The Reserve Flight Attendant will complete any portion of the added trip that is legal.

   e. A Reserve Flight Attendant wanting to trade a Reserve day must have at least one other Reserve day before/after the Reserve day being traded. The Reserve day trade cannot result in a single Reserve day. All Reserve Trades must be Reserve day for Reserve day.

   f. Reserve Flight Attendants who ADD/TRADE a non-Reserve trip from the TradeBoard will be considered a Line Holder for any schedule changes or irregular operations during that trip.

   g. Reserve Flight Attendants may trade Reserve days only with other Reserve Flight Attendants or Mixed Line holders.

4. Reserve Day Drop (No-Fly)

   a. On days of sufficient reserve coverage, the Company may offer Reserve No-Fly Days (RNF). Reserve Flight Attendants will submit a bid for a RNF in the Aggressive Reserve Folder in the Automated Bid System. Bids will only be considered for a single Reserve period for the following calendar day. Awards will be on a first-requested, first-awarded basis. Reserve Flight

FRONTIER AIRLINES (R. BRIGHAM) - 0000894
0371

ESI00000796-80

Attendants awarded a RNF will lose the four hours credit for the dropped Reserve day.

b.   The approval/denial of any bids will be based on staffing, any potential system disruptions, and the ability to retain an adequate number of Reserves that are available for multi-day trips.

c.   A maximum of three RNFs may be awarded to any Reserve Flight Attendant in each bid period. A Flight Attendant will be considered notified of a RNF if the drop request is marked approved in the Automated Bid System. A Reserve Flight Attendant approved a RNF will not be released until 2359 (base local time), the end of the current Reserve period, unless released by Crew Scheduling.

**Example:** Sally P. has placed a request in Aggressive Reserve for a RNF day for tomorrow. At 1800, Crew Scheduling approves the request. Sally P. is still on Reserve for the remainder of today. Crew Scheduling calls Sally P. at 1900 for a Stand-up that night. Sally P. must take the trip, as today's operation takes precedence over tomorrow. Sally P.'s RNF day will now be removed.

**Example:** Johnny W. has placed a request in Aggressive Reserve for a RNF day for tomorrow. At 1800, Crew Scheduling approves the request. Johnny W. is still on Reserve for the remainder of today. At 2100, Johnny W. calls Crew Scheduling to be released for the day and they approve that request. Johnny W. will be released for the remainder of the night and will have a RNF day the next day.

I.   **SHORT CALL LIST**

1.   Reserves will have the daily option of placing themselves on a Short Call List (to be assigned for call-outs two hours or less) via a telephone call to Crew Scheduling. The Reserve Flight Attendant will inform Crew Scheduling of their desire to be on the Short Call List by stating, "(Flight Attendant name and Employee Number) – I would like to be placed on the Short Call List for today." Crew Scheduling may assign these Flight Attendants out of assignment order. If a Reserve is given an assignment based on this preference and criteria, the Reserve may not reject the assignment.

2.   All Contact and Report Time Guidelines will apply to a Short Call assignment.

**Example:** Mary calls Crew Scheduling at 1000 and says: "This is Mary Smith, employee number 9999, and I would like to be

FRONTIER AIRLINES (R. BRIGHAM) - 0000895
0372

ESI00000796-81

placed on the Short Call List for today." Crew Scheduling calls Mary at 1230 and tells her that they have a trip for her that departs two hours from the time of the phone call. Mary is required to take the trip and will need to report within two hours of the original call from Crew Scheduling.

J. **MIXED LINES**

1. General Guidelines

   a. Flight Attendants awarded Reserve status during the monthly bid will have the opportunity to participate in a secondary bid, called Mixed Lines, when offered by the Company. Mixed Lines will be built by the Company and will have a credit value of at least 75 hours. Mixed Lines may not be offered every bid period. When the Company builds Mixed Lines, they may be built in one of the following ways:

      (i) Mixed Lines may contain any combination of trips and Reserve days; or

      (ii) Mixed Lines may contain only trips.

   b. Each Reserve day on a Mixed Line will carry a minimum credit value of 4 hours.

   c. Mixed Lines will be built by Crew Resources and will be posted in the Automated Bid System as a secondary bid after the initial Automated Bid System award and before the Reserve line award, when available. Mixed Line bidding will open each month on the 16th day at 1600. Bidding will conclude on the 17th day at 1400 each month.

   d. Mixed Lines will be constructed with a minimum of 40 credited trip hours. Reserve days will be added to bring the Mixed Line value to a minimum of 75 credit hours. Reserve days for Mixed Lines will have a value of four hours each. When a Mixed Line Flight Attendant is assigned trips on Reserve days, pay protections apply only to the block of Reserve days, not single days of Reserve.

      **Example:** Mary has a block of three RSN days worth 12 hours total. Crew Scheduling assigns her a three-day trip worth 15 hours total, but the first day of the trip is only worth 2:30. Mary will be credited the full 15 hours of the trip and no further pay protections are necessary because the trip was worth more than 12 hours of RSN time for all three RSN days.

      **Example:** Johnny also has a block of three RSN days.

Page 61 of 123

FRONTIER AIRLINES (R. BRIGHAM) - 0000896

Crew Scheduling assigns him a two-day trip worth 7:17 and he stayed at home on the third RSN day. Johnny is pay protected 43 minutes since the original value of his two RSN days was eight hours. He still receives four hours credit for the third RSN day in this block because he sat at home waiting to be assigned.

e.   A transition conflict is any interference or illegality from the current bid period to the following bid period. Transition conflicts for Mixed Line holders will be resolved in the following manner:

(i)   If a trip that begins in the current bid period conflicts with another trip in the following bid period, the transition conflict will be resolved by dropping the minimum amount of time necessary to resolve the conflict or illegality. This adjustment will be made in the following bid period rather than the current bid period and such adjustment will be made at the beginning or end of a trip. The Flight Attendant will not be pay protected for the time dropped.

**Example:**  Mary has a trip that reports on the last day of the current bid period and returns on the second of the following bid period. Mary's Mixed Line award for the following bid period begins with a two-day trip that reports on the first. Mary will be removed from the entire two-day trip, as it returns on the second, prior to the arrival of her four-day trip from the previous bid period. Mary lost 10 hours as a result of the removal. She is still at 65 hours so no adjustment needs to be made to her bid period.

(ii)   If a trip that begins in the current bid period conflicts with a scheduled Reserve day in the following bid period, the transition conflict will be resolved by adjusting the Reserve code to begin immediately following the debrief of the trip. After completing the transition trip, the Mixed Line Flight Attendant will call Crew Scheduling before leaving the airport for a Reserve assignment or release. A Reserve assignment or release will be based on the duty day upon completing the carry-over trip:

a)   If the duty day is less than 10 hours, the Flight Attendant will be: given a flight assignment or Ready Reserve assignment; placed on-call; or released. The Flight

Page 62 of 123

Attendant will be pay credited for the greater of the flight time flown or 4.0 hours.

b) If the duty day is 10 hours or more, the Flight Attendant will be released to rest or to days off, except in irregular operation situations. The Flight Attendant will be pay credited for the greater of the flight time flown or 4.0 hours.

**Example:** Mary has a trip that reports on the last day of the current bid period and returns on the second of the following bid period. Mary's Mixed Line award for the following bid period begins with Reserve days scheduled on the second and third. Mary must call Crew Scheduling before leaving the airport to be released or given an assignment. She's been on duty for less than 10 hours so Crew Scheduling may assign her: to another trip or Ready Reserve; Reserve status; or release her to rest. Mary has already flown three hours on the second so her pay credit for the day depends on any additional assignments. If she is released from Reserve status, she will receive four hours of pay credit for the day.

f. It is the Mixed Line Flight Attendant's responsibility to ensure he/she is above 60 credit hours by the end of the bid period. Flight Attendants may call Crew Planning before the 7th of the month to request Reserve days be added to their schedule to bring them above 60 hours. If the Flight Attendant falls below 60 hours, Crew Planning may balance the Flight Attendant on the 7th of the month by adding or swapping trips and/or adding additional Reserve days.

2. Mixed Line Non-Reserve Day Guidelines

a. Mixed Line Flight Attendants may not end the bid period below 60 credit hours.

b. Mixed Line Flight Attendants have full access to all Open Time processes and Trip Trades.

c. Mixed Lines will initially be built to a minimum credit of 75 hours. The minimum 75 credit hours will include trip credit, Reserve day credit, and any applicable absence credit.

Page 63 of 123

d.   All applicable rules pertaining to Line Holders will apply to Mixed Line Flight Attendants when not on a Reserve day.

3.   Mixed Line Reserve Day Guidelines

a.   Mixed Line Flight Attendants will be on call 24 hours, midnight-to-midnight, as indicated by "RSN" on his/her schedule, unless released by Crew Scheduling.

b.   Rules governing ADD/SWAP/TRADE adjacent to any Reserve days will apply.

c.   Only credit time on RSN days and applicable absence credit will count towards the Reserve credit calculation and the assignment of Mixed Line Flight Attendants on RSN days.

d.   All other Reserve rules will apply to Mixed Line Flight Attendants on their Reserve days.

e.   A Mixed Line holder may trade Reserve days only with Reserves or other Mixed Line holders. All Reserve Trades must be Reserve day for Reserve day.

4.   Mixed Line Vacation

a.   Flight Attendants will receive paid vacation. Flight Attendant vacation awards will be granted in seniority order. Flight Attendants will bid vacation based on their projected accrual as of December 31st.

b.   The number of guaranteed days off in the bid award will be prorated during bid periods with pre-awarded absences (vacation, etc.). (See the Reserve FA Absence Proration Table below.)

c.   Accrued but unused vacation will be paid in the event of furlough, retirement, or termination according to the terms of this Agreement. If any vacation days are not scheduled to be used by December 31st of the current year, they will be paid no later than January 21st of the next consecutive calendar year. Unused vacation for the current calendar year cannot be carried over into the next calendar year.

d.   Crew Planning will handle all vacation records and will administer the vacation bidding process via the Automated Bidding System.

e.   All vacation days are earned based on accrual rate.

Page 64 of 123

ESI00000796-85

376

Accrual rate increases on the Flight Attendant's 5- and 10-year Company anniversary dates. All vacation earned in the current year is taken next year.

f. Mixed Line Flight Attendants may slide their vacation, a maximum of three days, during the pre-award period. Vacation slides may not be between bid periods.

g. If Mixed Line Flight Attendant has a transition trip that overlaps an awarded vacation day(s) and the Flight Attendant chooses not to slide his/her vacation, the overlapping portion of the trip will be dropped without pay if the trip can be split in base. Otherwise, the entire trip will be dropped to resolve the conflict, and the Mixed Line Flight Attendant will not be pay protected.

h. The credit value for each day of vacation will be 3 hours per vacation day.

## K. RESERVE LINE VACATION

1. Reserve Flight Attendants will receive paid vacation. Flight Attendant vacation awards will be granted in seniority order. Flight Attendants will bid vacation based on their projected accrual as of December 31st.

2. Number of guaranteed days off in bid award will be prorated during bid periods with pre-awarded absences (vacation, etc.)

3. Accrued but unused vacation will be paid in the event of furlough, retirement, or termination according to the terms of this Agreement. If any vacation days are not scheduled to be used by December 31st of the current year, they will be paid no later than January 21st of the next consecutive calendar year. Unused vacation for the current calendar year cannot be carried over into the next calendar year.

4. Crew Planning will handle all vacation records and will administer the vacation bidding process via the Automated Bid System.

5. All vacation days are earned based on accrual rate. Accrual rate increases on the Flight Attendant's 5- and 10- year Company anniversary dates. All vacation earned in the current year is taken next year.

6. Flight Attendants may slide their vacation, a maximum of three days, during the pre-award period. Vacation slides may not be between bid periods.

7. The credit value for each day of vacation will be 3 hours per day.

Page 65 of 123

ESI00000796-86

377

L. **RESERVE FLIGHT ATTENDANT ABSENCE PRORATION TABLE**

*NOTE: Awarded Days Off does NOT include Vacation Days, etc.*

| 30-DAY MONTH | | 31-DAY MONTH | |
|---|---|---|---|
| **TOTAL DAYS ABSENT** | **AWARDED DAYS OFF** | **TOTAL DAYS ABSENT** | **AWARDED DAYS OFF** |
| 1 | 11 | 1 | 11 |
| 2-4 | 10 | 2-4 | 10 |
| 5-6 | 9 | 5-7 | 9 |
| 7-9 | 8 | 8-9 | 8 |
| 10-12 | 7 | 10-12 | 7 |
| 13-15 | 6 | 13-15 | 6 |
| 16-17 | 5 | 16-18 | 5 |
| 18-20 | 4 | 19-21 | 4 |
| 2 1-23 | 3 | 22-23 | 3 |
| 24-25 | 2 | 24-26 | 2 |
| 26-28 | 1 | 27-29 | 1 |
| 29-30 | 0 | 30-31 | 0 |

**Example:** John Q Reserve Flight Attendant has seven days of vacation (Total Absence Days) in a bid period that is a 30-day Month. According to the proration chart, John will get seven days of Vacation in his bid and will receive eight additional awarded days off.

M. **RESERVE CODES**

*NOTE: Reserve codes are subject to change.*

| Code | Definition | Description |
|---|---|---|
| RSV and/or R | Reserve – Normal Line | Reserve day 0000-2359 (base local time) unless adjusted by Crew Scheduling due to assignment or legalities. |
| RSN | Mixed Line FAs Reserve Days | Reserve day on a Mixed Line 0000-2359 (base local time) unless adjusted by Crew Scheduling due to assignment or legalities. |
| RSA | Ready Reserve – AM | Reserve shift at the airport on immediate standby status during the AM hours. This counts as duty for legality purposes. |
| RSB | Ready Reserve – MID | Reserve shift at the airport on immediate standby status during the late AM / early PM hours. This counts as duty for legality purposes. |
| RSC | Ready Reserve – PM | Reserve shift at the airport on immediate standby status during the PM hours. This counts as duty for legality purposes. |
| RSD | Ready Reserve – Stand-up/Red-Eye | Reserve shift at the airport on immediate standby status during the late PM hours. This counts as duty for legality purposes. |

Page 66 of 123

| RNF | Reserve No-fly Day | Day off from Reserve, bid via the Aggressive Reserve Process. A maximum of three RNF days may be awarded per Reserve Flight Attendant. |
|---|---|---|
| "X" | Required Day Off | In Reserve Awards on the Automated Bid System, this indicates a required day off due to legalities. |
| "W" | Pre-assigned Work Day | In Reserve Awards on the Automated Bid System, this indicates a work day that has been pre-awarded prior to the Reserve bid. Includes Recurrent Training, Company Business, etc. |
| "V" | Vacation Day | In Reserve Awards on the Automated Bid System, this indicates a Vacation Day. |
| "O" | Pre-assigned Day Off | In Reserve Awards on the Automated Bid System, this is a pre- assigned day off that will count as one of the required days off. |
| "L" | Pre-assigned Leave | In Reserve Awards on the Automated Bid System, this indicates a non-work day, and required days off will be prorated. (See the Reserve Flight Attendant Absence Proration Table above). |
| "P" | Transition Pairing | In Reserve Awards on the Automated Bid System, this indicates a work day, but it may not exceed six days in a row (i.e., 1 in 7 applies). |

FRONTIER AIRLINES (R. BRIGHAM) - 0000902
0379

ESI00000796-88

379

## ARTICLE 7
## TRAINING

### A.   CLASSROOM REQUIREMENTS

1.   Due to FAA classroom content restrictions, Inflight Training must operate under strict attendance policies. The following policies apply to all required training events.

2.   Class begins promptly at the published start time.

3.   If a Flight Attendant arrives to training up to 9 minutes late, he/she will be allowed to stay in class, but may be subject to discipline.

4.   If a Flight Attendant arrives to training 10 or more minutes late, he/she will be dismissed from class, re-scheduled for another training date on a day off, and may be subject to discipline.

### B.   REQUIREMENTS FOR ATTENDING RECURRENT TRAINING

Online Exam:

1.   All Flight Attendants must successfully pass Recurrent Training exam before attending class.

2.   Exam will be posted on the Company's computer based training website by the 5th of the month prior to attending Recurrent Training. First attempt of the exam is offered online. If a Flight Attendant fails the online exam, a second attempt will be conducted using a paper test. The Flight Attendant must contact Inflight Training to schedule a retake of a failed online examination. If the second attempt is unsuccessful, the Flight Attendant will be separated from company.

3.   If a Flight Attendant attends class without taking or passing the exam, the Flight Attendant will be dismissed from class, re-scheduled for another training date on a day off, and may be subject to discipline.

### C.   TRADING RECURRENT TRAINING DATES

1.   The Inflight Training department will handle all qualification training records and Crew Planning will administer the training bidding/trading process via the Automated Bid System.

2.   A Flight Attendant may trade a scheduled recurrent training date with any open recurrent date or with another Flight Attendant. Requests must be in compliance with duty and rest limitations as established by this Agreement and FARs.

3.   TRADE/SWAP of Recurrent Training dates starts at noon on the

FRONTIER AIRLINES (R. BRIGHAM) - 0000903
0380

ESI00000796-89

18th of the month prior to attending class. TRADES/SWAPS are allowed until 72 hours prior to scheduled Recurrent Training date TRADE/SWAP requests are made via the Automated Bid System.

4.  Two options are available for trading a scheduled recurrent training date:

    a.  Trade with open class slots: Trades are granted only if space is available in the requested class date and awarded first come, first serve via the Automated Bid System.

    b.  Trades with another Flight Attendant: All Recurrent Training trades will be completed via the Automated Bid System.

5.  Line Holders and Reserve Flight Attendants are eligible for Recurrent Training trades. Reserves using the Recurrent Training trade process will be subject to the limitations set forth in this Agreement, as well as the limitations outlined above.

6.  Neither Crew Scheduling/Crew Planning, nor Inflight Management will enter, modify or remove any request in the Automated Bid System for a Flight Attendant.

7.  Notifications of status of trades will be reflected in the Automated Bid System as well as CrewTrac (or replacement software).

8.  Trades must be made on scheduled days off and all legalities must be met.

9.  All Recurrent Training trades must be done in the bid period of the Flight Attendant's Recurrent Training event. Recurrent Training trades cannot take place from one bid period to another.

D.  **TRAINING OUT-OF-BASE**

    1.  Travel to a training event away from a Flight Attendant's base will be positive space must ride.

    2.  The Company is solely responsible for arranging travel for any Flight Attendant attending a training event away from his/her base. The Company will consider any personal schedule conflicts brought to its attention by the Flight Attendant regarding the day of travel and will make an effort to work with the Flight Attendant arrange an accommodating travel itinerary for the scheduled day of travel.

FRONTIER AIRLINES (R. BRIGHAM) - 0000904
0381

ESI00000796-90

# ARTICLE 8
## SICK LEAVE

A.   **ACCRUAL**

1.   Sick leave will accrue at the rate of 3.87 hours per month while the Flight Attendant is on active service. This accrual for full-time Flight Attendants is equal to 8 days for a full year of service.

2.   Sick leave is not accrued while on furlough or leave of absence.

3.   Sick leave accrual will be reduced by 50% each month that a Flight Attendant elects to job share, and during all months a Flight Attendant is on low-time status.

4.   A Flight Attendant will accrue a maximum of 696 hours.

5.   Earned but unused sick leave will not be paid in the event of furlough, retirement, or termination of employment, whether voluntary or involuntary, but will be retained while a Flight Attendant is on approved leaves of absence or furlough.

6.   Accrued sick leave is the manner in which an employee is paid when unable to work due to illness or injury. Accrued sick leave does not guarantee leave approval.

B.   **USE OF SICK LEAVE**

1.   Sick leave will be deducted from the Flight Attendant's bank on a one-for-one basis for each block hour, or portion thereof, missed because of illness or injury. If sick leave taken exceeds a Flight Attendant's bank of sick hours, he/she may take credit time from his/her vacation bank (each vacation day will be applied to sick leave in three hour increments).

2.   A Flight Attendant who wishes to apply hours from his/her vacation bank to sick leave must submit such request in writing to payroll (or as otherwise specified by the Company) by the last calendar day of the month. When all accrued days are exhausted, the Flight Attendant may be placed on unpaid medical leave. If the illness is covered by the Family and Medical Leave Act, the Flight Attendant must use all available sick accrual.

3.   A Flight Attendant may not use company pass benefits (including pass riders) while on sick leave without management approval.

C.   **REPLENISHMENT OF SICK BANK**

1.   A Flight Attendant may replenish his/her sick leave bank by picking up Open Time, unless he/she subsequently drops, or calls in sick for, that Open Time.

FRONTIER AIRLINES (R. BRIGHAM) - 0000905
0382

ESI00000796-91

382

2. A Reserve Flight Attendant may only replenish his/her sick leave bank by picking up Open Time on a scheduled day off, or by adding a Reserve block to the beginning or end of an already scheduled Reserve block, provided the additional Reserve block is within the duty time and rest limitations of this Agreement and the FARs.

3. Replenishment of sick leave bank will be on a one-for-one basis for each block hour flown, or portion thereof, that the Flight Attendant designates in accordance with this Article. Open Time that is picked up and subsequently replaced with Company Business may also be used to replenish the sick leave bank.

4. If a Flight Attendant wishes to replenish his/her sick leave bank, he/she must do so within the next two full Monthly Bid Periods of using such sick leave.

   **Example:** Bill calls in sick for a 6 hour trip on July 10. If he wishes to replenish his sick bank, he must do so no later than the end of September (i.e. the next two full Monthly Bid Periods following July are August and September).

5. A Flight Attendant must designate to payroll the sick date(s) for which the Flight Attendant wishes to apply picked up Open Time by the end of the Monthly Bid Period in which he/she picked up the Open Time.

   **Example:** Same facts as above. Bill picks up an 8 hour turn on his day o ff on August 12. Bill must contact payroll by August 31 to designate these hours to replenish his sick bank for the hours deducted on July 10. Payroll will apply 6 of the 8 hours to replenish Bill's sick bank, and the remaining two hours will be credited to his regular paycheck.

   **Example:** Jenny calls in sick for three Reserve days in February. Twelve hours will be deducted from her sick bank (four hours per day). She picks up an 8 hour two-day trip on her days off in March. She must contact payroll no later than March 31 if she wishes to apply those 8 hours to replenish 8 of the 12 sick bank hours deducted for her February sick call.

## D. SICK CALLS

1. A Flight Attendant who is unable to report for work because of illness or off-the-job injury will notify Crew Scheduling as soon as possible.

2. If a Flight Attendant is not able to contact Crew Scheduling, he/she may leave a message but must have positive contact with Crew Scheduling prior to his/her flight.

FRONTIER AIRLINES (R. BRIGHAM) - 0000906
0383

ESI00000796-92

383

3.     A 2-hour notice prior to report time is required when calling in sick as a Line Holder or as a Reserve who has previously been given a trip assignment and 3-hour notice for a Reserve Flight Attendant who has not been previously assigned a trip.

4.     All calls must be made to Crew Scheduling. A Flight Attendant on Reserve duty will notify Crew Scheduling at the start of his/her duty day, not at the time of trip notification. If a Reserve is calling in sick on a day off for the following day (and has not previously been given a flight assignment), the Reserve FA has until 2200 (base local time) to call in. A Reserve Flight Attendant may be subject to discipline if he/she refuses an assignment due to illness during the actual Reserve period.

5.     If a Flight Attendant becomes too ill to complete his/her trip and must call in sick at an outstation, he/she is responsible for notifying both Crew Scheduling and the captain as soon as possible, preferably at least 2 hours prior to report time.

6.     If a sick call is either an OJI, or one of extreme circumstances, or could create any form of liability against the Company, the Flight Attendant is responsible to seek medical attention at the request of his/her Inflight Manager. If Frontier management requires the Flight Attendant to seek medical attention due to OJI or extreme circumstances, the Company will cover the medical fee.

7.     Crewmembers who become ill/injured at an outstation and cannot complete their schedule will be listed as positive space on the next available Frontier flight out (the crewmember will not bump revenue passengers).

8.     When a Reserve Flight Attendant calls in sick, he/she must call and advise Crew Scheduling the number of Reserve days he/she is expected to miss due to illness, but not to exceed the number of Reserve days remaining in their current or upcoming block of Reserve days. A Line Holder need only call in prior to each new trip when on sick leave.

9.     Line Holding Flight Attendants who are removed from a trip or a portion of a trip due to illness will not have the ability to rejoin the portion of the trip previously called in sick for or "call in well." However, Line Holding Flight Attendants may call in sick for a portion of a trip if the Flight Attendant reasonably expects to be able to return to duty from illness during the duration of the trip. If a Flight Attendant chooses to call in sick for a portion of a trip, the removal must be for an entire duty day and must begin and end in base except in cases in which the Flight Attendant is sick in an outstation.

10.    Flight Attendants will only have the opportunity to split a trip due to illness once. Any subsequent sick calls for the same trip will

FRONTIER AIRLINES (R. BRIGHAM) - 0000907
0384

ESI00000796-93

384

result in the remainder of that trip dropped in its entirety as sick.

11. A Flight Attendant who has completely recovered from an illness, but is unable to rejoin their original trip due to the above provision, may pick up Open Time if available to replace his/her original trip.

**Example:** Bob has a four day trip and needs to be removed from the trip due to illness. He has the following options: Call in sick for the entire four day trip and not have the ability to rejoin the trip if he is feeling better later and be charged sick leave for the hours missed; or call in sick for a portion of the trip as he feels he will be better by day two of the trip. In this case he will be removed from the first turn and overnight of his trip as sick and rejoin the trip at the first point it reenters base on day two. Bob will be charged sick leave for those hours he missed. Bob will not be able to rejoin the trip at any point during the first duty day, nor will he be able to call in sick for just the first turn as the sick call must be for an entire duty day.

*NOTE: For the purposes of this example, the sick call was recovered on day two. Flight Attendants may choose to recover the trip on any day of a trip as long as the entire duty day and subsequent days are recovered.*

**Example:** Bob has a four day trip and needs to be removed from the trip due to illness. He opts to call in sick for the first duty day and recover the trip on the second duty day. Later that night Bob is not getting better and needs to call in sick for the next duty day. Because trips may only be split due to illness once, the remaining three days will be marked as sick and Bob will not be able to rejoin the sequence if he is feeling better on day three. Bob may pick up Open Time over the final two sick days of the original sequence to save his sick bank.

E. **SICK LEAVE PAY POLICY**

1. Sick time will be paid at a straight hourly rate. Sick time will not be included in the overtime for those who fly over 86 hours.

2. If a Flight Attendant has submitted his/her resignation and calls in sick within the two week period prior to the resignation date, a valid doctor's note will be required in order for the Flight Attendant to receive sick pay and remain eligible for rehire.

F. **VERIFICATION OF ILLNESS/INJURY**

1. At the Company's discretion, a Flight Attendant may be required to produce a physician's note documenting illness or injury. The note, when required, will state:

a. The date of illness;

FRONTIER AIRLINES (R. BRIGHAM) - 0000908
0385

ESI00000796-94

385

        b.      Date and time of examination;

        c.      Medical release to return to work without restriction.

2.      During a period (e.g., Christmas Holidays, Superbowl weekend) when all Flight Attendants are required to present a doctor's note for sick calls, prior notice will be given.

3.      Frontier may request that a Flight Attendant be seen by Frontier's designated physician to ensure fitness for duty. The cost of this examination will be borne by Frontier.

FRONTIER AIRLINES (R. BRIGHAM) - 0000909
0386

ESI00000796-95

386

## ARTICLE 9
## VACATION

A.  **GENERAL**

1.  Flight Attendants will receive paid vacation. Flight Attendant vacation awards will be granted in seniority order. Flight Attendants will bid vacation based on their projected accrual as of December 31st.

2.  Number of guaranteed days off in bid award will be prorated during bid periods with vacation days. See Inflight website or company provided preferential bidding info website for Vacation/Days Off Proration table.

3.  Accrued but unused vacation will be paid in the event of furlough, retirement, or termination according to the terms of this Agreement. If any vacation days are not scheduled to be used by December 31st of the current year, they will be paid no later than January 21st of the next consecutive calendar year. Unused vacation for the current calendar year cannot be carried over into the next calendar year.

4.  Crew Planning will handle all vacation records and will administer the vacation bidding process via the Automated Bid System.

5.  If a Flight Attendant changes base, any scheduled unused vacation period is forfeited. Forfeited vacation periods must be replaced from Flight Attendant Vacation Open Time in the Automated Bid System for the new base.

B.  **ACCRUAL**

1.  Vacation days will be accrued in the current calendar year to be taken in the following calendar year according to the following rates:

    a.  A Flight Attendant who, as of December 31 of any year, has less than 1 calendar year of active service with the Company will be entitled to vacation days on the basis of .58 calendar days per pay period.

    b.  A Flight Attendant who has completed 1 year or more of active service with the Company but less than 5 years of active service will accumulate vacation days on the basis of .58 calendar days per pay period, or 14 days per year.

    c.  A Flight Attendant who has completed 5 years or more of active service but less than 10 years of active service with the Company will accumulate vacation days on the basis of .88 calendar days per pay period, or 21 days per year. The Flight Attendant will accumulate 14 days plus

FRONTIER AIRLINES (R. BRIGHAM) - 0000910
0387

ESI00000796-96

the additional time earned with the higher accrual after
the completion of 5 years.

d. A Flight Attendant who has completed 10 years or more
of active service with the Company will accumulate
vacation days on the basis of 1.17 calendar days per pay
period, or 28 days per year. The Flight Attendant will
accumulate 21 days plus the additional time earned with
the higher accrual after the completion of 10 years.

2. Vacation accrual will not continue during periods of leave without
furlough.

3. Vacation accrual will be reduced by 50% each bid period that a
Flight Attendant elects to job share, and during all bid periods a
Flight Attendant is on low-time status.

4. The credit value of a vacation day is 3 hours per vacation day.

C.     **VACATION BIDDING**

1. Bidding for annual vacation will be accomplished in four rounds.
Vacation periods that are bid consecutively (adjacent periods) will
count as one choice. A Flight Attendant who does not bid a
sufficient number of choices in any round to receive an award will
have any remaining vacation carried into the next round.

2. Vacation periods of 10 days or fewer will be taken as one period.

3. Any vacation period of 11 days or more may be split.

4. Split vacation periods will contain one period of not fewer than 7
calendar days.

5. Vacations may be split according to the following:

a. Blocks of 7 days;

b. Multiples of 7 days (e.g. 7, 14, 21);

c. Blocks of 7 plus any additional days up to 13;

d. 10 days or fewer cannot be split.

6. Vacation days may be bid at once in any one round or split in
accordance with the above.

7. Vacation days must be bid consecutively during a vacation round.

8. Following the fourth round awards, a Flight Attendant who has
unawarded vacation will have that vacation assigned by the
Company.

FRONTIER AIRLINES (R. BRIGHAM) - 0000911
0388

ESI00000796-97

388

9. Vacation bidding rounds will occur as follows:

   a. Vacation adjustments will be made prior to the opening of the First Round Vacation Bid with company seniority and all Flight Attendant leave information (FMLA, MED, OJI, COLA, PLA, VLOA, etc.) as of August 27 of that year.

   b. Any leaves taken after that date will require adjustments of the leave information for those Flight Attendants. When adjustments are made, a phone call will be made to the Flight Attendant notifying him/her of the vacation accrual change in the Automated Bid System. A message will be left for the Flight Attendant if positive phone contact cannot be made.

      **Example:** Suzy Flight Attendant has 2 weeks of vacation earned to bid for the following year. If Suzy elects to take a COLA (which will reduce her accrual of vacation time) prior to the close of the vacation bid, reducing her vacation to 10 days, then Suzy's vacation will be combined into one vacation slot. However, if the COLA was awarded after the bid has closed for the vacation, then Suzy will be awarded her first round choice of 7 days and her second round choice of the remaining 3 days.

10. No later than September 1, the Company will post the First Round Vacation Bid on the Automated Bid System, covering the following calendar year. Bidding will commence immediately and close at 1100 hours on September 15. First round bids will be awarded no later than 1900 hours on September 15.

11. No later than September 16, the Company will post the Second Round Vacation Bid on the Automated Bid System, covering the remaining vacation bid periods for the following calendar year. Bidding will commence immediately and close at 1100 hours on September 30. Second round bids will be awarded no later than 1900 hours on September 30.

12. No later than October 1, the Company will post the Third Round Vacation Bid on the Automated Bid System, covering the remaining vacation bid periods for the following calendar year. Bidding will commence immediately and close at 1100 hours on October 15. Third round bids will be awarded no later than 1900 hours on October 15.

13. No later than October 16 at 1900, the Company will post the Fourth Round Vacation Bid on the Automated Bid System, covering the remaining vacation bid periods for the following calendar year. Bidding will commence immediately and close at 1100 hours on November 1. Fourth round bids will be awarded no

FRONTIER AIRLINES (R. BRIGHAM) - 0000912
0389

ESI00000796-98

389

later than 1900 hours on November 1.

14.    Flight Attendants may pick up Open Time or trip trades while on their scheduled vacation in accordance with the terms of this Agreement.

D.    **VACATION BID PERIODS**

The following periods will be used for bidding vacations:

| DATE (PERIOD) | DATE (PERIOD) | DATE (PERIOD) | DATE (PERIOD) |
|---|---|---|---|
| Jan 2-8 (1) | Jan 9-15 (2) | Jan 16-22 (3) | Jan 23-29 (4) |
| Feb 2-8 (5) | Feb 9-15 (6) | Feb 16-22 (7) | Feb 23-29 (8) |
| Mar 2-8 (9) | Mar 9-15 (10) | Mar 16-22 (11) | Mar 23-29 (12) |
| Apr 2-8 (13) | Apr 9-15 (14) | Apr 16-22 (15) | Apr 23-29 (16) |
| May 2-8 (17) | May 9-15 (18) | May 16-22 (19) | May 23-29 (20) |
| Jun 2-8 (21) | Jun 9-15 (22) | Jun 16-22 (23) | Jun 23-29 (24) |
| July 2-8 (25) | July 9-15 (26) | July 16-22 (27) | July 23-29 (28) |
| Aug 2-8 (29) | Aug 9-15 (30) | Aug 16-22 (31) | Aug 23-29 (32) |
| Sept 2-8 (33) | Sept 9-15 (34) | Sept 16-22 (35) | Sept 23-29 (36) |
| Oct 2-8 (37) | Oct 9-15 (38) | Oct 16-22 (39) | Oct 23-29 (40) |
| Nov 2-8 (41) | Nov 9-15 (42) | Nov 16-22 (43) | Nov 23-29 (44) |
| Dec 2-8 (45) | Dec 9-15 (46) | Dec 16-22 (47) | Dec 23-29 (48) |

*NOTE: There will be adjustment of vacation bid periods for leap year.*

E.    **VACATION TRADES**

A Flight Attendant may trade vacation periods with the following constraints:

1.    Vacation trades must be within the same calendar year;

2.    Trades must be made by the 4th of the month preceding the month in which the vacation trade would be effective (e.g., before March 4 at 1200 for an April vacation trade);

3.    Trades may be made between two Flight Attendants or between a Flight Attendant and posted open vacation slots;

4.    All trades must be submitted via the Automated Bid System. Crew Planning will not submit, modify or remove any trade request from the Automated Bid System;

5.    No vacation trade or slide will be awarded after the pre-award time frame has closed for the bid period requested. This includes both the vacation slot being traded from and traded to.

F.    **VACATION SLIDES**

1.    Vacation slides of up to 3 days are allowed. Slides may not go from one bid period to another.

FRONTIER AIRLINES (R. BRIGHAM) - 0000913
0390
ESI00000796-99

2. A Flight Attendant may slide his or her vacation period plus or minus 3 calendar days from the first day of the awarded period. Multiple slide requests will not be approved.

3. All slides must be submitted via the Automated Bid System during the pre-award period.

4. No vacation slide will be awarded after the pre-award time frame has closed for the bid period requested.

FRONTIER AIRLINES (R. BRIGHAM) - 0000914
0391

ESI00000796-100

391

# ARTICLE 10
# SENIORITY

A. **SENIORITY ACCRUAL**

1. The Frontier System Seniority List ("seniority list") in effect on the date of the signing of this Agreement will be the official seniority list and, thereafter, the seniority of a newly hired Flight Attendant (including transferees from another department within the Company) will commence on the first day a Flight Attendant enters training and will continue to accrue thereafter during his/her period of service with the Company, except as otherwise provided for in this Agreement. A Flight Attendant's longevity will commence concurrently with his/her seniority date, and will accrue thereafter during his/her active service with the Company, excluding leaves of absence, furlough, or other periods as may be provided for in this Agreement.

2. A former Frontier Flight Attendant who is re-hired as a Flight Attendant for the Company, and who is not required to attend initial Flight Attendant training, will be placed on the seniority list as of the Flight Attendant's new date of hire. A re-hired Flight Attendant who is required to attend initial Flight Attendant training will be treated, for purposes of placement on the seniority list, as a newly hired Flight Attendant.

3. When two or more Flight Attendants have their names placed on the seniority list on the same date, their position on the seniority list will be determined by their Social Security number, highest number the most senior.

4. Except as otherwise provided for in this Agreement, seniority will govern all Flight Attendants for retention in case of reduction in force, recall from furlough, preference of vacation periods, filling of vacancies, base assignments, Company-offered voluntary leaves of absence, and bidding rights.

B. **WHEN SENIORITY WILL NOT GOVERN**

Except as otherwise provided for in this Agreement, seniority will not in any respect govern: transfers into other departments outside of the Inflight Department, transfers into positions within the Inflight Department not covered under this Agreement (e.g., administrative positions), selection and promotion to Inflight instructor, selection and promotion to supervisory duty, assignment to non-flying duty (e.g., light duty), or special assignment duty.

C. **TRANSFERS**

1. A Flight Attendant transferring or who has transferred to a position(s) within the Inflight Services Department outside the coverage of this Agreement will retain and accrue seniority for a period of 2 years and if transfers back to a Flight Attendant position within that time will have his/her seniority reinstated as if

FRONTIER AIRLINES (R. BRIGHAM) - 0000915
0392

ESI00000796-101

392

he/she had not transferred. After a 2 year period the Flight Attendant occupying such position(s) will retain but not accrue seniority.

2. Any Flight Attendant who directly transfers to any position(s) outside of the Inflight Department will retain (but not accrue) seniority and longevity for 1 year from the effective date of the transfer. Upon Company approval, such individuals may return to a position covered under this Agreement prior to the end of the one-year period. If such an individual does not return to a position covered under this Agreement prior to the one-year expiration date, his/her name will be removed from the seniority list.

3. A Flight Attendant who is elected to or accepts a full-time position with the Union will retain and accrue seniority and longevity while working for the Union.

4. If a Flight Attendant is permitted by the Company to transfer to a position outside of the Flight Attendant craft or class on account of physical incapacity, illness, or injury, he/she will retain and accrue seniority for a period not to exceed 2 years of "continuous" service in such position after which the Flight Attendant will be removed from the seniority list. A period of service will be deemed "continuous" service until it is broken by a transfer back to the position of Flight Attendant.

5. Paragraph E (Seniority Rights Forfeited) also applies to employees covered under this Paragraph C. for purposes of removal from the seniority list.

D. **PROTEST OF SENIORITY LIST**

1. An employee covered under this Agreement will have 30 calendar days after the posting of the seniority list to protest any omission or incorrect posting affecting her seniority or position on the posted list. A covered employee, who fails to protest a seniority list within the time limits set forth in this paragraph, will forfeit his/her right to protest the seniority list.

2. The official system seniority list will be posted quarterly, no later than the fifteenth day of the quarter, in each calendar year. A covered employee is permitted to protest a seniority list only if it varies from the seniority list immediately preceding it.

3. All protests to the seniority list must be made in writing and provided to the Director of Inflight, or his/her designee, by hand-delivery, via overnight mail, via express mail, U.S. mail certified-return receipt requested, or e-mailed. Protests should not be faxed. The employee must be able to provide a form of delivery confirmation to substantiate transmission or delivery of the

Page 81 of 123

written protest. The Company will investigate the protest and will respond to the Flight Attendant in writing within 30 calendar days.

E. **SENIORITY RIGHTS FORFEITED**

A Flight Attendant covered under this Agreement, whose employment with the Company is permanently severed, will forfeit his/her seniority rights and that Flight Attendant's name will be removed from the seniority list. Such circumstances include, but are not limited to: resignation, discharge for cause, retirement, failure to return to active service following an authorized leave of absence, the covered Flight Attendant is not recalled from furlough within 3 years from the date of furlough, or the covered Flight Attendant does not comply with policies and procedures relating to furlough and recall. The recall period for any Flight Attendant(s) can be extended 2 additional years by mutual agreement of the Union and the Company.

F. **PROBATION**

1. A Flight Attendant will be on probation from date of hire through the first 9 months of active service following completion of training.

2. Active service will commence upon the successful completion of training. For purposes of this provision, Flight Attendants will be considered to be in active service unless on medical leave, furloughed, granted a leave of absence, or in another "no pay" status. A Flight Attendant's probation will be extended by the number of elapsed calendar days the Flight Attendant was inactive. Inactive periods of less than 7 consecutive workdays will not be counted.

3. Nothing in this Agreement will be construed to prevent the Company from releasing a Flight Attendant, with or without cause, during the probationary period. An employee may not be placed on the Frontier Flight Attendant Seniority List unless he/she successfully completes initial training and the period of probation.

FRONTIER AIRLINES (R. BRIGHAM) - 0000917
0394

ESI00000796-103

394

# ARTICLE 11
## UNIFORMS

### A. PURCHASE OF INITIAL UNIFORM

1. The Company will not provide the initial investment of the Flight Attendant uniform. The Flight Attendant must purchase all accessories.

2. Initial uniform costs may be deducted from the Flight Attendant's paycheck or may be paid in full. Deductions will be at the following rates:

   | | |
   |---|---|
   | $1 - $300 | Minimum of $25 per pay check |
   | $301-$600 | Minimum of $50 per pay check ($600 cap) |

### B. UNIFORM CREDIT AND MAINTENANCE OF UNIFORM

1. Flight Attendants will receive a $150 annual credit with the designated uniform vendor.

2. A Flight Attendant is eligible for the $150 annual credit if he/she is employed with Frontier on January 1 of that year.

3. The $150 will be credited to the designated uniform vendor on April 1. Any credit unused by March 31 will be forfeited and will not rollover into the new fiscal year.

4. A maternity uniform consisting of one top and one bottom will be made available at the Company's expense to a Flight Attendant who has notified the Company of her pregnancy. Such uniform will be returned to the Company cleaned, pressed, and in a dry cleaning bag with the dry cleaning tag attached.

5. If a Flight Attendant resigns or is terminated, he/she will be responsible for the remaining uniform balance.

FRONTIER AIRLINES (R. BRIGHAM) - 0000918
0395

395

ESI00000796-104

## ARTICLE 12
## LEAVES OF ABSENCE

### A. GENERAL GUIDELINES

1. A Flight Attendant on a Leave of Absence will not accrue vacation or sick leave hours and must pay for elected benefits.

2. Holiday pay, funeral pay, or jury duty pay will not be granted during a leave.

3. A Flight Attendant off payroll on a Leave of Absence will not be compensated for a parking permit.

4. For leaves of 30 or more days in which sick pay is applied, a Flight Attendant's sick bank will be reduced on an hour-for-hour basis, but no more than 82 hours per 30 day period.

5. Accrued sick leave does not guarantee leave approval.

### B. RETURNING FROM LEAVE OF ABSENCE

1. To be eligible to return to work and bid for a line of flying, the Flight Attendant must complete required training, if applicable. If a Flight Attendant requires only Recurrent Training, he/she may bid for the next bid period if Recurrent Training is scheduled and a doctor's release has been submitted.

2. If a Flight Attendant has been de-qualified during a leave of absence, he/she will not be allowed to pick up Open Time or to be assigned Reserve days until required training has been completed successfully.

3. A Flight Attendant returning from a Leave of Absence must coordinate his/her schedule with the Inflight Services Supervisor, and meet with Inflight Manager or Instructor to make certain the Flight Attendant's manual is current.

4. Upon returning to work from a Leave of Absence, a Flight Attendant must purchase a parking permit for the first month he/she is returning to work. A request must be submitted in writing to Payroll for reimbursement of the parking permit purchased by the last calendar day of that month.

### C. RETURNING FROM INTERMITTENT LEAVE OF ABSENCE

A Flight Attendant who has missed a portion of a trip or a complete trip due to an intermittent leave (FMLA, MED, OJI, etc.) and has been completely released will be returned to his/her original trip, if available. If the trip was picked up in Open Time, the Flight Attendant may pick up Open Time to replace the trip credit. If the there are no trips that the Flight Attendant wants to pick up, the Flight Attendant can opt to be placed on AVA status for

FRONTIER AIRLINES (R. BRIGHAM) - 0000919
0396
ESI00000796-105    396

the time of the original pairing. All AVA rules apply if this option is chosen by the Flight Attendant. If AVA or no trips are chosen by the Flight Attendant, then the original trip credit goes unpaid.

## D.    COMPANY-OFFERED LEAVE

1.    Company-offered leaves of absence (COLA) may be offered when overstaffing occurs in order to reduce payroll. Only Flight Attendants on active flight status (not on leave and currently eligible to bid) may apply. Leaves are granted in seniority order. Leaves are normally granted in 1-bid period increments.

2.    A Flight Attendant on COLA will retain pass privileges on Frontier; travel on other airlines will be according to interline agreements.

3.    Flight Attendants on COLA will retain and accrue seniority, and will retain longevity.

4.    COLAs may be granted even if the Flight Attendant has scheduled vacation that bid period. The Flight Attendant may trade the vacation for an open slot. The Flight Attendant may keep the scheduled vacation period and be paid his/her vacation credit at the Flight Attendant's hourly rate. A request must be submitted in writing by the last calendar day of the month.

## E.    FAMILY MEDICAL LEAVE

1.    Flight Attendants will receive Family Medical Leave under the Family Medical Leave Act, as amended ("FMLA"), in accordance with the eligibility requirements of the Act.

2.    Flight Attendants whose base has less than 50 employees will be covered by FMLA.

3.    Flight Attendants will retain and accrue seniority and longevity while on FMLA leave. Pass benefits will continue while the Flight Attendant is on FMLA leave.

## F.    MATERNITY LEAVE

1.    A Flight Attendant is required to advise the Company immediately upon confirmation of pregnancy by her doctor. The Flight Attendant must present a release from her doctor to the Company acknowledging her ability to perform Flight Attendant duties. The Flight Attendant will also be responsible for submitting a letter from her doctor each month stating that she is still fit and able to perform the necessary Flight Attendant duties.

2.    If qualification status will expire while on leave, the Flight Attendant must attend Recurrent Training before going on maternity leave.

FRONTIER AIRLINES (R. BRIGHAM) - 0000920
0397

ESI00000796-106

397

3.     Sick leave must be used, and vacation days may be used, during the maternity leave; otherwise, the leave is without pay.

4.     The Flight Attendant will retain and accrue her seniority and longevity during maternity leave.

5.     A Flight Attendant on maternity leave will retain Frontier pass benefits including buddy passes.

## G.     MEDICAL LEAVE

1.     Flight Attendants who do not meet the eligibility requirements for FMLA may be provided a Medical Leave of Absence in limited circumstances. Such a leave would include time off for a Flight Attendant's illness, injury or pregnancy.

2.     A Flight Attendant must have completed 90 days of employment with the Company to qualify for Medical Leave.

3.     Medical Leaves may be approved in up to 30-day intervals.

4.     Medical Leave may be granted up to a maximum period of 23 consecutive months. If the Flight Attendant is eligible and initially granted leave under FMLA, a Medical Leave may be granted beyond the 12 weeks allowed under the FMLA, but that extension may not exceed a combined total of 23 consecutive months under this policy. Periods of active service of less than 90 days will not constitute a break in the period of leave.

5.     A Flight Attendant requiring a leave beyond 23 consecutive months will be separated from the Company with the ability to re-apply.

6.     A Flight Attendant may request an unpaid leave of absence for his/her own illness or injury when he/she cannot return to work after exhausting FMLA leave or if he/she is not eligible for FMLA. Any Medical Leave of Absence request must have a supporting doctor's statement attached. This must include the date the Flight Attendant became unable to work and the expected date of return, if known.

7.     If an Flight Attendant is on FMLA leave and anticipates that FMLA leave will be exhausted before the Flight Attendant is released to return to work and the Flight Attendant intends to seek a Medical Leave, the Flight Attendant must certify the need for the Medical Leave of absence prior to the expiration (end date) of FMLA leave.

8.     If an extension of an existing Medical Leave is needed, the Flight Attendant must certify the need for the extension of the Medical Leave prior to the expiration (end date) of the current Medical Leave.

FRONTIER AIRLINES (R. BRIGHAM) - 0000921
0398

ESI00000796-107

9. Unless an emergency exists, requests for unpaid Medical Leave along with proper medical certification must be submitted at least two weeks prior to the requested leave date. If the Flight Attendant is unable to provide the request and medical certification prior to the medically related absence because of an emergency or urgent situation, the Flight Attendant's absence from work will be treated as an unexcused absence and the Flight Attendant will have 15 days from the date of the absence to submit proper medical certification. If proper medical certification is provided within the stated time period and the request for leave is approved, the unexcused absence will be changed to reflect an approved Medical Leave. If proper medical certification is not submitted within the stated time period and/or the leave is not approved, the Flight Attendant's absences will be unapproved and may subject the Flight Attendant to corrective action, up to and including termination.

10. If the Flight Attendant has any accrued sick time, sick time will be applied to FMLA or Medical Leave. If there is no accrued sick time remaining and the Flight Attendant would like to continue to be paid, the Flight Attendant must submit in writing to the payroll department what accrued time they would like to use, i.e. vacation.

11. Failure to follow the policies outlined above in seeking leave approval in advance of taking time off may lead to corrective action.

12. Leaves will be limited to 30 days with extensions allowed in limited circumstances.

13. While on Medical Leave, Flight Attendants will retain and accrue seniority, and retain and, up to 90 days, accrue longevity. Flight Attendants on Medical Leave are not eligible for pass benefits.

## H. ON-THE-JOB INJURY (OJI)

1. A Flight Attendant may file an occupational injury claim within the timelines set forth by Company policy if he/she believes he/she has suffered an injury or illness on the job. The state law of the state in which the Flight Attendant is domiciled will govern whether an individual claim is compensable.

2. The first three days of OJI may be covered by sick days, or the Flight Attendant may immediately be assigned light/modified duty.

3. The Flight Attendant may use pass privileges if he/she is on modified duty, completing the hours necessary each week; otherwise pass benefits are suspended until released.

4. A Flight Attendant on OJI leave may not occupy the jumpseat aboard any Frontier aircraft.

FRONTIER AIRLINES (R. BRIGHAM) - 0000922
0399
ESI00000796-108

399

5.   In order to bid following an OJI, the Flight Attendant must have a doctor's note by the 11th of the month at 1700, releasing him/her back to work no later than the 15th day of the bid period he/she will return to duty. The release must be given to Human Resources by 1100 on the 10th of the month prior to bidding.

**I.   PERSONAL LEAVE**

1.   A Personal Leave of Absence may be granted in limited circumstances based upon staffing and operational needs. A Flight Attendant who has not completed 90 active days of service is not eligible to apply for a personal leave.

2.   Personal Leave requests must be made in writing to Inflight Management.

3.   Personal Leaves may be granted if the Flight Attendant has scheduled vacation that month. The Flight Attendant may trade the vacation for an open slot. The Flight Attendant may keep the scheduled vacation period and be paid accordingly. A request must be submitted in writing to the Payroll by the last calendar day of the month.

4.   A Personal Leave will be granted for a period from 1 to 30 days and must be approved by Inflight Management. Prior to the expiration of the original leave, Inflight management must approve any extension beyond 30 days. Personal Leave is always without pay.

5.   A Flight Attendant on a Personal Leave will retain seniority and longevity, and continue to accrue each for the original 30 days of approved leave. Sick leave and vacation will not accrue during a personal leave. Pass benefits for a Flight Attendant and his/her eligible pass riders will be suspended for the duration of the leave. Holiday, funeral pay or employer's jury duty pay will not be granted during the leave.

6.   Failure to follow policies as outlined above in seeking approval in advance of taking time off may lead to corrective action.

**J.   FUNERAL LEAVE**

1.   Paid Funeral Leave will be granted for up to 4 working days to attend the funeral services of an immediate family member. Additional time off without pay may be granted at the discretion of the Company. For purposes of this section, "immediate family member" is defined as the Flight Attendant's: parents, stepparents, stepchildren, stepsiblings, spouse, children, siblings, parents-in-law, brother/sister-in-law, daughter/son-in-law, grandparents, grandchildren, and domestic partner.

FRONTIER AIRLINES (R. BRIGHAM) - 0000923
0400

ESI00000796-109    400

2.      Flight Attendants will be pay protected for the hours they would have flown during that time period. Pay will be at the regular rate of pay and will not be used in the calculation of overtime.

3.      An Unpaid Funeral Leave of up to 3 days may be requested for attending the funeral of another family member, neighbor, or friend but must be approved by an Inflight Manager. Unpaid Funeral Leave is unpaid leave or available vacation may be used. A request to use the vacation credit must be submitted in writing to payroll by the last calendar day of the month. Documentation may be requested by Inflight Management.

**K.    EMERGENCY LEAVE (EMR)**

1.      A Flight Attendant will be authorized Emergency Leave ("EMR") for an unavoidable, serious circumstance with the approval of Inflight Management. An Emergency Leave may be granted for up to 3 days. A Flight Attendant seeking EMR must contact his/her Inflight Manager or designee and present verifying documentation.

2.      The Flight Attendant will be removed from his/her trip without pay. The Flight Attendant has the option of using vacation credit that has not been awarded in a monthly bid in lieu of no pay; however, the request must be submitted in writing to the Payroll by the last calendar day of the month.

3.      Off-the-job injury is a sick call, not an emergency leave. The Flight Attendant should make arrangements to take care of personal appointments on his/her day off. Child care issues, car problems, etc., are not excused absences. Personal court appearances and subpoenas do not qualify for emergency leave.

4.      More than two emergency leave requests in a 12-month period may be considered excessive.

**L.    JURY DUTY LEAVE**

1.      The Flight Attendant is required to submit the jury summons to his/her Inflight Manager prior to the assigned date. The Inflight Manager will coordinate the removal from any assigned trips with Crew Scheduling.

2.      Pay will be at the regular rate of pay for flight assignments missed and will not be used in the calculation of overtime.

FRONTIER AIRLINES (R. BRIGHAM) - 0000924
0401

ESI00000796-110

401

**M.** **MILITARY LEAVE**

Flight Attendants are granted unpaid military leaves of absence, subject to
Federal Law. Members of the U.S. Armed Forces or National Guard are
granted an unpaid Leave of Absence when called for active duty or training.
This time is granted in addition to earned vacation and sick time. However,
if a Flight Attendant desires to use vacation time for this purpose, he/she
may voluntarily do so if you make a request in writing to the Company.

FRONTIER AIRLINES (R. BRIGHAM) - 0000925
0402

ESI00000796-111          402

# ARTICLE 13
# VACANCIES

A.    **STANDING BIDS**

1.    A standing bid is a request to change bases that will remain in effect until the Flight Attendant makes a change to the bid or is awarded the base change.

2.    Flight Attendants must submit a standing bid to indicate the order of preference for base vacancies. The Company may require Flight Attendants to submit new or updated standing bids at least 30 days prior to any circumstances that may cause the existing bid file to become outdated (base closures, base openings or other substantial operational changes, etc.). The Company will attempt to give at least 30 days notice to afford Flight Attendants the opportunity to change their standing bids.

3.    The standing bid file will be maintained by the Company. Standing bids will be available for inspection by any Flight Attendant during office hours.

4.    A Flight Attendant may change his/her standing bid at any time by submitting a new standing bid to the Company. A Flight Attendant must submit his/her standing bid through the Automated Bid System, if available, or otherwise via e-mail to Inflight.

B.    **NOTICE OF VACANCY**

1.    The Company will determine when a vacancy exists and will post the notice of when a vacancy will occur. Any vacancies, as well as projected vacancies, will be posted by the Company on the 21st of the month prior to the next bid period.

2.    Bidding will close at 1400 hours 7 days after posting the notice of vacancy.

C.    **AWARDING AND ASSIGNMENT OF VACANCIES**

1.    Awards will be posted no later than 1400 on the 5th of the month.

2.    Bids for vacancies will be awarded in order of seniority using standing bids on file as of the date bidding is closed.

3.    All Flight Attendants awarded a base transfer to fill a vacancy must remain in the new base for at least 3 bid periods (excluding base swaps). An exception may be made to this rule at such point whereby the Company elects to open a new base within the 3 bid periods.

4.    The Company will determine the effective date of an award, which may be changed provided adequate notice is given and the

FRONTIER AIRLINES (R. BRIGHAM) - 0000926
0403

ESI00000796-112

403

change is not made for arbitrary reasons. The Company may cancel an award at any time before its effective date.

5.    A Flight Attendant awarded a vacancy will fill the vacancy within 60 days after the effective date of the award.

**Example:** There are 3 openings in the MKE base for July. Frontier will post a Notice of Vacancy on May 21st that will close on May 28th. Flight Attendant Donna has a standing bid requesting a MKE base. On June 5th the bids are awarded and she is senior enough to be granted her base transfer. In the July bid, Donna will be bidding in the MKE base.

**Example:** There are 15 openings at the MKE base for July. Frontier will post a Notice of Vacancy on May 21st that will close on May 28th. Flight Attendant Donna has a standing bid for the MKE base. On June 5th, the bids are awarded and 15 people senior to Donna requested the MKE base and were awarded it. Donna's request to transfer to MKE will be denied as there are no more vacancies. Donna will remain in the DEN base. Donna's standing bid will remain in effect until she changes it.

**Example:** There are 10 openings at the MKE base for July. Frontier will post a Notice of Vacancy on May 21st that will close on May 28th. Flight Attendant Donna has a standing bid for the MKE base. However, Donna decides she no longer wants to go to MKE and must change her standing bid. She has until May 28th at 1159 local base time to change her standing bid. If she does not change her standing bid and is awarded MKE, she must transfer to the MKE base.

D.    **BASE SWAPS**

Flight Attendants requesting a mutual base swap must submit a request electronically if available, or otherwise via e-mail to Inflight, no later than the 21st of the month prior to the bid period. Approval of a swap is subject to the following:

1.    The Company will review the mutual swaps on file no later than the 28th of the month and post awarded swaps that will become effective with the following month's bid award.

2.    Flight Attendants may not request base swaps between entities with separate operating certificates.

FRONTIER AIRLINES (R. BRIGHAM) - 0000927
0404

ESI00000796-113

404

## ARTICLE 14
## FURLOUGH

A.    **FURLOUGH**

1.    In the event a furlough or displacement becomes necessary, Flight Attendants will be furloughed in inverse seniority order.

2.    A Flight Attendant who is furloughed and subsequently recalled will retain, but not accrue, longevity during a furlough, unless recalled within a period of less than 30 calendar days from the date of the furlough.

3.    Should an impacted Flight Attendant call out sick during the 14 calendar day period prior to the furlough start date, the Flight Attendant must provide a doctor's note in order to receive sick pay. Failure to provide documentation will result in a forfeiture of all recall rights.

4.    In the event there is a planned reduction in force, the Company must offer COLA prior to involuntary furloughs.

5.    The Company will, within 14 days prior to a reduction in force at base, send certified/return receipt letters to all affected Flight Attendants at that base, as well as post the reason for the reduction via Company communication to all Flight Attendants.

6.    So long as the system is comprised of no more than two bases, the specific base having a reduction in force will offer all Flight Attendants being furloughed or displaced the following options in seniority order:

   a.    If the total number of Flight Attendants in the system is being reduced, then the Flight Attendant may:

      (i)    Transfer to vacancies at the other base;

      (ii)   Displace a Flight Attendant at the other base in seniority order;

      (iii)  Accept furlough.

   b.    If the total number of Flight Attendants in the system is not being reduced, then the Flight Attendant may:

      (i)    Transfer to vacancies at the other base

      (ii)   Displace a Flight Attendant at the other base in seniority order

7.    In no event may a Flight Attendant accept and remain on furlough with recall rights if doing so would cause the Company to hire a

Page 93 of 123

FRONTIER AIRLINES (R. BRIGHAM) - 0000928
0405
ESI00000796-114

405

new Flight Attendant.

8. In the event more than two bases are established, then provisions relating to displacement and furlough will be negotiated at that time to take into account those changed circumstances.

9. Once these procedures above have been completed, all surplus Flight Attendants will be furloughed and will be eligible for recall based on the Furlough recall procedures.

B. **FURLOUGH PAY AND BENEFITS**

1. A Flight Attendant who is furloughed will be paid for any accrued unused vacation in a lump sum included with their final regular paycheck.

2. A furloughed Flight Attendant may continue his/her medical and other eligible group insurance for a period as specified under Consolidated Omnibus Budget Reconciliation Act ("COBRA").

C. **TRANSFER TO OTHER DEPARTMENT PRIOR TO FURLOUGH**

1. If a Flight Attendant has transferred to another department within the Company, and retains a position on the seniority list, and subsequently receives a furlough notice from the Inflight Department, he/she will retain rights to a Flight Attendant position as provided for in Article 10 "Seniority" of this Agreement.

2. If a furloughed Flight Attendant is terminated from another department, he/she will lose his/her recall rights to the Flight Attendant position. However, a Flight Attendant who resigns from another department will be on furlough status and will retain recall rights as provided herein.

3. A Flight Attendant may decline voluntary recall to a vacancy one time during his/her furlough. Such Flight Attendant will thereafter be recalled only after the remaining Flight Attendants on the recall list have been contacted.

4. If the Flight Attendant declines recall to Inflight a second time, the Flight Attendant will forfeit all rights under this rule and will be removed from the Flight Attendant Seniority List.

5. If a Flight Attendant accepts recall, the timeline for returning to active status in the Inflight Department will be coordinated with the Company.

D. **RECALL**

1. All Flight Attendants furloughed by the Company will provide current contact information to the Company at the time of furlough. Any change in contact information must be supplied to the Company promptly. A Flight Attendant who cannot be

FRONTIER AIRLINES (R. BRIGHAM) - 0000929
0406

ESI00000796-115

406

contacted due to failure to maintain updated contact information
with the Company will forfeit all seniority and recall rights.

2.  Recall from furlough will be in seniority order. A Flight Attendant
    will be notified by the Company of his/her recall with the Company
    via expedited mail, return receipt requested, e-mail, or positive
    contact (in person or by telephone). After delivery of such notice to
    the last address or telephone number on file with the Company,
    the Flight Attendant must notify the Company in writing of his/her
    intent to return to work or bypass recall within 10 calendar days.

3.  A Flight Attendant may decline voluntary recall to the vacancy one
    time during his/her furlough. A Flight Attendant who fails to
    respond within 10 days will be deemed to have declined the recall
    and will remain on the recall list. Such Flight Attendant will
    thereafter be recalled only after the remaining Flight Attendants
    on the recall list have been contacted.

4.  The Company will provide a furloughed Flight Attendant no fewer
    than 15 calendar days to report for duty at the base specified by
    the Company following his/her acceptance of recall. The Company
    may extend this time period.

FRONTIER AIRLINES (R. BRIGHAM) - 0000930
0407

ESI00000796-116

407

## ARTICLE 15
## MOVING EXPENSES

### A.   ELIGIBILITY

The Company will pay moving expenses only when a Flight Attendant is involuntarily displaced to another base for any reason.

### B.   MOVING BENEFITS

1.   An eligible Flight Attendant will be entitled to:

a.   Actual moving expenses for a professional mover, including packing materials, shipping and insurance, of household goods and effects up to a total weight of 10,000 lbs. Packing, unpacking, extra insurance and storage are not covered. The mover must be approved by the Company.

b.   The Company will reimburse a Flight Attendant at the current Company mileage rate or $.36 per mile, whichever is greater, for up to two of the Flight Attendant's registered vehicles driven to the new base, using the most direct mileage between bases. One car may be moved prior to moving to the new primary residence, and the other (or both) car(s) would be moved in conjunction with the actual move.

c.   The Company will reimburse a Flight Attendant for meals and lodging for the Flight Attendant and his/her immediate family, up to five days, for the time required to travel to the base. A Flight Attendant will be removed from, and pay protected for, the trips that conflict with the time allowed for travel. A day of travel will be considered a minimum of 350 miles by the most direct AAA mileage. The daily allowance for meals will be $25.00 per day for the Flight Attendant, and $15.00 per day for each dependent traveling with the Flight Attendant.

d.   The Company will pay up to $200.00 for termination and/or activation fees of gas and electric utilities, telephone and cable television (excluding deposits) resulting from a move to a new base.

e.   If a lease is broken as a result of moving to a new base and a penalty is incurred, the Company will pay the penalty, not to exceed 2 month's rent.

f.   If immediate occupancy of the new residence is impracticable because of time constraints imposed by the Company, the Company will pay meal and lodging

Page 96 of 123

expenses for up to 7 days. The Flight Attendant will make every effort to minimize this expense. If the moving company reimburses the Flight Attendant for these expenses, the Company will have no obligation to make any additional payment.

2.    The Company's liability for moving expenses will not exceed $7,000. Payment for cost of moving household goods will be paid directly from the Company to the moving vendor.

## C.    MOVING DAYS

A Flight Attendant who is moving his/her primary residence will be entitled to four consecutive days off (inclusive of scheduled days off) for a move of 700 miles or less, plus one additional day off for each 350 additional miles. These days off are to be taken in conjunction with the actual move. The Flight Attendant will be paid for the value of any trip(s) missed. Moving days may not be requested during the weeks of Thanksgiving, Christmas, and New Year's. The Flight Attendant will coordinate scheduling days off for moving with the Director of Inflight.

## D.    GENERAL

1.    If a Flight Attendant elects not to move, the Company will pay the Flight Attendant $250.00, which need not be verified by receipts.

2.    When the Company is required to pay moving expenses, the Company and the Flight Attendant may agree to an amount to be paid to the Flight Attendant in lieu of the expenses.

3.    When the Company is required to pay moving expenses, the move must be coordinated with the Company. Receipts verifying moving expenses should be submitted within 30 days after incurring the expenses. The Company will not be liable for any damages incurred during moving.

4.    The Company will not be responsible for paying any expenses after one year from the actual effective date of the Flight Attendant's assignment to the new base.

5.    If a Flight Attendant elects to move him/herself, the rental truck and/or trailer, packing materials, insurance, fuel, and $200.00 to offset other costs not included in this paragraph, will be paid to the Flight Attendant.

6.    An eligible Flight Attendant may elect to move from a location other than the base from which the Flight Attendant is being transferred. However, the Company's financial responsibility will not exceed the cost of moving the Flight Attendant from the former base to his/her new base.

FRONTIER AIRLINES (R. BRIGHAM) - 0000932
0409

ESI00000796-118

## ARTICLE 16
## UNION ACTIVITIES

A.    **GENERAL**

1.    The Company agrees to provide space at each Flight Attendant base for the placement of a glass-enclosed secured bulletin board. Such bulletin board will be purchased by the Union for future bases and installed by the Company. . The bulletin board may be no larger than the predominant size bulletin board used by the Company for its other bulletin boards. . The Union may post notices signed by authorized Union officials and related to Union business on such bulletin boards. No notice posted on such board will contain derogatory or inflammatory material.

2.    The Company and the Union will each pay half of the cost of printing and distributing copies of this Agreement to the Flight Attendants. Any subsequent side letters will be posted electronically and will be accessible to all Flight Attendants.

3.    All new hires will be given a copy of this Agreement during initial training.

4.    The Company will provide the Union with the names (in order of seniority), mailing addresses, telephone numbers, and domiciles of Flight Attendants after the initial assignment to a domicile.

5.    Upon request, but no more frequently than every three months, the Company will provide to the AFA International Office a seniority list that includes name, employee number, telephone number, address and domicile. The list will also identify Flight Attendants who have been terminated or experienced changes to their status lasting longer than 30 days, such as furloughs, leaves of absence, and transfers to non-flying or supervisory duties.

6.    A Union representative will be permitted to address new hire Flight Attendants during a training day. The Company and the Union will mutually agree upon the date and time for such a meeting. The time permitted will not be less than 1 hour or more than 2 hours.

7.    The Union will advise the Company in writing of the names of its designated representatives and such designation will remain effective until revoked by written notice.

B.    **UNION BUSINESS LEAVE**

1.    Subject to staffing and operational requirements, the Company will release Flight Attendants in accordance with this Section for the purpose of conducting official Union business.

2.    Requests for union leave must be submitted in writing to the Director of Inflight Services or his/her designee at least seven

Page 98 of 123

ESI00000796-119

410

days before the requested day off. The Company may waive the 7-day requirement. The request must include the names of the Flight Attendants, the date and time of the release, the date and time of return to duty, and specific business for which the release is requested.

3.    Flight Pay Loss for Union Business Leave:

   a.    **Blocked Days**: Union Business leave will be pre-blocked via use of PBS whenever possible. Pre-blocked Union Business leave will be credited at 5 hours per day and will be applied towards the Flight Attendant's minimum monthly guarantee.

   b.    **Days Not Blocked**: When a Flight Attendant is released from previously assigned/awarded flight duty for Union Business leave, and the leave was not previously blocked out via PBS, the Company will pay the Flight Attendant the scheduled value of the trip(s) dropped. A Flight Attendant taking Union Business leave on a previously scheduled Reserve day will be credited with 4 hours towards his/her guarantee.

   c.    The Union will reimburse the Company, within 45 days after receipt of a statement from the Company, for the amount of the flight pay loss paid to the Flight Attendant, plus an override of 23% to cover the cost of fringe benefits, FICA, etc. The Company will forward such statements to the Union on a monthly basis.

## C.    UNION COMMITTEES AND INSIGNIA

1.    Flight attendants may wear a current official Union insignia pin on their uniforms, provided it is no larger than 1" in diameter.

2.    The Union will supply the Company with a list of standing committees. The Company will endeavor to meet with these committee members as reasonably requested.

FRONTIER AIRLINES (R. BRIGHAM) - 0000934
0411

ESI00000796-120

411

## ARTICLE 17
## UNION SECURITY AND DUES CHECK-OFF

A.     **AGENCY SHOP**

Each Flight Attendant covered by this Agreement who fails to voluntarily acquire or maintain membership in the Union will be required as a condition of continued employment beginning 30 days after the signing of this Agreement or completion of his/her probationary period, whichever is later, to pay the Union each month a service charge as a contribution for the administration of the Agreement and representation of such Flight Attendant. The service charge will be an amount equal to the Union's regular or usual monthly dues, initiation fee or periodic assessments, all levied in accordance with the Railway Labor Act and Union's Constitution and By-laws, which would be required of the Flight Attendant if a member.

B.     **DELINQUENT DUES**

1.     If a Flight Attendant of the Company covered by this Agreement becomes more than 30 days delinquent in the payment of service charges, initiation fees, assessments and/or membership dues, the Union will notify such Flight Attendant by certified mail, return receipt requested, copy to Director of Inflight and the MEC President that she/he is delinquent in the payment of such service charge, initiation fee, assessments and/or membership dues as specified herein and subject to discharge as an Flight Attendant, and must remit the required payment within 15 days or be discharged. The notice of delinquency required under this paragraph will be deemed to be received by the Flight Attendant, whether or not it is personally received when mailed by the International Secretary-Treasurer of the Union by certified mail, return receipt requested, postage prepaid to the Flight Attendant's last known address, or to any other address which has been designated by the Flight Attendant. It will be the duty of every Flight Attendant covered by this Agreement to notify the Union's Membership Department of every change in home address, or of an address where the notice required by this paragraph can be sent and received by the Flight Attendant if the Flight Attendant's home address is at any time unacceptable for this purpose.

2.     If, upon the expiration of the 15 day period, the Flight Attendant still remains delinquent, the Union will certify in writing to the Director of Inflight with a copy to the Flight Attendant that the Flight Attendant has failed to remit payment within the grace period allowed and is, therefore to be discharged. The Director of Inflight will thereupon take proper steps to discharge such Flight Attendant from the service of the Company. The effective date of termination will be 15 days from the date of the Company's written notice of termination. The Union will also be so advised. Such discharge will be for "failure to comply with the terms and conditions of Article 17 of the Collective Bargaining Agreement" which is stipulated to be for just cause.

FRONTIER AIRLINES (R. BRIGHAM) - 0000935
0412

ESI00000796-121

412

C.      **REVIEW PROCEDURE**

1.      A grievance by a Flight Attendant who is to be discharged as a result of an interpretation or application of the provisions of this Section will be subject to the following procedures.

   a.      A Flight Attendant who believes that the provisions of this section have not been properly interpreted or applied as it pertains to her/him, may submit a request for a review in writing within five business days from the date of notification by the Director of Inflight as provided in paragraph B.2. above (not from the effective date of the termination). The request must be submitted to the Director of Inflight who will review the grievance and render a decision in writing not later than five business days following receipt of the grievance.

   b.      If a request in writing is not submitted within five business days from the date of notification by the Director of Inflight as provided in paragraph B.2. above, the Flight Attendant will be deemed to have waived the right of appeal and will, therefore be terminated as soon as possible

   c.      The Director of Inflight or his/her designee will forward a decision to the Flight Attendant with a copy to the International Secretary-Treasurer of the Union. Said decision will be final and binding on all interested parties, unless appealed as hereinafter provided. If the decision is not satisfactory to either the Flight Attendant or the Union, then either may appeal the grievance within 10 business days from the date of the receipt of such decision directly to the System Board of Adjustment as established in Article 18 of this Agreement. All such grievances will be processed by the System Board of Adjustment in accordance with the provisions of Article 19 provided, however, that the members of the System Board appointed by the Union and the Company in accordance with the provisions of Article 19 will not participate in the hearings, deliberations, or decisions of the Board. Such grievances will be presented solely to a neutral referee selected in accordance with Article 19, who will hear and determine such grievance. Such grievances will be heard by the System Board within 21 days of the receipt of the decision by the Director of Inflight. The parties to the System Board proceeding will be the Grievant, the Union and the Company.

   d.      The decision of the neutral referee will be requested within 30 days after the hearing of the appeal, unless otherwise agreed by the Flight Attendant, the Union and

Page 101 of 123

the Company, and will be final and binding on all parties to the dispute. The fees, charges and other reasonable expenses of such neutral will be borne equally by the Grievant and the Union.

2.    During the period a grievance is being handled under the provisions of this Article and until the final award by the System Board of Adjustment, the Flight Attendant will not be discharged from the Company nor lose any seniority rights because of non-compliance with the terms and provisions of this Article.

a.    A Flight Attendant discharged by the Company under the provisions of this paragraph will be deemed to have been discharged for cause within the meaning of the terms and provisions of this Agreement.

b.    The Union agrees that it will indemnify and hold the Company harmless against all forms of liability that will arise out of or by reason of action taken by the Company, which action was requested by the Union under the provisions of this Section or arising out of the Company's compliance with this Section.

D.    **DUES CHECK-OFF**

1.    The Company will deduct from the pay of each Flight Attendant covered by this Agreement an amount equal to the standard monthly membership dues, service charges, initiation fees and assessments, uniformly levied in accordance with the Railway Labor Act, as amended, and the Constitution and By-laws of the Union, provided such Flight Attendant Union executes the following agreed upon form known as a "Check-Off Form."

2.    For Flight Attendants who have executed a Check-Off Form, deductions will be made in the following manner:

a.    One-half of the deduction for dues or service charge will be made in the first paycheck of the month, and one-half of the deduction will be made in the second paycheck of the month.

b.    Initiation fees will be split into equal payments each paycheck over the period of 6 months.

**ASSIGNMENT AND AUTHORIZATION FOR VOLUNTARY CHECK-OFF OF UNION DUES TO: FRONTIER AIRLINES, INC.**

**I,_____, hereby authorize and direct FRONTIER AIRLINES to deduct from my pay dues, in an amount equal to such monthly dues, service charges, initiation fees, and/or assessments, as now or may hereinafter be established in accordance with the Constitution and By-laws of the Union, for remittance to the Association of Flight Attendants-CWA.**

FRONTIER AIRLINES (R. BRIGHAM) - 0000937
0414

ESI00000796-123      414

I agree this authorization will be irrevocable for one (1) year from the date hereof or until termination of the Check-Off agreement between Frontier Airlines and the Association of Flight Attendants-CWA, whichever occurs sooner.

If the Check-Off agreement is terminated this authorization will be automatically terminated. In the absence of a termination of the Check-Off agreement, this authorization may be revoked effective as of any anniversary date of the signing hereof by written notice given by me to Frontier and the Association of Flight Attendants-CWA by certified mail, return receipt requested, during the ten (10) days immediately preceding such anniversary.

Signature of Flight Attendant_____
Company Seniority Date_____
Inflight Seniority Date_____
Base_____
Date of First Deduction_____

*(The Company will have this form and the process in place no later than 30 days after date of signing of the Agreement)*

3.    During Flight Attendant's initial training, the Company will make known the dues Check-Off provisions of this Agreement. Those desiring to participate in the payroll deduction plan for the remittance of dues will at the time complete 2 copies of the above Check-Off form.

   a.    One copy of each completed form will be forwarded to the Union's headquarters office and the other copy to the Company's Payroll Department. On the first paycheck of the month following completion of the Flight Attendant's probationary period, the Payroll Department will begin the appropriate deduction.

   b.    The Company will also make available to the Union the names and base assignments of those Flight Attendants from each graduating class who have elected not to participate in the Check-Off arrangement.

4.    All other Check-Off forms will be submitted from the Union's headquarters office to the Company's Payroll Manager. A properly executed Check-Off form, filed before the 15th of any month, will become effective the 1st of the month following its receipt by the Company's payroll personnel. Illegible or improperly executed forms will be returned to the MEC President.

5.    Any notice of revocation as set forth in the Check-Off must be in writing, signed by the Flight Attendant, and delivered by certified mail, return receipt requested, addressed to the Company's Payroll Manager with a copy to the MEC President as soon as it is processed through the Company's payroll procedures. Check-Off forms and notices so received by the Company will be stamp-dated on the date received and will constitute notice to the

FRONTIER AIRLINES (R. BRIGHAM) - 0000938
0415

ESI00000796-124

Company on the date received, not mailed.

6. With 30 days notice from the Union, the Company will deduct from Flight Attendant's earnings any assessments levied by the Union.

7. The Company will prepare a monthly report that provides to the Union a list of all Flight Attendants on leave of absence, newly hired with probation end date, furloughed or recalled and Flight Attendants who have terminated employment. This list will be provided to the MEC President and can be transmitted in electronic format.

## E. DUES DEDUCTION

1. Deductions of total membership dues, service charges and assessments will be split at the time of the issuance of the first and second paychecks issued each month provided there is a sufficient balance due the Flight Attendant at those times after all other deductions authorized by the Flight Attendant or required by law have been satisfied. Within fifteen (15) days after each payday, the Company will remit to the Union via Electronic Money Transfer all dues, service charges and assessments collected on each payday pursuant to the outstanding and unrevoked Check-Off forms. The Company will promptly send to the Union via electronic medium a separate list of names, bases, pay periods and total amounts deducted for those Flight Attendants for whom such deductions have been made.

2. No dues, service charges or assessments will be deducted from the wages of any Flight Attendant who has executed a Check-Off Form and who has transferred to a job not covered by this Agreement, who is on furlough, or who is on leave without pay. Upon such Flight Attendant's return to work within a classification covered by this Agreement, whether by transfer, return from a leave without pay, or a recall from furlough, payroll deductions of dues will automatically be resumed, unless the Flight Attendant has revoked his/her Check-Off Form in accordance with the appropriate provisions of this Article and Railway Labor Act, as amended.

3. In the event of a strike or work stoppage by the Union, the Company's obligation under this Article will be suspended and be of no force or effect for the duration of such strike or work stoppage.

FRONTIER AIRLINES (R. BRIGHAM) - 0000939
0416

ESI00000796-125

416

## ARTICLE 18
## GRIEVANCE PROCEDURE

**A.**     **GENERAL**

Unless otherwise provided in this Agreement, a Flight Attendant, or the
Union on behalf of a Flight Attendant, may file a grievance concerning any
dispute:

1.     Arising out of the interpretation or application of any of the
provisions of this Agreement; or

2.     To dispute discipline or discharge that the Flight Attendant
believes was imposed without just cause.

**B.**     **INVESTIGATIONS – DISCIPLINE AND DISCHARGE**

1.     Investigatory Meetings

a.     A Flight Attendant will not be disciplined or discharged
without just cause and without previously being afforded
a meeting before the Director of Inflight or his/her
designee, provided that the Flight Attendant has made
him/herself available for the meeting.

b.     The Flight Attendant will be notified of the time and
place of the meeting and the nature of the matter to be
discussed. When a Flight Attendant is required to attend
an investigatory meeting, the Flight Attendant will be
permitted to have Union representation if a
representative is reasonably available on the date and
time of the scheduled investigatory meeting.

c.     If a Union representative is not reasonably available or if
the Flight Attendant declines Union representation, the
Flight Attendant may request the presence of another
available Frontier Flight Attendant during the
investigatory meeting. The Company may deny the
presence of a particular Flight Attendant(s) pursuant to
this paragraph if that Flight Attendant is involved in any
manner in the incident under investigation. Upon
agreement of the parties, the Flight Attendant may be
permitted to attend an investigatory meeting via
telephone conference.

2.     Nothing herein will prevent the Company from holding a Flight
Attendant out of service with or without pay during an
investigation. Flight Attendants will not be eligible for pass travel
benefits while held out of service, except to attend an
investigatory meeting.

FRONTIER AIRLINES (R. BRIGHAM) - 0000940
0417

ESI00000796-126

417

3.   When a Flight Attendant is disciplined or discharged, the Company
     will furnish him/her with a written statement of the precise
     charge(s) against him/her.

4.   A documented verbal discussion, verbal counseling or verbal
     warning does not constitute an action of discipline.

5.   A notice of discipline or discharge will be delivered to the Flight
     Attendant and the Union by any of the following methods: hand-
     delivery in person; v-file or e-mail (in either case, emailed
     concurrently to the Union); regular U.S. mail; U.S. certified
     mail/return receipt requested; or express delivery (e.g., DHL, UPS,
     FedEx, USPS, etc.).

## C.   THE GRIEVANCE PROCESS

1.   Discipline and Discharge

   a.   To be considered timely, a grievance challenging an
        action of discipline or discharge will be in writing, signed
        by the affected Flight Attendant or the Union
        representative and must be submitted to the Director of
        Inflight no later than 14 calendar days following the date
        upon which the Flight Attendant receives written notice
        of the discipline or discharge.

   b.   Grievances must be submitted to the Director of Inflight
        or his/her designee and will be deemed filed upon
        receipt.

   c.   Failure to file a grievance within the specified time limits
        constitutes a waiver of the grievance.

   d.   An investigation and hearing will be held by the Director
        of Inflight or his/her designee no later than 30 calendar
        days following the Flight Attendant's submittal of the
        grievance to the Director of Inflight. Such hearing will not
        be conducted by the same person who initiated the
        disciplinary action, or by anyone subordinate to that
        person.

   e.   The parties may agree to hold a Hearing for the
        purposes of hearing multiple grievances (i.e.,
        "consolidated Hearing"). If that is the case, then the 30
        calendar day time period above may be extended for the
        grievances to be heard during the consolidated Hearing.

   f.   Upon agreement of the parties, Hearings may be held
        telephonically.

   g.   Within 14 calendar days following the date of the

FRONTIER AIRLINES (R. BRIGHAM) - 0000941
0418

ESI00000796-127

418

Hearing, the Company will issue a decision in writing to the affected Flight Attendant and the Union. For group grievances or consolidated Hearings, the Company will issue a decision in writing to the Union within 30 calendar days following the hearing date.

h.   The decision of the Company may be appealed to the System Board of Adjustment in accordance with Article 19 "System Board of Adjustment" within 14 calendar days of receipt of the Company's written decision provided pursuant to Section 1.g. above.

i.   A Flight Attendant disciplined or discharged during his/her probationary period may not dispute or challenge such discipline or discharge through the grievance procedure.

2.   Non-Disciplinary Grievances

a.   A Flight Attendant or the Union on behalf of a Flight Attendant or group of Flight Attendants may file a grievance concerning any action of the Company affecting them that they believe violates the terms of this Agreement. Prior to filing such a grievance, the Flight Attendant should discuss the matter with his/her supervisor, and the Union should discuss the matter with the Director of Inflight in an effort to resolve the matter.

b.   Non-Disciplinary Grievances will be in writing, signed by the affected Flight Attendant or Union official and will state in reasonable detail the facts upon which the claim is based, identifying the specific provisions of the Agreement claimed to have been violated and the relief sought. The grievance must be submitted to the Director of Inflight or his/her designee within 30 calendar days from the time the Flight Attendant knew or reasonably should have known, of the event(s) giving rise to the grievance, whichever is earlier.

c.   An investigation and hearing will be held by the Director of Inflight or his/her designee no later than 30 calendar days following the Flight Attendant's request.

d.   The parties may agree to hold a Hearing for the purposes of hearing multiple grievances (i.e., "consolidated Hearing"). If that is the case, then the 30 calendar day time period above may be extended for the grievances to be heard during the consolidated Hearing.

e.   Upon agreement of the parties, Hearings may be held telephonically.

f.   Within 14 calendar days following the date of the

FRONTIER AIRLINES (R. BRIGHAM) - 0000942
0419

ESI00000796-128

Hearing, the Company will issue a decision in writing to the affected Flight Attendant and the Union. For group grievances or consolidated Hearings, the Company will issue a decision in writing to the Union only within 30 calendar days following the hearing date.

g.    The decision of the Company may be appealed to the System Board of Adjustment in accordance with Article 19 "System Board of Adjustment" within 14 calendar days of receipt of the Company's written decision provided pursuant to Section 2.f. above.

## D.   GRIEVANCE REVIEW MEETINGS

The Company and Union will schedule meetings regularly to review grievances pending at the System Board level in an effort to resolve as many grievances as possible. Both Company and Union will be represented by individuals with full authority to approve binding settlement agreements. Rejected offers of settlement made by the Company or Union and all other case evaluation(s) and discussion(s) will be without prejudice to either party and will be inadmissible in any System Board of Adjustment hearings. The parties may mutually agree to bypass this step in the grievance process.

## E.   TIME LIMITS & SUBMISSIONS

1.    Any time limits set forth in this Article for holding a grievance hearing may be extended by mutual agreement.

2.    If any action or decision made by the Company is not grieved or appealed by the Union or Flight Attendant within the time limits set forth in this Article, the action or decision of the Company will become final and binding.

3.    If the Company fails to render a decision within the time limits set forth in this Article, unless extended by mutual written agreement by the parties, the Union may advance the grievance to the next level in the Grievance process.

FRONTIER AIRLINES (R. BRIGHAM) - 0000943
0420

ESI00000796-129

420

## ARTICLE 19
## SYSTEM BOARD OF ADJUSTMENT

### A.   ESTABLISHMENT

In compliance with Section 204, Title II of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment for the purpose of adjusting and deciding disputes which may arise under the terms of the Agreement, and which are properly submitted to it as set forth in Article 18, which Board will be known as the "Frontier Flight Attendants' System Board of Adjustment."

### B.   MEMBERSHIP

1. The Board will be comprised of a Company Board Member, a Union Board Member, and a single neutral member (i.e., the Chairperson).

2. Each Board member will be free to discharge his/her duty in an independent manner, without fear that his/her individual relations with the Company or with the Union may be affected by action taken in good faith in his/her capacity as a Board member. Board members who are employees of the Company will be granted time off to attend the hearing and subsequent executive session(s).

3. The parties will agree on a panel of nine approved arbitrators from which neutral members will be selected using the alternate strike method. The panel will be established within 45 calendar days of the signing of this Agreement. Once selected, a party may permanently remove a neutral from the panel after one year; however, the neutral may not be removed from any case to which he/she has already been assigned without agreement between the Company and the Union. If a panel member is removed by a party, voluntarily removes him/herself from the panel, or can no longer act as a neutral (e.g., death, illness, retirement), the parties will select a mutually agreeable permanent replacement.

4. Notwithstanding the foregoing, the parties may at any time agree to select a neutral who is not a member of its standing panel to sit as the Chairperson of the System Board of Adjustment.

### C.   JURISDICTION

1. The Board will have jurisdiction over any grievance between any Flight Attendant and the Company, or the Union and the Company, growing out of grievances or out of interpretation of any of the terms of this Agreement; provided, however, that the jurisdiction of the Board will not extend to changes in hours of employment, rates of compensation or working conditions. The Board will consider any grievances properly submitted to it by the Union or the Company when such grievances have been previously

FRONTIER AIRLINES (R. BRIGHAM) - 0000944
0421

ESI00000796-130

421

submitted to, but not settled, in accordance with the grievances procedure provided for in this Agreement.

2. Each grievance presented to the Board will be treated as a separate case, unless the parties mutually agree otherwise.

3. Appeals to the Board will be made in writing with a copy of the grievance attached, and will contain the following:

   a. A statement of facts;

   b. The question(s) at issue;

   c. The position of the appealing party;

   d. The understood position of the other party;

   e. Specific provisions of the Agreement alleged to have been violated; and

   f. The remedy sought by the appealing party.

### D.    DOCUMENTS, WITNESSES, EVIDENCE AND REPRESENTATION

1. The Union will designate its representative and the Company will designate its representative. Evidence may be presented either orally, in writing, or both.

2. Witnesses may testify telephonically, provided that the party, whose witness(s) will testify telephonically, has notified the other party prior to the hearing date.

3. The number of witnesses summoned at any time will not be greater than the number which can be spared from the Company's operation without interference with the services of the Company.

4. Unless the parties mutually agree otherwise, a stenographic report is to be taken.

### E.    EXECUTIVE SESSION

Following the hearing, or at any time prior to the issuance of a final decision in the matter, upon the request of any member of the Board, the members of the Board will convene in executive session.

### F.    LOCATION OF BOARD HEARINGS

Board hearings will be held at a location agreed to by the parties on a case by case basis. If the parties are unable to agree to a location, the case will be heard at the Company's corporate headquarters or within the general vicinity of the Company's corporate headquarters.

FRONTIER AIRLINES (R. BRIGHAM) - 0000945
0422

ESI00000796-131

422

**G.      EXPENSES – ARBITRATOR/WITNESSES/HEARING**

1.      The parties will each pay the cost and expenses of their own attorneys and/or advocates, witnesses and Board Members.

2.      Unless otherwise provided in this Agreement, all fees and expenses of the arbitrator and those related to the conduct of the hearing will be borne equally by the Company and the Union (e.g., hearing room rental, arbitrator fees and travel expenses, court reporter, transcript, etc.)

3.      The grievant (whether an employee of the Company or not), employee witnesses, employee board members, and representatives who are employees of the Company will be provided roundtrip positive space transportation on the lines of the Company from their point of duty or assignment, if applicable, to the location at which they must appear as witness or representatives.

4.      Should a hearing before the Board be postponed or canceled without mutual consent of the Company and the Union, the party postponing or cancelling will bear any and all expenses incurred by the arbitrator and those related to the postponement or cancellation of the hearing (e.g., arbitrator cancellation fee and travel expenses, hearing room rental, etc.).

FRONTIER AIRLINES (R. BRIGHAM) - 0000946
0423

ESI00000796-132

423

## ARTICLE 20
## MISSING, INTERNMENT, HOSTAGE, OR PRISONER OF WAR BENEFITS

**A.** **GENERAL**

Any Flight Attendant who, while in the performance of duties for the Company, through no fault of his/her own becomes illegally interned (e.g., jailed, confined, etc.), is held as a prisoner of war, is hijacked or is held hostage (hereafter collectively referred to as "illegally interned") will accrue seniority and longevity, and will receive the following benefits until he/she returns to active employment with the Company or as otherwise provided in this Section:

1. The Flight Attendant will be paid his/her average monthly compensation received during the last 3 months of the last 6 months she/he worked with the Company, less legally mandated deductions and deductions and contributions previously authorized by the Flight Attendant. Where the Flight Attendant would be entitled to longevity raises, the Flight Attendant will be paid in accordance with those raises.

2. Full vacation and sick leave credit will continue to accrue.

3. This Article does not apply in situations where the Flight Attendant is interned/held/retained legally in another country (e.g. held pursuant to Canada's Immigration and Refugee Protection Act) or otherwise missing.

4. To the extent permitted by law, travel agreements (including interline agreements) and Company policy, continuation of travel benefits for dependents of the Flight Attendant will continue.

**B.** **DEATH AND SURIVOR BENEFITS**

1. If death of a Flight Attendant is established, or if there is sufficient presumption of death, all benefits set forth in paragraphs A (1) through (3) above will cease and death/survivor benefits, if any, will be paid.

2. If the parties are unable to confirm whether a Flight Attendant falling under this Section is alive or dead, compensation and other benefits under this Section will continue to be paid by the Company to the beneficiaries (or trust account) indicated in the Flight Attendant's letter of instruction to the Company until death/survivor benefits, if any, are paid or until a twelve-month period has passed, whichever occurs first.

3. The Company will require each Flight Attendant to execute and deliver to the Company a written direction in the form set forth in Paragraph 5 below. The monthly compensation set forth in Section A. above will be credited to such Flight Attendant and will

FRONTIER AIRLINES (R. BRIGHAM) - 0000947
0424

ESI00000796-133

424

be distributed according to written directions from the Flight Attendant.

4.  If a Flight Attendant due compensation under this Article has not completed a direction as per Paragraph 3 above, such compensation will be held in an interest bearing account at a federally-insured financial institution until the Flight Attendant is found or released and is able to claim the compensation. In the event of the Flight Attendant's death, the proceeds of said account will be paid to the legal representative of the Flight Attendant's estate.

5.  Form Of Written Direction

WRITTEN DIRECTION FOR DISBURSEMENT OF BENEFITS

TO:  Frontier Airlines

DATE: _____

In the event payment directly to me is not possible, you are hereby directed to pay all monthly compensation due me and any other benefits stipulated in the Agreement as follows:

$_____ or _____% per month to (name) _____, (address) _____, as long as living, and thereafter to (name) _____, (address) _____. The balance, if any amounts accruing after the death of the persons named above will be held for me and distributed as stipulated by Article 20 of the Collective Bargaining Agreement.

The foregoing directions may be modified from time to time by letter addressed to the Company and signed by the undersigned. Upon receipt by the Company, any such modification will become effective as of the postmarked date.

(Signature)                              _____

(Print name)                             _____

(Employee number)                        _____

FRONTIER AIRLINES (R. BRIGHAM) - 0000948
0425

ESI00000796-134

425

## ARTICLE 21
## DRUG AND ALCOHOL TESTING

A.   The Company will maintain and administer drug and alcohol testing programs in accordance with applicable federal laws and regulations and the Company's drug testing program.

B.   A Flight Attendant will be considered to be on duty for pay purposes during the time he/she is required to undergo random drug/alcohol testing. If the testing occurs after scheduled release from duty at the end of a duty period, the Flight Attendant will notify Crew Scheduling of his/her release time immediately following such test.

C.   No Flight Attendant will be required to take a random alcohol/drug test on a scheduled day off.

D.   A Flight Attendant ordered to submit to a "reasonable suspicion" test will be permitted to contact a Union representative prior to the test provided that doing so does not delay the test.

E.   A Flight Attendant who is removed from a trip for drug/alcohol testing that does not result in a positive result will be made whole for any time lost.

F.   All Flight Attendants will be provided a copy of the Company's FAA approved drug and alcohol program.

FRONTIER AIRLINES (R. BRIGHAM) - 0000949
0426

ESI00000796-135

426

## ARTICLE 22
## SAFETY, SECURITY, HEALTH AND EAP

**A. GENERAL**

    1.    The Company recognizes that safety, security and health are subjects that are an essential part of the Flight Attendant's working environment and will work with the Union's Safety, Security, ASAP, EAP and Health committees to resolve concerns.

    2.    Flight Attendants are not responsible for security sweeps, except in extreme circumstances.

    3.    In the event of a bomb threat, Flight Attendants will not be required to search for bombs and/or suspicious and potentially dangerous items on an aircraft, or to remain on board during such a search while the aircraft is on the ground.

    4.    The Company will maintain zero tolerance for assaults and/or interference involving crew members.

    5.    The Company will notify a Flight Attendant upon learning that he/she may have been exposed to Hepatitis B, Tuberculosis and/or HIV virus in the course of his/her duties and will provide testing should an exposure event occur.

    6.    Reasonable efforts will be made to standardize the configuration of safety/emergency equipment on each series of aircraft.

    7.    Whenever the Company refers Flight Attendants for voluntary participation in the Company EAP, either verbally or in writing, the Company will also inform the Flight Attendant of the existence of the Union EAP.

    8.    Professional Standards - When a conflict between Flight Attendants is brought to the attention of the Company in the first instance, the Company may refer the matter to the Union EAP.

**B. AFA SAFETY, SECURITY AND HEALTH COMMITTEE**

    1.    Upon request, the Company will meet with the Union's Safety, Security and Health Committee Chairs and EAP Chairs to address important issues.

    2.    Upon request the Company will provide the Union a copy of the OSHA300A report as provided to OSHA.

    3.    The Company recognizes the Union Accident Investigation Team ("Go Team") as potentially active participants in an accident investigation under the purview of the NTSB.

FRONTIER AIRLINES (R. BRIGHAM) - 0000950
0427

ESI00000796-136

427

**C.      ACCIDENT/HIJACKING**

1.      Upon learning of an aircraft accident or hijacking involving a Company aircraft with a Flight Attendant onboard, the Company will promptly notify the MEC President or designee.

2.      The Company will provide the Union with the reports pertaining to accidents or hijackings, provided such reports:

   a.      Are reasonably related to the duties and responsibilities of the Union as representative of the Frontier Flight Attendants;

   b.      Are reasonably available or producible without undue burden to the Company;

   c.      Do not contain or refer to confidential information of the Company or its employee, partners, or affiliates; and

   d.      Are not precluded from disclosure based on state or federal privacy laws or any other law or regulation.

FRONTIER AIRLINES (R. BRIGHAM) - 0000951
0428

ESI00000796-137

428

## ARTICLE 23
## GENERAL

**A.**   **COMMUTER POLICY**

1.   The Company recognizes Flight Attendants' desire to live in locations other than their base. The Company's commuter policy is intended to protect registered Flight Attendant Commuters ("FACs") from a dependability infraction when unable to report for duty in base. Once registered with the Company as a commuter, the Flight Attendant is responsible for reporting to assignments in a timely manner and rested for a full duty period. The following provisions are not intended to relieve Flight Attendants of that responsibility.

2.   The FAC policy does not alleviate the FAC's responsibility to attend mandatory personal meetings scheduled with Company management.

3.   Commuting crew members are not exempt from the Company's carry-on baggage policy which has been approved and is monitored by the FAA. This policy is in effect for Flight Attendants traveling to and from work. Please refer to the carry-on baggage policy posted on the Company's public website, www.FrontierAirlines.com, for the current policy.

4.   Registered City

A FAC must register his/her commuter city with the Company. Flight Attendants may commute from sister-cities that are within 180 miles of their commuter city. The commuter city may not be changed more than three times a year unless individual authorization is given by Inflight Management. The FAC policy applies only on Frontier Airlines and to carriers on which the Company has direct access to their computer reservation system.

5.   Flight Listing

a.   The FAC will select a primary and back-up flight with available seats. "Available" is defined as at least one seat open through https://ifc.id90.com/, or other designated online flight listing system, when the Flight Attendant lists within 12 hours of departure from the FAC's registered city. The number of non-revenue passengers listed does not impact this policy.

b.   The back-up flight, per the published schedule, must allow the FAC to report at base and check-in on-time.

c.   The cabin jumpseat may be utilized as the FAC's primary flight but may not be considered as his/her back-up flight. At times, Company management or training

FRONTIER AIRLINES (R. BRIGHAM) - 0000952
0429

ESI00000796-138

429

personnel (e.g., Check Flight Attendants, Instructors on Company Business) will occupy the additional jumpseat, and the FAC must plan accordingly.

    d.    A FAC receives no preferential treatment regarding priority for the cabin jumpseat in either direction from his/her registered city; all published jumpseat guidelines are in effect.

6.    Documentation

The FAC must be able to provide documentation to his/her Inflight Manager to substantiate listing and standing-by for two available flights. Listing and standing-by documentation includes:

    a.    Printout of F9-generated listings (e.g., auto-confirmation generated from website);

    b.    Boarding coupon;

    c.    Printout from customer service agent displaying non-revenue stand-by list;

    d.    ACM form.

7.    Corrective Action Protection

    a.    The FAC policy protects the FAC from the dependability corrective action if a circumstance beyond the FAC's control prevents reporting at base on-time for their trip. The four excusable incidents are:

        (i)    Weather delay or cancellation;

        (ii)    Mechanical delay or cancellation;

        (iii)    Denied jumpseat due to seniority, or by ACM on Company Business;

        (iv)    Unforeseen significant event (e.g. weight & balance, airport security breach, etc.).

    b.    If the FAC's flights are significantly delayed and the revised scheduled arrival into base is within 30 minutes prior to the FAC's report time, he/she must contact with Crew Scheduling and advise a Crew Scheduler of the delay and anticipated arrival into base. The FAC must be on the aircraft 40 minutes prior to departure in order to take the trip.

    c.    Any issues other than the four types of events listed above will not be excused for the FAC under this policy

Page 118 of 123

430

(e.g., traffic, car problems, weather on the drive to the airport).

8. Responsibilities

   a. A FAC unable to report to the aircraft within 20 minutes of his/her scheduled report time in base may be removed from that trip and replaced with a Reserve Flight Attendant.

   b. The Flight Attendant may be released from duty without pay for the portion of the trip he/she missed. The Flight Attendant may use the Automated Bid System, or Will Fly to replace the hours lost. A FAC must pick up time to meet the 60 hours requirement if the missed trip brings the Flight Attendant's hours below 60. If the trip missed is the last trip of the month, the FAC must contact the Company.

   c. The Flight Attendant may resume the original trip, if applicable, on its return through base. The Reserve Flight Attendant would be removed at that time, and the FAC would resume the trip and paid according to hours flown for the remainder of the trip. The FAC will not be allowed to resume the trip out of base. The FAC must make every effort to reach base to complete the assigned trip.

9. Training

   Training assignments for FACs will be treated the same as reporting for a scheduled trip, and the FAC must follow all procedures outlined in this Section A and Article 7. The FAC is responsible for contacting the Training Administrator for rescheduling the missed class. The FAC is solely responsible for maintaining in-flight qualification.

10. Reserve

    A Flight Attendant on Reserve may be registered as a FAC. Using the above-stated reporting procedures, the Reserve FAC must be able to arrive in base prior to 0001 of Day 1 of a series of days on Reserve. A Reserve Flight Attendant pre-assigned a trip, if released by Crew Scheduling until report time, may utilize the above-stated reporting procedures with regards to reporting in base for the assigned trip. Reserve FACs will not receive, nor request, preferential treatment from Crew Scheduling with regard to trip assignment or scheduling.

**B.   INFLIGHT RETIREMENT RECOGNITION**

The steps to take when preparing for retirement as a Flight Attendant from the Company are:

Page 119 of 123

1. A Flight Attendant must have at least 5 years in Inflight Services to qualify for Inflight Retirement Recognition.

2. The Flight Attendant will make an appointment with his/her Inflight Manager at least 30 days prior to his/her last flight, preferably prior to the Flight Attendant's last bid.

3. The Flight Attendant will not set a date for his/her last flight until he/she has met with the Inflight Manager; this is the time the date will be set.

4. The Flight Attendant may have up to four family members join him/her on his/her last flight. The Flight Attendant will provide the names to the Inflight Manager at least a week prior to the last flight, so positive space reservations may be made.

## C. RETAINED MANAGEMENT RIGHTS

1. Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate its business and work force, including but not limited to: the right to sell or discontinue all or part of the business; to sell or lease aircraft or facilities; to determine where and when to operate scheduled or unscheduled flights; to determine its marketing methods and strategies, and to enter into code sharing, affiliation or marketing agreements with other carriers; to invest (including equity investments) in other business entities including, without limitation, other air carriers; and to determine the number and type of aircraft it will utilize.

2. The exercise of any right reserved herein to management in a particular manner, or the non-exercise of such right, will not operate as a waiver of the Company's rights hereunder, or preclude the Company from exercising the right in a different manner.

3. Nothing in this Agreement will restrict the right of Inflight Management to fly as crew members to maintain proficiency and to provide expertise and assistance to Flight Attendants in the form of supervision, instruction and demonstration to achieve the goal of superior service to all passengers. When a Flight Attendant is displaced from his/her scheduled flight assignment by a management/supervisory/inflight Flight Attendant, he/she will be released from all duty and paid as if flown. The Company will provide as much notice as possible of the displacement to the Flight Attendant.

FRONTIER AIRLINES (R. BRIGHAM) - 0000955
0432

ESI00000796-141

432

## ARTICLE 24
## EQUITY, PROFIT-SHARING, AND WAGE & BENEFIT SNAPBACKS

### A.    EQUITY PARTICIPATION

Flight Attendants will be entitled to equity in the Company (the "Equity Participation") as described herein:

1.    The value of the Equity Participation is $16.0 million.

2.    The Equity Participation value will be converted to first dollar equity in the Company at a ratio of the greater of $0.18 per dollar of new equity invested in the Company, or any higher rate offered to any other key stakeholder in the restructuring process.

3.    The terms of the Equity Participation by and for the benefit of the Participating Flight Attendants will be equal to the terms obtained by a third party investor in an Equity Event or, if the Equity Event is a public offering of securities in the Company, the form of securities offered in the public offering.

4.    Other minority investor rights by and for the benefit of the Participating Flight Attendants will be negotiated, including tagalong rights and customary dragalong rights.

5.    Vesting: The Equity Participation will vest in proportion to the actual Investments as set forth in the letter dated October 11, 2011 between the Company and the Union entitled "Flight Attendant Restructuring Investments". To the extent the Investments as set forth in the referenced letter cease or are not made, the value of the Equity Participation in Paragraph A.1.a above will be reduced by the net present value discount rate of 15%

### B.    PROFIT SHARING PROGRAM.

The Company has established a Profit Sharing Plan (the "PSP") for employees participating in the Company's restructuring efforts. According to the terms of the PSP, the Company will make contributions as follows:

1.    For pre-tax earnings greater than 2%, but less that 4% of total Company revenue, 50% will be contributed to the PSP.

2.    For pre-tax earnings greater than 4%, but less than 6% of total Company revenue, 25% will be contributed to the PSP.

3.    For pre-tax earnings greater than 6% of total Company revenue, 10% will be contributed to the PSP.

4.    50% of contributions to the PSP will be allocated to the Frontier

FRONTIER AIRLINES (R. BRIGHAM) - 0000956
0433

ESI00000796-142

pilots and the remaining 50% will be allocated to the other participating Frontier employee groups in proportion to their contribution. The proportional share of the Flight Attendant group is 18% of the 50% share of the non-pilot groups.

5.    The Company will distribute all profit sharing payments no later than April 30 of each year based on the audited results from the preceding calendar year.

## C.    SNAPBACKS

1.    The overtime threshold, per diem and holiday pay will be reinstated if the Company is profitable for two consecutive years with pretax profits in excess of 5%, after profit sharing.

2.    The Company's matching contribution to the 401K Plan will be reinstated if the Company posts 2 straight years of pre-tax profits in excess of 5%, after profit sharing. The Company retains the right to restore the Company's matching contribution partially or fully in its discretion. Effective with the first paycheck in July 2016, the Company's matching contribution to the 401k Plan will be reinstated.

## D.    ADDITIONAL PROVISIONS

Equity Participation as set forth in Paragraph A above and participation in the PSP as set forth in Paragraph B above, will be exclusively for Frontier Flight Attendants on the Frontier Flight Attendant Seniority List as of January 1, 2012. This exclusion includes anyone who changes Class and Craft as outlined in Article 10 Seniority of this Agreement.

FRONTIER AIRLINES (R. BRIGHAM) - 0000957
0434

ESI00000796-143

434

## ARTICLE 25
## DURATION

A.    This Agreement will become effective on the date of signing and will
      continue in full force and effect until March 1, 2016 and will renew itself
      without change until each succeeding March 1 thereafter unless written
      notice of an intended change is served in accordance with Section 6, Title
      1, of the Railway Labor Act, as amended, by either party hereto at least 30
      days, but no more than 240 days, prior to March 1, 2016 or any March 1 of
      any subsequent year.

B.    Notwithstanding paragraph A. above, during the duration of this Agreement
      should Frontier Airlines, Inc. earn more than a 5% annual pretax profit, after
      payment of profit sharing payments, if any, for any two consecutive years,
      then the Association may reopen this Agreement for the limited purpose of
      negotiating over rates of pay, with the goal of achieving rates consistent
      with peer group (LCC) Flight Attendants.

C.    This Agreement shall be effective August 29, 2011 and shall remain in full
      force and effect as outlined by the terms of this Article.

      IN WITNESS WHEREOF, the undersigned parties have signed this
      Agreement this _____day of October, 2011.

FOR ASSOCIATION OF FLIGHT
ATTENDANTS – CWA, AFL-CIO              FOR FRONTIER AIRLINES, INC.


_____       _____
Veda Shook                            Ron Henson
International President                Vice President – Labor Relations


_____       _____
Erika Schweitzer                      Jacalyn Peter
MEC President                         Sr. Manager of Labor Relations


_____
Darol Glasscock
Negotiating Committee Member


_____
Theresa Owens
Negotiating Committee Member


_____
Suzanne Balzer
AFA-CWA Negotiator

FRONTIER AIRLINES (R. BRIGHAM) - 0000958
0435

ESI00000796-144

435

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

       Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

       Defendant.

---

## DECLARATION OF DAVID ST. HILAIRE

---

1.     My name is David St. Hilaire, and I possess personal knowledge of all contents contained in this Declaration.

2.     I am a former flight attendant for Frontier Airlines, Inc. ("Frontier"). I am well acquainted with Plaintiff Rebecca Brigham as we worked together at Frontier.

3.     I left my employment with Frontier on or about April 1, 2016 due to unfair and unlawful treatment that I suffered.

4.     On or about May 19, 2015, I entered treatment for alcohol addiction. I was fearful about disclosing my condition to Frontier because I was concerned that given Frontier's reputation for handling these types of issues, I would be retaliated against and treated unfairly.

5.     Instead, I worked with a union representative to obtain the needed time off for

alcohol treatment. I attended my treatment program, which was successful. After completion of this program, I returned to work at Frontier. At first, it seemed all was well upon my return.

6.     Unfortunately, a few weeks after my return, and while attending an annual training required of flight attendants, I was summoned out of the training room by my supervisor, Christopher Benedict. Mr. Benedict directed me to a meeting with himself, Shelley Leyner, and Jerry Arellano. Both Ms. Leyner and Mr. Arellano were in HR positions. Mr. Benedict was the director of compliance.

7.     At this meeting, I was told by the above-referenced management officials that they obtained my release to return to work from the treatment center I attended to treat my alcoholism. They were clearly concerned that I was released to return to work from a treatment center that treats alcohol and drug addiction. In an attempt to prevent further invasion of my privacy, and perhaps save my job, I stated that the treatment center treats a broad scope of disorders, not just those related to drug and alcohol treatment.

8.     These management officials told me they knew that I suffered from alcoholism. A former coworker of mine showed these management officials a Facebook post that I had recently posted celebrating the fact that I had been sober for 90 days.

9.     These management officials then insisted that I was not well, and that I needed to go back to treatment. This was unequivocally false. These management officials further insisted that it was improper for me to have arranged my time off for treatment through the union, and that I should have used Frontier's self-disclosure program. I disagreed.

10.     Still, I was suspended for over a month, without pay, following this meeting. I went through Frontier's self-disclosure program and ended up on a list compiled by the FAA of

employees with drug or alcohol issues, which would make it difficult to obtain future employment in the industry. Despite my compliance with all requirements of the self-disclosure program, Frontier harassed me repeatedly with drug testing (even though I was never treated for drug use).

11.     Often while on out-of-town trips, Frontier would drug test me while I was on my way to the hotel. This would require long waits for shuttle busses that would shorten my rest periods below the legally required 8 hours. Eventually, I realized I would need to quit working for Frontier when I was arriving back in Denver from a trip.

12.     When I opened the aircraft door, there was a gentleman waiting at the gate who immediately commanded me to follow him for drug testing. I informed him that I could not leave immediately as I was still required to deplane all of the passengers. The gentleman then crumpled up a piece of paper he was holding, threw it at me, and stated: "You just refused a drug test."

13.     Before I could even get down the jetway, after deplaning the passengers, HR was on the phone telling me I was terminated. My coworker on that flight, Angie (last name I cannot recall) witnessed the entire event and helped me plead my case to HR. Frontier reversed its decision to terminate based on this event, but it was clear that I had a target on my back. It was obvious I was being treated poorly because I suffered from alcoholism.

14.     I asked my supervisor, Christopher Benedict, how long I would be "randomly" drug tested because the entire process had devolved into harassment. He stated that Frontier could continue treating me this way for 3 to 5 years. I could not imagine living like this for an additional 3 to 5 years. Therefore, on or about April 1, 2016, I left my position with Frontier.

15.     I am now employed with another airline. At this other airline, I founded the Flight Attendant Drug and Alcohol Program. I have been successful in leading this program, and while

it is unfortunate that I suffered through these events at Frontier, I did find an opportunity to help prevent others from going through similar events. Drug and alcohol use are unfortunately common in the industry, but recovery is most certainly possible. It is my understanding that Ms. Brigham has also successfully recovered from her alcoholism. It is also my understanding that approximately 5 or 6 other flight attendants suffered stories similar to mine and Ms. Brigham's while I was employed by Frontier.

16.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of July, 2020.

David St. Hilaire

# 20200714 Declaration of David St. Hilaire

Final Audit Report                                                                2020-07-15

| | |
|---|---|
| Created: | 2020-07-15 |
| By: | John Crone (john@crone-law.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAjWQhMgvvxmTVDSYTZcEmUt3HkyigGbnB |

## "20200714 Declaration of David St. Hilaire" History

📄 Document created by John Crone (john@crone-law.com)
2020-07-15 - 0:09:46 AM GMT- IP address: 174.16.180.198

📧 Document emailed to David St. Hilaire (dsthilaire86@gmail.com) for signature
2020-07-15 - 0:09:59 AM GMT

📄 Email viewed by David St. Hilaire (dsthilaire86@gmail.com)
2020-07-15 - 0:10:19 AM GMT- IP address: 66.249.88.13

✍ Document e-signed by David St. Hilaire (dsthilaire86@gmail.com)
Signature Date: 2020-07-15 - 0:12:05 AM GMT - Time Source: server- IP address: 68.119.215.110

✅ Signed document emailed to David St. Hilaire (dsthilaire86@gmail.com) and John Crone (john@crone-law.com)
2020-07-15 - 0:12:05 AM GMT

Adobe Sign

## AFFIDAVIT OF CHRISTINE KERNEN IN SUPPORT OF CHARGES OF JO ROBY, STACY REWITZER, RENEE SCHWARTZKOPF, AND MELISSA HODGKINS AGAINST FRONTIER AIRLINES

*Re:* Charge Nos:
Jo Roby          541-2017-01427
Stacy Rewitzer  541-2017-01430
Renee Schwartzkopf (charge number to be assigned)
Melissa Hodgkins (charge number to be assigned)

1. My name is Christine Kernen. I was born on December 10, 1982.

2. My address is 149 Veronica Drive, Windsor, Colorado, 80550.

3. My current email address is christine.kernen@yahoo.com

4. My current phone number is 970-381-8430.

5. I submit this affidavit in support of the Charges of Discrimination filed on May 16, 2017 by the charging parties Jo Roby and Stacy Rewitzer (the "Charging Parties") against Frontier Airlines ("Frontier").

6. I worked as a flight attendant employed by Frontier for eleven years, beginning in May 2005 and ending in July 2016.

7. Prior to working at Frontier, I was an undergraduate student; I graduated from the University of Northern Colorado in 2005.

8. I gave birth to two children while working for Frontier, the first on March 3, 2014 and the second on November 9, 2015.

9. As was true for the Charging Parties, Frontier did not provide me with appropriate workplace accommodations for pregnancy or breastfeeding.

1

10.   With my first child, I stopped flying at 32 weeks, in late December 2013.  I did not have the option to seek a temporary ground position that would have permitted me to continue working during the remainder of my pregnancy.

11.   Through careful planning of my schedule and vacation days, and because I took an unpaid Company Offered Leave of Absence in February 2014, I was able to save twelve weeks of Family Medical Leave Act ("FMLA") leave for after childbirth.

12.   Upon my return to work in July 2014, Frontier did not offer me any on-the-job pumping accommodations, and the company never informed me of policies related to breastfeeding accommodations.

13.   I learned from another flight attendant with children that new mothers pumped in the aircraft lavatory during flights.  I generally worked two-day trips with eight to ten hour shifts. I occasionally pumped in the family bathroom at the Denver Airport, but I generally did not have long enough breaks to pump on the ground at the airport between flights.  Because of my medical need to express breast milk on a frequent and regular basis, at times I had no option but to pump in the aircraft lavatory during flight.  I suffered from pain and engorgement when I had to delay pumping because I lacked adequate time or a convenient location to express breast milk.

14.   I breastfed my first child until January 2016, when she was approximately ten-months old.

15.   With my second child, I again stopped working at approximately 32 weeks and did not have the option to seek a temporary ground position that would have permitted me to continue working during the remainder of my pregnancy.

16.     During my second pregnancy I suffered from pregnancy-related migraines and had to use approximately four weeks of my FMLA leave while pregnant to avoid accruing dependability points.

17.     Frontier calculated how much FMLA leave I had remaining after my second childbirth by deducting seven days of leave for every week that I would be out, even though flight attendants are never scheduled to work more than six days per week.  With the help of the flight attendants' union, the Association of Flight Attendants (AFA), I was able to secure the correct amount of FMLA leave to which I was entitled and took approximately eight weeks of FMLA leave following childbirth.  I also took four accrued paid vacation days in addition to my leave.

18.     After I gave birth to my second child, my doctor diagnosed me with post-partum depression, and Frontier granted me approximately eight weeks of extended unpaid medical leave, until the end of March 2016.  I did not request additional leave for breastfeeding because I was unaware of any Frontier policy permitting such leave.

19.     By the end of March, I no longer was experiencing post-partum depression, and it was not financially feasible for me to continue on unpaid leave.

20.     I returned to flying in April 2016, when my daughter was approximately five months old.  At the time, I was still breastfeeding and once again had no other option but to pump breast milk in the aircraft lavatory during flight, or in the family bathroom at the Denver Airport when feasible.  I was concerned about the unsanitary conditions of pumping breast milk for my child in the aircraft lavatory.

21.     Frontier again did not offer any accommodations or provide any information about pumping breast milk on the job.

22.     In April 2016, I emailed Kari Thompson, Manager of InFlight Services, to ask if there were any pumping rooms available for flight attendants at the Denver Airport other than at Frontier's General Office. Ms. Thompson responded that the only place for me to pump near the airport would be the Westin Airport Hotel—an offsite, privately owned airport hotel—which had a private bathroom that I could try to access. However, a bathroom, even private, is not an adequate place to pump. And even if it were better than the airport bathrooms, the hotel is located outside of the airport, an approximate 30 minute roundtrip walk away, making it impossible to get there, pump and get back during my short breaks between flights. Further, because the hotel is not owned by Frontier, I would not have been guaranteed access.

23.     In spring 2016, I was scheduled for several five-day trips with red-eye flights. Traveling away from home for five days at a time while nursing a young child would have been extremely exhausting and logistically challenging. It is difficult to keep milk stored, cold, and fresh during five consecutive days of travel. I also would struggle to find adequate break time and locations to pump while working for five consecutive days. In addition, red-eye flights exacerbated my chronic sleep deprivation, since I had to wake up every three hours to pump breast milk throughout the night.

24.     Because working my scheduled five-day trips and continuing to pump breast milk on the job was not feasible, I called in sick and accrued dependability points for those trips. These points were added to my points from an existing non-pregnancy related attendance occurrence that had not yet rolled off my record due to my FMLA and medical leave following childbirth.

25.     I became concerned about incurring additional dependability points if I continued to call in sick, risking disciplinary action or termination, but I could not maintain a schedule which was incompatible with my medical need to express breast milk frequently and regularly.

26.     In May 2016, I called Ms. Thompson to express concerns about my scheduled five-day trips and request a leave of absence, or any other feasible alternative accommodation. Ms. Thompson denied my request.

27.     Between May and July, I expressed breast milk on the job including at the hotel before a flight, in family bathrooms at outstations when possible, and in the aircraft lavatory. I often experienced pain and engorgement because I did not have adequate break time to express breast milk, and had to delay pumping until I was leaking and physically no longer able to stand the pain.

28.     In July 2016, I quit my job with Frontier because the lack of accommodations meant I would continue to accrue dependability points for absences, although I was already at imminent risk of termination due to my accumulated dependability points.

29.     Frontier's failure to accommodate breastfeeding mothers negatively impacted my health. On multiple instances, I suffered from pain and engorgement when I was not able to take breaks to express breast milk on the job. During that time, I either suffered from sleep deprivation when I pumped regularly throughout the night, or experienced pain and engorgement when I delayed pumping in order to get sufficient sleep to perform my duties. I was also forced to pump breast milk in unsanitary conditions, such as aircraft lavatories and family bathrooms.

30.     I support the policy changes being sought by the Charging Parties, and believe those policies would have benefitted a large number of female flight attendants. I support giving flight attendants the option to seek additional unpaid leave or have a temporary ground

assignment while they are unable to fly due to pregnancy and while they are breastfeeding. Had I had those options, I would not have had to stop breastfeeding my first child when she was approximately 10 months old, and would not have felt forced to quit my job in order to breastfeed my second child. If I had been offered adequate on-the-job accommodations after my second child, I would have still been employed as a flight attendant when Frontier distributed $62,000 equity payouts, just nine months after I left.

31.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. They are made voluntarily and without any benefit (actual or promised) offered in exchange for making these statements.


Executed on this 4 day of Oct , 2017.


Christine Kernan


Notary Public

DEANNA M. SMITH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20064043910
MY COMMISSION EXPIRES 6-15-2020

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Denver Field Office**

303 East 17ᵗʰ Avenue, Suite 410
Denver, CO  80203
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Denver Direct Dial:  (303) 866-1359
FAX (303) 866-1085
Website:  www.eeoc.gov

EEOC Charge No.: **32A-2016-00322**

Rebecca Brigham                    Charging Party
10148 Green Road
Goodrich, MI 48438

Frontier Airlines, Inc.             Respondent
7001 Tower Road
Denver, CO 80249

## DETERMINATION

On behalf of the U.S. Equal Employment Opportunity Commission ("Commission"), I issue the following determination on the merits of the subject charge under Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, et seq. (ADA). Respondent ("Frontier Airlines") is an employer within the meaning of the ADA. All requirements for coverage have been met.

Charging Party was employed as a Flight Attendant with Respondent from May 2007 until she was discharged on November 11, 2015. Charging Party is an individual with a disability within the meaning of the ADA.  Beginning in June 2015, Charging Party requested a reasonable accommodation based on her disability, of not working layovers or overnight flights. The Respondent denied Charging Party's request. Charging Party presented the Respondent with medical documentation, a treatment plan, and her own explanation of why this accommodation was necessary for her continued employment.  Charging Party presented several possible accommodations to the Respondent for consideration, which had the support of the Vice President of the Flight Attendants' union.

Respondent rejected Charging Party's proposed accommodations, and Respondent subjected Charging Party to its dependability policy when Charging Party had to miss work due to her disability.  Respondent stated that Charging Party had not met the requirements of her Family and Medical Leave Act (FMLA) certification by missing work. Charging Party implored the Respondent to accommodate her because she was missing work due to her disability. Between June 2015 and her discharge in November 2015, Charging Party communicated to Respondent's Human Resources Manager, her In-Flight Managers, and the Respondent's Leave of Absence Department, that she was being penalized for missing work due to her disability; Charging Party continued to request a reasonable accommodation.

Respondent failed to engage in an interactive process with Charging Party regarding her request for a reasonable accommodation and instead discharged her based on poor attendance.

Based upon a review of the evidence gathered from Respondent and Charging Party, I conclude that the Respondent violated the ADA when Charging Party was denied a reasonable accommodation and discharged.

The Commission makes no finding regarding any other allegation made in the charge.

This determination is final. The ADA requires that, if the Commission determines that there is reasonable cause to believe that violations have occurred, it shall endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion. Having determined that there is reason to believe that violations have occurred, the Commission now invites Respondent to join with it in an effort toward a just resolution of this matter. Disclosure of information obtained by the Commission during the conciliation process may only be made in accordance with the confidentiality provisions of the ADA and the Commission's Procedural Regulations.

You are hereby reminded that Federal Law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in the Commission's investigation is also prohibited. The protections apply regardless of the Commission's determination on the merits of the charge.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission. A Commission representative will contact each party in the near future to begin conciliation.

On Behalf of the Commission:

June 04, 2019
_____
Date

Amy Burkholder, Director
Denver Field Office

**Comanche Crossing Counseling, LLC**

Marla Madrid, LCSW · P.O. Box 554 · Strasburg, Colorado 80136 · 303.622.9260 · Fax: 303.622.9201

## INTAKE SHEET

NAME: Rebecca Brigham   DATE OF INTAKE: 6-13-14

DOB: 4-14-84   AGE: 30

MAILING ADDRESS: 831 centennial dr  Bennett Co 80102

PHONE:   (H)_____ (W)_____

(C) 303-913-6376 (F)_____

PHYSICAL ADDRESS: //

NEXT OF KIN: Sean Brigham   PHONE: 720-987-4274

ADDRESS: //

NAME OF INSURED: Rebecca Brigham DOB: 4-14-84

ADDRESS: //    PHONE:_____

INSURED'S EMPLOYER: Frontier Airlines

ADDRESS OF EMPLOYER: 7001 Tower Rd

INSURANCE COMPANY: United Health care

ID#:_____

ADDRESS OF INSURANCE:_____

PRIMARY CARE PHYSICIAN:_____ PHONE:_____

ADDRESS OF PCP:_____

REASON FOR APPOINTMENT: Deal with Trigers of
Alcoholism

_____

_____

0449

## COMANCHE CROSSING COUNSELING, LLC
### Diagnostic Intake Summary
### and Treatment Plan

Name:  Rebecca Brigham                  Date of Intake: 6/13/2014

**Brief Identifying Data:**
Rebecca is a 30-year-old female with long red hair, average height, thin, friendly, wife, mother of two children, and resides in Bennett Colorado.

**Presenting Problem(s)/History of Current Situation:**
Rebecca is currently struggling with admitting to being an alcoholic. At this time she is ready to take a path to recovery.

**Brief Psychiatric History/Treatment:**
Rebecca and husband have been in couples treatment prior.

**Substance Abuse Information:**
Rebecca currently uses alcohol in private. She stated she has been drinking since the age of 14. She noted that her parents are functioning alcoholics. Her mother has anywhere from 2 to 5 glasses of wine at night and on average her father has ten beers. Rebecca currently drinks alone. She noted that her husband smokes pot.

**Medical Problems:**
Rebecca had her thyroid removed. She discovered a lump in her throat and while doctors wanted to wait to assess the problem she requested that the lump be removed.

**Current Medications:**
Levothyroxine, 100 mg. Zoloft, 10 mg.

**Prescribing Physician:**
Rebecca will provide information following session.

**Treatment Requested and Rationale for Request:**
Rebecca is currently utilizing her employee assistance program benefits. She would like to work on sobriety in a therapeutic setting. She would like to get at the root of the triggers, which currently she believes are fighting and stressors with husband.

**Client Strengths:**
Rebecca has been to AA meetings in the past. She also notes that she is artistic, enjoys painting, drawing, and gardening. She is into natural and holistic care.

**Family History:**
Rebecca has had a good 10 year battle with alcohol. She began drinking during early adolescence. Her parents have drink her entire life. Her mother works at the Denver Museum of nature and science. Her father's retired schoolteacher. She notes that father binges with drinking at times. This is mostly when mother is away from home. Rebecca married Sean approximately 4 years ago. The two have a daughter, Sylvia-3 and a son, 14 months. Recently, Rebecca noticed the jointing picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her. She feels incredibly grateful. She has hid alcohol from Sean for some time. Rebecca also

noted that she realizes she has been through postpartum depression and attempted to manage the depression with alcohol. Rebecca also has unresolved grief and loss as she lost a daughter on May 22, 2009. Her daughter was born at 22 and half weeks and it was a live birth. She was able to hold her daughter and connect with her for 45 minutes.

**Interpersonal Relationships:**
Rebecca is connected to husband, children, and family. She has friendships and acquaintance ships at work. She enjoys the community she lives in.

**Current or History of Physical/Sexual Abuse:**
None reported.

**Legal Problems/History:**
None.

**Developmental Issues:**
None.

**Work History/Vocational Needs:**
Rebecca is currently employed with frontier airlines as a flight attendant.

**Military History:**
None.

**Educational History:**
Rebecca is a high school graduate has also gone through certification program to become a flight attendant.

**Cultural/Religious Concerns-Issues:**
Rebecca stated that she is not sure what her beliefs around God are which is why she had a difficult time with AA meetings as they are religious centered. At this time she notes no cultural or religious concerns.

**Client Assessment Summary:**
Rebecca has been battling and struggling with alcohol for nearly 16 years. She has attempted to take herself off of alcohol from time to time with little success. There has been underlying and unresolved grief and loss throughout her lifetime and this could possibly be a trigger for the alcohol use. She has a strong support system with husband as he is connected and invested. Rebecca clearly feels this.

**DMS Diagnosis:**
Axis I:  Dysthymia                                    Code #: 300.4
Diagnostic Criteria: postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless.
Axis I (Secondary): Alcohol dependence           Code #: 303.90
Diagnostic Criteria:
Axis II:  None.                                       Code #: V71.09
Diagnostic Criteria:
Axis III: Rebecca shared that she had her thyroid removed two years ago.

**Axis IV (Circle):**

| Problems with primary support group | Yes No | Problems related to the social environment | Yes No |
|---|---|---|---|
| Educational Problems | Yes No | Occupational Problems | Yes No |
| Housing Problems | Yes No | Economic Problems | Yes No |
| Problems with access to healthcare services | Yes No | Problems related to interaction with the legal system/crime | Yes No |
| Other psychosocial and environmental problems | Yes No | | |

**Axis V:**
Current GAF:   65                        Highest GAF in past year:

**Client's Goals for Treatment:**
1. Rebecca will establish rapport and safety with clinician.
2. Rebecca will begin to manage urges and use of alcohol.

**Treatment Plan (Long-term goals):**
Rebecca will abstain from alcohol as part of recovery.

**Criteria for Discharge:**
Rebecca is voluntary and will be able to verbalize her progress and success towards treatment goals. Termination will be reviewed when goals are reviewed.

**Estimated Length of Treatment, Modality, and Frequency:**
1. Individual treatment, one to two times monthly for six months (to be evaluated at that time).
2. Group therapy, weekly for six months (to be evaluated at that time).
3. Family therapy, p.r.n. for six months (to be evaluated at that time).

**Additional Information:**


_____, LCSW          24 June 14
Primary Therapist                                   Date

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03417-WJM

REBECCA BRIGHAM,

      Plaintiff,

v.

FRONTIER AIRLINES, INC.,

      Defendant.

---

### DEFENDANT FRONTIER AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT

---

Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier"), respectfully submits this Motion for Summary Judgment, stating as follows:

### I.   INTRODUCTION

In this disability discrimination case, former flight attendant and recovering alcoholic Rebecca Brigham ("Plaintiff" or "Ms. Brigham") claims that Frontier was required as a reasonable accommodation to excuse her from the seniority bidding requirements of the collective bargaining agreement between Frontier and the flight attendants' union, so that she could avoid all flights with layovers (which she worried hypothetically would jeopardize her sobriety). Short of that, Ms. Brigham claims that Frontier was required to create light-duty work for her on the ground. Under well-established precedent, Ms. Brigham's requests were not reasonable accommodation requests under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* (the "ADA"), and Frontier was well within its legal rights to terminate her employment based on her extensive attendance infractions. Ms. Brigham's claims fail as a matter of law.

1

At the outset, Ms. Brigham's own unequivocal deposition testimony demonstrates that her alcoholism has not limited her life activities at all, much less substantially, and never impacted her ability to do her job as a flight attendant. That fact alone is fatal to her claims, given that mere status as an alcoholic or recovering alcoholic does not *per se* render Ms. Brigham a qualified individual with a disability for purposes of protection under the ADA as a matter of law.

Further, according to Ms. Brigham herself, she could not perform the essential functions of her job as a flight attendant with or without an accommodation. It is undisputed that covering flights with layovers was an essential part of Ms. Brigham's job as a flight attendant. Ms. Brigham, however, insisted and continues to insist that she could not cover flights with layovers because they jeopardized her sobriety. Therefore, the accommodation Ms. Brigham sought would not have enabled Ms. Brigham to do her job as a flight attendant; it would have *removed* an essential function of the job. Frontier was not required to fundamentally alter Ms. Brigham's position as a flight attendant as a matter of law. In addition, it is undisputed that regular attendance and obeying Frontier's related policies and procedures regarding attendance was another essential function of Ms. Brigham's flight attendant position. Therefore, the accommodation Ms. Brigham sought— permission not to show up for scheduled flights with layovers—would not have enabled Ms. Brigham to do her job as a flight attendant either, but rather removed yet another essential function.

Even if Ms. Brigham could demonstrate that she was a qualified individual with a disability in that she could perform the essential functions of the flight attendant position with or without an accommodation, Ms. Brigham lost that status and disqualified herself from the protection offered by the ADA when she rejected the reasonable alternative accommodations Ms. Brigham admits Frontier proposed, including continuous leave, increasing her Intermittent FMLA Leave, and/or

2

0454

transferring internally within the company to an open, vacant position for which she was minimally qualified.

Moreover, in addition to eliminating fundamental elements of Ms. Brigham's job as a flight attendant, the primary accommodation Ms. Brigham requested was also unreasonable and therefore, not required under the ADA, because it would have sacrificed the bona fide seniority rights of other flight attendants as set forth in the collective bargaining agreement between flight attendants and Frontier.

Finally, the evidence overwhelmingly demonstrates that Frontier terminated Ms. Brigham's employment because she violated its attendance policies and related protocols—a legitimate, non-discriminatory and non-retaliatory reason—and there is simply no evidence to suggest this reason was mere pretext for discrimination or retaliation. Ms. Brigham does not dispute that she was repeatedly warned regarding her attendance issues, that ultimately, her unexcused absences exceeded the number Frontier allowed under its attendance policy, and that she failed to abide by the company's protocols for calling out, warranting her termination pursuant to the express terms of the applicable policies.

Ms. Brigham also does not dispute that Frontier had allowed her to exceed her Intermittent FMLA Leave without penalizing her and had reminded her yet again that she could apply for a continuous leave, additional Intermittent FMLA Leave, and/or another position within the company just weeks prior to her refusal to show up for a scheduled flight with layovers and failure to follow the company's call out procedures, leading to the termination of her employment. There is no evidence that Frontier treated similarly situated flight attendants with similar violations of its attendance policies more favorably than Ms. Brigham or has ever offered the accommodation Ms. Brigham requested to any other active flight attendant.

For these reasons and those set forth below, Frontier should be granted summary judgment on each of the claims asserted in Ms. Brigham's Complaint and Jury Demand [Dkt. No. 1] ("the Complaint").

## II.   MOVANT'S STATEMENT OF MATERIAL FACTS

### A.   FRONTIER FLIGHT ATTENDANTS

1.    Frontier flight attendants must be willing "to work flexible hours/schedules including nights, weekends and holidays," including layovers. *See* Declaration of Gerardo Arellano, attached as Exhibit A at ¶ 5; Excerpts from Pl. Dep. Tr., attached as Exhibit B at 118:10-18.

2.    During Plaintiff's employment with Frontier, flight schedules for active flight attendants were determined by a bidding process based upon seniority as set forth in the flight attendants' collective bargaining agreement with Frontier (the "CBA"), which required all active Frontier flight attendants to bid for the flights posted and accumulate a minimum of 60 credit hours. *See* Ex. A (Arellano Decl.) at ¶ 35; *see also,* Ex. B (Pl.'s Dep. Tr.) at 79:20-80:11.

3.    After the bidding process closed, awards were determined by seniority such that if multiple flight attendants bid for the same trip, the flight attendant with the greatest seniority was awarded the trip. *See* Ex. A (Arellano Decl.) at ¶ 36.

4.    After awards were determined, flight attendants had the ability to add, drop, and/or swap their scheduled flights on a first-come first-served basis using flights available in "Open Time," but were prohibited from dropping below forty-five (45) credit hours. *See* Ex. A (Arellano Decl.) at ¶ 37.

5.    Pursuant to the CBA, flight attendants were considered inactive and therefore, ineligible to bid if they have been granted Frontier-approved continuous leaves such as Leave of

4

0456

Absence ("LOA"), Medical Leave ("MED"), Family Medical Leave Act ("FMLA") Leave, On the Job Injury ("OJI") Leave, etc. *See* Ex. A (Arellano Decl.), Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000857.

6.      If a flight attendant returning from a Frontier-approved leave missed the above-described bid period, the flight attendant was permitted, for the remainder of that month, to pick up Open Time to build a schedule and/or be assigned Reserve days. *See* Ex. A (Arellano Decl.), Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000868.

7.      Flight attendants returning from continuous leaves of absence and therefore, inactive during the bidding period, were the only Frontier flight attendants who were excused from the bidding process and permitted for the remainder of that month, to pick up Open Time to build a schedule. *See* Ex. A (Arellano Decl.), Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000868.

***Attendance Policies Applicable to Flight Attendants***

8.      In addition to having the ability to work a full and flexible schedule determined by the CBA's seniority-based bidding process, Frontier flight attendants were also required to demonstrate their dependability by maintaining regular attendance. *See* Ex. A (Arellano Decl.) at ¶ 8.

9.      During the time period relevant to this litigation, Frontier's attendance policy, the "Dependability Policy," stated that employees incurring eight (8) unexcused absences, "Occurrences," within a twelve (12) month period would be subject to termination. *See* Ex. A (Arellano Decl.) at ¶ 10.

10.     The importance of reliable attendance was also reflected in the CBA, which required flight attendants who were unable to report for work because of illness or off-the-job injury to

notify Crew Scheduling at least two (2) hours prior to their assigned report time. *See* Ex. A (Arellano Decl.) at ¶ 11.

***Frontier's Leaves of Absence Policies***

11.    To accommodate unexpected circumstances that may require an employee to be absent from work for a period of time, Frontier offered and continues to offer various types of leaves including, FMLA Medical Leave, Intermittent FMLA Medical Leave, Non-FMLA Medical Leave, and Personal Leave. *See* Ex. A (Arellano Decl.) at ¶ 13.

12.    In addition, Frontier allowed employees to take FMLA Medical Leave on an intermittent basis ("Intermittent FMLA Leave"). *See* Ex. A (Arellano Decl.) at ¶ 13.

13.    Pursuant to the Intermittent FMLA Leave policy in place during the time period relevant to this lawsuit, employees were required to "make reasonable efforts to schedule leave…so as not to unduly disrupt the employer's operations," obtain approval for their leave from Frontier's LOA Department, and adhere to Frontier's policy for reporting absences or be subject to disciplinary action, including termination. *See* Ex. A (Arellano Decl.) at ¶ 14.

14.    When their need is foreseeable, employees were asked to provide 30 days advance notice of the need to take FMLA leave and when 30 day notice was not possible, asked to provide notice as soon as practicable --usually the same day or day after learning of the need for leave -- and to comply with Frontier's normal call-in procedures. *See* Ex. A (Arellano Decl.) at ¶ 15.

15.    An employee who failed to provide adequate notice of an unforeseeable leave or failed to comply with Frontier's absence-reporting procedures could be denied leave and/or subject to appropriate disciplinary action, up to and including termination of employment. *See* Ex. A (Arellano Decl.) at ¶ 16.

**B.     PLAINTIFF'S EMPLOYMENT & ATTENDANCE ISSUES**

16.     Plaintiff began her employment with Frontier as a flight attendant in 2007. *See*

Dkt. No. 1 at ¶ 1.

17.     Shortly after commencing her employment with Frontier, Plaintiff began

demonstrating a pattern of attendance issues to which Frontier responded as follows:

|        |                                              |
|--------|----------------------------------------------|
| i.     | November 17, 2008: coaching and counseling.  |
| ii.    | December 29, 2008: coaching and counseling.  |
| iii.   | February 16, 2009: coaching and counseling.  |
| iv.    | October 21, 2009: coaching and counseling.   |
| v.     | January 12, 2010: coaching and counseling.   |
| *vi.*  | March 29, 2012: written warning.             |
| vii.   | July 3, 2013: documented verbal warning.     |
| viii.  | September 3, 2013: written warning.          |
| ix.    | September 28, 2013: final warning.           |
| x.     | October 18, 2013: final warning.             |
| xi.    | March 6, 2015: documented verbal warning.    |
| xii.   | March 12, 2015: written warning.             |
| xiii.  | March 16, 2015: written warning.             |
| xiv.   | May 12, 2015: written warning.               |
| xv.    | May 26, 2015: final warning.                 |
| xvi.   | July 3, 2015: final warning.                 |
| xvii.  | August 7, 2015: final warning.               |
| xviii. | November 3, 2015: investigatory meeting.     |
| xix.   | November 11, 2015: termination.              |

*See* Ex. A (Arellano Decl.) at ¶¶ 17-18; *see also*, Excerpts from Pl.'s Dep. Tr., attached as Exhibit

B at 45:10-48:9.

**C.     PLAINTIFF SELF-DISCLOSES ALCOHOLISM.**

18.     On or around September 7, 2014, Plaintiff disclosed to Frontier that she had

entered an inpatient rehabilitation program for alcoholism. *See* Dkt. No. 1 at ¶ 4; Ex. A (Arellano

Decl.) at ¶ 19.

19.     Frontier granted Plaintiff continuous FMLA Leave to complete the sixty (60) day inpatient program. *See* Ex. A (Arellano Decl.) at ¶¶ 20-21; *see also,* Ex. B (Pl.'s Dep. Tr.) at 64:1-8; 65:10-12.

20.     After completing the in-patient program in October, Plaintiff was cleared to return to work without restrictions by her healthcare provider. *See* Ex. A (Arellano Decl.) at ¶¶ 22-23.

21.     Despite her entry into a rehabilitation program, Plaintiff's alcoholism ***never*** substantially limited her ability to perform her job as a flight attendant. *See* Ex. B (Pl.'s Dep. Tr.) at 67:20-68:4; Tr. 68:17-20; 70:23-71:5.

22.     Since September 5, 2014 (Plaintiff's "sobriety date") through the end of her employment with Frontier, Plaintiff was always able to perform the essential functions of her job as a flight attendant while on duty. *See* Ex. B (Pl.'s Dep. Tr.) at 67:20-68:4; Tr. 68:17-20; 70:2-12; 70:21-71:5.

23.     Since September 5, 2014, Plaintiff has been sober and alcoholism has not impacted her daily life activities or inhibited her ability to function. *See* Ex. B (Pl.'s Dep. Tr.) at 67:5; 69:16:20; 70:21-71:5.

### D.     PLAINTIFF'S REQUEST FOR AN ADDITIONAL ACCOMMODATION

24.     Not long after her return to Frontier, Plaintiff began calling out as "sick," incurring Occurrences under the Dependability Policy. *See* Ex. A (Arellano Decl.) at ¶ 24.

25.     A few days after receiving a written warning from Frontier, Plaintiff obtained paperwork from her medical care provider for purposes of certifying her for Intermittent FMLA Leave for four (4) days per month. *See* Ex. A (Arellano Decl.) at ¶¶ 25-26.

26.     Plaintiff, however, continued to call out "sick" after exceeding the number of authorized Intermittent FMLA Leave days per month and failed to abide by the two (2) hours

minimum notice requirement. *See* Ex. A (Arellano Decl.) at ¶ 27; Ex. B (Pl.'s Dep. Tr.) at 42:21-23; 43:21-24; 45:10-48:9; 180:13-16.

27.     On June 4, 2015, Plaintiff met with Cassie Micklich, Drug & Alcohol Specialist, Frontier, and Gerardo ("Jerry") Arellano, Sr. Employee/Labor Relations Manager/Special Projects, Frontier, to discuss her continued exhaustion of Intermittent FMLA, which Plaintiff recorded. *See* Ex. A (Arellano Decl.) at ¶¶ 29-31; Ex. B (Pl.'s Dep. Tr.) at 161:8-25.

28.     Plaintiff asked if Frontier could adjust her flight schedule so that she could avoid flights with layovers, including overnight layovers, which she said tempted her to drink and therefore, jeopardized her sobriety. *See* Ex. A (Arellano Decl.) at ¶ 32.

29.     Mr. Arellano indicated that Frontier wanted to support Plaintiff, but could not adjust Plaintiff's schedule to avoid flights with layovers or allow her to create her own schedule because doing so would violate the CBA. *See* Ex. A (Arellano Decl.) at ¶ 33.

30.     Union representative, Adrienne Prince, confirmed that it would not have authorized Frontier to grant Plaintiff's requested accommodation because doing so would have violated the CBA. *See* Excerpts from Prince Dep. Tr., attached as Exhibit C at 58:17-59:7.

31.     Further, allowing Plaintiff to build her own schedule from Open Time would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional flight opportunities from other flight attendants looking to modify their schedules. *See* Ex. A (Arellano Decl.) at ¶ 39.

32.     Mr. Arellano told Plaintiff that she could apply for other accommodations, including a personal leave or non-FMLA leave or explore other positions with the company. *See* Ex. A (Arellano Decl.) at ¶ 40.

33.     Plaintiff did not want to apply for any continuous personal or non-FMLA leave because she was concerned the leaves would be unpaid and therefore, did not apply for those leaves. *See* Ex. B (Pl.'s Dep. Tr.) at 64:1-65:7.

34.     Plaintiff did not want to transfer internally within Frontier because she preferred being a flight attendant and did not want to relocate and/or give up her seniority rights in exchange for a new position. *See* Ex. A (Arellano Decl.) at ¶ 41; Ex. B (Pl.'s Dep. Tr.) at 75:19-23.

35.     Ms. Micklich directed Plaintiff to review the sections of the CBA addressing seniority to the extent she would consider transferring internally within Frontier, but was concerned about losing seniority. *See* Email from Ms. Micklich to Ms. Brigham dated June 4, 2015, attached as Exhibit D; Ex. B (Pl.'s Dep. Tr.) at 167:2-168:6.

36.     Plaintiff did not consult the CBA for purposes of determining whether an internal transfer would actually negatively impact her seniority, but had she, she would have learned that if she were to transfer to a position within the Inflight Services Department, she would have retained and continued to accrue seniority for a period of two (2) years such that if she transferred back to a flight attendant position within that two (2) year period, she would have had her seniority reinstated as if she had never transferred. *See* Ex. B (Pl.'s Dep. Tr.) at 170:1-25; Ex. A (Arellano Decl.) at Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000915-16.

37.     Plaintiff also asked whether she could temporarily work at the General Office ("GO") doing administrative work without losing her seniority like Frontier employees on On-the-Job ("OJI") Leave were permitted to do. *See* Ex. A (Arellano Decl.) at ¶ 42.  The CBA included a collectively-bargained for OJI provision, allowing Frontier the discretion to provide flight attendants injured on the job – but only flight attendants injured on the job – with temporary light duty assignments in the GO.  *See* Ex. A (Arellano Decl.) at ¶ 43.  These assignments were not open

job positions.  *See* Ex. A (Arellano Decl.) at ¶ 43.  Rather, when a flight attendant injured on the job was temporarily unable to work, he or she would be permitted to help others in the GO with their own light-duty responsibilities.  *See* Ex. A (Arellano Decl.) at ¶ 43.

38.     Consistent with the CBA, work at the GO was only provided as an accommodation to flight attendants in Frontier's OJI program. *See* Ex. A (Arellano Decl.) at ¶ 44; *see also,* Ex. D (Email from Ms. Micklich to Ms. Brigham dated June 4, 2015); Ex. B (Pl.'s Dep. Tr.) at 79:14-16; 167:2-168:6

39.     In addition, Plaintiff did not know when or if she would be ever able to handle layovers again. *See* Ex. B (Pl.'s Dep. Tr.) at 76:19-77:22.

40.     Shortly after the June 4, 2015 meeting, Plaintiff submitted a revised Intermittent FMLA Certification Form, increasing the number of authorized Intermittent FMLA Leave from four (4) days per month twelve (12). *See* Ex. A (Arellano Decl.) at ¶¶ 45-46.

41.     Plaintiff, however, continued to exhaust her Intermittent FMLA Leave and incurred Occurrences for calling out "sick." *See* Ex. A (Arellano Decl.) at ¶¶ 47-48.

42.     On October 9, 2015, Plaintiff met with Jeff Varney, Manager, Inflight Services, Kari Thompson, Manager, Inflight Services, and Mr. Arellano and recorded the meeting. *See* Ex. A (Arellano Decl.) at ¶¶ 49-51; Ex. B (Pl.'s Dep. Tr.) at 172:24-173:7.

43.     Plaintiff reiterated how she loved being a flight attendant, particularly because of the job's flexibility and asked whether as an accommodation, she could start with a blank schedule and be responsible for building her own schedule up to 60 hours. *See* Ex. A (Arellano Decl.) at ¶ 52.

44.     Mr. Arellano explained that that practice was reserved for flight attendants returning from continuous leaves of absence who had not been active flight attendants during the

bidding period the month they returned from leave and therefore, could not have bid and that allowing Plaintiff to craft her own schedule would violate the CBA's seniority provisions, creating the impression that Frontier was "cherry-picking" flight attendants to have the benefit of building their own schedules without regard to seniority. *See* Ex. A (Arellano Decl.) at ¶ 53.

45.     Ms. Thompson echoed Mr. Arellano stating, "there is a lot of people that would like to start with a clean slate for the month. And build their schedule – right?" *See* Ex. A (Arellano Decl.) at ¶ 54; *see also*, Ex. A (Arellano Decl.), Ex. 13 (Pl.'s transcription of recorded meeting on Oct. 9, 2015) at BRIGHAM LM 00000035.

46.     At this point, Frontier had already been allowing Plaintiff to use Intermittent FMLA for purposes other than those included in her certifications (i.e. relapse prevention counseling and support group meetings) by allowing her to use Intermittent FMLA Leave to avoid flights with overnight layovers. *See* Ex. A (Arellano Decl.) at ¶¶ 55-56; Ex. B (Pl.'s Dep. Tr.) at 161:3-6.

47.     Mr. Arellano emphasized to Plaintiff that ultimately, Frontier needed "employees who can come to work," but reminded Plaintiff that she could apply for a personal leave as a further accommodation, additional Intermittent FMLA Leave, and/or for another internal position within the company. *See* Ex. A (Arellano Decl.) at ¶ 57.

48.     Mr. Arellano notified Plaintiff that a Flight Training Coordinator position was coming available, but Plaintiff repeated her concerns about losing her seniority. *See* Ex. A (Arellano Decl.) at ¶ 58.

49.     Ms. Thompson encouraged Plaintiff to check for other internal opportunities on the company's internal Ultipro system on a weekly basis. *See* Ex. A (Arellano Decl.) at ¶ 59; see also, Ex. A (Arellano Decl.), Ex. 13 (Pl.'s transcription of recorded meeting on October 9, 2015) at BRIGHAM LM 00000020.

50.     While Plaintiff "occasionally" looked at internal opportunities posted online, she had no intention of actually applying for any other position (other than potentially a work-from-home position) because she wanted to remain a flight attendant. *See* Ex. B (Pl.'s Dep. Tr.) at 175:2-178:14.

51.     Less than ten (10) days after the October 9, 2015 meeting, Plaintiff failed to report for a four (4) day trip.  *See* Ex. A (Arellano Decl.) at ¶¶ 60-61; Ex. B (Pl.'s Dep. Tr.) at 179:24-180:16.

52.     Plaintiff failed to contact the LOA Department for approval to use Intermittent FMLA Leave for the four (4) day trip until the day following the first day of the trip in violation of Frontier policy. *See* Ex. A (Arellano Decl.) at ¶¶ 60-61; Ex. A (Arellano Decl.), Ex. 11 (Pl.'s leave file) at FRONTIER AIRLINES (R. BRIGHAM) – 0004882; Ex. B (Pl.'s Dep. Tr.) at 179:24-180:16.

53.     Frontier's LOA Department denied Plaintiff's request to use Intermittent FMLA Leave for the four (4) day trip for her lack of timely notice. *See* Ex. A (Arellano Decl.) at ¶¶ 63-64.

54.     On October 30, 2015, Frontier sent Plaintiff a letter indicating that pursuant to the CBA, an Investigatory Meeting had been scheduled for November 3 for Plaintiff to attend to discuss her violations of the Dependability Policy. *See* Ex. A (Arellano Decl.) at ¶ 65.

55.     On November 3, 2015, Plaintiff, Stephanie Coppedge, Supervisor of Inflight Services, Frontier, Andrea Warfield, Sr. Human Resource Manager, Frontier, and union representative, Adrienne Prince met to discuss Plaintiff's violations of the Dependability Policy, which Plaintiff recorded. *See* Ex. B (Pl.'s Dep. Tr.) at182:1-9; 182:23-183:7; Pl. Dep. Ex. 44, attached as Exhibit E; Ex. B (Pl.'s Dep. Tr.) at 112:21-23.

56.     During that meeting Plaintiff admitted that she had forgotten to email Frontier's LOA Department immediately regarding her decision to call out "sick" for the four (4) day trip beginning October 23, 2015 as required by company policy. *See* Ex. E (Pl. Dep. Ex. 44) at BRIGHAM LM 00000040-41; Ex. C (Ms. Prince's Dep. Tr.) at 60:14-65:22.

57.     Plaintiff also reiterated that she needed to avoid flights with layovers, which tempted her to drink and therefore, jeopardized her recovery. *See* Ex. E (Pl. Dep. Ex. 44) at BRIGHAM LM 00000045.

58.     During the meeting, Plaintiff stated, "There was not one single layover that I did not drink. It was just what you did…I had never stepped on an airplane drunk luckily but that could have been my next step." Ex. E (Pl. Dep. Ex. 44) at BRIGHAM LM 00000045.

59.     Plaintiff also reiterated her request to remove her from overnights or allow her to build her own schedule out of Open Time. *See* Ex. E (Pl. Dep. Ex. 44) at BRIGHAM LM 00000045; Pl. Dep. Ex. 20, attached as Exhibit F; Ex. B (Pl.'s Dep. Tr.) at 112:11-25.

60.     However, pursuant to the CBA, active Frontier flight attendants, including Plaintiff, were required to bid for purposes of determining their flight schedules. *See* Ex. A (Arellano Decl.) at ¶ 35; Ex. C (Prince Dep. Tr.) at 20:1-21:3; Excerpts from Arellano Dep. Tr., attached as Exhibit G at 121:2-6; 124:7-9; 124:16-19; 205:8-20; Ex. B (Pl.'s Dep. Tr.) at 80:16-18.

61.     Therefore, allowing Plaintiff, an active Frontier flight attendant, to be excused from bidding and build her own schedule would have violated the CBA. *See* Ex. C (Prince Dep. Tr.) at 58:17-24; *see also,* Ex. A (Arellano Decl.) at ¶ 35.

62.     Similarly, removing Plaintiff from flights with long layovers and/or overnight layovers would also have violated the CBA. *See* Ex. C (Prince Dep. Tr.) at 58:25-59:4; *see also,* Ex. A (Arellano Decl.) at ¶ 35.

63.     Frontier had never allowed any active Frontier flight attendant to build their own schedule as Plaintiff was requesting. *See* Ex. A (Arellano Decl.) at ¶ 38; Ex. C (Prince Dep. Tr.) at 20:15-21:3.

64.     On November 11, 2015, Frontier informed Plaintiff that it was terminating her employment effective immediately for incurring ten (10) Occurrences within a twelve (12) month period in violation of the Dependability Policy under which eight (8) Occurrences subjected an employee to termination. *See* Ex. A (Arellano Decl.) at ¶¶ 67-68.

65.     Plaintiff does not dispute that she was absent on more than eight (8) occasions within the twelve (12) month period preceding her discharge. *See* Ex. B (Pl.'s Dep. Tr.) at 40:5-10; 41:21-42:7.

66.     Plaintiff did not look for any flight attendant positions after her separation from employment with Frontier because she would have lost seniority and therefore, started out as a reserve—a position which would have required her to cover flights with layovers. *See* Ex. B (Pl.'s Dep. Tr.) at 54:16-55:5.

## III.     <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, admissions on file, or affidavits [show] that there is no genuine issue as to any material fact." *See Zoutomou v. Copper*, 550 F. App'x 647, 650 (10th Cir. 2013) (citing FED. R. CIV. P. 56(c)). "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law." *E.E.O.C. v. Western Trading Co., Inc*., No. 10–cv–02387–WJM–MEH, 2012 WL 1460025 at *1 (D. Colo. April 27, 2012), citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986). "A fact is 'material' if it pertains to an

element of a claim or defense; a factual dispute is 'genuine' if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party." *Western Trading Co.*, 2012 WL 1460025 at *1, citing *Anderson,* 477 U.S. at 248.

   "The burden of showing that no genuine issue of material fact exists is borne by the moving party" and the Court must resolve factual ambiguities against the moving party. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). However, conclusory allegations or testimony will not establish an issue of fact sufficient to defeat summary judgment and the moving party may meet its summary judgment burden by merely "point[ing] to an absence of evidence to support the non-movant's claim." *Arabalo v. City of Denver*, 625 F. App'x 851, 861 (10th Cir. 2015) (internal alterations, quotations and citations omitted).

## IV.   LEGAL ARGUMENT

### A.   Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Failure to Engage in the Interactive Process (Count II).

   Frontier is entitled to summary judgment on Plaintiff's claim for failure to engage in the interactive process as a matter of law because the Tenth Circuit has expressly held that the failure to engage in the interactive process is not independently actionable under the ADA. *See Valdez v. McGill*, 462 Fed. Appx. 814, 819 (10th Cir. 2012) (affirming the trial court's decision to grant the defendant's motion for summary judgment on the plaintiff's claim for failure to engage in the interactive accommodation process on the grounds that such failure "is not actionable discrimination" under the ADA, explaining "The interactive process ensures a reasonable accommodation is identified, *if one is available*"...An employer "is not required to engage an employee in a futile interactive process where...no reasonable accommodation was possible."); *see also, McBride v. BIC Consumer Prods.,* 583 F.3d 92, 101 (2d Cir. 2009) ("[A]n employer's

failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA.").

**B.      Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Discrimination in Violation of the ADA (Count IV).**

In the absence of direct evidence of discrimination, the court applies the *McDonnell Douglas* burden-shifting framework to claims under the ADA. *Williams v. FedEx Corp. Servs.,* 849 F.3d 889 (10th Cir. 2017). Under *McDonnell Douglas*'s three-part analysis, a plaintiff must first establish a prime facie case of ADA discrimination by proving "(1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability." *Williams,* 849 F.3d at 896; *see also, Nagle v. Mink,* No. 10-CV-01935-PAB- MEH, 2012 WL 3150520, at *4 (D. Colo. Aug. 2, 2012) (emphasis added). If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* If the defendant does so, "the burden shifts back to the plaintiff to show that the defendant's stated reasons are merely 'pretextual.' " *Id.*

A person is "disabled" under the ADA only if they suffer from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). *Allen v. SouthCrest Hosp., 455 F. App'x 827, 831* (10th Cir. 2011), quoting *Berry v. T– Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (internal quotation marks omitted) (emphasis added). "For a physical or mental impairment to be "substantially limiting" the individual must be: '(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner,

or duration under which the average person in the general population can perform that same major life activity.'" *Burris v. Novartis Animal Health U.S., Inc.,* 309 F. App'x 241, 250 (10th Cir. 2009), citing *Nielsen v. Moroni Feed Co*., 162 F.3d 604, 611 n. 11 (10th Cir. 1998), quoting 29 C.F.R. § 1630.2(j)(1)). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). "Not all impairments are serious enough to be considered disabilities under the statute" and therefore, whether an individual's "impairment substantially limits a major life activity requires an individualized assessment." *Moore,* 2020 WL 972711, at *4, quoting 29 C.F.R. § 1630.2(j)(1)(i) & (iv).

### 1.  Plaintiff Did Not Have A Qualifying Disability.

"[T]here is no *per se* rule that categorizes recovering alcoholics ... as disabled" and "mere status as an alcoholic or substance abuser does not necessarily imply [the requisite] 'limitation' [for a disability determination]." *Kitchen v. BASF,* 343 F. Supp. 3d 681, 688–89 (S.D. Tex. 2018), *report and recommendation adopted,* No. 3:17-CV-00040, 2018 WL 5723147 (S.D. Tex. Nov. 1, 2018), *aff'd,* 952 F.3d 247 (5th Cir. 2020). Instead, a case-by-case evaluation is necessary "to determine whether a particular plaintiff, who is a recovering alcoholic, qualifies as disabled, because of his addiction." *Id.,* quoting *Radick v. Union Pac. Corp.*, No. 4:14-CV-02075, 2016 WL 639126, at *5 (S.D. Texas Jan. 25, 2016).

Courts, including the Tenth Circuit, have granted summary judgment where a recovering alcoholic has failed to produce evidence demonstrating that their alcoholism substantially limited their ability to perform a major life activity. For example, in *Burris v. Novartis Animal Health U.S., Inc.*, the Tenth Circuit affirmed the trial court's decision to grant summary judgment for the

defendant on the plaintiff's ADA discrimination claim on the grounds that the plaintiff's testimony that his alcoholism limited his "ability to take care of himself on a daily basis," required him to "exclude himself from daily situations that are healthy for a non-alcoholic," but which could trigger him to relapse, and required him to attend AA meetings was insufficient for purposes of demonstrating that his alcoholism substantially limited one or more of his major life activities. 249. 309 F. App'x 241, 251 (10th Cir. 2009). Instead, the Court found that the plaintiff's additional testimony that his alcoholism did not have anything to do with a peak or valley in his sales numbers or impair his ability to go to work, that he could perform his job functions before he decided to seek treatment and had been successful as a salesman even before seeking treatment, and that "as long as he continued with his AA meetings he could function 'somewhat normally' at work and as a father" demonstrated that the plaintiff's condition was not substantially limiting. *Id.* at 250.

Similarly, in *Burch v. Coca-Cola Co.,* the Fifth Circuit found the plaintiff's testimony that he drank heavily during his off hours, experiencing hangover-like symptoms at work, and that his ability to walk, talk, think, and sleep were affected when he drank too much insufficient for purposes of demonstrating that his alcoholism, even untreated, substantially limited any major life activity. 119 F.3d 305, 322 (5th Cir. 1997). The Court reasoned that the plaintiff had testified that ***he never drank during work hours*** and that his inebriation was only temporarily incapacitating and therefore, no different from an overindulging social drinker. *Id.* at 316. According to the Court, "in both situations, the natural result of overindulgence is the ***temporary*** impairment of senses, dulled reactions, and the prospect of a restless sleep followed by an unpleasant morning. Although Burch's alcoholism assuredly affected how he lived and worked, '***far more is required to trigger coverage under § 12102(2)(A)****.'" Id.* (emphasis added) (quoting *Ellison v. Software Spectrum*, 85 F.3d 187, 191 (5th Cir. 1996) (emphasis added; *see also, Moore v. Centralized Mgmt. Servs., LLC,*

No. 19-1592, 2020 WL 972711, at *4 (E.D. La. Feb. 28, 2020) ("episodic relapse" or an "occasional manifestation" of alcoholism did not satisfy the permanency requirement to constitute a substantially limiting impairment under the ADA.)

> **i.     Plaintiff Concedes That Her Alcoholism Was Not Substantially Limiting After September 5, 2014.**

During her deposition, Plaintiff testified unequivocally that her alcoholism has ***not*** substantially limited her ability to perform a major life activity since September 5, 2014. *See* SOMF at ¶ 21. Given that Plaintiff's ADA claims all rely upon alleged conduct occurring after September 5, 2014, this testimony alone, is undeniably fatal to her claims.

> **2.     Plaintiff Could Not Perform Essential Functions Of Her Job As A Flight Attendant With Or Without An Accommodation And Therefore, Was Not A "Qualified Individual" Under The ADA.**

Even assuming that Plaintiff was disabled at the time of the alleged misconduct (which she was not), Defendant is still entitled to summary judgment because Plaintiff has not and cannot demonstrate that she was otherwise qualified to perform the essential functions of her job as a flight attendant.

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, ***can perform essential functions of the employment position*** held or desired." *Mason v. Avaya Commc'ns, Inc.,* 357 F.3d 1114, 1119 (10th Cir. 2004) (emphasis added). "Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents

in the job. 29 C.F.R. § 1630.2(n)(3); *see also Wells v. Shalala,* 228 F.3d 1137, 1144 (10th Cir. 2000).

> **i.      Plaintiff Does Not Dispute That Layovers Were An Essential Function Of Plaintiff's Position As A Flight Attendant.**

It is undisputed that covering flights requiring layovers was an essential function of her position as a flight attendant. *See* SOMF at ¶ 1. According to Plaintiff, however, layovers jeopardized her sobriety and therefore, to do her job as a flight attendant, she needed to be excused from them as an accommodation. *See* SOMF at ¶ 28, 57. Plaintiff's admitted inability to do her job without an accommodation that would remove an essential function of that job disqualifies her for protection under the ADA as a matter of law. *See Gardenhire v. Manville*, 722 Fed. Appx. 835, 839 (10th Cir. 2018) (An employee's request to be relieved from an essential function of his position is not, as a matter of law, a reasonable or even plausible accommodation."); *see also, Ruiz v. Woodward, Inc.*, No. 17-CV-03046-MSK-KLM, 2019 WL 6893039, at *8 (D. Colo. Dec. 18, 2019) ("The 10th Circuit has repeatedly made clear that a proposed accommodation that reallocates or removes essential functions from an employee's job is not, as a matter of law, a "reasonable" accommodation").

Further, inherent in *all* flights is the risk of experiencing inclement weather and/or mechanical issues, which could require a layover. Therefore, even if the accommodation Plaintiff requested was reasonable and all flights with layovers were removed from Plaintiff's flight schedule, given that flight schedules are inevitably impacted by inclement weather and airplane mechanical issues, Frontier could never have guaranteed that Plaintiff would never be required to handle a flight with a layover. Therefore, given Plaintiff's testimony that she could not handle flights with layovers and maintain her sobriety, Plaintiff's request, would not have enabled her to perform the essential functions of her job as a flight attendant, precluding her ability to

demonstrate that she was a "qualified individual with a disability" for purposes of the ADA as a matter of law. *See e.g., US Airways, Inc. v. Barnett,* 535 U.S. 391, 400, 122 S. Ct. 1516, 1522, 152 L. Ed. 2d 589 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations."); *Santiago v. Executive Airlines*, 41 F. Supp. 2d (D. Puerto Rico 1999) (plaintiff's demand for an accommodation allowing her only to fly in aircrafts with pressurized cabins "was not viable" because "unforeseen circumstances may force last minute changes from a scheduled pressurized flight for an unpressurized one which requires that assigned crews be qualified to work in both"). Therefore, Plaintiff cannot demonstrate that she is a qualified individual with a disability under the ADA as a matter of law.

### ii. Plaintiff Does Not Dispute That Compliance With Frontier's Attendance Policy And Protocols Was An Essential Function Of Frontier's Flight Attendant Position.

"[P]hysical attendance in the workplace is itself an essential function of most jobs" and therefore, an employee who is unable to satisfy an employer's attendance expectations or comply with its attendance policy—even due to a disability—is not a "qualified individual" for purposes of ADA protection. *Mason v. Avaya Comms., Inc.,* 357 F.3d 1114, 119 (10th Cir. 2004) (internal citations and quotations omitted); *Boileau v. Capital Bank Fin. Corp.,* No. 15-5820, 2016 WL 1622349, at *4 (6th Cir. Apr. 25, 2016) (plaintiff was not qualified for her position because she could not meet the attendance requirement); *Banks v. Bosch Rexroth Corp.,* 610 Fed.Appx. 519, 528 (6th Cir. 2015) ("inability to satisfy basic attendance requirements and excessive absenteeism are bases for finding that a particular disabled individual is not a qualified individual with respect to the ADA's framework"); *see also, Steele v. Stallion Rockies Ltd,* 106 F. Supp. 3d 1205, 1212 (D. Colo. 2015) ("antidiscrimination law does not extend so far as to shield a disabled employee from the implementation of his employer's standard policies against employee misconduct.")

(internal citations and quotations omitted); *Dennis v. Fitzsimons,* No. 18-CV-0128-MSK-STV, 2019 WL 4201476, at *4 (D. Colo. Sept. 5, 2019) ("***unsatisfactory conduct caused by alcoholism…does not receive protection under the ADA***…") (emphasis added); *Williams v. Widnall,* 79 F.3d 1003, 1007 (10th Cir. 1996) (Employers are not required to accept egregious behavior by an alcoholic employee when that same behavior, exhibited by a nondisabled employee, would require termination.); *Moore,* 2020 WL 972711, at *6 ("The ADA explicitly allows an employer to 'hold an employee who ... is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, ***even if any unsatisfactory performance or behavior is related to the ... alcoholism of such employee***' ") (emphasis added), citing 42 U.S.C. § 12114(c)(2), (4).

Courts have not hesitated to dismiss ADA claims where a plaintiff's irregular attendance compromised essential job functions, even when the attendance issues stemmed from a disability. *See Dennis v. Fitzsimons,* No. 18-cv-0128, 2019 WL 4201476 (D. Colo. Sept. 5, 2019) ("unsatisfactory conduct caused by alcoholism…does not receive protection under the ADA…"); *Shim v. United Air Lines, Inc.,* No. CIV. 11-00162 JMS, 2012 WL 6742529, at *8 (D. Haw. Dec. 13, 2012) ("Both before and since the passage of the ADA, a majority of circuits have endorsed the proposition that in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions.") (internal citation and quotation omitted).

For example, in *Vandenbroek v. PSEG Power, CT LLC,* the Second Circuit affirmed the trial court's decision to grant the defendant's motion for summary judgment on the grounds that the plaintiff had failed to adduce sufficient evidence to permit a jury to find that he was "otherwise qualified" to perform his job as a boiler utility operator where the plaintiff had repeatedly violated the defendant's "no call/no show" policy despite the fact that his absenteeism

was the result of his alcoholism. 356 F. App'x 457, 461 (2d Cir. 2009). The court reasoned that "absenteeism resulting from alcoholism is a factor that bears on whether an employee is 'otherwise qualified' " and given that "employees in the boiler utility operator position had to be present to monitor the boiler and respond to any alarms,…[r]eliable employee attendance was essential to ensuring against a power outage or even an explosion." *Id.* at 459-60. The court also observed that the importance of reliable employee attendance was reflected in the "no call/no show" policy itself, which stated that even after a first offense, an employee could be discharged. *Id.*

Similarly, in *Stephens v. ExpressJet Airlines, Inc.* the court held that the plaintiff was not a "qualified individual" for purposes of performing her job as a flight attendant where she could not work longer than twenty-four (24) to forty-eight (48) consecutive hours of travel given her mental health conditions, which included anxiety. No. 4:16-CV-0890, 2018 WL 8459309, at *6 (S.D. Tex. May 4, 2018). The court explained that the defendant had established that "regular attendance for a full schedule" was an "essential function" of the plaintiff's position as a flight attendant, ***particularly given the airline industry's complicated scheduling systems, which largely depend upon customer demand, seasonal travel, aircraft maintenance, and weather***. *Id.* at *6. In support, the court pointed to (i) the defendant's flight attendant job description, which included an ability to withstand a work environment that may include "rotating schedule with variable hours that could include up to 16-hour duty days, holidays, and weekends," (ii) the defendant's flight attendant handbook which required that absent flight attendants make call-outs no less than two hours before their scheduled duty-in, (iii) the flight attendants' collective bargaining agreement, which required flight attendants "be available for a full schedule" and while not defining "full schedule," provided that trips may be scheduled for six consecutive days

of travel, and (iv) the seniority-based bidding system under which the defendant did not customize trips for any flight attendants or control what trips an active flight attendant bids on. *Id.*

Here, it is undisputed that regular attendance for a full flight schedule, including flights with layovers, was an essential function of Plaintiff's job as a Frontier flight attendant. It is also undisputed that Plaintiff refused to work flights with layovers, calling in "sick" and/or using her Intermittent FMLA Leave to avoid them. As a result, Plaintiff admittedly exceeded the number of unexcused absences permitted under Frontier's attendance policy. Therefore, as demonstrated by *Stephens* and *Vanderbroek*, Plaintiff's refusal to work a full schedule as a flight attendant, which necessarily included flights with layovers, and therefore, admitted inability to abide by Frontier's attendance policy is fatal to her ADA claims. *See Id.* at *9 (an employee who is unable to satisfy an employer's attendance expectations or comply with its attendance policy—even due to a disability—is not a "qualified individual" for purposes of ADA protection).

### iii.   Plaintiff Rejected Reasonable Alternative Accommodations.

Even assuming, *arguendo*, that Plaintiff could somehow demonstrate that she is a qualified individual with a disability under the ADA, Plaintiff lost that status and disqualified herself from the protection offered by the ADA as a matter of law when she rejected alternative reasonable accommodations proposed by Frontier. *See, e.g.*, *Kuehl v. Wal-Mart Stores, Inc.*, 909 F. Supp. 794, 803 (D. Colo. 1995) (holding employee lost any status she may have had under the ADA as a qualified individual with a disability by rejecting reasonable alternative accommodations offered by her employer).

Plaintiff did not want to sacrifice her compensation by taking an unpaid leave and did not want to transfer to another position because she enjoyed the flexibility of being a flight attendant

(and was clearly, trying to get more of it). Plaintiff was also concerned that if she transferred to another position within the company, she would lose her seniority, which would be disadvantageous if she intended to return to her position as a flight attendant. Plaintiff's concern, however, was unfounded. Pursuant to the express terms of the CBA, which Plaintiff's supervisor identified for her, Plaintiff would have maintained and continued to accrue her seniority for up to two (2) years if she transferred to another position within Frontier's Inflight group. Offering no explanation, Plaintiff also did not request additional Intermitted FMLA Leave prior to exhausting the number of days she had been approved for. Plaintiff, however, was not entitled to the most optimal or her preferred accommodation as a matter of law. *See Equal Employment Opportunity Comm'n v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1178 (D. Colo. 2018), *reconsideration denied,* No. 10-CV-02103-PAB-KLM, 2019 WL 4778796 (D. Colo. Sept. 30, 2019) ("an employee is entitled to a reasonable accommodation, not the accommodation that he or she prefers") (internal citation omitted).

> **3.      No Evidence Suggests Frontier Terminated Plaintiff's Employment *Because Of* Her Alcoholism.**

Even assuming that the Court concludes that Plaintiff was disabled and qualified to perform the essential functions of her job as a flight attendant at the time of the alleged misconduct (which she was not), Frontier is still entitled to summary judgment because Plaintiff has not and cannot demonstrate that Frontier terminated her employment on the basis of her disability and therefore, cannot state a prima facie case for discrimination in violation of the ADA. *See Hennagir v. Utah Dep't of Corr.*, 587 F. 3d 1255, 1261 (10th Cir. 2009) ("It is not enough that an adverse employment action is suffered by an individual with a disability; rather, the disabled individual must show that the adverse action was '***on the basis of*** the disability") (emphasis added); *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017).

Many courts, including this Court, have held that to establish a causal connection between a disability and adverse employment action, a plaintiff must do more than show that the misconduct resulting in the adverse employment action is merely related to the plaintiff's disability. For example, in *Kitchen v. BASF,* the Fifth Circuit granted summary judgment in favor of the defendant on the plaintiff's ADA claims where the plaintiff had been discharged for failing a breath alcohol test despite the fact that he was an alcoholic, concluding that there was no causal connection between the plaintiff's discharge and the plaintiff's alcoholism. 952 F.3d 247, 253 (5th Cir. 2020). The court rejected the plaintiff's argument that the fact that the plaintiff was discharged for failing a breath alcohol test effectively meant that he was discharged because of his alcoholism and instead, emphasized the fact that the evidence demonstrated that the defendant had a post-rehabilitation alcohol testing policy and that the plaintiff had signed a Final Written Warning informing him that testing positive for alcohol while at work could result in his termination. *See also, Curry v. MillerCoors, Inc.*, No. 12-CV-02471-JLK, 2013 WL 4494307 (D. Colo. Aug. 21, 2013) ("though [the plaintiff] may never have used medical marijuana absent his disability, [the defendant] did not unlawfully terminate him 'because of' his disability" when it terminated the plaintiff's employment after the employee failed a drug test, violating the defendant's drug-free workplace policy).

### i.   Plaintiff Concedes That She Violated Frontier's Attendance Policy And Protocols.

Like the employer in *Kitchen*, Frontier terminated Plaintiff's employment because of her violation of company policy—a legitimate, non-discriminatory reason, not because she was a recovering alcoholic. Therefore, Plaintiff cannot demonstrate a causal connection between her discharge and her alcoholism for purposes of stating a prima facie case of disability discrimination under the ADA.

At the time that Frontier terminated Plaintiff's employment, its Dependability Policy stated that an employee who accumulates eight (8) Occurrences of absenteeism/tardiness ("Dependability Occurrences") within a rolling twelve (12) month period "will be subject to termination of employment with Frontier." *See* SOMF at ¶ 9. Plaintiff does not dispute that she was in fact absent on more than eight (8) occasions within a twelve (12) month period, and that she failed to follow Frontier's procedure for calling out or using intermitted FMLA. *See* SOMF at ¶ 65. Therefore, it is undisputed that Plaintiff violated the Dependability Policy as it was written. Even assuming that some of Plaintiff's absences were directly related to her alcoholism or treatment plan, as demonstrated by the holding in *Kitchen*, that connection alone is insufficient for purposes of establishing that Frontier terminated Plaintiff's employment **on the basis of** her alcoholism. *See* 42 U.S.C.A. § 12114 (expressly permitting employers to terminate employees for violating reasonable policies and procedures even if the "unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee.").

Further, the connection between Plaintiff's alleged disability, misconduct, and termination from employment is much more attenuated than that in *Kitchen*, further undermining any causal connection. Unlike in *Kitchen* where the plaintiff directly engaged in conduct that directly violated their employer's policies to treat or cope with a disability, in this case, Plaintiff was refusing to show up to work in order to avoid the relapse of a condition she admits has not limited her ability to perform daily life activities since September 5, 2014 and *never* limited her ability to perform her job as a flight attendant. *See* SOMF at ¶ 21.

### 4. Frontier Terminated Plaintiff's Employment For Legitimate, Non-Discriminatory and Non- Retaliatory Reasons That Were Not Pretextual.

Even assuming that Plaintiff produces sufficient evidence to establish a prima facie case

28

of disability discrimination under the ADA (which she cannot), the undisputed material facts demonstrate that Frontier terminated Plaintiff's employment for violating its attendance policy—a legitimate, non-discriminatory reason—that was not pretextual and therefore, Plaintiff cannot sustain her burden under *McDonnell Douglas*.

Only when a plaintiff demonstrates that an employer's proffered reasons are "unworthy of credence," may a jury "infer the ultimate fact of discrimination" or retaliation. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 546 (10th Cir. 2014), citing *Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007); *see also, Sybrandt v. Home Depot*, 560 F.3d 553, 561 (6th Cir. 2009) (plaintiff's burden is to demonstrate that defendant's decision was "so unreasonable as to be disbelieved"). "Plaintiffs may show that an employer's proffered reasons for an adverse employment action are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.' " *Sloan v. Tate & Lyle Ingredients Americas LLC,* No. 3:14-CV-406-TAV-HBG, 2016 WL 4179959, at *13 (E.D. Tenn. Aug. 5, 2016) (internal citations and quotations omitted). Evidence of pretext may include evidence the plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 539 (10th Cir. 2014) (internal citations and quotations omitted).

In *Morgan v. Wells Fargo Bank, Nat. Ass'n,* the court held that the plaintiff failed to demonstrate that the defendant's proffered legitimate, nondiscriminatory reasons for terminating her were pretextual, such that a rational factfinder could find them worth of credence where the plaintiff's only argument was that the defendant treated similarly situated employees differently, but set forth no evidence in support. No. 7:13CV137, 2014 WL 688129, at *4 (W.D. Va. Feb.

21, 2014). In that case, the plaintiff alleged that the defendant had violated the ADA by terminating her employment as a call center worker because of her alleged disability—alcoholism. *Id.* at *1. The defendant moved for summary judgment on the grounds that it terminated the plaintiff's employment for a legitimate non-discriminatory and non-retaliatory reason—because she failed to adhere to the defendant's mandatory attendance policy, which the defendant considered essential to the call center's productivity. *Id.*

After exhausting the number of days permitted under the defendant's attendance policy and receiving a warning form her supervisor, the plaintiff continued to miss work ultimately resulting in the termination of her employment. During the termination conversation, however, the plaintiff told her supervisor that she was checking into a rehabilitation center for alcoholism. The defendant rescinded the termination and granted the plaintiff leave to seek treatment. *Id.* The company also reevaluated her absences, excusing certain absences as short-term disability leave and others as certified medical leave. *Id.* When the plaintiff returned to work, her supervisor indicated that she needed to contact Leave Management to establish whether any of her remaining absences could be excused otherwise, the plaintiff would remain in violation of the attendance policy and subject to termination. *Id.* The plaintiff contacted Leave Management and requested that it excuse two (2) of her absences as certified medical leave. *Id.* Leave Management denied the request because an employee qualifies for certified medical leave only after her condition caused her to miss five (5) consecutive workdays, but advised her to contact the Accommodations team to review her doctor's note. *Id.* The plaintiff did not contact them and therefore, remained in violation of the defendant's attendance policy. As a result, the defendant terminated her employment. *Id.*

Granting the defendant's motion for summary judgment on the plaintiff's ADA claim, the

court noted that the plaintiff did not contest her absences, that her absences exceeded those permitted under the company's attendance policy, that the plaintiff did not seek to have the unscheduled absences exceeding those permitted under the policy excused by the Accommodations team, and that the plaintiff knew the consequences of violating the company's attendance policy. *Id.* at *3. The court also noted that while the plaintiff claimed that the defendant deviated from its policies and treated similarly situated employees differently, she had failed to marshal any evidence in support of that argument. *Id.* at *4.

Here, like the plaintiff in *Morgan,* Plaintiff does not dispute that she was absent from work on eight (8) occasions, incurring ten (10) Occurrences under the Dependability Policy. *See* SOMF at ¶ 64. Plaintiff also does not dispute that incurring ten (10) Occurrences violated Frontier's Dependability Policy as it was written (although she may disagree with it). In addition, Plaintiff does not dispute that she failed to follow the "call out" protocols set forth in the Employee Handbook and CBA. *See* SOMF at ¶¶ 26, 56. Further, like the plaintiff in *Morgan,* Plaintiff has not and cannot adduce any evidence demonstrating that Frontier treated other flight attendants who had violated the Dependability Policy to a similar degree as Plaintiff more favorably than Plaintiff or adduced any other evidence demonstrating that Frontier's proffered reasons for terminating her employment—Plaintiff's admitted violation of its attendance policy—is "unworthy of credence." Accordingly, Frontier is entitled to summary judgment. *See Arabalo*, 625 F. App'x at 861 (moving party may meet its summary judgment burden by merely "point[ing] to an absence of evidence to support the non-movant's claim.").

## C.   Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Failure to Accommodate Claim (Count I).

In order to establish a *prima facie* case of failure to accommodate under the ADA, a plaintiff must demonstrate that "1) she was disabled, 2) she was otherwise qualified, 3) she

requested a plausibly reasonable accommodation, and 4) the [defendant] refused to accommodate her disability." *Aubrey v. Koppes,* No. 19-1153, 2020 WL 5583649, at *5 (10th Cir. Sept. 18, 2020).

For the reasons set forth in Sections IV.B.1 and IV.B.2 *supra*, Plaintiff was not disabled and was not otherwise qualified to perform the essential functions of her job as a flight attendant with or without an accommodation and therefore, cannot state a prima facie case for failure to accommodate under the ADA. Even if those arguments fail, however, Plaintiff's failure to accommodate claim will still fail because Frontier *did* accommodate Plaintiff's alcoholism and because the additional accommodation Plaintiff sought was unreasonable as a matter of law.

### 1.    Frontier Reasonably Accommodated Plaintiff.

Plaintiff's failure to accommodate is futile because Frontier not only tried, but went to great lengths to actually accommodate Plaintiff's alcoholism as best it could. Specifically, it is undisputed that Frontier unquestioningly approved Plaintiff's use of FMLA Leave to complete a sixty (60) day in-patient rehabilitation program and over the course of ***more than a year***, unquestioningly approved of her use of Intermittent FMLA Leave, allowed her to use more Intermittent FMLA Leave than had been certified by Plaintiff's healthcare provider, and allowed her to use Intermittent FMLA Leave for purposes other than those certified by her healthcare provider.  *See* SOMF at ¶ 46. Frontier not only tried, but went to great lengths to actually accommodate Plaintiff's alcoholism as best it could.

### 2.    Frontier Had No Obligation Under The ADA To Excuse Plaintiff From Layovers.

"[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Aubrey,* 2020 WL 5583649, at *7.  According to the ADA,   reasonable accommodations may

32

include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.,* quoting 42 U.S.C. § 12111(9).

The determination of whether a requested accommodation is reasonable "must be made on the facts of each case taking into consideration the particular individual's disability and employment position." *Punt v. Kelly Servs.,* 862 F.3d 1040, 1050–51 (10th Cir. 2017), quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1123–24 (10th Cir. 2004).

### i.   The Accommodation Plaintiff Sought Would Have Removed An Essential Function Of The Flight Attendant Position.

As discussed in Section IV.B.2 *supra,* the ADA does *not* require an employer to transfer any of the essential functions of a disabled employee's job in order to make reasonable accommodation for their disability. *Coats v. Goodyear Tire & Rubber Co.,* No. H-01-1322, 2002 WL 32123913, at *21 (S.D. Tex. Oct. 16, 2002). Therefore, Frontier cannot be held liable for denying Plaintiff's request for an accommodation that would excuse her from flying layovers— a request that Frontier remove an essential function of Plaintiff's position—as a matter of law. *See Stephens,* 2018 WL 8459309 at *6.

### ii.   The Accommodation Plaintiff Sought Would Have Sacrificed The Bona Fide Seniority Rights Of Other Flight Attendants.

In addition, "the ADA does not require an employer to take action inconsistent with the contractual rights of other workers under a collective bargaining agreement." *Coats,* 2002 WL 32123913, at *21 (internal citations and quotations omitted); *see US Airways, Inc.*, 122 S.Ct. at

1524 ("lower courts have unanimously found that collectively bargained seniority trumps the need for reasonable accommodation in the context of the linguistically similar Rehabilitation Act"); *Eckles v. Consolidated Rail Corp.* , 94 F.3d 1041, 1051 5 AD Cases 1367 (7th Cir. 1996), *cert. denied*, 520 U.S. 1146 6 ADCases 928 (1997) ("the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees"); *Milton*, 53 F.3d at 1125. An employer's demonstration that a requested accommodation conflicts with seniority rules "is ordinarily sufficient to show that accommodation is not reasonable." *US Airways, Inc. v. Barnett,* 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002) (Emphasizing "the importance of seniority to employee-management relations," stating "the typical seniority system provides important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment," including "job security and an opportunity for steady and predictable advancement based on objective standards" and includes "an element of due process," limiting "unfairness in personnel decisions" and "encourage[ing] employees to invest in the employing company, accepting less than their value to the firm early in their careers" in return for greater benefits in later years") (internal citations omitted).

For example, in *Santiago v. Executive Airlines*, the court granted the defendant airline's motion for summary judgment on the plaintiff flight attendant's ADA claim where the accommodation sought by the plaintiff would have encroached upon "the vested rights of other Flight Attendants with more seniority than plaintiff," explaining "an employer's obligation does not extend to contravening rights secured by other employees through a collective bargaining agreement." *Id.* at 135.  41 F. Supp. 2d 129, 135 (D. Puerto Rico 1999). In that case, the plaintiff requested to be scheduled exclusively in aircrafts with pressurized cabins due to an ear condition. *Id.* The airline denied the accommodation request and instead, reassigned her to a ramp-escort

position. *Id.* at 133. After the defendant terminated the plaintiff for excessive absences and violating the company's travel policies, the plaintiff claimed that the defendant's dismissal was based upon her disability and that the defendant had wrongly denied the accommodation she had requested. *Id.* The court disagreed, relying on the undisputed evidence presented by the defendant that given the limited number of airplanes with pressurized cabins and the desirability of those planes by flight attendants, granting the plaintiff the opportunity to work only in pressurized airplanes would have transgressed the rights of other flight attendants with more seniority than plaintiff and therefore, was not required. *Id.* at 137; *see also, Stephens*, 2018 WL 8459309, at *6 (plaintiff could not state a prima facie case for failure to accommodate where plaintiff's requested accommodation would violate the rules of a seniority system set forth in a collective bargaining agreement); *Moritz v. Frontier Airlines, Inc.,*147 F.3d 784, 788 (8th Cir. 1998) ( "[i]t is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform…As a result, Frontier is not required to revise its bidding system...").

Like the accommodation requested in *Santiago,* the accommodation Plaintiff sought— exemption from flights with layovers would have required excusing Plaintiff from the mandatory seniority-based bidding process set forth in the CBA, encroaching upon the vested rights of other flight attendants with more seniority than Plaintiff and violating the CBA's requirements that all active flight attendants bid for flights and accumulate a minimum of 60 credit hours, and that flight attendants never drop below forty-five (45) credit hours when making schedule adjustments using Open Time. *See* SOMF at ¶¶ 2, 4. In addition, excusing Plaintiff from the bidding process would have done far more than enable Plaintiff to obtain the ***same*** workplace opportunities than those without disabilities automatically enjoy and at the expense of her fellow flight attendants.

*See Aubrey v. Koppes,* No. 19- 1153, 2020 WL 5583649, at *7 (10th Cir. Sept. 18, 2020) (emphasis added). Further, allowing Plaintiff to build her own schedule from Open Time would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional flight opportunities from other flight attendants looking to modify their schedules. *See* SOMF at ¶ 31.

Regardless of whether or not Plaintiff's requested accommodation violated the terms of the CBA, like the airline in *Stephens*, which could not guarantee that the plaintiff would never be required to take a flight totaling greater than forty-eight (48) hours and the airline in *Santiago*, which could not guarantee that the plaintiff would never be required to take a flight in an aircraft without a pressurized cabin, given that flight attendant schedules were often unavoidably altered based upon  unforeseen weather conditions and aircraft maintenance (among other variables), Frontier simply could not have promised that Plaintiff would never end up with a layover. Therefore, Plaintiff's request to build her own schedule from Open Time to avoid flights with layovers was simply not reasonable, particularly given Plaintiff's own repeated testimony that if she had to do layovers and overnights, she would not have her sobriety. *See* IV.B.2 *supra*.

In addition, any argument that Frontier is liable under the ADA for denying Plaintiff's request to work at the GO until she was more secure in her sobriety is a red herring. Granting this request would have resulted in the same above-described issues in that it would have excused Plaintiff, an active flight attendant, from the mandatory, seniority-based bidding process set forth in the CBA. Further, allowing Plaintiff the opportunity to indefinitely work in the GO would not have enabled Plaintiff to fly layovers, but rather removed an essential function of Plaintiff's position, which Frontier was not required to do. In addition, Plaintiff did not know when her condition would improve such that she could fly layovers and therefore, return to her position as a

flight attendant. Frontier was not required to accommodate Plaintiff, allowing her to work at the GO indefinitely. *See* SOMF at ¶ 39; *see also., Aubrey,* 2020 WL 5583649, at *7 (the ADA covers people who can perform their essential job functions *in the present or near future)*; *Boykin v. ATC/VanCom of Colorado, L.P.,* 247 F.3d 1061, 1065 (10th Cir. 2001)*; Taylor v. Pepsi–Cola Co.,* 196 F.3d 1106, 1110 (10th Cir.1999) (keeping plaintiff on indefinite leave unreasonable accommodation where he had informed employer he "could *not* advise when and under what conditions he could return to any work"); *Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 729 (6th Cir.2000) (unreasonable to require employer to assign employee to new position that became available "well over a year" after employer became aware of disability); *Sloan v. Tate & Lyle Ingredients Americas LLC*, No. 3:14-CV-406-TAV-HBG, 2016 WL 4179959, at *9 (E.D. Tenn. Aug. 5, 2016) (A "reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected").

Regardless, the ADA does not require an employer to create a new position, light duty or otherwise. *See, Mannan v. Colorado*, No. 18-CV-01844-MSK-SKC, 2020 WL 533734, at *5 (D. Colo. Feb. 2, 2020) (ADA does not "require an employer to create a new position" or provide a permanent or indefinite light duty position). Frontier's creation of temporary light duty assignments at the GO for employees injured on the job did not change that fact or somehow obligate Frontier to do the same for Plaintiff, an active flight attendant whose alcoholism did not equate to an injury on the job and therefore, did not qualify her for Frontier's OJI program.

Indeed, Frontier did not maintain open light-duty job positions for flight attendants injured on the job, nor were light duty assignments job "positions" – instead, Frontier would temporarily assign those injured on the job to perform other employees' duties. *See* SOMF at ¶¶ 37, 38. Based on well-settled case law, Frontier was not required to do the same for Plaintiff. *See Benson v. Wal-*

*Mart Stores E., L.P.,* No. 2:16-CV-114-DBH, 2017 WL 2729491, at *3 (D. Me. June 23, 2017) (granting summary judgment on plaintiff's ADA claim where plaintiff failed to identify any vacant position to which she could transfer as an accommodation and relied only on the fact that defendant created a temporary position for workers injured on the job, emphasizing that an employee must demonstrate that there is an actual vacant position to which she can transfer and that an employer is not required by the ADA to create a new job for an employee); *Severson v. Heartland Woodcraft, Inc.,* No. 14-C-1141, 2015 U.S. Dist. LEXIS 153872, at *25-26 (E.D. Wis. Nov. 12, 2015) ("Heartland may voluntarily create light-duty positions for employees recovering from workplace injuries without becoming compelled to create such positions for employees who are protected by the ADA."); *see also,* Enforcement Guidance: Workers' Compensation and the ADA, Equal Employment Opportunity Commission, No. 915.002 (Sept. 3, 1996) at Question No. 27, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada (if an employer creates light duty positions for employees injured on the job, it does not have do the same as an accommodation for employees who were not injured on the job); *Wade v. Brennan,* 647 F. App'x 412, 415 (5th Cir. 2016) (employer not required to exempt employee from performance of essential function of the job, to find or create a new job for employee or to disadvantage other employees as a result of reassignment).

> **D.      Frontier is Entitled to Summary Judgment on Plaintiff's Retaliation Claim (Count III).**

To establish prima facie case of retaliation under ADA, an employee must show: "(1) he or she engaged in protected activity; (2) he or she was subjected to adverse employment action subsequent to or contemporaneous with the protected activity; and (3) causal connection between the protected activity and the adverse employment action." *Anderson v. Coors Brewing Co.,* 181 F.3d 1171 (10th Cir. 1999). Once the plaintiff establishes a prima facie case, *McDonnell Douglas*

burden-shifting described in Section IV.B *supra* applies.

For the reasons set forth in Section IV.B.3 *supra,* Plaintiff has not and cannot show any causal connection between Plaintiff's requests for accommodation and the termination of her employment. At the time that Frontier terminated Plaintiff's employment, the company had been engaging in the interactive process with Plaintiff and accommodating her alcoholism for ***over a year*** and Plaintiff had admittedly violated the company's Dependability Policy just weeks prior. *See* SOMF at ¶¶ 51, 52, 56; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) ("the timing of the termination actually cuts against a finding of pretext by strongly suggesting that [the employer] acted in response to specific and continuing disciplinary problems"). Although Frontier had denied Plaintiff's request to excuse her from flights with layovers, the company had reminded her that she could apply for a continuous leave or additional Intermittent FMLA Leave. *See* SOMF at ¶ 47; *Trujillo-Cummings v. Pub. Serv. Co. of N.M.*, 1999 WL 169336, at *3 (10th Cir. Mar. 29, 1999) (unpublished) (concluding that intervening positive employment actions, including employer's approval of work-at-home arrangement, undermined plaintiff's retaliation claim). Plaintiff did neither and instead, just weeks later, admittedly failed to show up for a scheduled four (4) day trip and admittedly failed to follow Frontier's call-out procedures. *See* SOMF at ¶¶ 51, 52, 56; *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (intervening acts of misconduct disrupt the causal connection that could be established by proximity). No reasonable jury could conclude that these undisputed material facts amounted to retaliation.

## V.   **CONCLUSION**

For the foregoing reasons, Frontier respectfully requests that this Court grant summary judgment in its favor on Plaintiff's Complaint in its entirety.

Respectfully submitted this 17th day of November, 2020.

> /s/ Danielle L. Kitson
> _____
> Danielle L. Kitson
> Carolyn B. Theis
> LITTLER MENDELSON, P.C.
> 1900 Sixteenth Street, Suite 800
> Denver, CO  80202
> Telephone: 303.629.6200
> Facsimile: 303.629.0200
> Email:  dkitson@littler.com
>          catheis@littler.com
>
> *Attorneys for Defendant Frontier Airlines,*
> *Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 17th day of November 2020, I filed and served the foregoing

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** via CM/ECF to the following:

John R. Crone
The Law Office of John R. Crone, LLC
4550 E. Cherry Creek Drive South, #1003
Glendale, Colorado 80246
john@crone-law.com

*Attorney for Plaintiff*

> s /Danielle Kitson
> _____

40

0492

## <u>DECLARATION OF GERARDO ARELLANO</u>

I, Gerardo Arellano, declare as follows:

1.      I make this declaration based on my personal knowledge.  If called to testify under oath, I could do so truthfully and competently.

2.      I am employed by Frontier Airlines, Inc. ("Frontier") as the Senior Manager of Talent Acquisition and Employee Relations.

3.      I was personally involved in the interactive process that Frontier engaged in with Plaintiff for purposes of attempting to accommodate her alcoholism.

4.      I was also personally involved in the decision to terminate Plaintiff's employment with Frontier for violating company policy.

**FLIGHT ATTENDANTS' ESSENTIAL JOB FUNCTIONS**

<u>Flexible Hours & Schedules</u>

5.      A true and correct copy of the Flight Attendant Job Description, is attached as Exhibit 1.

6.      Frontier flight attendants are, and at the time of Plaintiff's employment, were expected to work flexible hours/schedules including nights, weekends and holidays, and to travel to all current and future international destinations served by Frontier.

7.      This availability was and remains an essential function of the flight attendant position given the airline industry's complicated scheduling systems, which largely depend upon factors beyond the airline's control, including customer demand, seasonal travel, aircraft maintenance, and weather.  Inclement weather alone could require consecutive days of travel, including a layover, for crew members, including flight attendants.

<u>Regular & Reliable Attendance</u>

8.      Given the nature of the airline industry as described above, regular and dependable attendance was and remains critical to Frontier's operations and remains an essential job function of Frontier's flight attendant position.   The importance of this expectation was reflected in Frontier's Employee Handbook.  See Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000365-69.

9.      A true and correct copy of Frontier's 2015 Employee Handbook is attached as Exhibit 2.

10.      During the time period relevant to this litigation, Frontier's attendance policy, the "Dependability Policy," stated that employees incurring eight (8) unexcused absences, "Occurrences," within a twelve (12) month period would be subject to termination. *See* Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000365-69.  A flight attendant who failed to report an absence prior to the scheduled start of their shift incurred two Occurrences. *See id.*

11.      The importance of reliable attendance was also reflected in Frontier's collective bargaining agreement with the Association of Flight Attendants ("AFA") (the "CBA"), which required flight attendants who were unable to report for work because of illness or off-the-job injury to notify Crew Scheduling at least two (2) hours prior to their assigned report time. *See* Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000906-07.

12.      A true and correct copy of Frontier's collective bargaining agreement with the CBA is attached Exhibit 3.

<u>Compliance with Leaves of Absence Policies</u>

13.      To accommodate unexpected circumstances that may require an employee to be absent from work for a period of time, Frontier offered and continues to offer various types of

leaves including, intermittent leave under the Family Medical Leave Act ("FMLA"). *See* Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000307-18.

14.     Frontier's Leave of Absence Policy emphasized the importance of making reasonable efforts to schedule leave in advance to avoid disrupting Frontier's operations, obtaining approval for their leave from Frontier's Leave of Absence ("LOA") Department, and adhering to Frontier's policy for reporting absences or be subject to disciplinary action, including termination. *See* Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000312.

15.     When flight attendants' needs were foreseeable, employees were asked to provide thirty (30) days advance notice of the need to take FMLA leave and when thirty (30) day notice was not possible, asked to provide notice as soon as practicable--usually the same day or day after learning of the need for leave--and to comply with Frontier's normal call-in procedures. *See* Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000312-13.

16.     An employee who failed to provide adequate notice of an unforeseeable leave or failed to comply with Frontier's absence-reporting procedures could be denied leave and/or subject to appropriate disciplinary action, up to and including termination of employment. *See* Ex. 2 (Employee Handbook) at FRONTIER AIRLINES (R. BRIGHAM) – 0000313.

PLAINTIFF'S EMPLOYMENT WITH FRONTIER

17.     Shortly after commencing her employment with Frontier in 2007, Plaintiff began demonstrating a pattern of attendance issues.

18.     True and correct copies of Frontier's letters to Plaintiff regarding concerns about her attendance issues, including written warnings, are attached as Exhibit 4.

Plaintiff's Self-Disclosure & Frontier's Accommodations

19.     On or around September 7, 2014, Plaintiff disclosed to Frontier that she had entered an inpatient rehabilitation program for alcoholism.

20.     Frontier granted Plaintiff continuous FMLA Leave to complete the sixty (60) day inpatient program.

21.     A true and correct copy of Frontier's FMLA Designation Notice for Plaintiff dated September 16, 2014 is attached as Exhibit 5.

22.     After completing the in-patient program in October, Plaintiff was cleared to return to work without restrictions by her healthcare provider.

23.     A true and correct copy of the Fitness for Duty Certification form, dated November 8, 2014, that Frontier received from Plaintiff is attached as Exhibit 6.

24.     Not long after her return to Frontier, Plaintiff began calling out as "sick," incurring Occurrences under the Dependability Policy. *See* Ex. 4 (Attendance Warnings) at FRONTIER AIRLINES (R. BRIGHAM) – 0001725.

25.     A few days after receiving a written warning from Frontier, Plaintiff obtained paperwork from her medical care provider for purposes of certifying her for Intermittent FMLA Leave for four (4) days per month.

26.     A true and correct copy of the Intermittent FMLA Certification form dated March 10, 2015 that Frontier received from Plaintiff is attached as Exhibit 7.

27.     Plaintiff, however, continued to call out "sick" after exceeding the number of authorized Intermittent FMLA Leave days per month and failed to abide by the two (2) hours minimum notice requirement. *See* Ex. 4 (Attendance Warnings) at FRONTIER AIRLINES (R. BRIGHAM) – 0001128, 1729.

<u>Plaintiff's Requests to Customize her Schedule</u>

28.     Plaintiff requested the ability to customize her flight schedule to avoid flights with layovers, which she said jeopardized her sobriety.

29.     This request was discussed during a meeting I had on June 4, 2015, with Cassie Micklich, Drug & Alcohol Specialist and Plaintiff to discuss Plaintiff's continued exhaustion of Intermittent FMLA, which Plaintiff recorded.

30.     Frontier used a court reporter to transcribe Plaintiff's recording and a true and correct copy of that transcript is attached as Exhibit 8.

31.     I understand that Plaintiff also had her recording of the June 4, 2015 meeting transcribed.  The transcript attached as Exhibit 9 accurately reflects the conversation that took place during that meeting to the best of my recollection.

32.     During that meeting, Plaintiff specifically asked if Frontier could adjust her flight schedule so that she could avoid flights with layovers, including overnight layovers, which she said tempted her to drink and therefore, jeopardized her sobriety. *See* Ex. 8 (Frontier's transcript of June 4, 2015 recording) at FRONTIER AIRLINES (R. BRIGHAM) –0004282, 4285, 4293; Ex. 9 (Pl.'s transcript of June 4, 2015 recording) at BRIGHAM LM 00000002, 3, 6.

33.     I told Plaintiff that Frontier wanted to support Plaintiff, but could not adjust Plaintiff's schedule to avoid flights with layovers because doing so would violate the seniority-based bidding requirements in the CBA. *See* Ex. 8 (Frontier's transcript of June 4, 2015 recording) at FRONTIER AIRLINES (R. BRIGHAM) –0004283-84; Ex. 9 (Pl.'s transcript of June 4, 2015 recording) at BRIGHAM LM 00000003.

34.     Flight attendants' schedules were and remain determined by seniority-based bidding pursuant to the terms of the CBA. Frontier does not and did not customize trip schedules for flight attendants.

0497

35.     Pursuant to the CBA at issue in this case, all active Frontier flight attendants were required to bid for the flights posted by Frontier and accumulate a minimum of 60 credit hours. *See* Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000857-58; 869.

36.     After the bidding process closed, awards were determined by seniority such that if multiple flight attendants bid for the same trip, the flight attendant with the greatest seniority was awarded the trip. *See* Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000915-16.

37.     After awards were determined, flight attendants had the ability to add, drop, and/or swap their scheduled flights on a first-come first-served basis using flights available in "Open Time," but were prohibited from dropping below forty-five (45) credit hours. *See* Ex. 3 (CBA) at Frontier Airlines (R. Brigham) 0000869.

38.     Frontier has never excused an active flight attendant from the seniority-based bidding rules set forth in the CBA to allow that flight attendant to create their own schedule out of Open Time to avoid certain types of flights.

39.     In addition, it was Frontier's understanding that allowing Plaintiff to build her own schedule from Open Time would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional flight opportunities from other flight attendants looking to modify their schedules.

40.     I told Plaintiff that she could apply for other accommodations, including a personal leave or non-FMLA leave or explore other positions with the company. *See* Ex. 8 (Frontier's Transcript of June 4, 2015 Recorded Meeting) at FRONTIER AIRLINES (R. BRIGHAM) – 0004283, 4284; Ex. 9 (Pl.'s Transcript of June 4, 2015 Recording) at BRIGHAM LM 00000003.

41.     Plaintiff indicated that she did not want to transfer internally within Frontier because she preferred being a flight attendant and did not want to relocate and/or give up her

seniority rights in exchange for a new position.  *See* Ex. 8 (Frontier's Transcript of June 4, 2015 Recorded Meeting) at FRONTIER AIRLINES (R. BRIGHAM) – 0004286-87, 4316; Ex. 9 (Pl.'s Transcript of June 4, 2015 Recording) at BRIGHAM LM 00000013-14.

<u>Plaintiff's Request to Work in Frontier's General Office</u>

42.     Plaintiff also asked whether she could temporarily work at the General Office ("GO") doing administrative work without losing her seniority like Frontier employees on On-the-Job ("OJI") program were permitted to do. This request was also discussed during the June 4, 2015 meeting.  *See* Ex. 8 (Frontier's Transcript of June 4, 2015 Recorded Meeting) at FRONTIER AIRLINES (R. BRIGHAM) – 0004317; Ex. 9 (Pl.'s Transcript of June 4, 2015 Recording) at BRIGHAM LM 00000014.

43.     The CBA included a collectively-bargained for OJI provision, allowing Frontier the discretion to provide flight attendants injured on the job – but only flight attendants injured on the job – with temporary light duty assignments in the GO.  *See* Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000922. These assignments were not open job positions.   Rather, when a flight attendant injured on the job was temporarily unable to work, he or she would be permitted to help others in the GO with their own light-duty responsibilities.

44.     Consistent with the CBA, work at the GO was only provided as an accommodation to flight attendants in Frontier's OJI program, which I explained to Plaintiff. *See* Ex. 3 (CBA) at FRONTIER AIRLINES (R. BRIGHAM) – 0000922-23.

45.     Shortly after the June 4, 2015 meeting, Plaintiff submitted a revised Intermittent FMLA Certification Form, increasing the number of authorized Intermittent FMLA Leave from four (4) days per month twelve (12).

46.     A true and correct copy of the Intermittent FMLA Certification form dated May 28, 2015 that Frontier received from Plaintiff is attached as Exhibit 10.

47.     Plaintiff, however, continued to exhaust her Intermittent FMLA Leave and incurred Occurrences for calling out "sick." *See* Ex. 4 at FRONTIER AIRLINES (R. BRIGHAM) – 0001133; *see also,* Ex. 11 (Pl.'s Leave File) at FRONTIER AIRLINES (R. BRIGHAM) – 0004842-4871.

48.     A true and correct copy of Plaintiff's leave file is attached as Exhibit 11.

49.     On October 9, 2015, I met with Plaintiff again along with Jeff Varney, Manager, Inflight Services and Kari Thompson, Manager, Inflight Services, which Plaintiff recorded.

50.     Frontier had a court reporter transcribe Plaintiff's recording of the October 9, 2015 meeting and a true and correct copy of that transcription is attached as Exhibit 12.

51.     I understand that Plaintiff also had her recording of the October 9, 2015 meeting transcribed.  The transcript attached as Exhibit 13 accurately reflects the conversation that took place during that meeting to the best of my recollection.

52.     Plaintiff reiterated how she loved being a flight attendant, particularly because of the job's flexibility and asked whether as an accommodation, she could start with a blank schedule and be responsible for building her own schedule up to 60 hours. *See* Ex. 12 (Frontier's transcript of October 9, 2015 recording) at FRONTIER AIRLINES (R. BRIGHAM) – 0004343; Ex. 13 (Pl.'s transcription of October 9, 2015 recording) at BRIGHAM LM 00000032;  BRIGHAM LM 00000030; BRIGHAM LM 00000032, 34.

53.     I explained that that practice was reserved for flight attendants returning from continuous leaves of absence who had not been active flight attendance during the bidding period and therefore, could not have bid and that allowing Plaintiff to craft her own schedule would

violate the CBA's seniority provisions, creating the impression that Frontier was "cherry-picking" flight attendants to have the benefit of building their own schedules without regard to seniority. *See* Ex. 12 (Frontier's transcription of October 9, 2015 recording) at FRONTIER AIRLINES (R. BRIGHAM) – 0004387, 4392, 4395; Ex. 13 (Pl.'s transcription of October 9, 2015 recording) at BRIGHAM LM 00000032

54.     I also recall that Ms. Thompson explained to Plaintiff that a lot of flight attendants would have also wanted to start with a clean slate for the month and be allowed to create their own schedule.

55.     At this point, Frontier had already been allowing Plaintiff to use Intermittent FMLA for purposes other than those included in her certifications (i.e. relapse prevention counseling and support group meetings) by allowing her to use Intermittent FMLA Leave to avoid flights with overnight layovers. *See* Ex. 6 (Fitness for Duty Certification form dated Nov. 8, 2014); Ex. 7 (FMLA Certification form, dated March 10, 2015); Ex. 10 (Intermittent FMLA Certification form, dated May 28, 2015); Ex. 11 (Pl.'s leave file) at FRONTIER AIRLINES (R. BRIGHAM) – 0004845.

56.     A true and correct copy of the email I sent to Ms. Coppedge dated Oct. 15, 2015 regarding making exceptions for Plaintiff is attached as Exhibit 14.

57.     I emphasized to Plaintiff that ultimately, Frontier needed employees who could come to work, but reminded her that she could apply for a personal leave as a further accommodation, additional Intermittent FMLA Leave, and/or for another internal position within the company.

58.     I also notified Plaintiff that a Flight Training Coordinator position was coming available. Plaintiff, however, repeated her concerns about losing her seniority. *See* Ex. 12

(Frontier's transcription of October 9, 2015 recording) at BRIGHAM LM 0000004397; Ex. 13 (Pl.'s transcription of October 9, 2015 recording) at BRIGHAM LM 00000035, 36.

59.    In addition, I recall Ms. Thompson encouraging Plaintiff to regularly check for other internal opportunities on the company's internal Ultipro system.

***Frontier's Termination of Plaintiff's Employment***

60.    Less than ten (10) days after the October 9, 2015 meeting, Plaintiff failed to report for a four (4) day trip.

61.    A true and correct copy of the email that Frontier received from Plaintiff on October 26, 2015 regarding Plaintiff's admitted failure to notify the LOA Department that she was choosing to use Intermittent FMLA Leave for a four (4) day trip scheduled to begin on October 23, 2015 is attached as Exhibit 15.

62.    Regardless, Plaintiff had exhausted her available Intermittent FMLA Leave by October 19, 2015. *See* Ex. 11 (Plaintiff's leave file) at FRONTIER AIRLINES (R. BRIGHAM) – 0004885.

63.    Frontier denied Plaintiff's request to use Intermittent FMLA Leave for the four (4) day trip for her lack of timely notice.

64.    A true and correct copy of the email that I received from Shelly Leyner on Oct. 27, 2015 regarding the denial of Plaintiff's request to use Intermittent FMLA Leave for lack of timely notice to the LOA Department is attached as Exhibit 16.

65.    On or around October 30, 2015, Frontier sent Plaintiff a letter indicating that pursuant to the CBA, an Investigatory Meeting had been scheduled for November 3, 2015 for Plaintiff to attend to discuss her violations of the Dependability Policy. A true and correct copy of that letter is attached as Exhibit 17.

66.     Ultimately, based upon Plaintiff's violation of Frontier's Dependability Policy and policy concerning use of intermittent FMLA leave as well as Plaintiff's violation of the CBA's requirements for "Sick Calls," Frontier believed that Plaintiff was not a dependable or reliable employee. *See* Ex. 4 (Attendance Warnings); Ex. 11 (Pl.'s Leave File).

67.     On November 11, 2015, Frontier informed Plaintiff that it was terminating her employment effective immediately for incurring ten (10) Occurrences within a twelve (12) month period in violation of the Dependability Policy under which eight (8) Occurrences subjected an employee to termination.

68.     A true and correct copy of the termination letter Frontier sent to Plaintiff is attached as Exhibit 18.

***I have read this declaration and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.***

Dated: November 17, 2020

*/s/ Gerardo Arellano*

Gerardo Arellano

**Frontier Airlines**
**Job Description**

| Gray Area for Human Resources Use Only | Reports To: Manager, Inflight Services |
|---|---|
| EEO1 Code: 9 | Department Name: Inflight |
| Job Title: Flight Attendant | Department #: |
| Job Code: FFS1205 | Structure or Grade: Structure |
| FLSA Status: Exempt | # Weeks Vacation: 2 |
| Job Family: 09 | WC Code: 7405 |
| Org. Band: Individual Contributor | Creation/Revision Date: 2/24/14 (Revision) |

I. **Position Summary:** (Succinct statement (1 to 3 sentences) of the basic purpose of the position).

The Frontier Airlines Flight Attendant is essential to maintaining the well-being, safety, security and comfort of our passengers onboard our aircraft. The Flight Attendant performs a variety of services in order to maintain a high level of excellent customer service. Flight Attendants are involved in all passenger interactions in order to help answer any questions, address concerns, and sell products onboard. It is essential for all crew members to follow established FAA and Frontier guidelines in providing for the comfort and safety of passengers and respond to inflight emergencies and/or security concerns in the unlikely event they arise.

II. **Essential Functions:** (In order of importance, list only those functions that are necessary to carry out the purpose of the position. Include the percentage of time spent on each function.)

- Follows all Federal Aviation Regulations as required as well as all established Frontier Airlines Policies and procedures.
- Initializes and conducts emergency evacuation of cabin if necessary.
- Conducts preflight safety check of cabin emergency equipment.
- Ensures proper loading and storage of carry-on luggage prior to and during the flight.
- Ensures cabin safety and security during all phases of flight, including boarding and deplaning.
- Prepares and secures doors and announces departure/arrival information to passengers over the PA system.
- Provides instruction and demonstration of onboard safety features.
- Sets up galley, brews coffee, checks supplies, stows beverage carts/snacks and verifies count.
- Serves snacks and/or beverages (including alcohol), collects and stows all beverage and snack service items inflight and prior to landing, and informs passengers of all onboard products.
- Heavy lifting, pushing and/or pulling of objects up to 200 pounds occasionally and/or up to 50 pounds frequently
- Other duties as required

III. **Other Functions:** (Those that are marginally important to the position)

IV. **If management or supervisory position, which positions report directly to this one?**

V. **Qualifications:** (Formal education or training required; amount and type of prior experience required)

- High school graduate or GED required
- MUST BE 21 years of age to begin the interview process
- 1 to 2 years of customer service experience preferred
- Participate and comply with all DOT, FAA, and Frontier Airlines' regulations regarding drug and alcohol compliance of safety-sensitive transportation employees
- Willingness to work flexible hours/schedules including nights, weekends and holidays
- Valid passport is required, the ability to travel in and out of the United States, and the ability to travel to all current and future international destinations served by Frontier Airlines is required.
- Ability to sit in and be secured with seatbelt and shoulder harness in all jump seats without a seat belt extension
- Maintain a professional image and comply with all Flight Attendant uniform requirements, including no visible tattoos or multiple piercing

VI. **Knowledge, Skills and Abilities:** (Mental and physical abilities required for the position)

1

FRONTIER AIRLINES (R. BRIGHAM) - 0001863

EXHIBIT 1
0504

- Excellent interpersonal, oral, and written communication skills.
- Must be able to read, speak, write, and communicate in English fluently.
- Ability to communicate effectively with and reassure passengers in a hurried and stressful environment.
- Ability to work independently as a leader and as a team member among fellow employees and passengers.

## VII.   Working Conditions:

**Equipment** – List all machines and equipment used directly in the performance of this position includes, but not limited to: beverage/snack carts, galley equipment, POS devices/systems, flight stairs, aircraft cabin equipment including doors, and emergency equipment.

**Work Environment** – Describe the usual working environment (i.e. normal office, outdoors subject to weather variations, elevated noise levels etc.)  Identify irregular work shifts, on-call, or multiple work location requirements.

- Working environment subject to varying climate conditions, air turbulence, changing locations, variable hours, dry air, noise levels from engines and other equipment, dim lighting and confined spaces.
- Working environment is typically fast-paced and physically demanding.
- Work shifts/hours vary including weekends, evenings and holidays.

**Physical Effort** – How much physical effort is regularly required in this position?  (Occasionally means the activity exists up to one-third of the time.  Frequently means the activity exists from one-third to two-thirds of the time).

- Perform frequent repetitive motions, to include bending at the waist and knees and sustaining those positions for extended periods of time.
- Must have 20/20 (or "sufficient") vision and hearing to safely perform the essential functions of the position.
- Ability to hear, interpret and respond to onboard chime systems, call buttons and announcements or direction given over interphone and public address system.
- Ability to stand throughout most of work shift.
- Perform in-flight duties while in a pressurized cabin for extended periods of time.
- Possess the physical strength to reach and operate all emergency equipment and exits.
- Operate door and window exits in manual and emergency modes.  (Can include weight of 33 lb window exit and investigate door "emergency mode" resistance).
- Push/pull/move a galley cart weighing 100 lbs.
- Moderate physical activity required by handling objects up to 50 lbs occasionally and/or up to 35 lbs frequently.
- Ability to lift a 35 lb luggage (occasionally - bags heavier than 50 lbs) from the floor to 33"  (i.e. floor to passenger seat).
- Ability to lift a 35 lb luggage from 33" to 67" (i.e. passenger seat to overhead compartment). Bags heavier than 35 lbs should be checked.
- Ability to reach into overhead compartments with a height of 67" and depth of 28".
- Ability to be properly secured in the cabin jumpseat by the safety belt and shoulder harness without the use of seatbelt extensions.
- Ability to balance and reach across seats and serve passengers.

**Reviewed/Approved by:** _____jm / Compensation_____     **Date:** ____2/24/13____

**Disclaimer:** *The above statements are intended to describe the general nature and level of work being performed by the individuals assigned to this position.  They are not intended to be an exhaustive list of all responsibilities, duties and skills required of individuals in this position.  This position description is subject to change by the Company as the needs and requirements of the position change.*

2

FRONTIER AIRLINES (R. BRIGHAM) - 0001864

# FRONTIER   Your Employee Handbook & Policy Guide

For a summary of changes click here

Uncontrolled copy when downloaded or printed
Refer to the Controlled Document Library for the most current version of this document.

FRONTIER AIRLINES (R. BRIGHAM) - 0000246

EXHIBIT 2

## *FRONTIER*

**EMPLOYEE HANDBOOK**                                                    **00.00 Pg. 1**

# RECORD OF REVISIONS

As revisions are received, post them as directed and sign off the boxes corresponding to the revision number.

| Revision Number | Revision Date | Date Posted | Posted By | Revision Number | Revision Date | Date Posted | Posted By |
|---|---|---|---|---|---|---|---|
| 2 | 11/30/05 | 11/30/05 | Tech Pubs | 31 | | | |
| 3 | 03/13/06 | 03/13/06 | Tech Pubs | 32 | | | |
| 4 | 08/21/06 | 08/21/06 | Tech Pubs | 33 | | | |
| 5 | 02/22/07 | 02/22/07 | Tech Pubs | 34 | | | |
| 6 | 08/31/07 | 08/31/07 | Tech Pubs | 35 | | | |
| 7 | 03/03/09 | 03/03/09 | Tech Pubs | 36 | | | |
| 8 | 06/15/09 | 06/15/09 | Tech Pubs | 37 | | | |
| 9 | 11/24/09 | 11/24/09 | Tech Pubs | 38 | | | |
| 10 | 12/31/11 | 12/31/11 | Tech Pubs | 39 | | | |
| 11 | 05/01/12 | 05/01/12 | Tech Pubs | 40 | | | |
| 12 | 07/24/12 | 07/24/12 | TechPubs | 41 | | | |
| 13 | 08/15/12 | 08/15/12 | Tech Pubs | 42 | | | |
| 14 | 04/24/13 | 04/24/13 | Tech Pubs | 43 | | | |
| 15 | 05/17/13 | 05/17/13 | Tech Pubs | 44 | | | |
| 16 | 12/03/13 | 12/03/12 | Tech Pubs | 45 | | | |
| 17 | 02/19/14 | 02/19/14 | Tech Pubs | 46 | | | |
| 18 | 04/07/14 | 04/07/14 | Tech Pubs | 47 | | | |
| 19 | 06/09/14 | 06/09/14 | Tech Pubs | 48 | | | |
| 20 | 09/24/14 | 09/24/14 | Tech Pubs | 49 | | | |
| 21 | 01/06/15 | 01/06/15 | Tech Pubs | 50 | | | |
| 22 | 02/04/15 | 02/04/15 | Tech Pubs | 51 | | | |
| 23 | 02/06/15 | 02/06/15 | Tech Pubs | 52 | | | |
| 24 | 02/13/15 | 02/13/15 | Tech Pubs | 53 | | | |
| 25 | 03/04/15 | 03/04/15 | Tech Pubs | 54 | | | |
| 26 | 04/16/15 | 04/16/15 | Tech Pubs | 55 | | | |
| 27 | 06/11/15 | 06/11/15 | Tech Pubs | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |

**Rev5 02/22/07**                                          **Record of Revisions**

# *FRONTIER*

EMPLOYEE HANDBOOK                                                                00.00  Pg. 2

## RECORD OF TEMPORARY REVISIONS

After inserting each temporary revision, record the Revision Date, the Date Posted, and your initials next to the appropriate revision number. When instructed to remove the temporary revision, record the Date Removed and your initials next to each appropriate revision number.

| Temporary Revision Number | Temporary Revision Date | Date Posted | Posted By | Date Removed | Removed By |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

Rev5 02/22/07                                    Record of Temporary Revisions

**FRONTIER**

**EMPLOYEE HANDBOOK**                                                      **00.00  Pg. 3**

# LIST OF EFFECTIVE PAGES

| Revision Number: 27 | | 06/11/15 | |
|---|---|---|---|

| Chapter/Section/Page | Rev#/Date | Chapter/Section/Page | Rev#/Date | Chapter/Section/Page | Rev#/Date |
|---|---|---|---|---|---|
| 00.00 Pg. 1 | Rev5 02/22/07 | 05.05 Pg. 16 | Rev26 04/16/15 | 10.05 Pg. 13 | Rev17 02/19/14 |
| 00.00 Pg. 2 | Rev5 02/22/07 | 05.05 Pg. 17 | Rev26 04/16/15 | 10.05 Pg. 14 | Rev17 02/19/14 |
| 00.00 Pg. 3 | Rev27 06/11/15 | 05.05 Pg. 18 | Rev26 04/16/15 | 10.05 Pg. 15 | Rev17 02/19/14 |
| 00.00 Pg. 4 | Rev27 06/11/15 | 06.05 Pg. 1 | Rev15 12/03/13 | 10.05 Pg. 16 | Rev17 02/19/14 |
| 00.00 Pg. 5 | Rev8 06/15/09 | 06.05 Pg. 2 | Rev15 12/03/13 | 10.05 Pg. 17 | Rev17 02/19/14 |
| 00.00 Pg. 6 | Rev8 06/15/09 | 06.05 Pg. 3 | Rev17 02/19/14 | 10.05 Pg. 18 | Rev17 02/19/14 |
| 00.01 Pg. 1 | Rev26 04/16/15 | 06.05 Pg. 4 | Rev17 02/19/14 | 11.00 Pg. 1 | Rev17 02/19/14 |
| 00.01 Pg. 2 | Rev26 04/16/15 | 07.05 Pg. 1 | Rev10 12/31/11 | 11.00 Pg. 2 | Rev17 02/19/14 |
| 01.05 Pg. 1 | Rev17 02/19/14 | 07.05 Pg. 2 | Rev10 12/31/11 | 11.05 Pg. 1 | Rev19 06/09/14 |
| 01.05 Pg. 2 | Rev17 02/19/14 | 07.05 Pg. 3 | Rev17 02/19/14 | 11.05 Pg. 2 | Rev19 06/09/14 |
| 02.05 Pg. 1 | Rev25 03/04/15 | 07.05 Pg. 4 | Rev17 02/19/14 | 11.05 Pg. 3 | Rev17 02/19/14 |
| 02.05 Pg. 2 | Rev25 03/04/15 | 07.05 Pg. 5 | Rev17 02/19/14 | 11.05 Pg. 4 | Rev17 02/19/14 |
| 02.05 Pg. 3 | Rev25 03/04/15 | 07.05 Pg. 6 | Rev17 02/19/14 | 11.05 Pg. 5 | Rev17 02/19/14 |
| 02.05 Pg. 4 | Rev25 03/04/15 | 07.05 Pg. 7 | Rev17 02/19/14 | 11.05 Pg. 6 | Rev17 02/19/14 |
| 03.05 Pg. 1 | Rev22 02/04/15 | 07.05 Pg. 8 | Rev17 02/19/14 | 11.05 Pg. 7 | Rev17 02/19/14 |
| 03.05 Pg. 2 | Rev22 02/04/15 | 08.05 Pg. 1 | Rev17 02/19/14 | 11.05 Pg. 8 | Rev17 02/19/14 |
| 03.05 Pg. 3 | Rev25 03/04/15 | 08.05 Pg. 2 | Rev17 02/19/14 | 11.05 Pg. 9 | Rev22 02/04/15 |
| 03.05 Pg. 4 | Rev25 03/04/15 | 08.05 Pg. 3 | Rev10 12/31/11 | 11.05 Pg. 10 | Rev22 02/04/15 |
| 03.05 Pg. 5 | Rev25 03/04/15 | 08.05 Pg. 4 | Rev10 12/31/11 | 11.05 Pg. 11 | Rev17 02/19/14 |
| 03.05 Pg. 6 | Rev25 03/04/15 | 08.05 Pg. 5 | Rev10 12/31/11 | 11.05 Pg. 12 | Rev17 02/19/14 |
| 04.05 Pg. 1 | Rev17 02/19/14 | 08.05 Pg. 6 | Rev10 12/31/11 | 11.05 Pg. 13 | Rev17 02/19/14 |
| 04.05 Pg. 2 | Rev17 02/19/14 | 08.05 Pg. 7 | Rev17 02/19/14 | 11.05 Pg. 14 | Rev17 02/19/14 |
| 04.05 Pg. 3 | Rev17 02/19/14 | 08.05 Pg. 8 | Rev17 02/19/14 | 11.05 Pg. 15 | Rev17 02/19/14 |
| 04.05 Pg. 4 | Rev17 02/19/14 | 08.05 Pg. 9 | Rev17 02/19/14 | 11.05 Pg. 16 | Rev17 02/19/14 |
| 04.05 Pg. 5 | Rev17 02/19/14 | 08.05 Pg. 10 | Rev17 02/19/14 | 11.10 Pg. 1 | Rev17 02/19/14 |
| 04.05 Pg. 6 | Rev17 02/19/14 | 08.05 Pg. 11 | Rev17 02/19/14 | 11.10 Pg. 2 | Rev17 02/19/14 |
| 04.05 Pg. 7 | Rev14 04/24/13 | 08.05 Pg. 12 | Rev17 02/19/14 | 11.10 Pg. 3 | Rev17 02/19/14 |
| 04.05 Pg. 8 | Rev14 04/24/13 | 09.05 Pg. 1 | Rev17 02/19/14 | 11.10 Pg. 4 | Rev17 02/19/14 |
| 04.05 Pg. 9 | Rev17 02/19/14 | 09.05 Pg. 2 | Rev17 02/19/14 | 12.05 Pg. 1 | Rev10 12/31/11 |
| 04.05 Pg. 10 | Rev17 02/19/14 | 09.05 Pg. 3 | Rev17 02/19/14 | 12.05 Pg. 2 | Rev10 12/31/11 |
| 05.05 Pg. 1 | Rev23 02/06/15 | 09.05 Pg. 4 | Rev17 02/19/14 | 12.05 Pg. 3 | Rev24 02/13/15 |
| 05.05 Pg. 2 | Rev23 02/06/15 | 09.05 Pg. 5 | Rev27 06/11/15 | 12.05 Pg. 4 | Rev24 02/13/15 |
| 05.05 Pg. 3 | Rev23 02/06/15 | 09.05 Pg. 6 | Rev27 06/11/15 | 12.05 Pg. 5 | Rev17 02/19/14 |
| 05.05 Pg. 4 | Rev23 02/06/15 | 10.05 Pg. 1 | Rev14 04/24/13 | 12.05 Pg. 6 | Rev17 02/19/14 |
| 05.05 Pg. 5 | Rev23 02/06/15 | 10.05 Pg. 2 | Rev14 04/24/13 | 12.05 Pg. 7 | Rev17 02/19/14 |
| 05.05 Pg. 6 | Rev23 02/06/15 | 10.05 Pg. 3 | Rev14 04/24/13 | 12.05 Pg. 8 | Rev17 02/19/14 |
| 05.05 Pg. 7 | Rev26 04/16/15 | 10.05 Pg. 4 | Rev14 04/24/13 | 12.05 Pg. 9 | Rev17 02/19/14 |
| 05.05 Pg. 8 | Rev26 04/16/15 | 10.05 Pg. 5 | Rev10 12/31/11 | 12.05 Pg. 10 | Rev17 02/19/14 |
| 05.05 Pg. 9 | Rev26 04/16/15 | 10.05 Pg. 6 | Rev10 12/31/11 | 13.05 Pg. 1 | Rev10 12/31/11 |
| 05.05 Pg. 10 | Rev26 04/16/15 | 10.05 Pg. 7 | Rev10 12/31/11 | 13.05 Pg. 2 | Rev10 12/31/11 |
| 05.05 Pg. 11 | Rev26 04/16/15 | 10.05 Pg. 8 | Rev10 12/31/11 | 13.05 Pg. 3 | Rev17 02/19/14 |
| 05.05 Pg. 12 | Rev26 04/16/15 | 10.05 Pg. 9 | Rev14 04/24/13 | 13.05 Pg. 4 | Rev17 02/19/14 |
| 05.05 Pg. 13 | Rev26 04/16/15 | 10.05 Pg. 10 | Rev14 04/24/13 | 13.05 Pg. 5 | Rev17 02/19/14 |
| 05.05 Pg. 14 | Rev26 04/16/15 | 10.05 Pg. 11 | Rev17 02/19/14 | 13.05 Pg. 6 | Rev17 02/19/14 |
| 05.05 Pg. 15 | Rev26 04/16/15 | 10.05 Pg. 12 | Rev17 02/19/14 | 14.05 Pg. 1 | Rev16 12/03/13 |

**Rev27 06/11/15**                                              **List of Effective Pages**

**≡RONTIER**

EMPLOYEE HANDBOOK                                    00.00  Pg. 4

| Chapter/ Section/Page | Rev#/Date |
|---|---|
| 14.05 Pg. 2 | Rev16 12/03/13 |
| 14.05 Pg. 3 | Rev16 12/03/13 |
| 14.05 Pg. 4 | Rev16 12/03/13 |
| 14.05 Pg. 5 | Rev16 12/03/13 |
| 14.05 Pg. 6 | Rev16 12/03/13 |
| 14.05 Pg. 7 | Rev16 12/03/13 |
| 14.05 Pg. 8 | Rev16 12/03/13 |
| 15.05 Pg. 1 | Rev20 09/24/14 |
| 15.05 Pg. 2 | Rev20 09/24/14 |
| 16.05 Pg. 1 | Rev21 01/06/15 |
| 16.05 Pg. 2 | Rev21 01/06/15 |
| 16.05 Pg. 3 | Rev21 01/06/15 |
| 16.05 Pg. 4 | Rev21 01/06/15 |
| 16.05 Pg. 5 | Rev21 01/06/15 |
| 16.05 Pg. 6 | Rev21 01/06/15 |

Rev27 06/11/15

**FRONTIER**

EMPLOYEE HANDBOOK                                                    00.00  Pg. 5

## LIST OF EFFECTIVE TEMPORARY REVISIONS

As Temporary Revisions are issued, a new list of Effective Temporary Revisions page, printed on yellow paper will be supplied. Retain the

"white" page in order to maintain manual currency as shown on the List of Effective Pages.

| TR# | Date | Page Number |
|-----|------|-------------|

FRONTIER AIRLINES (R. BRIGHAM) - 0000251

**FRONTIER**

EMPLOYEE HANDBOOK                                     00.00  Pg. 6

Page Intentionally
Left Blank

Rev8 06/15/09                        List of Effective Temporary Revisions

FRONTIER AIRLINES (R. BRIGHAM) - 0000252
0542

# FRONTIER

| EMPLOYEE HANDBOOK | 00.01  Pg. 1 |
|---|---|

## TABLE OF CONTENTS

| Section | Subject | Page |
|---|---|---|
| 01.05 | Executive Statement | 1 - 2 |
| 02.05 | Introduction | 1 - 4 |
| 03.05 | Employment | 1 - 6 |
| 04.05 | Workplace Guidelines | 1 -10 |
| 05.05 | Standards of Conduct | 1 - 18 |
| 06.05 | Compensation | 1 - 4 |
| 07.05 | Benefits | 1 - 8 |
| 08.05 | Leaves of Absence | 1 - 12 |
| 09.05 | Safety and Health Program | 1 - 6 |
| 10.05 | Information Technology Acceptable Use Policy | 1 - 18 |
| 11.05 | Anti-Drug Policy and Regulations | 1 - 16 |
| 11.10 | General Policies | 1 - 4 |
| 12.05 | Dependability | 1 - 10 |
| 13.05 | Corrective Action | 1 - 6 |
| 14.05 | Anti-Corruption Compliance Policy | 1 - 8 |
| 15.05 | Procurement Policy | 1 - 2 |
| 16.05 | Records Retention And Destruction Policy | 1 - 6 |

**FRONTIER**

**EMPLOYEE HANDBOOK**                                                 **00.01 Pg. 2**

Page Intentionally
Left Blank

Rev26 04/16/15                                          **Table of Contents**

# FRONTIER

| EMPLOYEE HANDBOOK | 01.05  Pg. 1 |
|---|---|

## EXECUTIVE STATEMENT

## 01.05.1  WELCOME TO FRONTIER

Welcome to Frontier Airlines! As an ultra-low cost carrier, we provide consumers with choices. We offer a low base fare, and let our customers select the amenities that are important to them. Since our customers pay only for the product and services they actually use, we offer the best travel value in the industry.

We should think of each customer as a guest on our aircraft. We listen, take care of them when there is a problem, and always treat them with respect. Of course our primary mission is to ensure the safety of our guests and employees. Passengers want to be safely delivered to their destination, on time and with bags, while receiving consistent, friendly and professional customer service every time they fly with us.

Frontier is not just about the animals on our tails. It's about our employees, who are the very best and most professional in the industry. At Frontier, we are not just employees, we are a family and a team. We support and treat each other with dignity and respect. Working together, we can make a difference as we safely and reliably transport our passengers to their destination.

We offer a unique product - safety, reliability, choice, customer service and great employees, which equals great value for our guests.

Welcome to the Frontier team!

Sincerely,

David Siegel
Chief Executive Officer

| Rev17 02/19/14 | Executive Statement |
|---|---|

**FRONTIER**

## 01.05.2 EXECUTIVE STATEMENT ON SAFETY

# Frontier Airlines Executive Statement on Safety

Since Frontier Airlines began operating on July 5, 1994, there has been one underlying principle that has consistently guided our course: operate efficiently while exceeding the highest safety standards in the transportation industry.

Frontier is committed to the highest safety standards in our operation. When we say that our first fundamental is safety, we mean it. *People are priceless*.

Our first fundamental – Safety is the first priority and responsibility of every Frontier employee, whatever our job happens to be. We must never put at risk the lives of our customers, team members or anyone else. We must always act consistently with our primary commitment to safety.

It doesn't matter how good our on-time performance is or how much our customers love our service – if we aren't providing them with the highest level of safety every time they fly, we've failed.

The Chief Executive Officer (CEO) has the ultimate responsibility for the safety of Frontier's customers and employees. We will ensure that the necessary resources are committed throughout the organization to develop, maintain, and continually improve our safety culture.

One key element of improving safety is the implementation of a Safety Management System (SMS). Frontier is committed to implementing and maintaining a successful SMS. This program will provide Frontier with the framework for developing a system to ensure that hazards and risks are identified, managed, and mitigated or eliminated. It will require the commitment of all employees at all levels, including me and all of Frontier's senior leadership. Part of SMS is to set goals and objectives for safety improvement, document the procedures used to achieve those objectives, and periodically review and update those objectives. This includes providing you with a clear explanation of your role at Frontier, as well as the expectations of acceptable workplace performance.

We are committed to complying with all local, state and federal regulations applicable to our industry, as well as the international standards of the International Civil Aviation Organization (ICAO). These regulations are designed to provide the minimum acceptable level of safety, but it is our intention to go far beyond regulatory requirements.

To assist in improving safety, Frontier has developed a number of ways in which employees can report safety issues including incident reports, fatigue reports, Aviation Safety Action Program (ASAP) reports, and a phone-in safety hotline. New reporting tools will be rolled out in the future to make it even easier to report and communicate safety concerns without fear of any reprisal. I encourage you to uses these tools to report safety issues so that we can work together to fix them.

Communication is a two-way street. We will periodically update you with current safety related events and review our processes to ensure we are meeting safety objectives. Look for your managers to continually emphasize their support of our safety objectives, as well as update you on progress that we are making.

With your continued support, we will work together to build an organization in which every employee is a safety officer and achieve the high standards we have set for this airline.

Sincerely,

*M N [signature]*

David Siegel
Chief Executive Officer

Rev17 02/19/14

**FRONTIER**

EMPLOYEE HANDBOOK                                              02.05  Pg. 1

## INTRODUCTION

### 02.05.1  RESPONSIBILITY AND AUTHORITY

The Frontier Vice President, Human Resources & Labor Relations is responsible for the overall quality and has final authority for Frontier's Employee Handbook and the processes contained within. This individual has the authority, to the fullest extent set forth in the Vice President, Human Resources & Labor Relations job description, to take any lawful steps necessary to ensure compliance with the requirements set forth in this handbook.

The qualifications and work experience requirements for the Frontier Vice President, Human Resources & Labor Relations are contained in the job description filed with the Human Resources Department.

### 02.05.2  PURPOSE

This handbook is designed to acquaint you with Frontier and provide information about working at Frontier. The handbook is not all-inclusive, but is intended to provide you with a summary of some of Frontier's guidelines. This edition replaces all previously issued editions. For continuous updates of this manual check Frontier's intranet.

No employee handbook can anticipate every circumstance or question. After reading the handbook, if you have questions please talk with your immediate supervisor or Human Resources. Also, the need may arise to change the guidelines described in the handbook. Frontier reserves the right to interpret or change any guidelines or policies without prior notice.

If a policy in this section conflicts with a provision of a Collective Bargaining Agreement (CBA) or Departmental Guideline, the provisions in the CBA or Departmental Guideline will be followed. Departmental Guidelines may also have more complete information.

FRONTIER AIRLINES (R. BRIGHAM) - 0000257

**FRONTIER**

EMPLOYEE HANDBOOK                                                    02.05  Pg. 2

Employment with Frontier is considered "at-will". Employees have the
right to end their work relationship with Frontier, with or without advance
notice for any reason. Frontier has the same right. The language used in
this handbook and any verbal statements made by management are not
intended to constitute a contract of employment, either expressed or
implied, nor a guarantee of employment for a specific duration. No
representative of Frontier, other than the Chief Operating Officer (COO) of
Frontier, has the authority to enter into an agreement of employment for
any specified period. Such an agreement must be in writing and signed
by the COO and the employee.

## 02.05.3   FRONTIER FUNDAMENTALS

Frontier Fundamentals help define who we are as a company and provide
guidance as to how we should conduct ourselves.

### Safety
Safety is the first priority and responsibility of every Frontier employee,
whatever our job happens to be. We must never put at risk the lives of
our customers, team-members or anyone else. We must always act
consistently with our primary commitment to safety.

### Profit
Frontier is in business to make a profit. If we fail to make a profit, we will
ultimately go out of business. Safety is a prerequisite for profit.

### Honesty & Respect
To earn the trust of our customers, vendors and of each other, we must
act at all times with honesty and respect. Safety rests on a foundation of
trust.

### Reliability
Reliability is an operational imperative second only to safety. We believe
that the factors that promote safety generally also promote reliability and
that reliability is also consistent with profit.

### Value
Customers will only fly Frontier if we are able to provide them with value.
The primary way we are able to provide our customers with value is to
offer them a better deal than they are able to find from our competitors.

Rev26 04/16/15                                                    **Introduction**

**FRONTIER**

| EMPLOYEE HANDBOOK | 02.05  Pg. 3 |
|---|---|

## Friendliness

We transform our guest experience by being positive, energizing, and friendly. We enjoy, and take pride in, what we do.

## 02.05.4  DEFINITIONS

Certain words and terms used throughout this manual are key to a proper understanding and interpretation of Frontier policies and programs. Working definitions of these words and terms follow:

- **Accounting:** Refers to the Chief Accounting Officer or his/her designee.
- **Company:** Refers to Frontier.
- **Computer Resources:** Refers to the entire Frontier computer network. Specifically, Computer Resources include, but are not limited to: host computers, file servers, application servers, communication servers, mail servers, fax servers, Web servers, workstations, stand-alone computers, laptops, Personal Data Assistants, software, data files, and all internal and external computer and communications networks (for example: Internet, commercial online services, value-added networks, e-mail systems) that may be accessed directly or indirectly from our computer, or are linked to our computer network.
- **Employee:** Refers to any current employee, whether active or on-leave.
- **Home Office:**

  Frontier Center One
  7001 Tower Road
  Denver, Colorado 80249

- **Human Resources (HR):** Refers to Frontier's Vice President, Human Resources & Labor Relations or his/her designee.
- **My Frontier or myfrontier.org:** The Frontier on-line information system that includes important forms, documents and references for Frontier employees.
- **Senior Management:** This includes the Chief Executive Officer (CEO), Chief Operating Officer (COO), and/or Chief Financial Officer (CFO).
- **Supervisor:** The person to whom you are immediately responsible during your work period.

FRONTIER AIRLINES (R. BRIGHAM) - 0000259

0549

**FRONTIER**

- **Users:** Refers to all employees, independent contractors,
  consultants, temporary workers, business partners, vendors and
  other persons or entities that use our Computer Resources.

## 02.05.5  QUESTIONS

If you have any questions regarding any information contained in this
employee handbook, please contact:

> Frontier Human Resources
> Frontier Center One
> 7001 Tower Road
> Denver, Colorado 80249

or email: HR@flyfrontier.com. You may call the general office front desk
and be transferred to HR as well. The number is (720) 374-4200.

**FRONTIER**

| EMPLOYEE HANDBOOK | 03.05 Pg. 1 |
| --- | --- |

## EMPLOYMENT

### 03.05.1   EQUAL OPPORTUNITY EMPLOYMENT

At Frontier, we wholeheartedly support and have a strong commitment to Equal Employment Opportunity (EEO) and Affirmative Action. Frontier is committed to providing equal employment opportunities for all persons regardless of race, color, religion, gender, gender variance, sexual orientation, age, genetic information, marital status, national origin, citizenship status, disability, military, veteran status, and any other bases protected by federal, state, or local laws.

Equal opportunity extends to all aspects of the employment relationship including: hiring, training, employee development, promotions, transfers, compensation, benefits, working conditions, reduction in work force, social and recreation programs, termination, and other terms and conditions of employment.

Our Vice President, Human Resources & Labor Relations has been named our EEO Coordinator. The EEO Coordinator will be available to any member of management or any employee who may have a question concerning this policy and its implementation.

### 03.05.2   EMPLOYEE DEFINITIONS AND SENIORITY

All employment at Frontier is considered "at-will". Employment can be terminated at any time with or without cause. At the time you are hired, you are classified as a regular full-time, regular part-time, or scout employee. In addition, you are classified as either hourly or salaried.

#### 03.05.2.1   Regular Full-time Employee

Definition: an employee who is normally scheduled for and works at least an average of 30 hours per week. Regardless of average hours worked per week, pilots and flight attendants are classified as regular full-time employees (flight attendants must meet the collective bargaining agreement requirements for the flight attendant work group to qualify as full time unless a flight attendant bids for and is assigned part-time status).

FRONTIER AIRLINES (R. BRIGHAM) - 0000261

0521

**FRONTIER**

The employee's seniority date will be determined by Human Resources. Employees hired on the same day will have their seniority determined by the last four digits of the social security number with the higher being more senior.

### 03.05.2.2  Regular Part-time Employee
Definition: an employee who is normally scheduled for and works at least an average of 16 but less than 30 hours per week. Regular part-time employees are eligible for limited benefits on different terms and conditions than described for regular full-time employees in this employee handbook.

### 03.05.2.3  Scouts
Definition: an employee who is typically scheduled for no more than 15 hours per week and performs guest service functions, such as wheelchair assistance, supervision of unaccompanied minors, driving electric carts, security screening, monitoring of passenger movement, assisting with bags, and other miscellaneous tasks.

### 03.05.2.4  Initial Employment Evaluation Period - New Hires
For most employees at the Company, the Initial Employment Evaluation Period is defined as the initial, continuous nine (9) month period of active employment with Frontier. The initial period allows you to determine if you have made the right career decision and for Frontier to determine whether your initial work performance meets our needs and standards. During and after this initial evaluation period your employment with Frontier will remain "at-will".

### 03.05.2.5  Job Postings, Transfers and Promotions
We would like you to grow and progress in your career as an employee of the Frontier family. This section applies to employees interested in applying for a transfer or being considered for a promotion to an open or new position in Frontier. Except certain management positions, most openings within Frontier are posted in UltiPro.

If you are a current employee interested in applying for a posted position, you must request a job transfer using the Employee Transfer Request Form in UltiPro. Print this form, complete it and present it to your manager for approval. This Form must be approved by your manager before you apply online. If you apply online before completing this process you will not be able to move forward and will be removed from consideration.

Rev22 02/04/15                                                    Employment

**FRONTIER**

EMPLOYEE HANDBOOK                                    03.05 Pg. 3

This is a two-step process that must be followed for transfer consideration. For additional information, see details under "my company/job openings" in UltiPro.

All interview/transfer requests must be signed by your current manager and received by the "close date" indicated on the internal job posting in order to be considered for the position. Most positions will normally be posted for five (5) working days. External recruiting may be conducted concurrently with the internal job posting.

Employees will be screened, interviewed if qualified, and tested (if required) as all other candidates for that position. It is your responsibility to arrange for time off to interview for the position. Employee eligibility will be based on, but not limited to:

- Time in Present Position: May not be less than nine (9) continuous months of employment in present position. This time period may be waived by the Director or Vice President of the department.
- Present Job Performance/Work Habits: Employees that are or have been at a Final Written Warning level of discipline regarding work habits (attendance, behavior, safety, etc.) in the last twelve months will not be eligible for transfer unless otherwise mandated by a seniority integration agreement or other binding agreement.
- Qualifications, skills and ability to meet criteria of position.
- Active status: If you are not on active status you must gain approval from Human Resources at the time you apply for a transfer or promotion.

If you request and are awarded a transfer you are expected to honor that award. If you are awarded a position and then decline, you may be prohibited from bidding on future openings for a period of three (3) months from the date you decline. When transferring to a new department, your seniority date for salary adjustments, furloughs and bidding work schedules and vacations will be your transfer date. If you transfer from a non-safety sensitive position into a safety sensitive position you will be required to submit to a pre-employment drug screen.

## 03.05.3   RELOCATION REIMBURSEMENT

Relocation guidelines apply to current employees eligible for relocation in the following circumstances:

- Frontier requests the employee to relocate.

# FRONTIER

**EMPLOYEE HANDBOOK**                                                     **03.05  Pg. 4**

- The employee's promotion within Frontier requires relocation.

  *NOTE:   Promotion, for relocation purposes, is defined as moving from a management position to another management position, or moving from a non-management position to a management position.*

Employees relocating for personal reasons or lateral transfers (e.g., moving as a customer service agent from a station to Denver or to another station) will not receive financial assistance with relocation.

Employees moving at Frontier's request or due to a promotion will be granted three (3) paid days off to move to their new location. Additional non-work time needed to complete the move will be unpaid.

## 03.05.4  90 DAY REHIRE POLICY

An employee who separates from the company and is rehired within 90 days will have their seniority restored for purposes of sick and vacation accrual rates, and travel. Prior corrective action will be reinstated as well.

## 03.05.5  REDUCTION IN WORK FORCE

When economic conditions require a reduction in work force, the following criteria will be used as a guide to determine which employees will be retained:

### 03.05.5.1  Employees in Exempt (Salaried) Positions:

Will be based on job performance, work experience, qualifications, knowledge and ability, operational needs and other relevant factors, including length of service.

### 03.05.5.2  Employees in Non-Exempt (Hourly) Positions:

Will be based on time in position (seniority) unless department guidelines differ.

Employees (Exempt and Non-Exempt) affected by a reduction in work force may:

- Be offered a Company Offered Leave of Absence.
- Be separated from employment at Frontier and be eligible for rehire should economic conditions permit. If rehired on or before the 365th day following the date of furlough, the employee's seniority date will be adjusted for time away. The employee's vacation accrual will have

**FRONTIER**

**EMPLOYEE HANDBOOK**                                                **03.05  Pg. 5**

been paid so the accrual process will begin again. Accrual rate for vacations and sick leave will be at the employee's adjusted seniority date. Any corrective action in effect at the time of reduction in force will be reinstated at the same level, upon re-employment. If an employee does not return to active status on or before the 365th day following the furlough date, the employee's furlough status will become a termination.

Health insurance coverage will be extended through the last day of the month of termination. In addition, health insurance can be continued in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), which gives workers who lose their health benefits and their families the right to choose to continue group health benefits provided by their group health plan for limited periods of time under certain circumstances such as involuntary or voluntary job loss and other life events.

## 03.05.6   NOTICE TO EMPLOYER

In order to determine security clearance status, and general employment eligibility any employee charged with a felony must notify management and Human Resources within 24 hours of the charges via e-mail at HR@flyfrontier.com. If the employee does not have access to e-mail, the employee must call HR at (720) 374-4200 (ask to be transferred to HR). All criminal convictions, including misdemeanors must be reported to your Manager and Human Resources within 48 hours. In both cases, appropriate legal documentation must be provided within 72 hours.

An employee whose driver's license is suspended or revoked must notify his or her Manager and Human Resources within 24 hours of notification of revocation or suspension, if a driver's license is required for the employee's position.

Frontier reserves the right to take action up to and including termination of employment in any of these situations.

FRONTIER AIRLINES (R. BRIGHAM) - 0000265
0525

**FRONTIER**

| EMPLOYEE HANDBOOK | 03.05 Pg. 6 |
| --- | --- |

Page Intentionally
Left Blank

**FRONTIER**

EMPLOYEE HANDBOOK                                                    04.05  Pg. 1

## WORKPLACE GUIDELINES

### 04.05.1   WORK SCHEDULES

An airline is a 24-hour, seven-day-a-week operation. The normal workweek consists of five days, each eight hours long, Monday through Friday. The General Office's regular operating hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday. For individual field stations, hours of operation vary according to flight operational needs. Flexible work schedules (e.g., four 10-hour shifts) are available at the discretion of the department's management.

#### 04.05.1.1   Business Hours

Management will schedule/determine your particular work hours and meal period.

#### 04.05.1.2   Meal and Break Periods

Meal and break periods are scheduled depending on the needs of each department. You are free from all work duties during meal and break periods.

The airline operation and flight operations provide substantial periods of inactivity for many employees. These periods shall serve as breaks. Normally, breaks will be scheduled at two different intervals, one prior to your meal period and one after your meal period. If you work in a department where breaks are not directly assigned, please coordinate with your co-workers to maintain adequate coverage at all times.

#### 04.05.1.3   Time Off Clock (TOC)

On occasion, job demands will decrease the number of employees needed on duty. When this situation occurs, Frontier may choose to minimize cost by allowing individuals to leave work early or report to work later without pay. TOC is ALWAYS voluntary and cannot be mandated. In such cases the following procedure will apply:

1. A list will be maintained at the job location to allow every employee the opportunity to indicate if they would like to leave early or come in later than the start time.

2. If the opportunity for TOC materializes, the manager will go to the list and award the opportunity to the most senior person based on their scheduled shift and then seniority date.

Rev17 02/19/14                                                    Workplace Guidelines

**FRONTIER**

EMPLOYEE HANDBOOK                                                04.05  Pg. 2

3.  At times, advance TOC may occur for days or weeks at a time. If this
    takes place the manager will award the time off based on seniority
    within affected shifts.

### 04.05.1.4  Swapping/Trading Shifts and Days Off

Swapping or trading shifts, and days off may be permitted providing your
supervisor determines the swap will not interfere with the smooth and
efficient operation of your department. Frontier will not be responsible for
recouping any lost hours due to swaps under any circumstances,
including termination (either voluntary or involuntary) of the employment
of one of the individuals involved in the swap. Swapping or trade shifts
that result in understaffing may result in disciplinary action for all
involved, up to and including termination of employment. Your supervisor
or the Director or Vice President of the department reserves the right to
limit or eliminate all swapping either temporarily or permanently. Refer to
your department guidelines for swap/trade specifics.

### 04.05.1.5  Severe Weather and Emergency Conditions

We will, at all times, be considered open for business. Usually, in the
event of severe weather conditions or other emergencies, the COO or
your department head may decide to close a Frontier location prior to the
opening of business or during the business day. Your department head or
Corporate Communications will notify you as soon as possible.

Non-exempt hourly employees will be paid for hours they have worked up
to the time the location closes during the business day. If the business is
closed prior to the beginning of the day, hourly employees will not be paid
unless they are asked to, and are able to report to work, or they use
accrued vacation time. In no event may an employee use sick leave to be
paid for missing work due to severe weather.

Employees will be held accountable according to department attendance
standards for days missed beyond those identified by management as
severe weather days.

### 04.05.1.6  Assigning Duties and Responsibilities

Duties and responsibilities are assigned to other qualified personnel
when someone is out of the office. This is accomplished via company
email agreement between the individual and the designee. To ensure
those outside the department are aware the temporary contact change,
an 'out of office' message is created by the individual in Frontier's
calendar system and an out of office voice mail greeting if appropriate.

Rev17 02/19/14                                    **Workplace Guidelines**

**FRONTIER**

EMPLOYEE HANDBOOK                                                      04.05  Pg. 3

## 04.05.2  DRESS CODE

We expect our employees to wear clothing appropriate to the jobs being performed. For uniformed personnel, this means wearing the prescribed uniform. All other employees, while at work, should dress in a manner that allows them to present themselves well to the customer and create a professional work environment. If your manager feels your attire is out of place, you may be asked to leave your workplace until you are properly attired.

> NOTE:   Please refer to applicable department policies for specific guidelines (including uniform requirements) as different departments may have unique dress code requirements.

## 04.05.3  PARKING

You are provided with parking accommodations at your location of employment with Frontier. This benefit is provided by Frontier at no cost to you for one location only. A company parking pass must be returned upon your separation from Frontier. To the extent permitted by applicable law, you may be charged based on airport/parking fees if you fail to return a pass at separation or lose your pass.

## 04.05.4  TELEPHONE USAGE

Many customers and other people may form an opinion of Frontier based on your telephone conversations with employees or others. Because many may overhear conversations, telephone courtesy is vital. In order to keep telephone lines open for business calls, you are discouraged from making or receiving personal calls unless absolutely necessary. Personal calls, if necessary, should be made on your own time during your break or lunch period. Excessive personal calls or misuse of the telephone will result in disciplinary action. Making unauthorized long distance personal telephone calls at Frontier's expense is prohibited.

## 04.05.5  IDENTIFICATION BADGES

You are issued Frontier identification badges and access cards at the beginning of your employment and you are required to wear these badges whenever on Company premises. It is the responsibility of all Frontier employees to maintain security at Frontier's facilities at all times.

Rev17 02/19/14                                                   Workplace Guidelines

**FRONTIER**

| EMPLOYEE HANDBOOK | 04.05 Pg. 4 |

Your Frontier identification badge and access cards must be returned upon separation of employment from Frontier. To the extent permitted by applicable law, you will be charged a fixed amount if you fail to return a badge or access card at separation. You will also be responsible for replacement fees if your badge or access cards are lost or stolen. Your Frontier ID must be displayed on the outermost garment. If you encounter any individual not properly displaying Frontier identification on Frontier property, ask for proper identification. If identification is not provided, notify Frontier's Security Department immediately.

Vendors and various Technical Representatives from other companies performing work for Frontier over an extended period of time, normally considered over 30 days, may be issued a Company temporary vendor badge. These badges must be requested and approved by a Director or Vice President of the department.

All visitors to Frontier's General Office are required to register with the receptionist and receive a visitor badge.

## 04.05.6   CHARITABLE SPONSORSHIP REQUEST

Frontier strives to support nonprofit organizations' charitable efforts in the communities we serve. Forms and program policies can be found at: http://www.flyfrontier.com/who-we-are/company-info/corporate-responsibility/charitable-sponsorship-request

**FRONTIER**

| EMPLOYEE HANDBOOK | 04.05 Pg. 5 |
|---|---|

## 04.05.7   INSPECTION

To help maintain a safe, healthy and efficient working environment, Frontier reserves the right to conduct inspections of personal items brought onto Frontier premises. If a manager determines a search is necessary, your cooperation is required as a condition of employment.

An employee is subject to questions and personal property search at management's discretion. Personal items include items carried onto Company property such as backpacks, purses, etc. Any item you do not want searched should not be brought onto Company property. A search may also include areas such as Company vehicles, offices, cubicles, lockers, desks, filing cabinets, computer files, electronic mail and voice mail.

A company initiated search does not imply accusation or guilt. However, your cooperation is necessary. If you refuse, your employment with Frontier is subject to discipline up to and including termination.

## 04.05.8   OUTSIDE EMPLOYMENT

If you wish to work for another Company while employed with Frontier, you may do so as long as the outside employment does not constitute a conflict of interest (see 05.05.13 *Conflict of Interest*), as determined by Frontier. If you are in doubt as to whether working for another employer would constitute a conflict of interest; contact your manager or Human Resources for clarification.

## 04.05.9   RESIGNATION AND TERMINATION

Should an employee decide, for any reason, to separate their employment with Frontier, they must (1) provide notice of resignation in written form at least two (2) weeks prior to their final date of employment and (2) be in good standing as of their final date of employment (i.e. cannot be on corrective action at Final Termination Warning level or under investigation) to be considered eligible for rehire. Furthermore, any employee wishing to retire and possessing sufficient age and years of service to do so, must provide notice of their resignation in writing at least two (2) weeks in advance of their final date of employment. Failure to do so will result in denial of retirement benefits.

An employee may not resign or retire in order to avoid an active investigation or termination of employment for cause.

## ⁼RONTIER

| EMPLOYEE HANDBOOK | 04.05  Pg. 6 |
|---|---|

An exiting employee may be asked to grant an exit interview. Their manager or Human Resources representative may discuss the exiting employee's reasons for leaving and any other impressions that they may have about their time with Frontier.

Employees rehiring within 90 days of their separation of employment will not forfeit seniority (i.e. will have their seniority "bridged"). (Reference 03.05.04)

Should Frontier terminate an employee because of a reduction in the work force or elimination of a position, Frontier will attempt to give the employee notice in written form at least two (2) weeks prior. Any employee whose job is eliminated is encouraged to review any job openings at Frontier. At the time of separation all employees must complete a termination checkout form with their supervisor, manager or Human Resources. Also, you must return any Company property you have in your possession prior to leaving Frontier. This will include, but is not limited to: Company issued uniforms, identification badges, flight vouchers, employee handbooks, Company controlled manuals, tools, keys, credit cards, Company monies or any other Frontier property.

To the extent permitted by applicable laws, failure to return Frontier property may lead to a deduction in your final paycheck for an amount equal to the value of the unreturned items. A final accounting of your accrued, but unused vacation time, if any, will be included in your final paycheck. On the other hand, if your used vacation that has not been accrued, to the extent permitted by applicable laws, hours will be deducted from your final paycheck. To the extent permitted by applicable laws, if an employee resigns, Frontier will pay any accrued, but unused vacation pay awarded in the current calendar year only if the employee has at least one year of service.

FRONTIER AIRLINES (R. BRIGHAM) - 0000272
0532

**FRONTIER**

## 04.05.10 EXPENSE REIMBURSEMENT /ALLOWANCE

Frontier reimburses certain reasonable expenses incurred directly related to Frontier business when you travel and within the guidelines set forth below. Frontier will reimburse you for meals, travel, and related expenses when you are required to travel on company business. Frontier does not expect employees to be financially burdened due to required business travel. The reimbursement policies are designed to supplement the higher cost of meals and incidentals while traveling, but are not designed to replace what you would otherwise incur on a daily basis.

### 04.05.10.1 Lodging

Frontier maintains a list of which hotels must be used in each city to ensure that the lodging will be direct billed to Frontier. Lodging must be booked through Corporate Travel via Frontier Business Travel Request Form.

### 04.05.10.2 Meals and Incidentals:

You will receive $1.65 per hour in meal reimbursement for time spent away from your normal work location, outside of your metropolitan area. You should not expect reimbursement for meals and incidentals if you are performing work away from your normal work location, but are still within the same metropolitan area. Frontier does not expect to reimburse you for the time incurred in your normal daily commute.

- If you leave your home, the trip time commences upon departure and ends upon your return minus your normal daily commute time.
- If you leave from your work location and return to your home, the hours should be reduced by half your normal daily commute time.

If during your trip a meal is purchased by someone else or the hotel provides a meal, you should adjust your meal reimbursement hours by the following guidelines:

- Breakfast - reduce by 5 hours
- Lunch - reduce by 7 hours
- Dinner - reduce by 12 hours

If you request reimbursement for more than the rate per hour above allows, then itemized receipts are required. This expense reimbursement requires approval of your Director or Vice President. Frontier does not reimburse for entertainment expenses (movies, videos, concert tickets, music downloads etc.). Frontier does not reimburse for alcoholic beverage purchases.

**FRONTIER**

EMPLOYEE HANDBOOK                                          04.05  Pg. 8

**04.05.10.3 Rental Cars**

Occasionally, Frontier will approve the use of rental cars. If a rental car is required for Company travel, the following guidelines should be followed: when picking up a rental car all additional insurance is to be waived as well as the tank refueled before returning the vehicle. GPS systems and other upgrades will not be approved or paid by Frontier. Car rentals must be booked through Corporate Travel via Frontier Business Travel Request Form and approved by your Director or Vice President. A rental car should be requested for any vehicle travel above 100 average miles per day instead of driving your personal vehicle.

## 04.05.11 USE OF PERSONAL VEHICLE

The use of a personal vehicle for company purposes, beyond your normal commute to work, is reimbursable. In lieu of using your personal vehicle, you should request a rental car if their work assignment requires you to drive more than an average of 100 miles per day. Generally, any miles exceeding your normal commute (mileage to where you normally work) or use of your personal car after arriving at your base location will be reimbursed.

> *NOTE:   For the purposes of mileage reimbursement the Denver General Office and the Denver International Airport are considered the same location.*

**04.05.11.1 Mileage Reference Guide**

- DEN GO to UAL Simulator Center................................... 12.4 miles
- Mileage is calculated based on miles driven, but should not exceed the calculated mileage of online map services (i.e., Google Maps, MapQuest, etc.) or similar services.

**04.05.11.2 Other**

Any request for reimbursement for any item not covered above requires Director written approval. Expense policies may be reviewed by internal audit for compliance by submitters and approvers.

## 04.05.12 HOW TO SCHEDULE COMPANY TRAVEL

All travel for Company business must be arranged through Corporate Travel.

Rev14 04/24/13                                      **Workplace Guidelines**

**FRONTIER**

| EMPLOYEE HANDBOOK | 04.05 Pg. 9 |
|---|---|

When traveling on Company business, complete the Frontier Business Travel Request Form, found on Ultipro; click on Electronic Forms and send it to Corporate Travel at F9corporatetravel@flyfronter.com.

All Flight and Hotel requests must be approved by a Manager or above. All car rentals and expenses outside of the standards require the Director or Vice President's written approval.

## 04.05.13 HOW TO SUBMIT AN EXPENSE FORM

To obtain reimbursement for travel costs, you must complete an Expense Report. When traveling, all expenses for each trip must be included on an Expense Report. You can obtain the expense report on UltiPro.

- Click on My Company and choose electronic forms from the dropdown menu.
- Click on Employee Expense Form.
- Please complete the form and submit it along with a legible copy of any supporting documentation, if applicable, to your Manager or Director for approval. Supporting documentation should include legible itemized receipts.
- The approved expense report should be sent to the Accounts Payable department for processing via e-mail (*ap@flyfrontier.com*) or Company mail (Attn: AP Expense Claims at DEN GO).

It is your responsibility to submit your expense report each week as you incur authorized, reimbursable expenses. In order for the Company to keep records and accounting accurate and current, expense reports or vouchers older than 90 days may not be honored.

*NOTE: If no receipt or documentation is available, then the employee must attach a statement detailing such expenditures.*

FRONTIER AIRLINES (R. BRIGHAM) - 0000275
0535

**≡FRONTIER**

EMPLOYEE HANDBOOK                                      04.05  Pg. 10

Page Intentionally
Left Blank

Rev17 02/19/14                                  Workplace Guidelines

**FRONTIER**

## STANDARDS OF CONDUCT

Frontier Airlines is proud of the fundamentals established to help guide our employees through their employment with the company.

To ensure that our mission is achieved, standards of conduct are needed as a guideline to help everyone work together efficiently, effectively, and harmoniously. By accepting employment with Frontier Airlines, you have a responsibility to the company and to your fellow employees to use good judgment and appropriate behavior when dealing with customers, suppliers and each other. Failure to do so may result in corrective action, up to and including termination of employment. The purpose of standards of conduct is not to restrict your rights, but rather to be certain that you understand what conduct is expected and necessary. When each person is aware that he/she can fully depend upon fellow workers to follow the standards of conduct, our organization will be a better place for everyone to work.

Frontier depends on its employees to conduct themselves in a professional manner and to treat each other with respect. Employees are not to engage in behavior that could bring discredit to Frontier. Physical violence is never acceptable behavior. Work areas are expected to be free from inappropriate posters or pictures (hard copy or in the computer) and avoid language or jokes that could offend others. Employees are expected to communicate effectively with everyone they work with when performing their duties. However, it is completely acceptable for employees to speak another language while engaged in personal conversation.

Dishonesty, theft, willful destruction of company property or other violations of these standards of conduct will not be tolerated and could lead to corrective action, up to and including termination of employment. If you witness any act that violates this policy, report the incident immediately to a supervisor, or manager.

### 05.05.1  ANTI-DISCRIMINATION

Frontier Airlines is committed to treating every patron with courtesy and respect. Frontier prohibits its employees from discriminating against patrons based on race, color, national origin, ancestry, religion, gender, or age. Improper discrimination will not be tolerated. Frontier's non-

**FRONTIER**

EMPLOYEE HANDBOOK                                                05.05 Pg. 2

discrimination policy applies to all interactions between Frontier employees and patrons. Frontier employees shall not use race, color, ethnicity, national origin or religion to assess whether a patron should be reported to law enforcement, except where those factors are part of a description of a particular suspect.

## 05.05.2  HARASSMENT

Frontier employees are expected to show genuine respect and kindness to each other. We want to guard against inappropriate comments, unwise jesting, improper actions or indiscrete situations that could be misunderstood by others.

Frontier complies with federal and state equal employment opportunity laws and strives to keep the workplace free from all forms of unlawful harassment. The Company does not and will not permit employees to engage in unlawful discriminatory practices, sexual harassment, or harassment based on race, color, religion, gender, sexual orientation, gender identity, marital status, national origin, creed, age, disability, genetic information, or veteran status, as well as any other status protected by applicable federal or local law. Unlawful harassment by any employee, supervisor, manager, or person doing business with the Company is strictly prohibited.

Frontier also strives to provide and foster a safe environment, free from workplace violence, where people can work without fear of psychological or physical harm. Frontier considers harassment in all forms to be a serious offense and prohibits retaliation against anyone who reports any such violation. Harassment is unwelcome behavior that creates an intimidating, hostile, or offensive work environment that unreasonably interferes with an individual's work performance, or otherwise affects an individual's employment opportunities.

Workplace violence is any behavior that management identifies as (i) verbally or physically threatening; (ii) intimidating; or (iii) harassing in nature. This includes racially motivated comments, religious epithets, sabotage, vandalism of personal and company property, or verbal or physical threats of any kind.

Rev23 02/06/15                                      **Standards of Conduct**

**FRONTIER**

| EMPLOYEE HANDBOOK | 05.05  Pg. 3 |
| --- | --- |

If you believe you have been subjected to harassment, or workplace violence, you should directly inform the offending person that his or her conduct is unwelcome and must stop. If you feel uncomfortable in doing so, if you do not wish to communicate directly with the offending person, or if your communication is unsuccessful, immediately bring the matter to the attention of your manager or Human Resources. You may also use the Company hotline, but please note that anonymous complaints are inherently more difficult to investigation and resolve. Any complaint concerning these issues will be promptly investigated and handled as confidentially as possible.

Any employee found to have engaged in conduct that violates this policy will be subject to immediate corrective action, up to and including termination from employment.

Frontier prohibits retaliation against any employee for making any good faith complaint regarding conduct prohibited by this policy, or for participating in any investigation concerning such a complaint. If you believe you have been subject to any such retaliation you must promptly notify the Vice President, Human Resources & Labor Relations, or a designee.

Frontier recognizes that false accusations of harassment can have serious effects on innocent employees. As such, we will approach each complaint investigation with the interests of all employees in mind. We trust that all employees will act in good faith in reporting harassment.

**05.05.2.1  Sexual Harassment**

Because sexual harassment raises issues that are, to some extent, unique, Frontier believes it warrants separate emphasis. Frontier strives to provide all employees with an enjoyable work environment that is free from all forms of illegal discrimination, including sexual harassment. The term "work environment" includes any location in which an employee is performing any duty or interacting with other employees in the scope of their employment, including Company social functions.

Frontier strongly opposes sexual harassment and inappropriate sexual conduct. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when:

- Submission to such conduct is made explicitly or implicitly a term or condition of employment;

Rev23 02/06/15                                                    **Standards of Conduct**

**FRONTIER**

EMPLOYEE HANDBOOK                                                    05.05  Pg. 4

- Submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; or
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

All employees are expected to conduct themselves in a professional and business-like manner at all times. Inappropriate conduct that could lead to a claim of sexual harassment is expressly prohibited by this policy. Such inappropriate conduct includes, but is not limited to, sexually implicit communications whether in:

- Written form: cartoons, posters, calendars, notes, letters, electronic mail
- Verbal form: comments, jokes, foul or obscene language of a sexual nature, gossiping or questions about another's sex life, or unwanted requests for dates
- Physical gestures and other nonverbal behavior: unwelcome touching, grabbing, fondling, kissing, massaging, and brushing up against another's body

If you believe you have been subjected to any such conduct, you should directly inform the offending person that his or her conduct is unwelcome and must stop. If you feel uncomfortable in doing so, if you do not wish to communicate directly with the offending person, or if your communication is unsuccessful, immediately bring the matter to the attention of your manager or Human Resources. You may also use the Company hotline, but please note that anonymous complaints are inherently more difficult to investigation and resolve. Any complaints concerning these issues will be promptly investigated and handled as confidentially as possible. If a determination is made that an employee engaged in inappropriate conduct, that employee will be subject to disciplinary action, up to and including termination from employment.

## 05.05.3   AMERICANS WITH DISABILITIES ACT (ADA)

### 05.05.3.1  Policy
It is everyone's responsibility to adhere and support the Americans with Disabilities Act (ADA). This includes all leadership, staff and employees.

Rev23 02/06/15                                            **Standards of Conduct**

**FRONTIER**

EMPLOYEE HANDBOOK                                                    05.05  Pg. 5

It is the policy of Frontier to not discriminate against qualified individuals with disabilities in regard to application procedures, hiring, advancement, discharge, compensation, training, or other terms, conditions, and privileges of employment.

Additionally, the ADA requires employers to reasonably accommodate a qualified individual with a disability. It is the policy of Frontier to comply with all federal, state, and local laws concerning the employment of persons with disabilities.

Frontier will reasonably accommodate qualified individuals with a disability so they can perform the essential functions of the job in question.

An individual, who can be reasonably accommodated for the job in question, without undue hardship, will be given the same consideration for that position as any other employee or applicant.

All employees are required to comply with safety standards. Applicants who pose a direct threat to the health or safety of other individuals, including customers and co-workers, in the workplace, which threat cannot be eliminated by reasonable accommodation, will not be hired. Current employees who pose a direct threat to the health or safety of other individuals, including customers and co-workers, in the workplace will be placed on appropriate leave until an organizational decision has been made in regard to the employee's immediate employment situation.

The Human Resources Department is responsible for implementing this policy, including resolution of reasonable accommodation, safety, and undue hardship issues.

### 05.05.3.2  Definitions

In implementing this policy, Frontier will be guided by the then- applicable definitions stated in the ADA or in case law construing the ADA, and applicable state and local law. In the event of any conflict between definitions in the ADA and definitions in this policy, the legal definitions will control. The following discussion is provided for general guidance of employees and applicants in understanding the policy of Frontier.

**FRONTIER**

EMPLOYEE HANDBOOK                                                05.05 Pg. 6

- "Disability" refers to a physical or mental impairment that substantially limits one or more of the major life activities of an individual. An individual who has such an impairment, has a record of such an impairment is also deemed a "disabled individual". An individual may also be deemed "disabled" if that person is regarded as having such an impairment. However, in the "regarded as" instance, the situation is more complicated. Under amendments to the ADA in 2008, if the condition is transitory and minor, defined as having an actual or expected duration of 6 months or less, then the condition does not normally qualify as a disability under federal law.

  Generally, ameliorative measures such as medications and medical devices will not be considered in making a disability determination, although ordinary eyeglasses may be taken into consideration. So, for example, the mere fact that a person wears ordinary eyeglasses will not qualify that person as "disabled." On the other hand, the fact that a person has a hearing aid or takes medications to address the impairment will not disqualify that person as being "disabled" if the person otherwise meets the definition of "disabled."

- "Major life activity" may include things such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating or working. A "major life activity" may also include bodily functions such as functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive systems.

- "Direct threat to safety" refers to a significant risk to the health or safety of the employee in question or to others that cannot be eliminated by reasonable accommodation.

- "A "qualified individual with a disability" refers to an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or has applied for.

- "Reasonable accommodation" refers to making existing facilities readily accessible to and usable by individuals with disabilities, including but not limited to: job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modification of examinations, adjustment or modification of training materials, adjustment or modification of policies, and similar activities.

Rev23 02/06/15                                         **Standards of Conduct**

**FRONTIER**

- "Undue hardship" refers to an action requiring significant difficulty or expense by the employer. The factors to be considered in determining an undue hardship include: (1)The nature and cost of the accommodation; (2) The overall financial resources of the facility at which the reasonable accommodation is to be made; (3) The number of persons employed at that facility; (4) The effect on expenses and resources or other impact upon that facility and/or the other employees at that facility; (5) The overall financial resources of Frontier; (6) The overall number of employees and facilities; (7) The operations of the particular facility as well as the entire Company; (8) The relationship of the particular facility to Frontier. These are not all of the factors but merely examples.
- "Essential job functions" refers to those activities of a job that are the core to performing the job in question.

## 05.05.3.3  PROCEDURE

A qualified employee with a disability who would like to receive a reasonable accommodation should complete the Employee Accommodation Request Form and contact Human Resources, at hr@flyfrontier.com or call (720) 374-4200 and ask to be transferred to Human Resources. The employee should provide information about the nature of his or her disability, and request an accommodation. Once Human Resources receives an employee's documentation, they will engage in an interactive process with the employee. This interactive process consists of discussion among the employee, the employee's supervisor or manager, and Human Resources in an effort to determine the most appropriate workplace accommodation. Human Resources may ask for additional documentation of the employee's medical condition, and based on that information, will determine whether a reasonable accommodation is appropriate based on the impact of a disability. Under the law, the Company chooses which reasonable accommodation is appropriate.

## FRONTIER

**EMPLOYEE HANDBOOK**                                          **05.05  Pg. 8**

### 05.05.3.4  CONFIDENTIALITY

Information acquired by Human Resources including disability information, medical information or diagnoses, psychological information, case notes, and records will be maintained confidentially. Information relating to a person's disability is confidential and may only be released with the person's permission. In limited circumstances, sharing of disability-related information is permissible on a need-to-know basis. For example, when an employee receives a workplace accommodation, only the details of the accommodation are shared with the employee's supervisor.

### 05.05.3.5  COMPLAINT PROCEDURE

A person with a disability who believes his or her disability is not being accommodated, or who has experienced discrimination or harassment on the basis of disability, may file a complaint with the Vice President, Human Resources & Labor Relations or designee.

Issues that may form the basis of a complaint include, but are not limited to, a denial of a requested accommodation, the inadequacy of an accommodation, the inaccessibility of a program or activity due to disability, and discrimination or harassment based on disability.

### 05.05.4   WHISTLEBLOWER POLICY

> **Policy for Reporting Complaints Regarding Accounting, Internal Accounting Controls or Audit Matters**

> #### 05.05.4.1  Introduction

> Frontier Airlines, Inc. ("Frontier") is committed to high standards of ethical, moral and legal business conduct. It seeks to facilitate disclosure regarding accounting and auditing matters, encourage proper individual conduct, and provide notice to the Audit Committee of potential accounting problems before they have serious consequences. Accordingly, Frontier has established the procedures set forth below for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters (collectively, "Accounting Matters"). These procedures have been developed to ensure that Frontier employees can submit concerns regarding questionable Accounting Matters in a confidential, anonymous manner without fear of dismissal or retaliation of any kind.

Rev26 04/16/15                                          **Standards of Conduct**

## FRONTIER

| EMPLOYEE HANDBOOK | 05.05  Pg. 9 |
| --- | --- |

### Scope of Matters Covered

These procedures relate to complaints or concerns regarding Accounting Matters, including, without limitation, the following:

- fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of Frontier
- fraud or deliberate error in the recording or maintaining of financial records of Frontier
- deficiencies in or noncompliance with Frontier's internal accounting controls
- misrepresentations or false statements to or by an officer of Frontier or an accountant regarding a matter contained in the financial records, financial reports or audit reports of Frontier
- deviation from full and fair reporting of Frontier's financial condition
- conduct which may reasonably be believed to be a violation of the Foreign Corrupt Practices Act or other anti-corruption laws
- unlawful activities; or
- mail fraud, wire fraud, bank fraud, or securities fraud

### Submission and Receipt of Complaints

**General** Persons with complaints or concerns regarding Accounting Matters should promptly report them to the Company's General Counsel by mail addressed to General Counsel, Frontier Airlines, 7001 Tower Road, Denver, CO 80249, or by email to whistleblower@flyfrontier.com. The General Counsel will maintain the confidentiality and anonymity of persons making complaints to the fullest extent practicable and subject to existing legal or regulatory requirements.

**Anonymous Third Party Whistleblower Hotline Service** Frontier employees who have complaints or concerns regarding Accounting Matters may, rather than submitting such complaints directly to the Company through its General Counsel, submit them confidentially and anonymously by voice mail through Frontier's Whistleblower Hotline Service. All Complaints submitted to the Hotline Service will initially be reviewed by Frontier's Vice President of Human Resources. The Hotline Service voicemail may be reached by calling 800-837-9023.

### Content of Complaints

To assist in the response to or investigation of a complaint, the complaint

Rev26 04/16/15                                         Standards of Conduct

**FRONTIER**

| EMPLOYEE HANDBOOK | 05.05  Pg. 10 |
|---|---|

should be factual rather than speculative, and contain as much information as possible to allow for proper assessment of the nature, extent and urgency of the matter that is the subject of the complaint. Complaints that contain unspecified wrongdoing or broad allegations without verifiable evidentiary support will be less likely to result in investigation. Anyone filing a complaint concerning a violation or suspected violation of Accounting Matters must be acting in good faith and have reasonable grounds for believing the information disclosed indicates a violation. Any allegations that prove not to be substantiated and have been made maliciously or with knowledge of their falsity will be viewed as a serious disciplinary offense.

### Retention of Complaints

Written copies of all complaints will be retained by Frontier (as appropriate) in accordance with the Company's Records Retention and Destruction Policy and applicable law.

### Treatment of Complaints

All complaints will be taken seriously and addressed promptly, discreetly and professionally. If the Vice President of Human Resources determines that a complaint submitted to the Whistleblower Hotline pertains to an Accounting Matter, he/she will submit the complaint to the General Counsel for investigation. The General Counsel will evaluate each complaint and may conduct an investigation based upon such complaint. A summary of complaints received under this policy will be communicated to the Audit Committee on a quarterly basis (or a more frequent basis should conditions warrant more timely action). The Audit Committee may, at any time, request a briefing by the General Counsel or other person(s) conducting an investigation regarding their findings. The Audit Committee shall have full authority to determine the corrective action, if any, to be taken in response to a complaint.

**FRONTIER**

EMPLOYEE HANDBOOK                                                05.05  Pg. 11

## Non-Retaliation

It is Frontier's policy to comply with all applicable laws that protect our employees against unlawful discrimination or retaliation by us or our agents as a result of their lawfully reporting information regarding, or their participation in, investigations regarding Accounting Matters. If any employee believes that he or she has been subjected to any harassment, threat, demotion, discharge, discrimination or retaliation by Frontier or its agents for reporting complaints regarding Accounting Matters in accordance with this policy, he or she may file a complaint with our Vice President of Human Resources. If it is determined that an employee has experienced any improper employment action in violation of this policy, we shall promptly take appropriate corrective action.

## 05.05.5   EMPLOYMENT OF RELATIVES AND PERSONAL RELATIONSHIPS IN THE WORKPLACE

The employment of relatives or individuals involved in a dating or personal relationship may cause potential or actual conflicts of interest or favoritism, or the appearance of a conflict or favoritism. Frontier recognizes that even the appearance of potential conflict or favoritism can damage credibility, impair department morale, and undermine an employee's effectiveness. Accordingly, Frontier does not permit employees who are related or involved in a dating or personal relationship to have direct supervisory authority over one another. Frontier considers "direct supervisory authority" to include situations where one individual has direct influence over another individual's employment through decisions, recommendations, or judgment related to such matters as assessment of performance, work responsibilities, salary, career growth, or discipline.

Frontier permits the employment of relatives or individuals involved in a personal relationship if their employment does not, in the opinion of the Senior Director of HR or the department head, create an actual, potential, or perceived conflict of interest. Employees who have relatives seeking employment at Frontier or who are involved in a dating or personal relationship with individuals seeking employment at Frontier, which may violate this policy, must disclose the relationship to the Vice President or Director in charge of the department and Human Resources.

FRONTIER AIRLINES (R. BRIGHAM) - 0000287
0547

**FRONTIER**

EMPLOYEE HANDBOOK                                        05.05  Pg. 12

Additionally, if an employee becomes related to another employee, or involved in a dating or personal relationship with another employee, and either employee has direct supervisory authority over the other, the relationship must be immediately reported to the Vice President or Director in charge of the department and to Human Resources.

For the purpose of this guideline, a relative is defined as spouse, domestic partner (with an affidavit on file), parent, grandparent, child, grandchild, brother, sister, brother-in-law, sister-in-law, father-in-law, mother-in-law, stepparent, stepbrother, stepsister and stepchild.

## 05.05.6   COMPANY PROPERTY AND VEHICLE USAGE

Employees may not use Company equipment and tools for personal use.

If you are authorized to operate a Frontier vehicle in the course of your assigned work, or if you operate your own vehicle in performing your job, you must adhere to the following rules:

- You must be a licensed driver in your state of residence or as required by your airport authority.
- Frontier provides insurance on Company vehicles; however, you will be considered completely responsible for your actions, including fines, moving or parking violations incurred.
- Persons unauthorized or not employed by Frontier cannot operate or ride in a Company vehicle.
- Prior to operation of any Company vehicle, your manager or designated person will train you on the appropriate steps to take if you are involved in an accident.
- We encourage you to keep the vehicle clean at all times and to wash and vacuum the vehicle as often as necessary. You will be reimbursed for your reasonable expense of keeping the vehicle clean. Please retain any receipts for reimbursement.

You may be excluded from driving a Company vehicle if you have had a major traffic violation within the last 5 years including:

- A DWI, drug violation or refusal to take a blood alcohol test;
- Excessive speeding (15mph above the speed limit);
- Reckless driving or racing;
- License revocation or suspension;
- Leaving the scene of an accident;
- Any felony involving the use of an auto; or

**FRONTIER**

| EMPLOYEE HANDBOOK | 05.05 Pg. 13 |
|---|---|

- More than 2 moving violations (speeding, improper lane change, etc.).

## 05.05.7   SMOKING ON COMPANY PREMISES

Frontier is committed to providing its employees with a comfortable working environment. Due to the well-documented dangers of tobacco smoke, Frontier seeks to limit the usage of tobacco on its various premises. Employees are strongly encouraged not to smoke. All enclosed areas will be considered nonsmoking areas and all airport locations are subject to the regulations put in place by airport authorities. Additionally, Frontier complies with the Colorado Clean Air Act and all other applicable state laws. Employees in Colorado are not permitted to smoke within a 15-foot radius of designated entry ways.

## 05.05.8   PERSONAL PROPERTY

Frontier assumes no responsibility for the loss of or damage to an employee's personal property on Company premises or aircraft. Employees are responsible for securing their personal property and should not leave items unattended.

## 05.05.9   PERFORMANCE REVIEWS

Because it is important to have clear and consistent feedback given to you, it is our policy for supervisors to conduct performance reviews with you on a periodic basis. During the first nine (9) months of the initial employment period, you may be subject to periodic informal reviews by your supervisor. Upon completion of your one (1) year anniversary you may receive a formal performance review. You may receive periodic performance reviews thereafter.

## 05.05.10 BUSINESS ETHICS POLICY

### 05.05.10.1 Access to Personnel Files
Personnel files are maintained on each employee. The purpose of a personnel file is to maintain an accurate record of each Employee's work history, current employment and benefit status with Frontier. Company forms, documents and correspondence relevant to an employee's status are maintained and protected in either a permanent file or electronically

| Rev26 04/16/15 | Standards of Conduct |
|---|---|

**FRONTIER**

EMPLOYEE HANDBOOK                                                      05.05  Pg. 14

stored within UltiPro. Each employee has the responsibility to ensure that their records are current. Any updates or changes to the following should be entered into UltiPro by the employee within one business day:

- Name
- Address
- Telephone number
- Dependents
- Marital Status
- Beneficiary Information
- Medical, Dental Benefit Status (but not medical information)
- Contact in case of emergency
- Withholding tax information (W-4)

All changes should be made online through the UltiPro system.

All records maintained in the personnel files of employees are Frontier's property. Employees are allowed to review their own personnel file in the presence of a representative of the Human Resources Department. No employee may remove, machine copy or alter any documentation in their personnel file except as required by applicable law. Upon request, Frontier will provide information to outside organizations about current and former Company employees. The information that Frontier will release is limited to dates of employment, job title and verification of wages. No other information is provided without written consent from the employee or as required by law.

## 05.05.11 CONFIDENTIAL INFORMATION

Frontier considers all non-public information about Frontier, and our employees to be highly confidential.

- Company information includes, but is not limited to operating and financial information; compensation data; marketing strategies; pending projects and proposals; and operations or maintenance manuals.
- Employee information includes, but is not limited to employee and dependent names; employee and dependent addresses; employee and dependent phone numbers; employee and dependent social security numbers; employee and dependent dates of birth; any other personally identifiable information.

Rev26 04/16/15                                              **Standards of Conduct**

**FRONTIER**

Individuals who manage or use this type of information are required by Frontier to protect this information from unauthorized modification, disclosure, and destruction. The means of protection used shall be commensurate with the risk of exposure, the value of the information and the available computing resources. Employees are not authorized to gather, maintain, or disseminate personally identifiable information for any purpose or remove such information from Frontier's premises without written permission as permitted by applicable law, except when required for a business purpose or in the ordinary daily course of performing duties on behalf of Frontier. All requests to release such information must be directed to the Director or Vice President of the department or Human Resources. Personally identifiable information should not be transmitted to anyone outside Frontier without proper safeguards to protect the data during transit. Personally identifiable information should not be stored on an unencrypted laptop or on CD, DVD, memory stick, or any other form of portable media. Human Resources will take reasonable steps, in conjunction with technical assistance from Information Technology, to protect personal data from unauthorized access, including developing other personal identification methods and limiting access to such data to those employees with a business need to know. All departments maintaining paper or electronic personal data should follow similar protection procedures, including discontinuing the use or dissemination of social security number as an identifier on documents and reports. Social security number confidentiality will be maintained to the fullest extent required by law.

## 05.05.12 GIFTS OR TIPS

Approval from management is required before an employee may accept a gift of any kind from a customer, supplier or vendor representative, unless the gift is valued at less than $50. The term "gift" in this policy is used in its broadest sense and includes gifts, entertainment, services and favors. This policy is not intended to prohibit ordinary business entertainment or items representing reasonable Frontier advertising, publicity, or sales promotions.   Accepting tips from customers is also prohibited. If a customer insists on tipping, you should graciously state you are happy to help, but that Frontier employees do not accept tips. If you are pressed to accept a tip, you should turn the money in to the general tip fund from which management pays for employee recognition and activities.

**FRONTIER**

## 05.05.13 CONFLICT OF INTEREST

A conflict of interest will occur in situations where the personal interests of the employee conflict with their duties and responsibilities to Frontier. This includes an actual conflict or the appearance of a conflict of personal and business interests. You may not engage in outside business interests or employment including independent consulting services which compete with Frontier. Non-management positions with other airlines are generally not considered conflicts of interest. A conflict of interest that interferes with your Frontier responsibilities and duties or is detrimental to Frontier's image or interest is not permitted. You are required to disclose all outside employment to your management.

Approval from the Chief Financial Officer (CFO) is required before an employee may buy stock or otherwise take an ownership interest in any private placement, Initial Public Offering (IPO) or pre-IPO of any Company that is or may become a supplier or vendor.

## 05.05.14 CONFIDENTIAL INFORMATION AND INSIDER TRADING

As an essential part of our work, we have access to a large amount of Frontier's operational, financial, and corporate information, some of it highly confidential and of considerable value to Frontier™. Each person who possesses or uses this confidential information holds a special position of trust and confidence. We have an important responsibility to keep this information confidential until Frontier Corporate Communications makes it public via press release, conference call, the website, or through another public venue. This means you should not discuss this material information outside of work and should only discuss it at work when necessary. Please reference Media Contact and Official Statements on Behalf of Frontier, section 05.05.17 for further details.

FRONTIER AIRLINES (R. BRIGHAM) - 0000292
0552

# FRONTIER

We also have an important responsibility to avoid trading in Company stock before material information is disclosed to the public. Company policy is to publicly disclose material information on a prompt and timely basis in accordance with the federal securities laws. Trading in Company stock on the basis of material information before it is made public is not only against Frontier's policy, it is also illegal. This illegal insider trading can cause significant harm to Frontier's reputation for integrity and ethical conduct and result in significant liability for the individuals participating in the insider trading. Accordingly, all employees must comply with the procedures described in this policy. Individuals who fail to comply with this policy are subject to disciplinary action and potential violations of the federal securities laws.

Under the federal securities laws, an employee who possesses material nonpublic information or "inside information" is an "insider." As an insider, you are subject to legal action if you buy or sell stock on the basis of this inside information. As an insider, you can also be subject to legal action if you cause others to buy or sell Company stock on the basis of this inside information. While it is impossible to label clearly what is inside information, some of the general areas include earnings or financial results, favorable or unfavorable business developments, labor negotiations, major new contracts, daily and month-to-date load factors, on-time performance, *EarlyReturns*® numbers, average fares, city opening plans, unusual gains or losses in major operations, major marketing changes, and significant capital investment plans.

## 05.05.15 SOLICITATION

Solicitation refers to the act of approaching another (in person, by mail, or through any electronic medium) with the intent to petition or request support (such as, monetary support or personal commitment).

> **Example:** Distribute literature, hold meetings, send electronic mail, conduct surveys, place receptacles for donations or communications, or post advertisements on bulletin boards on behalf of non-Frontier business enterprises.

Solicitation in working areas during working times is prohibited unless prior authorization has been obtained from the Human Resources Department. In limited circumstances, approval for solicitation related to charitable events or organizations can be obtained. Examples include fund raising activities for employee hardship (applies to the employee and not the employee's family member). Authorization may also be given

**FRONTIER**

EMPLOYEE HANDBOOK                                                05.05 Pg. 18

to an organization with which Frontier has established a business-related partnership. All employee or vendor requests must be approved in advance by Frontier Human Resources.

Working areas are any areas where employees conduct or may conduct work on behalf of Frontier and may include break rooms if work, such as briefings, is conducted there. All the crew lounges are considered work areas. Working time does not include such time as before or after work, breaks, or lunch periods. Nonemployees must not solicit or distribute merchandise or literature on Frontier's premises without approval from Human Resources.

## 05.05.16 USE OF COMPANY LOGO AND NAME

Frontier logos may not be used without prior written consent from Frontier's Marketing department. It is a violation of our agreement with Frontier's Airline Partners to use their names, logos, or its subsidiaries without prior written consent. All requests for the use of these names and logos should be directed to a Director or Vice President of the department for approval.

## 05.05.17 MEDIA CONTACT AND OFFICIAL STATEMENTS ON BEHALF OF FRONTIER

As a Frontier employee, you will likely have access to a significant amount of information about Frontier, because Frontier values open and honest communication with its employees. Frontier also values and works very hard to maintain an appropriate image within the aviation, business, and consumer markets via positive relationships with the media. Frontier employees must comply with certain disclosure laws and regulations. Accordingly, employees must obtain approval from Corporate Communications prior to speaking with the media about Frontier. These simple procedures allow Frontier to maintain its public image, provide a consistent and appropriate message to the media and general public, and ensure compliance with the disclosure laws and regulations. If you have any questions regarding media or external communications, please contact your department head and/or Corporate Communications at CorpComm@flyfrontier.com.

Rev26 04/16/15                                                **Standards of Conduct**

**FRONTIER**

EMPLOYEE HANDBOOK                                                06.05 Pg. 1

## COMPENSATION

### 06.05.1  PAY PERIOD

Frontier operates on a bi-weekly pay system with twenty-six (26) pay periods a year. Generally, the pay period begins on Monday and ends on Sunday. Payday for most employees is the Thursday immediately following the day upon which the pay period ends. Paychecks will be distributed so that they are available to employees on every other Thursday.

#### 06.05.1.1  Direct Deposit

Direct payroll deposit is the automatic deposit of your pay into the financial institution account(s) of your choice. In addition, it may be possible for you to authorize Frontier to make additional deductions from your paycheck, such as for Christmas Clubs, credit union loan payments, or payroll savings plans. Employees may contact management, utilize Ultipro, or e-mail *F9payroll@flyfrontier.com* for details and the necessary authorization forms.

## FRONTIER

## 06.05.2  OVERTIME PAY

### 06.05.2.1  Exempt (Salaried) Employees

Exempt employees such as management and other administrative positions are paid on a salaried basis.

Salaried employees are not eligible for overtime pay due to their exempt status under applicable law and do not receive "step" increases. Salaried employees are evaluated annually and may receive salary adjustments based on their performance and Frontier's current policies. All salary adjustments are at the discretion of Frontier. If a salary adjustment becomes effective during a pay period, it will become effective for the entire pay period.

### 06.05.2.2  Non-Exempt (Hourly) Employees

Non-exempt employees normally are classified as hourly and their pay is determined by either a pay structure (i.e., customer service agent, reservation agent, etc.) or a grade level. Many hourly job categories consist of a starting pay rate, a series of periodic pay increases or "steps," and a maximum pay rate. If a "step" increase becomes due during the pay period, it will become effective for the entire pay period. No employee is allowed to be paid at an "off the scale" rate without the written authorization of the CFO or COO. Hourly pay scales are reviewed and may be adjusted at the discretion of Frontier. Hourly employees are eligible to receive overtime in accordance with applicable laws and Frontier policy.

## 06.05.3  OVERTIME

Sometimes business conditions and demands require that overtime be worked by employees. Employees will be given as much notice as possible when overtime will be required. However there will be times, due to operational requirements, that it will not be possible to give any notice prior to being required to work overtime.

As permitted by the "air carrier exemption" to the Fair Labor Standards Act, full-time and part time hourly employees overtime premium is paid at a rate equal to one and one-half (1 1/2) times the base rate of pay for each hour worked in excess of eighty (80) hours in any pay period. Managers and other overtime exempt personnel are paid on a salary basis.

FRONTIER AIRLINES (R. BRIGHAM) - 0000296
0556

**FRONTIER**

| EMPLOYEE HANDBOOK | 06.05  Pg. 3 |

Actual vacation time, sick time and bereavement/funeral pay will not be used in the calculation of overtime. At no time will an employee be paid at the overtime rate for time incurred because of a shift trade. All shift trades will be paid at the employee's regular rate of pay, unless the trade is a Company directive based on business demands. All overtime must be approved by the employee's Supervisor. For purposes of calculating overtime, the normal workweek begins at 12:01 a.m. on Monday and ends at 12:00 midnight on Sunday. Employees working in California are governed by that state's overtime rules: Please contact Human Resources or your manager for more information.

### 06.05.3.1  Paycheck Errors

Occasionally errors will occur in an employee's payroll check. If you think you have been paid incorrectly or an improper deduction was taken from your pay, contact your supervisor or manager immediately. The supervisor will investigate and resolve the issue with the Payroll Department. All paycheck errors must be reported on a Payroll Discrepancy form and signed by your supervisor. These forms must then be forwarded to the Payroll Department. A paycheck cannot be initiated until the Payroll Department receives the Payroll Discrepancy form. Overpayments must be reported immediately by you to your supervisor or manager, and Payroll and will be corrected at that time, to the extent permitted by law, or on your next paycheck, or as otherwise allowed by law.

### 06.05.3.2  Hours of Work and Time Records

We serve our customers every day of the year. Work schedules must provide adequate coverage each day of the week and in some departments, twenty-four (24) hours a day. Therefore, many employees will be assigned to a rotating shift and/or days off work schedule.

### 06.05.3.3  Timekeeping Policy

Federal and State regulations require Frontier to accurately record time worked for employees. As such, it is the responsibility of each employee to follow the approved timekeeping process utilized by their respective work-group. Failure to follow the applicable process may result in disciplinary action.

Falsification or misrepresentation of time or attendance information is grounds for immediate termination of employment.

Rev17 02/19/14                                                          **Compensation**

## FRONTIER

**EMPLOYEE HANDBOOK**                                      06.05  Pg. 4

## 06.05.4  TRAINING AND TRAVEL TIME COMPENSATION

At times, Frontier may require you to travel to different locations on company business or for job-related training. If you are traveling on company business (includes training), you will be paid at your straight time rate. As a guide, travel time will include one hour prior to a flight's scheduled departure. If a flight is delayed or space available status requires taking another flight; you will be paid straight time for the additional time. This guideline applies to all non-exempt hourly employees.

The overtime rate of one and one-half times your hourly rate will be paid only if actual work or work and training exceeds eighty (80) hours in any pay period for non-exempt employees. Travel time is not to be included in the calculation of time worked for paying the overtime rate of one and one-half times your hourly rate.

FRONTIER AIRLINES (R. BRIGHAM) - 0000298
0558

**FRONTIER**

EMPLOYEE HANDBOOK                                                      07.05  Pg. 1

## BENEFITS

This information is not intended to function as a Summary Plan Description (SPD). In preparing this information, we have tried to accurately summarize the provisions of our benefits plans in clear, understandable language. However, if there is any conflict between this information and the formal plan documents, the plan documents shall govern.

Frontier provides a benefits program for eligible employees. In addition to receiving a salary and having an equal opportunity for professional development and advancement, you may be eligible to enjoy other benefits. Frontier also provides industry leading flight benefits (refer to Ultipro for *Employee Travel Policies*).

## 07.05.1  ELIGIBILITY

Eligibility for benefits is based on your job classification, full-time (FT) or part-time (PT). More details regarding specific benefits coverage is available to you and your dependents as defined in the benefit summary plan descriptions (SPDs) that can be obtained from Human Resources or on Frontier's intranet.

### 07.05.1.1  Medical, Dental, Vision Care Coverage

Employees (including spouse, qualifying dependents and domestic partners) who meet the eligibility requirements may participate in Frontier 's health and welfare benefit programs. Frontier offers a comprehensive program that includes Medical, Dental and Vision coverage in addition to Short Term Disability and Company paid Life insurance. Frontier also offers various Flexible Spending Accounts. More detailed information can be found at *www.myfrontier.org* (UltiPro) or your Benefit Enrollment Guide.

Frontier defines Domestic Partner as your lifetime partner of the same sex if the following criteria apply:

- Same sex couple that share common necessities of life
- Neither partner is legally married to someone else
- Partners are not related by blood
- Partners are at least 18 years of age
- Are each other's sole lifetime partner and intend to remain so

Rev10 12/31/11                                                          **Benefits**

**FRONTIER**

- Are responsible for each other's common welfare and financial obligations
- Have resided together for at least 12 consecutive months and will continue to reside together during period covered on benefits
- Have provided a notarized copy of an Affidavit, Declaration or Registration of Domestic Partnership that has been filed with appropriate County or State offices. If such document is not recognized in state of residence copies of at least 2 of the following must be provided:
  - Deed showing joint ownership of property
  - Joint credit cards
  - Lease stating both partners' names as lessees
  - Joint checking
  - Will which designates the other as primary beneficiary or grants them a durable power of attorney.   For a domestic partner to be considered for coverage, a Domestic Partner Affidavit provided by Frontier must be completed and returned to the Benefits Department.

Information on Company-sponsored benefit plans is outlined in respective plan summaries on UltiPro at *www.myfrontier.org*. Frontier reserves the right to modify or terminate, in whole or part any plan at any time. New employees may enroll in the health and welfare benefit program within 31 days of employment, and all employees may make health and welfare benefit plan elections during Open Enrollment each year. Otherwise, health and welfare benefit elections may not be changed during the year unless a Qualified Family Status Change (QFSC) has occurred and the employee requests the change through Frontier 's Benefits Department within 31 days of the qualifying event. Refer to the plan summaries or the Benefit Enrollment Guide for more information.

### 07.05.1.2   Employee Assistance Program (EAP)

The Employee Assistance Program is a no-cost, confidential assistance program available to you to help address the personal issues you and your dependents may be facing. Trained clinicians are available 24 hours a day, 7 days a week. Additionally, assistance is available for you or a member of your family who has questions concerning legal, family, or financial issues, child care, elder care, relationships, substance abuse or addiction questions and concerns, work-related issues and any mental health issue.

FRONTIER AIRLINES (R. BRIGHAM) - 0000300
0560

**FRONTIER**

Confidentiality is one of the most important aspects of this program. If you contact the Employee Assistance Program directly, no one in Frontier will know unless you tell them. No information concerning the nature of your problem will be released without your written consent, unless provided for by law.

### 07.05.1.3   401(k) Plan

Employees who meet the eligibility requirements may participate in Frontier's 401(k) Retirement Plan. More detailed information can be found on UltiPro at *www.myfrontier.org*. Eligible employees may enroll in the 401(k) plan at any time.

## 07.05.2   PAID HOLIDAYS

Frontier observes the following holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Friday following Thanksgiving
- Christmas Day

Full-time hourly employees will receive 8 hours of Holiday Pay plus 1 ½ times their regular rate of pay for actual hours worked on the holiday. Part-time, hourly employees will receive 1 ½ times their regular rate of pay for actual hours worked on the holiday and holiday pay at straight time for actual hours worked up to maximum of 8 hours.

Salaried employees regularly scheduled to work a company observed holiday will receive an additional day off other than the actual holiday (within 90 days). If this is not possible, the employee will receive an additional 8 hours holiday pay. In no circumstance will an employee be paid more than 8 hours. Salaried employees who are not scheduled to work on a holiday do not receive any additional holiday pay, but can take a deferred holiday (additional day off at the discretion of the manager). If Deferred Holidays are not taken, they are not paid out. Those who are part of an employee group, such as management or office staff, not subject to shift work and rotating days off, will receive a day off with pay in observance of each holiday.

FRONTIER AIRLINES (R. BRIGHAM) - 0000301

0561

Part-time, hourly employees are not eligible for holiday pay if they do not work the holiday or if they work on a holiday as a result of a shift trade.

To receive holiday pay, employees are required to work their last, full scheduled shift prior to the holiday, their full scheduled shift on the holiday itself, and their first, full scheduled shift after the holiday, except for authorized absences, such as vacation or leave of absence, that have been approved in advance by your manager. This rule applies should the holiday fall on the employee's scheduled day off or scheduled work day. Holiday pay will not be paid if the employee is on an approved unpaid leave for the entire workweek. If the employee calls in sick on the holiday, they are not eligible for holiday pay, only sick pay.

## 07.05.3 VACATIONS

In the year that the employee is hired, vacation hours will be awarded in the following manner, based on the quarter hired by Frontier:

### 07.05.3.1 Vacation time:

| **Full-time (Scheduled for and Work 30 Hours per Week)** | |
|---|---|
| **Years of Continuous Employment** | **Total Accrual Hours** |
| Less than one completed year | 1st Quarter (Jan-Mar)=60<br>2nd Quarter (Apr-Jun)=40<br>3rd Quarter (Jul-Sep)=20<br>4th Quarter (Oct-Dec)=0 |
| One completed year, but less than seven completed years | 80 hours |
| *Note: If your* seven (7) *year anniversary falls July 1st or later, 80 hours will be awarded on January 1st.* | |
| Seven (7) or more completed years | 120 hours |
| *Note: If your* seven (7) *year anniversary is before July 1st, 120 hours will be awarded on January 1st.* | |
| **Part-time (Scheduled for and Work 16-29 Hours per Week)** | |
| **Years of Continuous Employment** | **Total Accrual Hours** |
| Less than one completed year | 1st Quarter (Jan-Mar)=30<br>2nd Quarter (Apr-Jun)=20<br>3rd Quarter (Jul-Sep)=10<br>4th Quarter (Oct-Dec)=0 |
| One or more completed years | 40 hours |

- Will be awarded each January 1st

## FRONTIER

| EMPLOYEE HANDBOOK | 07.05 Pg. 5 |

- Cannot be carried over from one year to the next
- Continues to be accrued during a leave of absence that is less than 30 days. If a leave extends past 30 days, vacation will be pro-rated based on the length of the leave.

Your vacation will be accrued during the year awarded. In the year in which you leave Frontier, the accrued vacation will be prorated and compared to the balance used. To the fullest extent permitted by applicable law, vacation hours used, but not accrued, will be deducted from your final paycheck. In the event you change status from part-time to full-time or full-time to part-time, there will be a reconciliation of accruals for vacation and sick hours based on the effective date of the change.

On rare occasion, Frontier may request you cancel or postpone vacation because of operational requirements. If asked by Frontier to cancel scheduled vacation 60 days prior to the end of the year, you may be allowed and use the carry-over the scheduled vacation hours for a maximum of 90 days into the new year. You will not be able to cash in your vacation time for additional pay. The business reason for the carry-over must be documented in writing by your manager and approved by Human Resources. Vacation is paid at your regular base rate of pay at the time the vacation is used.

Vacation period will normally be weekly "blocks" and generally will consist of five (5) workdays. Employees may take vacation time in increments of less than one week, provided it is approved by your manager. Requests should be in written form and approved by your manager. No compensatory time off (comp time) for salaried employees is allowed. Any time taken off during a two week pay period must be accounted for as either vacation or sick as applicable. The method of scheduling vacation period may vary from department to department.

### 07.05.4  SICK LEAVE

Sick leave is a form of insurance that accrues in an account and serves to protect you and your income in the event of an unexpected, non-work related illness, injury, accident, or prolonged medical condition that prevents you from working. It is advisable for all employees to make every effort to accumulate as much sick leave as possible to give themselves and their families the maximum protection available. Sick hours may be used only for the employee's own illness or for that of their immediate

**FRONTIER**

EMPLOYEE HANDBOOK                                                07.05  Pg. 6

family members. For the purpose of this family, "immediate family members" are defined as: spouse or domestic partner (provided an affidavit is on file with the company) and dependent children living in the same household. Sick leave is not another form of vacation, nor is it intended to give the employee paid time off for personal business or recreation. Abuse, including excessive use of sick leave, will lead to corrective action. An employee may be required to provide documentation from a healthcare provider in support of their need for sick leave.

Employees who are unable to report to work due to illness or injury should notify their immediate supervisor at least two (2) hours prior to the start of each shift. The employee's immediate supervisor must also be contacted on each additional day of absence, except when the employee is on approved medical leave, family leave, short-term disability or leave associated with a Worker's Compensation claim.

A sick bank account is maintained for each regular employee and they are eligible to accrue sick time following the completion of six (6) months of employment. Sick hours are accrued and credited to the employee's account on the pay period following eligibility or their anniversary, according to the following schedule:

The following guidelines exist regarding use of sick leave:

| Years of Service | Full-Time Employees | Part-Time Employees |
|---|---|---|
| Six Months or More | 12 hours | 6 hours |
| Completion of First Year | 24 hours | 12 hours |
| Completion of Second Year | 40hours | 20 hours |
| Completion of Third Year | 48 hours | 24 hours |
| Completion of Fourth Year | 56 hours | 28 hours |
| Completion of Fifth Year and Every Year Thereafter | 72 hours | 36 hours |

- Paid sick hours accrued are cumulative up to a maximum of 360 hours for full-time employees and 180 hours for part-time.
- Employees classified as regular full-time and regular part-time are eligible to accrue sick leave.
- Scouts are not eligible for sick leave.
- All sick pay use remains subject to Supervisor approval and, upon request, doctor verification.

Rev17 02/19/14                                                    Benefits

FRONTIER AIRLINES (R. BRIGHAM) - 0000304
0564

**FRONTIER**

| EMPLOYEE HANDBOOK | 07.05 Pg. 7 |
| --- | --- |

- Accumulated sick hours in your account will not be paid upon termination of employment. Upon notification of resignation, either verbally or in writing, sick time may not be paid without medical documentation to support the absence.
- Sick leave will be paid at the employee's regular rate of pay without shift differential. Sick leave will not be included in the calculation of overtime.
- Sick leave may be used in minimum increments of one hour.
- Sick leave may not be used for planned doctor or dentist appointments, or preventative care appointments. However, sick leave may be used for an initial doctor or dentist appointment that is the result of an unexpected illness or injury. Scheduled follow-up visits may not be covered with sick leave.

Rev17 02/19/14                                                                 Benefits

Page Intentionally
Left Blank

FRONTIER AIRLINES (R. BRIGHAM) - 0000306
0566

**FRONTIER**

## LEAVES OF ABSENCE

Frontier recognizes there are unexpected circumstances that may require an employee to be absent from work for a period of time. To accommodate your needs, Frontier has the following leaves of absence types available for eligible employees (not including Scouts): FMLA Medical Leave, FMLA Family Leave, FMLA Military Caregiver Leave, FMLA Military Qualifying Exigency Leave, Non-FMLA Medical Leave, Personal Leave, Military Leave, Jury Duty Leave, and Bereavement Leave. Other types of leaves may be available under state law. Contact the Leave of Absence department for additional details.

While on any type of leave in effect for 7 days or longer, travel privileges will be suspended for the duration of the leave. Exceptions to this policy will be considered on a case-by-case, individual basis. To request consideration of a travel request while on a leave in excess of 7 days, please contact the Leave of Absence Department (*LOA@flyfrontier.com*).

If you are on any approved leave, your group medical, dental, vision, life and disability insurance coverage continues under the same terms as if you continued to work for the first ninety (90) days of the absence from work. After 90 days, coverage will continue, if you elect; however, premium payments will be at full cost, paid by you. Coverage will not continue unless payment is made in a timely manner. You will be notified of the specific arrangements for maintaining coverage and making your share of premium payments at the time the leave is requested.

Employees with an outstanding 401(k) loan will be required to continue loan payments while on a leave. If you no longer are receiving a paycheck, you should arrange repayment of the loan to Principal Financial by contacting them directly. You also may be eligible for a temporary suspension of loan repayments for a limited time while on medical leave. Please contact the Human Resources Benefits Department for more information.

Employees on a leave of absence should check with their manager and Human Resources to determine eligibility for schedule bidding participation.

**FRONTIER**

Employees may apply for FMLA or medical leave in association with their treatment for substance abuse. If this is the case, the application will be considered self-disclosure and the employee made eligible for additional assistance - as outlined in Frontier's Drug and Alcohol-Free Policies and Regulations (Employee Assistance Following Self Disclosure). The employee's return to work will be governed by the policies and processes detailed in the same section.

## 08.05.1   ELECTION DAY

Since the polls are open for long periods, employees are encouraged to vote before or after regular working hours. If necessary, managers are authorized to grant a reasonable period of time, up to three (3) consecutive hours, during the workday to vote. Employees who do not have three (3) consecutive hours available during polling hours outside of their normal work schedule must request time off for voting in writing at least two (2) days in advance.

## 08.05.2   JURY DUTY

Frontier recognizes jury duty as a civil responsibility. Upon receipt of the jury summons, immediately present the summons or copy of the summons to your manager. Also provide the following:

• The date to report for jury duty
• The name and location of the court
• Approximate duration of jury duty obligation, if known

When released or excused early from jury duty during scheduled work hours, employees are expected to report for work. Employees that serve on jury duty will be paid regular straight time for all normally scheduled work hours up to two (2) weeks. Within 30 days of return from jury duty, management may request a court validated "Statement of Attendance" indicating the dates of attendance on jury duty. Failure to provide proof of attendance may result in corrective action and pay suspension.

Employees who are required to appear in court for their own alleged violation or for personal reasons will not be compensated for any hours missed from work.

**FRONTIER**

EMPLOYEE HANDBOOK                                            08.05 Pg. 3

## 08.05.3   PERSONAL LEAVE

Regular full- and part-time employees who have completed one year of service may apply for a personal leave of absence without pay. Requests for a personal leave of absence must be presented to your supervisor in writing no later than two (2) weeks in advance of the first day of the requested leave. Scouts are not eligible for a personal leave. Personal leave may not be granted for reasons such as taking other employment or taking an extended vacation. A personal leave of absence will be granted for a period not to exceed three (3) months, provided it does not create a hardship on the department or necessitate the hiring and training of a replacement. A personal leave of absence is granted at Frontier's discretion based on business needs. Employees may use any accrued vacation time while on a personal leave of absence.

Sick time and vacation will not accrue during a personal leave. An employee on approved Personal Leave will have his/her group medical, dental, vision, life and disability insurance coverage continued under the same terms as if the employee continued to work; however, the employee must make arrangements with Human Resources to pay the cost for these plans while on leave.

## 08.05.4   FAMILY AND MEDICAL LEAVE

### 08.05.4.1   Overview
The Family and Medical Leave Act of 1993 (FMLA) allows eligible employees to take unpaid leave from their job for special family, military and medical situations, while protecting their jobs and health benefits while on leave. To be eligible for this leave, you, as the employee must meet the minimum eligibility requirements listed below.

### 08.05.4.2   To Apply
To apply for FMLA a request must be submitted to the Frontier Human Resources Leave Coordinator via e-mail at _LOA@flyfrontier.com_. Frontier requires medical certification supporting the need for the leave due to your own serious health condition or that affecting an immediate family member. If the leave is foreseeable, you must provide written notice of the need for FMLA leave 30 days before the anticipated leave and if the leave is due to an emergency or unforeseen circumstances, then you

FRONTIER AIRLINES (R. BRIGHAM) - 0000309
0569

must provide written notice of the need for FMLA leave as soon as practicable. Failure to return FMLA forms may result in the delay or denial of the leave. If you are on FMLA leave for your own serious health condition, your are required to furnish a return to work notice from your physician to the Leave Coordinator prior to your return to work, unless the leave is intermittent, in which case, a return to work notice may be required only if Frontier has a significant safety concern.

### 08.05.4.3   Basic Leave Entitlement

Eligible employees may take up to 12 weeks of unpaid leave in a 12-month period, rolling backward from the date the leaves begins, FMLA may be granted for:

- The employee's own serious health condition (as defined below), which prevents the employee from being able to perform the functions of his or her job;
- Caring for the employee's spouse, child under 18 years of age (or older if disabled), domestic partner (provided an affidavit is on file), or parent with a serious health condition;
- The birth, adoption or foster care placement of a child, or the care of or bonding with a child, if leave is taken within the first 12 months after birth or placement.

### 08.05.4.4   Military Leave Entitlement

Eligible employees with a spouse, son, daughter, or parent on active duty or call to active duty in a foreign country from the National Guard or Reserves may use their 12 week basic FMLA leave entitlement to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings. An employee taking leave for a qualifying exigency is limited to a total of 12 weeks in the rolling 12-month period for any combination of the basic reasons and the qualifying exigency. If the qualifying exigency leave qualifies for leave under state law, the leaves will run concurrently.

Military Caregiver Leave permits you, if eligible, to take up to 26 weeks of leave during a single 12-month period to care for a covered service member who is your spouse, son, daughter, parent, or nearest blood relative ("next of kin"). A covered service member is a current member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of active duty rendering him or her medically unfit to perform duties for which the

**FRONTIER**

service member is undergoing medical treatment, recuperation, or therapy; is in outpatient status; or is on the temporary disability retired list. A covered service member is also a "veteran" who is undergoing medical treatment, recuperation, or therapy, for a serious injury or illness and who was a member of the Armed Forces (including a member of the National Guard or Reserves) at any time during the period of 5 years preceding the date on which the veteran undergoes that medical treatment, recuperation, or therapy. A "veteran" is a person who served in the active military, naval, or air service and who was released or discharged under conditions that were not dishonorable. If you are taking leave to care of a covered service member you are limited to a total of 26 weeks of leave for any combination of reasons covered by the FMLA in a single 12-month period.

### 08.05.4.5  Qualifying Serious Health Conditions

A serious health condition is an illness, injury, impairment, or physical or mental condition involving:

- An overnight stay in a hospital, hospice or residential medical care facility, including any period of incapacity and/or subsequent treatment;
- Inability to work for more than three (3) full consecutive days, treatment by a health care provider within seven (7) days of the first day of incapacity, and either:

    1. 1 or more additional treatments by a health care provider within 30 days of the first day of incapacity, or

    2. a regiment of treatment under the health care provider's supervision;

- Pregnancy or prenatal care;
- A chronic condition that continues over an extended period of time, even if episodic in nature, and requires at least two (2) visits to a health care provider each year;
- A permanent or long-term condition for which treatment may not be effective, but for which the person is under the continuing supervision of a health care provider; or
- A condition requiring multiple treatments by a health care provider for restorative surgery after an accident or other injury or a condition that would likely result in a period of incapacity for at least three (3) days in the absence of medical treatment.

FRONTIER AIRLINES (R. BRIGHAM) - 0000311
0557

# ℲRONTIER

### 08.05.4.6  Measuring the 12-month Period

The 12-month period during which qualified military caregiver leave may be taken is the 12-month period measured forward from the date the first FMLA leave began. However, the 12-month period during which any other form of FMLA leave may be taken is a rolling 12-month period, measured backward from the date the leave starts.

### 08.05.4.7  Eligibility Requirements

Employees may qualify for FMLA leave if they meet the following criteria:

• They have worked for Frontier for at least 12 months;
• They worked at least 1,250 hours in the 12 months prior to starting the leave; and
• They work at a site where there are at least 50 employees within a 75-mile radius.

Flight crewmembers are eligible for FMLA:

1. If they have worked or been paid for 60% minimum guarantee in the preceding 12 months; and
2. The employee has worked or been paid 504 hours (excluding personal commute time, or vacation, medical and sick leave).

Spouses who are both employees of Frontier are limited to a combined total of 12 weeks (or 26 weeks for qualified military caregiver leave) in a 12-month period, except that if the FMLA leave is for one of the spouse's or their child's serious health condition then each spouse may take up to 12 weeks of FMLA leave in a 12-month period.

*NOTE: In cases where an employee is not eligible for FMLA, for example in a work location with fewer than 50 employees within a 75-mile radius, the Company may consider alternative options for providing requested time off, with benefits similar to those offered under FMLA.*

*NOTE: Approved time off the clock (TOC) will not be credited for purposes of FMLA eligibility.*

### 08.05.4.8  Use of FMLA Leave on an Intermittent Basis

In certain instances, leave can be taken intermittently or on a reduced leave schedule. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations.

# FRONTIER

**EMPLOYEE HANDBOOK**                                                **08.05  Pg. 7**

Employees should note their work schedule remains their primary responsibility. Employees must adhere to Frontier's policy for reporting an absence, even when the intermittent leave has been approved. After reporting their absence, employees should send an e-mail to *LOA@flyfrontier.com* with their name, ID number, and the dates of their absence. This e-mail must be received as soon as practicable, usually the same day of the absence or the next day. Upon receipt the Leave of Absence Department will review the request for approval and submit notification to your appropriate management team.

## 08.05.4.9  Employee Responsibilities

When their need is foreseeable, employees must provide 30 days advance notice of the need to take FMLA leave. When a 30 day notice is not possible, the employee must provide notice as soon as practicable – usually the same day or day after learning of the need for leave - and must comply with Frontier's normal call-in procedures.  An employee who fails to provide adequate notice of an unforeseeable leave and comply with call-in procedures may be denied such leave. In addition, any employee who fails to comply with Frontier's absence-reporting procedures may be subject to appropriate disciplinary action, up to and including termination of employment.

Employees must provide sufficient information for Frontier to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Employees must inform Frontier if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees may be required to provide a certification and periodic recertification supporting the need for leave.

All employees must provide a return to work notice from their physician prior to their anticipated return-to-work date from a continuous leave for their own serious health condition.

Employees who are on FMLA leave are required to use banked sick time (to the extent the reason for the absence is covered by the Sick Leave Policy) and then accrued vacation time in conjunction with the FMLA leave. However, employees on FMLA leave may opt not to utilize accrued vacation time only if they are approved to receive Short Term Disability (STD) benefits. To ensure the preservation of their accrued vacation time, an employee in this situation must contact Frontier's Leave of Absence Department (*LOA@flyfrontier.com*) to inform them of the decision.

Rev17 02/19/14                                                **Leaves of Absence**

**FRONTIER**

EMPLOYEE HANDBOOK                                                        08.05  Pg. 8

### 08.05.4.10 Benefits While on FMLA Leave

All deductions, such as medical, dental, vision, life insurance, health care flexible spending account coverage, and 401(k) will continue for the time period that you are being paid from your accrued sick or vacation.

When accrued sick and vacation days are exhausted, the balance of your leave will be unpaid and you must pay your premiums. Failure to do so will result in coverage lapsing under the terms of the plan.

Employees who fail to return to work at the end of FMLA leave may be required to reimburse Frontier for the amount it paid for health insurance premiums during the leave. Vacation, sick time and other employment benefits do not accrue while the employee is on an approved leave. Holiday or funeral pay will not be granted during the leave. Company seniority and department seniority will not be affected by the use of FMLA leave. Pass benefits are suspended for all leaves in excess of seven (7) days, unless an exception is granted in accordance with the pass policy.

### 08.05.4.11 Return to Work

Prior to returning to work, employees who are taking FMLA leave for their own serious health condition must provide a fitness for duty certification from a health care provider, certifying that the employee is able to perform the essential functions of his or her job. The employee's return to work may be delayed until such a certification is received.

FRONTIER AIRLINES (R. BRIGHAM) - 0000314
0574

# ₣RONTIER

## 08.05.5   MEDICAL LEAVE (WHEN NOT ELIGIBLE UNDER FMLA)

Medical leaves are never guaranteed. If it is determined the leave may not be granted, your employment is subject to termination. Regular full-time and part-time employees who have been employed by Frontier for at least 30 continuous days and who do not meet the eligibility requirements for FMLA may be provided a medical leave of absence for limited circumstances. Non-FMLA leave may be used only for the employee's own illness or injury. Employees classified as on-call, or scout are not eligible for a medical leave.

For a medical leave to be granted, the following conditions must be met:

- The employee has completed 30 continuous days of employment with Frontier.
- For foreseeable absences, the employee must provide Frontier with at least 30 days notice. For unforeseeable absences, the employee must notify management as soon as possible of the need for medical leave.
- Management approves the leave prior to the start date.

If a Non-FMLA leave cannot be granted, the employee will have the opportunity to resign from Frontier.

Frontier will require medical certification supporting the need for leave due to a serious health condition affecting an employee. When planning medical treatment, you must consult with your management and make a reasonable effort to schedule the leave so as not to unnecessarily disrupt operations, subject to the approval of the health care provider. Except in emergencies, you are required to give your management as much notice as possible when you plan to start your leave and when you plan to return from leave. Employees who are on medical leave are required to use banked sick time (to the extent the reason for the absence is covered by the sick leave policy) and then accrued vacation time in conjunction with the medical leave.

# FRONTIER

| EMPLOYEE HANDBOOK | 08.05 Pg. 10 |
|---|---|

Seniority for pay and benefit purposes will continue to accrue for the duration of the approved leave. Company seniority will not be affected by taking a medical leave. Individual department policies or union contracts should be referenced with regard to departmental seniority. Pass benefits are suspended while on medical leave in excess of seven (7) days, unless an exception is granted in accordance with the pass policy. If you are enrolled at the time your leave begins, you may continue medical, dental, vision, life, health care flexible spending account coverage while you are on an approved medical leave; however, you must make arrangements with Human Resources to pay your share of the cost for these plans while you are on leave. Vacation, sick leave, and other employment benefits do not accrue while you are on an approved leave.

## 08.05.6   MILITARY LEAVE

Employees are granted unpaid military leaves of absence, subject to federal law. If you are a member of the U.S. Armed Forces or National Guard, you are granted an unpaid leave of absence when called for active duty or training. This time is granted in addition to your accrued vacation and sick time. However, if you desire to use your vacation time for this purpose, you may voluntarily do so if you make a request in writing to your management prior to the start of your leave. A copy of military orders or drill schedules may be faxed to the Human Resources Leave of Absence Department at 720-374-8013. Reinstatement from Military Leave shall be granted in accordance with state and federal laws.

The period an individual has to make application for reemployment or report back to work after military service is based on time spent on military duty. For service of less than 31 days, the service member must return at the beginning of the next regularly scheduled work period on the first day after release from service, taking into account safe travel home plus an eight-hour rest period. For service of more than 30 days but less than 181 days, the service member must submit an application for reemployment within 14 days of release from service. For service of more than 180 days, an application for reemployment must be submitted within 90 days of release from service.

Contact Human Resources for detailed information regarding Military Leave.

FRONTIER AIRLINES (R. BRIGHAM) - 0000316
0576

**FRONTIER**

EMPLOYEE HANDBOOK                                                   08.05  Pg. 11

## 08.05.7   DOMESTIC ABUSE LEAVE

Employees who are victims of domestic abuse, stalking, or sexual assault may be eligible for up to three (3) unpaid working days in a 12-month period. The employee may use the leave to seek a civil protection order, obtain medical care or mental health counseling for himself or herself or children, secure their home or seek new housing, or seek legal assistance. Appropriate advance notice must be provided except in cases of imminent danger.

## 08.05.8   PARENTAL INVOLVEMENT LEAVE

Eligible regular full- and part-time active employees may qualify for Parental Involvement Leave. Parental Involvement Leave applies to parents or guardians of children in Kindergarten through grade 12, the child must be enrolled in a school in Colorado, and the parent or guardian must reside in Colorado. The provisions within this leave allow a parent or guardian to attend a child's academic activities without fear of jeopardizing the parent's or guardian's employment.

Leave may be granted for academic activities, such as Parent-Teacher conferences, meetings related to special education services, response to intervention, dropout prevention, attendance, truancy, or disciplinary action. Leave may not be taken for school plays or sporting events.

Employee must provide notice of need for leave at least one (1) calendar week in advance. Applications for Parental Involvement Leave must be submitted to Human Resources in writing at least one (1) week before the leave begins including written verification from the school or school district. In the event of an unforeseen emergency, request Parental Involvement Leave as soon as practicable. Written verification from the school or school district will be required upon returning to work.

Rev17 02/19/14                                                      Leaves of Absence

## FRONTIER

EMPLOYEE HANDBOOK                                                08.05  Pg. 12

### 08.05.9   FUNERAL (BEREAVEMENT) LEAVE

Regular full-time employees are eligible to receive paid time-off, up to a maximum of five (5) calendar days (not to exceed 40 hours), to prepare for and/or attend the funeral services of an immediate family member. For the purpose of this policy, an immediate family member is defined as:

- spouse
- domestic partner (provided affidavit is on file)
- child
- step-child
- parent
- step-parent
- brother
- sister
- grandchild
- mother- or father-in-law

Two (2) days (not to exceed 20 hours) may be granted for an employee's brother- or sister-in-law, grandparent, or for the parents or siblings of a domestic partner.

Pay for bereavement will be at the employee's regular rate of pay, without shift differential or other premiums, and will not be used in the calculation of overtime. The Company may require verification of the need for the leave.

With management approval, available vacation time may be used or additional unpaid time-off granted for the purposes of attending the funeral of a family member not listed above or a neighbor or friend. Advance request must be made and approval is contingent upon operational need.

**FRONTIER**

## SAFETY AND HEALTH PROGRAM

## 09.05.1  SAFETY POLICY STATEMENT

**Frontier Airlines Safety Policy**

Safety and quality are fundamental priorities for Frontier. Excellence in safety and the quality of service are vital components of our mission, and the source of Frontier's competitive advantage. Frontier's leadership is committed to providing all employees with a safe and health workplace. Each and every employee, from the office of the CEO to the frontline, is responsible for safety and quality performance.

Frontier Airlines is committed to the highest safety standards in every area of the operation, including all supply systems and services. By developing, implementing and maintaining a robust Safety Management System (SMS), we ensure all aviation activities uphold the highest level of safety performance and comply with all local, state, and federal regulations applicable to our industry, and the international standards of the International Civil Aviation Organization (ICAO). Frontier is committed to managing safety risk through the SMS to continuously improve the level of Safety throughout our organization.

Frontier will allocate appropriate resources to establish and maintain programs that, with each employee's help, improve safety standards and quality performance. We demonstrate our continual commitment to safety by making safety excellence an integral part of all flight and ground activities through policies, procedures, and programs contained in our manual system.

A healthy safety culture is not only the result of a vibrant safety management system; it also encourages employee reporting, feedback and sharing of information. Further, it establishes standards for acceptable behavior for all employees and defines unacceptable behavior that will not be tolerated. Embedding a culture of safety in our daily activities reinforces that at all times, safety is paramount.

Frontier will measure safety performance by evaluating procedures, making changes accordingly, and settee realistic goals. Frontier seeks to become more proactive and predictive in finding latent hazards and risks. A key objective of the SMS is to minimize the risk associated with all aviation activities to a point as low as reasonably practicable and achievable.

All employees will be given adequate and appropriate safety information and training upon initial employment and throughout tenure. Employees must show competency in safety matters and will only be allocated tasks that are commensurate with their skills.

While management sets safety objectives and evaluates the safety risk, every employee throughout the company plays an integral part in identifying hazards and promoting a positive safety culture. As a condition of employment, compliance with the rules and procedures of the safety program is required of all employees regardless of position. Working together, we can achieve our goal of always operating at the highest possible levels of safety and quality.

David Siegel
Chief Executive Officer

FRONTIER AIRLINES (R. BRIGHAM) - 0000319

0579

**FRONTIER**

## 09.05.2  WORKPLACE SAFETY

Safety is a state of mind - a result of exhibiting specific character qualities, competency and consistency; and common sense. Safety is part of the way we think and act. It's not just words but actions. Safety is all the things we do to eliminate or minimize the risk of loss to our people, property and processes.

Frontier's number one core value is Safety - People are Priceless. Practicing alertness, attentiveness, and cautiousness will result in a safe operation, whether working in the office or around our aircraft. These character qualities are especially important for you, your coworkers, our guests and our industry partners. Frontier is committed to the safety and health of all employees and recognizes the need to comply with regulations governing injury and accident prevention and employee safety. Maintaining a safe work environment requires the continuous cooperation of all employees.

Frontier strives to maintain safety and health practices consistent with the needs of our industry. If you are ever in doubt about how to safely perform a job, it is your responsibility to ask your manager or supervisor for assistance. Any suspected unsafe conditions and all injuries that occur on the job must be reported immediately. Compliance with these safety rules is considered a condition of employment. Therefore, it is a requirement that management make the safety of employees an integral part of her/his regular management functions. It is the responsibility of each employee to accept and follow the established safety regulations and procedures.

Frontier's Safety and Health Program is not carved in stone because it is a dynamic, common sense approach to providing our guests with the safest possible air transportation and you with a safe and healthy work environment. It is the responsibility of each of you to identify and report hazards or substandard conditions to your supervisor or the Safety Department.

## 09.05.3  REPORTING SAFETY ISSUES

All accidents, injuries, potential safety hazards, safety suggestions, and health and safety related issues must be reported immediately to your supervisor, your manager or the Safety Department. It is important to be truthful in reporting to ensure claims are handled properly and any existing safety hazards are corrected.

Rev17 02/19/14                                    **Safety and Health Program**

**FRONTIER**

If you or another employee is injured, you should first contact outside emergency response agencies, if needed, then your supervisor. If an injury does not require medical attention, a supervisor and First Report of Injury/Accident Form must be completed in case medical treatment is later needed.

A Worker's Compensation Claim must be completed in all cases in which an injury requiring medical attention has occurred. If you fail to report an injury you may jeopardize your right to collect workers' compensation payments as well as health benefits.

The Occupational Safety and Health Administration (OSHA) also provides for your right to know about any health hazards that might be present on the job. Should you have any questions or concerns, contact your supervisor or manager for more information. A Safety Incident Report should be made to Frontier as soon as possible, no later than 48 hours after the incident. The Incident Report is available at www.F9safety.com or the Report incident or injury button on www.myfrontier.org.

### 09.05.3.1  SAFETY HOTLINE

Frontier has implemented a Safety Hotline for any individual to voice a concern or problem. The safety hotline is a voice mail system that is monitored on a regular basis by Safety Department personnel. The use of the hotline is confidential and the caller can remain anonymous if desired. Callers may identify themselves and request they be informed of action taken on their concern.

Each of you has an inherent responsibility to help maintain a safe and healthful work environment. Accidents, hazards, and safety concerns should be reported truthfully and as they are discovered or observed.

The hotline is available 24 hours a day, seven days a week. When a hotline call is received, immediate action will be taken by Safety Department personnel.

Toll Free...................................... (888) 839-4510
Local...........................................(720) 374-SAFE (7233)
Fax................................................ (720) 374-8030
Email ...........................................F9Safety@flyfrontier.com

**FRONTIER**

## 09.05.4   ON THE JOB INJURIES

Frontier works to provide a safe working environment for all employees. However, injuries on the job do occur.

### 09.05.4.1   Injuries

If you are injured on the job, you are responsible to notify your supervisor immediately. After appropriate actions are taken to ensure your wellbeing, you will be asked to provide information for or complete a 'First Report of Injury' and your supervisor will conduct an investigation.

### 09.05.4.2   Incidents & Accidents

If you are involved in an incident or accident, you may have to submit for a drug and alcohol test. At a minimum, you will be interviewed as to your involvement in the incident or accident. Your supervisor or manager will conduct an investigation and this may further warrant your participation in the investigation, documentation and conference call participation.

### 09.05.4.3   Protective Gear

Frontier supplies personal protective equipment (PPE) for jobs requiring such gear. The items provided are to protect you from illness and injury. PPE includes hearing protection, safety goggles, high visibility safety vests and gloves; this list is not all inclusive. Some PPE is shared and must not be removed from the workplace. Inoperative or ineffective PPE needs to be returned to your supervisor for replacement. All PPE is supplied and usage required under Federal Regulations 29CFR1910.

Because we care about your safety and well-being, wearing PPE as prescribed and designed is required and will be enforced to ensure hazards associated with the workplace are eliminated or minimized.

Lost time because of accident or illness is costly to you, your family, and to Frontier. Be alert to the fact that some accidents and illnesses, such as hearing loss, develop very subtly and slowly over time.

FRONTIER AIRLINES (R. BRIGHAM) - 0000322
0582

## FRONTIER

| EMPLOYEE HANDBOOK | 09.05  Pg. 5 |

### 09.05.5  WEAPONS

To the fullest extent permitted by applicable law, Frontier prohibits all persons who enter company property from carrying a handgun, firearm, knife, or other prohibited weapon of any kind regardless of whether the person is licensed to carry the weapon or not.

> NOTE:   Individual state statutes define what is considered a prohibited weapon.

The only exception to this guideline will be police officers, security guards or other persons who have been given written consent by Frontier to carry a weapon on company property.

Any employee disregarding this guideline will be subject to immediate termination of employment.

### 09.05.6  FIRE PREVENTION

An important part of fire prevention is to know the location of the fire extinguisher(s) in your area and make sure they are kept clear at all times. Notify your management if an extinguisher is used or if the seal is broken.

> NOTE:   Fire extinguishers that are rated ABC can be used for paper, wood, or electrical fires.

Make sure all flammable liquids, such as alcohol, are stored in approved and appropriately labeled safety cans and are not exposed to any ignition source.

### 09.05.7  HAZARD COMMUNICATION

In compliance with Occupational Safety and Health Administration (OSHA) Hazard Communication standards, Frontier has implemented the following communication methods for employees:

- Workplace Chemical Inventory Lists
- Intranet database containing MSDS Sheets
- PPE Hazard Assessment worksheets for various job functions

**FRONTIER**

EMPLOYEE HANDBOOK                                            09.05 Pg. 6

## 09.05.8   AVIATION SAFETY ACTION PROGRAM (ASAP)

Pilots, Mechanics, Dispatchers and Flight Attendants participate in the Aviation Safety Action Programs (ASAP). ASAP identifies significant safety concerns and issues; operational deficiencies; non-compliance with regulations; deviations from company policies and procedures; and safety events. Safety issues are resolved through corrective actions rather than punishment or discipline. This program allows employees to voluntarily disclose mistakes or errors. The overall goal of ASAP is to improve awareness and identify operation deficiencies by facilitating an open line of communication between Pilots, Mechanics, Dispatchers, Flight Attendants and management. All directors and managers at Frontier have committed to their respective departments to promptly respond to a report that identifies problem areas.

ASAP is based on a partnership between the Federal Aviation Administration (FAA), Frontier and the unions representing each work group. These programs are intended to generate safety information that may not otherwise be obtainable.

**FRONTIER**

EMPLOYEE HANDBOOK                                                      **10.05**  **Pg. 1**

## INFORMATION TECHNOLOGY ACCEPTABLE USE POLICY

The wise use of technology is essential for Frontier's success. Frontier must have the full commitment and cooperation of all employees, contractors, vendors, partners, and associates so Frontier uses technology in a legal, ethical, and productive manner.

Frontier relies on its computer network to conduct its business. To ensure that its computer resources are utilized properly by its users, Frontier has created this Information Technology Acceptable Use Policy. The rules and obligations described in this Policy apply to all users of the Frontier computer network, wherever they may be located. Violations will be taken very seriously and may result in disciplinary action, including possible termination and/or civil and criminal liability. It is every user's duty to utilize the Frontier computer resources responsibly, professionally, ethically, and lawfully.

## 10.05.1   POLICY

The Computer Resources are the property of Frontier and may be used only for legitimate Frontier business purposes. Users are permitted access to the Computer Resources to assist them in performance of their jobs. Use of the Computer Resources is a privilege that may be revoked at any time.

### 10.05.1.1    Scope

This policy applies to all equipment that is owned or leased by Frontier and governs the use of the following Frontier resources:

- Network Devices
- Laptops
- Operating Systems
- Personal Data Assistants (PDA)
- Applications
- Cell Phone/Smart Phone
- Databases
- Internet Use
- Remote Access Technologies
- E-mail Use

Rev14 04/24/13                        **Information Technology Acceptable Use Policy**

## FRONTIER

- Wireless Technologies
- Blogging
- Removable Electronic Media
- Social Media Forums
- Desktops

## 10.05.2   NO EXPECTATION OF PRIVACY

The computers and computer accounts given to users are to assist them in performance of their jobs. Users should not have an expectation of privacy in anything they create, store, send, or receive on the computer system. The computer system belongs to Frontier and may be used only for business purposes.

### 10.05.2.1    Waiver of Privacy Rights

Users expressly waive any right of privacy in anything they create, store, send, or receive on the computer or through the Internet or any other computer network via Frontier Computer Resources. Users consent to allowing authorized Frontier personnel to access and review all materials users create, store, send, or receive on the computer or through the Internet or any other computer network via Frontier Computer Resources. Users understand that Frontier may use human or automated means to monitor use of its Computer Resources.

### 10.05.2.2    Monitoring

Frontier does have, and will continue to have, systems in place for the purpose of monitoring all usage of the public Internet, Frontier systems, networks, and equipment via Frontier Computer Resources. These systems can and will monitor web site visits, chat-type messages, e-mail messages, newsgroup postings, and all files transferred to and from Frontier provided resources. Frontier will review and analyze usage patterns to ensure resources are being utilized within the scope of this and all other Frontier policies.

### 10.05.2.3    Deletion of Information

Deleting files or e-mail messages does not necessarily mean that there are not copies on the network or in storage, or that the information cannot be retrieved.

**FRONTIER**

EMPLOYEE HANDBOOK                                        10.05 Pg. 3

## 10.05.3  PROHIBITED ACTIVITIES

### 10.05.3.1    Inappropriate or Unlawful Material

The use of Computer Resources to access, transmit, store, display, or request inappropriate or unlawful material is prohibited. Inappropriate or unlawful material includes, but is not limited to, materials (including messages, images, video, or sound) that are fraudulent, harassing, embarrassing, sexually explicit, obscene, profane, intimidating, defamatory, racist, or that otherwise violate Frontier Airline's harassment policy or create a hostile working environment. Users encountering or receiving this kind of material should immediately report the incident to their Supervisors.

### 10.05.3.2    Prohibited Uses

Without prior written permission from the Chief Information Officer (CIO), Frontier Computer Resources may not be used for dissemination or storage of commercial or personal advertisements, solicitations, promotions, destructive programs (that is, viruses or self-replicating code), political material, or any other unauthorized use.

### 10.05.3.3    Waste of Computer Resources

Users may not deliberately perform acts that waste Computer Resources or unfairly monopolize resources to the exclusion of others. These acts include, but are not limited to: watching videos online, streaming audio, sending mass mailings or chain letters, spending excessive amounts of time on the Internet, playing games, engaging in online chat groups, printing multiple copies of documents, or otherwise creating unnecessary network traffic, or any other act that interferes with daily assigned duties.

### 10.05.3.4    Misuse of Software

Without prior written authorization from the Chief Information Officer (CIO) or their authorized representative, users may not do any of the following: (1) copy software for use on their home computers; (2) provide copies of software to any independent contractors or clients of Frontier or to any third person; (3) install software on any of Frontier workstations or servers; (4) download any software from the Internet or other online service to any of Frontier workstations or servers; (5) modify, revise, transform, recast, or adapt any software; or (6) reverse-engineer, disassemble, or de-compile any software. Users who become aware of any misuse of software or violations of copyright law should immediately report the incident to their Supervisors.

Rev14 04/24/13                    Information Technology Acceptable Use Policy

**FRONTIER**

### 10.05.3.5  Communication of Trade Secrets

Unless expressly authorized in writing by the Chief Information Officer (CIO), sending, transmitting, or otherwise disseminating proprietary data, trade secrets, or other confidential information of Frontier is strictly prohibited. Unauthorized dissemination of this information may result in substantial civil liability as well as severe criminal penalties under the Economic Espionage Act of 1996.

### 10.05.3.6  System Integrity

No activities should be engaged in with the intent to degrade system performance. No attempt should be made to prevent an authorized user access to a system resource. No attempt should be made to circumvent, or attempt to circumvent, security measures in place to gain access to resources for which proper authorization has not been given. No programs, utilities, or scripts should be run that would reveal weaknesses in the security of any system resources. No programs, utilities, or scripts should be run on Frontier resources that would reveal weaknesses in the security of any non-Frontier system resources.

### 10.05.3.7  Commercial Use

Frontier resources should not be used for any purpose that is competitive to Frontier or for any purpose that may constitute a conflict of interest with Frontier.

## 10.05.4  PASSWORDS

### 10.05.4.1  General Guidelines

All technologies connected to Frontier network or that have access to sensitive, confidential, or private information on them must be secured with a user ID and password, or another approved authentication method. None of the authentication (user ID, password, token, etc.) methods may be generic or shared when accessing systems described above.

### 10.05.4.2  Responsibility for Passwords

Users are responsible for safeguarding their passwords for access to the computer system. Individual passwords should not be printed, stored online, or given to others. Users are responsible for all transactions made using their passwords. No user may access the computer system with another user's password or account. Users of Frontier systems must never, under any circumstances, give out their user identity and/or

**FRONTIER**

| EMPLOYEE HANDBOOK | 10.05  Pg. 5 |
|---|---|

password. This includes requests made by apparent trusted parties. Any incidents of anyone attempting to obtain passwords are to be immediately reported to the IT Service Desk, Information Security, or a Supervisor. When users are creating passwords, they should use only passwords considered secure. All passwords must change every forty-five (45) days. Where not possible or appropriate they must change every ninety (90) days. When a user knows his or her password has been compromised, it must be reported immediately and a new password obtained.

### 10.05.4.3    Password Creation

To create a secure password, the following requirements should be met:

- All passwords will be a minimum of eight (8) characters.
- They must contain characters from three of the following four categories:
  - English uppercase characters (A through Z)
  - English lowercase characters (a through z)
  - Base 10 digits (0 through 9)
  - Non-alphanumeric characters (for example: !, @, #, $, %)
- Passwords should not be derived from common dictionary words.
- Passwords should not be a date such as birthday or anniversary.
- Passwords should not be a proper name, such as that of a spouse or child.

For your assistance, here is a list of "don'ts":

- Don't reveal a password over the phone to ANYONE.
- Don't reveal a password in an e-mail message.
- Don't reveal a password to your manager.
- Don't reveal a password to anyone on the Information Technology staff.
- Don't talk about a password in front of others.
- Don't hint at the format of a password (e.g., "my family name").
- Don't reveal a password on questionnaires or security forms.
- Don't share a password with family members.
- Don't reveal a password to co-workers while on vacation.
- Don't use Company names (Frontier, etc.) or common airline terms in or as your password.

FRONTIER AIRLINES (R. BRIGHAM) - 0000329
0589

**FRONTIER**

### 10.05.4.4    Passwords Do Not Imply Privacy

Use of passwords to gain access to the computer system or to encode particular files or messages does not imply that users have an expectation of privacy in the material they create or receive on the computer system. Frontier has global passwords that permit it access to all material stored on its computer system-regardless of whether that material has been encoded with a particular User's password.

## 10.05.5   SECURITY

### 10.05.5.1    Accessing Other User's Files

Users may not alter or copy a file belonging to another user without first obtaining permission from the owner of the file. Ability to read, alter, or copy a file belonging to another user does not imply permission to read, alter, or copy that file. Users may not use the computer system to "snoop" or pry into the affairs of other users by unnecessarily reviewing their files and e-mail.

### 10.05.5.2    Accessing Other Computers and Networks

A user's ability to connect to other computer systems through the network or by a modem does not imply a right to connect to those systems or to make use of those systems unless specifically authorized by the operators of those systems.

### 10.05.5.3    Computer Security

Each user is responsible for ensuring that use of outside computers and networks, such as the Internet, does not compromise the security of the Frontier Computer Resources. This duty includes taking reasonable precautions to prevent intruders from accessing Frontier's network without authorization and to prevent introduction and spread of viruses.

### 10.05.5.4    System Access

Requests for new user-IDs and changed privileges will be documented and approved by the user's manager and the data owner before a Systems Administrator fulfills these requests. Any user account modification requests such as adding or changing access will be initiated through the Information Technology Help Desk. New account passwords and user-IDs will be distributed to the requesting user's manager in a sealed envelope marked Confidential. No passwords or user-IDs are to be delivered in any unsealed envelope. Upon first logon, the default password will be changed to meet

**FRONTIER**

| EMPLOYEE HANDBOOK | 10.05  Pg. 7 |
| --- | --- |

Guidelines set for passwords. Revocation for terminations will be implemented as outlined in Termination Procedures.

### 10.05.5.5   Credit Card Data Confidentiality

All Frontier employees that have access to credit card data must take great care in protecting this data from disclosure to unauthorized parties or transmitting the credit card data in a format that might be exposed.

The following rules apply to all employees who have access to credit card data:

- Credit Card Numbers are not to be sent via end-user messaging technologies such as e-mail, instant messaging or chat/forum sessions.
- Explicit approval from management must be given to access any systems that contain credit card data and access can only be from approved locations. Only users with a business need may view full credit card numbers.
- All users that access systems that contain credit card data must be authenticated with user ID and password before accessing credit card data. No group, shared, or generic accounts and passwords can be used on systems that contain credit card data.
- Access to systems that contain credit card data can only be from Company-approved devices.
- All users accessing applications that contain credit card data remotely must automatically or manually disconnect from remote-access sessions after a 15 minute period of inactivity.
- All vendors, consultants or 3rd parties accessing credit card data must have activation of remote-access technologies only when needed and with immediate deactivation after use.
- All users are prohibited from copying, moving, or storing of credit card data onto local hard drives and removable electronic media when accessing such data via from the local network or remote-access technologies.

**FRONTIER**

EMPLOYEE HANDBOOK                                                   10.05  Pg. 8

## 10.05.6  E-MAIL USE

E-mail is made available to approved users solely for the purpose of facilitating effective business operations. All users of e-mail must gain access to use this technology via a formal request sent to the IT Service Desk and must be approved by the user's manager.

- All users are responsible for their e-mail activity and are encouraged to use e-mail in a judicious and ethical manner at all times.
- E-mail is to be used for business purposes, but may be used for personal necessities from time to time as long as the personal use does not violate any other portion of the Computer Usage policies.
- Connections to the internet for the use of e-mail are to be conducted through Frontier approved technologies and resources only.
- No insecure ports, protocols or services are to be used for e-mail activities.
- Users are not allowed to send or intentionally receive offensive material via e-mail including, but not limited to pornography and other material deemed offensive in nature.
- Users may not use e-mail to facilitate personal financial gain while at work.
- Users may not use e-mail to incite violence or conduct any other activity deemed criminal or offensive in nature.
- Any activity that may potentially compromise the organization's network infrastructure, cause harm to other related systems or pose a significant financial, operational or business threat to the organization because of misuse of e-mail will not be tolerated.
- Violation of these usage policies is grounds for being reprimanded, suspended or terminated.

Rev10 12/31/11                 Information Technology Acceptable Use Policy

# FRONTIER

**EMPLOYEE HANDBOOK**                                    **10.05  Pg. 9**

## 10.05.7   VIRUSES

### 10.05.7.1      Virus Detection
Viruses can cause substantial damage to computer systems. Each user is responsible for taking reasonable precautions to ensure he/she does not introduce viruses into Frontier network. To that end, all material received via e-mail, on a disk or other magnetic or optical medium, and all material downloaded from the Internet or from computers or networks that do not belong to Frontier MUST be scanned for viruses and other destructive programs before being placed onto the computer system. Users should understand that their home computers and laptops might contain viruses. It is the user's responsibility to ensure all e-mails sent to/from, or disks, files and media transferred from these computers to the Frontier network are scanned for viruses.

### 10.05.7.2      Accessing the Internet
To ensure security and avoid the spread of viruses, users accessing the Internet through a computer attached to the Frontier network must do so through an approved Internet firewall. Accessing the Internet directly by modem is strictly prohibited unless the computer you are using is not connected to the Frontier network.

## 10.05.8   ENCRYPTION SOFTWARE

### 10.05.8.1      Use of Encryption Software
Users may not install or use encryption software on any of Frontier's computers without first obtaining written permission from their Supervisor. If encryption software is approved for use, the storage of the key must be approved by the Manager of Information Security. A copy of each key must be shared with Chief Information Officer (CIO) or Manager of Information Security.

### 10.05.8.2      Export Restrictions
The federal government has imposed restrictions on export of programs or files containing encryption technology (such as e-mail programs that permit encryption of messages and electronic commerce software that encodes transactions).

Rev14 04/24/13                          Information Technology Acceptable Use Policy

**FRONTIER**

EMPLOYEE HANDBOOK                                                    10.05 Pg. 10

## 10.05.9   INFORMATION TECHNOLOGY RESOURCES

### 10.05.9.1   Purchasing

Any party considering evaluating and/or purchasing hardware and/or software not already installed should contact the Information Technology Service Desk for assistance prior to purchasing or attempting to install the software. Any request for additional hardware and/or software requires approval from the individual's Supervisor and the Chief Information Officer (CIO). All computing hardware and software for use by Frontier will be purchased through the Frontier Information Technology department.

### 10.05.9.2   Management

No computer systems, electronic devices (tablets, PDAs, smart phones, etc.) and/or networks will be attached to the Frontier infrastructure without the express written consent of the Chief Information Officer (CIO). All routers, switches, and firewalls attached to or part of the Frontier network infrastructure will be installed and managed by Frontier's Information Technology personnel. This includes any form of wireless network devices.

### 10.05.9.3   Disclosure of Information

At no time will any information regarding Frontier's information technology infrastructure be released to any third party without the written consent of the Chief Information Officer (CIO).

## 10.05.10 MISCELLANEOUS

### 10.05.10.1   Archiving and Backup

Employees who have computers connected to Corporate Computer systems are required to store documents and Frontier information on the designated file servers. The IT department will backup all data stored on file servers.

### 10.05.10.2   Compliance with Applicable Laws and Licenses

In their use of Computer Resources, users must comply with all software licenses, copyrights, and all other state, federal and international laws governing intellectual properly and online activities.

Rev14 04/24/13                    Information Technology Acceptable Use Policy

**10.05.10.3   Violation Reporting**

Users will promptly report all information security violations, alerts, warnings, suspected vulnerabilities and the like to the IT Service Desk (support@flyfrontier.com) or (720) 374-4400. Users are prohibited from utilizing Frontier's systems to forward such information to other users, whether the other users are internal or external to Frontier. In the event passwords or other system access control mechanisms are lost, stolen, or disclosed, or suspected of being lost, stolen or disclosed, the IT Service Desk should be notified immediately. All suspected data breaches, unusual system behavior, such as missing files, frequent system crashes, misrouted messages, and the like should be immediately reported to the IT Service Desk (support@flyfrontier.com or (720) 374-4400. The specifics of security problems or incidents should not be discussed openly but should instead be shared on a need-to-know basis. In the event of a compromise to any Frontier system, no generalities or details should be made available to any person outside of Frontier without written consent from the Chief Information Officer (CIO). Where deemed appropriate by Frontier management, all attempts will be made to ensure the anonymity of any individual disclosing or reporting a violation or incident.

**10.05.10.4   Amendments and Revisions**

This Policy may be amended or revised from time to time as the need arises. Users will be provided with copies of all amendments and revisions.

**10.05.10.5   Variance Policy**

Policies are meant to be the general guidelines for Frontier. As with any policy, instances may occur where normal operations may need to be, for a time, outside the scope and/or guidelines of a policy. To this end, the Information Security Policy Variance Form should be used. This form should be filled out as a joint effort between the requesting party and Frontier's' Information Technology personnel. Any variance requested must be approved by the Chief Information Officer (CIO) prior to being accepted as a variance.

**10.05.10.6   Company Information**

Do not distribute (in any form, including electronically) any confidential Frontier information; negatively referencing Frontier employees, clients, customers or partners. Do not post pictures of Frontier property without express permission from the office of Marketing and Branding.

Rev17 02/19/14                    Information Technology Acceptable Use Policy

**FRONTIER**

## 10.05.11 EMPLOYEES SOCIAL MEDIA USAGE POLICY

Frontier Airlines recognizes the importance of social media for its employees and encourages employees to use social media within the parameters of the Social Media Usage Policy and in a way that does not violate company policies, including our Standards of Conduct.

It is important to note that all Frontier Airlines social media policies are meant to supplement the Company's existing policies regarding both employee conduct and computer usage. Frontier's Employee Handbook should always be the first reference for questions on these matters. The social media policy is meant to provide both clarification and guidance for activity in the social media realm. Where no policy or guideline exits, employees are expected to use their professional judgment and take the most prudent action possible. Further, employees should check with their managers or supervisors if they are uncertain about the appropriateness of a social media posting or a particular use of social media. **Violation of this policy may lead to discipline up to and including the immediate termination of employment.**

> *NOTE:  As used in this policy, "social media" includes, but is not limited to, online forums such as blogs, industry message boards, and social networking sites, including Twitter, Facebook, Google+, foursquare, Instagram, FlyerTalk, etc.*

### 10.05.11.1  Use of Company Facilities and Computers

Company facilities and computers may not be used for personal social media use. The company monitors the use of its facilities and employee computers to ensure compliance with its policies. Please refer to the *Information Technology Acceptable Use Policy* in the Employee Handbook for more guidelines on computer and Internet usage.

### 10.05.11.2  Useful Tips When Using Social Media

- **Be transparent:** If your posts or communication on social media mention Frontier, its products or services, employees, customers, and/or competitors, you need to be clear that you work for the company, and your post is your opinion, not that of the Company. To help reduce the potential confusion you will need to put the following notice in a reasonably prominent place on the front page of your site/profile:

Rev17 02/19/14                    Information Technology Acceptable Use Policy