No. 21-1335

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

—————————————

REBECCA BRIGHAM,
*Plaintiff-Appellant,*

v.

FRONTIER AIRLINES, INC.,
*Defendant-Appellee.*

—————————————

**On Appeal from the United States District Court for the District of Colorado (Civil Action No. 19-cv-03417-WJM-STV, Hon. William J. Martinez)**

**APPENDIX – VOLUME 5**

John R. Crone
*Counsel of Record*
The Law Office of John R. Crone, LLC
2717 South Forest Street
Denver, CO 80222
(303) 598-3526
john@crone-law.com

*Counsel for Rebecca Brigham*

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Plaintiff's Response to Defendant's Motion for Summary Judgment    1193-1372

Defendant's Response to Plaintiff's Motion for Partial Summ. Jud.    1373-1468

Reply in Support of Plaintiff's Motion for Partial Summ. Jud.    1469-1476

Reply in Support of Defendant's Motion for Summary Jud.    1477-1490

stated: "Right. So and I get where you're coming from, but how do we compare only those individuals who have self-disclosure from everybody else who has a serious health condition? And we're not making exceptions –" Id. at 56:17-21. Ms. Brigham stated in response: "We're all individuals and you have to look at us as all individuals." Id. at 56:22-23. Mr. Arellano responded: "Unfortunately, FMLA does not allow us that ability, because now we're only giving special treatment to certain individuals." Id at 56:24-57:1.

35.    Admit. However, in her deposition, Plaintiff further explained: "I didn't even know what document she was even referring to. It didn't say in the Collective Bargaining Agreement or the employee handbook. To be honest, I didn't even look, because I'd already been told that you lose your seniority after 90 days." Ex. 3 to Pl.'s Mot. at 169:15-19. And in any event, the CBA permits a flight attendant to transfer "outside of the Flight Attendant craft or class" and "retain and accrue seniority" only if the transfer is on "account of physical incapacity, illness, or injury." Ex. 10 to Pl.'s Mot. at 102.

36.    Admit; however, as cited above, there were no transfer positions that Plaintiff qualified for. In order to transfer out of Inflight and still retain seniority, Ms. Brigham would have had to transfer on "account of physical incapacity, illness, or injury." Ex. 10 to Pl.'s Mot. at 102.

37.    Admit that Plaintiff requested to temporarily work at the GO as Frontier employees on OJI were regularly allowed to do so. Deny that the CBA only allowed transfers to the GO for "flight attendants injured on the job." Pl.'s Mot. at 9-12. Deny that assignments to the GO were not "open positions" as asserted by Mr. Arellano given that employees were routinely transferred to these positions when they were injured on the job. Id. Admit that transferees to the GO performed administrative or light-duty work.

1193

38.     Deny, again, Plaintiff disputes that the CBA limited Frontier's ability to transfer flight attendants to the GO for temporary administrative or light duty work only to cases of on-the-job injury. Pl.'s Mot. at 9-12. This restrictive interpretation of the CBA contravenes a plain and logical reading of the text. In any event, flight attendants were in fact routinely transferred to the GO when they suffered an OJI, Ex. 2 to Pl.'s Mot. at 66:18-23, and Defendant has proffered no rational reason for denying Plaintiff's request to do the same.

39.     Deny. While the exact duration of Plaintiff's treatment was not stated in terms of a specific date or hour, Plaintiff was clear that: "We were getting further along in my recovery, and it would have been pretty soon after . . . It's – it would never have been indefinitely." Ex. 3 to Pl.'s Mot. at 77:8-20; *see also* Def.'s Ex. 7 to Ex. A at 3 (wherein Ms. Brigham's healthcare provider noted a one (1) year "period of intermittent incapacitation").

40.     Admit.

41.     Deny. Plaintiff disputes the cause of these "occurrences." After Ms. Brigham's self-disclosure on September 7, 2014 and through the date of her termination on November 11, 2015, Plaintiff's absences from work were due directly to the fact that Frontier required Ms. Brigham to comply with her treatment plan but refused to reasonably accommodate Ms. Brigham to make her compliance possible. Pl's Motion at 8-13 [Dkt. 36].

42.     Admit, although as stated above, Plaintiff believes that Shelly Leyner, Defendant's HR Manager, was also at this meeting and is erroneously designated as "Meredith" in the transcript prepared by Defendant.

43.     Admit.

44.     Admit; however, as stated and cited above, Mr. Arellano was mistaken in his

1194

assertions.

45.     Admit.

46.     Deny. Plaintiff's FMLA form dated March 10, 2015 clearly stated that Ms. Brigham would require FMLA leave for both "intermittent capacitation" and "treatment appointments" such as "group sessions." Def.'s Ex. 7 to Ex. A at 3. Thus, Frontier actually approved Plaintiff for 8 FMLA days per month during this period (four (4) days of "intermittent incapacitation" and "1x per week" for "treatment appointments"). Id. Plaintiff's FMLA form dated May 28, 2015 clearly stated that Ms. Brigham would require FMLA leave for both "intermittent incapacitation" and "treatment appointments." Def.'s Ex. 10 to Ex. A at 4-5. Thus, Frontier actually approved Plaintiff for at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"). Id.

47.     Admit; however, as stated and cited above, Plaintiff could not afford unpaid leave nor was she qualified at that time for another internal position within the company.

48.     Admit, but even Shelly Leyner, Defendant's HR Manager also present at the meeting, noted that with regard to this position: "it's not easy to slide into that position" as Plaintiff may not have qualified. **Exhibit 3** at 62:10-63:5.

49.     Admit.

50.     Deny. As stated above, Plaintiff clearly stated she would have taken a position had she been qualified, but she was not. Ex. 3 at 178:9-14 ("A. . . . I still looked in there [referring to Frontier's online job postings]. You never know. There may have been an at-home – work-from-home position doing something that I qualified for, in which case, something like that, I would have considered. However, I did not want to lose my seniority."). Admit, that Ms. Brigham also

desired to remain a flight attendant and was concerned about losing a critical term of her employment: seniority.

51.     Deny. Ms. Brigham "kept the PDX turn on the end" of this trip, *i.e.*, she did not "fail[] to report for a four (4) day trip." Ex. 3 to Pl.'s Mot. at 180:7-23.

52.     Deny. As stated and cited above, Defendant misstates Frontier policy. Defendant's policy also states: "After reporting their absence, employees should send an email . . . [t]his email must be received as soon as practicable, usually the same day of the absence or the next day." Ex. 2 to Def.'s Ex. A at FRONTIER AIRLINES (R. BRIGHAM) – 0000313.

53.     Admit, although pursuant to Defendant's policy, the parties dispute whether Plaintiff's request was actually untimely.

54.     Admit.

55.     Admit, although Plaintiff notes that meeting was meant to discuss Frontier's allegation that Plaintiff had violated the Dependability Policy. *See* Ex. 17 to Def.'s Ex. A at 1. In fact, as Plaintiff had already been granted at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"), Def.'s Ex. 10 to Ex. A at 4-5, Plaintiff could not have been in violation of the Dependability Policy. And even if she was, this was only due to the fact that Defendant simultaneously required her to comply with her treatment plan while also denying her a reasonable accommodation to make such compliance possible. Pl's Motion at 8-13 [Dkt. 36].

56.     Admit, although as stated and cited above, Plaintiff disputes that Defendant has correctly characterized the policy.

57.     Admit.

58.     Admit.

59.     Admit.

60.     Deny. While flight attendants would generally build their schedules through an automated bidding process based on seniority, this was not always the case. Ex. 10 to Pl.'s Motion (the "CBA") at 43 (outlining that in order to bid on a schedule, a flight attendant must be "eligible," which includes all flight attendants unless they were on "company approved leave" such as "LOA, MED, FMLA, OJI, etc."). Thus, for example, a flight attendant coming back from leave for a medical reason (requiring a doctor's release) may not return to work early enough in any given month to start at the beginning of the bidding process. Id. at 43-44. In this case, the flight attendant would build their schedule from "Open Time" (trips leftover and unassigned in the seniority-based bidding process and available on a first-come first-served basis). Id. As such, flight attendants were sometimes allowed to build their schedules from the unawarded trips that more senior flight attendants did not take, *i.e.*, they built their schedules outside of the seniority-based bidding process. Id. And if the flight attendant missed part of a trip, or even a complete trip, while out on intermittent leave such as "FMLA, MED, OJI, etc.," then the flight attendant could simply "pick up Open Time to replace the trip" so long as the missed trip was originally scheduled from Open Time. Id. at 105. Again, this schedule would be built without utilizing the seniority bidding process.

Also, flight attendants who called in sick due to illness, but subsequently recovered without being able to rejoin their original trip, were allowed to "pick up Open Time if available to replace his/her original trip." Id. at 94. This scheduling would be accomplished without utilizing the seniority bidding process.

1197

Moreover, so long as a flight attendant was scheduled for a minimum of 60 hours at the end of the bidding process, while not dropping below 45 hours during the scheduling process, a flight attendant could swap out every single one of the flights they were initially awarded after bidding. Id. at 53-59; Ex. 6 to Pl.'s Mot., Deposition of Plaintiff's direct supervisor Stefanie Coppedge, at 57:5-7 ("Q. Got it. So as long as you maintain your [minimum] hours there, you could trade away all those trips for new trips? A. As long as you maintain [minimum] hours.").

Critically, there is no provision in the CBA that purports to restrict Frontier from complying with its obligation under the ADA to grant reasonable accommodations where required. Ex. 10 to Pl.'s Motion at 141 ("Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate is business and work force . . . .").

61.     Deny. *See* Para. 60 above. Ms. Prince never took this position until she was recently deposed by Frontier. **Exhibit 1**, Declaration of Adrienne Prince dated March 13, 2020 at 2, ¶ 6 ("Frontier claimed the requested accommodation would have violated the seniority provision in the collective bargaining agreement, and therefore, never granted the accommodation. However, I explained to Frontier that the Union was not seeking an accommodation that would violate the seniority provision, but rather, would work *within* the seniority provision. In other words, the Union requested that Ms. Brigham be allowed to bid for shifts within her existing seniority to avoid layovers as much as possible, and with regard to the whatever shifts were leftover containing layovers and assigned to Ms. Brigham, the Union proposed a method by which Ms. Brigham could have traded, swapped or dropped these shifts in compliance with the collective bargaining agreement."); Ex. E, Transcript of Meeting dated November 3, 2015, to Def.'s Mot. at BRIGHAM LM 0000043-44 (Ms. Prince: "And if she were picking up that open time or the trade it wouldn't

1198

be . . . [b]ecause it wouldn't be like pre-awarded if that was something that came up. Uh as far as the union stance – you know if she could bid what she could hold and then you know was either removed or able to pick up some open time – it wouldn't violate seniority. Because that's all first come first serve anyway."); Ex. E to Def.'s Motion at BRIGHAM LM 0000046 (Ms. Prince: "And I do know just so that you're familiar – a lot of times when people come back mid-month or they're not released to be able to bid they are given blank schedules and they to – and I mean it's something that inflight already does so it wouldn't be an undue hardship with the company . . . They already allow – pick up in this light so it's not like we are – it's a really unusual request that's never been done before . . . .").

And even in her recent deposition, Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have violated the CBA. **Exhibit 2**, Deposition of Adrienne Prince at 120:14-24; Ex. 2 at 125:9-12 ("Q. Do you still think that that was a reasonable solution, sitting here today looking back on things? A. I do."); Ex. 2 at 126:5-9 (confirming that Ms. Brigham's request for temporary transfer to the GO was also a reasonable request).

Critically, there is no provision in the CBA that purports to restrict Frontier from complying with its obligation under the ADA to grant reasonable accommodations where required. Ex. 10 to Pl.'s Motion at 141 ("Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate is business and work force . . . .").

62.     Deny. *See* Para. 60-61 above.

63.     Admit that both Frontier and Adrienne Prince have stated they believe this to be true. However, the CBA expressly allows for an active flight attendant to build their own schedule from Open Time. Ex. 10 to Pl.'s Motion at 105 (allowing flight attendants to pick up Open Time

1199

when missing a partial or complete trip due to use of intermittent leave). Thus, Plaintiff's request was routine and was permissible as it was within the bounds of the CBA.

64.    Admit.

65.    Admit, but Plaintiff does dispute whether those absences should have counted as "points" under the Dependability Policy given that she only accrued those absences due to Frontier's failure to accommodate her disability. Pl's Motion at 8-13 [Dkt. 36]. In fact, as Plaintiff had already been granted at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"), Def.'s Ex. 10 to Ex. A at 4-5, Plaintiff could not have been in violation of the Dependability Policy.

66.    Admit. This was part of her inability to secure another flight attendant position. However, Defendant leaves out critical context. Ex. 3 to Pl.'s Mot. at 54:11-55:2 ("I don't have a bunch of schooling. I don't – I mean, I was lucky to get the flight attendant job, and that was like my career. So for me to get a job that would actually pay anything over what my daycare costs would be difficult . . . when you get hired on as a flight attendant, you start at the very bottom. And you're on what's called reserve, which is where you have to be on call pretty much 24/7.") And since being terminated by Frontier, Plaintiff and her family moved to rural Michigan where it is unlikely that an individual can become employed as a flight attendant. Ex. 3 to Pl.'s Mot. at 56:21-59:7 (detailing that Plaintiff's current town is a "one-stoplight town," about 1.5 to 2 hours away from the closest airport (Detroit), and that Plaintiff's family moved to rural Michigan because the cost of living was cheaper and they could be closer to Plaintiff's husband's family).

## II.    LEGAL STANDARD

1200

Ms. Brigham agrees that Defendant has stated the correct legal standard in its Motion. Ms. Brigham also incorporates the summary judgment standard set forth in Plaintiff's Motion for Partial Summary Judgment at 14-15 [Dkt. 36].

### III.    ARGUMENT

Because Defendant is not entitled to summary judgment on: (a) Plaintiff's claim for failure to engage in the interactive process as required under the ADA; (b) Plaintiff's claim of unlawful discrimination under the ADA; (c) Plaintiff's claim of unlawful failure to accommodate under the ADA; or (d) Plaintiff's claim for unlawful retaliation under the ADA, Ms. Brigham respectfully requests the Court deny Defendant's Motion in its entirety.

### A.    Plaintiff's Claim for Failure to Engage in the Interactive Process in Violation of the ADA (Count II) Should Survive Summary Judgment.

Defendant's primary cited case in support of its argument that Ms. Brigham's claim for failure to engage in the interactive process must fail as a matter of law is unpublished and not precedential. *Valdez v. McGill*, 462 Fed. App'x 814, 814 (10th Cir. 2012). And in any event, *Valdez* does not stand for the proposition that Defendant proffers. In *Valdez*, the Tenth Circuit made a practical observation: "[A]n employer is not required to engage an employee in a futile interactive process where, as we have concluded was the case here, no reasonable accommodation was possible." *Id.* at 819. In *Valdez*, the Tenth Circuit quoted *Smith v. Midland Brake*, 180 F.3d 1154, 1172 (10th Cir. 1999) for the proposition: "The obligation to engage in the interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Id.* The Court further observed: "the interactive process is only a means to an end . . . **[t]o recover under the ADA, a plaintiff must show a reasonable accommodation was possible**." *Id.* (internal quotation and citation omitted) (emphasis added). In *Smith v. Midland*

1201

*Brake*, the Tenth Circuit provided a thorough analysis of what the interactive process requires and cited *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 634 (7th Cir. 1998) with approval: "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." 180 F.3d at 1173.

Recently, in *Aubrey v. Koppes*, Case No. 19-1153, at *20 (10th Cir. Sep. 18, 2020), the Tenth Circuit held: "[A] reasonable jury could find that the [Defendant] failed to meet its obligation of engaging with [Plaintiff] in good faith in an interactive process to identify her precise limitations and to explore whether there was any accommodation that could enable [Plaintiff] to return to work and perform the essential functions of her job . . . In fact, a reasonable jury could find that the [Defendant] affirmatively acted to avoid having to consider possible accommodations by . . . essentially ignoring any possible accommodation [Plaintiff] suggested during the pre-termination meeting." *Aubrey*, Case No. 19-1153, at *20. Of course, in order to submit these claims to a jury, the plaintiff in *Aubrey* still had to show that there was, in fact, a reasonable accommodation that would have enabled plaintiff to perform the essential functions of her job, "or another job to which the [Defendant] could have re-assigned her." *Id.* at *21-22 (citing *Smith*, 180 F.3d at 1174). Thus, Plaintiff's claim for failure to engage in the interactive process survives with her demonstration that she proffered various possible reasonable accommodations that would have enabled her to perform the essential functions of her job or another job to which Frontier could have reassigned her. Pl.'s Mot. at 9-13.

Here, Defendant does not even argue that it *actually* did participate in a good faith interactive process, let alone that in some way Ms. Brigham failed to engage in the same. Rather, Defendant offers a purely legal, and incorrect, argument that Ms. Brigham's claim fails as a matter

1202

of law. For these reasons, Defendant's request for summary judgment on this claim should be denied.

**B.      Plaintiff's Claim for Discrimination in Violation of the ADA (Count IV) Should Survive Summary Judgment.**

A prima facie case of discrimination under the ADA requires showing: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is qualified for the job held or desired; and (3) the plaintiff was discriminated against because of her disability. *Aubrey*, Case No. 19-1153, at *31. Establishing a prima facie claim is not onerous. *Id.* If Plaintiff establishes a prima facie case, then the burden shifts to the employer to establish a legitimate non-discriminatory reason for its adverse action; and finally, the plaintiff must then show that defendant's stated reasons are pretext for disability discrimination. *Id.* at 32. In *Aubrey*, the Tenth Circuit explained:

> A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

Case No. 19-1153, at *32 (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018)). Here, the parties agree that this is the correct analytical framework to analyze Plaintiff's ADA discrimination claim; however, the parties disagree on the remainder.

**1.      Plaintiff was disabled within the meaning of the ADA.**

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how she is disabled within the meaning of the ADA because: (1) she is substantially limited; (2) she had a record of such impairment; or (3) she was regarded as having such an impairment. Pl.'s Mot. at 18-24. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard

and grant Plaintiff's Motion seeking a finding that she is disabled within the meaning of the ADA.

Moreover, Defendant's cited authorities on this issue are unavailing or inapposite. Even assuming authority from the Fifth Circuit was binding on this Court, which it is not, Defendant conceded in its deposition that Ms. Brigham was disabled within the meaning of the ADA. Pl.'s Mot. at 19. And taken together, Defendant's citations to Fifth Circuit authority in *Kitchen v. BASF* and *Radick v. Union Pac. Corp.* stand only for the proposition that an individualized assessment should be undertaken to determine if Ms. Brigham is disabled within the meaning of the ADA. Def.'s Mot. at 18. Here, despite Defendant's concession that Ms. Brigham is disabled within the meaning of the ADA, Plaintiff has in fact provided the individualized analysis that Frontier demands. Pl.'s Mot. at 18-24.

Where Defendant does cite to Tenth Circuit authority, its arguments fare no better. Defendant cites to *Burris v. Novartis Animal Health U.S., Inc.*, 309 F. App'x 241 (10th Cir. 2009) which is unpublished and non-precedential. *Burris*, 309 F. App'x at 242. Critically problematic is that *Burris* cites to *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 609-10 (10th Cir. 1998) for the proposition that addiction must substantially limit one or more major life activities to be considered a disability under the ADA. *Id.* at 250. *Nielsen* was, of course, decided prior to the ADA's amendment in 2008. *Compare Nielsen*, 162 F.3d at 604 *with* 42 U.S.C § 12101 *et seq.* Thus, *Nielsen's* definition of "substantially limiting," cited and quoted by *Burris*, encompasses a standard deemed too restrictive and superseded by Congress. Rather, the proper standard is set forth at the current version of 29 C.F.R. § 1630.2(j):

> The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard . . . An impairment is a disability within the meaning of this section if it substantially limits the ability of an

individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual form performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section . . . The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment 'substantially limits' a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis . . . [I]n making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is **lower than the standard for 'substantially limits' applied prior to the ADAAA.**

29 C.F.R. § 1630.2(j)(1)(i)-(iv) (emphasis added). As such, Defendant's inapposite and nonbinding

authority should be disregarded. Ms. Brigham is disabled within the meaning of the ADA.

### i. Plaintiff did not concede that her alcoholism was not substantially limiting after September 5, 2014.

Defendant argues that "Plaintiff testified unequivocally that her alcoholism has *not*

substantially limited her ability to perform a major life activity since September 5, 2014." Def.'s

Mot. at 20. This assertion is indisputably incorrect and cannot be "undeniably fatal to her claims."

Plaintiff never allowed her *use of alcohol* to impede her ability to perform satisfactorily as

a flight attendant *i.e.*, she never drank on the job. Ex. 3 to Pl.'s Mot. at 68:2-9 ("No. Luckily, I had

never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on

duty. However, on overnights, after you're done, it's – it was just kind of a culture where you

would take off all your flight attendant gear, put on normal clothes, and go meet at the bar. Nine

times out of ten, that's what you did.").

However, Plaintiff's alcoholism was substantially limiting in a number of ways. Id. at

225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble

with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by

Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Ex. 7 to Pl.'s Mot. at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); Ex. 15 to Pl.'s Mot. at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her."); and Ex. 15 to Pl.'s Mot. at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol dependance.").

**2. Plaintiff was a qualified individual within the meaning of the ADA.**

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how she is a qualified individual within the meaning of the ADA because she was able to perform the essential functions of her job with an accommodation. Pl.'s Mot. at 16-18. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard and grant Plaintiff's Motion seeking a finding that she is a qualified individual within the meaning of the ADA.

1206

In this context, Defendant again cites the Court to outdated or incomplete authority defining "essential functions." Def.'s Mot. at 20-21. "Essential functions" are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires . . . [t]he term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Further, "a job function may be considered essential for any of several reasons, including but not limited to: (i) [t]he function may be essential because the reason the position exists is to perform that function; (ii) [t]he function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) [t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." Id. at Section 1630.2(n)(2)(i)-(iii).

And finally, "[e]vidence of whether a particular function is essential includes, but is not limited to: (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job; and/or (vii) [t]he current work experience of incumbents in similar jobs." Id at Section 1630.2(n)(3)(i)-(vii).

### i. Layovers were not an essential function of Ms. Brigham's position as a flight attendant.

Despite Defendant's contention otherwise, covering flights with overnight layovers was not an essential function of Plaintiff's position as a flight attendant. Defendant's own cited evidence does not state that being scheduled for layovers or overnights is an essential function of

the position of flight attendant. *See* Def.'s Ex. A at ¶ 5; Def.'s Ex. B at 118:10-18. Moreover, Mr. Arellano, when testifying on behalf of Defendant Frontier Airlines, Inc., stated that a flight attendant's primary job duties were those of a "safety professional . . . to make sure the passenger experience is a positive one from every aspect of serving drinks and sharing – safety is obviously the most important." Ex. 2 to Pl.'s Motion for Partial Summary Judgment at 50:1-5. When asked about flight attendants' job duties from the perspective of scheduling such as: "When do they start? Where do they go? How does the day end?", Mr. Arellano responded: "[I]t's hard to answer that question because everybody had a different – a flight attendant had a different way to bid a schedule based on their preference . . . So every day would be different for each flight attendant based on the type of routes they bid for, the type of flying they bid for . . . It just depended on the individual. It's all completely different. It's hard to answer that question." Id. at 55:4-56:21.

When questioned by Frontier's attorney as to whether or not the Position Description attached to Frontier's Motion properly listed all essential functions of a flight attendant, Plaintiff responded: "Yes." Ex. 3 to Pl.'s Motion at 118:10-119:14. Notably, the Position Description does not include layovers or overnights. Def.'s Ex. A at ¶5. Nor does the applicable CBA require overnight layovers. *See* generally Ex. 10 to Pl.'s Mot. And while Mr. Arellano testified that schedules for flight attendants are "completely different," Ms. Brigham also confirmed that some flight attendants prefer overnights, while others do not: "Q. I mean, doesn't most – don't most flight attendants want to come home at night? A. No, that's actually – most trips that are on the Trade Board are victory laps, which is the turn that is after your whole, let's say, three—or four-day trip. Most people want to be done when they first fly into Denver. They don't want to do Salt Lake City and then back to Denver. There were so many turns on the Trade Board that people were

trying to get rid of, so they wouldn't have to fly." Ex. 3 to Pl.'s Mot. at 94:20-95:4; *see also* Ex. 3 to Pl.'s Mot. at 212:7-18 ("So turns is what people typically – that – that was the premium, right, what people wanted? A. Not necessarily. Everybody was different. Q. But for the most part? A. No. I knew lots of people that would prefer two days, and lots of people that preferred to fly up to six days in a row. That way they could have, like, two weeks off. It just depended on the person . . . .").

Defendant's citations to *US Airways* and *Santiago* do nothing to change this fact as even if occasional unforeseen circumstances may require an overnight layover because "marginal functions of the position" are not considered essential functions. 29 C.F.R. § 1630.2(n)(1). Moreover, Defendant does not even attempt to argue that Ms. Brigham could not perform the essential functions of light duty or administrative work at the GO, which of course, she could. Pl.'s Mot. at 9-12.

### ii. Ms. Brigham never conceded that compliance with Frontier's Dependability Policy was an essential function of the position of flight attendant.

The totality of Defendant's cited authority in support of this proposition misses the mark because Frontier fundamentally misunderstands the cause of Ms. Brigham's absences from work after self-disclosing her disability. *See, e.g.,* Def.'s Mot. at 23 ("unsatisfactory conduct caused by alcoholism . . . does not receive protection under the ADA"); Def.'s Mot. at 23-34 (citing *Vandenbrook* where "plaintiff had repeatedly violated the defendant's 'no call/no show' policy despite the fact that this absenteeism was the result of his alcoholism"); and Def.'s Mot. at 24-25 (citing *Stephens* despite the fact the defendant airline in *Stephens* had a drastically different position description that required "16-hour duty days" and a CBA stating that trips may be

1209

scheduled for "six consecutive days" – all conditions not present in Ms. Brigham's case).

Ms. Brigham never testified that after her self-disclosure, she missed work due to alcohol use or her alcoholism; but rather, Ms. Brigham consistently testified that she was absent because: (1) Frontier **required** her to comply with terms of her treatment plan which directed her to avoid overnight layovers, while simultaneously, (2) Frontier failed to reasonably accommodate her so that she could comply the required treatment plan. Pl's Motion at 8-13 [Dkt. 36]. Additionally, it is doubtful that Ms. Brigham ever actually violated Frontier's Dependability Policy such that she should have been terminated. *See supra* p. 18, ¶ 46 (detailing that Plaintiff should have been approved for at least 16 intermittent FMLA days prior to being terminated). And of critical importance, while Defendant's argument is that Ms. Brigham "does not dispute that compliance with Frontier's attendance policy and protocols was an essential function of Frontier's flight attendant position," Def.'s Mot. at 22, Defendant **fails to cite to a single fact in the record in support of this proposition**. The parameters of Defendant's Dependability Policy, its application, and its proper or improper use against Ms. Brigham comprise facts that are very much disputed.

### iii.   Frontier never offered reasonable alternative accommodations.

Defendant is mistaken as to what constitutes a reasonable accommodation. A reasonable accommodation means: "(i) [m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or (ii) [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or (iii) [m]odifications or adjustments that enable a covered entity's employee with a disability to

enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(i)-(iii).

Thus, reasonable accommodations include, but are not limited to: "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . [or] appropriate adjustment or modifications of . . . policies . . . ." Id. at Section 1630.2(o)(2)(ii). And again, Defendant cites pre-ADA amendment law for an outdated proposition in *Kuehl v. Wal-Mart Stores, Inc.* The proper standard for when rejection of a reasonable accommodation may operate to forfeit the ADA's protections is as follows: "And individual is not required to accept an accommodation . . . However, if such individual rejects a reasonable accommodation . . . that is **necessary** to enable the individual to perform the essential functions of the position held or desired, and cannot, **as a result of that rejection**, perform the essential functions of the position, the individual will not be considered qualified." 29 C.F.R. § 1630.9(d).

Here, Defendant's offer of unpaid leave was not an offer for a reasonable accommodation because taking unpaid leave would not have enabled Ms. Brigham to "perform the essential functions of [her] position" or "enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." Ex. 3 to Pl.'s Mot. at 65:6-7 ("Correct. I needed money coming in. And had they accommodated me, I would have had that."). And Defendant's suggestion that Plaintiff apply for positions for which she was unqualified suffers from the same defects notwithstanding that Ms. Brigham also wanted to preserve her seniority. Ex. 3 to Pl.'s Mot. at 74:5-17 ("Q. Are you aware that Frontier provides preferential hiring for anyone who needs an accommodation under the Americans with Disabilities Act for positions for which they're minimally qualified? A. They never told me anything about that . . . I asked multiple

times what could be done to help me in this situation. I was never aware of whatever you're talking about. They never mentioned anything to me. All they said was that they could not help me."); Ex. 3 to Pl.'s Mot. at 165:22-166:6 ("So you were able to successfully look for potential transfer options; is that right? . . . A. From – honestly, from my memory. I remember seeing a bunch of stuff that I was not quite qualified for. And then at some point, I stopped, because I had been told that, You'll lose your seniority, and you won't be able to go back to inflight after 90 days."); Ex. 3 at 178:9-14 ("A. . . . I still looked in there [referring to Frontier's online job postings]. You never know. There may have been an at-home – work-from-home position doing something that I qualified for, in which case, something like that, I would have considered. However, I did not want to lose my seniority.").

        And finally, Plaintiff did request additional intermittent FMLA time during the period that Frontier failed to reasonably accommodate her and prior to her termination, but Defendant denied this request and terminated Ms. Brigham. Ex. E to Def.'s Ex. A, Termination Meeting dated November 3, 2015, at 2 ("REBECCA: Oh and then – before we leave I need to find out if LOA got my new intermittent FMLA paperwork for more days. We can deal with that after . . . we had to submit new intermittent FMLSA paperwork."); Ex. A. to Def.'s Mot. at 11, ¶ 67 ("On November 11, 2015, Frontier informed Plaintiff that it was terminating her employment effective immediately for incurring ten (10) occurrences within a twelve (12) month period . . . ."). Therefore, Defendant Frontier never offered any reasonable accommodations for Ms. Brigham to reject, resulting from its failure to actually engage in the interactive process, and moreover, Defendant denied any reasonable accommodations suggested by Plaintiff. Pl.'s Mot. at 10-12.

        **3.   Frontier terminated Ms. Brigham because of her disability.**

Plaintiff has presented more than adequate evidence to meet her "not onerous" duty to show her termination was due to her disability. **First**, Defendant required Plaintiff to comply with her treatment plan **for alcoholism** then terminated Ms. Brigham when she did so. Pl's Motion at 8-13 [Dkt. 36]. **Second**, Defendant did regularly grant requests for reasonable accommodation in the form modified schedules or light duty, just not for Plaintiff and not for alcoholics. Id. at 11-12. **Third**, Mr. Arellano stated that Ms. Brigham's requested accommodations would have amounted to "making exceptions" and that Frontier would not make a "separate accommodation." Ex. 3 at 52:16-21; 56:17-21. **Fourth**, Ms. Brigham had not actually violated the Dependability Policy as Frontier had previously granted her at least 16 days of intermittent FMLA time per month. Def.'s Ex. 10 to Ex. A at 4-5. **Fifth**, Ms. Brigham was not the only alcoholic at Frontier during the relevant time period to suffer discrimination at the hands of Mr. Arellano and Ms. Leyner. Pl.'s Mot. at 13 (detailing the experiences of David St. Hilaire). And **sixth**, Ms. Brigham was not the only Frontier flight attendant to be denied reasonable accommodations during the relevant time period. Pl.'s Mot. at 13-14 (detailing other flight attendants' failure to be accommodated for pregnancy related issues while being assessed points under the Dependability Policy).

### i. Ms. Brigham never conceded that she violated Frontier's Dependability Policy.

Again, Defendant presents as fact that "Plaintiff concedes that she violated Frontier's attendance policy and protocols" without citing a single fact in the record to support this concession. Moreover, as detailed above, these facts are disputed. *See supra* p. 32-33.

### 4. Frontier's stated reasons for Ms. Brigham's termination are pretext for unlawful discrimination in violation of the ADA.

Ms. Brigham has produced adequate evidence that her termination for violating Frontier's

Dependability Policy was pretext for unlawful termination. To do so Ms. Brigham must show that Frontier's proffered explanation is "factually false, or that discrimination was a primary factor in the employer's decision . . . [t]his is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Aubrey*, Case No. 19-1153, at *32. "[A] showing of pretext *is* evidence which allows a jury to infer discriminatory intent . . . [c]onsquently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to a jury." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir. 1994) (additional citation omitted)). Here, there can be no reasonable dispute that Ms. Brigham has produced adequate evidence of pretext with her prima facie case. *See supra* p. 36 (discussing evidence in support of assertion that Frontier terminated Plaintiff because of her disability).

### C.   Plaintiff's Claim for Failure to Accommodate in Violation of the ADA (Count I) Should Survive Summary Judgment.

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how Defendant violated the ADA when it failed to accommodate her. Pl.'s Mot. at 24-27. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard and grant Plaintiff's Motion seeking a finding that Frontier failed to accommodate her in violation of the ADA. Additional specific arguments in response to Defendant's Motion are set forth below.

First, Defendant did not reasonably accommodate Plaintiff nor did Defendant offer any reasonable accommodations, as reasonable accommodations are defined under the ADA—even if

Defendant granted Plaintiff 60 days of FMLA leave for a serious health condition when Plaintiff entered in-patient rehabilitation. *See supra* p. 33-36.

Second, completion of overnight layovers was not an essential function of Plaintiff's job, or at the very least, these facts are disputed for purposes of summary judgment, *see supra* p. 30-32, and therefore, Plaintiff was never requesting that an "essential job function" be removed. Moreover, even assuming *arguendo* that layovers were an essential function, this does not explain Frontier's failure to transfer Ms. Brigham to the GO as it routinely does for flight attendants on OJI.

Third, Defendant cites much law for the proposition that an employer need not accommodate an employee when that accommodation would violate the rights of other employees under a collective bargaining agreement. But Defendant's perceived violations of the CBA in this case are conjectural and inconsistent with a plain reading of the CBA and the Union's Vice President during the relevant time period. *See supra* p. 12-13. Moreover, Defendant's analogy to a case where a flight attendant could not always be guaranteed a pressurized flight cabin as similar to the observation that layovers might occur occasionally on an emergency basis does nothing to illuminate "essential job functions" in *this* case. Also, it has nothing to do with the terms of the CBA.

Similarly, Defendant argues that Plaintiff's contention that liability attached when Frontier failed to reassign Ms. Brigham to the GO is a "red herring." Defendant argues this is because granting this request would have "excused Plaintiff, an active flight attendant, from the mandatory, seniority-based bidding process set forth in the CBA." This hardly makes sense because per the terms of the CBA, Plaintiff could have been granted various types of leave in order to effect a

1215

transfer to the GO, and moreover, the OJI process set forth in the CBA does not prohibit such transfers to the GO for reasons of compliance with the ADA. *See supra* p. 2-4. Moroever, the CBA does not apply to "assignment to non-flying duty (e.g., light duty)." Ex. 10 to Pl.'s Mot. at 101.

Next, Defendant argues that transferring Plaintiff to the GO would have removed an essential function: layovers; but, apart from the fact that the ADA specifically authorizes reassignments to vacant positions as a reasonable accommodation, layovers were not an essential function of Ms. Brigham's job. *See supra* p. 30-34. And Plaintiff was not seeking an indefinite transfer to the GO. *See supra* p. 17, ¶ 39.

Finally, Defendant's argument that Plaintiff's request to be reassigned temporarily to the GO was tantamount to a request that Defendant "create a new position" is without merit. In *Mannan v. Colorado*, plaintiff was seeking assignment to one "post" that any other "Corrections Officer may be assigned to work on a given day." Case No. 18-cv-01844-MSK-SKC, at *10. Here, Plaintiff was seeking reassignment to a different and vacant position at the GO. Pl.'s Mot. at 9-10 (showing Plaintiff's request and Defendant's contention that she could have been reassigned but she was not because she was not "eligible" not because the position did not exist). Further, in *Mannan*, the Court recognized that an employer "may choose to provide <u>temporary</u> light duty assignments to disabled employees," while the employer is not required to "create a new position" nor is it required to "provide a permanent light duty post." *Id.* at 11 (underscore in original). Again, Plaintiff was seeking neither creation of a "new position" nor a "permanent light duty post," *see supra* p. 17, ¶ 39.

Defendant's citation to *Benson* is also inapposite as Plaintiff was not seeking transfer that would have required Defendant to create a job. Similarly, Defendant's citation to *Severson* is

unavailing as in *Severson*, the employer "d[id] not maintain any full- or part-time light-duty positions at its facility, and the plaintiff concedes that [defendant] would have had to create a light-duty position for him . . . ." *Severson v. Heartland Woodcraft, Inc.*, Case No. 14-C-1141, at *15 (E.D. Wis. Nov. 12, 2015). Here, as cited above, Defendant did maintain positions at the GO and could have reassigned Plaintiff to the same.

Importantly, assuming *arguendo* that Defendant's arguments as to creation of a light duty job have merit, this does not excuse the fact that Defendant failed to offer Ms. Brigham *any* type of reasonable accommodation. *See supra* p. 33-35. This fact alone creates liability on the part of Frontier for unlawful failure to accommodate under the ADA. *Exby-Stolley v. Bd. of Cnty. Comm'rs*, Case No. 16-1412, at *19 (10th Cir. Oct. 28, 2020) (". . . the third element of this general test—that the individual was discriminated against because of their disability—is satisfied in a failure-to-accommodate claim *as soon as* the employer, with adequate notice of the disabled employee's request for some accommodation, fails to provide a reasonable accommodation.").

### D. Plaintiff's Claim for Unlawful Retaliation in Violation of the ADA (Count III) Should Survive Summary Judgment.

Frontier's argument in this regard is limited solely to: "Plaintiff has not and cannot show any causal connection between Plaintiff's requests for accommodation and the termination of her employment." Def.'s Mot. at 39. But Defendant's facts cited in support of this argument are incorrect and incomplete, and Plaintiff has produced adequate evidence showing causation. *See supra* p. 35-36 (detailing facts in support of causation and Plaintiff's request for intermittent leave).

### IV. CONCLUSION

For the aforementioned reasons, Ms. Brigham respectfully requests the Court deny Defendant's Motion in its entirety.

Respectfully submitted this 8th day of December, 2020.

THE LAW OFFICE OF JOHN R. CRONE,
LLC


/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, a true and correct copy of the foregoing *Plaintiff's Response to Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
      John R. Crone

1218

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

       Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

       Defendant.

---

**DECLARATION OF ADRIENNE PRINCE**

---

1.      My name is Adrienne Prince, and I possess personal knowledge of all contents contained in this Declaration.

2.      From approximately 2007 through 2015, I am aware that Plaintiff Rebecca Brigham was employed by Frontier Airlines, Inc. ("Frontier") as a flight attendant and a member of the Association of Flight Attendants-CWA, AFL-CIO (the "Union" or the "AFA").

3.      I am also aware that Ms. Brigham suffered from alcoholism, voluntarily disclosed this disability to Frontier, and underwent inpatient treatment. When Ms. Brigham returned to the workplace, the Union assisted her in seeking accommodations for her disability.

4.      During this time period, late 2014 through 2015, I was Vice President of the AFA, and in that capacity, I requested accommodations from Frontier on behalf of Ms. Brigham.

5.      Primarily, the Union sought accommodations that would alter Ms. Brigham's work schedule to avoid long layovers. Without this type of accommodation, Ms. Brigham's only option to avoid long layovers was to use intermittent FMLA time; however, this time would eventually run out. It is my understanding that Ms. Brigham, who was denied this requested accommodation, did eventually exhaust her intermittent FMLA time which led to Frontier terminating Ms. Brigham for attendance issues.

6.      Frontier claimed the requested accommodation would violate the seniority provision in the collective bargaining agreement, and therefore, never granted the accommodation. However, I explained to Frontier that the Union was not seeking an accommodation that would violate the seniority provision, but rather, would work *within* the seniority provision. In other words, the Union requested that Ms. Brigham be allowed to bid for shifts within her existing seniority to avoid layovers as much as possible, and with regard to whatever shifts were leftover containing layovers and assigned to Ms. Brigham, the Union proposed a method by which Ms. Brigham could have traded, swapped or dropped these shifts in compliance with the collective bargaining agreement.

7.      In any event, Frontier refused to grant this accommodation, nor did Frontier offer any solution of its own. Eventually, Ms. Brigham was terminated as she had no way to effectively cover her shifts that called for long layovers.

8.      I declare under penalty of perjury that the foregoing is true and correct. Executed this 13 day of March , 2020.

_____
Adrienne Prince

1220

52

Page 1

1              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLORADO

2

    Civil Action No. 19-cv-03417-STV

3    ─────────────────────────────────────────────────

4

    REBECCA BRIGHAM,

5

             Plaintiff,

6

    vs.

7

    FRONTIER AIRLINES, INC.,

8

          ─────────Defendant.─────────────────────────

9

10      VIDEO VIDEOCONFERENCED DEPOSITION OF ADRIENNE PRINCE
        ──────────────────August 21, 2020──────────────────

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Job No. CS4205084

Veritext Legal Solutions
800-567-8658                                                                973-410-4098

Page 2

```
 1  VIDEOCONFERENCED APPEARANCES:
 2  ON BEHALF OF THE PLAINTIFF:
        JOHN REILY CRONE, ESQ.
 3      EVAN S. GRIMES, ESQ.
        John R. Crone, LLC
 4      4550 East Cherry Creek Drive South, Suite 1003
        Glendale, Colorado 80246
 5      Phone: 303-598-3526
        Email: john@crone-law.com
 6      Email: evan@crone-law.com
 7  ON BEHALF OF THE DEFENDANT:
        DANIELLE L. KITSON, ESQ.
 8      CAROLYN B. THEIS, ESQ.
        Littler Mendelson, P.C.
 9      1900 16th Street, Suite 800
        Denver, Colorado 80202
10      Phone: 303-629-6200
        Email: dkitson@littler.com
11      Email: ctheis@littler.com
12  ON BEHALF OF THE DEPONENT:
        JOSHUA CORDER SOUK, ESQ.
13      Association of Flight Attendants-CWA
        501 3rd Street NW, Floor 10
14      Washington, DC 20001
        Phone: 202-434-0579
15      Email: jsouk@afacwa.org
16  ALSO PRESENT: Cole Bartelt, Videographer
        Jacalyn Peter
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      PURSUANT TO WRITTEN NOTICE and the
 2  appropriate rules of civil procedure, the video
 3  videoconferenced deposition of ADRIENNE PRINCE, called
 4  for examination by the Defendant, was taken remotely,
 5  commencing at 9:19 a.m. on August 21, 2020, before
 6  Laurel S. Tubbs, a Registered Professional Reporter,
 7  Certified Realtime Reporter and Notary Public in and for
 8  the State of Colorado.
 9              INDEX
10  EXAMINATION:                    PAGE
11  By Ms. Kitson          6, 111, 130
    By Mr. Crone           89, 120, 133
12
    EXHIBITS:                       PAGE
13
    Exhibit 1 Collective Bargaining Agreement      21
14
    Exhibit 18 Search for Crew Absentee Records    70
15
    Exhibit 19 Letter Dated October 30, 2015       78
16
    Exhibit 20 Document Entitled "Untitled"        57
17
    Exhibit 21 Letter Dated November 11, 2015      80
18
    Exhibit 22 Letter Dated December 10, 2015      80
19
    Exhibit 31 Letter Dated December 21, 2015      85
20
    Exhibit 40 Declaration of Adrienne Prince      50
21
    Exhibit 44 #C Final Meeting with the           60
22          Company-Investigatory
23  Exhibit 45 Letter Dated November 18, 2016      74
24
25
```

Page 4

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER: Good morning. We're
 3  going on the record at 9:19 a.m. on August 21st, 2020.
 4  Please note that the microphones are sensitive and may
 5  pick up whispering, private conversations, and cellular
 6  interference.  Please turn off all cell phones or place
 7  them away from your computer microphones, as they can
 8  interfere with the deposition audio. Audio and video
 9  recording will continue to take place unless all parties
10  agree to go off the record.
11          This is Media Unit 1 of the video-recorded
12  deposition of Adrienne Prince, taken by counsel for the
13  Defendant, in the matter of Rebecca Brigham versus
14  Frontier Airlines, filed in the United States District
15  Court for the District of Colorado, Case Number
16  19-cv-03417. This deposition is being held via remote
17  video deposition, located in Douglas County, Colorado.
18          My name is Cole Bartelt from the firm
19  Veritext, and I'm the videographer. The court reporter
20  is Laurel Tubbs from the firm Veritext.
21          I'm not authorized to administer an oath
22  to any party in this action, nor am I financially
23  interested in the outcome.
24          Counsel, all -- counsel and everyone
25  appearing remotely will now state their appearances and
```

Page 5

```
 1  affiliations for the record.
 2          MS. KITSON: This is Danielle Kitson on
 3  behalf of the Defendant, Frontier Airlines. And on the
 4  Zoom call today is also Jacalyn Peter, Frontier's vice
 5  president of labor relations.
 6          MR. CRONE: John Crone on behalf of the
 7  Plaintiff, Rebecca Brigham.
 8          MR. GRIMES: Evan Grimes, attorney for
 9  Plaintiff.
10          MR. SOUK: I'm Joshua Souk representing
11  the Association of Flight Attendants, which represents
12  Ms. Prince.
13          THE VIDEOGRAPHER: At this time, will the
14  court reporter please enter the statement for remote
15  proceedings into the record.
16          THE REPORTER: The attorneys participating
17  in this deposition acknowledge that I am not physically
18  present in the deposition room and that I will be
19  reporting this deposition remotely. They further
20  acknowledge that in lieu of an oath administered in
21  person, the witness will verbally declare his/her
22  testimony in this matter is under penalty of perjury.
23  The parties and their counsel consent to this arrangement
24  and waive any objections to this manner of reporting.
25          Please indicate your agreement by stating
```

2 (Pages 2 - 5)

Page 6

1  your name and your agreement on the record, beginning
2  with the taking attorney.
3          MS. KITSON: I agree.
4          MR. CRONE: John Crone and Evans Grimes.
5  I agree.
6          MR. SOUK: Joshua Souk. I agree.
7          ADRIENNE PRINCE,
8  having been first duly sworn or affirmed, was examined and
9  testified as follows:
10          EXAMINATION
11  BY MS. KITSON:
12      Q. Good morning, Ms. Prince.
13          How are you today?
14      A. Good. Thanks.
15      Q. Can you please state your full name for the
16  record.
17      A. Adrienne Prince.
18      Q. What's your current address?
19      A. 16315 Rock Crystal Drive in Parker,
20  Colorado 80134.
21      Q. And have you ever been deposed before in a
22  deposition?
23      A. Yes.
24      Q. Okay. And how many times?
25      A. I don't remember. Just a few.

Page 7

1      Q. A few. How many years has it been?
2      A. Several.
3      Q. I'm assuming, then, that this is your first
4  remote deposition; is that right?
5      A. Yes.
6      Q. Do you understand that you're under oath
7  here today?
8      A. Yes, I do.
9      Q. Do you understand that that oath is the
10  same oath that you would take in a court of law?
11      A. Yes, I do.
12      Q. I'm going to talk to you just a little bit
13  about the new reality of deposition rules in which we're
14  living and kind of the rules for today.
15          Do you understand that you are being
16  recorded via a Zoom call link today?
17      A. I do.
18      Q. And do you understand that your words and
19  the words of everyone on the call are being taken down by
20  our court reporter?
21      A. I do.
22      Q. Okay. It's important, therefore, that you
23  give verbal responses today. It's pretty natural to say,
24  Uh-huh or Huh-uh. I do that and have to be reminded
25  myself.

Page 8

1          But can you endeavor today to give verbal
2  responses, a Yes or a No?
3      A. Yes, I will.
4      Q. Counsel for Ms. Brigham, Mr. Crone and
5  Mr. Grimes, are on the call today. And they may be making
6  objections throughout the questioning. Those objections
7  are for the record for a judge to rule on later in the
8  course of the litigation. So once they make their
9  objections, you can answer the question unless your
10  counsel, Mr. Souk, instructs you not to answer.
11          Do you understand that?
12      A. Yes, I do. Thanks.
13      Q. Okay. Will you agree to give me full and
14  complete answers to my questions today?
15      A. Yes, I will.
16      Q. Will you let me know at any point if
17  there's anything you want to add to a prior answer that
18  you gave?
19      A. Yes, I will.
20      Q. Okay. Will you let me know at any point in
21  the deposition if there's something you don't understand
22  about my question?
23      A. Yes, I will.
24      Q. Okay. And will you know -- sorry.
25          Will you let me know at any point today if

Page 9

1  you encounter any technical difficulties with this Zoom
2  link?
3      A. Yes, I will.
4      Q. Okay. We can take a break whenever you
5  need. I take breaks pretty frequently. But if at any
6  point you need a restroom break or, you know, need to get
7  a drink, or whatever you need, just let me know, and we
8  can take a break. I'd just ask that you answer any
9  question that's pending before we take that break.
10          Is that fair?
11      A. Yes, it is. Thank you.
12      Q. Okay. At the end of this, you'll have an
13  opportunity to review the transcript of what's being taken
14  down today.
15          Will you agree to review it and correct
16  anything that's inaccurate?
17      A. Yes, I will.
18      Q. Okay. How are you feeling today?
19      A. Good. Thank you.
20      Q. Okay. Are you sick at all?
21      A. No.
22      Q. Are you taking any medications that would
23  affect your ability to think clearly?
24      A. No.
25      Q. Any medications that would affect your

3 (Pages 6 - 9)

Page 10

1  ability to recall events?
2      A. No, I'm not.
3      Q. Is there anything at all that would affect
4  your ability to testify truthful -- truthfully and
5  accurately here today?
6      A. No.
7      Q. Okay. Will you let me know at any point if
8  you start to have problems concentrating or answering
9  questions?
10     A. I will. Thank you.
11     Q. Okay. Great.
12         I just want to ask you a little bit about
13  your background, basic stuff.
14         Where are you from originally?
15     A. I'm from Aurora, Colorado.
16     Q. And have you ever lived in any other
17  states?
18     A. I lived in California for a little while.
19     Q. Okay. And tell us about your educational
20  background, if you would.
21     A. I graduated from Colorado State
22  University.
23     Q. Okay. And what year was that?
24     A. '98.
25     Q. Okay. What -- what degree did you receive?

Page 11

1      A. Spanish.
2      Q. That's a B.A., I'm taking it?
3      A. Yeah. Yeah. Yeah. Bachelor of arts.
4      Q. Yeah. And tell us about your employment
5  after college.
6         Where else have you worked other than
7  Frontier?
8      A. I worked at Frontier full-time. I have
9  some side -- I'm a substitute teacher, and I also work
10  for a school for their before- and after-school program.
11     Q. So you started with Frontier right out of
12  college?
13     A. Yep, in 1999.
14     Q. Wow. That's cool.
15     A. Yeah.
16     Q. Well, at a high level, can you tell us,
17  have -- what are your dates of employment at Frontier,
18  then; 1999 to today, correct?
19     A. Correct.
20     Q. Okay. And what positions have you held at
21  Frontier?
22     A. Just flight attendant, and then I did work
23  for the union.
24     Q. Okay. So what's your position on the
25  seniority list?

Page 12

1      A. I think I'm roughly number 50-ish.
2      Q. Wow. Interesting.
3         Tell me about your roles with the union.
4  When did you start having a position with the union?
5      A. I believe I started -- the actual year I
6  don't recall right offhand, but I started as the MEC
7  Grievance chair. I want to say that was roughly 2012,
8  2013. And after that, I became vice president, and
9  was vice president for about two years.
10     Q. When was that, approximately?
11     A. I'm going to say, roughly, like 2014,
12  2015.
13     Q. Do you currently have any role with the
14  union?
15     A. I do not. Just a member.
16     Q. And was vice president your last role with
17  the union?
18     A. Yes.
19     Q. So since about 2015, you've no longer been
20  associated with the union other than being a member of the
21  union?
22     A. Correct.
23     Q. Okay. When you were MEC of the
24  grievance -- or MEC Grievance chair -- I'm sorry -- what
25  does MEC stand for?

Page 13

1      THE REPORTER: I'm sorry. One more time?
2      THE DEPONENT: I'm sorry. Master
3  Executive Council.
4      Q. (By Ms. Kitson) So starting in about 2012,
5  you were the Master Executive Council Grievance chair; is
6  that correct?
7      A. Correct.
8      Q. And what did you do in that role?
9      A. Advocated for flight attendants.
10     Q. And is that in the grievance process, then?
11     A. Correct.
12     Q. And did you have a boss in that role?
13     A. The -- I would say that the president
14  and -- of the -- of our union.
15     Q. And was that an elected role? Were you
16  elected into it?
17     A. As Grievance chair, no; I was appointed.
18     Q. Okay. And so in that role as Grievance
19  chair, you reported to the president of the union, for
20  lack of a better phrase?
21     A. Correct.
22     Q. Okay. But the president of the union
23  didn't have any ability to fire you, demote you, promote
24  you, anything like that?
25     A. I believe, since I was appointed, that --

4 (Pages 6 - 9)

Page 14

1 that she could have had me removed if she wanted to.
2     Q. But not in your flight attendant role for
3 Frontier?
4     A. Correct -- oh, correct. Correct.
5     Q. Okay. Did anyone within the union report
6 up to you as the Grievance chair?
7     A. The local Grievance representatives.
8     Q. How many of those were there?
9     A. At that time, I don't recall the exact
10 number.
11     Q. Ballpark?
12     A. Maybe two or three.
13     Q. Okay. When you became vice president of
14 the union, were -- how many other vice presidents were
15 there, if any?
16     A. There was one for each base.
17     Q. Okay.
18     A. And -- yeah.
19     Q. So you have the president of the union,
20 correct?
21     A. Correct.
22     Q. And then a vice president for each base; is
23 that correct?
24     A. And each base had their president as well.
25     Q. Okay. And then was there someone above the

Page 15

1 president that they reported to?
2     A. Not -- I don't -- no. I mean, we asked
3 AFA International for advice, but other than that, it
4 wasn't like reporting to as in a job-type role --
5 managerial-type role.
6     Q. And in that 2012-to-2015 period of time,
7 how many bases were there?
8     A. Let me think. I believe, at the time,
9 there was only two. Maybe three. I can't remember if
10 Orlando was part of that at that time.
11     Q. Who was your president in that time frame?
12     A. Angie Piller.
13     Q. And in your role as vice president for your
14 base at the time, which representatives reported up to
15 you?
16     A. Kori Halverson and Dee Emricson.
17     Q. Anyone else?
18     A. I can't remember if there was -- I can't
19 remember if there was anyone else at that time.
20     Q. And what was Kori Halverson's role?
21     A. When I was vice president, she was the MEC
22 Grievance chair.
23     Q. And what was Ms. Emricson's role?
24     A. She was a Grievance rep.
25     Q. And did anyone report up to them at that

Page 16

1 time?
2     A. Not to my recollection.
3     Q. Okay. During the time that you were vice
4 president of the union, can you describe for us your job
5 duties in that role?
6     A. As vice president, I oversaw some
7 committees, and I advocated for flight attendants and
8 helped the -- the president do what -- their -- their
9 duties, if they needed help. And I also participated in
10 grievance hearings.
11     Q. How much time did you spend on union duties
12 versus your regular flight attendant duties, or were you
13 not flying at the time?
14     A. I flew. I would say it was split -- I
15 don't know -- I probably flew -- well, I flew full-time.
16 And then I added probably maybe a few hours a month, a
17 few hours a week, doing union duties.
18     Q. During the time that you were vice
19 president of the union, did you have the authority to make
20 decisions on behalf of the union?
21     A. Not solely, no.
22     Q. What would you have to do in order to make
23 a decision on behalf of the union?
24     A. Typically, I would have to ask for an
25 officer or officers. We did things collectively.

Page 17

1     Q. So, for instance, if someone wanted to
2 change the terms of the Collective Bargaining Agreement,
3 for instance, you would not be able to do that just
4 yourself; is that right?
5     A. Correct.
6     Q. And do you know if your president could
7 have done that herself?
8     THE REPORTER: She's frozen. Can we go
9 off the record?
10     MS. KITSON: Yes.
11     Are you there?
12     THE DEPONENT: Yep. I'm still here.
13     MS. KITSON: You froze up for one second,
14 but --
15     THE DEPONENT: Oh, sorry.
16     MS. KITSON: That's all right.
17     Should we go back on the record?
18     THE REPORTER: Yes.
19     THE VIDEOGRAPHER: I never completely went
20 off, so...
21     MS. KITSON: Oh, that's fine.
22     Q. (By Ms. Kitson) Let me ask that question
23 again.
24     Your president at the time that you were
25 vice president, do you know if she had the sole authority

5 (Pages 6 - 9)

Page 18

1 to make decisions on behalf of the union?
2    A. No, she did not.
3    Q. Okay. And what did she have to do in order
4 to make a decision on behalf of the union?
5    A. Well, it would depend on the type of
6 decision. She would either have to get a vote from our
7 members or consult with the rest of the council -- the
8 Executive Council.
9    Q. And is that true for any change to the
10 Collective Bargaining Agreement?
11    A. Yes.
12    Q. Is that true for anyone wanting an
13 exception to the Collective Bargaining Agreement?
14    A. To my knowledge, yes.
15    Q. Okay. And just so I'm clear -- I want to
16 make sure I understand it.
17    So if someone came to you during the time
18 that you were vice president of the union and said, I
19 would like to be given an exception, I don't want to have
20 to bid every month for flights, would you be able to
21 approve that yourself?
22    A. No, I would not.
23    Q. Okay. And who would be required to approve
24 that kind of exception?
25    A. Well, typically, that would be either

Page 19

1 something that would come in agreement between the union
2 and the company, in that particular case.
3    Q. And the entire union then would have to
4 negotiate something like that with the company; is that
5 right?
6    A. It would be -- that type of agreement
7 would be between the -- the officers, council, and the --
8 and the company.
9    Q. Okay.
10    A. If I'm understanding.
11    Q. Did you ever seek any kind of exception to
12 the Collective Bargaining Agreement for Rebecca Brigham?
13    A. Not to my recollection, no, I did not.
14    Q. To your knowledge, was she always subject
15 to the terms of the Collective Bargaining Agreement?
16    A. Yes.
17    Q. You would have expected her to follow the
18 terms of the Collective Bargaining Agreement; is that
19 right?
20    A. Yes.
21    Q. To the letter; is that right?
22    A. Yes.
23    Q. If you could tell me, just generally -- and
24 I know that the Collective Bargaining Agreement's changed
25 over the years -- or changed in 2016, I believe.

Page 20

1    Can you remember back to 2015 and tell us,
2 generally, how the bidding process worked under the
3 Collective Bargaining Agreement as a flight attendant?
4    A. Yeah. We would bid based on the program
5 FLiCA, and it was in seniority order. So we would submit
6 our selections, and then it was awarded based on
7 seniority.
8    Q. Were you required to bid every month?
9    A. Yes, if you wanted a schedule, correct.
10    Q. What would happen if you missed a bid?
11    A. You would be placed on -- well, depending
12 on your seniority, you would get either the trips that
13 were left or, potentially, you could be put back on
14 reserve.
15    Q. Was anyone given the ability, to your
16 knowledge, to skip bidding and then just build their
17 schedule from scratch?
18    A. The only time that people were able to
19 build their own schedules and not bid is if they were on
20 a leave and then they came back. And -- but it
21 was -- they had to pick what was left on open time.
22    Q. And when you say "leave," you mean a
23 continuous leave of absence, correct, like a medical leave
24 of absence or an FMLA-approved leave of absence?
25    A. Correct.

Page 21

1    Q. And someone on intermittent FMLA still had
2 to bid; is that correct?
3    A. Correct.
4    Q. Okay. Let's take a look at that Collective
5 Bargaining Agreement together. And this will be Brigham
6 Exhibit 1.
7    MS. KITSON: If the court reporter could
8 mark that virtually. I don't know how that works, but
9 I'll ask the court reporter to mark either now or
10 subsequent to the deposition Brigham Exhibit 1, which she
11 will have in her possession. I attempted to send it to
12 her, but we'll send it via FTP.
13    For the record, that is Bates number
14 FRONTIERAIRLINES(R.BRIGHAM)-0000815 through 0000958, for
15 the record.
16    And I will now share my screen with you,
17 Ms. Prince. And you're going to see some yellow
18 highlighting on this document, and that actually is my
19 yellow highlighting, which will help point you to what
20 I'm looking at.
21    Q. (By Ms. Kitson) Are you -- can you now see
22 the document?
23    A. I am.
24    Q. And do you recognize this as the Collective
25 Bargaining that -- Agreement that was in place from 2011

Page 22

1 to 2016?
2      A. Yes.
3      Q. And in your role as vice president of the
4 union, were you generally familiar with the Collective
5 Bargaining Agreement at that time?
6      A. Yes.
7      Q. Okay. I'm going to direct you to --
8      MS. KITSON: For anyone who's
9 on -- looking at it electronically, I'm going to page 24
10 of the PDF, which is page 838 in terms of a Bates stamp.
11      Q. (By Ms. Kitson) And I'm now looking at
12 Article 2, Definitions.
13      Are you with me?
14      A. Yes, I am.
15      Q. Okay. And there's a reference in number 7
16 to an Automated Bid System. It says, A system that
17 constructs monthly schedules for flight attendants based
18 on his/her preference and seniority.
19      Do you see that?
20      A. I do.
21      Q. Is that the FLiCA system that you were
22 referring to?
23      A. Yes. And sometimes I think it's also
24 called -- I don't remember if it was called the -- back
25 then, pref-bidding system.

Page 23

1      Q. Okay.
2      A. So it might be referred to as both things;
3 FLiCA and pref-bidding.
4      Q. Okay. I'm going to move ahead to page 26
5 in the PDF, which is page 840 on the Bates stamp. And I'm
6 looking at the Definition of Line, which is paragraph 44.
7      Are you with me?
8      A. I am.
9      Q. It says, Line, A bid period award built in
10 accordance with this agreement that consists of assigned
11 trips, days off, and pre-award requests.
12      Do you see that?
13      A. I do.
14      Q. And so every month, were the flight
15 attendants required to bid a line?
16      A. Yes.
17      Q. And the next definition is, Line Holder.
18 It says, A flight attendant who has been awarded a line.
19      Do you see that?
20      A. I do.
21      Q. So once you bid and -- and you get your
22 trips, eventually, you are a line holder; is that right?
23      A. Correct.
24      Q. Do you know what a pre-award is?
25      A. Yeah. It's certain assignments that are

Page 24

1 awarded before lines are -- or even reserves are given.
2 So, like vacation, training, those kind of things.
3      Q. Is that also based on seniority?
4      A. Yes.
5      Q. All right. I'm going to jump ahead to
6 page 39 of the PDF, which is Bates page 853. And I'm
7 looking at paragraph 8.
8      Are you with me?
9      A. I am.
10      Q. Paragraph 8 reads, A line-holding flight
11 attendant who is unable to report for work due to illness
12 or off-duty injury, must notify Crew Scheduling at least
13 two hours prior to trip report time.
14      Do you see that?
15      A. I do.
16      Q. And were all flight attendants subject to
17 that requirement?
18      A. Yes.
19      Q. Was Ms. Brigham, in 2015, subject to that
20 requirement?
21      A. I believe so.
22      Q. Okay. And a flight attendant who was on
23 intermittent FMLA, meaning that on a particular day, they
24 may have to take an FMLA day, or they may have to take
25 FMLA period of time off -- was Ms. Brigham required still

Page 25

1 to notify Crew Scheduling at least two hours prior to trip
2 report time?
3      A. No, she was not.
4      Q. Okay. And explain to me why not.
5      A. It would be based on -- to my knowledge,
6 it's based on your intermittent FMLA approval. And you
7 just would have to let the company know within a
8 reasonable amount of time.
9      Q. And you'd have to let them know that it was
10 a -- an absence for FMLA purposes, correct?
11      A. Correct.
12      Q. All right. Go to page 43 of the PDF, which
13 is Bates page 857. And I'm looking at a table that says,
14 Date, Time, and Event.
15      Do you see that?
16      A. I do.
17      Q. Now, what is this table?
18      A. It's the bidding timelines for our
19 pref-bidding or FLiCA bidding.
20      Q. So, it talks about the 4th day of the
21 month, the 5th day of the month, the 6th day of the month,
22 and so on.
23      Do you see that?
24      A. I do.
25      Q. And is this what happens every month in the

7 (Pages 6 - 9)

Page 26

1  bidding process in terms of how the process proceeds?
2      A. Yes.
3      Q. Okay. And so it looks like on the 4th day
4  of every month, the pre-award bid period closes; is that
5  right?
6      A. Yes.
7      Q. And then, No later than the 6th of every
8  month, the monthly bids open and are posted, including
9  pre-awards.
10      Do you see that?
11      A. I do see that.
12      Q. So on the 6th of every month, then, are the
13  flight attendants able to bid?
14      A. Correct. Yes.
15      Q. Okay. And then if you go one below that,
16  it talks about Credit Balancing.
17      Do you see that?
18      A. Yes, I do see that.
19      Q. What is Credit Balancing?
20      A. It means that if a flight attendant, for
21  whatever reason, was below 60 credit hours, the company
22  would add a trip to fill those hours to make sure that
23  the flight attendant was above 60.
24      Q. Got it.
25      So you always, at the end of the month, had

Page 27

1  to have 60 hours -- you had to line hold at least
2  60 hours; is that right?
3      A. Yes.
4      Q. And that's regardless of seniority.
5      Every single flight attendant had to do
6  that; is that right?
7      A. Correct.
8      Q. And then on the 12th day of every month,
9  bids close; is that correct?
10      A. Yes.
11      Q. And then the 16th day of the month, bid
12  awards are posted; is that correct?
13      A. Correct.
14      Q. And if you go a little bit further
15  down -- so now, as of the 16th day of every month, every
16  flight attendant has a schedule for the following month,
17  and that schedule is at least 60 hours worth of trips; is
18  that correct?
19      A. Correct.
20      Q. Okay. And then if you go a little bit
21  further down, it says on the 18th of the month that
22  TradeBoard opens.
23      Do you see that?
24      A. I do see that.
25      Q. Tell us what the TradeBoard is.

Page 28

1      A. The TradeBoard is where flight attendants
2  can post trips to either trade with other flight
3  attendants, pick up, or flight attend- -- other flight
4  attendants can just pick up those trips.
5      Q. Now, when you're trading, you can never
6  drop below 45 hours in that process; is that right?
7      A. Correct.
8      Q. Okay. So you've got your schedule, there's
9  things you want to drop, things you want to trade, but no
10  matter what -- you know, if this were a game of cards, for
11  instance, you've got to hold at least 45 while you're
12  doing that trading?
13      A. Yes.
14      Q. Okay. If you go down, then, to the 19th of
15  the month, it says, Daily open time begins, drop/swap/add
16  only, no splits.
17      Do you see that?
18      A. Yes.
19      Q. What is open time?
20      A. Open time is basically trading or swapping
21  with the company. So the company has open trips that you
22  can manipulate your schedule with.
23      Q. And when a flight attendant is dropping,
24  swapping, adding, in open time, once again, that flight
25  attendant always has to hold 45 hours, correct?

Page 29

1      A. Correct.
2      Q. Okay. And then, obviously, at the end of
3  the whole process, you've got to get back up to 60; is
4  that correct?
5      A. Correct.
6      Q. Do you know if there's a maximum amount
7  that you can hold as a line holder?
8      A. I don't believe there is a maximum amount,
9  no.
10      Q. Okay. So this whole time that you're
11  playing kind of this board game of drop/swap/trade, and
12  drop/swap/trade on open time, you're always holding 45,
13  and the ability for you to kind of play with your schedule
14  is between 45 and whatever maximum amount you want to hold
15  as a line holder.
16      Do I have that right?
17      A. Correct. Yes.
18      Q. So then the 26th day of the month, it says,
19  Daily open time split and TradeBoard split for the current
20  bid period close. Daily open time split for the new bid
21  period begins.
22      Can you explain that to us? What is a
23  split?
24      A. So a split is trade -- basically, breaking
25  up your trips. If you have, let's say, a multi-day trip

8 (Pages 6 - 9)

Page 30

1 that has some, maybe, overnights, and then let's say a
2 turn on either end of the trip, you might not want to do
3 just the turn or you might not want to do just the
4 overnight. So you could break that trip into -- for lack
5 of a better term -- several different trips.
6     Q. Okay. And once again through that split
7 process, a flight attendant still always has to hold the
8 45 hours, correct?
9     A. Correct.
10     Q. If you look a little further down on that
11 page, there is a section C, Eligible to Bid.
12     Are you with me?
13     A. Yes, I am.
14     Q. And then it's much easier for you to be
15 with me with this yellow highlighting.
16     A. Yeah.
17     Q. I usually don't get to show the witness the
18 yellow highlighting.
19     But Eligible to Bid, under number 1, it
20 says, Flight attendants are considered eligible to bid,
21 unless they have been granted company-approved leaves,
22 LOA, MED, FMLA, OJI, et cetera, or removed for company
23 business.
24     Do you see that?
25     A. I do.

Page 31

1     Q. And once again, that's a continuous leave,
2 correct?
3     A. Correct.
4     Q. Okay. So a flight attendant like
5 Ms. Brigham, who had been granted intermittent FMLA, that
6 flight attendant still is eligible to bid and expected to
7 bid, correct?
8     A. Correct.
9     Q. Let's go down to page 46 of the PDF, which
10 is Bates page 860. And we're on paragraph 5.
11     Are you seeing what I've got on my screen
12 here?
13     A. That's highlighted underneath Misbidding?
14     Q. Yes.
15     A. Yes, I see that.
16     Q. Okay. And it reads, Each flight attendant
17 will be accountable for bidding correctly. In the event,
18 he/she fails to bid, including the default bid, there are
19 trips left, and the flight attendant is senior enough to
20 hold the line, the Automated Bid System will build a
21 line for the flight attendant. If there are not enough
22 trips to fill a line, then the flight attendant will go on
23 reserve for the misbid.
24     Do you see that?
25     A. I do see that.

Page 32

1     Q. All right. So that's a lot of information.
2 So I'm with this for about, you know, The event that he or
3 she fails to bid and there are trips left.
4     Does that mean trips left just in the
5 company kind of on open time?
6     A. Correct.
7     Q. And the flight attendant is senior enough
8 to hold the line.
9     What does that mean?
10     A. It means it's the -- the flight attendant
11 holds enough seniority to hold enough trips to be
12 full-time, so minimum of 60 hours all the way up to
13 whatever the company threshold was for that month.
14     Q. Got it.
15     So, scenario: You have the most senior
16 flight attendant in the entire company, and for whatever
17 reason he or she is below 60 or failed to bid, misbid,
18 something happened, and there are 60 hours exactly left in
19 open time, that senior-most person is going to get all 60
20 of those hours.
21     Do I have that right?
22     A. Honestly, I'm not sure if they would
23 receive all of those 60 hours. But they would definitely
24 have been given trips to -- I believe at least to
25 75 hours. I don't think it was, they get the

Page 33

1 whole -- all of the trips left.
2     Q. Gotcha.
3     But in any event, it's a -- it's a system
4 of them trying to pick up above 45 hours, they're trying
5 to pick up enough hours to get to 60, and if they can't,
6 they go on reserve; is that right?
7     A. Yes.
8     Q. And what is reserve?
9     A. Reserve is on call for the company.
10     Q. And that's for if someone calls in sick or
11 can't make a flight for some reason?
12     A. Correct.
13     Q. Okay. We're going to go to page -- pages
14 50 and 51 of the Collective Bargaining Agreement. And
15 this is Bates pages 864 and 865. And I just have a quick
16 question about this. It talks about, Low-Time Flight
17 Attendants.
18     Do you see that?
19     A. I do.
20     Q. What are Low-Time Flight Attendants?
21     A. A Low-time is essentially another word for
22 part-time or less than 60 hours.
23     Q. And it says, Inflight will offer low-time
24 flight attendant positions.
25     Do you see that?

9 (Pages 6 - 9)

Page 34

1      A. I do see that.
2      Q. So it's a specific position; is that right?
3      A. I wouldn't consider it a specific
4  position. It's the same -- it's a flight attendant that
5  just flies less than 60 hours.
6      Q. And that was something that was available
7  to Rebecca Brigham at the time; is that correct?
8      A. She was available to bid for that type of
9  schedule, but it was also based on seniority order. And
10  I don't believe at the time Rebecca would have been
11  senior enough to hold that position.
12      Q. Gotcha.
13      And this low-time flight attendant, in the
14  board game of bidding, swapping, trading, dropping, this
15  low-time position -- let me just skip to page 53 -- or,
16  actually, sorry. Here it is.
17      We're on Bates page 865, page 51 of the
18  P -- PDF. It reads, 4a, Any flight attendant who is
19  awarded a low-time position must fly between 37 and a half
20  hours and 59 hours and 59 -- sorry. Let me try that
21  again.
22      Any flight attendant who is awarded a
23  low-time position must fly between 37:30 and 59:59 hours
24  per monthly bid -- bid period.
25      Do you see that?

Page 35

1      A. Yes.
2      Q. So a regular flight attendant always has to
3  hold 45 in the game of bid/swap/trade/drop, correct?
4      A. Correct.
5      Q. But a low-time flight attendant can go down
6  as little as 37 and a half hours in that game; is that
7  correct?
8      A. Correct. And can I -- I'm sorry. I need
9  to correct you.
10      I think the full-time flight attendants
11  actually have to be at 60 hours. I should have corrected
12  you before. I don't think 45 is as low as -- because
13  that was for the low-time flight attendant.
14      So I may have misunderstood you in the
15  previous questions, but it should be for full-time --
16  60 hours for a full-time flight attendant. And then as
17  you see in this low-time flight attendant, the 37 and a
18  half to 59 hours would be for the low-time positions.
19      So I apologize for not correcting that
20  before.
21      Q. No, that's okay. So I -- I may be
22  confused, then.
23      But I thought that, at the end of the month
24  when the whole process is over, you have to, as a regular
25  flight attendant, have 60, right?

Page 36

1      A. Correct. That is correct. Yes.
2      Q. But in the process in between, before the
3  whole thing is over, and when you're doing the
4  drop/swap/trade, can't you drop as low as 45, but no
5  lower, or do I have that incorrect?
6      A. Honestly, I think -- I don't think you had
7  to -- and I may be wrong. I would have to relook through
8  the contract.
9      But I think you could -- yes, 45 would be
10  what you could drop down to. And as long as at the end
11  of the month, you had 60 -- at least 60 hours, you could
12  then be okay.
13      Q. Got it. I think I may be coming up on
14  that.
15      Here we go. There it is.
16      A. I see it, yeah.
17      Q. So this would be your reference to the
18  contract, then. So --
19      A. Yes.
20      Q. -- it's at page 55 of the PDF, which is
21  Bates page 869. And I'm looking at L, Open Time, Minimum
22  Credit Requirements.
23      Are you with me?
24      A. Yes. Yes. And that's what I was looking
25  for that I didn't have reference to at the --

Page 37

1      Q. Got it.
2      So it says, number 1, At the completion of
3  each bid period, each flight attendant must accumulate a
4  minimum of 60 credit hours.
5      Do you see that?
6      A. Yes.
7      Q. And so that's what you're talking about
8  with at the end, you have to have 60, right?
9      A. Yes. Correct.
10      Q. And it says, At no time will a flight
11  attendant be allowed to drop below 45 credit hours, except
12  for provided for in this agreement.
13      Do you see that?
14      A. Yes. Yes. Correct.
15      Q. And is that what we're talking about, that
16  when you're, you know, trading and swapping and dropping,
17  you can do all of that before the bid period closes, but
18  you can't drop below 45, right?
19      A. Correct.
20      Q. Okay. And then number 2 here, I believe,
21  is what you were talking about with the credit balancing;
22  that, you know, if -- if at the end of the bid period, you
23  don't have 60, the automated bid system will get you up to
24  60.
25      Is that right?

10 (Pages 6 -

Page 38

1     A. No. Credit balancing only happens between
2  certain days of the month.  And I think it shows it right
3  below your highlighting.  Between the 7th and the 8th,
4  the credit balancing happens. Other than that, it was
5  the flight attendant's responsibility.
6     Q. Oh, gotcha.
7        But in any event, credit balancing, if it's
8  required at the end, will bring a flight attendant up to
9  60.
10       Do I have that right?
11    A. It would. But it didn't happen except
12 between the 7th and the 8th.
13    Q. Gotcha.
14    A. Does that make -- okay.
15    Q. Yeah, I think so.
16    A. So that the company didn't add trips.
17       THE REPORTER: Whoa, whoa, whoa.
18       THE DEPONENT: Sorry.
19    Q. (By Ms. Kitson) Yeah. Sorry about that.
20 I'll start over.
21    A. No, I'm just saying that -- that -- that
22 the credit balancing only happened on those two days.
23 Other than that, the flight attendant had to be
24 responsible to be up above 60 hours.
25    Q. I think I'm with you. So you bid

Page 39

1  initially; then there's credit balancing; and then you go
2  into the swap/drop/trade; and you've got the
3  responsibility to end at 60.
4     Do I have that right now?
5     A. Essentially, yeah. The trading, all that
6  stuff, can happen any time. And then if the company saw
7  that you were below 60 hours, between the 7th and the
8  8th, they would add the trips. And then if you still
9  wanted to trade or whatever, you could go -- and you can
10 even drop below 60 hours after the 8th, as long as by the
11 end of the month, you still had -- you made it back up to
12 60 hours.
13    Q. I see.
14    A. So the timeline is only -- for the 7th and
15 8th is only for credit balancing. But the flight
16 attendant had that flexibility the entire month, if that
17 makes sense.
18    Q. That makes sense.
19       And that's where, in terms of the
20 flexibility, you can drop below 60, but never below 45,
21 right?
22    A. Correct.
23    Q. Okay. I think I've got this, so I don't
24 need to ask you about this page that you're seeing right
25 now.

Page 40

1     A. Okay.
2     Q. I'm headed to page 58 of the PDF, which is
3  Bates page 872. And I'm seeing here on Trip Trades, A
4  flight attendant may trade any trip on his/her current
5  schedule with another flight attendant. Requests must be
6  in compliance with duty and rest limitations as
7  established by this agreement.
8        Do you see that?
9     A. I do.
10    Q. So that's a reference of what we've been
11 talking about in terms of the TradeBoard; is that right?
12    A. Correct.
13    Q. Okay. All right. I'm going to go to
14 page 93 in the PDF, which is Bates page 907. And it says
15 here again, A two-hour notice prior to report time is
16 required when calling in sick as a line holder or as a
17 reserve who has previously been given a trip assignment,
18 and three-hour notice for a reserve flight attendant who
19 has not been previously assigned a trip.
20       Do you see that?
21    A. I do.
22    Q. So even if you're on reserve, you still
23 have a notice period for calling out sick; is that right?
24    A. Yes.
25    Q. Okay. We're almost done with the

Page 41

1  Collective Bargaining Agreement, I promise.
2        Page 101 of the PDF and 945 of the
3  Bates pages -- actually, no, I'm sorry. I think I jumped
4  down too far.
5        Okay. I'm on page 101 of the PDF, which is
6  page 915 of the Bates stamp. And I'm looking at
7  Seniority Accrual.
8        Are you with me?
9     A. I am.
10    Q. It says, the Frontier Systems Seniority
11 List, Seniority List, is in effect on the date of the
12 signing of this agreement, will be the official seniority
13 list, and, thereafter, the seniority of a newly-hired
14 flight attendant, including transferees from another
15 department within the company, will commence on the first
16 day a flight attendant enters training. And it continues
17 on from there.
18       Do you see that?
19    A. I do.
20    Q. What is the seniority list?
21    A.  It's the list of the flight attendants
22 that are -- well, for bidding, it'd be that they were
23 active and able to bid. And it's based on date of hire.
24    Q. Okay. And the more senior you are -- it
25 seems pretty obvious -- the better ability you have to

11 (Pages 6 -

Page 42

1 control your schedule, correct?
2      A. Correct.
3      Q. Okay. And then number 4 of that same page,
4 Except as otherwise provided for in this agreement,
5 seniority will govern all flight attendants for retention
6 in case of reduction-in-force, recall from furlough,
7 preference of vacation periods, filling of vacancies, base
8 assignments, company-offered voluntary leaves of absence,
9 and bidding rights.
10      Do you see that?
11      A. I do.
12      Q. So, basically, seniority governs pretty
13 much everything; is that right?
14      A. Yes.
15      Q. Seniority is king?
16      A. Yes.
17      Q. All right. I'm going to page 105 of the
18 PDF. This is the only question I had. This is page --
19 Bates-stamped page 919 to 920.
20      And it talks about what happens when you're
21 returning from a leave of absence, correct?
22      A. Yes.
23      Q. And that would be, again, a continuous
24 leave of -- of absence, like you're out for a month on
25 medical leave, correct?

Page 43

1      A. Correct.
2      Q. Okay. And it says, number 1, To be
3 eligible to return to work and bid for a line of flying,
4 the flight attendant must complete required training, if
5 applicable. If a flight attendant requires only recurrent
6 training, he/she may bid for the next bid period, if
7 recurrent training is scheduled and a doctor's release has
8 been submitted.
9      Do you see that?
10      A. I do.
11      Q. So when a flight attendant returns from a
12 continuous leave, they have to provide a release from a
13 doctor saying that they're fit to fly; is that right?
14      A. Correct.
15      Q. And if they do that, after the bidding
16 period closes -- so after everyone's submitted their bids
17 through the Automated Bid System -- is that when they can
18 build their schedule from open time, as you were
19 discussing earlier?
20      A. Yes.
21      Q. Okay. All right. I think that's what this
22 is talking about as well. I'll skip through that.
23      And on page 107 of the PDF, which is
24 page 921, Bates stamped -- do you need to get water or
25 anything?

Page 44

1      A. No. I'm okay. Sorry. Thank you.
2      Q. And I'm planning to take a break in just
3 about eight minutes here or so.
4      A. Okay. Perfect.
5      Q. We can take one earlier if you want.
6      A. No. We're good. Thank you.
7      Q. All right. So we are on Bates page 921.
8 And --
9      A. Okay.
10      Q. -- we are looking at the provisions for
11 medical leave.
12      Are you with me?
13      A. I am.
14      Q. Okay. And number 1 says, Flight attendants
15 who do not meet the eligibility requirements for FMLA may
16 be provided a medical leave of absence.
17      Do you see that?
18      A. I do.
19      Q. And is that a benefit that the company
20 provided to flight attendants in the form of additional
21 leave above and beyond what the FMLA provided?
22      A. Yes.
23      Q. Okay. And if you go down to number 4, it
24 says, Medical leave may be granted up to a maximum period
25 of 23 consecutive months.

Page 45

1      Do you see that?
2      A. I do.
3      Q. And so a flight attendant who needed leave
4 for an extended period of time could -- for a medical
5 reason could take up to 23 months of leave; is that right?
6      A. Yes.
7      Q. Okay. And that's job-protected leave,
8 right; meaning at the end of that 23 months, their job is
9 still there for them, right?
10      A. That's my understanding, yes.
11      Q. All right. And then I'm now on page 922 of
12 the document. That's the Bates-stamp number.
13      Paragraph 13, While on medical leave,
14 flight attendants will retain and accrue seniority, and
15 retain and, up to 90 days, accrue longevity.
16      Do you see that?
17      A. I do see that.
18      Q. So the entire time that a flight attendant
19 is out on that 23 months of medical leave, they're
20 accruing seniority the whole time. Is that your
21 understanding?
22      A. That's my understanding of it, yes.
23      Q. Okay. All right. And I'm going to stop
24 sharing my screen, because we're done with this document,
25 except I'm going to have to find out -- somehow I've

12 (Pages 6 -

Page 46

1  adjusted my screen -- all right. I don't know exactly
2  what I did here. Hold on one second while I try to -- oh,
3  I need to stop share. Got it.
4       Okay. Okay. All right. So setting that
5  document aside, I want to just talk to you a little bit
6  more about Rebecca Brigham.  And in fact, before we get
7  into that, why don't we just go ahead and break now, since
8  it's a new topic area.
9       MS. KITSON:  So we can go off the record.
10      THE VIDEOGRAPHER:  We're going off the
11 record at 10:10 am.
12      (Recess from 10:10 a.m. to 10:24 a.m.)
13      THE VIDEOGRAPHER: We're going back on the
14 record at 10:24 am.
15      Q.  (By Ms. Kitson) Ms. Prince, do you
16 understand that you're still under oath?
17      A. I do.
18      Q. I wanted to ask a couple follow-up
19 questions from what we talked about earlier this morning.
20      First of all, I had made a reference to the
21 contract changing in 2016. But I looked back at the
22 records, and it -- it looks to me like the contract
23 actually changed in 2019?
24      Is that your understanding as well?
25      A.  I believe so.  I can't -- yes, I believe

Page 47

1  it was last year.
2       Q.  Okay.  And I also understand, from the
3  company's HR department, that all flight attendants were
4  required to provide two-hours' notice, even if they were
5  on intermittent FMLA; however, the company would then
6  evaluate if there were any extenuating circumstances.
7       Is that your understanding as well?
8       A. Yes, that is correct.
9       Q. So if you were on intermittent FMLA, you
10 still had to follow the callout procedures, but if you
11 missed them, the company would then evaluate whether there
12 was an extenuating circumstance with respect to you; is
13 that correct?
14      A. Correct.
15      Q. When did you first meet Rebecca Brigham?
16      A. Honestly, I don't recall.
17      Q. Years and years ago, or...
18      A. I would assume so. Yeah, like when she
19 first started flying, I would assume.
20      Q. Okay. So at least since about 2007.
21      Does that sound about right?
22      A. Probably, yes.
23      Q. Okay. And can you describe for us the
24 nature of your relationship? Are you friends? We
25      A. It was pretty much just work-related. We

Page 48

1  didn't meet outside of work.
2       Q. How often would you fly with her, if ever?
3       A. I don't believe I ever flew with her, to
4  my knowledge. Maybe once or twice.
5       Q. When was the last time you spoke with her?
6       A. I do believe she sent me a message asking
7  my contact information through Facebook.
8       Q. How long ago was that?
9       A. I believe it was March this year; maybe a
10 little bit earlier in this year.
11      Q. Did you then talk with her?
12      A. All I did was answer her questions, just
13 gave her my contact information.
14      Q. And before March of this year, when was the
15 last time you spoke with her?
16      A. Directly, probably when she was terminated
17 from Frontier. And I believe that was maybe 2015, 2014.
18      Q. Yeah. And we'll look at some documents.
19      It's roughly November of 2015. October --
20 when you were involved in all of this, it was the
21 October-to-December 2015 time frame. But we'll get that
22 in a minute?
23      Have you had communications with
24 Ms. Brigham's attorney?
25      A. Yes.

Page 49

1       Q. Okay. And how many times have you spoken
2  with Ms. Brigham's attorney?
3       A. I believe maybe two -- twice, three times.
4       Q. And when was the first time?
5       A. It was roughly around that -- March of
6  this year when --
7       THE REPORTER:  She cut out.  She's frozen.
8       MS. KITSON:  Yeah.  You cut out there for
9  a second, but we've got you back.
10      THE DEPONENT: Oh, I'm sorry. I'm still
11 here.
12      MS. KITSON: No, that's okay.
13      Q.  (By Ms. Kitson) So the first time that you
14 spoke with Rebecca Brigham's attorney was approximately
15 March of 2020; is that right?
16      A. Correct. I believe, yes.
17      Q. Did you speak on the phone?
18      A. We had -- I believe he sent me an email,
19 and he did call me, I believe.
20      Q. What did you talk about?
21      A. He asked what I remembered of her case.
22      Q. You provided a written statement in this
23 lawsuit; is that correct?
24      A. Yes.
25      Q. And was that provided in connection with

13 (Pages 6 -

Page 50

1 your conversation with Mr. Crone, the attorney?
2     A. Yes. Yes.
3     Q. Okay. And is that written statement a good
4 summary of what you told him?
5     A. I believe so, yes.
6     Q. Okay. Is there anything outside of that
7 statement that you told him?
8        I'll pull it up for you now, actually. Let
9 me just get it here.
10       MR. CRONE: Danielle, I'm sorry. This is
11 John Crone.
12       Did you mark that as an exhibit? I was
13 just looking through, and I couldn't find it. I don't
14 know if it is.
15       MS. KITSON: No, I did. And I'm so sorry,
16 I believe that that was -- it is Exhibit 40, which is one
17 that was missing. So I'm going to email that to you
18 right now, John.
19       MR. CRONE: Okay. Thank -- thank you.
20       MS. KITSON: And actually, I'm going to
21 copy our court reporter, Laurel, because I think it was
22 not in the -- bear with me one moment here. Okay. Let
23 me just share my screen.
24       And are you now seeing a document entitled
25 Declaration of Adrienne Prince?

Page 51

1       THE DEPONENT: I am.
2       Q. (By Ms. Kitson) Okay. If you would like
3 to read through the document, Ms. Prince, and let me know
4 when you're finished.
5       A. Okay.
6       Q. We'll mark this as Brigham Exhibit 40, and
7 that's what I'll be referring to. The Bates stamp is
8 BrighamR_PlaintiffRecords0644 through
9 BrighamR_PlaintiffRecords0645, and I'll wait until you've
10 finished reviewing.
11      A. Okay. Is there a way I can scroll through
12 it myself, or is it only through you?
13      Q. Oh, I forgot you're sharing a screen.
14 Here, let -- let's do it this way: I'll hold it here, and
15 let me know when you're ready for me to scroll to the next
16 piece.
17      A.  Okay.  Okay.  I can scroll now -- or you
18 can scroll now.
19      Q. Let me know when you're ready.
20      A. I'm ready. Okay. Okay. Okay. Okay.
21      Q. Okay. I'm scrolling back up to the first
22 page of the document. Well, first of all, I'm going to
23 scroll down.
24       Is this your signature at the end of the
25 document?

Page 52

1       A. Yes.
2       Q. And did you provide this statement under
3 penalty of perjury?
4       A. Yes.
5       Q. Okay. I'm scrolling back up.
6        Now having read the declaration, is there
7 anything that you talked about with Mr. Crone that is
8 inconsistent with this statement?
9       A. I don't believe so.
10      Q. Okay. Is this the sum and substance of
11 what you told him?
12      A. Yes.
13      Q. Is there anything else you told him that is
14 not encapsulated within this document?
15      A. I don't believe so.
16      Q. Okay. It says that, From approximately
17 2007 through 2015, I am aware that Plaintiff,
18 Rebecca Brigham, was employed by Frontier Airlines,
19 Incorporated.
20       Do you see that?
21      A. Yes.
22      Q. Okay. And you worked with her in your
23 capacity as a union vice president at the time; is that
24 correct?
25      A. Correct.

Page 53

1       Q. Okay. You say in paragraph 3, I am also
2 aware that Ms. Brigham suffered from alcoholism,
3 voluntarily disclosed this disability to Frontier, and
4 underwent inpatient treatment.
5        Do you see that?
6       A. I do.
7       Q. How did you become aware of that?
8       A. It was my knowledge, because when we were
9 working on her grievance when she was terminated, that's
10 how it came to fruition.
11      Q. When Ms. Brigham returned to the workplace,
12 the union assisted her in seeking accommodations for her
13 disability.
14       Do you see that?
15      A. Yes.
16      Q. Okay. And -- and did you do that?
17      A. Yes, I did it.
18      Q. Okay. I want to go down to paragraph 5 --
19      A. Okay.
20      Q. -- or actually, I'm sorry. Paragraph 6.
21      A. Okay.
22      Q. Are you with me?
23      A. Yes.
24      Q. And I want to start with the sentence,
25 However, which is three lines down.

14 (Pages 6 -

Page 54

1      A. Yes.
2      Q. However, I explained to Frontier that the
3  union was not seeking an accommodation that would violate
4  the seniority provision, but rather, would work within the
5  seniority provision.
6         Do you see that?
7      A. Yes.
8      Q. Is that seniority provision a reference to
9  the seniority rules that we just saw in the Collective
10  Bargaining Agreement, Brigham Exhibit 1?
11      A. Yes.
12      Q. Okay. And you say here that you proposed
13  that you work within that Collective Bargaining Agreement;
14  is that correct?
15      A. Correct.
16      Q. Did you ever intend that any accommodation
17  for Rebecca Brigham would violate the Collective
18  Bargaining Agreement?
19      A. No.
20      Q. Did you ever intend that Ms. Brigham should
21  be excused from the requirement that she bid like every
22  other flight attendant?
23      A. No, I did not intend.
24      Q. Did you ever intend that she be excused
25  from the requirement that in the bidding process she hold

Page 55

1  45 hours just like everyone else?
2      A. Can you repeat that question?
3      Q. Did you ever intend that she be given an
4  exception to the Collective Bargaining Agreement so that
5  she didn't have to hold those 45 hours in the bidding
6  process like everyone else did?
7      A. No.
8      Q. So it was your intention, on behalf of the
9  union, that she had to comply with those rules, correct?
10      A. Correct.
11      Q. Okay. And it was your intention, on behalf
12  of the union, that she not be allowed to get any benefit
13  that someone more senior to her did not get, correct?
14      A. Correct.
15      Q. You say in paragraph 6, continuing on, In
16  other words, the union requested that Ms. Brigham be
17  allowed to bid for shifts within her existing seniority to
18  avoid layover as much as possible, and with regard to
19  whatever shifts were leftover containing layovers and
20  assigned to Ms. Brigham, the union proposed a method by
21  which Ms. Brigham could have traded, swapped, or dropped
22  these shifts in compliance with the Collective Bargaining
23  Agreement.
24         Do you see that?
25      A. I do.

Page 56

1      Q. Aren't you effectively saying here that,
2  within what the Collective Bargaining Agreement provided,
3  Ms. Brigham could drop/swap/trade just like everyone else?
4      A. Correct.
5      Q. Okay. And you say that, in paragraph 7,
6  Frontier refused to grant this accommodation.
7         Do you see that?
8      A. Yes.
9      Q. Now, to your knowledge, Frontier never said
10  that the Collective Bargaining Agreement wouldn't apply to
11  Ms. Brigham, right?
12      A. Correct.
13      Q. Okay. So anything in the Collective
14  Bargaining Agreement was an accommodation that Frontier
15  fully granted to her, correct?
16      A. Correct.
17      Q. Okay. So what did you mean, "Frontier
18  refused to grant this accommodation"?
19      A. Well, they didn't give her her job back
20  based on -- based on the grievance process.
21      Q. Okay. So by "Frontier refused to grant
22  this accommodation," you meant Frontier refused to
23  reinstate her; is that correct?
24      A. Correct.
25      Q. Did you mean anything else by that?

Page 57

1      A. No.
2      Q. Okay. Okay. I'm going to stop sharing
3  that document. And I'm going to show you what has been
4  marked as Brigham Exhibit 20.
5         Are you seeing a document marked
6  "Untitled"?
7      A. Yes.
8      Q. Okay. And this is going to be Bates stamp
9  1766.
10         Do you see that?
11      A. I do.
12         MS. KITSON: Okay. And all counsel on the
13  line, do you have this exhibit?
14         MR. CRONE: Yes. Thanks, Danielle.
15         MR. SOUK: Yes.
16      Q. (By Ms. Kitson) Okay. This exhibit reads,
17  Untitled, I am requesting a reasonable accommodation.
18         Do you see that?
19      A. Yes.
20      Q. Have you seen this document before?
21      A. I don't remember that specific document,
22  no.
23      Q. Okay. It reads, I am requesting a
24  reasonable accommodation. It is to not do overnight
25  trips, because it will put my recovery at risk. Also be

15 (Pages 6 -

Page 58

1 able to maintain enough hours to live on.  Ideas, just
2 remove me from the overnights, have be build by own
3 schedule out of open time and TradeBoard.
4        Do you see that?
5     A. Correct. Yes, I see that.
6     Q.  Is it your understanding that these were
7 the accommodations that Rebecca Brigham was requesting?
8     A. Yes.
9     Q. Okay. And did you understand that
10 Ms. Brigham wanted to just have her overnight trips
11 removed?
12     A. Yes.
13     Q. And did you understand that Ms. Brigham
14 just wanted to build her own schedule from scratch out of
15 open time or the TradeBoard?
16     A. Yes.
17     Q. Okay. And the union would not allow her to
18 build her schedule from scratch on open time, because that
19 would have violated the Collective Bargaining Agreement,
20 correct?
21     A. Correct.
22     Q. Okay. So it was not the union's intention
23 to grant this accommodation, correct?
24     A. Correct.
25     Q. Okay. And the idea of "just remove me from

Page 59

1 the overnights," that would have violated the seniority
2 bidding provisions of the Collective Bargaining Agreement
3 to just do that for her, correct?
4     A. Correct.
5     Q. So that's not an accommodation that the
6 union intended to grant to her, correct?
7     A. Correct.
8     Q. Okay. I'll stop sharing that.
9        Since you originally spoke with Mr. Crone
10 and provided this statement, have you spoken with him or
11 anyone else from his firm?
12     A. No.
13     Q. Okay. So you had -- I think you said you
14 had two conversations with him. Or was it only one?
15     A.  I believe it was two, maybe three.  It was
16 the initial, Hi, this is who I am; and then me responding
17 to him giving him this statement; and then him responding
18 back thanking me for get -- helping.
19     Q. Was Ms. Brigham on either of those calls?
20     A. Not to my knowledge.
21     Q. Okay. And why did you provide the
22 statement?
23     A.  Because, as a union rep, I advocate -- I
24 was advocating for a flight attendant, and so I was
25 continuing that.

Page 60

1     Q.  So you felt you were in an advocacy role,
2 correct?
3     A. Yeah.
4     Q. But you still would not have approved a --
5 an exception to the Collective Bargaining Agreement for
6 her, correct?
7     A. Correct.
8     Q. I'm going to show you what's been marked as
9 Brigham Exhibit 44.
10     A. Okay.
11     Q. Are you seeing a document with number 3 in
12 the upper left-hand corner?
13     A. Yes.
14     Q. Okay. This is Brigham Exhibit 44, which is
15 Bates stamp BRIGHAM LM 39 through BRIGHAM LM 46.
16     A. Okay.
17        MS. KITSON: And, Counsel, do you have
18 this document available to you?
19        MR. CRONE: I do.
20        MR. SOUK: Yes, I do.
21     Q. (By Ms. Kitson) Okay. And, Ms. Prince,
22 I'll represent to you that this is a transcription that I
23 believe Ms. Brigham made of an audio-recording that she
24 took of a meeting that you participated in.
25        Were you aware that Ms. Brigham had

Page 61

1 audio-recorded a meeting with you?
2     A. No, I was not aware.
3     Q. Okay. Go ahead and read through the
4 document, and let me know when you're finished.
5     A. Okay. Hold on just a second.
6     Q. Oh, my gosh. I keep forgetting that you're
7 looking at this. I'm so sorry.
8     A. No, that's okay.
9     Q. Okay.
10     A. No, that's okay.
11     Q. You tell me when to scroll. You tell me
12 when to scroll.
13     A. Okay. Okay. I -- you can scroll down.
14     Q. Okay.
15     A. Okay. Okay. Okay. Okay.
16     Q. And this red highlighting that you're
17 seeing on the page here, I believe, is Ms. Brigham's.
18     A. Okay. Okay. Okay. Okay. Okay.
19 Okay.
20     Q. And this yellow highlighting is mine. This
21 is what I'm going to be asking you about.
22     A. Okay. Okay. Okay. Okay.
23     Q. This green is, again, Ms. Brigham's
24 highlighting. Just FYI.
25     A. Okay. Okay. Okay.

16 (Pages 6 -

Page 62

1    Q. And the yellow highlighting, this one is
2    mine again.
3    A. Okay. Okay.
4    Q. And I think that's the end. So I'm going
5    back to the beginning of the document.
6    A. Okay.
7    Q. And I'm going back to -- hold on one second
8    here. I'm looking at Stefanie's statement.
9    Do you see that?
10   A. Yeah.
11   Q. And is that Stefanie Coppedge?
12   A. I would assume so, but I'm not 100 --
13   Q. And Stefanie --
14   A. She's the only Stefanie I know that would
15   have been in those meetings, to my knowledge, so I
16   believe that was her, yes.
17   Q. Okay. And Stefanie Coppedge was
18   Ms. Brigham's direct supervisor; is that correct?
19   A. I believe so.
20   Q. Who is Andrea?
21   A. If I recall, she was -- I can't
22   remember -- I don't know her exact position, but I
23   believe she had a position in HR. She worked alongside
24   with Jerry Arellano.
25   Q. Okay. And going back up to the top, having

Page 63

1    read through this, does this refresh your recollection of
2    a meeting that you had with Ms. Brigham and the others
3    listed here on November 3rd, 2015?
4    A. Slightly, yes.
5    Q. Okay. But you don't know whether these are
6    the exact words that were said; is that right?
7    A. No, I don't know.
8    Q. Is there anything about this that struck
9    you as inconsistent or incorrect based on the meeting that
10   you had on November 3rd?
11   A. It -- I -- I -- I don't -- I mean, I
12   100 percent don't recall that meeting. We had several
13   meetings. So whether or not that was specific to that
14   one, I couldn't be 100 percent certain.
15   Q.   Was -- it says, Final
16   Meeting With the Company, Investigatory.
17   Do you see that?
18   A. Yes.
19   Q. Do you remember having a final meeting with
20   the company in the grievance process for Ms. Brigham?
21   A. Yes.
22   Q. And what is that, Final Meeting? What's
23   that a reference to?
24   A. It's essentially the last step in the
25   grievance process, kind of a last-ditch effort to see if

Page 64

1    there's anything we can do to help the flight attendant.
2    Q. Okay. The first person speaking here, it
3    says, Adrian, Union VP.
4    It looks like that's a misspelling of your
5    name, but is that you?
6    A. I would believe so. Probably, yes.
7    Q. And then "Rebecca" is a reference to
8    Ms. Brigham; is that right?
9    A. I would assume, yes.
10   Q. Okay. Just scrolling through here.
11   So we're back at Stefanie Coppedge's
12   statement. She says, So, of course, this is the
13   fact-finding meeting, uh, because, Rebecca, you have hit,
14   uh -- so I have provided you with your absentee record.
15   That's the first little pile. I have a letter -- an email
16   from Shelly Liner for the sick call that was, uh, 10/23.
17   Uh, she sent out an email that you probably just got a
18   photocopy of it too that your request was denied for lack
19   of timely notice to the FMLA department.
20   Do you see that?
21   A. Yes.
22   Q. Is it your recollection that Ms. Brigham
23   had a sick call on October 23rd, 2015, that put her over
24   the permissible points on the dependability policy such
25   that her employment was to be terminated under policy?

Page 65

1    A. It looks that way, yes.
2    Q. And was it true at the time at Frontier
3    that the attendance policy had a termination level of date
4    points?
5    A. Yes.
6    Q. Can you explain what that means?
7    A. For every instance that you called out,
8    whether it be being sick or being late, you acquired
9    points.  And each instance had -- like a sick instance
10   had a different point value than being tardy.
11   And then you -- you would accumulate eight
12   points.  And so in each step before that -- and I don't
13   remember the exact points, but, like, if you had four
14   points, it was a written warning; if you had 6, it was
15   another step of discipline; and then at the eighth, it
16   was termination.
17   Q. And it was your understanding that
18   Ms. Brigham had reached that termination level, correct?
19   A. It looks that way, yes.
20   Q. And that was the reason you were having
21   this meeting, correct?
22   A. Correct.
23   Q. Okay. And Ms. Coppedge says that her
24   request to be excused from that sick call was denied
25   because of lack of timely notice to the FMLA department.

17 (Pages 6 -

Page 66

1     Do you see that?
2     A. Yes.
3     Q. Okay. Scrolling down to the next page, we
4  have Ms. Brigham say -- saying, Which I take that. It is
5  my fault. I did not send it in a timely manner. I did
6  email her Monday morning before I did the Portland turn,
7  and just said, Oh, my gosh, I woke up in a panic. I
8  completely forget. Here is the day, and I understand
9  that. Uh, and I will gladly take that point and a half.
10     Do you see that?
11     A. Yes.
12     Q. Was it your understanding that Ms. Brigham
13  agreed that those final points from the October 23rd trip
14  were correctly classified under the dependability policy?
15     A. It appears that way, yes.
16     Q.  And was that your understanding at the
17  time?
18     A. Yes.
19     Q. And was the union taking any issue with the
20  coding of those points for the October 23rd trip?
21     A. I don't recall specific to that particular
22  date and those particular points.
23     Q. If Ms. Brigham is saying, though, that she
24  doesn't contest it, would the union agree with that?
25     A. I would assume that we would have agreed

Page 67

1  with that.
2     Q. Okay. I am now looking at part of the
3  transcript where you're speaking. And you say, And if she
4  were picking up that open time or the trade, it wouldn't
5  be -- it would not -- because it wouldn't be, like,
6  pre-awarded, if that was something that came up. Uh, as
7  far as the union's stance, you know, if she could bid what
8  she could hold, and then, you know, was either removed or
9  able to pick up some open time, it wouldn't violate
10  seniority, because that's all first come, first served
11  anyway.
12     Do you see that?
13     A. Yes.
14     Q.  Was that you kind of piecing together in
15  your mind what the Collective Bargaining Agreement might
16  allow her to do under its terms?
17     A. Yes.
18     Q. Were you in any way suggesting that she
19  should be given an exception from the Collective
20  Bargaining Agreement provisions?
21     A. No.
22     Q. Were you in any way suggesting that she
23  should be allowed to violate the Collective Bargaining
24  Agreement?
25     A. No.

Page 68

1     Q. I'm going to go, then, to the end here.
2  And again, we've got you speaking. You say, And I do
3  know, just so that you're familiar, a lot of times when
4  people come back mid-month, and they're not released to be
5  able to bid, they are given blank schedules, and they have
6  to -- and I mean, it's something that Inflight already
7  does.  So it wouldn't be an undue hardship with the
8  company, because I know some part of this, too, is that
9  her request cannot make it.
10     Andrea Warfield says, For the company?
11     And then you say, They already allow pickup
12  in this light, so it's not like we are -- it's a really
13  unusual request, that's never been done before, and the
14  placement is responsible for giving that to the -- and if
15  they don't, then there is other disciplines.
16     Do you see that?
17     A. Yeah.
18     Q. And again, it sounds to me like you're kind
19  of piecing together how would this work; is that right?
20     A. Yes.
21     Q. And you're referring it -- to it being an
22  unusual request.
23     Do you see that?
24     A. Yes.
25     Q. And you're talking this through, but it

Page 69

1  doesn't appear to me that you came to any conclusion. Is
2  that right?
3     A. That's what it looks like, yes. I don't
4  believe there was any conclusion.
5     Q. And the recording -- it looks like it cuts
6  out here right in the middle.
7     Does that appear to be what happened?
8     A. It looks like that, yes.
9     Q. Yeah.
10     So I want to ask you, Ms. Prince -- you're
11  talking about this potential to do something for
12  Ms. Brigham, correct?
13     A.  Yes.
14     Q. But it was never your intention that she
15  should be able to violate the Collective Bargaining
16  Agreement, correct?
17     A. Correct.
18     Q. And it was never your intention that she
19  should be able to skip the bidding process, correct?
20     A. Correct.
21     Q. And it was never your intention that she
22  should be allowed to drop below 45 hours in the bidding
23  process, correct?
24     A. Correct.
25     Q. And it was never your intention, then, that

18 (Pages 6 -

Page 70

1 she be able to come in and build a schedule from scratch
2 from open time, correct?
3     A.  Correct.
4     Q.  Okay. I'm going to stop sharing that
5 document.
6         MS. KITSON: I've got another one, Counsel,
7 that I'm going to pull up. And I'm going to send it to
8 you-all because I don't think it was in the original.
9         I'm sending everyone what has been
10 marked as Brigham Exhibit 18. And, Mr. Crone and
11 Mr. Souk, if you could let me know when you have that in
12 front of you.
13         MR. CRONE: I just got it.
14         THE REPORTER:  Who just said that?  I'm
15 sorry.
16         MS. KITSON:  I did, Danielle -- oh, who
17 just said that? That was John.
18         MR. CRONE: That was -- sorry. I -- this
19 is John.
20         I also have it.
21         MS. KITSON: Brigham Exhibit 18 is a
22 document with a Bates stamp
23 FRONTIERAIRLINES(R.BRIGHAM)-0000101 to 103. And I'm
24 going to share the screen with you now.
25     Q.  (By Ms. Kitson) Ms. Prince, are you seeing

Page 71

1 a document entitled "Search for Crew Absentee Records"?
2     A.  Yes.
3     Q.  Okay. Do you recognize this document?
4     A.  I've seen one before, yes.
5     Q.  And what is this document generally?
6     A.  It looks like it's the attendance records
7 for flight attendant -- for -- for Rebecca.
8     Q.  Okay. And is this a document that you
9 typically see in your role as a union rep?
10     A.  Yes.
11     Q.  And is this essentially a flight
12 attendant's attendance record?
13     A.  Yes.
14     Q.  And here in this portion of the page, you
15 see a box that has, Job Performance, Attendance,
16 Recommendation/Commendation, Letters, LOA, Compliance, and
17 Miscellaneous.
18         Do you see that?
19     A.  I do see that.
20     Q.  And it looks like these are a series of
21 warning letters that Ms. Brigham received, including an
22 August 12th, 2015 final order, a July 10th, 2015, final
23 warning, a May 29th, 2015, final warning, a May 14th, 2015
24 written warning, a March 16th, 2015, written warning, and
25 a March 6th, 2015, verbal warning.

Page 72

1         Do I --
2     A.  Yes.
3     Q.  -- have that correct?
4     A.  Yes.
5     Q.  And what are these warnings, in general?
6     A.  They're just documentation from the
7 company to a flight attendant warning -- letting them
8 know where they are in the step-of-discipline process.
9     Q.  Okay. We now have a box that has a series
10 of dates in it.
11         Do you see that?
12     A.  I do.
13     Q.  And are these dates dates on which
14 Ms. Brigham was absent?
15     A.  It looks that way, yes.
16     Q.   Okay.  And then the right-hand column says,
17 OCC Count.
18         Do you see that?
19     A.  Yes.
20     Q.   And for most of these absences, there's a 0
21 number.
22         Do you see that?
23     A.  Yes.
24     Q.  But then two of them have the number 1.
25         Do you see that here?

Page 73

1     A.  Yes.
2     Q.  Does this reflect the dependability points
3 that were assessed against Ms. Brigham, these two number
4 1s?
5     A.  Yes.
6     Q.  Okay. And all of these other 0s were
7 absences for which she did not incur an attendance point;
8 is that correct?
9     A.  Correct.
10     Q.  Okay. If we go to the next page, we
11 continue to see the series of 1s and 0s.
12         Do you see that?
13     A.  Yes.
14     Q.  And over a period of time, starting
15 back -- back at the beginning on September 16th, 2014.
16         Do you see that?
17     A.  Yes.
18     Q.  And continuing on until October 30th, 2015.
19         Do you see that?
20     A.  Yes.
21     Q.  And -- or October -- I'm sorry.
22 October 23rd, 2015 -- wait, strike -- yes.
23         So at the -- at the end of all of this, we
24 come to Total OCC Adjusted For Med is 10 points.
25         Do you see that?

19 (Pages 6 -

Page 74

1    A. Yes.
2        Q. Are those the occurrence points that
3  Ms. Brigham had incurred?
4        A. It looks that way, yes.
5        Q. Okay. And that's above the 8-point
6  termination level, correct?
7        A. Yes.
8        Q. Did the union have any reason to dispute
9  any of these points?
10       A. I don't recall.
11       Q. If the union did dispute them, how would
12  you have communicated that?
13       A. We would have filed a grievance.
14       Q. Okay. But to your recollection sitting
15  here today, none of these points are incorrect or
16  incorrectly assigned?
17       A. Correct. To my knowledge today, I
18  can't -- yeah.
19       Q. Okay.
20       A. I don't believe that there was an, you
21  know, inconsistency.
22       Q. Okay. I'm going to stop sharing that.
23       We're going to look at the exhibit marked
24  45.
25       I'm showing you what has been marked as

Page 75

1  Brigham Exhibit 45. And it carries the Bates stamp
2  FRONTIERAIRLINES(R.BRIGHAM)-0004475.
3       Are you seeing that?
4       A. Yes.
5       Q. And this document is dated November 18th,
6  2016.
7       Do you see that?
8       A. I do see that.
9       Q. And it's a letter from Kori Halverson to
10  Jerry Arellano.
11       Do you see that?
12       A. Yes.
13       Q. And I believe you mentioned that
14  Kori Halverson was the Grievance chair while you were vice
15  president; is that right?
16       A. Yes.
17       Q. Okay. And you are copied on this as the
18  vice president, along with Angie Piller, the president,
19  and others.
20       Do you see that?
21       A. Yes.
22       Q. Okay. And Ms. Halverson says, Dear
23  Mr. Arellano, this is to confirm that the Association of
24  Flight Attendants hereby withdraws this grievance without
25  prejudice.

Page 76

1        Do you see that?
2        A. Yes.
3        Q. Do you remember receiving this letter?
4        A. Specifically, no, I don't.
5        Q. Okay. Do you have any reason to believe
6  you did not receive it?
7        A. No. I'm sure I did receive it.
8        Q. Okay. And what is it this mean, Hereby
9  withdraws this grievance without prejudice?
10       A. It means that we are not pursuing the case
11  with the company.
12       Q. Okay. At some point, Ms. Brigham filed a
13  grievance with respect to her termination of employment
14  with Frontier; is that correct?
15       A. Correct.
16       Q. And she went through the grievance process,
17  correct?
18       A. Correct.
19       Q. And you advocated on her behalf as a
20  representative of the union, correct?
21       Oh, I think we're frozen again. Oh, we
22  lost you there --
23       A. Nope.
24       Q. -- for a second again.
25       A. Yeah. I'm back. I lost you momentarily.

Page 77

1        Q. Got it. Okay. So we were looking at
2  Brigham Exhibit 45, and I was asking you about this.
3        So Ms. Brigham filed a grievance. You went
4  through the grievance process.
5        And you, as a representative of the union,
6  were her advocate; is that correct?
7        A. Correct.
8        Q. Okay. And as an advocate, what is your
9  role?
10       You're trying to get her reinstated; is
11  that right?
12       A. Correct.
13       Q. Okay. And you're supposed to do everything
14  you can in that regard, correct?
15       A. Correct.
16       Q. Okay. And in this situation, I believe the
17  union made a determination that she should be reinstated;
18  is that correct?
19       A. Well, based on the document that I see, we
20  withdrew that grievance. So I don't know if you're
21  referring to the same instance or another -- I -- I don't
22  see if you're referring to something else.
23       Q. Okay. I'll show you those in a moment.
24       So question for you, then, when the union
25  withdraws a grievance in a situation like this with

20 (Pages 6 -

Page 78

1 Ms. Brigham, is it determining that she should be
2 reinstated?
3     A.  Well, we file grievances based on
4 different things.  So it could have -- I don't know if
5 this particular withdrawal was a grievance on one
6 particular instance for her attendance or if it was for
7 the entire termination case.  To me, it's not clear based
8 on this letter.
9     Q. Okay.
10     A. So I'm not sure if that's what you're
11 referring to.
12     Q.  But in any event, the union decided not to
13 pursue it further; is that correct?
14     A. Correct.
15     Q. Okay. Let's look at some of that history
16 with respect to her grievance. First, I'm just going to
17 show you some documents pretty quickly just to refresh
18 your recollection about dates and the like.
19         I'm showing you now what's been marked as
20 Brigham Exhibit 19.
21         Are you seeing a document --
22     A. Okay.
23     Q. -- that is a letter to Rebecca Brigham
24 dated October 30th, 2015?
25     A. Yes.

Page 79

1         MS. KITSON:  Okay.  And, Counsel, do you
2 have that document?
3         MR. CRONE: Yes.
4         MR. SOUK: Yes.
5     Q. (By Ms. Kitson) And this is a letter to
6 Rebecca Brigham that states, In accordance with the
7 Collective Bargaining Agreement, Article 18, Section B.1,
8 an investigatory meeting has been scheduled for you to
9 attend on November 3rd, 2015, at 11:00 a.m., to discuss
10 your attendance, specifically your ten occurrences.  Your
11 sick call on October 23rd, 2015, did not qualify for IFM.
12         Do you see that?
13     A. Yes.
14     Q. And IFM is intermittent FMLA; is that
15 correct?
16     A. Correct.
17     Q. Okay. And this is a letter from
18 Stefanie Coppedge.
19         Do you see that?
20     A. Yes.
21     Q. And you're copied, along with Angie Reef
22 and Kori Halverson.
23         Do you see that?
24     A. Yes.
25     Q. And is this the letter that led up to the

Page 80

1 November 3rd, 2015, meeting that we were discussing in
2 connection with the transcript we were looking at?
3     A. It appears that way, yes.
4     Q. Do you remember receiving this letter,
5 specifically?
6     A. I don't specifically remember it, no.
7     Q. Okay. I'm showing you what has been marked
8 as Brigham Exhibit 21. And this is a letter to
9 Rebecca Brigham dated November 11th, 2015.
10         Do you see that?
11     A. Yes.
12     Q. Have you seen this document before?
13     A. I don't specifically recall seeing it, but
14 I may have.
15         MS. KITSON: Okay. And, Counsel, do you
16 have this document?
17         MR. CRONE: Got it.
18         MR. SOUK: Yeah.
19     Q. (By Ms. Kitson) And the letter is from
20 Stefanie Coppedge again.
21         Do you see that?
22     A. Yes.
23     Q. And it states, Dear Rebecca, please let
24 this memo serve to confirm your employment with
25 Frontier Airlines has been terminated effective

Page 81

1 November 11th, 2015, for the violation of the
2 dependability policy.
3         Do you see that?
4     A. Yes.
5     Q. Does that refresh your recollection that
6 Ms. Brigham's employment was terminated effective
7 November 11th, 2015?
8     A. Yes.
9     Q. Okay. I'm going to show you what's been
10 marked as Brigham Exhibit 22.
11         Are you seeing a letter dated
12 December 10th, 2015?
13     A. Yes.
14         MS. KITSON: And, Counsel, do you have the
15 same exhibit?
16         MR. SOUK: Yes.
17         MR. CRONE: What number is this one,
18 Danielle?
19         MS. KITSON: 22.
20         MR. CRONE: Yeah. I've got it. Thanks.
21         MS. KITSON: Uh-huh.
22     Q. (By Ms. Kitson) This is a letter dated
23 December 10th, 2015, to Angie Reef, the MEC Council 71
24 president, and it's from Frontier, from Jerry Arellano.
25         Do you see that?

21 (Pages 6 -

Page 82

1    A. Yes.
2    Q. And he states, in this highlighted
3  paragraph -- this highlighting is mine, by the way -- A
4  grievance hearing was scheduled for December 2nd, 2015, in
5  accordance with the Collective Bargaining Agreement
6  between Frontier Airlines and the flight attendants of
7  Frontier Airlines, as represented by the Association of
8  Flight Attendants, on the above-referenced grievance.
9  Ms. Brigham was not present for the meeting.
10    Do you see that?
11    A. Yes.
12    Q. And does that refresh your recollection
13  that there was a grievance hearing on December 2nd, 2015,
14  related to Ms. Brigham's termination of employment?
15    A. Briefly, yeah.
16    Q. Okay. Go ahead and read this paragraph,
17  and let me know when you're done -- or this portion of the
18  page.
19    A. Okay. Okay. I'm finished.
20    Q. Okay. Does this refresh your
21  recollection -- well, strike that.
22    It says, number 1, Reinstate flight
23  attendant, Rebecca Brigham, to her position as flight
24  attendant with full backpay.
25    Do you see that line?

Page 83

1    A. Yes.
2    Q. Is that what the union was seeking to do
3  with respect to Rebecca Brigham?
4    A. Yes, it looks that way. Yes.
5    Q. Okay. And in the bullet point, it appears
6  to be the company's position; is that right?
7    A. It looks that way. Yes.
8    Q. Okay. And Mr. Arellano says, An
9  investigation was conducted on behalf of Ms. Brigham. It
10  was determined that her dependability was accurately
11  documented and addressed in a timely manner.
12    It is essential for any organization to
13  have employees in their workstations at their expected
14  times for orderly operation of their business, and
15  Frontier is no exception. We understand employees are
16  absent on occasion or late to work for reasons beyond
17  their control. For that reason, tracking attendance,
18  absences, or tardiness is not intended to reflect
19  negatively on any employee, but to treat everyone fairly
20  and impartially.
21    On October 23rd, 2015, Ms. Brigham incurred
22  an absence, which brought her balance to 10.0, which is
23  above termination level at 8.0, resulting in the
24  termination of her employment.
25    Do you see that?

Page 84

1    A. I do see that.
2    Q. And is that an accurate description of what
3  occurred?
4    A. Yes.
5    Q. Okay. And does that refresh your
6  recollection that this was the grievance that the union
7  withdrew and stopped pursuing?
8    A. To my recollection. I -- I -- I don't
9  recall the exact reasons why we didn't pursue.
10    Q. Okay.
11    THE DEPONENT: I'm going to briefly get up
12  really quick and just get a charger for my iPad. I'll be
13  -- I'll be right back.
14    MS. KITSON: Actually, you know what? I
15  think we've been going another hour. So why don't we
16  take a 10-minute break. And I should have very few
17  questions left at that point; maybe 10 additional
18  minutes. So then -- and Mr. Crone may be asking
19  questions, or your counsel, Mr. Souk. So let's go off
20  the record and reconvene in 10 minutes, if that works for
21  everyone.
22    THE DEPONENT: Okay.
23    MR. SOUK: That works.
24    MR. CRONE: Thanks.
25    THE VIDEOGRAPHER: We're going off the

Page 85

1  record at 11:22 am.
2    (Recess from 11:22 a.m. to 11:33 a.m.)
3    THE VIDEOGRAPHER: We're going back on the
4  record at 11:33 a.m.
5    Q. (By Ms. Kitson) Ms. Prince, do you
6  understand you're still under oath?
7    A. Yes.
8    Q. Okay. I just have one more document to
9  show you. This will be what's been marked Brigham
10  Exhibit 31.
11    And are you seeing a document with the
12  Association of Flight Attendants letterhead at the top?
13    A. Yes.
14    Q. Okay. And this is a document Bates stamped
15  FRONTIERAIRLINES(R.BRIGHAM)-209, and it goes to 212.
16    MS. KITSON: Counsel, do you have the
17  document?
18    MR. CRONE: I've got it.
19    MR. SOUK: Yes, I do. Thank you.
20    MS. KITSON: Okay. Great.
21    Q. (By Ms. Kitson) Ms. Prince, this appears
22  to be a letter from the Association of Flight Attendants
23  to Frontier Airlines Flight Attendants' System Board of
24  Adjustment.
25    Do you see that?

22 (Pages 6 -

Page 86

1        A. Yes.
2        Q. And the letter's dated December 21st of
3 2015.
4            Do you see that?
5        A. Yes.
6        Q. It looks like it's from Sara Nelson, the
7 international president.
8            Do you see that?
9        A. Yes. Yes.
10        Q.  And you are not copied on this letter.
11        Did you ever receive this letter?
12        A. I don't recall receiving it.
13        Q. Okay. The only reason I have this in front
14 of you is kind of to lace all of this together. We've
15 been looking at various different pieces of
16 correspondence.
17            And if you look at the attachment here to
18 this letter, it is a grievance form.
19            Do you see that?
20        A. Yes.
21        Q. And it states that the grievant's name and
22 address is Rebecca Brigham, and then the date is
23 November 23rd, 2015.
24            Do you see that?
25        A. Yes.

Page 87

1        Q. Does that refresh your recollection that
2 the union filed a grievance on behalf of Rebecca Brigham
3 on November 23rd, 2015?
4        A. Yes.
5        Q. Okay. And it says, AFA Grievance Number
6 52-71-01-68-15.
7            Do you see that?
8        A. Yes.
9        Q. And is that the grievance number that the
10 union refers to throughout -- throughout the grievance
11 process?
12        A. Yes.
13        Q. Okay. And then if you go down one more
14 page in the attachments, you've got that letter that we
15 saw before dated December 10th, 2015, from Mr. Arellano to
16 Ms. Reef. And that was Brigham Exhibit 22 that we looked
17 at before.
18            Do you recognize that letter as the one we
19 looked at before?
20        A. Yes.
21        Q. Okay. And again, it has the same grievance
22 number, 52-71-01-68-15.
23            Do you see that?
24        A. Yes.
25        Q. And does that indicate that this piece of

Page 88

1 correspondence is related to the original grievance?
2        A. Yes.
3        Q. Okay. And then if you go to the
4 letter -- cover letter, again, it has that AFA case
5 number, 52-71-01-68-15.
6            Do you see that?
7        A. Yes.
8        Q. And does that indicate to you that this
9 relates to that same initial grievance?
10        A. Yes.
11        Q. Okay. And then last one is to look back at
12 that Exhibit 45 again.
13            And are you seeing the AFA letter to
14 Jerry Arellano dated November 18th, 2016?
15        A. Yes.
16        Q. Okay. And this was the withdrawal letter
17 that we looked at earlier, correct?
18        A. Correct.
19        Q. And the case number again is AFA Case
20 Number 52-71-01-68-15.
21            Do you see that?
22        A. Yes.
23        Q.  And is that the same grievance that we
24 looked at before?
25        A. Yes.

Page 89

1        Q. So does this refresh your recollection,
2 tying it all up then, that the union filed a grievance on
3 Rebecca Brigham's behalf, that Frontier responded and
4 denied the grievance, that the union then pursued it and
5 continued to advocate on her before, but then withdrew the
6 grievance?
7        A. Yes.
8        Q. Okay. All right.
9            MS. KITSON: Those are my only questions
10 for you today. Thank you so much.
11            THE DEPONENT: Thank you.
12            MS. KITSON: And we should -- Mr. Crone or
13 Mr. Souk may have questions. So let's just hold on a
14 second here.
15            THE DEPONENT: Okay.
16            MR. CRONE: I've got a few, if I may.
17                EXAMINATION
18 BY MR. CRONE:
19        Q. And so, Ms. Prince, I -- really just a few.
20 And I'll kind of start backwards, because Danielle was
21 just asking you about the -- the -- the grievance process
22 and sort of put all those pieces of paper in front of you
23 and asked you if it refreshed your recollection on the
24 process.
25            Is it your understanding that the union

23 (Pages 6 -

Page 90

1 lost the grievance?
2    A. No. It looks like we withdrew the
3 grievance.
4    Q. So -- so did -- did Frontier deny the
5 grievance at some point?
6    A. Honestly, I don't recall how that played
7 out, specifically.
8    Q. When -- when the union ultimately withdrew
9 the grievance, it says -- do you recall looking at a piece
10 of paper that says that it was withdrawn without
11 prejudice?
12    A. Yes.
13    Q. What -- what does that mean?
14    A. It means that we're not pursuing it.
15    Q. Do you know why?
16    A. I --
17       MR. SOUK: I'm going to have to -- yeah,
18 I'll have to voice an objection there.
19       The reasons why a grievance may or may not
20 be pursued at the System Board level generally fall under
21 attorney-client privilege because the staff attorney who
22 is involved gives the Grievance Committee legal advice on
23 whether or not to pursue a grievance to arbitration.
24       MR. CRONE: Thanks. Yeah, I -- I -- I
25 appreciate the explanation. And all -- all I'm asking is

Page 91

1 whether she knows why or not. I'm not asking for the
2 basis, just whether she -- whether Ms. Prince knows why.
3       And so it's a yes-or-no-type question. So
4 if you're fine with that --
5       MR. SOUK: Yeah, if it's -- if it's just a
6 yes or no, if she knows why, that's -- that's okay.
7       MR. CRONE: Yeah.
8    Q. (By Mr. Crone) So let -- let me repeat
9 that, Ms. Prince, sorry. So you probably -- you may have
10 lost track of it.
11       Do you know why the union withdrew the
12 grievance without prejudice?
13    A. I don't recall.
14    Q. Okay. Do you know sort of how far a
15 grievance can go?
16       In other words, what's the end of the road
17 for a grievance? How far can the union push it?
18    A. The grievance -- or the union can push it
19 to arbitration.
20    Q. Got it. Okay.
21       Would they -- would the union ever -- if
22 arbitration failed, would the union ever file a court case
23 on behalf of a flight attendant?
24    A. That, I'm not 100 percent sure. I don't
25 believe so, but I'm not 100 percent sure.

Page 92

1    Q. Does -- does the union ever file an EEOC
2 charge on behalf of a -- of a flight attendant?
3    A. I'm not certain, but I don't believe
4 that's the union's responsibility.
5    Q. Do you know what an EEOC charge is?
6    A. It's -- I don't know the exact initials,
7 but it's like equal opportunity something, along those
8 lines.
9    Q. Okay. Do you recall way back at the
10 beginning when you were talking with Danielle about the
11 flight attendants -- so, a full-time flight attendant in
12 the bidding process has to maintain 45 hours throughout
13 the process?
14    A. Yes.
15    Q. So that's -- after a flight attendant
16 initially bids, and then based on his or her seniority,
17 they -- they obtain a line, correct?
18    A. Correct.
19    Q. And that after they obtain the line, they
20 might need to trade or swap or -- trade or swap. And
21 through that process, they need to maintain 45 hours. Is
22 that how it works?
23    A. Correct. Yes.
24    Q. So there's nothing then stopping a flight
25 attendant from swapping out all of his or her flights,

Page 93

1 correct, as long as they just did it a couple at a time?
2    A. Do you mean they could -- they can't drop
3 down to zero and have zero trips.
4       But can they trade every single trip?
5 Yes.
6    Q. Yeah. And -- and -- and that's what I
7 meant. And that wouldn't violate --
8    A. Okay.
9    Q. Yeah. And that wouldn't violate the
10 Collective Bargaining Agreement in any way, correct?
11    A. Correct.
12    Q. And then do you -- do you recall how many
13 hours per month Ms. Brigham was trying to maintain, like
14 what type of schedule, just in terms of how many hours she
15 wanted per month back at the time you were trying to help
16 her negotiate these issues?
17    A. I don't recall her specific request, no.
18    Q. Okay. Was it -- do you recall if she was
19 trying -- trying to stay full time?
20    A. I would assume she was trying to stay full
21 time.
22    Q. Okay. Ms. Kitson asked you a few questions
23 about coming off of leave and then being able to build a
24 schedule from scratch. She made the distinction about
25 continuous leave or intermittent leave.

24 (Pages 6 -

Page 94

1    Do you recall that conversation?
2    A. I do.
3    Q. Okay. Does the Collective Bargaining
4 Agreement specify that a flight attendant must be coming
5 off of continuous leave in order to have to produce a
6 doctor's note and be approved to bid again?
7    MS. KITSON: Object to the form.
8    THE DEPONENT: Do I still answer?
9    MS. KITSON: Yes.
10    Q. (By Mr. Crone) Oh, yeah. And I can -- I
11 can repeat it for you, and I could --
12    A. Please.
13    Q. -- I could put it -- I could put the
14 Collective Bargaining Agreement up on the screen too, if
15 that's -- I'm just trying to get at whether or not you
16 remember it now. So let me just repeat the question to
17 make it easier.
18    A. Okay.
19    Q. Do you recall if the CBA requires
20 continuous -- so that a flight attendant is coming off of
21 continuous, as opposed to intermittent, leave time in
22 order for that requirement that a doctor's note be
23 submitted before they can bid again?
24    MS. KITSON: Object to the form.
25    A. There's no requirement for intermittent

Page 95

1 FMLA to have doctors' notes to come back to rebid.
2    Q. (By Mr. Crone) Got it.
3    So -- so if someone -- so when Ms. Brigham
4 was -- was she on intermittent -- did she have
5 intermittent FMLA leave approved?
6    A. I believe she was going through the
7 process to get that approved. I don't know if she
8 specifically had that approved at the time of the case.
9    Q. Okay. And -- and if she did, then in order
10 to bid each month, she wouldn't need a doctor's note or
11 anything like that?
12    A. Correct.
13    Q. Okay. And then -- and then the -- the
14 Collective Bargaining Agreement itself --
15    MR. CRONE: I'm -- I'm going to -- I'm
16 going to pull this up just so we can make sure that we're
17 clear about what we're talking about. I -- I wrote down
18 the page number. Give me just a second here.
19    All right. So let me try and share this.
20    Sorry, Adrienne, I have to --
21    THE DEPONENT: That's okay.
22    MR. CRONE: I have to get the -- I have to
23 grant it access in the system preferences. Let's see if
24 I can get this to work.
25    Can you see that, Adrienne, or did I --

Page 96

1 did I succeed?
2    THE DEPONENT: I can -- I can see it, yes.
3    Q. (By Mr. Crone) Okay. Excellent. Okay.
4 Sorry about the delay.
5    Okay. So I'm going to get to the
6 page here. Sorry. I should have wrote down what
7 page number it was on the PDF, instead of the Bates
8 number, and then that would have been easier.
9    And do you see where it says "eligible to
10 bid" there down at the bottom of this page?
11    A. Yes.
12    Q. Okay. And -- and under 1, it says -- I
13 think you've looked at this with Danielle, but I'm just
14 going to read it again to make sure. Flight attendants
15 are considered eligible to bid, unless they have been
16 granted company-approved leaves, LOA, Med, FMLA, OJI,
17 et cetera, or removed for company business.
18    There, it doesn't say that it has to be
19 continuous. How -- how do you know that that's true?
20    A. Well, the types of leaves that are listed
21 are typically continuous for an extended period of time,
22 whether it be just a week, two weeks, or a whole month.
23    Q. Okay. And so -- but -- but given that it
24 doesn't say "continuous" there, was this just something
25 that was understood between the company and the union, or

Page 97

1 was that agreement written down somewhere else, or how did
2 that work?
3    MS. KITSON: Object to the form.
4    A. I don't know if it's listed anywhere else,
5 like in the company handbook or anything, but those
6 are -- I mean, the definitions of those types of leaves
7 of absences that are listed are always continuous.
8    Q. (By Mr. Crone) Except that FMLA could be
9 intermittent, right?
10    A. Right, but it's listed -- it would have
11 been listed specifically with the use of IFMLA or IFML or
12 IFM typically.
13    Q. Okay. So that would be -- so somebody who
14 had intermittent FMLA would say "IFMLA" or something like
15 that?
16    A. Correct.
17    Q. And then that wouldn't be included under
18 this Eligibility to Bid provision?
19    A. Typically, correct.
20    Q. Okay. Are you -- are you aware of whether
21 or not Ms. Brigham requested an accommodation to be
22 reassigned temporarily to light duty at the GO?
23    A. I'm not 100 percent sure if she did
24 request that.
25    Q. Okay. And that -- another question on this

25 (Pages 6 -

Page 98

1  document -- sorry. I've just got to scroll down to the
2  right Bates-numbered page.
3       Okay. And are you with me on that -- this
4  is Bates number page 919.
5       Do you see the capital letter B, Returning
6  From Leave of Absence paragraph?
7       A. I do see it.
8       Q. Okay. And then below that, do you see this
9  paragraph C, Returning From Intermittent Leave Absence?
10      A. Yes.
11      Q. Okay. There, it says, A flight attendant
12  who has missed a portion of a trip or a complete trip due
13  to an intermittent leave, FMLA, Med, OJI, et cetera, and
14  has been completely released, will be returned to his or
15  her original trip if available.
16      What does that mean; do you know?
17      A. Yeah. It means that if a -- a flight
18  attendant, let's say, has called out for the beginning
19  turn of a trip and has an overnight connected to it, that
20  when the flight attendant comes back, then they should be
21  returned to their original trip, unless Crew Scheduling
22  may have assigned it to somebody else for whatever
23  reason.
24      Q. So -- so if -- so Crew Scheduling may have
25  assigned it to somebody else, and then it wouldn't be

Page 99

1  available?
2       A. Correct.
3       Q. Got it. Okay.
4       And then the next sentence says, If the
5  trip was picked up in open time, the flight attendant may
6  pick up open time to replace the trip credit.
7       What does that mean?
8       A. It means they can go into open time, which
9  is essentially the -- the company's TradeBoard, and then
10  they can look and see if there's something that they want
11  to pick.
12      Q. And is open time available to anybody, or
13  is that seniority-based?
14      A. It's open to anybody.
15      Q. Okay. And then it says, If there are no
16  trips that the flight attendant wants to pick up, the
17  flight attendant can opt to be placed on AVA status for
18  the time of the original pairing.
19      What's the AVA status?
20      A. It means available to assign. So it would
21  almost be like a reserve-type position with different
22  parameters.
23      Q. Sort of like being on call again or
24  something?
25      A. Correct.

Page 100

1  that and the regular reserve time?
2  Q. Okay. And what -- what's different between
3       A. AVA has specific requirements. It has to
4  be based on the original trip, certain time frames of
5  that. And they -- you don't get called on an as-needed
6  basis. The company has to call you the day before, I
7  believe -- by 5:00 the day before the specific AVA
8  assignment.
9       Q. So it's like being on call, but a little --
10  a little nicer. So -- so you're not going to be -- it's a
11  little easier to predict when you might be called up; is
12  that fair?
13      A. Yes.
14      Q. Okay. And I -- I've skipped back up in the
15  document to what's page 870.
16      And --
17      A. Okay.
18      Q.  -- it's got -- do you see paragraph M,
19  where it says, Daily Open Time. First Come, First Served?
20      A. Yes.
21      Q. Okay. Is -- is this what you've
22  been -- well, let me just -- let me just read the first
23  paragraph.
24      It says, All available open time will be
25  displayed in the Automated Bid System. A flight attendant

Page 101

1  may submit requests in the Automated Bid System to modify
2  his or her schedule using add/drop/swap with open time on
3  a first-come, first-served basis?
4       So does that mean that that's not
5  seniority-based?
6       A. Specifically open time, no, is not
7  seniority-based.
8       Q. Okay. And --
9       A. It's first come, first served.
10      Q.  And so if -- so if Rebecca Brigham, for
11  example, had initially bid at the beginning of the month,
12  or -- or even just not bid at all and -- and -- and
13  received -- let's say she didn't bid at all. Would she
14  just receive an automated line based on her seniority?
15      A. I believe so, yes.
16      Q. And then she could use this add/drop/swap
17  with the open time to -- to totally rebuild her schedule
18  without dropping below that 45-hour limit, right?
19      A. In theory, yes.
20      Q. Okay. And -- and -- and then she would fly
21  whatever the schedule is, presumably, right, and then just
22  subject to all the normal, you know, rules that Frontier
23  has in place?
24      A. Correct.
25      Q. Okay. And -- and so when you were

26 (Pages 6 -

Page 102

1  advocating to -- to Frontier that Ms. Brigham be allowed
2  to build her schedule this way, did -- did Frontier ever
3  tell you why they wouldn't allow it?
4       A.  I don't recall if they gave me specifics.
5       Q.  But in that last meeting when you were
6  asking for her -- when the union was asking for her to be
7  reinstated, is it your understanding that if Frontier
8  would have allowed this, they would have reinstated her?
9       A.  That would be an -- my assumption, yes.
10      Q.  I mean, that's what you were asking for,
11  wasn't it?
12      A.  Correct.
13          THE REPORTER: I'm sorry?
14          MS. KITSON: Object to the form.
15      Q.  (By Mr. Crone)  There's another page in
16  this Collective Bargaining Agreement -- and I didn't write
17  down what page number it was, but it was -- it was the
18  page where Danielle drew your attention to --
19  Danielle Kitson, Frontier's attorney, drew your attention
20  and said, This contract would allow somebody 23 months of
21  medical leave, and their job would be protected.
22          Do -- do you remember that provision?
23      A.  I do.
24      Q.  Is that medical leave paid or unpaid?
25      A.  I believe you have to use your sick time

Page 103

1  or your vacation time, and then it goes unpaid. But I --
2  I would have to relook at the specifics on that.
3       Q.  So let's assume you're right, that you've
4  got to use up your accrued sick and vacation time first,
5  and then you go to unpaid.
6           How does an employee -- how does an
7  employee that uses -- let's say the full 23 months of --
8  of -- of medical leave, how does an employee pay their
9  bills during that time?
10      A.  I guess that would be --
11          MR. SOUK: Objection. Speculative.
12  Object. Speculation.
13          You can still answer.
14      A.  Okay.  I guess that would be up to the
15  individual flight attendant how they would pay their own
16  bills.
17      Q.  (By Mr. Crone)  But Frontier, through the
18  Collective Bargaining Agreement, didn't commit itself to
19  pay for that -- to pay the employee's salary beyond the
20  sick and the -- and the -- and the other leave time?
21      A.  It doesn't look that way, no.
22      Q.  So Danielle Kitson has pointed you to
23  various provisions of the Collective Bargaining Agreement,
24  and so have I.
25          Did you negotiate this Collective

Page 104

1  Bargaining Agreement? Were -- were you involved in that
2  process at all?
3       A.  No, I was not.
4       Q.  And I think you already answered this, but
5  I just want to make sure.
6           You didn't have at the time -- so back when
7  you were helping Ms. Brigham negotiate with Frontier, you
8  didn't have any ability to amend this Collective
9  Bargaining Agreement on yourself -- by -- by yourself, did
10  you?
11      A.  No, I did not.
12      Q.  Okay. And when the Collective Bargaining
13  Agreement was renegotiated, apparently, in 2019, did you
14  have any part in doing -- in negotiating those amendments?
15      A.  No, I did not.
16      Q.  Okay. Okay. Give me just a minute here.
17          When you were -- when you were negotiating
18  with Frontier on -- on Ms. Brigham's behalf, do you recall
19  if Frontier offered any solutions of its own?
20      A.  I don't recall.
21      Q.  Have you seen anything today -- in -- in
22  all the pieces of paper you've looked at, have you seen
23  anything today that refreshes your memory as to whether or
24  not Frontier offered any of its own solutions?
25      A.  Short of Rebecca asking for an extended

Page 105

1  medical leave, I don't see anything else that Frontier
2  specifically sent to her or the union with other
3  suggestions.
4       Q.  Okay. And you and -- you and Ms. Kitson
5  had a short exchange about the points that Ms. Brigham
6  accrued due to absences.
7           Do -- do you recall that discussion?
8       A.  Yes.
9       Q.  And Ms. Kitson asked you if Ms. Brigham was
10  conceding that these final points were proper.
11          Do -- do you recall that question?
12      A.  I do.
13      Q.  Do you know whether Ms. Brigham thought
14  those final 4 points ought to be assessed against her?
15      A.  The only thing I can recall is seeing what
16  was written in that transcript. And it said that Rebecca
17  had agreed -- or that she had agreed to that.
18      Q.  Yeah. I -- I know that's your
19  interpretation of what it said.
20          I'm asking, do you know what Rebecca
21  actually thought?
22          MS. KITSON: Object to the form.
23      A.  Specifically, no. And I don't recall if
24  she and I specifically had a conversation regarding that.
25      Q.  (By Mr. Crone)  In fact, you never did have

27 (Pages 6 -

Case 1:19-cv-03417-WJM-STV   Document 44-2   Filed 12/08/20   Page 29 of 75

Appellate Case: 21-1335   Document: 010110614801   Date Filed: 12/06/2021   Page: 59

**Page 106**

1  a conversation regarding that, did you?
2  MS. KITSON: Object to form.
3  MR. SOUK: Object.
4  A. I don't know.
5  Q. (By Mr. Crone) Did your -- did you -- do
6  you recall telling Ms. Kitson that if an employee -- if a
7  flight attendant is on intermittent FMLA leave, and they
8  don't notify that they're calling out in that two-hour
9  period or whatever it was before a flight, that Frontier
10  would review that -- because they're on intermittent FMLA
11  leave, Frontier would review that after the fact to
12  determine how to code it?
13  Do -- do you recall that?
14  A. I do recall that, yes.
15  Q. (By Mr. Crone) And --
16  THE REPORTER: I'm sorry. Was there an
17  objection?
18  MS. KITSON: Yes. Object to the form.
19  Q. (By Mr. Crone) Okay. And so in -- in that
20  instance with the final points with -- with Ms. Brigham,
21  do you know why Frontier didn't review that after the
22  fact?
23  MS. KITSON: Object to the form. Assumes
24  facts not in evidence.
25  THE DEPONENT: Do --

**Page 107**

1  MS. KITSON: You can answer.
2  THE DEPONENT: Do I still --
3  MR. SOUK: You can answer.
4  THE DEPONENT: Okay. Okay. Sorry.
5  A. Typically, the -- the flight attendant
6  would have to pursue -- like to request them to review
7  that if there was a discrepancy.
8  Q. (By Mr. Crone) Oh, I got it.
9  So -- so on that final absence, if
10  Ms. Brigham was on IFM -- intermittent FMLA leave, and if
11  she had asked that they look at that, then Frontier would
12  review how to code that. Is -- is that --
13  MS. KITSON: Object to --
14  Q. (By Mr. Crone) Am I understanding that
15  correctly?
16  MS. KITSON: Object to the form.
17  A. Correct.
18  Q. (By Mr. Crone) Okay. And do you know
19  if -- at that time when Frontier assessed those final
20  points, do you know if Rebecca had intermittent FMLA leave
21  approved?
22  A. I don't recall specifically if she had
23  intermittent FMLA at that time.
24  Q. And do you know if she requested that
25  Frontier review how they coded that absence?

**Page 108**

1  A. If it was specifically that absence? No,
2  I don't recall.
3  Q. And, Ms. Prince, did you prepare for
4  today's deposition in any way?
5  A. Briefly, yes.
6  Q. Who did you prepare with?
7  A. I did have some conversation with
8  Josh Souk, and I just re-looked at what I had sent you
9  previously.
10  Q. Okay. And did you -- did you speak at all
11  with Ms. Kitson prior to today's conversation?
12  A. No, short of just getting the information
13  regarding having this meeting. But, no, I did not
14  prepare with her.
15  Q. Do you know if Mr. Luke (sic) communicated
16  with Ms. Kitson prior to today's deposition?
17  A. I believe he did, just to confirm details.
18  Q. Okay. And how long did you and
19  Mr. Luke (sic) meet to prepare for today?
20  A. Like the duration of our conversations; is
21  that what you're asking -- how long our conversations
22  were?
23  Q. Yeah. Exactly.
24  A. Oh, maybe an hour, half hour.
25  MR. SOUK: Just to jump in, if you're

**Page 109**

1  referencing me, my last name is Souk.
2  MR. CRONE: Oh, Souk. I'm sorry.
3  MR. SOUK: Yeah. That's okay. No one
4  ever gets it right.
5  Q. (By Mr. Crone) Yeah. Did you -- did you
6  understand that I was referencing Mr. Souk, not Luke?
7  I'm sorry, Adrienne.
8  A. I did assume that, yes.
9  Q. Okay.
10  A. Thank you.
11  Q. And did you and Mr. Souk review any
12  documents as part of your preparation?
13  A. Together? No, we did not. Well, that's
14  not true. I think I did ask him about the deposition
15  that I had sent you.
16  Q. Okay. Do you understand that I represent
17  Ms. Brigham in a lawsuit against Frontier that alleges
18  Frontier violated the AVA in various ways?
19  A. Yes.
20  Q. And you -- back when Ms. Brigham filed her
21  grievance, you represented her in that -- in that
22  proceeding, right?
23  A. Yes.
24  Q. Okay. And today, do you feel like you're
25  giving testimony for or against any one side?

28 (Pages 6 -

Veritext Legal Solutions
1249
800-567-8658                                            973-410-4098   81

Page 110

1    A. No, I don't believe it's for either side
2  or the other.
3    Q. Does the union take a side -- when it files
4  a grievance for, say, the flight attendant -- say,
5  Rebecca Brigham -- was the union on a side during that
6  grievance?
7    A. Yes, the union is advocating for the
8  flight attendants.
9    Q. Got it. And so -- so the union was
10  advocating for Ms. Brigham at the time of the grievance,
11  right?
12    A. Correct.
13    Q. And you understand I'm advocating for
14  Ms. Brigham in a lawsuit on her behalf, correct?
15    A. Correct.
16    Q. Do you think it's odd that -- that -- that
17  Mr. Souk objected to some of my questions to you today,
18  given the fact that I also represent Ms. Brigham?
19      MS. KITSON: Object to the form.
20    A. I don't understand why lawyers object.
21  I'm just following along.
22      MR. CRONE: I don't have any further
23  questions, Ms. Prince. Thank you.
24      THE DEPONENT: Thank you.
25      MS. KITSON: I have a little follow-up, if

Page 111

1  that's okay.
2      EXAMINATION
3  BY MS. KITSON:
4    Q. Ms. Prince, I really appreciate your
5  patience today. I -- I need to ask you a little bit more
6  about this 45 hours, because I believe the record is
7  unclear.
8      So you testified earlier that during the
9  bidding process, a flight attendant is not permitted to
10  drop below 45 hours at any point in that process, correct?
11    A. Correct.
12    Q. Okay. So I want to walk through a
13  hypothetical with you. Let's say that Ms. Brigham did not
14  bid.
15      Are you with me?
16    A. Yes.
17    Q. And the automated system spits out a
18  line for her of 60 hours.
19      Are you with me?
20    A. Yes.
21    Q. And is that what would happen?
22    A. Honestly, I don't know the specifics if
23  Ms. Brigham had misbid, not bid, how many hours she would
24  have been given. It varies -- that varies month to
25  month. But she would have been awarded some sort of

Page 112

1  line based on whatever company -- the threshold was at
2  that time.
3    Q. Okay. And that line would have been above
4  45 hours for sure, right?
5    A. Oh, for sure, yes.
6    Q. Okay. Now, she now has this line, correct?
7    A. Yes.
8    Q. All right. Let's assume that she has
9  60 hours.
10    A. Yes.
11    Q. Are you with me?
12    A. Yes.
13    Q. Okay. And she wants to get rid of all of
14  her trips.
15    A. Correct.
16    Q. Are you with me?
17    A. Yes.
18    Q. She has to drop all of them all at once in
19  the system.
20      Are you with me?
21    A. Yes.
22    Q. She cannot do that, right?
23    A. Correct.
24    Q. Okay. Now, she's holding -- she -- she
25  decides she wants to give up one trip that's worth five

Page 113

1  hours.
2      Are you with me?
3    A. Yes.
4    Q.  She drops that trip.
5      Are you with me?
6    A. Yes. Yes.
7    Q. She's now at 55 hours, correct?
8    A. Correct.
9    Q. And that's okay, right?
10    A. Yes.
11    Q. Now she wants to drop a block of 20 hours.
12      Are you with me?
13    A. Yes.
14    Q. She can't do that, because it would take
15  her down under 45, correct?
16    A. Correct.
17    Q. Okay. So when she's sitting at 55, the
18  most she can drop in one shot is 15, correct -- oh, I'm
19  sorry. I'm terrible at math. Let me say that again.
20      Ms. Brigham has 50 -- 55 hours, and she
21  wants to drop 20, she cannot do that, correct?
22    A. Correct.
23    Q. But she could drop 10 because that will
24  bring her to the 45-hour threshold, correct?
25    A. Yes.

29 (Pages 6 -

Page 114

```
 1      Q. Okay. Now she's at 45.
 2         Are you with me?
 3      A. Yes.
 4      Q. Okay. And she can't drop any more trips,
 5   then, until she picks up trips to take her above 45,
 6   correct?
 7      A. Correct.
 8      Q. Okay. So at no point -- you can't trade
 9   out a trip that's going to bring her below 45 at any point
10   in the process, right?
11      A. Okay. Now you're talking two different
12   things, because trading is different than dropping. So
13   she wouldn't have been able to drop, but she could
14   have -- if she had a trip that was 20 hours that she
15   wanted to get rid of, and she saw a trip that was -- I'm
16   really bad at math -- 35 hours, she could have traded
17   those to keep her above whatever math we are at.
18         So she could trade to get back up. She
19   wouldn't have been able to drop first and then pick up,
20   in theory.
21         Does that make sense?
22      Q. That does make sense. So she can't -- she
23   can't drop unless she's replacing, if she's at that 45
24   mark, right?
25      A. Correct. Correct.
```

Page 115

```
 1      Q. So she's -- let me follow it through. So
 2   she's at 45.
 3         Are you with me?
 4      A. Yes.
 5      Q. She wants to trade with another flight
 6   attendant. She wants to give that flight attendant 20 and
 7   get 20 back.
 8         Are you with me?
 9      A. Yes. Yes.
10      Q. She can do that, right?
11      A. Correct. Correct.
12      Q. But let's say she's at 45, and she wants to
13   give a flight attendant 20, but only get back 10.
14      A. Yes.
15      Q. Let me try that again.
16      A. Okay.
17      Q. Ms. Brigham is at 45 hours.
18         Are you with me?
19      A. Yes.
20      Q. She wants to drop 20 of her hours.
21      A. Okay.
22      Q. Are you with me?
23      A. Yes.
24      Q. She can't drop it, right?
25      A. Right.
```

Page 116

```
 1      Q. She sees another flight attendant has a
 2   20-hour trip that she would be willing to take.
 3         So she's able to swap that, right, give 20
 4   and get 20 right back?
 5      A. As long as that other flight attendant
 6   wants to do the same, then, yes.
 7      Q.  Okay.  But she can't -- let's say that she
 8   wants to drop 20 and she sees another flight attendant
 9   with only 10.
10         She can't give away 20 and only get back 10
11   so that she's at 35 hours, can she?
12      A. Correct. No, she cannot.
13      Q. Okay. So she always has to balance at 20;
14   is that right? I'm sorry. Let me --
15      A. Whatever it is to be at 45, yes.
16      Q. Got it. So she always has to balance to
17   45, whatever move she's making?
18      A. Correct.
19      Q. Now, is that also true in terms of trading
20   off of open time?
21         So let's say that Ms. Brigham is sitting at
22   45.
23         Are you with me?
24      A. Yes.
25      Q. Okay. And she wants to drop 20, right?
```

Page 117

```
 1      A. Yes.
 2      Q.  And she sees there's 20 available on open
 3   time.
 4         Are you with me?
 5      A. Yes.
 6      Q. Can she swap those?
 7      A. The difference with open time is that the
 8   company has minimum requirements on each day. So if she
 9   had a trip that was on the 5th and the 6th, for example,
10   and she wanted to get rid of that and pick up something
11   on the 7th and 8th, the 5th and the 6th would have to
12   have enough reserve coverage to allow her to drop that
13   trip to pick up the other trip on the 7th and 8th, unless
14   it was day-for-day.
15         Does that make sense?
16      Q. Yes.
17      A. Okay.
18      Q. And nothing ever stopped her from following
19   these rules, right?
20         These rules applied to everybody, correct?
21      A. Correct.
22      Q. And so it's not like Frontier was saying
23   she couldn't do that, right?
24      A. Correct.
25      Q. She could. She could play by the same
```

30 (Pages 6 -

Page 118

1 rules as everyone else, right?
2     A. Correct.
3     Q. So when you said -- I was a little bit
4 confused about what you said before, when you said that if
5 Frontier had granted what she wanted, she would be
6 reinstated.
7     Was that your testimony?
8     A. Yes. I mean, granted that she was able
9 to -- she wanted her job back and trade and drop trips to
10 not have overnights.
11     Q. Okay. And so what the union was saying is
12 that she should be able to do whatever she could within
13 the existing Collective Bargaining Agreement to try to
14 achieve that, correct?
15     A. Correct.
16     Q. Okay. And you're not saying that she
17 should be able to drop below the 45 and start over again
18 from scratch, correct?
19     A. Correct.
20     Q. Okay. And so when you say she would have
21 been reinstated, you don't know that for sure, right?
22     A. I don't think so. I -- what I -- I think
23 what I'm trying to clarify is that if her attendance had
24 been not at -- you know, when you -- you file a grievance
25 and you fight against the attendance, whatever, and if

Page 119

1 she'd have been able to drop and trade and everything,
2 she would have been able to have her job back. But the
3 attendance was the issue.
4     Q. Yeah. But the union did not approve her
5 ability to do what she wanted, which was drop everything
6 and start from scratch?
7     A. I don't recall that that's what she -- she
8 didn't want to drop everything; she just wanted to drop
9 overnights.
10     Q. Okay. And if she --
11     A. To my -- to my understanding.
12     Q. Okay. So let me ask you this: If she
13 tried everything she could under the Collective Bargaining
14 Agreement and she still had overnights, and the company
15 took those overnights from her, that would be a violation
16 of the seniority bidding rules of the Collective
17 Bargaining Agreement, right?
18     A. Correct.
19     Q. Okay.
20     A. Correct.
21     Q. So she can't just have the overnights taken
22 away magically, right?
23     A. Correct.
24     Q. She's got to follow the same rules?
25     A. Correct.

Page 120

1     Q. Okay.
2     MS. KITSON: Those are my only questions.
3 Thank you.
4     THE DEPONENT: Okay.
5     EXAMINATION
6 BY MR. CRONE:
7     Q. And I'll -- I just have a few follow-up
8 based on that, of course.
9     So Ms. -- I think we should sort of nail
10 down and be clear about what Ms. Brigham was asking.
11     She wasn't asking to magically eliminate
12 overnights, was she?
13     A. Not to magically eliminate, no.
14     Q. I mean, really what she was proposing was
15 that -- was that if she could build her schedule out of
16 the -- the -- the open time -- you know, the trade time
17 and the open time, what she was proposing was to take that
18 burden on herself to make sure she didn't have the
19 overnights.
20     Isn't that correct?
21     A. Correct.
22     Q. And -- and so that wouldn't violate the
23 Collective Bargaining Agreement, right?
24     A. Correct.
25     Q. But -- but, still, despite that fact, when

Page 121

1 you went into the grievance meeting with Ms. Brigham, she
2 had absences that put her over the limit and -- and -- and
3 set her up for termination, right?
4     A. Correct.
5     Q. So wasn't -- and so -- so, was she asking
6 to be allowed to build a schedule in such a way that she
7 wouldn't have these absences that would put her over the
8 line for termination?
9     A. It was -- from my understanding, what
10 the -- the accommodation, it was moving forward to be
11 able to manipulate her schedule.
12     Q. Because prior to that, it wasn't working,
13 which is why she had racked up these termination points;
14 isn't that correct?
15     A. Correct. Correct.
16     Q. And isn't -- so -- so Ms. Brigham, what she
17 was proposing is -- is actually different -- slightly
18 different than what everybody else is entitled to, because
19 she's trying to eliminate overnights; is that correct?
20     MS. KITSON: Object to the form.
21     A. I -- I don't think it's different than
22 what everybody -- everybody is able to manipulate their
23 schedules, whether they don't want overnights or certain
24 trips.
25     Q. (By Mr. Crone) Sure. And -- but -- but

31 (Pages 6 -

Page 122

1 in -- in her case, it wasn't working.
2        I mean, she was at the termination level
3 based on attendance, right?
4        A. Correct.
5        Q. Okay. And -- and so what she was
6 proposing, which was to take -- you know, whether she bid
7 originally or just didn't bid and received a line, and
8 then traded and swapped with other people or with open
9 time after that, isn't -- that process that she was
10 proposing, isn't that nicer to the more senior flight
11 attendants in a way, because then she didn't originally
12 bid on trips she really wasn't going to keep?
13        MS. KITSON: Object to the form.
14        A. I would disagree with that. I mean --
15        Q. (By Mr. Crone) Why?
16        A. Well, if she had bid and followed with the
17 procedure, she would have probably gotten better trips
18 than she would have been awarded anyway, and it would
19 have been easier for her to trade based on what flight
20 attendants like to fly, the availability.
21        Q. Got it. So she could -- she could try to
22 bid for those non-overnight flights in the first place?
23        A. Correct.
24        Q. And then -- yeah. And then she's going to
25 keep more than she's going to need to trade or swap later

Page 123

1 in the month?
2        A. Correct.
3        Q. Okay. So I guess it's the same question,
4 though.
5        Is -- isn't that friendly to the other
6 flight attendants in terms of the seniority provision?
7 She's just not just picking up trips that
8 she really wants to dump; she's trying to pick up trips
9 that she can keep?
10        MS. KITSON:  Object to form.
11        A.  I don't really -- I don't really think
12 that that's exactly how it works. And being friendly
13 or -- I mean, that's not how the system works. It's all
14 on seniority.
15        Q. (By Mr. Crone) Oh, I know it's all on
16 seniority. But what -- what I'm saying is that -- that a
17 flight attendant could -- could -- he or she could bid on
18 trips that they don't really want, with the idea that
19 they're going to swap them out later, which means they're
20 not available for some other flight attendant who wants it
21 when they first bid at the beginning of the month.
22        Does that make sense?
23        A. Yeah. But in theory, you always bid for
24 the best. So it's either whether you want to fly it --
25 you have the best that you want to fly or you have the

Page 124

1 best that you can trade.
2        Q. Got it. Okay. Okay. So -- so then -- so
3 then, again -- and maybe I already asked you this.
4 In -- and I don't think I asked it in quite the same way.
5        In -- in the meetings leading up to that
6 final meeting -- so either that final meeting or the
7 meetings leading up to that final meeting, did Frontier
8 ever discuss why what Ms. Brigham was proposing wasn't
9 acceptable?
10        A. I don't recall the specifics on each
11 meeting.
12        Q. I mean, you thought it was acceptable at
13 the time, though, didn't you?
14        MS. KITSON: Object to the form.
15        A. We suggested what was based on the
16 contract.
17        Q. (By Mr. Crone) Because that would help
18 Ms. Brigham, right?
19        MS. KITSON: Object to the form.
20        A. Correct.
21        Q. (By Mr. Crone) Okay. I mean, you
22 were -- you -- you were representing an interest of your
23 member at that time, right?
24        A.  Of course.
25        Q. Okay. And so you thought this was a

Page 125

1 reasonable solution, or you wouldn't have proposed it,
2 would you?
3        MS. KITSON: Object to form.
4        A. Correct.
5        Q. (By Mr. Crone) Okay.
6        THE REPORTER: I'm sorry. Your answer was
7 "Correct"?
8        THE DEPONENT: Yes.
9        Q. (By Mr. Crone) Okay. Do you still think
10 that that was a reasonable solution, sitting here today
11 looking back on things?
12        A. I do.
13        Q. Okay. And what about -- you -- I can't
14 remember. Were you aware that Ms. Brigham also requested
15 temporary light-duty reassignment?
16 A. I -- I'd --
17        THE REPORTER: She cut out.
18        MR. CRONE: Yeah.
19        MR. SOUK: It's frozen.
20        MR. CRONE: I think if history serves as a
21 guide, it will come back in a second here.
22        THE DEPONENT: Sorry, I'm back.
23        It's true.
24        Q. (By Mr. Crone) No. You're fine. You're
25 fine.

32 (Pages 6 -

Page 126

1    I was asking -- I couldn't remember --
2    if -- if you were aware of whether or not Ms. Brigham also
3    requested a temporary light-duty reassignment to the GO.
4        A. I'm not 100 percent sure, but I think so.
5        Q. Okay. And sitting here today, looking back
6    on that, would -- would that have been a reasonable
7    solution to her problem?
8        MS. KITSON: Object to the form.
9        A. Yes.
10       Q. (By Mr. Crone) Do you know -- do you know
11   why Frontier didn't allow her to do that?
12       A. There was a certain time that --
13       MS. KITSON: Object to form.
14       THE DEPONENT: Oh, sorry.
15       A. There was a certain time that there were
16   no light-duty or availability to flight attendants to
17   work not flying.
18       Q. (By Mr. Crone) And was it --
19       A. But I don't know exactly when those were.
20       Q. And do you know if flight attendants ever
21   were reassigned to light duty at any time you've been at
22   Frontier?
23       A. At some point, yes, they have been.
24       Q. Okay. Do you know if that's -- if that
25   goes on now, today?

Page 127

1        A. I'm not sure if it goes on now.
2        Q. Do you know if it happened in 1999, when
3    you started?
4        A. I believe so, yes.
5        Q. So -- so -- and you just -- but there was
6    some point where it wasn't allowed; you just can't
7    remember when that was?
8        A. Correct. And it -- it wasn't offered
9    like -- they -- you had to do a different program. It
10   was like working at the Goodwill or some -- some sort of
11   charity. It wasn't working at Frontier.
12       Q. Okay. Okay. Do you know -- are you aware
13   of a flight attendant ever being injured on the job?
14       A. Yes.
15       Q. Do you know if that injured flight
16   attendant is reassigned to light duty ever?
17       A. It depends. And like I said, sometimes
18   they were not offered light -- light assignments.
19   There -- there wasn't the ability to have that.
20       Q. Okay. But do you recall if it ever
21   happened?
22       A. I believe it has happened, yes.
23       Q. Okay. And can you think of anyone in
24   particular -- an actual specific name -- can you remember
25   a flight attendant that was injured and reassigned?

Page 128

1        A. Yes.
2        Q. Who is that?
3        A. Marilyn Actor.
4        Q. Marilyn -- I'm sorry, what was the last
5    name?
6        A. Actor, A-c-t-o-r.
7        Q. Do you recall when this happened?
8        A. No. Specifically, no.
9        Q. Do you recall what the injury was?
10       A. She broke her wrist.
11       Q. And you can't remember when, but you
12   remember that she got temporarily reassigned to light
13   duty?
14       A. At the Goodwill, yes. It was not at
15   Frontier.
16       Q. Okay. Was she still paid by Frontier; do
17   you know?
18       A. I don't know how that worked.
19       Q. Okay. And did she return to regular flight
20   attendant duties?
21       A. I believe so, yes.
22       Q. Can you recall anybody else that this
23   occurred with?
24       A. Specifically, no.
25       Q. When -- when a flight attendant has their

Page 129

1    60 hours, they have their line, and now they want to trade
2    and swap, they can't drop below 45.
3        But they could, for example, trade
4    ten hours six times, right?
5        A. Yes. In theory, yes.
6        Q. Okay. And -- and that could be pulled out
7    of open time, too, so long as each trip that they're
8    swapping out of the open time is a one-for-one trade.
9        So it's like if they have a five-hour trip
10   and they swap it with a five-hour trip in open time,
11   that's okay?
12       A. Yes, as long as there's coverage on the
13   days that they're -- like if it's not
14   same-day-for-same-day, the day that they want to trade
15   has to have separate coverage for what they want to pick
16   up on the other day.
17       Q. Got it. So -- so if it's on the same day,
18   they can just trade it out five hours for five hours. But
19   if they want to trade something on a Monday, that -- for
20   something on a Wednesday, how do they know there's
21   coverage?
22       A. We have a chart that's listed on FLiCA,
23   and it shows how many open periods there are, how many
24   reserves are available.
25       Q. Okay. So it's pretty easy for a flight

33 (Pages 6 -

Page 130

1 attendant at that point to figure out where they
2 can -- where they can --
3     A. Correct.
4     Q. -- where they can trade?
5     A. Correct.
6         MR. CRONE: That's all, Ms. Prince. Thank
7 you again.
8         MS. KITSON: I'm so sorry. I have a few
9 follow-up. All right.
10         EXAMINATION
11 BY MS. KITSON:
12     Q. So, really fast, temporary light-duty
13 assignments, those were only for people injured on the
14 job, correct?
15     A. That's my understanding, but I'm not
16 100 percent sure.
17     Q. And the program was the OJI program, right?
18     A. Correct.
19     Q. Okay. You talked about the reasonable
20 solution that the union was proposing.
21         Do you remember that testimony?
22     A. Yes.
23     Q. And wasn't the reasonable solution for
24 Ms. Brigham to work within the confines of the Collective
25 Bargaining Agreement?

Page 131

1     A. Yes.
2     Q. Okay. And we talked about how, you know,
3 letting Ms. Brigham do whatever it was she was asking,
4 that wouldn't hurt anybody.
5         Do you remember that -- him asking you
6 those questions?
7     A. Yes.
8     Q. My question to --
9     A. Correct.
10     Q. -- you is, if Ms. Brigham were permitted to
11 drop below the 45 hours, she would have an advantage over
12 those more senior to her who had to hold that 45; isn't
13 that correct?
14     A. Correct.
15     Q. And she would be treated preferentially in
16 that regard, correct?
17     A. Yes.
18         MS. KITSON: All right. Those are my only
19 questions -- oh, wait. No, sorry. I have a few more.
20 Sorry. Sorry. Sorry.
21     Q. (By Ms. Kitson) Ms. Prince, did the
22 company ever prohibit Ms. Brigham from doing something
23 with her schedule that was allowed by the contract?
24     A. I don't believe so.
25     Q. Yeah. In other words, she was allowed to

Page 132

1 do all the things under the contract that anybody else
2 could, right?
3     A. I believe so, yes.
4     Q. And if the company had prohibited her from
5 doing what the contract allowed -- for instance, dropping,
6 swapping -- that would have been a violation of the
7 contract's (sic), correct?
8     A. Correct.
9     Q. Let me ask you that again. All right.
10 I'll ask that again.
11         If the company had allowed her -- strike
12 that.
13         If the company had prohibited Ms. Brigham
14 from doing something that was allowed by the contract,
15 like dropping or swapping or trade, that in itself would
16 have been a violation of the contract's work rules, right?
17     A. Correct.
18     Q. Okay. Quickly here. Does the union
19 routinely file grievances related to alleged company
20 violation of work rules?
21     A. Yes.
22     Q. Okay. Did the company ever violate the
23 open time rules with respect to Ms. Brigham, to your
24 knowledge?
25     A. To my knowledge, I don't think so.

Page 133

1     Q. Did the company ever violate the CBA at all
2 with respect to Ms. Brigham, to your knowledge?
3     A. Not to my knowledge.
4     Q. Okay. And if Frontier had prohibited --
5 strike that.
6         If Frontier had prohibited Ms. Brigham from
7 doing anything that the contract allowed, the union would
8 have filed a grievance based on that, correct?
9     A. Correct.
10         MS. KITSON: Okay. I think those are my
11 only questions. Let me just double-check here. Bear
12 with me.
13         Okay. I think I'm done. Thank you very
14 much.
15         MR. CRONE: Just -- just --
16         THE DEPONENT: Thank you.
17         MR. CRONE: -- just one. Just one,
18 Ms. Prince, and then I -- and then --
19         MS. KITSON: He has to get the last word.
20         MR. CRONE: -- you can be released from --
21 you can release -- no, I just don't understand.
22         EXAMINATION
23 BY MR. CRONE:
24     Q. If -- if -- if the -- if the company didn't
25 deny Ms. Brigham what she needed, then why were you and

34 (Pages 6 -

Page 134

1 her in a grievance meeting in the first place?
2         In other words, why was she up for
3 termination, if Frontier was giving her what she needed?
4         MS. KITSON: Object to form.
5         A. We were in a grievance hearing because she
6 had exceeded her attendance points.
7         Q. (By Mr. Crone) And why did she exceed her
8 attendance points?
9         MS. KITSON: Object to the form.
10         A. Because she called in sick to work too
11 many times.
12         Q. (By Mr. Crone) And why did she call in
13 sick too many times?
14         MS. KITSON: Object to the form.
15         A. Well, each time, I don't know why she
16 called in sick. She wasn't able to be at her trips, for
17 whatever reason.
18         Q. (By Mr. Crone) For whatever reason.
19         Do you know what those reasons were?
20         MS. KITSON:  Object to the form.
21         A.  Well, I do know that some of the reasons
22 were due to alcoholism, but I don't know if every single
23 instance was.
24         Q. (By Mr. Crone) Okay. So were you really
25 in a good position to be advocating for her back then?

Page 135

1         MS. KITSON: Object to the form.
2         A. At the time, I believe I advocated to the
3 best of my ability.
4         Q. (By Mr. Crone) Okay. And -- but sitting
5 here today, you're not sure why she accrued the absences
6 she accrued, but that -- well, let's just start there.
7         Sitting here today, you can't -- you can't
8 recall why she accrued all of the absences she accrued; is
9 that correct?
10         A. Correct. That was several years ago.
11         Q. Okay. And -- but that's what the fight was
12 over in the grievance hearing, right?
13         A. Correct.
14         Q. Okay. Do you think, looking back, that
15 there was perhaps somebody else that may have been better
16 equipped to advocate on her behalf?
17         MR. SOUK: Objection. Calls for
18 speculation.
19         You can answer.
20         THE DEPONENT: I can answer?
21         MR. SOUK: Yes.
22         A. I don't know. Maybe if -- I mean, she
23 went through the process. We provided the resources that
24 we had for her.
25         MR. CRONE: Okay. And thank you,

Page 136

1 Ms. Prince. That's all.
2         THE DEPONENT: Okay.
3         MS. KITSON: He gets the last word this
4 time.
5         Thank you very much.
6         THE DEPONENT: Thank you.
7         THE REPORTER: Just a moment.
8         Starting with Ms. Kitson, your order,
9 please?
10         MS. KITSON: I think we have a standard
11 order with you through our paralegal, but I don't know.
12 What -- I don't know what the options are.
13         THE REPORTER: Etran, PDF.
14         MS. KITSON: I'm going to have to consult
15 with my paralegal and get back to you. I'm sorry.
16         THE REPORTER: Mr. Crone, your order?
17         MR. CRONE: So we're going to want
18 whatever the regular is. It doesn't need to be
19 expedited.  Whatever that order is that's -- that's just
20 sort of the slowest, cheapest version it, that's what we
21 want.
22         THE REPORTER: Okay. And signature?
23         (Discussion held off the record.)
24         THE REPORTER: Do you want to handle
25 signature, and do you want exhibits, Mr. Crone?

Page 137

1         MR. CRONE: I think I -- we do want
2 exhibits, yes.
3         THE VIDEOGRAPHER: And then did anyone
4 want the video at all?
5         MS. KITSON: We would want it, for sure.
6         THE VIDEOGRAPHER: Go ahead.
7         MR. CRONE: And we'll also want the video.
8         THE VIDEOGRAPHER: Do you know if you just
9 want MP4 or synch or --
10         MR. CRONE: MP4 is great for the
11 Plaintiff.
12         THE VIDEOGRAPHER:  And Ms. Kitson?
13         MS. KITSON:  You can always sync it later,
14 right?
15         THE VIDEOGRAPHER: Yes.
16         MS. KITSON: We'll do MP4 for now.
17         THE REPORTER: Who wants to take care of
18 signature, or do you want us to do it?
19         MS. KITSON: Mr. Souk, would you mind
20 doing that?  Would you mind having her review and sign?
21         MR. SOUK:  That's fine.  I can do that.
22         THE REPORTER: He's not ordering a copy,
23 so I can't send it to him.
24         MR. SOUK: I -- actually, I will -- I'll
25 order, like Mr. Crone said, the slowest and cheapest.

35 (Pages 6 -

Page 138

1 But E-copy, PDF, if I could.
2          THE REPORTER: Okay. Thank you.
3          I'm off the record.
4          THE VIDEOGRAPHER: This concludes the
5 videotaped deposition of Adrienne Prince. We're going
6 off the record at 12:36 p.m.
7 * * * * * * *
8          WHEREUPON, the foregoing deposition was
9 concluded at the hour of 12:36 p.m. Total time on the
10 record was 2 hours and 51 minutes.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1          REPORTER'S CERTIFICATE
2
3
4          I, Laurel S. Tubbs, a Registered
5 Professional Reporter, Certified Realtime Reporter, and
6 Notary Public within the State of Colorado, do hereby
7 certify that previous to the commencement of the
8 examination, the deponent was duly sworn by me to testify
9 to the truth.
10          I further certify that this deposition was
11 taken in shorthand by me remotely and thereafter reduced
12 to a typewritten form; that the foregoing constitutes a
13 true and correct transcript.
14          I further certify that I am not related
15 to, employed by, nor of counsel for any of the parties or
16 attorneys herein, nor otherwise interested in the result
17 of the within action.
18          My commission expires September 1, 2023.
19
20          LAUREL S. TUBBS
21          Registered Professional Reporter
            Certified Realtime Reporter
22          and Notary Public
23
24
25

Page 141

1 Joshua Souk, Esq.
2 jsouk@afacwa.org
3          September 9, 2020
4 RE:   Brigham, Rebecca v. Frontier Airlines, Inc.
5    8/21/2020, Adrienne Prince (#4205084)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 142

1 Brigham, Rebecca v. Frontier Airlines, Inc.
2 Adrienne Prince (#4205084)
3     E R R A T A S H E E T
4 PAGE_____LINE_____CHANGE_____
5 _____
6 REASON_____
7 PAGE_____LINE_____CHANGE_____
8 _____
9 REASON_____
10 PAGE_____LINE_____CHANGE_____
11 _____
12 REASON_____
13 PAGE_____LINE_____CHANGE_____
14 _____
15 REASON_____
16 PAGE_____LINE_____CHANGE_____
17 _____
18 REASON_____
19 PAGE_____LINE_____CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Adrienne Prince                    Date
25

36 (Pages 138, 140, 141, 142)

Page 143

1  Brigham, Rebecca v. Frontier Airlines, Inc.

2  Adrienne Prince (#4205084)

3          ACKNOWLEDGEMENT OF DEPONENT

4      I, Adrienne Prince, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Adrienne Prince              Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____DAY OF____, 20 .

16

17

18      _____

19      NOTARY PUBLIC

20

21

22

23

24

25

37 (Page 143)

**[0 - 50]**                                                                 Page 1

| 0 |
|---|
| **0**  72:20 |
| **0000101**  70:23 |
| **0000815**  21:14 |
| **0000958**  21:14 |
| **0004475**  75:2 |
| **03417**  1:2 4:16 |
| **0s**  73:6,11 |

| 1 |
|---|
| **1**  3:13 4:11 21:6 21:10 30:19 37:2 43:2 44:14 54:10 72:24 82:22 96:12 140:18 |
| **10**  2:13 3:18 73:24 84:16,17,20 113:23 115:13 116:9,10 |
| **10.0**  83:22 |
| **10/23**  64:16 |
| **100**  62:12 63:12,14 91:24,25 97:23 126:4 130:16 |
| **1003**  2:4 |
| **101**  41:2,5 |
| **103**  70:23 |
| **105**  42:17 |
| **107**  43:23 |
| **10:10**  46:11,12 |
| **10:24**  46:12,14 |
| **10th**  71:22 81:12 81:23 87:15 |
| **11**  3:17 |
| **111**  3:11 |
| **11:00**  79:9 |
| **11:22**  85:1,2 |

**12:36**  138:6,9
**12th**  27:8 71:22
**13**  45:13
**130**  3:11
**133**  3:11
**14th**  71:23
**15**  113:18
**16315**  6:19
**16th**  2:9 27:11,15 71:24 73:15
**1766**  57:9
**18**  3:14,23 70:10 70:21 79:7
**18th**  27:21 75:5 88:14
**19**  1:2 3:15 4:16 78:20
**1900**  2:9
**1999**  11:13,18 127:2
**19th**  28:14
**1s**  73:4,11

| 2 |
|---|
| **2**  22:12 37:20 138:10 |
| **20**  3:16 57:4 113:11,21 114:14 115:6,7,13,20 116:2,3,4,8,10,13 116:25 117:2 143:15 |
| **20001**  2:14 |
| **2007**  47:20 52:17 |
| **2011**  21:25 |
| **2012**  12:7 13:4 15:6 |
| **2013**  12:8 |

**20:1**  24:19 48:17 48:19,21 52:17 63:3 64:23 71:22 71:22,23,23,24,25 73:18,22 78:24 79:9,11 80:1,9 81:1,7,12,23 82:4 82:13 83:21 86:3 86:23 87:3,15
**2016**  3:23 19:25 22:1 46:21 75:6 88:14
**2019**  46:23 104:13
**202-434-0579**  2:14
**2020**  1:10 3:5 4:3 49:15 141:3
**2023**  140:18
**209**  85:15
**21**  1:10 3:5,13,17 3:19 80:8
**212**  85:15
**21st**  4:3 86:2
**22**  3:18 81:10,19 87:16
**22402**  140:20
**23**  44:25 45:5,8,19 102:20 103:7
**23rd**  64:23 66:13 66:20 73:22 79:11 83:21 86:23 87:3
**24**  22:9
**26**  23:4
**26th**  29:18
**29th**  71:23
**2nd**  82:4,13

| 3 |
|---|

**30th**  73:18 78:24
**31**  3:19 85:10
**35**  114:16 116:11
**37**  34:19 35:6,17
**37:30**  34:23
**39**  24:6 60:15
**3rd**  2:13 63:3,10 79:9 80:1

| 4 |
|---|
| **4**  42:3 44:23 105:14 |
| **40**  3:20 50:16 51:6 |
| **4205084**  141:5 142:2 143:2 |
| **43**  25:12 |
| **44**  3:21 23:6 60:9 60:14 |
| **45**  3:23 28:6,11,25 29:12,14 30:8 33:4 35:3,12 36:4 36:9 37:11,18 39:20 55:1,5 69:22 74:24 75:1 77:2 88:12 92:12 92:21 101:18 111:6,10 112:4 113:15,24 114:1,5 114:9,23 115:2,12 115:17 116:15,17 116:22 118:17 129:2 131:11,12 |
| **4550**  2:4 |
| **46**  31:9 60:15 |
| **4a**  34:18 |
| **4th**  25:20 26:3 |

| 5 |
|---|

| | | | |
|---|---|---|---|
| **11:33**  85:2,4<br>**11th**  80:9 81:1,7<br>**120**  3:11 | **2014**  12:11 48:17<br>73:15<br>**2015**  3:15,17,18,19<br>12:12,19 15:6 | **30**  3:15 141:17<br>**303-598-3526**  2:5<br>**303-629-6200**  2:10 | **5**  31:10 53:18<br>**50**  3:20 12:1 33:14<br>113:20 |

**[501 - administered]**                                        Page 2

| | | | |
|---|---|---|---|

**501** 2:13
**51** 33:14 34:17
138:10
**52-71-01-68-15**
87:6,22 88:5,20
**53** 34:15
**55** 36:20 113:7,17
113:20
**57** 3:16
**58** 40:2
**59** 34:20,20 35:18
**59:59** 34:23
**5:00** 100:7
**5th** 25:21 117:9,11

**6**
**6** 3:11 53:20 55:15
65:14
**60** 3:21 26:21,23
27:1,2,17 29:3
32:12,17,18,19,23
33:5,22 34:5
35:11,16,25 36:11
36:11 37:4,8,23,24
38:9,24 39:3,7,10
39:12,20 111:18
112:9 129:1
**6th** 25:21 26:7,12
71:25 117:9,11

**7**
**7** 22:15 56:5
**70** 3:14
**71** 81:23
**74** 3:23
**75** 32:25
**78** 3:15
**7th** 38:3,12 39:7
39:14 117:11,13

**8**
**8** 24:7,10 74:5
**8.0** 83:23
**8/21/2020** 141:5
**80** 3:17,18
**800** 2:9
**80134** 6:20
**80202** 2:9
**80246** 2:4
**838** 22:10
**840** 23:5
**85** 3:19
**853** 24:6
**857** 25:13
**860** 31:10
**864** 33:15
**865** 33:15 34:17
**869** 36:21
**870** 100:15
**872** 40:3
**89** 3:11
**8th** 38:3,12 39:8
39:10,15 117:11
117:13

**9**
**9** 141:3
**90** 45:15
**907** 40:14
**915** 41:6
**919** 42:19 98:4
**920** 42:19
**921** 43:24 44:7
**922** 45:11
**93** 40:14
**945** 41:2
**98** 10:24
**9:19** 3:5 4:3

**a**
**a.m.** 3:5 4:3 46:12
46:12 79:9 85:2,2
85:4
**ability** 9:23 10:1,4
13:23 20:15 29:13
41:25 104:8 119:5
127:19 135:3
**able** 17:3 18:20
20:18 26:13 41:23
58:1 67:9 68:5
69:15,19 70:1
93:23 114:13,19
116:3 118:8,12,17
119:1,2 121:11,22
134:16
**absence** 20:23,24
20:24 25:10 42:8
42:21,24 44:16
83:22 98:6,9
107:9,25 108:1
**absences** 72:20
73:7 83:18 97:7
105:6 121:2,7
135:5,8
**absent** 72:14
83:16
**absentee** 3:14
64:14 71:1
**acceptable** 124:9
124:12
**access** 95:23
**accommodation**
54:3,16 56:6,14,18
56:22 57:17,24
58:23 59:5 97:21
121:10
**accommodations**
53:12 58:7
**accountable** 31:17

**accrual** 41:7
**accrue** 45:14,15
**accrued** 103:4
105:6 135:5,6,8,8
**accruing** 45:20
**accumulate** 37:3
65:11
**accuracy** 141:9
**accurate** 84:2
**accurately** 10:5
83:10
**achieve** 118:14
**acknowledge** 5:17
5:20
**acknowledgement**
143:3
**acknowledgment**
141:12
**acquired** 65:8
**action** 1:2 4:22
140:17
**active** 41:23
**actor** 128:3,6
**actual** 12:5 127:24
**add** 8:17 26:22
28:15 38:16 39:8
101:2,16
**added** 16:16
**adding** 28:24
**additional** 44:20
84:17
**additions** 143:6
**address** 6:18
86:22
**addressed** 83:11
**adjusted** 46:1
73:24
**adjustment** 85:24
**administer** 4:21
**administered** 5:20

**adrian** 64:3
**adrienne** 1:10 3:3
  3:20 4:12 6:7,17
  50:25 95:20,25
  109:7 138:5 141:5
  142:2,24 143:2,4
  143:12
**advantage** 131:11
**advice** 15:3 90:22
**advocacy** 60:1
**advocate** 59:23
  77:6,8 89:5
  135:16
**advocated** 13:9
  16:7 76:19 135:2
**advocating** 59:24
  102:1 110:7,10,13
  134:25
**afa** 15:3 87:5 88:4
  88:13,19
**afacwa.org** 2:15
  141:2
**affect** 9:23,25 10:3
**affiliations** 5:1
**affirmed** 6:8
**ago** 47:17 48:8
  135:10
**agree** 4:10 6:3,5,6
  8:13 9:15 66:24
**agreed** 66:13,25
  105:17,17
**agreement** 3:13
  5:25 6:1 17:2
  18:10,13 19:1,6,12
  19:15,18 20:3
  21:5,25 22:5
  23:10 33:14 37:12
  40:7 41:1,12 42:4
  54:10,13,18 55:4
  55:23 56:2,10,14
  58:19 59:2 60:5

67:15,20,24 69:16
  79:7 82:5 93:10
  94:4,14 95:14
  97:1 102:16
  103:18,23 104:1,9
  104:13 118:13
  119:14,17 120:23
  130:25
**agreement's** 19:24
**ahead** 23:4 24:5
  46:7 61:3 82:16
  137:6
**airlines** 1:7 4:14
  5:3 52:18 80:25
  82:6,7 85:23
  141:4 142:1 143:1
**alcoholism** 53:2
  134:22
**alleged** 132:19
**alleges** 109:17
**allotted** 141:20
**allow** 58:17 67:16
  68:11 102:3,20
  117:12 126:11
**allowed** 37:11
  55:12,17 67:23
  69:22 102:1,8
  121:6 127:6
  131:23,25 132:5
  132:11,14 133:7
**alongside** 62:23
**amend** 104:8
**amendments**
  104:14
**amount** 25:8 29:6
  29:8,14
**andrea** 62:20
  68:10
**angie** 15:12 75:18
  79:21 81:23

**answer** 8:9,10,17
  9:8 48:12 94:8
  103:13 107:1,3
  125:6 135:19,20
**answered** 104:4
**answering** 10:8
**answers** 8:14
**anybody** 99:12,14
  128:22 131:4
  132:1
**anyway** 67:11
  122:18
**apologize** 35:19
**apparently** 104:13
**appear** 69:1,7
**appearances** 2:1
  4:25
**appearing** 4:25
**appears** 66:15
  80:3 83:5 85:21
**appended** 143:7
**applicable** 43:5
  141:8
**applied** 117:20
**apply** 56:10
**appointed** 13:17
  13:25
**appreciate** 90:25
  111:4
**appropriate** 3:2
**approval** 25:6
**approve** 18:21,23
  119:4
**approved** 20:24
  30:21 60:4 94:6
  95:5,7,8 96:16
  107:21
**approximately**
  12:10 49:14 52:16
**arbitration** 90:23
  91:19,22

**area** 46:8
**arellano** 62:24
  75:10,23 81:24
  83:8 87:15 88:14
**arrangement** 5:23
**article** 22:12 79:7
**arts** 11:3
**aside** 46:5
**asked** 15:2 49:21
  89:23 93:22 105:9
  107:11 124:3,4
**asking** 48:6 61:21
  77:2 84:18 89:21
  90:25 91:1 102:6
  102:6,10 104:25
  105:20 108:21
  120:10,11 121:5
  126:1 131:3,5
**assessed** 73:3
  105:14 107:19
**assign** 99:20
**assigned** 23:10
  40:19 55:20 74:16
  98:22,25
**assignment** 40:17
  100:8
**assignments** 23:25
  42:8 127:18
  130:13
**assisted** 53:12
**associated** 12:20
**association** 2:13
  5:11 75:23 82:7
  85:12,22
**assume** 47:18,19
  62:12 64:9 66:25
  93:20 103:3 109:8
  112:8
**assumes** 106:23
**assuming** 7:3

[assumption - bates]                                                           Page 4

**assumption** 102:9
**attached** 141:11
**attachment** 86:17
**attachments** 87:14
**attempted** 21:11
**attend** 28:3 79:9
**attendance** 65:3
  71:6,12,15 73:7
  78:6 79:10 83:17
  118:23,25 119:3
  122:3 134:6,8

**attendant** 11:22
  14:2 16:12 20:3
  23:18 24:11,22
  26:20,23 27:5,16
  28:23,25 30:7
  31:4,6,16,19,21,22
  32:7,10,16 33:24
  34:4,13,18,22 35:2
  35:5,13,16,17,25
  37:3,11 38:8,23
  39:16 40:4,5,18
  41:14,16 43:4,5,11
  45:3,18 54:22
  59:24 64:1 71:7
  72:7 82:23,24
  91:23 92:2,11,15
  92:25 94:4,20
  98:11,18,20 99:5
  99:16,17 100:25
  103:15 106:7
  107:5 110:4 111:9
  115:6,6,13 116:1,5
  116:8 123:17,20
  127:13,16,25
  128:20,25 130:1
**attendant's** 38:5
  71:12
**attendants** 2:13
  5:11 13:9 16:7

26:13 28:1,3,4
30:20 33:17,20
35:10 41:21 42:5
44:14,20 45:14
47:3 75:24 82:6,8
85:12,22,23 92:11
96:14 110:8
122:11,20 123:6
126:16,20
**attention** 102:18
102:19

**attorney** 5:8 6:2
48:24 49:2,14
50:1 90:21,21
102:19 141:13
**attorneys** 5:16
140:16
**audio** 4:8,8 60:23
61:1
**august** 1:10 3:5
4:3 71:22
**aurora** 10:15
**authority** 16:19
17:25
**authorized** 4:21
**automated** 22:16
31:20 37:23 43:17
100:25 101:1,14
111:17
**ava** 99:17,19 100:3
100:7 109:18
**availability**
122:20 126:16
**available** 34:6,8
60:18 98:15 99:1
99:12,20 100:24
117:2 123:20
129:24 141:6
**avoid** 55:18
**award** 23:9,11,24

**awarded** 20:6
23:18 24:1 34:19
34:22 67:6 111:25
122:18
**awards** 26:9 27:12
**aware** 52:17 53:2
53:7 60:25 61:2
97:20 125:14
126:2 127:12

**b**

**b** 2:8 98:5
**b.1** 79:7
**b.a.** 11:2
**bachelor** 11:3
**back** 17:17 20:1
20:13,20 22:24
29:3 39:11 46:13
46:21 49:9 51:21
52:5 56:19 59:18
62:5,7,25 64:11
68:4 73:15,15
76:25 84:13 85:3
88:11 92:9 93:15
95:1 98:20 100:14
104:6 109:20
114:18 115:7,13
116:4,10 118:9
119:2 125:11,21
125:22 126:5
134:25 135:14
136:15
**background** 10:13
10:20
**backpay** 82:24
**backwards** 89:20
**bad** 114:16
**balance** 83:22
116:13,16
**balancing** 26:16

**ballpark** 14:11
**bargaining** 3:13
17:2 18:10,13
19:12,15,18,24
20:3 21:5,25 22:5
33:14 41:1 54:10
54:13,18 55:4,22
56:2,10,14 58:19
59:2 60:5 67:15
67:20,23 69:15
79:7 82:5 93:10

94:3,14 95:14
102:16 103:18,23
104:1,9,12 118:13
119:13,17 120:23
130:25
**bartelt** 2:16 4:18
**base** 14:16,22,24
15:14 42:7
**based** 20:4,6 22:17
24:3 25:5,6 34:9
41:23 56:20,20
63:9 77:19 78:3,7
92:16 99:13 100:4
101:5,7,14 112:1
120:8 122:3,19
124:15 133:8
**bases** 15:7
**basic** 10:13
**basically** 28:20
29:24 42:12
**basis** 91:2 100:6
101:3
**bates** 21:13 22:10
23:5 24:6 25:13
31:10 33:15 34:17
36:21 40:3,14
41:3,6 42:19
43:24 44:7 45:12
51:7 57:8 60:15

| 22:17 23:15 24:16 | 26:4 | 26:19 37:21 38:1 38:4,7,22 39:1,15 | 70:22 75:1 85:14 |

[bates - carries]                                                          Page 5

96:7 98:2,4
**bear** 50:22 133:11
**beginning** 6:1 62:5
73:15 92:10 98:18
101:11 123:21
**begins** 28:15 29:21
**behalf** 2:2,7,12 5:3
5:6 16:20,23 18:1
18:4 55:8,11
76:19 83:9 87:2
89:3 91:23 92:2
104:18 110:14
135:16
**believe** 12:5 13:25
15:8 19:25 24:21
29:8 32:24 34:10
37:20 46:25,25
48:3,6,9,17 49:3
49:16,18,19 50:5

50:16 52:9,15
59:15 60:23 61:17
62:16,19,23 64:6
69:4 74:20 75:13
76:5 77:16 91:25
92:3 95:6 100:7
101:15 102:25
108:17 110:1
111:6 127:4,22
128:21 131:24
132:3 135:2
**benefit** 44:19
55:12
**best** 123:24,25
124:1 135:3
**better** 13:20 30:5
41:25 122:17
135:15
**beyond** 44:21
83:16 103:19
**bid** 18:20 20:4,8

22:16 23:9,15,21
26:4,13 27:11
29:20,20 30:11,19
30:20 31:6,7,18,18
31:20 32:3,17
34:8,24,24 35:3
37:3,17,22,23
38:25 41:23 43:3
43:6,6,17 54:21
55:17 67:7 68:5
94:6,23 95:10
96:10,15 97:18
100:25 101:1,11
101:12,13 111:14
111:23 122:6,7,12
122:16,22 123:17
123:21,23
**bidding** 20:2,16
22:25 23:3 25:18

25:19,19 26:1
31:17 34:14 41:22
42:9 43:15 54:25
55:5 59:2 69:19
69:22 92:12 111:9
119:16
**bids** 26:8 27:9
43:16 92:16
**bills** 103:9,16
**bit** 7:12 10:12
27:14,20 46:5
48:10 111:5 118:3
**blank** 68:5
**block** 113:11
**board** 29:11 34:14
85:23 90:20
**boss** 13:12
**bottom** 96:10
**box** 71:15 72:9
**break** 9:4,6,8,9
30:4 44:2 46:7

**breaking** 29:24
**breaks** 9:5
**briefly** 82:15
84:11 108:5
**brigham** 1:4 4:13
5:7 8:4 19:12 21:5
21:10 24:19,25
31:5 34:7 46:6
47:15 51:6 52:18
53:2,11 54:10,17
54:20 55:16,20,21
56:3,11 57:4 58:7
58:10,13 59:19
60:9,14,15,15,23
60:25 63:2,20
64:8,22 65:18
66:4,12,23 69:12
70:10,21 71:21
72:14 73:3 74:3

75:1 76:12 77:2,3
78:1,20,23 79:6
80:8,9 81:10 82:9
82:23 83:3,9,21
85:9 86:22 87:2
87:16 93:13 95:3
97:21 101:10
102:1 104:7 105:5
105:9,13 106:20
107:10 109:17,20
110:5,10,14,18
111:13,23 113:20
115:17 116:21
120:10 121:1,16
124:8,18 125:14
126:2 130:24
131:3,10,22
132:13,23 133:2,6
133:25 141:4
142:1 143:1
**brigham's** 48:24

62:18 81:6 82:14
89:3 104:18
**brighamr** 51:8,9
**bring** 38:8 113:24
114:9
**broke** 128:10
**brought** 83:22
**build** 20:16,19
31:20 43:18 58:2
58:14,18 70:1
93:23 102:2
120:15 121:6
**built** 23:9
**bullet** 83:5
**burden** 120:18
**business** 30:23
83:14 96:17

---
c
---

**c** 3:21 4:1 30:11
98:9 128:6
**california** 10:18
**call** 5:4 7:16,19
8:5 33:9 49:19
64:16,23 65:24
79:11 99:23 100:6
100:9 134:12
**called** 3:3 22:24,24
65:7 98:18 100:5
100:11 134:10,16
**calling** 40:16,23
106:8
**callout** 47:10
**calls** 33:10 59:19
135:17
**capacity** 52:23
**capital** 98:5
**cards** 28:10
**care** 137:17
**carolyn** 2:8

| 20:10,19 21:2 | 84:16 | 49:2,14 61:17,23 | **carries**  75:1 |

[case - continuous]                                                           Page 6

**case** 4:15 19:2
  42:6 49:21 76:10
  78:7 88:4,19,19
  91:22 95:8 122:1
**cba** 94:19 133:1
**cell** 4:6
**cellular** 4:5
**certain** 23:25 38:2
  63:14 92:3 100:4
  121:23 126:12,15
**certificate** 140:1
**certified** 3:7 140:5
  140:21
**certify** 140:7,10
  140:14
**cetera** 30:22 96:17
  98:13
**chair** 12:7,24 13:5
  13:17,19 14:6
  15:22 75:14
**change** 17:2 18:9
  142:4,7,10,13,16
  142:19
**changed** 19:24,25
  46:23
**changes** 141:10
  143:6
**changing** 46:21
**charge** 92:2,5
**charger** 84:12
**charity** 127:11
**chart** 129:22
**cheapest** 136:20
  137:25
**check** 133:11
**cherry** 2:4
**circumstance**
  47:12
**circumstances**
  47:6

**civil** 1:2 3:2
**clarify** 118:23
**classified** 66:14
**clear** 18:15 78:7
  95:17 120:10
**clearly** 9:23
**client** 90:21
**close** 27:9 29:20
**closes** 26:4 37:17
  43:16
**code** 106:12
  107:12
**coded** 107:25
**coding** 66:20
**cole** 2:16 4:18
**collective** 3:13
  17:2 18:10,13
  19:12,15,18,24
  20:3 21:4,24 22:4
  33:14 41:1 54:9
  54:13,17 55:4,22
  56:2,10,13 58:19
  59:2 60:5 67:15
  67:19,23 69:15
  79:7 82:5 93:10
  94:3,14 95:14
  102:16 103:18,23
  103:25 104:8,12
  118:13 119:13,16
  120:23 130:24
**collectively** 16:25
**college** 11:5,12
**colorado** 1:1 2:4,9
  3:8 4:15,17 6:20
  10:15,21 140:6
**column** 72:16
**come** 19:1 67:10
  68:4 70:1 73:24
  95:1 100:19 101:3
  101:9 125:21

**comes** 98:20
**coming** 36:13
  93:23 94:4,20
**commence** 41:15
**commencement**
  140:7
**commencing** 3:5
**commendation**
  71:16
**commission**
  140:18
**commit** 103:18
**committee** 90:22
**committees** 16:7
**communicated**
  74:12 108:15
**communications**
  48:23
**company** 3:22
  19:2,4,8 25:7
  26:21 28:21,21
  30:21,22 32:5,13
  32:16 33:9 38:16
  39:6 41:15 42:8
  44:19 47:5,11
  63:16,20 68:8,10
  72:7 76:11 96:16
  96:17,25 97:5
  100:6 112:1 117:8
  119:14 131:22
  132:4,11,13,19,22
  133:1,24
**company's** 47:3
  83:6 99:9
**complete** 8:14
  43:4 98:12 143:8
**completed** 141:17
**completely** 17:19
  66:8 98:14
**completion** 37:2

**compliance** 40:6
  55:22 71:16
**comply** 55:9
**computer** 4:7
**conceding** 105:10
**concentrating**
  10:8
**concluded** 138:9
**concludes** 138:4
**conclusion** 69:1,4
**conducted** 83:9
**confines** 130:24
**confirm** 75:23
  80:24 108:17
**confused** 35:22
  118:4
**connected** 98:19
**connection** 49:25
  80:2
**consecutive** 44:25
**consent** 5:23
**consider** 34:3
**considered** 30:20
  96:15
**consists** 23:10
**constitutes** 140:12
**constructs** 22:17
**consult** 18:7
  136:14
**contact** 48:7,13
**containing** 55:19
**contest** 66:24
**continue** 4:9 73:11
**continued** 89:5
**continues** 41:16
**continuing** 55:15
  59:25 73:18
**continuous** 20:23
  31:1 42:23 43:12
  93:25 94:5,20,21
  96:19,21,24 97:7

corrupted

**contract**  36:8,18
46:21,22 102:20
124:16 131:23
132:1,5,14 133:7
**contract's**  132:7
132:16
**control**  42:1 83:17
**conversation**  50:1
94:1 105:24 106:1
108:7,11
**conversations**  4:5
59:14 108:20,21
**cool**  11:14
**copied**  75:17
79:21 86:10
**copies**  141:14
**coppedge**  62:11,17
65:23 79:18 80:20
**coppedge's**  64:11
**copy**  50:21 137:22
138:1
**corder**  2:12
**corner**  60:12
**correct**  9:15 11:18
11:19 12:22 13:6

13:7,11,21 14:4,4
14:4,20,21,23 17:5
20:9,23,25 21:2,3
23:23 25:10,11
26:14 27:7,9,12,13
27:18,19 28:7,25
29:1,4,5,17 30:8,9
31:2,3,7,8 32:6
33:12 34:7 35:3,4
35:7,8,9 36:1,1
37:9,14,19 39:22
40:12 42:1,2,21,25
43:1,14 47:8,13,14
49:16,23 52:24,25
54:14,15 55:9,10

56:15,16,23,24
58:5,20,21,23,24
59:3,4,6,7 60:2,6,7
62:18 65:18,21,22
69:12,16,17,19,20
69:23,24 70:2,3
72:3 73:8,9 74:6
74:17 76:14,15,17
76:18,20 77:6,7,12
77:14,15,18 78:13
78:14 79:15,16
88:17,18 92:17,18
92:23 93:1,10,11
95:12 97:16,19
99:2,25 101:24
102:12 107:17
110:12,14,15
111:10,11 112:6
112:15,23 113:7,8
113:15,16,18,21
113:22,24 114:6,7
114:25,25 115:11
115:11 116:12,18
117:20,21,24
118:2,14,15,18,19

119:18,20,23,25
120:20,21,24
121:4,14,15,15,19
122:4,23 123:2
124:20 125:4,7
127:8 130:3,5,14
130:18 131:9,13
131:14,16 132:7,8
132:17 133:8,9
135:9,10,13
140:13 143:8
**corrected**  35:11
**correcting**  35:19
**corrections**  143:6
**correctly**  31:17

**correspondence**
86:16 88:1
**council**  13:3,5
18:7,8 19:7 81:23
**counsel**  4:12,24,24
5:23 8:4,10 57:12
60:17 70:6 79:1
80:15 81:14 84:19
85:16 140:15
141:14
**count**  72:17
**county**  4:17
**couple**  46:18 93:1
**course**  8:8 64:12
120:8 124:24
**court**  1:1 4:15,19
5:14 7:10,20 21:7
21:9 50:21 91:22
**cover**  88:4
**coverage**  117:12
129:12,15,21
**credit**  26:16,19,21
36:22 37:4,11,21
38:1,4,7,22 39:1
39:15 99:6

**creek**  2:4
**crew**  3:14 24:12
25:1 71:1 98:21
98:24
**crone**  2:2,3,5,6
3:11 5:6,6 6:4,4
8:4 50:1,10,11,19
52:7 57:14 59:9
60:19 70:10,13,18
79:3 80:17 81:17
81:20 84:18,24
85:18 89:12,16,18
90:24 91:7,8
94:10 95:2,15,22
96:3 97:8 102:15

**106:5,15,19 107:8**
107:14,18 109:2,5
110:22 120:6
121:25 122:15
123:15 124:17,21
125:5,9,18,20,24
126:10,18 130:6
133:15,17,20,23
134:7,12,18,24
135:4,25 136:16
136:17,25 137:1,7
137:10,25
**crystal**  6:19
**cs**  141:15
**cs4205084**  1:25
**ctheis**  2:11
**current**  6:18 29:19
40:4
**currently**  12:13
**cut**  49:7,8 125:17
**cuts**  69:5
**cv**  1:2 4:16
**cwa**  2:13

**d**

**d**  4:1
**daily**  28:15 29:19
29:20 100:19
**danielle**  2:7 5:2
50:10 57:14 70:16
81:18 89:20 92:10
96:13 102:18,19
103:22
**date**  25:14 41:11
41:23 65:3 66:22
86:22 142:24
143:12
**dated**  3:15,17,18
3:19,23 75:5
78:24 80:9 81:11

| 55:13,14 56:4,12 | 66:14 107:15 | 103:17 105:25 | 81:22 86:2 87:15 88:14 |
|---|---|---|---|

[dates - duration]                                                        Page 8

**dates** 11:17 72:10
72:13,13 78:18
**day** 24:23,24
25:20,21,21 26:3
27:8,11,15 29:18
29:25 41:16 100:6
100:7 117:8,14,14
129:14,14,14,16
129:17 143:15
**days** 23:11 38:2,22
45:15 66:8 129:13
141:17
**dc** 2:14
**dear** 75:22 80:23
**december** 3:18,19
48:21 81:12,23
82:4,13 86:2
87:15
**decided** 78:12
**decides** 112:25
**decision** 16:23
18:4,6
**decisions** 16:20
18:1
**declaration** 3:20
50:25 52:6
**declare** 5:21 143:4
**dee** 15:16
**deemed** 143:6
**default** 31:18
**defendant** 1:8 2:7
3:4 4:13 5:3
**definitely** 32:23
**definition** 23:6,17
**definitions** 22:12
97:6
**degree** 10:25
**delay** 96:4
**demote** 13:23
**denied** 64:18
65:24 89:4

**denver** 2:9
**deny** 90:4 133:25
**department** 41:15
47:3 64:19 65:25
**depend** 18:5
**dependability**
64:24 66:14 73:2
81:2 83:10
**depending** 20:11
**depends** 127:17
**deponent** 2:12
13:2 17:12,15
38:18 49:10 51:1
84:11,22 89:11,15
94:8 95:21 96:2
106:25 107:2,4
110:24 120:4
125:8,22 126:14
133:16 135:20
136:2,6 140:8
141:13 143:3
**deposed** 6:21
**deposing** 141:13
**deposition** 1:10
3:3 4:8,12,16,17
5:17,18,19 6:22
7:4,13 8:21 21:10
108:4,16 109:14
138:5,8 140:10
**describe** 16:4
47:23
**description** 84:2
**despite** 120:25
**details** 108:17
**determination**
77:17
**determine** 106:12
**determined** 83:10
**determining** 78:1
**difference** 117:7

**different** 30:5
65:10 78:4 86:15
99:21 100:1
114:11,12 121:17
121:18,21 127:9
**difficulties** 9:1
**direct** 22:7 62:18
**directly** 48:16
**disability** 53:3,13
**disagree** 122:14
**discipline** 65:15
72:8
**disciplines** 68:15
**disclosed** 53:3
**discrepancy** 107:7
**discuss** 79:9 124:8
**discussing** 43:19
80:1
**discussion** 105:7
136:23
**displayed** 100:25
**dispute** 74:8,11
**distinction** 93:24
**district** 1:1,1 4:14
4:15
**ditch** 63:25
**dkitson** 2:10
**doctor** 43:13
**doctor's** 43:7 94:6
94:22 95:10
**doctors** 95:1
**document** 3:16
21:18,22 45:12,24
46:5 50:24 51:3
51:22,25 52:14
57:3,5,20,21 60:11
60:18 61:4 62:5
70:5,22 71:1,3,5,8
75:5 77:19 78:21
79:2 80:12,16
85:8,11,14,17 98:1

100:15
**documentation**
72:6
**documented** 83:11
**documents** 48:18
78:17 109:12
**doing** 16:17 28:12
36:3 104:14
131:22 132:5,14
133:7 137:20
**double** 133:11
**douglas** 4:17
**drew** 102:18,19
**drink** 9:7
**drive** 2:4 6:19
**drop** 28:6,9,15
29:11,12 35:3
36:4,4,10 37:11,18
39:2,10,20 56:3
69:22 93:2 101:2
101:16 111:10
112:18 113:11,18
113:21,23 114:4
114:13,19,23
115:20,24 116:8
116:25 117:12
118:9,17 119:1,5,8
119:8 129:2
131:11
**dropped** 55:21
**dropping** 28:23
34:14 37:16
101:18 114:12
132:5,15
**drops** 113:4
**due** 24:11 98:12
105:6 134:22
**duly** 6:8 140:8
**dump** 123:8
**duration** 108:20

**duties** 16:5,9,11
16:12,17 128:20
**duty** 24:12 40:6
97:22 125:15
126:3,16,21
127:16 128:13
130:12

**e**

**e** 4:1,1 138:1 142:3
142:3,3
**earlier** 43:19 44:5
46:19 48:10 88:17
111:8
**easier** 30:14 94:17
96:8 100:11
122:19
**east** 2:4
**easy** 129:25
**educational** 10:19
**eeoc** 92:1,5
**effect** 41:11
**effective** 80:25
81:6
**effectively** 56:1
**effort** 63:25
**eight** 44:3 65:11
**eighth** 65:15
**either** 18:6,25
20:12 21:9 28:2
30:2 59:19 67:8
110:1 123:24
124:6
**elected** 13:15,16
**electronically** 22:9
**eligibility** 44:15
97:18
**eligible** 30:11,19
30:20 31:6 43:3
96:9,15
 **eliminate** 120:11
120:13 121:19

**email** 2:5,6,10,11
2:15 49:18 50:17
64:15,17 66:6
**employed** 52:18
140:15
**employee** 83:19
103:6,7,8 106:6
**employee's** 103:19
**employees** 83:13
83:15
 **employment** 11:4
11:17 64:25 76:13
80:24 81:6 82:14
83:24
**emricson** 15:16
**emricson's** 15:23
**encapsulated**
52:14
**encounter** 9:1
**endeavor** 8:1
**enter** 5:14
**enters** 41:16
**entire** 19:3 32:16
39:16 45:18 78:7
**entitled** 3:16 50:24
71:1 121:18
**equal** 92:7
**equipped** 135:16
**errata** 141:11,13
141:17
**erratas** 141:15
**esq** 2:2,3,7,8,12
141:1
**essential** 83:12
**essentially** 33:21
39:5 63:24 71:11
99:9
**established** 40:7
**et** 30:22 96:17
98:13

**etran** 136:13
**evaluate** 47:6,11
**evan** 2:3,6 5:8
**evans** 6:4
**event** 25:14 31:17
32:2 33:3 38:7
78:12
**events** 10:1
**eventually** 23:22
**everybody** 117:20
121:18,22,22
**everyone's** 43:16
**evidence** 106:24
**exact** 14:9 62:22
63:6 65:13 84:9
92:6
**exactly** 32:18 46:1
108:23 123:12
126:19
**examination** 3:4
3:10 6:10 89:17
111:2 120:5
130:10 133:22
140:8
**examined** 6:8
**example** 101:11
117:9 129:3
**exceed** 134:7
**exceeded** 134:6
**excellent** 96:3
**exception** 18:13
18:19,24 19:11
55:4 60:5 67:19
83:15
**exchange** 105:5
**excused** 54:21,24
65:24
**executive** 13:3,5
18:8
**exhibit** 3:13,14,15
3:16,17,18,19,20

3:21,23 21:6,10
50:12,16 51:6
54:10 57:4,13,16
60:9,14 70:10,21
74:23 75:1 77:2
78:20 80:8 81:10
81:15 85:10 87:16
88:12
**exhibits** 3:12
136:25 137:2
**existing** 55:17
118:13
**expected** 19:17
31:6 83:13
**expedited** 136:19
**expires** 140:18
**explain** 25:4 29:22
65:6
**explained** 54:2
**explanation** 90:25
**extended** 45:4
96:21 104:25
**extenuating** 47:6
47:12

**f**

**facebook** 48:7
**fact** 46:6 64:13
105:25 106:11,22
110:18 120:25
**facts** 106:24
**failed** 32:17 91:22
**fails** 31:18 32:3
141:19
**fair** 9:10 100:12
**fairly** 83:19
**fall** 90:20
**familiar** 22:4 68:3
**far** 41:4 67:7
91:14,17
**fast** 130:12

**[fault - fruition]**                                                Page 10

**fault** 66:5
**feel** 109:24
**feeling** 9:18
**felt** 60:1
**fight** 118:25
  135:11
**figure** 130:1
**file** 78:3 91:22
  92:1 118:24
  132:19
**filed** 4:14 74:13
  76:12 77:3 87:2
  89:2 109:20 133:8
**files** 110:3
**fill** 26:22 31:22
**filling** 42:7
**final** 3:21 63:15,19
  63:22 66:13 71:22
  71:22,23 105:10
  105:14 106:20
  107:9,19 124:6,6,7
**financially** 4:22
**find** 45:25 50:13
**finding** 64:13
**fine** 17:21 91:4
  125:24,25 137:21
**finished** 51:4,10
  61:4 82:19
**fire** 13:23
**firm** 4:18,20 59:11
**first** 6:8 7:3 41:15
  46:20 47:15,19
  49:4,13 51:21,22
  64:2,15 67:10,10
  78:16 100:19,19
  100:22 101:3,3,9,9
  103:4 114:19
  122:22 123:21
  134:1
**fit** 43:13

**five** 112:25 129:9
  129:10,18,18
**flew** 16:14,15,15
  48:3
**flexibility** 39:16
  39:20
**flica** 20:5 22:21
  23:3 25:19 129:22
**flies** 34:5
**flight** 2:13 5:11
  11:22 13:9 14:2
  16:7,12 20:3
  22:17 23:14,18
  24:10,16,22 26:13
  26:20,23 27:5,16
  28:1,2,3,3,23,24
  30:7,20 31:4,6,16
  31:19,21,22 32:7
  32:10,16 33:11,16
  33:20,24 34:4,13
  34:18,22 35:2,5,10
  35:13,16,17,25
  37:3,10 38:5,8,23
  39:15 40:4,5,18
  41:14,16,21 42:5
  43:4,5,11 44:14,20
  45:3,14,18 47:3
  54:22 59:24 64:1
  71:7,11 72:7
  75:24 82:6,8,22,23
  85:12,22,23 91:23
  92:2,11,11,15,24
  94:4,20 96:14
  98:11,17,20 99:5
  99:16,17 100:25
  103:15 106:7,9
  107:5 110:4,8
  111:9 115:5,6,13
  116:1,5,8 122:10
  122:19 123:6,17
  123:20 126:16,20

  127:13,15,25
  128:19,25 129:25
**flights** 18:20 92:25
  122:22
**floor** 2:13
**fly** 34:19,23 43:13
  48:2 101:20
  122:20 123:24,25
**flying** 16:13 43:3
  47:19 126:17
**fmla** 20:24 21:1
  24:23,24,25 25:6
  25:10 30:22 31:5
  44:15,21 47:5,9
  64:19 65:25 79:14
  95:1,5 96:16 97:8
  97:14 98:13 106:7
  106:10 107:10,20
  107:23
**follow** 19:17 46:18
  47:10 110:25
  115:1 119:24
  120:7 130:9
**followed** 122:16
**following** 27:16
  110:21 117:18
**follows** 6:9
**force** 42:6
**foregoing** 138:8
  140:12 143:5
**forget** 66:8
**forgetting** 61:6
**forgot** 51:13
**form** 44:20 86:18
  94:7,24 97:3
  102:14 105:22
  106:2,18,23
  107:16 110:19
  121:20 122:13
  123:10 124:14,19
  125:3 126:8,13

  134:4,9,14,20
  135:1 140:12
**forward** 121:10
**four** 65:13
**frame** 15:11 48:21
**frames** 100:4
**frequently** 9:5
**friendly** 123:5,12
**friends** 47:24
**front** 70:12 86:13
  89:22
**frontier** 1:7 4:14
  5:3 11:7,8,11,17
  11:21 14:3 41:10
  48:17 52:18 53:3
  54:2 56:6,9,14,17
  56:21,22 65:2
  76:14 80:25 81:24
  82:6,7 83:15
  85:23 89:3 90:4
  101:22 102:1,2,7
  103:17 104:7,18
  104:19,24 105:1
  106:9,11,21
  107:11,19,25
  109:17,18 117:22
  118:5 124:7
  126:11,22 127:11
  128:15,16 133:4,6
  134:3 141:4 142:1
  143:1
**frontier's** 5:4
  102:19
**frontierairlines**
  21:14 70:23 75:2
  85:15
**froze** 17:13
**frozen** 17:8 49:7
  76:21 125:19
**fruition** 53:10

Case 1:19-cv-03417-WJM-STV   Document 44-2   Filed 12/08/20   Page 53 of 75
Appellate Case: 21-1335   Document: 010110614801   Date Filed: 12/06/2021   Page: 83

[ftp - holder]                                                          Page 11

**ftp** 21:12
**full** 6:15 8:13 11:8 16:15 32:12 35:10 35:15,16 82:24 92:11 93:19,20 103:7
**fully** 56:15
**furlough** 42:6
**further** 5:19 27:14 27:21 30:10 78:13 110:22 140:10,14
**fyi** 61:24

**g**

**g** 4:1
**game** 28:10 29:11 34:14 35:3,6
**general** 72:5
**generally** 19:23 20:2 22:4 71:5 90:20
**getting** 108:12
**give** 7:23 8:1,13 56:19 95:18 104:12 112:25 115:6,13 116:3,10
**given** 18:19 20:15 24:1 32:24 40:17 55:3 67:19 68:5 96:23 110:18 111:24 143:9
**gives** 90:22
**giving** 59:17 68:14 109:25 134:3
**gladly** 66:9
**glendale** 2:4
**go** 4:10 17:8,17 25:12 26:15 27:14 27:20 28:14 31:9 31:22 33:6,13 35:5 36:15 39:1,9 40:13 44:23 46:7

46:9 53:18 61:3 68:1 73:10 82:16 84:19 87:13 88:3 91:15 97:22 99:8 103:5 126:3 137:6
**goes** 85:15 103:1 126:25 127:1
**going** 4:3 7:12 12:11 21:17 22:7 22:9 23:4 24:5 32:19 33:13 40:13 42:17 45:23,25 46:10,13 50:17,20 51:22 57:2,3,8 60:8 61:21 62:4,7 62:25 68:1 70:4,7 70:7,24 74:22,23 78:16 81:9 84:11 84:15,25 85:3 90:17 95:6,15,16 96:5,14 100:10 114:9 122:12,24 122:25 123:19 136:14,17 138:5
**good** 4:2 6:12,14 9:19 44:6 50:3 134:25
**goodwill** 127:10 128:14
**gosh** 61:6 66:7
**gotcha** 33:2 34:12 38:6,13
**gotten** 122:17
**govern** 42:5
**governs** 42:12
**graduated** 10:21
**grant** 56:6,18,21 58:23 59:6 95:23
**granted** 30:21 31:5 44:24 56:15 96:16 118:5,8

**great** 10:11 85:20 137:10
**green** 61:23
**grievance** 12:7,24 12:24 13:5,10,17 13:18 14:6,7 15:22,24 16:10 53:9 56:20 63:20 63:25 74:13 75:14 75:24 76:9,13,16 77:3,4,20,25 78:5 78:16 82:4,8,13 84:6 86:18 87:2,5 87:9,10,21 88:1,9 88:23 89:2,4,6,21 90:1,3,5,9,19,22 90:23 91:12,15,17 91:18 109:21 110:4,6,10 118:24 121:1 133:8 134:1 134:5 135:12
**grievances** 78:3 132:19
**grievant's** 86:21
**grimes** 2:3 5:8,8 6:4 8:5
**guess** 103:10,14 123:3
**guide** 125:21

**h**

**h** 142:3
**half** 34:19 35:6,18 66:9 108:24
**halverson** 15:16 75:9,14,22 79:22
**halverson's** 15:20
**hand** 60:12 72:16
**handbook** 97:5
**handle** 136:24
**happen** 20:10 38:11 39:6 111:21

**happened** 32:18 38:22 69:7 127:2 127:21,22 128:7
**happens** 25:25 38:1,4 42:20
**hardship** 68:7
**headed** 40:2
**hearing** 82:4,13 134:5 135:12
**hearings** 16:10
**held** 4:16 11:20 136:23
**help** 16:9 21:19 64:1 93:15 124:17
**helped** 16:8
**helping** 59:18 104:7
**hereto** 143:7
**hi** 59:16
**high** 11:16
**highlighted** 31:13 82:2
**highlighting** 21:18 21:19 30:15,18 38:3 61:16,20,24 62:1 82:3
**hire** 41:23
**hired** 41:13
**history** 78:15 125:20
**hit** 64:13
**hold** 27:1 28:11,25 29:7,14 30:7 31:20 32:8,11 34:11 35:3 46:2 51:14 54:25 55:5 61:5 62:7 67:8 89:13 131:12
**holder** 23:17,22 29:7,15 40:16

**holding** 24:10
  29:12 112:24
**holds** 32:11
**honestly** 32:22
  36:6 47:16 90:6
  111:22
**hour** 40:15,18
  84:15 101:18
  106:8 108:24,24
  113:24 116:2
  129:9,10 138:9
**hours** 16:16,17
  24:13 25:1 26:21
  26:22 27:1,2,17
  28:6,25 30:8
  32:12,18,20,23,25
  33:4,5,22 34:5,20
  34:20,23 35:6,11
  35:16,18 36:11
  37:4,11 38:24
  39:7,10,12 47:4
  55:1,5 58:1 69:22
  92:12,21 93:13,14
  111:6,10,18,23
  112:4,9 113:1,7,11
  113:20 114:14,16
  115:17,20 116:11
  129:1,4,18,18
  131:11 138:10
**hr** 47:3 62:23
**huh** 7:24,24 81:21
**hurt** 131:4
**hypothetical**
  111:13

## i

**idea** 58:25 123:18
**ideas** 58:1
**ifm** 79:11,14 97:12
  107:10
**ifml** 97:11

**ifmla** 97:11,14
**illness** 24:11
**impartially** 83:20
**important** 7:22
**inaccurate** 9:16
**included** 97:17
**including** 26:8
  31:18 41:14 71:21
**inconsistency**
  74:21
**inconsistent** 52:8
  63:9
**incorporated**
  52:19
**incorrect** 36:5
  63:9 74:15
**incorrectly** 74:16
**incur** 73:7
**incurred** 74:3
  83:21
**index** 3:9
**indicate** 5:25
  87:25 88:8
**individual** 103:15
**inflight** 33:23 68:6
**information** 32:1
  48:7,13 108:12
**initial** 59:16 88:9
**initially** 39:1
  92:16 101:11
**initials** 92:6
**injured** 127:13,15
  127:25 130:13
**injury** 24:12 128:9
**inpatient** 53:4
**instance** 17:1,3
  28:11 65:7,9,9
  77:21 78:6 106:20
  132:5 134:23
**instructs** 8:10

**intend** 54:16,20,23
  54:24 55:3
**intended** 59:6
  83:18
**intention** 55:8,11
  58:22 69:14,18,21
  69:25
**interest** 124:22
**interested** 4:23
  140:16
**interesting** 12:2
**interfere** 4:8
**interference** 4:6
**intermittent** 21:1
  24:23 25:6 31:5
  47:5,9 79:14
  93:25 94:21,25
  95:4,5 97:9,14
  98:9,13 106:7,10
  107:10,20,23
**international** 15:3
  86:7
**interpretation**
  105:19
**investigation** 83:9
**investigatory** 3:22
  63:16 79:8
**involved** 48:20
  90:22 104:1
**ipad** 84:12
**ish** 12:1
**issue** 66:19 119:3
**issues** 93:16
**it'd** 41:22

## j

**jacalyn** 2:16 5:4
**jerry** 62:24 75:10
  81:24 88:14
**job** 1:25 15:4 16:4
  45:7,8 56:19
  71:15 102:21

  118:9 119:2
  127:13 130:14
**john** 2:2,3,5 5:6
  6:4 50:11,18
  70:17,19
**josh** 108:8
**joshua** 2:12 5:10
  6:6 141:1
**jsouk** 2:15 141:2
**judge** 8:7
**july** 71:22
**jump** 24:5 108:25
**jumped** 41:3

## k

**keep** 61:6 114:17
  122:12,25 123:9
**kind** 7:14 18:24
  19:11 24:2 29:11
  29:13 32:5 63:25
  67:14 68:18 86:14
  89:20
**king** 42:15
**kitson** 2:7 3:11 5:2
  5:2 6:3,11 13:4
  17:10,13,16,21,22
  21:7,21 22:8,11
  38:19 46:9,15
  49:8,12,13 50:15
  50:20 51:2 57:12
  57:16 60:17,21
  70:6,16,21,25 79:1
  79:5 80:15,19
  81:14,19,21,22
  84:14 85:5,16,20
  85:21 89:9,12
  93:22 94:7,9,24
  97:3 102:14,19
  103:22 105:4,9,22
  106:2,6,18,23
  107:1,13,16
  108:11,16 110:19

110:25 111:3
120:2 121:20
122:13 123:10
124:14,19 125:3
126:8,13 130:8,11
131:18,21 133:10
133:19 134:4,9,14

134:20 135:1
136:3,8,10,14
137:5,12,13,16,19
**know**  8:16,20,24
8:25 9:6,7 10:7
16:15 17:6,25
19:24 21:8 23:24
25:7,9 28:10 29:6
32:2 37:16,22
46:1 50:14 51:3
51:15,19 61:4
62:14,22 63:5,7
67:7,8 68:3,8
70:11 72:8 74:21
77:20 78:4 82:17
84:14 90:15 91:11
91:14 92:5,6 95:7
96:19 97:4 98:16
101:22 105:13,18
105:20 106:4,21
107:18,20,24
108:15 111:22
118:21,24 120:16
122:6 123:15
126:10,10,19,20
126:24 127:2,12
127:15 128:17,18
129:20 131:2
134:15,19,21,22
135:22 136:11,12
137:8
**knowledge**  18:14
19:14 20:16 25:5

59:20 62:15 74:17
132:24,25 133:2,3
**knows**  91:1,2,6
**kori**  15:16,20 75:9
75:14 79:22

---

**l**

**l**  2:7 36:21
**labor**  5:5
**lace**  86:14
**lack**  13:20 30:4
64:18 65:25
**late**  65:8 83:16
**laurel**  3:6 4:20
50:21 140:4,20
**law**  7:10
**law.com**  2:5,6
**lawsuit**  49:23
109:17 110:14
**lawyers**  110:20
**layover**  55:18
**layovers**  55:19
**leading**  124:5,7
**leave**  20:20,22,23
20:23,24 31:1
42:21,24,25 43:12
44:11,16,21,24
45:3,5,7,13,19
93:23,25,25 94:5
94:21 95:5 98:6,9
98:13 102:21,24
103:8,20 105:1
106:7,11 107:10
107:20
**leaves**  30:21 42:8
96:16,20 97:6
**led**  79:25
**left**  20:13,21 31:19
32:3,4,18 33:1
60:12 84:17

**legal**  90:22 141:23
**letter**  3:15,17,18
3:19,23 19:21
64:15 75:9 76:3
78:8,23 79:5,17,25
80:4,8,19 81:11,22
85:22 86:10,11,18

87:14,18 88:4,4,13
88:16 98:5
**letter's**  86:2
**letterhead**  85:12
**letters**  71:16,21
**letting**  72:7 131:3
**level**  11:16 65:3,18
74:6 83:23 90:20
122:2
**lieu**  5:20
**light**  68:12 97:22
125:15 126:3,16
126:21 127:16,18
127:18 128:12
130:12
**limit**  101:18 121:2
**limitations** 40:6
**line**  23:6,9,15,17
23:18,22 24:10
27:1 29:7,15
31:20,21,22 32:8
40:16 43:3 57:13
82:25 92:17,19
101:14 111:18
112:1,3,6 121:8
122:7 129:1 142:4
142:7,10,13,16,19
**liner**  64:16
**lines**  24:1 53:25
92:8
**link**  7:16 9:2
**list**  11:25 41:11,11
41:13,20,21

**listed**  63:3 96:20
97:4,7,10,11
129:22
**litigation**  8:8
**little**  7:12 10:12,18
27:14,20 30:10
35:6 46:5 48:10

64:15 100:9,10,11
110:25 111:5
118:3
**littler**  2:8
**littler.com** 2:10,11
**live**  58:1
**lived**  10:16,18
**living**  7:14
**llc**  2:3
**lm**  60:15,15
**loa**  30:22 71:16
96:16
**local**  14:7
**located**  4:17
**long**  36:10 39:10
48:8 93:1 108:18
108:21 116:5
129:7,12
**longer**  12:19
**longevity**  45:15
**look**  21:4 30:10
48:18 74:23 78:15
86:17 88:11 99:10
103:21 107:11
**looked**  46:21
87:16,19 88:17,24
96:13 104:22
108:8
**looking**  21:20 22:9
22:11 23:6 24:7
25:13 36:21,24
41:6 44:10 50:13
61:7 62:8 67:2

| 48:4 53:8 56:9 | **leftover**  55:19 | | 77:1 80:2 86:15 |

**[looking - needed]**                                                                  Page 14

90:9 125:11 126:5
135:14
**looks**   26:3 46:22
64:4 65:1,19 69:3
69:5,8 71:6,20
72:15 74:4 83:4,7
86:6 90:2
**lost**   76:22,25 90:1
91:10
**lot**   32:1 68:3
**low**   33:16,20,21,23
34:13,15,19,23
35:5,12,13,17,18
36:4
**lower**   36:5
**luke**   108:15,19
109:6

**m**

**m**   100:18
**magically**   119:22
120:11,13
**maintain**   58:1
92:12,21 93:13
**making**   8:5 116:17
**managerial**   15:5
**manipulate**   28:22
121:11,22
**manner**   5:24 66:5
83:11
**march**   48:9,14
49:5,15 71:24,25
**marilyn**   128:3,4
**mark**   21:8,9 50:12
51:6 114:24
**marked**   57:4,5
60:8 70:10 74:23
74:25 78:19 80:7
81:10 85:9
**master**   13:2,5
**math**   113:19
114:16,17

**matter**   4:13 5:22
28:10
**maximum**   29:6,8
29:14 44:24
**mean**   15:2 20:22
32:4,9 56:17,25
63:11 68:6 76:8
90:13 93:2 97:6
98:16 99:7 101:4
102:10 118:8
120:14 122:2,14
123:13 124:12,21
135:22
**meaning**   24:23
45:8
**means**   26:20 32:10
65:6 76:10 90:14
98:17 99:8,20
123:19
**meant**   56:22 93:7
**mec**   12:6,23,24,25
15:21 81:23
**med**   30:22 73:24
96:16 98:13
**media**   4:11
**medical**   20:23
42:25 44:11,16,24
45:4,13,19 102:21
102:24 103:8
105:1
**medications**   9:22
9:25
**meet**   44:15 47:15
48:1 108:19
**meeting**   3:21
60:24 61:1 63:2,9
63:12,16,19,22
64:13 65:21 79:8
80:1 82:9 102:5
108:13 121:1
124:6,6,7,11 134:1

**meetings**   62:15
63:13 124:5,7
**member**   12:15,20
124:23
**members**   18:7
**memo**   80:24
**memory**   104:23
**mendelson**   2:8
**mentioned**   75:13
**message**   48:6
**method**   55:20
**microphones**   4:4,7
**mid**   68:4
**middle**   69:6
**mind**   67:15 137:19
137:20
**mine**   61:20 62:2
82:3
**minimum**   32:12
36:21 37:4 117:8
**minute**   48:22
84:16 104:16
**minutes**   44:3
84:18,20 138:10
**misbid**   31:23
32:17 111:23
**misbidding**   31:13
**miscellaneous**
71:17
**missed**   20:10
47:11 98:12
**missing**   50:17
**misspelling**   64:4
**misunderstood**
35:14
**modify**   101:1
**moment**   50:22
77:23 136:7
**momentarily**
76:25

**monday**   66:6
129:19
**month**   16:16
18:20 20:8 23:14
25:21,21,21,25
26:4,8,12,25 27:8
27:11,15,16,21
28:15 29:18 32:13
35:23 36:11 38:2
39:11,16 42:24
68:4 93:13,15
95:10 96:22
101:11 111:24,25
123:1,21
**monthly**   22:17
26:8 34:24
**months**   44:25 45:5
45:8,19 102:20
103:7
**morning**   4:2 6:12
46:19 66:6
**move**   23:4 116:17
**moving**   121:10
**mp4**   137:9,10,16
**multi**   29:25

**n**

**n**   4:1
**nail**   120:9
**name**   4:18 6:1,15
64:5 86:21 109:1
127:24 128:5
**natural**   7:23
**nature**   47:24
**necessary**   143:6
**need**   9:5,6,6,7 35:8
39:24 43:24 46:3
92:20,21 95:10
111:5 122:25
136:18
**needed**   16:9 45:3
100:5 133:25

134:3
**negatively** 83:19
**negotiate** 19:4
93:16 103:25
104:7
**negotiating** 104:14
104:17
**nelson** 86:6
**never** 17:19 28:5

39:20 56:9 68:13
69:14,18,21,25
105:25
**new** 7:13 29:20
46:8
**newly** 41:13
**nicer** 100:10
122:10
**non** 122:22
**nope** 76:23
**normal** 101:22
**notary** 3:7 140:6
140:22 143:13,19
**note** 4:4 94:6,22
95:10 141:10
**noted** 143:7
**notes** 95:1
**notice** 3:1 40:15
40:18,23 47:4
64:19 65:25
**notify** 24:12 25:1
106:8
**november** 3:17,23
48:19 63:3,10
75:5 79:9 80:1,9
81:1,7 86:23 87:3
88:14
**number** 4:15 12:1
14:10 21:13 22:15
30:19 37:2,20
42:3 43:2 44:14

72:21,24 73:3
81:17 82:22 87:5
87:9,22 88:5,19,20
95:18 96:7,8 98:4
102:17
**numbered** 98:2
**nw** 2:13

**o**

**o** 4:1 128:6
**oath** 4:21 5:20 7:6
7:9,10 46:16 85:6
**object** 94:7,24
97:3 102:14
103:12 105:22
106:2,3,18,23
107:13,16 110:19
110:20 121:20
122:13 123:10
124:14,19 125:3
126:8,13 134:4,9
134:14,20 135:1
**objected** 110:17
**objection** 90:18
103:11 106:17
135:17
**objections** 5:24
8:6,6,9
**obtain** 92:17,19
**obvious** 41:25
**obviously** 29:2
**occ** 72:17 73:24
**occasion** 83:16
**occurred** 84:3
128:23
**occurrence** 74:2
**occurrences** 79:10
**october** 3:15 48:19
48:21 64:23 66:13
66:20 73:18,21,22

**odd** 110:16
**offer** 33:23
**offered** 42:8
104:19,24 127:8
127:18
**offhand** 12:6
**officer** 16:25
**officers** 16:25 19:7
**official** 41:12

**oh** 14:4 17:15,21
38:6 46:2 49:10
51:13 61:6 66:7
70:16 76:21,21
94:10 107:8
108:24 109:2
112:5 113:18
123:15 126:14
131:19
**oji** 30:22 96:16
98:13 130:17
**okay** 6:24 7:22
8:13,20,24 9:4,12
9:18,20 10:7,11,19
10:23,25 11:20,24
12:23 13:18,22
14:5,13,17,25 16:3
18:3,15,23 19:9
21:4 22:7,15 23:1
23:4 24:22 25:4
26:3,15 27:20
28:8,14 29:2,10
30:6 31:4,16
33:13 35:21 36:12
37:20 38:14 39:23
40:1,13,25 41:5,24
42:3 43:2,21 44:1
44:4,9,14,23 45:7
45:23 46:4,4 47:2
47:20,23 49:1,12
50:3,6,19,22 51:2

51:20,20,20,21
52:5,10,16,22 53:1
53:16,18,19,21
54:12 55:11 56:5
56:13,17,21 57:2,2
57:8,12,16,23 58:9
58:17,22,25 59:8
59:13,21 60:10,14
60:16,21 61:3,5,8

61:9,10,13,13,14
61:15,15,15,15,18
61:18,18,18,18,18
61:19,22,22,22,22
61:25,25,25 62:3,3
62:6,17,25 63:5
64:2,10 65:23
66:3 67:2 70:4
71:3,8 72:9,16
73:6,10 74:5,14,19
74:22 75:17,22
76:5,8,12 77:1,8
77:13,16,23 78:9
78:15,22 79:1,17
80:7,15 81:9
82:16,19,19,20
83:5,8 84:5,10,22
85:8,14,20 86:13
87:5,13,21 88:3,11
88:16 89:8,15
91:6,14,20 92:9
93:8,18,22 94:3,18
95:9,13,21 96:3,3
96:5,12,23 97:13
97:20,25 98:3,8,11
99:3,15 100:1,14
100:17,21 101:8
101:20,25 103:14
104:12,16,16
105:4 106:19
107:4,4,18 108:10

| 44:23 45:12 60:11 | 78:24 79:11 83:21 | 51:5,11,17,17,20 | 108:18 109:3,9,16 |

**[okay - pick]**                                                    Page 16

109:24 111:1,12
112:3,6,13,24
113:9,17 114:1,4,8
114:11 115:16,21
116:7,13,25
117:17 118:11,16
118:20 119:10,12
119:19 120:1,4
122:5 123:3 124:2
124:2,21,25 125:5
125:9,13 126:5,24
127:12,12,20,23
128:16,19 129:6
129:11,25 130:19
131:2 132:18,22
133:4,10,13
134:24 135:4,11
135:14,25 136:2
136:22 138:2
**once**  8:8 23:21
28:24 30:6 31:1
48:4 112:18
**open**  20:21 26:8
28:15,19,20,21,24
29:12,19,20 32:5
32:19 36:21 43:18
58:3,15,18 67:4,9
70:2 99:5,6,8,12
99:14 100:19,24

101:2,6,17 116:20
117:2,7 120:16,17
122:8 129:7,8,10
129:23 132:23
**opens**  27:22
**operation**  83:14
**opportunity**  9:13
92:7
**opposed**  94:21
**opt**  99:17
**options**  136:12

**order**  16:22 18:3
20:5 34:9 71:22
94:5,22 95:9
136:8,11,16,19
137:25
**ordering**  137:22
**orderly**  83:14
**organization**
83:12
**original**  70:8 88:1
98:15,21 99:18
100:4
**originally**  10:14
59:9 122:7,11
**orlando**  15:10
**ought**  105:14
**outcome**  4:23
**outside**  48:1 50:6
**overnight**  30:4
57:24 58:10 98:19
122:22
**overnights**  30:1
58:2 59:1 118:10
119:9,14,15,21
120:12,19 121:19
121:23
**oversaw**  16:6

**p**

**p**  4:1 34:18
**p.c.**  2:8
**p.m.**  138:6,9
**page**  3:10,12 22:9
22:10 23:4,5 24:6
24:6 25:12,13
30:11 31:9,10
33:13 34:15,17,17
36:20,21 39:24
40:2,3,14,14 41:2
41:5,6 42:3,17,18

61:17 66:3 71:14
73:10 82:18 87:14
95:18 96:6,7,10
98:2,4 100:15
102:15,17,18
142:4,7,10,13,16
142:19
**pages**  33:13,15
41:3
**paid**  102:24
128:16
**pairing**  99:18
**panic**  66:7
**paper**  89:22 90:10
104:22
**paragraph**  23:6
24:7,10 31:10
45:13 53:1,18,20
55:15 56:5 82:3
82:16 98:6,9
100:18,23
**paralegal**  136:11
136:15
**parameters**  99:22
**parker**  6:19
**part**  15:10 33:22
67:2 68:8 104:14
109:12
**participated**  16:9

60:24
**participating**  5:16
**particular**  19:2
24:23 66:21,22
78:5,6 127:24
**parties**  4:9 5:23
140:15
**party**  4:22
**patience**  111:5
**pay**  103:8,15,19
103:19

**pdf**  22:10 23:5
24:6 25:12 31:9
34:18 36:20 40:2
40:14 41:2,5
42:18 43:23 96:7
136:13 138:1
**penalty**  5:22 52:3
**pending**  9:9
**people**  20:18 68:4
122:8 130:13
**percent**  63:12,14
91:24,25 97:23
126:4 130:16
**perfect**  44:4
**performance**
71:15
**period**  15:6 23:9
24:25 26:4 29:20
29:21 34:24 37:3
37:17,22 40:23
43:6,16 44:24
45:4 73:14 96:1
106:9
**periods**  42:7
129:23
**perjury**  5:22 52:3
**permissible**  64:24
**permitted**  111:9
131:10

**person**  5:21 32:19
64:2
**peter**  2:16 5:4
**phone**  2:5,10,14
49:17
**phones**  4:6
**photocopy**  64:18
**phrase**  13:20
**physically**  5:17
**pick**  4:5 20:21
28:3,4 33:4,5 67:9

| | 42:19 43:23,24 44:7 45:11 51:22 | | 99:6,11,16 114:19 |

[pick - proposing]                                                                                          Page 17

117:10,13 123:8
129:15
**picked** 99:5
**picking** 67:4 123:7
**picks** 114:5
**pickup** 68:11
**piece** 51:16 87:25
90:9
**pieces** 86:15 89:22
104:22
**piecing** 67:14
68:19
**pile** 64:15
**piller** 15:12 75:18
**place** 4:6,9 21:25
101:23 122:22
134:1
**placed** 20:11
99:17
**placement** 68:14
**plaintiff** 1:5 2:2
5:7,9 52:17
137:11
**plaintiffrecords0...**
51:8
**plaintiffrecords0...**
51:9
**planning** 44:2
**play** 29:13 117:25
**played** 90:6
**playing** 29:11
**please** 4:4,6 5:14
5:25 6:15 80:23
94:12 136:9
**point** 8:16,20,25
9:6 10:7 21:19
65:10 66:9 73:7
74:5 76:12 83:5
84:17 90:5 111:10
114:8,9 126:23
127:6 130:1

**pointed** 103:22
**points** 64:24 65:4
65:9,12,13,14
66:13,20,22 73:2
73:24 74:2,9,15
105:5,10,14
106:20 107:20
121:13 134:6,8
**policy** 64:24,25
65:3 66:14 81:2
**portion** 71:14
82:17 98:12
**portland** 66:6
**position** 11:24
12:4 34:2,4,11,15
34:19,23 62:22,23
82:23 83:6 99:21
134:25
**positions** 11:20
33:24 35:18
**possession** 21:11
**possible** 55:18
**post** 28:2
**posted** 26:8 27:12
**potential** 69:11
**potentially** 20:13
**pre** 23:11,24 26:4
26:9 67:6
**predict** 100:11
**pref** 22:25 23:3
25:19
**preference** 22:18
42:7
**preferences** 95:23
**preferentially**
131:15
**prejudice** 75:25
76:9 90:11 91:12
**preparation**
109:12

**prepare** 108:3,6
108:14,19
**present** 2:16 5:18
82:9
**president** 5:5 12:8
12:9,16 13:13,19
13:22 14:13,19,22
14:24 15:1,11,13
15:21 16:4,6,8,19
17:6,24,25 18:18
22:3 52:23 75:15
75:18,18 81:24
86:7
**presidents** 14:14
**presumably**
101:21
**pretty** 7:23 9:5
41:25 42:12 47:25
78:17 129:25
**previous** 35:15
140:7
**previously** 40:17
40:19 108:9
**prince** 1:10 3:3,20
4:12 5:12 6:7,12
6:17 21:17 46:15
50:25 51:3 60:21
69:10 70:25 85:5
85:21 89:19 91:2
91:9 108:3 110:23
111:4 130:6
131:21 133:18
136:1 138:5 141:5
142:2,24 143:2,4
143:12
**prior** 8:17 24:13
25:1 40:15 108:11
108:16 121:12
**private** 4:5
**privilege** 90:21

**probably** 16:15,16
47:22 48:16 64:6
64:17 91:9 122:17
**problem** 126:7
**problems** 10:8
**procedure** 3:2
122:17
**procedures** 47:10
**proceeding** 109:22
**proceedings** 5:15
**proceeds** 26:1
**process** 13:10 20:2
26:1,1 28:6 29:3
30:7 35:24 36:2
54:25 55:6 56:20
63:20,25 69:19,23
72:8 76:16 77:4
87:11 89:21,24
92:12,13,21 95:7
104:2 111:9,10
114:10 122:9
135:23
**produce** 94:5
**professional** 3:6
140:5,21
**program** 11:10
20:4 127:9 130:17
130:17
**prohibit** 131:22
**prohibited** 132:4
132:13 133:4,6
**promise** 41:1
**promote** 13:23
**proper** 105:10
**proposed** 54:12
55:20 125:1
**proposing** 120:14
120:17 121:17
122:6,10 124:8
130:20

**protected**  45:7
  102:21
**provide**  43:12
  47:4 52:2 59:21
**provided**  37:12
  42:4 44:16,20,21
  49:22,25 56:2
  59:10 64:14
  135:23
**provision**  54:4,5,8
  97:18 102:22
  123:6
**provisions**  44:10
  59:2 67:20 103:23
**public**  3:7 140:6
  140:22 143:19
**pull**  50:8 70:7
  95:16
**pulled**  129:6
**purposes**  25:10
**pursuant**  3:1
**pursue**  78:13 84:9
  90:23 107:6
**pursued**  89:4
  90:20
**pursuing**  76:10
  84:7 90:14
**push**  91:17,18
**put**  20:13 57:25
  64:23 89:22 94:13
  94:13 121:2,7

**q**

**qualify**  79:11
**question**  8:9,22
  9:9 17:22 33:16
  42:18 55:2 77:24
  91:3 94:16 97:25
  105:11 123:3
  131:8
**questioning**  8:6

**questions**  8:14
  10:9 35:15 46:19
  48:12 84:17,19
  89:9,13 93:22
  110:17,23 120:2
  131:6,19 133:11
**quick**  33:15 84:12
**quickly**  78:17
  132:18
**quite**  124:4

**r**

**r**  2:3 4:1 128:6
  142:3,3
  **r.brigham**  21:14
  70:23 75:2 85:15
**racked**  121:13
**reached**  65:18
**read**  51:3 52:6
  61:3 63:1 82:16
  96:14 100:22
  141:9 143:5
**reads**  24:10 31:16
  34:18 57:16,23
**ready**  51:15,19,20
**reality**  7:13
**really**  68:12 84:12
  89:19 111:4
  114:16 120:14
  122:12 123:8,11
  123:11,18 130:12
  134:24
**realtime**  3:7 140:5
  140:21
**reason**  26:21
  32:17 33:11 45:5
  65:20 74:8 76:5
  83:17 86:13 98:23
  134:17,18 141:11
  142:6,9,12,15,18
  142:21

**reasonable**  25:8
  57:17,24 125:1,10
  126:6 130:19,23
**reasons**  83:16 84:9
  90:19 134:19,21
**reassigned**  97:22
  126:21 127:16,25
  128:12
**reassignment**
  125:15 126:3
**rebecca**  1:4 4:13
  5:7 19:12 34:7,10
  46:6 47:15 49:14
  52:18 54:17 58:7
  64:7,13 71:7
  78:23 79:6 80:9
  80:23 82:23 83:3
  86:22 87:2 89:3
  101:10 104:25
  105:16,20 107:20
  110:5 141:4 142:1
  143:1
**rebid**  95:1
**rebuild**  101:17
**recall**  10:1 12:6
  14:9 42:6 47:16
  62:21 63:12 66:21
  74:10 80:13 84:9
  86:12 90:6,9
  91:13 92:9 93:12
  93:17,18 94:1,19
  102:4 104:18,20
  105:7,11,15,23
  106:6,13,14
  107:22 108:2
  119:7 124:10
  127:20 128:7,9,22
  135:8
**receipt**  141:18
**receive**  10:25
  32:23 76:6,7

**86:11 101:14
received**  71:21
  101:13 122:7
**receiving**  76:3
  80:4 86:12
**recess**  46:12 85:2
**recognize**  21:24
  71:3 87:18
**recollection**  16:2
  19:13 63:1 64:22
  74:14 78:18 81:5
  82:12,21 84:6,8
  87:1 89:1,23
**recommendation**
  71:16
**reconvene**  84:20
**record**  4:3,10 5:1
  5:15 6:1,16 8:7
  17:9,17 21:13,15
  46:9,11,14 64:14
  71:12 84:20 85:1
  85:4 111:6 136:23
  138:3,6,10
**recorded**  4:11
  7:16 61:1
**recording**  4:9
  60:23 69:5
**records**  3:14 46:22
  71:1,6
**recovery**  57:25
**recurrent**  43:5,7
**red**  61:16
**reduced**  140:11
**reduction**  42:6
**reef**  79:21 81:23
  87:16
**reference**  22:15
  36:17,25 40:10
  46:20 54:8 63:23
  64:7

Case 1:19-cv-03417-WJM-STV  Document 44-2  Filed 12/08/20  Page 64 of 75
Appellate Case: 21-1335  Document: 010110614801  Date Filed: 12/06/2021  Page: 94

[referenced - right]                                              Page 19

**referenced** 82:8
141:6
**referencing** 109:1
109:6
**referred** 23:2
**referring** 22:22
51:7 68:21 77:21
77:22 78:11
**refers** 87:10
**reflect** 73:2 83:18
**refresh** 63:1 78:17
81:5 82:12,20
84:5 87:1 89:1
**refreshed** 89:23
**refreshes** 104:23
**refused** 56:6,18,21
56:22
**regard** 55:18
77:14 131:16
**regarding** 105:24
106:1 108:13
**regardless** 27:4
**registered** 3:6
140:4,21
**regular** 16:12 35:2
35:24 100:2
128:19 136:18
**reily** 2:2
**reinstate** 56:23
82:22
**reinstated** 77:10
77:17 78:2 102:7
102:8 118:6,21
**related** 47:25
82:14 88:1 132:19
140:14
**relates** 88:9
**relations** 5:5
**relationship** 47:24
**release** 43:7,12
133:21

**released** 68:4
98:14 133:20
**relook** 36:7 103:2
**remember** 6:25
15:9,18,19 20:1
22:24 57:21 62:22
63:19 65:13 76:3
80:4,6 94:16
102:22 125:14
126:1 127:7,24
128:11,12 130:21
131:5
**remembered**
49:21
**reminded** 7:24
**remote** 4:16 5:14
7:4
**remotely** 3:4 4:25
5:19 140:11
**remove** 58:2,25
**removed** 14:1
30:22 58:11 67:8
96:17
**renegotiated**
104:13
**rep** 15:24 59:23
71:9
**repeat** 55:2 91:8
94:11,16
**replace** 99:6
**replacing** 114:23
**report** 14:5 15:25
24:11,13 25:2
40:15
**reported** 13:19
15:1,14
**reporter** 3:6,7
4:19 5:14,16 7:20
13:1 17:8,18 21:7
21:9 38:17 49:7
50:21 70:14

102:13 106:16
125:6,17 136:7,13
136:16,22,24
137:17,22 138:2
140:5,5,21,21
**reporter's** 140:1
**reporting** 5:19,24
15:4
**represent** 60:22
109:16 110:18
**representative**
76:20 77:5
**representatives**
14:7 15:14
**represented** 82:7
109:21
**representing** 5:10
124:22
**represents** 5:11
**request** 64:18
65:24 68:9,13,22
93:17 97:24 107:6
**requested** 55:16
97:21 107:24
125:14 126:3
**requesting** 57:17
57:23 58:7
**requests** 23:11
40:5 101:1
**required** 18:23
20:8 23:15 24:25
38:8 40:16 43:4
47:4 143:13
**requirement**
24:17,20 54:21,25
94:22,25
**requirements**
36:22 44:15 100:3
117:8
**requires** 43:5
94:19

**reserve** 20:14
31:23 33:6,8,9
40:17,18,22 99:21
100:2 117:12
**reserves** 24:1
129:24
**resources** 135:23
**respect** 47:12
76:13 78:16 83:3
132:23 133:2
**responded** 89:3
**responding** 59:16
59:17
**responses** 7:23 8:2
**responsibility**
38:5 39:3 92:4
**responsible** 38:24
68:14
**rest** 18:7 40:6
**restroom** 9:6
**result** 140:16
**resulting** 83:23
**retain** 45:14,15
**retention** 42:5
**return** 43:3
128:19 141:13,17
**returned** 53:11
98:14,21
**returning** 42:21
98:5,9
**returns** 43:11
**review** 9:13,15
106:10,11,21
107:6,12,25
109:11 137:20
141:7
**reviewing** 51:10
**rid** 112:13 114:15
117:10
**right** 7:4 11:11
12:6 17:4,16 19:5

Case 1:19-cv-03417-WJM-STV   Document 44-2   Filed 12/08/20   Page 65 of 75
Appellate Case: 21-1335   Document: 010110614801   Date Filed: 12/06/2021   Page: 95

**[right - seniority]**                                                                     Page 20

19:19,21 23:22
24:5 25:12 26:5
27:2,6 28:6 29:16
32:1,21 33:6 34:2
35:25 37:8,18,25
38:2,10 39:4,21,24
40:11,13,23 42:13
42:17 43:13,21
44:7 45:5,8,9,11
45:23 46:1,4
47:21 49:15 50:18

56:11 63:6 64:8
68:19 69:2,6
72:16 75:15 77:11
83:6 84:13 89:8
95:19 97:9,10
98:2 101:18,21
103:3 109:4,22
110:11 112:4,8,22
113:9 114:10,24
115:10,24,25
116:3,4,14,25
117:19,23 118:1
118:21 119:17,22
120:23 121:3
122:3 124:18,23
129:4 130:9,17
131:18 132:2,9,16
135:12 137:14
**rights**   42:9
**risk**   57:25
**road**   91:16
**rock**   6:19
**role**   12:13,16 13:8
13:12,15,18 14:2
15:4,5,13,20,23
16:5 22:3 60:1
71:9 77:9
**roles**   12:3
**room**   5:18

**roughly**   12:1,7,11
48:19 49:5
**routinely**   132:19
**rule**   8:7
**rules**   3:2 7:13,14
54:9 55:9 101:22
117:19,20 118:1
119:16,24 132:16
132:20,23

**s**

**s**   2:3 3:6 4:1 140:4
140:20 142:3
**salary**   103:19
**sara**   86:6
**saw**   39:6 54:9
87:15 114:15
**saying**   38:21 43:13
56:1 66:4,23
117:22 118:11,16
123:16
**says**   22:16 23:9,18
25:13 27:21 28:15
29:18 30:20 33:23
37:2,10 40:14
41:10 43:2 44:14
44:24 52:16 63:15
64:3,12 65:23
68:10 72:16 75:22
82:22 83:8 87:5
90:9,10 96:9,12
98:11 99:4,15
100:19,24
**scenario**   32:15
**schedule**   20:9,17
27:16,17 28:8,22
29:13 34:9 40:5
42:1 43:18 58:3
58:14,18 70:1
93:14,24 101:2,17

131:23
**scheduled**   43:7
79:8 82:4
**schedules**   20:19
22:17 68:5 121:23
**scheduling**   24:12
25:1 98:21,24
**school**   11:10,10
**scratch**   20:17
58:14,18 70:1
93:24 118:18

119:6
**screen**   21:16 31:11
45:24 46:1 50:23
51:13 70:24 94:14
**scroll**   51:11,15,17
51:18,23 61:11,12
61:13 98:1
**scrolling**   51:21
52:5 64:10 66:3
**search**   3:14 71:1
**second**   17:13 46:2
49:9 61:5 62:7
76:24 89:14 95:18
125:21
**section**   30:11 79:7
**see**   21:17,21 22:19
23:12,19 24:14
25:15,23 26:10,11
26:17,18 27:23,24
28:17 30:24 31:15
31:24,25 33:18,25
34:1,25 35:17
36:16 37:5,13
39:13 40:8,20
41:18 42:10 43:9
44:17 45:1,16,17
52:20 53:5,14
54:6 55:24 56:7
57:10,18 58:4,5

64:20 66:1,10
67:12 68:16,23
71:9,15,18,19
72:11,18,22,25
73:11,12,16,19,25
75:7,8,11,20 76:1
77:19,22 79:12,19
79:23 80:10,21
81:3,25 82:10,25
83:25 84:1 85:25
86:4,8,19,24 87:7

87:23 88:6,21
95:23,25 96:2,9
98:5,7,8 99:10
100:18 105:1
**seeing**   31:11 39:24
40:3 50:24 57:5
60:11 61:17 70:25
75:3 78:21 80:13
81:11 85:11 88:13
105:15
**seek**   19:11
**seeking**   53:12 54:3
83:2
**seen**   57:20 71:4
80:12 104:21,22
**sees**   116:1,8 117:2
**selections**   20:6
**send**   21:11,12 66:5
70:7 137:23
**sending**   70:9
**senior**   31:19 32:7
32:15,19 34:11
41:24 55:13
122:10 131:12
**seniority**   11:25
20:5,7,12 22:18
24:3 27:4 32:11
34:9 41:7,10,11,12
41:13,20 42:5,12

| | 101:21 102:2 120:15 121:6,11 | 62:9 63:17,25 | 42:15 45:14,20 |
|---|---|---|---|

54:4,5,8,9 55:17
59:1 67:10 92:16
99:13 101:5,7,14
119:16 123:6,14
123:16
**sense**  39:17,18
114:21,22 117:15
123:22
**sensitive**  4:4
**sent**  48:6 49:18
64:17 105:2 108:8
109:15 141:14
**sentence**  53:24
99:4
**separate**  129:15
**september** 73:15
140:18 141:3
**series**  71:20 72:9
73:11
**serve**  80:24
**served**  67:10
100:19 101:3,9
**serves**  125:20
**set**  121:3
**setting**  46:4
**share**  21:16 46:3
50:23 70:24 95:19
**sharing**  45:24
51:13 57:2 59:8
70:4 74:22
**she'd**  119:1
**sheet**  141:11
**shelly**  64:16
**shifts**  55:17,19,22
**short**  104:25 105:5
108:12
**shorthand**  140:11
**shot**  113:18
**show**  30:17 57:3
60:8 77:23 78:17
81:9 85:9

**showing**  74:25
78:19 80:7
**shows**  38:2 129:23
**sic**  108:15,19
132:7
**sick**  9:20 33:10
40:16,23 64:16,23
65:8,9,24 79:11
102:25 103:4,20
134:10,13,16
**side**  11:9 109:25
110:1,3,5
**sign**  137:20 141:12
**signature**  51:24
136:22,25 137:18
140:20
**signed**  141:20
**signing**  41:12
**single**  27:5 93:4
134:22
**sitting**  74:14
113:17 116:21
125:10 126:5
135:4,7
**situation**  77:16,25
**six**  129:4
**skip**  20:16 34:15
43:22 69:19
**skipped**  100:14
**slightly**  63:4
121:17
**slowest**  136:20
137:25
**sole**  17:25
**solely**  16:21
**solution**  125:1,10
126:7 130:20,23
**solutions**  104:19
104:24 141:23
**somebody**  97:13
98:22,25 102:20

135:15
**sorry**  8:24 12:24
13:1,2 17:15
34:16,20 35:8
38:18,19 41:3
44:1 49:10 50:10
50:15 53:20 61:7
70:15,18 73:21
91:9 95:20 96:4,6
98:1 102:13
106:16 107:4
109:2,7 113:19
116:14 125:6,22
126:14 128:4
130:8 131:19,20
131:20,20 136:15
**sort**  89:22 91:14
99:23 111:25
120:9 127:10
136:20
**souk**  2:12 5:10,10
6:6,6 8:10 57:15
60:20 70:11 79:4
80:18 81:16 84:19
84:23 85:19 89:13
90:17 91:5 103:11
106:3 107:3 108:8
108:25 109:1,2,3,6
109:11 110:17
125:19 135:17,21
137:19,21,24
141:1
**sound**  47:21
**sounds**  68:18
**south**  2:4
**spanish**  11:1
**speak**  49:17
108:10
**speaking**  64:2
67:3 68:2

**specific**  34:2,3
57:21 63:13 66:21
93:17 100:3,7
127:24
**specifically**  76:4
79:10 80:5,6,13
90:7 95:8 97:11
101:6 105:2,23,24
107:22 108:1
128:8,24
**specifics**  102:4
103:2 111:22
124:10
**specify**  94:4
**speculation**
103:12 135:18
**speculative**  103:11
**spend**  16:11
**spits**  111:17
**split**  16:14 29:19
29:19,20,23,24
30:6
**splits**  28:16
**spoke**  48:5,15
49:14 59:9
**spoken**  49:1 59:10
**staff**  90:21
**stamp**  22:10 23:5
41:6 45:12 51:7
57:8 60:15 70:22
75:1
**stamped** 42:19
43:24 85:14
**stance**  67:7
**stand**  12:25
**standard**  136:10
**start**  10:8 12:4
38:20 53:24 89:20
118:17 119:6
135:6

**started** 11:11 12:5
12:6 47:19 127:3
**starting** 13:4
73:14 136:8
**state** 3:8 4:25 6:15
10:21 140:6
**statement** 5:14
49:22 50:3,7 52:2
52:8 59:10,17,22
62:8 64:12

**states** 1:1 4:14
10:17 79:6 80:23
82:2 86:21
**stating** 5:25
**status** 99:17,19
**stay** 93:19,20
**stefanie** 62:11,13
62:14,17 64:11
79:18 80:20
**stefanie's** 62:8
**step** 63:24 65:12
65:15 72:8
**stop** 45:23 46:3
57:2 59:8 70:4
74:22
**stopped** 84:7
117:18
**stopping** 92:24
**street** 2:9,13
**strike** 73:22 82:21
132:11 133:5
**struck** 63:8
**stuff** 10:13 39:6
**stv** 1:2
**subject** 19:14
24:16,19 101:22
**submit** 20:5 101:1
**submitted** 43:8,16
94:23

**subsequent** 21:10
**substance** 52:10
**substitute** 11:9
**succeed** 96:1
**suffered** 53:2
**suggested** 124:15
**suggesting** 67:18
67:22
**suggestions** 105:3
**suite** 2:4,9

**sum** 52:10
**summary** 50:4
**supervisor** 62:18
**supposed** 77:13
**sure** 18:16 26:22
32:22 76:7 78:10
91:24,25 95:16
96:14 97:23 104:5
112:4,5 118:21
120:18 121:25
126:4 127:1
130:16 135:5
137:5
**swap** 28:15 29:11
29:12 35:3 36:4
39:2 56:3 92:20
92:20 101:2,16
116:3 117:6
122:25 123:19
129:2,10
**swapped** 55:21
122:8
**swapping** 28:20
28:24 34:14 37:16
92:25 129:8 132:6
132:15
**sworn** 6:8 140:8
143:14
**sync** 137:13

**system** 22:16,16
22:21,25 31:20
33:3 37:23 43:17
85:23 90:20 95:23
100:25 101:1
111:17 112:19
123:13
**systems** 41:10

**t**

**t** 128:6 142:3,3
**table** 25:13,17
**take** 4:9 7:10 9:4,5
9:8,9 21:4 24:24
24:24 44:2,5 45:5
66:4,9 84:16
110:3 113:14
114:5 116:2
120:17 122:6
137:17
**taken** 3:4 4:12
7:19 9:13 119:21
140:11
**talk** 7:12 46:5
48:11 49:20
**talked** 46:19 52:7
130:19 131:2
**talking** 37:7,15,21
40:11 43:22 68:25
69:11 92:10 95:17
114:11
**talks** 25:20 26:16
33:16 42:20
**tardiness** 83:18
**tardy** 65:10
**teacher** 11:9
**technical** 9:1
**tell** 10:19 11:4,16
12:3 19:23 20:1

**telling** 106:6
**temporarily** 97:22
128:12
**temporary** 125:15
126:3 130:12
**ten** 79:10 129:4
**term** 30:5
**terminated** 48:16
53:9 64:25 80:25
81:6

**termination** 65:3
65:16,18 74:6
76:13 78:7 82:14
83:23,24 121:3,8
121:13 122:2
134:3
**terms** 17:2 19:15
19:18 22:10 26:1
39:19 40:11 67:16
93:14 116:19
123:6
**terrible** 113:19
**testified** 6:9 111:8
**testify** 10:4 140:8
**testimony** 5:22
109:25 118:7
130:21 141:9,18
143:8
**thank** 9:11,19
10:10 44:1,6
50:19,19 85:19
89:10,11 109:10
110:23,24 120:3
130:6 133:13,16
135:25 136:5,6
138:2
**thanking** 59:18
**thanks** 6:14 8:12
57:14 81:20 84:24

| **subscribed** 143:14 | **synch** 137:9 | 27:25 61:11,11 102:3 | 90:24 |

**theis**  2:8
**theory**  101:19
  114:20 123:23
  129:5
**thing**  36:3 105:15
**things**  16:25 23:2
  24:2 28:9,9 78:4
  114:12 125:11
  132:1
**think**  9:23 12:1
  15:8 22:23 32:25
  35:10,12 36:6,6,9
  36:13 38:2,15,25
  39:23 41:3 43:21
  50:21 59:13 62:4
  70:8 76:21 84:15
  96:13 104:4
  109:14 110:16
  118:22,22 120:9
  121:21 123:11
  124:4 125:9,20
  126:4 127:23
  132:25 133:10,13
  135:14 136:10
  137:1
**thought**  35:23
  105:13,21 124:12
  124:25
**three**  14:12 15:9
  40:18 49:3 53:25
  59:15
**threshold**  32:13
  112:1 113:24
**time**  5:13 11:8
  13:1 14:9 15:6,8
  15:10,11,14,19
  16:1,3,11,13,15,18
  17:24 18:17 20:18
  20:21 22:5 24:13
  24:25 25:2,8,14
  28:15,19,20,24

29:10,12,19,20
32:5,12,19 33:16
33:20,21,22,23
34:7,10,13,15,19
34:23 35:5,10,13
35:15,16,17,18
36:21 37:10 39:6
40:15 43:18 45:4
45:18,20 48:5,15
48:21 49:4,13
52:23 58:3,15,18
65:2 66:17 67:4,9
70:2 73:14 92:11
93:1,15,19,21
94:21 95:8 96:21
99:5,6,8,12,18
100:2,4,19,24
101:2,6,17 102:25
103:1,4,9,20 104:6
107:19,23 110:10
112:2 116:20
117:3,7 120:16,16
120:17 122:9
124:13,23 126:12
126:15,21 129:7,8
129:10 132:23
134:15 135:2
136:4 138:9
141:19
**timeframe**  141:8
**timeline**  39:14
**timelines**  25:18
**timely**  64:19 65:25
  66:5 83:11
**times**  6:24 49:1,3
  68:3 83:14 129:4
  134:11,13
**today**  5:4 6:13 7:7
  7:14,16,23 8:1,5
  8:14,25 9:14,18
  10:5 11:18 74:15

74:17 89:10
104:21,23 108:19
109:24 110:17
111:5 125:10
126:5,25 135:5,7
**today's**  108:4,11
  108:16
**told**  50:4,7 52:11
  52:13
**top**  62:25 85:12
**topic**  46:8
**total**  73:24 138:9
**totally**  101:17
**track**  91:10
**tracking**  83:17
**trade**  28:2,9 29:11
  29:12,24 35:3
  36:4 39:2,9 40:4
  56:3 67:4 92:20
  92:20 93:4 114:8
  114:18 115:5
  118:9 119:1
  120:16 122:19,25
  124:1 129:1,3,8,14
  129:18,19 130:4
  132:15
**tradeboard**  27:22
  27:25 28:1 29:19
  40:11 58:3,15
  99:9
**traded**  55:21
  114:16 122:8
**trades**  40:3
**trading**  28:5,12,20
  34:14 37:16 39:5
  114:12 116:19
**training**  24:2
  41:16 43:4,6,7
**transcript**  9:13
  67:3 80:2 105:16
  140:13 141:6,20

143:5,8
**transcription**
  60:22
**transferees**  41:14
**treat**  83:19
**treated**  131:15
**treatment**  53:4
**tried**  119:13
**trip**  24:13 25:1
  26:22 29:25 30:2
  30:4 40:3,4,17,19
  66:13,20 93:4
  98:12,12,15,19,21
  99:5,6 100:4
  112:25 113:4
  114:9,14,15 116:2
  117:9,13,13 129:7
  129:9,10
**trips**  20:12 23:11
  23:22 27:17 28:2
  28:4,21 29:25
  30:5 31:19,22
  32:3,4,11,24 33:1
  38:16 39:8 57:25
  58:10 93:3 99:16
  112:14 114:4,5
  118:9 121:24
  122:12,17 123:7,8
  123:18 134:16
**true**  18:9,12 65:2
  96:19 109:14
  116:19 125:23
  140:13 143:8
**truth**  140:9
**truthful**  10:4
**truthfully**  10:4
**try**  34:20 46:2
  95:19 115:15
  118:13 122:21
**trying**  33:4,4
  77:10 93:13,15,19

**[trying - wants]**                                                          Page 24

93:19,20 94:15
118:23 121:19
123:8
**tubbs**  3:6 4:20
140:4,20
**turn**  4:6 30:2,3
66:6 98:19
**twice**  48:4 49:3
**two**  12:9 14:12
15:9 24:13 25:1
38:22 40:15 47:4
49:3 59:14,15
72:24 73:3 96:22
106:8 114:11
**tying**  89:2
**type**  15:4,5 18:5
19:6 34:8 91:3
93:14 99:21
**types**  96:20 97:6
**typewritten**
140:12
**typically**  16:24
18:25 71:9 96:21
97:12,19 107:5

**u**

**uh**  7:24,24 64:13
64:14,16,17 66:9
67:6 81:21
**ultimately**  90:8
**unable**  24:11
**unclear**  111:7
**underneath**  31:13
**understand**  7:6,9
7:15,18 8:11,21
18:16 46:16 47:2
58:9,13 66:8
83:15 85:6 109:6
109:16 110:13,20
133:21
**understanding**
19:10 45:10,21,22

46:24 47:7 58:6
65:17 66:12,16
89:25 102:7
107:14 119:11
121:9 130:15
**understood**  96:25
**underwent**  53:4
**undue**  68:7
**union**  11:23 12:3,4
12:14,17,20,21
13:14,19,22 14:5
14:14,19 16:4,11
16:17,19,20,23
18:1,4,18 19:1,3
22:4 52:23 53:12
54:3 55:9,12,16,20
58:17 59:6,23
64:3 66:19,24
71:9 74:8,11
76:20 77:5,17,24
78:12 83:2 84:6
87:2,10 89:2,4,25
90:8 91:11,17,18
91:21,22 92:1
96:25 102:6 105:2
110:3,5,7,9 118:11
119:4 130:20
132:18 133:7
**union's**  58:22 67:7
92:4
**unit**  4:11
**united**  1:1 4:14
**university**  10:22
**unpaid**  102:24
103:1,5
**untitled**  3:16 57:6
57:17
**unusual**  68:13,22
**upper**  60:12
**use**  97:11 101:16
102:25 103:4

**uses**  103:7
**usually**  30:17

**v**

**v**  141:4 142:1
143:1
**vacancies**  42:7
**vacation**  24:2 42:7
103:1,4
**value**  65:10
**varies**  111:24,24
**various**  86:15
103:23 109:18
**verbal**  7:23 8:1
71:25
**verbally**  5:21
**verify**  141:9
**veritext**  4:19,20
141:14,23
**veritext.com**
141:15
**version**  136:20
**versus**  4:13 16:12
**vice**  5:4 12:8,9,16
14:13,14,22 15:13
15:21 16:3,6,18
17:25 18:18 22:3
52:23 75:14,18
**video**  1:10 3:2 4:8
4:11,17 137:4,7
**videoconferenced**
1:10 2:1 3:3
**videographer**  2:16
4:2,19 5:13 17:19
46:10,13 84:25
85:3 137:3,6,8,12
137:15 138:4
**videotaped**  138:5
**violate**  54:3,17
67:9,23 69:15
93:7,9 120:22
132:22 133:1

**violated**  58:19
59:1 109:18
**violation**  81:1
119:15 132:6,16
132:20
**virtually**  21:8
**voice**  90:18
**voluntarily**  53:3
**voluntary**  42:8
**vote**  18:6
**vp**  64:3
**vs**  1:6

**w**

**wait**  51:9 73:22
131:19
**waive**  5:24
**walk**  111:12
**want**  8:17 10:12
12:7 18:15,19
28:9,9 29:14 30:2
30:3 44:5 46:5
53:18,24 69:10
99:10 104:5
111:12 119:8
121:23 123:18,24
123:25 129:1,14
129:15,19 136:17
136:21,24,25
137:1,4,5,7,9,18
**wanted**  14:1 17:1
20:9 39:9 46:18
58:10,14 93:15
114:15 117:10
118:5,9 119:5,8
**wanting**  18:12
**wants**  99:16
112:13,25 113:11
113:21 115:5,6,12
115:20 116:6,8,25
123:8,20 137:17

[warfield - zoom]                                                      Page 25

warfield   68:10
warning   65:14
   71:21,23,23,24,24
   71:25 72:7
warnings   72:5
washington   2:14
water   43:24
way   32:12 51:11
   51:14 65:1,19
   66:15 67:18,22
   72:15 74:4 80:3
   82:3 83:4,7 92:9
   93:10 102:2
   103:21 108:4
   121:6 122:11
   124:4
ways   109:18
we've   40:10 49:9
   68:2 84:15 86:14
wednesday   129:20

week   16:17 96:22
weeks   96:22
went   17:19 76:16
   77:3 121:1 135:23
whispering   4:5
whoa   38:17,17,17
willing   116:2
withdrawal   78:5
   88:16
withdrawn   90:10
withdraws   75:24
   76:9 77:25
withdrew   77:20
   84:7 89:5 90:2,8

   91:11
witness   5:21 30:17
   141:8,10,12,19
woke   66:7
word   33:21 133:19

words   7:18,19
   55:16 63:6 91:16
   131:25 134:2
work   11:9,22
   24:11 43:3 47:25
   48:1 54:4,13
   68:19 83:16 95:24
   97:2 126:17
   130:24 132:16,20
   134:10
worked   11:6,8
   20:2 52:22 62:23
   128:18
working   53:9
   121:12 122:1
   127:10,11
workplace   53:11
works   21:8 84:20
   84:23 92:22
   123:12,13

workstations
   83:13
worth   27:17
   112:25
wow   11:14 12:2
wrist   128:10
write   102:16
written   3:1 49:22
   50:3 65:14 71:24
   71:24 97:1 105:16
wrong   36:7
wrote   95:17 96:6

y

yeah   11:3,3,3,4,15
   14:18 20:4 23:25
   30:16 36:16 38:15
   38:19 39:5 47:18
   48:18 49:8 60:3

90:24 91:5,7 93:6
93:9 94:10 98:17
105:18 108:23
109:3,5 119:4
122:24 123:23
125:18 131:25
year   10:23 12:5
   47:1 48:9,10,14
   49:6
years   7:1 12:9
   19:25 47:17,17
   135:10
yellow   21:17,19
   30:15,18 61:20
   62:1
yep   11:13 17:12

z

zero   93:3,3
zoom   5:4 7:16 9:1

| 136:3 | 62:10 68:17 69:9 74:18 76:25 80:18 81:20 82:15 90:17 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness;  Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that  the
transcript or recording is available in  which:

(A)  to review the transcript or recording;  and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making  them.

(2)  Changes Indicated in the Officer's  Certificate.
The officer must note in the certificate prescribed by
Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day  period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES  ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

1              CIVIL ACTION NO. 19-cv-03417-STV

2

3    REBECCA BRIGHAM,

4              Plaintiff,

5    vs.

6    FRONTIER AIRLINES, INC.

7              Defendant.
     _____/

8

9

10

11           TRANSCRIPTION OF RECORDING:

12     BrighamR_Plaintiff Records0633 [10-9-15]

13

14

15

16

17

18

19

20

21

22

23

24

25



H+G

Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ▪ www.huntergeist.com
800.525.8490     Denver, CO 80203                  ▪ scheduling@huntergeist.com

                 Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0004336

1296

EXHIBIT

33

128

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015
REBECCA BRIGHAM v. FRONTIER AIRLINES

```
 1                    CIVIL ACTION NO. 19-cv-03417-STV

 2

 3    REBECCA BRIGHAM,

 4              Plaintiff,

 5    vs.

 6    FRONTIER AIRLINES, INC.

 7              Defendant.
      _____/
 8

 9

10

11               TRANSCRIPTION OF RECORDING:

12        BrighamR_Plaintiff Records0633 [10-9-15]

13

14

15

16

17

18

19

20

21

22

23

24

25
```

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
      Court Reporting, Legal Videography, and Videoconferencing

1297

FRONTIER AIRLINES (R. BRIGHAM) - 0004297

1       REBECCA BRIGHAM:        Thank you.

2       (Background conversation.)

3       FEMALE SPEAKER:        Hi.

4       REBECCA BRIGHAM:        Hi.      Good.      How are you?

5       FEMALE SPEAKER:        Good.

6       REBECCA BRIGHAM:        I'm wondering, I need to

7    speak with either somebody from leave of

8    absence or an inflight manager.                    If anybody is

9    available.

10      FEMALE SPEAKER:        Okay.      Inflight, you know

11   what, you could probably go back down there.

12   They've got quite a few people back there.

13      REBECCA BRIGHAM:        Okay.      Where is it at?

14   I haven't been to the ...

15      FEMALE SPEAKER:        So you're going to make a

16   left.

17      REBECCA BRIGHAM:        Uh-huh.

18      FEMALE SPEAKER:        Just follow the hallway

19   all the around.

20      REBECCA BRIGHAM:        Okay.

21      FEMALE SPEAKER:        Once you get to the

22   auditorium, it's to the right of the

23   auditorium.        It will say inflight right on

24   that.

25      REBECCA BRIGHAM:        Oh, awesome.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1298

FRONTIER AIRLINES (R. BRIGHAM) - 000130

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 3
REBECCA BRIGHAM v. FRONTIER AIRLINES

1        FEMALE SPEAKER:      And you just go in

2    through there.

3        REBECCA BRIGHAM:      Perfect.      Thank you so

4    much.

5        FEMALE SPEAKER:      (Indiscernible) people

6    back there for you.

7        REBECCA BRIGHAM:      Awesome.     Thank you.

8        FEMALE SPEAKER:      You're welcome.

9        REBECCA BRIGHAM:      (Indiscernible) find an

10   inflight manager?

11       FEMALE SPEAKER:      Normally, yes.        They're

12   along that wall over there, but they just

13   stepped out for about five minutes.

14       REBECCA BRIGHAM:      Okay.

15       FEMALE SPEAKER:      They should be back any

16   time now.

17       REBECCA BRIGHAM:      Okay.

18       FEMALE SPEAKER:      Now, did you want to talk

19   to like Kari Thompson who's the actual inflight

20   manager?     She is over there also.

21       REBECCA BRIGHAM:   Okay.

22       FEMALE SPEAKER:      She's just --

23       REBECCA BRIGHAM:      And do you know if

24   Stephanie's here?

25       FEMALE SPEAKER:      She's not in the office

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1299

FRONTIER AIRLINES (R. BRIGHAM) - 000133

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 4
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    today.      She's out on DIA (phonetic).

2         REBECCA BRIGHAM:      Okay.     Who's here?

3         FEMALE SPEAKER:      Jenny and Jeff --

4         REBECCA BRIGHAM:      Okay.

5         FEMALE SPEAKER:      -- are here today.

6         REBECCA BRIGHAM:      I'll wait.

7         FEMALE SPEAKER:      And they should be back

8    any time now, but there are little

9    (indiscernible) right there along the wall.

10        REBECCA BRIGHAM:      Awesome.     Thank you.

11        FEMALE SPEAKER:      Sorry.

12        REBECCA BRIGHAM:      No worries.

13        FEMALE SPEAKER:      Hi.

14        REBECCA BRIGHAM:      Hi.

15        FEMALE SPEAKER:      How are you?

16        REBECCA BRIGHAM:      I'm good.      How are you?

17        JEFF:      I'm good.     How are you?

18        REBECCA BRIGHAM:      Hi.

19        (Indiscernible.)

20        REBECCA BRIGHAM:      Yes, please.

21        FEMALE SPEAKER:      Sitting there

22    (indiscernible).

23        (Background conversation.)

24        REBECCA BRIGHAM:      Hi, Kari.

25        KARI:      You're quiet.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1300

FRONTIER AIRLINES (R. BRIGHAM) - 000132

BrighamR_Plaintiff Records 0633 (10.09.15)  **10/09/2015**                Page 5
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:      I just showed up to work

2    and they took my Dallas turn off.              I don't know

3    what to do anymore, Jeff.            I'm trying so hard

4    to do everything I'm supposed to be doing, and

5    leave of absence at every turn is just messing

6    everything up.        I called in for my four-day

7    because I can't do layovers.

8      KARI:      Right.

9      REBECCA BRIGHAM:      And I kept the Dallas

10   turn at the beginning, and they said that was

11   fine for scheduling 940 report.            So I show up

12   to work and it's -- I got on a bus and checked

13   my schedule and it wasn't there.            So I called

14   scheduling, and they're like, oh, I have it

15   noted in here that you were going to keep the

16   Dallas turn and then leave of absence contacted

17   us and took it off.          So you need to contact

18   leave of absence.        So --

19      JEFF:      Did you talk to them?

20      REBECCA BRIGHAM:      No, not yet.      I was just

21   right here obviously from being at the airport.

22   I'm just -- I don't know what to do.

23      JEFF:      Do you want to go down there?

24      REBECCA BRIGHAM:      What's that?

25      JEFF:      You want to go down there?

**H+G**  Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1301

FRONTIER AIRLINES (R. BRIGHAM) - 000133

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015              Page 6
REBECCA BRIGHAM v. FRONTIER AIRLINES

1        REBECCA BRIGHAM:        Yeah, after I kind of

2    compose myself.

3        KARI:        Let me get you some tissue.              It's

4    okay.

5        REBECCA BRIGHAM:        Kari, do you know of any

6    list that's going on?

7        KARI:        What's that?

8        REBECCA BRIGHAM:        Do you know any list

9    situation that's going on on Rebecca Brigham?

10   Okay.    As long as everybody's kind of in the

11   loop.    I just don't know what to do.              Just

12   figure out like why leave of absence took the

13   Dallas turn.        This was like -- I already have a

14   hard time getting hours.

15       KARI:        (Indiscernible).

16       REBECCA BRIGHAM:        I think Jeff is trying

17   to get ahold of leave of absence.              It fees like

18   at every turn everything I try to do, it seems

19   like leave of absence is just messing with me,

20   and it's not fair.        All I'm trying to do is

21   stay sober.        It's not fair.        I'm not senior to

22   hold turns, which is the problem.

23       KARI:        Right.

24       (Background noise.)

25       JEFF:        (Indiscernible) they have a

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001342

1    conference down there.

2       REBECCA BRIGHAM:      Okay.

3       JEFF:      I can't get ahold of any

4    (indiscernible).

5       REBECCA BRIGHAM:      I just don't know what

6    to do anymore, Jeff.

7       JEFF:      Okay.    (Indiscernible).          Okay?

8       REBECCA BRIGHAM:      Okay.    Sorry.

9       KARI:      It's okay.

10      MEREDITH:      Let's walk down there and see

11   (indiscernible) talk to somebody.          So you don't

12   feel like you know what's going on?          You just

13   showed up --

14      REBECCA BRIGHAM:      I feels like anything --

15   I showed up.      Nobody even called me to tell me

16   that I needed to contact leave of absence.  I

17   just showed up and it's like not even a

18   courtesy call.

19      JEFF:      Okay.    So removed per LOA.

20      MEREDITH:      Right.    Yep.    That's what she

21   was saying.

22      REBECCA BRIGHAM:      So and I don't know,

23   I've thrown all these options out there before

24   like can I start with a blank schedule, and

25   then it's my responsibility to build up to 60?

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1303

FRONTIER AIRLINES (R. BRIGHAM) - 000135

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 8
REBECCA BRIGHAM v. FRONTIER AIRLINES

```
 1    Can I work in the office for a while.              I mean,

 2    what can I do?         I've thrown all these options

 3    out, and just pretty much everybody just seems

 4    to know not what to do with me, basically.  I

 5    just don't know what to do.               It's getting so

 6    frustrating.

 7        MEREDITH:      If you don't mind me asking, do

 8    why you keep this job?           I mean, why -- if it

 9    doesn't really work for what you're trying to

10    accomplish, why are you keeping?

11        REBECCA BRIGHAM:        It works for me because

12    I love the people I work with and I do love the

13    job.     I just had two layovers and I like

14    working with the customers.             I still the

15    mentality of the old customer service.              I like

16    making people happy and I love the people I

17    work with.       This is like the perfect job for me

18    as long as I can just do day trips.

19        MEREDITH:      Right.

20        REBECCA BRIGHAM:        And it was able to be

21    okay for a while as long as I could pick up

22    enough, and then call out for my overnights but

23    keep the turns on either end.

24        MEREDITH:      Yeah.

25        REBECCA BRIGHAM:        And then I don't know
```

H+G  Hunter + Geist, Inc.  800.525.8490  scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1304

FRONTIER AIRLINES (R. BRIGHAM) - 0001304

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 9
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    what's going on.          I don't know if like they're

2    just trying to push me out and make me so

3    frustrated that I quit.

4         MEREDITH:       I actually, I don't think that

5    is the case at all, but, unfortunately.

6         REBECCA BRIGHAM:       Okay.

7         MEREDITH:       Part of the job that you love

8    is layovers and --

9         REBECCA BRIGHAM:       Right.

10        MEREDITH:       -- it's all by seniority.

11        REBECCA BRIGHAM:       Right, and I get it.

12        MEREDITH:       That's why I was asking like if

13   this is so incredibly stressful --

14        REBECCA BRIGHAM:       I don't know what else

15   to do.

16        MEREDITH:       Yeah.

17        REBECCA BRIGHAM:       I don't want to throw

18   myself for a loop in this whole recovery thing.

19   It's just insurance is through me.          My babies

20   can't have no insurance.

21        MEREDITH:       Yeah.    Okay.

22        REBECCA BRIGHAM:       I don't know what to do.

23        MEREDITH:       Have you ever looked at other

24   positions within the company, or you're not

25   interested in that?



H+G   Hunter + Geist, Inc.    800.525.8490     scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1305

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 10
REBECCA BRIGHAM v. FRONTIER AIRLINES

1        REBECCA BRIGHAM:       Well, I talked to

2    training at one point and thought that maybe I

3    could, or I just -- I don't know where to took

4    I don't know.

5        MEREDITH:       On ALTI PRO (phonetic).

6        REBECCA BRIGHAM:       Okay.

7        MEREDITH:       You go into ALTI PRO and the

8    job listings are there.

9        REBECCA BRIGHAM:       Okay.

10       MEREDITH:       And I would strongly suggest

11   like starting looking at it.

12       REBECCA BRIGHAM:       And see if there's

13   something.

14       MEREDITH:       And you want to look at it

15   every week because a lot of times jobs are only

16   posted for one week.

17       REBECCA BRIGHAM:       Okay.

18       MEREDITH:       So I would just get in the

19   habit, Rebecca, every Monday getting on there

20   and seeing what's new.

21       REBECCA BRIGHAM:       Seeing what's knew.

22       MEREDITH:       Every Monday and every Friday,

23   and see what's in there.

24       REBECCA BRIGHAM:       Right.

25       MEREDITH:       Because there's all these

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1306

FRONTIER AIRLINES (R. BRIGHAM) - 000138

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015          Page 11
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    different opportunities that you probably

2    aren't even aware of that exist.

3         REBECCA BRIGHAM:      Right.

4         MEREDITH:      Right?     And it might not

5    necessarily be inflight.

6         REBECCA BRIGHAM:      Right.

7         MEREDITH:      But there's, I mean, you know,

8    there's a lot happening.          So ...

9         REBECCA BRIGHAM:      Okay.

10        MEREDITH:      I mean, since you want to stay

11   with Frontier, and I know it's not the flight

12   attendant job, but --

13        REBECCA BRIGHAM:      Right.

14        MEREDITH:      -- I don't think it's going to

15   get easier with the schedules.

16        REBECCA BRIGHAM:      Right.     I know Denver is

17   just going -- I mean.

18        MEREDITH:      I mean, that's the reality of

19   what's happening --

20        REBECCA BRIGHAM:      Right.

21        MEREDITH:      -- with our base here.

22        REBECCA BRIGHAM:      Right, and I get it.

23        MEREDITH:      The schedules are not going to

24   get better as far as turns.

25        REBECCA BRIGHAM:      Right, and I get it.  I



Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001397

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 12
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    think it's just hard for me to let go of it,

2    you know?

3         MEREDITH:         Sure.      Sure.

4         REBECCA BRIGHAM:        Yeah.      I just don't

5    know.

6         MEREDITH:         But for your own health and

7    well-being maybe you need to start looking

8    (indiscernible).            So that you aren't constantly

9    having to go through this.                It's not worth it.

10   It's just not.

11        REBECCA BRIGHAM:        Yeah.

12        MEREDITH:         You know?

13        REBECCA BRIGHAM:        Right.

14        MEREDITH:         So maybe start looking at other

15   opportunities.

16        REBECCA BRIGHAM:        Okay.

17        MEREDITH:         But for right now let's try and

18   get you through the immediate.

19        REBECCA BRIGHAM:        Right.

20        MEREDITH:         Okay.     And?    We'll have Jeff

21   take you down there.

22        REBECCA BRIGHAM:        Okay.

23        MEREDITH:         And find out what the heck is

24   going on and --

25        REBECCA BRIGHAM:        Okay.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1308

FRONTIER AIRLINES (R. BRIGHAM) - 000140

1      MEREDITH:        -- why you were removed and,

2   you know, you deserve to have an answer on

3   that.

4      Right.

5      MEREDITH:        And I don't know.          I seriously

6   have no idea.

7      REBECCA BRIGHAM:      Okay.

8      MEREDITH:     So.    Okay?

9      REBECCA BRIGHAM:      Awesome.    Thank you.

10     MEREDITH:     Uh-huh.    I'm proud of you.

11     REBECCA BRIGHAM:      Thank you.

12     MEREDITH:     What you've done is super

13  courageous.

14     REBECCA BRIGHAM:      Thank you.

15     MEREDITH:     It really is.

16     REBECCA BRIGHAM:      Thanks.    It's hard right

17  now.    Thank you, Meredith.

18     MEREDITH:     Uh-huh.    Yeah.

19     REBECCA BRIGHAM:      Thank you.    Thank you.

20     MEREDITH:     Uh-huh.    Okay.    Go on down

21  there and see what's going on.          Okay?    If you

22  need anything, let me know.

23     REBECCA BRIGHAM:      Thank you so much, Kari.

24  I'll move your chair back.

25     MEREDITH:     No, it's okay.          I just have to

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1309

FRONTIER AIRLINES (R. BRIGHAM) - 0001419

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 14
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    leave it out there because it's crowded

2    (indiscernible).

3        REBECCA BRIGHAM:       Thank you.

4        (Indiscernible).

5        REBECCA BRIGHAM:       And nobody's answering?

6    Okay.

7        (Indiscernible).

8        REBECCA BRIGHAM:       Ah-huh.     Yeah, I called

9    them (indiscernible).

10       Just what everybody (indiscernible) get

11   like besides you .

12       (Walking.) (Background conversation.)

13       (Background noise.)

14       REBECCA BRIGHAM:       (Indiscernible).

15       JEFF:      Oh, (indiscernible).

16       REBECCA BRIGHAM:       Hi.

17       JEFF:      This is our new (indiscernible)

18   supervisor.

19       How are you?        Good to see you.

20   (Indiscernible).

21       FEMALE SPEAKER:       I guess so.       I got the

22   easiest thing wrong.           (indiscernible) A, D and

23   F or A, D and E.         I don't mind getting

24   something wrong if it's (indiscernible) or

25   tricky.

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1310

FRONTIER AIRLINES (R. BRIGHAM) - 000142

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 15
REBECCA BRIGHAM v. FRONTIER AIRLINES

1       FEMALE SPEAKER:        (Indiscernible).

2       JEFF:       (Indiscernible) Meredith.               This is

3   our new tracking supervisor.                  She's going

4   through initial too.            So ...

5       REBECCA BRIGHAM:        Nice.

6       JEFF:       So, yeah.

7       FEMALE SPEAKER:        It's been fund.          A really

8   good experience so far.

9       REBECCA BRIGHAM:        Good.

10      FEMALE SPEAKER:        How long have you been

11  with Frontier?

12      REBECCA BRIGHAM:        Eight-and-a-half years.

13      FEMALE SPEAKER:        Wow.    That's a long time.

14  I was telling (indiscernible) that, I'm like it

15  says something if everyone's been here like a

16  while, you know?

17      JEFF:       Yeah.

18      FEMALE SPEAKER:        How's your morning going?

19      JEFF:       Busy.    You know, I can't believe

20  it's 9:30 and I've been here for two-and-a-half

21  hours already.

22      FEMALE SPEAKER:        It could be worse.          You

23  could be at the airport, right.

24      JEFF:       (Indiscernible).

25      FEMALE SPEAKER:        Okay.

H+G  Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 000143

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015              Page 16
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:       So (indiscernible) meeting in two

2    hours.

3      FEMALE SPEAKER:       Uh-huh.

4      JEFF:       I was going to ask you real quick

5    because Kari had asked me yesterday, did Rich

6    train you at all on that?                I know --

7      FEMALE SPEAKER:       I know how to do open

8    call.

9      JEFF:       (Indiscernible).

10      FEMALE SPEAKER:       Yeah, he kind of touched

11    on it.      I know it has to be done and that's

12    kind of like a gray area for me, because I'm

13    not like -- do you determine like where it

14    should be coded to, or is that something --

15    it's a gray area.            So, no, I need more.

16      JEFF:       Inflight kind of -- he just kind of

17    threw it on me.        I mean, not in a bad way.

18    It's just of (indiscernible).

19      FEMALE SPEAKER:       Right.

20      JEFF:       (Indiscernible).         So -- she -- I

21    said I would ask you.

22      FEMALE SPEAKER:       I mean, I don't mind

23    doing it once I get, you know, settled and into

24    my routine.

25      JEFF:       (Indiscernible).

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001452

BrighamR_Plaintiff Records 0633 (10.09.15)   **10/09/2015**                    Page 17
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    FEMALE SPEAKER:     Yeah, I think so.

2    JEFF:     So I'm just --

3    FEMALE SPEAKER:     That was the impression I

4    got.

5    JEFF:     (Indiscernible) getting to.              So

6    we'll touch base once you get --

7    FEMALE SPEAKER:     You don't want to keep

8    doing it?

9    JEFF:     I don't mind it but I'm just

10   (indiscernible).

11   FEMALE SPEAKER:     Yeah.

12   JEFF:     (Indiscernible).

13   FEMALE SPEAKER:     Yeah.    Yeah.    Yeah.

14   Right.     Right.

15   JEFF:     Because you start so much earlier.

16   FEMALE SPEAKER:     Right.    Right.    It makes

17   sense.    Yeah, it makes sense.          That's fine.

18   I'm there for eight hour anyways, right?

19   JEFF:     (Indiscernible).

20   FEMALE SPEAKER:     Yeah, we'll connect.

21   JEFF:     Get together.

22   FEMALE SPEAKER:     Okay.

23   JEFF:     Okay.

24   FEMALE SPEAKER:     I don't want to keep you

25   guys.    It was nice meeting you.

**H+G**   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1313

FRONTIER AIRLINES (R. BRIGHAM) - 000453

145

1      REBECCA BRIGHAM:      Nice to meet you.

2      JEFF:      So, yeah.

3      FEMALE SPEAKER:      Okay.

4      JEFF:      Anyway.

5      FEMALE SPEAKER:      So are you just hanging

6   out today or are you for the (indiscernible?)

7      REBECCA BRIGHAM:      No, just dealing with

8   leave of absence stuff.

9      FEMALE SPEAKER:      Oh.

10      JEFF:      (Indiscernible).

11      FEMALE SPEAKER:      How's your little puppy?

12      JEFF:      Good.

13      REBECCA BRIGHAM:      Do you have pictures?

14      JEFF:      (Indiscernible).

15      FEMALE SPEAKER:      I know.      How sweet,

16   though.

17      JEFF:      I'll show you the dog sitter from

18   yesterday.

19      FEMALE SPEAKER:      You have a dog sitter

20   every day, or do you take him to doggy daycare?

21      JEFF:      Oh, she comes by.

22      FEMALE SPEAKER:      Oh, okay.

23      JEFF:      She's usually available.          She's a

24   flight attendant for Southwest.

25      FEMALE SPEAKER:      Do you crate train, or

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1314

FRONTIER AIRLINES (R. BRIGHAM) - 0001494

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 19
REBECCA BRIGHAM v. FRONTIER AIRLINES

1   no?

2       JEFF:        Uh-huh.

3       FEMALE SPEAKER:      You do.

4       JEFF:        Yeah, but (indiscernible) with the

5   dog sitter yesterday.

6       REBECCA BRIGHAM:       Oh.

7       FEMALE SPEAKER:       Oh.    It's cute. Gosh,

8   it's grown a lot, huh?

9       JEFF:       She's 14 pounds.

10      FEMALE SPEAKER:      Is she really?          Did you

11   see that video that was on the news about a

12   little French bulldog chasing bears off the --

13      JEFF:        Yeah.

14      REBECCA BRIGHAM:      Yes.

15      FEMALE SPEAKER:       I thought of you.

16      JEFF:       I know.     That would be totally

17   like -- now, her I'm not so much sure yet, but

18   the older French bulldog.

19      FEMALE SPEAKER:       Uh-huh.      Oh, my gosh.  I

20   like your couch or your chair.

21      JEFF:        Thank you.

22      FEMALE SPEAKER:       Is that not a sweet

23   picture?      I'm a dog lover.

24      REBECCA BRIGHAM:       Are you?

25      FEMALE SPEAKER:       Oh, my God, how cute.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1315

FRONTIER AIRLINES (R. BRIGHAM) - 000147

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015        Page 20
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:        So she has talks with her and tries

2    to tell her that, you know, this is what you

3    need to do, or it's time to go pee.                    So ...

4    because she's stubborn.

5        FEMALE SPEAKER:       How are the other ones

6    adjusting to her?

7        JEFF:        Good.     The older (indiscernible) is

8    kind of more like we'll maybe play or we maybe

9    won't.

10       FEMALE SPEAKER:       Yeah, I'll get back to

11   you on that.

12       JEFF:        Yeah.

13       FEMALE SPEAKER:      Cute.     Cute.     Cute.

14       JEFF:        Isn't that funny?

15       FEMALE SPEAKER:      Yes.

16       REBECCA BRIGHAM:       How many in this class?

17       FEMALE SPEAKER:       I think it started out

18   like originally when the all the invites went

19   out, I think it was like mid 70s or --

20       REBECCA BRIGHAM:       Wow.

21        FEMALE SPEAKER:   But then it dropped down

22   to I think maybe 65 showed, and then I think

23   now it's probably in the low 50s, high -- I

24   don't know.         I tried to count, but I get

25   distracted.

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 000148

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 21
REBECCA BRIGHAM v. FRONTIER AIRLINES

1       JEFF:        My class was 18, and I think

2    there's four of us left.

3       FEMALE SPEAKER:       Really?

4       JEFF:       Uh-huh.

5       FEMALE SPEAKER:       Wow.    And I guess next

6    month there's like 75 scheduled or 80.

7       REBECCA BRIGHAM:       Wow.

8       JEFF:        Think we started with 18 and we

9    graduated 15 or something.

10      REBECCA BRIGHAM:       Wow.

11      FEMALE SPEAKER:       Wow.    Yeah.

12      REBECCA BRIGHAM:       Because at the time we

13   had like a big class.        I think we had like

14   almost 50.

15      JEFF:       Did you?

16      REBECCA BRIGHAM:       And then we graduated

17   like 42.

18      JEFF:       I was one of those little filler

19   classes (indiscernible).        You know, those kind

20   of like -- kind of just for a little attrition.

21      REBECCA BRIGHAM:       Yeah.

22      FEMALE SPEAKER:       Yeah.    Yeah.    Yeah.

23   Yeah.

24      JEFF:       But everything was all Denver, you

25   know.     (Indiscernible).

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001497

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                 Page 22
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:        Yeah.

2      FEMALE SPEAKER:       Yeah.     Yeah.     Yeah.

3      So is Kari here today?

4      JEFF:       Yeah.

5      FEMALE SPEAKER:       Oh, she is.

6      REBECCA BRIGHAM:        Good.     How you are?

7      JEFF:       Yeah, so ...

8      FEMALE SPEAKER:       Everything's going good,

9      though.      (Indiscernible) I've been away from

10     home now for I guess four weeks already.                 Yeah,

11     so because they had training (indiscernible)

12     Chicago and then these guys and that got turned

13     into initial.

14     JEFF:       She's a jack-of-all-trades.

15     REBECCA BRIGHAM:        Nice.     You kind of have

16     to be a manager.

17     FEMALE SPEAKER:       Yeah.     Yeah.     Yeah.

18     Yeah.      So I just hope I don't forget everything

19     I learned before I went through initial, you

20     know, but they taught me and stuff.                Which I

21     don't think -- I think it's pretty -- it's just

22     repetitive, once I do it a few times.

23     REBECCA BRIGHAM:        It will be like riding a

24     bike.

25     FEMALE SPEAKER:       Right.

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1318

FRONTIER AIRLINES (R. BRIGHAM) - 0001558

1     REBECCA BRIGHAM:      Like, oh, I do remember

2     that.

3     FEMALE SPEAKER:      Yeah.     Yeah.     Yeah.

4     Yeah.

5     JEFF:      I did the same as you, though.  I

6     started as manager and then --

7     FEMALE SPEAKER:      Had to get through

8     initial.

9     JEFF:      Yep, so it was funny because I had

10    started and all of a sudden, oh, you didn't go

11    through initials I was like.

12    REBECCA BRIGHAM:      What?

13    JEFF:      Okay.    Because I didn't know when

14    because there were really no classes, and all

15    of sudden (indiscernible).

16    REBECCA BRIGHAM:      So now have you actually

17    ever flown, Jeff?

18    JEFF:      Not the line.

19    REBECCA BRIGHAM:      Not the line.

20    FEMALE SPEAKER:      Never?    Never?

21    REBECCA BRIGHAM:  You're (indiscernible).

22    (Talking simultaneously.)

23    JEFF:      Yep.

24    FEMALE SPEAKER:      No kidding?

25    JEFF:      Yes.

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                Page 24
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    REBECCA BRIGHAM:        Now, if you wanted to,

2    could you?

3        JEFF:        Uh-huh.

4    REBECCA BRIGHAM:        Okay.    Good.    Good.

5        JEFF:        Because I was Midwest and Republic

6    (indiscernible) Frontier so I actually flew for

7    Republic on Sunday night and started with

8    Frontier on (indiscernible).

9    FEMALE SPEAKER:        Did you really?

10       JEFF:        Uh-huh.

11   REBECCA BRIGHAM:        Nice.

12       JEFF:        I finished my classes

13   (indiscernible) flying Republic on a Sunday

14   night turn.

15   FEMALE SPEAKER:        Oh, wow.

16   REBECCA BRIGHAM:        That's cool.

17   FEMALE SPEAKER:        Do you miss it, or not

18   really?

19       JEFF:        The line?

20   FEMALE SPEAKER:        Yes.

21       JEFF:        Pros and cons.

22   REBECCA BRIGHAM:        Yeah.

23   FEMALE SPEAKER:        Yeah.    Yeah.

24       JEFF:        You know?

25   FEMALE SPEAKER:        Yeah.

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1320

FRONTIER AIRLINES (R. BRIGHAM) - 000152

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 25
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:      So some days you'll be like

2    (indiscernible) miss the line and then there's

3    other times where you're like well

4    (indiscernible).

5      FEMALE SPEAKER:      Right.      Yeah, it's apples

6    and oranges.      Yeah.      Yeah.      Yeah.      I think it's

7    really -- I came from -- well, majority of

8    where I was at, U.S. Airways, but I came from

9    regional, I was a base manager there

10    (indiscernible),              but um, and I absolutely did

11    not like flying the box and all of that.              You

12    know.

13      REBECCA BRIGHAM:      Yeah.

14      FEMALE SPEAKER:      That was just -- that's

15    why I wanted get into the office, but now, you

16    know, through initial I'll get that nostalgia.

17    Like, the jets and the crew, and, you know, all

18    of that.        This is (indiscernible), you know,

19    so.      But, yeah.

20      JEFF:      That's kind of my (indiscernible)

21    with Republic is, you know, they brought in

22    (indiscernible), you know, because took over

23    (indiscernible) from Frontier.

24      REBECCA BRIGHAM:      Yeah.

25      JEFF:      And so you had dual.        You had jets

**H+G**   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1321

FRONTIER AIRLINES (R. BRIGHAM) - 000153

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 26
REBECCA BRIGHAM v. FRONTIER AIRLINES

1     and --

2          REBECCA BRIGHAM:      And the props.

3          FEMALE SPEAKER:      And the probs, yeah.

4          JEFF:      (Indiscernible) two flight

5     attendants and see (indiscernible).

6          FEMALE SPEAKER:      See, that's fun.          We had

7     (indiscernible).          So loud, noisy,

8     (indiscernible).

9          REBECCA BRIGHAM:      Yeah.

10         JEFF:      And honestly (indiscernible).

11         REBECCA BRIGHAM:      Yeah.     Yeah.     Yeah.

12    Yeah.

13         JEFF:      (Indiscernible) rows.          So

14    (indiscernible).

15         REBECCA BRIGHAM:      Yeah.

16         FEMALE SPEAKER:      (Indiscernible), but

17    they're a lot more quiet today.

18         JEFF:      They are.

19         FEMALE SPEAKER:      You know?

20         JEFF:      Uh-huh.

21         FEMALE SPEAKER:      Like, a lot more quite.

22    So ...

23         JEFF:      I actually miss flying into all the

24    mountain communities.

25         FEMALE SPEAKER:      Do you really?

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001582

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 27
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:      It's so beautiful.

2      FEMALE SPEAKER:      Yeah.    Yeah.

3      REBECCA BRIGHAM:      I bet.      I bet you don't

4    miss like the Aspen people or, no, what is

5    Vail?      Vail people.

6      JEFF:        Oh, they're awful.

7      FEMALE SPEAKER:      Are they really high

8    maintenance?

9      REBECCA BRIGHAM:      Yeah.

10      FEMALE SPEAKER:      Really high maintenance.

11      REBECCA BRIGHAM:      Like the do everything

12    for me you servants.        It's their attitude.

13      JEFF:      To be honest with you, I know this

14    sounds bad, but I just basically steered clear

15    of them and just did the (indiscernible) safety

16    things that would jeopardize their safety.

17      FEMALE SPEAKER:      Right.

18      JEFF:        That's all that I basically

19    enforced the codes (indiscernible).

20      REBECCA BRIGHAM:      Yeah.

21      FEMALE SPEAKER:      Uh-huh.

22      JEFF:        It's not worth it, you know?

23      REBECCA BRIGHAM:      It's like how I deal

24    with my daughter.          Seriously.

25      FEMALE SPEAKER:      How old is she?

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1323

FRONTIER AIRLINES (R. BRIGHAM) - 0001553

BrighamR_Plaintiff Records 0633 (10.09.15)   **10/09/2015**                    Page 28
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:      Five.

2      FEMALE SPEAKER:      Oh, gosh.

3      REBECCA BRIGHAM:      And then I have a

4   two-and-a-half year old.            So it's like, what.

5      FEMALE SPEAKER:      Do you really?

6      JEFF:      And the funniest thing is, we had

7   first class on those we had three year old in

8   first class.

9      REBECCA BRIGHAM:      Oh, you did?

10     JEFF:      So it was one seat, maybe two and

11   (indiscernible) first class service

12   (indiscernible).

13     FEMALE SPEAKER:      Yeah.

14     JEFF:      (Indiscernible) you had to do a

15   first class service even on the mountain

16   routes.

17     REBECCA BRIGHAM:      Wow.

18     FEMALE SPEAKER:      And it's pretty quick,

19   huh.

20     JEFF:      Yeah, like 30 minutes.            Serve

21   cocktails as you're bouncing around, you know.

22     REBECCA BRIGHAM:      Right.      30 minutes,

23   right?      Was it about 30 minutes?

24     JEFF:      Yeah.

25     FEMALE SPEAKER:      Yeah.      Yeah.

**H+G**   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1324

FRONTIER AIRLINES (R. BRIGHAM) - 0001564

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 29
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:      Just tossing a bunch of

2      stuff, serve yourself.

3      JEFF:      You have to give them you know,

4      (indiscernible).

5      REBECCA BRIGHAM:      Really?

6      JEFF:      Yes, on a prop (indiscernible).

7      FEMALE JEFF:      It's out of control.

8      JEFF:      I know.

9      FEMALE SPEAKER:      Out of control.

10     JEFF:      That's that, I don't care.          You

11     know?

12     FEMALE JEFF:      Yeah.    Yeah.    Yeah.

13     JEFF:      Then you have to hang up, you know,

14     their coats in the (indiscernible).

15     FEMALE SPEAKER:      And now look what you're

16     doing.

17     JEFF:      Right.

18     FEMALE SPEAKER:      Just makes you love your

19     job (indiscernible).

20     JEFF:      Uh-huh.

21     FEMALE SPEAKER:      You're like now I know

22     why I do this.

23     JEFF:      Yep.

24     REBECCA BRIGHAM:      What could have been.

25     JEFF:      It was funny because they are like,

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001575

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                Page 30
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    oh, you know, the probs are coming.                I was

2    like, you're kidding me there's (indiscernible)

3    on this.

4        FEMALE SPEAKER:      Uh-huh.     What year was

5    this?

6        JEFF:      Oh, this was just up until three

7    years ago.

8        FEMALE SPEAKER:      Oh, really?

9        JEFF:      They sill have them.

10       FEMALE SPEAKER:      Do they have express?

11   Who does their express line?

12       JEFF:       (Indiscernible).

13       REBECCA BRIGHAM:      We used to have links.

14   We used to have links.

15       FEMALE SPEAKER:      Okay.     Maybe that's what

16   I was thinking.

17       JEFF:       Yep.

18       FEMALE SPEAKER:      But that's no longer?

19       JEFF:       Huh-uh.

20       REBECCA BRIGHAM:      No.

21       JEFF:       And that's when Republic took over,

22   they bought all their equipment.                The propeller

23   (indiscernible) and they flown their routes.

24       REBECCA BRIGHAM:      Uh-huh.     Yeah.     There

25   for a while, when it seemed more like it was

H+G   Hunter + Geist, Inc.   800.525.8490     scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1326

FRONTIER AIRLINES (R. BRIGHAM) - 000158

1    going to be a merger when everybody was like,

2    oh, well, you know, like it's all going to be

3    one, and that went through that phase.

4        JEFF:       Which was --

5        REBECCA BRIGHAM:      And then they dissolved

6    links.

7        JEFF:       (Indiscernible) nice routes to

8    Colorado (indiscernible) Springs, you know,

9    Durango and all that.

10       REBECCA BRIGHAM:      I had a girlfriend who

11   just did Colorado Spring stand ups.              It's like

12   nice.

13       JEFF:       Uh-huh.

14       REBECCA BRIGHAM:      Yeah.

15       JEFF:       Yep.    Uh-huh.    (indiscernible).

16       REBECCA BRIGHAM:      Yeah.

17       JEFF:       We actually flew the jet, the 190.

18       REBECCA BRIGHAM:      Where?

19       JEFF:       In Colorado Springs.

20       FEMALE SPEAKER:      Oh, really?

21        REBECCA BRIGHAM:  Yeah.

22       FEMALE SPEAKER:      Remember when we did

23   that?

24       REBECCA BRIGHAM:      Uh-huh.

25       JEFF:       And that seated 99 people.

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1327

FRONTIER AIRLINES (R. BRIGHAM) - 000159

1      FEMALE SPEAKER:        Wow.

2      REBECCA BRIGHAM:        Wow.

3      FEMALE SPEAKER:        Rebecca, what kind of

4   flights do you prefer to do?

5      REBECCA BRIGHAM:        Day trips.

6      FEMALE SPEAKER:        (Indiscernible) ones?

7      REBECCA BRIGHAM:        Yeah.

8      FEMALE SPEAKER:        Yeah.    Yeah.    Yeah.

9      REBECCA BRIGHAM:        And I try to avoid New

10   York.

11      FEMALE SPEAKER:        Uh-huh.

12      REBECCA BRIGHAM:        Just because they're

13   so -- I'm so much like bubblier and friendlier

14   than they are that they totally try to take

15   advantage of me.        You have to be like

16   (indicating).

17      FEMALE SPEAKER:        Yeah, you have to be

18   their mentality.

19      REBECCA BRIGHAM:        Yes.

20      JEFF:        You do.

21      REBECCA BRIGHAM:        And it's hard for me.

22      FEMALE SPEAKER:        I know, right?        I know,

23   I'm the same way, right?            But once you do that

24   they're fine.        They're like, you know, you put

25   them in their place.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1328

FRONTIER AIRLINES (R. BRIGHAM) - 0001968

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 33
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:        I (indiscernible) was a LaGuardia

2      server.

3      FEMALE SPEAKER:       Oh, really?

4      JEFF:        Isn't that too funny.

5      REBECCA BRIGHAM:       Oh, my gosh.

6      JEFF:        I had the morning LaGuardia.

7      REBECCA BRIGHAM:       Yeah, I mean, it's not

8      awful, I just, I prefer to be happy.

9      FEMALE SPEAKER:       Right.    Yeah.    Yeah.

10     JEFF:        I'll never forget my

11     (indiscernible) for Midwest was LaGuardia and

12     I'll never forget because we had to use a tray

13     that (indiscernible), because, you know, we

14     were all first class in Midwest, and as I

15     served (indiscernible), stuff like boom.                    Did

16     you see that?       I was trying to be nice and --

17     FEMALE SPEAKER:       Stuff out of their way.

18     JEFF:        But I wasn't used to New York.

19     Okay.    That's the way they are.

20     REBECCA BRIGHAM:       Try doing -- this is my

21     worst when I was with U.S. Airways.              Is

22     LaGuardia to West Palm beach.

23     FEMALE SPEAKER:       Oh, my God.      Oh, talk

24     about high maintenance.

25     REBECCA BRIGHAM:       What's the one that we

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1329

FRONTIER AIRLINES (R. BRIGHAM) - 0001019

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015          Page 34
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    have now, it's like Atlanta, LA.

2         FEMALE SPEAKER:       Uh-huh.

3         REBECCA BRIGHAM:      I've head horror stories

4    about that.

5         FEMALE SPEAKER:       The thing is, you just

6    have to laugh because you're like I cannot

7    believe this behavior?          You know?

8         REBECCA BRIGHAM:      Right.

9         FEMALE SPEAKER:       You just have to find it

10   comical and not take it personally.

11        REBECCA BRIGHAM:      And I do, I find myself

12   talking to passengers sometimes --

13        JEFF:      Hi, guys.

14        FEMALE SPEAKER:       There she is.

15        REBECCA BRIGHAM:      Hi.

16        JEFF:      How are you?

17        REBECCA BRIGHAM:      Talking to passengers

18   like I'm talking to my child.

19        FEMALE SPEAKER:       (Indiscernible).        I'm

20   sorry, I see HR coming (indiscernible).             What

21   did I do?

22        REBECCA BRIGHAM:      No, they're here for me.

23   You're fine.

24        JEFF:      Tough (indiscernible).

25        REBECCA BRIGHAM:      Just ghetto.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 000162

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 35
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JEFF:        Don't think they have to abide by

2    anything.

3      REBECCA BRIGHAM:        Anything.

4      JEFF:        Yeah.

5      REBECCA BRIGHAM:        So.

6      FEMALE SPEAKER:        What are you doing this

7    weekend?

8      JERRY:        Do you have a second?

9      REBECCA BRIGHAM:        I do.

10      FEMALE SPEAKER:        It's nice talking to you.

11    Nice meeting you.

12      REBECCA BRIGHAM:        Bye.

13      JEFF:        See you later.

14      JERRY:        (Indiscernible) conference room.

15      REBECCA BRIGHAM:        Okay.

16    Thanks.

17      JERRY:        So what's going on?

18      REBECCA BRIGHAM:        I just, I showed up to

19    work this morning for my Dallas turn, and I got

20    on a bus to check my Flicka (phonetic).

21      JERRY:        Yeah.

22      REBECCA BRIGHAM:        And it was just gone.

23    It sort of like -- I'm going to start crying

24    again.     I'm sorry.

25      JERRY:        That's okay.        So we were looking

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1331

FRONTIER AIRLINES (R. BRIGHAM) - 000163

1    at your schedule, but you didn't have a Dallas

2    turn.

3        REBECCA BRIGHAM:      There was a Dallas turn

4    in the beginning of the (indiscernible).

5        JERRY:      We were looking on there and it

6    looks like the trip never came back to Denver.

7        REBECCA BRIGHAM:      No, there was just a

8    Dallas turn.        It was Denver, Dallas, Dallas,

9    Denver and then it was go back to Dallas and

10   then to Cleveland.

11       JERRY:      Got it.      So let's look at your

12   schedule.

13       REBECCA BRIGHAM:      Is that --

14       JERRY:      Uh-huh.

15       REBECCA BRIGHAM:      Yeah, there was a Dallas

16   turn at the very beginning.

17       JERRY:      That's the --

18       REBECCA BRIGHAM:      No, it was a four leg.

19   It was four-leg day.

20       JERRY:      Go really quick.        I'm going to go

21   look it up.

22       REBECCA BRIGHAM:      Okay.

23       MEREDITH:      Where do you want to sit, Joe?

24       JEFF:      I'm just texting -- I forgot who

25   I'm working with.        Jenny.    Isn't that terrible

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1332

FRONTIER AIRLINES (R. BRIGHAM) - 000164

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015               Page 37
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    when you have so many (indiscernible).

2         REBECCA BRIGHAM:        Right.      Just let her

3    know what's going on.           Okay.     Don't cry.        Don't

4    cry.     Don't cry.

5      JEFF:        Sorry.     I'm just going through

6    emails.      So in the time I've been away, 17

7    emails have come through.

8         REBECCA BRIGHAM:        Oh, my God.

9      JEFF:      Isn't the (indiscernible).                The

10   amount of emails we get is ridiculous.

11        REBECCA BRIGHAM:        Is it from flight

12   attendants.

13     JEFF:       No, it's just everything.

14        REBECCA BRIGHAM:        Oh.

15     JEFF:       Some are fight attendants, some are

16   delays.      Some are -- it's just amazing.

17        REBECCA BRIGHAM:        It hasn't even been a

18   half an hour.

19        JEFF:      No.     Like you miss a day of work

20   and it could be a 100, a 113.

21        REBECCA BRIGHAM:        Now, do you have access

22   so that you can check it home if you need to?

23     JEFF:       Yeah.

24        REBECCA BRIGHAM:        Okay.

25     JEFF:       From ...      How are the kiddos?

H+G   Hunter + Geist, Inc.    800.525.8490     scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 000165

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015          Page 38
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:        They're good.

2      JEFF:        Yeah?

3      REBECCA BRIGHAM:        Tulley (phonetic) is in

4      preschool.        Case (phonetic) is, oh, my gosh,

5      he's two-and-a-half, but like he doesn't really

6      talk.        He uses like eh, eh.            Like, he'll use

7      words like mommy, dadda.            Like, oh, my God,

8      it's just at that frustrating point.  I

9      remember the point when my daughter was right

10     there.

11     JEFF:        Uh-huh.

12     REBECCA BRIGHAM:        It's like use your

13     words.

14     JEFF:        Uh-huh.      Well, it's -- that's kind

15     of ironic that you say that because I'm good

16     friends with the breeder of our newest puppy,

17     and she's frustrated because her daughter

18     started kindergarten and she's not good with

19     words, and they tried speech therapists.

20     REBECCA BRIGHAM:        Gotcha.

21     JEFF:        And they said it will come in time.

22     She tends not -- she's always like use your

23     words, why you -- you know.

24     REBECCA BRIGHAM:        Right.

25     JEFF:        And it's not like she has like a

Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

FRONTIER AIRLINES (R. BRIGHAM) - 0001664

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 39
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    disability.

2        REBECCA BRIGHAM:       Uh-huh.

3        JEFF:       But she's just --

4        REBECCA BRIGHAM:       She's just quiet?

5        JEFF:       No.

6        REBECCA BRIGHAM:       No?

7        JEFF:       She's vocal, but she doesn't want

8    to use her words.

9        REBECCA BRIGHAM:       She just vocalizes it

10   like, uhh, errr (phonetic).

11       JEFF:       Right.

12       REBECCA BRIGHAM:       Yeah.     Every time we

13   catch my daughter doing stuff like that --

14       JEFF:       And Gary's like, Gary's like is

15   something wrong with her, you know.

16       REBECCA BRIGHAM:       Like, no, that's how she

17   communicates.

18       JEFF:       Yeah.

19       REBECCA BRIGHAM:       Yeah, because baby's, I

20   mean, that's their only way to communicate is

21   by crying and --

22       JEFF:       Yep.

23       REBECCA BRIGHAM:       And they have all their

24   different cries for hungry sad, sick.                    You

25   know?

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1335

FRONTIER AIRLINES (R. BRIGHAM) - 000197

1      JEFF:       Yeah.

2      REBECCA BRIGHAM:       And it takes awhile for

3    them to break out of that.

4      JEFF:       Yeah.

5      REBECCA BRIGHAM:       Because my daughter will

6    still do like the whiney voice when she wants

7    something.

8      JEFF:       Uh-huh.

9      REBECCA BRIGHAM:       And I just ignore her

10   until she starts talking normal.

11     JEFF:       Exactly.

12     REBECCA BRIGHAM:     I'm like, I don't

13   understand you when you talk like that.

14     Do I have mascara all over my face?

15     JEFF:       No, I would have told you.

16     REBECCA BRIGHAM:     Okay.    I would hope so.

17     JEFF:       And boogers in the cave -- bats in

18   the cave.

19     REBECCA BRIGHAM:     Bats in the cave.

20     JEFF:       That's what I would always flying

21   in the line, I was always like --

22     REBECCA BRIGHAM:     Worried about.

23     JEFF:       Please tell me if I do.

24     REBECCA BRIGHAM:     Right.    Or if you like

25   you just got done eating and you have something

BrighamR_Plaintiff Records 0633 (10.09.15)  **10/09/2015**                              Page 41
REBECCA BRIGHAM v. FRONTIER AIRLINES

1   on your cheek.

2       JEFF:        Yeah, like a seed in your teeth or

3   something.      Oh, I had that in there.

4       REBECCA BRIGHAM:       Right.      I always drink

5   those chia and water drinks.

6       JEFF:        Uh-huh.

7       REBECCA BRIGHAM:       And, yeah, I'll like

8   feel them.      Like, oh, my God, how long has that

9   been in there.

10      JEFF:        Yeah, you step in the lav and

11  you're like.

12      REBECCA BRIGHAM:       Yeah.

13      JEFF:        Go in the bathroom, like oh, my

14  God.

15      REBECCA BRIGHAM:       Oh, my God, I just did

16  that the safety demo or your like your fly is

17  down.

18      JEFF:        All right.        The hole service.

19      REBECCA BRIGHAM:       And smiling.

20      JEFF:        Uh-huh.

21       REBECCA BRIGHAM:  Yeah.

22      JEFF:        I look like a hillbilly.

23      REBECCA BRIGHAM:       Here's your flight

24  attendant for the day.

25      JEFF:        Yep, exactly.        I'm from Denver.

**H+G**  Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1337

FRONTIER AIRLINES (R. BRIGHAM) - 000497

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 42
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:      Too funny.      Yeah, I

2   just, I don't know what else I'd want to do,

3   Jeff, and this gives me enough time off because

4   I'm going to start school in November, and this

5   job --

6      JEFF:       (Indiscernible) the office job.

7      REBECCA BRIGHAM:      Yeah.

8      JEFF:      You lose so much time off.

9      REBECCA BRIGHAM:      Do you?

10      MEREDITH:      Yeah.    I feel like, God, I get

11   up, I come to work, I go home, eat dinner, and

12   I go to.      Bed I'm like it's five days a week.

13      REBECCA BRIGHAM:      Yeah.

14      JEFF:      Like, oh, my God.

15      REBECCA BRIGHAM:      Yeah.

16      JEFF:      You know, I so look forward to my

17   weekends and it's like shit, Sunday night, I

18   have to go no work again.

19      REBECCA BRIGHAM:      Uh-huh, see, that's what

20   I don't want.

21      JEFF:      Your flexibility is all gone.

22      REBECCA BRIGHAM:      Yeah.    That's why I want

23   to keep doing turns if I can, because then I'll

24   be able to go back to school, and in 22 months

25   have my degree and --

1338

FRONTIER AIRLINES (R. BRIGHAM) - 000170

1      JEFF:        What are you looking for?

2      REBECCA BRIGHAM:        To become a naturopath.

3   So it's like a natural doctor using the body

4   and different herbs in nature to cure the body

5   naturally.        Rather than using pharmaceutical

6   drugs.       So on ND program is 22 months, and then

7   after that you get your master herbalist and

8   then you get your acupressure, and then there

9   is one other at the very end.

10     JEFF:        Is that like the needles, like

11  acupuncture.

12     REBECCA BRIGHAM:        That's acupuncture.

13  Acupressure is just pressure.

14     JEFF:        Oh.

15     REBECCA BRIGHAM:        It's sort of like a

16  massage using pressure points, yeah, to cure

17  different ailments.              Which has always

18  interested me and I've been reading --

19     JEFF:        Does that help with migraine?

20     REBECCA BRIGHAM:        Uh-huh.      Yeah, like you

21  can do natural stuff.

22     JEFF:        (Indiscernible).

23     JERRY:        All right.        I tried to establish

24  what happened.

25     REBECCA BRIGHAM:        Okay.

FRONTIER AIRLINES (R. BRIGHAM) - 0001719

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 44
REBECCA BRIGHAM v. FRONTIER AIRLINES

1       JERRY:      So I think from what we get to see

2   (indiscernible).

3       MEREDITH:      I'm sitting here

4   (indiscernible).

5       JEFF:      Oh.    Are you okay?

6       MEREDITH:      Yeah (indiscernible).

7       JEFF:      Okay.

8       MEREDITH:      Yeah.    Yeah.    Yeah.    That would

9   be great.

10      JEFF:      Okay.    Sounds good.

11      MEREDITH:      Just, Rebecca doesn't need to

12  (indiscernible) sitting in here --

13      REBECCA BRIGHAM:      That's all right.  I

14  don't mind either way.

15      MEREDITH:      We appreciate your support.

16      REBECCA BRIGHAM:      Thanks, Jeff.

17      JEFF:      Okay.

18      REBECCA BRIGHAM:      Thanks, Jeff.

19       JEFF:      Thank you.

20      JERRY:      So we had an opportunity to look

21  and see what happened.          We do see that when you

22  called in, you did have that Denver --

23  (indiscernible) Denver, Dallas --

24      REBECCA BRIGHAM:      Yeah.

25      JERRY:      -- and then back to Denver.          So

**H+G**   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1340

FRONTIER AIRLINES (R. BRIGHAM) - 000172

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 45
REBECCA BRIGHAM v. FRONTIER AIRLINES

1   right now, just at quick glance, but we still

2   need to look into a little bit more that it

3   might have been removed in error.

4        REBECCA BRIGHAM:       Okay.

5        JERRY:       So if it was, we'll go ahead and

6   pay protective, but we just need to look a

7   little bit deeper to find out what happened.

8        REBECCA BRIGHAM:       Okay.

9        JERRY:       So we'll try and figure that out

10  by today.

11       REBECCA BRIGHAM:       Okay.    It was just sort

12  of like super frustrating this morning.

13       JERRY:       Yeah, and so we'll try and figure

14  out what happened, and then we'll follow up

15  with you.

16       REBECCA BRIGHAM:       Okay.

17       JERRY:       But we also want to take the

18  advantage of while you're here, to talk about

19  your FMLA situation.

20       REBECCA BRIGHAM:       Okay.

21       JERRY:       So for the month of September

22  towards the end of --

23       REBECCA BRIGHAM:       I have 13 days used,

24  right?

25       JERRY:       Yes.

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1341

FRONTIER AIRLINES (R. BRIGHAM) - 000178

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015          Page 46
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:      Is it only approved --

2   because I had sent an email and I heard nothing

3   back.      Is it only approved for 12?

4      JERRY:         Twelve.

5      REBECCA BRIGHAM:      Okay.     So then I had

6   requested more intermittent FMLA paperwork to

7   increase the number up to 15, that way just in

8   case.      My hopes that are within the next

9   month-and-a-half that I don't have to use as

10  much of it.

11     JERRY:        Okay.

12     REBECCA BRIGHAM:      Because I'm hoping that

13  through manipulation and scheduling and stuff,

14  I'm able to swap and drop and trade more.

15     JERRY:        Okay.

16     REBECCA BRIGHAM:      But I will still have to

17  use for the overnights.

18     JERRY:        Yes.

19     REBECCA BRIGHAM:      I mean, there's just no

20  way around that.

21     JERRY:       And so when we looked at that, I

22  think initially the idea was, let's see what we

23  can do --

24     REBECCA BRIGHAM:      Yeah.

25     JERRY:        -- and help you.            And I think

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1342

FRONTIER AIRLINES (R. BRIGHAM) - 000472

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015            Page 47
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    somebody maybe heard you make a comment that

2    we're out to get you.

3        REBECCA BRIGHAM:      Yes, that's what I feel

4    like.

5        JERRY:       And so I'm having difficulty

6    understanding that because I think the company

7    has been extremely flexible with your usage

8    of FMLA for what -- because initially you're

9    approved for sessions, and then right now when

10   we look at your bidding, we're looking at you

11   bid for 4-day trips over the weekends.

12       REBECCA BRIGHAM:      Over the weekends.

13   Which is I talked to Fritz in scheduled and he

14   said that I can pre-call out for my overnights.

15   What I hold is 4-day trips.

16       JERRY:       Uh-huh.

17       REBECCA BRIGHAM:      What I bid is trying

18   getting trips with turns on either end.

19       JERRY:       Uh-huh.

20       REBECCA BRIGHAM:      It doesn't matter what

21   days, but I know I'm going to hold a 4-day over

22   the weekend.

23       JERRY:       Uh-huh.

24       REBECCA BRIGHAM:      With turns on either

25   end.

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1343

FRONTIER AIRLINES (R. BRIGHAM) - 000173
175

1      JERRY:        Okay.

2      REBECCA BRIGHAM:        And then I call out for

3   the overnights.          I don't hold Monday through

4   Thursday.

5      JERRY:        Okay.

6      REBECCA BRIGHAM:        Four days.        I just

7   don't.

8      JERRY:        Okay.

9      REBECCA BRIGHAM:        So I bid for what I know

10   I can hold and I keep the turns at either end,

11   and then I try to pick up turnings during the

12   week.

13      JERRY:        Perfect.

14      REBECCA BRIGHAM:        And that's -- I mean --

15      JERRY:        And we're seeing --

16      REBECCA BRIGHAM:        I don't see another way

17   to go.

18      JERRY:        Right, but I think the statements

19   that we're out to get you, I just don't

20   understand.

21      REBECCA BRIGHAM:        It's what it fees like.

22   Every time I turn around, when my life seems to

23   be just going very, like, smooth, it's like all

24   of a sudden I show up to work without even a

25   courtesy call, and this has happened once

1   before too.        I just don't get it.            I feel like

2   everything that I try to throw out there as a

3   suggestion, it just gets shot down.            I mean, I

4   need more hours.

5        JERRY:        Uh-huh.

6        REBECCA BRIGHAM:        I need something more

7   substantial.

8        JERRY:        Uh-huh.

9        REBECCA BRIGHAM:        And it's just not being

10   able to work.        Which is why I threw out last

11   time the idea of when people come back from

12   leave of absence, they start with a blank

13   canvas.

14        JERRY:        Uh-huh.

15        REBECCA BRIGHAM:        I don't know if it's

16   possible.

17        JERRY:        Uh-huh.

18        REBECCA BRIGHAM:        But can I just have

19   that?        Then it's my responsibility to build it

20   up to sixty.

21        JERRY:        Uh-huh.

22        REBECCA BRIGHAM:        Something has something

23   on the trade board that their wanting to get

24   rid of, I alleviate some of that.

25        JERRY:        Uh-huh.

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1345

FRONTIER AIRLINES (R. BRIGHAM) - 000175

177

1      REBECCA BRIGHAM:      I don't -- maybe that's

2    not a possibility.                Maybe it's a possibility to

3    take an extended leave of absence.

4      JERRY:        Uh-huh.

5      REBECCA BRIGHAM:        I mean, maybe it's a

6    possibility to switch to a different job within

7    Frontier.

8      JERRY:        Uh-huh.

9      MEREDITH:      I talked to her this morning.

10     REBECCA BRIGHAM:      I don't know.          I'm going

11   to be honest here.          Okay?    I don't know what

12   else I want to do.

13     JERRY:        Okay.

14     REBECCA BRIGHAM:      I like being a flight

15   attendant.      It gives me enough time off so that

16   I can start school.

17     JERRY:        Okay.

18     REBECCA BRIGHAM:      I like the flexibility

19   of it.

20     JERRY:        Okay.

21     REBECCA BRIGHAM:      And I don't want to do

22   something drastic.

23     JERRY:        Right.

24     REBECCA BRIGHAM:      That's going to throw my

25   for a loop in my recovery.

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1346

FRONTIER AIRLINES (R. BRIGHAM) - 000178

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 51
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      JERRY:      Which makes sense.

2      REBECCA BRIGHAM:      It's the number one

3   priority.

4      JERRY:      Uh-huh.      And so, ultimately, yes,

5   we're hearing the recommendations that you're

6   making, but from our perspective we have to be

7   consistent in our practices.            So the only time

8   that we carve out certain bidding requirements

9   are those who are out on a continuous leave of

10   absence.

11      REBECCA BRIGHAM:      Okay.

12      JERRY:      So at that time since they're not

13   allowed to bid, and the difference between you

14   is you're allowed to bid.

15      REBECCA BRIGHAM:      Right.

16      JERRY:      So if we made -- if we

17   cherrypicked to try and create you a certain

18   situation --

19      REBECCA BRIGHAM:      Right.

20      JERRY:      -- now we've created a whole

21   separate accommodation for you --

22      REBECCA BRIGHAM:      For somebody else that

23   were possibly going through recovery as well

24   dealing with my same situation?            Maybe this is

25   where we start.      Maybe this is where we start

FRONTIER AIRLINES (R. BRIGHAM) - 000179

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 52
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    doing a new guideline.              How are we going to

2    actually help these people rather than stress

3    them out even more?

4        JERRY:        That's why we're helping you in

5    the form of having this FMLA in place and using

6    it outside of what you're approved for.

7        REBECCA BRIGHAM:        Okay.

8        JERRY:        And then you've approved FMLA --

9    the department has also approved personal

10   leaves for you in certain situations where FMLA

11   wasn't covered.

12       REBECCA BRIGHAM:        Okay.    Well, then how --

13       JERRY:        For you.

14       (Talking simultaneously.)

15       JERRY:        When the statements come out that

16   we're out to get you, that's what --

17       REBECCA BRIGHAM:        It feels like it to

18   me --

19       JERRY:        Frustrating.

20       REBECCA BRIGHAM:        -- at every turn.

21       JERRY:        But it gets very frustrating from

22   our position --

23       REBECCA BRIGHAM:   I'm just telling you how

24   I feel.

25       JERRY:        -- when we're doing everything

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1348

FRONTIER AIRLINES (R. BRIGHAM) - 000180

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015              Page 53
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    that we can.          And I understand that but when

2    we're doing everything that we can for you and

3    then --

4        REBECCA BRIGHAM:      It doesn't feel like

5    that to me, Jerry.

6        JERRY:      Okay.

7        REBECCA BRIGHAM:      It doesn't feel like

8    that to me.

9        JERRY:      Okay.

10        REBECCA BRIGHAM:      It feel like in the

11    beginning it kind of was and now it just feels

12    like stuff like this, this is the second time.

13    I mean, Portland turn was taken off my

14    schedule.      I mean, it just -- I don't get it.

15        JERRY:      So this is the other day that the

16    conversation that Shelly and I had, you've

17    exceeded the amount of time that you had that

18    month.      I even told Shelly, let's go ahead and

19    approve it and extent it beyond that, even

20    though she's not approved.

21        REBECCA BRIGHAM:      Well, thank you.          I mean

22    wish there was --

23        JERRY:      Statements.

24        REBECCA BRIGHAM:      Maybe more communication

25    between us.

1        JERRY:        Okay.

2        REBECCA BRIGHAM:        So I know that you're

3    actually doing something, rather than I show up

4    to work and all of sudden --

5        JERRY:        Now, this, I don't know what

6    happened.        This -- we don't know who moved it,

7    what happened.        We still need to look into

8    that.

9        REBECCA BRIGHAM:        Okay.

10       JERRY:        It's nothing that the company --

11       REBECCA BRIGHAM:        Because when I called

12   scheduled, they just said that, oh, we have it

13   noted here that you were going to do the Dallas

14   turn and then we have it noted that leave of

15   absence removed it.

16       JERRY:        Okay.    And that we don't know.        We

17   need to find out what happened.

18       MEREDITH:        Obviously, looking at it, it's

19   complicated when we try to look through all the

20   history.        I'll look into that, Rebecca.        That's

21   why we're saying if it was an error on the

22   company's part, you'll be paid protective for

23   today.    Okay?

24       REBECCA BRIGHAM:        I also wanted to work.

25   I haven't worked in like six days.        I wanted to

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1350

FRONTIER AIRLINES (R. BRIGHAM) - 000182

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 55
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    work.      And I get it.          I do get that there are

2    errors, but I just, today was just so

3    overwhelming for me when I just -- I want to

4    know that there's something more that we can

5    maybe do.

6         JERRY:      Uh-huh.

7         REBECCA BRIGHAM:       And maybe this is where

8    we kind of start to help other people not feel

9    the way that I do sometimes.

10        JERRY:      Uh-huh.

11        REBECCA BRIGHAM:       Maybe we start a whole

12   new -- people who self-disclose, let's get

13   everybody on the same page and figure out

14   exactly what we need to do, rather than

15   everybody kind of being on the same, or maybe

16   the next page.

17        JERRY:      Right.    So and I get where you're

18   coming from, but how do we compare only those

19   individuals who have self-disclosure from

20   everybody else who has a serious health

21   condition?      And we're not making exceptions --

22        REBECCA BRIGHAM:       We're all individuals

23   and you have to look at us as all individuals.

24        JERRY:      Unfortunately, FMLA does not allow

25   us that ability, because now we're only giving

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1351

FRONTIER AIRLINES (R. BRIGHAM) - 000183

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 56
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    special treatment to certain individuals.

2         REBECCA BRIGHAM:      Right.      Well, here's

3    this --

4         JERRY:      (Indiscernible).

5         REBECCA BRIGHAM:      I'm not talking just in

6    FMLA.    I'm talking in the company's general

7    self-disclosure policy, could there be

8    something in there that you guys say, okay,

9    we're here to support you, what can we do.

10   Okay.    When it comes to my personal situation

11   like layovers, okay, well, there's no other

12   creative way that we can go around this?              It's

13   not like I've gone broadcasting to the entire

14   flight attendants like, hey, go ahead and just

15   claim an alcohol problem, and they'll work with

16   you.

17        JERRY:      I hear what you're saying, but in

18   this industry where everything is seniority

19   driven, any exceptions to that not -- it's just

20   not -- if we were in an office environment, we

21   can definitely do that --

22        REBECCA BRIGHAM:      And I'm not asking to go

23   ahead of my seniority --

24        JERRY:      But you're asking us to hold trips

25   right that now that you can't --

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1352

FRONTIER AIRLINES (R. BRIGHAM) - 000184

1        REBECCA BRIGHAM:        Not hold trips.            It's

2    leave me with nothing.            Nothing. it's my

3    responsibility to get up to sixty.            I'll pick

4    up more turns.        I'd tried more and I pick stuff

5    up stuff on open time.            That's what alerts are

6    for, and then it's my responsibility to get

7    above sixty.

8        MEREDITH:        Yeah, Rebecca, I can talk to

9    that, speak to that.            I mean, it's just not

10   even an option.        It's pot.        We would have the

11   union pounding down the front doors.            Right?

12   And that's the purpose of a union.

13       REBECCA BRIGHAM:        Okay.

14       MEREDITH:        Right?        Like to keep everything

15   consistent for every employee.            That's the

16   purpose of a union.

17       REBECCA BRIGHAM:        Okay.

18       MEREDITH:        And, actually, I would

19   recommend if you're wanting to start some sort

20   of a program or whatever for your situation,

21   you actually would go through the union.

22       REBECCA BRIGHAM:        Through the union.

23       MEREDITH:        On that.

24       REBECCA BRIGHAM:        Okay.

25       MEREDITH:        We as a company -- and just,

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1353

FRONTIER AIRLINES (R. BRIGHAM) - 000185

1    you have to keep that in mind too, we are

2    running a business.

3        REBECCA BRIGHAM:        Right.

4        MEREDITH:        We're running a company.

5        REBECCA BRIGHAM:        And I get that.

6        MEREDITH:        We need employees who can come

7    to work.

8        REBECCA BRIGHAM:        Right.

9        MEREDITH:        We're working with you within

10   the guidelines Jerry has said and Shelly, but

11   we have to stay within those guidelines.                We

12   do.

13       REBECCA BRIGHAM:        Okay.

14       MEREDITH:        And we're all sensitive to what

15   you're going through.

16       REBECCA BRIGHAM:        Okay.

17       MEREDITH:        We're not going through it

18   ourselves, but we are trying to work with you

19   as much as possible.

20       REBECCA BRIGHAM:        Right, and I do get

21   that, and today was --

22       MEREDITH:        We are --

23       REBECCA BRIGHAM:        -- just so

24   overwhelming --

25       MEREDITH:        -- so.

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1354

FRONTIER AIRLINES (R. BRIGHAM) - 0001864
186

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015          Page 59
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      REBECCA BRIGHAM:       -- it just felt --

2      MEREDITH:       Right.      So it can be

3   overwhelming, but as I said to you earlier when

4   we're talking, you know, you were saying I love

5   being a flight attendant, unfortunately, part

6   of being a flight attendant at your seniority

7   is layovers.

8      REBECCA BRIGHAM:       Right.

9      MEREDITH:       And that's why I was

10   encouraging you, you have to evaluate, even

11   though you love the job, is this really the

12   right job for me in my situation?

13      REBECCA BRIGHAM:       If I can just do day

14   turns, yes.

15      MEREDITH:       Right.      And, I mean, it's just

16   not possible that you can do -- you can't hold

17   them.      We can't clear your schedule and let --

18   there's a lot of people that would love to

19   have -- start with a clean slate for the month.

20      REBECCA BRIGHAM:       Right.

21      MEREDITH:       And build their schedule.

22   Right?      Anybody that's, you know, past a

23   certain seniority, they would love to have that

24   option.

25      REBECCA BRIGHAM:       Right.

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1355

FRONTIER AIRLINES (R. BRIGHAM) - 000187

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 60
REBECCA BRIGHAM v. FRONTIER AIRLINES

1      MEREDITH:      But it's just not an option.

2      REBECCA BRIGHAM:      What about --

3      MEREDITH:      So.

4      REBECCA BRIGHAM:      -- and I had asked this

5   before and I think it was a no too.          What about

6   doing something like somebody who's on OJI?

7   Like going to work at the desk at an airport,

8   or coming in here to do something?          I mean, is

9   that an option for a little while?

10     MEREDITH:      So once again, even the OJI

11  program has guidelines that we have to follow

12  for people who are injured on the job, because

13  we're paying them a salary anyway.

14     REBECCA BRIGHAM:      Right.

15     MEREDITH:      So we utilize those people as

16  we can.

17     REBECCA BRIGHAM:      Right.

18     MEREDITH:      Because we're having to pay

19  them anyway.

20     REBECCA BRIGHAM:      Right.

21     MEREDITH:      So we can't just slip people

22  into those positions.

23     REBECCA BRIGHAM:      Right.

24     MEREDITH:      Because we're having to pay

25  them anyway, but like I said to you earlier, I

H+G   Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1356

FRONTIER AIRLINES (R. BRIGHAM) - 000186

1    highly recommend you start going on to ALTI PRO

2    and look at other opportunities within the

3    company that have you home every night like you

4    need right now.

5        JERRY:        There's a position opening now,

6    Santo's (phonetic) position.                It's the inflight

7    training coordinator.

8        REBECCA BRIGHAM:        Okay.      What does that

9    entail?

10       JERRY:        It's the individual that

11   coordinates all the travel, the scheduling,

12   recurrent training, they do 21 trainings.

13       REBECCA BRIGHAM:        Okay.

14       JERRY:        So she just took another role in

15   payroll.        So that position posted yesterday.

16       REBECCA BRIGHAM:        Okay.      (Indiscernible).

17       JERRY:        Yeah, so you report directly to

18   Laura Jacobson.

19       REBECCA BRIGHAM:        Okay.

20       JERRY:        So that just opened up.

21       REBECCA BRIGHAM:        I don't know if I

22   qualify.

23       MEREDITH:        Right, you may or may not, but

24   I --

25       I was telling her earlier there's so many

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 62
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    opportunities, right?             There are.

2         So just go in and look, if you don't feel

3    like you qualify for that one -- because it's

4    pretty -- it's not easy to slide into that

5    position.

6         JERRY:        (Indiscernible).

7         MEREDITH:        So, yeah, start --

8         REBECCA BRIGHAM:        Just start looking.

9         MEREDITH:        Yeah, and I know want to be a

10   flight attendant --

11        REBECCA BRIGHAM:        Yeah.

12        MEREDITH:        -- but maybe right now is not

13   the best time, and if you move to a different

14   position.

15        REBECCA BRIGHAM:        (Indiscernible).

16        MEREDITH:        Maybe in a couple years you

17   would feel like you could go back to flying.

18        REBECCA BRIGHAM:        Right.    Do you lose your

19   seniority?

20        MEREDITH:        After --

21        JERRY:        Ninety days.

22        MEREDITH:        Oh, is it ninety days?        Oh, if

23   you stay within inflight --

24        JERRY:        If you stay within the company --

25        MEREDITH:        -- it's two years.        If you

H+G    Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
                 Court Reporting, Legal Videography, and Videoconferencing

1358

FRONTIER AIRLINES (R. BRIGHAM) - 0001996

1    leave inflight, it's ninety days.

2        JERRY:      Or if you leave the company.

3        REBECCA BRIGHAM:      Right.      Right.      I get

4    that.      So I would have to take a position with

5    inflight more in those darameters --

6    parameters.

7        MEREDITH:      Uh-huh.      If you wanted to keep

8    your seniority.

9        REBECCA BRIGHAM:      Keep seniority.          Okay.

10       MEREDITH:      All right?

11       JERRY:      So in terms of your FMLA your

12   request, can we give you your paperwork so we

13   can extend.

14       FEMALE SPEAKER:      I've already given it

15   you, haven't I --

16       REBECCA BRIGHAM:      I haven't gotten any.

17       FEMALE SPEAKER:      Okay.      I'll work on it.

18       REBECCA BRIGHAM:      Okay.

19       JERRY:      So we'll get you an application so

20   we can increase the number of days --

21       REBECCA BRIGHAM:      Okay.

22       JERRY:      -- also, and I think we did an

23   audit, you still have plenty of time accrued.

24   And as days roll off, you're get getting more

25   time off.

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1359

FRONTIER AIRLINES (R. BRIGHAM) - 000193

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 64
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    REBECCA BRIGHAM:        Okay.

2    MEREDITH:        So that still gives you a

3    little bit more flexibility too to use some of

4    that.

5    REBECCA BRIGHAM:        Okay.     And thank you for

6    last month, for that extra day.                Thank you.

7    JERRY:        And then we'll look into finding

8    out what happened with today.

9    REBECCA BRIGHAM:        With the Dallas.

10    MEREDITH:        Yeah, I'll look into that, but

11    it's OCM cross-eyed trying to figure it out

12    what.

13    (Talking simultaneously.)

14    MEREDITH:        It looks like most of your --

15    it looks like the rest of the trip got removed,

16    but then somebody did go back in and remove the

17    Dallas trip, but I don't know how that

18    happened.

19    REBECCA BRIGHAM:        Okay.

20    MEREDITH:        We'll look at it, and if it's

21    our error, you'll be paid.

22    REBECCA BRIGHAM:        Okay.

23    MEREDITH:    Okay?

24    REBECCA BRIGHAM:    Thank you very much.

25    MEREDITH:    Yeah.

H+G   Hunter + Geist, Inc.   800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1360

FRONTIER AIRLINES (R. BRIGHAM) - 000192

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                    Page 65
REBECCA BRIGHAM v. FRONTIER AIRLINES

1     REBECCA BRIGHAM:      Thank you, guys.

2     FEMALE SPEAKER:      I'll send you over all

3   the info for to get recertified.

4     REBECCA BRIGHAM:      Okay.

5     FEMALE SPEAKER:      And then I'll also give

6   you an account as to how many days you have to

7   get over.

8     REBECCA BRIGHAM:      Perfect.      Thank you very

9   much.     Sorry for my emotional --

10    JERRY:      No --

11    REBECCA BRIGHAM:      -- outburst.

12    JERRY:      It happens.      We understand.

13    REBECCA BRIGHAM:      Okay.    Thank you.

14    JERRY:      And I agree, let's keep the lines

15   of communication open.

16    REBECCA BRIGHAM:      Yes, let's just try and

17   keep it open so I don't feel so like, uhhh

18   (phonetic).

19    JERRY:      Definitely.

20    REBECCA BRIGHAM:      You know?      Thank you

21   very much.

22    JERRY:      You bet.

23    REBECCA BRIGHAM:      And I'll keep looking on

24   there to see if there's things that work.

25    MEREDITH:      Yeah.    Yeah, you have some time

H+G   Hunter + Geist, Inc.    800.525.8490    scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1361

FRONTIER AIRLINES (R. BRIGHAM) - 000193

BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015
REBECCA BRIGHAM v. FRONTIER AIRLINES
Page 66

```
 1   now that you weren't expecting.
 2        REBECCA BRIGHAM:     I know.
 3        MEREDITH:     You should take advantage of
 4   it.     Go to the library, open up the computer,
 5   and look around.        Take advantage of the time.
 6        REBECCA BRIGHAM:     Perfect.     Thank you very
 7   much.
 8        MEREDITH:     Yeah, you're welcome.
 9        REBECCA BRIGHAM:     Thank you, guys.
10        MEREDITH:     Sorry for all the frustrations
11   as.
12        REBECCA BRIGHAM:     Yeah, I'm sorry for my
13   emotionalness [sic].
14        MEREDITH:     It's okay.
15        FEMALE SPEAKER:     I'm going to give you my
16   card, Rebecca.
17        REBECCA BRIGHAM:     Okay.     Great.
18        FEMALE SPEAKER:     If you have issues with
19   anything (indiscernible).
20        REBECCA BRIGHAM:     Okay.     Awesome.     Thank
21   you.
22        Perfect.        Thank you so much, guys.
23   Awesome.     Cool.     Thank you, Shelly.
24   (Indiscernible).
25        MEREDITH:     Okay.
```

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015                Page 67
REBECCA BRIGHAM v. FRONTIER AIRLINES

1    REBECCA BRIGHAM:   Meeting over.

2

3    (End of recording.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BrighamR Plaintiff Records          0633 (10915)

68

1                          CERTIFICATE

2

3          I, ERINN GREEN, Professional Court

4    Reporter/Transcriptionist, do hereby certify that I

5    was authorized to transcribe the foregoing recorded

6    proceeding, and that the transcript is a true and

7    accurate transcription of my shorthand notes, to the

8    best of my ability, taken while listening to the

9    provided recording.

10

11         I further certify that I am not of counsel or

12   attorney for either or any of the parties to said

13   proceedings, nor in any way interested in the events

14   of this cause, and that I am not related to any of

15   the parties thereto.

16

17         Dated this 22nd day of January, 2020.

18

19

20   _____

21    ERINN L. GREEN, Professional Court Reporter
     Notary Public, State of Florida

22

23

24

25

U.S. LEGAL SUPPORT
866-339-2608

1364          FRONTIER AIRLINES (R. BRIGHAM) - 0001964

| **1** | | |
|---|---|---|
| **100** 37:20 | | |
| **113** 37:20 | | |
| **12** 46:3 | | |
| **13** 45:23 | | |
| **14** 19:9 | | |
| **15** 21:9 46:7 | | |
| **17** 37:6 | | |
| **18** 21:1,8 | | |
| **190** 31:17 | | |

| **2** | | |
|---|---|---|
| **21** 61:12 | | |
| **22** 42:24 43:6 | | |

| **3** | | |
|---|---|---|
| **30** 28:20,22,23 | | |

| **4** | | |
|---|---|---|
| **4-day** 47:11,15,21 | | |
| **42** 21:17 | | |

| **5** | | |
|---|---|---|
| **50** 21:14 | | |
| **50s** 20:23 | | |

| **6** | | |
|---|---|---|
| **60** 7:25 | | |
| **65** 20:22 | | |

| **7** | | |
|---|---|---|
| **70s** 20:19 | | |
| **75** 21:6 | | |

**8**

**80** 21:6

**9**

**940** 5:11
**99** 31:25
**9:30** 15:20

**abide** 35:1
**ability** 55:25
**absence** 2:8 5:5,16,18 6:12,17,19 7:16 18:8 49:12 50:3 51:10 54:15
**absolutely** 25:10
**access** 37:21
**accommodation** 51:21
**accomplish** 8:10
**account** 65:6
**accrued** 63:23
**actual** 3:19
**acupressure** 43:8,13
**acupuncture** 43:11,12
**adjusting** 20:6
**advantage** 32:15 45:18 66:3,5
**agree** 65:14
**Ah-huh** 14:8
**ahead** 45:5 53:18 56:14,23
**ahold** 6:17 7:3
**ailments** 43:17
**airport** 6:13 14:5 28:6,9 8490
**Airways** 25:8 33:21
**alcohol** 56:15
**alerts** 57:5

**alleviate** 49:24
**allowed** 51:13,14
**ALTI** 10:5,7 61:1
**amazing** 37:16
**amount** 37:10 53:17
**answering** 14:5
**anymore** 5:3 7:6
**apples** 25:5
**application** 63:19
**applied** 46:10 52:13
**approved** 46:1,3 47:9 52:6,8,9 53:20
**area** 16:12,15
**Aspen** 27:4
**Atlanta** 34:1
**attendant** 11:12 18:24 41:24 50:15 59:5,6 62:10
**attendants** 26:5 37:12, 15 56:14
**attitude** 27:12
**attrition** 21:20
**audit** 63:23
**auditorium** 2:22,23
**avoid** 32:9
**aware** 11:2
**awesome** 2:25 3:7 4:10 13:9 66:20,23
**awful** 27:6 33:8
**awhile** 40:2

**B**

**babies** 9:19
**baby's** 39:19
**back** 5:10 6:18 12:3 4:7 7:3,21 26:10 36:6,9 42:24 44:25 46:3 49:11 62:17 64:16
**background** 2:2 4:23 6:24 14:12,13

**bad** 16:17 27:14
**base** 11:21 17:6 25:9
**basically** 8:4 27:14,18
**bathroom** 41:13
**bats** 40:17,19
**beach** 33:22
**bears** 19:12
**beautiful** 27:1
**Bed** 42:12
**beginning** 5:10 36:4, 16 53:11
**behavior** 34:7
**bet** 27:3 65:22
**bid** 47:11,17 48:9 51:13,14
**bidding** 47:10 51:8
**big** 21:13
**bike** 22:24
**bit** 45:2,7 64:3
**blank** 7:24 49:12
**board** 49:23
**body** 43:3,4
**boogers** 40:17
**boom** 33:15
**bought** 30:22
**bouncing** 28:21
**box** 25:11
**break** 40:3
**breeder** 38:16
**Brigham** 2:1,4,6,13,17, 20,25 3:3,7,9,14,17,21, 23 4:2,4,6,10,12,14,16, 18,20,24 5:1,9,20,24 6:1,5,8,9,16 7:2,5,8,14, 22 8:11,20,25 9:6,9,11, 14,17,22 10:1,6,9,12, 17,21,24 11:3,6,9,13, 16,20,22,25 12:4,11,13, 16,19,22,25 13:7,9,11, 14,16,19,23 14:3,5,8, 14,16 15:5,9,12 18:1,7, 13 19:6,14,24 20:16,20



BrighamR_Plaintiff Records 0633 (10.09.15)   **10/09/2015**   Page 70
REBECCA BRIGHAM v. FRONTIER AIRLINES

21:7,10,12,16,21 22:1,
6,15,23 23:1,12,16,19,
21 24:1,4,11,16,22
25:13,24 26:2,9,11,15
27:3,9,11,20,23 28:1,3,
9,17,22 29:1,5,24
30:13,20,24 31:5,10,14,
16,18,21,24 32:2,5,7,9,
12,19,21 33:5,7,20,25
34:3,8,11,15,17,22,25
35:3,5,9,12,15,18,22
36:3,7,13,15,18,22
37:2,8,11,14,17,21,24
38:1,3,12,20,24 39:2,4,
6,9,12,16,19,23 40:2,5,
9,12,16,19,22,24 41:4,
7,12,15,19,21,23 42:1,
7,9,13,15,19,22 43:2,
12,15,20,25 44:13,16,
18,24 45:4,8,11,16,20,
23 46:1,5,12,16,19,24
47:3,12,17,20,24 48:2,
6,9,14,16,21 49:6,9,15,
18,22 50:1,5,10,14,18,
21,24 51:2,11,15,19,22
52:7,12,17,20,23 53:4,
7,10,21,24 54:2,9,11,24
55:7,11,22 56:2,5,22
57:1,13,17,22,24 58:3,
5,8,13,16,20,23 59:1,8,
13,20,25 60:2,4,14,17,
20,23 61:8,13,16,19,21
62:8,11,15,18 63:3,9,
16,18,21 64:1,5,9,19,
22,24 65:1,4,8,11,13,
16,20,23 66:2,6,9,12,
17,20 67:1

**broadcasting** 56:13

**brought** 25:21

**bubblier** 32:13

**build** 7:25 49:19 59:21

**bulldog** 19:12,18

**bunch** 29:1

**bus** 5:12 35:20

**business** 58:2

**Busy** 15:19

**Bye** 35:12

**C**

**call** 7:18 8:22 16:8 48:2,
25

**called** 5:6,13 7:15 14:8
44:22 54:11

**canvas** 49:13

**card** 66:16

**care** 29:10

**carve** 51:8

**case** 9:5 35:4 46:8

**catch** 39:13

**cave** 40:17,18,19

**chair** 13:24 19:20

**chasing** 19:12

**check** 35:20 37:22

**checked** 5:12

**cheek** 41:1

**cherrypicked** 51:17

**chia** 41:5

**Chicago** 22:12

**child** 34:18

**claim** 56:15

**class** 20:16 21:1,13
28:7,8,11,15 33:14

**classes** 21:19 23:14
24:12

**clean** 59:19

**clear** 27:14 59:17

**Cleveland** 36:10

**coats** 29:14

**cocktails** 28:21

**coded** 16:14

**codes** 27:19

**Colorado** 4:3

**comical** 34:10

**comment** 47:1

**communicate** 39:20

**communicates** 39:17

**communication** 53:24
65:15

**communities** 26:24

**company** 9:24 47:6
54:10 57:25 58:4 61:3
62:24 63:2

**company's** 54:22 56:6

**compare** 55:18

**complicated** 54:19

**computer** 66:4

**condition** 55:21

**conference** 7:1 35:14

**connect** 17:20

**cons** 24:21

**consistent** 51:7 57:15

**constantly** 12:8

**contact** 5:17 7:16

**contacted** 5:16

**continuous** 51:9

**control** 29:7,9

**conversation** 2:2 4:23
14:12 53:16

**cool** 24:16 66:23

**coordinates** 61:11

**coordinator** 61:7

**couch** 19:20

**count** 20:24

**couple** 62:16

**courageous** 13:13

**courtesy** 7:18 48:25

**covered** 52:11

**crate** 18:25

**created** 51:20

**creative** 56:12

**crew** 25:17

**cries** 39:24

**cross-eyed** 64:11

**crowded** 14:1

**cry** 37:3,4

**crying** 35:23 39:21

**cure** 43:4,16

**customer** 8:15

**customers** 8:14

**cute** 19:7,25 20:13

**D**

**dadda** 38:7

**Dallas** 5:2,9,16 6:13
35:19 36:1,3,8,9,15
44:23 54:13 64:9,17

**darameters** 63:5

**daughter** 27:24 38:9,
17 39:13 40:5

**day** 8:18 18:20 32:5
36:19 37:19 41:24
53:15 59:13 64:6

**daycare** 18:20

**days** 25:1 42:12 45:23
47:21 48:6 54:25 62:21,
22 63:1,20,24 65:6

**deal** 27:23

**dealing** 18:7 51:24

**deeper** 45:7

**degree** 42:25

**delays** 37:16

**demo** 41:16

**Denver** 11:16 21:24
36:6,8,9 41:25 44:22,
23,25

**department** 52:9

**deserve** 13:2

**desk** 60:7

**determine** 16:13

**DIA** 4:1

**difference** 51:13



BrighamR_Plaintiff Records 0633 (10.09.15)  **10/09/2015**          Page 71
REBECCA BRIGHAM v. FRONTIER AIRLINES

**difficulty** 47:5

**dinner** 42:11

**directly** 61:17

**disability** 39:1

**dissolved** 31:5

**distracted** 20:25

**doctor** 43:3

**dog** 18:17,19 19:5,23

**doggy** 18:20

**doors** 57:11

**drastic** 50:22

**drink** 41:4

**drinks** 41:5

**driven** 56:19

**drop** 46:14

**dropped** 20:21

**drugs** 43:6

**dual** 25:25

**Durango** 31:9

**E**

**earlier** 17:15 59:3
    60:25 61:25

**easier** 11:15

**easiest** 14:22

**easy** 62:4

**eat** 42:11

**eating** 40:25

**Eight-and-a-half**
    15:12

**email** 46:2

**emails** 37:6,7,10

**emotional** 65:9

**emotionalness** 66:13

**employee** 57:15

**employees** 58:6

**encouraging** 59:10

**end** 8:23 43:9 45:22
    47:18,25 48:10 67:3

**enforced** 27:19

**entail** 61:9

**entire** 56:13

**environment** 56:20

**equipment** 30:22

**error** 45:3 54:21 64:21

**errors** 55:2

**errr** 39:10

**establish** 43:23

**evaluate** 59:10

**everybody's** 6:10

**everyone's** 15:15

**Everything's** 22:8

**exceeded** 53:17

**exceptions** 55:21
    56:19

**exist** 11:2

**expecting** 66:1

**experience** 15:8

**express** 30:10,11

**extend** 63:13

**extended** 50:3

**extent** 53:19

**extra** 64:6

**extremely** 47:7

**F**

**face** 40:14

**fair** 6:20,21

**feel** 7:12 41:8 42:10
    47:3 49:1 52:24 53:4,7,
    10 55:8 62:2,17 65:17

**feeling** 42:13 54:20

**fees** 6:17 48:21

**felt** 59:1

**FEMALE** 2:3,5,10,15,
    18,21 3:1,5,8,11,15,18,

22,25 4:3,5,7,11,13,15,
21 14:21 15:1,7,10,13,
18,22,25 16:3,7,10,19,
22 17:1,3,7,11,13,16,
20,22,24 18:3,5,9,11,
15,19,22,25 19:3,7,10,
15,19,22,25 20:5,10,13,
15,17,21 21:3,5,11,22
22:2,5,8,17,25 23:3,7,
20,24 24:9,15,17,20,23,
25 25:5,14 26:3,6,16,
19,21,25 27:2,7,10,17,
21,25 28:2,5,13,18,25
29:7,9,12,15,18,21
30:2,4,7,11,13,15,18,
20,22 31:3,6,9,13,17,
23,25 33:13,15,18 31:20,
22 32:1,3,6,8,11,17,22
33:3,9,17,23 34:2,5,9,
14,19 35:6,10 63:14,17
65:2,5 66:15,18

**fight** 37:15

**figure** 6:12 45:9,13
    55:13 64:11

**filler** 21:18

**find** 3:9 12:23 34:9,11
    45:7 54:17

**finding** 64:7

**fine** 5:11 17:17 32:24
    34:23

**finished** 24:12

**flew** 24:6 31:17

**flexibility** 42:21 50:18
    64:3

**flexible** 47:7

**Flicka** 35:20

**flight** 11:11 18:24 26:4
    37:11 41:23 50:14
    56:14 59:5,6 62:10

**flights** 32:4

**flown** 23:17 30:23

**fly** 41:16

**flying** 24:13 25:11
    28:1,10,21 45:20

**FMLA** 45:19 46:6 47:8
    52:5,8,10 55:24 56:6
    63:11

**follow** 2:18 45:14 60:11

**forget** 22:18 33:10,12

**forgot** 36:24

**form** 52:5

**forward** 42:16

**four-day** 5:6

**four-leg** 36:19

**French** 19:12,18

**Friday** 10:22

**friendlier** 32:13

**friends** 38:16

**Fritz** 47:13

**front** 57:11

**Frontier** 11:11 15:11
    24:6,8 25:23 50:7

**frustrated** 9:3 38:17

**frustrating** 8:6 38:8
    45:12 52:19,21

**frustrations** 66:10

**fun** 26:6

**fund** 15:7

**funniest** 28:6

**funny** 20:14 23:9 29:25
    33:4 42:1

**G**

**Gary's** 39:14

**general** 56:6

**ghetto** 34:25

**girlfriend** 31:10

**give** 29:3 63:12 65:5
    66:15

**giving** 55:25

**glance** 45:1

**God** 19:25 33:23 37:8
    38:7 41:8,14,15 42:10,
    14

**good** 2:4,5 4:16,17
    14:19 15:8,9 18:12 20:7
    22:6,8 24:4 38:1,15,18
    44:10



BrighamR_Plaintiff Records 0633 (10.09.15)  10/09/2015                    Page 72
REBECCA BRIGHAM v. FRONTIER AIRLINES

gosh 19:7,19 28:2 33:5
38:4

Gotcha 38:20

graduated 21:9,16

gray 16:12,15

great 44:9 66:17

grown 19:8

guess 14:21 21:5 22:10

guideline 52:1

guidelines 58:10,11
60:11

guys 17:25 22:12 34:13
56:8 65:1 66:9,22

**H**

habit 10:19

half 37:18

hallway 2:18

hang 29:13

hanging 18:5

happened 43:24 44:21
45:7,14 48:25 54:6,7,17
64:8,18

happening 11:8,19

happy 8:16 33:8

hard 5:3 6:14 12:1
13:16 32:21

he'll 38:6

head 34:3

health 12:6 55:20

hear 56:17

heard 46:2 47:1

hearing 51:5

heck 12:23

helping 52:4

herbalist 43:7

herbs 43:4

hey 56:14

high 20:23 27:7,10

33:24

highly 61:1

hillbilly 41:22

history 54:20

hold 6:22 47:15,21
48:3,10 56:24 57:1
59:16

hole 41:18

home 22:10 37:22
42:11 61:3

honest 2:8,10 23 3:10,
62:23 63:1,5

honestly 26:10

hope 22:18 40:16

hopes 46:8

hoping 46:12

horror 34:3

hour 17:18 37:18

hours 6:14 15:21 16:2
49:4

How's 15:18 18:11

HR 34:20

Huh-uh 30:19

hungry 39:24

**I**

idea 13:6 46:22 49:11

ignore 40:9

impression 17:3

increase 46:7 63:20

incredibly 9:13

indicating 32:16

indiscernible 3:5,9
4:9,19,22 6:15,25 7:4,7,
11 12:8 14:2,4,7,9,10,
14,15,17,20,22,24 15:1,
2,14,24 16:1,9,12 17:
1,14,24 18:1,9,19 19:15
17 20:7 21:19,25
22:9,11 23:15,21 24:6,
8,13 25:2,4,10,18,20,
22,23 26:4,5,7,8,10,13,
14,16 27:15,19 28:11,

12,14 29:4,6,14,19
30:2,12,23 31:7,8,15
32:6 33:1,11,13,15
34:19,20,24 35:14 36:4
37:1,9 42:6 43:22 44:2,
4,6,12,23 56:4 61:16
62:6,15 66:19,24

individual 61:10

individuals 55:19,22,
23 56:1

industry 56:11

inflight 2:8,10 23 3:10,
62:23 63:1,5

info 65:3

initial 15:4 22:13,19
23:8 25:16

initially 46:22 47:8

initials 23:11

injured 60:12

insurance 9:19,20

interested 9:25 43:18

intermittent 46:6

invites 20:18

ironic 38:15

issues 66:18

**J**

jack-of-all-trades
22:14

Jacobson 61:18

Jeff 4:3,17 5:3,19,23,25
6:16,25 7:3,6,7,19
12:20 14:15,17 15:2,6,
17,19,24 16:1,4,9,16,
20,25 17:2,5,9,12,15,
19,21,23 18:2,4,10,12,
14,17,21,23 19:2,4,9,
11,14,24 20:1,7,12,14
18,21 21:9,11,17,18
7,14 23:8,9,15,17,18,
23,25 24:3,5,10,12,19,
21,24 25:1,20,25 26:4,
10,13,18,20,23 27:1,6,
13,18,22 28:6,10,14,20,

24 29:3,6,7,8,10,12,13,
17,20,23,25 30:6,9,12,
17,19,21 31:4,7,13,15,
17,19,25 32:20 33:1,4,
6,10,18 34:13,16,24
35:1,4,13 36:24 37:5,9,
13,15,19,23,25 38:2,11,
14,21,25 39:3,5,7,11,
14,18,22 40:1,4,8,11,
15,17,20,23 41:2,6,10,
13,18,20,22,25 42:3,6,
8,14,16,21 43:1,10,14,
19,22 44:5,7,10,16,17,
18,19

Jenny 4:3 36:25

jeopardize 27:16

Jerry 35:8,14,17,21,25
36:5,11,14,17,20 43:23
44:1,20,25 45:5,9,13,
17,21,25 46:4,11,15,18,
21,25 47:5,16,19,23
48:1,5,8,13,15,18 49:5,
8,14,17,21,25 50:4,8,
13,17,20,23 51:1,4,12,
16,20 52:4,8,13,15,19,
21,25 53:5,6,9,15,23
54:1,5,10,16 55:6,10,
17,24 56:4,17,24 58:10
61:5,10,14,17,20 62:6,
21,24 63:2,11,19,22
64:7 65:10,12,14,19,22

jet 31:17

jets 25:17,25

job 8:8,13,17 9:7 10:8
11:12 29:19 42:5,6 50:6
59:11,12 60:12

jobs 10:15

Joe 36:23

**K**

Kari 3:19 4:24,25 5:8
6:3,5,7,15,23 7:9 13:23
16:5 22:3

keeping 8:10

kidding 23:24 30:2

kiddos 37:25

kind 6:1,10 16:10,12,16
20:8 21:19,20 22:15


Hunter + Geist, Inc.   800.525.8490   scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015   Page 73
REBECCA BRIGHAM v. FRONTIER AIRLINES

25:20 32:3 38:14 53:11
55:8,15

kindergarten 38:18

knew 10:21

**L**

LA 34:1

Laguardia 33:1,6,11,
22

laugh 34:6

Laura 61:18

lav 41:10

layovers 5:7 8:13 9:8
56:11 59:7

learned 22:19

leave 2:7 5:5,16,18
6:12,17,19 7:16 14:1
18:8 49:12 50:3 51:9
54:14 57:2 63:1,2

leaves 52:10

left 2:16 21:2

leg 36:18

library 66:4

life 48:22

lines 65:14

links 30:13,14 31:6

list 6:6,8

listings 10:8

LOA 7:19

long 6:10 8:18,21
15:10,13 41:8

longer 30:18

looked 9:23 46:21

loop 6:11 9:18 50:25

lose 42:8 62:18

lot 10:15 11:8 19:8
26:17,21 59:18

loud 26:7

love 8:12,16 9:7 29:18
59:4,11,18,23

lover 19:23

low 20:23

**M**

made 51:16

maintenance 27:8,10
33:24

majority 25:7

make 2:15 9:2 47:1

makes 17:16,17 29:18
51:1

making 8:16 51:6
55:21

manager 2:8 3:10,20
22:16 23:6 25:9

manipulation 46:13

mascara 40:14

massage 43:16

master 43:7

matter 47:20

meet 18:1

meeting 16:1 17:25
35:11 67:1

mentality 8:15 32:18

Meredith 7:10,20 8:7,
19,24 9:4,7,10,12,16,
21,23 10:5,7,10,14,18,
22,25 11:4,7,10,14,18,
21,23 12:3,6,12,14,17,
20,23 13:1,5,8,10,12,
15,17,18,20,25 15:2
36:23 42:10 44:3,6,8,
11,15 50:9 54:18 57:8,
14,18,23,25 58:4,6,9,
14,17,22,25 59:2,9,15,
21 60:1,3,10,15,18,21,
24 61:23 62:7,9,12,16,
20,22,25 63:7,10 64:2,
10,14,20,23,25 65:25
66:3,8,10,14,25

merged 31:1

messing 5:5 6:19

mid 20:19

Midwest 24:5 33:11,14

migraine 43:19

mind 8:7 14:23 16:22
17:9 44:14 58:1

minutes 3:13 28:20,22,
23

mommy 38:7

Monday 10:19,22 48:3

month 21:6 45:21
53:18 59:19 64:6

month-and-a-half
46:9

months 42:24 43:6

morning 15:18 33:6
35:19 45:12 50:9

mountain 26:24 28:15

move 13:24 62:13

moved 54:6

**N**

natural 43:3,21

naturally 43:5

nature 43:4

naturopath 43:2

necessarily 11:5

needed 7:16

needles 43:10

newest 38:16

news 19:11

nice 15:5 17:25 18:1
22:15 24:11 31:7,12
33:16 35:10,11

night 24:7,14 42:17
61:3

ninety 62:21,22 63:1

nodding 18:3

noise 6:24 14:13

noisy 26:7

normal 40:10

nostalgia 25:16

noted 5:15 54:13,14

November 42:4

number 46:7 51:2
63:20

**O**

OCM 64:11

office 3:25 8:1 25:15
42:6 56:20

OJI 60:6,10

older 19:18 20:7

open 16:7 57:5 65:15,
17 66:4

opened 61:20

opening 61:5

opportunities 11:1
12:15 61:2 62:1

opportunity 44:20

option 57:10 59:24
60:1,9

options 7:23 8:2

oranges 25:6

originally 20:18

outburst 65:11

overnights 8:22 46:17
47:14 48:3

overwhelming 55:3
58:24 59:3

**P**

paid 54:22 64:21

Palm 33:22

paperwork 46:6 63:12

parameters 63:6

part 9:7 54:22 59:5

passengers 34:12,17

past 59:22

pay 45:6 60:18,24



BrighamR_Plaintiff Records 0633 (10.09.15)   **10/09/2015**                Page 74
REBECCA BRIGHAM v. FRONTIER AIRLINES

paying 60:13

payroll 61:15

pee 20:3

people 2:12 3:5 8:12,16
27:4,5 31:25 49:11 52:2
55:8,12 59:18 60:12,15,
21

perfect 3:3 8:17 48:13
65:8 66:6,22

personal 52:9 56:10

personally 34:10

perspective 51:6

pharmaceutical 43:5

phase 31:3

phonetic 4:1 10:5
35:20 38:3,4 39:10 61:6
65:18

pick 8:21 48:11 57:3,4

picture 19:23

pictures 18:13

place 32:25 52:5

play 20:8

plenty 63:23

point 10:2 38:8,9

points 43:16

policy 56:7

Portland 53:13

position 52:22 61:5,6,
15 62:5,14 63:4

positions 9:24 60:22

possibility 50:2,6

possibly 51:23

posted 10:16 61:15

pot 57:10

pounding 57:11

pounds 19:9

practices 51:7

pre-call 47:14

prefer 32:4 33:8

preschool 38:4

pressure 43:13,16

pretty 8:3 22:21 28:18
62:4

priority 51:3

PRO 10:5,7 61:1

problem 6:22 56:15

probs 26:3 30:1

program 43:6 57:20
60:11

prop 29:6

propeller 30:22

props 26:2

Pros 24:21

protective 45:6 54:22

proud 13:10

puppy 18:11 38:16

purpose 57:12,16

push 9:2

put 32:24

**Q**

qualify 61:22 62:3

quick 16:4 28:18 36:20
45:1

quiet 4:25 26:17 39:4

quit 9:3

**R**

reading 43:18

real 16:4

reality 11:18

Rebecca 2:1,4,6,13,17,
20,25 3:3,7,9,14,17,21,
24 4:2,5,6,10,12,16,18,
22,24,25 5:1,10,12,20,24
6:1,5,8,9,16 7:2,5,8,14,
22 8:11,20,25 9:6,9,11,
14,17,22 10:1,6,9,12,
17,19,21,24 11:3,6,9,

13,16,20,22,25 12:4,11,
13,16,19,22,25 13:7,9,
11,14,16,19,23 14:3,5,
8,14,16 15:5,9,12 18:1,
7,13 19:6,14,24 20:16,
20 21:7,10,12,16,21
22:1,6,15,23 23:1,12,
16,19,21 24:1,4,11,16,
22 25:13,24 26:2,9,11,
15 27:3,9,11,20,23
28:1,3,9,17,22 29:1,5,
24 30:13,20,24 31:5,10,
14,16,18,21,24 32:2,3,
5,7,9,12,19,21 33:5,7,
11,15,17, 11,15,17,
22,25 35:3,5,9,12,15,
18,22 36:3,7,13,15,18,
22 37:2,8,11,14,17,21,
24 38:1,3,12,20,24
39:2,4,6,9,12,16,19,23
40:2,5,9,12,16,19,22,24
41:4,7,12,15,19,21,23
42:1,7,9,13,15,19,22
43:2,12,15,20,25 44:11,
13,16,18,24 45:4,8,11,
16,20,23 46:1,5,12,16,
19,24 47:3,12,17,20,24
48:2,6,9,14,16,21 49:6,
9,15,18,22 50:1,5,10,
14,18,21,24 51:2,11,15,
19,22 52:7,12,17,20,23
53:4,7,10,21,24 54:2,9,
11,20,24 55:7,11,22
56:2,5,22 57:1,8,13,17,
22,24 58:3,5,8,13,16,
20,23 59:1,8,13,20,25
60:2,4,14,17,20,23
61:8,13,16,19,21 62:8,
11,15,18 63:3,9,16,18,
21 64:1,5,9,19,22,24
65:1,4,8,11,13,16,20,23
66:2,6,9,12,16,17,20
67:1

recertified 65:3

recommend 57:19
61:1

recommendations
51:5

recovery 9:18 50:25
51:23

recurrent 61:12

13,16,20,22,25 12:4,11,

regional 25:9

remember 23:1 31:22
38:9

remove 64:16

removed 7:19 13:1
45:3 54:15 64:15

repetitive 22:22

report 5:11 61:17

Republic 24:5,7,13
25:21 30:21

request 63:12

requested 46:6

requirements 51:8

responsibility 7:25
49:19 57:3,6

rest 64:15

Rich 16:5

rid 49:24

ridiculous 37:10

riding 22:23

role 61:14

roll 63:24

room 35:14

routes 28:16 30:23
31:7

routine 16:24

rows 26:13

running 58:2,4

**S**

sad 39:24

safety 27:15,16 41:16

salary 60:13

Santo's 61:6

schedule 5:13 7:24
36:1,12 53:14 59:17,21

scheduled 21:6 47:13
54:12

schedules 11:15,23

  Hunter + Geist, Inc.   800.525.8490      scheduling@huntergeist.com
Court Reporting, Legal Videography, and Videoconferencing

1370

scheduling 5:11,14
46:13 61:11

school 42:4,24 50:16

seat 28:10

seated 31:25

seed 41:2

self-disclose 55:12

self-disclosure 55:19
56:7

send 65:2

senior 6:21

seniority 9:10 56:18,23
59:6,23 62:19 63:8,9

sense 17:17 51:1

sensitive 58:14

separate 51:21

September 45:21

servants 27:12

serve 28:20 29:2

served 33:15

server 33:2

service 8:15 28:11,15
41:18

sessions 47:9

settled 16:23

Shelly 53:16,18 58:10
66:23

shit 42:17

shot 49:3

show 5:11 18:17 48:24
54:3

showed 5:1 7:13,15,17
20:22 35:18

sic 66:13

sick 39:24

sill 30:9

simultaneously 23:22
52:14 64:13

sit 36:23

sitter 18:17,19 19:5

sitting 4:21 44:3,12

situation 6:9 45:19
51:18,24 56:10 57:20
59:12

situations 52:10

sixty 49:20 57:3,7

slate 59:19

slide 62:4

slip 60:21

smiling 4:16

smooth 48:23

sober 6:21

sort 35:23 43:15 45:11
57:19

sounds 27:14 44:10

Southwest 18:24

speak 2:7 57:9

SPEAKER 2:3,5,10,15,
18,21 3:1,5,8,11,15,18,
22,25 4:3,5,7,11,13,15,
21 14:21 15:1,7,10,13,
18,22,25 16:3,7,10,19,
22 17:1,3,7,11,13,16,
20,22,24 18:3,5,9,11,
15,19,22,25 19:3,7,10,
15,19,22,25 20:5,10,13,
15,17,21 21:3,5,11,22
22:2,5,8,17,25 23:3,7,
20,24 24:9,15,17,20,23,
25 25:5,14 26:3,6,16,
19,21,25 27:2,7,10,17,
21,25 28:2,5,13,18,25
29:9,15,18,21 30:4,8,
10,15,18 31:20,22 32:1,
3,6,8,11,17,22 33:3,9,
17,23 34:2,5,9,14,19
35:6,10 63:14,17 65:2,5
66:15,18

special 56:1

speech 38:19

Springs 31:8,19

stand 31:11

start 7:24 12:7,14 17:15

35:23 42:4 49:12 50:16
51:25 55:8,11 57:19
59:19 61:1 62:7,8

started 20:17 21:8
23:6,10 24:7 38:18

starting 10:11

starts 40:10

statements 48:18
52:15 53:23

stay 6:21 11:10 58:11
62:23,24

BrighamR_Plaintiff Records 0633 (10.09.15)   10/09/2015
REBECCA BRIGHAM v. FRONTIER AIRLINES

step 41:10

Stephanie's 3:24

stepped 3:13

stories 34:3

stress 52:2

stressful 9:13

strongly 10:10

stubborn 20:4

stuff 18:8 22:20 29:2
33:15,17 39:13 43:21
46:13 53:12 57:4,5

substantial 49:7

sudden 23:10,15 48:24
54:4

suggest 10:10

suggestion 49:3

Sunday 24:7,13 42:17

super 13:12 45:12

supervisor 14:18 15:3

support 44:15 56:9

supposed 5:4

swap 46:14

sweet 18:15 19:22

switch 50:6

**T**

takes 40:2

talk 3:18 5:19 7:11
33:23 38:6 40:13 45:18
57:8

talked 10:1 47:13 50:9

talking 23:22 34:12,17,
18 35:10 40:10 52:14
56:5,6 59:4 64:13

talks 20:1

taught 22:20

teeth 41:2

telling 15:14 52:23
61:25

terms 63:11

terrible 36:25

texting 36:24

therapists 38:19

thing 9:18 14:22 28:6
34:5

things 27:16 65:24

thinking 30:16

Thompson 3:19

thought 10:2 19:15

threw 16:17 49:10

throw 9:17 49:2 50:24

thrown 7:23 8:2

Thursday 48:4

time 3:16 4:8 6:14
15:13 20:3 21:12 37:6
38:21 39:12 42:3,8
48:22 49:11 50:15 51:7,
12 53:12,17 57:5 62:13
63:23,25 65:25 66:5

times 10:15 22:22 25:3

tissue 6:3

today 4:1,5 18:6 22:3
26:17 45:10 54:23 55:2
58:21 64:8

told 40:15 53:18

tossing 29:1

totally 19:16 32:14

touch 17:6



BrighamR_Plaintiff Records 0633 (10.09.15)   **10/09/2015**                    Page 76
REBECCA BRIGHAM v. FRONTIER AIRLINES

touched 16:10

Tough 34:24

tracking 15:3

trade 46:14 49:23

train 16:6 18:25

training 10:2 22:11
61:7,12

trainings 61:12

travel 61:11

tray 33:12

treatment 56:1

tricky 14:25

trip 36:6 64:15,17

trips 8:18 32:5 47:11,
15,18 56:24 57:1

Tulley 38:3

turn 5:2,5,10,16 6:13,18
24:14 35:19 36:2,3,8,16
48:22 52:20 53:13
54:14

turned 22:12

turnings 48:11

turns 6:22 8:23 11:24
42:23 47:18,24 48:10
57:4 59:14

Twelve 46:4

two-and-a-half 15:20
28:4 38:5

___

**U**

U.S. 25:8 33:21

Uh-huh 2:17 13:10,18,
20 16:3 19:2,19 21:4
24:3,10 26:20 27:21
29:20 30:4,24 31:13,15,
24 32:11 34:2 36:14
38:11,14 39:2 40:8
41:6,20 42:19 43:20
47:16,19,23 49:5,8,14,
17,21,25 50:4,8 51:4
55:6,10 63:7

uhh 39:10

uhhh 65:17

ultimately 51:4

understand 40:13
48:20 53:1 65:12

understanding 47:6

union 57:11,12,16,21,
22

ups 31:11

usage 47:7

utilize 60:15

___

**V**

Vail 27:5

video 19:11

vocal 39:7

vocalizes 39:9

voice 40:6

___

**W**

wait 4:6

walk 7:10

Walking 14:12

wall 3:12 4:9

wanted 24:1 25:15
54:24,25 63:7

wanting 49:23 57:19

water 41:5

week 10:15,16 42:12
48:12

weekend 35:7 47:22

weekends 42:17
47:11,12

weeks 22:10

well-being 12:7

West 33:22

whiney 40:6

wondering 2:6

words 38:7,13,19,23
39:8

work 5:1,12 8:1,9,12,17
35:19 37:19 42:11,18
48:24 49:10 54:4,24
55:1 56:15 58:7,18 60:7
63:17 65:24

worked 54:25

working 8:14 36:25
58:9

works 8:11

Worried 40:22

worries 4:12

worst 33:21

worth 12:9 27:22

wow 15:13 20:20 21:5,
7,10,11 24:15 28:17
32:1,2

wrong 14:22,24 39:15

___

**Y**

year 28:4,7 30:4

years 15:12 30:7 62:16,
25

yesterday 16:5 18:18
19:5 61:15

York 32:10 33:18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

      Plaintiff,

v.

FRONTIER AIRLINES, INC.,

      Defendant.

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier"), respectfully submits this Response in Opposition to Plaintiff Rebecca Brigham's ("Plaintiff" or "Brigham") Motion for Partial Summary Judgment (Dkt. No. 36) ("Plaintiff's Motion"), stating as follows:

## I.      INTRODUCTION

This Court should deny Plaintiff's Motion because no reasonable jury could conclude, based upon the record in this case and Plaintiff's own admissions in deposition, that Plaintiff's alcoholism substantially limited her in any major life activity that would render her disabled for purposes of protection under the Americans with Disabilities Act as Amended ("ADAAA"). Even assuming Plaintiff suffered from a qualifying disability (which she did not), Plaintiff rejected Frontier's proposed reasonable accommodations that would have enabled her to perform the essential functions of her job as a flight attendant—additional intermittent leave under the Family and Medical Leave Act ("IFMLA"), a continuous leave of absence until Plaintiff was

more secure in her sobriety, and/or internal placement in a vacant position within Frontier for which she was minimally qualified. Plaintiff therefore was not a "qualified individual" for purposes of the ADAAA's protection.

Instead, Plaintiff continued to insist on her preferred, unreasonable accommodations, namely that she be excused from the Collective Bargaining Agreement's ("CBA") seniority bidding requirements and relieved of flying any flights with layovers (an essential function of her job as a flight attendant); that Frontier create a position for her in its General Office ("GO"); and/or that she be given temporary light-duty work in the GO. Regarding the GO, Frontier did not have open positions for which Plaintiff was minimally qualified at the time, a fact not in dispute. As a result, transferring Plaintiff to the GO would have required Frontier to create a new position for Plaintiff. The creation of a new position is not considered a "reasonable accommodation" under the ADAAA as a matter of law. Accordingly, Frontier's denial of Plaintiff's request to transfer to the GO did not violate the ADAAA as Plaintiff claims.

Additionally, it is undisputed that Frontier only offered temporary light duty assignments in the GO to those flight attendants injured on the job, in accordance with the CBA's provisions and Frontier's on-the-job-injury program. It is well settled under the law – including the EEOC's enforcement guidance – that Frontier was not required to provide Plaintiff with a light-duty assignment under the undisputed facts here, where Frontier limited such assignments to flight attendants injured on the job.

Regarding Plaintiff's request to be relieved of the seniority bidding requirements in the CBA, and relieved of all flights with layovers, the law is clear that a request to violate seniority bidding requirements is unreasonable. In addition, allowing Plaintiff to skip seniority bidding

(which is not allowed for in the CBA) and build her own flight schedule to avoid flights with layovers, or removing such flights from Plaintiff schedule post-bidding, would have relieved Plaintiff of an essential function of her job. Relieving an employee from an essential function of their job is also not considered a "reasonable accommodation" under the ADAAA as a matter of law. For these reasons and those set forth below, this Court should deny Plaintiff's Motion [Dkt. No. 36].

## II.   DEFENDANT'S RESPONSE TO MOVANT'S STATEMENT OF MATERIAL FACTS

1.   Admitted.

2.   Denied.[1] It is undisputed that, shortly after commencing her employment with Frontier, Plaintiff began demonstrating a pattern of attendance issues to which Frontier responded with the following written warnings:

|       |                                                  |
|-------|--------------------------------------------------|
| i.    | November 17, 2008: coaching and counseling.      |
| ii.   | December 29, 2008: coaching and counseling.      |
| iii.  | February 16, 2009: coaching and counseling.      |
| iv.   | October 21, 2009: coaching and counseling.       |
| v.    | January 12, 2010: coaching and counseling.       |
| vi.   | March 29, 2012: written warning.                 |
| vii.  | July 3, 2013: documented verbal warning.         |
| viii. | September 3, 2013: written warning.              |
| ix.   | September 28, 2013: final warning.               |
| x.    | October 18, 2013: final warning.                 |
| xi.   | March 6, 2015: documented verbal warning.        |
| xii.  | March 12, 2015: written warning.                 |
| xiii. | March 16, 2015: written warning.                 |
| xiv.  | May 12, 2015: written warning.                   |
| xv.   | May 26, 2015: final warning.                     |

---

[1] While Frontier disputes Plaintiff's characterization of her performance prior to her self-disclosure, the dispute is not material to any legal claim – Frontier did not base its termination or accommodation decisions on any past performance deficiencies. *See Zoutomou v. Copper*, 550 F. App'x 647, 650 (10th Cir. 2013) (citing FED. R. CIV. P. 56(c)) (summary judgment is only appropriate where there are genuine issues of material fact).

       xvi.       July 3, 2015: final warning.

       xvii.      August 7, 2015: final warning.

       xviii.     November 3, 2015: investigatory meeting.

       xix.       November 11, 2015: termination.

*See* Dkt. No. 38-1 (Arellano Decl.) at ¶¶ 17-18; *see also,* Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 45:10-48:9; Dkt. No. 36 (Plaintiff's Motion) at p. 4, ¶ 3 (conceding Frontier issued written warnings to Plaintiff regarding her attendance issues).

      3.     Denied as to the first sentence. Frontier issued written warnings to flight attendants, including Plaintiff, consistent with its Dependability Policy; such warnings were disciplinary in nature as the Policy itself states. *See* Dkt. No. 38-4 (Frontier Employee Handbook) at Frontier Airlines (R. Brigham) – 0000368 (describing verbal warnings, written warnings, final suspension, and termination as "Corrective Action" under the Dependability Policy). As to the second sentence, Frontier objects that the material cited to support Plaintiff's characterization of the opinions of others cannot be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). Frontier denies that flight attendants viewed the Dependability Policy as unreasonable.[2]

      4.     Admitted.

      5.     Admitted upon information and belief.

      6.     Admitted upon information and belief.

      7.     Denied. During her deposition, Plaintiff testified unequivocally that her alcoholism has not substantially limited her ability to perform a major life activity since September 5, 2014, the date on which she became sober; she has not had a drink since. *See* Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 67:20-68:4; Tr. 68:17-20; 70:23-71:5. Plaintiff's own

---

[2] Again, any dispute with respect to these facts is immaterial to the legal analysis.

deposition testimony further establishes that her alcoholism never substantially limited her ability to perform her job as a flight attendant, and that she was always able to perform the essential functions of her job while on duty. *See* Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 67:20-68:4; Tr. 68:17-20; 70:2-12; 70:21-71:5; Dkt. No. 36-3 (Excerpts from Pl.'s Dep. Tr.) at 67:20-68:16; *see also,* Dkt. No. 38-24 (Transcript of Recorded Meeting on Nov. 3, 2015) at BRIGHAM LM 00000045.

8.      Admitted upon information and belief that Plaintiff did not violate any rules surrounding alcohol. Denied that Plaintiff undertook "great efforts" to do so, based on her own deposition testimony that her alcoholism has not substantially limited her ability to perform a major life activity since September 5, 2014. *See* Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 67:20-68:4; Tr. 68:17-20; 70:23-71:5.

9.      Frontier objects on the grounds that Paragraph 9 states a legal conclusion regarding the phrase "capable of performing all essential functions of her job with reasonable accommodation." Denied that Plaintiff was capable of performing her essential job functions, given her inability to fly layovers and ultimate termination of employment due to attendance infractions. *See* Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 67:5-68:4; Tr. 68:17-20; 70:2-12; 70:21-71:5; *see also*, Dkt. No. 38-1 (Arellano Decl.) at ¶¶ 5-7; Dkt. No. 38-2 (Frontier Airlines Job Description); Dkt. No. 36 (Plaintiff's Motion) at p. 7 at ¶¶ 4, 9; Dkt. No. 38 at p. 11 at ¶ 39.

10.     Denied. Frontier was aware that Plaintiff suffered from alcoholism, and that alcoholism could be considered a disability under the ADAAA, but Frontier did not consider Plaintiff to be substantially limited in any major life activity or herself disabled under the

5

ADAAA – Frontier believed, as Plaintiff represented, that she had not had a single drink after

September 5, 2014. *See* Declaration of Gerardo ("Jerry") Arellano, attached as Exhibit A at ¶ 5.

11.    Denied that Plaintiff had a disability or was regarded as having a disability. *See*

RSOF ¶ 10 *supra*.  Frontier admits the remainder of Paragraph 11 upon information and belief.

12.    Frontier admits that Plaintiff has accurately quoted the document cited. Frontier

denies that Plaintiff's treatment plan "required" her to avoid overnight trips or trips longer than a

given work day. The treatment plan identifies Plaintiff's "Treatment, Modality, and Frequency"

as follows: "1. Individual treatment, one to two times monthly for six months (to be evaluated at

that time). 2. Group therapy, weekly for six months (to be evaluated at that time)," notably

making no mention of avoiding layovers as part of Plaintiff's "treatment." Dkt. No. 36-8

(Treatment Plan). Under the section titled "Additional Information," the treatment plan states

"*Rebecca* has identified triggers to cravings and opportunities to consume alcohol and those are

on overnight trips or anything longer than a given work day in her professional arena. At this

time *it would not be a good idea to encourage a vulnerable situation* with a work schedule that

serves as a temptation, *if possible*." *See* Dkt. No. 36-8 (Treatment Plan) (emphasis added); *see*

*also,* Dkt. No. 38-24 (Transcript of Recorded Meeting on Nov. 3, 2015) at BRIGHAM LM

00000045 (Plaintiff's testimony that she drank off-duty during layovers). The "Additional Note"

is nothing more than a suggestion, not requiring anything. Frontier does not dispute that the

treatment plan states that the plan and Plaintiff's progress towards meeting her goals as they are

reflected in the plan "will be reviewed every 90 days." Dkt. No. 36-8 (Treatment Plan).

13.    Frontier denies that Plaintiff's non-compliance with her treatment plan would

have required or necessarily resulted in Frontier's termination of her employment. *See* Ex. A

(Arellano Decl.) at ¶ 11. Frontier admits, however, that Frontier had the discretion to discipline Plaintiff for any non-compliance with the treatment plan, and that such discipline could include the termination of employment. *See* Dkt. No. 36-9.

14.    Admitted.

15.    Frontier denies that anything proposed by Plaintiff constituted an "accommodation" for purposes of the ADAAA in that to be an accommodation, the adaptation must actually be effective. *Equal Employment Opportunity Comm'n v. JBS USA, LLC,* 115 F. Supp. 3d 1203, 1231 (D. Colo. 2015) ("in ordinary English the word 'reasonable' does not mean 'effective.' It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness."), quoting *U.S. Airways v. Barnett,* 535 U.S. 391, 400 (2002).[3] Plaintiff requested one specific accommodation—that she be excused from handling flights with layovers. Frontier does not dispute that Plaintiff proposed three ways Frontier could facilitate the accommodation, which Frontier admits are accurately described by Plaintiff as (1) transferring Plaintiff to the General Office ("GO"), which would have excused her from handling any type of flight, including flights with layovers, (2) allowing Plaintiff to skip the bidding process required by the CBA and start each month with a blank schedule, so that she could build her own flight schedule from Open Time or the Trade Board that would avoid flights with layovers, and (3) having Frontier remove overnight trips from her schedule post-bidding. *See* Dkt. No. 36-3 (Excerpts from Pl.'s Dep. Tr.) at 72:1-4; 72:8-15; 72:18-24; 76:10-16.

16.    Frontier objects to the allegations in Paragraph 16 on the grounds that they are immaterial, in that Plaintiff's request to transfer to the GO was unreasonable because there were

---

[3] Frontier is not conceding that the requests identified by Plaintiff were in fact "accommodations" for purposes of the ADAAA.

no vacant positions in the GO, Plaintiff had already been sober for approximately nine (9) months, and Plaintiff did not and could not have provided Frontier with a date by which Plaintiff expected to be secure enough in her sobriety as a flight attendant. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶ 43 ("These assignments were not open job positions"); Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 77:14-17; Dkt. No. 38-21 38-21 (Excerpts from Pl.'s Dep. Tr.) at 76:19-77:22. Therefore, Frontier's decision to deny the request did not violate the ADAAA. Frontier admits that Frontier denied Plaintiff's request because there were no vacant positions in the GO, and because Plaintiff was not eligible for a temporary light-duty assignment under Frontier's On-The-Job-Injury ("OJI") Program. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶ 42-44.

17.     Frontier denies that the CBA permitted the temporary assignment of active flight attendants to light-duty work in the GO, other than through the OJI Program.[4] *See* Dkt. No. 38-5 (CBA "On-the-Job Injury" Section).

18.     Denied.  The CBA's OJI provisions allow for light-duty assignments only for flight attendants injured on the job. *See* Dkt. No. 38-5 (CBA "On-the-Job Injury" Section). Further, Frontier did not maintain open light-duty job positions for flight attendants injured on the job, nor were light duty assignments job "positions" – instead, Frontier would temporarily assign those injured on the job to perform other employees' duties. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶ 43.

---

[4] Flight attendants were considered inactive and therefore, ineligible to bid if they have been granted Frontier-approved continuous leaves such as Leave of Absence ("LOA"), Medical Leave ("MED"), Family Medical Leave Act ("FMLA") Leave, OJI Leave, etc. *See* Dkt. No. 38-1 (Arellano Decl.) at p. 4 at ¶¶ 5-7.

19.     Denied.  As the spreadsheet itself makes clear, with to respect to <u>flight attendants</u>, as it turns out, Frontier since 2012 has never provided light duty assignments to any flight attendant (injured on the job or not) as an accommodation, nor has Frontier placed any flight attendant (injured on the job or not) into a vacant ground position as an accommodation, although Frontier's On-the-Job Injury Program ("OJI") would have allowed for temporary light duty assignments if requested by flight attendants injured on the job *See* Dkt. No. 36-11 at Tab 2012 at Lines 12, 15, 22; Tab 2013 at Lines 11-13, 20-12; Tab 2014 at 18, 30; Tab 2015 at 8-13; Tab 2016 at 9-13, 16; Ex. 1 at Response to Request for Production No. 17 and Frontier Airlines (R. Brigham – 0004809-CONFIDENTIAL). In addition, as reflected in Dkt. No. 36-11 and Ex. 1, since 2012, Frontier has never transferred a flight attendant to a temporary ground assignment in Frontier's General Office ("GO") as an accommodation. Further, the spreadsheet makes clear that no <u>flight attendants</u> were offered modified work schedules. *Id.* Instead, only non-comparable workers in ground positions (who were not subject to a collective bargaining agreement) were offered schedule modifications. *See* Ex. A (Arellano Decl.) at ¶ 16. Flight attendants' schedules are controlled exclusively by the CBA, and governed by the seniority bidding requirements of the CBA, unlike non-unionized employees working on the ground. *See* Ex. A (Arellano Decl.) at ¶ 16.

20.     Denied. Plaintiff was not comparable to non-unionized employees offered temporary light duty assignments and/or modified schedules because, among other things, (1) she did not have a temporary on-the-job injury; and (2) she was a flight attendant subject to a CBA and the requirements of a seniority bidding system (unlike those ground workers not subject to a CBA). *See* Ex. A (Arellano Decl.) at ¶ 16. Plaintiff happened to be the only

individual reflected on the spreadsheet who was diagnosed with alcoholism, but that was certainly not the only difference between Plaintiff and others on the spreadsheet. *See* RSOF 19 *supra*; Ex. A (Arellano Decl.) at ¶¶ 14, 16; Excerpts from Arellano (Corp. Rep.) Dep. Tr., attached as Ex. B, at 95:17-23; 123:21-124:9; 149:21-150:7; Dkt. No. 38-23 (Email) ("the GO is only to accommodate OJI").

21.    Denied that Frontier did not reasonably accommodate Plaintiff. Frontier provided Plaintiff with both continuous and intermittent leave and proposed additional reasonable accommodations, which Plaintiff rejected, including transferring to a vacant or soon-to-be vacant position within Frontier, applying for additional IFMLA, or applying for a continuous leave until Plaintiff was more secure in her sobriety. *See* Dkt. No. 38 at p. 8-10 at ¶¶ 19, 25, 32-36. Admitted that Plaintiff accrued absences leading to termination of employment under Frontier's attendance policy, but denied that she was "required" to comply with the suggestion in her treatment plan that she may not want to fly layovers. *See* RSOF ¶ 12 *supra.* Frontier admits that in the event that Plaintiff failed to follow her treatment plan, the company had the discretion to take corrective action, including termination. *See* Dkt. No. 36-9. Frontier denies, however, that Plaintiff's treatment required Frontier to terminate Plaintiff's employment in the event that she failed to abide by the terms of her treatment plan. *See* RSOF ¶ 12 *supra.* Frontier also denies that the treatment plan prohibited Plaintiff from taking flights with layovers. *See* RSOF ¶ 12 *supra.* The treatment plan, which was not provided to Frontier until approximately 6 months after Plaintiff had been discharged from her in-patient treatment program and returned to Frontier— only indicated to Frontier, that to the extent possible, Frontier should not "encourage" Plaintiff to take overnight flights, because Plaintiff herself had indicated to her therapist, the treatment

plan's author, that she was tempted to drink while on layovers. *See* RSOF ¶ 12; *see* Ex. A (Arellano Decl.) at ¶¶ 8-11. Frontier admits that Plaintiff accrued absences constituting violations of Frontier's attendance policy, which ultimately culminated in Frontier's decision to terminate her employment.

22.     Frontier objects that the declaration and matters cited in support cannot be presented in a form that would be admissible at trial. Instead, it constitutes inadmissible "me too" evidence, which this Court has held is only admissible "if the plaintiff can demonstrate that 'such past discriminatory behavior by the employer is close in time to the events at issue in this case, the same decisionmakers were involved, the witness and the plaintiff were treated in a similar manner, and the witness and the plaintiff were otherwise similarly situated.'" *Parker v. Nat'l R.R. Passenger Corp.,* 214 F. Supp. 3d 19, 30 (D.D.C. 2016), aff'd, 696 F. App'x 522 (D.C. Cir. 2017), quoting *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010) and citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 385 (2008); *Hendricks v. Geithner*, 568 F.3d 1008, 1010 (D.C. Cir. 2009); s*ee* Fed. R. Civ. P. 56(c)(2). Here, according to Mr. St, Hilaire's own declaration, he was (i) supervised by Christopher Benedict, (ii) lied to Frontier about the fact that he had received treatment for alcoholism from a treatment facility, (iii) was required by Frontier to take routine drug tests, (iv) refused a drug test in violation of Frontier policy, (v) never requested an accommodation, and (vi) voluntarily left Frontier in April 2016, approximately five (5) months after the termination of Plaintiff's employment. *See* Dkt. No. 36-12 (St. Hilaire Decl.) at ¶¶ 6, 7, 12, 14. In contrast, Plaintiff was not supervised by Mr. Benedict, self-disclosed her alcoholism and treatment, never refused to take a drug test, requested an accommodation, and was involuntarily discharged for attendance infractions. *See* Ex. A

(Arellano Decl.) at ¶¶ 18-19. In sum, as reflected by both Plaintiff's allegations and Mr. St. Hilaire's declaration, Plaintiff was not similarly situated to or treated similarly to Mr. St. Hilaire. The "me too" evidence concerning Mr. St. Hilaire's employment with Frontier is not probative and therefore, inadmissible at trial. In any event, Frontier denies the allegations in Paragraph 22 – Frontier did not unlawfully discriminate against or harass Mr. St. Hilaire. *See* Ex. A (Arellano Decl.) at ¶ 20.

23.     Frontier objects to the allegations set forth in Paragraph 23 on the grounds that what constitutes a "reasonable accommodation" is a legal issue, not a fact issue. In addition, Frontier objects on the grounds that the declaration cited in support cannot be presented in a form that would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). Ms. Kernen's affidavit constitutes "me too" evidence, which this Court has held is only admissible "if the plaintiff can demonstrate that 'such past discriminatory behavior by the employer is close in time to the events at issue in this case, the same decisionmakers were involved, the witness and the plaintiff were treated in a similar manner, and the witness and the plaintiff were otherwise similarly situated.'" *Parker,* 214 F. Supp. 3d at 30, quoting *Nuskey*, 723 F. Supp. 2d at 233 and citing *Sprint,* 552 U.S. at 385; *Hendricks*, 568 F.3d at 1010. At the outset, the accommodations identified in Ms. Kernen's declaration related to pregnancy and lactation, which are not disabilities recognized under the ADAAA.  *See* Dkt. No. 36-13 (Kernen Decl.) at ¶¶ 20, 26. Further, Ms. Kernen voluntarily left Frontier in July 2016—approximately 8 months after Frontier terminated Plaintiff's employment. *See* Dkt. No. 36-13 (Kernen Decl.) at ¶ 28; Ex. A (Arellano Decl.) at ¶ 23. Further, the accommodation Ms. Kernen claims she requested—a leave of absence—was *offered* to Plaintiff who rejected it. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶¶ 32-36. Ms. Kernen did not suffer from

the same or similar medical condition, did not request the same accommodations, and was not

discharged due to attendance infractions (or at all). Ms. Kernen was not similarly situated to or

treated similarly to Plaintiff. Therefore, "me too" evidence concerning Ms. Kernen's

employment with Frontier is not probative and therefore, inadmissible at trial. In any event,

Frontier denies the allegations in Paragraph 23 – Frontier did not unlawfully deny Ms. Kernen

reasonable accommodations. *See* Ex. A (Arellano Decl.) at ¶ 24.

24.    Frontier objects to the allegations set forth in Paragraph 24 on the grounds that

the EEOC determination cited cannot be presented in a form that would be admissible at trial.

*See* Fed. R. Civ. P. 56(c)(2). To begin, unlike a discrimination case pending before the

judiciary, the EEOC needs only "reasonable cause" to issue a determination favorable to the

complainant. This lesser standard means that the complainant need not actually prove their case

as required in a court of law. For this reason and others, EEOC Determinations are not

automatically admissible at trial; instead, like any evidence, their admissibility is subject to the

general balancing test set forth in the Federal Rules of Evidence. *See Tuffa v. Flight Servs. &*

*Sys., Inc.,* 644 F. App'x 853, 857 (10th Cir. 2016) ("Rule 803(8) addresses hearsay, but does not

vitiate Rule 403 or imply that agency findings will always be more probative than prejudicial"),

citing *Coleman v. Home Depot, Inc.,* 306 F.3d 1333, 1345 (3d Cir. 2002) ("[W]e decline

Coleman's invitation to conclude that, based on the presumption of admissibility under Rule

803(8)(C), EEOC Letters  of Determination are *per  se* more  probative  than  prejudicial  under

Rule 403...."); *Cortes v. Maxus Expl. Co.,* 977 F.2d 195, 201 (5th Cir.1992) (concluding that

an EEOC determination, to be admissible, must pass the test under Rule 403 even if the EEOC

determination  satisfies  the  hearsay  exception  in  Rule  803(8)); *see also, E.E.O.C.  v. Loral*

*Aerospace Corp.,* 162 F.3d 1172, 1998 WL 769820, 2 (10th Cir. 1998) (finding no abuse of the trial court's discretion in excluding an EEOC Determination at trial); *Palage v. HCA-HealthONE, LLC,* No. 11-CV-01285-LTB-CBS, 2012 WL 5493998, at *10 (D. Colo. Nov. 13, 2012) ("EEOC Determinations are not admissible in this case")*; Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1331 (10th Cir.1999) ("when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one") (abrogated on other grounds).

Here, the Determination is inadmissible because it lacks probative value and is instead, highly prejudicial. As facially evident from the Determination itself, the EEOC failed to address the threshold inquiry for all ADAAA claims—whether Plaintiff was in fact disabled. *See* Exhibit 14 to Plaintiff's Motion. The EEOC also failed to make any determination with respect to whether Plaintiff was actually qualified to perform the essential functions of her job as a flight attendant with or without a reasonable accommodation. *See id.* Instead, the EEOC concluded that because Plaintiff had "presented [Frontier] with medical documentation, a treatment plan, and her own explanation of why this accommodation was necessary for her continued employment" as well as "several possible accommodations…which had the support of the Vice President of the Flight Attendants' union," Frontier's decision to deny Plaintiff "a reasonable accommodation" and ultimately discharge her employment violated the ADA. Not only did the EEOC fail to engage in any legal analysis, the EEOC's determination was based on false assumptions that have not been borne out by the actual evidence in this case. For instance, the EEOC's determination relies upon the mistaken fact that the union supported the accommodation

sought by Plaintiff, which the union's representative unequivocally denied in deposition. *See* Dkt. No. 38-22 (Excerpts from Prince Dep. Tr.) at 58:17-59:7. Finally, Plaintiff herself has admitted that Frontier representatives met with Plaintiff on multiple occasions to discuss potential accommodations Frontier could provide Plaintiff and that during these meetings, Frontier encouraged Plaintiff to look for and apply for other internal positions within Frontier that would not require her to fly, apply for additional intermittent FMLA, and/or apply for another continuous leave of absence, all of which Plaintiff concedes she refused to do. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶ 40; Dkt. No. 38-21 (Excerpts from Pl.'s Dep. Tr.) at 64:1-65:7; Dkt. No. 38-15 (Transcript of Recorded Meeting on October 9, 2015) at BRIGHAM LM 00000020-21. In sum, given the likelihood (or even the mere possibility) that a jury would find the EEOC's Determination persuasive despite its lack of probative value, the EEOC Determination is inadmissible at trial.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, admissions on file, or affidavits [show] that there is no genuine issue as to any material fact." *See Zoutomou v. Copper*, 550 F. App'x 647, 650 (10th Cir. 2013) (citing FED. R. CIV. P. 56(c)). "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law." *E.E.O.C. v. Western Trading Co., Inc.*, No. 10–cv–02387–WJM–MEH, 2012 WL 1460025 at *1 (D. Colo. April 27, 2012), citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986). "A fact is 'material' if it pertains to an element of a claim or defense; a factual dispute is 'genuine' if the evidence is so contradictory

that if the matter went to trial, a reasonable party could return a verdict for either party." *Western Trading Co.*, 2012 WL 1460025 at *1, citing *Anderson,* 477 U.S. at 248.

"The burden of showing that no genuine issue of material fact exists is borne by the moving party" and the Court must resolve factual ambiguities against the moving party. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

## IV.    ARGUMENT

### A.    Plaintiff Was Not Disabled Within The Meaning Of The ADAAA.

Plaintiff's claim that "there can be no reasonable dispute that Ms. Brigham was 'disabled' within the meaning of the ADA," ignores both the law and record, including Plaintiff's own testimony. *See infra* at Section IV.A.2. For the reasons set forth below and those set forth in Frontier's Motion for Summary Judgment (Dkt. No. 38) at pp. 18-20, which Frontier incorporates by reference, the Court should deny Plaintiff's Motion because no reasonable jury could conclude based on the evidence that Plaintiff was disabled for purposes of the ADAAA.

### 1.    Status As An Alcoholic Does Not Automatically Render A Person Disabled Under The ADAAA.

A plaintiff's status as an alcoholic does not automatically render her disabled, and therefore protected, under the ADAAA. *Kitchen v. BASF,* 343 F. Supp. 3d 681, 688–89 (S.D. Tex. 2018), *report and recommendation adopted,* No. 3:17-CV-00040, 2018 WL 5723147 (S.D. Tex. Nov. 1, 2018), *aff'd,* 952 F.3d 247 (5th Cir. 2020) ("[T]here is no *per se* rule that categorizes recovering alcoholics ... as disabled" and "mere status as an alcoholic or substance abuser does not necessarily imply [the requisite] 'limitation' [for a disability determination].").
Instead, the plaintiff must demonstrate that their alcoholism substantially limited their ability to perform a major life activity. *See id.* (a case-by-case evaluation is necessary "to determine

whether a particular plaintiff, who is a recovering alcoholic, qualifies as disabled, because of his

addiction."), quoting *Radick v. Union Pac. Corp.*, No. 4:14-CV-02075, 2016 WL 639126, at *5

(S.D. Texas Jan. 25, 2016).

### 2.    Plaintiff Herself Testified That Her Alcoholism Was Not Substantially Limiting.

A person is "disabled" under the ADAAA only if they suffer from "a physical or mental

impairment that substantially limits one or more major life activities." 42 U.S.C.

§ 12102(1)(A). *Allen v. SouthCrest Hosp.,* 455 F. App'x 827, 831 (10th Cir. 2011), quoting

*Berry v. T– Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (internal quotation marks

omitted) (emphasis added). "For a physical or mental impairment to be "substantially

limiting" the individual must be: '(i) Unable to perform a major life activity that the average

person in the general population can perform; or (ii) Significantly restricted as to the

condition, manner or duration under which [the] individual can perform a particular major life

activity as compared to the condition, manner, or duration under which the average person in

the general population can perform that same major life activity.'" *Burris v. Novartis Animal*

*Health U.S., Inc.,* 309 F. App'x 241, 250 (10th Cir. 2009), citing *Nielsen v. Moroni Feed Co*.,

162 F.3d 604, 611 n. 11 (10th Cir. 1998), quoting 29 C.F.R. § 1630.2(j)(1)). Major life

activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). "Not

all impairments are serious enough to be considered disabilities under the statute" and

therefore, whether an individual's "impairment substantially limits a major life activity

requires an individualized assessment." *Moore v. Centralized Mgmt. Servs., LLC,* No. CV 19-

1592, 2020 WL 972711, at *4 (E.D. La. Feb. 28, 2020), reconsideration denied, No. CV 19-1592, 2020 WL 2037191 (E.D. La. Apr. 28, 2020), at *4, quoting 29 C.F.R. § 1630.2(j)(1)(i) & (iv).

To demonstrate that an impairment is substantially limiting, a plaintiff must show that he is "unable to perform the activity or is significantly restricted in the ability to perform the major life activity compared to the general population." *Gomez v. Sam's W., Inc.,* No. 16-CV-02240-CMA-STV, 2018 WL 3475167, at *6 (D. Colo. July 19, 2018), citing *Lusk v. Ryder Integrated Logistics,* 238 F.3d 1237, 1240 (10th Cir. 2001). "Where an impairment is not so severe that it is 'substantially limiting on its face,' the plaintiff must present 'evidence comparing [his] ... restrictions to that of an average person.'" *Id.* (internal citations and quotation omitted). Unless a plaintiff can show that her impairment reduces his capabilities significantly below those of the average person, she is not deemed "disabled" under the Act." *Id.* (internal citations and quotation omitted).

During her deposition, Plaintiff testified unequivocally that (i) her alcoholism has ***never*** substantially limited her ability to perform her job as a flight attendant; (ii) since September 5, 2014 (Plaintiff's "sobriety date") through the end of her employment with Frontier, Plaintiff was always able to perform the essential functions of her job as a flight attendant while on duty; and (iii) since September 5, 2014, Plaintiff has been sober and alcoholism has not impacted her daily life activities or inhibited her ability to function. RSOF at ¶ 7. This testimony alone not only undermines her argument that it is undisputed that Plaintiff was disabled for purposes of the ADAAA, but is undeniably fatal to her claims.

While Plaintiff's counsel unsuccessfully attempted to rehabilitate his client, he obtained

only the conclusory testimony that Plaintiff "had trouble caring for [herself], eating, sleeping, concentrating, and working." SOF at ¶ 7. Such testimony is insufficient for purposes of satisfying Plaintiff's burden of demonstrating that her alcoholism substantially limited her ability to perform daily activities. *See Burch v. Coca-Cola Co.,* 119 F.3d 305, 316 (5th Cir. 1997) (holding plaintiff's testimony that he experienced hangovers and that his ability to talk, walk, think, remember things, and sleep were affected by his drinking were insufficient for purposes of demonstrating that his alcoholism substantially limited his daily activities, explaining "Although Burch's alcoholism assuredly affected how he lived and worked, far more is required to trigger coverage under § 12102(2)(A).") *Id* at. 316 (internal citation and quotation omitted).

### 3. The Testimony Plaintiff Relies Upon Is Mischaracterized And Directly Contradicted By Plaintiff Herself.

Plaintiff claims that Frontier conceded that Plaintiff was disabled under the ADAAA, citing to testimony where Frontier's corporate representative confirmed that Frontier considers alcoholism to be a disability that could be covered by the ADAAA. *See* Dkt. No. 36 (Plaintiff's Motion) at p. 19. To begin, testimony that Frontier acknowledges alcoholism as a possible disability is insufficient for purposes of demonstrating that Frontier believed Plaintiff's alcoholism substantially limited her ability to perform daily activities, and therefore was disabling for purposes of the ADAAA. *See Burch,* 119 F.3d at 315 (expert testimony that alcoholics are disabled under the ADA was insufficient for purposes of demonstrating that the plaintiff, an alcoholic, was disabled under the ADA because the expert "testified only in general terms about alcoholics as a class" and as a result "shed no light on the individualized inquiry required by the ADA"); *see also, Moore v. Centralized Mgmt. Servs., LLC*, No. CV 19-1592,

2020 WL 972711, at *7 (E.D. La. Feb. 28, 2020), *reconsideration denied*, No. CV 19-1592, 2020 WL 2037191 (E.D. La. Apr. 28, 2020) (concluding that communications between the plaintiff and defendants' human resources consultant in which the consultant asked the plaintiff for documentation of his treatment to substantiate his ADA claim and stating that she believed recovering alcoholics seeking treatment are protected by the ADA do not prove that the defendants regarded the plaintiff as disabled, explaining "There is nothing in them indicating that Defendants perceived Moore as having a substantial limitation as that term is understood under the ADA. Rather, these text messages acknowledge only that Moore is seeking protection under the ADA *and belie the non-lawyer Schram's incomplete comprehension of the law regarding whether alcoholism is a disability under the ADA"*) (emphasis added).

Further, despite the fact that Mr. Arellano is not a lawyer and testified that he had no medical training, Plaintiff's counsel never asked Mr. Arellano if he knew that the ADAAA has a specific definition for the term "disability" or whether Mr. Arellano was familiar with the ADAAA's specific definition of the term "disability." *See* RSOF at ¶ 10. Had he done so, he would have learned that Mr. Arellano was unaware that the ADAAA has its own definition of the term "disability" and that as a result, he had simply understood the question as asking whether Frontier believed that alcoholism was an impairment recognized by the ADAAA and therefore, answered in the affirmative. *See* RSOF at ¶ 10.

In addition, Plaintiff's counsel never actually asked Mr. Arellano whether Frontier believed that Plaintiff was in fact disabled or whether Plaintiff's alcoholism—as she experienced it—substantially impaired her ability to perform daily life activities. *See* Dkt. No. 36 (Plaintiff's Motion) at p. 7 at ¶ 10 and RSOF at ¶ 10. Even if he had and even if Mr. Arellano had testified in

the affirmative, that testimony would not nullify Plaintiff's own admissions as discussed above

or "obviate the requirement, explicit in the ADA and its implementing regulations, that purported

conditions be examined to ascertain whether a specific condition substantially limited a major

life activity." *Burch,* 119 F.3d at 317.

### 4.   Plaintiff's "Record Of" And "Regarded As" Theories Should Not Be Considered.

To begin, Plaintiff's "regarded as" and "record of" disability theories are not properly

before the Court and therefore, should not be considered given that they were not pled in

Plaintiff's Complaint and instead, were raised for the first time in Plaintiff's Motion nearly a year

after Plaintiff filed her Complaint and without any adequate explanation for the delay. *See*

*Astorga v. Idahoan Foods, LLC*, No. 1:18-CV-000195-DCN, 2019 WL 4120803, at *5 (D. Idaho

Aug. 29, 2019) (rejecting plaintiff's "regarded as" theory introduced for the first time at

summary judgment, explaining "Astorga did not actually plead a "regarded as" disability claim

in her Complaint and, therefore, is precluded from raising such an argument at summary

judgment…If Astorga wanted to plead a "regarded as" ADA claim, she could have done so, but

she did not. She cannot do so now"), citing *Stuart v. Vilsack,* No. 2:14-CV-416, 2016 WL

6902347 *3 (E.D. Wash. 2016) (because Plaintiff had not plead a "regarded as" claim she could

not argue such a theory at summary judgment); *Ruiz Rivera v. Pfizer Pharmaceuticals, LLC,* 521

F.3d 76, 85 (1st Cir. 2008) (finding "it simply will not do for a plaintiff to fail to plead with

adequate specificity facts to support a regarded as claim, all-the-while hoping to play that card if

her initial hand is a dud"); *see also, Lewis v. Powers*, No. 1:15-CV-02692-MEH, 2018 WL

6272259, at *13 (D. Colo. Nov. 30, 2018) (Even "[t]he liberalized pleading rules do not allow [a

plaintiff] 'to wait until the last minute to ascertain and refine the theories on which [she]

intend[s] to build [her] case'") (quoting *Evans v. McDonald's Corp.,* 936 F.2d 1087, 1090–91

(10th Cir. 1991)); *Evans v. McDonald's Corp.,* 936 F.2d 1087, 1090–91 (10th Cir. 1991)

("untimeliness alone is a sufficient reason to deny leave to amend.... when the party filing the

motion has no adequate explanation for the delay") (internal citation omitted).

### 5.     Plaintiff Had No Record Of Impairment.

Even assuming Plaintiff's "record of" a disability theory is properly before the Court

(which it is not), Plaintiff is still not entitled to summary judgment. "An individual has a record

of a disability if the individual has a history of, or has been misclassified as having, a mental or

physical impairment ***that substantially limits one or more major life activities.***" 29 C.F.R. §

1630.2 (emphasis added).

Plaintiff's argument that it is undisputed that Plaintiff had a record of impairment rests

upon the assumption that Plaintiff's alcoholism substantially limited a major life activity, which

as discussed in Sections IV.A.1-3 *infra* is insufficient. Relying on *Mestas v. Town of Evansville,*

Plaintiff's citations to testimony concerning requirements for individuals participating in

Frontier's self-disclosure program and Plaintiff's requests for accommodation are similarly

unavailing. 186 Fed. Appx. 153 (10th Cir. 2019). *Mestas* involved a former sanitation truck

driver who had been injured on the job after slipping on ice. *Id.* at 155. The plaintiff had

submitted documentation from his physician stating that he was unable to work until further

notice before being placed on a medical leave. *Id.* Ultimately, the plaintiff returned to work, but

reinjured his back. *Id.* Although initially he did not notify his supervisor of his re-injury, he did

notify his supervisor that he had scheduled a doctor's appointment for a steroid injection to

relieve his back pain and requested time off to attend the appointment. *Id.* He also requested the

ability to use a snowblower rather than a shovel because of his back pain. *Id.* The following day, the plaintiff notified his supervisor that he had in fact reinjured his back and asked to be excused from shoveling snow. *Id.* at 156. The supervisor hung up on the plaintiff and when the plaintiff called him back, and fired the plaintiff, telling him that he should go "take care of [his] back or whatever." *Id.* Following the termination of his employment, the plaintiff applied for and received Social Security Disability Insurance dating back to the time he reinjured his back and had requested accommodations. *Id.* While the trial court had granted summary judgment in favor of the defendant on the plaintiff's ADA hostile work environment claim on the grounds that he had failed to establish a record of disability, the Tenth Circuit reversed on the grounds that a reasonable jury could have found that the plaintiff established a record of disability through his physician's documentation about his injured back and subsequent medical leave, his request to take time off for a steroid injection, and his request to have snow-removal accommodations because of back pain. *Id.*

In contrast, while evidence in *Mestas* suggested that the plaintiff had reinjured his back while on the job and that he needed additional accommodations for purposes of receiving treatment (i.e. steroid injections), in this case, there is no evidence indicating that Plaintiff needed any additional accommodation for purposes of receiving treatment (i.e. in-patient or out-patient rehabilitation treatment, AA meetings, and/or therapy) for alcoholism. Instead, Plaintiff herself has testified that at the time that she was requesting to be excused from flights with layovers, she had been sober for over nine (9) months, never having relapsed. *See* RSOF at ¶ 7. In addition, unlike the plaintiff in *Mestas* who had injured his back on the job and had previously experienced back pain performing a specific job function, Plaintiff testified that she had never

consumed alcohol on the job and that her alcoholism had never interfered with her ability to perform her job as a flight attendant. *See* RSOF at ¶ 7. Further, while the plaintiff's back pain was triggered when he performed certain work on jobsites during his scheduled shift, according to Plaintiff's own testimony, Plaintiff only felt tempted to drink off the job—specifically, at hotels during the course of overnight layovers. *See* RSOF ¶ 7.

To the extent that Plaintiff is trying to suggest that Frontier's drug and alcohol policies and protocols, including requirements for employees who had self-disclosed a substance abuse disorder and wanted to return to work, were part of Plaintiff's "treatment regimen" and therefore, a factor in determining whether her alcoholism is substantially limiting, she is mistaken. Plaintiff's treatment regimen was the in-patient or out-patient rehabilitation treatment, AA meetings, and/or therapy proscribed by her medical care providers. Frontier's policies and protocols applied to everyone who had self-disclosed a substance abuse disorder and therefore, considering them could not be useful for purposes of determining whether Plaintiff's alcoholism substantially limited Plaintiff's ability to perform daily life activities. *See Ramsay v. Nat'l Bd. of Med. Examiners,* No. 19-CV-2002, 2019 WL 7372508, at *10 (E.D. Pa. Dec. 31, 2019), *aff'd,* 968 F.3d 251 (3d Cir. 2020) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment."); *Burch,* 119 F.3d at 315 (testimony concerning alcoholics as a class shed no light on the individualized inquiry required by the ADA for purposes of determining whether the plaintiff's alcoholism substantially limited his ability to perform a major life activity).

**6.   Plaintiff Was Not Regarded As Disabled.**

Similarly, even if Plaintiff's "regarded as" theory is properly before the Court (which it is

not), Plaintiff is still not entitled to summary judgment. As explained by the Supreme Court, the "regarded as" claim protects those individuals who are subjected to employer misconceptions that "result from stereotypic assumptions not truly indicative of individual ability." *Rakity v. Dillon Companies, Inc.,* 302 F.3d 1152, 1162 (10th Cir. 2002) (internal citation and quotation omitted). "An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." *Briggs v. Delta Air Lines, Inc.,* 353 F. Supp. 3d 641, 648 (E.D. Mich. 2019), quoting *Sutton v. United Air Lines*, *Inc.,* 527 U.S. 471, 490, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *overturned due to legislative action* (U.S. Pub. L. 110-325 January 1, 2009). Therefore, the "regarded as" theory results from one of the following two scenarios: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489; *see also, Adair,* 823 F.3d at 1305–06 (An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited by the ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity so long as the impairment is not transitory or minor"), citing § 12102(3)(A), (B), (C) (A transitory impairment is an impairment with an actual or expected duration of 6 months or less.).

According to Plaintiff, "Defendant **was aware of and therefore perceived the impairment** [presumably, Plaintiff's alcoholism] at the time of the alleged discriminatory action," citing to a letter from Frontier regarding her completion of her Substance Abuse

Program ("SAP"). Dkt. No. 36 (Plaintiff's Motion) at p. 23 (emphasis added). However, to prevail on a "regarded as claim," Plaintiff must demonstrate not just that Frontier was aware of her alcoholism, but that Frontier *regarded her alcoholism as substantially limiting one or more of her major life activities*. *See e.g., Moore v. Centralized Mgmt. Servs., LLC,* No. CV 19-1592, 2020 WL 972711, at \*7 (E.D. La. Feb. 28, 2020), *reconsideration denied,* No. CV 19-1592, 2020 WL 2037191 (E.D. La. Apr. 28, 2020) ("the fact that a person is perceived to be a drug addict does not necessarily mean that person is perceived to be disabled under the ADA," but he "must also show that [the employer] regarded [his] addiction as substantially limiting one of [his] major life activities."); *Cause of Action to Recover Damages Under ADA (42 U.S.C.A. §§ 12101, et seq.) for Employment Discrimination for Having a "Record of" a Disability or Being "Regarded as Disabled,"* 16 Causes of Action 2d 153 (Nov. 2020 Update) ("Under the Americans with Disabilities Act (ADA), the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action") (citing *Kruger v. Hamilton Manor Nursing Home,* 10 F. Supp. 3d 385 (W.D. N.Y. 2014)); *Id.* (citing *Walker v. U.S. Secretary of the Air Force,* 7 F. Supp. 3d 438 (D.N.J. 2014)) ("That the Air Force was aware of civilian employee's impairment following traumatic brain injury, and gave him two hours to respond to a suspension notice, and that human resources official used the word "disability" in referring to employee did not show that the Air Force regarded employee as substantially limited in any major life activities, and thus, Air Force did not regard him as being disabled within the meaning of the ADA"); *see also, Kitchen,* 343 F. Supp. 3d at 689 ("In an effort to avoid summary judgment, Kitchen argues that he was "regarded by [BASF] as having a

disability" because BASF knew he was recovering alcoholic, allowed him to participate in an Employee Assistance Program, and required him to submit to alcohol tests…If the Court accepts Kitchen's theory, "every employee ever subjected to alcohol testing or placed on leave for drinking at work necessarily would be disabled under the statute... That is an absurd result that finds no support in the case law").

Further, Plaintiff's insistence that Frontier repeatedly refused to accommodate her— failing to recognize the severity of her alcoholism—undermines any claim that Frontier regarded Plaintiff's alcoholism as substantially limiting. In addition, for the reasons described in Section IV.A.3 *supra,* Plaintiff's own testimony that she had been sober for over a year at the time that Frontier terminated her employment, that alcoholism had never impacted her ability to do her job as a flight attendant demonstrates that her alcoholism was not in fact actually substantially limiting. RSOF at ¶ 7. Therefore, Plaintiff cannot prevail on a "regarded as" theory under the ADAAA. *See Burch,* 119 F.3d at 322 ("[T]he evidence [is] insufficient to support a finding that [the employer] regarded [the employee] as anything other than what he actually was: an alcoholic whose alcoholism did not substantially impair any major life activity, including the major life activity of working.").

Regardless, even if Plaintiff was "regarded as" disabled for purposes of the ADAAA (which she was not), she was not subjected to an action prohibited under the ADAAA, and therefore cannot prevail on her ADAAA claims on a "regarded as" theory. Regarding Plaintiff's failure to accommodate claim, Plaintiff cannot prevail under her "regarded as" theory because an employer is not required to accommodate an employee based solely upon a perceived disability. *See Brownwood v. Wells Trucking,* LLC, No. 16-CV-01264-PAB-NYW, 2017 WL 3621830, at

*3 (D. Colo. Aug. 22, 2017), citing 29 C.F.R. § 1630.2(o)(4). Further, as discussed in Frontier's Motion for Summary Judgment (Dkt. No. 38), Frontier *did* provide Plaintiff with reasonable accommodations and was not required to excuse Plaintiff from performing an essential function of her job as a flight attendant (i.e. handling flights with layovers) as an accommodation or required to provide unreasonable accommodations that would violate the terms of the CBA or infringe upon the seniority rights of other flight attendants.[5] Regarding Plaintiff's discrimination claim, the record clearly reflects that Frontier did not deny Plaintiff's requests for accommodation or terminate her employment because it perceived her alcoholism as substantially limiting Plaintiff's ability to perform daily life activities, but rather because she admittedly violated Frontier's attendance policy. *See* Dkt. No. 38 at pp. 27-29; *see also, Manna v. Phillips 66 Co.,* 820 F. App'x 695, 705 (10th Cir. 2020) (the same evidence that demonstrates causation under § 12102(3)(A) also demonstrates causation under the *McDonnell Douglas* prima facie demonstration of disability discrimination.); RSOF at ¶¶ 2, 21.

### B. Plaintiff Was Not Qualified To Perform Her Job As A Flight Attendant.

Plaintiff's claim that the undisputed material facts demonstrate that Plaintiff was a "qualified individual" within the meaning of the ADAAA also ignores both the law and the record, including Plaintiff's own testimony. For the reasons set forth below and those set forth in Frontier's Motion for Summary Judgment (Dkt. No. 38)[6], which Frontier incorporates by reference, the Court should deny Plaintiff's Motion because no reasonable jury could conclude based on the evidence that Plaintiff could perform the essential functions of her job as a flight attendant with or without a reasonable accommodation.

---

[5] Frontier incorporates by reference Dkt. No. 38 at pp. 26-28.
[6] Frontier incorporates by reference Dkt. No. 38 at pp. 20-27.

Determining whether a plaintiff is a qualified individual such that he can bring a disability-discrimination claim, requires "a two-part analysis." *Adair,* 823 F.3d at 1307 (internal citations and quotations omitted). First, the Court asks "whether the plaintiff can perform the essential functions of the job, *i.e.,* "functions that bear more than a marginal relationship to the job at issue." *Id.* (alterations and quotation marks omitted). Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the time spent performing the particular function; (4) the consequences if the individual cannot perform the function; (5) any collective-bargaining agreement; (6) the work experience of those in the position in the past; and (7) the current work experience of those in similar positions. *Adair,* 823 F.3d at 1307, citing 29 C.F.R. § 1630.2(n)(3). Second, if the Court concludes that Plaintiff is *not* able to perform the essential functions of the job, it must determine whether any reasonable accommodation by the employer would enable him to perform those functions. *Id.* (internal citation and quotation omitted).

> 1. **Plaintiff Admits That Flights With Layovers Were An Essential Function Of Her Job As A Flight Attendant And That She Could Not Perform That Function.**

Plaintiff contends that "[t]he undisputed factual record demonstrates that Ms. Brigham had no difficulty completing the essential functions of her job as a flight attendant until she required a reasonable accommodation" and that "the accommodations requested by Ms. Brigham would have allowed her to comply with her treatment plan as well as the terms of Defendant's self-disclosure program, i.e., Ms. Brigham's requested accommodations would have permitted her to perform the essential functions of her job." Dkt. No. 36 (Plaintiff's Motion) at p. 18.

Compliance with Plaintiff's individualized treatment plan and Frontier's self-disclosure program, however, were not essential functions of Frontier's flight attendant position.[7] As explained in Frontier's Motion for Summary Judgment, "Essential functions" are "the fundamental job duties of the employment position." Dkt. No. 38 at p. 20, citing 29 C.F.R. § 1630.2(n)(1). Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job. *Id.,* citing 29 C.F.R. § 1630.2(n)(3); *Wells v. Shalala,* 228 F.3d 1137, 1144 (10th Cir. 2000).

It is undisputed that handling flights requiring layovers, including overnight layovers was an essential function of Frontier's flight attendant position. *See* RSOF ¶ 9. According to Plaintiff, however, layovers jeopardized her sobriety and therefore, to do her job as a flight attendant, she needed to be excused from them as an accommodation. *See* RSOF ¶ 9.

### 2. The Accommodation Plaintiff Requested Would Not Have Enabled Plaintiff To Fly Flights With Layovers And Was Unreasonable.

The accommodation Plaintiff requested—relief from flights with layovers—was not a reasonable or even plausible because relief from an essential function of a position is not reasonable or even plausible accommodation as a matter of law. *See Gardenhire v. Manville,* 722 Fed. Appx. 835, 839 (10th Cir. 2018) (An employee's request to be relieved from an essential function of his position is not, as a matter of law, a reasonable or even plausible

---

[7] Even if they were, as discussed in Section V.A.3 *supra,* neither prohibited Plaintiff from the job function she sought to avoid—overnight flights. *See also* RSOF ¶ 12.

1402

accommodation."); *see also, Ruiz v. Woodward, Inc.,* No. 17-CV-03046-MSK-KLM, 2019 WL 6893039, at *8 (D. Colo. Dec. 18, 2019) ("The 10th Circuit has repeatedly made clear that a proposed accommodation that reallocates or removes essential functions from an employee's job is not, as a matter of law, a "reasonable" accommodation").

Further, inherent in *all* flights is the risk of experiencing inclement weather and/or mechanical issues, which could require a layover. Therefore, even if the accommodation Plaintiff requested was reasonable and all flights with layovers were removed from Plaintiff's flight schedule, given that flight schedules are inevitably impacted by inclement weather and airplane mechanical issues, Frontier could never have guaranteed that Plaintiff would never be required to handle a flight with a layover.

Therefore, given Plaintiff's testimony that she could not handle flights with layovers and maintain her sobriety, Plaintiff's request, would not have enabled her to perform the essential functions of her job as a flight attendant, precluding her ability to demonstrate that she was a "qualified individual with a disability" for purposes of the ADAAA as a matter of law. *See e.g., US Airways, Inc. v. Barnett,* 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations."); *Santiago v. Executive Airlines*, 41 F. Supp. 2d 129, 137 (D. Puerto Rico 1999) (plaintiff's demand for an accommodation allowing her only to fly in aircrafts with pressurized cabins "was not viable" because "unforeseen circumstances may force last minute changes from a scheduled pressurized flight for an unpressurized one which requires that assigned crews be qualified to work in both").

### 3.    Plaintiff Rejected Reasonable Alternative Accommodations.

Even assuming, *arguendo*, that Plaintiff could somehow demonstrate that she is a qualified individual with a disability under the ADAAA, Plaintiff lost that status and disqualified herself from the protection offered by the ADAAA as a matter of law when she rejected alternative reasonable accommodations proposed by Frontier, including transferring to another internal position within the company, applying for additional IFMLA, or taking a continuous leave of absence until she felt more secure in her sobriety. *See* Dkt. No. 38 at p. 25, citing *Kuehl v. Wal-Mart Stores, Inc.*, 909 F. Supp. 794, 803 (D. Colo. 1995) (holding employee lost any status she may have had under the ADA as a qualified individual with a disability by rejecting reasonable alternative accommodations offered by her employer); *see also,* Sharing the Dream: Is the ADA Accommodating All? Substance Abuse Under the ADA, U.S. Commission on Civil Rights, available at [https://www.usccr.gov/pubs/ada/ch4.htm#_ftn60](https://www.usccr.gov/pubs/ada/ch4.htm#_ftn60) ("Reasonable accommodation for an alcoholic would generally involve a modified work schedule so the employee could attend Alcoholics Anonymous meetings, or a leave of absence"), citing 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o)(2).

### C.    Frontier Did Not Violate The ADAAA When It Denied Plaintiff's Request For Reassignment To The GO Or Temporary Light Duty Assignment.

Plaintiff claims that her request to be transferred to the GO was a request for reassignment and therefore, plausibly reasonable. *See* Dkt. No. 36 (Plaintiff's Motion) at p. 26. Plaintiff, however, ignores the fact that to be plausibly reasonable, a request for reassignment must be to an ***existing vacant position***. *See* 42 U.S.C. § 12111(9) (providing that a reasonable accommodation may include "reassignment ***to a vacant position***") (emphasis added); *see also, Johnson v. Sedgwick Cty. Sheriff's Dep't.*, 461 Fed. Appx. 756, 758 (10th Cir. 2012) (noting

that an employee has no duty to accommodate an employee by creating a new position or a new vacancy). "A position is vacant *when a similarly situated, non-disabled employee would be able to apply for it.*" *Koessel v. Sublette Cty. Sheriff's Dep't,* 717 F.3d 736, 745 (10th Cir. 2013), citing *Duvall v. Georgia–Pacific Consumer Prods., L.P.,* 607 F.3d 1255, 1263 (10th Cir. 2010). Here, Frontier did not have any open positions at the GO for which Plaintiff was minimally qualified at the time that she sought accommodation.

Regardless, as Plaintiff herself acknowledges, a request for a plausibly reasonable accommodation "refers to those accommodations which *presently, or in the near future*, enable the employee to perform the essential functions of [their] job." *Aubrey v. Koppes,* 975 F.3d 995, 1007 (10th Cir. 2020). Plaintiff testified that at the time, she did not know when her condition would improve such that she could fly layovers and return to her position as a flight attendant. *See* RSOF ¶ 16. Further, according to Plaintiff's own testimony, at the time of her request she had been sober for approximately nine (9) months. *See* RSOF at ¶ 7; *see also, Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 729 (6th Cir. 2000) (unreasonable to require employer to assign employee to new position that became available "well over a year" after employer became aware of disability); *Sloan v. Tate & Lyle Ingredients Americas LLC,* No. 3:14-CV-406-TAV-HBG, 2016 WL 4179959, at *9 (E.D. Tenn. Aug. 5, 2016) (A "reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected") (internal citations and quotations omitted); *Adair v. City of Muskogee,* 823 F.3d 1297, 1312 (10th Cir. 2016) (holding plaintiff's disability discrimination claim failed as a matter of law where plaintiff was unable to perform the essential functions of his job and failed to identify any possibility of reassignment to a vacant position), citing

*Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) (holding that "in a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant—even if it also appears that the defendant failed to engage in good faith in the interactive process"). Further, as noted in Section IV.B.3 *supra,* Plaintiff admits Frontier *did* propose Plaintiff transfer to a vacant or soon-to-be vacant position within Frontier, but that she rejected that idea. *See* RSOF at ¶ 23; *See Aubrey,* 975 F.3d at 1007 ('[t]he interactive process [necessarily] includes good-faith communications between the employer and employee.'). Therefore, Plaintiff's request to transfer generally to the GO was unreasonable in that Plaintiff did not and could not identify any vacant position at the GO and rejected the notion of transferring to other internal positions that were in fact vacant.

Regardless, the ADAAA does not require an employer to create a new position, light duty or otherwise. *See Mannan v. Colorado*, No. 18-CV-01844-MSK-SKC, 2020 WL 533734, at *5 (D. Colo. Feb. 2, 2020) (ADAAA does not "require an employer to create a new position" or provide a permanent or indefinite light duty position). Frontier's creation of temporary light duty assignments at the GO for flight attendants injured on the job did not change that fact or somehow obligate Frontier to do the same for Plaintiff, an active flight attendant whose alcoholism did not equate to an injury on the job and therefore, did not qualify her for Frontier's OJI program.

Indeed, Frontier did not maintain open light-duty job positions for flight attendants injured on the job, nor were light duty assignments job "positions" – instead, Frontier would

temporarily assign those injured on the job to perform other employees' duties. *See* RSOF at ¶¶ 16-17. Based on well-settled case law, Frontier was not required to do the same for Plaintiff. *See Benson v. Wal-Mart Stores E., L.P.,* No. 2:16-CV-114-DBH, 2017 WL 2729491, at *3 (D. Me. June 23, 2017) (granting summary judgment on plaintiff's ADAAA claim where plaintiff failed to identify any vacant position to which she could transfer as an accommodation and relied only on the fact that defendant created a temporary position for workers injured on the job, emphasizing that an employee must demonstrate that there is an actual vacant position to which she can transfer and that an employer is not required by the ADAAA to create a new job for an employee); *Severson v. Heartland Woodcraft, Inc.,* No. 14-C-1141, 2015 WL 7113390, at *9 (E.D. Wis. Nov. 12, 2015), aff'd, 872 F.3d 476 (7th Cir. 2017) ("Heartland may voluntarily create light-duty positions for employees recovering from workplace injuries without becoming compelled to create such positions for employees who are protected by the ADA."); *see also,* Enforcement Guidance: Workers' Compensation and the ADA, Equal Employment Opportunity Commission, No. 915.002 (Sept. 3, 1996) at Question No. 27, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada  (if an employer creates light duty positions for employees injured on the job, it does not have do the same as an accommodation for employees who were not injured on the job); *Wade v. Brennan*, 647 F. App'x 412, 415 (5th Cir. 2016) (employer not required to exempt employee from performance of essential function of the job, to find or create a new job for employee or to disadvantage other employees as a result of reassignment).

Plaintiff also contends that it is undisputed that her request to be allowed to start each month with a "blank schedule" so that she could build her own flight schedule to avoid layovers

was reasonable. *See* Dkt. No. 36 (Plaintiff's Motion) at p. 25. To the extent that Plaintiff is claiming that such accommodation would only constitute a modification to her schedule and therefore, reasonable she is mistaken. "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Aubrey,* 975 F.3d at 1010 (internal quotation and citation omitted); *see also,* 29 C.F.R. § 1630.2(*o*)(1)(ii)). As previously discussed, Plaintiff's request to be able to create her own schedule to avoid overnight flights would be relieving her of an essential function of the flight attendant position and therefore, was not plausible as a matter of law. *See Gardenhire v. Manville,* 722 Fed. Appx. 835, 839 (10th Cir. 2018) (An employee's request to be relieved from an essential function of his position is not, as a matter of law, a reasonable or even plausible accommodation."); *see also, Ruiz v. Woodward, Inc.,* No. 17-CV-03046-MSK-KLM, 2019 WL 6893039, at *8 (D. Colo. Dec. 18, 2019) ("The 10th Circuit has repeatedly made clear that a proposed accommodation that reallocates or removes essential functions from an employee's job is not, as a matter of law, a "reasonable" accommodation"). The same argument applies to Plaintiff's request that Frontier remove overnight trips from her schedule. *See* Dkt. No. 36 (Plaintiff's Motion) at p. 25. In addition, to the extent Plaintiff contends that the fact that Frontier had previously removed flights with layovers from her schedule "a few times prior" does not make her subsequent request that Frontier remove flights with layovers from her schedule for the indefinite future reasonable.

Further, allowing Plaintiff to skip seniority bidding as required by the CBA and create her own schedule, or requiring Frontier to remove flights with layovers from Plaintiff's schedule post-bidding would have been inconsistent with the vested rights of other flight attendants with greater seniority than Plaintiff under the CBA and therefore, not reasonable under the ADAAA

as a matter of law.[8] *Coats v. Goodyear Tire & Rubber Co.,* No. H-01-1322, 2002 WL 32123913, at *21 (S.D. Tex. Oct. 16, 2002) ("the ADA does not require an employer to take action inconsistent with the contractual rights of other workers under a collective bargaining agreement." (internal citations and quotations omitted), citing *US Airways, Inc.*, 535 U.S. at 403 ("lower courts have unanimously found that collectively bargained seniority trumps the need for reasonable accommodation in the context of the linguistically similar Rehabilitation Act"); *Eckles v. Consol. Rail Corp.,* 94 F.3d 1041, 1051 (7th Cir. 1996)("the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees"); *Santiago v. Executive Airlines,* 41 F. Supp. 2d 129, 135 (D. Puerto Rico 1999) ("an employer's obligation does not extend to contravening rights secured by other employees through a collective bargaining agreement"); *Stephens v. ExpressJet Airlines, Inc., No.* 4:16-CV-0890, 2018 WL 8459309, at *6 (S.D. Tex. May 4, 2018) (plaintiff could not state a prima facie case for failure to accommodate where plaintiff's requested accommodation would violate the rules of a seniority system set forth in a collective bargaining agreement).

## V.    CONCLUSION

For the foregoing reasons, Frontier respectfully requests that this Court grant summary judgment in its favor on Plaintiff's Complaint in its entirety.

Respectfully submitted this 8th day of December, 2020.

_/s/ Danielle L. Kitson_
Danielle L. Kitson
Carolyn B. Theis
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202

---

[8] Defendant incorporates by reference its Motion for Summary Judgment (Dkt. No. 38) at pp. 33

Telephone: 303.629.6200
Facsimile: 303.629.0200
Email:  dkitson@littler.com
        catheis@littler.com
*Attorneys for Defendant Frontier Airlines,
Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 8th day of December 2020, I filed and served the foregoing

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**

**JUDGMENT** via CM/ECF to the following:

John R. Crone
The Law Office of John R. Crone, LLC
4550 E. Cherry Creek Drive South, #1003
Glendale, Colorado 80246
john@crone-law.com

*Attorney for Plaintiff*

*s /Joanna Fox*
Joanna Fox, Legal Secretary

## DECLARATION OF GERARDO ARELLANO

I, Gerardo Arellano, declare as follows:

1.      I make this declaration based on my personal knowledge. If called to testify under oath, I could do so truthfully and competently.

2.      I am employed by Frontier Airlines, Inc. ("Frontier") as the Senior Manager of Talent Acquisition and Employee Relations.

**Plaintiff's Alcoholism**

3.      At the time of my deposition as Frontier's corporate representative, I was unaware that the Americans with Disabilities Act as Amended ("ADAAA") has a specific definition for the term "disability." Therefore, when Ms. Brigham's counsel questioned me regarding whether Frontier believed that alcoholism constituted a disability under the ADAAA, I answered affirmatively, under the mistaken belief that the term "disability" was synonymous with the term "impairment."

4.      Based upon the medical paperwork certifying Ms. Brigham to return to work without restrictions and certifying her for Intermittent FMLA ("IFMLA"), Frontier did not believe that Ms. Brigham experienced any substantial or significant limitations as a result of her alcoholism with respect to her ability to perform daily activities, including her work as a flight attendant, after she completed her in-patient treatment program and returned to Frontier.

5.      Frontier believed that Plaintiff was sober from the time that she completed in-patient rehabilitation treatment for alcoholism and returned to work through the date Frontier terminated her employment.

EXHIBIT A

**Plaintiff's Treatment Plan**

6.      Given that the flight attendant position is characterized by both safety-sensitive and security-related functions and heavily regulated by the Department of Transportation/Federal Aviation Administration ("DOT/FAA"), Frontier requires flight attendants to abide by its Drug and Alcohol Misuse Prevent Policies and Programs, which it strictly enforces.

7.      As part of those policies, Frontier requires flight attendants who self-disclose a substance abuse disorder to comply with any treatment or aftercare recommended by their rehabilitation program/substance abuse medical care provider and comply with unannounced drug and alcohol testing after returning to Frontier. *See, e.g.,* Dkt. No. 36-9.

8.      Frontier received a treatment plan for Ms. Brigham approximately six (6) months after Ms. Brigham had completed her in-patient rehabilitation program and returned to her job as a flight attendant for Frontier. *See* Treatment Plan attached as Exhibit 2.

9.      Frontier never interpreted Plaintiff's treatment plan as requiring Ms. Brigham herself to abstain from flying layovers. Rather, Frontier interpreted the plan to mean that *Ms. Brigham* had indicated to her therapist that she felt tempted to drink during layovers and therefore, that her therapist suggested that she avoid flights requiring layovers to the extent possible.

10.      Frontier never interpreted the treatment plan to impose any obligations upon Frontier.

11.      Ms. Brigham's non-compliance with her treatment plan would not have required or necessarily resulted in Frontier's termination of her employment.

**Accommodations**

12.     Dkt. No. 36-11 is a true and correct copy of the spreadsheet maintained by Frontier to track accommodations Frontier discussed with Frontier employees as part of the interactive process for the years 2012-2016 and 2020.

13.     A true and correct copy of Defendant's Supplemental Responses to Plaintiff's Fifth Set of Discovery Requests is attached as Exhibit 1. Response to Request for Production No. 17 and Frontier Airlines (R. Brigham) – 0004809-CONFIDENTIAL accurately reflect accommodations Frontier discussed with flight attendants who were not part of Frontier's On-The-Job Injury ("OJI") Program as part of the interactive process for the years 2017 through October 2020.

14.     Other than Ms. Brigham, none of the employees reflected on Dkt. No. 36-11 and Exhibit 1 were requesting accommodations for conditions involving alcoholism or substance abuse.

15.     Regarding Dkt. No. 36-11, the "X" indicated in the column titled "Modify Work Schedule" indicates only that modifying the employee's work schedule as an accommodation was *discussed* with the Frontier employee as part of the interactive process. The "X" does not indicate that Frontier actually provided the employee with a modified work schedule.

16.     As Dkt. No. 36-11 itself makes clear, with to respect to flight attendants, since 2012, Frontier has never provided light duty assignments to any flight attendant (injured on the job or not) as an accommodation, nor has Frontier placed any flight attendant (injured on the job or not) into a vacant ground position as an accommodation, although Frontier's OJI Program would have allowed for temporary light duty assignments if requested by flight attendants injured on the job *See* Dkt. No. 36-11 at Tab 2012 at Lines 12, 15, 22; Tab 2013 at Lines 11-13, 20-12; Tab 2014 at

18, 30; Tab 2015 at 8-13; Tab 2016 at 9-13, 16; Exhibit 1 at Response to Request for Production No. 17 and Frontier Airlines (R. Brigham) – 0004809-CONFIDENTIAL. In addition, as reflected in Dkt. No. 36-11 and Exhibit 1, since 2012, Frontier has never transferred a flight attendant to a temporary ground assignment in Frontier's General Office ("GO") as an accommodation. Further, no <u>flight attendants</u> were offered modified work schedules. *Id*. Instead, only non-comparable workers in ground positions (who were not subject to a collective bargaining agreement) were offered schedule modifications. Flight attendants' schedules are controlled exclusively by the CBA, and governed by the seniority bidding requirements of the CBA, unlike non-unionized employees working on the ground.

**David St. Hilaire**

17.      Unlike Ms. Brigham who self-disclosed her alcoholism and never refused to take a drug or alcohol test for purposes of ensuring she could perform the safety-sensitive and security-related functions of his position as a flight attendant and to ensure compliance with DOT/FAA regulations, Mr. St. Hilaire initially denied his alcoholism and refused a routine sobriety test.

18.      Also unlike Ms. Brigham who requested accommodations, some of which were granted and was ultimately terminated for violating Frontier's attendance policy, Mr. St. Hilaire never requested or otherwise indicate any need for accommodation and instead, voluntarily left his employment with Frontier.

19.      Frontier did not unlawfully discriminate against or harass Mr. St. Hilaire.

**Christine Kernen**

20.      Frontier never discussed providing Ms. Kernen with accommodations due to alcoholism.

21.     The only accommodations Frontier discussed and provided to Ms. Kernen were leaves of absence for purposes of pregnancy and pregnancy-related conditions.

22.     Ms. Kernen left her employment with Frontier voluntarily.

23.     Frontier did not unlawfully deny Ms. Kernen reasonable accommodations.

***I have read this declaration and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.***

Dated: December 8, 2020

*/s/ Gerardo Arellano*
Gerardo Arellano

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

Civil Action No.:  19-cv-03417-WJM-STV
_____

REBECCA BRIGHAM,

Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

Defendant.
_____

   VIDEOTAPED VIDEOCONFERENCE 30(B)(6) DEPOSITION OF
                 FRONTIER AIRLINES, INC.,
       THROUGH THE TESTIMONY OF GERARDO ARELLANO
                    July 13, 2020
_____
```

        PURSUANT TO NOTICE and the Federal Rules

of Civil Procedure, the videotaped videoconference

30()b)(6) deposition of FRONTIER AIRLINES, through

the testimony of GERARDO ARELLANO, whose identity has

been verified by the court reporter, was taken on

behalf of the Plaintiff on July 13, 2020, commencing

at 9:01 a.m., before Jill S. Nielsen, Registered

Professional Reporter and Notary Public within the

state of Colorado.


(The reporter, Jill S. Nielsen, appearing remotely

via videoconference.)

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

1    Q.    And do you recall whether Frontier granted

2   that request?

3    A.    We did not.

4    Q.    And why was that?

5    A.    Due to the collective bargaining agreement.

6    Q.    So Frontier thought if -- if Ms. Brigham

7   was allowed to modify her schedule, that would

8   violate the terms of the collective bargaining

9   agreement?

10    A.    I agree, yes.

11    Q.    Okay.   Do you recall Adrienne Prince

12   communicating to Frontier that it would not violate

13   the terms of the collective bargaining agreement?

14    A.    I do not.

15    Q.    And sorry.   I'm going to go back just a

16   little bit.

17          Did Frontier think that transferring

18   Ms. Brigham to the GO, reassigning her would violate

19   the terms of the collective bargaining agreement, or

20   was that due to the OGI -- or OJI work comp issue?

21    A.    It was the OJI work comp.   She was just not

22   eligible.   At the time, she wasn't part of the work

23   comp program.

24    Q.    Okay.   Does Frontier's opinion change at

25   all today about whether a modified schedule would

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

1  program, two cases, because she wasn't -- she hadn't

2  sustained an injury that removed her from service,

3  and the other piece is it was only awarded to

4  those -- that -- reassignment was only offered to

5  individuals on a work comp status.

6       Q.   Okay.  Okay.

7       A.   It all determines on that status of the

8  individual.  It's hard to --

9       Q.   Okay.

10      A.   So yeah.

11      Q.   Yeah, and I think -- I think we're covering

12  some ground we already covered, so I think we --

13  we've closed that loop.

14      A.   Okay.

15      Q.   I -- I appreciate the explanation.

16      A.   Yeah.

17      Q.   I -- the last question on -- on this topic:

18  When -- in the interactive process that you outlined

19  for me --

20      A.   Yeah.

21      Q.   -- and you had said, you know, we have to

22  take into consideration the CBA, is that what you're

23  talking about, what you just described here?  So

24  you -- you looked at Ms. Brigham's request, and then

25  the issue with the work comp and OJI is taking into

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

1  consideration the collective bargaining agreement; is

2  that fair?

3      A.    In -- in one moment -- in one factor, I

4  should say, but it's also looking at her status.

5  We have to look at her status to make that

6  determination.  And her status goes, then, back to

7  the contract.  If she's an active employee per the

8  collective bargaining agreement, she's required to

9  submit a bid.

10     Q.    Okay.

11     A.    And if she then doesn't submit a bid, then

12  other pieces then kick in.  And so it's kind of a --

13  that's how we need to determine -- it all goes back

14  to what was her status at the time?

15     Q.    Yeah.

16     A.    So if she was on intermittent FMLA leave,

17  she was not considered to be on a leave of absence;

18  therefore, making her an active individual, an active

19  bidder.

20     Q.    Okay.  Do you happen to know -- can you

21  recall what other provisions of the collective

22  bargaining agreement are then triggered by this

23  request?

24     A.    Yes.  The -- basically, it comes out to

25  eligible to bid.  If she's eligible to bid, then at

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

```
1           Does that mean the date Frontier was first
2    notified about the existence of her disability or the
3    request for a reasonable accommodation or something
4    else?
5           A.   Let me -- let me read the notes.
6           Q.   Sure.  Thank you.
7           A.   Typically, it's down in the notes.
8           Q.   Yeah.  No problem.
9           A.   I would have to look at the date when HR
10   was aware; not when the company was notified.
11          Q.   Okay.
12          A.   Because I think she had notified the
13   supervisors prior to that.
14          Q.   Okay.  All right.  So this is -- so that
15   Date Filed column means date HR is aware?
16          A.   Yes.
17          Q.   Okay.  All right.  And then at -- for
18   Rebecca Brigham again, so staying on Line -- or Row
19   12 --
20          A.   Okay.
21          Q.   -- at Column Q, it says -- that's the
22   Modify Work Schedule column under the reasonable
23   accommodation umbrella.  Do you see where I'm at
24   there?
25          A.   Yes.
```

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

1    Q.   And in Rebecca's column there, it says N/A.
2  Do you see that?

3    A.   I do.

4    Q.   Do you know why it says N/A there?

5    A.   Typically, N/A, not applicable, since it
6  wasn't necessarily associated with a work comp claim
7  or OJI, on-the-job injury.

8    Q.   Okay.  I don't see N/A in that column for
9  any other employee on any other tab for any year in
10  this spreadsheet.

11         Can you explain why it's only in
12  Rebecca Brigham's row?

13    A.   If you give me a second, let me just kind
14  of review that.

15    Q.   Yeah.

16    A.   Honestly, I don't know.

17    Q.   Okay.  But you -- you -- you did fill in
18  this information because you're noted as the client
19  manager.  Jerry, in -- in Column G, that's you,
20  right?

21    A.   Yes.

22    Q.   Okay.

23    A.   The only piece with this, because of the
24  case that had been -- it was a long case for Rebecca.
25  There were different responsibilities, so at one

FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

```
 1              REPORTER'S CERTIFICATE

 2   STATE OF COLORADO     )
                           ) ss.
 3   COUNTY OF DENVER      )

 4           I, JILL S. NIELSEN, do hereby certify that I
     am a Registered Professional Reporter and Notary
 5   Public within the State of Colorado; that previous to
     the commencement of the examination, the witness was
 6   duly sworn by me to testify to the truth.

 7           I further certify this deposition was taken
     remotely in shorthand by me at the time herein set
 8   forth, and that it was thereafter reduced to
     typewritten form, and that the foregoing constitutes
 9   a true and correct transcript.

10           I further certify that I am not related to,
     employed by, nor of counsel for any of the parties or
11   attorneys herein, nor otherwise interested in the
     result of the within action.

12
             IN WITNESS WHEREOF, I have hereunto affixed
13   my hand and seal this 22nd day of July, 2020.

14      My commission expires July 7, 2023.

15      _____

16      JILL S. NIELSEN, RPR
        Notary Public in and for the
        State of Colorado
17

18

19

20

21

22

23

24

25
```

JILL S. NIELSEN
Notary Public
State of Colorado
Notary ID # 19994018852
My Commission Expires 07-07-2023

**ROCKY MOUNTAIN REPORTING**
**(720) 872-9910**
1422

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No.  19-cv-03417-WJM-STV

REBECCA BRIGHAM,

　　　Plaintiff,

v.

FRONTIER AIRLINES, INC., a Colorado corporation,

　　　Defendant.

---

**DEFENDANT'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S FIFTH SET OF WRITTEN DISCOVERY**

---

　　　Pursuant to Federal Rules of Civil Procedure 33, 34, and 36, Defendant Frontier Airlines, Inc. ("Frontier" or "Defendant"), by and through its undersigned counsel of record, serves the following Supplemental Objections and Responses to Plaintiff's Fifth Set of Written Discovery:

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 15:** Please produce any insurance policy in force during 2014 through 2015 and obtained by Defendant for the purpose of covering employment related claims, including those policies commonly known as EPLI or Employment Practices Liability Insurance.

　　　**RESPONSE:**  Frontier is producing the responsive insurance policy.

**REQUEST FOR PRODUCTION NO. 16:** Please produce the information contained at Frontier Airlines (R. Brigham) – 0004442 – CONFIDENTIAL for the time period November 14, 2011 through 2012.

　　　**OBJECTION:** Frontier objects to Request for Production No. 16 on the grounds that the request that Frontier "produce the information" is vague and ambiguous.

EXHIBIT 1   1423

**RESPONSE:** Subject to, and without waiving its objections, Frontier states that the information for 2012 is contained in the already-produced document. Frontier states that there is no responsive log, chart, or compilation of the same type of information in existence for the November-December, 2011 time period.

**REQUEST FOR PRODUCTION NO. 17:** Please produce the information contained at Frontier Airlines (R. Brigham) – 0004442 – CONFIDENTIAL for the time period 2017 through present.

**OBJECTION:** Frontier objects to Request for Production No. 17 on the grounds that the request that Frontier "produce the information" is vague and ambiguous. Frontier further objects to this Request on the grounds that it is overly broad as to timeframe, and therefore requests irrelevant information, is unduly burdensome, is not proportional to the issues or needs of this case, and is beyond the permissible scope of discovery as set forth in Fed. R. Civ. P. 26(b)(1).

**RESPONSE:** Subject to, and without waiving its objections, Frontier states that there is no responsive log, chart, or compilation of the same type of information in existence for the 2017 – 2020 time period.

**SUPPLEMENTAL RESPONSE:** Subject to, and without waiving its objections, Frontier directs Plaintiff to the document produced with beginning bates-label Frontier Airlines (R. Brigham) –0004809-CONFIDENTIAL. Further responding, Frontier states that none of the conditions accommodated involved alcoholism, substance abuse, or an on-the-job injury.

Respectfully submitted this 28th day of October, 2020.

s/ Danielle L. Kitson
Danielle L. Kitson
Carolyn B. Theis
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, Colorado 80202
Telephone: 303-629-6200
Facsimile: 303-629-0200
Email:  dkitson@littler.com
        catheis@littler.com

*Attorneys for Defendant Frontier Airlines, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October, 2020, a true and correct copy of

**DEFENDANT'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S**

**FIFTH SET OF WRITTEN DISCOVERY** was served via e-mail on the following:

John R. Crone
John R. Crone, LLC
4550 East Cherry Creek Drive South
Suite 1003
Glendale, CO 80246
Phone: 303-598-3526
Email: john@crone-law.com

*Attorney for Plaintiff*

s/Mary Mathews
Mary Mathews

| Flight Attendant | Nature of Accommodation Requested | Accommodation(s) Granted | Accommodation(s) Denied |
|---|---|---|---|
| Rewitzer, Stacy | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Rewitzer, Stacy | Provision of facilities for lactation off aircraft | X | |
| Rewitzer, Stacy | Temporary ground assignment as a pregnancy and/or lactation accommodation | | X |
| Rewitzer, Stacy | Provision of breaks on duty, in flight, for lactation | | X |
| Rewitzer, Stacy | Flight schedule modifications to accommodate for lactation | | X |
| Roby, Jo | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Roby, Jo | Flight schedule modification to accommodate for lactation | | X |
| Schwartzkopf, Renee | Provision of breaks on duty, in flight, for lactation | X | |
| Crowe, Heather | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Crowe, Heather | Temporary ground assignment as a pregnancy and/or lactation accommodation | | X |
| Hodgkins, Melissa | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Hodgkins, Melissa | Temporary ground assignment as a pregnancy and/or lactation accommodation | | X |
| Stevens, Chandra | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Osborne, Angela | Extensions of medical leaves of absence related to pregnancy and lactation | X | |
| Mares, Andria | Leave (medical & personal) | X | |
| Jobin, John | Did not want to share a hotel room during training | X | |
| Hall, Dirinda | Request to wear hat while in chemo recovery | X | |
| Ground, Cielito | Uniform accommodation | X | |
| Cole, Damian | Uniform accommodation | X | |
| Dobson, Lele | Uniform accommodation | X | |
| McDonald, Amber | Uniform accommodation | X | |
| Shepard, Zoe | Uniform accommodation | X | |

# Treatment Plan

**Name:** Rebecca Brigham                    **Date of Update:** 5/1/2015

**DMS Diagnosis:**

**Axis I:** Generalized Anxiety Disorder          **Code #:** 300.02

Diagnostic Criteria: changes in heart rate, change in breathing pattern, fearful, feels frozen.

**Axis I (Secondary):** Alcohol Withdrawal          **Code #:** 291.81

Diagnostic Criteria: In recovery.

**Axis II:** No diagnosis.          **Code #:** V71.09

Diagnostic Criteria:

**Axis III:** Thyroid removed September 2011

**Axis IV (Circle):**

| | | | |
|---|---|---|---|
| Problems with primary support group | Yes (No) | Problems related to the social environment | (Yes) No |
| Educational Problems | Yes (No) | Occupational Problems | (Yes) No |
| Housing Problems | (Yes) No | Economic Problems | Yes (No) |
| Problems with access to healthcare services | (Yes) No | Problems related to interaction with the | |
| Other psychosocial and environmental problems | Yes (No) | legal system/crime | Yes (No) |

**Axis V:**

Current GAF:     67          Highest GAF in past year:  65

**Client's Goals for Treatment:**

1. Continued self-regulation skill set enhancement and utilization.
   a. Objective: meditation, reading AA big book, gardening, utilizing prayer
2. Rebecca would like to embrace and increase self-love, self-worth, and self-esteem.
   a. Objective: Rebecca will engage in a workbook regarding yogic philosophy on the yamas and niyamas via reading and journaling.
   b. Objective: Rebecca will reflect and write down the positive things she has done over the course of time to remind herself of her positive elements.
   c. Objective: Rebecca will utilize the first yama (non-violence) on self by reducing the amount of negative self-talk.
3. Rebecca will improve her health and mental health by slowly shifting her diet and nutrition base.
   a. Objective: Practicing mindfulness during meal times.
   b. Objective: Will grow a garden for food.

**Treatment Plan (Long-term goals):**

Rebecca would like to maintain sobriety throughout the lifespan. The listed goals are the pathway she has chosen to guide her through recovery and into sobriety.

**Criteria for Discharge:**

Rebecca will have maintained a full-time job without modifications for 6 full months.

**Estimated Length of Treatment, Modality, and Frequency:**

1. Individual treatment, one to two times monthly for six months (to be evaluated at that time).
2. Group therapy, weekly for six months (to be evaluated at that time).

_____ , LCSW          16 June 15
Primary Therapist                                   Date


_____          _____
Client/Guardian Signature                              Date

FRONTIER AIRLINES (R. BRIGHAM) - 0000188

EXHIBIT 2          1428

**Name:** Rebecca Brigham                          **Date of Update:** 5/1/2015

**Additional information:**
Rebecca has identified triggers to cravings and opportunities to consume alcohol and those are on over night trips or anything longer than a given work day in her professional arena. At this time it would not be a good idea to encourage a vulnerable situation with a work schedule that serves as a temptation, if possible. Her treatment plan and progress towards goals will be reviewed every 90 days.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

        Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

        Defendant.

---

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff, by and through the undersigned, hereby submits *Plaintiff's Reply in Support of Motion for Partial Summary Judgment*. As there remain no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff respectfully requests the Court grant her Motion in its entirety.

### I.   INTRODUCTION

The majority of Defendant's arguments set forth in response to Plaintiff's Motion are advanced in Defendant's Motion for Summary Judgment and addressed by Plaintiff in her response to the same. Therefore, Ms. Brigham incorporates her legal and factual arguments made in her

Response to Defendant's Motion for Summary Judgment [Dkt. 44] and attempts to limit this brief to any issues that may not be sufficiently addressed in the Parties' prior briefing.

## II.     REPLY CONCERNING UNDISPUTED FACTS

2.     Defendant's assertion that Ms. Brigham exhibited a "pattern of attendance issues" is without basis. Pl.'s Resp. to Def.'s Mot. for Summary Judgment [Dkt. 44] at 6-7. Defendant also advances a curious argument that Ms. Brigham's performance is "not material to any legal claim" because, apparently, performance and attendance are unrelated. Of course, Ms. Brigham disagrees as stated and cited in her Motion and Response briefing.

3.     While Frontier now argues that "such warnings were disciplinary in nature," the actual "reminders" issued to Plaintiff state differently. Pl.'s Mot. at 4, ¶ 3. Moreover, Plaintiff's recollection of whether or not flight attendants tried to strike over Defendant's attendance policy is admissible. Fed. R. Evid. 402.

7.     Defendant's assertion that "alcoholism has not substantially limited [Ms. Brigham's] ability to perform a major life activity" is without basis. Dkt. 44 at 7-10.

9.     Defendant's assertion that Ms. Brigham was not capable of performing the essential functions of her job with a reasonable accommodation is without basis. Dkt. 44 at 7-10.

10.     Defendant's denial in its briefing is inconsistent with its deposition testimony and represents an attempt to ignore Defendant's straightforward testimony that alcoholism is a disability under the ADA, and Plaintiff suffers from the same.

11.     The existence of Plaintiff's disability as defined under the ADA is well established in her Motion and in her Response to Defendant's Motion for Summary Judgment. Dkt. 44 at 7-10.

12. Defendant's current interpretation of Ms. Brigham's treatment plan is strained, and Defendant is unable to point to any evidence in the factual record demonstrating that Defendant interpreted Ms. Brigham's treatment as not requiring her to avoid overnight layovers during the relevant time period.

13. Defendant's denial does not comport with the factual record presented by Plaintiff, which includes contemporaneous evidence and more recent deposition testimony from Defendant.

15. Frontier's own deposition testimony cited by Ms. Brigham establishes that Ms. Brigham's factual assertions are undisputed.

16. Certain of Frontier's denials are legal arguments as opposed to addressing the substance of Plaintiff's factual allegations. Where Frontier "admits" Plaintiff's factual allegations it does so against its own unequivocal deposition testimony in that it states: "Frontier denied Plaintiff's request because there were no vacant positions in the GO." Frontier never provided this reasoning in its deposition instead claiming the only reason for the denial was: "she wasn't part of the work comp program."

17. In Defendant's denial, it points out various ways in which it could have accommodated Ms. Brigham's request to be temporarily transferred to the GO given its belief that "active" flight attendants could not be transferred to positions within the GO: "Flight attendants were considered inactive and therefore, ineligible to bid if they have been granted . . . Leave of Absence . . . Medical Leave . . . Family Medical Leave Act Leave . . . OJI Leave, etc." Def.'s Resp. at 17, n.4; *see also* Dkt. 44 at 17, 20-21.

18. Defendant's denial is contrary to a commonsense interpretation of the evidence attached to Plaintiff's Motion. *See also* Dkt. 44 at 39-40 (explaining how Defendant's argument

1432

that Plaintiff was not seeking an open position through her request for reasonable accommodation is without merit).

19.     Defendant's denial is without factual basis. One need only look at the first tab of Defendant's spreadsheet to find an inflight employee, *i.e.*, a flight attendant, that was offered a "modif[ied] work schedule" *and* the opportunity to "explore other positions within Frontier." Ex. 11 at Tab 2012 (Plaintiff is not citing this flight attendant's name as Ex. 11 was filed restricted). Additional examples of flight attendants being offered "modif[ied] work schedules" or the opportunity to "explore other positions within Frontier" exist within Exhibit 11 at Tabs 2013, 2014, 2015, and 2016.

20.     Again, Defendant's denial is without factual basis. *See* Para. 19 above.

21.     Defendant's assertion that it provided Plaintiff with "proposed additional reasonable accommodations" is without merit. Dkt. 44 at 13-16.

22.     Mr. Hilaire's Declaration is admissible. Fed. R. Evid. 402. Moreover, Defendant's cited case, *Parker v. Nat'l R.R. Passenger Corp.*, stands for the same proposition as Mr. Hilaire was employed by Frontier during the relevant time period, in the same position, and supervised by the same decision makers at issue in this lawsuit. Pl.'s Mot. at 13, ¶ 22.

23.     Defendant's objections to this evidence fail for the same reasons stated in Paragraph 22 above.

24.     Defendant's objection to this evidence is summed as follows: "the Determination is inadmissible because it lacks probative value and is instead, highly prejudicial." Def.'s Resp. at 14, ¶ 24. Thus, Defendant is not arguing that EEOC determinations are never admissible just that they may *sometimes* fail Rule 403's balancing test. Here, all of Defendant's arguments as to the

supposed unduly prejudicial nature of the EEOC's Determination in this case are without factual merit. Dkt. 44 at 13-16, 21-23. As such, this evidence is proper for the Court to consider upon summary judgment.

### III.   LEGAL STANDARD

The Parties do not appear to disagree over the general analytical framework that should apply to review of motions made under Federal Rule of Civil Procedure 56.

### IV.   ARGUMENT

Because there are no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff seeks summary judgment on the same.

### A.   Plaintiff is a qualified individual with a disability under the ADA.

Defendant's arguments in this regard rely upon inapposite law and an improper view of the factual record in this case. Nearly all of Defendant's arguments are either addressed in Plaintiff's Motion or in Plaintiff's Response to Defendant's Motion for Summary Judgment [Dkt. 44], which is incorporated herein.

Moreover, Defendant's argument that "Plaintiff's 'regarded as' and 'record of' disability theories are not properly before the Court and therefore, should not be considered given that they were not pled in Plaintiff's Complaint" is without merit. Def.'s Mot. at 21-22. Plaintiff pled that she was disabled within the meaning of the ADA and entitled to the ADA's benefits and protections. *See generally* Pl.'s Compl. and Jury Demand [Dkt. 1]. In her Complaint, Ms. Brigham never limited herself to any narrower theory to assert she fit the definition of "disabled." Id. The

1434

ADA unquestionably defines a person with a disability under the ADA as an individual who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)).

Now, Defendant seeks to determine the scope of Plaintiff's Complaint by unilaterally declaring that Plaintiff may only seek to establish her disability through the "substantially limits" prong. Def.'s Mot. at 21-22. This does not comport with Plaintiff's pleading or the ADA's requirement that whether a person has a substantially limiting impairment or that they established a record of such should "construed broadly," *Mestas*, Case No. 17-8092, at *5; and moreover, Defendant's primary cited case in support of its argument is inapposite. *Astorga v. Idahoan Foods, LLC*, Case No. 1:18-cv-000195-DCN, at *8-10 (D. Idaho Aug. 29, 2019) (holding plaintiff could not rely on her anxiety diagnosis as basis for ADA suit because she pled arthritis as the basis).

Further, Defendant continues to rely on law that has been outdated by amendments to the ADA (although in Defendant's Response, at least the reliance is specified). *See, e.g.,* Def.'s Resp. at 25 (citing *Briggs* quoting *Sutton v. United Air Lines, Inc.* despite Sutton being "*overturned due to legislative action*."). Thus, Defendant insists that the "regarded as" analysis requires Ms. Brigham to show that Frontier was aware of her disability *and* regarded her disability as "substantially limiting one or more of her major life activities." Def.'s Resp. at 26. Of course, this is not what the law requires. Pl.'s Mot. at 22-23 ("regarded as" claim requires showing: (1) an actual or perceived impairment; (2) that is neither transitory nor minor; and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action."). Plaintiffs statement of the law is consistent with the current Code of Federal Regulations defining

1435

the same. *See* 29 C.F.R. § 1630.2(l)(1) ("An individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, **whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity**.") (emphasis added).

The remaining of Defendant's arguments asserting that Plaintiff "was not qualified to perform her job as a flight attendant" are well addressed in Plaintiff's Motion, Dkt. 36 at 16-18, and in Plaintiff's Response to Defendant's Motion for Summary Judgment, Dkt. 44 at 26-35. Because the undisputed and material facts demonstrate that Plaintiff is a qualified individual with a disability within the meaning of the ADA, Plaintiff respectfully requests summary judgment on the same.

**B.** **Defendant violated the law when it failed to reasonably accommodate Ms. Brigham's request for temporary reassignment.**

Here, Defendant raises no new arguments that are not already addressed in Plaintiff's Motion or Plaintiff's Response to Defendant's Motion for Summary Judgment, which are incorporated herein. Dkt. 36 at 24-28; Dkt. 44 at 37-40. Because the undisputed and material facts demonstrate that Defendant violated the law when it failed to reasonably accommodate Ms. Brigham's request for temporary reassignment, Plaintiff respectfully requests summary judgment on the same.

**V.** **CONCLUSION**

For the reasons stated in Plaintiff's Motion, Plaintiff's Response to Defendant's Motion for Summary Judgment, and herein, Plaintiff respectfully requests the Court grant her Motion in its entirety thereby holding: (a) Plaintiff was a qualified individual with a disability under the ADA; and (b) Defendant violated the ADA when it denied Plaintiff's request to be temporarily

reassigned as a reasonable accommodation.

Respectfully submitted this 21st day of December, 2020.

THE LAW OFFICE OF JOHN R. CRONE, LLC


/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, a true and correct copy of the foregoing *Plaintiff's Reply in Support of Motion for Partial Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
John R. Crone

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

     Plaintiff,

v.

FRONTIER AIRLINES, INC.,

     Defendant.

---

## DEFENDANT FRONTIER AIRLINES, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier"), respectfully submits this Reply in Support of its Motion for Summary Judgment [Dkt. No. 38], stating as follows:

### I.  INTRODUCTION

The Americans with Disabilities Act as Amended ("ADAAA") does not require an employer to prevent an employee from experiencing circumstances outside (or even inside) the workplace that may aggravate an employee's underlying medical condition. That is precisely what Plaintiff asked of Frontier—to excuse her from certain job functions (i.e. layovers and the bidding requirements set forth in Frontier's collective bargaining agreement with Plaintiff's flight attendant union) so that she could avoid off-duty situations during layovers (i.e. bars and hotel rooms) that might tempt her to consume alcohol and therefore, jeopardize her sobriety. Similarly, the ADAAA does not require an employer to continue to engage in the interactive process so long as the employer provides a reasonable accommodation. Therefore, Plaintiff's claim for failure to engage

in the interactive process in good faith should be dismissed. Regardless, Plaintiff's own evidence makes clear that Frontier not only engaged in the interactive process in good faith, but proposed a means of providing Plaintiff with the accommodation she claimed she needed and in fact requested. Plaintiff rejected the proposal, disqualifying herself from any protection she claims she had under the ADAAA.

Finally, Plaintiff failed to identify any evidence in the record aside from her own conclusory, speculative, and subjective testimony to sustain her burden of demonstrating that she was experiencing specific and substantial limitations in comparison to the average person as a result of her alcoholism at the time that she requested accommodation from Frontier, that her Substance Abuse Provider ("SAP") prohibited her from flying layovers as part of her treatment for alcoholism, and that handling flights with layovers was *not* an essential function of the Frontier flight attendant position. Accordingly, summary judgment should be granted in Frontier's favor and Plaintiff's claims should be dismissed in their entirety.

## II.   REPLY CONCERNING UNDISPUTED FACTS

1.     The fact that the term "layover" is absent from the Frontier flight attendant job description is immaterial. The ability to handle layovers is inherently required to perform the job of any flight attendant and inherently required to be able to work the "flexible hours/schedules including, nights, weekends and holidays" and "to travel to all current and future international destinations served by Frontier Airlines" as expressly reflected in the job description. Dkt. No. 38-2; *see, e.g. Collins v. Abbott Labs., Inc.*, No. 17-CV-4534 (NEB/SER), 2019 WL 2718323, at *6 (D. Minn. June 28, 2019), aff'd, 972 F.3d 976 (8th Cir. 2020), citing *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 708–09 (8th Cir. 2002) (finding certain job functions were essential, even

though they were not listed in the written job description, because they were inherently required to perform the written job functions). The requirement that flight attendants be willing and able to fly is also absent from the job description, but no one would argue that flying is not a fundamental part of the flight attendant position.

7.     The fact that flight attendants returning from intermittent leave could pick up Open Time to replace the trip if the original trip had been scheduled using Open Time does not alter the fact that all active/eligible flight attendants (i.e. all flight attendants not on a continuous leave of absence during the bid period) are <u>required</u> to bid. Nor is it disputed that Plaintiff was on active/eligible status at the time that she requested to be excused from bidding. *See* Dkt. No. 38-5 at Frontier Airlines (R. Brigham – 919); *see also,* Dkt. No. 38-22 at 20:15-21. There are no facts in the record supporting the notion that flight attendants using IFMLA were excused from the bidding process.

8.     Plaintiff's opinion as to whether compliance with the policy actually demonstrated "dependability" is immaterial. *See Latham v. High Mesa Commc'ns,* No. 17-CV-2118-JLK-GPG, 2019 WL 8267700, at *2 (D. Colo. Dec. 19, 2019), report and recommendation adopted, No. 17-CV-02118-JLK-GPG, 2020 WL 1317394 (D. Colo. Jan. 14, 2020) ("Conclusory statements, unsupported allegations, and testimony based merely on conjecture or subjective belief are insufficient evidence to support summary judgment.").

9.     This distinction is immaterial given that Plaintiff is claiming that she should not have incurred Occurrences for her absences at *all* and not disputing how Occurrences were calculated.

10. Despite Plaintiff's denial, there appears to be no dispute—both parties agree that the CBA required flight attendants *who were unable to report for work because of illness or off-the-job injury* to notify Crew Scheduling at least two (2) hours prior to their assigned report time. SUMF ¶ 10 does not state that the Dependability Policy was part of the CBA as Plaintiff suggests and regardless, whether or not it was is immaterial.

17. When shown the warnings/coaching and counseling documents referenced in SUMF ¶ 17, which the Handbook refers to as "corrective action" during her deposition, Plaintiff did not dispute that she had received them and conceded that she was subject to "several disciplinary actions because of attendance." *See* Dkt. No. 36-3 at 48:7-9; 33:10-13. Plaintiff's opinion about whether the warnings/coaching and counseling documents she received from Frontier evidences a pattern of "attendance issues," is immaterial.

20. Plaintiff fails to identify *any* restrictions identified by her medical care provider on the Fitness-for-Duty Certification form. *See* Dkt. No. 38-8. Frontier's requirements for employees who self-disclosed is not addressed in SUMF ¶ 20.

21. Paragraph 21 is limited to the impact of Plaintiff's *alcoholism* on her *performance as a flight attendant*—not whether Plaintiff's alcoholism was generally substantially limiting. Plaintiff's own Complaint states "…*Ms. Brigham's disability, alcoholism, never interfered with the performance of her job duties*" and that despite her alcoholism, Plaintiff "excelled in her position, accumulating accolades from Defendant for her superior performance." Dkt. 1 at ¶ 1 (emphasis added); *see also*, Dkt. No. 36-3 at 71:17-21; 119:15-18; 67:25-68:4; 68:17-22; 69:8-14. Plaintiff's distinction between Plaintiff's alcoholism and "use of alcohol" as a flight attendant is nonsensical and immaterial.

22.     Plaintiff's distinction between Plaintiff's alcoholism and "use of alcohol" as a flight attendant is nonsensical and immaterial.

23.     Plaintiff unequivocally testified that since getting sober on September 5, 2014, alcoholism has not impacted her daily life activities or inhibited her ability to function. *See* Dkt. No. 36-3 at 71:11-14 ("Q. …From September 5th, 2014 [the date Plaintiff got sober] to the present, alcoholism has not impacted any of your major life activities; is that right? A. Correct."). In fact, since getting sober, Plaintiff has not only been able to care for herself but also for her children and her husband's grandmother. *See* Dkt. No. 36-3 at 70:5-20.  Plaintiff's reliance on her response to a written discovery request is immaterial in that the response only concerns the impact of Plaintiff's alcoholism *prior* to the time she sought in-patient treatment rather than at the time she was requesting accommodation from Frontier. *See* Dkt. No. 36-7.

24.     Whether or not Plaintiff specifically called out as "sick" or as needing to use, IFMLA is immaterial.  Plaintiff does not dispute that she refused to handle flights with layovers and that she called into Frontier to notify the airline when she planned not to show up for a flight because it had a layover. *See* Dkt. 1 at 6 (acknowledging that Plaintiff missed work days to avoid long layovers or overnight flights);  Dkt. No. 36-3 at 124:16-24  ("Q. …So every time you had an overnight trip that you could not drop through collective bargaining bidding, you called out for that trip; is that correct? A. Yes. And Frontier told me to use intermittent FMLA for that."). Plaintiff also does not dispute that when she would run out of IFMLA, her absences would be coded as "sick" and as a result, that she incurred Occurrences and corresponding points under the Dependability Policy. *See* Dkt. No. 36-3 at 39:10-11;  40:5-10;  45:2-5.

26.     *See* ¶ 26 *supra,* ¶ 52 *infra.* To the extent Plaintiff claims she was complying with the terms of her treatment plan as required by Frontier, the evidence Plaintiff identifies indicates that the treatment plan must have been prepared by Plaintiff's Department of Transportation qualified SAP. Plaintiff has failed to present any evidence demonstrating that the treatment plan she relies upon was in fact a treatment plan prepared by her SAP. *See* Letter from Mr. Arellano to Plaintiff dated Sept. 16, 2014, attached as Exhibit 1 ("When an employee discloses a drug or alcohol dependency they must…[b]e evaluated by a Department of Transportation (DOT) qualified SAP – When you contact the Benefits Department or Compliance Department with your disclosure, the D&A Program Administrator will contact Ceridian's Employee Assistance Program and request a Substance Abuse Provider in your area who is qualified to make Department of Transportation determinations"). Further, the treatment plan does not prohibit Plaintiff from flying layovers or prohibit Frontier from requiring Plaintiff handle flights with layovers and Plaintiff's own contemporaneous communications with Frontier demonstrate that Frontier never held either belief.

29.     Plaintiff does not dispute that Frontier conveyed to Plaintiff that her requested accommodation would violate the terms of the CBA, which is all that is material for purposes of SUMF ¶ 29. *See* Dkt. No. 1 at ¶ 5.

30.     When Ms. Prince formed the opinion that Plaintiff's requested accommodation would violate the CBA is not addressed in SUMF ¶ 30 because it is immaterial. Regardless, as explained by Ms. Prince herself, Ms. Prince's Declaration is entirely consistent with her deposition testimony. *See* Dkt. No. 44-2 at 51:6-57:1. To the extent Plaintiff claims that "Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have

violated the CBA, her unequivocal deposition testimony is to the contrary. *See* Dkt. No. 44-2 at 58:13-24 ("Q….the union would not allow her to build her [schedule from] scratch on open time, because that would have violate the Collective Bargaining Agreement, correct? A. Correct."). Further, to the extent Ms. Prince testified that Plaintiff's request to temporarily transfer to the GO was reasonable, Ms. Prince also testified that there may not have been any light-duty assignments available at the time and that even flight attendants in Frontier's OJI Program were not always provided with light-duty assignments in the GO. *See* Dkt. No. 44-2 at 126:15-17 ("A. There was a certain time that there were no light-duty or availability to flight attendants to work not flying"); 127:12-19 ("Q. Do you know if that injured flight attendant is reassigned to light duty ever? A. It depends. And like I said, sometimes they were not offered light – light assignments. There—there wasn't the ability to have that.").

31.    Plaintiff again improperly reads language into SUMF ¶ 31, which has nothing to do with seniority to attempt to create a basis for her denial. *See* SUMF ¶ 31 (specifically stating "regardless of seniority").

32.    Plaintiff again improperly reads language into SUMF ¶ 32, which does not mention "reasonable accommodations" to attempt to create a basis to deny it. The basis for Plaintiff's denial—that the undisputed accommodations Mr. Arellano proposed were not "reasonable"—is a legal conclusion, which cannot generate a genuine dispute of material fact. *See Rich v. Torain,* No. CV PX-17-1285, 2018 WL 3122453, at *4 (D. Md. June 26, 2018) (bald legal conclusions couched as fact cannot generate a genuine dispute of material fact); *Brier v. De Cay,* 719 F. App'x 1001, 1002 (11th Cir. 2018) ("A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, evidence that is merely colorable or not significantly probative of

a disputed fact cannot satisfy a party's burden.") (internal citations omitted).

37.     Plaintiff does not point to any evidence to support her conclusory statements that (i) assignments to the GO were not reserved for flight attendants injured on the job, (ii) there were vacant/open positions in the GO available at the time she requested accommodation, or (iii) Frontier "routinely transferred" flight attendants to such positions. *See id.*

38.     *See* Reply in Support of SUMF ("RSSUMF") ¶ 37 *supra*. Mr. Arellano specifically testified that he was providing a "guestimate," which cannot satisfy Plaintiff's burden on summary judgment. Dkt. No. 36-2 at 66:18-23. Further, Frontier's documentation actually demonstrates that since 2012, Frontier has not provided light duty assignments to any flight attendant (injured on the job or not) as an accommodation. *See* Dkt. No. 45 at p. 9, ¶ 19.

39.     Plaintiff cannot on the one hand concede that she did not have a definite date by which she would be able to handle layovers again and simultaneously maintain that the time she needed to become secure enough in her sobriety to handle layovers was not indefinite.[1]   The IFMLA certification cited by Plaintiff does not mention layovers or any recommendation that Plaintiff be excused from flights with layovers for any period of time. Further, the last IFMLA Certification Form Plaintiff submitted indicated that she needed 30 to 31 days for "intermittent incapacitation" per month beginning October 23, 2015 and ending May 23, 2016. *See* IFMLA Certification Executed October 27, 2015, attached as Exhibit 2.

41.     *See* ¶ 26 *supra.*

46.     Plaintiff fails to demonstrate how her refusals to fly scheduled flights with layovers

---

[1] The definition of "indefinite" is "not precise" and "having no exact limits." *See* Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/indefinite (last visited Dec. 18, 2020).

in order to avoid off-duty situations during layovers that could tempt her to drink constitute "treatment appointments" or "incapacitation"[2]—the only circumstances under which Plaintiff was authorized to use IFMLA pursuant to the express terms of the her IFMLA certification forms and as acknowledged by Plaintiff. *See* Dkt. No 38-9; Dkt. No. 38-12; Ex. 2 (IFMLA Certification Executed October 27, 2015).

50.     Plaintiff cannot create a dispute of fact by contradicting her own deposition testimony, which plainly states that there were vacant positions available that Plaintiff was qualified for, but not interested in and that even with respect to the positions she would have been interested in regardless of qualification, she wanted to remain a flight attendant. *See* Dkt. No. 36-3 at 177:19-25; 178:6-9; 188:10-16; Dkt. No. 38-11 at p. 14.

51.     Plaintiff's own testimony and emails plainly admit that she forgot to email LOA before the start of a four (4) day trip scheduled to begin on October 23, 2015, to notify them that she planned to use IFMLA, contacting them instead on October 26, 2015.[3] *See* Dkt. No. 38-18; Dkt. No. 38-24 at pp. 2-3; Dkt. No. 36-3 at 180:13-23; 42:18-23. Plaintiff's union representative also made note of that fact along with the fact that had Plaintiff ever disagreed with the way her absences were coded, she should have contacted LOA. *See* Exhibit 3 (AFA Notes/Comments).

52.     *See* ¶ 51 *supra*. Regardless of whether Plaintiff was required to email "as soon as practicable," two hours before report time, the same day of the absence, or even the day following the absence, Plaintiff admittedly did not notify LOA until October 26, 2015—three (3) days after the October 23, 2015 trip was scheduled to commence and therefore, was in violation of Frontier

---

[2] Plaintiff refers to "intermittent capacitation," but presumably intended to refer to "intermittent *in*capacitation."
[3] Whether or not Plaintiff intended to keep the PDX turn is immaterial.

policy. *See* Dkt. No. 38-4 at Frontier Airlines (R. Brigham) – 317; Dkt. No. 38-3 at Frontier

Airlines (R. Brigham) – 304; Dkt. No. 38-5 at Frontier Airlines (R. Brigham) – 907.

      53.     *See* ¶ 52 *supra*.

      60.     *See* ¶ 7 *supra*. [4]

      61.     *See* ¶ 30 *supra*. Even assuming *arguendo* that no provision in the CBA restricts

Frontier from granting Plaintiff's request for accommodation, that fact is immaterial in that it does

not make the requested accommodation reasonable or change the fact that Plaintiff was not entitled

to an accommodation at all.

## III.   LEGAL ARGUMENT

### A.   Failure To Engage In The Interactive Process Is Not An Independent Claim.

      This Court has specifically held that "an employer's failure to follow the interactive process

**is not an independent basis for liability under the ADA**." *Lucero v. Terumo BCT, Inc.,* No. 14-

CV-03061-LTB-NYW, 2015 WL 3619343, at \*4 (D. Colo. June 10, 2015) (emphasis added).

citing *Valdez v. McGill*, 462 Fed. Appx. 814, 819 n.5 (10th Cir. 2012) (citation and quotations

omitted); *see also, Lowe v. Indep. Sch. Dist. No. 1 of Logan Cty.,* 363 F. App'x 548, 557 (10th Cir.

2010) ("[T]he interactive process is merely a method of facilitating statutory goals. It is a

recommendation, not a statutory requirement . . . . [A] plaintiff cannot base a reasonable

accommodation claim solely on the allegation that the employer failed to engage in an interactive

process. Clearly an employer could, with impunity, ignore the interactive process so long as it

reasonably accommodated employee needs.") (J. O'Brien, concurring). Unlike *Lucero,* the case

---

[4] Although immaterial, Plaintiff herself explained flight attendants could only swap trips in Open
Time if the Reserve Board was in the green. *See* Dkt. No. 36-3 at 95:5-13, 95:23-96:20; 97:5-25.

Plaintiff cites—*Aubrey v. Koppes*—did not actually involve a separate claim for failure to engage in the interactive process and therefore, cannot stand for the proposition that failure to engage in the interactive process can be brought as an independent claim under the ADAAA. 975 F.3d 995, 1004 (10th Cir. 2020). Plaintiff's claim that Frontier has never argued that it participated in the interactive process in good faith is contradicted by the record, which addresses the argument in the context of the claims that are actually cognizable. *See* Dkt. No. 38 at SUMF ¶¶ 27-29, 32-36; 42-49, p. 25-26; Dkt. No. 45 at p. 32.

**B.    Plaintiff Failed To Sustain Her Burden Of Identifying Her Limitations With Precision And Comparing Them To Those Of The Average Person.**

Though "substantially limits" is a less demanding standard post-ADAAA, to establish a physical or mental impairment substantially limits one or more major life activities, "a plaintiff must articulate **with precision** both her impairment and the major life activity it substantially limited" and demonstrate that the impairment renders her unable or significantly restricted in her ability to perform a major life activity ***compared to the average person in the general population.***" *Ortega v. S. Colorado Clinic, P.C.,* No. 13-CV-01397-WYD-CBS, 2015 WL 269812, at *2 (D. Colo. Jan. 20, 2015) (emphasis added) (citations and quotations omitted). For example, in *Ortega v. S. Colorado Clinic, P.C.,* this Court concluded that summary judgment was appropriate where the plaintiff, who suffered fibromyalgia and intersititial cystitis, had testified that she was capable of working without substantial problems and had failed to present evidence of how her difficulties compared to those of an average person in the general population. 2015 WL 269812, at *2. The plaintiff claimed that her fibromyalgia caused her "chronic widespread severe musculoskeletal pain and severe loss of sleep, resulting in only 2-3 hours of rest at night." *Id.* While the plaintiff submitted evidence that her fibromyalgia substantially limited her sleep, including a medical chart

indicating that the plaintiff to approximately three to four hours of nonrestorative sleep, the Court reasoned that she failed to present any evidence, "*as she must*," suggesting how her difficulties sleeping "compar[ed] to those of the average person in the general population (many of whom, of course, have nightmares or trouble sleeping)." *Id.*

Similarly, here, Plaintiff unequivocally testified that since getting sober on September 5, 2014, alcoholism has not impacted her daily life activities or inhibited her ability to function. *See* RSSUMF ¶ 23 *supra.* Like the plaintiff in *Ortega* who claimed her medical condition substantially limited her ability to see, learn, read, concentrate, think and work, Plaintiff claims she had trouble caring for herself, eating, sleeping, concentrating, and working. *See* Dkt. No. 44 at RSUMF ¶ 21. However, according to Plaintiff herself, she experienced these limitations *prior* to completing in-patient treatment and prior to requesting that she be excused from flights with layovers as an accommodation. *See* Dkt. No. 36-7 at pp. 8-9; *see Crowell v. Denver Health & Hosp. Auth.,* 572 F. App'x 650, 658 (10th Cir. 2014) (plaintiff failed to establish her physical impairments substantially limited her major life activities where plaintiff offered limited testimony concerning her limitations and it was unclear whether some of it concerned her abilities at the time she should have been reasonably accommodated). In fact, after completing in-patient treatment, Plaintiff testified that her life was dramatically better with the exception of occasional sleep issues. *See* Dkt. No. 70:19-20; 225:12-16. Like the Plaintiff in *Ortega*, however, Plaintiff has not presented any evidence "*as she must*," indicating how her problems sleeping compared to those of the average person in the general population, which as this Court observed in *Ortega*, much of which also experiences trouble sleeping. *Id.* at *5. Accordingly, Frontier is entitled to summary judgment on Plaintiff's discrimination and failure to accommodate claims because Plaintiff has failed to

adduce evidence demonstrating that her alcoholism substantially limited a major life activity as compared to most people in the general population and in fact, testified unequivocally to the contrary. *See also, Chavez v. Adams Cty. Sch. Dist. No. 50*, No. 15-CV-00411-RBJ, 2016 WL 1426919, at *5 (D. Colo. Apr. 12, 2016) (concluding that "no reasonable juror could conclude that [plaintiff's] anxiety and depression constituted a 'disability' within the meaning of the ADA" where plaintiff denied either condition limited her ability to perform her job or any life activities, rejecting her claim that her ability to "sleep, concentrate, think, and communicate" were limited on the grounds that she failed to support the assertion with evidence sufficient to overcome summary judgment.).

**C.    Plaintiff Was No Longer Qualified For The Flight Attendant Position Based Upon Her Own Insistence That She Could Not Cover Flights With Layovers.**

Plaintiff only points to her own self-serving deposition testimony in support of her argument that handling flights with layovers was not an essential function of her job as a flight attendant, which is insufficient for purposes of surviving summary judgment. *See Latham v. High Mesa Commc'ns,* No. 17-CV-2118-JLK-GPG, 2019 WL 8267700, at *2 (D. Colo. Dec. 19, 2019), report and recommendation adopted, No. 17-CV-02118-JLK-GPG, 2020 WL 1317394 (D. Colo. Jan. 14, 2020) ("Conclusory statements, unsupported allegations, and testimony based merely on conjecture or subjective belief are insufficient evidence to support summary judgment."); *see also, Adair v. City of Muskogee,* 823 F.3d 1297, 1309 (10th Cir. 2016) ("We are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience…Adair offers nothing but his personal experience to argue that his role does not require him to lift heavy objects. That's not enough.") (internal citation and quotation omitted). Even assuming *arguendo* that Plaintiff's self-serving testimony was not conclusory or

subjective, for purposes of determining which functions are essential to a particular position, courts nevertheless defer to employers not employees. *See Wells v. Shalala,* 228 F.3d 1137, 1144 (10th Cir. 2000), citing 29 C.F.R. § 1630.2(n)(3) (the employer's judgment is evidence considered for purposes of determining which functions are essential to a particular position); *Adair,* 823 F.3d at 1307-09 ("[O]ur disability-discrimination caselaw explicitly incorporates the EEOC's regulations and counsels in favor of deference to an employer's judgment concerning essential functions...[T]he employer describes the job and functions required to perform that job, and we defer to the employer's description...[T]he essential function inquiry is not intended to second guess the employer...[W]e will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity...[I]t is not our job as a court to sit as a super personnel department that second guesses employer's business judgments...[W]e weigh heavily the employer's judgment regarding whether a job function is essential...[W]e are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience...") (internal citations and quotations omitted).

In contrast to Plaintiff, Frontier has pointed to significant evidence demonstrating that handling a flight schedule that included layovers was an essential function of the flight attendant position. *See* Dkt. No. 35-5 (job description); Dkt. No. 45 at p. 9, ¶ 19 (since 2012, no other Frontier flight attendant has ever been excused from handling flights with layovers as an accommodation); Dkt. No. 36-3 at 218:16-219:14 (Plaintiff's testimony that she is unaware of any flight attendant who was excused from flying layovers as an accommodation); Dkt. No. 44-2 at 58:13-24 (testimony from the flight attendants' union that excusing a flight attendant from flights with

layovers would have violated the CBA); Dkt. No. 72:14-15 (Plaintiff's testimony that without Frontier's help, she could not avoid flights with layovers); Dkt. No. 36-3 at 54:16-55:5 (Plaintiff's testimony that she did not apply to any other flight attendant position with any other airline because she would have lost all seniority and therefore, started as a Reserve whose schedule would necessarily include layovers); Dkt. No. 38-5 at Frontier (R. Brigham) - 851 (discussing minimum scheduled rest periods between duty outstations and in layover stations and layover cities); Dkt. No. 38-5 at Frontier (R. Brigham) - 851 891 (discussing hotel accommodations for multi-day Reserve assignments). The fact that the Frontier flight attendant job description does not expressly use the term "layover" does not mean that layovers were not in fact essential functions of the position. *See* Dkt. No. 38-1 (Arellano Decl.) at ¶ 7 (The nature of any flight attendant position requires the ability to handle flights with layovers given that inclement weather and maintenance issues alone could require consecutive days of travel, necessarily requiring layovers for crewmembers); see also *Wells v. Shalala,* 228 F.3d 1137, 1144 (10th Cir. 2000) (job descriptions, the work experience of past incumbents in the job, the consequences of not requiring the incumbent to perform the function, the amount of time spent on the job performing the function, and the terms of a collective bargaining agreement are all considered for purposes of determining whether a job function is essential.).

### D.    The ADAAA Does Not Require An Employer To Prevent Potentially Aggravating Circumstances Outside The Workplace.

The ADAAA does not require an employer to preemptively protect employees from circumstances that may trigger or aggravate an underlying mental health condition. S*ee Powrzanas v. Jones Util. & Contracting Co.,* No. 2:17-CV-975-GMB, 2019 WL 4305612, at *7 (N.D. Ala. Sept. 11, 2019), aff'd, No. 19-14314, 2020 WL 6375108 (11th Cir. Oct. 30, 2020) ("…under the

ADA the obligation to make reasonable accommodation [does not extend] to providing an aggravation-free environment") (internal quotation omitted), citing *Cannice v. Norwest Bank Iowa, N.A.,* 189 F.3d 723, 728 (8th Cir. 1999); *Christie v. Loomis Armored US, Inc.,* No. 10-cv-02011, 2013 WL 3381268 at *8 (D. Colo. July 8, 2013) ("Neither Title VII nor the ADA is intended to…promote an alcohol-free workplace"). Accordingly, Frontier was not required to excuse Plaintiff's absences resulting from her refusal to fly flights with layovers, which she believed could aggravate her alcoholism by placing her in environments in which she previously abused alcohol as an accommodation. *See* Dkt. No. 1 at ¶ 18 (describing layovers as situations that "exacerbate[ed] her disability"); *Grillasca-Pietri v. Portorican Am. Broad. Co.*, 25 NDLR P 26, 233 F. Supp. 2d 258, 264 (D.P.R. 2002) (Preventing stress-producing situations at work is an unreasonable accommodation under ADA as a matter of law).

Plaintiff's argument that even if she was required to use IFMLA to be excused from flights with layovers, she had unused IFMLA is not only immaterial, but wrong. Plaintiff had already exceeded the number of days she was permitted to take under the FMLA[5] and even if she had not, Plaintiff *never* submitted any IFMLA Certification Form medically certifying that she could not fly flights with layovers and has failed to present any evidence indicating otherwise. Frontier was simply allowing her to use her IFMLA for that purpose as an accommodation. The IFMLA Certification forms all indicated that Plaintiff's alcoholism was ***not*** interfering with her ability to do her job as a flight attendant, that Plaintiff was able to perform all functions of her job, and certified her for a certain number of absences per month for purposes of attending "***treatment***

---

[5] Even assuming she had been granted 16 days per month as Plaintiff claims, she could not exceed the limit permitted under the FMLA.

*appointments*" or to account for episodes of "***incapacitation***"[6] resulting from her alcoholism.[7] *See* Dkt. No. 38-9; Dkt. No. 38-12; Ex. 2 (IFMLA Certification Executed October 27, 2015). Plaintiff refusal to fly scheduled flights with layovers in order to avoid off-duty situations during layovers that could tempt her to drink do not fall into either category.[8] *See Conlon v. City & Cty. of Denver, Colo.,* No. 11-CV-02039-RBJ-CBS, 2013 WL 143453, at *6 (D. Colo. Jan. 14, 2013) ("An employee's failure to provide medical information necessary to the interactive process precludes [her] from claiming that the employer violated the ADA by failing to provide reasonable accommodation.") (internal citation and quotation omitted); *see also, Brown v. E. Maine Med. Ctr.,* 514 F. Supp. 2d 104, 111 (D. Me. 2007) (distinguishing between a medical *cause* established by a medical care provider's certification for IFMLA and a true medical *need*, emphasizing that the statute and regulations require a "medical need for leave" to support intermittent entitlement). Further, if Plaintiff believed that certain absences should have been coded differently (i.e. as IFMLA rather than sick), she was required to contact LOA to refute the coding, which as indicated by her own union representative, she failed to do. *See* RSSUMF at ¶ 51.

### E.    No Juror Could Reasonably Infer From the Record That Plaintiff's SAP Prohibited Her From Flying Layovers.

To the extent Plaintiff claims that absences to avoid flights with layovers were mis-coded or should not have counted for purposes of the Dependability Policy because they were "required" pursuant to the terms of her treatment plan, she cites no evidence in the record that actually

---

[6] Plaintiff refers to "intermittent capacitation," but presumably intended to refer to "intermittent *in*capacitation."

[7] Examples of intermittent incapacitation identified by FMLA regulations include an employee with asthma who is unable to report to work due to an asthma attack or an employee who is pregnant is unable to report to work due to severe morning sickness. *See* 29 C.F.R. § 825.115.

[8] Despite this fact, Frontier had been allowing Plaintiff to use her IFMLA as an accommodation.

supports her position.  Plaintiff is correct in that Frontier required employees who self-disclosed to comply with treatment, after-care, or support group services *recommended by their SAP* who must be DOT certified.  *See* Dkt. No. 36-8; *see also*, Dkt. No. 38-4 ("Frontier requires full compliance with any additional treatment or aftercare *recommended by a Substance Abuse Provider*"); RSSUMF ¶ 26 *supra*. Plaintiff, however, has failed to point to *any* evidence in the record indicating that Marla Madrid—the author of the treatment plan Plaintiff claims prohibited her from flying layovers—was her SAP.

Regardless, even assuming Ms. Madrid was Plaintiff's SAP and that Dkt. No. 36-8 was the treatment plan Plaintiff was required to abide by, it is facially clear from the document that Ms. Madrid was not prohibiting Plaintiff to avoid flights with layovers or requiring Frontier to excuse Plaintiff from flights with layovers. Under the section titled "Additional Information," the treatment plan simply states "*Rebecca* has identified triggers to cravings and opportunities to consume alcohol and those are on overnight trips or anything longer than a given work day in her professional arena. At this time *it would not be a good idea to encourage a vulnerable situation with a work schedule that serves as a temptation, if possible*." *See* Dkt. No. 36-8 (emphasis added); *see also,* Dkt. No. 38-24 at BRIGHAM LM 00000045 (Plaintiff's testimony that she drank off-duty during layovers). The "Additional Information" is just that—additional information reflecting a suggestion to Frontier based upon information conveyed to Ms. Madrid by Plaintiff herself and Plaintiff's subjective belief about what could trigger her to relapse is not "competent summary judgment evidence" that can support her claim that she needed an accommodation, including the one she requested. *See Anderson v. Guar. Bank & Tr. Co.,* No. 14-CV-01508-NYW, 2015 WL 5915366, at *2 (D. Colo. Oct. 9, 2015), judgment entered, No. 14-CV-01508-NYW, 2015 WL

5915367 (D. Colo. Oct. 9, 2015) ("Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence."). Further, the rest of the document, which describes Plaintiff's treatment, including modality and frequency makes no mention of avoiding flights with layovers as part of Plaintiff's "treatment" and instead, affirms that Plaintiff was **not** experiencing occupational problems as a result of her alcoholism. *See* Dkt. No. 36-8.

F.   **Plaintiff Rejected Accommodations That By Her Own Testimony She Needed To Perform Her Job As A Flight Attendant.**

Plaintiff testified that she could not complete the essential functions of her job as a flight attendant without an accommodation that would allow her to get further into her recovery and become more secure in her sobriety, which she claimed would be in the near future. *See* Dkt. No. 36-3 (Pl.'s Dep. Tr.) at 224:14-22; 77:8-9; 77:2-4; 76:10-16. Frontier offered exactly that— additional forms of leave[9] so that Plaintiff could get further along in her recovery and have the ability to handle flights with layovers. *See* Dkt. No. 32 at SUMF ¶ 31; *Aubrey v. Koppes,* 975 F.3d 995, 1007 (10th Cir. 2020) ("a request for a plausibly reasonable accommodation refers to those

---

[9] While Plaintiff claims that the leave Frontier proposed was not a reasonable accommodation because it was unpaid, she cites no case law in support. *See,* 29 C.F.R. § Pt. 1630, App. (2016) ("other accommodations could include permitting the use of accrued paid leave or providing additional **unpaid leave** for necessary treatment") (emphasis added); EEOC Enforcement Guidance, https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada (quoting same); *Jacobsen v. Dillon Companies, Inc.*, No. 10-CV-01944-LTB-BNB, 2012 WL 638122, at *7 (D. Colo. Feb. 28, 2012) (leave in order to recover from an injury or illness may be a reasonable accommodation if such a request allows the employee to perform the essential functions of the job in 'the near future'"); *Jones v. Parkview Hosp., Inc.,* No. 1:16-CV-408, 2020 WL 6291462, at *9 (N.D. Ind. Oct. 26, 2020) (*"*With respect to unpaid leaves, an unpaid leave may be a reasonable accommodation provided that the leave is likely to be effective in allowing the employee to return to work at the end of the leave, with or without further reasonable accommodation ...."), citing 2 C.C.R. § 11068(c).

accommodations which presently, *or in the near future*, enable the employee to perform the essential functions of [their] job") (internal citation and quotation omitted); *see also, Kuehl v. Wal-Mart Stores, Inc.,* 909 F. Supp. 794, 803 (D. Colo. 1995) ("[w]here the nature of the accommodation offered by an employer is undisputed and no reasonable jury could find the offered accommodation to be unreasonable, however, summary judgment is appropriate."). Plaintiff, however, rejected those proposals and instead, continued to refuse to handle flights with overnights while demanding that she be able to build her schedule from scratch, disqualifying herself from any protection she may have had under the ADAAA as a result. *See* Dkt. No. 44 at ¶¶ 33, 24 29; C.F.R. § 1630.9(d) ("…if such individual rejects a reasonable accommodation…that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified").

Plaintiff's claim that the positions Frontier encouraged her to apply to internal positions for which she was unqualified is contradicted by the record, which only shows that Frontier repeatedly encouraged Plaintiff to look at vacant opportunities posted on UltiPro and MyFrontier.org and to indicate to Frontier whether she was interested in any of them. *See* Dkt. No. 38-11 (June 4 Meeting) at p. 3, 12-13. Plaintiff testified unequivocally that she "occasionally" looked at vacant internal positions and that although she was qualified for some of them, she was not interested in those positions and was not seriously considering *any* internal transfer as an accommodation because she wanted to remain a flight attendant. *See* Dkt. No. 36-3 at 176:6-177:5; 177:20-25; *see also,* Dkt. No. 38-11 at p. 14; Dkt. No. 38-15 at p. 17-18 (reiterating request to be excused from layovers); Dkt. No. 38-25 (reiterating request to be excused from layovers).

Finally, while Plaintiff contends she *did* request additional IFMLA as Frontier proposed, she failed to do so until *after* she had already exceeded her IFMLA and accumulated more than enough attendance points to warrant her termination of employment, and as noted by Plaintiff's own union representative, failed to return the IFMLA paperwork within the required timeframe and faxed it to the wrong number. *See* Ex. 3 (AFA Notes/Comments). Retroactively excusing absences is not something the ADAAA requires of employers. *See Aman v. Dillon Companies, Inc.,* 645 F. App'x 719, 726 (10th Cir. 2016) (rejecting plaintiff's argument that his employer should have retroactively excused his absences when he submitted a doctor's note); *Brookins v. Indianapolis Power & Light Co.,* 90 F. Supp. 2d 993, 1007 (S.D. Ind. 2000) ("retroactive 'excusing' of the prior weeks of absences is not something that the ADA required [defendant] to accept.").

## IV.    CONCLUSION

For the forgoing reasons and those set forth in Frontier's Motion [Dkt. No. 38], Frontier respectfully requests that the Court grant summary judgment in its favor on Plaintiff's claims in their entirety, dismissing them with prejudice.

Respectfully submitted this 22nd day of December, 2020.

<div style="margin-left:50%;">

*/s/ Danielle L. Kitson*
Danielle L. Kitson
Carolyn B. Theis
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200
Email:  dkitson@littler.com
              catheis@littler.com
*Attorneys for Defendant Frontier Airlines, Inc.*

</div>

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of December 2020, I filed and served the foregoing

**DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY**

**JUDGMENT** via CM/ECF to the following:

John R. Crone
The Law Office of John R. Crone, LLC
4550 E. Cherry Creek Drive South, #1003
Glendale, Colorado 80246
john@crone-law.com

*Attorney for Plaintiff*

<p style="text-align:right">s /Joanna Fox<br>Joanna Fox, Legal Secretary</p>

4843-8600-0084.5 057446.1017

# FRONTIER.

Frontier Airlines, Inc.          P 720.374.4200          frontierairlines.com
Frontier Center One              F 720.374.4375
7001 Tower Road
Denver, CO 80249

September 16, 2014

Mrs. Rebecca Brigham
300 Iinda Lane
Denver, CO 80221

Dear Rebecca,

We are thankful to hear that you have contacted a company representative in an effort to obtain assistance. Asking for help is the first step on the road to recovery.  We are committed to helping you through your journey. Below you will find answers to some questions regarding steps and guidance.

Representatives from two departments within Human Resources will actually be involved in your process, but rest assured that your confidential information will remain exactly that…**CONFIDENTIAL.** You have also contacted your Union representative, so they may also be informed of progress, if necessary.

When an employee discloses a drug or alcohol dependency they must:

1. Be removed from the performance of safety-sensitive functions **– the Benefits Department will assist you in requesting a Leave of Absence. A Leave Coordinator can be reached at 720-374-4531.** If you are not in a safety-sensitive position, you will be granted LOA, if suggested after assessment, by your Substance Abuse Professional. If you are eligible, you will be granted FMLA.
2. Contact the Employee Assistance Program (EAP) within 24 hours of receiving this letter or disclosing to a company representative. Frontier Airline's direct contact is:

   **Dr. Rick Carlson, LPC, NCC, CEAP, Certified Clinical Trauma Professional Ceridian LifeWorks 800-234-5154 X300**0

*A whole different animal.*

FRONTIER AIRLINES (R. BRIGHAM) - 0000524

EXHIBIT 1   1460

# FRONTIER

Frontier Airlines, Inc.          P 720.374.4200          frontierairlines.com
Frontier Center One              F 720.374.4375
7001 Tower Road
Denver, CO 80249

3. Be evaluated by a Department of Transportation (DOT) qualified SAP – **When you contact the Benefits Department or Compliance Department with your disclosure, the D&A Program Administrator will contact Ceridian's Employee Assistance Program and request a Substance Abuse Provider in your area who is qualified to make Department of Transportation determinations.**

4. Comply with all recommendations given by the SAP – **The SAP will give recommendations for an individualized program. These recommendations must be followed in order for that SAP to release you to return to work.**

5. Return for a follow-up evaluation and receive return-to-duty clearance from the SAP – **Showing compliance with SAP recommendations will result in clearance to return to work. You will need to get that clearance from the SAP in the form of a letter that describes your program and lists the date of successful completion. The letter should also state recommendations for aftercare, support groups or testing in the future. This information should be sent to the Compliance Department at hrcompliance@flyfrontier.com.**

6. Take and pass a return-to-work test and be placed in the company follow-up testing program - **Once the clearance letter is received, a Compliance Coordinator will contact you with information and documents for a Return to Duty test. As negative results are received, the Compliance Coordinator will release you to return to work.  You will be placed in the company Follow-Up testing program as directed by your SAP's recommendations.**

Please feel free to contact either me if you have any questions regarding your responsibility or the next steps to take.

Sincerely,

**Jerry Arellano**
**D&A Program Administrator**
**720.374.4594**
**Gerardo.Arellano@flyfrontier.com**

*A whole different animal.*



Frontier Airlines,
Frontier Center One
7001 Tower Road
Denver, CO 80249

P 720.374.4245
F 720.374.8013

loa@flyfrontier.com

## CERTIFICATION OF HEALTH CARE PROVIDER FOR
## EMPLOYEE'S SERIOUS HEALTH CONDITION
## (FAMILY AND MEDICAL LEAVE ACT)
## INTERMITTENT LEAVE OF ABSENCE

Frontier Contact: LOA Coordinator
LOA@flyfrontier.com

### EMPLOYEE INFORMATION

### TO BE COMPLETED BY EMPLOYEE

**EMPLOYEE:** Please complete this section before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. Per 29 U.S.C. §§ 2613, 2614(c)(3), if requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. Per 20 C.F.R. § 825.313, failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request.

Employee Name: _Rebecca Brigham_   Employee ID #: _413206_

Employee Phone: _303-913-6376_   Job Title: _Flight Attendant_

Manager: _JJ Williams_   Base/Location: _DEN_

### MEDICAL CERTIFICATION

### MEDICAL PROVIDER IS TO COMPLETE PARTS A AND B AND ANY ADDITIONAL INFORMATION

**MEDICAL PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

THE GENETIC INFORMATION NON-DISCRIMINATION ACT OF 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information", as defined by GINA, includes an individual's family medical history, the results of an individual's or their family member's genetic tests, the fact that an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual.

Page 1 of 4

**FRONTIER**

---

**PART A: MEDICAL FACTS**

Approximate date condition commenced: ___6/13/2014___

Probable duration of condition: ___Lifetime recovery___

Date(s) you treated the patient for condition: ___Consistenly since 12/2014 1x per week.___

1. Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care
   facility?   ☐ No   ☑ Yes

   If yes, dates of admission: ___September 7, 2014 - November 7, 2014___

2. Will the patient need to have treatment visits at least twice per year due to the condition?
   ☐ No   ☑ Yes

3. Was medication, other than over-the-counter medication, prescribed?
   ☐ No   ☑ Yes

4. Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical
   therapist)?   ☐ No   ☑ Yes

   If yes, state the nature of such treatments and expected duration of treatment: ___Psychiatry___

5. Is the medical condition pregnancy?   ☑ No   ☐ Yes

   If yes, expected delivery date: _____

6. Use the information provided by the employer to answer this question. If the employer does not
   provide a list of the employee's essential functions or a job description, answer these questions
   based upon the employee's own description of his/her job functions.

   Is the employee unable to perform any of his/her job functions due to their condition?
   ☑ No   ☐ Yes

   If so, identify the job functions the employee is unable to perform: _____

7. Describe other relevant medical facts, if any, related to the condition for which the employee seeks
   leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment
   such as the use of specialized equipment):

   ___Update: Rebecca continues to work towards maintaining sobriety.___
   ___She is currently stressed because of her work schedule, and___
   ___notices triggers arise as the stressors increase. Her work___
   ___schedule consist of overnight trips to which she cannot partake___
   ___due to the lack of___ (CONTINUED ON NEXT PAGE) ___know resources in case___

   | Page 2 of 4 | ___she needs to reach out for support when vulnerable.___ |
   | | ___Rebecca does not feel safe working overnights as___ |
   | | ___of this update.___ |



## PART B: AMOUNT OF LEAVE NEEDED

1. Please indicate if any of the following apply to the patient:

   ☑ They will experience intermittent incapacitation that will require FMLA Leave

   ☑ They will require treatment appointments for their condition

2. Please detail below based on your previous answer:

   - If you indicated that the patient will experience *intermittent incapacitation* requiring FMLA Leave, based upon the patient's medical history and your knowledge of the medical condition, please *estimate the maximum frequency and duration* of intermittent leave time they might require. Note that terms such as "indefinite, unknown, n/a and undetermined cannot be accepted and will result in a denial of the leave request:

   30 - 31
   (Number)
   ☐ hours    per    ☐ day       ☐ quarter
   ☑ days            ☐ week      ☐ year
                     ☑ month

   Please indicate the beginning and ending dates for the period of intermittent incapacitation:

   **Begin (mm/dd/yyyy):** 10/23/2015   **End (mm/dd/yyyy):** 5/23/2016

   - If you indicated that the employee will need to attend follow-up treatment appointments, is it medically necessary for the employee to be absent from work to attend these appointments?
   ☐ No          ☑ Yes

   If yes, please estimate treatment schedule:
   Frequency: 1 - 2 x per week & as needed.
   Length of Appointment (including any recovery period): 1 - 2 hrs+

   If yes, please also provide a general description of this regimen (e.g. Physical Therapy,

   medication administration, etc.):

   Rebecca is worried that she may face termination
   if she is not able to take overnight trips. This worry
   serves as a barrier in relapse prevention. Additionally,
   her benefits are what allows her to maintain treatment
   and the threat of termination would/does have
   implications. She continues to utilize all resources
   and support as (CONTINUED ON NEXT PAGE) she maintains
   sobriety.

Page 3 of 4

**ADDITIONAL INFORMATION (Please identify the question number with your additional answer):**

If possible, a modified work schedule would help Rebecca significantly. She has complied with all other requirements placed on her to maintain her position. Thank you for your consideration.

Signature of Health Care Provider    Date  27OCT15

Provider's Name (printed): Marla M. Madrid, LCSW

Business Address: PO Box 554
Strasburg, Co 80136

Telephone: (303) 622.9280    Fax:(303) 622.9201

Type of practice / Medical specialty: Behavioral Health

Page 4 of 4



Rebecca Brigha
52-71-01-68-1



## NOTES/COMMENTS

12/2/15 — Grievance hearings — Rebecca didn't call re: IFM until 3-4 days later, company gave paperwork to increase days, didn't get it back in required timeframe, faxed to wrong number

12/10/15 - Company response denying grievance

12/21/15 - Submitted to system board.

5/11/16 - Screened out.

4/26/16 - Screen letter sent (30 days 10/26)

11/18/16 - Case withdrawn. RH

BrighamR_PlaintiffRecords1089

EXHIBIT 3

The Company considers ~~Rebecca~~ to have self
disclosed due to a conversation with Fadia while
in treatment.

A condition of her return to work was compliance
with all required program components. One of
Rebecca's requirements of the SAP was not to do
overnights. Her seniority did not allow for her to
bid turns. It was up to her to manipulate her
schedule, calling in sick for trips where she couldn't
drop/swap/trade. This became more + more
difficult last year as the DEN base continued
to shrink and she came closer + closer to RSV.

Rebecca did not immediately qualify for IFM due
to Absences in 2014, so began accumulating
sick occurrences. She qualified for IFM in April
2015. Rebecca was required to contact LOA to
recode absences, but wasn't consistent therefor
accumulating dependability points. There was
1 trip in July where LOA said she'd exhausted
her days (July 26), however the Company
resumed recoding absences with her July 31
sick call.

A FTW for 7 pts issued 5/26/15. The Company recoded
2 calls. ~~Rebecca~~ received another FTW for 7 pts on
7/3/15.

Rebecca had another call that remained "sick"
Aug 7-10. Rebecca stated that she was ill
for that call so didn't email LOA. This
resulted in FTW dated 8/7/15 due to 8 pts.

The Company did not term Rebecca in August
when she reached 8 pts.

Rebecca missed much of Sept 2015 as IFM,
also much of Oct 1-19 also IFM. Rebecca
then had more sick calls for Oct 23-26 and
Oct 30-Nov2 where she did not email to recode.
Rebecca was suspended Nov 3, and
terminated Nov 11, 2015

this brought to 10 pts

BrighamR_PlaintiffRecords1091

1468

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

       Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

       Defendant.

---

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff, by and through the undersigned, hereby submits *Plaintiff's Reply in Support of Motion for Partial Summary Judgment*. As there remain no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff respectfully requests the Court grant her Motion in its entirety.

## I.    INTRODUCTION

The majority of Defendant's arguments set forth in response to Plaintiff's Motion are advanced in Defendant's Motion for Summary Judgment and addressed by Plaintiff in her response to the same. Therefore, Ms. Brigham incorporates her legal and factual arguments made in her

Response to Defendant's Motion for Summary Judgment [Dkt. 44] and attempts to limit this brief to any issues that may not be sufficiently addressed in the Parties' prior briefing.

## II.     REPLY CONCERNING UNDISPUTED FACTS

2.     Defendant's assertion that Ms. Brigham exhibited a "pattern of attendance issues" is without basis. Pl.'s Resp. to Def.'s Mot. for Summary Judgment [Dkt. 44] at 6-7. Defendant also advances a curious argument that Ms. Brigham's performance is "not material to any legal claim" because, apparently, performance and attendance are unrelated. Of course, Ms. Brigham disagrees as stated and cited in her Motion and Response briefing.

3.     While Frontier now argues that "such warnings were disciplinary in nature," the actual "reminders" issued to Plaintiff state differently. Pl.'s Mot. at 4, ¶ 3. Moreover, Plaintiff's recollection of whether or not flight attendants tried to strike over Defendant's attendance policy is admissible. Fed. R. Evid. 402.

7.     Defendant's assertion that "alcoholism has not substantially limited [Ms. Brigham's] ability to perform a major life activity" is without basis. Dkt. 44 at 7-10.

9.     Defendant's assertion that Ms. Brigham was not capable of performing the essential functions of her job with a reasonable accommodation is without basis. Dkt. 44 at 7-10.

10.     Defendant's denial in its briefing is inconsistent with its deposition testimony and represents an attempt to ignore Defendant's straightforward testimony that alcoholism is a disability under the ADA, and Plaintiff suffers from the same.

11.     The existence of Plaintiff's disability as defined under the ADA is well established in her Motion and in her Response to Defendant's Motion for Summary Judgment. Dkt. 44 at 7-10.

12.     Defendant's current interpretation of Ms. Brigham's treatment plan is strained, and Defendant is unable to point to any evidence in the factual record demonstrating that Defendant interpreted Ms. Brigham's treatment as not requiring her to avoid overnight layovers during the relevant time period.

13.     Defendant's denial does not comport with the factual record presented by Plaintiff, which includes contemporaneous evidence and more recent deposition testimony from Defendant.

15.     Frontier's own deposition testimony cited by Ms. Brigham establishes that Ms. Brigham's factual assertions are undisputed.

16.     Certain of Frontier's denials are legal arguments as opposed to addressing the substance of Plaintiff's factual allegations. Where Frontier "admits" Plaintiff's factual allegations it does so against its own unequivocal deposition testimony in that it states: "Frontier denied Plaintiff's request because there were no vacant positions in the GO." Frontier never provided this reasoning in its deposition instead claiming the only reason for the denial was: "she wasn't part of the work comp program."

17.     In Defendant's denial, it points out various ways in which it could have accommodated Ms. Brigham's request to be temporarily transferred to the GO given its belief that "active" flight attendants could not be transferred to positions within the GO: "Flight attendants were considered inactive and therefore, ineligible to bid if they have been granted . . . Leave of Absence . . . Medical Leave . . . Family Medical Leave Act Leave . . . OJI Leave, etc." Def.'s Resp. at 17, n.4; *see also* Dkt. 44 at 17, 20-21.

18.     Defendant's denial is contrary to a commonsense interpretation of the evidence attached to Plaintiff's Motion. *See also* Dkt. 44 at 39-40 (explaining how Defendant's argument

that Plaintiff was not seeking an open position through her request for reasonable accommodation is without merit).

19.     Defendant's denial is without factual basis. One need only look at the first tab of Defendant's spreadsheet to find an inflight employee, *i.e.*, a flight attendant, that was offered a "modif[ied] work schedule *and* the opportunity to "explore other positions within Frontier." Ex. 11 at Tab 2012 (Plaintiff is not citing this flight attendant's name as Ex. 11 was filed restricted). Additional examples of flight attendants being offered "modif[ied] work schedules" or the opportunity to "explore other positions within Frontier" exist within Exhibit 11 at Tabs 2013, 2014, 2015, and 2016.

20.     Again, Defendant's denial is without factual basis. *See* Para. 19 above.

21.     Defendant's assertion that it provided Plaintiff with "proposed additional reasonable accommodations" is without merit. Dkt. 44 at 13-16.

22.     Mr. Hilaire's Declaration is admissible. Fed. R. Evid. 402. Moreover, Defendant's cited case, *Parker v. Nat'l R.R. Passenger Corp.*, stands for the same proposition as Mr. Hilaire was employed by Frontier during the relevant time period, in the same position, and supervised by the same decision makers at issue in this lawsuit. Pl.'s Mot. at 13, ¶ 22.

23.     Defendant's objections to this evidence fail for the same reasons stated in Paragraph 22 above.

24.     Defendant's objection to this evidence is summed as follows: "the Determination is inadmissible because it lacks probative value and is instead, highly prejudicial." Def.'s Resp. at 14, ¶ 24. Thus, Defendant is not arguing that EEOC determinations are never admissible just that they may *sometimes* fail Rule 403's balancing test. Here, all of Defendant's arguments as to the

supposed unduly prejudicial nature of the EEOC's Determination in this case are without factual merit. Dkt. 44 at 13-16, 21-23. As such, this evidence is proper for the Court to consider upon summary judgment.

### III.   LEGAL STANDARD

The Parties do not appear to disagree over the general analytical framework that should apply to review of motions made under Federal Rule of Civil Procedure 56.

### IV.   ARGUMENT

Because there are no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff seeks summary judgment on the same.

### A.   Plaintiff is a qualified individual with a disability under the ADA.

Defendant's arguments in this regard rely upon inapposite law and an improper view of the factual record in this case. Nearly all of Defendant's arguments are either addressed in Plaintiff's Motion or in Plaintiff's Response to Defendant's Motion for Summary Judgment [Dkt. 44], which is incorporated herein.

Moreover, Defendant's argument that "Plaintiff's 'regarded as' and 'record of' disability theories are not properly before the Court and therefore, should not be considered given that they were not pled in Plaintiff's Complaint" is without merit. Def.'s Mot. at 21-22. Plaintiff pled that she was disabled within the meaning of the ADA and entitled to the ADA's benefits and protections. *See generally* Pl.'s Compl. and Jury Demand [Dkt. 1]. In her Complaint, Ms. Brigham never limited herself to any narrower theory to assert she fit the definition of "disabled." Id. The

ADA unquestionably defines a person with a disability under the ADA as an individual who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)).

Now, Defendant seeks to determine the scope of Plaintiff's Complaint by unilaterally declaring that Plaintiff may only seek to establish her disability through the "substantially limits" prong. Def.'s Mot. at 21-22. This does not comport with Plaintiff's pleading or the ADA's requirement that whether a person has a substantially limiting impairment or that they established a record of such should "construed broadly," *Mestas*, Case No. 17-8092, at *5; and moreover, Defendant's primary cited case in support of its argument is inapposite. *Astorga v. Idahoan Foods, LLC*, Case No. 1:18-cv-000195-DCN, at *8-10 (D. Idaho Aug. 29, 2019) (holding plaintiff could not rely on her anxiety diagnosis as basis for ADA suit because she pled arthritis as the basis).

Further, Defendant continues to rely on law that has been outdated by amendments to the ADA (although in Defendant's Response, at least the reliance is specified). *See, e.g.,* Def.'s Resp. at 25 (citing *Briggs* quoting *Sutton v. United Air Lines, Inc.* despite Sutton being "*overturned due to legislative action*."). Thus, Defendant insists that the "regarded as" analysis requires Ms. Brigham to show that Frontier was aware of her disability *and* regarded her disability as "substantially limiting one or more of her major life activities." Def.'s Resp. at 26. Of course, this is not what the law requires. Pl.'s Mot. at 22-23 ("regarded as" claim requires showing: (1) an actual or perceived impairment; (2) that is neither transitory nor minor; and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action."). Plaintiffs statement of the law is consistent with the current Code of Federal Regulations defining

the same. *See* 29 C.F.R. § 1630.2(l)(1) ("An individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, **whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity**.") (emphasis added).

The remaining of Defendant's arguments asserting that Plaintiff "was not qualified to perform her job as a flight attendant" are well addressed in Plaintiff's Motion, Dkt. 36 at 16-18, and in Plaintiff's Response to Defendant's Motion for Summary Judgment, Dkt. 44 at 26-35. Because the undisputed and material facts demonstrate that Plaintiff is a qualified individual with a disability within the meaning of the ADA, Plaintiff respectfully requests summary judgment on the same.

**B.      Defendant violated the law when it failed to reasonably accommodate Ms. Brigham's request for temporary reassignment.**

Here, Defendant raises no new arguments that are not already addressed in Plaintiff's Motion or Plaintiff's Response to Defendant's Motion for Summary Judgment, which are incorporated herein. Dkt. 36 at 24-28; Dkt. 44 at 37-40. Because the undisputed and material facts demonstrate that Defendant violated the law when it failed to reasonably accommodate Ms. Brigham's request for temporary reassignment, Plaintiff respectfully requests summary judgment on the same.

**V.      CONCLUSION**

For the reasons stated in Plaintiff's Motion, Plaintiff's Response to Defendant's Motion for Summary Judgment, and herein, Plaintiff respectfully requests the Court grant her Motion in its entirety thereby holding: (a) Plaintiff was a qualified individual with a disability under the ADA; and (b) Defendant violated the ADA when it denied Plaintiff's request to be temporarily

reassigned as a reasonable accommodation.

Respectfully submitted this 21st day of December, 2020.

THE LAW OFFICE OF JOHN R. CRONE,
LLC


/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020, a true and correct copy of the foregoing *Plaintiff's Reply in Support of Motion for Partial Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
John R. Crone

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

     Plaintiff,

v.

FRONTIER AIRLINES, INC.,

     Defendant.

---

## DEFENDANT FRONTIER AIRLINES, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

Defendant Frontier Airlines, Inc. ("Defendant" or "Frontier"), respectfully submits this Reply in Support of its Motion for Summary Judgment [Dkt. No. 38], stating as follows:

### I. INTRODUCTION

The Americans with Disabilities Act as Amended ("ADAAA") does not require an employer to prevent an employee from experiencing circumstances outside (or even inside) the workplace that may aggravate an employee's underlying medical condition. That is precisely what Plaintiff asked of Frontier—to excuse her from certain job functions (i.e. layovers and the bidding requirements set forth in Frontier's collective bargaining agreement with Plaintiff's flight attendant union) so that she could avoid off-duty situations during layovers (i.e. bars and hotel rooms) that might tempt her to consume alcohol and therefore, jeopardize her sobriety. Similarly, the ADAAA does not require an employer to continue to engage in the interactive process so long as the employer provides a reasonable accommodation. Therefore, Plaintiff's claim for failure to engage

in the interactive process in good faith should be dismissed. Regardless, Plaintiff's own evidence makes clear that Frontier not only engaged in the interactive process in good faith, but proposed a means of providing Plaintiff with the accommodation she claimed she needed and in fact requested. Plaintiff rejected the proposal, disqualifying herself from any protection she claims she had under the ADAAA.

Finally, Plaintiff failed to identify any evidence in the record aside from her own conclusory, speculative, and subjective testimony to sustain her burden of demonstrating that she was experiencing specific and substantial limitations in comparison to the average person as a result of her alcoholism at the time that she requested accommodation from Frontier, that her Substance Abuse Provider ("SAP") prohibited her from flying layovers as part of her treatment for alcoholism, and that handling flights with layovers was *not* an essential function of the Frontier flight attendant position. Accordingly, summary judgment should be granted in Frontier's favor and Plaintiff's claims should be dismissed in their entirety.

## II.   REPLY CONCERNING UNDISPUTED FACTS

1.     The fact that the term "layover" is absent from the Frontier flight attendant job description is immaterial. The ability to handle layovers is inherently required to perform the job of any flight attendant and inherently required to be able to work the "flexible hours/schedules including, nights, weekends and holidays" and "to travel to all current and future international destinations served by Frontier Airlines" as expressly reflected in the job description. Dkt. No. 38-2; *see, e.g. Collins v. Abbott Labs., Inc.*, No. 17-CV-4534 (NEB/SER), 2019 WL 2718323, at *6 (D. Minn. June 28, 2019), aff'd, 972 F.3d 976 (8th Cir. 2020), citing *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 708–09 (8th Cir. 2002) (finding certain job functions were essential, even

though they were not listed in the written job description, because they were inherently required to perform the written job functions). The requirement that flight attendants be willing and able to fly is also absent from the job description, but no one would argue that flying is not a fundamental part of the flight attendant position.

7.     The fact that flight attendants returning from intermittent leave could pick up Open Time to replace the trip if the original trip had been scheduled using Open Time does not alter the fact that all active/eligible flight attendants (i.e. all flight attendants not on a continuous leave of absence during the bid period) are <u>required</u> to bid. Nor is it disputed that Plaintiff was on active/eligible status at the time that she requested to be excused from bidding. *See* Dkt. No. 38-5 at Frontier Airlines (R. Brigham – 919); *see also,* Dkt. No. 38-22 at 20:15-21. There are no facts in the record supporting the notion that flight attendants using IFMLA were excused from the bidding process.

8.     Plaintiff's opinion as to whether compliance with the policy actually demonstrated "dependability" is immaterial. *See Latham v. High Mesa Commc'ns,* No. 17-CV-2118-JLK-GPG, 2019 WL 8267700, at *2 (D. Colo. Dec. 19, 2019), report and recommendation adopted, No. 17-CV-02118-JLK-GPG, 2020 WL 1317394 (D. Colo. Jan. 14, 2020) ("Conclusory statements, unsupported allegations, and testimony based merely on conjecture or subjective belief are insufficient evidence to support summary judgment.").

9.     This distinction is immaterial given that Plaintiff is claiming that she should not have incurred Occurrences for her absences at *all* and not disputing how Occurrences were calculated.

10.     Despite Plaintiff's denial, there appears to be no dispute—both parties agree that the CBA required flight attendants ***who were unable to report for work because of illness or off-the-job injury*** to notify Crew Scheduling at least two (2) hours prior to their assigned report time. SUMF ¶ 10 does not state that the Dependability Policy was part of the CBA as Plaintiff suggests and regardless, whether or not it was is immaterial.

17.     When shown the warnings/coaching and counseling documents referenced in SUMF ¶ 17, which the Handbook refers to as "corrective action" during her deposition, Plaintiff did not dispute that she had received them and conceded that she was subject to "several disciplinary actions because of attendance." *See* Dkt. No. 36-3 at 48:7-9; 33:10-13. Plaintiff's opinion about whether the warnings/coaching and counseling documents she received from Frontier evidences a pattern of "attendance issues," is immaterial.

20.     Plaintiff fails to identify ***any*** restrictions identified by her medical care provider on the Fitness-for-Duty Certification form. *See* Dkt. No. 38-8. Frontier's requirements for employees who self-disclosed is not addressed in SUMF ¶ 20.

21.     Paragraph 21 is limited to the impact of Plaintiff's ***alcoholism*** on her ***performance as a flight attendant***—not whether Plaintiff's alcoholism was generally substantially limiting. Plaintiff's own Complaint states "…***Ms. Brigham's disability, alcoholism, never interfered with the performance of her job duties***" and that despite her alcoholism, Plaintiff "excelled in her position, accumulating accolades from Defendant for her superior performance." Dkt. 1 at ¶ 1 (emphasis added); *see also,* Dkt. No. 36-3 at 71:17-21; 119:15-18; 67:25-68:4; 68:17-22; 69:8-14. Plaintiff's distinction between Plaintiff's alcoholism and "use of alcohol" as a flight attendant is nonsensical and immaterial.

1480

22.     Plaintiff's distinction between Plaintiff's alcoholism and "use of alcohol" as a flight attendant is nonsensical and immaterial.

23.     Plaintiff unequivocally testified that since getting sober on September 5, 2014, alcoholism has not impacted her daily life activities or inhibited her ability to function. *See* Dkt. No. 36-3 at 71:11-14 ("Q. …From September 5th, 2014 [the date Plaintiff got sober] to the present, alcoholism has not impacted any of your major life activities; is that right? A. Correct."). In fact, since getting sober, Plaintiff has not only been able to care for herself but also for her children and her husband's grandmother. *See* Dkt. No. 36-3 at 70:5-20. Plaintiff's reliance on her response to a written discovery request is immaterial in that the response only concerns the impact of Plaintiff's alcoholism ***prior*** to the time she sought in-patient treatment rather than at the time she was requesting accommodation from Frontier. *See* Dkt. No. 36-7.

24.     Whether or not Plaintiff specifically called out as "sick" or as needing to use, IFMLA is immaterial. Plaintiff does not dispute that she refused to handle flights with layovers and that she called into Frontier to notify the airline when she planned not to show up for a flight because it had a layover. *See* Dkt. 1 at 6 (acknowledging that Plaintiff missed work days to avoid long layovers or overnight flights); Dkt. No. 36-3 at 124:16-24 ("Q. …So every time you had an overnight trip that you could not drop through collective bargaining bidding, you called out for that trip; is that correct? A. Yes. And Frontier told me to use intermittent FMLA for that."). Plaintiff also does not dispute that when she would run out of IFMLA, her absences would be coded as "sick" and as a result, that she incurred Occurrences and corresponding points under the Dependability Policy. *See* Dkt. No. 36-3 at 39:10-11; 40:5-10; 45:2-5.

26.     *See* ¶ 26 *supra,* ¶ 52 *infra.* To the extent Plaintiff claims she was complying with the terms of her treatment plan as required by Frontier, the evidence Plaintiff identifies indicates that the treatment plan must have been prepared by Plaintiff's Department of Transportation qualified SAP. Plaintiff has failed to present any evidence demonstrating that the treatment plan she relies upon was in fact a treatment plan prepared by her SAP. *See* Letter from Mr. Arellano to Plaintiff dated Sept. 16, 2014, attached as Exhibit 1 ("When an employee discloses a drug or alcohol dependency they must…[b]e evaluated by a Department of Transportation (DOT) qualified SAP – When you contact the Benefits Department or Compliance Department with your disclosure, the D&A Program Administrator will contact Ceridian's Employee Assistance Program and request a Substance Abuse Provider in your area who is qualified to make Department of Transportation determinations"). Further, the treatment plan does not prohibit Plaintiff from flying layovers or prohibit Frontier from requiring Plaintiff handle flights with layovers and Plaintiff's own contemporaneous communications with Frontier demonstrate that Frontier never held either belief.

29.     Plaintiff does not dispute that Frontier conveyed to Plaintiff that her requested accommodation would violate the terms of the CBA, which is all that is material for purposes of SUMF ¶ 29. *See* Dkt. No. 1 at ¶ 5.

30.     When Ms. Prince formed the opinion that Plaintiff's requested accommodation would violate the CBA is not addressed in SUMF ¶ 30 because it is immaterial. Regardless, as explained by Ms. Prince herself, Ms. Prince's Declaration is entirely consistent with her deposition testimony. *See* Dkt. No. 44-2 at 51:6-57:1. To the extent Plaintiff claims that "Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have

violated the CBA, her unequivocal deposition testimony is to the contrary. *See* Dkt. No. 44-2 at 58:13-24 ("Q….the union would not allow her to build her [schedule from] scratch on open time, because that would have violate the Collective Bargaining Agreement, correct? A. Correct."). Further, to the extent Ms. Prince testified that Plaintiff's request to temporarily transfer to the GO was reasonable, Ms. Prince also testified that there may not have been any light-duty assignments available at the time and that even flight attendants in Frontier's OJI Program were not always provided with light-duty assignments in the GO. *See* Dkt. No. 44-2 at 126:15-17 ("A. There was a certain time that there were no light-duty or availability to flight attendants to work not flying"); 127:12-19 ("Q. Do you know if that injured flight attendant is reassigned to light duty ever? A. It depends. And like I said, sometimes they were not offered light – light assignments. There—there wasn't the ability to have that.").

   31.   Plaintiff again improperly reads language into SUMF ¶ 31, which has nothing to do with seniority to attempt to create a basis for her denial. *See* SUMF ¶ 31 (specifically stating "regardless of seniority").

   32.   Plaintiff again improperly reads language into SUMF ¶ 32, which does not mention "reasonable accommodations" to attempt to create a basis to deny it. The basis for Plaintiff's denial—that the undisputed accommodations Mr. Arellano proposed were not "reasonable"—is a legal conclusion, which cannot generate a genuine dispute of material fact. *See Rich v. Torain,* No. CV PX-17-1285, 2018 WL 3122453, at *4 (D. Md. June 26, 2018) (bald legal conclusions couched as fact cannot generate a genuine dispute of material fact); *Brier v. De Cay,* 719 F. App'x 1001, 1002 (11th Cir. 2018) ("A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, evidence that is merely colorable or not significantly probative of

a disputed fact cannot satisfy a party's burden.") (internal citations omitted).

37.    Plaintiff does not point to any evidence to support her conclusory statements that (i) assignments to the GO were not reserved for flight attendants injured on the job, (ii) there were vacant/open positions in the GO available at the time she requested accommodation, or (iii) Frontier "routinely transferred" flight attendants to such positions. *See id.*

38.    *See* Reply in Support of SUMF ("RSSUMF") ¶ 37 *supra*. Mr. Arellano specifically testified that he was providing a "guestimate," which cannot satisfy Plaintiff's burden on summary judgment. Dkt. No. 36-2 at 66:18-23. Further, Frontier's documentation actually demonstrates that since 2012, Frontier has not provided light duty assignments to any flight attendant (injured on the job or not) as an accommodation. *See* Dkt. No. 45 at p. 9, ¶ 19.

39.    Plaintiff cannot on the one hand concede that she did not have a definite date by which she would be able to handle layovers again and simultaneously maintain that the time she needed to become secure enough in her sobriety to handle layovers was not indefinite.[1]   The IFMLA certification cited by Plaintiff does not mention layovers or any recommendation that Plaintiff be excused from flights with layovers for any period of time. Further, the last IFMLA Certification Form Plaintiff submitted indicated that she needed 30 to 31 days for "intermittent incapacitation" per month beginning October 23, 2015 and ending May 23, 2016. *See* IFMLA Certification Executed October 27, 2015, attached as Exhibit 2.

41.    *See* ¶ 26 *supra.*

46.    Plaintiff fails to demonstrate how her refusals to fly scheduled flights with layovers

---

[1] The definition of "indefinite" is "not precise" and "having no exact limits." *See* Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/indefinite (last visited Dec. 18, 2020).

in order to avoid off-duty situations during layovers that could tempt her to drink constitute "treatment appointments" or "incapacitation"[2]—the only circumstances under which Plaintiff was authorized to use IFMLA pursuant to the express terms of the her IFMLA certification forms and as acknowledged by Plaintiff. *See* Dkt. No 38-9; Dkt. No. 38-12; Ex. 2 (IFMLA Certification Executed October 27, 2015).

50.     Plaintiff cannot create a dispute of fact by contradicting her own deposition testimony, which plainly states that there were vacant positions available that Plaintiff was qualified for, but not interested in and that even with respect to the positions she would have been interested in regardless of qualification, she wanted to remain a flight attendant. *See* Dkt. No. 36-3 at 177:19-25; 178:6-9; 188:10-16; Dkt. No. 38-11 at p. 14.

51.     Plaintiff's own testimony and emails plainly admit that she forgot to email LOA before the start of a four (4) day trip scheduled to begin on October 23, 2015, to notify them that she planned to use IFMLA, contacting them instead on October 26, 2015.[3] *See* Dkt. No. 38-18; Dkt. No. 38-24 at pp. 2-3; Dkt. No. 36-3 at 180:13-23; 42:18-23. Plaintiff's union representative also made note of that fact along with the fact that had Plaintiff ever disagreed with the way her absences were coded, she should have contacted LOA. *See* Exhibit 3 (AFA Notes/Comments).

52.     *See* ¶ 51 *supra*. Regardless of whether Plaintiff was required to email "as soon as practicable," two hours before report time, the same day of the absence, or even the day following the absence, Plaintiff admittedly did not notify LOA until October 26, 2015—three (3) days after the October 23, 2015 trip was scheduled to commence and therefore, was in violation of Frontier

---

[2] Plaintiff refers to "intermittent capacitation," but presumably intended to refer to "intermittent *in*capacitation."

[3] Whether or not Plaintiff intended to keep the PDX turn is immaterial.

policy. *See* Dkt. No. 38-4 at Frontier Airlines (R. Brigham) – 317; Dkt. No. 38-3 at Frontier Airlines (R. Brigham) – 304; Dkt. No. 38-5 at Frontier Airlines (R. Brigham) – 907.

53.     *See* ¶ 52 *supra*.

60.     *See* ¶ 7 *supra*.[4]

61.     *See* ¶ 30 *supra*. Even assuming *arguendo* that no provision in the CBA restricts Frontier from granting Plaintiff's request for accommodation, that fact is immaterial in that it does not make the requested accommodation reasonable or change the fact that Plaintiff was not entitled to an accommodation at all.

## III.   LEGAL ARGUMENT

### A.     Failure To Engage In The Interactive Process Is Not An Independent Claim.

This Court has specifically held that "an employer's failure to follow the interactive process **is not an independent basis for liability under the ADA**." *Lucero v. Terumo BCT, Inc.,* No. 14-CV-03061-LTB-NYW, 2015 WL 3619343, at *4 (D. Colo. June 10, 2015) (emphasis added). citing *Valdez v. McGill*, 462 Fed. Appx. 814, 819 n.5 (10th Cir. 2012) (citation and quotations omitted); *see also, Lowe v. Indep. Sch. Dist. No. 1 of Logan Cty.,* 363 F. App'x 548, 557 (10th Cir. 2010) ("[T]he interactive process is merely a method of facilitating statutory goals. It is a recommendation, not a statutory requirement . . . . [A] plaintiff cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process. Clearly an employer could, with impunity, ignore the interactive process so long as it reasonably accommodated employee needs.") (J. O'Brien, concurring). Unlike *Lucero,* the case

---

[4] Although immaterial, Plaintiff herself explained flight attendants could only swap trips in Open Time if the Reserve Board was in the green. *See* Dkt. No. 36-3 at 95:5-13, 95:23-96:20; 97:5-25.

Plaintiff cites—*Aubrey v. Koppes*—did not actually involve a separate claim for failure to engage in the interactive process and therefore, cannot stand for the proposition that failure to engage in the interactive process can be brought as an independent claim under the ADAAA. 975 F.3d 995, 1004 (10th Cir. 2020). Plaintiff's claim that Frontier has never argued that it participated in the interactive process in good faith is contradicted by the record, which addresses the argument in the context of the claims that are actually cognizable. *See* Dkt. No. 38 at SUMF ¶¶ 27-29, 32-36; 42-49, p. 25-26; Dkt. No. 45 at p. 32.

> **B.   Plaintiff Failed To Sustain Her Burden Of Identifying Her Limitations With Precision And Comparing Them To Those Of The Average Person.**

Though "substantially limits" is a less demanding standard post-ADAAA, to establish a physical or mental impairment substantially limits one or more major life activities, "a plaintiff must articulate **with precision** both her impairment and the major life activity it substantially limited" and demonstrate that the impairment renders her unable or significantly restricted in her ability to perform a major life activity *compared to the average person in the general population.*" *Ortega v. S. Colorado Clinic, P.C.,* No. 13-CV-01397-WYD-CBS, 2015 WL 269812, at *2 (D. Colo. Jan. 20, 2015) (emphasis added) (citations and quotations omitted). For example, in *Ortega v. S. Colorado Clinic, P.C.,* this Court concluded that summary judgment was appropriate where the plaintiff, who suffered fibromyalgia and intersititial cystitis, had testified that she was capable of working without substantial problems and had failed to present evidence of how her difficulties compared to those of an average person in the general population. 2015 WL 269812, at *2. The plaintiff claimed that her fibromyalgia caused her "chronic widespread severe musculoskeletal pain and severe loss of sleep, resulting in only 2-3 hours of rest at night." *Id.* While the plaintiff submitted evidence that her fibromyalgia substantially limited her sleep, including a medical chart

indicating that the plaintiff to approximately three to four hours of nonrestorative sleep, the Court reasoned that she failed to present any evidence, "*as she must*," suggesting how her difficulties sleeping "compar[ed] to those of the average person in the general population (many of whom, of course, have nightmares or trouble sleeping)." *Id.*

Similarly, here, Plaintiff unequivocally testified that since getting sober on September 5, 2014, alcoholism has not impacted her daily life activities or inhibited her ability to function. *See* RSSUMF ¶ 23 *supra*. Like the plaintiff in *Ortega* who claimed her medical condition substantially limited her ability to see, learn, read, concentrate, think and work, Plaintiff claims she had trouble caring for herself, eating, sleeping, concentrating, and working. *See* Dkt. No. 44 at RSUMF ¶ 21. However, according to Plaintiff herself, she experienced these limitations *prior* to completing in-patient treatment and prior to requesting that she be excused from flights with layovers as an accommodation. *See* Dkt. No. 36-7 at pp. 8-9; *see Crowell v. Denver Health & Hosp. Auth.,* 572 F. App'x 650, 658 (10th Cir. 2014) (plaintiff failed to establish her physical impairments substantially limited her major life activities where plaintiff offered limited testimony concerning her limitations and it was unclear whether some of it concerned her abilities at the time she should have been reasonably accommodated). In fact, after completing in-patient treatment, Plaintiff testified that her life was dramatically better with the exception of occasional sleep issues. *See* Dkt. No. 70:19-20; 225:12-16. Like the Plaintiff in *Ortega*, however, Plaintiff has not presented any evidence "*as she must*," indicating how her problems sleeping compared to those of the average person in the general population, which as this Court observed in *Ortega*, much of which also experiences trouble sleeping. *Id.* at *5. Accordingly, Frontier is entitled to summary judgment on Plaintiff's discrimination and failure to accommodate claims because Plaintiff has failed to

adduce evidence demonstrating that her alcoholism substantially limited a major life activity as compared to most people in the general population and in fact, testified unequivocally to the contrary. *See also, Chavez v. Adams Cty. Sch. Dist. No. 50*, No. 15-CV-00411-RBJ, 2016 WL 1426919, at *5 (D. Colo. Apr. 12, 2016) (concluding that "no reasonable juror could conclude that [plaintiff's] anxiety and depression constituted a 'disability' within the meaning of the ADA" where plaintiff denied either condition limited her ability to perform her job or any life activities, rejecting her claim that her ability to "sleep, concentrate, think, and communicate" were limited on the grounds that she failed to support the assertion with evidence sufficient to overcome summary judgment.).

### C. Plaintiff Was No Longer Qualified For The Flight Attendant Position Based Upon Her Own Insistence That She Could Not Cover Flights With Layovers.

Plaintiff only points to her own self-serving deposition testimony in support of her argument that handling flights with layovers was not an essential function of her job as a flight attendant, which is insufficient for purposes of surviving summary judgment. *See Latham v. High Mesa Commc'ns,* No. 17-CV-2118-JLK-GPG, 2019 WL 8267700, at *2 (D. Colo. Dec. 19, 2019), report and recommendation adopted, No. 17-CV-02118-JLK-GPG, 2020 WL 1317394 (D. Colo. Jan. 14, 2020) ("Conclusory statements, unsupported allegations, and testimony based merely on conjecture or subjective belief are insufficient evidence to support summary judgment."); *see also, Adair v. City of Muskogee,* 823 F.3d 1297, 1309 (10th Cir. 2016) ("We are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience…Adair offers nothing but his personal experience to argue that his role does not require him to lift heavy objects. That's not enough.") (internal citation and quotation omitted). Even assuming *arguendo* that Plaintiff's self-serving testimony was not conclusory or

subjective, for purposes of determining which functions are essential to a particular position, courts nevertheless defer to employers not employees. *See Wells v. Shalala,* 228 F.3d 1137, 1144 (10th Cir. 2000), citing 29 C.F.R. § 1630.2(n)(3) (the employer's judgment is evidence considered for purposes of determining which functions are essential to a particular position); *Adair,* 823 F.3d at 1307-09 ("[O]ur disability-discrimination caselaw explicitly incorporates the EEOC's regulations and counsels in favor of deference to an employer's judgment concerning essential functions…[T]he employer describes the job and functions required to perform that job, and we defer to the employer's description…[T]he essential function inquiry is not intended to second guess the employer…[W]e will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity…[I]t is not our job as a court to sit as a super personnel department that second guesses employer's business judgments…[W]e weigh heavily the employer's judgment regarding whether a job function is essential…[W]e are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience…") (internal citations and quotations omitted).

In contrast to Plaintiff, Frontier has pointed to significant evidence demonstrating that handling a flight schedule that included layovers was an essential function of the flight attendant position. *See* Dkt. No. 35-5 (job description); Dkt. No. 45 at p. 9, ¶ 19 (since 2012, no other Frontier flight attendant has ever been excused from handling flights with layovers as an accommodation); Dkt. No. 36-3 at 218:16-219:14 (Plaintiff's testimony that she is unaware of any flight attendant who was excused from flying layovers as an accommodation); Dkt. No. 44-2 at 58:13-24 (testimony from the flight attendants' union that excusing a flight attendant from flights with