No. 21-1335

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

—————————————

Rebecca Brigham,

*Plaintiff-Appellant,*

v.

Frontier Airlines, Inc.,

*Defendant-Appellee.*

—————————————

**On Appeal from the United States District Court for the District of Colorado (Civil Action No. 19-cv-03417-WJM-STV, Hon. William J. Martinez)**

—————————————

**BRIEF FOR APPELLANT**

—————————————

John R. Crone
   *Counsel of Record*
The Law Office of John R. Crone, LLC
2717 South Forest Street
Denver, CO 80222
(303) 598-3526
john@crone-law.com

*Counsel for Rebecca Brigham*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                    iv-vi

STATEMENT OF PRIOR OR RELATED APPEALS                                      1

JURISDICTIONAL STATEMENT                                                   1

STATEMENT OF THE ISSUES                                                    1

INTRODUCTION                                                               2

STATEMENT OF THE CASE                                                      4

I.          Ms. Brigham started working for Frontier as a flight
attendant in May 2007.                                                     4

II.         After losing her daughter shortly after childbirth, Ms.
Brigham's alcoholism worsened, but she never drank alcohol while on
the job.    5

III.        With a reasonable accommodation, Ms. Brigham was capable
of performing all essential functions of her position, but Frontier denied
all such requests.                                                        7

IV.         The Collective Bargaining Agreement ("CBA") did not
prohibit Ms. Brigham's requested accommodations.                          13

V.          Frontier's flight attendants were not always required to
create their schedules based on seniority.                                17

VI.         Frontier regularly granted other employees' requests for
reasonable accommodation in the form of modified schedules or
transfers to light duty positions.                                        19

VII.          Frontier counted any of Ms. Brigham's disability-related

absences as violations of its "dependability policy."                    21

VIII.    Ms. Brigham was approved to use *more* intermittent FMLA leave days than she in fact used, for which she was terminated.                    23

IX.            Ms. Brigham was not the only disabled alcoholic at Frontier to suffer unlawful treatment under the ADA.                    25

PROCEDURAL BACKGROUND                    26

SUMMARY OF THE ARGUMENT                    27

ARGUMENT                    28

I.            MS. BRIGHAM PROPOSED PLAUSIBLY REASONABLE ACCOMMODATIONS, AND FRONTIER FAILED TO SHOW HER PROFFERED ACCOMMODATIONS WERE UNREASONABLE OR AN UNDUE BURDEN.                    28

A.            Ms. Brigham's request to transfer to the GO was a plausibly reasonable accommodation.                    29

B.            Ms. Brigham's request to create her schedule from Open Time was a plausibly reasonable accommodation.                    39

II.            FRONTIER TERMINATED MS. BRIGHAM ON THE BASIS OF HER DISABILITY AND BECAUSE SHE REQUESTED REASONABLE ACCOMMODATIONS.                    55

A.            Ms. Brigham presented ample evidence that her termination was due to unlawful discrimination and retaliation.                    56

III.            MS. BRIGHAM PROPERLY STATED A CLAIM FOR FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS BECAUSE FRONTIER'S FAILURE TO ENGAGE IN THIS PROCESS LED TO HER DENIED ACCOMMODATIONS.                    59

CONCLUSION                    63

STATEMENT REGARDING ORAL ARGUMENT                    63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT     65

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTIONS                                           66

CERTIFICATE THAT ELECTRONIC COPY AND REQUIRED HARD
COPIES ARE IDENTICAL                                 67

CERTIFICATE OF SERVICE                               68

<u>Required Attachments</u>

Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment, ECF No. 59, *Rebecca Brigham v. Frontier Airlines, Inc.*, No. 19-cv-03417-WJM-STV (August 27, 2021)

Final Judgment, ECF No. 60, *Rebecca Brigham v. Frontier Airlines, Inc.*, No. 19-cv-03417-WJM-STV (August 27, 2021)

# TABLE OF AUTHORITIES

## STATUTES

28 U.S.C. § 1291 ------------------------------------------------------------- 1

28 U.S.C. § 1331 ------------------------------------------------------------- 1

28 U.S.C. § 1367 ------------------------------------------------------------- 1

42 U.S.C. § 2000e ----------------------------------------------------------- 1

42 U.S.C. § 12101 ---------------------------------------------------------- 1

42 U.S.C.S. § 12111 ------------------------------------------------- 40, 53, 54

## CASES

*Aldrich v. Boeing Co.*, 146 F. 3d 1265 (10th Cir. 1998) --------------------- 40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ---------------- 51

*Aubrey v. Koppes,* 975 F.3d 995, 1005 (10th Cir. 2020) ----------- 30, 60, 61

*Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995) 41

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ------------------------- 56

*Carter v. Tisch*, 822 F.2d 465, 469 (4th Cir. 1987) --------------------------- 41

*Dale v. TWC Admin. LLC*, 2016 U.S. Dist. LEXIS 200841 at *19

  (E.D.N.C. Aug. 11, 2016) --------------------------------------------------- 53

*Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996) 41,

47

*EEOC v. Firestone Fibers & Textiles Co.*, 515 F. 3d 307, 314 (4th Cir. 2008) -------------------------------------------------------------- 53

*Emrick v. Libbey-Owens-Ford Co.*, 875 F. Supp. 393, 396-97 (E.D. Tex. 1995) -------------------------------------------------------------- 47

*Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) -- 41

*Groff v. Dejoy,* 2021 U.S. Dist. LEXIS 66174 at *30 (E.D. Pa. Apr. 6, 2021) -------------------------------------------------------------- 53

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998)  34

*Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021) ------------------------------------------------- 29, 56, 60

*Kemmis v. McGoldrick*, 706 F.2d 993, 996 (9th Cir. 1983) ---------------- 38

*Kralik v. Durbin*, 130 F.3d 76, 83 (3d Cir. 1997) ----------------------------- 41

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) ---- 29, 30

*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ------------ 41

*Patrick v. Henry Cnty., Ga.*, Civil Action No. 1:13-CV-1344-RWS, at *11-12 (N.D. Ga. Mar. 31, 2015) -------------------------------------------- 36

*Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) --------------- 31

*Shea v. Tisch*, 870 F.2d 786, 790 (1st Cir. 1989) ----------------------------- 41

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1167 (10th Cir. 1999)-- 30, 60

*Stone v. City of Mount Vernon*, 118 F.3d 92, 100 (2d Cir. 1997)---------- 36

*Tabura v. Kellogg USA*, 880 F. 3d 544 (10th Cir. 2018) ------------------ 52

*Transportation-Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 161 (1966)------------------------------------- 39

*Valdez v. McGill*, 462 Fed. App'x 814 (10th Cir. 2012) -------------------- 60

### OTHER AUTHORITIES

EEOC Enforcement Guidance: Workers' Compensation and the ADA, ¶ 28 ------------------------------------------------------------------------ 35

Ann C. Hodges, *The Americans with Disabilities Act in the Unionized Workplace,* 48 U. Miami L. Rev. 567, 615-16 (1994) --------------------- 47

NLRB Gen. Couns. Mem. 92-9------------------------------------------------ 47

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals in this matter.

## JURISDICTIONAL STATEMENT

Ms. Brigham brought this action under 42 U.S.C. § 12101 *et seq.*
(the "ADA") to redress unlawful discrimination, retaliation, failure to
engage in the interactive process, and failure to accommodate her
disability. The district court had jurisdiction under 28 U.S.C. § 1331, and
dismissed all claims contained within Ms. Brigham's Complaint and Jury
Demand on August 27, 2021 (Vol. 6[1] at 1535-1563, Order Granting
Defendant's Motion for Summary Judgment and Denying Plaintiff's
Motion for Partial Summary Judgment), with Final Judgment entered in
favor of Frontier Airlines, Inc. ("Frontier") on August 27, 2021 (Vol. 6 at
1564-1565). The Notice of Appeal was timely filed in the district court on
September 24, 2021. (Vol. 6 at 1566.) This Court has jurisdiction over this
appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in dismissing Ms. Brigham's
claims for failure to accommodate under the ADA when it ruled she failed

---

[1] Citations to "Vol. __" are to volumes 1 through 6 of the Appendix
containing the record on appeal.

to request a plausibly reasonable accommodation.

2.    Whether the district court erred in dismissing Ms. Brigham's claims for discrimination and retaliation under the ADA when it ruled she failed to demonstrate that Frontier terminated her employment on the basis of her disability (for discrimination) or that there was a causal connection between her requests for accommodation and her termination (for retaliation).

3.    Whether the district court erred in dismissing Ms. Brigham's claim for failure to engage in the interactive process under the ADA when it ruled that such a claim is not independently actionable under the ADA.

## INTRODUCTION

Ms. Brigham was a flight attendant with Frontier for just over eight years, starting in May 2007 and ending with her unlawful termination in November 2015. Ms. Brigham thoroughly enjoyed her position with Frontier, incorporated the position of flight attendant into her identity, and importantly, was able to support her family on the good and stable income the job provided. Unfortunately, Ms. Brigham also struggled with alcoholism from her teenage years into adulthood.

A couple of years into her tenure with Frontier, Ms. Brigham

suffered a tragic situation: her daughter passed away just 45 minutes after birth. This event greatly exacerbated Ms. Brigham's alcoholism, and while she never let her drinking negatively affect her job performance, her condition did take a toll on her family, marriage, and general health. As a result, and because she was on the verge of losing all that she cared for, Ms. Brigham checked herself into an in-patient rehabilitation program to treat her alcoholism in late 2014. Ms. Brigham self-disclosed her alcoholism to Frontier through its self-disclosure program. While Ms. Brigham's treatment has been a great success in that she has not touched alcohol since completing her treatment program, after her disclosure, Frontier subjected her to unlawful treatment in violation of the ADA.

Unable to complete her essential job functions without reasonable accommodation and stuck with the unreasonable choice between maintaining a job or foregoing alcohol treatment, Ms. Brigham chose to prioritize her health and well-being while attempting to maintain all scheduled shifts with Defendant. To achieve these goals, Ms. Brigham suggested two reasonable accommodations to Frontier: (1) eliminate overnight flights from her schedule for a temporary duration by allowing

her to build her schedule from Open Time (her treatment plan required avoiding overnight trips); or (2) transfer her to the General Office (the "GO") for light duty work for a temporary duration. Frontier denied these requested accommodations without offering or suggesting any other possible solutions.

Unfortunately, and predictably given that Ms. Brigham's treatment plan required her to avoid overnight trips, Ms. Brigham accrued enough absences (according to Frontier) under Frontier's "dependability program" to suffer termination. Frontier's failure to accommodate Ms. Brigham's requests for reasonable accommodation, its retaliation against her for requesting accommodations, its failure to meaningfully engage in the interactive process, and its discriminatory treatment, were all in violation of the ADA; and therefore, Ms. Brigham filed the instant litigation (after obtaining a positive determination from the EEOC).

The district court should be reversed and the claims contained in Ms. Brigham's Complaint and Jury Demand should be set for trial.

## STATEMENT OF THE CASE

**I.  Ms. Brigham started working for Frontier as a flight attendant in May 2007.**

Ms. Brigham started working for Frontier as a flight attendant in

May 2007. (Vol. 1 at 0010.) Throughout her tenure Ms. Brigham was an excellent performer, and up until she disclosed her disability, she incurred no serious performance or disciplinary issues. Gerardo Arrellano, Frontier's senior manager of employee relations, testified in his deposition: "Q. And at that time [referring to 2008 through 2010] . . . were you ever aware of any performance issues with regard to Ms. Brigham? A. Not that I recall, no." (Vol. 1 at 0071, 8:21-24.)

Stefanie Coppedge, Ms. Brigham's direct supervisor during the relevant time period, testified in her deposition: "Q. Any sort of performance or work issues that – you know, negative things that you can think of related to Ms. Brigham? A. We had to work through the dependability process [referring to absences accrued *after* Ms. Brigham disclosed her disability]. Q. Okay. Anything outside of the dependability process?  A. No, sir." (Vol. 1 at 0254, 12:2-7.)

**II.   After losing her daughter shortly after childbirth, Ms. Brigham's alcoholism worsened, but she never drank alcohol while on the job.**

Unfortunately for Ms. Brigham, she has battled issues related to alcoholism for most of her adolescent and adult life. (Vol. 1 at 0160, 62:24-63:10) ("I mean, that's hard. I have – since I was a teenager, I have always

5

liked alcohol. It was my escape from reality. It was my best friend. And I've always – I was always sort of like a binge drinker, where if I had one, I had to have 20 more. And I was the life of the party. I was just a party girl, and it was all fine and dandy. And then there was a major shift in my drinking after my first daughter passed away. She – she passed away in 2009. And that's when my drinking switched from happy-go-lucky party to sort of drinking more out of sadness and to numb and – yeah.").

The passing of Ms. Brigham's daughter in 2009 had a profound effect on her life and her alcoholism. (Vol. 1 at 0198, 214:5-20) ("I was five and a half months pregnant, and I got an infection in the lining of my uterus, because I have an incompetent cervix, which we didn't know then. And I got an infection in the lining of my uterus, and my body went into labor to try and get rid of the infection. My daughter, Cindy Lee Brigham, was born, and lived for 45 minutes and died in my arms. Q. How does that still impact you today? A. It's hard. I would have a 12-year old. It's really hard. I'm not going to lie . . . I did lots of therapy about it, so I'm way better than, of course, I was. Prior to going to treatment, I just hadn't even dealt with it emotionally. I ignored it. I drank it away.").

Ms. Brigham completed her job duties sober and in compliance with

any of Frontier's rules surrounding the use of alcohol. (Vol. 1 at 0161, 68:17-22) ("Q. Was there ever a time that you could not fly because you were drunk or because of the aftereffects of that? A. No, not while I was already on a trip at all. I mean, there were plenty of times that I flew pretty hung over, but never intoxicated."); (Vol. 1 at 0161, 67:25-68:8) ("Q. Before that, did you ever have a drink while on the job at Frontier? A. No. Luckily, I have never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on duty. However, on overnights, after you're done, it's – it was just kind of a culture where you would take off all the flight attendant gear, put on normal clothes, and go meet at the bar. Nine times out of ten, that's what you did.").

**III.   With a reasonable accommodation, Ms. Brigham was capable of performing all essential functions of her position, but Frontier denied all such requests.**

After disclosing her disability to Defendant, Ms. Brigham was capable of performing all essential functions of her job with reasonable accommodation. (Vol. 1 at 0200, 224:14-22) ("Q. And when – when you – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to

7

do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

Ms. Brigham successfully completed an in-patient treatment program, was discharged with a treatment plan, and has not touched alcohol since. (Vol. 1, Dep. of Ms. Brigham, at 0160, 65:10-66:8); Id. at 0108-0109, Dep. of Frontier, 70:15-73:12 ("Q. Did – did Frontier have any sort of program related to substance abuse? A. Yes. It was our self-disclosure program . . . Anybody who felt they needed assistance due to some type of . . . dependency . . . had the ability to step forward then essentially say, I'm – I need assistance . . . If an employee did step forward, then that then starts what we call the checklist . . . We would partner with the EAP [employees assistance program] to then identify a substance abuse professional, or SAP. The SAP would then contact the individual . . . And so the SAP would then determine the severity of the situation; they would identify recommendations for the individual; and they would then communicate with our compliance individual."); (Vol. 1, Treatment Plan, at 0289-0290); and (Vol. 1, Dep. of Ms. Brigham, at 0161, 67:4-10) ("Q. When was the last time you had a drink? A. My sobriety date is September 5th of 2014. I got some treatment September 7th of

8

2014.").

Ms. Brigham's treatment plan required, among other things, that she avoid "triggers" for drinking identified as "overnight trips or anything longer than a given work day in her professional arena," with a review of treatment plan requirements to occur every 90 days. (Vol. 1 at 0290.)

Frontier required Ms. Brigham to comply with the terms of her treatment plan as a condition of continued employment through Defendant's self-disclosure program. (Vol. 1, Letter to Ms. Brigham Regarding Completion of Substance Abuse Program, at 0291) ("Congratulations on completion of your Substance Abuse Program and beginning the process of returning to work . . . As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or testing may result in your removal from the performance of your job duties and cause you to be subjected to disciplinary action, up to and including termination of employment."); (Vol. 1, Dep. of Frontier, at 0109-0110, 76:25-77:1) (" . . . [W]e're not a second-chance company.").

Unfortunately for Ms. Brigham, it was difficult for her to avoid

overnight trips altogether because she did not possess enough seniority to create a schedule that would never include such trips. (Vol. 1, Dep. of Ms. Brigham, at 0197, 211:19-212:6) ("Senior flight attendants, and at one point, I was not considered a super senior, but I was senior enough to hold turns. Little turns. I couldn't hold the big high-hour New York/LaGuardia turns, but I was able to hold the super early in the morning Dallas turn that had me home by 11:00 in the afternoon. And then Frontier opened up – Frontier opened the new base in Orlando, and everybody junior to me went over there to get a line. So, therefore, because I obviously couldn't move to Orlando, I – my seniority went down, and that's when we started having problems. And that's when I started asking for reasonable accommodations so that this could work with my recovery.").

Ms. Brigham requested two primary accommodations from Frontier so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the GO to complete administrative or other light duty work; or (2) to be allowed to build a schedule out of Open Time such that she could avoid flying overnight trips. (Vol. 1, Dep. of Ms. Brigham, at 0162, 71:24-72:24.)

With respect to Ms. Brigham's request to temporarily transfer to the GO, Frontier denied the request because "she wasn't in the work comp program or on OJI [on the job injury], [] she was not eligible to be reassigned." (Vol. 1, Dep. of Frontier, at 0114, 93:19-21); *see also* (Vol. 1, Dep. of Frontier, at 0114, 95:17-23) ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program.").

With respect to Ms. Brigham's request to build a schedule out of Open Time, Frontier denied this request because Frontier asserted that allowing Ms. Brigham to build her schedule from Open Time would have required excusing Ms. Brigham from the mandatory, seniority-based bidding process set forth in the Collective Bargaining Agreement. (Vol. 6, Order Granting Frontier's Motion for Summary Judgment, at 1558.) Thus, Frontier argued, allowing Ms. Brigham to build her schedule from Open Time (which is expressly categorized as "first come, first served") would have "encroach[ed] upon the vested rights of other flight attendants with more seniority" than Ms. Brigham. (Vol. 6 at 1559.)

Frontier never offered any possible reasonable accommodations for Ms. Brigham's consideration other than suggesting she could apply for unpaid leave or apply for open positions available to any other Frontier employees (or the public). (Vol. 1, Dep. of Frontier, at 0114-0115, 96:24-98:13.) While Ms. Brigham was utilizing intermittent FMLA leave where possible to avoid overnight flights and attend treatment, this was not enough to escape Frontier from claiming she was accruing too many absences; and moreover, Mr. Arellano told Ms. Brigham with regard to requesting additional FMLA time: "[U]nfortunately there's no more for you to use of that piece." (Vol. 3, Transcript of Meeting Between Ms. Brigham, Mr. Arrellano, and Others, at 0843, 9:14-15.)

Ms. Brigham did not qualify for any of the open positions with Frontier available at the time, other than the light duty positions at the GO that Frontier would not provide. (Vol. 1, Dep. of Ms. Brigham, at 0185-0186, 165:22-166:6.) And, in any event, Mr. Arellano made it clear that Frontier would not reasonably accommodate Ms. Brigham: "So if we made – if we cherrypicked to try and create you a certain situation – now we've created a whole separate accommodation for you –" (Vol. 5, Transcript of Meeting Between Ms. Brigham, Mr. Arrellano, and Others,

12

at 1347, 52:16-21.)

Mr. Arellano further made clear Frontier's intention to deny Ms. Brigham a reasonable accommodation when he stated: "Right. So and I get where you're coming from, but how do we compare only those individuals who have self-disclosure from everybody else who has a serious health condition? And we're not making exceptions –" (Vol. 5 at 1351, 56:17-21.) Ms. Brigham stated in response: "We're all individuals and you have to look at us as all individuals." (Vol. 5 at 1351, 56:22-23.) Mr. Arellano responded: "Unfortunately, FMLA does not allow us that ability, because now we're only giving special treatment to certain individuals." (Vol. 6 at 1351-1352, 56:24-57:1.)

**IV.  The Collective Bargaining Agreement ("CBA") did not prohibit Ms. Brigham's requested accommodations.**

The CBA applicable to Ms. Brigham during the relevant time period contains no prohibition on temporarily reassigning Plaintiff to the GO as a reasonable accommodation for her disability. (Vol. 2, CBA, at 0334) ("Flight Attendants are eligible to bid [on a schedule] unless they have been granted Company approved leaves (LOA, MED, FMLA, OJI, etc.) or removed for Company Business."); (Vol. 2 at 0399-0400) (outlining the process by which an employee suffering an occupational injury may file a

13

claim, seek leave, and return to duty, but notably, this process contains no restrictions on *who* may be temporarily reassigned to the GO or for *what* reasons).

In fact, Frontier made sure to retain all the necessary management rights which would have allowed it to grant or deny Ms. Brigham's request to temporarily transfer to the GO: "Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate its business and work force . . . ." (Vol. 2 at 0432.) Critically, the seniority provisions contained in the CBA do not apply to "assignment to non-flying duty (e.g., light duty)," *i.e.*, the seniority provisions did not apply to Ms. Brigham's request to be transferred to the GO. (Vol. 2 at 0392.)

The Union's Vice President during the relevant time period, Adrienne Prince, argued on behalf of Ms. Brigham that her requested accommodations would not have violated the CBA if granted by Frontier. (Vol. 5, Declaration of Adrienne Prince, at 1220, ¶ 6) ("Frontier claimed the requested accommodation would have violated the seniority provision in the collective bargaining agreement, and therefore, never granted the accommodation. However, I explained to Frontier that the Union was not

seeking an accommodation that would violate the seniority provision, but rather, would work *within* the seniority provision. In other words, the Union requested that Ms. Brigham be allowed to bid for shifts within her existing seniority to avoid layovers as much as possible, and with regard to whatever shifts were leftover containing layovers and assigned to Ms. Brigham, the Union proposed a method by which Ms. Brigham could have traded, swapped or dropped these shifts in compliance with the collective bargaining agreement.").

During a meeting with Frontier on November 3, 2015, Ms. Prince further argued on Ms. Brigham's behalf: "And if she were picking up that open time or the trade it wouldn't be . . . [b]ecause it wouldn't be like pre-awarded if that was something that came up. Uh as far as the union stance – you know if she could bid what she could hold and then you know was either removed or able to pick up some open time – it wouldn't violate seniority. Because that's all first come first serve anyway." (Vol. 4, Transcript of Meeting Between Ms. Brigham, Ms. Prince, and Frontier Management Officials, at 1167-1168.)

Ms. Prince, anticipating any undue hardship argument on the part of Frontier, also argued: "And I do know just so that you're familiar – a

15

lot of times when people come back mid-month or they're not released to be able to bid they are given blank schedules and they to – and I mean it's something that inflight already does so it wouldn't be an undue hardship with the company . . . They already allow – pick up in this light so it's not like we are – it's a really unusual request that's never been done before . . . .") (Vol. 4 at 1170.)

In her deposition for this case, Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have violated the CBA. (Vol. 5, Dep. of Adrienne Prince, at 1252, 120:14-24); Id. at 1253, 125:9-12 ("Q. Do you still think that that was a reasonable solution, sitting here today looking back on things? A. I do."); Id. at 1254, 126:5-9 (confirming that Ms. Brigham's request for temporary transfer to the GO was also a reasonable request.). Currently, Ms. Prince is no longer affiliated with the Union and does not perform advocacy work on behalf of flight attendants. (Vol. 5 at 1225, 12:13-22.)

In certain circumstances, the CBA expressly allows for an active flight attendant to build their own schedule from Open Time. (Vol. 2 at 0396) (allowing flight attendants to pick up Open Time when missing a partial or complete trip due to use of intermittent leave). And in any

event, the seniority-based bidding system for flight attendants contemplates a process where *after* flight schedules are awarded by seniority, flight attendants may drop, add or swap Open Time, which is expressly designated as "first-come first serve" as opposed to seniority-based. (Vol. 2 at 0344-0347.) Thus, if Ms. Brigham was allowed to build her schedule from Open Time, she would have been choosing from the flights more *and* less senior flight attendants did not want in the initial seniority-based bidding process thereby benefitting all other flight attendants by allowing more route choices in the first round of bidding. *See id.*

**V.    Frontier's flight attendants were not always required to create their schedules based on seniority.**

While flight attendants would generally build their schedules through a bidding process based on seniority, this was not always the case. (Vol. 2, CBA, at 0334) (outlining that in order to bid on a schedule, a flight attendant must be "eligible," which includes all flight attendants unless they were on "company approved leave" such as "LOA, MED, FMLA, OJI, etc."). For example, a flight attendant coming back from leave for a medical reason may not return to work early enough in any given month to start at the beginning of the bidding process. Id. at 0334-

35. In this case, the flight attendant would build their schedule from "Open Time" (trips leftover and unassigned in the seniority-based bidding process and available on a first-come first-served basis). Id. As such, flight attendants were sometimes allowed to build their schedules from the unawarded trips that more senior flight attendants did not take, *i.e.*, they built their schedules outside of the seniority-based bidding process. Id. And if the flight attendant missed part of a trip, or even a complete trip, while out on intermittent leave such as "FMLA, MED, OJI, etc.," then the flight attendant could simply "pick up Open Time to replace the trip" so long as the missed trip was originally scheduled from Open Time. Id. at 0396. Again, this schedule would be built without utilizing the seniority bidding process. Id.

Flight attendants who called in sick due to illness, but subsequently recovered without being able to rejoin their original trip, were allowed to "pick up Open Time if available to replace his/her original trip." Id. at 0385. This scheduling would be accomplished without utilizing the seniority bidding process. Id.

So long as a flight attendant was scheduled for a minimum of 60 hours at the end of the bidding process, while not dropping below 45

hours during the scheduling process, a flight attendant could swap out every single one of the flights they were initially awarded after bidding. Id. at 0344-0347; (Vol. 1, Dep. of Stefanie Coppedge, at 0266, 57:5-7) ("Q. Got it. So as long as you maintain your [minimum] hours there, you could trade away all those trips for new trips? A. As long as you maintain [minimum] hours.").

## VI. Frontier regularly granted other employees' requests for reasonable accommodation in the form of modified schedules or transfers to light duty positions.

In response to companywide requests for reasonable accommodation between 2012 and 2016, Frontier did in fact regularly grant requests to modify schedules or transfer to light duty positions. (Vol. 1, Dep. of Frontier, at 0124, 134:7-25) ("Q. Okay. And so this document [referring to a spreadsheet produced by Frontier and filed restricted with the district court[2]] – is this – is this document something you created in preparation for this deposition, or did this document already exist? A. It was already in existence . . . Okay. And who maintains this document? Do you know? A. It depends on – ERMs, the employee

---

[2] Testimony regarding this spreadsheet at Frontier's deposition was not designated confidential or restricted in any way, as such, Ms. Brigham refers here to Frontier's testimony regarding the spreadsheet.

relations managers, predominantly are the ones navigating around this document, and any interactive process will be documented on here."); Id. at 0126, 141:22-142:3 ("Q. Are these – are these employees just in Denver, or are they employees based anywhere in the country? A. Back in 2012, it would have been – we only had our hub in Denver, so it would include – well, outside of our customer service, so it would include everybody. It would be companywide."); Id. at 0127, 147:1-9 ("So in this case [still referring to Frontier's spreadsheet of accommodations], we had her [referring to a flight attendant that suffered an on-the-job injury] – see if she wanted the offer of the role of reservations agent. So we extended her the offer, which would then require her to transfer to a role, which means change of job title, not just job functions. She would transfer from the flight attendant role into the department of reservations.").

But, no employees accommodated by Frontier from 2012 through 2016 suffered from the disability of alcoholism. (Vol. 1 at 0130, 159:23-160:10) ("Q. Okay. So is it – for the – for the – for the years that we looked at and that are relevant to this deposition, so definitely the 2012, 2013, 2014, and 2015 tabs . . . you weren't able to identify any – at least not based on the notes, you weren't able to identify any employees that

suffered from the disability of alcoholism . . . A. Just based on what was on that document, no.").

## VII. Frontier counted any of Ms. Brigham's disability-related absences as violations of its "dependability policy."

Because Ms. Brigham was not accommodated by Defendant but was nevertheless required to comply with her treatment plan, she began to accrue absences that Defendant considered to be violations of its attendance policy, culminating in Plaintiff's termination. (Vol. 1, Dep. of Ms. Brigham, at 0154, 41:12-20) ("A. Correct, and I could not do overnights. And I could not do overnights. It's not that I didn't want to do these trips . . . I could not do overnights in order to adhere to my program. Frontier knew this. We had multiple meetings about this. I asked multiple times for reasonable accommodations that they denied, denied, denied. And then give me sick points, and then ultimately fired me for said sick points. It was not fair, and I will argue that till the day I die."); Id., Dep. of Frontier, at 0114, 94:3-19 ("Q. Was – was Ms. Brigham ultimately terminated due to attendance issues? A. Yes . . . Q. Was she terminated for any other reason than attendance? A. No, sir.").

Frontier cited Ms. Brigham's "pattern of attendance issues" as basis for its termination; however, Frontier's own evidence does not support its

argument. Frontier's employment records demonstrate the following: (1) Ms. Brigham was sick once in 2007 and absent twice; (2) in 2008, Ms. Brigham received an "advisement only" as she was sick four times between 2007 and 2008 (Defendant tracked these sick "occurrences" on a rolling 12-month basis); (3) in 2009, Ms. Brigham utilized another sick day and informed Frontier that she would be "applying for intermittent FMLA to cover absences due to pregnancy;" and (4) in 2010, Ms. Brigham utilized a sick day. (Vol. 3, Frontier's Employment Records, at 0802-0808).

The record does not pick back up until March 29, 2012, where Ms. Brigham was issued "performance counseling" for taking five sick days in 2011 and one sick day in 2012. Id. at 0809. The record then goes blank again until July 3, 2013 where Ms. Brigham was again warned for using an additional three sick days in 2012 and one sick day in 2013. Id. at 0810. Notably, one of the sick days in 2013 was coded as "MED" (meaning "medical"). Id. Ms. Brigham then utilized four more sick days in 2013, and one sick day in 2014 prior to self-disclosing her disability of alcoholism to Frontier on or about September 7, 2014. Id. at 0811-0814.

Thus, between the date of Ms. Brigham's hire and her self-

disclosure, a period of approximately **seven (7) years**, Ms. Brigham utilized **25 sick days** – for issues ranging from illness to pregnancy and personal issues. Id.; *see also* (Vol. 1, Dep. of Ms. Brigham, at 0153, 36:13-16) ("That's four times being sick in a year, when you're working with the public, who are sick. And I just – I will argue all day that Frontier's attendance policy was ridiculous. We even tried to strike over it."). Under Frontier's own Dependability Policy a flight attendant could utilize four (4) sick days per year without penalty, or 28 sick days in seven (7) years, *more* than Ms. Brigham actually used. (Vol. 3, Frontier's Employee Handbook, at 0628); Id., Frontier's Employment Records, at 0804 ("Four Sick Instances Reminder" that stated: "The purpose of this letter is for advisement only.").

## VIII. Ms. Brigham was approved to use *more* intermittent FMLA leave days than she in fact used, for which she was terminated.

Ms. Brigham's approved FMLA form dated March 10, 2015 clearly stated that Ms. Brigham would require FMLA leave for both "intermittent capacitation" and "treatment appointments" such as "group sessions." (Vol. 3, Ms. Brigham's Intermittent FMLA Form, at 0830-0833.) Thus, Frontier approved Ms. Brigham for 8 intermittent FMLA

days per month as of March 10, 2015 (4 days of "intermittent incapacitation" and "1x per week" for "treatment appointments"). Id.

Ms. Brigham's subsequently approved FMLA form dated May 28, 2015 again stated that Ms. Brigham would require FMLA leave for both "intermittent incapacitation" and "treatment appointments" during the time period May 1, 2015 through November 1, 2015 (Vol. 4, Ms. Brigham's Intermittent FMLA Form, at 0914-0917.) By way of Ms. Brigham's May 28, 2015 FMLA request, Frontier approved Ms. Brigham for *at least* 16 FMLA days per month (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per "treatment appointment[]"). Id.; Id. at 0994, Frontier's Internal Emails (noting Frontier's approval of Ms. Brigham's May 28, 2015 FMLA request).

Therefore, when Frontier stated it terminated Ms. Brigham for having accrued "ten (10) Occurrences within a twelve (12) month period in violation of the Dependability Policy under which eight (8) Occurrences subjected an employee to termination," (Vol. 2, Aff. of Mr. Arrellano, at 0503), Ms. Brigham had not even used the full amount of her approved intermittent FMLA leave. Therefore, even under Frontier's

own policy and its approval of FMLA leave for Ms. Brigham, Frontier's termination of Ms. Brigham lacks a sound basis.

**IX.   Ms. Brigham was not the only disabled alcoholic at Frontier to suffer unlawful treatment under the ADA.**

Ms. Brigham is not the only alcoholic at Frontier that suffered unlawful and discriminatory treatment. (Vol. 2, Dec. of David St. Hilaire, at 0436-0440) ("On or about May 19, 2015, I entered treatment for alcohol addiction. I was fearful about disclosing my condition to Frontier because I was concerned that given Frontier's reputation for handling these types of issues, I would be retaliated against and treated unfairly . . . These management officials [including Jerry Arellano and Shelley Leyner] told me they knew that I suffered from alcoholism. A former coworker of mine showed these management officials a Facebook post that I had recently posted celebrating the fact that I had been sober for 90 days . . . I was suspended for over a month, without pay, following this meeting."). Notably, Mr. St. Hilaire was never engaged in the interactive process despite management's discovery of his disability; instead, Mr. St. Hilaire was harassed until he quit. Id.

Ms. Brigham is likewise not the only individual at Frontier that has been unlawfully denied reasonable accommodations. (Vol. 2, Aff. of

Christine Kernen in Support of Charges of Jo Roby, Stacy Rewitzer, Renee Schwartzkopf, and Melissa Hodgkins Against Frontier Airlines, at 0441-0446) ("I gave birth to two children while working for Frontier, the first on March 3, 2014 and the second on November 9, 2015 . . . As was true for the Charging Parties, Frontier did not provide me with appropriate workplace accommodations for pregnancy or breastfeeding . . . I became concerned about incurring additional dependability points if I continued to call in sick, risking disciplinary action or termination, but I could not maintain a schedule which was incompatible with my medical need to express breast milk frequently and regularly.").

Prior to filing this lawsuit, the United States Equal Employment Opportunity Commission issued a Determination in Ms. Brigham's favor. (Vol. 2, EEOC Determination, at 0448) ("Based upon a review of the evidence gathered from Respondent and Charging Party, I conclude that the Respondent violated the ADA when the Charging Party was denied a reasonable accommodation and discharged.").

## PROCEDURAL BACKGROUND

Seeking redress for the damages suffered due to Frontier's unlawful discrimination, retaliation, failure to engage in the interactive process,

and failure to accommodate her disability, Ms. Brigham commenced this litigation.

The district court granted Frontier's motion for summary judgment, and denied Ms. Brigham's motion for partial summary judgment, thereby dismissing Ms. Brigham's Complaint and Jury Demand with prejudice. (Vol. 6 at 1563.) The district court ruled that: (1) "Frontier is entitled to summary judgment on Brigham's putative claim for failure to engage in the interactive process as a matter of law," (Vol. 6 at 1545); (2) "the Court finds that [Brigham] has failed to satisfy the third element of both claims, which requires her to demonstrate that Frontier terminated her employment on the basis of her disability (for discrimination) or that there is a causal connection between her requests for accommodations and her termination (for retaliation)," Id. at 1548; and (3) "the Court finds that Brigham has failed to meet the third element of her prima facie burden to demonstrate that she requested a plausibly reasonable accommodation." Id. at 1558.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing Ms. Brigham's claims against

Frontier as set forth in her Complaint and Jury Demand and should be reversed. Ms. Brigham: (1) proposed plausibly reasonable accommodations to Frontier; (2) presented a prima facie case that she was terminated because of her disability and for having requested reasonable accommodations; and (3) properly stated a claim under the ADA for Frontier's failure to engage in the interactive process. Notwithstanding, the district court dismissed all of Ms. Brigham's claims on summary judgment. The district court should be reversed and the claims contained in the Complaint and Jury Demand should be set for trial.

## ARGUMENT

**I.    Ms. Brigham proposed plausibly reasonable accommodations, and Frontier failed to show her proffered accommodations were unreasonable or an undue burden.**

Ms. Brigham proposed plausibly reasonable accommodations and Frontier failed to demonstrate that her proffered accommodations were unreasonable or an undue burden; therefore, her claims should not have been dismissed and the district court should be reversed. The district court addressed this issue in its Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment. (Vol. 6 at 1557-1562.) This Court "conduct[s] de novo review

28

and uphold[s] summary judgment only in the absence of a genuine dispute of material fact." *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

## A. Ms. Brigham's request to transfer to the GO was a plausibly reasonable accommodation.

The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the [employer's business] operation[s]." 42 U.S.C. § 12112(b)(5)(A). "Because any failure to provide reasonable accommodations for a disability is necessarily because of the disability, it follows that a plaintiff need not prove the employer's motivation or intent to discriminate to prevail on a failure to accommodate claim." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (internal quotation omitted).

Therefore, failure to accommodate claims are analyzed under a modified *McDonnell Douglas* burden-shifting framework whereby the plaintiff must prove: (1) they are disabled; (2) they are otherwise qualified; and (3) they requested a plausibly reasonable accommodation.

*Id.* "Establishing a prima facie case is not onerous." *Aubrey v. Koppes,* 975 F.3d 995, 1005 (10th Cir. 2020). If a plaintiff makes out their prima facie case, the burden shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer. *Lincoln*, 900 F.3d at 1204.

"The term 'reasonable accommodation' refers to those accommodations which presently, or in the future, enable the employee to perform the essential functions of [their] job." *Aubrey*, 975 F.3d at 1007. The ADA defines "reasonable accommodation" to include: "job restructuring, part-time or modified work schedules, **reassignment to a vacant position**, acquisition or modification of equipment or devices . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9) (emphasis added). "[R]eassignment of an employee to a vacant position in a company is one of the range of reasonable accommodations which must be considered and, if appropriate, offered if the employee is unable to perform his or her existing job." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1167 (10th Cir. 1999).

"The determination of whether a requested accommodation is reasonable must be made on the facts of each case taking into consideration the particular individual's disability and employment position." *Aubrey*, 975 F.3d at 1007 (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017)).

Here, the district court dismissed Ms. Brigham's failure to accommodate claim for just one reason: "Brigham has failed to meet the third element of her prima facie burden to demonstrate that she requested a plausibly reasonable accommodation." (Vol. 6 at 1558.) *First*, the district court agreed with Frontier's argument that granting Ms. Brigham's request to transfer to the GO "would have excused Plaintiff, an active live flight attendant, from the mandatory, seniority-based bidding process set forth in the CBA." (Vol. 6 at 1561.) But, Frontier's argument ignores the fact that flight attendants that are reassigned to light duty are excepted from operation of any applicable seniority provisions.

The CBA's seniority provisions, by their own express terms, do not apply when an employee is assigned to light duty:

**WHEN SENIORITY WILL NOT GOVERN**

31

> Except as otherwise provided in this Agreement, seniority will not in any respect govern: . . . assignment to non-flying duty (e.g., light duty), or special assignment.

(Vol. 2 at 0392) (emphasis in original). Moreover, the CBA is clear that flight attendants are eligible to bid for a schedule "**unless** they have been granted Company approved leaves (LOA, MED, FMLA, OJI, etc.) or removed for Company Business." (Vol. 2 at 0334.) (emphasis added).

Thus, the CBA is clear both that (1) its seniority provisions do not apply to the accommodation requested by Ms. Brigham, i.e., transfer to the GO for light duty or administrative work, and (2) that when an employee has been granted leave to complete such work (such as for OJI—on the job injury or FMLA), the employee is not eligible to bid for a schedule pursuant to the seniority based bidding system described in the CBA. Frontier's argument that granting Ms. Brigham's requested accommodation would impermissibly excuse her from a "mandatory" seniority-based bidding process required by the CBA is simply wrong, and the district court's adoption of the same was error.

*Second*, the district court adopted Frontier's argument that light duty assignments were only available to those injured on the job ("OJI") because the CBA prohibited reassignment to light duty for any other

reason. (Vol. 6 at 1561-62); *see also* (Vol. 1, Dep. of Frontier, at 0114, 95:17-23) ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program."). The CBA's provisions allowing for OJI employees to be reassigned to light duty at the GO says *nothing* about whether a disabled employee may or may not be granted the same accommodation:

> The first three days of OJI may be covered by sick days, or the Flight Attendant may immediately be assigned to light/modified duty.

(Vol. 2 at 0399.) Put simply, there is no language in the CBA supportive of Frontier's assertion that transferring Ms. Brigham to the GO would have violated its obligations under the CBA—let alone violated the rights of other employees. *See infra* Sec. II(B) (arguing that deviation from CBA permissible as accommodation under CBA where other employees' rights are not *actually violated*).

That the CBA does not purport to restrict Frontier's ability to accommodate a disabled employee through reassignment to a light duty

position is not surprising given that the law *requires* an employer to offer the same when the employer otherwise maintains a light duty program for workers injured on the job. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir. 1998) ("[t]he ADA does require that [the employer] make its light-duty program available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate").[3] The EEOC Enforcement Guidance for Workers' Compensation and the ADA are in accord:

> If an employer reserves light duty positions for employees with occupational injuries, does the ADA require it to consider reassigning an employee with a disability who is not occupationally injured to such positions as a reasonable accommodation?
>
> Yes. If an employee with a disability who is not occupationally injured becomes unable to perform the essential functions of his/her job, and there is no other effective accommodation available, the employer must reassign him/her to a vacant reserved light duty position as a reasonable accommodation . . . This is because reassignment to a vacant position and appropriate modification of an employer's policy are forms of reasonable accommodation required by the ADA . . . An employer cannot establish that the reassignment to a vacant reserved light duty position imposes an undue hardship

---

[3] Ms. Brigham notes that in *Hendricks-Robinson*, the parties disputed whether the light duty positions were temporary or permanent, *see id.*; however, here, that dispute does not exist and, in any event, Ms. Brigham was seeking a *temporary* reassignment to the GO. (Vol. 1, Dep. of Ms. Brigham, at 0162, 71:24-72:24.)

simply by showing that it would have no other vacant light duty positions available if an employee became injured on the job and needed light duty.

EEOC Enforcement Guidance: Workers' Compensation and the ADA, ¶ 28 (available at: https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada). Indeed, the EEOC's example contained in its guidance is directly on point and instructive of the proper outcome in this case:

> Example: R has light duty positions which it reserves for employees in its manufacturing department when they are unable to perform their regular job duties because of on-the-job injuries. CP, an assembly line worker, has multiple sclerosis (MS) which substantially limits a number of major life activities . . . As a reasonable accommodation, CP requests the she be reassigned to a vacant light duty position for which she is qualified. R says that the vacant light duty position is reserved for employees who are injured on the job and refuses to reassign CP, although it would not impose an undue hardship to do so. R has violated the ADA by refusing to reassign her to the vacant light duty position.

Id. Here, Frontier denied Ms. Brigham's request to be transferred to the GO to perform light duty work, in one of the positions reserved by Frontier for OJI employees and guaranteed as such in the CBA, despite providing no evidence whatsoever of an undue burden. Frontier's refusal to transfer Ms. Brigham was not prohibited by the CBA, and the district court's decision adopting this argument was in error. *See also Stone v.*

*City of Mount Vernon*, 118 F.3d 92, 100 (2d Cir. 1997) (reassignment to light duty for disabled employee deemed "reasonable" even though reassignment otherwise reserved for injured employees); *Patrick v. Henry Cnty., Ga.*, Civil Action No. 1:13-CV-1344-RWS, at *11-12 (N.D. Ga. Mar. 31, 2015) (denying defendant's motion for summary judgment where defendant eliminated plaintiff's light duty position by restricting those positions only to employees injured on the job).

*Finally*, the district court adopted Frontier's argument that the light duty positions reserved for OJI employees, and guaranteed as such in the CBA, were not "open" and were not actually "job positions," rather, "Frontier merely temporarily assigned those employees who were injured on the job to perform other employees' duties." (Vol. 6 at 1562.) Thus, the district court reasoned, because the ADA "does not require an employer to create positions merely to accommodate an ADA plaintiff," Ms. Brigham's requested transfer to the GO was unreasonable. Id. However, Frontier's arguments, if given credit, would have prevented reassignment to light duty in *Hendricks-Robinson*, *Stone*, *Patrick*, and pursuant to the EEOC Enforcement Guidance cited herein, and as such, are contrary to law.

In other words, giving credence to Frontier's argument would allow it to take the odd position of guaranteeing, in this case, a theoretically infinite number of light duty positions for OJI employees, (Vol. 2 at 0399-0400) (setting no cap on the amount of positions that will be set aside for injured employees and setting no time limit on how long injured employees may occupy these positions), while at the same time, allowing Frontier to claim that these unlimited light duty positions are unavailable for any employees requiring an accommodation under the ADA. Frontier's position is illogical based on the plain governing language contained within the CBA, not in accord with the law, and it was error for the district court to adopt the same.

Further, and to the extent this Court may see value in the Union's subjective evaluation of the meaning of the terms of the CBA, the former Union Vice President, Adrienne Prince, confirmed in her deposition that allowing Ms. Brigham to transfer to the GO was a reasonable request. (Vol. 5 at 1254, 126:5-9.) While the district court did not apply principles of contract interpretation regarding the question of whether or not allowing Ms. Brigham to transfer to the GO would have violated the CBA or the rights of other employees under the CBA, (Vol. 6 at 1561-1562)

(relying solely upon Frontier's testimony to give meaning to the CBA's OJI provisions), conflicting testimony from Ms. Prince should have been considered as creating genuine issues of material fact as to the meaning of the CBA.

It was error for the district court to rely upon one party's subjective interpretation of the meaning of the CBA rather than engaging in its own independent analysis of the same. *See, e.g., Kemmis v. McGoldrick*, 706 F.2d 993, 996 (9th Cir. 1983) ("A district court may use forum contract law to flesh out federal principles affecting the respective rights of parties, but only where it 'effectuates the policy that underlies federal labor legislation' . . . A collective bargaining agreement is not governed by the same principles of interpretation applicable to private contracts.").

Here, the district court engaged in no consideration of forum contract law or federal policies underlying federal labor legislation when it simply chose to credit Frontier's assertion that "the CBA included a collectively-bargained for OJI provision, allowing Frontier the discretion to provide flight attendants injured on the job—but only flight attendants injured on the job—with temporary light duty assignments in the GO." (Vol. 6 at 1561-1562.) The district court's analysis was error given that

38

"[i]nterpreting such agreements [collective bargaining agreements] requires us to 'consider the scope of other related collective bargaining agreements, as well as the practice, usage, and custom pertaining to all such agreements.'" *Kemmis*, 706 F.2d at 996 (quoting *Transportation-Communication Employees Union v. Union Pacific Railroad Co.*, 385 U.S. 157, 161 (1966)). The district court engaged in no such analysis when interpreting the CBA at issue in this case.

For these additional reasons, the district court's dismissal of Ms. Brigham's failure to accommodate claims should be reversed. Alternatively, if this Court agrees with Ms. Brigham that no disputed issues of material fact prevent judgment in her favor on this claim, as argued below in her motion for partial summary judgment, then she requests this claim be remanded with instruction to enter judgment in her favor.

**B.   Ms. Brigham's request to create her schedule from Open Time was a plausibly reasonable accommodation.**

The same analytical framework for analyzing reasonable accommodations set forth above in Section I(A) applies to Ms. Brigham's request to create her schedule from Open Time. Indeed, the ADA

39

expressly defines "reasonable accommodation" to include "job restructuring" or a "modified work schedule[]." 42 U.S.C. § 12111(9). The district court credited Frontier's arguments and dismissed Ms. Brigham's claims by committing the following principal errors: (1) misapplication of law concerning the intersection of ADA reasonable accommodations and collective bargaining agreements; (2) reliance upon incredible and disputed testimony; and (3) inappropriate application of a "total accommodation standard."

*First*, in concluding that Ms. Brigham's request to build her own schedule from Open Time was not plausibly reasonable, the district court relied on the standard set forth in *Aldrich v. Boeing Co.*, 146 F. 3d 1265 (10th Cir. 1998), noting: "The Tenth Circuit has cited with approval opinions from other circuit courts which conclude that the ADA does not require an employer to take actions to accommodate a plaintiff which would violate the contractual rights of other workers under a collective bargaining agreement." (Vol. 6 at 1559.) The district court cited the correct general standard, but failed in applying the legal rule comprehensively as it failed to find what this Court in *Aldrich* found, including the courts it approved found: a discernible violation of other

employees' rights.

In *Aldrich*, the plaintiff requested over twenty position reassignments as reasonable accommodations for his disability. 146 F. 3d at 1271 n. 5. Of those reassignment requests, the court held that three of them (Maintenance Oiler, Assembler Sub-Assembly B, and Assembler Installer General B) were unreasonable because they would have violated the seniority provisions of the collective bargaining agreement. *Id.* (citing *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995); *Kralik v. Durbin*, 130 F.3d 76, 83 (3d Cir. 1997); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997); *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir. 1995); *Shea v. Tisch*, 870 F.2d 786, 790 (1st Cir. 1989); and *Carter v. Tisch*, 822 F.2d 465, 469 (4th Cir. 1987)). While this Court in *Aldrich* limited its analysis of the collective bargaining violations to a footnote, every case cited by this Court in support of its holding found that *actual employee rights* must be interfered with for a CBA violation to constitute an unreasonable accommodation. *Milton*, 53 F.3d at 1125 (allowing transfer to positions without the requisite seniority would interfere with job transfer rights of those employees with

41

the required amount of seniority); *Kralik*, 130 F.3d at 77-79 (removing plaintiff from forced overtime shifts would force more senior employees to work overtime shifts); *Foreman*, 117 F.3d at 809-10 (requested reassignment would violate others' rights because plaintiff was not otherwise qualified for the position due to lacking seniority); *Eckles*, 94 F.3d at 1044, 1051 ("bumping" a more senior employee in order to accommodate disabled employee not required because other employees' seniority rights would be "sacrifice[ed]"); *Benson*, 62 F.3d at 1114 (employer not required to create a permanent position that would violate rights of more senior union members); *Shea*, 870 F.2d at 789-90 (reassignment to position that would otherwise be filled on basis of seniority held to be unreasonable); and *Carter*, 822 F.2d at 466-67 (reassignment without requisite seniority held to be unreasonable as it would violate the rights of other employees).

Here, the district court cut its analysis short. While it identified the ways in which Ms. Brigham's request to build her schedule out of Open Time deviated from the procedures described by the CBA, (Vol. 6 at 1558), it did not identify *how* any of these deviations would have interfered with the seniority rights of *other* employees. The district court

stated that granting the accommodation "would have required excusing Brigham from the mandatory, seniority-based bidding process set forth in the CBA." Id. But Ms. Brigham has shown that excusing her from the bidding process would have no impact on those more senior than her (because their bids would trump Ms. Brigham's anyway) and would actually improve the bidding positions of those with less seniority, insofar as they would be able to obtain shifts that Ms. Brigham would have otherwise obtained due to her seniority. (Vol. 2 at 0344-0347) (the seniority-based bidding system for flight attendants contemplates a process where *after* flight schedules are awarded by seniority, flight attendants may drop, add or swap Open Time, which is expressly designated as "first-come first serve" as opposed to seniority based). Thus, if Ms. Brigham was allowed to build her schedule from Open Time, she would have been choosing from the flights more *and* less senior flight attendants did not want in the initial seniority-based bidding process thereby benefitting all other flight attendants by allowing more route choices in the first round of bidding. *See id.*

Plaintiff did not ask for a better bidding position. She did not ask to cut in front of anyone in the seniority line. Instead, she asked to leave

the line entirely, and build a suitable schedule from the leftover shifts in Open Time (to which no group of flight attendants, *more* or *less* senior, had any contractual preference on which to bid). Thus, the district court erred in holding otherwise.

The district court also credited Frontier's purely speculative argument that allowing her to build a schedule from Open Time "would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional flight opportunities from other flight attendants looking to modify their schedules." (Vol. 6 a5 1560.) The district court identified no evidence indicating the shift preferences of other flight attendants. Further, it is undisputed that Open Time shifts were available on a "first come, first served" basis. (Vol. 2 at 0344-0347.) As such, no flight attendant had a reasonable expectation, let alone a right, to *any* shift in Open Time. Therefore, insofar as no flight attendant had a right to any particular Open Time shift, nor a reasonable expectation that any type of shift would be available, allowing Plaintiff to build her schedule from Open Time would not interfere with the rights of any other employees.

The district court credited Mr. Arellano's statement that: "Frontier

has never excused an active flight attendant from the seniority-based bidding rules set forth in the CBA to allow that flight attendant to create their own schedule out of Open Time to avoid certain types of flights." (Vol. 6 at 1560.) Again, in so doing, the district court failed to identify any way in which allowing Ms. Brigham to build her schedule from Open Time would interfere with the rights of any other employees. And the fact that Frontier has never granted any particular accommodation request is not dispositive evidence that the accommodation is unreasonable, nor could Frontier to cite to any authority for this proposition. After all, every employer who has ever granted a reasonable accommodation has necessarily granted an accommodation it has never granted before.

The district court also gave credence to Frontier's argument that Ms. Brigham's "active" status or her ability to use "intermittent FMLA leave" were such that she was "required" to bid for shifts. (Vol. 6 at 1560.) Setting aside the fact that the CBA makes employees on FMLA leave ineligible to bid, (Vol. 2 at 0334), the district court again failed to identify how either deviation from the CBA would interfere or violate *any* other employees' rights.

Alternatively, the district court argued that, even if allowing Ms.

Brigham to build her schedule from Open Time would not necessarily violate the seniority rights of other employees, the "requested accommodation would still be inconsistent with the contractual rights of other workers under the CBA, which require someone in Brigham's position to engage in the bidding process." Id. However, the district court did not identify any right of another that would somehow require Ms. Brigham to exercise her seniority and bid for shifts, instead of leaving the bidding line entirely and building her schedule from the leftover shifts (to which no employees have a contractual right of preference). The relevant right of other workers is *their* right to bid in accordance with *their* seniority, and nothing in the CBA indicates that allowing Ms. Brigham to build a schedule from Open Time interferes with this right. In fact, as discussed above, granting Ms. Brigham's request would have had no effect on the seniority rights of those more senior than her, and would have only enhanced the bidding opportunities of those less senior than her.

That the district court was required to go beyond identifying a deviation from the CBA's terms and actually conclude that the requested accommodation would interfere with other employees' rights is not a

novel proposition. In *Eckles v. Consolidated Rail Corp.*, the court observed:

> This discussion does not extend to forms of accommodation that might violate the terms of a collective bargaining agreement without actually impairing the rights of other employees. There may well be situations where a minor departure from the terms of a collective bargaining agreement could accommodate a disabled employee without interfering with other employees' contractual rights. This court's reasoning is based on the rights of other employees. If those rights are not affected, the collective bargaining agreement should not stand as an obstacle to accommodation.

890 F. Supp. 1391, 1412 (S.D. Ind. 1995) (citing NLRB Gen. Couns. Mem. 92-9, 1993 WL 407395 at *1; Ann C. Hodges, *The Americans with Disabilities Act in the Unionized Workplace,* 48 U. Miami L. Rev. 567, 615-16 (1994)); *see also Emrick v. Libbey-Owens-Ford Co.*, 875 F. Supp. 393, 396-97 (E.D. Tex. 1995) ("Unlike the Rehabilitation Act, the ADA specifically lists reassignment as a method of accommodation. Moreover, most commentators examining the issue before the Court conclude that rather than adopting the *per se* rule allowing a collective bargaining agreement to prevail under the Rehabilitation Act, decisions under the ADA should weigh any conflict with a collective bargaining agreement as merely another factor in examining the reasonableness of the proposed accommodation. The Court finds that because of the specific listing of

47

reassignment as a means of accommodation and because of the seemingly plain wording of the legislative history of the ADA regarding conflicts with a seniority system or collective bargaining agreement, the *per se* rule adopted under the Rehabilitation Act does not apply to cases under the ADA. Rather, the Court is of the opinion that when reassignment of an otherwise qualified employee would conflict with an otherwise valid collective bargaining agreement or seniority system, this conflict shall be weighed by the fact finder in evaluating the reasonableness of such an accommodation under the ADA.").

Here, the district court identified that Ms. Brigham's requested accommodation would require a deviation from the terms of the CBA, but then failed to properly consider whether any such deviation would violate the rights of other employees. As this deviation would have impaired no other rights, the district court's dismissal of Ms. Brigham's claims should be reversed.

*Second*, the district court relied on incredible testimony and failed to recognize disputed issues of material fact. Insofar as the district court relied on the testimony of Adrienne Prince to conclude that the Union would not have authorized Frontier to grant Ms. Brigham's requested

accommodations, (Vol. 6 at 1558-59), such reliance was inappropriate. During the time period Ms. Brigham was seeking accommodations from Frontier, Ms. Prince, arguing on behalf of Ms. Brigham, was adamant that Ms. Brigham's requested accommodations would not have violated the CBA. (Vol. 5, Declaration of Adrienne Prince, at 1220, ¶ 6.) At a meeting with Frontier on November 3, 2015, Ms. Prince further argued on Ms. Brigham's behalf: "And if she were picking up that open time or the trade it wouldn't be . . . [b]ecause it wouldn't be like pre-awarded if that was something that came up. Uh as far as the union stance – you know if she could bid what she could hold and then you know was either removed or able to pick up some open time – it wouldn't violate seniority. Because that's all first come first serve anyway." (Vol. 4, Transcript of Meeting Between Ms. Brigham, Ms. Prince, and Frontier Management Officials, at 1167-1168.)

Ms. Prince, anticipating any undue hardship argument on the part of Frontier, also argued: "And I do know just so that you're familiar – a lot of times when people come back mid-month or they're not released to be able to bid they are given blank schedules and they to – and I mean it's something that inflight already does so it wouldn't be an undue

hardship with the company . . . They already allow – pick up in this light so it's not like we are – it's a really unusual request that's never been done before . . . .") (Vol. 4 at 1170.)

In her deposition for this case, Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have violated the CBA. (Vol. 5, Dep. of Adrienne Prince, at 1252, 120:14-24); Id. at 1253, 125:9-12 ("Q. Do you still think that that was a reasonable solution, sitting here today looking back on things? A. I do.")

Yet, inexplicably, in Ms. Prince's deposition for this case, she also testified as indicated in the district court's order granting Frontier's motion for summary judgment. (Vol. 6 at 1558-59) (wherein Ms. Prince testifies that building a schedule from Open Time would have violated the CBA). Currently, Ms. Prince is no longer affiliated with the Union and does not perform advocacy work on behalf of flight attendants. (Vol. 5 at 1225, 12:13-22.) Thus, the district court failed to identify that Ms. Prince created disputed issues of material fact within her own testimony and raised credibility issues with regards to which version of her story should have been credited (to the extent her opinion of what is reasonable, or not, under the CBA and the ADA carries any dispositive

weight).

The United States Supreme Court has clearly stated the roles of the court and jury in the context of summary judgment motions:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [they are] ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [their] favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (internal citation omitted). Here, the district court improperly credited Ms. Prince's testimony over her own conflicting testimony as well as all other evidence proffered by Ms. Brigham (for example, the clear language in the CBA demonstrating that seniority rights of others would not be affected by her ability to bid her schedule exclusively from Open Time).

*Finally*, the district court erred by adopting Frontier's argument that Ms. Brigham's requested accommodation was unreasonable because it "could not have promised Brigham that she would never end up with a layover . . . [a]s Frontier describes, 'inherent in *all* flights is the risk of experiencing inclement weather and/or mechanical issues, which could require a layover.'" (Vol. 6 at 1561.) In other words, the district court reasoned that because the requested accommodation was not guaranteed

51

to work perfectly, it was unreasonable.

Guidance from caselaw interpreting the reasonable accommodation standard under Title VII makes clear that this "total accommodation" standard is inappropriate. In *Tabura v. Kellogg USA*, 880 F. 3d 544 (10th Cir. 2018), plaintiffs requested Saturdays off as a reasonable accommodation for their religious beliefs, which identified Saturday as Sabbath requiring a day of rest. 880 F. 3d at 548. The employer sought to accommodate plaintiffs' religious practices by (1) allowing them to use vacation and other paid time off for their Saturday shifts; and (2) allowing them to swap their Saturday shifts with other employees. *Id.* at 555. The court held that, while an accommodation must provide plaintiffs with the opportunity to avoid working any Saturdays in order to be reasonable, "an accommodation need not provide a 'total' accommodation; that is, Kellogg is not required to guarantee plaintiffs will never be scheduled for a Saturday shift, nor is Kellogg required to provide an accommodation that spares the employee any cost whatsoever." *Id.* at 550 (citations and quotations omitted). This Court reasoned that requiring a "total accommodation" would "read 'reasonably' out of the statute." *Id.* at 551.

Other courts have held similarly. *See EEOC v. Firestone Fibers &*
*Textiles Co.*, 515 F. 3d 307, 314 (4th Cir. 2008) ("A duty of 'reasonableness'
cannot be read as an invariable duty to eliminate the conflict between the
workplace rules and the religious practice. . . . [T]he burden is on the
employer to show either (1) that it has provided the plaintiff with a
reasonable, though not necessarily a total, accommodation or (2) that
such reasonable accommodation was not possible without causing undue
hardship to the conduct of its business."); *Groff v. Dejoy,* 2021 U.S. Dist.
LEXIS 66174 at *30 (E.D. Pa. Apr. 6, 2021) ("[A]n employer does not need
to wholly eliminate a conflict in order to offer an employee a reasonable
accommodation."); *Dale v. TWC Admin. LLC*, 2016 U.S. Dist. LEXIS
200841 at *19 (E.D.N.C. Aug. 11, 2016) ("The burden accordingly shifts
to defendant to show either that a reasonable, though not necessarily
total, accommodation was provided to plaintiff or that a reasonable
accommodation was not possible without causing undue hardship upon
its business.").

These holdings are consistent with the enumerated examples of
reasonable accommodations under the ADA at 42 U.S.C.S. § 12111(9).
For example, the "acquisition or modification of equipment or devices" is

an example of what may be a reasonable accommodation, despite the fact such equipment or devices *could* break or malfunction, thereby rendering the accommodation ineffective. Similarly, "the provision of qualified readers or interpreters" can be a reasonable accommodation, despite the fact that such readers or interpreters *could* fall ill and be temporarily unavailable, thereby rendering the accommodation ineffective. Moreover, the ADA does not define reasonable accommodation to require an employer to provide a perfect or "total" accommodation. *See* 42 U.S.C. § 12111(9) (defining "reasonable accommodation").

Thus, the district court's conclusion that the remote possibility of an unscheduled layover renders the requested accommodation unreasonable is contradicted both by analogous Title VII caselaw, as well as the plain language of the ADA itself. Frontier may desire to present evidence to a jury that its unique unreliability as an airline results in an unusually high risk of unplanned layovers. But it offered no such evidence to the district court, and its identification of the mere possibility of a layover is insufficient to support summary judgment on the reasonableness of Ms. Brigham's accommodation request. Instead, the district court's conclusion that: "[Ms. Brigham's] requested

54

accommodation would not have enabled her to perform the essential functions of her job," (Vol. 6 at 1561), is speculative, based only upon Frontier's conjecture. It is entirely possible that an occasional unplanned layover would have had no effect on Ms. Brigham's ability to continue her treatment and perform her job, but unfortunately, the parties may never know given that Frontier unlawfully denied Ms. Brigham's requested accommodation.

For these reasons, Ms. Brigham respectfully requests the Court reverse the district court's dismissal of her failure to accommodate claims.

**II.    Frontier terminated Ms. Brigham on the basis of her disability and because she requested reasonable accommodations.**

Ms. Brigham presented ample evidence demonstrating that she was terminated due to her disability and for having requested reasonable accommodations; therefore, her claims should not have been dismissed and the district court should be reversed. The district court addressed this issue in its Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment. (Vol. 6 at 1546-1557.) This Court "conduct[s] de novo review

and uphold[s] summary judgment only in the absence of a genuine dispute of material fact." *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

### A. Ms. Brigham presented ample evidence that her termination was due to unlawful discrimination and retaliation.

A prima facie case of discrimination under the ADA requires showing: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is qualified for the job held or desired; and (3) the plaintiff was discriminated against because of her disability. *Aubrey*, 975 F.3d at 1014. Establishing a prima facie claim is not onerous. *Id.* The district court held that in order to prevail on a claim of discrimination under the ADA, a plaintiff must "prov[e] the employer acted with discriminatory intent." (Vol. 6 at 1547.) Given the United States Supreme Court's recent definition of "but for" causation in Title VII cases, set forth in *Bostock v. Clayton County*, and the similar standards of prohibited conduct in both Title VII and the ADA, the district court should have applied a standard of causation wherein the employer's subjective intent is deemed irrelevant. 140 S. Ct. 1731, 1745-46 (2020).

A prima facie case of retaliation under the ADA requires showing: (1) the plaintiff engaged in protected activity; (2) the employer took action that an objectively reasonable employee would find adverse; and (3) a causal connection between the protected activity and adverse action sufficient to justify an inference that the employer took the adverse action because of the protected activity. *Id.* at 1015. Requesting an accommodation qualifies as protected activity under the ADA, and an adverse action taken in close temporal proximity to protected activity may be considered in establishing a causal connection. *Id.* at 1015-16.

Here, the district court dismissed both of Ms. Brigham's discrimination and retaliation claims for failure to establish a prima facie case: "Assuming *arguendo* that Brigham has met the first two elements of her prima facie burden for discrimination and retaliation, for the following reasons, the Court finds that she has failed to satisfy the third element of both claims, which requires her to demonstrate that Frontier terminated her employment on the basis of her disability (for discrimination) or that there is a causal connection between her requests for accommodations and her termination (for retaliation)." (Vol. 6 at 1548.) If there was any doubt as to the scope of the district court's

analysis, it concluded by stating: "For the reasons stated above, the Court finds that Brigham has failed to demonstrate that a genuine issue of material fact exists regarding whether Frontier terminated her on the basis of her disability or her requests for accommodation . . . [t]herefore, because Brigham has failed to meet her prima facie burden . . . the Court will grant summary judgment in favor of Frontier on those claims." (Vol. 6 at 1556-57.)

The district court's conclusion that Ms. Brigham failed to meet her "not onerous" burden in presenting a prima facie case of discrimination and retaliation was error. The district court focused on Frontier's assertion that Ms. Brigham violated its dependability policy as justifying Ms. Brigham's termination and the district court's dismissal of her claims. (Vol. 6 at 1549-50, 1553-54.) However, the facts underlying whether Ms. Brigham should have been terminated under the terms of Frontier's dependability policy, including the amount of approved FMLA leave for Ms. Brigham are material and disputed. *Supra* Statement of the Case, Sec. 8; *see also* (Vol. 6 at 1553-54) (wherein the district court holds "this exhibit [referring to Ms. Brigham's FMLA leave form] does not demonstrate that Frontier ever previously granted Brigham 16 days of

IFMLA leave," but then cites an email that *references approval of the same*: " . . . she is only approved for 12 days per month [the approval of 12 days per month refers to the exact form where Frontier actually approved Ms. Brigham for *at least* 16 days per month—meaning she never violated the dependability policy]). The remaining facts as cited by the district court in support of its dismissal of Ms. Brigham's claims were likewise material and disputed as argued by Ms. Brigham in the underlying summary judgment briefing. (Vol. 1 at 0042 through Vol. 2 at 0452, Plaintiff's Mot.); (Vol. 4 at 1178 through Vol. 5 at 1372, Plaintiff's Resp. to Defendant's Mot.).

For these reasons, Ms. Brigham respectfully requests the Court reverse the district court's dismissal of her discrimination and retaliation claims.

## III. Ms. Brigham properly stated a claim for failure to engage in the interactive process because Frontier's failure to engage in this process led to her denied accommodations.

Frontier's failure to engage in the interactive process in good faith led directly to the denial of Ms. Brigham's requested reasonable accommodations; therefore, her claims should not have been dismissed and the district court should be reversed. The district court addressed

this issue in its Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment. (Vol. 6 at 1545-1546.) This Court "conduct[s] de novo review and uphold[s] summary judgment only in the absence of a genuine dispute of material fact." *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

In *Valdez v. McGill*, 462 Fed. App'x 814 (10th Cir. 2012), cited in support by the district court, this Court made a practical observation: "[A]n employer is not required to engage an employee in a futile interactive process where, as we have concluded was the case here, no reasonable accommodation was possible." *Id.* at 819. In *Valdez*, this Court quoted *Smith v. Midland Brake* for the following proposition: "The obligation to engage in the interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Id.* The Court further observed: "the interactive process is only a means to an end . . . **[t]o recover under the ADA, a plaintiff must show a reasonable accommodation was possible**." *Id.* (internal quotation and citation omitted) (emphasis added).

Recently, in *Aubrey v. Koppes*, this Court held: "[A] reasonable jury

could find that the [defendant] failed to meet its obligation of engaging with [plaintiff] in good faith in an interactive process to identify her precise limitations and to explore whether there was any accommodation that could enable [plaintiff] to return to work and perform the essential functions of her job . . . In fact, a reasonable jury could find that the [defendant] affirmatively acted to avoid having to consider possible accommodations by . . . essentially ignoring any possible accommodation [plaintiff] suggested during the pre-termination meeting." *Aubrey*, 975 F.3d at 1009. This Court made clear that the jury could make a finding on Defendant's failure to engage in the interactive process: "There may not always be a workable accommodation, but the ADA mandates that the employer work with the employee to try to find one . . . A jury could certainly find that that did not happen here." *Id.*

Of course, in order to submit these claims to a jury, the plaintiff in *Aubrey* still had to show that there was, in fact, a reasonable accommodation that would have enabled plaintiff to perform the essential functions of her job, "or another job to which the [Defendant] could have re-assigned her." *Id.* at 1009-10 (citing *Smith*, 180 F.3d at 1174). Therefore, *Valdez* and *Aubrey* are in accord. Notwithstanding, the

district court chose to credit Frontier's argument that "*Aubrey* did not involve a separate claim for failure to engage in the interactive process, rendering Brigham's argument unavailing." (Vol. 6 at 1546.)

But Frontier's argument is beside the point: both Ms. Brigham and the plaintiff in *Aubrey* argued that a failure to properly engage in the interactive process led to an unlawful failure to accommodate under the ADA. This Court, in *Aubrey*, made clear that such a claim is viable so long as the plaintiff can "establish that there was, in fact, a reasonable accommodation that would have enabled her to perform the essential functions of her job, or another job to which the [employer] could have reassigned her." *Aubrey*, 975 F.3d at 1009-10.

The district court failed to realize that when a plaintiff states a claim for failure to engage in the interactive process (which leads to a failure to accommodate), the theory of *liability* may be different than the same plaintiff's stated claim for failure to accommodate. The former, of course, requires a showing of a flawed or nonexistent interactive process whereas the latter requires showing a denied accommodation request. Both theories require showing that a possible reasonable accommodation in fact existed. Here, despite this Court's guidance that a plaintiff may

show failure to accommodate by way of failure to engage in the interactive process, the district court denied Ms. Brigham's ability to present her claim to a jury.

Plaintiff has established that plausibly reasonable accommodations did in fact exist that would have enabled her to perform the essential functions of her job, *supra* Sec. I(A) and (B); and therefore, the district court's dismissal of this claim was in error and should be reversed.

## CONCLUSION

For the foregoing reasons, the district court should be reversed and the claims contained in the Complaint and Jury Demand should be set for trial.

## STATEMENT REGARDING ORAL ARGUMENT

Because of the importance of the issues presented in this appeal, including whether or not a disabled employee should be reasonably accommodated with reassignment to light duty in light of an employer's unilateral restrictive interpretation of a collective bargaining agreement, the undersigned counsel believes that the decisional process will be significantly aided by oral argument.

Respectfully submitted,

/s/ John R. Crone

The Law Office of John R.
Crone
2717 South Forest Street
Denver, CO 80222
(303) 598-3526
john@crone-law.com
*Counsel for Rebecca Brigham*

December 6, 2021

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   __X__ this brief contains 12,977 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I relied on my word processor, Microsoft Word for Mac, Version 16.51, to obtain the count.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   __X__ this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, Version 16.51, in Century Schoolbook font, size 14.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

December 6, 2021

/s/ John R. Crone
*Counsel for Rebecca Brigham*

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that (1) the foregoing brief contains no information subject to the privacy redaction requirements of 10th Cir. R. 25.5; (2) the hard copies of the brief to be submitted to the Court are exact copies of the electronic copy filed using the Court's CM/ECF system; and (3) the electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

_/s/ John R. Crone_

December 6, 2021                    *Counsel for Rebecca Brigham*

66

## CERTIFICATE THAT ELECTRONIC COPY AND REQUIRED HARD COPIES ARE IDENTICAL

I hereby certify that seven hard copies of this brief, which are required to be submitted to the Clerk's Office within five days of electronic filing pursuant to 10th Cir. R. 31.5, are exact copies of that which was filed with the Clerk of the Court using the electronic filing system on December 6, 2021.


<u>/s/ John R. Crone</u>

December 6, 2021                    *Counsel for Rebecca Brigham*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2021, I electronically filed a copy of the foregoing brief with the Clerk of the United States Court of Appeals for the Tenth Circuit using the Court's appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users who will be served by the appellate CM/ECF system.

/s/ John R. Crone<br>*Counsel for Rebecca Brigham*

December 6, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-3417-WJM-STV

REBECCA BRIGHAM,

     Plaintiff,

v.

FRONTIER AIRLINES, INC.,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Before the Court are Defendant Frontier Airlines, Inc.'s ("Frontier") Motion for Summary Judgment ("Motion for Summary Judgment") (ECF No. 38) and Plaintiff Rebecca Brigham's ("Brigham") Motion for Partial Summary Judgment ("Motion for Partial Summary Judgment") (ECF No. 36). For the following reasons, the Motion for Summary Judgment is granted, and the Motion for Partial Summary Judgment is denied.

## I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An

issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325)). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## II. BACKGROUND AND PROCEDURAL HISTORY[1]

Brigham began her employment as a flight attendant with Frontier in 2007. On September 7, 2014, Brigham disclosed to Frontier that she had entered an inpatient

---

[1] The following factual summary is based on the parties' briefs on the Motion for Summary Judgment, the Motion for Partial Summary Judgment, and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

rehabilitation program for alcoholism.  Frontier granted Brigham continuous Family and

Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, leave to complete the 60 day

inpatient program in October 2014.  In November 2014, Brigham's healthcare provider

completed a Frontier Airlines Fitness for Duty Certification, in which he stated she had

no restrictions whatsoever and is able to work a full, regular schedule beginning on

November 17, 2014.  (ECF No. 38-8.)  Brigham has been sober since September 5,

2014.

   During Brigham's employment with Frontier, flight schedules for active flight

attendants were determined by a bidding process based upon seniority as set forth in

the flight attendants' collective bargaining agreement with Frontier (the "CBA"), which

required all active Frontier flight attendants to bid for the flights posted and accumulate

a minimum of 60 credit hours.  (ECF No. 38 at 4 ¶ 2; ECF No. 38-1 ¶ 35; ECF No. 36-3

at 21; ECF No. 38-5.)  After the bidding process closed, awards were determined by

seniority such that if multiple flight attendants bid for the same trip, the flight attendant

with the greatest seniority was awarded the trip.  (ECF No. 38 at 4 ¶ 3; ECF No. 38-1 ¶

36.)  After awards were determined, flight attendants had the ability to add, drop, and/or

swap their scheduled flights on a first-come first-served basis using flights available in

"Open Time," but they were prohibited from dropping below 45 credit hours.  (ECF No.

38 at 4 ¶ 4; ECF No. 38-1 ¶ 37.)

   Pursuant to the CBA, flight attendants were considered inactive, and therefore,

ineligible to bid if they have been granted Frontier-approved continuous leaves such as

Leave of Absence ("LOA"), Medical Leave ("MED"), FMLA Leave, or On the Job Injury

("OJI") Leave.  (ECF No. 38 at 4–5 ¶ 5; ECF No. 38-1 ¶ 37; ECF No. 38-5 at 43–44.)  If

a flight attendant returning from a Frontier-approved leave missed the above-described bid period, the flight attendant was permitted, for the remainder of that month, to pick up Open Time to build a schedule and/or be assigned Reserve days.  (ECF No. 38 at 5 ¶ 6; ECF No. 38-1; ECF No. 38-5 at 54.)  Flight attendants returning from continuous leaves of absence, and were therefore inactive during the bidding period, were the only Frontier flight attendants who were excused from the bidding process and permitted for the remainder of that month to pick up Open Time to build a schedule.  (ECF No. 38 at 5 ¶ 7; ECF No. 38-1; ECF No. 38-5 at 54.)  A flight attendant on Intermittent FMLA ("IFMLA") leave still had to bid.  (ECF No. 38-22 at 3.)

In addition, during the time period relevant to this litigation, Frontier's attendance policy, the "Dependability Policy," applied.  (ECF No. 38-4 at 51–55.)  The Dependability Policy defines Occurrences in various ways, for example, "Absenteeism/Sick Call = 1 Occurrence," and "No Call/No Show = 2 Occurrences," and states that employees incurring eight "Occurrences" within a twelve-month period would be subject to termination.  (*Id.*)

After returning to Frontier from her rehabilitation program, Brigham began calling out as sick, incurring Occurrences under the Dependability Policy.  (ECF No. 38 at 8 ¶ 24; ECF No. 38-1 ¶ 24; ECF No. 38-6.)  However, according to Brigham, she "was complying with the terms of her treatment plan, as required by Frontier, while Frontier was simultaneously failing to accommodate [her]."  (ECF No. 44 at 10 ¶ 24.)  A few days after receiving a written warning from Frontier, Brigham obtained paperwork from her medical care provider for purposes of certifying her for IFMLA leave for four days per month.  Brigham, however, continued to call out as sick when she exceeded the number

of authorized IFMLA leave days per month and failed to abide by the two hours minimum notice requirement.  (ECF No. 38 at 8–9 ¶ 26; ECF No. 38-1 ¶ 27.)

On June 4, 2015, Brigham met with Cassie Micklich, Drug & Alcohol Specialist at Frontier, and Gerardo Arellano, Senior Employee/Labor Relations Manager/Special Projects at Frontier, to discuss her continued exhaustion of IFMLA leave.  At that meeting, Brigham made certain requests for accommodations.  Brigham asked if Frontier could adjust her flight schedule so that she could avoid flights with layovers, including overnight layovers, which she said tempted her to drink and thus, jeopardized her sobriety.  (ECF No. 38 at 9 ¶ 28.)

Arellano indicated that Frontier wanted to support Brigham but could not adjust her schedule to avoid flights with layovers or allow her to create her own schedule because doing so would violate the CBA.  (ECF No. 38 at 9 ¶ 29; ECF No. 38-1 ¶ 33.) Brigham disputes that Arellano mentioned her request might violate the CBA.  (ECF No. 44 at 12 ¶ 29.)  Arellano states in his declaration that flight attendants' schedules were and remain determined by seniority-based bidding under the CBA, and Frontier does not and did not customize trip schedules for flight attendants.  (ECF No. 38-1 ¶ 34.) Further, Arellano states that Frontier has never excused an active flight attendant from the seniority-based bidding rules set forth in the CBA to allow that flight attendant to create her own schedule out of Open Time to avoid certain types of flights.  (ECF No. 38-1 ¶ 38.)

In addition, according to Arellano, it was Frontier's understanding that allowing Brigham to build her own schedule from Open Time would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional

flight opportunities from other flight attendants looking to modify their schedules.  (ECF No. 38-1 ¶ 39.)  Adrienne Prince,[2] a union representative, testified at her deposition that the union would not allow Brigham to build her schedule from scratch on Open Time or simply remove Brigham from overnight trips because doing so would violate the CBA.  (ECF No. 48 at 6–7 ¶ 30; ECF No. 44-2 at 5, 17.)

Arellano suggested that Brigham could apply for other accommodations—though Brigham disputes the characterization of the suggestions as "accommodations"—including personal leave or non-FMLA leave, or explore other positions with Frontier.  (ECF No. 38-1 ¶ 40; ECF No. 44 at 13 ¶ 32.)  However, Brigham did not want to transfer internally because she preferred being a flight attendant and did not want to relocate and/or give up her seniority rights in exchange for a new position.  (ECF No. 38-1 ¶ 41.)

Also at the June 4, 2015 meeting, Brigham asked whether she could temporarily work at the General Office ("GO") doing administrative work without losing her seniority, like Frontier employees on OJI program were permitted to do.  (ECF No. 38 at 10 ¶ 37; ECF No. 38-1 ¶ 42.)  In his declaration, Arellano explains that the CBA included a collectively-bargained for OJI provision, allowing Frontier the discretion to provide flight attendants injured on the job—but only flight attendants injured on the job—with temporary light duty assignments in the GO.  (ECF No. 38 at 10 ¶ 37; ECF No. 38-1 ¶ 43.)  He clarifies that these assignments were not open job positions; rather, when a flight attendant injured on the job was temporarily unable to work, she would be permitted to help others in the GO with their own light-duty responsibilities.  (ECF No.

---

[2] From late 2014–2015, Prince was Vice President of the Association of Flight Attendants-CWA, AFL-CIO.  (ECF No. 44-1 at 1.)  In that capacity, Prince requested accommodations from Frontier on behalf of Brigham.  (*Id.*)

38 at 10 ¶ 37; ECF No. 38-1 ¶ 43.)  Arellano states that consistent with the CBA, work

at the GO was only provided as an accommodation to flight attendants in Frontier's OJI

program, which he explained to Brigham.  (ECF No. 38 at 11 ¶ 38; ECF No. 38-1 ¶ 44;

ECF 38-23.)

Shortly after the June 4, 2015 meeting, Brigham submitted a revised IFMLA

Certification Form, increasing the number of authorized IFMLA leave from four days per

month to 12.  (ECF No. 38 at 11 ¶ 40.)  According to Frontier, however, Brigham

continued to exhaust her IFMLA leave and incurred Occurrences for calling out "sick."

(ECF No. 38 at 11 ¶ 41.)  Brigham disputes the causes of the Occurrences, stating that

her absences were directly related to the fact that Frontier required her to comply with

her treatment plan but refused to reasonably accommodate her to make compliance

possible.  (ECF No. 44 at 17 ¶ 41.)

On October 9, 2015, Brigham met with Jeff Varney and Kari Thompson, both

Managers with Inflight Services, and Arellano.  (ECF No. 38 at 11 ¶ 42.)  Brigham

reiterated how she loved being a flight attendant, particularly because of the job's

flexibility and asked whether as an accommodation, she could start with a blank

schedule and be responsible for building her own schedule up to 60 hours.  (ECF No.

38 at 11 ¶ 43; ECF No. 38-1 ¶ 52.)  Arellano explained that this practice was reserved

for flight attendants returning from continuous leaves of absence who had not been

active flight attendants during the bidding period the month they returned from leave

and therefore, could not have bid; thus, allowing Brigham to craft her own schedule

would violate the CBA's seniority provisions, creating the impression that Frontier was

"cherry-picking" flight attendants to have the benefit of building their own schedules

without regard to seniority.  (ECF No. 38 at 11–12 ¶ 44; ECF No. 38-1 ¶ 53.)  Brigham admits that Arellano said as much but states he was mistaken in his assertions.  (ECF No. 44 at 17–18 ¶ 44.)

According to Arellano, Frontier had already been allowing Plaintiff to use IFMLA for purposes other than those included in her certifications (*i.e.*, relapse prevention counseling and support group meetings) by allowing her to use IFMLA leave to avoid flights with overnight layovers.  (ECF No. 38 at 12 ¶ 46; ECF No. 38-1 ¶ 46.)  However, Brigham denies Arellano's characterization of her use of IFMLA leave, stating that based on the designations of use of leave for "intermittent incapacitation" and "treatment appointments," Frontier actually approved her for anywhere between eight and 16 days of leave per month.  (ECF No. 44 at 18 ¶ 46; ECF No. 38-1 ¶¶ 55–56.)  Arellano emphasized to Brigham that ultimately, Frontier needed "employees who can come to work," but reminded her that she could apply for a personal leave as a further accommodation, additional IFMLA leave, and/or for another internal position within the company.  (ECF No. 38 at 12 ¶ 47; ECF No. 38-1 ¶ 57.)  Arellano notified Brigham that a Flight Training Coordinator position was becoming available, but Brigham repeated her concerns about losing her seniority.  (ECF No. 38 at 12 ¶ 48; ECF No. 38-1 ¶ 58.)  Brigham was encouraged to check for other internal opportunities on Frontier's internal system on a weekly basis.  (ECF No. 38 at 12 ¶ 49; ECF No. 38-1 ¶ 59.)

Less than 10 days after the October 9, 2015 meeting, Brigham failed to report for a four-day trip.  (ECF No. 38 at 13 ¶ 51.)  Brigham denies as much, stating that she "kept the PDX turn on the end" of this trip, *i.e.*, that she did not fail to report for the four-day trip.  (ECF No. 44 at 19 ¶ 51.)  However, Frontier submits Brigham's October 26,

2015 e-mail to Frontier regarding the incident, in which Brigham wrote to LOA Frontier

Employees:

> I woke up this morning in a panic, I forgot to send you an
> email on Friday, I had to use my intermittent Fmla on 10/23
> for a 4 day but I kept the pdx turn on the end.  Please let me
> know if this will have to be coded as sick and if so what # of
> points am I at?  Also the new fmla paperwork will be faxed
> by Tuesday. I hope you have a good day.

(ECF No. 38-17.)  As this e-mail demonstrates, Brigham failed to contact the LOA

Department for approval to use IFMLA Leave for the four-day trip until the day following

the first day of the trip in violation of Frontier policy—this was three days after the

October 23, 2015 trip was scheduled to commence.  (ECF No. 38 at 13 ¶ 52.)

According to Arellano, Brigham had exhausted her available IFMLA leave by October

19, 2015.  (ECF No. 38-1 ¶ 62; ECF No. 38-13.)  Frontier's LOA Department denied

Brigham's request to use IFMLA Leave for the four-day trip for her lack of timely notice,

though Brigham disputes that her notice was untimely.  (ECF No. 38 at 13 ¶ 53; ECF

No. 44 at 19 ¶ 53.)

On October 30, 2015, Frontier sent Brigham a letter indicating that pursuant to

the CBA, an Investigatory Meeting had been scheduled for November 3, 2015 for her to

attend to discuss her violations of the Dependability Policy.  (ECF No. 38 at 13 ¶ 54.)

On November 3, 2015, Brigham, Stephanie Coppedge, Supervisor of Inflight Services at

Frontier, Andrea Warfield, Senior Human Resource Manager at Frontier, and Prince

met to discuss Brigham's violations of the Dependability Policy.  (ECF No. 38 at 13 ¶

55.)  During that meeting Brigham admitted that she had forgotten to email Frontier's

LOA Department immediately regarding her decision to call out "sick" for the four-day

trip beginning October 23, 2015 as required by company policy.  (ECF No. 38 at 13 ¶

56.)  Brigham reiterated her request to avoid flights with layovers or to allow her to build her own schedule out of Open Time.  (ECF No. 38 at 13 ¶¶ 57–59.)  Frontier again explained that these requests would violate the CBA; Brigham disputes as much.  (ECF No. 38 at 13 ¶¶  60–62; ECF No. 44 at 20 ¶ 60; ECF No. 48 at 6 ¶ 30.)

On November 11, 2015, Frontier informed Brigham that it was terminating her employment effective immediately for incurring 10 Occurrences within a 12-month period in violation of the Dependability Policy under which eight Occurrences subjected an employee to termination.  (ECF No. 38 at 15 ¶ 64; ECF No. 38-20.)  Brigham does not dispute that she was absent on more than eight occasions within the 12-month period preceding her discharge, though she does dispute whether those absences should have counted under the Dependability Policy because she "only accrued [them] due to Frontier's failure to accommodate her disability."  (ECF No. 38 at 15 ¶ 65; ECF No. 44 at 23 ¶ 65.)

On May 10, 2016, Brigham filed a Charge of Discrimination with the Colorado Civil Rights Division, and her charge was transferred to the United States Equal Employment Opportunity Commission ("EEOC").  (ECF No. 1 ¶ 15.)  On June 4, 2019, the EEOC issued a determination in Brigham's favor.  (*Id.* ¶ 22.)  The parties were nonetheless unable to resolve the dispute after the EEOC's determination.  (*Id.* ¶ 23.)

On December 4, 2019, Brigham filed her Complaint.  (ECF No. 1.)  She brings four claims against Frontier, including: (1) failure to accommodate in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* (the "ADA"); (2) failure to engage in the interactive process in violation of the ADA; (3) retaliation in violation of the ADA; and (4) discrimination in violation of the ADA.  (*Id.*)

On February 3, 2020, Frontier filed its Answer.  (ECF No. 12.)

On November 17, 2020, Brigham filed her Motion for Partial Summary Judgment, arguing that there are no disputed issues of material fact between the parties regarding: (1) whether she was a qualified individual with a disability under the ADA; or (2) whether Frontier violated the ADA when it denied her request to be temporarily reassigned as a reasonable accommodation.  (ECF No. 36 at 1.)  Frontier responded in opposition (ECF No. 45), and Brigham replied (ECF No. 47).

Also on November 17, 2020, Frontier filed its Motion for Summary Judgment, arguing that it is entitled to summary judgment on all claims.  (ECF No. 38 at 1.) Brigham responded in opposition (ECF No. 44), and Frontier replied (ECF No. 48).

## III. ANALYSIS[3]

### A.   Failure to Engage in the Interactive Process (Count II)

In her Complaint, Brigham alleges that Frontier violated the ADA by failing to engage in the interactive process.  (ECF No. 1 ¶¶ 30–35.)  In connection with this claim, she alleges that the "ADA requires that employers . . . engage in a good faith interactive process with employees to determine the nature of possible reasonable accommodations . . . ."  (*Id.* ¶ 33.)  She further alleges that her "many requests for a reasonable accommodation were denied; [and that] Frontier refused to engage in the interactive process in good faith . . . ."  (*Id.* ¶ 34.)

Frontier is entitled to summary judgment on Brigham's putative claim for failure to engage in the interactive process as a matter of law.  The Tenth Circuit has held that

---

[3] The parties both moved for summary judgment on numerous claims, asserting numerous theories; however, the Court limits its analysis to those issues which are dispositive of all claims in this case and will not address the parties' remaining arguments.

the failure to engage in the interactive process is not independently actionable under the

ADA.  *See Valdez v. McGill*, 462 F. App'x 814, 819 (10th Cir. 2012) (affirming the trial

court's decision to grant the defendant's motion for summary judgment on the plaintiff's

claim for failure to engage in the interactive accommodation process on the grounds

that such failure "is not actionable discrimination" under the ADA); *Lucero v. Terumo*

*BCT, Inc.*,  2015 WL 3619343, at *4 (D. Colo. June 10, 2015) ("an employer's failure to

follow the interactive process is not an independent basis for liability under the ADA").

To the extent Brigham disputes as much by relying on *Aubrey v. Koppes*, 975 F.3d 995,

1007 (10th Cir. 2020), Frontier correctly points out that *Aubrey* did not involve a

separate claim for failure to engage in the interactive process, rendering Brigham's

argument unavailing.  Accordingly, the Court will grant summary judgment in favor of

Frontier on her putative claim for failure to engage in the interactive process.

## B.   Discrimination (Count IV) and Retaliation (Count III)[4]

The ADA prohibits discrimination "against a qualified individual on the basis of

disability."  42 U.S.C. § 12112(a).  Thus, to establish a prima facie case of

discrimination under the ADA, a plaintiff must show that (1) she is disabled as defined

under the ADA; (2) she is qualified, with or without reasonable accommodation by the

employer, to perform the essential functions of the job; and (3) she was discriminated

---

[4] In her response, Brigham characterizes Frontier's arguments regarding her retaliation claim as follows: "Frontier's argument in this regard is limited solely to: 'Plaintiff has not and cannot show any causal connection between Plaintiff's requests for accommodation and the termination of her employment.' . . .  But Defendant's facts cited in support of this argument are incorrect and incomplete, and Plaintiff has produced adequate evidence showing causation. *See supra* p. 35-36 (detailing facts in support of causation and Plaintiff's request for intermittent leave)."  (ECF No. 44 at 40.)  Thus, Brigham does not make a separate argument in response to Frontier's arguments concerning her retaliation claim and refers to her prior arguments in connection with her discrimination claim.  Because Brigham herself states that the same arguments apply to her discrimination and retaliation claims, the Court addresses these claims together in this section.

against because of her disability.  *See Adair v. City of Muskogee*, 823 F.3d 1297, 1304

(10th Cir. 2016) (citing *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th

Cir. 2015)).

ADA discrimination claims generally follow the familiar burden-shifting framework

of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> Under that analysis, a plaintiff carries the burden of raising a
> genuine issue of material fact on each element of his prima
> facie case.  If plaintiff establishes a prima facie case, the
> burden shifts to the defendant to offer a legitimate
> nondiscriminatory reason for its employment decision.  If
> defendant articulates a nondiscriminatory reason, the burden
> shifts back to plaintiff to show a genuine issue of material
> fact as to whether the defendant's reason for the adverse
> employment action is pretextual.

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (citations omitted).

In general, the ADA provides that "[n]o covered entity shall discriminate against a

qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training,

and other terms, conditions, and privileges of employment."  *Punt v. Kelly Servs.*, 862

F.3d 1040, 1047–48 (10th Cir. 2017) (quoting 42 U.S.C. § 12112(a)).  "Because the

statute only prohibits discrimination 'on the basis of disability,' there must be a nexus

between the disability and the adverse employment action."  *Id.* at 1048.  The Tenth

Circuit has stated that "it is not enough that an adverse employment action is suffered

by an individual with a disability; rather, the disabled individual must show that the

adverse action was 'on the basis of' the disability."  *Id.*

In most types of ADA cases, this is done by proving the employer acted with

discriminatory intent.  *Id.*  Such discriminatory intent can be shown either through direct

evidence—that is, "evidence, which if believed, proves the existence of a fact in issue

without inference or presumption"—or through circumstantial evidence, which is evaluated under the *McDonnell Douglas* burden-shifting framework to determine whether a reasonable factfinder could infer that the employer's motivation was discriminatory and that any proffered nondiscriminatory business reason for the decision was merely pretextual.  *Id.*

To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) she "engaged in a protected activity"; (2) she was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity"; and (3) there was "a causal connection between the protected activity and the adverse employment action."  *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016).

Assuming *arguendo* that Brigham has met the first two elements of her prima facie burden for discrimination and retaliation, for the following reasons, the Court finds that she has failed to satisfy the third element of both claims, which requires her to demonstrate that Frontier terminated her employment on the basis of her disability (for discrimination) or that there is a causal connection between her requests for accommodations and her termination (for retaliation).

"[A] termination for misconduct is not converted into a termination because of a disability just because the instigating misconduct somehow relates to a disability." *Curry v. MillerCoors, Inc.*, 2013 WL 4494307, at *3 (D. Colo. Aug. 21, 2013).  However, by arguing that her termination was because of her alcoholism and requests for accommodations in connection with that condition, and not because she exceeded the allowed number of Occurrences in a 12-month period under the Dependability Policy,

Brigham is attempting to do just that—convert her termination for the violating the Dependability Policy into termination because of her disability.

Here, Frontier has demonstrated that it terminated Brigham's employment because she violated the Dependability Policy.  Brigham failed to report for the four-day trip and admittedly failed to notify the LOA Department that she was choosing to use IFMLA leave.  (ECF No. 38-1 ¶¶ 60–61.)  Nevertheless, Brigham exhausted her available IFMLA leave by October 19, 2015 (ECF No. 38-1 ¶ 62), and the LOA Department denied her request to use IFMLA leave for her lack of timely notice (ECF No. 38-1 ¶¶ 63–64; ECF No. 38-18; ECF No. 38-24).  The language in Brigham's e-mail informing the LOA Department that she had missed the four-day trip, in which she asked the LOA Department whether "this will have to be coded as sick," demonstrates that Brigham herself was aware she did not have enough IFMLA leave to cover this absence.  (ECF No. 38-17.)

An Investigatory Meeting was held on November 3, 2015 in accordance with the CBA to address Brigham's violations of the Dependability Policy.  (ECF No. 38-1 ¶ 65; ECF No. 38-19.)  On November 11, 2015, Frontier informed Brigham in a letter that it was terminating her employment effective immediately for incurring 10 Occurrences within a 12-month period in violation of the Dependability Policy, under which eight Occurrences subjected an employee to termination.  (ECF No. 38-1 ¶¶ 66–67; ECF No. 38-6; ECF No. 38-13; ECF No. 38-20.)  In his declaration, Arellano noted that in addition to Brigham's violation of the Dependability Policy, Brigham's policy violations concerning use of IFMLA leave and the CBA's requirements for "Sick Calls" contributed to her termination because "Frontier believed that [Brigham] was not a dependable or

reliable employee."  (ECF No. 38-1 ¶ 66.)

In response, Brigham argues that she has presented more than adequate evidence to meet her "not onerous" duty to show her termination was due to her disability.  (ECF No. 44 at 36.)  The Court addresses each of her arguments.

First, Brigham argues that Frontier required her to comply with her treatment plan for alcoholism then terminated her when she did so.  (*Id.*)  For the following reasons, the Court finds her argument unavailing.  The evidence shows that Frontier requires employees who self-disclose their alcoholism to comply with treatment, aftercare, or support group services recommended by their Substance Abuse Provider ("SAP"), who must be Department of Transportation certified.  (ECF No. 48 at 18; ECF No. 36-8; ECF No. 38-4 ("Frontier requires full compliance with any additional treatment or aftercare recommended by a Substance Abuse Provider").)  However, Brigham has not pointed to any evidence indicating that Marla Madrid, the Primary Therapist who signed her Treatment Plan, was her SAP.  (ECF No. 48 at 18.)  Regardless, even assuming Madrid was Brigham's SAP, the Treatment Plan does not require Brigham to avoid overnight trips with layovers which, according to Brigham, jeopardize her sobriety.  Brigham's Treatment Plan provides:

> Estimated Length of Treatment, Modality, and Frequency:
>
> 1.  Individual treatment, one to two times monthly for six months (to be evaluated at that time).
>
> 2.  Group therapy, weekly for six months (to be evaluated at that time).

(ECF No. 36-8 at 1.)  The Additional Information section of the Treatment Plan provides:

> *Rebecca* has identified triggers to avoid cravings and opportunities to consume alcohol and those are on overnight

> trips or anything longer than a given work day in her
> professional arena.  At this time *it would not be a good idea*
> *to encourage a vulnerable situation* with a work schedule
> that serves as a temptation, *if possible.*  Her treatment plan
> and progress towards goals will be reviewed every 90 days.

(*Id.* at 2 (emphasis added).)  The Additional Information section demonstrates that it is a suggestion, not a requirement, that Brigham avoid overnight trips.  Therefore, to the extent that Brigham argues that Frontier terminated her because she was complying with her Treatment Plan when she missed the four-day trip and incurred more Occurrences, her argument is without merit.

Next, Brigham argues that Frontier "did regularly grant requests for reasonable accommodation in the form [of] modified schedules or light duty, just not for Plaintiff and not for alcoholics."  (ECF No. 44 at 36.)  As an initial matter, this argument and accompanying evidence does not refute the fact that Frontier terminated Brigham because she violated the Dependability Policy, not because she is an alcoholic and not because she requested certain accommodations.  Regardless, the CBA's OJI provisions allow for light-duty assignments only for flight attendants injured on the job. (ECF No. 38-5 at 108–09.)  According to Arellano, Frontier did not maintain open light-duty job positions for flight attendants injured on the job, nor were light duty assignments job "positions"; instead, Frontier would temporarily assign those injured on the job to perform other employees' duties.  (ECF No. 38-1 ¶ 43.)  The Tenth Circuit has found that it is "not reasonable to require an employer to create a new job for the purpose of reassigning an employee to that job."  *Duvall v. Georgia-Pac. Consumer Prod., L.P.*, 607 F.3d 1255, 1261 (10th Cir. 2010).

Frontier provides a spreadsheet which demonstrates that since 2012, with

respect to flight attendants, Frontier has never provided light duty assignments to any flight attendant (injured on the job or not) as an accommodation, nor has Frontier placed any flight attendant (injured on the job or not) into a vacant ground position as an accommodation, although the OJI program would have allowed for temporary light duty assignments if requested by flight attendants injured on the job.  (ECF No. 45 at 9 ¶ 19; ECF No. 36-11.)  Additionally, since 2012, Frontier has never transferred a flight attendant to a temporary ground assignment in the GO as an accommodation.  (*Id.*) And no flight attendants have been offered modified work schedules.  (*Id.*)  Instead, Frontier shows that only non-comparable workers in ground positions (not subject to a CBA) were offered schedule modifications.  (*Id.*; ECF No. 45-1 ¶ 16.)  To the extent Brigham disputes as much (ECF No. 47 at 4 ¶¶ 19–20), Frontier has shown that Brigham is not similarly situated to non-union employees who were offered temporary light duty assignments or modified schedules because Brigham did not have a temporary on the job injury and she was a flight attendant subject to the CBA.  (ECF No. 45-1 ¶ 16.)  Further, other than Brigham, none of the employees reflected in the spreadsheet were requesting accommodations for conditions involving alcoholism or substance abuse.  (ECF No. 45-1 ¶ 14.)  Therefore, Brigham's argument is unavailing.

Third, Brigham argues that Arellano stated that her requested accommodations would have amounted to "making exceptions" and that Frontier would not make a "separate accommodation."  (ECF No. 44 at 36.)  Again, this argument is not evidence that Brigham's disability, or her requests for accommodation, caused her termination. Moreover, for support, Brigham merely cites the transcript of her October 9, 2015 meeting.  (*Id.*)  She makes no further argument on this point.  Therefore, Brigham's

argument on this point is also without merit.

Fourth, Brigham argues that she had not "actually violated the Dependability Policy as Frontier had previously granted her at least 16 days of intermittent FMLA time per month."  (ECF No. 44 at 36 (citing "Def.'s Ex. 10 to Ex. A at 4-5")).)  She provides no additional evidence or argument in support.  She also argues that she "did request additional intermittent FMLA time during the period that Frontier failed to reasonably accommodate her and prior to her termination, but Defendant denied this request and terminated [her]."  (ECF No. 44 at 35.)

The Court has reviewed what appears to be the cited exhibit.[5]  As an initial matter, this document appears to be a form concerning "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act) Intermittent Leave of Absence."  (ECF No. 38-12.)  It appears as though Madrid completed this form on May 28, 2015 and stated that Brigham would require 12 days of IFMLA leave from May 1, 2015 to November 1, 2015.  (*Id.* at 4.)  The Court does not see a signature from a Frontier employee approving the leave or an indication that Frontier approved 16 days of IFMLA leave, as Brigham states in her response.  (ECF No. 44 at 36.)  Therefore, this exhibit does not demonstrate that Frontier ever previously granted Brigham 16 days of IFMLA leave.

Nonetheless, even if Frontier *had* previously granted Brigham 16 days of leave— which Brigham has not demonstrated based on evidence in the record —it would not change the fact that when she failed to report for the four-day trip on October 23, 2015,

---

[5] Brigham did not provide a citation to the entry on CM/ECF.  Nevertheless, the Court believes Brigham was citing Exhibit 10 to Frontier's Motion for Summary Judgment, which is located on the docket at ECF No. 38-12.

she had already exhausted her IFMLA leave for the month.  (ECF No. 38-1 ¶ 62; ECF

No. 38-13 at 77.)  In an e-mail to Arellano, Frontier's Supervisor of Disability Program

Management said:

> Rebecca Brigham did request FMLA for 10/23/2015-
> 10/26/2015 but it was not until 10/26/2015 11:37am.  She
> had already exhausted her IFM allowance for the month of
> October by the 19th so because it was late and she had
> exceeded her approval the dates were denied.

> As for the 10/30/2015 trip- again she did request the time as
> FMLA and it was within 24 hours but she is only approved
> for up to 12 days per month and those were exhausted on
> 10/19/2015.  The dates of 10/30-10/31/2015 were denied
> and the November dates of 11/1/2015 and 11/2/2015 will be
> coded according to the IFM approval, which I have
> completed.

> I did look at the fitness for duty that was provided for her
> RTW and it does not state any restrictions.  I don't see that
> we have received anything stating that she was not able to
> work overnight trips.

> Hope this helps.

(ECF No. 38-13 at 77.)  Thus, Brigham's argument that she had previously obtained 16

days of IFMLA leave is unsupported and unavailing.

Fifth, Brigham argues that she "was not the only alcoholic at Frontier during the

relevant time period to suffer discrimination at the hands of Mr. Arellano and Ms.

Leyner."  (ECF No. 44 at 36 (citing Pl.'s Mot. at 13).)  For support, she relies on the

experiences of David St. Hilaire.  She quotes his declaration, which Frontier objects to

on the basis that it is inadmissible at trial.  (ECF No. 45 at 11 ¶ 22.)  While this is likely

the case, the Court rejects Brigham's arguments on its merits because St. Hilaire is not

similarly situated to her.

"When deciding whether a plaintiff's claim survives summary judgment, the court

must determine whether plaintiff had adduced enough evidence to support a finding that the [other employee] and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1200 (D. Kan. 2020), *aff'd*, 851 F. App'x 828 (10th Cir. 2021) (internal quotation marks omitted) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)). "Individuals are considered similarly-situated when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it." *Id.* (citation omitted); *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." (citation and internal quotation marks omitted)). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (citation omitted).

According to St. Hilaire's declaration, he was supervised by Christopher Benedict, lied to Frontier about the fact that he had received treatment for alcoholism from a treatment facility, was required by Frontier to take routine drug tests, refused a drug test in violation of Frontier policy, never requested an accommodation, and voluntarily left Frontier in April 2016, approximately five months after the termination of Brigham's employment.  (ECF No. 36-12 ¶¶ 6–7, 12, 14.)  By contrast, Brigham was not

supervised by Benedict, self-disclosed her alcoholism and treatment, did not refuse to take a drug test, requested accommodations, and was terminated involuntarily for attendance infractions.  (ECF No. 45 at 11 ¶ 22; ECF No. 38-1 ¶¶ 18–19.)  Therefore, the Court finds that St. Hilaire and Brigham are not similarly situated and that Brigham's argument on this issue fails as a result.

Finally, Brigham argues that she was not the only Frontier flight attendant to be denied reasonable accommodations during the relevant time period.  (ECF No. 44 at 36 (citing Pl.'s Mot. at 13-14).)  This argument incorporates her arguments regarding St. Hilaire, which the Court has just rejected.  Brigham also points to the experiences of former Frontier flight attendant Christine Kernen.[6]  (ECF No. 36 at 13–14 ¶ 23.) However, Kernen's complaints regarding Frontier's treatment of her are in connection with requests for accommodations related to pregnancy and breastfeeding,[7] not alcoholism.  (ECF No. 36-13.)  Kernen and Brigham are not similarly situated for a variety of other reasons, including that the accommodation Kernen claims she requested (a leave of absence) was offered to but rejected by Brigham, Kernen did not suffer from the same medical condition, Kernen did not request the same accommodations as Brigham, and Kernen was not terminated by Frontier due to attendance infractions but instead voluntarily left Frontier in July 2016.  (ECF No. 45-1 ¶¶ 20–23.)  Therefore, the Court finds this argument, too, is without merit.

For the reasons stated above, the Court finds that Brigham has failed to

---

[6] Frontier makes the same objections regarding Kernen's declaration regarding its inadmissibility at trial.  (ECF No. 45 at 12 ¶ 23.)

[7] Frontier points out that pregnancy and breastfeeding are not disabilities under the ADA. (ECF No. 45 at 12 ¶ 23.)

demonstrate that a genuine issue of material fact exists regarding whether Frontier

terminated her on the basis of her disability or her requests for accommodations.

Therefore, because Brigham has failed to meet her prima facie burden in connection

with her discrimination and retaliation claims, the Court will grant summary judgment in

favor of Frontier on those claims.

## C.     Failure to Accommodate (Count I)

The Court next turns to Brigham's failure to accommodate claim.  Under the

ADA, disability discrimination includes "not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability

who is an applicant or employee, unless [the employer] can demonstrate that the

accommodation would impose an undue hardship on the [employer's business]

operation[s]."  42 U.S.C. § 12112(b)(5)(A).  This claim "does not require any evidence of

discriminatory intent, whether direct or circumstantial."  *Punt*, 862 F.3d at 1048.  This is

because "the only reason an accommodation is required is because of the disability,

and thus the failure to provide a reasonable accommodation to a qualified employee

with a disability is inherently 'on the basis of [the] disability,' 42 U.S.C. § 12112(a),

regardless of the employer's motivation."  *Id.*

If challenged at summary judgment, a failure to accommodate claim proceeds as

follows:

> [T]he employee must make an initial showing that (1) she is
> disabled; (2) she is otherwise qualified; and (3) she
> requested a plausibly reasonable accommodation.  Once the
> employee produces evidence sufficient to make a facial
> showing on her prima facie case, the burden of production
> shifts to the employer to present evidence either
> (1) conclusively rebutting one or more elements of plaintiff's
> prima facie case or (2) establishing an affirmative defense,
> such as undue hardship or one of the other affirmative

> defenses available to the employer.  If the employer does
> either of the above, summary judgment will be appropriate
> for the employer unless the employee then presents
> evidence establishing a genuine dispute regarding the
> affirmative defenses and/or rehabilitates any challenged
> elements of her prima face case sufficiently to establish at
> least a genuine dispute of material fact as to such
> challenged elements.

*Id.* at 1050 (internal quotation marks and citations omitted; alterations incorporated).

For the following reasons, the Court finds that Brigham has failed to meet the third element of her prima facie burden to demonstrate that she requested a plausibly reasonable accommodation.

First, Brigham requested an exemption from flights with layovers or overnight trips, or that she be allowed to build her own schedule from Open Time, as accommodations.  (ECF No. 36 at 25.)  However, if Frontier had granted the accommodations Brigham sought, it would have required excusing Brigham from the mandatory, seniority-based bidding process set forth in the CBA.  (ECF No. 38-1 ¶ 35.)  Arellano told Brigham as much at the June 4, 2015 meeting.  (ECF No. 38-1 ¶ 29.)  Additionally, Prince confirmed that the union would not have authorized Frontier to grant these accommodations because it would have violated the CBA, testifying:

> Q. Okay. And did you understand that Ms. Brigham wanted
> to just have her overnight trips removed?
> A. Yes.
> Q. And did you understand that Ms. Brigham just wanted to
> build her own schedule from scratch out of open time or the
> TradeBoard?
> A. Yes.
> Q. Okay. And the union would not allow her to build her
> schedule from scratch on open time, because that would
> have violated the Collective Bargaining Agreement, correct?
> A. Correct.
> Q. Okay. So it was not the union's intention to grant this
> accommodation, correct?
> A. Correct.

> Q. Okay. And the idea of "just remove me from the overnights," that would have violated the seniority bidding provisions of the Collective Bargaining Agreement to just do that for her, correct?
> A. Correct.
> Q. So that's not an accommodation that the union intended to grant to her, correct?
> A. Correct.

(ECF No. 44-2 at 17.)[8]

    As Frontier emphasizes, allowing Brigham to be excused from flights with layovers would have "encroach[ed] upon the vested rights of other flight attendants with more seniority than Plaintiff and violat[ed] the CBA's requirements that all active flight attendants bid for flights and accumulate a minimum of 60 credit hours, and that flight attendants never drop below 45 credit hours when making schedule adjustments using Open Time."  (ECF No. 38 at 35.)  The Tenth Circuit has stated that the ADA does not require an employer to transfer an employee to a job as a reasonable accommodation if doing so would violate the seniority provisions of a collective bargaining agreement, observing that "[t]his is not required by the ADA."  *See Aldrich v. Boeing Co.*, 146 F.3d 1265, 1272 n.5 (10th Cir. 1998); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) (holding transfer to another job that would violate seniority rights under collective bargaining agreement unreasonable).

    Further, Frontier denied Brigham's request to build her schedule from Open Time

---

[8] Brigham disputes that Prince's declaration is consistent with her deposition testimony. (ECF No. 44 at 12 ¶ 30.)  However, the above-quoted testimony demonstrates that her declaration and deposition testimony are, as Frontier argues, in fact consistent.  (ECF No. 48 at 6–7 ¶ 30.)  To the extent Brigham argues that Prince confirmed that Brigham's request to build her schedule out of Open Time would not have violated the CBA, the deposition testimony quoted above shows that is incorrect: "Q. Okay. And the union would not allow her to build her schedule from scratch on open time, because that would have violated the Collective Bargaining Agreement, correct? A. Correct."  (ECF No. 44-2 at 17.)

because it "would necessarily penalize other flight attendants, regardless of seniority, by taking away alternative and/or additional flight opportunities from other flight attendants looking to modify their schedules."  (ECF No. 38-1 ¶ 39.)  Arellano states that "Frontier has never excused an active flight attendant from the seniority-based bidding rules set forth in the CBA to allow that flight attendant to create their own schedule out of Open Time to avoid certain types of flights."  (ECF No. 38-1 ¶ 38.)  Brigham was on active/eligible status when she requested to be excused from bidding.  (ECF No. 38-5 at 105; ECF No. 38-22 at 2–3.)  Under the CBA, all active/eligible flight attendants (*i.e.*, all flight attendants not on a continuous leave of absence during the bid period) are required to bid.  (ECF No. 38-1; ECF No. 38-5 at 54.)  Moreover, Prince testified at her deposition that someone on IFMLA still had to bid.  (ECF No. 38-22 at 3.)

Given the foregoing, even if allowing Brigham to build her schedule from Open Time would not necessarily violate the seniority rights of other employees under the CBA, her requested accommodation would still be inconsistent with the contractual rights of other workers under the CBA, which require someone in Brigham's position to engage in the bidding process.  The Tenth Circuit has cited with approval opinions from other circuit courts which conclude that the ADA does not require an employer to take actions to accommodate a plaintiff which would violate the contractual rights of other workers under a collective bargaining agreement.  *See Aldrich*, 146 F.3d at 1272 n.5 (citing *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("Following the other circuits which have considered this issue, we hold that the ADA does not require an employer to take action inconsistent with the contractual rights of other workers under a collective bargaining agreement."); *Benson v. Nw. Airlines, Inc.*, 62

F.3d 1108, 1114 (8th Cir. 1995) ("The ADA does not require that [the employer] take action inconsistent with the contractual rights of other workers under a collective bargaining agreement.")).

The Court agrees with Frontier that Brigham's request to be excused from layovers or build her schedule from Open Time is unreasonable for an additional reason.  Frontier contends that regardless of whether or not Brigham's requested accommodation violated the terms of the CBA, Frontier could not have promised Brigham that she would never end up with a layover.  (ECF No. 38 at 36.)  As Frontier describes, "inherent in *all* flights is the risk of experiencing inclement weather and/or mechanical issues, which could require a layover."  (*Id.* at 21 (emphasis in original).)  Given Brigham's position that she could not work as a flight attendant on flights with layovers and maintain her sobriety, her requested accommodation would not have enabled her to perform the essential functions of her job as a flight attendant, rendering the request unreasonable.

Finally, Brigham requested that she be permitted to work at the GO to perform administrative or other light duty work until she was more secure in her sobriety.[9]  (ECF No. 36 at 25.)  The Court agrees with Frontier that granting this request "would have resulted in the same above-described issues in that it would have excused Plaintiff, an active flight attendant, from the mandatory, seniority-based bidding process set forth in the CBA."  (ECF No. 38 at 36.)  Further, Arellano stated in his declaration that the CBA included a collectively-bargained for OJI provision, allowing Frontier the discretion to

---

[9] The Court has already examined arguments related to this request and incorporates that analysis herein, but will also examine the issue now in the context of Brigham's failure to accommodate claim.  *See supra*, Part III.B.

provide flight attendants injured on the job—but only flight attendants injured on the job—with temporary light duty assignments in the GO.  (ECF No. 38-1 ¶ 43; ECF No. 38-5 at 108–09.)  Importantly, he states that these assignments were "not open job positions."  (ECF No. 38-1 ¶ 43.)  Specifically, Frontier explains that it did not maintain open light-duty job positions for flight attendants injured on the job, and the light duty assignments were not job positions; rather, Frontier merely temporarily assigned those employees who were injured on the job to perform other employees' duties.  (ECF No. 45 at 34–35.)

As noted above, the Tenth Circuit does not require an employer to create positions merely to accommodate an ADA plaintiff.[10]  *See Aldrich*, 146 F.3d at 1272 n.5 (citing *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir. 1995) (noting that an employer is not required to "create a new position to accommodate the disabled worker")).  Therefore, because allowing Brigham to work in the GO office temporarily would have been inconsistent with the mandatory bidding process in the CBA and also would have required Frontier to create a position for her, the Court finds that her requested accommodation is unreasonable.

Given that none of the accommodations that Brigham requested were "plausibly reasonable accommodations," the Court will grant summary judgment in favor of Frontier on Brigham's failure to accommodate claim.

### IV. CONCLUSION

For the foregoing reasons, the Court ORDERS:

---

[10] The Court notes that Frontier suggested that Brigham transfer to other vacant or soon to be vacant positions within Frontier, but she rejected those suggestions for a variety of reasons, including that she enjoyed being a flight attendant and did not want to lose her seniority.  (ECF No. 38-1 ¶¶ 52, 58.)

1.  Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment (ECF No. 38) is GRANTED in its entirety;

2.  Plaintiff Rebecca Brigham's Motion for Partial Summary Judgment (ECF No. 36) is DENIED;

3.  Defendant shall have its costs reasonably incurred in this action upon compliance with D.C.COLO.LCivR 54.1; and

4.  The Clerk of Court shall enter judgment in favor of Defendant and against Plaintiff, and shall thereafter terminate the action.

Dated this 27th day of August, 2021.

BY THE COURT:

William J. Martinez
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

     Plaintiff,

v.

FRONTIER AIRLINES, INC., a Colorado corporation,

     Defendant.

---

## FINAL JUDGMENT

---

     In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     Pursuant to the Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Partial Summary Judgment of United States District Judge William J. Martínez entered on August 27, 2021, it is ORDERED that Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment (ECF No. 38) is GRANTED in its entirety. It is

     FURTHER ORDERED that Plaintiff Rebecca Brigham's Motion for Partial Summary Judgment (ECF No. 36) is DENIED.  It is

     FURTHER ORDERED that final judgment is hereby entered in favor of Defendant Frontier Airlines, Inc. and against Plaintiff Rebecca Brigham.  It is

     FURTHER ORDERED that Defendant Frontier Airlines, Inc. shall have its costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen days of the entry of judgment, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated at Denver, Colorado this 27th day of August, 2021.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: <u>s/Emily Buchanan</u>
Emily Buchanan, Deputy Clerk